1  Joseph J. Popolizio, Bar #017434
   Justin M. Ackerman, Bar #030726
2  Ian C. Beck, Bar #035599
   JONES, SKELTON & HOCHULI, P.L.C.
3  40 North Central Avenue, Suite 2700
   Phoenix, Arizona 85004
4  Telephone: (602) 263-1700
   Fax: (602) 200-7876
5  jpopolizio@jshfirm.com
   jackerman@jshfirm.com
6  ibeck@jshfirm.com

7  Attorneys for Defendants

8                    UNITED STATES DISTRICT COURT

9                        DISTRICT OF ARIZONA

10

11  Johnny Wheatcroft and Anya Chapman, as      NO. 2:18-cv-02347-MTL
    husband and wife, and on behalf of minors J.W.
12  and B.W.,                                   **DEFENDANTS' PARTIAL
                                                DAUBERT MOTION
13                              Plaintiffs,     REGARDING JEFFERY HYNES**

14              v.

15  City of Glendale, a municipal entity; Matt
    Schneider, in his official and individual
16  capacities; Mark Lindsey, in his official and
    individual capacities; and Michael Fernandez, in
17  his official and individual capacities,

18                              Defendants.

19

20          Defendants the City of Glendale, Matt Schneider, Mark Lindsey, and Michael

21  Fernandez ("Defendants") move to preclude Plaintiff's expert, Jeffery Hynes from providing

22  certain expert opinions in opposition to Defendants' summary judgment motion or at trial.

23  As more fully set forth below, Mr. Hynes should be precluded from offering: (1) any

24  opinions that invade the province of the jury; (2) offering opinions that he lacks qualifications

25  to provide; and (3) offering opinions that lack a factual basis in the record and are purely

26  speculative in nature.

27

28

9266749.1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence tasks the trial court with ensuring that any expert testimony is relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999). "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed.R.Evid. 401. The *Daubert* analysis is applicable to testimony concerning non-scientific areas of specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999). Further, it is the burden of the party proffering the expert testimony to establish admissibility. *Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996). At the outset, Plaintiff must establish that Mr. Lauck is "qualified as an expert by knowledge, skill, expertise, training, or education." Fed.R.Evid. 702. In its role as "gatekeeper," this Court must exercise care "to assure that a proffered witness truly qualifies as an expert." *Jinro Am., Inc. v. Secure Invs., Inc.,* 266 F.3d 993, 1004 (9th Cir. 2001). An expert witness can offer opinions only if the "opinion [has] a reliable basis in the knowledge and experience of his discipline." *Id.* (quoting *Daubert*, 509 U.S. at 592).

### II.    MR. HYNES' PURPORTED EXPERT OPINIONS ARE UNQUALIFIED AND IMPROPER UNDER *DAUBERT* AND FED.R.CIV.P. 702.

Mr. Hynes provided an expert report (**Exhibit 1**) and a rebuttal expert report (**Exhibit 2**) in this matter.[1]  Mr. Hynes improperly offers expert opinions that are simply improper for an expert to provide, he lacks qualifications to opine, that simply fail to comply with Rule 702/*Daubert,* and/or are untimely under this Court's Scheduling Order.

#### A.    Mr. Hynes Improperly Opines That The Claims At Issue Have Been Proven By Plaintiff.

"An expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 10

---

[1] As already noted in Defendants' separately filed Motion to Preclude Hynes' rebuttal report, Plaintiff untimely disclosed Mr. Hynes' rebuttal report without good cause.  [*See* Docs. 225, 231].

(9th Cir. 2002); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Similarly, instructing the jury as to the applicable law "is the distinct and exclusive province" of the court. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (citations and quotation marks omitted). For example, courts in the Ninth Circuit have repeatedly and consistently held that it is improper for a witness to opine on the existence of probable cause. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1214 n. 11 (9th Cir. 2008) (holding that the district court abused its discretion when it denied a motion in limine seeking to preclude witnesses from testifying as to whether there was probable cause for an arrest); *Stuart v. United States*, 23 F.3d 1483, 1487 (9th Cir. 1994) (upholding district court's ruling to preclude plaintiff's expert witness from opining as to whether probable cause existed); *see also*, *Quinn v. Fresno Cty. Sheriff*, No. 1:10-CV-01617 LJO, 2012 WL 2995477, at *4 (E.D. Cal. July 23, 2012); *Hao–Qi Gong v. Jones, No. C 03–05495 TEH*, 2008 U.S. Dist. LEXIS 111178, at * 12, 2008 WL 4183937 (N.D.Cal. Sept. 9, 2008); *Accord Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212–13 (D.C.Cir.1997) ("[A]n expert may offer his opinion as to the facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied).

Almost the entirety of Mr. Hynes's "conclusion(s)" is framed as to whether the specific claims at issue have been satisfied, thereby constituting improper expert opinions, *to wit*:

- The officers' behavior was extremely *excessive and was criminal in my opinion.* Even when Mr. Wheatcroft was handcuffed they still Tase him. There are four, five officers visible and each one of them had a *legal and ethical obligation to stop this abusive excessive Use of Force.* This has the open visual appearance of their *excessive force being an intentional torturing overt act.* There's *no legitimate law enforcement purpose for their excessive actions.* [Ex. 1 at 15].

- "Officer Schneider, along with Officers Lindsey, Fernandez and the other officers present at this abusive detention and arrest of Mr. Wheatcroft *were … excessive ….*" [Ex. 1 at 25 (emphasis added)].

- "Seeing Mr. Wheatcroft being pulled violently from the passenger seat and Tased repeatedly for not producing identification, while still physically restrained by his entangled seatbelt, and in front of his family, *clearly shows the excessive Use of*

3

1  *Force used against him.*" [Ex. 1 at 25 (emphasis added)].

2  - "Officer Schneider's belief that he could demand identification
3     from a passenger within a vehicle and because of non-
       compliance from that subject, then detain, arrest and transport
       that subject to a police facility to determine identity *was legally*
4     *incorrect.*" [Ex. 1  at 26 (emphasis added)].

5  - "My strongest argument² however that is the *stated reasonable*
      *suspicion justification for the initial traffic stop contact was not valid.*" [Ex.
6     1  at 26; Ex. 2 at 16].

7  - "Without *'reasonable suspicion'* or *'probable cause'* for the initial
      traffic stop and contact, the detention and arrest of Mr.
8     Wheatcroft was *not valid* and was *not legally justified.*" [Ex. 1  at 27
      (emphasis added); Ex. 2 at 16].

9
10  - "…Mr. Wheatcroft was falsely arrested and physically was a
       victim of *extreme excessive Use of Force,* an *unlawful stop* and an
11    *unlawful arrest* being utilized against him." [Ex. 1  at 27 (emphasis
       added)].

12  Mr. Hynes "rebuttal" report makes the same mistakes as well:

13  - "To be so aggressively contacted and forcibly removed from
       their car as described within this incident, *was an excessive*
14    *utilization of force and unjustifiable* as described within my expert
       report." [Ex. 2 at 3 (emphasis added)].

15
16  - "My Observation: *I found that within 28-754, subsection A,* noted,
       that as long as the movement can be done safely, there is no
17    noted statutory requirement to utilize a "turn signal" while
       making a turn from the roadway into a private property
18    driveway. Therefore, my position would be that the stated
       justification for the initial contact and subsequent arrest of Mr.
19    Wheatcroft was *invalid and illegal.*"   [Ex. 2 at 4-5 (emphasis
       added)].

20  - Supplemental Report at 6 (citing actual case law regarding police
       stops and appearing to apply it to the facts of this case)

21
22  - "There is *no reasonable suspicion or probable cause* against the
       passenger Mr. Wheatcroft, to demand his identification and grab
23    him, physically removing him from his car, then Tasing him 10
       to 11 times, kicking him, and utilizing pain compliance holds, as
24    described within this report. *There was only passive resistance*
       *demonstrated by Mr. Wheatcroft,* as he is asking his reasonable
25    questions, in a pleading manner, that I could see reviewing the
       BWC. Therefore, the officers' actions *were extremely excessive and in*
       *my opinion criminal.* His family is present and is screaming and

26

27  ² Experts do not have "arguments" they have "opinions" that merely aid the
    factfinder in evaluating the evidence in a matter.  That Plaintiffs' expert is clearly advocating
28  for a position goes well outside what is proper expert opinion under Rule 702 and *Daubert.*

crying out loud as their father *is being arrested for simply not producing identification from an invalid cited traffic violation*." [Ex. 2 at 7 (emphasis added)].

- "The forceful attempt to remove Mr. Wheatcroft utilizing pain compliance holds *was excessive*." [Ex. 2 at 8 (emphasis added)].

- "This BWC video is extremely hard for a law enforcement professional to watch as the force used against Mr. Wheatcroft is *clearly unwarranted and excessive*." [Ex. 2 at 9 (emphasis added)].

- "My Observation: The officers' behavior was *extremely excessive* and was *criminal* in my opinion. Even when Mr. Wheatcroft was handcuffed, they still Tased him. There are four or five officers visible and each one of them had a legal and ethical obligation to stop this *abusive excessive Use of Force*. This has the open visual appearance of their *excessive force being an intentional, torturing, overt act.* There is *no legitimate law enforcement purpose for their excessive actions*." [Ex. 2 at 10 (emphasis added)].

- Supplemental Report at 13 (actually performing a Graham analysis of the facts).

- I have found that specifically Officer Schneider, along with Officers Lindsey, Fernandez and the other officers present at this *abusive detention and arrest of Mr. Wheatcroft were egregious, excessive*… [Ex. 2 at 15 (emphasis added)].

- Seeing Mr. Wheatcroft, being pulled violently from the passenger seat and Tased repeatedly for not producing identification, while still physically restrained by his entangled seatbelt, and in front of his family, *clearly shows the excessive Use of Force used against him.* [*Id.* (emphasis added)].

-  "The requirement of producing identification from a passenger within a vehicle for such a minor traffic violation *was overly punitive* and *was also not a reason for a legal arrest.* [*Id.* (emphasis added)].

- Mr. Wheatcroft was *falsely arrested* and was a victim of *extreme excessive Use of Force, an unlawful stop and an unlawful arrest.* [Ex. 2 at 17 (emphasis added)].[3]

Indeed, Judge Brnovich's recent ruling in *Krause* is revealing, as the expert in that action gave the exact same kinds of improper opinions as Mr. Hynes has done in this action:

> On this point, Defendants are correct—Lauck may not offer opinion testimony in the form of legal conclusions that presume the success of Plaintiff's arguments on specific claims. Many of

---

[3] These are but only examples of comments repeatedly made within Hynes Report and Supplemental Rebuttal Report. Nearly every line of Mr. Hynes' report is filled with improper commentary and vernacular set forth above.

5

Lauck's opinions take that form. For example, Lauck repeatedly opines that the use of force was "was not objectively reasonable." (Mot. 2, Ex. 1 at 20.) Whether Selmanson's actions were "objectively reasonable" in light of the facts and circumstances confronting them is a question reserved for the jury, or, if no material facts are in dispute, for the Court. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994)… Elsewhere in his report, Lauck goes further—he not only offers undisguised legal conclusions but concludes that elements of specific legal claims are satisfied. (See e.g., Mot. 2, Ex. 1 at 33 & 35 (concluding that Selmanson caused "a harmful and offensive touching and the death of Krause").) The Court agrees that the opinions identified by Defendants constitute legal conclusions and are subject to exclusion. (See Mot. 2 at 3-4.).

*Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1264–65 (D. Ariz. 2020).

To be clear, undersigned counsel is not arguing that Mr. Hynes cannot opine on whether certain acts, in his opinion, do or do not comply with the City of Glendale's police procedures.  Indeed, Mr. Hynes provides a few opinions on this point (which are not listed in the bullet points above).   But to the extent he overextends his opinions and makes conclusions regarding the ultimate issues to be decided by this Court at summary judgment or by a jury at trial, Mr. Hynes impermissibly invades the province of the factfinder.  *See Krause,* 459 F. Supp. 3d at 1265 ("While expert opinions may indeed "embrace an ultimate issue," experts cannot intrude upon the province of the factfinder and render "legal conclusions" for which they are unqualified to make. So, while Lauck may not use the terms and adopt the conclusions identified, the Court does not bar him from expressing opinions on the issues that derive from his expertise in police practices that fall short of legal conclusions.") (citation omitted).

Accordingly, to the extent Plaintiffs attempt to offer any of Mr. Hynes' testimony on the ultimate issues involved in this case, such as whether reasonable suspicion existed for a traffic stop, probable cause for an arrest, or whether certain uses of force were excessive, it is improper and should be precluded.

**B.**   **Mr. Hynes Lacks Qualifications And Foundation To Opine On Whether Any of the Plaintiffs Suffered Any Kind Of Emotional Distress As A Result Of This Incident.**

Mr. Hynes is a retired Phoenix Police Commander who provided 32 years of

6

service.  [Ex. 1 at 6].  During Mr. Hynes' time with the City of Phoenix, he was involved in over 1,000 internal and criminal investigations.  He also trained thousands of police officers on topics involving use of force, defensive tactics, report writing, tactical deployment and community policing. [*Id.* at 6]. Since September 9, 2011, Mr. Hynes has taught at Glendale Community College as a full time professor as well as teaching at Arizona State University, Northern Arizona University, Ottawa University, Grand Canyon University, Arizona Regional Policing Institute, Arizona POST, and the Phoenix Police Department.  [*Id.*].

There is no doubt that Mr. Hynes is qualified to opine on matters related to police training, use of force, defensive tactics, and policing.  Nevertheless, Mr. Hynes has absolutely no qualifications to offer opinions as a psychologist, a medical expert regarding the medical treatment required for individuals suffering from emotional distress (or the lack thereof), and whether an individual themselves has suffered, is currently suffering, and will continue to suffer in the future from severe emotional distress.   Despite the utter lack of qualifications to offer these types of opinions as if he has expertise in these disciplines, Mr. Hynes twice states in his January 31, 2020 report and his late disclosed supplemental report the following conclusion as a result of his purported "expert opinion" on this case:

> The screaming and hysterical crying of Mr. Wheatcroft's children, wife and friend who witnessed this abusive police action could be emotionally [sic] impacting for years to come for Mr. Wheatcroft and his family that watched this abuse.

[Report at 25-26].  Because Mr. Hynes has no expertise to opine on this topic, it is improper under Rule 702 and *Daubert*.  Such prospective testimony stemming from this improper opinion must be precluded if offered in response to a dispositive motion or at trial in this matter.

**C.**    **Mr. Hynes' Opinions Are Not Based Upon Sufficient Facts And Data, As Required By Rule 702/*Daubert*.**

It is mandatory that "an expert must back up his opinion with specific facts." *Guidroz-Brault v. Mo. Pac. R.R. Co.,* 254 F.3d 825, 831 (9th Cir. 2001) (affirming exclusion of three experts whose opinions were not grounded in fact) (quoting *U.S. v. Various Slot Machines*, 658 F.2d 697, 700 (9th Cir. 1981). If an expert's testimony is not based on sufficient facts, it

should be excluded. *Guidroz-Brault*, 254 F.3d 829-32. Mr. Lauck's opinion is based on nothing more than sheer speculation, which is not reliable. *Daubert*, 509 U.S. at 590 (expert testimony "must be based on more than subjective belief or unsupported speculation"); *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1436 (9th Cir. 1995) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.") (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)); *Henricksen v. Conoco Phillips Co.,* 605 F.Supp.2d 1142, 1169-70 (E.D. Wash. 2009) ("[E]xpert opinions must be based on facts which enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation."); *Franklin v. City of Boise*, 806 F.Supp. 879, 890 (D. Idaho 1992) ("[W]hen an expert's opinion rests on 'unsupported assumptions and unsound extrapolation' it should be excluded." (quoting *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 807 (9th Cir. 1988))).

### 1.   Mr. Hynes Opinions Regarding Emotional Distress.

As referenced above, Mr. Hynes lacks any expertise to opine on any emotional distress damages, but even if he had the requisite expertise, there was no evidence in the record that he reviewed (other than the subject incident videos) that would even show whether the minor plaintiffs suffered any emotional distress.[4]  But the body worn camera videos, which only contained a singular snapshot in time on the day of the incident, cannot demonstrate a basis to state that the minor plaintiffs have lasting emotional distress "for years to come" as a result of seeing the subject incident.   As a result, the record contains insufficient facts and evidence for Mr. Hynes to make this flagrantly unsupported "conclusion" even if he had the requisite background to make it (which he does not).

### 2.   Mr. Hynes' Opinions Regarding How The Incident Unfolded.

Much of Mr. Hynes' Report contains a detailed rendition of his *interpretation* on

---

[4] To the extent Mr. Hynes stated in his report that the minor children went to counseling as a result of this incident that is patently untrue – as their depositions revealed that nether sought or received any professional counseling following the subject incident.

8

1    how the events at issue unfolded, with sporadic comments thrown in, based on his review of

2    the record provided to him by Plaintiffs' counsel.  [*See* Ex. 1, Report at 8-29; *see also* Ex. 2].

3    To the extent Plaintiffs attempt to Mr. Hynes' rendition of the facts at issue in this case as a

4    basis to preclude summary judgment or as a factual basis for Plaintiffs' claims at trial, it would

5    be improper.  That is because Plaintiff's expert's report in this capacity is simply doing the

6    job of the factfinder, to review the evidence, determine which evidence and testimony is

7    credible and to make ultimate conclusions on what claims have and have not been satisfied.

8          This is precisely what a fact finder (not an expert) is supposed to do.  *See*

9    *Krause*, 459 F. Supp. 3d at 1264–65; *Torres v. Johnson Lines*, 932 F.2d 748, 751 (9th Cir. 1991)

10   (expert testimony properly excluded where record did not reveal "any specific evidence that

11   was so technical or complex that a jury could not have grasped it without the aid of experts");

12   *Quinn v. Fresno Cty. Sheriff*, No. 1:10-cv-01617 LJO BAM, 2012 WL 2995477, at *3 (E.D. Cal.

13   2012) ("Weighing the credibility of witnesses and resolving factual matters is not outside the

14   common ability and knowledge of a layperson; it is the precise role that the law assigns solely

15   to a layperson as juror.") (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir.

16   2005)); *see also United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991) (rejecting expert

17   testimony regarding the purpose of a transaction because "[m]uch of [the expert's] testimony

18   consists of nothing more than drawing inferences from the evidence that [the expert] was no

19   more qualified than the jury to draw"); *Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 1802066,

20   at *8 (N.D.Ill. May 17, 2012) (finding that "the jury is fully capable of considering the issue of

21   intent based on the evidence presented at trial"); *United States Gypsum Co. v. Lafarge N. Am.,*

22   *Inc.*, 670 F.Supp.2d 768, 775 (N.D.Ill.2009) (finding that expert testimony on intent is no

23   more than drawing inferences from the evidence, that "[s]uch opinions merely substitute the

24   inferences of the expert for those the jury can draw on its own," and that testimony about

25   intent is not helpful to the jury); *Smith v. Wyeth–Ayerst Labs. Co.*, 278 F.Supp.2d 684, 700

26   (W.D.N.C.2003) ("[T]he jury should hear and/or see first-hand any relevant evidence

27   pertaining to the Defendant's intent. Then the jury, not the witnesses, should consider the

28   facts and make its own determination regarding Defendant's intent.").  Thus, to the extent

1    Mr. Hynes opines on how the events occurred or whether testimony is "consistent" with
2    other facts in the record he is directly and improperly invading the province of the jury.

3              In addition, many of Hynes' conclusions are not supported by the factual
4    record as well.  For example, Mr. Hynes' report repeatedly argues that there was only "passive
5    resistance" demonstrated by Wheatcroft between the time he was questions and when he was
6    removed from his car.  [Ex. 1 at 13-14, 18, 23, 25, 26].  Aside from the fact that this is a legal
7    determination outside an expert's opinion, this is demonstratively false from Schneider's and
8    Lindsey's body cameras.  As noted in their cameras, Wheatcroft refused to obey orders, was
9    shouting and screaming obscenities, was physically resisting Schneider's attempt to control
10   him and interfering with the officers' removal of him from the vehicle.  Schneider's body
11   camera clearly reveals Wheatcroft struggling with the officers for over 25 seconds before
12   Lindsey came over to assist Schneider and initially drive stunned Wheatcroft.  [SBC at
13   2:33:54-2:34:19].  Specifically, while Schneider held Wheatcroft's right bicep and grabbed
14   onto Wheatcroft's right wrist, Wheatcroft pushes his arm back and continues to fight with
15   Schneider's attempt to control his right arm.  [SBC at 2:33:56-2:34:01].  Once Wheatcroft's
16   arm was behind his back he continued to struggle, as you can see on Schneider's body camera
17   Wheatcroft's arm shifting back and forth as Schneider gave repeated commands to stop
18   struggling and to relax.   [SBC at 2:34:01-2:34:19; LBC 2:34:09-2:34:16].   Once again,
19   Wheatcroft verbally stated he was not struggling but the video clearly depicts he was.  [*Id.*].
20   In light of Wheatcroft's active resistance, Lindsey warned Wheatcroft that he had a Taser on
21   his shoulder.  [LBC at 2:34:16-23].  Despite this warning, Wheatcroft still did not comply with
22   officer commands, continued to tense his arm, and resisted the officers' attempted control.  It
23   was only at this point, after commands became futile and a warning was given, that Lindsey
24   drive stunned Wheatcroft.  Thus, as more fully addressed in Defendants' summary judgment
25   motion, Wheatcroft displayed active resistance before he was Tased for the first time by
26   Lindsey.

27              Mr. Hynes also entirely ignores the fact that the officers only used their Tasers
28   in dart mode after Anya Chapman knocked out Officer Lindsey by assaulting him with a

deadline weapon – a 4.5 pound bag of soda.  It was only then, based on this escalation of force, that the officers resorted to their use of a Taser in dart mode against Wheatcroft.  Mr. Hynes' report is devoid of any reference to Anya Chapman's actions in his assessment of the officers' respective uses of force.

Finally, Mr. Hynes opinions of Wheatcroft's actions after he is handcuffed entirely ignores the fact that Wheatcroft was actively resisting arrest, attempting to get off the ground, and was actively kicking the officers on scene including Schneider and Fernandez.

Thus, the Court should preclude Plaintiffs from relying on Hynes' factual recitation of the record as a basis to oppose summary judgment or as a basis to prove up their claims at trial.  Moreover, as set forth above, Mr. Hynes' recitation of the record itself omits significant, material facts in order to justify his opinions.  In so doing they should be entirely excluded pursuant to Rule 702 and *Daubert*.

### 3. Mr. Hynes Rebuttal Opinion That The City Of Glendale Did Not Provide Officers Schneider, Lindsey And Fernandez With An Appropriate Level Of Training And Supervision.

Defendants' expert, Dr. Blake McCelland, opined that the City of Glendale properly trained and supervised Officers Schneider, Lindsey, and Fernandez.   [McCelland Report at 32, attached as **Exhibit 3**].  Dr. McCelland opined as follows:

> **5. Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that City of Glendale provided Officers Schneider, Lindsey, and Fernandez with an appropriate level of training and supervision.**
>
> I have reviewed the personnel records and prior disciplinary histories of Officers Schneider, Lindsey, and Fernandez. These personnel records included commendations, performance reviews, and previous incidents of misconduct.
>
> None of the files I reviewed would indicate a failure to supervise or properly discipline these officers. I did not find any of the officers to have a proclivity towards violent behavior, or a history of negative contacts with the community. In fact, the officers had numerous commendations that documented their exemplary performance over the years.
>
> I also reviewed the training records of Officers Schneider, Lindsey, and Fernandez. Table 5 describes the relevant training that they received prior to this incident. (It should be noted that

11

1    this table is not all-inclusive of the training the officers received)

2    [Ex. 3 at 32; *id.* at 33-34].  Dr. McCelland then attached a table (Table 5) including all of the

3    training the officers received while employed by the City of Glendale prior to the incident at

4    issue.  [*See* Ex. 3 at 32].

5        Mr. Hynes' initial report said nothing of whether the City of Glendale's training

6    was inadequate or whether supervision was inadequate.  [*See generally* Ex. 1].  **For the very first**

7    **time**, in his untimely rebuttal report, Mr. Hynes now opines on the topic of training and

8    supervision from the City of Glendale in an attempt to rebut Mr. McCelland's opinions in

9    this regard.   But the sum total of Mr. Hynes "opinion" purportedly rebutting Mr.

10   McCelland's on the adequacy of the City of Glendale's training and supervision is as follows:

> I disagree with Dr. McClelland, and with the brutality committed by these officers against Mr. Wheatcroft and his family. The proper *"Reasonable and Prudent Officer"* standard, as well as the proper application of Glendale Police Department use of force policy and philosophy, was clearly absent, with regard to their use of force deployment, application and force utilization.
>
> From the Glendale Police Department General Order, 23.000 (*Id. 9 at p.1*):
>
> *"A. Response to Resistance: It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department. The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect. Employees will only use the amount of force/control reasonably necessary to overcome this resistance, protect property, and save lives. Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives"*… *Id. 9 at p.1 of 37.*
>
> **My Observation:** Officer Schneider and the assisting officers far exceeded this policy based on the *"Passive resistance"* and non-complaint verbal responses being demonstrated by Mr. Wheatcroft. Therefore, the City of Glendale did not provide Officers Schneider, Lindsey, and Fernandez with an appropriate level of controlling use of force application training and required organizational supervision.
>
> In addition, an internal Glendale Police Department Professional Standards Bureau investigation resulted in Officer Schneider being disciplined for violating their "*Range of Response*" policy and the Officer was suspended for three (3) working days. *Id. 20 at p.34 of 40.*

[Ex. 2 at 14].

12

1    Importantly, nothing contained within this "opinion" provides any facts or

2  evidence to support that would permit Mr. Hynes to opine that the City of Glendale's

3  training was improper on the individual officers or that there was not proper supervision.

4  Rather, Mr. Hynes simply repeats the same excessive force analysis and general City of

5  Glendale Philosophy Order.  But this speaks nothing to how the training provided by the

6  City of Glendale was deficient or that it did not adequately train Officers Schneider,

7  Fernandez, or Lindsey.  Nor does it address, in any way, how the City of Glendale did not

8  properly supervise its employees.

9    As such, any opinion by Mr. Hynes that the City of Glendale did not provide

10 Officers Schneider, Lindsey, and Fernandez with an appropriate level of training and

11 supervision must be precluded under *Daubert* and Rule 702.

12      **4.    Mr. Hynes' Opinions That Any Of The Individual Officers**
13            **Violated City of Glendale Policies Are Not Relevant To Any Issue**
              **Involving Plaintiffs' Federal Section 1983 Claims Or The Minor**
14            **Plaintiffs' State Law Claims.**

15    The question in a § 1983 claim against a municipality, such as the City of Glendale, is

16 focused on whether a policy or procedure "'amounts to deliberate indifference' to the

17 plaintiff's constitutional right" and not whether the County or individual officers fell below

18 the standards that Mr. Hynes believes were applicable. *See Plumeau v. Sch. Dist. No. 40 Cty. of*

19 *Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997); *Stuart v. United States,* 23 F.3d 1483, 1487 (9th Cir.

20 1994) ("[S]tandard police procedure, as developed by an expert, may not shed light on what is

21 reasonable conduct…").  In addition, internal policies do not create constitutionally protected

22 due process rights.  *See Devereaux v. Perez,* 218 F.3d 1045, 1056 (9th Cir. 2000); *see also Cousins*

23 *v. Lockyer,* 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to follow internal prison policies does

24 not rise to the level of a constitutional violation); *Case v. Kitsap Cnty. Sheriff's Dep't,* 249 F.3d

25 921, 929 (9th Cir. 2001) (collecting cases); *Mesa v. City of New York*, 09 CIV. 10464 JPO, 2013

26 WL 31002, at *25 (S.D.N.Y. Jan. 3, 2013) (noting that police-operations order is merely

27 internal policy that does not establish constitutional standard).  Thus, the violation of a

28 departmental regulation or policy alone does not establish a constitutional violation.  *Case v.*

9266749.1

1   *Kitsap County Sheriff's Dept.*, 249 F.3d 921, 929-30 (9th Cir. 2001) (collecting cases).

2   Here, to the extent that Mr. Hynes opines that the individual Officers failed to follow

3   the City of Glendale's policies, such testimony is not relevant to any of the federal or state

4   law claims at issue in this litigation, nor does it assist this Court in evaluating whether any of

5   the claims at issue can survive summary judgment and be entertained by a jury if any claims

6   proceed to trial this matter.  Indeed, unlike other cases, Wheatcroft has no state law negligent

7   training or supervision claim against the individual officers – making his violation of such

8   policies irrelevant.  Moreover, the minor plaintiffs only have emotional distress claims that

9   are untethered to any issue of whether the City's policies and procedures were followed.

10  Thus, because Mr. Hynes opinions in this regard do not assist a factfinder in any

11  determination it needs to make, as a matter of law, they should be precluded.

12  **III.    CONCLUSION.**

13  As set forth above, Mr. Hynes' purported expert opinion is nothing more than

14  a *sock puppet* for Plaintiff's counsel's arguments. Based on the foregoing, the Court must

15  preclude Mr. Hynes from opining as set forth above, and the Court must not consider such

16  testimony and opinions as a basis to deny Defendants' summary judgment.

17

18  DATED this 26th day of March, 2021.

19  JONES, SKELTON & HOCHULI, P.L.C.

20

21  By /s/ Joseph J. Popolizio

22  Joseph J. Popolizio
    Justin M. Ackerman

23  Ian C. Beck
    40 North Central Avenue, Suite 2700

24  Phoenix, Arizona  85004
    Attorneys for Defendants

25

26

27

28

14

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of March, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Marc J. Victor
Jody L. Broaddus
Attorneys for Freedom
3185 South Price Road
Chandler, Arizona 85248
Marc@AttorneyForFreedom.com
Jody@AttorneyForFreedom.com
Attorneys for Plaintiffs


/s/Karen Gawel

15

9266749.1

# *EXHIBIT 1*

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

UNITED STATES DISTRICT COURT

For the

DISTRICT OF ARIZONA

MR. WHEATCROFT AND ANYA CHAPMAN, AS
HUSBAND AND WIFE, AND ON BEHALF OF MINORS
J.W. AND B.W., PLAINTIFFS,

V.

CITY OF GLENDALE, A MUNICIPAL ENTITY; MATT
SCHNEIDER, IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES; MARK LINDSEY, IN HIS OFFICIAL AND
INDIVIDUAL CAPACITIES; AND MICHAEL FERNANDEZ,
IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES

NO. 2:18-CV-02347-DWL

Submitted by: Dr. Jeffeory G. Hynes, Ed.D.

January 31, 2020

DR. JEFFEORY G. HYNES, ED.D.

January 31, 2020

Ms. Jody L. Broaddus (Supervising Civil Attorney) Esq.

Ms. Alexz Thompson (Civil Litigation Paralegal)

Attorneys For Freedom Law Firm

3185 South Price Road

Chandler, Arizona 85248

Reference: Wheatcroft v City of Glendale, NO. 2:18-CV-02347

Dear Ms. Broaddus / Ms. Thompson

I was retained July 18, 2018, on the case of Wheatcroft v. City of Glendale, NO. 2:18-CV-02347, to serve as an expert witness, to evaluate the conduct of the Defendants in this case. Below is my review and concluding opinion.

This report is respectfully submitted.

DR. JEFFEORY G. HYNES, ED.D.

