1  Joseph J. Popolizio, Bar #017434
   Justin M. Ackerman, Bar #030726
2  Ian C. Beck, Bar #035599
   JONES, SKELTON & HOCHULI, P.L.C.
3  40 North Central Avenue, Suite 2700
   Phoenix, Arizona  85004
4  Telephone:  (602) 263-1700
   Fax:  (602) 200-7876
5  jpopolizio@jshfirm.com
   jackerman@jshfirm.com
6  ibeck@jshfirm.com
   Attorneys for Defendants
7

8              **UNITED STATES DISTRICT COURT**

9                  **DISTRICT OF ARIZONA**

10 Johnny Wheatcroft and Anya Chapman, as      NO. 2:18-cv-02347-MTL
   husband and wife, and on behalf of minors J.W.
11 and B.W.,                                   **DEFENDANTS' MOTION FOR
                                               SUMMARY JUDGMENT**
12                          Plaintiffs,
                                               **(Oral Argument Requested)**
13            v.

14 City of Glendale, a municipal entity; Matt
   Schneider, in his official and individual
15 capacities; Mark Lindsey, in his official and
   individual capacities; and Michael Fernandez, in
16 his official and individual capacities,

17                          Defendants.

18

19

20

21

22

23

24

25

26

27

28

   9263426.1

   9263426.1

Defendants City of Glendale ("City"), Matthew Schneider ("Schneider"), Mark Lindsey ("Lindsey"), and Michael Fernandez ("Fernandez") (collectively "Defendants") move for summary judgment on Plaintiffs' claims.[1]  As set forth below, Defendants are entitled to summary judgment on all claims in Plaintiffs' Second Amended Complaint (Doc. 35).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.

### A.   The July 26, 2017 Incident.[2]

#### 1.   A Vehicle That Plaintiffs Were In Turned Into A Motel 6 Parking Lot That Had A Blanket Trespass Agreement In A High Crime Location Without A Proper Turn Signal And, Upon Seeing Police Presence, Executed A Suspicious Parking Maneuver.

On July 26, 2017, Glendale Police Officers were conducting intensive patrol due to increased crime reported in the area. [DSOF ¶ 2].  At approximately 7:30 p.m., Officers Matt Schneider and Mark Lindsey, of the Glendale Police Department Neighborhood Response Squad ("NRS"), contacted the occupants of a Ford Taurus in the parking lot of Motel 6 at 7116 N. 59th Avenue.  [DSOF ¶ 3].  Schneider, who was driving, observed the Ford Taurus turn into the Motel 6 without a turn signal.  [DSOF ¶ 4].[3]  The occupants of the Ford Taurus were Shawn Blackburn (driver), Johnny Wheatcroft (front passenger) and Anya Chapman and minors J.W. and B.W. (rear passengers).  [DSOF ¶ 6].[4]  The Shawn Blackburn would later testify he could not recall whether he used a turn signal and no one asserted one was used after the car was stopped.  [DSOF ¶¶ 8-9].

As the car pulled into Motel 6, it headed to a parking space, but then quickly backed into another, hiding its license plate from the officers' view.  [DSOF ¶ 10].  Schneider

---

[1] Anya Chapman dismissed her claims with prejudice.  [*See* Doc. 199].  Plaintiffs are Johnny Wheatcroft, J.W., and B.W.

[2] On July 26, 2017, a misdemeanor arrest warrant for Johnny Wheatcroft was outstanding.  [Defendants' Statement of Facts ("DSOF") ¶ 1].

[3] Schneider was the only occupant of the patrol vehicle who observed the traffic violation.  Lindsey did not observe the vehicle until after it was inside the arches of the Motel 6.  [DSOF ¶ 5].

[4] Schneider, Lindsey, and Fernandez all testified they did not know any of the occupants of the vehicle before this incident.  [DSOF ¶ 7].

1

and Lindsey knew the Motel 6 was "notorious" for crime, including stolen vehicles, drug activity, and gang violence. [DSOF ¶ 11]. Because of these issues, Motel 6 had a blanket trespass agreement with Glendale Police Department ("GPD"), which gave every GPD police officer the authority to enforce trespass laws on the property as an agent of Motel 6. [DSOF ¶ 12]. At the time of the incident, Schneider and Lindsey were aware that the agreement gave GPD the right to contact individuals at Motel 6 to verify guest status and make arrests without contacting motel management. [DSOF ¶ 13].

### 2. Wheatcroft Refused To Give His Name And Repeatedly Reached Into Concealed Areas Despite Officer Commands.

Schneider and Lindsey both approached the Ford Taurus. [DSOF ¶ 14]. As the Officers approached, both the driver's side and driver's side passenger doors were open; this put Lindsey on guard for officer safety issues. [DSOF ¶ 15]. Schneider then approached the passenger side of the car, while Lindsey approached the driver's side. [DSOF ¶ 16]. As Schneider approached the passenger side, he noticed that Wheatcroft was hugging his unbuckled seatbelt over his shoulder, which he believed was in violation of the seat belt law. [DSOF ¶¶ 17-18]. Schneider asked Wheatcroft if he was staying at Motel 6, to which he responded "not yet, about to get a room"; Schneider then asked if anyone had ID. [DSOF ¶ 19]. Wheatcroft said, "No." [DSOF ¶ 20]. Schneider then walked to the back of the vehicle to run the plate, after which he returned to the passenger side where Wheatcroft was sitting. [DSOF ¶ 21]. Schneider then requested Wheatcroft's name; Wheatcroft refused to provide it and became increasingly agitated. [DSOF ¶ 22].

At this point, Schneider observed Wheatcroft being evasive, hunched over, and attempting to reach his hand into his backpack at his feet. [DSOF ¶ 23]. Schneider then commanded Wheatcroft to stop reaching into his backpack, since Wheatcroft already stated he did not have any ID and, thus, had no reason to reach into his bag. [DSOF ¶ 24]. Wheatcroft then said "Oh, okay. I'm sorry." [DSOF ¶ 25].[5] Schneider and Lindsey noted

---

[5] While Lindsey testified he could not see Wheatcroft reach into the backpack, he could hear Schneider give Wheatcroft commands to stop reaching. [DSOF ¶ 27].

that Wheatcroft's attempts to reach down toward his backpack at his feet caused them great concern for their safety; Fernandez also noted it caused him a safety concern.  [DSOF ¶ 26]. Schneider testified he did not know what was in Wheatcroft's hands while he was reaching down.  [DSOF ¶ 28].  Despite safety concerns and Schneider's commands not to reach in his backpack, Wheatcroft turned away from Schneider and appeared to stick his hand between the seat and center console.  [DSOF ¶ 29].  Thus, while Wheatcroft verbally stated he was complying with Schneider's commands, physically he was not.  [DSOF ¶ 30].[6]

### 3.    Wheatcroft Actively Resisted Schneider's Control.

Because of Wheatcroft's actions, and for the safety of the officers and others, including the minor children, Schneider opened the car door and attempted to remove Wheatcroft to keep an eye on him for the duration of the traffic stop and to conduct a pat down for weapons.  [DSOF ¶ 35].[7]  After the door opened, Wheatcroft put his foot down outside the vehicle without Schneider's permission.  [DSOF ¶ 37].  This caused Schneider to have heightened awareness that Wheatcroft was going to get out of the vehicle before Schneider was ready.  [DSOF ¶ 38].  Schneider then placed Wheatcroft's right arm in an escort hold to assist him from the vehicle and prevent him from lunging back into the vehicle to grab something.  [DSOF ¶ 39].  Instead of cooperating, Wheatcroft immediately displayed physical resistance, tensed his arm, and pulled away from Schneider.  [DSOF ¶ 40].

### 4.    Lindsey Drive Stunned Wheatcroft.

After feeling Wheatcroft tense his arm and pull away, Schneider asked Wheatcroft if he was going to fight and displayed his Taser to gain his compliance and to deter him from physically resisting.  [DSOF ¶ 41].  Wheatcroft stated he was not going to

---

[6] During this interaction, Lindsey spoke with Shawn Blackburn who did not have proof of a valid driver's license.  [DSOF ¶ 31].  Blackburn later admitted to driving on a suspended license and without insurance. [DSOF ¶ 32].  Lindsey also allowed Chapman, who was in the back seat, to step out of the vehicle due to the heat.  [DSOF ¶ 33].  As Wheatcroft became more agitated, Lindsey asked Blackburn why his friend was so upset.  [DSOF ¶ 34].

[7] As Sgt. McDaniel noted during his review of this incident, Schneider's body camera angle did not capture everything Schneider was seeing, including the entire movement of Wheatcroft's hands.  [DSOF ¶ 36].

3

fight and, as a result, Schneider deescalated the situation by holstering his Taser.  [DSOF ¶ 42].  However, after Schneider attempted to grab Wheatcroft's wrist to place him in a control hold, Wheatcroft began to shout profanities and actively resist Schneider's control hold and attempt to remove him from the car.  [DSOF ¶ 43].  Schneider repeatedly commanded Wheatcroft to stop tensing up, yet despite Wheatcroft's verbal denial that he was not, Schneider's body camera clearly shows striations in Wheatcroft's right arm as he tensed up and resisted Schneider's control.  [DSOF ¶ 44].  Schneider, upon feeling Wheatcroft's arm tense in resistance to Schneider's attempted control, relayed to Lindsey that Wheatcroft was "gonna fight."  [DSOF ¶ 45].

Lindsey then came around from the driver side of the vehicle to the front passenger door area to assist Schneider.  [DSOF ¶ 46].  Around this time, Fernandez arrived on scene and was immediately gestured over by Lindsey for assistance to the driver side door. [DSOF ¶¶ 47-48].  While Schneider attempted to remove Wheatcroft from the vehicle by applying a control hold, Lindsey placed his Taser on Wheatcroft's shoulder and warned Wheatcroft that if he continued to resist he would be tased.  [DSOF ¶ 49].  Despite this warning, Wheatcroft continued to resist Schneider.  [DSOF ¶¶ 50; 115-118].