In formulating my opinion in this case, I reviewed the following materials. This list may expand as additional discovery items are noted:

1. Notice of Claim, dated January 22, 2018.

2. Amended Complaint Case, No.: 2:18-CV-02347-ROS, Filed, 11/5/2018.

3. Defendants' Answers to Plaintiffs' Amended Complaint Filed, 11/26/2018.

4. Joint Case Management Report Filed, 12/21/2018.

5. Case Management Order Filed, 1/11/2019.

6. Defendants' Response to Plaintiffs' First Set of Requests for Admissions, Dated 2/7/2019.

7. Defendants' Response to Plaintiffs' Request for Production, Dated 2/7/2019.

8. Defendants' Response to Plaintiffs' Non-Uniform Interrogatories, Dated 2/7/2019.

9. Glendale Police Department General Order Response to Resistance 23.000, Date 11/02/2012.

10. Glendale Police Department General Order Use of Force 23.000, Review Date 02/25/2000.

11. MCAO Charging Document Dated August 4, 2017.

12. Defendants' Response to Mandatory Initial Discovery Pilot Program Requests, 408 pages.

13. Defendant First Supplemental MIDP Responses Folder:

    a. Defendants' First Supplemental Responses to Mandatory Requests, Dated 1/29/2019, 35 pages.

    b. Body Worn Camera Video: Officer Aten's BWC-Bates No. 000374.

    c. Body Worn Camera Video: Officer Doerr's BWC-Bates No. 000375.

    d. Body Worn Camera Video: Officer Fernandez's BWC-Bates No. 000376.

    e. Body Worn Camera Video: Officer Koehler's BWC-Bates No. 000377.

    f. Body Worn Camera Video: Officer Lewis' BWC-Blackburn Interview-Bates No. 000378.

    g. Body Worn Camera Video: Officer Lewis' BWC-Chapman Interview-Bates No. 000379.

    h. Body Worn Camera Video: Officer Lindsey's BWC-Bates No. 000380.

    i. Body Worn Camera Video: Officer Pittman's BWC-Bates No. 000381.

    j. Body Worn Camera Video: Officer Pittman's BWC-Officer Lindsey Interview-Bates No. 000382.

    k. Body Worn Camera Video: Officer Schneider's BWC-Bates No. 000383.

    l. Body Worn Camera Video: Officer Spiwak's BWC-Bates No. 000384.

    m. Body Worn Camera Video: Officer Tolbert's BWC-Bates No. 000385.

    n. Body Worn Camera Video: Officer Tolbert's BWC-Wheatcroft Interview-Bates No. 000386.

DR. JEFFEORY G. HYNES, ED.D.

    o.  Body Worn Camera Video: Officer Vasquez's BWC-Bates No. 000387.

    p.  Body Worn Camera Video: Sgt. Gallagher's BWC-Wheatcroft Interview-Bates No. 000389.

    q.  Audio File: Glendale Police Department's Dispatch Audio-Bates, No. 000373.

    r.  Audio File: Sgt. Flosman's Audio-Chapman Interview-Bates, No. 000388.

    s.  Motel 6 Surveillance Video: 000372.

14. Defendants' Second Supplemental MIDP Folder:

    a.  Defendants' Second Supplemental Responses to Mandatory Initial Discovery Requests, 39 pages.

    b.  Human Resource Folder, 3 Files, HR Mark Lindsey 000467-000614, HR File - Matthew Schneider 000615-000832, HR File - Michael Fernandez 000833-001218.

    c.  Policies Folder,

        1)  GPD GO 20.170, Departmental Property Management- 000390-000394.

        2)  GPD GO 21.470, Uniform Regulation 000395-000421s.

        3)  GPD GO 21.500, Body Armor (Ballistic Vests) 000422-000426.

        4)  GPD GO 23.000, Response to Resistance 000427-000462.

        5)  GPD GO 23.300, Vehicle Stops 001764-001770.

        6)  GPD GO 24.000, Law of Arrest 001771-001779.

        7)  GPD GO 51.900, Neighborhood Response Unit, 000463-000466.

15. Professional Standards Unit (PSU) Folder:

    a.  001747-Sergeant Moody Telephone Call to Wheatcroft, 12-19-17.

    b.  001748-Lewis Interview with Sergeant Moody, 11-1-17.

    c.  001749-Lindsey BWC-07-26-2017.

    d.  001750-Lindsey Interview, with Sergeant Moody-11-1-17.

    e.  001751-Lindsey Interview, with Sergeant Flosman-09-01-2017.

    f.  001752-Lieutenant Montgomery Interview, with Sergeant Moody-11-03-17.

    g.  001753-Motel 6 Video.

    h.  001754-Pittman Interview with Sergeant Moody, 11-1-17.

    i.  001755-PSU Attempted Call to Wheatcroft, 8-8-17.

    j.  001756-Dispatch Radio Call-07-26-2017.

    k.  001757-Schneider, BWC-07-26-2017.

    l.  001758-Schneider Interview, with Sergeant Moody-11-14-17.

    m.  001759-Schneider Interview, with Sergeant Moody-11-29-17.

    n.  001760-Fernandez Interview, with Sergeant Moody-11-1-17.

DR. JEFFEORY G. HYNES, ED.D.   4

   o.  001761-Tolbert Interview, with Sergeant Moody-10-31-17.

   p.  001762-Wheatcroft Telephone Call, to Sergeant Moody-1-23-18.

   q.  001763-Sergeant Moody Voicemail, to Wheatcroft-01-23-18.

   r.  DI 2017-073 001236-001287.

   s.  DR17-107320 001288-001344.

   t.  DR17-107320 001345-001404.

   u.  MCAO Turndown, 001405.

   v.  Notice of Admonishment, 001406.

   w.  Notice of Departmental Investigation, 001407.

   x.  Notice of Investigation, 001408-001409.

   y.  Photographs, 001410-001667.

   z.  Pulse Log Evaluation – Fernandez, 001468-001669.

   aa.  Pulse Log Evaluation – Lindsey, 001470-001674.

   bb.  Pulse Log Evaluation – Schneider, 001675-001691.

   cc.  Schneider - Time Sync, 001692.

   dd.  Schneider Discipline, 001693-001696.

   ee.  Schneider's Taser Report, 001697-001698.

   ff.  Sgt. McDaniel's Memo, 001699-001700.

   gg.  Sgt. Moody's Executive Summary, 001701-001739.

   hh.  Tape Request Form, 2017-073 001740.

   ii.  Time Sync-Lindsey 001741.

   jj.  Wheatcroft signed complaint-Bates No. 001742.

   kk.  X2 Taser Download-Fernandez 001743.

   ll.  X2 Time Sync-Fernandez 001744.

16. Depositions Folder:

   a.  20190603, Fernandez Transcript.

   b.  20190605, Lindsey Transcript.

   c.  20190918, CONFIDENTIAL, Tolbert Transcript

   d.  20190918, Tolbert Transcript.

   e.  20191211, Sgt. Jerry McDaniel.

17 Disclosure Folder: containing Supplemental MIDP Files 2-7, numerous files, if utilized I will reference them specifically.

18. Graham v. Connor Case, 490 U.S. 386, 396-97 (1989).

19. United States v. Landeros, No. 17-10217 (9th Cir. 2019)17-10217-2019-01-11.

DR. JEFFEORY G. HYNES, ED.D.  5

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

**Personal Background**

Dr. Jeffeory G. Hynes, Ed.D.
(Vita included as a separate document)

Dr. Hynes retired as a Phoenix Police Commander (32 years of dedicated service) September 9, 2011 before making a career transition to Glendale Community College as a full-time professor.  Dr. Hynes, as a Commander and Lieutenant has been assigned to the Professional Standards Bureau (Internal Affairs) and has been involved in over 1,000 internal and criminal investigations that examined police employees' conduct and performance.  He has interviewed and trained thousands of police officers, supervisors and command staff on topics ranging from Use of Force, Defensive Tactics, Report Writing, Proficiency Skills, Tactical Deployment, and Community Policing.  He has written, developed, researched and directly managed the implementation of police departmental policies/procedures and training governing Use of Force issues.  Dr. Hynes is a Federal and State nationally recognized court expert in the topics of Defensive Tactics, Use of Force and shootings investigations, involving both police and security officers and has been involved in training on these topics for more than 30 years (http://iptacs.com/).

Dr. Hynes is also a long-time adjunct instructor / course developer for Arizona State University, Northern Arizona University, Ottawa University, Grand Canyon University, Arizona Regional Policing Institute, Arizona Peace Officer Standards and Training Board (Arizona POST) and the Phoenix Police Department.  He has been qualified as an Arizona POST Subject Matter Expert in Defensive Tactics, Community Policing / Problem Solving, Instructor Certification and Law Enforcement Physical Fitness programs.

Dr. Hynes' corporate training includes developing and leading courses in Defensive Tactics, Security Procedures, Problem-Solving and Leadership for clients including W.L. Gore and Associates, Banner Health Systems, Mayo Clinic, Macerich and Westcor cooperation's.

Dr. Hynes earned his Bachelor of Science degree in Police Science, his Master's in Educational Leadership, and his Doctorate in Educational Leadership (Ed.D), each from Northern Arizona University.  In addition, he has a Certified Public Manager (CPM) certificate from Arizona State University.

DR. JEFFEORY G. HYNES, ED.D.   5

**Overview of Incident Involvement:** *Id. 12; at pp. 2-14 of 408.*

| | |
|---|---|
| REPORT: | Glendale Police Department Report # 17-107320 |
| DATE / TIME: | July 26, 2017 at approximately 7:30 p.m. |
| LOCATION: | Motel 6 Parking lot, 7116 N. 59 Ave, Glendale, AZ. |
| PLAINTIFF: | Johnny Wheatcroft and Anya Chapman, individually, and on behalf of J.W. and B.W. |
| VEHICLE: | Gray Colored 2000 Ford Taurus, Arizona License Plate |
| OFFICERS: | |

OFFICER: Officer Mark Lindsey, Glendale Police Department, Neighborhood Response Squad ("NRS"), alleged aggravated assault from Anya Chapman, which knocked him unconscious.

OFFICER: Officer Matt Schneider, Glendale Police Department, Neighborhood Response Squad ("NRS"), primary contact officer.

OFFICER: Officer Michael Fernandez, Glendale Police Department: was involved at the scene with Officers' Schneider & Lindsey.

OFFICER: Officer Roy Lewis, Glendale Police Department: responded to the Motel 6 motel upon a request for back-up radio broadcast.

OFFICER: Officer Adam Spiwak, Glendale Police Department: responded to the Motel 6 motel upon a request for back-up radio broadcast.

OFFICER: Officer Lacey Tolbert, Glendale Police Department: responded to the Motel 6 motel upon a request for back-up radio broadcast.

OFFICER: Officer Linda Berg, Glendale Police Department Court Liaison: submission of charges of Aggravated Assault with a Weapon against Anya Chapman to MCAO and submitted an additional charge against Mr. Wheatcroft with a Failure to Appear charge, on another pending criminal matter.

OFFICER: Officer Jeffrey Pittman, Glendale Police Department: responded to the Motel 6 motel upon a request for back-up radio broadcast.

OFFICER: Officer Glenn Doerr, Glendale Police Department: responded to the Motel 6 motel upon a request for back-up radio broadcast.

OFFICER: Officer Diana Lopez, Glendale Police Department: submission of charges of Aggravated Assault & Resisting Arrest to Maricopa County Attorneys' Office (MCAO) against Mr. Wheatcroft and Anya Chapman.

SERGEANT: Sergeant Joe Flosman, Glendale Police Department: reviewed BWC footage of Officers' Fernandez, Schneider & Lindsey. He also reviewed the Motel 6 Surveillance video.

WITNESSES:

| | |
|---|---|
| WITNESS: | Anya Chapman, wife of Mr. Wheatcroft. |
| WITNESS: | Jonathan Wheatcroft, minor child. |
| WITNESS: | Brody Wheatcroft, minor child. |
| WITNESS: | Shawn W. Blackburn, driver & owner of the incident vehicle. *Id. 12; at pp. 2-14 of 408.* |

DR. JEFFEORY G. HYNES, ED.D.                7

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

**Incident Synopsis:**

From my review of the reports written, and the Body Worn Cameras (BWC) captured videos and the surveillance footage from the Motel 6 hotel reviewed, the following is the synopsis from this incident:

On July 26, 2017 at approximately 7:30 p.m. Mr. Wheatcroft was forcibly removed and aggressively arrested from the passenger seat of a friend's vehicle, a silver/gray colored Ford Taurus. This arrest incident occurred while they were parked within the Motel 6 motel parking lot at 7116 N. 59 Ave, Glendale, AZ. There were two other juvenile members of the Wheatcroft family, his wife and the driver Mr. Shawn Blackburn within the car. According to Mr. Wheatcroft he was being driven with his family to the Motel 6 so that he could have a family day, with his kids and that they could swim there. Mr. Wheatcroft did not have a vehicle, therefore Mr. Blackburn, his friend drove them. *Id. 16e; at p.125 of 206.*

Minutes later, Mr. Wheatcroft was forcibly removed from the passenger seat of Mr. Blackburn's car, for not producing his identification, upon Officer Schneider's request and he ended up being uncompromisingly handcuffed lying face down on the hot asphalt, on a 108-degree day, in the presence of his children, who could be heard screaming on the recorded Body Worn Camera (BWC) footage, with terror in their screams, being expressed loudly.

Mr. Wheatcroft had already been tased 10 times, with one officer kneeling on his back, as a control hold, which applied great pressure and pain to Mr. Wheatcroft. During the arrest altercation, Officer Schneider had already Tased Mr. Wheatcroft numerous (10) times prior to kicking him in the groin area and then proceeded to pull down Mr. Wheatcrofts' athletic shorts and delivered one final Taser application to his genital area, which included his testicles. The testicle and genital area Tasing were clearly captured on-scene body worn cameras (BWC).

A Professional Standards Unit complaint was lodged with the Glendale Police Department, against Officer Schneider and the other officers involved in the alleged unlawful traffic stop, unlawful arrest and excessive force, which was used against a handcuffed and restrained Mr. Wheatcroft.

This case/incident has gathered international media attention, to the exposure point, that once focus was initiated by local news organizations, the Federal Bureau of Investigations reviewed the Body Worn Camera (BWC) footage and has since launched an investigation into the department.

Officers at the scene attempted to validate their aggressive enforcement style of contacting suspicious persons on the Motel 6 property and as related by Officer Roy Lewis, who wrote within his supplemental report, that the property was known for criminal activity and members of his squad had made numerous arrests from that area over the past few months and that there had been 49 police offense reports generated from the motels' address during the year of 2017. *Id. 12; at p. 42 of 408.*

**Incident Details:**

On July 26, 2017 at approximately 7:30 p.m., Mr. Wheatcroft, his wife, Ms. Anya Chapman, and their children, Jonathan, and Brody Wheatcroft were with Mr. Blackburn within his parked Gray Ford Taurus, which was in the Motel 6 parking lot at 7116 N. 59 Ave, Glendale, Az. The Wheatcroft family was at the Motel 6 to get a room and let their accompanied children swim there. BWC footage shows that Officers Schneider and Lindsey arrived at the Motel 6 in the same vehicle shortly after their arrival.

The order of the involved officers in this incident is as follows:

DR. JEFFEORY G. HYNES, ED.D.    8

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

- Officer Schneider and Lindsey made contact with Mr. Blackburn, Mr. Wheatcroft and his family within Mr. Blackburn's Taurus in the parking lot of the Motel 6 at approximately 1930 hours.

- Officer Lindsay made contact with the driver Mr. Blackburn and Officer Schneider made contact with Mr. Wheatcroft, who is in the front passenger side seat.

- As an arrest is being instigated by Officer Schneider of Mr. Wheatcroft, for not producing identification, he is joined by Officer Lindsey and then Officer Fernandez, who has responded as a backup officer.

- Officer Lindsey and Schneider are struggling to remove Mr. Wheatcroft from the front seat, when Officer Lindsey is struck on the head with a white plastic bag, by who he speculates was Ms. Chapman at approximately 1931 hours.

- Officer Pittman responds as another backup officer at approximately 1932 hours.

- Officer Lewis arrives at the Motel 6 and he assists in Ms. Chapmans' arrest at approximately 1933 hours. *Id. 12; at p. 44 of 408.*

As background, Officer Schneider and Officer Lindsey approached the vehicle after Officer Schneider claimed to have seen Mr. Blackburn's vehicle fail to use a turn signal, when it drove in from Glenn Drive turned into the Motel 6 parking lot, which was the driveway by the motel office. Officer Lindsey did not make that claim on the evening of July 26, 2017. Sergeant Flosman and Officer Lindsey initial thoughts expressed were that they suspected that the vehicle had come to the property for possible criminal activity instead of the reason Mr. Wheatcroft had shared. Mr. Wheatcroft had his friend Mr. Blackburn drive him and his family there to get a room and enjoy an evening swimming there at the motel. Mr. Wheatcroft actually had his wife and two minor sons with him to check into the Motel 6 together.

While examining the reason for the initial stop, I found within Officer Pittman's supplemental report that he interviewed Officer Lindsey on the evening of the arrest, July 26, 2017. Officer Lindsey had been taken to the hospital for a medical examination and subsequently released, after being stuck in the head at the scene allegedly by Ms. Chapman.

During his interview on July 26, 2017, Officer Lindsey reported the following from that interview:

> *"While at the hospital I asked Officer Lindsey what happened and he stated that Officer Schneider and he entered the Motel 6 parking lot from the north side and observed the vehicle pull in the center parking lot from the south and Officer Lindsey believes that when the occupants saw them coming from the north side they stopped and backed into a parking spot. Based off their activities Officer Schneider and Officer Lindsey pulled up to them and they contacted them... Id. 13a; at pp. 72-73 of 408.*

Approximately a month later Officer Lindsey adjusted his justification reasons for the initial contact which was now more in-line with Officer Schneider's initial statements, on the night of the incident (July 26, 2017). His change in his story occurred on September 1, 2017, when being interviewed by his Sergeant, Sergeant Flosman. From that interview he related that in relation to the contact the following occurred:

> *"... we were coming through the north parking lot, the parking lot is divided into three sections... we coming on the north side passageway when Officer Schneider looked down to the left of the middle to see if anyone was down there. He observed the vehicle pulling in, he made mention to me that he didn't*

DR. JEFFEORY G. HYNES, ED.D.      9

WHEATCROFT V. CITY OF GLENDALE NO. 2:18 CV-02347

*see a blinker. He said you know see what happens. Let's try and stop this vehicle. It pulled in in the main section and then abruptly, it appeared abruptly to reserve and back into a spot real quick." Id. 13a; at pp. 87-88 of 408.*

In my examination of Arizona Revised Statute 28-754, Turning Movements and Required Signals, the reason for Officer Schneider's and Lindsey's contact was invalid. The statute is below:

28-754. <u>Turning movements and required signals</u>
(https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/28/00754.htm)

> *"A. A person shall not turn a vehicle at an intersection unless the vehicle is in proper position on the roadway as required in section 28-751, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left on a roadway unless and until the movement can be made with reasonable safety. A person shall not so turn any vehicle without giving an appropriate signal in the manner provided by this article in the event any other traffic may be affected by the movement.*

> *B. A signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning.*

> *C. A person shall not stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided by this article to the driver of any vehicle immediately to the rear when there is opportunity to give the signal."*

**Observation:** I found that within 28-754, subsection A, noted, that as long as the movement can be done safely, there is no noted statutory requirement to utilize a *"turn signal"* while making a turn from the roadway into a private property driveway. Therefore, my position would be that the stated justification for the initial contact and subsequent arrest of Mr. Wheatcroft was invalid and illegal.

> From 28-754, subsection A: *"or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left on a roadway unless and until the movement can be made with reasonable safety."*

To supplement the above narrative, below is the Body Worn Camera (BWC) breakdown from officers Schneider and Lindsey BWC cameras, from my examination and viewing is below:

BWC TIME: 0:00 - 0:55

Upon contact with Mr. Blackburn and Mr. Wheatcroft, Officer Schneider advised Mr. Blackburn that he needed to use his turn signal and then, at the 1:00 minute mark of the BWC footage, Officer Schneider walks over to the passenger side where Mr. Wheatcroft is sitting, within the front passenger side seat. Officer Lindsey walks to the driver's side. A friend of Wheatcroft's, Mr. Blackburn, is seated in the driver's seat. In the backseat are Mr. Wheatcroft's wife, Anya Chapman, and their two children.

When contacted by Officer Schneider Mr. Wheatcroft told Officer Schneider that he does not have identification, but Ms. Anya Chapman, sitting in the backseat, states that she does have identification and offers to show hers. Ms. Chapman then hands her identification to Officer Schneider and he proceeds to the back of the stopped Taurus and calls in record check.

DR. JEFFEORY G. HYNES, ED.D.    10

**WHEATCROFT000281**

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

**Observation:** I have concerns about the initial justification for the initial contact being that of such a minor traffic violation for the contact and stop. Utilizing the reason of the no turn signal appeared to be a shadow reason and not a justification for the aggressive next steps which take place. Utilizing an invalid turn signal violation, to removing the passenger from the vehicle, was an extreme over-action, especially when there are children in the car and the appearance of a family outing and coming into the motel regardless of the past crime trends occurring on the Motel 6 property. I will explain further why I question whether Officer Schneider actual stated traffic violation was as he claims that he witnessed, in my conclusion section.

BWC TIME: 0:55 - 2:05

Officer Schneider tells Mr. Wheatcroft, *"If you're a passenger in a vehicle, you need to have ID."*

At approximately the 1:40 minute mark Officer Schneider walks back to the passenger-side window and instructs Mr. Wheatcroft not to reach into his bag for anything, and he complies. Mr. Wheatcroft related that he was actually looking for his identification, as told to do so by Officer Schneider. Officer Schneider asks Mr. Wheatcroft repeatedly for identification. Mr. Wheatcroft responds by asking why that's necessary, since he wasn't driving the car. Officer Schneider asks Mr. Wheatcroft what his name is, and Mr. Wheatcroft asks why he is being asked to provide his name.

At approximately the 1:55 minute mark, Mr. Wheatcroft states that he does have an identification but doesn't have to give it to the officer because he didn't do anything wrong. Officer Schneider responds that *"if you're a passenger in a vehicle, you need to have an ID."* Officer Schneider then tells Mr. Wheatcroft, *"I can take you down to the station and we can fingerprint you."* And continues to relate, *"because we made a traffic stop on the vehicle, brother."* Mr. Wheatcroft continues to insist that he didn't do anything wrong in opposition to producing any identification.

**Observation:** Mr. Wheatcroft, the passenger, was asking very reasonable questions: '*Why are you asking for ID?'* Officer Schneider telling Mr. Wheatcroft that, *'If you're a passenger in the vehicle, you have to give ID'* is not correct, as well as Officer Schneider saying: "*I can take you down to the station and fingerprint you."* is also incorrect. Below are researched cases that support my observation: *Id. 19; at pp. 2-17.*

1) United States v. Landeros, No. 17-10217 (9th Cir. 2019), *Id. 19; at pp. 2-17.*

2) Rodriguez v. United States, 135 S. Ct. 1609 (2015)

3) United States v. Rodriguez, 741 F.3d 905, 907–08 (8th Cir. 2014), vacated and remanded, 135 S. Ct. 1609.

4) United States v. Cornejo, 196 F. Supp. 3d 1137, 1151 (E.D. Cal. 2016).

4) United States v. Turvin, 517 F.3d 1097 (9th Cir. 2008), *Id. 19; at pp. 2-17.*

BWC TIME: 2:05 - 2:55

At approximately the 2:10 mark, Officer Schneider then opens the car door and grabs Mr. Wheatcroft's right arm aggressively. Officer Schneider says, *"we can do this one of two ways."*

DR. JEFFEORY G. HYNES, ED.D.   

The grabbing of Mr. Wheatcroft's arm prevents the seatbelt from releasing and sliding off completely and Mr. Wheatcroft is being restrained by his seatbelt as he is being pulled out of the car. Officer Schneider then pulls his Taser and applies it to Mr. Wheatcroft's arm. Mr. Wheatcroft says, *"Stop please. I didn't do anything wrong."* Officer Schneider replies, *"Here's the deal, you tense up and I'm going to, listen to me. Listen to me. Relax your arm."* Mr. Wheatcroft asks, *"What did I do wrong? What did I do wrong?"*

**Observation:** At this point the *"reasonable and prudent officer"* standard needed to take over and Officer Schneider and Lindsey needed to ask themselves, *"what are we doing"* and revert back to their agencies Use of Force philosophy: from the Glendale Police Department General Order 23.000 and the subsection 23.002, Use of Physical Control/Force and Less Lethal Weapons: (1.2.2).

> *"It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department. The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances." Id. 9 at p.1.*

Mr. Wheatcroft is still wearing his seatbelt and has a plastic bag and a few dollar bills in his left hand and a soda in his right hand. Officer Schneider verbally accuses Mr. Wheatcroft of trying to stuff something in between the seats, and Mr. Wheatcroft denies doing so and steps one foot outside of the car as he is being determinedly pulled. With Mr. Wheatcrofts' right foot on the ground outside of the vehicle, Officer Schneider grips Mr. Wheatcrofts' right arm (still entangled in the seatbelt) with his left hand and orders Mr. Wheatcroft not to get out of the car. Mr. Wheatcroft stops trying to get out of the car and Officer Schneider takes the soda from him.

Mr. Wheatcroft asks Officer Schneider to stop because he didn't do anything wrong, and at the 2:27 minute mark, Officer Schneider takes out his Taser and while still gripping Mr. Wheatcrofts' right arm presses the Taser against Mr. Wheatcrofts' right shoulder. Mr. Wheatcroft then tells Officer Schneider *"okay, okay, I understand you."* At approximately the 2:33 minute mark, Mr. Wheatcrofts' right hand is resting on his knee and Officer Schneider tells Mr. Wheatcroft to relax his arm. Mr. Wheatcroft says, *"I am"* and holds out his arm, seemingly to show the officer that he is complying.

At the 2:40 minute mark, Officer Schneider offers his first explanation for what Mr. Wheatcroft has done wrong, stating that Mr. Wheatcroft doesn't have an ID on him and accuses Mr. Wheatcroft of stuffing *"something"* down in his backpack and in between the seats. Mr. Wheatcroft promises Officer Schneider that he didn't stuff anything in his backpack, and Officer Schneider responds, *"are you gonna fight or not?"* and Mr. Wheatcroft responds that he is not.

Officer Schneider put his Taser back into the holster and starts to twist Mr. Wheatcrofts' right arm behind his back in an apparent pain compliance attempt of control, while Mr. Wheatcroft is still seated and wrapped and restrained in his seatbelt. Mr. Wheatcroft is obviously in pain and says so out loud verbally.

At the 3:00 minute mark, Officer Schneider tells Officer Lindsey that *"he is going to fight."* Mr. Wheatcroft states to the officers that he is not going to fight, but Officer Schneider tells Officer Lindsey to get his Taser out.

DR. JEFFEORY G. HYNES, ED.D.     12

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

By the 3:05 minute mark, Ms. Chapman is begging the officers to please wait, and Mr. Wheatcrofts' kids are calling out and screaming loudly to their dad.

**Observation:** There is no reasonable suspicion or probable cause against the passenger Mr. Wheatcroft, to demand his identification and grab him, physically removing him from his car, then Tasing him 10 to 11 times, kicking him, and utilizing pain compliance holds, as described within this report. There was only passive resistance demonstrated by Mr. Wheatcroft, as he is asking his reasonable questions, in a pleading manner, that I could see reviewing the BWC and therefore the officers' actions were extremely excessive and in my opinion criminal. His family is present and is screaming and crying out loud as their father is being arrested for simply not producing identification from an invalid cited traffic violation being committed.

BWC TIME: 2:55 - 3:20

Officer Schneider then puts his Taser away and uses his other hand to grab Wheatcrofts' elbow and put him into an apparent arm compliance hold. The seatbelt is still seen wrapped around Wheatcrofts' head and legs as Officer Schneider tries to insistently pull the restrained Mr. Wheatcroft from the vehicle. The unreleased seatbelt is not allowing Mr. Wheatcroft to comply with Officer Schneider's arrest intentions.

**Observation:** The forceful attempt to remove Mr. Wheatcroft utilizing pain compliance holds was excessive. He's still strapped in the vehicle with his shoulder seat belt engaged.

Officer Schneider and other officers, Lindsey and Fernandez continued trying to twist Mr. Wheatcrofts' arm behind his back and bend his head over, but with Mr. Wheatcroft clearly tangled in the seatbelt, they aren't able to do so. Their frustration is apparent and it appears as though they believe that he is resisting their efforts, when he is actually restrained by the unreleased seatbelt. Their forceful actions are clearly torturous and is clearly excessive. Mr. Wheatcroft calls out in pain, tells them to *"stop motherfuckers"* and at the 3:20 minute mark Mr. Wheatcroft is Tased.

By the 3:30 minute mark, Mr. Wheatcroft is lying on the ground outside the vehicle with his head against the door screaming out in pain, and Mr. Wheatcrofts' kids are crying hysterically and yelling for their *"daddy"*. The officers inexplicably continue to use their Tasers on Mr. Wheatcroft, yelling at him to stay down, and Mr. Wheatcroft cries out that he can't move due to being restrained by the entangled seatbelt.

BWC TIME: 3:20 - 4:10

With Mr. Wheatcroft tangled in the seatbelt, another officer Tases him again multiple times in the left side by using what's called a *"drive stun."* Officer Schneider then steps back and fires his Taser probes at Wheatcroft who's on the ground between the car door and the vehicle, with the seatbelt wrapped around his legs. The engaged officers then drive stun Wheatcroft several more times and he is finally forcibly placed in handcuffs.

At the 3:40 minute mark, Officer Fernandez approaches Mr. Wheatcroft screaming at him to *"turn over, motherfucker."* Mr. Wheatcrofts' kids can be seen in distress in the backseat, begging the officers to please stop. It is professionally disturbing to watch and was an extremely

DR. JEFFEORY G. HYNES, ED.D.   13

excessive utilization of force options. Below I will discuss the Glendale Police Department's actual Use of Force policy and Response to Resistance prescribed policy mandated options.

At approximately the 4:00 minute mark, Mr. Wheatcroft can be seen on his knees leaning against the car with both hands behind his back and a Taser pressed against the base of his neck in a threatening manner. For no visible reason, another Taser strike is again used on Mr. Wheatcroft. Officer Schneider reports to another officer that Officer Lindsey had been injured and when he sees Ms. Chapman leaning into the front seat, he points his Taser at her and orders her to put her hands up.

**Observation:** Mr. Wheatcroft was being drive stunned while he was still strapped into the seatbelt and unable to comply with the Officers verbal orders or forceful actions, to remove him from the car. The strapped on unreleased seat beat could have been cut off instead of the multiple, multiple Taser applications being utilized against Mr. Wheatcroft, who was only displaying *"Passive Resistance"*.

BWC TIME: 4:10 - 4:50

During the previous noted time observations, officers claim Ms. Chapman hit Officer Lindsey in the head with a plastic bag of items. You hear Officer Schneider say, *"Mark is hurt."*

At approximately the 4:25 minute mark, the officers' then try to drag Mr. Wheatcroft away from the vehicle, but his legs are still stuck in the entwined seatbelt. At the 4:32 mark, you can hear Mr. Wheatcroft yelling that he's stuck in the seatbelt. At the 4:47 mark the 11-year-old son in the car moves into the front seat to attempt to free his father, from the entangled seatbelt. Mr. Wheatcrofts' son is clearly traumatized, crying hysterically, puts his face in his hands, and collapses into the seat. Mr. Blackburn can be seen sitting in the driver seat rubbing the child's back trying to comfort him. Officer Schneider commands the boy to go to the front of vehicle, causing him to continue his panic-stricken crying.

At the 4:55 minute mark, Mr. Wheatcroft can be seen lying face down on the ground. Officer Schneider tells another officer to get Ms. Chapman and Mr. Wheatcrofts' other son sticks his head out the passenger doorway begging the officers not to take his *"mommy"*.