Lindsey then used his Taser in short drive stun mode capacity twice, for a combined total of only 0.4 seconds, to attempt to gain compliance from, control of, and to avoid physical injury to, Wheatcroft.  [DSOF ¶ 51-52].[8]

### 5. Chapman Struck Lindsey In The Head With A Heavy Bag Of Soda, Knocking Him Unconscious.

While Schneider and Lindsey attempted to detain Wheatcroft, Chapman re-entered the vehicle and saw her husband resisting the Officers.  [DSOF ¶ 53].  Chapman then obtained a plastic bag of soda weighing 4.45 lbs. from the front passenger seat near Wheatcroft.  [DSOF ¶ 54].  Then, just as Lindsey drive stunned Wheatcroft, suddenly, intentionally, and without any warning, Chapman, who had re-entered the rear passenger

---

[8] Lindsey believed his initial drive stun was ineffective because Wheatcroft moved, so he followed with a second drive stun use.  [DSOF ¶ 52].

compartment of the vehicle and injected herself into the front of the vehicle between the driver's and front passenger's seats, violently struck Lindsey with a plastic bag filled with soft drinks.  [DSOF ¶ 55].  Chapman's assault rendered Lindsey unconscious; and made him fall backward onto the pavement. [DSOF ¶ 56].[9]

### 6. After Lindsey Was Knocked Out, Schneider and Fernandez Deployed Their Tasers In Dart Mode Against Wheatcroft.

After observing Chapman knock out Lindsey, Schneider stepped back and deployed his Taser (dart mode) to attempt to control the now out of control situation. [DSOF ¶ 58].  However, Schneider's Taser was ineffective. [DSOF ¶ 59].  Wheatcroft was still able to move, kick and thrash at the Officers.  [*Id.*].

As the video and unopposed expert analysis would later reveal, one of Schneider's probes did not connect with Wheatcroft and was on the ground, making the use of his Taser in dart mode ineffective in incapacitating Wheatcroft.  [DSOF ¶ 60]. Defendants' expert, Darko Babic, also opined that Schneider's Taser likely had a battery problem during the encounter.  [DSOF ¶ 61].  Most important, Wheatcroft admitted that the dart mode Taser applications did not hurt him. [DSOF ¶ 62]. In his post incident interview, Wheatcroft stated, "Fine tase me with those wires, they don't hurt; they don't hurt at all." [DSOF ¶ 63].

After realizing that Chapman assaulted Lindsey, Fernandez came from the driver's side of the car to assist Schneider with Wheatcroft. [DSOF ¶ 64].  Fernandez then deployed his Taser after seeing Schneider's Taser fail to disable Wheatcroft.  [DSOF ¶ 65]. Importantly, while Fernandez did not actually see who struck Lindsey, he thought that it was Wheatcroft, not Chapman, who knocked Lindsey out.  [DSOF ¶ 66].  Fernandez's Taser completed its connection for 1.5 to 2 seconds.  [DSOF ¶ 67].  After Fernandez's Taser use, Wheatcroft momentarily locked up.  [DSOF ¶ 68].  Despite this, Fernandez still had difficulty handcuffing, but finally did handcuff, the aggressively resisting Wheatcroft.  [DSOF ¶ 69].

---

[9] From this point forward Lindsey was no longer involved in the altercation with Wheatcroft.  As his body worn camera demonstrates, before and as backup Officers arrived, Lindsey tried to regain his faculties and assist Schneider but could not.  [DSOF ¶ 57].

### 7.   After Wheatcroft Was Handcuffed He Continued To Refuse Police Commands And Fight With The Officers.

After handcuffing Wheatcroft, he continued to thrash and resist officer control.  [DSOF ¶ 70; *Id.* at Ex. 16 (Fernandez Dec. at ¶¶ 8-13)].  Thus, at about the exact same time as Fernandez handcuffed Wheatcroft, Schneider drive stunned Wheatcroft's shoulder blade.  [DSOF ¶ 71].  Due to the fluidity of the situation, Schneider did not know that Fernandez had finally handcuffed Wheatcroft.  [DSOF ¶ 72].  Fernandez then attempted to remove Wheatcroft from the car, at which point Wheatcroft's legs then became wrapped in his seatbelt. [DSOF ¶ 73].  During this, J.W. easily removed the seatbelt from Wheatcroft's legs. [DSOF ¶ 74].  Wheatcroft was then laid on the ground.  [DSOF ¶ 75].

While on the ground, Fernandez attempted to place his body weight on the still resisting Wheatcroft to attempt to control him.  [DSOF ¶ 76].  At that time, Wheatcroft noticed his wife, Chapman, being taken into custody; Wheatcroft then strenuously tried to get up and continue the fight with the officers. [DSOF ¶ 77].  Body camera footage reveals that Wheatcroft began vigorously kicking and striking the Officers, including Schneider.  [DSOF ¶ 78].  This occurred just as Schneider was momentarily distracted and attempting to address and calm down J.W. [DSOF ¶ 79].  Schneider then reflexively kicked back in response to Wheatcroft's kicks, pinned Wheatcroft's legs to the ground, and commanded him to stop kicking.  [DSOF ¶ 80].  Wheatcroft continued fighting, so Schneider drive stunned Wheatcroft in the buttocks area.[10]  [DSOF ¶ 81].  Wheatcroft can then be seen rolling away from Schneider.  [DSOF ¶ 85].  Schneider took out his Taser one last time and used forceful, verbal commands telling Wheatcroft he was "done f**king around with you"; this is "shock language" commonly used by officers during violent encounters.  [DSOF ¶ 86].  Wheatcroft then responded to that language, *finally* stopped fighting, and was arrested.  [DSOF ¶ 87].

---

[10] There is no evidence in the record to demonstrate Wheatcroft was tased in his testicles, perineum, or taint.  Schneider testified that he was aiming for Wheatcroft's buttock or thigh when he tased him at this point. [DSOF ¶ 82].  Schneider's body camera shows the Tasing did not occur on Wheatcroft's genitals.  [DSOF ¶ 83].  Even Chapman and Wheatcroft admitted they could not see a Tasing of Wheatcroft's genitals. [DSOF ¶ 84]. Finally, there is no medical documentation establishing Wheatcroft was tased on his testicles.

In sum, the entire rapidly evolving, dynamic, dangerous, and chaotic encounter between Wheatcroft and the Officers lasted under three minutes. [DSOF ¶ 88]. The Officers testified this was a fast-moving situation without time to think or deliberate. [DSOF ¶ 89]. Moreover, as later revealed, due to a malfunctioning Taser, Schneider's dart mode and drive stun Taser uses were largely ineffective. [DSOF ¶ 90]. Finally, among all of the Officers during the three-minute confrontation there were a total of 4 drive stuns and 1-2 dart mode Taser applications that were used on Wheatcroft. [DSOF ¶ 91].

Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.

**C.** **Methamphetamine Was Found In the Car After The Arrests.**

Officers discovered meth in the car after arresting Wheatcroft and Chapman. [DSOF ¶ 98]. Mr. Blackburn was adamant the meth found was not his. [DSOF ¶ 99].

**D.** **Wheatcroft Was Charged With Aggravated Assault And Resisting Arrest.**

On July 31, 2017, MCAO filed charges of Aggravated Assault and Resisting Arrest against Chapman and Wheatcroft. [DSOF ¶ 100]. On August 4, 2017, a Grand Jury returned "A True Bill" indicting Chapman and Wheatcroft for Aggravated Assault and Resisting Arrest. [DSOF ¶ 101]. Despite the Grand Jury's indictment of Wheatcroft, on October 3, 2017, the County Attorney chose not to prosecute Wheatcroft and dismissed the charges without prejudice. [DSOF ¶ 102]. On October 25, 2017, Chapman pled guilty to aggravated assault, a class 4 felony. [DSOF ¶ 103].

E.     **The City Properly Trained, Supervised and Disciplined Its Officers.**

The GPD has various police policies governing traffic stops, use of force, and de-escalation training.  [DSOF ¶ 104].  The GPD regularly trains its officers on these policies. [DSOF ¶ 105].  Officers Schneider, Lindsey, and Fernandez were all trained on these policies in the academy and received Annual Officer Training.  [DSOF ¶ 106]. Officers Schneider, Lindsey, and Fernandez all testified that they were familiar with GPD's policies.  [DSOF ¶ 107].  The individual officers were also all POST certified officers.  [DSOF ¶ 108].  The City also supervised the Officers on a daily basis.  [DSOF ¶¶ 109-110].  Finally, before the incident, Schneider, Lindsey and Fernandez never received discipline for any use of force. [DSOF ¶ 111].  Indeed, the individual Defendants had no use of force issues prior to their hiring.  [DSOF ¶ 112].  Following the subject incident, the City disciplined Officer Schneider for violating its use of force policy for the one drive stun to Wheatcroft's shoulder just after he was handcuffed by suspending him for three days (30 hours).  [DSOF ¶ 113].

II.     **WHEATCROFT'S § 1983 WRONGFUL ARREST CLAIM FAILS.**

Wheatcroft's arrest did not violate his Fourth Amendment rights.   The Officers' actions were justified beginning with a *Terry* stop from an observed traffic infraction and blanket trespass agreement with Motel 6, progressing to an officer safety concern to remove Wheatcroft from the vehicle based on his on-scene conduct, which resulted in Wheatcroft's arrest after he actively resisted the officers' control and became combative.  As a result, probable cause existed for Wheatcroft's arrest.  At a minimum, no prior case with similar facts put the officers on notice their arrest would violate Wheatcroft's rights.

A.     **The Officers Had Reasonable Suspicion To *Terry* Stop The Car.**

The Fourth Amendment permits brief investigatory stops by police if the officers' actions are supported by reasonable suspicion that criminal activity is afoot.  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).  "[M]ost traffic stops," this Court has observed, "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." *Berkemer v. McCarty*, 468 U.S. 420, 439, n. 29 (1984).  To establish reasonable suspicion, the officer must articulate a particularized and objective basis for his suspicion that

8

the person is, or recently was, engaged in criminal activity.  *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014); *see also State v. Salcido,* 238 Ariz. 461, 464, ¶ 7 (2015) ("a traffic stop may be based on an officer's articulable suspicion that the person has committed a traffic violation."). Proof of wrongdoing is not required, and the level of suspicion is less than the probable cause necessary to arrest.  *Id.*  The officer is also allowed to "draw on [his or her] own experience and specialized training to make inferences from and deductions about the cumulative information available ... that might well elude an untrained person."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Important to the traffic stop at issue in this action, Arizona law requires an individual to use a turn signal "continuously" for at least one hundred feet before turning.  *See* A.R.S. § 28-754(B).  Indeed, the Court in *Salcido* also made clear that an individual is required to use their turn signal even where the only traffic near the vehicle is a police officer's vehicle.  *See Salcido*, 238 Ariz. at 465, ¶ 13.