**Observation:** Mr. Wheatcroft is clearly trying to let officers know, *'I'm trying to comply. I'm stuck I can't do what you want me to do.'* A child, a small child within the car, is able to release his father's legs, which in effect helped the officers. This BWC video is extremely hard to professionally watch as the force used against Mr. Wheatcroft is clearly unwarranted and excessive.

BWC TIME: 4:50 - 6:00

At the 5:04 mark Officer Schneider turns back to Mr. Wheatcroft, who, for reasons that are unclear, is lying on the ground with his pants pulled down. The officers continue to Tase Mr. Wheatcroft, including his testicles area. Mr. Wheatcroft can be seen kicking and writhing in pain and appears now to be handcuffed.

At this point, Mr. Wheatcroft is seen laying face down on the asphalt, handcuffed, with an officer kneeling on his back. Officer Schneider then turns, accuses Wheatcroft of kicking, and then

DR. JEFFEORY G. HYNES, ED.D.          14

WHEATCROFT V CITY OF GLENDALE NO. 2:18-CV-02347

kicks Wheatcroft in the groin twice. I couldn't see the described kicking by Mr. Wheatcroft, I only saw passive pain filled reactive resistance.

Officer Schneider then takes his left hand, pulls down Wheatcroft's athletic shorts below his buttocks, and Tases him in the testicles area. Shortly later, Officer Schneider recharges his Taser and this time places it on Wheatcroft's penis area while he's lying on his side, saying *"You want it again? Shut your mouth. I'm done fucking around with you."*

At the 5:20 minute mark Mr. Wheatcroft is on the ground and Ms. Chapman is seen being lifted from the ground in handcuffs.

At approximately the 5:35 mark, officers are heard talking about removing the probes from Mr. Wheatcroft, including one officer who says, *"there are probes everywhere."* Mr. Wheatcroft continues to yell out in pain as the officers seem to be moving him, and Officer Schneider presses his Taser against Mr. Wheatcroft and threatens to Taser him again. Officers can be seen pulling Taser probes out of Mr. Wheatcroft without assistance from medical staff.

**Observation:** The officers' behavior was extremely excessive and was criminal in my opinion. Even when Mr. Wheatcroft was handcuffed they still Tase him. There are four, five officers visible and each one of them had a legal and ethical obligation to stop this abusive excessive Use of Force. This has the open visual appearance of their excessive force being an intentional torturing overt act. There's no legitimate law enforcement purpose for their excessive actions.

BWC TIME: 6:00 - END

A handful of officers pull Wheatcroft to his feet and pull Taser probes from his skin rather than having them removed by medical personnel as required by their policy. He yells in pain, Officer Schneider tells him, *"Shut up…You shouldn't have been stupid then… Quit acting like a big baby."* Officer Wheatcroft was tased 11 unwarranted times and kicked and put into numerous pain compliance holds.

At approximately the 6:30 mark Mr. Wheatcroft is finally brought to his feet by three officers. He is handcuffed and can be heard trying to catch his breath. He tells the officers that he can't breathe and has pneumonia, and Officer Schneider yells at him to shut up.

At the 7:00 minute mark, officers are still finding probes that have to be removed from all over Mr. Wheatcrofts' body. For reasons that aren't clear, Mr. Wheatcroft jumps and screams out in pain, and Officer Schneider shoves Mr. Wheatcrofts' head and tells him to relax, that he's being a *"big baby."* The officers can be seen moving Mr. Wheatcroft over to a police cruiser and Mr. Wheatcroft screams out that his wrist is in pain. He is shoved and locked into the backseat of a police cruiser by the 7:30 mark.

After approximately one minute of debriefing with other scene officers, Officer Schneider is alerted to the fact that his microphone is still on and he turns it off. Prior to turning his microphone off, the officers mostly talk about Ms. Chapman hitting one of the officers with a heavy bag. Officer Schneider is asked if Mr. Wheatcroft had dope on him, and Officer Schneider responds that he *"doesn't know what he was stuffing."* This comment was reference to Officer Schneider seeing Mr. Wheatcroft reaching between the passenger and driver's seat, when he was asking for identification. No illegal contraband was found between the passenger and driver's seat.

DR. JEFFEORY G. HYNES, ED.D.

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

Concerning the original stated reason for the contact with the involved vehicle, Ms. Broaddus examined this point during her questioning of the Glendale Police Department's Use of Force designated expert, Sergeant McDaniel during his deposition, as they watched the surveillance video from the Motel 6 camera. Officer Schneider claimed that they had witnessed the vehicle driven by Mr. Blackburn fail to engage his turn signal when turning in the Motel 6 parking lot. There were 32-seconds from when the car parked to the contact by Officer Schneider and Lindsey. Below are a series of questions and answer regarding that examination: *Id. 16e; at p. 137 of 206.*

> Question: *"Are you aware that the alleged violation that they were approaching the vehicle was for a turn signal coming off of Glenn Drive into that parking lot?"*

> Answer: *"I know that it was for a turn signal, ma'am. I don't know where the turn signal allegedly occurred or did not occur."*

> Question: *"Would it concern you if the allegation was that they did not use their turn signal turning into the parking lot from Glenn?"*

> Answer: *"Would it concern me?"*

> Question: *"Yes, if you saw where the police vehicle was when the car was coming through the archway, and you're familiar with that area, and you testified if you were on the back side of the building you wouldn't be able to see the entrance."*

> Answer: *"Correct. But I don't know where those officers were when that vehicle was on Glenn."*

> Question: *"And you wouldn't be able to see all the traffic that would be on Glenn from the back side of the building either, true?"*

> Answer: *"Depending on where you were at, I imagine..." Id. 16e; at pp. 138-139 of 206.*

I reviewed Sergeant Flosman's supplemental report and focused upon the narrative of how the contact between Mr. Blackburn noted Taurus vehicle occurred, looking for confirmation of what Officer Schneider presented for their reason for the initial traffic stop contact.

From his review of the Motel 6 parking lot camera footage he made the following narrative:

> 'The only camera footage that was in evidence.com was from camera#6. The date and time stamp on the lower left portion of the screen was dated 2017/07/26 with a time of 19:38:27 hours. At approx. 19:29:29 hours, the gray in color Ford Taurus comes into camera view from the south entrance of the Motel 6 off of Glenn Drive. At the same time, in the upper right portion of the screen, you can see the front quarter panel of the marked Glendale Olice Tahoe come into view, just past the corner of the Eats (East) of the Motel 6. The Glendale Tahoe was driving west bound in the alley just north of the Motel 6 and south of the Glendale Star Newspaper building.

> The Ford Taurus drives north into the parking lot and then backs into the first parking spot along the east portion of the parking lot, just north of Glenn Drive, besides the concrete arch over the entrance. As the Taurus backed in, the Glendale marked Tahoe with the number 31 on the roof pulled into the same parking lot from the north and pulled in facing perpendicular to the Taurus. In the video, it appears that no emergency lights were activated on the Patrol Tahoe just the driver's alley light was

DR. JEFFEORY G. HYNES, ED.D.   16

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

*turned on and pointed at the driver of the Taurus. The driver's side front and rear door on the Taurus open…"*

Sergeant Flosman's observations continue and I found no contradictions to the BWC and surveillance video. Sergeant Flosman does note that he released the Wheatcroft minors to their grandmother Ms. Robin Nash at 1000 hours and she came and picked them up.

**Observation:**

Still examining the reason for the initial stop, I found within Officer Pittman's supplemental report that he interviewed Officer Lindsey, who had been taken to the hospital, from being stuck in the head at the scene allegedly by Ms. Chapman. I also noted this observation above, but now would like to examine the concepts of" *reasonable suspicion"* or if there was any *"probable cause"* established for this stop and brutal arrest of Mr. Wheatcroft.

During his interview, Officer Lindsey reported the following from that interview:

*"While at the hospital I asked Officer Lindsey what happened and he stated that Officer Schneider and he entered the Motel 6 parking lot from the north side and observed the vehicle pull in the center parking lot from the south and Officer Lindsey believes that when the occupants saw them coming from the north side they stopped and backed into a parking spot. Based off their activities Officer Schneider and Officer Lindsey pulled up to them and they contacted them… Id. 13a; at pp. 72-73 of 408.*

**Observation:** This initial story given on the night of this incident, July 26, 2017, directly contradicts Officer Schneider's claims that they approached the Taurus because of a turn signal violation and is also contradicted by BWC footage that shows the Taurus already parked when the officers pulled up. This observation greatly concerns me regarding Officer Schneider's version of what occurred during this incident.

Transitioning to Officer Tolbert's' supplemental report, he notes that he interviewed Officer Fernandez, Mr. Wheatcroft and Officer Schneider.

From Officer Tolbert's interview with Mr. Wheatcroft the following was related, while they were still at the Motel 6 on July 26th. Officer Tolbert read Mr. Wheatcroft his Miranda Rights and Mr. Wheatcroft responded "yes" to understanding. Mr. Wheatcroft's version of why they were contacted matches closely to Officer Lindsey's reason for the contact on the incident evening but was in absolute contradiction to Officer Schneider's recall of their reason for initiating the contact. *Id. 13a; at pp. 62-63 of 408.*

*"Johnny said that he arrived at the Motel 6 with his friend, wife, and two sons. His friend, Shawn had given them a ride. Johnny said he and his family were going to rent a room."*

*"Johnny said his friend backed into a parking spot and was "spotlighted" by a police officer. Johnny said he saw the same police car in the other parking lot of the Motel 6 just moments before (East parking lot). Johnny said those officer "started shit with other people."*

*"Johnny said Officer Schneider immediately contacted him on the passenger side of the Taurus. Officer Schneider asked Johnny for his identification. Johnny said that he told Officer Schneider he did not have to give him anything since he was just a passenger in the vehicle. Johnny felt Officer Schneider had singled him out and had gone straight to talk to him instead of the actual driver of the car (Shawn). Johnny said he knew his rights and did not think a passenger of a vehicle was required to*

DR. JEFFEORY G. HYNES, ED.D.    17

*give the information Officer Schneider was asking for. Johnny said, "I know I look like a scumbag, but I'm not."*

*"Johnny said when he saw Officer Schneider's police vehicle it was headed north in the east parking lot towards the alleyway on the Northside of the Motel. Johnny said the police car was driving away from other people…"*

*Johnny said the police car had headed west in the north alleyway. I told Johnny I was told the vehicle he was traveling in was observed by officers to not use its blinker turning into the parking lot."*

*Johnny said that was impossible. Johnny said there was no way the officers could have seen if the Taurus used its blinker or not based on where the police car was in relation to the Taurus." Id. 13a; at pp. 62-63 of 408.*

**Observation:** The rest of the interview was consistent with my watching of the BWC's and the Motel 6 surveillance video with one exception which is as follows:

*"Johnny became very upset and appeared to get teary-eyed when he recalled being Tased in his genital area. Johnny said he was Tased in both his testicles, buttocks and "taint" area (his perineum, the area between his testicles and anus). Johnny said this was very painful, and he felt the Taser was held in those areas for a long time. Johnny admitted he had tried to hit the Taser away from this area with his hand because it was so painful. Johnny said he knows the police were not allowed to Tase people in those areas." Id. 13a; at p. 65 of 408.*

From Officer Tolbert's interview with Officer Schneider the following was related, while they were still at the Motel 6 on July 26th.

*"Officer Schneider believed Johnny was trying to fight with Officers and was not just trying to get away."*

*'Officer Schneider said even after Johnny was in handcuffs he was still trying to kick at Officers." Id. 13a; at pp. 58-59 of 408.*

**Observation:** Officer Schneider's comments were not consistent with my viewing on the BWC's and the Motel 6 Surveillance video. Mr. Wheatcroft's actions were *"passive resistance"* with no aggressive actions witnessed against or towards the officers.

From Officer Tolbert's interview with Officer Fernandez the following was related, while they were still at the Motel 6 on July 26th.

*"Officer Fernandez said Johnny would fight, kick, and thrash around, but then stop when the Taser was used. This behavior was repeated. I asked Officer Fernandez if he believed Johnny's actions were being done to fight with Officers or if they were being done to escape from Officers. Officer Fernandez said that he was unsure". Id. 13a; at p. 62 of 408.*

Mr. Wheatcroft and Ms. Chapman were taken to the Glendale City Jail and their children were moved to the Motel 6 lobby. A police report states that the children weren't interviewed because the incident *"appeared to be traumatic for them."* However, BWC footage suggests that the children were asked some questions.

DR. JEFFEORY G. HYNES, ED.D.     18

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

From my review of Glendale Police Department Sergeant Jerry McDaniel's deposition taken on December 11, 2019, I made the following observations below.  I was also present during his deposition, which was held at the Attorneys For Freedom Law Firm and the interview was being conducted by Ms. Broaddus, Attorney for the Plaintiffs.

Sergeant McDaniel had been with the Glendale Police Department since 1998 and described his career with the following assignments:

Patrol Officer to Field Training Officer to SEU Detective, to Patrol Sergeant to Professional Standards Unit Sergeant to FTO Coordinator Sergeant to Patrol Training Sergeant to Range Master Proficiency Training Sergeant to SWAT Team Leaders and currently serves as a SWAT Team Leader and Patrol Sergeant. *Id. 16e; at pp. 10-11 of 206.*

In 2017 he was a SWAT Sergeant, Range Master and was the Proficiency Training Sergeant and conducted the departmental review of the BWC taken during the incident with Mr. Wheatcroft.  As the Range Master, Sergeant McDaniel oversaw the all training for Forearms, Defensive Tactics, Taser, Physical Fitness and all proficiency training. *Id. 16e; at p. 12 of 206.*

Sergeant McDaniel explained that in 2017 that their Taser training was utilized from outlines developed from the BWC AXON Company.  The following direct questions were asked by Ms.  Broaddus in connection to the Taser training conducted. *Id. 16e; at pp. 17-19 of 206.*

> Question: *"So with the training that you mentioned, AXON and their lesson plan, was that more geared on how to actually use the Taser versus when to use it?"*
>
> Answer: *"Absolutely, yes, ma'am" Id. 16e; at p. 17 of 206.*
>
> Question: *"And then you'd use your other sources such as Glendale's policies for the basis as to when it would be appropriate to use the Taser?"*
>
> Answer: *"The AXON does not provide policy to law enforcement.  AXON provides a guide of how the Taser—how to instruct the use of the Taser.  Basically how to pull the trigger.  They don't decide when a Taser should be used.  That's policy that's directed through the chain of command."*
>
> Question: *"I've taken a number of depositions in this case, and your name has popped up a couple times, and they've identified you as the expert on different types of response to resistance. Were you aware of that?"*
>
> Answer: *"I don't consider myself an expert, Ma'am." Id. 16e; at p. 18 of 206.*
>
> Question: *"Do you know why they would refer to you as an expert?* Answer: *"I believe the word—used and thrown about too easily, just like the word "hero" Ma'am." Id. 16e; at pp. 18-19 of 206.*
>
> Question: *"Sounds like there's an issue on response or resistance.  You might be the go-to-guy in the department that they would go to, since you're responsible for training.  Would you agree with that?"*

DR. JEFFEORY G. HYNES, ED.D.        49

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-EV-02347

Answer: *"Yes Ma'am." Id. 16e; at pp. 18-19 of 206.*

Sergeant McDaniel related that he has never qualified as an expert in any court and that he has been interviewed in depositions that have not gone to a trial setting, while representing the Glendale Police Department. *Id. 16e; at pp. 20-22 of 206.*

In addition, regarding his status as a recognized expert Ms. Broaddus asked the following series of questions:

Question: *"Have you ever been qualified as a subject as a subject matter expert by AZPOST?"*

Answer: *"No, ma'am." Id. 16e; at p 25 of 206.*

Concerning his specialty or area of expertise, Sergeant McDaniel's related that he has assisted with only firearms type classes when associated with AZPOST classes, which he has helped with. *Id. 16e; at pp. 25-27 of 206.*

When Sergeant McDaniel was asked about the Glendale Police Department's Use of Force and Response to Resistance policy, in comparison to other agencies in the Phoenix Metro area, he agreed that their polices are consistent as to the appropriate standard of care utilized by officers elsewhere. He also agreed that their policies were consistent for what a *"reasonable officer"* should or should not be doing in relation to Use of Force / Response to Resistance policies. *Id. 16e; at pp. 25-27 of 206.*

During his deposition, Sergeant McDaniel explained his departmental review in 2017, of the Wheatcroft incident was per a request from the Professional Standards Unit. He related that he reviewed Officer Schneider's' and Lindsey's' BWC's and the Motel 6 Surveillance video for his offered memorandum, which was passed up his chain of command to Assistant Chief Chris Briggs for review. *Id. 16e; at p. 28 of 206.*

Sergeant McDaniel related that he was only to examine Officer Schneider's use of force utilized in this incident and not examine the reason for the stop or anything else related to this incident. Sergeant McDaniel shared that the reason for this stop had no basis on the Use of Force in this incident. Then he clarified and admitted that *"officer's presence"* was the lowest level of force that an officer would utilize. Sergeant McDaniel was asked about the purpose of his review, and the following question was asked and answered: *Id. 16e; at pp. 43-45 of 206.*

Question: *"With regard to your review of the matter involving Officer Schneider, what was the purpose of your review? What was your understanding of why you were reviewing that?"*

Answer: *"They—my understanding is that the Chief wanted me to look at the force used by Officer Schneider in reference this incident, whether it was within policy or out of policy. Assistant Chief Briggs…" Id. 16e; at p. 45 of 206.*

Sergeant McDaniel reviewed the three mentioned videos and it took him a day or two to review and write his memorandum. He received no input during his review period. When asked again about if he did any analysis on the basis of the arrest, he again said that he hadn't. He also focused on the functionality of the Taser and the technique of utilizing the drive stun technique for possible future training/s." *Id. 16e; at pp. 46-50 of 206.*

DR. JEFFEORY G. HYNES, ED.D.    20

When questioned about the Glendale Police Department Use of Force policy Ms. Broaddus asked a series of questions with regard to the "Response to Resistance" in relation to the amount of force utilized within this incident.

> Question: *"Under subsection E it talks about passive resistance cases when – and it says that cannot be used unless there's a reasonable and necessary—I'm sorry- "the use is reasonable and necessary under the circumstances." And it also says, "a lesser means of control or force has not been attempted—or has been attempts and failed." "Do you see that?"*
>
> Answer: *"Yes, ma'am."*
>
> Question: *"So what is your interpretation of that?"*
>
> Answer: *"In passive resistance cases you have to try something prior to using the Taser"*
>
> Question: *"Under subsection F it says--this is –we're still talking about Taser use that should not be deployed under any circumstances. And subsection F says, "To threaten or attempt to gain information from a suspect." Do you see that?"*
>
> Answer: *"Yes, ma'am."*
>
> Question: *"So would you agree that it would be unreasonable for an officer to use a Taser or threaten to use a Taser to try to get information from a suspect?"*
>
> Answer: *"Yes, ma'am."*
>
> Question: *"That would include using a Taser to try and get someone to give maybe identification when that don't need to?"*
>
> Answer: *"Yes, ma'am."*
>
> Question: *"And subsection G talks about generally that you're not allowed—or an officer is not allowed to use a Taser against a restrained subject—somebody who could be handcuffed—unless there are certain circumstances where physical resistance still is needed to overcome the additional resistance. Would you agree with that?"*
>
> Answer: *"The way it's written?"*
>
> Question: *"Subsection 8 on this page—we're still talking about prohibited uses of a Taser—and it says, 'No officer shall playfully, maliciously, recklessly or intentionally misuse the Taser in display of power or against an individual as a punitive measure." "Do you see that?"*
>
> Answer: *"Yes, ma'am." Id. 16e; at pp. 81-84 of 206.*

**Observation:** Sergeant McDaniel has been contacted by investigators from the Federal Bureau of Investigations (FBI), the Arizona Attorney General Officer and the Arizona Peace Officer Standards and Training Board have regarding his review and opinion of this incident. Their investigative results are still pending and were not noted as of the writing of my report. *Id. 16e; at pp. 92-96 of 206.*

DR. JEFFEORY G. HYNES, ED.D.    21

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

And as further clarification I offer an examination of their policy (Glendale Police Department General Order, 23.000 (*Id. 9 at p.1 or 37*) Use of Force and *"Responses to Resistance"* utilized by Officer Schneider and the other officers present against Mr. Wheatcroft. According to the Glendale Police Department's Use of Force policy: *"Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives… Id. 9 at p.1.*

From the Glendale Police Department General Order, 23.000 (*Id. 9 at p.1*):

> *"A. Response to Resistance: It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department. The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect. Employees will only use the amount of force/control reasonably necessary to overcome this resistance, protect property, and save lives. Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives"… Id. 9 at p.1 of 37.*

**Observation:** Officer Schneider and the assisting officers far exceeded this policy based on the *"Passive resistance"* and non-complaint verbal responses being demonstrated Mr. Wheatcroft.

From, the subsection, Use of Physical Control/Force and Less Lethal Weapons: (1.2.2)

> *"It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department. The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances." Id. 9 at p.1.*

As a point of reference and from the Glendale Police Department's definition section of General Order, Use of Force, 23.000 are definitions utilized concerning Use of Force responses to possible resistance offered against someone being arrested: *Id. 10 at p.2 of 21.*

> E. Empty Hand Control: A method of control employed by officers without the aid of equipment or weapons. There are two subcategories called *"soft empty hand techniques"* and *"hard empty hand techniques".*

> F. Hard Empty Hand Techniques: The subcategory in the *"empty hand control"* that includes kicks, punches, or other striking techniques such as a brachial stun, or other strikes to key motor points that have a moderate chance of injury.

> G. Soft Empty Hand Techniques: The subcategory in the *"empty hand control"* that includes escort control holds, touch pressure points, and take down techniques that have a minimal chance of injury.

> J. Less Lethal: The application of force and/or tactics, that when properly applied are not likely to result in death or serious injury. Approved less lethal weapons include: (a number of listed items) including the Taser…

> K. Officer Presence: The method of control/force which includes the mere presence of an officer in uniform and/or identified by a badge, police identification, police vehicle, or other form of police identification such as a raid jacket.

DR. JEFFEORY G. HYNES, ED.D.   22

M. Preclusion: Elimination of all lesser means of control/force.  The lesser means of control/force have been tried and they have not been effective, or the type of resistance is great than the method of control/force. *Id. 10 at pp. 2-3 of 21.*

From the noted Use of Force policies from within General Order 23.008, (Dated 2000) listed are the noted Types of Resistance and Methods of Control with my observation being noted (*Id. 9 at p. 16 of 21*):

| Types of Resistance | Methods of Control | Dr. Hynes Observations |
|---|---|---|
| **Passive:** (suspect fails to obey any command or direction of the officer, displays no acts of assault, threat, verbal non-compliance and never resists control attempt of the officer) | Verbal commands<br>Soft empty hands<br><br>Threaten OC spray<br>Threaten Stun Device/Taser | Mr. Wheatcroft was only demonstrating passive non-complaint behavior from the passenger seat of Mr. Shawn W. Blackburn's vehicle.<br><br>The use of the Taser was not justified based upon Mr. Wheatcroft's BWC captured conduct and this noted level of resistance. |
| **Verbal Non-Compliance:** (Acts where suspect voices their unwillingness to obey officer's commands or the conveying of verbal threats) | Verbal Commands<br>Soft Empty Hand<br>Taser<br>OC Spray<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Stun Device/Taser<br>Threaten use of K-9 | Mr. Wheatcroft was only demonstrating passive non-complaint behavior.<br><br>The use of the Taser was not justified based upon Mr. Wheatcroft's BWC captured conduct and this noted level of resistance. |
| **Psychological Intimidation:** (Physical acts or non-verbal cues indicating the suspect's attitude or readiness to resist. Officer may perceive actions as threatening in nature) | Verbal Commands<br>Soft Empty Hand<br>Stun Device/Taser<br>OC Spray<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9 | Not exhibited by Mr. Wheatcroft therefore the use of the Taser was excessive force being utilized.<br><br>There was no Psychological Intimidation exhibited by Mr. Wheatcroft.<br><br>The use of the Taser because Mr. Wheatcroft was questioning Officer Schneider's threatened arrest and Tasing was because Mr. Wheatcroft wasn't producing any identification. |
| **Physical (Defensive resistance):** (Physical acts of fleeing or escaping suspect attempts to resist arrest without assaulting | Verbal Commands<br>Soft Empty Hand<br>OC Spray<br>Taser<br>Hard Empty Hands | Not exhibited by Mr. Wheatcroft therefore the use of the Taser was excessive force being utilized.<br><br>There was no physical Defensive resistance exhibited by Mr. |

DR. JEFFEORY G. HYNES, ED.D.   23

| officer) | (Avoid head/neck)<br>Use of K-9(felony)<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9 | Wheatcroft.<br><br>The use of the Taser because Mr. Wheatcroft was questioning Officer Schneider's threatened arrest, and Tasing was because Mr. Wheatcroft wasn't producing any identification. |
|---|---|---|
| **Active Aggression:** (Physical acts of assault on an officer) | Verbal Commands<br>Soft Empty Hand<br>OC Spray<br>Hard Empty Hands<br>Impact Weapons<br>Taser<br>Use of K-9<br>Extended Range Impact<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9<br>Threaten Deadly Force | Not exhibited by Mr. Wheatcroft therefore the use of the Taser was excessive force being utilized.<br><br>There was no active aggression exhibited by Mr. Wheatcroft.<br><br>The use of the Taser because Mr. Wheatcroft was questioning Officer Schneider's threatened arrest and Tasing was because Mr. Wheatcroft wasn't producing any identification. |
| **Aggravated Active Aggression:** (Attempts to severely injure or kill officer) | Verbal Commands<br>Soft Empty Hand<br>OC Spray<br>Hard Empty Hands<br>Impact Weapons<br>Taser<br>Use of K-9<br>Extended Range Impact<br>Scorpion<br>Deadly Force<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9<br>Threaten Deadly Force | Not exhibited by Mr. Wheatcroft therefore the use of the Taser was excessive force being utilized. |

Utilizing phraseology from the court case *Graham v. Connor* (1989, No. 87-6571), an incident should be judged from the perspective of the officer involved.  However, as from the decision, *"the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."*  Officers are licensed to use force *"only when no reasonably effective alternative appears to exist"* and with this incident there were numerous other de-escalation options available to them.  Officer Schneider clearly violated his agency's Use of Force policy as I have illustrated.

This court case opinion limits the level of force to the amount a *"reasonably prudent officer"* would use in a similar case.  Because the court conveyed that this test of reasonableness *"is not capable of precise definition*

DR. JEFFEORY G. HYNES, ED.D.     24

*or mechanical application*," many departments have moved away from policies that create a "continuum" of force options to be applied in a mechanical way, with increasingly severe types of force matched with increasing levels of resistance by a subject. The Glendale Police Department's Use of Force policy is reflective of these guidelines, although in my opinion, that policy was not followed by the officers involved in this case, and specifically Officers Schneider, Lindsey and Fernandez.

Specifically, the *Graham* court stated: determining whether the force used to affect a particular outcome is:
> … *'Reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake…. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,… its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight…. The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.*

**Observation:** Even though the Glendale Police Department policy 23.000 embraces the concepts from *Graham v. Connor,* these officers did not perform at the *"reasonably prudent officer"* standard. These officers were overly quick to act and utilize severe physical force against Mr. Wheatcroft. Officer Schneider forcibly removed Mr. Wheatcroft from the passenger side of his noted friends' vehicle with extreme physicality; they overreacted to the *"Passive Resistance" and* non-complainant actions of Mr. Wheatcroft not providing identification.

As he was answering Officer Schneider's demanding questions, Officer Schneider decided quickly to take Mr. Wheatcroft into custody for failing to produce identification, as a passenger within a vehicle. As Officer Schneider was attempting to pull Mr. Wheatcroft out of the front passenger seat. Mr. Wheatcroft was restrained by his seat belt. He was taken into custody aggressively as explained above, and he was Tased 11 times, while not demonstrating any behavior that would justify such an excessive force application. I have demonstrated by the above illustrated Glendale Police Department policy chart, regarding the response options, to a detained/arrested person's resistance, that Officer Schneider and his assisting officer's behavior were tremendously excessive. In addition, I would argue that these officers exhibited criminal behavior by such a Tasing and physical abuse of a seat belted and restrained Mr. Wheatcroft.

**Conclusion:**

Based upon my 32-year law enforcement career, my education, and academic background I have found that specifically Officer Schneider, along with Officers Lindsey, Fernandez and the other officers present at this abusive detention and arrest of Mr. Wheatcroft were egregious, excessive and their actions were not based on the Use of Force and Types of Resistance Policy, within the Glendale Police Department General Orders 23.000 and it's subsections.

Seeing Mr. Wheatcroft being pulled violently from the passenger seat and Tased repeatedly for not producing identification, while still physically restrained by his entangled seatbelt, and in front of his family, clearly shows the excessive Use of Force used against him. Being Tased 11-times and the disgrace of being openly Tased in the genital area, as his shorts were pulled down during this invalid arrest was professionally unsettling. The screaming and hysterical crying of Mr. Wheatcroft's children, wife and friend who witnessed

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

this abusive police action could be emotionally impacting for years to come for Mr. Wheatcroft and his family that watched this abuse.

As mentioned above and from the Glendale Police Department's *"Philosophy"* section of the General Order, Response to Resistance, 23.002

> *"It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department. The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances." Id. 9 at p. 1of 37.*

Officer Schneider and the other officers on-scene who were assisting in the arrest of Mr. Wheatcroft totally missed the mark of living up to their agencies stated Use of Force *"Philosophy"* in relation to their actions during this incident.

Mr. Wheatcroft was asking very reasonable questions of Officer Schneider, such as: *"Why are you asking for ID?"* Officer Schneider telling Mr. Wheatcroft that, if you're a passenger in the vehicle, you have to give ID' is not legally correct, as well as Officer Schneider saying: *"I can take you down to the station and fingerprint you."* The requirement of producing identification from a passenger within a vehicle for such a minor traffic violation was overly punitive and was also not a reason for a legal arrest. I illustrated a number of court cases above to address the illegality of Officer Schneider's actions for arresting and utilizing such a degree of excessive force against Mr. Wheatcroft. Mr. Wheatcroft didn't and wouldn't produce any identification and was demonstrating only passive non-compliant behavior as he was being aggressively arrested and abused physically.

Officer Schneider's belief that he could demand identification from a passenger within a vehicle and because of non-compliance from that subject, then detain, arrest and transport that subject to a police facility to determine identity was legally incorrect. The basis for his then brutal and disturbing arrest of Mr. Wheatcroft in front of his screaming family was not supported by his agencies Use of Force policy. I have shown above how Officer Schneider and the other on scene officers conduct was in direct contradiction to the Glendale Police Department's Use of Force and Response to Resistance policy.

Ms. Chapman, who after being arrested and charged with aggravated assault on a police officer, spent months in jail after the incident because she and Mr. Wheatcroft couldn't afford bail. Ms. Chapman agreed to plead guilty to a lesser charge in order to get home to her children, her attorneys have related in public comments.

My strongest argument however that is the stated reasonable suspicion justification for the initial traffic stop contact was not valid. I challenge Officer Schneider's instantaneous reason for initiating the stop and trying to validate his arrest of Mr. Wheatcroft.