Here, Officer Schneider had reasonable suspicion of criminal activity to briefly detain the car and its occupants.  Schneider testified he observed the car make a turn into the Motel 6 without using a turn signal.  His personal observation of a lack of a turn signal was more than reasonable suspicion that the driver of the vehicle had committed a traffic infraction and justified a *Terry* stop of the car and its passengers.  In addition, Motel 6 had a blanket trespass agreement with the City which justified the Officers stopping and confirming whether the vehicle and its occupants were guests of the Motel 6.  Thus, the Officers properly, temporarily, stopped the vehicle in the Motel 6 parking lot.

**B.     Schneider Had Authority To Request Wheatcroft's Name.**

An officer is free to ask a person for identification during a *Terry* stop. *See* A.R.S. § 13-2412; *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County*, 542 U.S. 177, 178 (2004) (citing to *INS v. Delgado*, 466 U.S. 210, 216, (1984)) ("Terry principles permit a State to require a suspect to disclose his name in the course of a Terry stop."); *see also United States v. Landeros*, 2017 WL 693371, at *6 (D. Ariz. Jan. 24, 2017) ("[t]he police may ask people who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure.") (citing *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007)).

9

In *Michigan v. Summers*, 452 U.S. 692 (1981), for example, the Supreme Court noted that one of the "most common" investigative techniques used in *Terry* stops is "interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained." *Id.* at 700 n. 12 (citation omitted) (emphasis added). In *Adams v. Williams*, 407 U.S. 143 (1972), the Supreme Court noted that "[a] brief stop of a suspicious individual… to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146 (emphasis added); *See also* A.R.S. § 28-622(A) ("A person shall not willfully fail or refuse to comply with any lawful order or direction of a police officer invested by law with authority to direct, control or regulate traffic.").

Here, considering the location's criminal history, the Taurus suspiciously backing into the parking spot with two men sitting in the front seats, the time of night, and the traffic infraction that Schneider observed, sufficient suspicion existed to inquire about trespassing and the observed traffic violation. As stated, because of the blanket trespassing agreement, Schneider and Lindsey did not need probable cause or reasonable suspicion to contact and talk with the occupants of the Ford Taurus to ascertain their reason for being present at the Motel 6. As a result, Schneider appropriately questioned Wheatcroft and asked for his identification.

**C.    Schneider Had Authority To Remove Wheatcroft Due To Legitimate Officer Safety Concerns.**

As the traffic stop transformed from routine into something more, Schneider properly and temporarily removed Wheatcroft from the car for officer safety concerns without turning the traffic stop into an arrest. Importantly, this Court and the Supreme Court have repeatedly emphasized that traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,'" the Supreme Court has stressed "'if the officers routinely exercise unquestioned command of the situation.'" *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 702–

10

703 (1981)). Thus, in *Arizona v. Johnson*, 555 U.S. 323, 330–31 (2009), the Supreme Court clarified that officers who conduct "routine traffic stop[s]" may "perform a 'patdown' of a driver and ***any passengers*** upon reasonable suspicion that they may be armed and dangerous." (emphasis added)

Here, under the totality of circumstances, Schneider had reasonable suspicion to believe that Wheatcroft may be armed and dangerous.  From Schneider's initial approach, Wheatcroft was evasive, refused to identify himself, and was reaching into his backpack and in various other parts of the car.  Wheatcroft then became increasingly agitated upon Schneider's questioning *while his backpack remained at his feet* – so much so that Lindsey heard the encounter from the other side of the vehicle and began asking the driver why Wheatcroft was so upset.  At this point, Schneider was justifiably concerned for his and Lindsey's safety given Wheatcroft's furtive movements, the high crime area, the inherent dangerousness in traffic stops, and the number of occupants in the vehicle (which outnumbered him and Lindsey). Thus, under existing precedent, Schneider properly attempted to temporarily remove Wheatcroft from the car for officer safety. *Johnson,* 555 U.S. at 330-31.

> **D.**    **Probable Cause Existed To Arrest Wheatcroft After He Refused Lawful Commands, Resisted Officer Control, and Assaulted The Officers.**

Probable cause to arrest or detain is an absolute defense to any § 1983 claim against police officers for wrongful seizure.  *Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998); *see also Hart v. Parks*, 450 F.3d 1059, 1065-66 (9th Cir. 2006) ("Probable cause exists when the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense."). Importantly, "suspicion to stop for investigatory detention may ripen into probable cause to arrest through the occurrence of facts or incidents after the stop." *United States v. Medina-Gasca*, 739 F.2d 1451, 1453 (9th Cir. 1984); *United States v. Greene*, 783 F.2d 1364, 1368 (9th Cir. 1986).

After Schneider opened the car door and attempted to remove Wheatcroft

11

1    from the vehicle due to safety concerns, Wheatcroft immediately tensed up and resisted

2    Schneider's lawful commands. Schneider told Lindsey that Wheatcroft was going to fight

3    despite Wheatcroft's contention otherwise. Sure enough, the encounter turned violent.

4    Wheatcroft refused to obey lawful commands and physically resisted any attempt to remove

5    him from the car.  Chapman then struck and knocked out Lindsey, after which Wheatcroft

6    was Tased and placed in handcuffs, but still continued to fight and resist arrest.    As

7    Schneider's body camera shows, Wheatcroft clearly kicked at Schneider and Fernandez after

8    he was handcuffed and continued to resist the Officers' control.  Based on his conduct,

9    probable cause existed to arrest Wheatcroft for resisting arrest and aggravated assault under

10   Arizona law after he resisted arrest and assaulted the Officers by fighting and kicking them.

11   *See* A.R.S. §§ 13-2508; 13-1204(A)(8)(a).

12           In addition, and independent of any probable cause developed by Schneider, a

13   Grand Jury indicted and delivered a True Bill on the charges against Wheatcroft.  Even

14   though the County Attorney chose not to prosecute, the True Bill establishes that probable

15   cause existed for Wheatcroft's arrest.  *Bryant v. City of Goodyear*, 2014 WL 2048013, at *3

16   (2014) ("[P]robable cause for an arrest 'may be satisfied by an indictment returned by a grand

17   jury.'") (*quoting Lacy v. Cnty. of Maricopa*, 631 F.Supp.2d 1183, 1193 (D.Ariz. 2008); *Awabdy v.

18   City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)).  Indeed, even Wheatcroft agreed during

19   his deposition that probable cause existed for his arrest as a result of the grand jury's

20   indictment.  [*See* DSOF ¶ 114].  In addition, as required at a criminal initial appearance, a

21   magistrate judge independently determines "whether probable cause exists for the purpose of

22   release from custody." Ariz.R.Crim.P. 4.2(a)(4).  Here, there was a clear determination that

23   probable cause existed for Wheatcroft's arrest under Ariz.R.Crim.P. 4.2(a)(4) because he was

24   held in custody until the turn down decision by the County Attorney.  *See also Rodriguez v.

25   Pima County Superior Court,* 123 Ariz. 555 (App. 1979); *State v. Abbott*, 103 Ariz. 336 (1968).

26           Thus, because probable cause clearly existed for Wheatcroft's arrest, his Fourth

27   Amendment § 1983 wrongful arrest claim fails as a matter of law.

28

E.      **The Officers Are Entitled To Qualified Immunity For The Investigatory Stop and Ultimate Arrest of Wheatcroft.**

The doctrine of qualified immunity protects government agents from liability for good faith actions while exercising discretionary authority in their official capacity. *Sonoda v. Cabrera*, 255 F.3d 1035, 1042 (9th Cir. 2001). Government officials performing such discretionary functions are generally shielded from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The United States Supreme Court has clarified the importance and burden of a plaintiff opposing a motion for summary judgment on a § 1983 claim to provide the Court with **specific** case law that put government agents on notice that their conduct violated clearly established law. *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017). Therefore, the dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Here, no case put the Officers on notice that their initial *Terry* stop of the vehicle was unconstitutional.  As a threshold issue, no case addresses the scope of an officer's ability to stop and question an individual where a blanket trespass agreement exists for the location of the stop. In any event, the stop at issue resembles many of the seminal cases affirming an officer's right to conduct a traffic stop.  Qualified immunity is proper for the initial stop for this reason alone.

Moreover, the cases cited above clearly establish an officer's right to question an individual about their identification and to remove an individual (passenger or otherwise) from a car during a traffic stop when the officer believes the individual poses a threat to officers or others.  No case with any facts similar to this one put Schneider on notice that he could not ask for Wheatcroft's name or that he would violate Wheatcroft's rights by temporarily detaining him for officer safety concerns.

Finally, after Wheatcroft refused to obey officer commands and became violent and fought with the Officers, probable cause existed for his arrest, as both the Grand

13

9263426.1

Jury and magistrate judge concluded.  Again, no case would have put the officers on notice they lacked probable cause to arrest Wheatcroft at this point. *See e.g., Wesbrock v. Ledford*, 464 F. Supp. 3d 1094, 1105 (D. Ariz. 2020) (noting qualified immunity may apply for arrest of suspect where Glendale Defendants had a reasonably arguable basis for believing, even after their investigation, that there was probable cause to arrest Plaintiff for trespassing (A.R.S. § 13-1502(A)(1)) and/or for refusing to provide his name after advisement by a peace officer (A.R.S. § 13-2412(A)); *Reed v. Lieurance*, 863 F.3d 1196, 1204-05 (9th Cir. 2017) ("[I]f an officer makes an arrest without probable cause, he or she may be entitled to qualified immunity as long as it is reasonably arguable that there was probable cause for the arrest.").