Officer Schneider and Lindsey can be seen on the Motel 6 surveillance video, making contact after the vehicle was already stopped and backed into its parking spot. The reason given by Officer Schneider is in direct conflict with the versions provided by his partner Officer Lindsey and Mr. Wheatcroft on the night of the incident. They both have given similar accounts on July 26, 2017, as to how the contact occurred and that the reason of no turn signal being demonstrated was not contact reason. To illustrate my logic path for this conclusion, I offer the following, which was also noted above:

DR. JEFFEORY G. HYNES, ED.D.   26

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

I found within Officer Pittman's supplemental report that he interviewed Officer Lindsey, who had been taken to the hospital, from being stuck in the head at the scene, allegedly by Ms. Chapman. During the interview by Officer Pittman, on July 26, 2017, Officer Lindsey reported the following reason for their contact with Mr. Wheatcroft and Mr. Blackburn:

> "*While at the hospital I asked Officer Lindsey what happened and he stated that Officer Schneider and he entered the Motel 6 parking lot from the north side and observed the vehicle pull in the center parking lot from the south and Officer Lindsey believes that when the occupants saw them coming from the north side they stopped and backed into a parking spot. Based off their activities Officer Schneider and Officer Lindsey pulled up to them and they contacted them…*" Id. 13a; at pp. 72-73 of

Continuing my logic path challenging Officer Schneider's *"reasonable suspicion"* reason for the contact with Mr. Wheatcroft and the Taurus driven by Mr. Blackburn I offer the following:

From Officer Tolbert's supplement report noted interview with Mr. Wheatcroft on July 26, 2017, the following was related. Mr. Wheatcroft's version of why they were contacted matches closely to Officer Lindsey's reason for the contact but was in absolute contradiction to Officer Schneider's recall of their reason of initiating the stated traffic violation reason for the original contact. *Id. 13a; at pp. 62-63 of 408.*

> "*Johnny said when he saw Officer Schneider's police vehicle it was headed north in the east parking lot towards the alleyway on the Northside of the Motel. Johnny said the police car was driving away from other people…*"
>
> *Johnny said the police car had headed west in the north alleyway. I told Johnny I was told the vehicle he was traveling in was observed by officers to not use its blinker turning into the parking lot.*"
>
> *Johnny said that was impossible. Johnny said there was no way the officers could have seen if the Taurus used its blinker or not based on where the police car was in relation to the Taurus.*" Id. 13a; at pp. 62-63 of 408.

Without *"reasonable suspicion"* or *"probable cause"* for the initial traffic stop and contact, the detention and arrest of Mr. Wheatcroft was not valid and was not legally justified. As related above, I found that within 28-754, subsection A, that as long as the driving movement can be done safely, there is no noted statutory requirement to utilize a *"turn signal"* while making a turn from the roadway into a private property driveway. Therefore, my position would be that the stated justification for the initial contact and subsequent arrest of Mr. Wheatcroft was invalid and illegal.

The excessive Use of Force behavior in my opinion is a serious Glendale Police Department policy violation, and Mr. Wheatcroft was falsely arrested and physically was a victim of extreme excessive Use of Force, an unlawful stop and an unlawful arrest being utilized against him.

The charges against Wheatcroft were dismissed by the Maricopa County Attorney's Office after the prosecutors from that office reviewed the body camera (BWC) and surveillance footage. In addition, Sergeant McDaniel, who completed the Glendale Police Department Use of Force review, has been contacted by investigators from the Federal Bureau of Investigations (FBI), the Arizona Attorney General Officer and the Arizona Peace Officer Standards and Training Board regarding his review and opinion of this incident. Their investigative results are still pending and were not noted as of the writing of my report. *Id. 16e; at pp. 92-96 of 206.*

DR. JEFFEORY G. HYNES, ED.D.      27

I await their investigative review also and believe as I do, that Officer Schneider's and the other noted officers within these incident actions were inexcusable, unwarranted, and excessive and involve criminal and civil rights violations against Mr. Wheatcroft and his family.

The final result from the Professional Standards investigation against Officer Schneider was issued within a *"Notice to Suspend without Pay for Thirty (30) Working Hours"* findings memorandum, dated 09/26/2018. The memorandum noted that Officer Schneider's actions were *"Sustained"* against him, for the incident's unlawful traffic stop, unlawful arrest and excessive force used against a handcuffed subject, being Mr. Wheatcroft.  Noted within the findings memorandum:

> *"Based upon the suspect's lack of resistance at the time of your use of force, review of the video-recordings, and subject matter expert review of all of the circumstances, the amount of force you used against the suspect was unreasonable and unnecessary.  Therefore, the allegations against you are sustained." Id. 15dd. at pp. 1-4.*

I reserve the right to alert and/or amend my opinion should addition evidence and information becomes available from pending dispositions and additional information discovered.

This report is respectfully submitted.

Dr. Jeffeory G. Hynes, Ed.D.

NOTE TO READERS:  It is imperative to note that all opinions found in this report are based upon my interpretation of documents and information presented for my review. This report is based upon my law enforcement training and experience in evaluating police officer conduct, police policies, practices and training. Statements in this report are only my personal opinion and should not be interpreted as offering any type of legal opinion. I reserve the right to correct errors, misinterpretations, and/or modify or change my opinions at any time.

DR. JEFFEORY G. HYNES, ED.D.    28

Dr. Jeffeory G. Hynes expert witness rate sheet:

This fee schedule applies to the two elements of case consultation: expert witness case preparation and testimony/deposition/s.  Fees quoted below apply nationwide.  Exceptions to fees may be made for cases involving special circumstances.

## EXPERT WITNESS OPINION

Fee (national):  Two Hundred and Fifty dollars ($250.00) per hour, charged in 1/4 hour increments.  Fees are applicable to research, preparation, and production of opinion.

Expenses:  Mileage at standard IRS rate per mile if applicable, actual hotel and meals if applicable.  In addition, reimbursement for all other case related expenses such as mailings, etc.

Retainer:  A minimum retainer of 10 hours ($2500.00) to Hynes Consulting

## COURTROOM TESTIMONY & DEPOSITIONS

Deposition and Court Testimony - $1500 for up to the first 4 hours & $250 per hour after 4 hours and $50 per hour for waiting periods at court hearing.

Respectfully submitted:

DR. JEFFEORY G. HYNES, ED.D.    29

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

**Case Involvement for the last 5 years;** Federal Expert Witness Qualification in Use of Force Related Policy & Procedure al Issues

- September 2019, Expert Use of Force Police Procedures, Arrest and Use of Force situation, U.S. v. William Ernest Ottway Williams, Attorney David Lish, Mayes/Telles Law Firm, Opinion Pending

- September 2019, Expert Use of Force Police Procedures, Shooting and Use of Force situation, Acosta v Al-Muwali et al., Attorney Andy Rojas, Law Office of Robert Andy Rojas, Opinion Pending

- August 2019, Expert Use of Force Police Procedures, Arrest and Use of Force situation, Gregory Mack / Mohave County, Attorney Kathleen E. Brody, Mitchell/Stein/Carey / Chapman Law Firm, Superior Court Case # CR-2018-01945, Opinion Submitted.

- June 2019 Expert Use of Force Police Procedures, Disorderly Conduct Arrest situation & Excessive Force, Brandon Phillips v. Lake Havasu Police Department, Superior Court Case (M-0844-CR0201900489), Attorneys, Andrew Marcantel, Howard Dworman, Jody Broaddus Esq.'s. Mark Victor Law Firm, Opinion pending.

- June 2019 Expert Use of Force Police Procedures, Police Custody Death, Ortega v United States of America Burch & Cracchiolo Law Firm, Case 3:18-CV-08251-GMS, Pending opinion

- May 2019, Wise v. United States of America / Navajo Nation, Traffic Related Death from Police Action  Case 3:19-CV-08013-DJH, Aspey, Watkins & Diesel Law Firm, Opinion Submitted

- February 2019. Expert Use of Force Police Procedures, Trespassing Arrest Situation Westgate Entertainment District, Robert F. Greer vs. Officer Trevor Goode et al. CV – 18- 00693-PHX-DJH Report submitted & deposition taken for Robbins Curtin Law Office.

- November 2018, Expert Police Procedures, Domestic Violence response, Opinion pending discovery, Karen Voss et al. v. City of El Mirage et al. Sara Powell Law Office, PLLC
- October 2018, Expert Police Procedures, Domestic Violence and Internal Investigations, Arizona Peace Officer Standards & Training Board Hearing testimony provided with positive outcome, Joshua Adams Phoenix Police Department, #14A-145-post. (Positive outcome)
- August 2018 Expert Police Procedures, Expert Use of Force/ Police Shooting Witness Opinion submitted, Coleman vs. City Of Tempe CV-17-02570-PHX-DLR. Jennifer L. Levine and Dave Dow, PLC
- July 2018 Expert Police Procedures, Expert Use of Force & Police Procedures Witness Opinion pending, Wheatcroft Glendale PD Case 17-107320 ( https://www.abc15.com/news/local-news/investigations/abuse-of-force-body-camera-video-shows-man-tased-11-times-by-glendale-officers / https://www.abc15.com/news/abuse-of-force ). Marc Victor Law Firm
- January 2018, Expert Police Procedures, Expert Use of Force & Police Procedures Witness Opinion submitted, Ochoa vs Mesa & Gilbert Police Department's (Ochoa  v. City of Mesa, et al) https://dockets.justia.com/docket/arizona/azdce/2:2018cv00905/1087916 Marc Victor Law Firm
- January 2018, Expert Police Procedures, Crimes against Children (Homicide) Expert Witness Opinion submitted, Avitia vs Avondale PD CV_2016-051180 (Positive settlement outcome) https://www.azcentral.com/story/news/local/southwest-valley/breaking/2015/08/31/police-details-emerge-avondale-double-murder/71460800/ McCain & Bursh, PLC
- October 2017, Expert Police Procedures, Expert Use of Force Witness Opinion, Elvin Wyatt et al. v. City of Tucson et al. (Deposition provided). The Law Office of Ned Garn PLLC

DR. JEFFEORY G. HYNES, ED.D.   30

- August 2017, Expert Police Procedures and Use of Force Opinion, Domestic Violence Arrest Incident, Jennifer Ross Mesa PD Case #2:16-cv-00628-SRB (Deposition provided). Brown & Little, P.L.C.
- June 2017, Expert Police Procedures, April Henrietta Rivera Case v City of Patagonia, CIV 16-164-TUC-CKJ, (Deposition provided). Brad Thrush Group, PLLC
- May, 2017 Expert Police Procedures, Expert Use of Force Witness Opinion, Bonar, Agg. Assault, Flagstaff Police Department Case No. CR2017-00132 (Grand jury video presented). Marc Victor Law Firm
- May 2017, Expert Police Procedures, Police Shooting Situation, Opinion Pending, Mark Knourek, Agg. Assault, Mesa Police Department (Jury trial set for July, 2018). Cameron A. Morgan Esq.
- May 2017, Expert Police Procedures, Police Shooting Situation, Opinion Pending, Krstic v. City of Mesa, et al. (Deposition provided, settlement with a positive outcome) https://www.phoenixnewtimes.com/news/mesa-settles-krstic-family-2015-police-shooting-video-10767156 . Robbins Curtin Law Office
- December 2015, Expert Police Procedures Opinion Submission, Samuel Paz v. City of Tucson, Superior Court of Arizona, Pima County, No. C20152622 (Deposition & Trial testimony provided). Risner & Graham Law Office
- October 2014, Expert Police Procedures Opinion Submission, Glover v. City of San Clemente, et al. (settled with a positive outcome March 2015). DiMarco, Araujo, Montevideo Law Firm
- October 2014, Expert Use of Force Witness Opinion Submission, Deadly Force Incident, Woodward v. City of Tucson, et al. Kinerk Schmidt & Sethi, P.L.L.C.
- August 2014, Expert Use of Force Witness Opinion Submission, Campbell/Wilson v. Town of Buckeye, et al. (Deposition provided). Titus Brueckner & Levine P.L.L.C. Law Firm
- August 2014, Expert Use of Force Witness Opinion Submission, Fuciarelli v. City of Scottsdale et al. (Deposition & Actual Federal Court Trial & Testimony March / April 2017) https://www.pacermonitor.com/public/case/10996121/Fuciarelli_v_Scottsdale,_City_of_et_al . Thrasher, Jemsek P.L.L.C. Law Firm
- March 2014, Expert Use of Force Witness Opinion Submission, City of Laurel, Mississippi  vs. Samuel Mayfield, Case # 10329 (settled with a positive outcome Feb. 2015). Colom Law Firm

DR. JEFFEORY G. HYNES, ED.D.    31

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

**Publications & Creative Development, Last Five Year:**

- Television Interview Channels' 12, Reporter Colleen Sikora, Police Chief Jeri Williams fired an officer, against the recommendations of the disciplinary review board. One expert believes that could have sweeping consequences. https://www.12news.com/article/news/local/valley/former-phoenix-police-commander-looks-at-impact-of-jeri-williams-firing-officer/75-e2716f19-cf38-4b4a-8121-54f135dddfa4 / https://12news.com/video/news/local/valley/fallout-from-firing-of-phoenix-police-officer/75-11db1b00-1743-4c89-a303-c26e0b22a0cf

- Radio Interview KTAR News Gaydos in the Afternoon, October 24, 2019, Phoenix Police Chief, Jeri Williams, has fired three Phoenix police officers, former Police Commander Jeff Hynes, joins to discuss her decision: https://ktar.com/category/podcast_player/?a=bf8898aa-d8dc-4236-90fb-aaf1001a28ac&sid=1002&n=Gaydos+In+The+Afternoon

- Television Interview Channels' 12, Reporter Joe Dana, October 3, 2019, MCSO Practices Improving After Racial Profiling: https://www.12news.com/video/news/verify/verify-are-mcso-practices-improving-after-racial-profiling/75-627787c5-6532-465b-8a2f-2cbb8a72a20a

- Television Interview Channels' 12, Reporter Michael Doudna, October 6, 2019, FBI: Violent Crime Down in Phoenix: https://www.12news.com/video/news/crime/nationwide-fbi-report-shedding-new-light-on-arizona-violent-crime/75-9de04c0d-24d2-4ef3-a680-a32cb9c28c92?jwsource=cl

- Television Interview Channels' 3 & 5, Az Family News, Story by Carissa Planalp, August 19, 2019, Former Phoenix Police Commander: Phoenix PD use-of-force tracking sparks concerns about officer safety: https://www.azfamily.com/news/phoenix-pd-use-of-force-tracking-sparks-concerns-about-officer/article_c0a4b728-c2fd-11e9-915a-ab598f210729.html

- Curriculum Development (Fall 2019) for Glendale Community College, two Fire Science discipline course development; 3-credit college courses developed included; FSC 113 and FSC 117.

- Television Interview Channel 12 News, Reporter William Potts, How good of an eyewitness are you: https://www.12news.com/video/news/investigations/are-you-a-good-eyewitness-put-yourself-to-the-test/75-2f5fa45d-c846-4a27-ac38-7205eee3c454 / https://www.facebook.com/12news/videos/vb.32616834014/2409401172622183/?type=2&theater May 15, 2019

- Television Interview 2019 Channel 12 News, Reporter Michael Doudna,  Body Worn Cameras, https://www.12news.com/video/news/local/valley/are-police-body-camera-helping-or-hurting/75-13155cab-c563-44b6-91a6-7c81c55bc4f2 (03/31/2019)

- Television Interview 2019 Channel 12 News, Reporter Michael Doudna,  Hacienda Healthcare Sexual Assault Investigation, https://www.12news.com/video/news/investigations/i-team-are-there-more-victims-at-hacienda-healthcare/75-15ff39e2-69fb-4c9f-b41f-143ac4932dd2 (Feb. 2019)

- Television Interview 2018 Channel 10 News, Reporter Ty Brennan, "Retired Phoenix Police commander comments on Las Vegas police shooting bodycam footage," http://www.fox10phoenix.com/news/347307739-video & https://www.registercitizen.com/news/media/Retired-Phoenix-Police-commander-comments-on-Las-1298561.php , July 18, 2018, Phoenix, Arizona

- Television Interview Channel 12 News, Reporter Charly Edsitty, "Is the Phoenix Police Department understaffed?" http://www.12news.com/article/news/local/valley/is-the-phoenix-police-department-understaffed/542887621?complete , April 18, 2018, Phoenix, Arizona

- Television Interview Channel 12 News, Reporter Bianca Buono, "Legal loophole allows hundreds of sex offenders to go undetected in Phoenix", http://www.12news.com/news/local/valley/legal-loophole-allows-hundreds-of-sex-offenders-to-go-undetected-in-phoenix/75-2903695 , February 4, 2018.

DR. JEFFEORY G. HYNES, ED.D.    32

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

- Curriculum development for Ottawa University, "Ethics, Liabilities and Rights in the Public Safety Field", PSA 32000, four-credit hour course containing eight modules, December 2017.
- Television Interview Channels' 3 & 5, Az Family News, Story by staff reporters; "Mesa police release dramatic body camera video following Brailsford verdict" December 8, 2017: http://www.azfamily.com/story/37024282/mesa-police-release-dramatic-body-camera-video-following-brailsford-verdict?autostart=true / https://www.facebook.com/arizonasfamily/videos/10155132710877014/

- Conference Presentation, AZ-Chapter of the Association of Threat Assessment Professionals (ATAP), October 19th, 2017, Flagstaff, Arizona

- Conference Presentation, Arizona Process Servers Association, Active Shooter: Response to Crisis Incidents, September 17, 2017, Phoenix, Arizona

- Television Interview Channels' 3 & 5, Az Family News, Story by Carissa Planalp, August 16, 2017, Police Preparing for Demonstrators During Trump Visit: http://www.azfamily.com/story/36153438/police-preparing-for-demonstrators-during-trump-visit?autostart=true

- Television Interview Channels' 3 & 5, Az Family News, Story by Carissa Planalp, August 12, 2017, Former Phoenix Police Commander: Early Buffer Zones Prevent Protestor Violence: http://www.azfamily.com/story/36123520/former-phoenix-police-commander-early-buffer-zones-prevent-protester-violence?autostart=true & http://www.azfamily.com/clip/13588180/former-phoenix-police-commander-early-buffer-zones-prevent-protester-violence
- Television Interview, 12 News Connecting Arizona, Story by Nico Santos, May 25th, 2017, Phoenix Police Department: Phony Cop Story: http://www.12news.com/news/local/valley/phoenix-pd-warns-phony-cop-may-pull-you-over-and-rob-you/443098364
- Curriculum update for Glendale Community College Administration of Justice Studies, Fire Science and EMT on-line courses, over 30 courses were updated (Fall 2016 / Spring 2017)
- Curriculum update for Arizona State University on-line courses, CRJ 412 International Terrorism, CRJ 554 Domestic Terrorism (Fall 2016 / Spring 2017)
- Article Interview, The Associated Press, Police Department Standards, November 14, 2016 http://bigstory.ap.org/article/6d702437ff77441bb0ef7f87ff5dcbf0/smoking-pot-no-college-may-not-bar-you-police-work
- Television Interview Glendale City Public Channel 11 with Glendale Councilmember Bart Turner of the Barrel District showcasing GCC Public Safety Sciences Department, April 18th, 2016, https://www.youtube.com/watch?v=6k8EmDIPEIM&index=7&list=PLh2qy1UEBrT9OG0kVJfA2wsOK Ba5cKEVr / https://www.youtube.com/watch?v=6k8EmDIPEIM&list=PLh2qy1UEBrT9OG0kVJfA2wsOKBa5cKEVr &index=7
- Television Subject Matter Expert Interview; Channel 15, April 6th, 2016, Phoenix PD Submitting Fewer Felony Cases to County Prosecutors; Sources, City Disagree on Cause http://www.abc15.com/news/local-news/investigations/phoenix-pd-submitting-fewer-felony-cases-to-county-prosecutors-sources-city-disagree-on-cause
- Curriculum development  for Northern Arizona University; JUS – 630, Executive Leadership, Justice Studies Three - credit graduate level on-line course (Fall 2015)
- Television Subject Matter Expert Interview; Channel 5, November 17th, 2015, Phoenix Police hiring 100s: Are new standards too low.  http://www.kpho.com/story/30538363/phoenix-police-hiring-100s-are-new-standards-too-low
- Radio Interview Subject Matter Expert Interview; Use of Force Internet App on Phones, KJZZ Radio 91.5, November 13th, 2015;

DR. JEFFEORY G. HYNES, ED.D.   33

WHEATCROFT000304

WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347

- Television Subject Matter Expert Interview; Channel 15, November 12th, 2015; ABC15 Investigation: National police use-of-force reporting scattered; DOJ wants to standardize data, http://www.abc15.com/news/local-news/investigations/abc15-investigation-national-police-use-of-force-reporting-scattered-doj-wants-to-standardize-data
- Television Subject Matter Expert Interview; Channel 3 & Channel 5, July 29th, 2015; Cincinnati Officer-involved shooting could affect public trust http://www.kpho.com/story/29666153/cincinnati-officer-involved-shooting-could-affect-public-trust  /  http://www.azfamily.com/story/29666153/cincinnati-officer-involved-shooting-could-affect-public-trust
- Television Subject Matter Expert Interview; Channel 12, July13th, 2015; Cell Phone Gun Case http://www.12news.com/media/cinematic/video/30113663/cell-phone-case-looks-like-a-gun/
- Television Subject Matter Expert Interview; Channel 12, May 18th, 2015; Debate over military gear for police was examined: http://www.12news.com/media/cinematic/video/27560603/debate-over-military-gear-for-police/
- Blog Publication Entry; International Teaching, Abu Dhabi UAE http://cjbulletin.com/ (March 2015)
- Blog Publication Entry; The Criminal Justice Bulletin Issues in criminal justice education and training, Article posting, The Importance of Education Within The Law Enforcement Profession, http://cjbulletin.com/ (March 2015)
- Television Subject Matter Expert Interview, Channel 12, Racial Connection to Police Shootings Opinion, December 8th, 2014: http://www.azcentral.com/videos/news/local/arizona/2014/12/08/20116395/
- Radio Interview Subject Matter Expert Interview; Use of Force Regarding the Ferguson, Missouri Michael Brown Shooting Incident (Ferguson Sparks Discussion Of Police Weapon Use) KJZZ Radio 91.5, August 21st, 2014; http://theshow.kjzz.org/content/42558/ferguson-sparks-discussion-police-weapon-use
- Television Subject Matter Expert Interview; Channel 15, April 28th, 2014; Is the Phoenix Police Department's shrinking force hurting public safety? http://www.abc15.com/news/local-news/investigations/is-the-phoenix-police-departments-shrinking-force-hurting-public-safety
- Article contribution: Has 'Stop and Frisk Been Stopped" Ward, Stephanie (2014) Posted Mar 1, 2014 5:40 AM CST: http://www.abajournal.com/magazine/article/has_stop_and_frisk_been_stopped/
- Television Subject Matter Expert Interview; Use of Force, Police Shooting, Channel 5, March 18th, 2014; http://www.kpho.com/story/25012718/asu-professor-increase-in-officer-involved-shootings-tied-to-reduction-in-force
- Radio Interview Subject Matter Expert Interview; Use of Force, KTAR Radio 92.3, March 19th, 2014; http://ktar.com/22/1715177/Expert-Economy-to-blame-for-rise-in-officerinvolved-shootings
- Curriculum development (Fall 2014) for Arizona State University, Criminology courses CRJ 512 Current Issues in Policing & CRJ 412 International Terrorism, Three - credit hour courses
- Curriculum development (Fall 2014) for Northern Arizona University; JUS 240 Law Enforcement Systems, Three - credit hour course
- Curriculum development (Spring 2014) for Glendale Community College, Administration of Justice Studies course development; AJS 260 Procedural Criminal Law & AJS 275 Criminal Investigation I.
- Curriculum development (May/June 2014) for DSSG International trainings, Abu Dhabi; United Arab Emirates; Administrative Excellence and Creative Problem Solving, two 40-hour blocks of instruction to police officers

DR. JEFFEORY G. HYNES, ED.D.

*EXHIBIT 2*

UNITED STATES DISTRICT COURT

For the

DISTRICT OF ARIZONA

MR. WHEATCROFT AND ANYA CHAPMAN, AS
HUSBAND AND WIFE, AND ON BEHALF OF MINORS
J.W. AND B.W., PLAINTIFFS,

V.

CITY OF GLENDALE, A MUNICIPAL ENTITY; MATT
SCHNEIDER, IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES; MARK LINDSEY, IN HIS OFFICIAL AND
INDIVIDUAL CAPACITIES; AND MICHAEL FERNANDEZ,
IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES

NO. 2:18-CV-02347-DWL

Submitted by: Dr. Jeffeory G. Hynes, Ed.D.

December 20, 2020

DR. JEFFEORY G. HYNES, ED.D.   1

December 20, 2020

Ms. Jody L. Broaddus (Supervising Civil Attorney) Esq.

Marc Victor Law Firm

3185 South Price Road

Chandler, Arizona 85248

Reference: Wheatcroft v City of Glendale, NO. 2:18-CV-02347-DWL

Dear Ms. Broaddus

I was retained July 18, 2018, on the case of Wheatcroft v. City of Glendale, NO. 2:18-CV-02347-DWL, to serve as an expert witness, to evaluate the conduct of the Defendants in this case. My concluding opinion and submitted expert report was sent to your office on January 31, 2020.

At your request, I have reviewed the defendant's expert opinion written by Dr. Blake McClelland. Dr. McClelland's report was dated November 6, 2020; the contents to be examined were included in his 40-page document.

I strongly disagree with Dr. McClelland's conclusion, stated opinion/s and summarization. I stand by my January 31, 2020 expert report and have listed my observations, opinions and conclusion within this document to illustrate my steadfastness to my earlier stated opinions.

First, I will focus upon Dr. McClelland's *"Case Details"* section within his report. Dr. McClelland's opening topic statement to his *"Case Details"* is; *"Unless otherwise noted, the following information is contained in the Glendale Police Department Offense Report 17-107320; Assault with a Deadly Weapon, Authored by Officer Roy Lewis #15542." Id. 20 at p. 14 of 40.*

Dr. McClelland offered within his *"Case Details Section"* of his report, information directly from the Officer's perspective and his observations from the noted report does not change my observation or opinions offered. I standby my submitted January 31, 2020 expert report and to illustrate my overview of this incident I offer from my report the section titled, *"Incident Synopsis"* which is as follows:

**Incident Synopsis:** *Id. 21; at p.8 of 34.*

From my review of the reports written, the Body Worn Cameras (BWC) captured videos, and the surveillance footage from the Motel 6 hotel reviewed, the following is the synopsis from this incident:

On July 26, 2017 at approximately 7:30 p.m. Mr. Wheatcroft was forcibly removed and aggressively arrested from the passenger seat of a friend's vehicle, a silver/gray colored Ford Taurus. This arrest incident occurred while they were parked within the Motel 6 motel parking lot at 7116 N. 59 Ave, Glendale, AZ. There were two other juvenile members of the Wheatcroft family, his wife and the driver Mr. Shawn Blackburn within the car. According to Mr. Wheatcroft, he was being driven with his family

to the Motel 6 so that he could have a family day with his kids and that they could swim there. Mr. Wheatcroft did not have a vehicle, therefore Mr. Blackburn, his friend, drove them. *Id. 16e; at p.125 of 206.*

Minutes later, Mr. Wheatcroft was forcibly removed from the passenger seat of Mr. Blackburn's car for not producing his identification upon Officer Schneider's request. Mr. Wheatcroft ended up being uncompromisingly handcuffed lying face down on the hot asphalt, on a 108-degree day. This action occurred in the presence of his children, who could be heard screaming loudly on the recorded Body Worn Camera (BWC) footage, with terror in their screams.

Mr. Wheatcroft had already been tased 10 times, with one officer kneeling on his back, as a control hold, which applied great pressure and pain to Mr. Wheatcroft. During the arrest altercation, Officer Schneider Tased Mr. Wheatcroft numerous (10) times prior to kicking him in the groin area and then proceeded to pull down Mr. Wheatcrofts' athletic shorts and delivered one final Taser application to his genital area, which included his testicles. The testicle and genital area Tasing was clearly captured on-scene with Body Worn Cameras (BWCs).

This case/incident has gathered local and national media attention, to the exposure point that once focus was initiated by local news organizations, the Maricopa County Attorney's Office reviewed the Body Worn Camera (BWC) footage and the pending charges were dismissed against Mr. Wheatcroft and he was released. A Professional Standards Unit complaint was also logged with the Glendale Police Department, against Officer Schneider and the other officers involved in the alleged unlawful traffic stop, unlawful arrest, and the excessive force which was used against a handcuffed and restrained Mr. Wheatcroft.

Officers at the scene attempted to validate their aggressive enforcement style of contacting a suspicious person on the Motel 6 property, and as related by Officer Roy Lewis, who wrote within his supplemental report, the property was known for criminal activity. He further wrote that members of his squad had made numerous arrests from that area over the past few months and that there had been 49 police offense reports generated from the motel's address during the year of 2017. *Id. 12; at p. 42 of 408.*

**Opinions Conveyed with Dr. McClelland's Report:**

**Dr. McClelland's Opinion 1:** *"Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the Motel 6 property located at 7116 North 59thAvenue is a high crime location that' should be taken into consideration when evaluating this incident." Id. 20; at p. 19 of 40.*

Dr. McClelland's noted observations of the Motel 6 Hotel at 7116 N. 59 Ave, Glendale, AZ does not change the expectations of a family to be treated professionally, as any other citizen upon arriving at the hotel to check-in and utilize the swimming pool with their accompanying children. To be so aggressively contacted and forcibly removed from their car as described within this incident, was an excessive utilization of force and unjustifiable as described within my expert report.

**Dr. McClelland's Opinion 2:** *"Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the vehicle stop of the Ford Taurus, initiated by Officers Schneider and Lindsey, was reasonable and consistent with normal police practice." Id. 20; at p. 21 of 40.*

I disagree with his opinion and as background, and noted within my expert report, Officer Schneider and Officer Lindsey approached the vehicle after Officer Schneider claimed to have seen Mr. Blackburn's vehicle fail to use a turn signal, when it drove in from Glenn Drive and turned into the Motel 6 parking lot, which was

the driveway by the motel office. Officer Lindsey did not make that claim on the evening of July 26, 2017. Sergeant Flosman's and Officer Lindsey's initial thoughts expressed were that they suspected that the vehicle had come to the property for possible criminal activity instead of the reason Mr. Wheatcroft had shared. Mr. Wheatcroft had his friend Mr. Blackburn drive him and his family there to get a room and enjoy an evening of swimming at the motel. Mr. Wheatcroft had his wife and two minor sons with him planning to check into the Motel 6 together.

While examining the reason for the initial stop, I found within Officer Pittman's supplemental report that he interviewed Officer Lindsey on the evening of the arrest, July 26, 2017. Officer Lindsey had been taken to the hospital for a medical examination and subsequently released, after being stuck in the head at the scene, allegedly by Ms. Chapman.

During his interview on July 26, 2017, Officer Lindsey reported the following from that interview:

"While at the hospital I asked Officer Lindsey what happened and he stated that Officer Schneider and he entered the Motel 6 parking lot from the north side and observed the vehicle pull in the center parking lot from the south and Officer Lindsey believes that when the occupants saw them coming from the north side they stopped and backed into a parking spot. Based off their activities Officer Schneider and Officer Lindsey pulled up to them and they contacted them… *Id. 13a; at pp. 72-73 of 408.*

Approximately a month later, Officer Lindsey adjusted his justification and reasons for the initial contact, which was now more in line with Officer Schneider's initial statements on the night of the incident (July 26, 2017). The change in Officer Lindsey's in his story occurred on September 1, 2017, when being interviewed by his Sergeant, Sergeant Flosman. From that interview he related that in relation to the contact the following occurred:

> *"… we were coming through the north parking lot, the parking lot is divided into three sections… we coming on the north side passageway when Officer Schneider looked down to the left of the middle to see if anyone was down there. He observed the vehicle pulling in, he made mention to me that he didn't see a blinker. He said you know see what happens. Let's try and stop this vehicle. It pulled in in the main section and then abruptly, it appeared abruptly to reserve and back into a spot real quick." Id. 13a; at pp. 87-88 of 408.*

In my examination of Arizona Revised Statute 28-754, Turning Movements and Required Signals, the reason for Officer Schneider's and Lindsey's contact was invalid. The statute is below:
28-754. Turning movements and required signals
(https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/28/00754.htm )

> A. A person shall not turn a vehicle at an intersection unless the vehicle is in proper position on the roadway as required in section 28-751, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left on a roadway unless and until the movement can be made with reasonable safety. A person shall not so turn any vehicle without giving an appropriate signal in the manner provided by this article in the event any other traffic may be affected by the movement.