## III.    WHEATCROFT'S § 1983 EXCESSIVE FORCE CLAIMS FAIL.[11]

Wheatcroft claims that Schneider, Lindsey, and Fernandez violated his Fourth Amendment rights by using excessive force against him. Defendants note that if the Court were to just examine the number of applications of Taser use against Wheatcroft (four drive stuns and one to two dart mode tasings) arising out of a civil misdemeanor traffic stop, the use of force may appear to be excessive on its face.   Defendants anticipate Plaintiffs will argue such in their response.  However, each officer's respective use of force was measured and commensurate with the ever-increasing degree of force and dangerousness of the circumstances that Wheatcroft and Chapman posed. When examining each officer's use of force within the context and time period it occurred, without the benefit of 20-20 hindsight, each use of force was objectively reasonable under the circumstances.  What's more, no prior case "clearly" put the individual officers on notice that their respective uses of force would violate Wheatcroft's constitutional rights, within the context and time period they occurred, as they simply reacted to the circumstances presented and attempted to gain control over the rapidly unfolding, dangerous circumstances created by Chapman and Wheatcroft.

---

[11] Plaintiffs' Second Amended Complaint appears to plead a Fourteenth Amendment excessive force claim. [*See* Doc. 35 at 8]. However, the only cognizable claim for an intentional use of excessive force by law enforcement is under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *see also Lane v. City of Mesa*, No. CV-10-00852-PHX-SMB (D. Ariz. Dec. 10, 2019). Thus, as a matter of law, Plaintiffs' alleged Fourteenth Amendment excessive force claim must be dismissed with prejudice.

14

A.   **The Officers' Uses Of Force Did Not Violate Wheatcroft's Fourth Amendment Rights**.[12]

Fourth Amendment claims of excessive force are analyzed under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). The Court must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests in determining whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The Ninth Circuit has set forth a three-step test to determine objective reasonableness: "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posted an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* Here, all "*Graham* factors" weigh in favor of summary judgment for the Defendants on Wheatcroft's excessive force claim.

1.   **Non-Lethal Force Was Used.**

The use of a Taser in drive stun mode constitutes less than intermediate force while the use of a Taser in dart mode constitutes intermediate force. *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011); *Bryan v. MacPherson,* 630 F.3d 805 (9th Cir. 2010. The use of restraint tactics to gain control over an aggressively resisting suspect constitutes intermediate force. *Young v. County of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011).

2.   **Wheatcroft And Chapman Committed Serious Crimes.**

While this encounter initially began as a routine civil traffic stop, it rapidly

---

[12] Importantly, the Court's analysis of excessive force differs from any seizure inquiry under the Fourth Amendment. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015); *Bynum v. City of N. Las Vegas*, 2020 WL 8483837, at *6 (D. Nev. Aug. 31, 2020) (same). Thus, even in the event the Court finds that the initial stop and arrest of Wheatcroft was improper (which it was not), the reasonableness of the force used is independent of whether the seizure itself was proper and should be adjudicated pursuant to the applicable *Graham* standards set forth below.

15

evolved into chaos as the Officers were initially faced with an aggressive and noncompliant Wheatcroft who refused to provide his identification in violation of Arizona law.  *See* A.R.S. §§ 13-2412; 28-622(A).  The Officers were then faced with Chapman's violent physical assault on Lindsey.  Immediately after Chapman rendered Lindsey unconscious, Wheatcroft increased his actively aggressive resistance and became more combative and violent upon seeing his wife be taken into custody.  As a result, both Wheatcroft and Chapman committed serious felony crimes of resisting arrest and aggravated assault under Arizona law.  *See* A.R.S. §§ 13-2508; 13-1204(A)(8)(a).  Indeed, both were indicted and charged with these crimes, with Chapman ultimately pleading guilty.

### 3.     The Officers' Use Of Force Was Objectively Reasonable.[13]

Whether the Officers' use of force was "objectively reasonable" turns on "whether the degree of force used was necessary; in other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1281 (citing *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)).  A court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances." *Jackson v. Cty. of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001). This includes whether it was reasonable for "[the officer] to believe – at the point when events were rapidly unfolding – that someone was at risk of serious physical harm." *Mitchell v. Miller*, 790 F.3d 73, 80 (1st Cir. 2015).

### a.     Schneider's Use Of An "Escort Hold."

The Ninth Circuit has repeatedly held that the use of an escort hold and wrist lock techniques do not constitute an unreasonable use of force to obtain control over a suspect and do not pose a significant risk of injury.  *See Fuller v. Cty. of Orange,* 276 F. App'x 675, 680 (9th Cir. 2008) ("[P]lacing [the plaintiff] in a rear wristlock did not constitute an

---

[13] This section addresses the remainder of the *Graham* factors for the individual officers' respective uses of force including: (1) the risk of harm posed by Wheatcroft and Anya Chapman (the most important *Graham* factor) during the struggle, (2) whether warnings and/or lesser force were given/attempted prior to the use of force, and (3) whether the suspects were resisting arrest. *Glenn v. Wash. Cty.*, 673 F.3d 864, 872 (9th Cir. 2011).

16

unreasonable use of force."); *Bettis v. Bean*, 2015 WL 5725625, at *13 (D. Vt. Sept. 29, 2015) (recognizing that "[t]he rear wrist lock is a minimal use of force that generally does not pose a significant risk of injury" and that "use of [a] rear wrist lock was [] a reasonable means of obtaining control of an agitated and noncompliant individual whom he had probable cause to arrest and who appeared to pose an immediate threat to those in close proximity to him.").[14]

Here, under the totality of circumstances, Schneider placed his hand on Wheatcroft's right arm and then applied a control hold in an attempt to remove him from the vehicle for officer safety concerns. The stop itself occurred in a high crime area and the vehicle occupants attempted to exit the vehicle before officers could even approach it, putting them on alert. Wheatcroft then refused to obey officer commands, refused to identify himself, attempted on two occasions to put his hands into his backpack and center console area (when he had no reason to move them), and became increasingly agitated upon Schneider's questioning. Wheatcroft's movements within the vehicle caused the Officers great concern because they did not know what was in his hands, his backpack (which remained at his feet), or what was otherwise accessible in the vehicle. This, in combination with the dangerous nature of a traffic stop and the area in which it occurred, justified Schneider's minimally invasive use of force (i.e., to engage Wheatcroft's arm in an escort hold to control him and ensure that he would not reach for anything in any other area of the car, and to safely, temporarily, remove him from the vehicle).

### b.   Schneider's Taser Display.

Once Schneider put his hands on Wheatcroft, he immediately felt Wheatcroft tense up. Schneider commanded Wheatcroft to calm down and to stop resisting his attempts to place his arm into a control hold. After Wheatcroft refused to obey these commands, Schneider then drew his Taser and placed it on Wheatcroft, warning him that he would activate his Taser if Wheatcroft continued to resist him. After Wheatcroft told him he was

---

[14] *See also, Lee v. Hefner*, 136 F. App'x 807, 813 (6th Cir.2005); *Wilson v. Stallard*, 2010 WL 3291798, at *8 (W.D.Va. Aug. 19, 2010), aff'd, 403 F. App'x 797 (4th Cir.2010); *Johnson v. Nwankwo*, 2004 WL 1660375, at *1 (N.D.Tex. July 23, 2004); *Bermudez v. Kelly*, 1998 WL 798893, at *3 (N.D.Cal. Nov. 9, 1998).

9263426.1

not going to fight, Schneider holstered his Taser (despite Wheatcroft's continuing to tense his arm).  This minimal use of force, if it is force at all, was objectively reasonable given the totality of the circumstances, and demonstrated Schneider's attempt to de-escalate.

### c.   Lindsey's Drive Stuns After Wheatcroft Actively Resisted.

After Schneider holstered his Taser and attempted to remove Wheatcroft from his vehicle, Wheatcroft continued to actively and aggressively resist Schneider and Lindsey's control.  Importantly, to date the Ninth Circuit and the Supreme Court have failed to designate the use of a Taser in drive stun mode at a specific level of force.  *See Bynum,* 2020 WL 8483837, at *7 ("The Ninth Circuit has yet to opine as to what level of force is used when a taser is deployed in drive stun mode.").  However, when a suspect refuses to comply with lawful orders, poses a threat, and displays active resistance, courts within this Circuit have repeatedly indicated that the use of a Taser in drive stun mode is constitutional. *See Ceyala v. Toth*, 2020 WL 5868427, at *3 (D. Ariz. Oct. 2, 2020) ("It was objectively reasonable to pepper spray and Taser Mr. Valencia because he refused to comply with verbal commands to stop, drop the fire extinguisher, and get on the ground."); *Bynum*, 2020 WL 8483837, at *7 ("while Bynum's offenses may have not been considered severe, he posed a potential threat to safety when he resisted arrest and placed his hands under his body. He continued resisting, which resulted in an injury to Tonry's hand, and he was tased once in drive stun mode after being warned that he would be tased if he did not comply. There is no genuine dispute that the force was reasonable under the circumstances.").

While "active resistance" is not generally defined as "a failure to comply with the full extent of an officer's orders", *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012), an individual's physical interference against an arresting officer constitutes active resistance. *See e.g., Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001) (arrestee who repeatedly physically interfered with officer's arrest was actively resisting); *Hesterberg v. United States*, 71 F. Supp. 3d 1018, 1030 (N.D. Cal. 2014) (finding suspect resisted arrest under *Graham* when he pulled his arm away from the officer after she attempted to physically restrain him and suspect refused to turn around and put his hands behind his back so the

18

1   officer could handcuff him).