> B. A signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning.

DR. JEFFEORY G. HYNES, ED.D.    4

C. A person shall not stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided by this article to the driver of any vehicle immediately to the rear when there is opportunity to give the signal."

**My Observation:** I found that within 28-754, subsection A, noted, that as long as the movement can be done safely, there is no noted statutory requirement to utilize a "turn signal" while making a turn from the roadway into a private property driveway. Therefore, my position would be that the stated justification for the initial contact and subsequent arrest of Mr. Wheatcroft was invalid and illegal.

From 28-754, subsection A: "or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left on a roadway unless and until the movement can be made with reasonable safety."

**Dr. McClelland's Opinion 3:** *"Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that sufficient probable cause existed to arrest Johnny Wheatcroft for Resisting Arrest and Aggravated Assault on a Police Officer, and Anya Chapman for Aggravated Assault on a Police Officer." Id. 20; at p. 23 of 40.*

I disagree with Dr. McClelland that probable cause existed to justify the arrests of Mr. Wheatcroft and his wife. From my expert report I noted the following: *Id. 21; at pp.10-14 of 34.*

To supplement the above narrative, below is the Body Worn Camera (BWC) breakdown from officers Schneider and Lindsey BWC cameras, from my examination and viewing is below:

BWC TIME: 0:00 - 0:55

Upon contact with Mr. Blackburn and Mr. Wheatcroft, Officer Schneider advised Mr. Blackburn that he needed to use his turn signal and then, at the 1:00 minute mark of the BWC footage, Officer Schneider walks over to the passenger side where Mr. Wheatcroft is sitting in the front passenger side seat. Officer Lindsey walks to the driver's side. A friend of Wheatcroft's, Mr. Blackburn, is seated in the driver's seat. In the backseat are Mr. Wheatcroft's wife, Anya Chapman, and their two children.

When contacted by Officer Schneider Mr. Wheatcroft told Officer Schneider that he does not have identification, but Ms. Anya Chapman, sitting in the backseat, states that she does have identification and offers to show hers. Ms. Chapman then hands her identification to Officer Schneider and he proceeds to the back of the stopped Taurus and calls in a record check.

**My Observation:** I have concerns about the initial justification for the initial contact being based on such a minor traffic violation for the contact and stop. Utilizing the reason of the "no turn signal" appeared to be a shadow reason and not a justification for the aggressive steps which take place next. Utilizing an invalid turn signal violation to removing the passenger from the vehicle was an extreme overaction. This is especially pertinent when there are children in the car and the appearance of a family outing to the motel, regardless of the past crime trends occurring on the Motel 6 property. I will explain further, in my conclusion section, why I question whether Officer Schneider's actual stated traffic violation was as he claims that he witnessed.

BWC TIME: 0:55 - 2:05

Officer Schneider tells Mr. Wheatcroft, *"If you're a passenger in a vehicle, you need to have ID."*

DR. JEFFEORY G. HYNES, ED.D.   5

At approximately the 1:40 minute mark of the BWC video, Officer Schneider walks back to the passenger-side window and instructs Mr. Wheatcroft not to reach into his bag for anything; Mr. Wheatcroft complies. Mr. Wheatcroft related that he was looking for his identification, as told to do so by Officer Schneider. Officer Schneider asks Mr. Wheatcroft repeatedly for identification. Mr. Wheatcroft responds by asking why that is necessary, since he wasn't driving the car. Officer Schneider asks Mr. Wheatcroft what his name is, and Mr. Wheatcroft asks why he is being asked to provide his name.

At approximately the 1:55 minute mark, Mr. Wheatcroft states that he does have identification, but doesn't have to give it to the officer because he didn't do anything wrong. Officer Schneider responds that *"if you're a passenger in a vehicle, you need to have an ID."* Officer Schneider then tells Mr. Wheatcroft, *"I can take you down to the station and we can fingerprint you."* He continues to relate, *"because we made a traffic stop on the vehicle, brother."* Mr. Wheatcroft continues to insist that he didn't do anything wrong, in opposition to producing any identification.

**My Observation:** Mr. Wheatcroft, the passenger, was asking very reasonable questions: '*Why are you asking for ID?'* Officer Schneider telling Mr. Wheatcroft that, *'If you're a passenger in the vehicle, you have to give ID'* is not correct, as well as Officer Schneider saying: "*I can take you down to the station and fingerprint you."* is also incorrect. Below are researched cases that support my observation: *Id. 19; at pp. 2-17.*

    1) United States v. Landeros, No. 17-10217 (9th Cir. 2019), *Id. 19; at pp. 2-17.*

    2) Rodriguez v. United States, 135 S. Ct. 1609 (2015)

    3) United States v. Rodriguez, 741 F.3d 905, 907–08 (8th Cir. 2014), vacated and remanded, 135 S. Ct. 1609.

    4) United States v. Cornejo, 196 F. Supp. 3d 1137, 1151 (E.D. Cal. 2016).

    4) United States v. Turvin, 517 F.3d 1097 (9th Cir. 2008), *Id. 19; at pp. 2-17.*

BWC TIME: 2:05 - 2:55

At approximately the 2:10 mark, Officer Schneider then opens the car door and grabs Mr. Wheatcroft's right arm aggressively. Officer Schneider says, *"we can do this one of two ways."*

The grabbing of Mr. Wheatcroft's arm prevents the seatbelt from releasing and sliding off completely and Mr. Wheatcroft is being restrained by his seatbelt as he is being pulled out of the car. Officer Schneider then pulls his Taser and applies it to Mr. Wheatcroft's arm. Mr. Wheatcroft says, "*Stop please. I didn't do anything wrong."* Officer Schneider replies, *"Here's the deal, you tense up and I'm going to, listen to me. Listen to me. Relax your arm."* Mr. Wheatcroft asks, *"What did I do wrong? What did I do wrong?"*

**My Observation:** At this point the *"reasonable and prudent officer"* standard needed to take over and Officer Schneider and Lindsey needed to ask themselves, *"What are we doing?"* and revert back to their agency's Use of Force philosophy from: Glendale Police Department General Order 23.000 and the subsection 23.002, Use of Physical Control/Force and Less Lethal Weapons: (1.2.2).

*"It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department. The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances." Id. 9 at p.1.*

Mr. Wheatcroft is still buckled into his seatbelt, has a plastic bag and a few dollar bills in his left hand, and a soda in his right hand. Officer Schneider verbally accuses Mr. Wheatcroft of trying to stuff something in between the seats. Mr. Wheatcroft denies doing so and steps one foot outside of the car as he is being determinedly pulled. With Mr. Wheatcrofts' right foot on the ground outside of the vehicle, Officer Schneider grips Mr. Wheatcrofts' right arm (still entangled in the seatbelt) with his left hand and orders Mr. Wheatcroft not to get out of the car. Mr. Wheatcroft stops trying to get out of the car and Officer Schneider takes the soda from him.

Mr. Wheatcroft asks Officer Schneider to stop because he didn't do anything wrong, and at the 2:27 minute mark, Officer Schneider takes out his Taser, and while still gripping Mr. Wheatcrofts' right arm, presses the Taser against Mr. Wheatcroft's right shoulder. Mr. Wheatcroft then tells Officer Schneider *"okay, okay, I understand you."* At approximately the 2:33 minute mark, Mr. Wheatcrofts' right hand is resting on his knee and Officer Schneider tells Mr. Wheatcroft to relax his arm. Mr. Wheatcroft says *"I am"* and holds out his arm, seemingly to show the officer that he is complying.

At the 2:40 minute mark, Officer Schneider offers his first explanation for what Mr. Wheatcroft has done wrong, stating that Mr. Wheatcroft doesn't have an ID on him and accuses Mr. Wheatcroft of stuffing *"something"* down in his backpack and in between the seats. Mr. Wheatcroft promises Officer Schneider that he didn't stuff anything in his backpack, and Officer Schneider responds, *"are you gonna fight or not?"* Mr. Wheatcroft responds that he is not.

Officer Schneider put his Taser back into the holster and starts to twist Mr. Wheatcrofts' right arm behind his back in an apparent pain compliance attempt of control, while Mr. Wheatcroft is still seated and wrapped and restrained in his seatbelt. Mr. Wheatcroft is obviously in pain and says so out loud verbally.

At the 3:00 minute mark, Officer Schneider tells Officer Lindsey that *"he is going to fight."* Mr. Wheatcroft states to the officers that he is not going to fight, but Officer Schneider tells Officer Lindsey to get his Taser out.

By the 3:05 minute mark, Ms. Chapman is begging the officers to please wait, and Mr. Wheatcrofts' kids are calling out and screaming loudly to their dad.

**My Observation:** There is no reasonable suspicion or probable cause against the passenger Mr. Wheatcroft, to demand his identification and grab him, physically removing him from his car, then Tasing him 10 to 11 times, kicking him, and utilizing pain compliance holds, as described within this report. There was only passive resistance demonstrated by Mr. Wheatcroft, as he is asking his reasonable questions, in a pleading manner, that I could see reviewing the BWC. Therefore, the officers' actions were extremely excessive and in my opinion criminal. His family is present and is screaming and crying out loud as their father is being arrested for simply not producing identification from an invalid cited traffic violation.

BWC TIME: 2:55 - 3:20

DR. JEFFEORY G. HYNES, ED.D.    7

**WHEATCROFT000408**

Officer Schneider then puts his Taser away and uses his other hand to grab Wheatcrofts' elbow and put him into an apparent arm compliance hold. The seatbelt is still seen wrapped around Wheatcrofts' head and legs as Officer Schneider tries to insistently pull the restrained Mr. Wheatcroft from the vehicle. The fastened seatbelt is not allowing Mr. Wheatcroft to comply with Officer Schneider's arrest intentions.

**My Observation:** The forceful attempt to remove Mr. Wheatcroft utilizing pain compliance holds was excessive. He's seen still strapped in the vehicle with his shoulder seat belt engaged.

Officer Schneider and other officers, Lindsey and Fernandez continued trying to twist Mr. Wheatcroft's arm behind his back and bend his head over, but with Mr. Wheatcroft clearly tangled in the seatbelt, they aren't able to do so. Their frustration is apparent, and it appears as though they believe that he is resisting their efforts, when he is actually restrained by the unreleased seatbelt. Their forceful actions are clearly torturous, on Mr. Wheatcroft and clearly excessive. Mr. Wheatcroft calls out in pain, tells them to *"stop motherfuckers"* and at the 3:20 minute mark Mr. Wheatcroft is Tased.

By the 3:30 minute mark, Mr. Wheatcroft is lying on the ground outside the vehicle with his head against the door screaming out in pain, and Mr. Wheatcrofts' kids are crying hysterically and yelling for their *"daddy."* The officers inexplicably continue to use their Tasers on Mr. Wheatcroft, yelling at him to stay down, and Mr. Wheatcroft cries out that he can't move due to being restrained by the entangled seatbelt.

BWC TIME: 3:20 - 4:10

With Mr. Wheatcroft tangled in the seatbelt, another officer Tases him again multiple times in the left side by using what is called a *"drive stun."* Officer Schneider then steps back and fires his Taser probes at Wheatcroft who is on the ground between the car door and the vehicle, with the seatbelt wrapped around his legs. The engaged officers then drive stun Wheatcroft several more times and he is finally forcibly placed in handcuffs.

At the 3:40 minute mark, Officer Lindsey approaches Mr. Wheatcroft screaming at him to *"turn over, motherfucker."* Mr. Wheatcrofts' kids can be seen in distress in the backseat, begging the officers to please stop. It is professionally disturbing to watch and was an extremely excessive utilization of force options. Below I will discuss the Glendale Police Department's actual Use of Force policy and Response to Resistance prescribed policy mandated options.

At approximately the 4:00 minute mark, Mr. Wheatcroft can be seen on his knees leaning against the car with both hands behind his back and a Taser pressed against the base of his neck in a threatening manner. For no apparent visible reason, another Taser strike is again used on Mr. Wheatcroft. Officer Schneider reports to another officer that Officer Lindsey had been injured and when he sees Ms. Chapman leaning into the front seat, he points his Taser at her and orders her to put her hands up.

**My Observation:** Mr. Wheatcroft was being drive stunned while he was still strapped into the seatbelt and unable to comply with the Officers verbal orders or forceful actions, to remove him from the car. The unreleased seat beat could have been cut off instead of the multiple, multiple Taser applications being utilized against Mr. Wheatcroft, who was only displaying *"Passive Resistance."*

DR. JEFFEORY G. HYNES, ED.D.                    8

BWC TIME: 4:10 - 4:50

During the previous noted time observations, officers claim Ms. Chapman hit Officer Lindsey in the head with a plastic bag filled with items. You hear Officer Schneider say, *"Mark is hurt."*

At approximately the 4:25 minute mark, the officers' then try to drag Mr. Wheatcroft away from the vehicle, but his legs are still stuck in the entwined seatbelt. At the 4:32 mark, you can hear Mr. Wheatcroft yelling that he's stuck in the seatbelt. At the 4:47 mark the 11-year-old son in the car moves into the front seat to attempt to free his father, from the entangled seatbelt. Mr. Wheatcroft's son is clearly traumatized, crying hysterically, puts his face in his hands, and collapses into the seat. Mr. Blackburn can be seen sitting in the driver seat rubbing the child's back trying to comfort him. Officer Schneider commands the boy to go to the front of vehicle, causing him to continue his panic-stricken crying.

At the 4:55 minute mark, Mr. Wheatcroft can be seen lying face down on the ground. Officer Schneider tells another officer to get Ms. Chapman, at which point Mr. Wheatcroft's other son sticks his head out the passenger doorway begging the officers not to take his *"mommy."*

**My Observation:** Mr. Wheatcroft is clearly trying to let officers know, *'I'm trying to comply. I'm stuck I can't do what you want me to do.'* A child, a small child within the car, is able to release his father's legs, which in effect helped the officers. This BWC video is extremely hard for a law enforcement professional to watch as the force used against Mr. Wheatcroft is clearly unwarranted and excessive.

BWC TIME: 4:50 - 6:00

At the 5:04 mark Officer Schneider turns back to Mr. Wheatcroft, who, for reasons that are unclear, is lying on the ground with his pants pulled down. The officers continue to Tase Mr. Wheatcroft, including his testicles area. Mr. Wheatcroft can be seen kicking and writhing in pain and appears now to be handcuffed.

At this point, Mr. Wheatcroft is seen lying face down on the asphalt, handcuffed, with an officer kneeling on his back. Officer Schneider then turns, accuses Wheatcroft of kicking, and then kicks Wheatcroft in the groin twice. I couldn't see the kicking described by Mr. Wheatcroft, I only saw passive, pain-filled reactive resistance.

Officer Schneider then takes his left hand, pulls down Wheatcroft's athletic shorts below his buttocks, and Tases him in the testicles area. Shortly after, Officer Schneider recharges his Taser and this time places it on Wheatcroft's apparent penis area while he's lying on his side, saying *"You want it again? Shut your mouth. I'm done (expletive) around with you."*

At the 5:20 minute mark, Mr. Wheatcroft is on the ground and Ms. Chapman is seen being lifted from the ground in handcuffs.

At approximately the 5:35 mark, officers are heard talking about removing the probes from Mr. Wheatcroft, including one officer who says, *"there are probes everywhere."* Mr. Wheatcroft continues to yell out in pain as the officers seem to be moving him, and Officer Schneider presses his Taser against Mr. Wheatcroft and threatens to Taser him again. Officers can be seen pulling Taser probes out of Mr. Wheatcroft without assistance from medical staff.

**My Observation:** The officers' behavior was extremely excessive and was criminal in my opinion. Even when Mr. Wheatcroft was handcuffed, they still Tased him. There are four or five officers visible and each one of them had a legal and ethical obligation to stop this abusive excessive Use of Force. This has the open visual appearance of their excessive force being an intentional, torturing, overt act. There is no legitimate law enforcement purpose for their excessive actions.

**Dr. McClelland's Opinion 4: "***Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the amount of force used by Officers Schneider, Lindsey, and Fernandez to arrest Johnny Wheatcroft was reasonable under the circumstances. Id. 20; at p. 26 of 40.*

I disagree with this opinion as well, utilizing the above observation to Dr. McClelland's Opinion 3 and the following from my expert report and to disagree with his Opinion 4 as well: *Id. 21; at p. 22-25 of 40.*

As further clarification, I offer an examination of their policy (Glendale Police Department General Order, 23.000 (*Id. 9 at p.1 or 37*) Use of Force and *"Responses to Resistance"* utilized by Officer Schneider and the other officers present against Mr. Wheatcroft. According to the Glendale Police Department's Use of Force policy: *"Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives... Id. 9 at p.1.*

From the Glendale Police Department General Order, 23.000 (*Id. 9 at p.1*):

*"A. Response to Resistance: It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department. The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect. Employees will only use the amount of force/control reasonably necessary to overcome this resistance, protect property, and save lives. Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives"*… Id. 9 at p.1 of 37.

**My Observation:** The actions of Officer Schneider and the assisting officers far exceeded this policy, based on the *"Passive resistance"* and non-complaint verbal responses being demonstrated Mr. Wheatcroft.

From, the subsection, Use of Physical Control/Force and Less Lethal Weapons: (1.2.2)

*"It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department. The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances." Id. 9 at p.1.*

As a point of reference and from the Glendale Police Department's definition section of General Order, Use of Force, 23.000 are definitions utilized concerning Use of Force responses to possible resistance offered against someone being arrested: *Id. 10 at p.2 of 21.*

E. Empty Hand Control: A method of control employed by officers without the aid of equipment or weapons. There are two subcategories called "*soft empty hand techniques*" and "*hard empty hand techniques*".

F. Hard Empty Hand Techniques: The subcategory in the "*empty hand control*" that includes kicks, punches, or other striking techniques such as a brachial stun, or other strikes to key motor points that have a moderate chance of injury.

DR. JEFFEORY G. HYNES, ED.D.     10

G. Soft Empty Hand Techniques: The subcategory in the *"empty hand control"* that includes escort control holds, touch pressure points, and take down techniques that have a minimal chance of injury.

J. Less Lethal: The application of force and/or tactics, that when properly applied are not likely to result in death or serious injury. Approved less lethal weapons include: (a number of listed items) including the Taser…

K. Officer Presence: The method of control/force which includes the mere presence of an officer in uniform and/or identified by a badge, police identification, police vehicle, or other form of police identification such as a raid jacket.

M. Preclusion: Elimination of all lesser means of control/force. The lesser means of control/force have been tried and they have not been effective, or the type of resistance is great than the method of control/force. *Id. 10 at pp. 2-3 of 21.*

From the noted Use of Force policies from within General Order 23.008, (Dated 2000) listed are the noted Types of Resistance and Methods of Control with my observation being noted (*Id. 9 at p. 16 of 21*):

| Types of Resistance | Methods of Control | **Dr. Hynes Observations** |
|---|---|---|
| **Passive:** (suspect fails to obey any command or direction of the officer, displays no acts of assault, threat, verbal non-compliance and never resists control attempt of the officer) | Verbal commands<br>Soft empty hands<br><br>Threaten OC spray<br>Threaten Stun Device/Taser | Mr. Wheatcroft was only demonstrating passive non-complaint behavior from the passenger seat of Mr. Shawn W. Blackburn's vehicle.<br><br>The use of the Taser was not justified based upon Mr. Wheatcroft's BWC-captured conduct and this noted level of resistance. |
| **Verbal Non-Compliance:** (Acts where suspect voices their unwillingness to obey officer's commands or the conveying of verbal threats) | Verbal Commands<br>Soft Empty Hand<br>Taser<br>OC Spray<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Stun Device/Taser<br>Threaten use of K-9 | Mr. Wheatcroft was only demonstrating passive non-complaint behavior.<br><br>The use of the Taser was not justified based upon Mr. Wheatcroft's BWC-captured conduct and this noted level of resistance. |
| **Psychological Intimidation:** (Physical acts or non-verbal cues indicating the suspect's attitude or readiness to resist. Officer may perceive | Verbal Commands<br>Soft Empty Hand<br>Stun Device/Taser<br>OC Spray<br><br>Threaten OC Spray<br>Threaten Impact Weapon | Not exhibited by Mr. Wheatcroft, therefore the use of the Taser was excessive force being utilized.<br><br>There was no Psychological Intimidation exhibited by Mr. Wheatcroft. |

DR. JEFFEORY G. HYNES, ED.D.          11

**REBUTTAL TO DR. MCCLELLAND REPORT: WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347-DWL**

| | | |
|---|---|---|
| actions as threatening in nature) | Threaten Taser<br>Threaten use of K-9 | The use of the Taser because Mr. Wheatcroft was questioning Officer Schneider's threatened arrest and Tasing because Mr. Wheatcroft wasn't producing any identification. |
| **Physical (Defensive resistance):** (Physical acts of fleeing or escaping suspect attempts to resist arrest without assaulting officer) | Verbal Commands<br>Soft Empty Hand<br>OC Spray<br>Taser<br>Hard Empty Hands<br>(Avoid head/neck)<br>Use of K-9(felony)<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9 | Not exhibited by Mr. Wheatcroft, therefore the use of the Taser was excessive force.<br><br>There was no physical Defensive resistance exhibited by Mr. Wheatcroft.<br><br>The use of the Taser because Mr. Wheatcroft was questioning Officer Schneider's threatened arrest and Tasing because Mr. Wheatcroft wasn't producing any identification. |
| **Active Aggression:** (Physical acts of assault on an officer) | Verbal Commands<br>Soft Empty Hand<br>OC Spray<br>Hard Empty Hands<br>Impact Weapons<br>Taser<br>Use of K-9<br>Extended Range Impact<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9<br>Threaten Deadly Force | Not exhibited by Mr. Wheatcroft therefore the use of the Taser was excessive force being utilized.<br><br>There was no active aggression exhibited by Mr. Wheatcroft.<br><br>The use of the Taser because Mr. Wheatcroft was questioning Officer Schneider's threatened arrest and Tasing because Mr. Wheatcroft wasn't producing any identification. |
| **Aggravated Active Aggression:** (Attempts to severely injure or kill officer) | Verbal Commands<br>Soft Empty Hand<br>OC Spray<br>Hard Empty Hands<br>Impact Weapons<br>Taser<br>Use of K-9<br>Extended Range Impact<br>Scorpion<br>Deadly Force<br><br>Threaten OC Spray<br>Threaten Impact Weapon<br>Threaten Taser<br>Threaten use of K-9 | Not exhibited by Mr. Wheatcroft therefore the use of the Taser was excessive force. |

DR. JEFFEORY G. HYNES, ED.D.   12

| | Threaten Deadly Force | |
|---|---|---|

Utilizing phraseology from the court case *Graham v. Connor* (1989, No. 87-6571), an incident should be judged from the perspective of the officer involved. However, as from the decision, *"the question is whether the office*rs' actions are *'objectively reasonable'* in light of the facts and circumstances confronting them."* Officers are licensed to use force *"only when no reasonably effective alternative appears to exist"* and with this incident there were numerous other de-escalation options available to them. Officer Schneider clearly violated his agency's Use of Force policy, as I have illustrated.

This court case opinion limits the level of force to the amount a *"reasonably prudent officer"* would use in a similar case. Because the court conveyed that this test of reasonableness *"is not capable of precise definition or mechanical application,"* many departments have moved away from policies that create a "continuum" of force options to be applied in a mechanical way, with increasingly severe types of force matched with increasing levels of resistance by a subject. The Glendale Police Department's Use of Force policy is reflective of these guidelines, although in my opinion, that policy was not followed by the officers involved in this case, and specifically Officers Schneider, Lindsey and Fernandez.

Specifically, the *Graham* court stated: determining whether the force used to affect a particular outcome is:
> … *'Reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake…. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,… its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight…. The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.*

**My Observation:**  even though the Glendale Police Department policy 23.000 embraces the concepts from *Graham v. Connor,* these officers did not perform at the *"reasonably prudent officer"* standard. These officers were overly quick to act and utilize severe physical force against Mr. Wheatcroft. Officer Schneider forcibly removed Mr. Wheatcroft from the passenger side of his friend's vehicle with extreme physicality; they overreacted to the *"Passive Resistance" and* non-complainant actions of Mr. Wheatcroft not providing identification.

As Mr. Wheatcroft was answering Officer Schneider's demanding questions, Officer Schneider decided quickly to take Mr. Wheatcroft into custody for failing to produce identification, as a passenger within a vehicle. As Officer Schneider was attempting to pull Mr. Wheatcroft out of the front passenger seat, Mr. Wheatcroft was retrained by his still fastened seat belt.

Mr. Wheatcroft was taken into custody aggressively as explained above, and he was Tased 10-11 times, while not demonstrating any behavior that would justify such an application of excessive force. I have demonstrated using the above illustrated Glendale Police Department policy chart regarding the response options to a detained/arrested person's resistance, that Officer Schneider and his assisting officers' behavior were tremendously excessive. In addition, I would argue that these officers exhibited criminal behavior by such a Tasing and physical abuse of a seatbelt-restrained Mr. Wheatcroft.

**Dr. McClelland's Opinion 5:** *"Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that City of Glendale provided Officers Schneider, Lindsey, and Fernandez with an appropriate level of training and supervision." Id. 20; at p. 32 of 40.*

I disagree with Dr. McClelland, and with the brutality committed by these officers against Mr. Wheatcroft and his family. The proper *"Reasonable and Prudent Officer"* standard, as well as the proper application of Glendale Police Department use of force policy and philosophy, was clearly absent, with regard to their use of force deployment, application and force utilization.

From the Glendale Police Department General Order, 23.000 (*Id. 9 at p.1*):

> *"A. Response to Resistance: It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department. The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect. Employees will only use the amount of force/control reasonably necessary to overcome this resistance, protect property, and save lives. Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives"... Id. 9 at p.1 of 37.*

**My Observation:** Officer Schneider and the assisting officers far exceeded this policy based on the *"Passive resistance"* and non-complaint verbal responses being demonstrated by Mr. Wheatcroft. Therefore, the City of Glendale did not provide Officers Schneider, Lindsey, and Fernandez with an appropriate level of controlling use of force application training and required organizational supervision.

In addition, an internal Glendale Police Department Professional Standards Bureau investigation resulted in Officer Schneider being disciplined for violating their *"Range of Response"* policy and the Officer was suspended for three (3) working days. *Id. 20 at p.34 of 40.*

DR. JEFFEORY G. HYNES, ED.D.    14

REBUTTAL TO DR. MCCLELLAND REPORT: WHEATCROFT V. CITY OF GLENDALE NO. 2:18-CV-02347-DWL

**Conclusion:**

As stated with my expert report submitted January 31, 2020 and based upon my 32-year law enforcement career, my education, and academic background I have found that specifically Officer Schneider, along with Officers Lindsey, Fernandez and the other officers present at this abusive detention and arrest of Mr. Wheatcroft were egregious, excessive and their actions were not based on the Use of Force and Types of Resistance Policy within the Glendale Police Department General Orders 23.000 and it's subsections.

Seeing Mr. Wheatcroft, being pulled violently from the passenger seat and Tased repeatedly for not producing identification, while still physically restrained by his entangled seatbelt, and in front of his family, clearly shows the excessive Use of Force used against him. Being Tased 11-times and the disgrace of being openly Tased in the genital area, as his shorts were pulled down during this invalid arrest was professionally unsettling. The screaming and hysterical crying of Mr. Wheatcroft's children, wife and friend who witnessed this abusive police action could be emotionally impacting for years to come for Mr. Wheatcroft and his family that watched this abuse.

As mentioned above and from the Glendale Police Department's *"Philosophy"* section of the General Order, Response to Resistance, 23.002

> *"It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department. The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances." Id. 9 at p. 1of 37.*

Officer Schneider's and the other officers on scene who were assisting in the arrest of Mr. Wheatcroft totally missed the mark of living up to their agency's stated Use of Force *"Philosophy"* in relation to their actions during this incident.

Mr. Wheatcroft was asking very reasonable questions of Officer Schneider, such as: *"Why are you asking for ID?"* Officer Schneider telling Mr. Wheatcroft that, if you're a passenger in the vehicle, you have to give ID' is not legally correct, as well as Officer Schneider saying: *"I can take you down to the station and fingerprint you."* The requirement of producing identification from a passenger within a vehicle for such a minor traffic violation was overly punitive and was also not a reason for a legal arrest. I provided a number of court cases above to address the illegality of Officer Schneider's actions for arresting and utilizing such a degree of excessive force against Mr. Wheatcroft. Mr. Wheatcroft didn't and wouldn't produce any identification, and was demonstrating only passive non-complaint behavior as he was being aggressively arrested and abused physically.

Officer Schneider's belief that he could demand identification from a passenger within a vehicle and because of non-compliance from that subject, then detain, arrest and transport that subject to a police facility to determine identity was legally incorrect. The basis for his then brutal and disturbing arrest of Mr. Wheatcroft in front of his screaming family was not supported by his agency's Use of Force policy. I have shown above how Officer Schneider and the other on scene officers conduct was in direct contradiction to the Glendale Police Department's Use of Force and Response to Resistance policy.

Ms. Chapman, who after being arrested and charged with aggravated assault on a police officer, spent months in jail after the incident because she and Mr. Wheatcroft couldn't afford bail. Ms. Chapman agreed to plead guilty to a lesser charge in order to get home to her children, her attorneys have related in public comments.

DR. JEFFEORY G. HYNES, ED.D.   15

**WHEATCROFT000416**

My strongest argument however is the stated reasonable suspicion justification for the initial traffic stop contact that was not valid. I challenge Officer Schneider's instantaneous reason for initiating the stop and trying to validate his arrest of Mr. Wheatcroft.

Officer Schneider and Lindsey can be seen on the Motel 6 surveillance video, making contact after the vehicle was already stopped and backed into its parking spot. The reason given by Officer Schneider is in direct conflict with the versions provided by his partner Officer Lindsey and Mr. Wheatcroft on the night of the incident. They both have given similar accounts on July 26, 2017, as to how the contact occurred and that the reason of no turn signal being demonstrated was not contact reason. To illustrate my logic path for this conclusion, I offer the following, which was also noted above:

> I found within Officer Pittman's supplemental report that he interviewed Officer Lindsey, who had been taken to the hospital, from being stuck in the head at the scene, allegedly by Ms. Chapman. During the interview by Officer Pittman, on July 26, 2017, Officer Lindsey reported the following reason for their contact with Mr. Wheatcroft and Mr. Blackburn:
>
> > "*While at the hospital I asked Officer Lindsey what happened and he stated that Officer Schneider and he entered the Motel 6 parking lot from the north side and observed the vehicle pull in the center parking lot from the south and Officer Lindsey believes that when the occupants saw them coming from the north side they stopped and backed into a parking spot. Based off their activities Officer Schneider and Officer Lindsey pulled up to them and they contacted them...*" *Id. 13a; at pp. 72-73 of*

Continuing my logic path challenging Officer Schneider's "*reasonable suspicion*" reason for the contact with Mr. Wheatcroft and the Taurus driven by Mr. Blackburn I offer the following:

> From Officer Tolbert's supplement report noted interview with Mr. Wheatcroft on July 26, 2017, the following was related. Mr. Wheatcroft's version of why they were contacted matches closely to Officer Lindsey's reason for the contact, but was in absolute contradiction to Officer Schneider's recall of their reason of initiating the stated traffic violation for the original contact. *Id. 13a; at pp. 62-63 of 408.*
>
> > "*Johnny said when he saw Officer Schneider's police vehicle it was headed north in the east parking lot towards the alleyway on the Northside of the Motel. Johnny said the police car was driving away from other people...*"
> >
> > *Johnny said the police car had headed west in the north alleyway. I told Johnny I was told the vehicle he was traveling in was observed by officers to not use its blinker turning into the parking lot.*"
> >
> > *Johnny said that was impossible. Johnny said there was no way the officers could have seen if the Taurus used its blinker or not based on where the police car was in relation to the Taurus.*" *Id. 13a; at pp. 62-63 of 408.*

Without "*reasonable suspicion*" or "*probable cause*" for the initial traffic stop and contact, the detention and arrest of Mr. Wheatcroft was not valid and was not legally justified. As related above, I found that within 28-754, subsection A, that as long as the driving movement can be done safely, there is no noted statutory requirement to utilize a "*turn signal*" while making a turn from the roadway into a private property driveway. Therefore, my position would be that the stated justification for the initial contact and subsequent arrest of Mr. Wheatcroft was invalid and illegal.