2            Here, Wheatcroft engaged in active resistance before Lindsey used his Taser in

3   drive stun mode.[15] Wheatcroft had refused to obey orders, was shouting and screaming

4   obscenities, was physically resisting Schneider's attempt to control him, and was interfering

5   with the Officers' removal of him from the vehicle.   Schneider's body camera reveals

6   Wheatcroft struggling with the officers for over 25 seconds before Lindsey drive stunned

7   Wheatcroft.  [DSOF ¶ 115 (SBC at 2:33:54-2:34:19)].  Specifically, while Schneider held the

8   back of Wheatcroft's right arm and grabbed Wheatcroft's right wrist, Wheatcroft pushed his

9   arm back and continued to fight Schneider's attempt to control his right arm.  [DSOF ¶ 116

10  (SBC at 2:33:56-2:34:01)].  Once Wheatcroft's arm was behind his back, he continued to

11  struggle, as seen on Schneider's body camera. Wheatcroft moved his arm back and forth, as

12  Schneider gave repeated commands to stop struggling and to relax.  [DSOF ¶ 117 (SBC at

13  2:34:01-2:34:19; LBC 2:34:09-2:34:16)].  Once again, Wheatcroft verbally stated he was not

14  struggling, but the video depicts he was.  [*Id.*]; *Scott*, 550 U.S. at 380-81.  In light of

15  Wheatcroft's active resistance, Lindsey warned Wheatcroft that he had a Taser on his

16  shoulder.  [DSOF ¶ 118 (LBC at 2:34:16-23)].  Despite this warning, Wheatcroft still did not

17  comply with officer commands, continued to tense his arm, and resisted the officers'

18  attempted control.

19  _____

20      [15] While Wheatcroft stated he was complying with officer commands, the video shows
him struggling with the officers by refusing to give his arm for them to control and remove
21  him from the vehicle.  This Court recently recognized that this kind of conduct is active
resistance in spite of a plaintiff's testimony to the contrary.  *See Spencer v. Aaron Pew, et al.*,
22  *2021 WL 927661, at \*5 (D. Ariz. Mar. 11, 2021)* ("Plaintiff contends that after he was on the
ground he was not resisting. Plaintiff's assertion is plainly contradicted by the video evidence.
23  The video of the incident shows that Plaintiff was struggling and refusing to submit both of
his hands to be handcuffed despite the Officers' repeated orders to allow them to handcuff
24  him. Although Plaintiff argues that his actions were "involuntary" because he could not move
his arm, this is not supported by the video. The video shows three large Officers straining to
25  get Plaintiff into a position where he could be successfully handcuffed, that Plaintiff is
repeatedly not complying with the Officer's orders, and that he is struggling against them. In
26  short, the evidence shows that Plaintiff resisted the officers' attempts to handcuff him.")
(citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (when opposing parties tell two different
27  stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could
believe it, a court should not adopt that version of the facts" in ruling on summary
28  judgment)).

It was only at this point, after commands became futile and a warning was given, that Lindsey drive stunned Wheatcroft. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012) ("if the officer warned the offender that he would employ force, but the suspect refused to comply, the government has an increased interest in the use of force."). This was the sum total of force involving Lindsey in this matter and it did not constitute excessive force under the circumstances given Wheatcroft's active resistance.

### d. Schneider And Fernandez's Taser Use In Dart Mode.

The Ninth Circuit has clearly stated the use of a Taser in dart-mode constitutes the use of "intermediate force." *Mattos*, 661 F.3d at 443.  The Ninth Circuit, however, has been less generous in defining what circumstances justify the use of a Taser in dart mode.[16] For example, while the Ninth Circuit has held that "a desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury", it has recognized that that concern paired with some "other significant circumstances that warrant[s] the use of such a degree of force at the time it is used" would be sufficient to justify use of a Taser in dart mode. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).  In *Bryan v. MacPherson,* 630 F.3d 805 (9th Cir. 2010), the Ninth Circuit clarified that the use of a Taser in dart mode without warning against a mentally ill suspect, who was 15-25 feet away from the officer and faced away from and posed no risk of harm to the officer, violated the suspect's Fourth Amendment rights.  *Id.* at 833. Regardless, the guiding force of the inquiry is always the objective reasonableness under the totality of circumstances.  *Bryan*, 630 F.3d at 826.

### (1)   Schneider's Taser Use In Dart Mode.

Here, under the totality of the circumstances, the facts of this case demonstrate the kind of circumstances contemplated by *Deorle* (and unlike those in *Bryan*) to justify Officer

---

[16] As of the time of the incident giving rise to this action, there were only **two** cases in the Ninth Circuit addressing the use of a Taser, *see e.g., Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) and *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (consolidating two appeals), with only one (*Bryan*) addressing the use of a Taser in dart mode.  Defendants note that *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 950 (9th Cir. 2017), was decided after the incident involving this action.

Schneider's use of a Taser in dart mode on Wheatcroft. As noted above, despite repeated officer commands, Wheatcroft refused to exit his vehicle, tensed up, and resisted officer control after shifting his hands in between his backpack and the center console. Schneider commanded Wheatcroft to exit the vehicle for officer safety concerns, which Wheatcroft ignored. Schneider warned Wheatcroft that he would drive stun him if he was going to fight. Wheatcroft said he would not, yet continued to fight. Lindsey then placed his Taser on Wheatcroft's shoulder and warned him he would be drive stunned. Wheatcroft also ignored this warning and, as warned, received a drive stun from Lindsey. That drive stun was ineffective at gaining compliance. In fact, Wheatcroft continued to actively resist after drive stun. *See Little v. City of Richmond*, 13-CV-02067-JSC, 2015 WL 3543127, at *6 (N.D. Cal. June 5, 2015) (finding Plaintiff's continued thrashing after two ineffective applications of a Taser was not due to incapacitation, but rather continued active resistance).

During the struggle with Wheatcroft, Anya Chapman intentionally reentered the vehicle, obtained a weapon (in the form of a 4.5-pound plastic bag filled with soda), and hit Officer Lindsey in the head, knocking him unconscious. This was potentially the use of deadly force by Chapman. At that point, Schneider had a legitimate, well-grounded concern for his own safety, and the safety of Lindsey and Fernandez; he had witnessed Chapman violently assault and knock out Lindsey and he was now facing three adults, two of whom were already violent. Moreover, unlike most cases which address this situation, Schneider was not speculating, but had just witnessed the objective reality that Chapman had violently assaulted and incapacitated Lindsey. *C.f., Rodriguez v. City of Modesto*, 2015 WL 1565354, at *17 (E.D. Cal. Apr. 8, 2015) ("a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."). Indeed, Schneider's body worn video camera moments after the incident demonstrates, in real time, Schneider's concern about having a "3 on 1" after Lindsey was knocked out. [Ex. 9, SBC at 2:39:00-15]. It was only after seeing Lindsey's incapacitation, and repeated warnings that Wheatcroft would be tased if he continued to fight, that Schneider resorted to dart mode Taser use. These acts are a far cry from those involved in *Bryan. See* 630 F.3d at

21

830 ("The only resistance Officer MacPherson testified to was a failure to comply with his order that Bryan remain in his car. Shouting gibberish and hitting one's quadriceps is certainly bizarre behavior, but such behavior is a far cry from actively struggling with an officer attempting to restrain and arrest an individual.").

Finally, the record is clear that both of Schneider's Taser probes in dart mode did not properly connect with Wheatcroft and neither was Wheatcroft incapacitated after Schneider used his Taser in dart mode. [DSOF ¶¶ 59-61]. Schneider's use of a Taser in dart mode, then, was not the use of intermediate force. Moreover, Wheatcroft *admitted* that the Taser dart mode use did not incapacitate him. [DSOF ¶ 63]. Thus, without the actual incapacitating effect caused by a Taser in dart mode, Plaintiff cannot prove the causation requirement contained within § 1983 to support an excessive force claim based on dart mode Taser use. 42 U.S.C. § 1983; *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008) ("In a § 1983 action, the plaintiff must ... demonstrate that the defendant's conduct was the actionable cause of the claimed injury."); *id.* at 1026 (plaintiff must establish both causation-in-fact (which is sometimes also known as actual causation), and proximate causation (which is sometimes also known as legal causation)).

In sum, under the totality of circumstances involving these rapidly evolving and escalating circumstances, Schneider was justified in using his Taser in dart mode to resolve what was *already* a dangerous situation, gain control over Wheatcroft, and avoid any further violence by Chapman or others.

### (2)     Fernandez's Taser Use in Dart Mode.

Fernandez's dart mode Taser use was also appropriate. When Fernandez arrived on scene it was already rapidly devolving into chaos. Upon arriving, Fernandez was immediately waved over by Lindsey to watch the driver of the car as Wheatcroft became increasingly agitated. After hearing Officers Schneider and Lindsey struggle in an attempt to control Wheatcroft, Fernandez went to the passenger side of the car to assist. As he was moving, he saw Lindsey fall to the ground and believed that Wheatcroft (not Chapman) had knocked Lindsey out. Fernandez then observed Schneider deploy his Taser in dart-mode,

22

1    which was ineffective at immobilizing Wheatcroft.  It was only at this point that Fernandez

2    used his own Taser in dart mode against Wheatcroft.  Under the totality of circumstances,

3    Fernandez's use of a Taser in this fashion was justified and entirely proper.

4                    **e.      Schneider's Post-Handcuffing Groin Strike & Drive Stuns.**

5                    The effect of Fernandez's dart mode only delayed Wheatcroft's active

6    resistance. Fernandez still had great difficulty handcuffing, but finally did handcuff the

7    actively resisting Wheatcroft. As Wheatcroft was still resisting arrest, unbeknownst to

8    Schneider, Fernandez was able to place him in handcuffs.   Unaware that Fernandez had

9    handcuffed Wheatcroft, Schneider used his Taser in drive stun mode on the still resisting

10   Wheatcroft.[17]  Given Wheatcroft's active resistance at that moment and his failure to comply

11   with repeated officer commands, this use of force was objectively reasonable under the

12   circumstances.  *See Wade v. Fresno Police Department*, 2012 WL 253252 (E.D. Calif. 2012)

13   (finding even where a suspect is handcuffed and resisting, use of drive stun mode is not

14   excessive force); *Ceyala*, 2020 WL 5868427, at *3; *Bynum*, 2020 WL 8483837, at *7; *Sanders*,

15   409 Fed. Appx. at 290 ("It is not clearly established that a police officer is prohibited from

16   momentarily tasering an uncooperative handcuffed arrestee who—after multiple warnings—

17   refuses to comply…").[18]

18                   Wheatcroft was then rolled onto the ground where he continued to resist

19   arrest, violently thrashed his legs, and kicked Officer Schneider.  The record is undisputed

20   that even after Wheatcroft was handcuffed, he was far from under the officers' control.