DR. JEFFEORY G. HYNES, ED.D.   16

The excessive Use of Force behavior in my opinion is a serious violation of Glendale Police Department policy, and Mr. Wheatcroft was falsely arrested and was a victim of extreme excessive Use of Force, an unlawful stop and an unlawful arrest.

The charges against Wheatcroft were dismissed by the Maricopa County Attorney's Office after the prosecutors from that office reviewed the body camera (BWC) and surveillance footage. In addition, Sergeant McDaniel, who completed the Glendale Police Department Use of Force review, has been contacted by investigators from the Federal Bureau of Investigations (FBI), the Arizona Attorney General Officer and the Arizona Peace Officer Standards and Training g Board regarding his review and opinion of this incident. Their investigative results are still pending and were not noted as of the writing of my report. *Id. 16e; at pp. 92-96 of 206.*

From Dr. McClelland's expert report, I noted that as a result of an internal Glendale Police Department Professional Standards Bureau investigation, Officer Schneider was disciplined for violating their *"Range of Response"* policy and was suspended for three (3) working days. *Id. 20 at p.34 of 40.*

As noted with my report from January 31, 2020: the final result from the Professional Standards investigation against Officer Schneider was issued within a *"Notice to Suspend without Pay for Thirty (30) Working Hours"* findings memorandum, dated 09/26/2018. The memorandum noted that Officer Schneider's actions were *"Sustained"* against him, for the incident's unlawful traffic stop, unlawful arrest and excessive force used against a handcuffed subject, being Mr. Wheatcroft. Noted within the findings memorandum:

> *"Based upon the suspect's lack of resistance at the time of your use of force, review of the video-recordings, and subject matter expert review of all of the circumstances, the amount of force you used against the suspect was unreasonable and unnecessary. Therefore, the allegations against you are sustained." Id. 15dd. at pp. 1-4.*

I reserve the right to alert and/or amend my opinion should addition evidence and information become available from pending dispositions and additional information discovered.

This report is respectfully submitted.

Dr. Jeffeory G. Hynes, Ed.D.

NOTE TO READERS:  It is imperative to note that all opinions found in this report are based upon my interpretation of documents and information presented for my review. This report is based upon my law enforcement training and experience in evaluating police officer conduct, police policies, practices and training. Statements in this report are only my personal opinion and should not be interpreted as offering any type of legal opinion. I reserve the right to correct errors, misinterpretations, and/or modify or change my opinions at any time.

In formulating my opinion in this case, I reviewed the following materials and I added item 20, Dr. McClelland's report.

1. Notice of Claim, dated January 22, 2018.

2. Amended Complaint Case, No.: 2:18-CV-02347-ROS, Filed, 11/5/2018.

3. Defendants' Answers to Plaintiffs' Amended Complaint Filed, 11/26/2018.

4. Joint Case Management Report Filed, 12/21/2018.

5. Case Management Order Filed, 1/11/2019.

6. Defendants' Response to Plaintiffs' First Set of Requests for Admissions, Dated 2/7/2019.

7. Defendants' Response to Plaintiffs' Request for Production, Dated 2/7/2019.

8. Defendants' Response to Plaintiffs' Non-Uniform Interrogatories, Dated 2/7/2019.

9. Glendale Police Department General Order Response to Resistance 23.000, Date 11/02/2012.

10. Glendale Police Department General Order Use of Force 23.000, Review Date 02/25/2000.

11. MCAO Charging Document Dated August 4, 2017.

12. Defendants' Response to Mandatory Initial Discovery Pilot Program Requests, 408 pages.

13. Defendant First Supplemental MIDP Responses Folder:

    a. Defendants' First Supplemental Responses to Mandatory Requests, Dated 1/29/2019, 35 pages.

    b. Body Worn Camera Video: Officer Aten's BWC-Bates No. 000374.

    c. Body Worn Camera Video: Officer Doerr's BWC-Bates No. 000375.

    d. Body Worn Camera Video: Officer Fernandez's BWC-Bates No. 000376.

    e. Body Worn Camera Video: Officer Koehler's BWC-Bates No. 000377.

    f. Body Worn Camera Video: Officer Lewis' BWC-Blackburn Interview-Bates No. 000378.

    g. Body Worn Camera Video: Officer Lewis' BWC-Chapman Interview-Bates No. 000379.

    h. Body Worn Camera Video: Officer Lindsey's BWC-Bates No. 000380.

    i. Body Worn Camera Video: Officer Pittman's BWC-Bates No. 000381.

    j. Body Worn Camera Video: Officer Pittman's BWC-Officer Lindsey Interview-Bates No. 000382.

    k. Body Worn Camera Video: Officer Schneider's BWC-Bates No. 000383.

    l. Body Worn Camera Video: Officer Spiwak's BWC-Bates No. 000384.

    m. Body Worn Camera Video: Officer Tolbert's BWC-Bates No. 000385.

    n. Body Worn Camera Video: Officer Tolbert's BWC-Wheatcroft Interview-Bates No. 000386.

DR. JEFFEORY G. HYNES, ED.D.   18

    o.   Body Worn Camera Video: Officer Vasquez's BWC-Bates No. 000387.

    p.   Body Worn Camera Video: Sgt. Gallagher's BWC-Wheatcroft Interview-Bates No. 000389.

    q.   Audio File: Glendale Police Department's Dispatch Audio-Bates, No. 000373.

    r.   Audio File: Sgt. Flosman's Audio-Chapman Interview-Bates, No. 000388.

    s.   Motel 6 Surveillance Video: 000372.

14. Defendants' Second Supplemental MIDP Folder:

    a.   Defendants' Second Supplemental Responses to Mandatory Initial Discovery Requests, 39 pages.

    b.   Human Resource Folder, 3 Files, HR Mark Lindsey 000467-000614, HR File - Matthew Schneider 000615-000832, HR File - Michael Fernandez 000833-001218.

    c.   Policies Folder,

        1)   GPD GO 20.170, Departmental Property Management- 000390-000394.

        2)   GPD GO 21.470, Uniform Regulation 000395-000421s.

        3)   GPD GO 21.500, Body Armor (Ballistic Vests) 000422-000426.

        4)   GPD GO 23.000, Response to Resistance 000427-000462.

        5)   GPD GO 23.300, Vehicle Stops 001764-001770.

        6)   GPD GO 24.000, Law of Arrest 001771-001779.

        7)   GPD GO 51.900, Neighborhood Response Unit, 000463-000466.

15. Professional Standards Unit (PSU) Folder:

    a.   001747-Sergeant Moody Telephone Call to Wheatcroft, 12-19-17.

    b.   001748-Lewis Interview with Sergeant Moody, 11-1-17.

    c.   001749-Lindsey BWC-07-26-2017.

    d.   001750-Lindsey Interview, with Sergeant Moody-11-1-17.

    e.   001751-Lindsey Interview, with Sergeant Flosman-09-01-2017.

    f.   001752-Lieutenant Montgomery Interview, with Sergeant Moody-11-03-17.

    g.   001753-Motel 6 Video.

    h.   001754-Pittman Interview with Sergeant Moody, 11-1-17.

    i.   001755-PSU Attempted Call to Wheatcroft, 8-8-17.

    j.   001756-Dispatch Radio Call-07-26-2017.

    k.   001757-Schneider, BWC-07-26-2017.

    l.   001758-Schneider Interview, with Sergeant Moody-11-14-17.

    m.   001759-Schneider Interview, with Sergeant Moody-11-29-17.

    n.   001760-Fernandez Interview, with Sergeant Moody-11-1-17.

DR. JEFFEORY G. HYNES, ED.D.   19

 o. 001761-Tolbert Interview, with Sergeant Moody-10-31-17.

 p. 001762-Wheatcroft Telephone Call, to Sergeant Moody-1-23-18.

 q. 001763-Sergeant Moody Voicemail, to Wheatcroft-01-23-18.

 r. DI 2017-073 001236-001287.

 s. DR17-107320 001288-001344.

 t. DR17-107320 001345-001404.

 u. MCAO Turndown, 001405.

 v. Notice of Admonishment, 001406.

 w. Notice of Departmental Investigation, 001407.

 x. Notice of Investigation, 001408-001409.

 y. Photographs, 001410-001667.

 z. Pulse Log Evaluation – Fernandez, 001468-001669.

 aa. Pulse Log Evaluation – Lindsey, 001470-001674.

 bb. Pulse Log Evaluation – Schneider, 001675-001691.

 cc. Schneider - Time Sync, 001692.

 dd. Schneider Discipline, 001693-001696.

 ee. Schneider's Taser Report, 001697-001698.

 ff. Sgt. McDaniel's Memo, 001699-001700.

 gg. Sgt. Moody's Executive Summary, 001701-001739.

 hh. Tape Request Form, 2017-073 001740.

 ii. Time Sync-Lindsey 001741.

 jj. Wheatcroft signed complaint-Bates No. 001742.

 kk. X2 Taser Download-Fernandez 001743.

 ll. X2 Time Sync-Fernandez 001744.

16. Depositions Folder:

 a. 20190603, Fernandez Transcript.

 b. 20190605, Lindsey Transcript.

 c. 20190918, CONFIDENTIAL, Tolbert Transcript

 d. 20190918, Tolbert Transcript.

 e. 20191211, Sgt. Jerry McDaniel.

17 Disclosure Folder: containing Supplemental MIDP Files 2-7, numerous files, if utilized I will reference them specifically.

18. Graham v. Connor Case, 490 U.S. 386, 396-97 (1989).

19. United States v. Landeros, No. 17-10217 (9th Cir. 2019)17-10217-2019-01-11.

DR. JEFFEORY G. HYNES, ED.D. 20

20. Defendant's Experts Report, Dr. McClelland (40 pages), Dated November 6. 2020
21. Expert Report, written by Dr. Hynes, (34 pages), dated January 31, 2020

DR. JEFFEORY G. HYNES, ED.D.   21

# *EXHIBIT 3*

# Blake A. McClelland

Phone (602) 763-2830
E-mail:
Blake.McClelland@Cox.net

November 6, 2020

Joseph J. Popolizio, Partner
Jones, Skelton & Hochuli, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, AZ 85004

Re:     **Wheatcroft, et al. v. City of Glendale, et al.**
        **United States District Court Case Number: 2:18-cv-02347-MTL**

Dear Mr. Popolizio:

In formulating my opinions on this case, I have reviewed the following materials:

1.  Glendale Police Department Offense Report 17-107320; Assault with a Deadly Weapon, Authored by Officer Roy Lewis #15542.  Bates Nos. CoG_WHEATCROFT 000001-000060.

2.  Glendale Police Department Evidence Chain of Custody Report for Incident 17-107320.  Bates Nos. CoG_WHEATCROFT 000061-000062.

3.  Glendale Police Department Vehicle Removal Report for Incident 17-107320, Authored by Officer B.A. Aten #15280.  Bates No. CoG_WHEATCROFT 000063.

4.  Taser Report for Officer Schneider #12251; July 26, 2017.  Incident 17-107320.  Bates No. CoG_WHEATCROFT 000064.

5.  Taser Report for Officer Fernandez #15225; July 26, 2017.  Incident 17-107320.  Bates Nos. CoG_WHEATCROFT 000065-000067.

6.  Glendale Police Department Property Room Property Slip for Incident 17-107320.  Bates Nos. CoG_WHEATCROFT 000068-000070.

7.  Glendale Police Department CAD History Report for Incident 17-107320.  Bates Nos. CoG_WHEATCROFT 000071-000073.

8.  Glendale Police Department Arrest Sheet for Anya Chapman; Arrest date: July 26, 2017.  Bates Nos. CoG_WHEATCROFT 000074-000081.

1

9.   Glendale Police Department Arrest Sheet for Johnny Wheatcroft; Arrest date: July 26, 2017.  Bates Nos. CoG_WHEATCROFT 000082-000089.

10.   Glendale Police Department Booking Sheet for Anya Chapman; Arrest date: July 26, 2017.  Bates Nos. CoG_WHEATCROFT 000090-000093.

11.   Glendale Police Department Booking Sheet for Johnny Wheatcroft; Arrest date: July 26, 2017.  Bates Nos. CoG_WHEATCROFT 000094-000097.

12.   Glendale Police Department Calls for Service Sheet for Incident 17-107320.  Call date: July 26, 2017.  Bates Nos. CoG_WHEATCROFT 000098-000102.

13.   Glendale Police Department Inmate Tracking Sheet for Anya Chapman for Incident 17-107320.  Bates Nos. CoG_WHEATCROFT 000103-000107.

14.   Glendale Police Department Inmate Tracking Sheet for Johnny Wheatcroft for Incident 17-107320.  Bates Nos. CoG_WHEATCROFT 000108-000111.

15.   Glendale Police Department Photographs from Incident 17-107320.  (260 page pdf file).  Bates Nos. CoG_WHEATCROFT 000112-000371.

16.   Glendale Police Department Photographs from Incident 17-107320 (Unredacted).  Bates Nos. CoG_WHEATCROFT 000112-000371.

17.   Motel 6 Video Surveillance Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000372.

18.   Glendale Police Department Audio Dispatch from July 26, 2017.  Bates No. CoG_WHEATCROFT 000373.

19.   Glendale Police Officer Brian Aten's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000374.

20.   Glendale Police Officer Glenn Doerr's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000375.

21.   Glendale Police Officer Michael Fernandez's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000376.

22.   Glendale Police Officer Glenn Koehler's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000377.

23.   Glendale Police Officer Roy Lewis's Body-Worn Camera Interview with Shawn Blackburn from July 26, 2017.  Bates No. CoG_WHEATCROFT 000378.

24.   Glendale Police Officer Roy Lewis's Body-Worn Camera Interview with Anya Chapman from July 26, 2017.  Bates No. CoG_WHEATCROFT 000379.

*CoG_WHEATCROFT 059076*

25.   Glendale Police Officer Mark Lindsey's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000380.

26.   Glendale Police Officer Jeffrey Pittman's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000381.

27.   Glendale Police Officer Jeffrey Pittman's Body-Worn Camera Interview with Officer Mark Lindsey from July 26, 2017.  Bates No. CoG_WHEATCROFT 000382.

28.   Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000383.

29.   Glendale Police Officer Adam Spiwak's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000384.

30.   Glendale Police Officer Lacey Tolbert's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000385.

31.   Glendale Police Officer Lacey Tolbert's Body-Worn Camera Interview with Johnny Wheatcroft from July 26, 2017.  Bates No. CoG_WHEATCROFT 000386.

32.   Glendale Police Officer Gabe Vasquez's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000387.

33.   Glendale Sergeant Joe Flosman's Audio Recorded Interview with Anya Chapman from footage from August 23, 2017.  Bates No. CoG_WHEATCROFT 000388.

34.   Glendale Sergeant Gallagher's Body-Worn Camera Interview with Johnny Wheatcroft from July 27, 2017.  Bates No. CoG_WHEATCROFT 000389.

35.   Glendale Police Department General Order 20.170 regarding Departmental Property Management.  Bates Nos. CoG_WHEATCROFT 000390-000394.

36.   Glendale Police Department General Order 21.470 regarding Uniform Regulations.  Bates Nos. CoG_WHEATCROFT 000395-000421.

37.   Glendale Police Department General Order 21.500 regarding Body Armor (Ballistic Vests).  Bates Nos. CoG_WHEATCROFT 000422-000426.

38.   Glendale Police Department General Order 23.000 regarding Response to Resistance.  Bates Nos. CoG_WHEATCROFT 000427-000462.

39.   Glendale Police Department General Order 21.900 regarding Neighborhood Response Unit.  Bates Nos. CoG_WHEATCROFT 000463-000466.

40.   Glendale Officer Mark Lindsey's Human Resource File.  Bates Nos. CoG_WHEATCROFT 000467-000614.

**CoG_WHEATCROFT 059077**

41. Glendale Officer Matt Schneider's Human Resource File.  Bates Nos. CoG_WHEATCROFT 000615-000832.

42. Officer Michael Fernandez's Human Resource File.  Bates Nos. CoG_WHEATCROFT 000833-001218.

43. Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 001219-001763.

44. Glendale Police Department General Order 23.300 regarding Vehicle Stops.  Bates Nos. CoG_WHEATCROFT 001764-0011770.

45. Glendale Police Department General Order 24.000 regarding Laws of Arrest.  Bates Nos. CoG_WHEATCROFT 001771-001779.

46. Glendale Officer Schneider's 07/01/2017—06/30/2018 Goal Setting & Review Worksheet.  Bates Nos. CoG_WHEATCROFT 001780-001792.

47. Glendale Officer Schneider's 02/11/2018 Midpoint Review.  Bates Nos. CoG_WHEATCROFT 001793-001794.

48. Glendale Officer Fernandez's April 30, 2013 Commendation.  Bates Nos. CoG_WHEATCROFT 001795-001803.

49. Glendale Officer Fernandez's May 12, 2016 Commendation.  Bates Nos. CoG_WHEATCROFT 001804-001807.

50. Glendale Officer Fernandez's December 1, 2017 Commendation.  Bates Nos. CoG_WHEATCROFT 001808-001811.

51. Glendale Officer Lindsey's July 11, 2013 Commendation.  Bates Nos. CoG_WHEATCROFT 001812-001816.

52. Glendale Officer Lindsey's January 8, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001817-001819.

53. Glendale Officer Lindsey's June 3, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001820-001823.

54. Glendale Officer Lindsey's May 12, 2016 Commendation.  Bates Nos. CoG_WHEATCROFT 001824-001827.

55. Glendale Officer Schneider's March 23, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001828-001830.

56. Glendale Officer Schneider's May 19, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001831-001832.

*CoG_WHEATCROFT 059078*

57. Glendale Officer Schneider's June 15, 2011 Commendation.  Bates No. CoG_WHEATCROFT 001833.

58. Glendale Officer Schneider's July 5, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001834-001835.

59. Glendale Officer Schneider's October 28, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001836-001837.

60. Glendale Officer Schneider's July 15, 2013 Commendation.  Bates Nos. CoG_WHEATCROFT 001838-001850.

61. Glendale Officer Schneider's March 7, 2014 Commendation.  Bates Nos. CoG_WHEATCROFT 001851-001864.

62. Glendale Officer Schneider's November 27, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001865-001871.

63. Glendale Officer Schneider's December 31, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001872-001876.

64. Glendale Officer Schneider's August 18, 2017 Commendation.  Bates Nos. CoG_WHEATCROFT 001877-001879.

65. Glendale Officer Schneider's May 5, 2017 Commendation.  Bates Nos. CoG_WHEATCROFT 001880-001881.

66. Glendale Officer Schneider's December 31, 2018 Commendation.  Bates Nos. CoG_WHEATCROFT 001882-001883.

67. Glendale Officer Schneider's July 24, 2018 Commendation.  Bates Nos. CoG_WHEATCROFT 001884-001894.

68. Glendale Officer Fernandez's Departmental Investigation #2013-063, re Use of Force.  Bates Nos. CoG_WHEATCROFT 001895-001930.

69. Glendale Officer Fernandez's Departmental Investigation #2015-012 re Use of Force.  Bates Nos. CoG_WHEATCROFT 001931-001966.

70. Glendale Officer Fernandez's Departmental Investigation #2015-060 re Use of Force.  Bates Nos. CoG_WHEATCROFT 001967-001976.

71. Glendale Officer Lindsey's Departmental Investigation #2012-081 re Use of Force.  Bates Nos. CoG_WHEATCROFT 001977-002001.

72. Glendale Officer Lindsey's Departmental Investigation #2014-040 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002002-002039.

*CoG_WHEATCROFT 059079*

73.  Glendale Officer Lindsey's Departmental Investigation #2014-061 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002040-002100.

74.  Glendale Officer Schneider's Departmental Investigation #2014-032 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002101-002129.

75.  Glendale Officer Schneider's Departmental Investigation #2017-073 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002130-002163.

76.  Glendale Police Department's 2012 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002164-002362.

77.  Glendale Police Department's 2013 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002363-002426.

78.  Glendale Police Department's 2014 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002427-002523.

79.  Glendale Police Department's 2015 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002524-002622.

80.  Glendale Police Department's 2016 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002623-002757.

81.  Glendale Police Department's 2017 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002758-002960.

82.  Glendale Police Department's 2018 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002961-003203.

83.  Glendale Officer Fernandez's Training File.  Bates Nos. CoG_WHEATCROFT 003204-003223.

84.  Glendale Officer Lindsey's Training File.  Bates Nos. CoG_WHEATCROFT 003224-003297.

85.  Glendale Officer Schneider's Training File.  Bates Nos. CoG_WHEATCROFT 003298-003339.

86.  Glendale Officer Lindsey's Body-Worn Camera Audit Log.  Bates Nos. CoG_WHEATCROFT 003340-003345.

87.  Glendale Officer Schneider's Body-Worn Camera Audit Log.  Bates Nos. CoG_WHEATCROFT 003346-003363.

88.  City of Glendale Email Communications with the FBI.  Bates Nos. CoG_WHEATCROFT 003364-003376.

89.  Glendale Officer Fernandez's Departmental Investigation #2014-022 re Attentiveness to Duty. Bates Nos. CoG_WHEATCROFT 003377-003412.

*CoG_WHEATCROFT 059080*

90.   Glendale Officer Fernandez's Departmental Investigation #2014-039 re Orders and Directives. Bates Nos. CoG_WHEATCROFT 003413-003443.

91.   Glendale Officer Fernandez's Departmental Investigation #2015-032 re Review of Accidents. Bates Nos. CoG_WHEATCROFT 003444-003450.

92.   Glendale Officer Lindsey's Departmental Investigation #2016-064 re Vehicle Pursuits.  Bates Nos. CoG_WHEATCROFT 003451-003460.

93.   Glendale Officer Schneider's Departmental Investigation #2013-066 re Review of Accidents. Bates Nos. CoG_WHEATCROFT 003461-003467.

94.   Glendale Officer Schneider's Department Investigation #2017-055 re Workplace Harassment. Bates Nos. CoG_WHEATCROFT 003468-003981.

95.   Glendale Police Department's Professional Standard Unit's 2015 Annual Report.  Bates Nos. CoG_WHEATCROFT 003982-003993.

96.   Glendale Police Department's Professional Standard Unit's 2016 Annual Report.  Bates Nos. CoG_WHEATCROFT 003994-004006.

97.   Glendale Police Department's Professional Standard Unit's 2017 Annual Report.  Bates Nos. CoG_WHEATCROFT 004007-004018.

98.   Glendale Police Department's 2015 Response to Report.  Bates Nos. CoG_WHEATCROFT 004019-004023.

99.   Glendale Police Department's 2016 Response to Report.  Bates Nos. CoG_WHEATCROFT 004024-004035.

100.   Glendale Police Department's 2017 Response to Report.  Bates Nos. CoG_WHEATCROFT 004036-004046.

101.   Chief's Directive from Chief Rick St. John dated June 26, 2019 re Response to Resistance Reporting.  Bates No. CoG_WHEATCROFT 004080.

102.   Glendale Police Department's General Order 22.050 re Functional Requirements.  Bates Nos. CoG_WHEATCROFT 004082-004083.

103.   Officer Lacey Tolbert's Goal Setting & Review Worksheet from July 1, 2016-June 30, 2017 and May 10, 2017 Comments Regarding Annual Review.  Bates Nos. CoG_WHEATCROFT 004084-004106.

104.   Sergeant Don LaBrant's May 10, 2018 Memorandum to Lieutenant Montgomery and Commander Blanco re Officer Lacey Tolbert.  Bates No. CoG_WHEATCROFT 004107.

105.   Motel 6 Video Surveillance Screenshot from July 26, 2017.  Bates No. CoG_WHEATCROFT 004108.

CoG_WHEATCROFT 059081

106.  Motel 6 Video Surveillance Screenshot Taken on or about September 1, 2017.  Bates No. CoG_WHEATCROFT 004109.

107.  Deposition Transcript of Glendale Officer Michael Fernandez w/Exhibits.

108.  Deposition Transcript of Glendale Officer Mark Lindsey w/Exhibits.

109.  Deposition Transcript of Glendale Officer Lacey Tolbert w/Exhibits.

110.  Deposition Transcript of Glendale Police Chief Rick St. John w/Exhibits.

111.  Deposition Transcript of Glendale Sergeant Donald LaBrant w/Exhibits.

112.  Deposition Transcript of Glendale Sergeant Matthew Moody w/Exhibits.

113.  Deposition Transcript of Glendale Lieutenant Earl Montgomery w/Exhibits.

114.  Deposition Transcript of Glendale Commander Brandon Blanco w/Exhibits.

115.  Deposition Transcript of Glendale Assistant Chief Rich LeVander w/Exhibits.

116.  Deposition Transcript of Glendale Sergeant Joseph Flosman w/Exhibits.

117.  Deposition Transcript of Glendale Officer Jeffrey Pittman.

118.  Deposition Transcript of Glendale Chief Chris Briggs.

119.  Expert Report of Dr. Jeffeory G. Hynes.  Bates Nos. CoG_WHEATCROFT 000272-000305.

120.  Officer Schneider's March 29, 2017 Body-Worn Camera Footage Associated with Glendale Police Departmental Report No. I17044932.  Bates Nos. CoG_WHEATCROFT 004110-004111.

121.  Emails Responsive to Plaintiffs' Third Request for Production of Documents.  Bates Nos. CoG_WHEATCROFT 004112-009807.

122.  Additional Emails Responsive to Plaintiffs' Third Request for Production of Documents.  Bates Nos. CoG_WHEATCROFT 009808-017993.

123.  Johnny Wheatcroft's Records from University of Phoenix.  Bates Nos. CoG_WHEATCROFT 018067-018227.

124.  Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2005-009896.  Bates Nos. CoG_WHEATCROFT 036650-036651.

125.  Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2006-121971.  Bates Nos. CoG_WHEATCROFT 036652-036653.

*CoG_WHEATCROFT 059082*

126. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2013-426915. Bates No. CoG_WHEATCROFT 036654.

127. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2014-001088. Bates Nos. CoG_WHEATCROFT 036655-036658.

128. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2014-106681. Bates Nos. CoG_WHEATCROFT 036659-036660.

129. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2018-106681. Bates Nos. CoG_WHEATCROFT 036661-036665.

130. Maricopa County Superior Court Criminal Docket re Johnny Wheatcroft.  Bates No. CoG_WHEATCROFT 036666.

131. Public Access to Court Information Docket re Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036667-036668.

132. Johnny Wheatcroft's Criminal Court Docket re M-0741-4580018.  Bates No. CoG_WHEATCROFT 036669.

133. Johnny Wheatcroft's Criminal Court Docket re M-0741-4688688.  Bates No. CoG_WHEATCROFT 036670.

134. Johnny Wheatcroft's Criminal Court Docket re M-0741-4720093.  Bates No. CoG_WHEATCROFT 036671.

135. Johnny Wheatcroft's Criminal Court Docket re M-0741-4724304.  Bates No. CoG_WHEATCROFT 036672.

136. Johnny Wheatcroft's Criminal Court Docket re M-0741-4778974.  Bates No. CoG_WHEATCROFT 036673.

137. Johnny Wheatcroft's Criminal Court Docket re M-0741-5127495.  Bates No. CoG_WHEATCROFT 036674.

138. Johnny Wheatcroft's Criminal Court Docket re M-0741-5235126.  Bates No. CoG_WHEATCROFT 036675.

139. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2005-009896.  Bates Nos. CoG_WHEATCROFT 036676-036679.

140. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2006-121971.  Bates Nos. CoG_WHEATCROFT 036680-036683.

141. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2013-426915.  Bates Nos. CoG_WHEATCROFT 036684-036685.

CoG_WHEATCROFT 059083

142. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2014-001088.  Bates Nos. CoG_WHEATCROFT 036686-036692.

143. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2014-106681.  Bates Nos. CoG_WHEATCROFT 036693-036695.

144. Correspondence from Dr. Jeffeory G. Hynes' re Defendants' Subpoena for Expert Job File.  Bates Nos. CoG_WHEATCROFT 036696-036709.

145. Anya Chapman's Maricopa County Adult Probation Presentence Investigation Report dated November 16, 2017.  Bates Nos. CoG_WHEATCROFT 036744-036752.

146. Glendale Police Department's Blank Blanket Trespassing Enforcement Authorization Form.  Bates No. CoG_WHEATCROFT 036802.

147. Maricopa County Superior Court Minute Entry dated October 25, 2017 re Anya Chapman's Change of Plea to Aggravated Assault.  Bates Nos. CoG_WHEATCROFT 036803-036804.

148. City of Glendale Fire Department's Records re Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036805-036811.

149. Johnny Wheatcroft's Employment File from PGM2, LLC, doing business as CMS/Morrell, Commodity Management Services, LLC and CMS, LLC.  Bates Nos. CoG_WHEATCROFT 036812-036827.

150. Maricopa County Attorney's Office Criminal Complaint re CR2017-134395-001 and CR2017-134395-002, Against Anya Ann Chapman and Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036828-036833.

151. Maricopa County Superior Court Docket re CR2017-134395.  Bates Nos. CoG_WHEATCROFT 036834-036836.

152. Empire Metal Products, Inc.'s Declaration of Custodian of Records.  Bates No. CoG_WHEATCROFT 036837.

153. EZ Metals, LLC's Declaration of Custodian of Records.  Bates No. CoG_WHEATCROFT 036838.

154. Glendale Police Department's General Order re Laws of Arrest with December 09, 2016 Revision Date.  Bates Nos. CoG_WHEATCROFT 036839-036847.

155. Johnny Wheatcroft's Employment File from Green World Recycling Inc.  Bates Nos. CoG_WHEATCROFT 036848-036850.

156. Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036851-036853.

157. Glendale Police Department's Location History Report for Motel 6.  Bates Nos. CoG_WHEATCROFT 036854-036904.

*CoG_WHEATCROFT 059084*

158. Glendale Police Department's Trespassing Enforcement Authorization Form for Motel 6 dated August 30, 2018.  Bates No. CoG_WHEATCROFT 036905.

159. Maricopa County Attorneys' Office Order of Dismissal re Johnny Wheatcroft.  Bates No. CoG_WHEATCROFT 036906.

160. Johnny Wheatcroft's Employment Information from Raytek Lighting, LLC.  Bates Nos. CoG_WHEATCROFT 036907-036908.

161. Maricopa County Attorneys' Office Motion and Order to Dismiss re Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036910-036911.