21   Indeed, Wheatcroft stated after he was handcuffed and, on the ground, that he saw his wife

22   being arrested, at which point he continued to fight with the officers.  Schneider's body

23   camera shows Wheatcroft thrashing on the ground and resisting the officers' attempted

24

25      [17]  Again, the record is uncontested that Schneider's Taser was defective and not delivering the appropriate charge for its use.

26      [18]  That Schneider was later disciplined for violating the City of Glendale's use of force
27   policy for this particular act does not establish a constitutional violation. *See Devereaux v. Perez*,
     218 F.3d 1045, 1056 (9th Cir. 2000) (internal policy did not create constitutionally protected
     due process rights); *see also Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to
28   follow internal prison policies does not rise to the level of a constitutional violation).

                                                      23

control.  The officers commanded Wheatcroft to "stop" as they tried to control him.  Then Wheatcroft kicks Schneider with his unrestrained feet. In direct response to Wheatcroft's kicking, Schneider reflexively kicked Wheatcroft back.  This was reasonable given the totality of the circumstances.  *See Buckley*, 292 Fed. Appx. at 795 ("The district court's suggestion that Plaintiff had been fully secured because he was handcuffed is mistaken: Plaintiff was not bound at the feet (so, he could both run and kick), he was moving around on the ground … and he would not comply with the deputy's repeated instructions...").

This reflexive kick, however, proved ineffective at stopping Wheatcroft's continue active aggression and kicking.  Therefore, in an attempt to gain compliance, Schneider drive stunned Wheatcroft in the buttocks area (the only area exposed as Wheatcroft was on his stomach on the ground).  This act was also reasonable under the circumstances.  *See e.g., Wade*, 2012 WL 253252; *Sanders*, 409 Fed. Appx. at 290; *Devoe v. Rebant*, 2006 WL 334297, at *6 (E.D. Mich. Feb. 13, 2006) ("Even after being handcuffed, Mr. DeVoe argued with officers and refused to enter the patrol car. Attempting to physically force Mr. DeVoe into the vehicle likely would have escalated the situation into a physical struggle in which Mr. DeVoe or the officers could have been seriously injured. The single use of the Taser gun causing a one-time shocking which did not inflict any serious injury was a reasonable use of force under the circumstances.").

\*\*\*

In short, although not required to use the least intrusive degree of force possible, the officers' uses of force increased in degree as Wheatcroft escalated the physical encounter rapidly and violently—i.e., officer presence, Schneider/Lindsey's verbal commands, Schneider's attempted control tactics, Lindsey's Taser drive stun applications, and Schneider/Fernandez's dart mode Taser use.  The officers' use of force then deescalated as the situation began to get under control and Wheatcroft continued to actively resist, but was placed in handcuffs.  Finally, when the situation reignited and Wheatcroft began violently struggling on the ground and assaulted the Officers, they reacted in turn (i.e., Schneider's drive stuns and minor physical force on Wheatcroft after he was handcuffed).  Given the

short time frame in which this rapidly evolving encounter occurred, Chapman's incapacitating assault on Lindsey, and Wheatcroft's subsequent assaults on Schneider and Fernandez, the officers' respective uses of force were objectively reasonable.

**B.    The Individual Officers Are Entitled To Qualified Immunity.**

Even if Officers Schneider, Lindsey, or Fernandez used excessive force at some point in their encounter with Wheatcroft, *which they did not*, they would be entitled to qualified immunity for their individual acts.  Again, to defeat qualified immunity a Plaintiff must provide specific case law with similar facts on point to demonstrate the officers were on notice that their conduct violated an individual's constitutional rights.  *See supra* § II(E).  Moreover, in the Fourth Amendment excessive force context, "specificity is especially important," *Mullenix v. Luna*, 577 U.S. 7 (2015), and "thus police officers are entitled to qualified immunity unless existing precedent *squarely* governs the specific facts at issue," *Kisela* v. *Hughes*, 138 S.Ct. 1148, 1153 (2018) (emphasis added); *see also Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) *Ventura v. Rutledge*, 2020 WL 6192981, at *2 (9th Cir. Oct. 22, 2020).  Here, there was no case law that "squarely" put Officers Schneider, Lindsey, or Fernandez on notice that their actions violated clearly established Fourth Amendment rights when they each attempted to react and control the rapidly evolving, violent, and combative circumstances that Wheatcroft and Chapman created.

**1.    No Prior Case Put Schneider and Lindsey On Notice That Their Removal of Wheatcroft From The Vehicle Using an "Escort Hold" Violated His Constitutional Rights.**

The law in the Ninth Circuit affirms the use of defensive tactics when removing a suspect from a vehicle for officer safety concerns.  *See Fuller v. Cty. of Orange,* 276 F. App'x 675, 680 (9th Cir. 2008); *Bettis v. Bean*, 2015 WL 5725625, at *13 (D. Vt. Sept. 29, 2015); *see also Martinez v. Town of Prescott Valley*, 2020 WL 3403239 (D. Ariz. June 19, 2020) (granting officers summary judgment after using a takedown maneuver and using pressure points to restrain and handcuff non-compliant suicidal person).  No case law squarely put Schneider or Lindsey on notice that their attempts to remove Wheatcroft from the vehicle for officer safety concerns would violate his Fourth Amendment rights.  Qualified immunity

25

is appropriate in their favor for this use of force.

### 2. No Prior Case Put Schneider On Notice That Threatening Use of His Taser Violated Wheatcroft's Constitutional Rights.

To the extent Schneider's threatened Taser use constituted a use of force and it was actually improper (which it was not), no case exists within the Ninth Circuit or Supreme Court demonstrating that brandishing a Taser to gain control over a noncompliant and resisting suspect constitutes excessive force – particularly when Schneider holstered his Taser after Wheatcroft stated he was not going to fight.

### 3. No Prior Case Put Lindsey On Notice That A Drive Stun Into Wheatcroft's Shoulder Violated His Constitutional Rights.

A multitude of courts in the Ninth Circuit have either found that multiple drive-stun Taser applications do not constitute excessive force and/or found qualified immunity under similar circumstances as in this case. *See e.g., Sanders v. City of Fresno,* 551 F.Supp.2d 1149 (E.D. Calif. 2008) (finding qualified immunity where multiple drive stun applications used on a struggling misdemeanant); *Neal-Lomas v. Las Vegas Metropolitan PD,* 574 F.Supp.2d 1170 (D. Nev. 2008) (finding 7 discharges from stun gun were reasonable force on a resisting/struggling arrestee); *Law v. City of Post Falls,* 772 F.Supp.2d 1283, 1299 (D. Idaho, 2011) (finding "even if this Court were to rule that Plaintiff was entirely compliant, under the Ninth Circuit's holding in *Brooks*, this Court cannot find the use of the Taser in 'drive-stun' mode to be excessive. Put a slightly different way, if tasing a pregnant woman three times during a traffic stop and 'extract[ing] her from the car through a combination of pushing and pulling' does not constitute excessive force, then this Court cannot find the use a Taser in drive stun mode excessive…"); *Ciampi v. City of Palo Alto,* 790 F.Supp.2d 1077 (N.D. Cal. 2011) (finding use of drive-stun mode not excessive where suspect was resisting arrest); *Williams v. City of Merced,* 2013 WL 498854 (E.D. Cal. 2013) (finding no clearly established law that going "hands-on" with a suspect and using drive-stun mode is unconstitutional).

Thus, Lindsey was not on notice that his two 0.2 second Taser applications would violate Wheatcroft's Fourth Amendment rights, when Wheatcroft did not comply with officer commands and actively resisted officer control.

26

9263426.1

1      **4.    No Prior Case Put Schneider And Fernandez On Notice That The**
2                  **Use Of A Taser In Dart Mode Violated Wheatcroft's**
                 **Constitutional Rights.**

3      With regard to Schneider, no Ninth Circuit or United States Supreme Court

4  case involved the use of a Taser in dart-mode against a non-compliant suspect who: 1)

5  created officer safety concerns (reaching into bag and between the seats); 2) ignored repeated

6  officer commands; 3) was warned he would be tased twice; 4) was still physically resisting

7  officer control; and 5) was in the immediate zone of danger of another individual who just

8  used potential deadly force to render another officer unconscious right next to Schneider,

9  leaving him legitimately concerned about then having to face three combative adults.

10  Existing case law demonstrates that qualified immunity is appropriate under these

11  circumstances. *See e.g., Dormaier v. City of Soap Lake*, 2020 WL 6687356, at *6 (E.D. Wash.

12  Nov. 12, 2020), appeal dismissed, 20-36012, 2021 WL 650784 (9th Cir. Feb. 12, 2021)

13  (Finding officer was entitled to qualified immunity on Plaintiff's excessive force claim because

14  there was no case law as of October 12, 2017 that unambiguously announced a right to not

15  be tased, where officer was alone in a rural area with a resistant suspect, and backup was not

16  certain to come quickly).  Moreover, there is certainly no Ninth Circuit case addressing the

17  use of a Taser that not only fails to properly connect with both probes, but also has a

18  defective battery. *See e.g., A.B. v. County of San Diego*, 2020 WL 5847551, at *15 (S.D. Cal. Oct.

19  1, 2020) ("Here, there is no genuine dispute that Kristopher was actively resisting detainment

20  by first wrestling with Deputy Garza just prior to the first Taser deployment, then lunging at

21  Deputy Garza before fleeing to the parking lot after the initial Taser deployment and during

22  the next Taser deployments. Moreover, the Taser deployments did not have the intended

23  effect of immobilizing Kristopher long enough for the deputies to handcuff him.").

24      With regard to Fernandez, not only was he under the reasonably mistaken

25  belief that Wheatcroft (not Chapman) knocked out Lindsey, but he also observed the

26  ineffectiveness of Schneider's dart mode Taser application on Wheatcroft. No existing case

27  law put Fernandez on notice that his use of a Taser in dart mode was unconstitutional after

28  Schneider's previous use failed to incapacitate the suspect and Fernandez reasonably believed

that the suspect had just assaulted and knocked out a fellow police officer.  Again, existing case law justifies qualified immunity findings under similar circumstances.  *See e.g., A.B.*, 2020 WL 5847551, at *15; *see also Lamont v. New Jersey,* 637 F.3d 177, 183 (3d Cir. 2011) ("[A]n officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable."); *Graham* 490 U.S. at 396 ("Court must account for the reality that police officers make quick decisions in high-stress situations.").