162. Dr. Jeffeory G. Hynes' Notes from Sergeant Jerry McDaniel's Deposition.  Bates Nos. CoG_WHEATCROFT 036913-036924.

163. Maricopa County Superior Court's October 3, 2017 Minute Entry re Johnny Wheatcroft.  Bates No. CoG_WHEATCROFT 036925.

164. Johnny Wheatcroft's ADOC Medical Records.  Bates Nos. CoG_WHEATCROFT 036927-037562.

165. Johnny Wheatcroft's Correctional Health Services Medical Records.  Bates Nos. CoG_WHEATCROFT 037563-037968.

166. Anya Chapman's Maricopa County Adult Probation File.  Bates Nos. CoG_WHEATCROFT 038693-038789.

167. Glendale Police Department Incident Report #18025107.  Bates Nos. CoG_WHEATCROFT 038790-038829.

168. Glendale Police Department Dash Camera Footage re Incident Report #18025107.  Bates No. CoG_WHEATCROFT 038830.

169. Glendale Police Department Body Camera Footage re Incident Report #18025107.  Bates No. CoG_WHEATCROFT 038831.

170. Glendale Police Department's Audio Recorded Interview of Anya Chapman re Incident Report #18025107.  Bates No. CoG_WHEATCROFT 038832.

171. Phoenix Police Department Photographs re Departmental Report #2018-01405322.  Bates Nos. CoG_WHEATCROFT 039621-041336.

172. Phoenix Police Departmental Report #2018-01405322.  Bates Nos. CoG_WHEATCROFT 041337-041588.

173. Johnny Wheatcroft's Records from Arizona Department of Corrections Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 041592-042075.

CoG_WHEATCROFT 059085

174.  Manistee Justice Court Case No. CC2019-098267, Robin L. Nash v. Anya A. Chapman.  Bates Nos. CoG_WHEATCROFT 042078-042085.

175.  Johnny Wheatcroft's Maricopa County Adult Probation File.  Bates Nos. CoG_WHEATCROFT 055387-055518.

176.  City of Phoenix Police Department Custodian of Records Declaration.  Bates No. CoG_WHEATCROFT 055519.

177.  City of Phoenix Police Department Departmental Reports Involving Johnny Wheatcroft and/or Anya Chapman Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 055520-055930.

178.  City of Phoenix Police Department Photographs re Departmental Report 2013-01783673 Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 055931-056073.

179.  Anya Chapman's Records from Maricopa County Sheriff's Office Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 056074-056168.

180.  Johnny Wheatcroft's Records from Maricopa County Sheriff's Office Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 056169-056578.

181.  Glendale Police Department's Location History Report for 4530 West Myrtle Avenue.  Bates Nos. CoG_WHEATCROFT 056579-056580.

182.  Glendale Police Department's 911 Call Detail for 4530 West Myrtle Avenue.  Bates Nos. CoG_WHEATCROFT 056581-056602.

183.  Glendale Police Department Incident Report No. 17084200.  Bates Nos. CoG_WHEATCROFT 056603-056628.

184.  Glendale Police Department Incident Report No. 17085068.  Bates Nos. CoG_WHEATCROFT 056629-056638.

185.  Glendale Police Department Incident Report No. 17173854.  Bates Nos. CoG_WHEATCROFT 056639-056649.

186.  Glendale Police Department Incident Report No. 18088651.  Bates Nos. CoG_WHEATCROFT 056650-056656.

187.  Glendale Police Department Incident Report No. 20039176.  Bates Nos. CoG_WHEATCROFT 056657-056663.

188.  Glendale Police Department Incident Report No. 20040072.  Bates Nos. CoG_WHEATCROFT 056664-056670.

189.  Deposition Transcript of Robin Nash.

CoG_WHEATCROFT 059086

190.  Deposition Transcript of B.W. (Juvenile name withheld).

191.  Deposition Transcript of J.W. (Juvenile name withheld).

192.  Deposition Transcript of Officer Matthew Schneider.

193.  Deposition Transcript of B.W. (2nd) and Exhibits.

194.  Deposition Transcript of Shawn Blackburn and Exhibits.

**Personal Background**

I have thirty-four (34) years of experience with the Phoenix Police Department.  I have served in numerous assignments from Police Officer to Assistant Police Chief.  Some of my assignments have included (but are not limited to) patrol operations, investigations, tactical operations (SWAT), internal affairs, auditing, planning, and training.  I have been involved in approximately two thousand (2,000) internal investigations that examined police employees' conduct and performance.  I have interviewed and trained hundreds of police officers, supervisors, and command-level personnel.  I served as the Chairman of the Use of Force and Disciplinary Review Boards that evaluated the actions of police officers and supervisors.  I have led empirical research projects designed to improve the efficiency and effectiveness of police operations.

I honorably retired from the Phoenix Police Department in August 2016 and assumed a full-time faculty position at Arizona State University (ASU) in the School of Criminology and Criminal Justice.  I am the Director of the Master of Arts program, and I hold a Ph.D. in Public Administration from ASU.  I have taught classes in criminal investigations, public policy, criminology, statistics, and police use of force.  I provide subject matter expert consultation to the CNA Corporation (Arlington, VA), assisting them with research funded by the United States Department of Justice.

Through my work experience, training, and academic qualifications, I am familiar with the nationally recognized "best practices" regarding police procedures, investigations, training, and use of force.  Additional information regarding my qualifications and background can be found in Addendum 1 of this report.

*CoG_WHEATCROFT 059087*

**Case Details**

*Unless otherwise noted, the following information is contained in the Glendale Police Department Offense Report 17-107320; Assault with a Deadly Weapon, Authored by Officer Roy Lewis #15542.  The juvenile witness's names have been redacted from these reports and "Witness JW" and "Witness BW" will be used when referring to them.*

On July 26, 2017 at 1932 hours, Glendale Police **Officers Matt Schneider and Mark Lindsey** were on routine patrol in the area of the Motel 6 hotel at 7116 North 59th Avenue.  The officers were riding in a fully marked Chevrolet Tahoe, and both officers were wearing Glendale Police uniforms.  Officer Schneider was driving, and Officer Lindsey was in the passenger seat.

Officer Schneider and Lindsey are members of the Glendale Police Neighborhood Response Squad (NRS). This squad is deployed in addition to the regular patrol officers to provide additional police resources in high crime areas.  The NRS squad also apprehends fugitives, and conducts investigations into street-level drug and criminal activity.  The Motel 6 where the officers were patrolling was known for a high level of criminal activity that included drug offenses, violent crimes, and property crimes.  Because of the high incidence of crime at this location, the management of the Motel 6 had signed an Authority to Arrest Trespassers agreement with the Glendale Police Department[1].

While driving through the alley north of the Motel 6, Officer Schneider observed a silver Ford Taurus turn northbound into the hotel parking lot (from Glenn Drive) without using a turn signal.  Officer Schneider turned into the hotel parking lot and could see the Ford Taurus had backed into a parking space very quickly.  Officer Lindsey observed the vehicle attempt to pull into an open spot, but it changed directions and immediately backed in.  This raised the officer's suspicion, because stolen vehicles try to hide their license plates.[2]

Without using the police car's overhead lights, Officer Schneider initiated a traffic stop in the parking lot of the hotel by pulling in front of the parked vehicle and contacting the occupants.

Officer Schneider went to the passenger side of the vehicle and contacted Johnny Wheatcroft, while Officer Lindsey went to the driver's side of the vehicle and contacted Shawn Blackburn.  There was also an adult female in the back seat (Anya Chapman) and two children (Witness JW and Witness BW).

Officer Schneider asked Johnny if he was staying at the Motel 6, then Schneider asked him for identification.  Officer Schneider also told the occupants of the car they were being stopped because they did not signal while turning into the motel parking lot.  The two men in the front seats of the Taurus (Johnny Wheatcroft and Shawn Blackburn) did not have identification, so Officer Schneider walked to the rear of the car to see the license plate.  Officer Schneider called in a "Code-6" on his police radio.  This provided dispatch with the license plate number and his location.

Officer Schneider returned to the front passenger window of the Taurus and, once again, asked everyone in the car if they had identification.  Officer Schneider also warned Johnny Wheatcroft to not reach into a brown backpack that was on the floor by his (Wheatcroft's) legs.  Wheatcroft then turned away from Schneider, facing towards the center console.

CoG_WHEATCROFT 059088

According to Glendale Incident report 17-107320, Officer Schneider believed Johnny Wheatcroft was sticking his hand between the seat and console.  At this point Officer Schneider did not know if there were any weapons in the vehicle, so he opened the car door and initiated contact with Johnny Wheatcroft.

*(Additional details of this contact and the analysis of the Body Worn Camera videos will be evaluated in the Opinions section of this report.)*

As Officer Schneider opened the car door, Johnny Wheatcroft brought his right leg out of the vehicle. Officer Schneider grabbed Johnny's right arm, and felt it tense up.  Officer Schneider warned Johnny to stop tensing his arm, and at this point Officer Schneider believed that Johnny was trying to resist and pull away from him.  Officer Schneider unholstered his Taser and told Johnny he was going to be Tased if he chose to fight with officers.  Johnny Wheatcroft seemed to calm down, so Officer Schneider re-holstered his Taser and tried to control Johnny's right arm.

Officer Schneider struggled with Johnny, so Officer Lindsey came to the passenger side of the Taurus to help.  Officer Schneider related that he could hear crying in the back seat, and the adult female (Anya Chapman) was yelling profanities.

Officer Schneider tried to control Johnny Wheatcroft's right arm, but he continued resisting, so Officers Lindsey and Schneider used their Tasers to control him.  Officer Schneider related that Johnny was kicking his legs and making it difficult to restrain him.

While the officers were struggling with Johnny Wheatcroft, Officer Schneider related that he saw a bag being flung forward from the back seat of the car.  Officer Schneider saw Officer Lindsey fall backwards, and it appeared that Officer Lindsey was unconscious on the ground.  Officer Schneider learned later that Anya had swung a bag full of soft drinks and hit Officer Lindsey in the head.

Officer Schneider then radioed for urgent back-up.  **Officer Fernandez** had arrived and assisted Officer Schneider attempt to restrain Johnny Wheatcroft.  Officer Schneider related that Johnny continued to kick and thrash at the officers.  Officer Schneider deployed his Taser (probes) and also drive-stunned Johnny Wheatcroft to gain control of him.  Officers **Roy Lewis, Lacey Tolbert, Adam Spiwak, Jeffrey Pitman, and Glen Doerr** responded to the scene and assisted with taking Anya Chapman into custody and securing the scene.

Ultimately, Johnny Wheatcroft was taken out of the car and onto the ground.  Officer Schneider related that Johnny continued fighting on the ground, and was initially hung up in the seatbelt of the passenger seat.  Once Johnny was free from the seatbelt, he continued kicking at Officer Schneider, striking him in his (Schneider's) legs.  Officer Schneider related that even after Johnny was in handcuffs, he was still trying to kick at officers.  Johnny Wheatcroft was drive-stunned by Officer Schneider and he (Wheatcroft) calmed down and discontinued fighting.

Once the scene was stabilized, an investigation was conducted into this incident.  Glendale Officer Roy Lewis wrote the original offense report, making the following assignments:

*Officer Lacey Tolbert-* Conducted interviews with Officers Schneider and Fernandez (who were listed as victims of aggravated assault).

*Officer Jeffrey Pittman-* Conducted an interview of victim Officer Lindsey.

15

*Officer Aten-* Completed the paperwork required for the tow of the Ford Taurus.

*Officer Adam Spiwak-* Spoke with the children involved in the incident and arranged for a family member to pick them up.  Officer Spiwak also notified Arizona Child Protective Services (CPS) about the incident.

*Officers Fernandez and Doerr -* Transported Johnny Wheatcroft and Shawn Blackburn (driver of the Taurus) to the police station.

*Officer Lewis-* Interviewed Anya Chapman and Shawn Blackburn.  Also transported Anya Chapman to the Glendale City Jail.

Johnny Wheatcroft was treated by Glendale Fire Unit E150 (A Shift).  His chief complaint was shortness of breath, not pain. It should be noted that Johnny Wheatcroft did not complain about any injuries to his testicles, scrotum, or other parts of his body that may have been injured by the Tasers.  Johnny denied hospitalization.

During his investigation, Officer Roy Lewis collected and impounded evidence from the crime scene. The evidence included two Taser cartridges, 3 bottles and 1 can of Dr. Pepper, a backpack with cell phones and jewelry, $56.00 in U.S. Currency, a usable amount of a crystalline substance, black and gray bolt cutters, and yellow bolt cutters.

Johnny Wheatcroft was charged with Aggravated Assault on a Police Officer (ARS 13-1204.A.8) and Resisting Arrest (13-2508.A.1).  Anya Chapman was charged with Aggravated Assault on a Police Officer (ARS 13-1204.A.8).

On August 28, 2017, Sergeant Joe Flosman downloaded the body camera footage from Officers Fernandez, Schneider, and Lindsey.  He reviewed the footage and documented the details of the incident in his supplement to Glendale Incident Report 17-107320[3].  Table 1 paraphrases his observations:

**Table 1**

| Video Time Stamp | Activity |
|---|---|
| 2:31:01Z | Camera footage begins.  There is a 30 second delay in the sound.  Officer Schneider is driving into the Motel 6 parking lot. |
| 2:31:33Z | Officer Schneider exits his patrol vehicle and walks to the passenger side of the Taurus.  Schneider asks the occupants if they are staying at the motel.  He then asks the occupants "Do you guys have your ID's on you, real quick?"  Officer Schneider tells the driver the reason for the stop by saying: "Hey, when you turn in here man, just make sure you throw on your signal for us." |
| | Officer Schneider is told that they don't have IDs, so he asks the occupants of the car for anything with their name on it.  Johnny Wheatcroft makes an inaudible response, and Officer Schneider replies "All of you."  Officer Schneider then asks if there is anything in the vehicle that they shouldn't have. |

16

Officer Schneider then puts out (over the police radio) their location and license plate information.

Johnny Wheatcroft is holding a brown backpack.  Officer Schneider asks Johnny not to reach into the backpack since he has no identification and therefore no reason to look in the backpack.  Officer Schneider asks for Johnny's name, and Johnny asks why is he required to give it.  Officer Schneider responds that if he is a passenger in a vehicle, he is required to present it.  Johnny responds that he has one, but doesn't want to give it to Officer Schneider because he hasn't done anything wrong.  Officer Schneider tells Johnny Wheatcroft that he (Schneider) can take Johnny to the police station and fingerprint Johnny because of the traffic stop.

Officer Schneider puts his field interrogation (FI) cards and pen back in his pocket and tells Johnny Wheatcroft: "We can do this one of two ways."

Johnny Wheatcroft holds up his right hand and says, "Okay, relax for a minute please."

Officer Schneider states: "I don't want you stuffing anything down in between the seats like you're doing."

Johnny replies: "Stop please."  At this point Officer Schneider draws his Taser and grabs Johnny's right arm.  Officer Schneider tells Johnny "Here's the deal.  If you tense up, listen to me, listen to me.  Relax your arm."

There is a short conversation between Officer Schneider and Johnny Wheatcroft.  Officer Schneider asks Johnny if he is going to fight, and Johnny says "No".  Officer Schneider then re-holstered his Taser and placed Johnny in an arm hold.  Officer Schneider stated (to Officer Lindsey) "He's going to fight, dude".

Officer Lindsey came to the passenger side of the vehicle to help Officer Schneider.  The body camera footage shows Officer Schneider attempting to control Johnny Wheatcroft with an arm hold on his right arm.  A Taser comes into view from Officer Lindsey contacting Johnny's right arm and shoulder area.

Johnny Wheatcroft says "I'm not doing nothing."  The passenger seatbelt is still attached and across Johnny's upper torso.  As Officer Schneider is attempting to gain control of Johnny, Johnny states: "What the fuck's wrong with you." Johnny then leans forward (while still seated in the car).

Sergeant Flosman relates that at this point in the body camera video, Johnny is still wearing his seatbelt, and it is wrapped around his upper torso and his lower legs behind his knees.  There is shouting going on, as Officer Lindsey moves around to the back side of Johnny.

17

| 2:34:20 | Officer Lindsey deploys a drive stun to the center of Johnny's back.  Johnny turns toward his left, falling into a sitting position now facing Officer Lindsey and Schneider.  There is continual screaming. |
|---|---|
| 2:34:22 | From the back seat of the Taurus, Anya Chapman swings a white grocery bag at Officer Lindsey and hits him in the head.  Officer Lindsey goes out of view, and Officer Schneider backs up several feet and deploys his Taser (probes).<br><br>At this point Officer Fernandez comes into the camera view and goes "hands on" with Johnny attempting to get him away from the open car door.  Officer Fernandez appears to be struggling with Johnny Wheatcroft who seems to be caught in the seatbelt. |
| 2:34:47 | Officer Fernandez gets Johnny Wheatcroft into handcuffs, but it appears as though Johnny is still tangled up in the seatbelt and Taser wires. |
| 2:35:01 | Officer Schneider deploys a drive-stun with his Taser between Johnny's shoulder blades.  Sergeant Flosman notes that at one point in the body camera footage you can see the seatbelt wrapped around Johnny's lower legs and knees.  Officer Fernandez is attempting to get Johnny up on his feet and pulled away from the open car door. |
| 2:35:06 | Johnny Wheatcroft is on his knees facing the interior of the Taurus.  He is handcuffed at this time and Officer Fernandez is holding Johnny's left arm near the triceps area.  Officer Schneider, with his Taser in his right hand, drive-stuns Johnny between the shoulder blades for several seconds. |
| 2:35:32 | As Johnny is being moved backwards away from the car door, his son comes out of the back seat and removes Johnny's legs from the seatbelt.  Officer Fernandez moves Johnny to the back of the Taurus near an SUV parked next to it.<br>As Officer Schneider is dealing with the child, Sergeant Flosman noted that someone in the background of the video could be heard saying "Ow Ow Bro!"  Officer Schneider directs Officer Lewis to take a female (Anya Chapman) into custody for assaulting Officer Lindsey.  Officer Schneider still has his Taser in his hand. |
| 2:36:00 | Officer Fernandez is off-camera dealing with Johnny who is now face-down and handcuffed next to the SUV.  Johnny then says "Hey Hey", and appears to be kicking his lower legs.  Officer Schneider's body camera footage turns towards Johnny and Officer Fernandez is observed kneeling beside Johnny.  Officer Schneider places his Taser in the butt-cheek area of Johnny and drive-stuns him in the buttocks.  The Taser is at a right angle to Johnny's left buttocks partially on the left buttocks and partially in the intergluteal cleft.  Sergeant Flosman also notes that there is a lot of commotion, and an unknown officer can be heard saying "Stop, stop it."  Johnny Wheatcroft can be heard saying "Ow" over and over. |

CoG_WHEATCROFT 059092

| 2:36:42 | Officer Fernandez and another officer are still attempting to get Johnny under control when Officer Schneider places his Taser near Johnny's waist area and yells "Keep fighting and you're going to get it again.  You want it again?  Shut your mouth.  I am done fucking around with you."<br><br>Officer Schneider then disengages with Johnny and starts briefing other officers that have arrived on-scene. |
|---|---|

On September 1, 2017 **Glendale Detective Diana Lopez #13611** supplemented Glendale Police Department Offense Report #17-107320.  She noted that the County Attorney filed charges of Aggravated Assault and Resisting Arrest on Johnny Wheatcroft.  In a separate supplemental report, Detective Lopez noted that the charges of Aggravated Assault and Resisting Arrest were filed on Anya Chapman.

On August 4, 2017 a Grand Jury was convened and "A True Bill" finding was sustained on Anya Chapman for Aggravated Assault, and on Johnny Wheatcroft for Aggravated Assault and Resisting Arrest[4].

On October 3, 2017 the complaint against Johnny Wheatcroft was dismissed by the Maricopa County Attorney without prejudice[5].  Anya Chapman pled guilty to the assault.


## Opinions


After reviewing the previously listed case-specific information, I will offer my opinions regarding the arrests of Johnny Wheatcroft and Anya Chapman.  In addition to the materials reviewed, my opinions are based on my knowledge, experience, education, and training.  In analyzing the reasonableness of the officer's actions, I will also examine best practices in police operations.  I am also mindful that the jury is the ultimate finder of fact, and that all legal issues are resolved by the court.

I provide the following opinions along with supporting information:


1. ***Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the Motel 6 property located at 7116 North 59th Avenue is a high crime location that should be taken into consideration when evaluating this incident.***

   When evaluating the actions of police officers, it is important to examine the context in which an incident occurs.  Police officers are trained to handle a variety of circumstances, and very often the location of the incident dictates the response, tactics, and actions.  The arrest of Johnny Wheatcroft and Anya Chapman occurred in the parking lot of the Motel 6 at 7116 North 59th Avenue.  This Motel 6 is located near downtown Glendale and is just north of the intersection of North 59 Avenue and NW Grand Avenue (Arizona Highway 60).

19

CoG_WHEATCROFT 059093

According to the Location History Report[6], this Motel 6 has been the location of a wide range of criminal activity.  These crimes include, but are not limited to:

- Theft
- Loud music disturbing
- Subject Disturbing/Harassing
- Unwanted Guests
- Trespassing
- Domestic Violence
- Attempt Suicide
- Possession of Dangerous Drugs
- Possession of Marijuana
- Assault
- Suspicious Vehicles
- Stolen Vehicles
- Misconduct Involving Weapons
- Soliciting (Prostitution)
- Felony Flight

Due to the high volume of criminal activity, Officers from the Glendale Police Department, with the cooperation of the Motel 6 management, completed a *Trespassing Enforcement Authorization Form*[7].  This agreement gives every police officer of the Glendale Police Department the authority to act as an agent of the Motel 6 in enforcing the trespassing laws on the property in accordance with ARS 13-1502 through 13-1504.  It has been my experience that "Authority to Arrest" trespass forms are used for high crime areas that have been adversely affected by frequent drug dealing, foot traffic, and disturbances.  The agreement demonstrates that the Motel 6 management does not tolerate trespassing, and that they will aid in the prosecution of offenders.

This incident began with Officers Schneider and Lindsey on routine patrol in the area of the Motel 6, which is a known high crime location.  The officers are members of the Glendale Police Neighborhood Response Squad (NRS), whose primary responsibility is to patrol these high crime areas.  Since the Motel 6 had a *Trespassing Enforcement Authorization Form* on file, officers will routinely check on suspected trespassers.

The criminal activity surrounding the Motel 6 was a significant factor that guided the officer's tactics and actions.  According to Officer Schneider's statements, he observed the Ford Taurus pull into the Motel 6 parking lot without signaling.  When initiating the traffic stop, Officer Schneider activated his spotlight.  Although it was daylight when the traffic violation occurred, activating a spotlight can distract the occupants of the car and improve the level of officer safety when approaching.

CoG_WHEATCROFT 059094

*(The vehicle stop and subsequent arrest of Johnny Wheatcroft and Anya Chapman will be examined in the next section of this report)*

Once the Ford Taurus was parked, Officers Schneider and Lindsey did not know whether the occupants of the car were trespassers or whether they had a bona fide reason for being in the hotel parking lot.  It is my opinion that *regardless* of the traffic stop, Officers Schneider and Lindsey should have contacted the occupants of the Ford Taurus to determine their reason for being at the hotel.  The Ford Taurus was backed into a parking spot, with two adult males in the front seats.  Stolen vehicles are often backed into parking spaces so that the license plate is hidden from the traffic lane.  Two adult men sitting in a parked car at that location may also be indicative of a drug transaction.

Since the *Trespassing Enforcement Authorization Form* had been signed by the Motel 6 manager, Officers Schneider and Lindsey did not need probable cause or reasonable suspicion to contact and talk with the occupants of the Ford Taurus.  Taking into consideration the criminal history of this location, the way the Taurus was backed into the parking spot, and two men sitting in the front seats, sufficient suspicion existed that they may be trespassing.  The vehicle had also just committed a traffic offense, and the passenger did not appear to be wearing his seatbelt.

2.  ***Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the vehicle stop of the Ford Taurus, initiated by Officers Schneider and Lindsey, was reasonable and consistent with normal police practice.***

Officer Schneider observed the Ford Taurus pull into the Motel 6 parking lot from West Glenn Avenue without signaling.  Officer Schneider then pulled his police vehicle into the parking lot from the north alleyway where the officers observed the Taurus make a suspicious move.  Officer Lindsey related in his deposition[8] that the car appeared to want to make a left-hand turn into a spot where there was an open spot, but it changed directions and immediately backed up into a parking spot.  Officer Schneider stopped his police car perpendicular to the front of the Ford Taurus.

Backing quickly into a parking space would raise an officer's level of suspicion.  It is common practice for auto theft suspects to try to obscure a vehicle's license plate from an officer's view.  Criminal suspects also try to hide expired, missing, or fraudulent license plates as well.

The location in the parking lot where Shawn Blackburn chose to park the Taurus would also raise suspicions.  According to the Motel 6 video[9], there were numerous empty parking spots in the parking lot.  The fact that Shawn Blackburn parked on the very end was unusual, because there were several other more readily available spots.  Shawn Blackburn claimed he parked in that spot because it was closest to the office.[10]

21

Officer Schneider exited the police car and approached the passenger side of the Ford Taurus, where Johnny Wheatcroft was sitting.  Officer Lindsey exited and approached the driver's side of the car, and contacted Shawn Blackburn.  The officer's approach to the Taurus is consistent with sound police practice when considering officer safety.  Officer Schneider contacting the passenger side of the Taurus eliminated the need to cross in front of the Taurus.  It is extremely dangerous for officers to walk between a violator's car and a police car.  If the driver of a stopped vehicle tries to flee in their vehicle, an officer can get pinned between the suspect vehicle and the police car.  Police Officers are trained to avoid the area between vehicles.

Upon contact with Johnny Wheatcroft, Officer Schneider says:

"How ya'll doin?  You guys staying here?"[11]

"Hey, when you turn in here man, make sure you throw on your turn signal for us."[12]

Schneider also says "Nothing in the car that shouldn't be? Right, anybody?"[13]

Once Officer Schneider looked into the Ford Taurus, it became apparent (from his body worn camera video) that several people, including children, were in the car.  The presence of children in the car does not eliminate or reduce the amount of risk involved in a traffic stop.  It has been my experience that the presence of children often creates situations where adults act more aggressively so they do not "look bad" in front of their children.  Adults have also been known to hide contraband and weapons on juveniles because they are less likely to be "frisked" or searched by the police.

According to Officer Schneider's deposition testimony, he believed that Johnny Wheatcroft was not wearing his seatbelt.  Officer Schneider said "He (Wheatcroft) was hugging the seat belt.  It was over his right shoulder not buckled".[14]

It is my opinion that Officers Schneider and Lindsey had sufficient reasons to stop the Ford Taurus, and talk with the occupants.  The Motel 6 is a high crime location, and it was Officer Schneider's perception that the driver (Shawn Blackburn) did not activate his turn signal, thus committing a traffic violation.  It was also unknown whether the occupants of the Taurus were trespassing on the Motel 6 property.  Reasonable suspicion of a traffic violation and trespassing offense were present.  As previously described, the Motel 6 had a *Trespassing Enforcement Authorization* agreement with the Glendale Police Department.

It was later determined that Shawn Blackburn was driving on a suspended license, and he did not have automobile insurance on the Taurus at the time of this incident.  Methamphetamine was found in the car, along with burglary tools (bolt cutters and screwdriver).  Also found in the car were credit cards bearing other people's names, fraudulent Social Security cards, and multiple cell phones.

On August 4, 2017 a Grand Jury was convened and "A True Bill" finding was sustained on Anya Chapman and Johnny Wheatcroft.[15] The purpose of a grand jury is to determine whether probable cause exists and to decide whether someone should be formally charged with a crime.  This indictment demonstrates that the Officers had sufficient cause to stop the vehicle.  If the

CoG_WHEATCROFT 059096

Grand Jury deemed the stop illegal or without cause, a true bill finding would not have been returned.

3. *Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that sufficient probable cause existed to arrest Johnny Wheatcroft for Resisting Arrest and Aggravated Assault on a Police Officer, and Anya Chapman for Aggravated Assault on a Police Officer.*

Officers Schneider and Lindsey stopped the Ford Taurus in the parking lot of the Motel 6 for a traffic violation and suspicion of trespassing. According to my review of Officer Schneider's body camera video and other documentation, it is my opinion that there was sufficient probable cause to arrest Johnny Wheatcroft for Resisting Arrest and Aggravated Assault on a Police Officer. There was also probable cause to arrest Anya Chapman for Aggravated Assault on a Police Officer. Table 2 is a summary of the events during the vehicle stop.

**Table 2**

| Video Time Stamp[16] | Activity |
|---|---|
| 2:31:39 | Officer Schneider approaches the passenger side of the car and asks the occupants if they stay at the hotel. He also asks everyone for identification. |
| 2:32:01 | Officer Schneider has a brief conversation with Johnny Wheatcroft. Johnny tells Officer Schneider that he does not have identification. |
| 2:32:20 | Officer Schneider calls in the license plate and location of the stop. |
| 2:32:40 | Officer Schneider asks Johnny Wheatcroft to not reach into the bag inside the car. Officer Schneider asks Johnny for his name, but Johnny refuses and asks why he has to give Schneider his name. |
| 2:33:14 | Officer Schneider opens the car door to contact Johnny Wheatcroft. Schneider again tells Johnny not to stuff anything between the seats. Johnny tries to step out, but Officer Schneider tells him to get his foot back into the car. |
| 2:33:26 | Officer Schneider takes a can out of Johnny's right hand and places it on the roof of the car. At this point Officer Schneider is holding Johnny's right tricep area with his left hand. |

CoG_WHEATCROFT 059097

| | |
|---|---|
| 2:33:28 | Officer Schneider warns Johnny Wheatcroft to not tense up.  Schneider draws his Taser and places it on Johnny's right shoulder.  Johnny appears to calm down, so Officer Schneider re-holsters the Taser. |
| 2:34:06 | Officer Schneider grabs Johnny's right wrist at which time Johnny begins to struggle and pull away. |
| 2:34:18 | Officer Lindsey comes to the passenger side of the vehicle to help Officer Schneider.  Johnny Wheatcroft struggles with the officers. |
| 2:34:20 | Officer Lindsey drive-stuns Johnny Wheatcroft in the back.  These drive-stuns were very short in duration (.2 seconds each). |
| 2:34:22 | Anya Chapman hits Officer Lindsey in the head with a bag containing cans of soda. |
| 2:34:25 | Officer Schneider steps back and deploys his Taser (with probes). |
| 2:34:37 | Officer Fernandez arrives and attempts to control Johnny Wheatcroft.  Officer Fernandez attempts to handcuff Johnny.  Officer Schneider drive-stuns Johnny. |
| 2:35:05 | Officer Fernandez successfully handcuffs Johnny Wheatcroft. |
| 2:35:06 | Officer Schneider drive-stuns Johnny Wheatcroft. |
| 2:35:11 | Johnny Wheatcroft is removed from the car and lifted to his feet.  He is tangled in the seatbelt, so he is laid on the ground next to the Ford Taurus.  Johnny's son untangles his legs. |
| 2:35:42 | Officer Schneider tries to get Johnny's son to come out of the car.  Officer Schneider assures the boy that he is okay. |
| 2:36:01 | Johnny Wheatcroft can be seen kicking his legs at the officers.  Officer Schneider delivers a kick to Johnny's groin area. |
| 2:36:07 | Officer Schneider delivers a drive-stun with his Taser to Johnny's buttocks area. |
| 2:36:09 | Johnny Wheatcroft and Anya Chapman are in custody. |

Table 2 documents the events leading up to the arrest of Johnny Wheatcroft and Anya Chapman.  Several areas of this incident will be emphasized to demonstrate that sufficient probable cause existed to arrest both persons.  Johnny Wheatcroft and Anya Chapman will be examined individually.