### 5. No Prior Case Put Schneider On Notice That His Post-Handcuffing Acts Violated Wheatcroft's Constitutional Rights.

Finally, no specific legal authority as of July 26, 2017, put Schneider on notice that a single application of a drive stun just as Wheatcroft was handcuffed (and still resisting as Wheatcroft admitted and as seen on body camera footage) or after Wheatcroft kicked him was unconstitutional.  *See e.g., Wade,* 2012 WL 253252; *Sanders,* 409 Fed. Appx. at 290; *Devoe,* 2006 WL 334297, at *6.  In addition, no case previously establishes under similar facts that a single reactionary groin strike against a combative, resisting suspect who was handcuffed, but had just kicked the officer, was unconstitutional. This is particularly true where Schneider's Taser was defective and not operating properly.  Schneider is, therefore, entitled to qualified immunity for his use of force after Wheatcroft was handcuffed.

## IV. WHEATCROFT'S § 1983 RETALIATION CLAIM FAILS.

As a threshold issue, because there was probable cause to arrest Wheatcroft, Wheatcroft's First Amendment retaliation claim fails. *Hunt v. City of Boulder City,* 2020 WL 1548469, at *2 (9th Cir. Apr. 1, 2020) (citing *Nieves v. Bartlett,* 139 S.Ct. 1715, 1724 (2019)) ("When there is probable cause for an arrest, a First Amendment retaliation claim fails as a matter of law.").  But even if Schneider lacked probable cause to arrest Wheatcroft, Wheatcroft does not satisfy the required elements of a First Amendment claim. To state a First Amendment retaliation claim against a government official, "a plaintiff must prove '(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between

the constitutionally protected activity and the adverse action.'" *Alfred E. Caraffa v. Tempe (AZ) Police Dep't.*, 2020 WL 919168, at *4 (D. Ariz. Feb. 26, 2020) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (footnote omitted)).

Here, even assuming Wheatcroft was engaged in any First Amendment-protected speech, there was no substantial causal relationship between his speech and his eventual arrest.[19] For a plaintiff to prevail on their First Amendment retaliation claim, he must be able to show that the officer would not have detained him *but for* his First Amendment-protected speech. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). When substantial evidence demonstrates that an individual was detained for safety concerns and his physical conduct towards the officer, there can be no causation finding sufficient to sustain a First Amendment retaliation claim. *Crump v. Bay Area Rapid Transit District, et. al*, 2020 WL 4037413 (9th Cir. July 17, 2020).

As set forth above, Wheatcroft was detained as part of a routine traffic stop. While detained, he aggravated the situation by reaching into a backpack, failed to give his name, and not complying with Officer Schneider's commands. As this occurred, Wheatcroft escalated the encounter by resisting Schneider and Lindsey's efforts to remove him from the vehicle and then later actively resisted and ultimately fought with the Officers after his wife (Chapman) knocked Lindsey out. Put simply, there is no causal connection between Wheatcroft's conversation and refusal to give his name and his eventual arrest other than the Officers' reacting to Wheatcroft's ever escalating and violent conduct. Wheatcroft, therefore, did not suffer a First Amendment violation. Wheatcroft was arrested for violent crimes, not for failing to provide his name.

Finally, without repeating the qualified immunity case law above, Plaintiff must provide, and cannot, a specific case with substantially similar facts that put Schneider on notice that his conduct would violate Wheatcroft's First Amendment rights. Therefore, even if there were a First Amendment violation, Schneider is entitled to qualified immunity.

---

[19] Defendants do not waive any right to later contest that Wheatcroft was not engaged in constitutionally protected speech or that such speech was chilled by Schneider's conduct.

## V.   WHEATCROFT'S MALICIOUS PROSECUTION CLAIM FAILS.

A Plaintiff's failure to establish a lack of probable cause in a malicious prosecution action is a complete defense and warrants a grant of summary judgment. *See e.g., Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994); *Bird v. Rothman*, 128 Ariz. 599, 602 (Ariz.Ct.App. 1981).   Probable cause existed for Wheatcroft's arrest.  *See supra* § II.  Thus, Wheatcroft's malicious prosecution claim fails as a matter of law.  In addition, to prevail on a § 1983 claim of malicious prosecution, a plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).   Schneider and the other Officers had no malice in arresting Wheatcroft.   Rather, their conduct was entirely in reaction to the aggressive and violent conduct of Wheatcroft and Chapman.  There is simply no evidence in the record that Schneider, Lindsey, or Fernandez arrested Wheatcroft "with malice" and for the purpose of denying him equal protection under the law.  Finally, even if Wheatcroft could somehow establish a malicious prosecution claim, Defendants are entitled to qualified immunity for their acts, since no case with similar facts put the Defendants on notice that arresting Wheatcroft for resisting arrest and aggravated assault under these facts would violate his constitutional rights.

## VI.   PLAINTIFFS' § 1983 FAMILIAL ASSOCIATION CLAIM FAILS.[20]

To prevail on a familial association claim, plaintiffs must "prove that the officers' use of force shocked the conscience." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  When, as a practical matter, the officer does not have time to deliberate, as here, "a use of force shocks the conscience *only* if the officer[] had a 'purpose to harm' the decedent for reasons unrelated to

---

[20] Plaintiffs have identified Count V of their Second Amended Complaint as "Civil Rights Violations" under 42 U.S.C. § 1983. However, the language of that section of their complaint describes a "constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of the parent/child relationship without governmental interference . . . ." [*See* Doc. 35 at ¶ 108]. Accordingly, the Defendants treat this as a familial association claim, albeit pled under a different identifier.

1    legitimate law enforcement objectives. *Id.*  Thus, a plaintiff must have more than speculation

2    as to improper motive to survive summary judgment. *Id.* at 798.

3          Here, it is undisputed that Officers Schneider, Lindsey, and Fernandez had to

4    make a series of split-second decisions based the chaotic and rapidly unfolding situation

5    before them. This rapidly-escalating and violent confrontation lasted less than three minutes,

6    leaving the Defendant Officers with no time to deliberate in the face of Wheatcroft's

7    noncompliance and Chapman's violent attack on Officer Lindsey. Therefore, Plaintiffs must

8    show that the Officers had a purpose to harm Wheatcroft, B.W. or J.W. unrelated to

9    legitimate law enforcement objectives. The record is devoid of any facts that demonstrate this

10   was the case.  All of the officers were reacting to the chaotic situation which was directly

11   related to legitimate law enforcement objectives.  Moreover, Plaintiffs do not allege, and the

12   record fails to demonstrate, that any of the Officers previously knew the Plaintiffs prior to

13   the incident and wanted to "get even" with any of them for some alleged prior wrong. *See*

14   *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). For this reason, Plaintiff's Fourteenth

15   Amendment familial association claim fails.  But even if Plaintiffs could somehow establish

16   the Officers acted with some vendetta to "get even", Defendants are entitled to qualified

17   immunity for their acts because no similar case put them on notice that their conduct violated

18   Plaintiffs' familial association constitutional rights.

19   **VII.    PLAINTIFFS' *MONELL* CLAIMS AGAINST THE CITY ALL FAIL.**[21]

20       **A.    Plaintiffs' Claims Fail Because There Is No Individual Officer Liability.**

21         Under 42 U.S.C. § 1983, if there is no constitutional violation, the municipality

22   cannot be held liable as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799

23   (1986); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Here, because the

24   Plaintiffs suffered no constitutional violation by the individual Defendants (or because the

25   Defendants are entitled to qualified immunity), summary judgment is appropriate on

26   ───────────────

27       [21] The Court should dismiss Plaintiffs' claims against the individual Officers in their "official capacity" because such claims are duplicative of their *Monell* claim against the City of

28   Glendale. *Center for Bio-Ethical Reform, Inc. v. L.A. County Sheriff's Dep't*, 533 F.3d 780, 799 (9th Cir. 2008); *Topete, v. Mesa Police Dep't, et al.*, 2019 WL 11851136, at *2 (D. Ariz. July 18, 2019).

1   Plaintiffs' *Monell* claim. *See Daily v. City of Phoenix*, 2017 WL 6527298 at *9 (D. Ariz. Aug. 8,
2   2017) affirmed in part, reversed in part on other grounds, 765 Fed.Appx. 325 (9th Cir. 2019).

3        **B.**     **Plaintiffs' *Monell* Claims Fail On The Merits.**

4            **1.**    **Failure to Train.**

5           To establish a "policy" of inadequate training, Plaintiff must offer "proof of
6   facts evidencing the local government's awareness of a high probability of harm if the
7   government failed to act." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1453 (9th Cir. 1991). "A
8   pattern of similar constitutional violations by untrained employees is ordinarily necessary to
9   demonstrate deliberate indifference for purposes of failure to train[.]" *Flores v. Cty. of L.A.*,
10   758 F.3d 1154, 1159 (9th Cir. 2014). After all, "[w]ithout notice that a course of training is
11   deficient in a particular respect, decision makers can hardly be said to have deliberately
12   chosen a training program that will cause violations of constitutional rights." *Connick v.
13   Thompson*, 563 U.S. 51, 62 (2011). In addition, Plaintiff must identify the specific deficiency in
14   the City's training or supervision and establish that the deficiency directly caused the
15   constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Atwood v. Town
16   of Ellington*, 427 F. Supp. 2d 136, 145 (2006). Plaintiff must also show the City made a
17   "conscious" or "deliberate" policy decision knowing this incident would likely result. *City of
18   Canton*, 489 U.S. at 389. Thus, municipal liability "is at its most tenuous where a claim turns
19   on a failure to train." *Connick*, 131 S. Ct. at 1359. Simply put, the City cannot be held liable
20   absent sufficient evidence of a "program-wide inadequacy in training." *Blankenhorn v. City of
21   Orange*, 485 F.3d 463, 484–85 (9th Cir. 2007).