CoG_WHEATCROFT 059098

***Johnny Wheatcroft***

When Officer Schneider approached the Ford Taurus, Johnny Wheatcroft was sitting in the front passenger seat.  Officer Schneider asked whether Johnny and the occupants of the car were staying at the Motel 6.

Officer Schneider then asked Johnny for identification, which he did not have.  In high crime areas, it is standard police procedure to ask all the occupants of a stopped vehicle for identification.  Since a *Trespassing Enforcement Authorization Form* was on file with the Motel 6, the occupants of the car were also suspected of trespassing.

Johnny Wheatcroft became argumentative with Officer Schneider when asked for his identification.  Johnny asked several times why he was being stopped, and Officer Schneider attempted to explain it to him.  Concerned for his own safety, Officer Schneider asked Johnny to not reach into the bag that was on the floor of the car.  At this point, it is my opinion that Johnny Wheatcroft posed a significant threat to Officers Schneider and Lindsey.  Johnny Wheatcroft was argumentative and making furtive movements by reaching into the backpack.  Officer Schneider even said to Johnny that without identification, he had no reason for going into the backpack.

When detaining individuals, police officers are allowed to use physical force to ensure their own safety.  The following is an excerpt from the *Terry v. Ohio* Supreme Court case:

*"An officer justified in believing that an individual whose suspicious behavior he is investigating at close range is armed may, to neutralize the threat of physical harm, take necessary measures to determine whether that person is carrying a weapon."*[17]

Officer Schneider opened the car door and tried to gain Johnny's compliance by threatening him with his Taser and controlling (Johnny's) right arm.  Officer Schneider again told Johnny to not stuff anything between the seats.  Officer Schneider also told Johnny to relax and keep his foot inside the car.  Under these circumstances, it is reasonable for Officer Schneider to remove Johnny from the car, to distance him from any possible weapons or contraband.  Officers are not compelled to first ask subjects to exit the vehicle before attempting to remove them.

Johnny then tensed up and appeared to fight Officer Schneider's attempts to control his movements.  Johnny was physically combative, and once the violent struggling occurred, there was probable cause to believe that Johnny was resisting the officers.  Further evidence of the assault and resisting arrest can be seen while Johnny Wheatcroft is on the ground kicking at the officers.

As previously stated in this report, a Grand Jury was convened and "A True Bill" finding was sustained on Johnny Wheatcroft and Anya Chapman[18].  This indictment demonstrates that the Officers had sufficient probable cause to make an arrest.  If the Grand Jury considered the stop illegal or without probable cause, a true bill finding would not have been returned.

25

CoG_WHEATCROFT 059099

*Anya Chapman*

Anya Chapman was sitting in the back seat of the Ford Taurus when it was stopped by Officers Schneider and Lindsey.  Officer Lindsey contacted the driver's side of the vehicle and spoke with Shawn Blackburn and Anya Chapman while Officer Schneider contacted Johnny Wheatcroft on the passenger side of the vehicle.  Anya stepped out of the vehicle while Officer Lindsey spoke to Shawn Blackburn.

After several seconds, it became apparent to Officer Lindsey that Officer Schneider was having difficulty with Johnny, so Officer Lindsey went around to the passenger side of the vehicle.

During the struggle with Johnny Wheatcroft, Anya hit Officer Lindsey in the head with a bag filled with several cans of soda.  Officer Lindsey fell backwards, unconscious, onto his back, with his body worn camera facing the blue sky.[19]

After Johnny Wheatcroft was arrested, Anya was ordered to the ground, handcuffed, and taken into custody without any problems.  Ordering suspects to "prone out" is a common practice when arresting violent offenders.  Anya had demonstrated her willingness to assault police officers, so it is my opinion that putting her on the ground was reasonable under these circumstances.

Officer Lindsey was treated and released at a nearby hospital for his injuries.  Anya Chapman was booked into jail and ultimately pled guilty to the offenses.[20]

4. *Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the amount of force used by Officers Schneider, Lindsey, and Fernandez to arrest Johnny Wheatcroft was reasonable under the circumstances.*

In order to evaluate the officers' use of force during the arrest of Johnny Wheatcroft, each officer will be examined individually.  Officer Schneider, Lindsey, and Fernandez each participated in the arrest of Johnny Wheatcroft.  My assessment of the officer's actions takes into consideration my law enforcement experience, Glendale Police Department policies, court decisions, and constitutional policing best practices.

Glendale Police Department General Order 23.000 provides officers with guidelines for using physical force when making arrests.  The following is an excerpt from the *Purpose* section of the policy (23.001):

*"These policies are intended to provide guidance to employees in carrying out public safety activities and the mission of the department. They are definitely not intended to be standards of conduct that, if breached, expose employees to civil liability because to do so would seriously undermine the department's ability and motivation for writing policy and severely restrict employee discretion."  (Page 1)*

The following is an excerpt from the *Philosophy* section of the same policy:

CoG_WHEATCROFT 059100

*"Response to Resistance: It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department. The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect." (Page 1)*

The *Graham v. Connor*[21] Supreme Court case also provides guidance when evaluating police use of force.  It says:

*"The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*

Glendale Police Department General Order 23.007 also provides a table[22] that outlines what method of control is appropriate for the type of resistance demonstrated by the suspect.  This table will be referenced throughout my evaluation of the officers' actions.


***Officer Matt Schneider***

Officer Schneider was the primary officer during the arrest of Johnny Wheatcroft.  Table 3 describes my assessment of the type of resistance demonstrated by Johnny Wheatcroft, the method of control used by Officer Schneider, and the determination whether it meets the requirements of Glendale Police Department General Order 23.000.


**Table 3**

| *Suspect's Actions (Wheatcroft)* | *Type of Resistance (Wheatcroft)* | *Method of Control (Schneider)* | *Compliant with GPD Policy?* |
|---|---|---|---|
| While being detained, suspect becomes argumentative with Schneider. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence Verbal Commands | Yes |
| Suspect refuses to quit reaching into backpack. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence Verbal Commands Display Taser | Yes |
| While in the car, suspect tightens arm and tries to pull away. | Verbal Non-Compliance Physical (Defensive Resistance) | Officer Presence Verbal Commands Soft-Empty Hands Taser Use | Yes |
| While handcuffed on the ground, suspect kicks Schneider. | Verbal Non-Compliance Active Aggression | Officer Presence Verbal Commands Soft-Empty Hands Hard-Empty Hands (kick) Taser Use | Yes |

27

CoG_WHEATCROFT 059101

Officer Schneider reacted to several types of physical resistance during the traffic stop with Johnny Wheatcroft.  These areas will be examined below:

*Vehicle Approach*- Officers Schneider and Lindsey stopped the Ford Taurus during daylight hours.  Both officers were in uniform and driving a marked police car.  It is reasonable to assume that the occupants of the Taurus knew they were the police, so the method of control used by Officer Schneider during the approach was *Officer Presence*.

*Initial contact with Johnny Wheatcroft*- While detaining Johnny Wheatcroft, Officer Schneider used verbal commands and persuasion to compel Johnny to provide identification and to quit reaching into the backpack that was next to his legs.  Johnny Wheatcroft did not comply.

*Removing Johnny Wheatcroft from the vehicle*- It was appropriate for Officer Schneider to remove Johnny Wheatcroft from the vehicle.  This is a common officer safety measure that is done to separate suspects from weapons and contraband.  Glendale Police Department General Order 23.300 allows officers to remove subjects from vehicles.  The policy states:

*"Depending on the circumstances, the officer may allow the operator and any other occupants to remain in the vehicle or to exit the vehicle during the stop[23]*

*Opening the Door and grabbing Johnny Wheatcroft's right arm*- Johnny Wheatcroft was not complying with Officer Schneider's request to quit reaching into the backpack.  He continued to make furtive movements, so Officer Schneider made the decision to remove him from the vehicle.  Johnny Wheatcroft had a can of soda in his right hand, which Officer Schneider removed and placed on the roof of the car.  Removing the can from Johnny's hand is also an officer safety measure, because if a suspect chooses to resist, the soda can or other contents held in their hands can become weapons.

When Officer Schneider reached into the vehicle, he grabbed Johnny Wheatcroft by the right arm.  In my review of Officer Schneider's body-worn camera video, this appears to be an *escort* hold, not a *control* hold.  Escort holds are designed to guide someone along, and not be pain-compliant.  The resistance demonstrated by Johnny Wheatcroft at this time was Passive, and Verbal Non-compliance.

*Johnny Wheatcroft tenses his arm and struggles with Officer Schneider*- When Officer Schneider grabbed Johnny's right arm, Johnny tensed up and tried to twist away from Officer Schneider.  At this point, Johnny was displaying Physical (Defensive resistance) against Officer Schneider. Officer Schneider responded by threatening to use his Taser, but then de-escalated the situation momentarily and re-holstered his Taser. Johnny Wheatcroft resumed struggling, so Officer Lindsey delivered two drive-stuns to Johnny's back.  Officer Schneider also used Soft-Empty Hands by pulling Johnny's arm behind his back.  Officer Lindsey, while helping Officer Schneider, was struck in the head by Anya Chapman (Officer Lindsey's use of force will be evaluated separately). The strike to the head by Anya Chapman incapacitated Officer Lindsey, thus eliminated his ability to assist Officer Schneider with the arrest of Johnny Wheatcroft.

28

*Officers Schneider and Fernandez remove Johnny Wheatcroft from the Taurus-* As Officers Fernandez and Schneider struggle with Johnny Wheatcroft, they take him out of the car onto the ground.  He is handcuffed, but continues to resist the officers' commands.  Since Johnny Wheatcroft is still resisting and Officer Schneider is unaware that he is handcuffed, Officer Schneider delivers a drive-stun to Johnny's right shoulder area.  Johnny Wheatcroft gets tangled in the seat belt, and his son (JW) asks the officers several times to stop.  JW reaches down and releases Johnny's feet.  At this point in the confrontation, Officer Schneider again tries to de-escalate the situation by asking JW to exit the car and get in front of the car.  Officer Schneider tries to assure the child that everything is okay, but JW stays in the car.

During the confrontation, eleven-year-old JW asks the officers several times to stop, but none of the officers acknowledged the boy's request.  Under these circumstances, it would be unreasonable for the officers to consider the boy's request because the officers were in the middle of dealing with the violent actions of Johnny Wheatcroft.

The officers laid Johnny Wheatcroft on the ground between the Taurus and another parked car.  He was placed face-down on the asphalt, where he continued to kick at the officers.  Placing suspects on the ground is a common practice among police officers to gain control of violent subjects.  The ground offers stability, and there is a less likely chance of injuries from a fall.  This incident occurred in July, so the asphalt was probably hot, but due to the close quarters between the cars and Johnny Wheatcroft's resistance, the officers had limited choices as to where Johnny could be placed.

*Johnny Wheatcroft kicks Officer Schneider-* While on the ground between the cars, Johnny Wheatcroft can be seen kicking at Officer Schneider.[24] This is *Active Aggression* as defined by Glendale Police Policy.  Officer Schneider delivers a kick, which would be a Hard-Empty Hands Control method.  This is reasonable under the circumstances, and within Glendale's policies.  Officer Schneider also Tases Johnny Wheatcroft in the right buttocks.

When Officer Schneider Tases Johnny in the buttocks, it appears as though Johnny's pants have slipped down and the Taser is touching bear skin.  It also appears that the Taser target is the right or left buttocks, not the genitals or the perineum area.  At no time is the scrotum, testicles, or any male genitalia visible.

According to Officer Schneider's Taser report[25] the total time activated either through trigger use or drive-stun was forty-five (45) seconds.  The photos in the Taser report show that one probe missed Johnny completely and was lying on the ground next to him.  From the body worn camera video that was reviewed, it did not appear as though Johnny Wheatcroft was incapacitated by the Tasers.  Johnny Wheatcroft did not appear to stop fighting during the Taser deployment, and the Tasers seemed to be ineffective.

Following the Taser deployments, the probes were removed from Johnny Wheatcroft and the Taser cartridges were impounded as evidence.  According to the Glendale Police *Response to Resistance Policy 23.00,* officers are allowed to remove the probes as long as they have not penetrated a sensitive/soft tissue area[26].  Removing Taser probes is standard police procedure, and is not considered inhumane or torture.

29

*Officer Mark Lindsey*

Officer Lindsey was riding with Officer Schneider when they stopped Johnny Wheatcroft (and the other occupants of the Ford Taurus) at the Motel 6.  Table 4 describes my assessment of the types of resistance demonstrated by Johnny Wheatcroft, the method of control used by Officer Lindsey, and the determination whether it meets the requirements of Glendale Police Department General Order 23.000.

**Table 4**

| Suspect's Actions (Wheatcroft) | Type of Resistance (Wheatcroft) | Method of Control (Lindsey) | Compliant with GPD Policy? |
|---|---|---|---|
| While being detained, suspect becomes argumentative with Schneider. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence | Yes |
| Suspect refuses to quit reaching into backpack. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence | Yes |
| While in the car, suspect tightens arm and tries to pull away. | Verbal Non-Compliance Physical (Defensive Resistance) | Officer Presence Verbal Commands Soft-Empty Hands Taser Use (Two drive-stuns) | Yes |
| While handcuffed on the ground, suspect kicks Schneider. | Verbal Non-Compliance Active Aggression | (Officer Lindsey has been incapacitated and can no longer control the resistance of Wheatcroft.) | Not applicable |

When Officers Schneider and Lindsey stopped the Ford Taurus, Officer Lindsey went to the driver's side of the vehicle and Officer Schneider went to the passenger side.  Officer Lindsey's body worn camera video depicts him talking with Shawn Blackburn,[27] asking him basic questions about his identification card.  After approximately two minutes, Officer Lindsey recognizes that Officer Schneider is arguing with the passenger of the vehicle, Johnny Wheatcroft.  Officer Lindsey goes to the passenger side of the vehicle to help Officer Schneider.  From Officer Lindsey's body camera, it can be seen that Officer Schneider is struggling with Johnny Wheatcroft, trying to get him under control.  At this point, Officer Lindsey is observing *Physical (Defensive Resistance)* by Johnny Wheatcroft.

Officer Lindsey delivers two drive-stuns with his Taser to Johnny's shoulder area.  This response is appropriate under the circumstances, and is allowed by Glendale Police Department policy.

30

CoG_WHEATCROFT 059104

During the struggle with Johnny Wheatcroft, Officer Lindsey was struck in the head by Anya Chapman, wielding a plastic bag filled with full cans of soda.  Officer Lindsey falls backward and is rendered unconscious for a short time.  The assault on Officer Lindsey ended his participation in the arrest of Johnny Wheatcroft and Anya Chapman.

According to Officer Lindsey's Taser Report[28], the total time activated during the drive-stuns was one second, and the completed connection was just over .2 seconds.

### Officer Michael Fernandez

Over the police radio, Officer Fernandez heard Officers Schneider and Lindsey conduct a traffic stop at the Motel 6.  He responded to their location to back-up the officers.

When Officer Fernandez arrived, he saw that Officers Schneider and Lindsey had a silver Ford Taurus stopping in the parking lot.  Officer Lindsey waved Officer Fernandez over to his location. According to Glendale Incident Report 17-107320[29] Officer Fernandez initially went to the driver's side of the Taurus, but then ran to the passenger side of the car when he saw Officer Lindsey get knocked backwards.

Officer Fernandez helped Officer Schneider take Johnny Wheatcroft into custody.  At no time did the officers communicate regarding the reasons for the arrest or the charges.  It would have been unreasonable to communicate the reasons for the arrest since Officer Schneider was actively engaged in a physical struggle with Johnny.

Officer Fernandez said he saw Taser probes coming from Johnny, so he believed a previous deployment had not been effective.  Officer Fernandez then deployed his Taser at Johnny. Officer Fernandez believed his deployment was effective, because it seemed to lock-up Johnny's movements, causing him to stop fighting.

At this point during the arrest of Johnny Wheatcroft, he was displaying *Physical (Defensive Resistance)* towards the officers.  Officer Fernandez's use of a Taser to control this type of resistance is within Glendale Police policies.

Officer Fernandez successfully handcuffed Johnny Wheatcroft and laid him between the parked cars.  Officer Fernandez related that Johnny Wheatcroft was kicking and thrashing despite being handcuffed.  According to Glendale Police policy, kicking at police officers would be classified as an *Active Aggression* type of resistance.

Officer Fernandez secured Johnny Wheatcroft on the ground, and after the drive-stun to the buttocks by Officer Schneider, he quit fighting with the officers.

According to Officer Fernandez's Taser Report[30], the total time activated by trigger pull was five (5) seconds.

31

CoG_WHEATCROFT 059105

**5. Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that City of Glendale provided Officers Schneider, Lindsey, and Fernandez with an appropriate level of training and supervision.**

I have reviewed the personnel records and prior disciplinary histories of Officers Schneider, Lindsey, and Fernandez.  These personnel records included commendations, performance reviews, and previous incidents of misconduct.

None of the files I reviewed would indicate a failure to supervise or properly discipline these officers.  I did not find any of the officers to have a proclivity towards violent behavior, or a history of negative contacts with the community.  In fact, the officers had numerous commendations that documented their exemplary performance over the years.

I also reviewed the training records of Officers Schneider, Lindsey, and Fernandez.  Table 5 describes the relevant training that they received prior to this incident.  *(It should be noted that this table is not all-inclusive of the training the officers received)*

**Table 5**

| Officer | Topic | Date |
|---|---|---|
| Fernandez | 2017 Advanced Officer Training (Firearms, CPR, Defensive Tactics, Baton and Taser Recertification, De-escalation Training) | 04/19/17 |
| Schneider | Body Worn Camera Training | 08/11/16 |
| Schneider Lindsey Fernandez | 2016 Advanced Officer Training (Firearms, Driving, Defensive Tactics) | 05/24/16 02/16/16 02/16/16 |
| Schneider Lindsey Fernandez | 2015 Advanced Officer Training (Taser, Firearms, Defensive Tactics, CPR, Gas Mask Fit Testing) | 10/01/15 04/02/15 10/06/15 |
| Schneider Lindsey Fernandez | 2014 Advanced Officer Training (Taser, Defensive Tactics, First Aid, Tactical Driving, Trauma Kit Training) | 09/05/14 10/01/14 11/17/14 |
| Fernandez | Verbal Judo | 08/08/14 |
| Schneider Lindsey Fernandez | 2013 Advanced Officer Training (Firearms, Driving, Defensive Tactics, Taser | 04/30/13 04/30/13 01/22/13 |
| Schneider | X2 Transition Training (Taser) | 12/11/12 |

CoG_WHEATCROFT 059106

In addition to the training described in Table 5, Officers Schneider, Lindsey, and Fernandez are certified by the Arizona Peace Officer Standards and Training (AZPOST) Board to be police officers in the State of Arizona.  The AZPOST Basic Peace Officer Course (police academy training) is 585 hours of mandated training.  Officers must complete all of the academy requirements, and pass a comprehensive final exam to become AZPOST certified.  Officers Schneider, Lindsey, and Fernandez also attended advanced officer training throughout their careers.

During the arrest of Johnny Wheatcroft, the officers used several expletives while struggling with him and trying to control his actions.  Although the use of swear words may seem unprofessional, it is common practice for officers to use "shock language" during violent encounters with suspects.  Shock language is meant to emphasize the urgency of the command, and is generally accepted by police management.

Following the arrest of Johnny Wheatcroft, the Glendale Police Department Professional Standards Unit (PSU) investigated the incident.  Sergeant Matt Moody completed the written investigation, and he sustained three allegations against Officer Schneider.  One of the allegations was a violation of the Glendale Police Department *Response to Resistance* policy.  Sergeant Moody provides the following justification in his report:

*"After Johnny was handcuffed near the passenger compartment by Fernandez, he was in a crouched position, not resisting, and Schneider delivered a one second drive-stun to his back. Schneider advised he thought Johnny was actively fighting, however BWC video shows he was not. Schneider's first kick to Johnny's groin was reactionary to being kicked in the legs by Johnny, and is justifiable. However, the second kick to Johnny's groin was not necessary as Johnny was handcuffed in the fetal position and giving up. Schneider contests the second kick and states that it wasn't a kick at all.[31]*

Sergeant Moody also alleged that Officer Schneider violated the Vehicle Stops policy (General Order 23.301) and the Laws of Arrest policy (General Order 24.000).  During the Discipline Review process, these sustained allegations were reviewed by the chain of command and changed to *Not Sustained* and *Exonerated*.  Below is an excerpt from the PSU report:

*"In the Discipline Review process, Assistant Chiefs LeVander and Briggs differed in their findings on the sustained allegations. In Sergeant Moody's findings, he sustained on all three listed allegations. While A/C Briggs agreed with Sergeant Moody's findings to Sustain on all the listed allegations; A/C LeVander decided the allegations as follows:*
*• Allegation #1: G.O. 23.002 Response to Resistance- SUSTAINED*
*• Allegation #2: G.O. 23.301 Vehicle stops- NOT SUSTAINED*
*• Allegation #3: G.O. 24.000 Laws of Arrest- EXONERATED"*
*Because Gateway Division falls under Chief LeVander, the determination of findings are consistent with his decision, and have been updated to reflect the change.[32]*


It is my opinion that the allegation that Officer Schneider violated the *Response to Resistance* policy should also be unfounded in the PSU report and subsequent disciplinary actions.  At the time Officer Schneider delivered the drive-stun, Johnny Wheatcroft was still non-compliant and

CoG_WHEATCROFT 059107

Officer Schneider did not know that Johnny had already been handcuffed.  It was a dynamic, fluid situation, and a one-second burst from a Taser does not rise to the level of "excessive" when dealing with a violent, combative person.  The excerpt from the PSU investigation indicates that there were differing opinions among the Assistant Chiefs as to the merits of the stop and arrest of Johnny Wheatcroft.  Also, the *Graham v. Connor* Supreme Court case emphasizes that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight.

Despite the disagreement among the Glendale Police Chiefs on two out of three of the allegations against Officer Schneider, he was disciplined for violating the *Range of Response* policy and was suspended for three (3) working days.

## Summation/Conclusions

I have reviewed numerous documents associated with this incident and have found that Officers Schneider and Lindsey had sufficient suspicion to stop and talk with the occupants of the Ford Taurus in the parking lot of the Motel 6.  While detained, Johnny Wheatcroft aggravated the situation by reaching into a backpack, and not complying with Officer Schneider's commands.  Johnny Wheatcroft made the decision to fight the officers, and was subsequently Tased and lawfully arrested.  Johnny Wheatcroft was arrested for violent crimes, not for the mere lack of identification or for exercising his First Amendment rights.

Although the scene of the arrest was very chaotic, the officer's actions were reasonable under the circumstances.  The actions of Glendale Police Officers Schneider, Lindsey, and Fernandez, based on the information known to them at the time, was consistent with contemporary law enforcement policies, practices, and training.

This report is based on my law enforcement training and experience in evaluating police officers' conduct, investigations, police policies, practices, and training, and my opinions are made to a reasonable degree of police practices/law enforcement professional certainty.  This report should not be interpreted as offering any legal opinion.  This report is submitted in accordance with Rule 26 of the Federal Rules of Civil Procedure, and I reserve the right to amend my opinions if additional evidence or information is discovered.

Respectfully Submitted,

*Blake A. McClelland*

Blake A. McClelland

CoG_WHEATCROFT 059108

**Publications**

Coldren, J., Shultz, A., LaRochelle, J., and McClelland,B. (2017).  *Collaborative Reform Initiative: Interim Final Report of the Philadelphia Police Department*. Washington, DC: United States Department of Justice, Office of Community Oriented Policing Services.

Rodriguez-King, D., Saloom, C., and McClelland, B. (2014).  *Collaborative Reform Model: A Review of Use of Force Policies, Processes, and Practices in the Spokane Police Department*.  Washington DC: United States Department of Justice, Office of Community Oriented Policing Services.

**Previous Expert Witness Cases**

Not Applicable.  *(In the last four years, none of my previous expert witness cases have required testimony or deposition.)*

**Fee Schedule**

| | |
|---|---|
| Case review and report preparation: | $200.00 per hour |
| Deposition and court testimony: | $1200.00 for up to 4 hours; $250.00 per hour after 4 hours |
| Travel and related expenses: | 100% reimbursement |

*CoG_WHEATCROFT 059109*

**Endnotes**

[1] Trespassing Enforcement Authorization Form (Bates No. 036802)

[2] Deposition Transcript of Officer Lindsey (Page 157, Lines 3-10)

[3] Glendale Police Incident Report 17-107320 pages 46-48.  (Bates Nos. 000046-000048)

[4] Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  (Bates Nos. 036851-036853)

[5] Maricopa County Attorneys' Office Order of Dismissal re Johnny Wheatcroft.  (Bates No. 036906)

[6] Glendale Police Department's Location History Report for Motel 6.  (Bates Nos. 036854-036904)

[7] Trespassing Enforcement Authorization Form (Bates No. 036802)

[8] Deposition Transcript of Officer Lindsey (Page 157, Lines 3-10)

[9] Motel 6 Video Surveillance Footage from July 26, 2017.  (Bates No. 000372)

[10] Deposition Transcript of Shawn Blackburn and Exhibits.  (Page 150, Line 6)

[11] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Time stamp 0:00:40)

[12] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Time stamp 0:00:53)

[13] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Time stamp 0:01:06)

[14] Deposition Transcript of Officer Matthew Schneider (Page 104, Line 12)

[15] Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  (Bates Nos. 036851-036853)

[16] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Axon Time Stamps used)

[17] Terry v. Ohio, 392 U.S. 1 (1968)

[18] Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  (Bates Nos. 036851-036853)

[19] Glendale Police Officer Mark Lindsey's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000380, Axon Time Stamp 2:34:31)

CoG_WHEATCROFT 059110

[20] Maricopa County Superior Court Minute Entry dated October 25, 2017 re Anya Chapman's Change of Plea to Aggravated Assault.  (Bates Nos. 036803-036804)

[21] *Graham v. Connor* Supreme Court 1989, No. 87-6571

[22] Glendale Police Department General Order 23.000 regarding Response to Resistance.  (Bates Nos. 000450-000451)

[23] Glendale Police Department General Order 23.300 regarding Vehicle Stops.  (Bates No. 001765)

[24] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Axon Time Stamp 2:36:01)

[25] Officer Schneider's Taser Report is contained in Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  (Bates Nos. 001675-001691)

[26] Glendale Police Department General Order 23.000 regarding Response to Resistance.  (Bates Nos. 000438-000439)

[27] Glendale Police Officer Mark Lindsey's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000380)

[28] Officer Lindsey's Taser Report is contained in Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  (Bates Nos. 001670-001674)

[29] Glendale Police Incident Report 17-107320 page 24.  (Bates No. 000024)

[30] Officer Fernandez's Taser Report is contained in Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  (Bates Nos. 001668-001669)

[31] Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft. (Bates No. 002202)

[32] Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft. (Bates No. 002205)

CoG_WHEATCROFT 059111

**ADDENDUM 1 (Personal Resume)**

Phone (602) 763-2830
E-mail:
Blake.McClelland@Cox.net

# Blake A. McClelland

| **Education** | 1997-2002 | Arizona State University | Tempe, AZ |

**Doctor of Philosophy (Ph.D.)**

- School of Public Affairs with an emphasis on Organizational Theory and Behavior.

| | 1994-1997 | Arizona State University | Tempe, AZ |

**Master of Public Administration (M.P.A.)**

- School of Public Affairs with an emphasis on Organizational Theory and Behavior.

| | 1976-1983 | Arizona State University | Tempe, AZ |

**Bachelor of Science (B.S.)**

- College of Business Administration with an emphasis on Personnel Management.

| **Professional Experience** | 2016-present | Arizona State University | Tempe, AZ |

**Lecturer**

- Director of the Master of Arts program in Criminal Justice.
- Full-time faculty member in the School of Criminology and Criminal Justice.  Instructor for *CRJ302 Research Methods, CRJ308 Advanced Criminological Theory, CRJ303 Statistical Analysis, CRJ306 Race, Ethnicity, and Crime,* and *CRJ494 Police Use of Force.*
- Also teaches graduate-level classes *CRJ510 Criminal Justice Planning and Program Evaluation,* and *CRJ511 Applied Data Analysis in Criminal Justice.*  These classes are required in the Master of Science program in Criminal Justice.
- Instructor for the *Certified Public Manager (CPM)* curriculum in the Bob Ramsey Executive Education Department in the School of Public Affairs. Conducts classes in public policy and ethics.

*CoG_WHEATCROFT 059112*

1982-2016              Phoenix Police Department          Phoenix, AZ

**Police Commander/Assistant Chief (Retired)**

- Thirty-four years' experience with the Phoenix Police Department. Promoted through the ranks and has held command-level positions at the Lieutenant, Commander, and Assistant Chief ranks.
- Assignments have included (but are not limited to) patrol operations, investigations, SWAT, internal affairs, auditing, strategic planning, training, hiring, and others.
- Successful track record of leadership, good judgment, innovation, and reasonable risk-taking.  I have held numerous command positions, the largest being 1,412 employees (sworn officers, supervisors, and civilians) with a budget of $120 million dollars.
- Commanded the Planning and Research Bureau that was responsible for the statistical analyses of crime trends and other organizational problems.
- Conducted or led empirical research projects designed to measure the Patrol Division staffing levels and manpower needs.  Also conducted staffing studies of the Communications Bureau and Special Assignments Unit (SWAT Team)
- Served as Chairman of the Use of Force Board and Disciplinary Review Board that evaluate the actions of police officers and supervisors.


2005-present    U.S. Department of Justice          Washington, D.C.

**Consultant, National Institute of Justice**

- Member of the National Institute of Justice (NIJ) Consultant Database.
- Participated as a practitioner reviewer of grant applications for the *FY 2011 NIJ Research and Evaluation in Crime Control and Prevention* solicitation. (June 2011)
- Participated as a practitioner reviewer of grant applications for the *FY 2010 Research on Policing* solicitation. (May 2010)
- Conducted a peer review of the Police Foundation Study titled: *The Impact of Shift Length on Performance, Health, Quality of Life, Sleep, Fatigue, and Extra-Duty Employment.* (NIJ Grant # 2005-FS-BX-0057)

CoG_WHEATCROFT 059113

2013-present    CNA Corporation                          Arlington, VA
**Subject Matter Expert, Consultant**
- Research team member specializing in police investigations, use of force and training.
- Funded by the U.S. Department of Justice, Community Oriented Policing Services (COPS) to conduct a *Collaborative Reform Process* for the Spokane, Washington Police Department.
- The review of the Spokane Police Department included their use of force policies, investigative protocols, community outreach, and other areas.
- Co-authored the initial publication that is available on the Department of Justice website.  Presently conducting a review of Spokane's progress toward achieving the recommendations from the initial report.
- Research team member assisting with the compliance monitoring of the Philadelphia Police Department.

**Professional memberships**

- Center for Violence Prevention and Community Safety, Arizona State University (Advisory Board member)

- American Society for Public Administration (Former Board Member, Arizona Chapter)

- FBI National Academy Association (member)

- Police Executive Research Forum (member)

- National Tactical Officers Association (member)

**Professional Accomplishments and Training**

- Graduate of the FBI National Academy, Quantico Virginia, March 2000.

- Certified by Arizona Peace Officers Standards and Training (AZPOST) Board to teach Defensive Tactics, Firearms, Impact Weapons, Physical Fitness, and High Risk Vehicle Stops.

- Trained in the use of the National Incident Management System (NIMS) and the Incident Command System (ICS) by the Phoenix Fire Department.

- Distinguished Service Award, February 2005, for providing a leadership role in the Violence Impact Project.

- Medal of Lifesaving, June 1994, for saving the life of a heart attack victim.

*CoG_WHEATCROFT 059114*