22           Here, Plaintiff's *Monell* training claim fails because he cannot refute that the
23   individual officers completed all training requirements for AZPOST certification. *See Mendez
24   v. Cnty. of San Bernardino*, 540 F.3d 1109, 1123 (9th Cir. 2008), *overruled on other grounds*, *Arizona
25   v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (affirming dismissal where plaintiff failed to
26   controvert evidence that officer's training met state POST requirements); *Hillbloom v. Cnty. Of
27   Fresno*, 2010 WL 4481770, at *11, 34 (E.D. Cal. Nov. 1, 2010); *see also Ward v. Still*, 2012 WL
28   37518, *13-14 (E.D. Tenn. 2012) ("If ... police officers were certified by the POST

Commission, then the issue of the adequacy *vel none* of their training is resolved."). In addition, the record lacks evidence of any pattern of deficient training to put the City on notice that its training and policies regarding police procedures, traffic stops, or use of force were deficient. *Flores*, 758 F.3d at 1159. Specifically, the City's policy on use of force properly instructed the individual officers on the appropriate scope of force and use of a Taser. Neither are there any facts in the record involving prior incidents putting the City on notice that its policies were deficient. Accordingly, there was no formal or informal policy, practice, or custom by the City that was the moving force behind Plaintiff's injuries. Further, there was no formal or informal policy, practice, custom, or procedure that constituted deliberate indifference toward Plaintiffs' rights. Thus, to the extent Plaintiff asserts *Monell* liability on the ground that the Officers failed to follow the City's policies and procedures, such an argument cannot establish *Monell* liability. *See City of Canton*, 489 U.S. at 390-91.

### 2. Failure to Supervise.

"Usually, a failure to supervise gives rise to section 1983 liability only in situations in which there is a history of widespread abuse." *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir.1982) (emphasis added); *see also Santos ex rel. Santos v. City of Culver City*, 228 Fed.Appx. 655, 659 (9th Cir. 2007) (affirming the district court's grant of summary judgment on a *Monell* claim under the "moving force" prong because there was no evidence of a causal link between city's policies and the officer's actions); *D.T. ex rel. M.T. & K.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1180, 1192–93 (10th Cir. 1990) (holding that a school district's policy of supervising its employees was not the "moving force" behind a teacher's alleged molestation of students because there was insufficient evidence of a direct causal link between only sporadic supervision and subsequent molestations). Here, the record demonstrates that the individual Officers were adequately and routinely supervised while they were in the field. Moreover, no evidence shows the City should have provided additional supervision to these Officers because neither had any prior discipline for use of force. Defendants are unaware of any authority requiring officers to be constantly operating under an acting supervisor while on duty. Moreover, even if such supervision were required, such

33

1   purported failure amounts to a single incident of officer misbehavior, which cannot establish

2   *Monell* liability as a matter of law. *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000);

3   *Vasquez v. City of Santa Paula*, 2015 WL 12734071, at *3 (C.D. Cal. Mar. 11, 2015).

### 3.    Ratification.

5          To prove ratification, Plaintiff must show the authorized policymaker

6   approved both a subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik*, 485

7   U.S. 112, 127 (1988). This requires a showing that the decision triggering § 1983 liability "was

8   the product of a conscious, affirmative choice to ratify the [unconstitutional] conduct in

9   question." *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) (internal quotation marks

10   omitted), *rev'd on other grds*, *Brosseau v. Haugen*, 543 U.S. 194 (2004). In addition, the Ninth

11   Circuit has held that merely failing to discipline individual officers accused of

12   unconstitutional conduct does not amount to ratification. *Haugen*, 351 F.3d at 393. Rather,

13   Plaintiff must show the City made a deliberate choice to endorse the officers' actions and the

14   bases for them as its own policy. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Here,

15   there was no unconstitutional decision the City could ratify.  The individual officers did not

16   use excessive force or otherwise violate Plaintiffs' constitutional rights.  There is also no

17   evidence that the City had a policy that tolerated or ratified Defendants conduct. In fact, the

18   City enacted policies to ensure discipline for out-of-policy conduct. That Schneider **was**

19   **disciplined** for one of his uses of force during this incident after an investigation is not

20   evidence of ratification, but rather proof that the City investigated and disciplined its

21   employee.  The City did not ratify any conduct at issue in this action.

## VIII.  THE MINOR PLAINTIFFS' STATE LAW CLAIMS FAIL.

23          As set forth below, because the individual officers in this action neither

24   committed the tort of negligent infliction of emotional distress (NIED), nor intentional

25   infliction of emotional distress (IIED), the City of Glendale has no liability for the minor

26   Plaintiffs' state law claims. *See Torres v. Kennecott Copper Corp.*, 15 Ariz.App. 272, 274 (1971).

### A.    The Minor Plaintiffs' IIED Claim Fails.

28          To establish an IIED claim in Arizona, a plaintiff must show that: (1) the

defendant intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his conduct; (2) the conduct by the defendant was extreme and outrageous; and (3) severe emotional distress occurred as a result of defendant's conduct. *Pankratz v. Willis,* 155 Ariz. 8, 13 (App. 1987) (To support an intentional infliction of emotional distress claim "[t]here must be conduct 'intended to inflict injury or engaged in with the realization that injury will result."). To survive summary judgment, the plaintiff must also show that the defendant's acts were "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exch.,* 10 Ariz. App. 560, 562 (1969). The issue may only go to the jury where "reasonable minds may differ." *Nelson v. Phoenix Resort Corp.,* 181 Ariz. 188, 199 (App. 1994) (trial court must "make a preliminary determination" whether conduct was extreme and outrageous). Thus, "[e]ven if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Nelson,* 181 Ariz. at 199. Rather, "conduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct." *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 257 (1980).

Moreover, "[a] line of demarcation should be drawn between conduct likely to cause mere 'emotional distress' and that cause 'severe emotional distress.'" *Midas Muffler Shop v. Ellison,* 133 Ariz. 194, 199 (App. 1982) (citation omitted); *see also* Restatement (Second) of Torts § 46 cmt. j (1965) (liability only arises when emotional distress is extreme; "Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people."). Thus, crying, being stressed and upset, and occasional trouble sleeping are not enough to establish severe emotional distress. *Midas,* 133 Ariz. at 199.

Here, there is no evidence that any of the individual officers **intended** to cause the minor Plaintiffs emotional distress. Rather, the only evidence of Defendants' intent is their own unrefuted testimony that they were reacting to a chaotic situation, created and

35

exacerbated by the minor children's parents' conduct. For these same reasons, the officers'

conduct was not extreme and outrageous under the totality of circumstances.

Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.

### B. The Minor Plaintiffs' NIED Claim Fails.

Plaintiffs' NIED claim also fails for the same reasons as their IIED claim. "Arizona courts have long held that a claim for negligent infliction of emotional distress requires a showing of bodily harm." *Monaco v. HealthPartners of S. Arizona*, 196 Ariz. 299, 302, ¶ 7 (App. 1999). Unlike an IIED claim, however, a claim for NIED requires even *more* of a showing of mental harm. Specifically, the *Monaco* court held that "the Arizona cases and Restatement § 436A make clear that a physical injury, as well as a long-term physical illness or mental disturbance, constitutes sufficient bodily harm to support a claim of negligent

Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.

Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.

As a result, summary judgment is appropriate on the minor

9263426.1

1  children's NIED claim.[22]

2      **C.**    __The Minor Plaintiffs' Loss Of Consortium Claim Fails.__

3          Loss of consortium is a derivative claim, which means that the success of a loss

4  of consortium claim is dependent on the success of another claim. *See Barnes v. Outlaw*, 192

5  Ariz. 283, 285–86, ¶ 8 (1998) (derivative claim for loss of consortium necessarily requires

6  proof of each of the elements of the underlying cause of action).   As set forth above,

7  Plaintiff's state law claims fail and, therefore, their loss of consortium claim fails with them. [23]

8  **IX.**    __PLAINTIFFS' PUNITIVE DAMAGES CLAIM FAILS.__

9          Punitive damages are unavailable against the individual Officers under federal

10  law because Plaintiffs' § 1983 claims fail, as explained *supra*.   Moreover, this record is utterly

11  devoid of any evidence that any of the Officers acted with the requisite "evil motive" or

12  "callous indifference" to warrant punitive damages under § 1983. *Smith v. Wade*, 461 U.S. 30,

13  56 (1983). Finally, punitive damages are unavailable under state law because the Officers were

14  acting within the scope of their employment. *See* A.R.S. § 12-820.04.

15  **X.**    __CONCLUSION.__

16          Based on the foregoing, summary judgment is appropriate on all of Plaintiffs'

17  claims in this action.

18

19

20

21

22

23

24

25

---

26      [22] Plaintiffs' Complaint also appears to allege a "gross" NIED claim.   However, no Arizona court has ever recognized a "gross" NIED claim.

27      [23] Based on the facts above, Arizona's self-defense/justification statutes also apply to the facts of this case precluding liability. *See* A.R.S. §§ 13-404, -409, -413.  The Court need go

28  no further to grant summary judgment on the minor Plaintiffs' claims.

1    FDATED this 26th day of March, 2021.

2                                   JONES, SKELTON & HOCHULI, P.L.C.

3

4                              By  /s/Joseph J. Popolizio
                                   Joseph J. Popolizio
5                                  Justin M. Ackerman
                                   Ian C. Beck
6                                  40 North Central Avenue, Suite 2700
                                   Phoenix, Arizona  85004
7                                  Attorneys for Defendants

8

9

                            **CERTIFICATE OF SERVICE**
10
            I hereby certify that on this 26th day of March, 2021, I caused the foregoing
11
    document to be filed electronically with the Clerk of Court through the CM/ECF System
12
    for filing; and served on counsel of record via the Court's CM/ECF system.
13

14   Marc J. Victor
     Jody L. Broaddus
15   Attorneys for Freedom
     3185 South Price Road
16   Chandler, Arizona 85248
     Marc@AttorneyForFreedom.com
17   Jody@AttorneyForFreedom.com
     Attorneys for Plaintiffs
18

19
     /s/Karen Gawel
20

21

22

23

24

25

26

27

28
                                         38

9263426.1