# INDEX TO EXHIBITS

**Wheatcroft v. City of Glendale, et al**
**No. 2:18-cv-02347-MTL**

| EXHIBIT | DESCRIPTION | |
|---------|-------------|---|
| 1 | Deposition of Johnny Wheatcroft | |
| 2 | Officer Tolbert's Body Camera Video | Non-Electronic Exhibit - CD |
| 3 | Motel 6 Location History Report | |
| 4 | Deposition of Mark Lindsey | |
| 5 | Deposition of Matthew Schneider | |
| 6 | Deposition of Shawn Blackburn | |
| 7 | Deposition of Michael Fernandez | |
| 8 | Deposition of Anya Chapman | Filed Under Partial Seal |
| 9 | Officer Schneider's Body Camera Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 10 | Deposition of Jerry McDaniel | |
| 11 | Motel 6's Response to Plaintiffs' Subpoena Duces Tecum | |
| 12 | Officer Lindsey Body Camera Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 13 | Motel 6 Surveillance Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 14 | Matthew Schneider's Declaration | |
| 15 | Darko Babic Declaration/Report | |
| 16 | Michael Fernandez's Declaration | |
| 17 | Blake McClelland Declaration/Report | |
| 18 | Mark Lindsey's Declaration | |
| 19 | Glendale Fire Department Records | Filed Under Seal |

9265126.1

| 20 | Deposition of Robin Nash | Filed Under Seal |
|---|---|---|
| 21 | Deposition of J.W. | Filed Under Seal |
| 22 | Deposition of B.W. | Filed Under Seal |
| 23 | Scene Photographs of Methamphetamines | |
| 24 | Deposition of Roy Lewis | |
| 25 | Criminal Complaint | |
| 26 | Indictment | |
| 27 | Order Dismissing Complaint | |
| 28 | Minute Entry Regarding Anya Chapman's Plea Agreement | |
| 29 | Glendale Police Department's General Order-23.000 | |
| 30 | Deposition of Richard St. John | |
| 31 | Deposition of Brandon Blanco | |
| 32 | Deposition of Earl Montgomery | |
| 33 | Deposition of Donald LaBrant | |
| 34 | Training Records | |
| 35 | Arizona Post Certifications | |
| 36 | Mark Lindsey's Employment Application | |
| 37 | Matthew Schneider's Employment Application | |
| 38 | Michael Fernandez's Employment Application | |
| 39 | Scene Photographs of Soda/Scale | |
| 40 | Officer Fernandez's Pulse Log Evaluation | |

9265126.1

# *EXHIBIT 1*

Transcript of the Testimony of

# Johnny Wheatcroft

January 20, 2021

Wheatcroft v. City of Glendale

## Herder & Associates Court Reporters

Phone:  480-481-0649

Info@CourtReportersAZ.com

www.CourtReportersAz.com

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Johnny Wheatcroft and Anya | ) | |
| Chapman, as husband and wife, | ) | |
| and on behalf of minors J.W. | ) | |
| and B. W., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 2:18-cv-02347-MTL |
| | ) | |
| City of Glendale, a municipal | ) | |
| entity; Matt Schneider, in his | ) | |
| official and individual | ) | |
| capacities; Mark Lindsey, in | ) | |
| his official and individual | ) | |
| capacities; and Michael | ) | |
| Fernandez, in his official and | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THE DEPOSITION OF JOHNNY WHEATCROFT
(Video Recorded)

Tucson, Arizona
January 20, 2021
9:13 a.m.

(ORIGINAL)
PREPARED FOR:                    REPORTED BY:
                                 Herder & Associates
                                 Marty Herder, CCR, CSR
DISTRICT COURT                   Certified Court Reporter
                                 AZ-CR No. 50162
        © Herder & Associates  (480)481-0649
              www.CourtReportersAz.com

Johnny Wheatcroft   Wheatcroft v. City of Glendale                    1/20/2021

---

30

1    Q.  Okay.
2        So the first count in the complaint, it starts,
3    just to let you know, on Page 8.
4        Do you see that?
5        I know it's a little tedious because of your setup
6    there, so take your time.
7    A.  Yeah, I do.
8    Q.  Okay.
9        And that, that count is for excessive force --
10   A.  Yeah.
11   Q.  -- is that right?
12       Okay.
13       Now, we're going to spend the majority of our time
14   today discussing issues regarding that, but I want to move
15   to a couple of other claims and see if we can discuss those
16   first.  Okay?
17   A.  Okay.
18   Q.  All right.
19       So count two is also in this complaint, and it's
20   on Page 10.
21       Do you see that?
22   A.  Yes.
23   Q.  And it's-- it's entitled retaliation in violation
24   of the First Amendment.
25       Do you see that?

---

31

1    A.  Yes.
2    Q.  Okay.
3        That is against Officer Schneider only; right?
4    A.  Yes.
5    Q.  Who do you understand Officer Schneider to be,
6    which was the officers?
7    A.  He was the one that grabbed me by my arm.
8    Q.  Okay.
9        Was he the officer that approached the -- the car
10   that you were in the Motel 6 parking lot --
11   A.  Yes.
12   Q.  -- on the date of the incident?
13   A.  Yes.
14   Q.  Okay.
15       So basically there's paragraphs in this, but in --
16   on the next page, on Page 11, paragraph 74.
17   A.  Yes.
18   Q.  Okay.  You're there?
19       In that, in that paragraph you claim that
20   Defendant Schneider had retaliatory animus toward
21   plaintiff Johnny Wheatcroft's lawful speech and he urged
22   prosecution of plaintiff Johnny Wheatcroft despite the
23   absence of probable cause.
24       Do you see that?
25   A.  Yes.

---

32

1    Q.  Did I read that correctly?
2    A.  Yes.
3    Q.  Good.  I got something right today.
4        So you claim that your First Amendment rights were
5    violated; is that right?
6    A.  Yes.
7    Q.  Okay.
8        Could you tell me each and every fact that you
9    have to support that claim?
10   A.  Yeah.
11       MS. BROADDUS:  Just, just to be clear.  Anything
12   that you and I have talked about is not part of that, so you
13   don't have to disclose that.
14       If you have something independent of our
15   conversations and our -- what we've talked about, then you
16   can answer that.
17       Only those portions.  Okay?
18   BY MR. POPOLIZIO:
19   Q.  So, so just so that I might add something.
20       I don't want -- like, when I'm asking you
21   questions, I'm never asking you a question to find out what
22   you've talked about with counsel.
23   A.  Right, right, right.
24   Q.  Okay?
25       That's privileged, and I'm not going there.

---

33

1        So when I ask you questions it's, you know, you
2    can give me from your knowledge, I just don't want to say --
3    I don't want to hear you say my attorney told me or my
4    attorney said --
5    A.  Yeah, yeah.
6    Q.  -- unless it's an appropriate issue.  But probably
7    it's not going to be.  Okay?
8    A.  Right.
9    Q.  So, again, in terms of paragraph 74 to the
10   complaint, could you give me each and every fact that you
11   claim supports your contention that Defendant
12   Officer Schneider had retaliatory animus towards your lawful
13   speech.
14       MS. BROADDUS:  And, again, I'm going to object to
15   the extent that you talked about the facts that were
16   related to that claim and to that statement.
17       Anything that you have outside of that, you can
18   answer.
19       THE WITNESS:  Yeah, I have nothing then.  I got
20   nothing.
21   BY MR. POPOLIZIO:
22   Q.  You have no facts to support that claim?
23       MS. BROADDUS:  Object to form.
24       THE WITNESS:  I don't understand.
25

---

Johnny Wheatcroft   Wheatcroft v. City of Glendale                    1/20/2021

---

**34**

1    BY MR. POPOLIZIO:
2        Q.  Well, you -- when you bring claims against some --
3    somebody --
4        A.  Yeah, yeah.  I know.  I understand that.
5        Q.  You have to have a basis --
6        A.  Yeah.
7        Q.  Let me, let me finish for a second.
8            You have to have a basis, a factual basis, for the
9    claims.  Okay?
10       A.  Yes.
11       Q.  So I'm asking you what is your factual basis for
12   the claim that Defendant Schneider had retaliatory animus
13   toward you, your lawful speech?
14           MS. BROADDUS:  I'm going to object again only to
15   the extent that you have facts that were discussed outside
16   of our relation -- our attorney-client relationship that
17   talked about the relationship to this claim and what you
18   were alleging in the complaint.
19           THE WITNESS:  Okay.
20           I'm still confused.  I'm not sure if I -- what if
21   I am answering, like, what I. . .
22           So, what I'm claiming is that he violated my
23   rights because he not only tried to force me into giving him
24   my ID but he also incarcerated me without any probable
25   cause.

---

**35**

1    BY MR. POPOLIZIO:
2        Q.  And is that the basis for your claim that he had
3    retaliatory animus toward your lawful speech?
4            MS. BROADDUS:  I'm going to object again to the
5    extent that this relates to the -- our communications and
6    relates to things that we discussed as to the basis of your
7    claims and what you're alleging, then that is
8    attorney-client privilege.
9            And if you have something outside of that, you can
10   go ahead and answer that.
11           THE WITNESS:  No, I don't.
12           MR. POPOLIZIO:  Okay.
13           THE WITNESS:  That's it.
14           MR. POPOLIZIO:  Okay.
15           Okay.  And I just want to state for the record,
16   Jody, that I -- I'm well aware and I've stated on the record
17   that I'm not looking for attorney-client privilege
18   communications.
19           However, if there, if there were necessarily
20   within that relation you're going to have to discuss facts.
21   I don't want to know what facts you discussed.  I just want
22   to know the facts that he bases his claims.  That's all.
23   Okay?
24           MS. BROADDUS:  Well --
25           MR. POPOLIZIO:  I just wanted to make that clear.

---

**36**

1            MS. BROADDUS:  I understand what you're staying,
2    but what you're also doing is you're asking him to give his
3    legal opinion as to what facts relate to this issue, which
4    is something that we've talked about.
5            If you want to ask him facts about what happened
6    and what occurred, that's fine.  But if you're asking him in
7    a legal sense saying what facts form the basis for your
8    claims, that gets into things that we've talked about
9    relating claims to facts.
10           MR. POPOLIZIO:  Actually it's no different than
11   asking a contention interrogatory.  But I'm going to -- I'm
12   going to continue because every plaintiff has to know the
13   factual basis of the claim.
14   BY MR. POPOLIZIO:
15       Q.  So, you've answered my question fully?
16       A.  Yes.
17       Q.  Do you have anything to add?
18       A.  No.
19       Q.  Okay.
20           All right.  And then the second part of that
21   paragraph says that he, meaning Officer Schneider, right,
22   urged prosecution of you, plaintiff Johnny Wheatcroft,
23   despite the absence of probable cause.
24           Do you see that?
25       A.  Yes.

---

**37**

1        Q.  Okay.
2            So is it your claim that there are no probable
3    cause for your arrest?
4        A.  Yes.
5        Q.  Okay.
6            Now, you were -- you were indicted after this
7    incident; right?
8        A.  No.
9        Q.  You were not indicted?
10       A.  No.
11       Q.  Okay.
12           Let's show you what's been marked as Exhibit 75 to
13   your deposition.
14           (Deposition Exhibit No. 75 was marked for
15   identification by the reporter.)
16   BY MR. POPOLIZIO:
17       Q.  Just look at that document.
18       A.  I've seen it.
19       Q.  Have you ever seen this document before?
20       A.  No, I never received them.
21       Q.  Okay.
22           And it's entitled, as you can see here,
23   indictment.
24           Do you see that?
25       A.  I see it, yes.

---

Johnny Wheatcroft  Wheatcroft v. City of Glendale                    1/20/2021

---

**38**

1    Q.  And underneath there's some numbers and letters.
2         Do you see that those?
3    A.  Yes.
4    Q.  And there's 698 GJ 662?
5    A.  Yes.
6    Q.  Okay.
7         And under there, there are -- it indicates there
8    are three counts.
9         Do you see that?
10   A.  Yes.
11   Q.  Count one; right?
12   A.  Yes.
13   Q.  Count two; right?
14   A.  Yes.
15   Q.  And then count three; right?
16   A.  Yes.
17   Q.  So count one is, as it says here, it's against
18   Anya Ann Chapman; right?
19   A.  Yes.
20   Q.  Okay.
21        But count two is for aggravated assault.
22        Do you -- assault.  Do you see that?
23   A.  Yes.
24   Q.  Okay.
25        And that it says is a Class 5 felony.

---

**39**

1         Do you see that?
2    A.  Yes.
3    Q.  Okay.
4         And after that in parens is your name, Johnny
5    Wheatcroft; correct?
6    A.  Yes.
7    Q.  Okay.
8         So, did you have any knowledge that you have --
9    you had been indicted for aggravated assault arising from
10   this incident?
11   A.  No.
12   Q.  Okay.
13        This is the first time you're hearing -- hearing
14   about it is today?
15   A.  Yes.
16   Q.  Okay.
17        And the next is count three; right?
18   A.  Yes.
19   Q.  And it says resisting arrest.
20        Do you see that?
21   A.  Yes.
22   Q.  And after that it says a Class 6 felony.
23        Do you see that?
24   A.  Yes.
25   Q.  And in parens after that there are two names;

---

**40**

1    correct?
2    A.  Yes.
3    Q.  And the first name is Anya Ann Chapman; right?
4    A.  Yes.
5    Q.  And the second name is Johnny Wheatcroft?
6    A.  Yes.
7    Q.  All right.
8         So have you until -- up till today, did you
9    realize that you had been indicted for resisting arrest
10   arising out of this incident?
11   A.  No.  I don't remember being indicted.
12   Q.  If you turn to the second page -- are you there?
13   A.  Yes.
14   Q.  When you look, it says count two.  Do you see that
15   right in the middle of the page?
16   A.  Yes.
17   Q.  And that, that paragraph there, have you ever read
18   that paragraph at all?
19   A.  No.
20   Q.  Okay.  Because you've never seen this document;
21   right?
22   A.  No.
23   Q.  Okay.
24        So the paragraph there under count where it says
25   count two, says:  Johnny Wheatcroft, on or about July 26th,

---

**41**

1    2017, knowing, or having reason to know, that Matthew
2    Schneider was a peace officer, or a person summoned and
3    directed by a peace officer engaged in the execution of any
4    official duties or if the assault resulted from the
5    execution of the peace officer's official duties, knowingly
6    did touch Matthew Schneider, a peace officer engaged in
7    official duties, with the intent to injure, insult, or
8    provoke him in violation of A.R.S. sections 13-1203,
9    13-1204, 13-701, and 13-801.
10        Did I read that correctly?
11   A.  You forgot the 702, but yes.
12   Q.  Ah.  Thank you for very much.
13        13-702.
14        Thank you.  I -- I didn't realize that I skipped that
15   but I do thank you for that.
16        So, now that we corrected that, did I generally
17   read that, what it said there?
18   A.  Yes.
19   Q.  Okay.
20        And did you know that you were indicted for
21   knowingly touching Matthew Schneider, a peace officer
22   engaged in his official duties?
23   A.  No.
24   Q.  Okay.
25        But you did know that you were arrested for that;

---

Johnny Wheatcroft  Wheatcroft v. City of Glendale                 1/20/2021

**42**

1    right?
2        A.   Yes.
3        Q.   Okay.  You just didn't know you were indicted for
4    that?
5        A.   Right.
6        Q.   Okay.
7            In terms of count three -- well, let -- let's go
8    back.
9            We've already established, and, and I read a date
10   in the above paragraph under count two, the date of July 26,
11   2017; right?
12       A.   Yes.
13       Q.   And that's the date of this incident; right?
14       A.   Yes.
15       Q.   Okay.
16           So in count three, when we look at the paragraph
17   below, it says Anya Chap -- Anya Ann Chap and Johnny
18   Wheatcroft, on or about July 26, 2017, intentionally
19   prevented or attempted to prevent Glendale peace -- police
20   officers Mark Lindsey and/or Matthew Schneider and/or
21   Michael Fernandez, a person or persons reasonably known to
22   him/her to be a peace officer or officers, acting under
23   color of his/their official authority, from effecting an
24   arrest by using or threatening to use physical force against
25   the peace officer or officers, in violation of

**43**

1    A.R.S. sections 13-2508, 13-301, 13-302, 13-303, 13-304,
2    13-701, 13-702, and 13-801.
3            Did I read that correctly?
4        A.   Yes.
5        Q.   Okay.
6            That was a mouthful.
7            And, and, again, did you have any idea until today
8    that you had been indicted for resisting arrest?
9        A.   No.
10       Q.   And that you had been charged and indicted under
11   the statutes that are listed in paragraphs -- the paragraphs
12   that I read under count two and count three?
13       A.   No.
14       Q.   Okay.
15           Do you know what -- what it means to be indicted?
16       A.   Just means it's brought in front of a, a, a judge
17   and some peers, and they vote on if they think there's
18   another probable cause to convict somebody or not.
19       Q.   Okay.
20           That's actually a pretty good -- that's a pretty
21   good definition, probably more than most know and certainly
22   most first year law students even know.
23           So, this matter or the charges against you were
24   brought in front of a Grand Jury.
25           You understand that; right?

**44**

1        A.   Yes.
2        Q.   And the Grand Jury returned the indictments that I
3    read to you?
4        A.   Yes.
5        Q.   And you understand that; right?
6        A.   Yes.
7        Q.   Okay.
8            And -- and you said, and that's why I commended
9    you on knowing this, that it's basically when the indictment
10   comes down, so to speak, it's an indication of probable
11   cause?
12       A.   Yes.
13           MS. BROADDUS:  Object to form, foundation.
14   BY MR. POPOLIZIO:
15       Q.   Okay.  All right.
16           So, but, I mean, until today going over this, you
17   didn't know about this indictment?
18       A.   No.  I was already in jail for those, those, those
19   charges.
20       Q.   Were you represented though by criminal counsel
21   for charges against you arising from this incident?
22       A.   I seen him one time.
23       Q.   So you just had -- you had like a public defender?
24       A.   A public defender, I seen him one time when they
25   were dismissing me.

**45**

1        Q.   Okay.  All righty.
2            From time to time, I'll go through, look at my
3    notes, and cross it off so I don't ask you again.  Okay?
4        A.   Yes.
5        Q.   Okay.  So, put the indictment, Exhibit 75, to the
6    side a second.
7        A.   Yes.
8        Q.   We'll go back to Exhibit 74.  All right?
9            Okay.  On Exhibit 74, which is the second amended
10   complaint, could you look at paragraph 75, please?
11       A.   Yes.
12       Q.   Okay.
13           And in that paragraph it states:
14   Defendant Schneider's retaliatory conduct in attacking,
15   assaulting, and torturing a person who simply asked for the
16   basis for requesting identification and stating that he/she
17   had done nothing wrong, would chill any reasonable person of
18   ordinary firmness in their exercise of their First Amendment
19   rights.
20           Did I read that correctly?
21       A.   Yes.
22       Q.   Okay.
23           So, is, is it your claim that Officer Schneider
24   attacked, assaulted, and tortured you simply because
25   you asked for the basis of his request for -- to -- for

Johnny Wheatcroft  Wheatcroft v. City of Glendale                1/20/2021

---

**46**

1  your ID?
2      A.  Yes.
3      Q.  Okay.
4          Now, is that because you asked him or -- or is
5  that based on your statement that you said that you had done
6  nothing wrong?
7      A.  Yeah, I don't -- yes.
8      Q.  Okay.
9      A.  I don't have to produce ID.
10     Q.  Okay.
11         Is, is, is there any other fact that you claim
12  supports your contention in paragraph 75 that
13  Defendant Schneider retaliated against you and attacked and
14  assaulted and tortured you?
15     MS. BROADDUS:  I'm going to object just to the
16  extent that it gets into the attorney-client privilege on
17  what you know specifically and not what we talked about, the
18  other evidence of the case that supports that.  Okay?
19     THE WITNESS:  Yes.
20     Can you ask that again?
21     MR. POPOLIZIO:  Sure.
22     Could you read that back, Marty.
23     (Pending question read.)
24     MS. BROADDUS:  Same objection.
25     THE WITNESS:  Then, then, then, no, I have -- then

**47**

1  I have nothing to say on it, I guess.
2      MR. POPOLIZIO:  I'm sorry.
3      THE WITNESS:  I have nothing to say on it.
4      MR. POPOLIZIO:  You have -- okay.
5      THE WITNESS:  Then I can't answer; right?
6      I'm confused.
7  BY MR. POPOLIZIO:
8      Q.  Do you have anything to --
9      A.  Add to it?  No.
10     Q.  All right.
11         Okay.  And still looking at Exhibit 74, going to
12  Page 12, you see that there's a Count III there?
13     A.  Yes.
14     Q.  Okay.
15         And Count III is, is a claim for wrongful arrest
16  in violation of the Fourth and Fourteenth Amendments.
17         Do you see that?
18     A.  Yes.
19     Q.  Okay.
20         So you claim that you were wrongfully arrested;
21  right?
22     A.  Yes.
23     Q.  Okay.
24         But, again, you agree there that there is -- the
25  Grand Jury indicted you; correct?

**48**

1      A.  Yes.
2      Q.  And that indictment indicated probable cause for
3  your arrest?
4      MS. BROADDUS:  Object to form.
5      THE WITNESS:  That was weeks after though.
6      MR. POPOLIZIO:  Yeah.
7      THE WITNESS:  I was already incarcerated for weeks
8  before I was indicted.
9  BY MR. POPOLIZIO:
10     Q.  Okay.
11         But no matter of the timing, the Grand Jury
12  indictment indicated probable cause for your arrest; is that
13  right?
14     A.  Yes.
15     Q.  Okay.
16         Now, on paragraph 89 of, of that count.
17         It's kind of a, a long sentence, so I might, I
18  might break it up.
19         But, paragraph 89 states:  Defendants Schneider,
20  Lindsey, and Fernandez's conduct was engaged in with intent
21  to cause injury, was wrongful conduct motivated by spite or
22  will -- or ill will or the involved officers acted to serve
23  their own interests, having reason to know and consciously
24  disregarding a substantial risk that their conduct might
25  significantly injure the rights of Plaintiff Johnny

**49**

1  Wheatcroft.
2          Did I read that generally okay?
3      A.  Yes.
4      Q.  Okay.
5          I know I messed up a little bit there, but the --
6  I read it almost perfect but not quite; right?
7      A.  Yes.
8      Q.  But that's what is stated there; right?
9      A.  Yes.
10     Q.  I didn't misstate anything in there; right?
11     A.  No.
12     Q.  In fact, I left out the word ill, it should have
13  said ill will, and I corrected myself; right?
14     A.  Yes.
15     Q.  Okay.
16         So in looking at that, part of that paragraph
17  states that the -- there was wrongful conduct motivated by
18  spite or ill will or the involved officers acted to serve
19  their own interests.
20         Do you see that part of it?
21     A.  Yes.
22     Q.  Okay.
23         So could you tell me how the officers acted to
24  serve their own interests?
25     MS. BROADDUS:  I'm going to object to the extent

---

**50**

1 that this gets into our communications and talks about other
2 evidence in the case that supports that that's not your
3 independent knowledge. If you have independent knowledge
4 outside of those communications, go ahead and answer.
5     THE WITNESS: I do not.
6 BY MR. POPOLIZIO:
7     Q. Okay.
8     So, could you give me any facts to support your
9 claim as set forth in paragraph 89 that the officers acted
10 to serve their own interests?
11     MS. BROADDUS: Same objection. If you have
12 something else other than what we talked about --
13     THE WITNESS: No.
14 BY MR. POPOLIZIO:
15     Q. Nothing to add?
16     A. No.
17     Q. Okay.
18     Do you -- let me ask you this. Do you happen to
19 know what personal interest or interests the officers were
20 pursuing?
21     MS. BROADDUS: If you know something outside of
22 what we talked about.
23     THE WITNESS: No, I don't.
24 BY MR. POPOLIZIO:
25     Q. Okay.

**51**

1     You probably figured out by now I'm going to ask
2 you something about Count IV, the next count. All right?
3     All right. The next count is Count IV.
4     Right?
5     A. Yes.
6     Q. And it's for malicious prosecution in violation of
7 the Fourth and Fourteenth Amendments.
8     Do you see that?
9     A. Yes.
10     Q. Okay.
11     So you're -- you're claiming in that count that
12 you were maliciously prosecuted?
13     A. Yes.
14     Q. Okay.
15     Within that count though, too, there's mention of
16 a -- of familial association. We'll talk about that too.
17 Okay?
18     A. Yes.
19     Q. Okay.
20     But, again, malicious prosecution, were you
21 prosecuted for anything arising, that you did, arising
22 out of the incident that occurred at Motel 6 on July 26th,
23 2017?
24     MS. BROADDUS: Object to form.
25     THE WITNESS: No.

**52**

1 BY MR. POPOLIZIO:
2     Q. Okay. You were indicted. We beat that to death.
3 Right?
4     A. Yes.
5     Q. Okay.
6     But you weren't prosecuted; right?
7     A. No.
8     MS. BROADDUS: Object to form.
9 BY MR. POPOLIZIO:
10     Q. You didn't go to trial; right?
11     A. No.
12     Q. Okay.
13     And a jury wasn't impaneled for a criminal trial
14 for you where you sat there and there was a trial over what
15 you did; right?
16     A. No.
17     MS. BROADDUS: Object to form.
18 BY MR. POPOLIZIO:
19     Q. Okay.
20     Now, together with this count and the, next
21 count, because there's -- there's another -- there's the
22 next count, Johnny, which is Count V. And it's a civil
23 rights violation.
24     Do you see that?
25     A. Yes.

**53**

1     Q. And then there's another count, Count VI, where it
2 says municipal liability.
3     Do you see that?
4     A. Yes.
5     Q. It's okay.
6     Do you see where it says for the count; right?
7     A. Yes.
8     Q. Okay.
9     And the reason why I brought you forward to there
10 is because there's mentions of different things in, in the
11 counts. So there are the titles and then there are familial
12 associations mentioned a couple times. I just want to go
13 over the claims that you're -- that you're making, not
14 necessarily just based on titles. Okay?
15     A. Yes.
16     Q. So, again -- well, with regard to malicious --
17 malicious prosecution and your claim for malicious
18 prosecution, you've already indicated that due to the Grand
19 Jury indictment that there was probable cause for your
20 arrest; right?
21     MS. BROADDUS: Object to form and foundation.
22 BY MR. POPOLIZIO:
23     Q. That's what you said before; right?
24     MS. BROADDUS: Misstates testimony.
25     Go ahead and answer.

Johnny Wheatcroft  Wheatcroft v. City of Glendale          1/20/2021

**54**

1     THE WITNESS:  Yes, I said that.
2   BY MR. POPOLIZIO:
3     Q.  Okay.
4        In paragraph 94, under Count IV, on Page 14.
5     A.  Ninety-four?
6     Q.  Yeah.
7     A.  Okay.
8     Q.  Are you there?
9     A.  Yes.
10    Q.  Okay.  Good.
11       It states:  Plaintiff Johnny Wheatcroft, at all
12   well relevant times, had the clearly established right to be
13   free from malicious prosecution and the right to familial
14   association under the Fourth and Fourteenth Amendment.
15       Do you see that?
16    A.  Yes.
17    Q.  Did I read that correctly?
18    A.  Yes.
19    Q.  Okay.
20       With regard to familial association, that claim,
21   what do you understand that claim to be?
22       MS. BROADDUS:  I'm going to object to the extent
23   that if -- if you know anything or even heard that term
24   outside of your communications with me, you can go ahead and
25   answer.  If you know -- have any independent knowledge

**55**

1   outside of that, go ahead and answer.
2       THE WITNESS:  I don't.  I don't have any more.
3   BY MR. POPOLIZIO:
4     Q.  You're bringing a claim for familial association;
5   right?
6     A.  Yes.
7     Q.  And aside from what -- I don't want to know what
8   you talked about with, with counsel.  I want to know the
9   factual basis for your claim that the officers interfered
10  with your right to familial association.
11       MS. BROADDUS:  I'm going to object to the extent
12  that that gets into our attorney-client privilege.
13       Anything that we've talked about is protected and
14  don't answer that, or any other evidence that we've talked
15  about that supports that.  If you have information outside
16  of communications --
17       THE WITNESS:  I do not.
18       MS. BROADDUS:  -- go ahead.
19  BY MR. POPOLIZIO:
20    Q.  Okay.
21       So you're not going to provide me any facts that
22  support that claim?
23       MS. BROADDUS:  Object to form.
24       THE WITNESS:  I don't have any, no.
25

**56**

1   BY MR. POPOLIZIO:
2     Q.  Okay.
3        Now I want to talk about some of the claims under
4   Counts V and VI of your complaint.  Okay?
5     A.  Yes.
6     Q.  And there are civil rights violations against the
7   officers in Count V, and in Count VI against the City of
8   Glendale for municipal liability.
9        Do you see that?
10    A.  Yes.
11    Q.  Okay.
12       So, with regard to municipal liability against the
13  City of Glendale, what is the factual basis that you have
14  for that particular claim?
15       MS. BROADDUS:  I'm going to object again.  To the
16  extent that you have any information that was out our --
17  outside of our communications that discuss facts that
18  specifically related to that claim, you can go ahead and
19  answer.
20       THE WITNESS:  I do not.
21  BY MR. POPOLIZIO:
22    Q.  When, when -- you realize that these, the claims
23  set forth in the second amended complaint, are your claims
24  against the defendants in this action; right?
25    A.  Yes.

**57**

1     Q.  And do you realize that they have to have a
2   factual basis?
3     A.  Yes.
4     Q.  And -- okay.
5        Do you claim that the City of Glendale had a
6   policy, practice, or custom that demonstrates that it had an
7   indifference to the training of these officers in violation
8   of your rights?
9     A.  Can you ask that one more time?
10    Q.  Sure.
11       Well, let me ask it this way.
12       Do you -- do you contend that the City of Glendale
13  failed to train its officers properly?
14    A.  Yes.
15    Q.  Okay.
16       Do you contend that the City of Glendale has a
17  policy, custom, practice, that demonstrates that they failed
18  to train these officers?
19       MS. BROADDUS:  Let me object to the extent that
20  gets into communications that you and I have had about the
21  evidence in this case.
22       If you have something outside of that or the
23  complaint, alone, if it says that, go ahead and answer.
24       THE WITNESS:  Yeah, I have nothing else.
25

Johnny Wheatcroft  Wheatcroft v. City of Glendale                    1/20/2021

---

**58**

1  BY MR. POPOLIZIO:
2    Q.  Okay.
3       So do you -- well, do you contend that?
4    A.  I don't understand what that means.
5    Q.  Do you contend that the City of Glendale failed to
6  train its officers?
7       MS. BROADDUS:  And if you're relying on legal
8  advice for that, just let him know you're relying on legal
9  advice as to the basis of your claims.
10      THE WITNESS:  Yeah, I'm relying on legal advice.
11 BY MR. POPOLIZIO:
12   Q.  So you can't provide any facts to support that
13 claim for failure to train the officers by the City of
14 Glendale here today?
15      MS. BROADDUS:  Same objection.
16      If you --
17      THE WITNESS:  No.
18      MS. BROADDUS:  -- have something outside of the
19 information we talked about or the other evidence in the
20 case.
21 BY MR. POPOLIZIO:
22   Q.  Do you also claim that they failed -- the City of
23 Glendale failed to supervise the officers that you're suing
24 in this action?
25   A.  Yes.

---

**59**

1    Q.  And do you claim that that failure of supervision
2  caused you damages?
3    A.  Yes.
4    Q.  Okay.
5       And could you give me the factual basis of that
6  claim?
7       MS. BROADDUS:  I'm going to also object.  If you
8  have information outside our communication as to --
9       THE WITNESS:  No.
10      MS. BROADDUS:  -- the other evidence in the case,
11 go ahead and let him know.
12      THE WITNESS:  No, no.
13      MR. POPOLIZIO:  And your answer is?
14      THE WITNESS:  No, I cannot.
15      MR. POPOLIZIO:  Okay.  We were getting into
16 that --
17      THE WITNESS:  I see.
18      MR. POPOLIZIO:  -- talking over each other.  Okay?
19      MS. BROADDUS:  Sorry, Marty.
20 BY MR. POPOLIZIO:
21   Q.  Do you claim that the City of Glendale was
22 indifferent to your Constitutional rights?
23   A.  I don't understand that question.
24   Q.  Okay.
25      Do you claim that the City of Glendale had a

---

**60**

1  policy or practice or custom with regard to the training of
2  these officers that constituted indifference to your
3  Constitutional rights?
4       MS. BROADDUS:  I'm going to object.  To the extent
5  you have any information outside of your communications with
6  your attorney, you can rely on the documents to answer the
7  question, but if it relates to our communications or the
8  evidence related thereto that we've talked about outside of
9  what you know, you can answer those things that are outside
10 of that.
11      THE WITNESS:  I do not.
12 BY MR. POPOLIZIO:
13   Q.  And the same question for supervision.
14      Do you claim that the City of Glendale has a
15 policy, practice, or custom that demonstrates it was
16 indifferent to the supervision of these officers that led to
17 any Constitutional right violations?
18      MS. BROADDUS:  Same objection.  If you have
19 something other than our communications, go ahead and
20 answer.
21      THE WITNESS:  I do not.
22 BY MR. POPOLIZIO:
23   Q.  So just to make it simple, could you point to a,
24 a, a policy, practice, or custom that demonstrates that the
25 City of Glendale failed to train its officers?

---

**61**

1       MS. BROADDUS:  And if you have something outside
2  of what we've looked at and discussed in this case that
3  you're aware of that we haven't talked about, you can go
4  ahead and tell him about that.
5       THE WITNESS:  I do not.
6  BY MR. POPOLIZIO:
7    Q.  And could you point to a policy, practice, or
8  custom that -- that indicates that the City of Glendale
9  failed to supervise the officers you sued and that caused
10 you some sort of a violation of your Constitutional rights?
11      MS. BROADDUS:  Again, if you have any information
12 outside of what we've talked about the other evidence in the
13 case, if you have any independent information, go ahead and
14 answer.
15      THE WITNESS:  I do not.
16 BY MR. POPOLIZIO:
17   Q.  Okay.
18      Do you -- do you claim that the City of Glendale
19 failed to discipline any of these officers?
20      MS. BROADDUS:  Object to form.
21      If you know anything outside of our communications
22 based on the evidence that we've talked about, you can
23 answer that.
24      THE WITNESS:  I just know that they have stuff in
25 their history that they weren't, I don't believe, held

---

www.CourtReportersAz.com

**16 (Pages 58 to 61)**

Johnny Wheatcroft  Wheatcroft v. City of Glendale                    1/20/2021

---

**62**

1  liable for.
2      They, they -- they should have been retrained or,
3  or, or watched, supervised, better after their first
4  incident.
5  BY MR. POPOLIZIO:
6      Q.  Could you give me every fact you have or you claim
7  to have to support those claims?
8      A.  No.
9          MS. BROADDUS:  And if you have something outside
10 of something you've learned from me in this lawsuit or as
11 part of our representation, go ahead and answer.  If it's
12 only stuff you've learned from me, then that's protected.
13         THE WITNESS:  No, no, I don't.
14 BY MR. POPOLIZIO:
15     Q.  Okay.
16         And when you say that, that the officers weren't
17 disciplined or retrained, can you tell me specifically, if
18 you know, with regard to any of these officers how they were
19 not disciplined?
20         MS. BROADDUS:  If you have anything outside of
21 what we've talked about, go ahead and answer it.
22         THE WITNESS:  Okay.
23         No, I do not.
24 BY MR. POPOLIZIO:
25     Q.  Okay.

---

**63**

1          And being that you don't have any specifics about
2  how any of these officers weren't disciplined, as you
3  allege, you don't have any facts which -- which would
4  support your claim that a failure to discipline these
5  officers prior to the incident led to what happened that day
6  at Motel 6, do you?
7          MS. BROADDUS:  I'm going to object.  If you have
8  evidence that's out -- only about what we've talked about,
9  about the other information that you've learned in the case
10 and the other evidence, if you have something outside of
11 that, you can go ahead and answer.
12         THE WITNESS:  No, I don't.
13 BY MR. POPOLIZIO:
14     Q.  That's exactly what I'm looking for, is evidence
15 and your personal knowledge and facts that would support
16 your claims in this action.
17         You understand that; right?
18     A.  Yes.
19     Q.  I don't want to know what you talked about with,
20 with your attorney.  I think that's pretty clear by now;
21 right?
22     A.  Yeah, yeah.
23     Q.  But what did you do to prepare for your deposition
24 today?
25     A.  Nothing.

---

**64**

1      Q.  Did you -- don't what to know if -- any substance.
2  Did you speak with your attorney before your deposition
3  today?
4      A.  Yes.
5      Q.  Okay.
6          How long was that conversation?
7      A.  Twenty minutes.
8      Q.  Okay.
9          Was it over the phone?
10     A.  Yes.
11     Q.  And when did that occur?
12     A.  Three days ago.  Four days ago.
13     Q.  Okay.  Thank you.
14     A.  I believe.
15     Q.  So although I, I can sense by now how you're going
16 to answer the question, I'm going to ask it nevertheless.
17 And it's just part of my job, so you understand; right?
18     A.  Yes, yes.
19     Q.  Okay.
20         So could you testimony me what policy, custom, or
21 practice was the moving force behind your claimed injuries
22 in this case?
23         MS. BROADDUS:  Object to the extent that it -- you
24 can answer if you have facts outside of what we've talked
25 about the other -- about the other evidence in the case that

---

**65**

1  supports those claims.  Okay?
2          THE WITNESS:  No, I do not.
3  BY MR. POPOLIZIO:
4      Q.  Could you look on Page 19, paragraph 127 of your
5  complaint.
6      A.  Yes.
7      Q.  All right.
8          You're already there.  Good.
9      A.  Yeah.
10     Q.  And that's in Count VI; right?
11     A.  Yes.
12     Q.  All right.
13         In paragraph 127, it states:  In addition, under
14 a ratification theory, Defendant Glendale delegated
15 authority to Defendants Schneider, Lindsey, and Fernandez to
16 engage in unlawful arrest and the use of illegal and
17 excessive force.
18         Do you see that?
19     A.  Yes.
20     Q.  Now that's not the whole paragraph; right?
21     A.  No.
22     Q.  I just read up to that point; correct?
23     A.  Yes.
24     Q.  Okay.
25         So, could, could you give me every fact that you

---

Johnny Wheatcroft   Wheatcroft v. City of Glendale                1/20/2021

---

**66**

1    have that supports your claim that the defendant Glendale
2    delegated authority to Defendants Schneider, Lindsey, and
3    Fernandez to engage in unlawful arrest?
4         MS. BROADDUS:  And to the extent that you have
5    information outside of communications as to other evidence
6    in the case, go ahead and answer.
7         THE WITNESS:  No, I cannot.
8    BY MR. POPOLIZIO:
9      Q.  Okay.
10        Or how about the next part that I read just a
11   second ago, could you give me every fact that supports your
12   claim that the defendant Glendale delegated authority to
13   Defendants Schneider, Lindsey, and Fernandez to use illegal
14   and excessive force?
15        MS. BROADDUS:  Same objection.  If you have
16   something outside of what we've talked about as to facts
17   that relate to which particular claim or other evidence, go
18   ahead and answer.
19        THE WITNESS:  No, I cannot.
20   BY MR. POPOLIZIO:
21     Q.  You don't have any independent facts other than
22   what you discussed with counsel?  And I am not asking for
23   that.
24     A.  No.
25        (Brief pause.)

---

**67**

1    BY MR. POPOLIZIO:
2      Q.  Do you contend that the City of Glendale had a
3    policy that allowed their police officers to engage in
4    unlawful arrests?
5         MS. BROADDUS:  If you have information outside of
6    our communications, go ahead and answer.
7         If you know what the allegations are in the case,
8    something you're relying on your legal counsel for, outside
9    of that you can go ahead and answer.
10        THE WITNESS:  No, I do not.
11   BY MR. POPOLIZIO:
12     Q.  Do you claim that the City of Glendale had a
13   policy that allowed its officers to use excessive force?
14        MS. BROADDUS:  Same objection.
15        THE WITNESS:  No, I do not.
16   BY MR. POPOLIZIO:
17     Q.  Do you claim that the City of Glendale had a
18   policy that allowed the defendant officers in this case,
19   Schneider, Lindsey, and Fernandez, to engage in an unlawful
20   arrest of you?
21        MS. BROADDUS:  If you have information outside of
22   our communications as to other evidence in the case, go
23   ahead and answer.
24        THE WITNESS:  No, I do not.
25

---

**68**

1    BY MR. POPOLIZIO:
2      Q.  Okay.
3         So you don't have any facts to provide me?
4      A.  No.
5         MS. BROADDUS:  Object to form.
6    BY MR. POPOLIZIO:
7      Q.  Do you claim that the City of Glendale had a
8    policy that allowed these officers, the defendants in this
9    action, to use excessive force on you?
10        MS. BROADDUS:  If you have something outside of
11   our communications as to other evidence in the case, you
12   have an independent knowledge, go ahead and answer.
13        THE WITNESS:  No, I do not.
14        MR. POPOLIZIO:  Okay.
15        (Brief pause.)
16   BY MR. POPOLIZIO:
17     Q.  Do you claim that the City of Glendale failed to
18   train the officers in this action to execute arrests?
19        MS. BROADDUS:  If you have information outside of
20   our communications, go ahead and answer.
21        THE WITNESS:  No, I do not.
22   BY MR. POPOLIZIO:
23     Q.  Do you claim that the City of Glendale failed to
24   train these officers in the proper use of force?
25        MS. BROADDUS:  If you have something outside of

---

**69**

1    our discussions as to what the claims would be or what would
2    not be, go ahead and answer.
3         THE WITNESS:  No, I do not.
4    BY MR. POPOLIZIO:
5      Q.  Do you claim that the City of Glendale failed to
6    train these officers with regard to the concept of probable
7    cause?
8         MS. BROADDUS:  Same objection.
9         THE WITNESS:  No, I do not.
10   BY MR. POPOLIZIO:
11     Q.  Did you -- do you claim that the City of Glendale
12   failed to ensure that these police officers would conduct
13   themselves in a manner to avoid violating your
14   Constitutional rights?
15        MS. BROADDUS:  If you have anything -- any of our
16   communications are obviously protected, if it's something
17   that you're relying on for your attorneys what we've talked
18   about, other than what's already documented in the
19   complaint, go ahead and answer.
20        THE WITNESS:  No, I do not.
21   BY MR. POPOLIZIO:
22     Q.  And looking at the -- so, strike that.
23        So, are you going to rely what's document -- on
24   what's documented in this complaint for the factual basis of
25   your claims?

---

Johnny Wheatcroft  Wheatcroft v. City of Glendale                1/20/2021

---

**70**

1    A.  Yes.
2    Q.  In looking at paragraph 128 on Page 19 of the
3  second amended complaint -- are you there?
4    A.  Yes.
5    Q.  It says:  At all times -- at all times relevant,
6  the City of Glendale had policies, customs, and/or patterns
7  and practices of failing to properly discipline, train, and
8  supervise its police officers, including the individual
9  defendants named in this complaint, in the proper use of
10  force, probable cause, and the execution of arrests.  The
11  City of Glendale failed to ensure its police officers could
12  and would conduct themselves in a manner to avoid violating
13  the Constitutional rights of the inhabitants of -- of
14  Defendant Glendale.
15       Did I read that correctly?
16    A.  Yes.
17    Q.  Okay.
18       And, and paragraph 128 is a paragraph in the
19  second amended complaint; right?
20    A.  Yes.
21    Q.  And it sets forth claims that you are making in
22  this action; right?
23    A.  Yes.
24       MR. POPOLIZIO:  Got that pen going over there,
25  huh, Jody?

---

**71**

1       MS. BROADDUS:  Sorry.
2       MR. POPOLIZIO:  That's all right.
3       MS. BROADDUS:  Nervous habit, I guess.
4       Usually the other pen I use doesn't rattle, so I
5  apologize.
6       Is that picking up on the -- okay.
7       I'll put my pen down.  You should have yelled at
8  me sooner.
9  BY MR. POPOLIZIO:
10    Q.  Look on Page 20 of, of the second amended
11  complaint, Johnny.
12    A.  Yes.
13    Q.  Paragraph 132?
14    A.  Yes.
15    Q.  It states:  Acting under the color of law, by
16  and through policy makers of Defendant Glendale and
17  pursuant to official policy, customs, and/or patterns and
18  practices, Defendant Glendale intentionally, knowingly,
19  recklessly, and/or with deliberate indifference to the
20  rights of inhabitants of Defendant Glendale failed to
21  instruct, supervise, control, and monitor its police
22  officers.
23       Did I read that correctly?
24    A.  Yes.
25    Q.  Now I know I read that one correctly.

---

**72**

1    A.  Yes.
2    Q.  All right.
3       So, and, and these are your claims; right?
4    A.  Yes.
5    Q.  And they're set forth in paragraph 132 of the
6  second amended complaint; right?
7    A.  Yes.
8    Q.  Okay.
9       Could you give me every fact that you have to
10  support your contention that the City of Glendale failed to
11  instruct the officers you sued in this case?
12       MS. BROADDUS: If you have information outside of
13  our communications as to other evidence in the case, go
14  ahead and answer.
15       THE WITNESS:  No, I do not.
16  BY MR. POPOLIZIO:
17    Q.  Do you have any facts that supports a contention
18  that the City of Glendale's alleged failure to instruct
19  these particular officers caused you any harm?
20       MS. BROADDUS: Do you have anything outside of our
21  communications, go ahead and answer.
22       THE WITNESS:  No, I do not.
23  BY MR. POPOLIZIO:
24    Q.  In fact, do you -- well, do you have any fact to
25  support your claim that the City of Glendale failed to

---

**73**

1  supervise the officers you sued in this action and that
2  failure to supervise caused you harm?
3       MS. BROADDUS: If you have something outside of
4  our communications as to other evidence in the case, go
5  ahead and answer.
6       THE WITNESS:  No, I do not.
7  BY MR. POPOLIZIO:
8    Q.  Do you have any facts to support your contention
9  that the City of Glendale failed to control the three
10  officers that you sued in this action and that failure to
11  control them caused you harm?
12       MS. BROADDUS:  Same objection.
13       If you have something outside of that, go ahead
14  and answer.
15       THE WITNESS:  No, I do not.
16  BY MR. POPOLIZIO:
17    Q.  And do you have any fact that supports your
18  contention that the City of Glendale failed to monitor the
19  three police officers that you sued in this action and that
20  failure to monitor caused you harm?
21       MS. BROADDUS: If you have something outside of
22  our communications and the evidence, go ahead and answer.
23       THE WITNESS:  No, I do not.
24  BY MR. POPOLIZIO:
25    Q.  Looking at paragraph 133 of the second amended

---

Johnny Wheatcroft   Wheatcroft v. City of Glendale                1/20/2021

---

**74**

1  complaint, again on Page 20, it states: These policies,
2  customs, and/or patterns and practices led the individual
3  defendants to believe that misconduct and abuse of
4  Constitutional rights would be tolerated and not be subject
5  to any meaningful reprimand or punishment.
6      Did I read that correctly?
7  A.  Yes.
8  Q.  Okay.
9      And that's an allegation you're making in this
10  complaint; right?
11  A.  Yes.
12  Q.  Okay.
13      So could you tell me what policy, custom, pattern,
14  or practice led these particular three officers, the
15  defendants in this action, to believe that misconduct and
16  abuse of Constitutional rights would be tolerated?
17      MS. BROADDUS:  If you have something outside our
18  communication as to other evidence in the case, go ahead and
19  answer that.
20      THE WITNESS:  No, I do not.
21  BY MR. POPOLIZIO:
22  Q.  So you have no facts when you say no?
23      MS. BROADDUS:  Object to form.
24      THE WITNESS:  No.
25

---

**75**

1  BY MR. POPOLIZIO:
2  Q.  Do you have any facts to support your claim that
3  the City of Glendale had policies, customs, and/or patterns
4  and practices that would lead these officers to believe that
5  they would not be the subject of any meaningful reprimand or
6  punishment?
7      MS. BROADDUS:  Object to form.  If you have
8  something outside of our communications, then you can go
9  ahead and answer.  If you're relying on completely our
10  communications, then let him know.
11      THE WITNESS:  No, I do not.
12  BY MR. POPOLIZIO:
13  Q.  Now, Count VIII in your complaint is actually
14  entitled loss of consortium.
15      Do you see that on Page 22?
16  A.  Yes.
17  Q.  Okay.
18      But those are -- those are counts -- that's a
19  count that contains claims for your sons; right?
20  A.  Yes.
21  Q.  Okay.
22      Excuse me.
23      Now, you, you shared with me, Johnny, that your
24  first child was born in 2000; right?
25  A.  Yes.

---

**76**

1  Q.  And that was Jessica?
2  A.  Yes.
3  Q.  And then you gave me the birth dates of, of your
4  other children; right?
5  A.  Yes.
6  Q.  Okay.  And you have four children; right?
7  A.  Yes.
8  Q.  And, since -- well, you've done -- strike that.
9      Currently you're incarcerated in prison; right?
10  A.  Yes.
11  Q.  Okay.
12      But that's something -- that has to do with
13  something unrelated to the incident that occurred on
14  July 26, 2017, at the Motel 6; right?
15  A.  Yes.
16      MS. BROADDUS:  I'm going to object to form.  If it
17  gets into the communications we've had about that, then
18  that's also protected.  So if you have something outside of
19  that, let him know.
20      THE WITNESS:  Okay.
21  BY MR. POPOLIZIO:
22  Q.  So, general terms, don't want to know what you
23  talked about with your, with your -- with your attorney.
24  A.  Yes.
25  Q.  However, you're serving some time now; right?

---

**77**

1  A.  Yes.
2  Q.  And your sentence is for a crime that you
3  committed; right?
4  A.  Yes.
5  Q.  And you were convicted for?
6  A.  Yes.
7  Q.  But that, that crime occurred after this incident;
8  right?
9  A.  Yes.
10  Q.  Okay.  In fact, in February of 2018 you were
11  arrested; right?
12  A.  Yes.
13  Q.  And that arrest led to the conviction for which
14  you're serving a sentence in prison currently; right?
15  A.  Yes.
16  Q.  Okay.
17      And you're incarcerated where right now?
18  A.  In Cimarron, Tucson complex.
19  Q.  Cimarron?  Okay.
20      And that's a Department of Corrections facility?
21  A.  Yes.
22  Q.  Okay.
23      And you've been incarcerated since what date?
24  A.  February of 2018.
25  Q.  Okay.  So basically you were arrested on -- in, in

---

Johnny Wheatcroft   Wheatcroft v. City of Glendale                    1/20/2021

---

342

1   let me go.
2       Q.   When -- when did this occur?  What's, what's the
3   year?
4       A.   Same year.
5       Q.   Same year?  2017?
6       A.   Yes.
7       Q.   What's the month?
8       A.   I don't remember.
9            Months before that though.
10      Q.   What was the apartment complex?
11      A.   59th and Bethany Home.
12      Q.   What was the name of it?
13      A.   I don't know.
14      Q.   What you were doing there?
15      A.   I was trying to get away from him.
16      Q.   When you said we, who were you with?
17      A.   I was by myself on a bike.
18      Q.   But you said we.
19      A.   No, I did not.
20      Q.   Okay.
21           You didn't say we were.  You said I was there on a
22   bike?
23           I mean, I thought you said we pretty clearly,
24   Johnny.
25      A.   I didn't say we.  I was there by myself.

---

343

1       Q.   Okay.  So were you there by yourself?
2       A.   Yes.
3       Q.   You were just riding your bike?
4       A.   Yes, I was riding down 59th Avenue.  And he turned
5   around and came -- flipped a bitch and came after me.  And I
6   went across the street and went into the apartments right
7   there to try to lose him, because I did have a misdemeanor
8   warrant.
9           And then as I tried to come through the other side
10  of the parking lot, there's a bunch of undercover cops
11  there.
12      Q.   So you're saying this was Officer Lindsey; right?
13      A.   Yes.
14      Q.   And he was the one that was on -- initially on
15  Officer -- on Shawn Blackburn's side of the car; right?
16      A.   Him and that woman that was here this day also.
17      Q.   No, I just asked you -- I asked you a question.
18           In identifying Officer Lindsey, you're saying that
19  occurred, he's the officer that was initially and the day of
20  this incident on the driver's side of the car talking to
21  Shawn Blackburn; right?
22      A.   Yes.
23      Q.   Okay.
24           So you're saying that you had an encounter as you
25  described -- just described; right?

---

344

1       A.   Yes.
2       Q.   And then you also said you had a misdemeanor
3   warrant out for your arrest; right?
4       A.   Yes.
5       Q.   And then you said that you tried -- you tried to
6   elude him at that time; is that right?
7       A.   No.
8            MS. BROADDUS:  Object to form.
9            THE WITNESS:  I just tried to avoid him and go
10  through an apartment complex.
11  BY MR. POPOLIZIO:
12      Q.   Okay.
13           Okay.  You didn't -- all right.
14           We'll -- we'll let the -- we'll let the -- you
15  didn't use the word elude, but we'll let the, the transcript
16  read the way it reads.
17           So why would you try to get away from him?
18           MS. BROADDUS:  Object to form.
19           THE WITNESS:  I just told you.  I had misdemeanor
20  warrant and I didn't want to get stopped.
21  BY MR. POPOLIZIO:
22      Q.   Okay.  Because what would happen if you got a
23  misdemeanor warrant and you were stopped?
24           MS. BROADDUS:  Object to form and foundation.
25           THE WITNESS:  Possibility of going to jail I

---

345

1   guess.
2   BY MR. POPOLIZIO:
3       Q.   I'm sorry, what did you say?
4       A.   Possibility of going to jail I guess.  I don't
5   know.
6       Q.   Okay.
7            Do you remember at that time what your misdemeanor
8   warrant was for?
9            MS. BROADDUS:  Object to form.  Foundation.
10           THE WITNESS:  No.  I think tickets.
11  BY MR. POPOLIZIO:
12      Q.   Tickets?
13      A.   Yeah.
14      Q.   What kind of tickets?
15      A.   I don't know.  I don't remember actually.
16           I don't remember what it was for.
17      Q.   Okay.  But you -- but you do remember that in 2017
18  when you described you were stopped by Officer Lindsey in
19  the 59th Avenue area in an apartment complex you had a
20  misdemeanor warrant; right?
21      A.   Yes.
22      Q.   Okay.
23           And do you know what city that was out of?
24      A.   Maricopa.
25      Q.   Maricopa County?

---

**Johnny Wheatcroft  Wheatcroft v. City of Glendale**                    1/20/2021

---

438

1    tased.
2         Let me see you lay still while that's happening to
3    you, and I'll -- you know what, I'll give you a high five,
4    bud, because it can't happen.
5         Q.  Well, whether you want to high five me or not,
6    when you were on the ground here after you're handcuffed,
7    did you see what was happening with your wife?
8         A.  Some of it, yeah, when they slammed her over here.
9         Q.  Okay.
10        Did that anger you?
11        A.  Anger me?  No.
12        It was -- you got -- they were scaring me is what
13   they were doing.
14        Q.  Okay.
15        A.  It didn't anger me or make me mad.  It scared me
16   because they weren't stopping.  Everyone that showed back up
17   on scene, they came and got some too.
18        And it's -- no.
19        Q.  So --
20        A.  That's my answer.
21        Q.  So you didn't move when you were on the ground
22   here to get up or try to get up to help your wife?
23        A.  Get up to help her?  I'm in handcuffs.
24        Q.  So that's a no?
25        A.  Yes.

---

439

1         Q.  Okay.
2         So you didn't resist the officers at this point
3    because of what you saw happen to your wife in the corner;
4    right?
5         A.  No.
6         Q.  Did you ever tell any officer that you saw that
7    happen to your wife and that's when you started fighting the
8    officers or something to that effect?
9         MS. BROADDUS:  Form.
10        THE WITNESS:  No.
11   BY MR. POPOLIZIO:
12        Q.  Never that said?
13        A.  I've never said to anybody.
14        Q.  Okay.
15        Do you remember being interviewed after the
16   incident?
17        A.  Yeah.
18        Q.  Do you remember telling any officer that you saw
19   what happened to your wife and that's -- at that point you
20   started resisting the officers?
21        A.  No.  I never said that.  I never said --
22        Q.  Or something to that effect.  I'm not saying
23   verbatim.
24        A.  No, I never said that period.
25        MR. POPOLIZIO:  Okay.

---

440

1         We're going to do -- we're going to play 504 to
2    516, we're going to play it in slow speed.  Okay?
3         (Video played.)
4    BY MR. POPOLIZIO:
5         Q.  We stopped it at 514.
6         So you see the drive stun tase when you're on the
7    ground; right?  You saw that?
8         A.  Yeah.
9         Q.  Okay.
10        So, when you received that tase at this, at this
11   point, Johnny, you saw your buttocks was exposed?
12        A.  Yeah.
13        Q.  Okay.
14        Specifically like your left buttocks.
15        Did you see that?
16        A.  Yeah.
17        Q.  Okay.
18        And you -- you got a taser application; correct?
19        A.  Yeah.
20        Q.  And you put both hands over your, your -- your
21   buttocks.
22        Did you see that?
23        A.  Yeah, I tried to get them to stop tasing me, yeah.
24        Q.  So, did you receive -- you just saw that; right?
25   You just saw the video?

---

441

1         A.  I know exactly what happened.
2         Q.  Did it -- did it appear to you that you received
3    the taser application to your left buttocks, upper thigh
4    area?
5         MS. BROADDUS:  Object to form.
6         THE WITNESS:  No.
7    BY MR. POPOLIZIO:
8         Q.  Okay.  Where did it appear to you that you got
9    that tase?
10        A.  He didn't just hold it on me like that.  Okay?  He
11   ground it like this.  Okay?
12        I don't know if you can see that in the video or
13   not, but that's what he did.
14        All right?
15        And when my legs were stuck together like this,
16   okay, it makes my balls pop out, okay, in the back, is
17   what -- what happened.
18        All right?
19        And when he's grounding like this, okay, he almost
20   burst my ball.  My testicle was this big around for
21   two months.
22        Q.  Okay.
23        A.  Okay?
24        Q.  Did -- when you watched this video right there,
25   did you see any of your testicles visible?

---

Johnny Wheatcroft   Wheatcroft v. City of Glendale                    1/20/2021

---

442

1     A.  No.
2     Q.  Do you see your penis visible?
3     A.  No.
4     Q.  How about your -- you know, you know what the
5  perineum is?
6     A.  Yeah, I know what it is.
7     Q.  Okay.
8         Did you see that?
9     A.  No.
10    Q.  So. . .
11        While she's getting the video to that point, you
12  said that --
13        (Simultaneous crosstalk.)
14    A.  It might be regular --
15    Q.  -- your --
16    A.  -- both --
17    Q.  -- you said -- I'm asking you a question.  Please.
18        So when you --
19    A.  Tough to see, I'm sorry.
20    Q.  You just said that your -- your testicle was
21  swollen?
22    A.  Yeah.
23    Q.  Was your testicle swollen when you were at the
24  station being interviewed, at jail?
25    A.  Yeah, I told them.

---

443

1     Q.  Did you tell anybody at the station that your
2  testicle was swollen?
3     A.  I told that blonde officer, the lady, the one that
4  I tried to file sexual assault charges and stuff right there
5  at the window.
6     Q.  Okay.
7     A.  I tried to --
8     Q.  Is that a yes?  Because I asked you a specific
9  question.  Did you tell anybody at the station --
10    A.  I told --
11    Q.  -- when you were interviewed -- I'm not done with
12  my question.
13        Did you tell --
14    A.  Yes.
15    Q.  -- anybody at the station when you were
16  interviewed that your testicle was swollen?
17    A.  I told her that my balls were hurt, yes.  I told
18  her-
19    Q.  Did you tell her it was swollen?
20    A.  No, I told her they were hurt.
21    Q.  Did you ask her at that point to -- that if you
22  could see or get some medical attention?
23    A.  I tried to get medical attention on the scene,
24  yes, I did.
25    Q.  Did you ask -- okay.  We'll get to that.

---

444

1         Did you ask her --
2     A.  I didn't ask her.  I asked the officer.
3     Q.  Johnny, you got to listen.  You got to let me
4  finish my question.
5         Okay?
6         Did you ask her during that interview whether you
7  could be seen by medical?
8     A.  No, I asked the officers --
9     Q.  Okay.
10    A.  -- right there when I was at the, at the front --
11  at the thing, when the fire department came, I asked them to
12  see me and they wouldn't.
13        MR. POPOLIZIO:  What's the next exhibit, Marty?
14        THE REPORTER:  Johnny, can I have the exhibits,
15  please.
16        THE WITNESS:  Oh, I'm sorry.
17        MR. POPOLIZIO:  Can we just go off the record for
18  a moment?
19        THE VIDEOGRAPHER:  Off the record at 5:20.
20        (Brief pause.)
21        THE VIDEOGRAPHER:  Back on the record at 5:21.
22        (Deposition Exhibit No. 80 was marked for
23  identification by the reporter.)
24  BY MR. POPOLIZIO:
25    Q.  Johnny, I'm showing you what's been marked as

---

445

1  Exhibit 80 to your deposition.
2         Do you see that?
3     A.  Yep.
4     Q.  Okay.
5         And it is a multi-page document that starts with
6  off with Bates No. CoG_Wheatcroft 036805 and runs through
7  036811.
8         Do you see that?
9     A.  Yes.
10    Q.  All right.
11        And I want you -- it's a patient care report, and
12  I want you to turn to the third page of this exhibit, which
13  is 036807.
14    A.  Uh-hmm.
15    Q.  Are you there?
16    A.  Yep.
17    Q.  Okay.  Do you see where it says narrative?
18        Up at the top, near the top.  Narrative.  Right in
19  the middle of the page.
20    A.  I might be on the wrong one.
21    Q.  No, you're not.  You're -- you're on the right
22  page.
23        First black line --
24    A.  Yeah, yeah, yeah, I see it.
25    Q.  All right.

---

**Johnny Wheatcroft   Wheatcroft v. City of Glendale**                      1/20/2021

---

474

1  the back.  And then while you were handcuffed prone on the
2  ground with your face on the ground, middle of July, hot
3  asphalt pavement, your pants were pulled down, and you were
4  tased in the testicles.
5        Is that what happened to you?
6        MR. POPOLIZIO:  Objection; form.
7        THE WITNESS:  Yes.
8  BY MS. BROADDUS:
9     Q.   Okay.
10       How did that make you feel?
11       MR. POPOLIZIO:  Objection; form.
12       THE WITNESS:  Pretty bad.
13 BY MS. BROADDUS:
14    Q.   Now, if we go back to why you were pulled over --
15 well, first of all, you weren't even driving that day.  You
16 were a passenger; correct?
17    A.   Correct.
18    Q.   And were you ever told specifically why the car
19 was being pulled over?
20       MR. POPOLIZIO:  Form.
21       THE WITNESS:  No.
22 BY MS. BROADDUS:
23    Q.   You weren't told that; fair?
24       MR. POPOLIZIO:  Form.
25       THE WITNESS:  No.

---

475

1  BY MS. BROADDUS:
2     Q.   Were you ever told that you were ever to get out
3  of the car?
4        MR. POPOLIZIO:  Form.
5        THE WITNESS:  No.
6  BY MS. BROADDUS:
7     Q.   Were you ever told why they were pulling you or
8  trying to drag you out of the car or tasing you?
9        MR. POPOLIZIO:  Form.
10       THE WITNESS:  No.
11 BY MS. BROADDUS:
12    Q.   Did anyone -- you were charged with resisting
13 arrest; is that correct?
14    A.   Yes.
15    Q.   What arrest -- do you know what arrest you were
16 resisting?
17       MR. POPOLIZIO:  Form.
18       THE WITNESS:  I don't know.
19 BY MS. BROADDUS:
20    Q.   So you charged with resisting arrest, but you
21 don't know what you were being arrested for.  Fair
22 statement?
23    A.   Yes.
24    Q.   Did you ever get a citation for not wearing your
25 seat belt that day?

---

476

1     A.   No.
2     Q.   Were you wearing your seat belt that day when you
3  were a passenger in the car when the car entered the parking
4  lot at Motel 6?
5     A.   Yes.
6     Q.   And after the vehicle was -- do you know whether
7  your seat belt came off unlatched before or after the car
8  was in the parking spot that it was in?
9        MR. POPOLIZIO:  Form.
10       THE WITNESS:  It was still latched when the cop
11 first talked to me.
12       Because I had money in my hand, and I tried to
13 undo it on and I couldn't do it because my thumb doesn't
14 bend.  And so I was trying to undo it.
15       It was after he walked away from my door I
16 believe.  But he had already come and talked to me, and I
17 was undoing my seat belt.
18 BY MS. BROADDUS:
19    Q.   You were asked some questions about shady
20 disposition, so to speak, of this Motel 6, asked about
21 prostitution, asked about car thefts and drug deals and all
22 that stuff that goes on in this parking lot.
23       Isn't this Motel 6 right by the police station?
24    A.   Yes.  Right across the street.
25    Q.   The Glendale police station; correct?

---

477

1     A.   Yeah.
2        MS. BROADDUS:  All right.  We'll read and sign.
3        MR. POPOLIZIO:  Okay.  Thank you.
4        THE VIDEOGRAPHER:  This concludes today's
5  deposition.  Off the record at 5:56.
6        (Whereupon, the deposition concluded.)
7
8
9                                    _____
                                         JOHNNY WHEATCROFT
10
11
12                       * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

478

```
 1   STATE OF ARIZONA  )
                       ) SS
 2   COUNTY OF MARICOPA )
 3              C E R T I F I C A T E
 4       BE IT KNOWN that the foregoing proceedings were taken
     before me; that the witness before testifying was duly
 5   sworn by me to testify to the whole truth; that the 477
     foregoing pages are a full, true and accurate record of the
 6   proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
 7   thereafter reduced to print under my direction.
 8       I CERTIFY that I am in no way related to any of the
     parties hereto nor am I in any way interested in the
 9   outcome hereof.
10
         [x] Review  and  signature was requested.
11       [ ] Review  and  signature was waived.
         [ ] Review  and  signature not required.
12
         I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206.
14       Dated this 31st day of January, 2021,
             Chandler, Arizona.
15
16
17   _____
         C. Martin Herder, CSR, CCR
18       Certified Reporter
         Arizona CCR No. 50162
19
20       It is FURTHER CERTIFIED that Herder & Associates,
     Registered Reporting Firm, has complied with the ethical
21   obligations set forth in ACJA 7-206.
22
23
24   _____
         Registered Reporting Firm
         Arizona RRF No. R1145
25
```

# *EXHIBIT 2*

# *Non-Electronic Exhibit - CD*

# EXHIBIT 3




# Location History Report

Location:7116 n 59th ave  Apartment/Unit#
From: 1/1/2016  To:12/31/2017

| | | | Calls For Service | | |
|---|---|---|---|---|---|
| **Event** | **Date/Time** | **Apt** | **Call Title** | **Dispo** | **Officer** |
| E1600000711 | 1/2/2016 13:01 | | THEFT | CONTACT MADE, NO PAPERWORK | JONES, JASON #14688 |
| E1600000848 | 1/2/2016 19:01 | 129 | INJURED OR SICK PERSON | CONTACT MADE, NO PAPERWORK | FINK, NATHANIEL #17071 |
| E1600000952 | 1/3/2016 00:01 | | LOUD MUSIC OR NOISE DISTURBING | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600001373 | 1/4/2016 08:01 | | THEFT | CONTACT MADE, NO PAPERWORK | TORRES, JAMES #11260 |
| E1600002867 | 1/7/2016 15:01 | | SUSPICIOUS CIRCUMSTANCE | OFFENSE REPORT | LARSEN, KRISTOPHER #16907 |
| E1600003241 | 1/8/2016 11:01 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | MISNER, GERALD #15179 |
| E1600004008 | 1/10/2016 01:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | SINGER, ELAINE #10643 |
| E1600004438 | 1/11/2016 01:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600004888 | 1/12/2016 00:01 | 260 | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600005212 | 1/12/2016 15:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600005250 | 1/12/2016 17:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600005426 | 1/13/2016 02:01 | | THEFT OF VEHICLE | OFFENSE REPORT | MCLEOD, BRET #11368 |
| E1600005830 | 1/13/2016 21:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600006379 | 1/14/2016 22:01 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | HARDESTY, SHAUN #11575 |
| E1600006435 | 1/15/2016 00:01 | 136 | UNWANTED GUESTS | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1600006445 | 1/15/2016 01:01 | 136 | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1600007020 | 1/16/2016 11:01 | | THEFT | OFFENSE REPORT | MISNER, GERALD #15179 |
| E1600007224 | 1/16/2016 20:01 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LARSEN, KRISTOPHER #16907 |
| E1600007577 | 1/17/2016 16:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600008231 | 1/19/2016 08:01 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | HUBBUCH, JAMISON #12524 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036854

| | | | | | |
|---|---|---|---|---|---|
| E1600008506 | 1/19/2016 19:01 | 282 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | DOERR, GLENN #15123 |
| E1600009755 | 1/22/2016 01:01 | | PODD | OFFENSE REPORT | YATES, AADAM #13508 |
| E1600009793 | 1/22/2016 03:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600010042 | 1/22/2016 15:01 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | SMITH, ALISSANDRA #16910 |
| E1600010224 | 1/22/2016 23:01 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1600010320 | 1/23/2016 04:01 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SINGER, ELAINE #10643 |
| E1600011046 | 1/24/2016 20:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600011169 | 1/25/2016 02:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600012135 | 1/26/2016 22:01 | | THEFT | OFFENSE REPORT | RAMSAY, JUSTIN #15093 |
| E1600012565 | 1/27/2016 18:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600012977 | 1/28/2016 12:01 | | SUSPICIOUS PERSON/CIRCUMSTANCE | OFFENSE REPORT | HUBBUCH, JAMISON #12524 |
| E1600013066 | 1/28/2016 15:01 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1600013309 | 1/29/2016 02:01 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600013964 | 1/30/2016 14:01 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1600014347 | 1/31/2016 13:01 | | THEFT | OFFENSE REPORT | GELLMAN, RACHEL #14572 |
| E1600015004 | 2/1/2016 17:02 | | THEFT | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600015015 | 2/1/2016 18:02 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | PLAISTED, ROBERT #17193 |
| E1600015061 | 2/1/2016 20:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600015469 | 2/2/2016 15:02 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | DOERR, GLENN #15123 |
| E1600015685 | 2/3/2016 02:02 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600015717 | 2/3/2016 04:02 | | CHECK WELFARE | FIELD INTERVIEW CARD | KING, MARCUS #17000 |
| E1600016080 | 2/3/2016 17:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600017398 | 2/5/2016 22:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036855

| | | | | | |
|---|---|---|---|---|---|
| E1600017414 | 2/5/2016 22:02 | 278 | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1600018621 | 2/8/2016 14:02 | | TRESPASSING | FIELD INTERVIEW CARD | ROOKS, JORDAN #17143 |
| E1600018873 | 2/9/2016 03:02 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600019735 | 2/10/2016 16:02 | 122 | ATTEMPT SUICIDE | CONTACT MADE, NO PAPERWORK | MILLANES, FRANCISCO #17250 |
| E1600019750 | 2/10/2016 17:02 | | UNWANTED GUESTS | FIELD INTERVIEW CARD | SMITH, ALISSANDRA #16910 |
| E1600020702 | 2/12/2016 11:02 | | POSSESSION OF MARIJUANA | OFFENSE REPORT NRU | PITTMAN, JEFFREY #12718 |
| E1600020704 | 2/12/2016 11:02 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600022744 | 2/16/2016 15:02 | | THEFT | OFFENSE REPORT | TURSKI, CHRISTOPHER #14529 |
| E1600022784 | 2/16/2016 16:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600022862 | 2/16/2016 19:02 | | ASSAULT | OFFENSE REPORT | CARFAGNA, NICOLINO #15252 |
| E1600023254 | 2/17/2016 12:02 | | UNWANTED GUESTS | FIELD INTERVIEW CARD | ROOKS, JORDAN #17143 |
| E1600024139 | 2/18/2016 23:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1600024217 | 2/19/2016 03:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LA BRANT, DONALD #8917 |
| E1600024759 | 2/20/2016 00:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | HARDESTY, SHAUN #11575 |
| E1600024789 | 2/20/2016 03:02 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600025264 | 2/21/2016 02:02 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | HARDESTY, SHAUN #11575 |
| E1600025570 | 2/21/2016 20:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600025683 | 2/22/2016 01:02 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600026027 | 2/22/2016 18:02 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | DOERR, GLENN #15123 |
| E1600026235 | 2/23/2016 07:02 | | THEFT | OFFENSE REPORT | LIVINGSTON, JENNIFER #12223 |
| E1600026669 | 2/23/2016 23:02 | | SPEEDING OR RACING | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600028810 | 2/27/2016 23:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600029054 | 2/28/2016 14:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600029109 | 2/28/2016 15:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600029228 | 2/28/2016 21:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600030320 | 3/1/2016 23:03 | | POND FOR SALE | SUPPLEMENTAL REPORT | YATES, AADAM #13508 |
| E1600030337 | 3/1/2016 23:03 | | MISCONDUCT W/WEAPONS | OFFENSE REPORT | YATES, AADAM #13508 |
| E1600030917 | 3/3/2016 02:03 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600030980 | 3/3/2016 07:03 | | INVESTIGATE UNKNOWN TROUBLE | CONTACT MADE, NO PAPERWORK | HUBBUCH, JAMISON #12524 |
| E1600032282 | 3/5/2016 13:03 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1600032834 | 3/6/2016 19:03 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600033401 | 3/8/2016 03:03 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BASTIN, CHRISTOPHER #16581 |
| E1600033599 | 3/8/2016 12:03 | 293 | THEFT | OFFENSE REPORT | KULB, STEVEN #12430 |
| E1600033844 | 3/8/2016 21:03 | | INJURED OR SICK PERSON | ASSIST FIRE DEPARTMENT | CARFAGNA, NICOLINO #15252 |
| E1600034220 | 3/9/2016 15:03 | | POSSESSION OF MARIJUANA | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1600035657 | 3/12/2016 00:03 | | LOSS REPORT | OFFENSE REPORT | COLLINS, SCOTT #15178 |
| E1600036279 | 3/13/2016 10:03 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | MILLS, GREGORY #15610 |
| E1600037720 | 3/16/2016 08:03 | | CRIMINAL DAMAGE | OFFENSE REPORT | KULB, STEVEN #12430 |
| E1600038507 | 3/17/2016 17:03 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW NRU | PITTMAN, JEFFREY #12718 |
| E1600039148 | 3/18/2016 17:03 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | WAITE, SCOTT #14091 |
| E1600039281 | 3/18/2016 22:03 | 121 | ASSAULT | OFFENSE REPORT | SINGER, ELAINE #10643 |
| E1600039788 | 3/20/2016 00:03 | | SUBJ DISTURBING/HARASSING | UNABLE TO LOCATE | LA BRANT, DONALD #8917 |
| E1600041537 | 3/23/2016 16:03 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW CARD | DOERR, GLENN #15123 |
| E1600043810 | 3/28/2016 03:03 | | POSSESSION OF DRUG PARAPHERNALIA | OFFENSE REPORT | HUNTER, KEITH #16887 |
| E1600044215 | 3/28/2016 21:03 | | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600044282 | 3/29/2016 02:03 | | DV/DISORDERLY CONDUCT | OFFENSE REPORT | FAIR, LANCE #16781 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036857

| | | | | |
|---|---|---|---|---|
| E1600047244 | 4/3/2016 15:04 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600047417 | 4/3/2016 22:04 | LOUD MUSIC OR NOISE DISTURBING | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600048899 | 4/6/2016 20:04 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600050921 | 4/10/2016 19:04 | POSS OF DANGEROUS DRUGS | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1600051057 | 4/11/2016 01:04 | MISCONDUCT INVOLVING WEAPONS | OFFENSE REPORT | PEREZ, DANIEL #16909 |
| E1600051590 | 4/12/2016 04:04 | TRESPASSING | FIELD INTERVIEW CARD | BASTIN, CHRISTOPHER #16581 |
| E1600051601 | 4/12/2016 05:04 | THEFT FROM VEHICLE | OFFENSE REPORT | ZARAGOZA, SAMANTHA #13340 |
| E1600052053 | 4/12/2016 20:04 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600052167 | 4/13/2016 03:04 | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600052552 | 4/13/2016 18:04 | THEFT | OFFENSE REPORT | LARSEN, KRISTOPHER #16907 |
| E1600052736 | 4/14/2016 07:04 | RECOVERY OF VEHICLE | OFFENSE REPORT | MCLEOD, BRET #11368 |
| E1600053103 | 4/14/2016 19:04 | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1600053584 | 4/15/2016 17:04 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1600053938 | 4/16/2016 10:04 | RECOVERY OF VEHICLE | SUPPLEMENTAL REPORT | DIRKS, SHAWN #13103 |
| E1600054571 | 4/17/2016 16:04 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600056429 | 4/21/2016 00:04 | MISDEMEANOR WNT OUTSTANDING | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600057319 | 4/22/2016 13:04 | HIT AND RUN, NON-INJURY | ACCIDENT | FINK, NATHANIEL #17071 |
| E1600057834 | 4/23/2016 12:04 | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1600058222 | 4/24/2016 05:04 | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600058446 | 4/24/2016 17:04 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600058908 | 4/25/2016 16:04 | | CONTACT MADE, NO PAPERWORK | DOERR, GLENN #15123 |
| E1600059134 | 4/25/2016 22:04 | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | KING, MARCUS #17000 |
| E1600059241 | 4/26/2016 06:04 | SUBJ DISTURBING/HARASSING | FIELD INTERVIEW CARD | HANEY, ANTHONY #9971 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036858

| | | | | | |
|---|---|---|---|---|---|
| E1600059301 | 4/26/2016 08:04 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | KULB, STEVEN #12430 |
| E1600059370 | 4/26/2016 10:04 | | TRESPASSING | UNABLE TO LOCATE | GONZALEZ, LARRY #10659 |
| E1600059413 | 4/26/2016 12:04 | | TRESPASSING | FIELD INTERVIEW CARD | ZARAGOZA, SAMANTHA #13340 |
| E1600060059 | 4/27/2016 15:04 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600060088 | 4/27/2016 15:04 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600060122 | 4/27/2016 16:04 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600060215 | 4/27/2016 20:04 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | DIRKS, SHAWN #13103 |
| E1600061611 | 4/30/2016 03:04 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600062306 | 5/1/2016 15:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600062333 | 5/1/2016 16:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600062519 | 5/2/2016 01:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600062829 | 5/2/2016 17:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600062898 | 5/2/2016 20:05 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW CARD | ATEN, BRIAN #15250 |
| E1600063360 | 5/3/2016 15:05 | | FELONY FLIGHT | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1600063545 | 5/3/2016 22:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1600064619 | 5/5/2016 18:05 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1600065953 | 5/8/2016 13:05 | | FAMILY FIGHT/DOMESTIC VIOLENCE | FIELD INTERVIEW CARD | SAYLOR, JAMES #16782 |
| E1600066073 | 5/8/2016 18:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600066119 | 5/8/2016 20:05 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | CARFAGNA, NICOLINO #15252 |
| E1600066239 | 5/9/2016 05:05 | | ASSAULT | OFFENSE REPORT | CLUBB, JONATHAN #16439 |
| E1600066280 | 5/9/2016 07:05 | 290 | INSANE PERSON | CONTACT MADE, NO PAPERWORK | MISNER, GERALD #15179 |
| E1600066716 | 5/10/2016 02:05 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | MACDONALD, ROBERT #10704 |
| E1600066771 | 5/10/2016 07:05 | 121 | INSANE PERSON | CONTACT MADE, NO PAPERWORK | TORRES, JAMES #11260 |
| E1600067377 | 5/11/2016 08:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600068340 | 5/13/2016 01:05 | | BURGLARY VEHICLE | OFFENSE REPORT | KUEFER, WESLEY #16905 |
| E1600068391 | 5/13/2016 07:05 | | BURGLARY VEHICLE | CONTACT MADE, NO PAPERWORK | JONES, JASON #14688 |
| E1600068396 | 5/13/2016 07:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600068455 | 5/13/2016 09:05 | | THEFT | CONTACT MADE, NO PAPERWORK | GONZALEZ, LARRY #10659 |
| E1600068752 | 5/13/2016 20:05 | 123 | SOLICITING | CONTACT MADE, NO PAPERWORK | ROWE, TORII #17074 |
| E1600069737 | 5/16/2016 01:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600070159 | 5/16/2016 20:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600070721 | 5/17/2016 21:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600070755 | 5/17/2016 22:05 | | BACK UP, ASSIST | ASSIST OTHER AGENCY | KING, MARCUS #17000 |
| E1600071187 | 5/18/2016 18:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600071268 | 5/18/2016 23:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | HARDESTY, SHAUN #11575 |
| E1600072247 | 5/20/2016 15:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARLO, RICARDO #15952 |
| E1600072788 | 5/21/2016 19:05 | | CRIMINAL DAMAGE | OFFENSE REPORT | RATLIFF, TREVOR #17222 |
| E1600072925 | 5/22/2016 02:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600073362 | 5/23/2016 02:05 | | BURGLARY FROM VEHICLE | OFFENSE REPORT | BRILL, JOSHUA #16583 |
| E1600073575 | 5/23/2016 12:05 | | BURGLARY VEHICLE | SUPPLEMENTAL REPORT | HUBBUCH, JAMISON #12524 |
| E1600073819 | 5/23/2016 23:05 | | FIGHT | UNABLE TO LOCATE | BRILL, JOSHUA #16583 |
| E1600074397 | 5/25/2016 00:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600074821 | 5/25/2016 17:05 | | NARCOTICS | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1600075726 | 5/27/2016 12:05 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600076155 | 5/28/2016 07:05 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | GELLMAN, RACHEL #14572 |
| E1600076604 | 5/29/2016 01:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600076649 | 5/29/2016 03:05 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036860

| | | | | | |
|---|---|---|---|---|---|
| E1600076847 | 5/29/2016 17:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600077042 | 5/30/2016 03:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600077318 | 5/30/2016 15:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600077415 | 5/30/2016 20:05 | | TRESPASSING | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1600077945 | 5/31/2016 19:05 | | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600078457 | 6/1/2016 16:06 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600079190 | 6/2/2016 22:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1600079374 | 6/3/2016 07:06 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | MISNER, GERALD #15179 |
| E1600079866 | 6/4/2016 00:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600080145 | 6/4/2016 18:06 | | CRIMINAL DAMAGE | OFFENSE REPORT | LARSEN, KRISTOPHER #16907 |
| E1600080748 | 6/5/2016 23:06 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | HORNBAKER, KYLE #17072 |
| E1600081434 | 6/7/2016 10:06 | | BACK UP, ASSIST | ASSIST FIRE DEPARTMENT | HUBBUCH, JAMISON #12524 |
| E1600081673 | 6/7/2016 19:06 | | SUSPICIOUS VEHICLE | FIELD INTERVIEW NRU | LEWIS, LEROY #15542 |
| E1600081794 | 6/8/2016 02:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600082124 | 6/8/2016 19:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600083528 | 6/11/2016 09:06 | 120 | THEFT | CONTACT MADE, NO PAPERWORK | MISNER, GERALD #15179 |
| E1600083619 | 6/11/2016 13:06 | | MISSING PERSON | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600083910 | 6/12/2016 02:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600084031 | 6/12/2016 12:06 | | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | SCHMUCK, ROBERT #11194 |
| E1600084081 | 6/12/2016 16:06 | | INTENSIVE PATROL (PREVENTATIVE) | NO ACTION | , ATL CALL (FROM CAD) #9000 |
| E1600084407 | 6/13/2016 11:06 | | FOUND PROPERTY | OFFENSE REPORT | JONES, JASON #14688 |
| E1600084713 | 6/13/2016 23:06 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600084747 | 6/14/2016 01:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600084762 | 6/14/2016 01:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | KING, MARCUS #17000 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600085786 | 6/15/2016 20:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600087872 | 6/20/2016 00:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARLO, RICARDO #15952 |
| E1600088222 | 6/20/2016 18:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600088313 | 6/20/2016 23:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600088373 | 6/21/2016 02:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600088758 | 6/21/2016 18:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600088860 | 6/21/2016 22:06 | 131 | AGGRAVATED ASSAULT | OFFENSE REPORT | FAIR, LANCE #16781 |
| E1600088936 | 6/22/2016 03:06 | | SHOTS FIRED | UNABLE TO LOCATE | YATES, AADAM #13508 |
| E1600089323 | 6/22/2016 15:06 | | CHECK WELFARE | UNABLE TO LOCATE | SEIDL, ALLAN #16321 |
| E1600089354 | 6/22/2016 17:06 | | NARCOTICS | OFFENSE REPORT NRU | LEWIS, LEROY #15542 |
| E1600089360 | 6/22/2016 16:06 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | DOERR, GLENN #15123 |
| E1600089574 | 6/23/2016 05:06 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | SINGER, ELAINE #10643 |
| E1600089852 | 6/23/2016 14:06 | | TRESPASSING | FIELD INTERVIEW CARD | LARSEN, KRISTOPHER #16907 |
| E1600090013 | 6/23/2016 20:06 | | THEFT | OFFENSE REPORT | LARSEN, KRISTOPHER #16907 |
| E1600090116 | 6/24/2016 02:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600090188 | 6/24/2016 08:06 | | STOLEN VEHICLE/FOJ RECOVERY | OFFENSE REPORT | MCLEOD, BRET #11368 |
| E1600090642 | 6/25/2016 00:06 | | UNWANTED GUESTS | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600091158 | 6/26/2016 02:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600091174 | 6/26/2016 03:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600091487 | 6/26/2016 21:06 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | KING, MARCUS #17000 |
| E1600092641 | 6/29/2016 03:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600092645 | 6/29/2016 03:06 | | POSSESSION OF NARCOTIC DRUGS | OFFENSE REPORT | BRILL, JOSHUA #16583 |
| E1600092942 | 6/29/2016 14:06 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | GRIFFITH, MICHAEL #9974 |
| E1600093146 | 6/29/2016 23:06 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600093534 | 6/30/2016 15:06 | | FIELD CONTACT | FIELD INTERVIEW NRU | DAVIDGE, JOHN #15637 |
| E1600094027 | 7/1/2016 15:07 | 278 | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | LARSEN, KRISTOPHER #16907 |
| E1600094111 | 7/1/2016 18:07 | | FIELD CONTACT | GANG ACTIVITY NO OFFENSE REPORT | JOHNSTON, WILLIAM #8134 |
| E1600094124 | 7/1/2016 18:07 | | CODE 5/SURVEILLANCE | UNABLE TO LOCATE | JOHNSTON, WILLIAM #8134 |
| E1600094350 | 7/2/2016 03:07 | | ASSAULT | CONTACT MADE, NO PAPERWORK | KUEFER, WESLEY #16905 |
| E1600094825 | 7/2/2016 23:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600095445 | 7/4/2016 03:07 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600095457 | 7/4/2016 05:07 | | LOUD MUSIC OR NOISE DISTURBING | CONTACT MADE, NO PAPERWORK | REYNOLDS, BRIAN #13324 |
| E1600095828 | 7/5/2016 00:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600095855 | 7/5/2016 01:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600096180 | 7/5/2016 15:07 | 119 | THEFT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600096227 | 7/5/2016 17:07 | 119 | UNWANTED GUESTS | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600096385 | 7/5/2016 23:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1600096663 | 7/6/2016 13:07 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | DIRKS, SHAWN #13103 |
| E1600096860 | 7/6/2016 21:07 | | FIELD CONTACT | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1600096947 | 7/7/2016 01:07 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600097832 | 7/8/2016 17:07 | | FIELD CONTACT | FIELD INTERVIEW NRU | DAVIDGE, JOHN #15637 |
| E1600097984 | 7/8/2016 23:07 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600098023 | 7/9/2016 01:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600098054 | 7/9/2016 04:07 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | SINGER, ELAINE #10643 |
| E1600099021 | 7/11/2016 11:07 | | SUBJ DISTURBING/HARASSING | UNABLE TO LOCATE | MISNER, GERALD #15179 |
| E1600099084 | 7/11/2016 14:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | PROCOPIO, JOSEPH #17447 |
| E1600099316 | 7/11/2016 23:07 | | STOLEN VEHICLE RECOVERY/FOJ | OFFENSE REPORT | ROWE, TORII #17074 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600099696 | 7/12/2016 16:07 | 277 | DANGEROUS DRUGS | OFFENSE REPORT NRU | TOLBERT, LACEY #13338 |
| E1600099728 | 7/12/2016 18:07 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW CARD | LEWIS, LEROY #15542 |
| E1600099814 | 7/12/2016 22:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | DAVIDGE, JOHN #15637 |
| E1600099884 | 7/13/2016 02:07 | 118 | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | HUNTER, KEITH #16887 |
| E1600100208 | 7/13/2016 15:07 | | THEFT | OFFENSE REPORT | DIRKS, SHAWN #13103 |
| E1600100219 | 7/13/2016 15:07 | | FRAUD | OFFENSE REPORT | , ATL CALL (FROM CAD) #9000 |
| E1600100330 | 7/13/2016 19:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600101041 | 7/15/2016 02:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SINGER, ELAINE #10643 |
| E1600101562 | 7/16/2016 01:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | THOMAS, ROCHELLE #15803 |
| E1600102244 | 7/17/2016 13:07 | 118 | THEFT | OFFENSE REPORT | MISNER, GERALD #15179 |
| E1600102285 | 7/17/2016 15:07 | | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | PROCOPIO, JOSEPH #17447 |
| E1600102553 | 7/18/2016 05:07 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | CASILLAS, ERNEST #15636 |
| E1600103566 | 7/20/2016 05:07 | 275 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | KING, MARCUS #17000 |
| E1600104279 | 7/21/2016 11:07 | | SHOTS FIRED | CONTACT MADE, NO PAPERWORK | HUBBUCH, JAMISON #12524 |
| E1600105615 | 7/24/2016 13:07 | | BACK UP, ASSIST | ASSIST FIRE DEPARTMENT | THOMPSON, ASHLEY #16704 |
| E1600105875 | 7/25/2016 04:07 | | THEFT OF MEANS OF TRANSPORTATION | OFFENSE REPORT | CLUBB, JONATHAN #16439 |
| E1600106672 | 7/26/2016 16:07 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1600106892 | 7/27/2016 03:07 | 293 | SUBJ DISTURBING/HARASSING | UNABLE TO LOCATE | CLUBB, JONATHAN #16439 |
| E1600106904 | 7/27/2016 04:07 | | PODD | CONTACT MADE, NO PAPERWORK | BASTIN, CHRISTOPHER #16581 |
| E1600106946 | 7/27/2016 07:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600107893 | 7/28/2016 21:07 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600108025 | 7/29/2016 05:07 | | THEFT | OFFENSE REPORT | SORENSON, ERIK #16783 |
| E1600108219 | 7/29/2016 14:07 | | POSSESSION OF NARCOTIC DRUGS | OFFENSE REPORT NRU | PITTMAN, JEFFREY #12718 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036864

| | | | | | |
|---|---|---|---|---|---|
| E1600108471 | 7/30/2016 00:07 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600110391 | 8/2/2016 21:08 | | POSSESSION OF MARIJUANA | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600110437 | 8/2/2016 23:08 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | KING, MARCUS #17000 |
| E1600110438 | 8/2/2016 23:08 | | CHECK WELFARE | UNABLE TO LOCATE | RAMSAY, JUSTIN #15093 |
| E1600112371 | 8/6/2016 18:08 | | DV/AGGRAVATED ASSAULT | OFFENSE REPORT | QUEENAN, JOEL #16320 |
| E1600112422 | 8/6/2016 21:08 | | FIELD CONTACT | FIELD INTERVIEW CARD | SEIDL, ALLAN #16321 |
| E1600112450 | 8/6/2016 22:08 | | FIELD CONTACT | FIELD INTERVIEW CARD | BUSTOZ, JOHN #6896 |
| E1600112575 | 8/7/2016 02:08 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600112893 | 8/7/2016 19:08 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600112970 | 8/7/2016 22:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600112984 | 8/7/2016 22:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1600113550 | 8/9/2016 01:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | PEREZ, DANIEL #16909 |
| E1600114227 | 8/10/2016 06:08 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | BUCHBERGER, JUSTIN #13200 |
| E1600114354 | 8/10/2016 14:08 | | TRAFFIC STOP | FIELD INTERVIEW NRU | LINDSEY, MARK #15543 |
| E1600115083 | 8/11/2016 22:08 | | FIELD CONTACT | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600115504 | 8/12/2016 19:08 | 279 | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1600116566 | 8/15/2016 03:08 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600116588 | 8/15/2016 05:08 | | RECOVERY OF VEHICLE | OFFENSE REPORT | MCLEOD, BRET #11368 |
| E1600117898 | 8/17/2016 15:08 | 125 | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600117918 | 8/17/2016 15:08 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600118154 | 8/18/2016 01:08 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600118180 | 8/18/2016 03:08 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW CARD | CARROLL, JOSHUA #16003 |
| E1600118218 | 8/18/2016 07:08 | | THEFT OF VEHICLE | CONTACT MADE, NO PAPERWORK | BUCHBERGER, JUSTIN #13200 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036865

| | | | | | |
|---|---|---|---|---|---|
| E1600118348 | 8/18/2016 11:08 | | SOLICITING | OFFENSE REPORT | COKING, JAMES #6897 |
| E1600118492 | 8/18/2016 16:08 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600118949 | 8/19/2016 14:08 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1600118953 | 8/19/2016 14:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1600119351 | 8/20/2016 09:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600120086 | 8/21/2016 23:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600120136 | 8/22/2016 03:08 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | CLONTZ, DANNY #16886 |
| E1600121146 | 8/23/2016 21:08 | | SUSPICIOUS VEHICLE | FIELD INTERVIEW CARD | ATEN, BRIAN #15250 |
| E1600122392 | 8/26/2016 03:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600122765 | 8/26/2016 20:08 | | FIELD CONTACT | GANG ACTIVITY NO OFFENSE REPORT | JOHNSTON, WILLIAM #8134 |
| E1600123051 | 8/27/2016 10:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600123877 | 8/29/2016 00:08 | | INVESTIGATE UNKNOWN TROUBLE | FIELD INTERVIEW CARD | FELDER, SYLVIA #17297 |
| E1600123904 | 8/29/2016 02:08 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1600125061 | 8/31/2016 01:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | GALLAGHER, BRIAN #14243 |
| E1600126159 | 9/1/2016 20:09 | | MISDEMEANOR WNT OUTSTANDING | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600126328 | 9/2/2016 04:09 | | THEFT | OFFENSE REPORT | CARROLL, JOSHUA #16003 |
| E1600126783 | 9/2/2016 22:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600127044 | 9/3/2016 14:09 | | FIELD CONTACT | COMPL/ALARM COMPANY CALLED TO CANCEL | QUEENAN, JOEL #16320 |
| E1600127093 | 9/3/2016 17:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SPIWAK, ADAM #15729 |
| E1600127333 | 9/4/2016 02:09 | 290 | TRESPASSING | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600127505 | 9/4/2016 14:09 | | CIVIL ISSUE | UNABLE TO LOCATE | FIKEJS, STEPHANIE #16890 |
| E1600128147 | 9/6/2016 00:09 | 281 | TRESPASSING | CONTACT MADE, NO PAPERWORK | HAJEK, JAMES #15007 |
| E1600128319 | 9/6/2016 09:09 | | CHECK WELFARE | FIELD INTERVIEW CARD | CANO, ANTHONY #12534 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036866

| | | | | | |
|---|---|---|---|---|---|
| E1600128376 | 9/6/2016 11:09 | | UNWANTED GUESTS | CONTACT MADE, NO PAPERWORK | CANO, ANTHONY #12534 |
| E1600129100 | 9/7/2016 20:09 | | DANGEROUS DRUGS | OFFENSE REPORT NRU | LEWIS, LEROY #15542 |
| E1600129195 | 9/8/2016 00:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600129232 | 9/8/2016 01:09 | | FOUND NARCOTICS | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600129385 | 9/8/2016 09:09 | | TRESPASSING | FIELD INTERVIEW CARD | SANDERS, KARINA #17432 |
| E1600129586 | 9/8/2016 15:09 | | FIELD CONTACT | NO ACTION | QUEENAN, JOEL #16320 |
| E1600129790 | 9/8/2016 23:09 | | SUBJ DISTURBING/HARASSING | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600130231 | 9/9/2016 19:09 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600130636 | 9/10/2016 16:09 | | THEFT OF VEHICLE | CONTACT MADE, NO PAPERWORK | SMITH, ALISSANDRA #16910 |
| E1600130861 | 9/11/2016 02:09 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | ANSELL, DYLAN #17089 |
| E1600131105 | 9/11/2016 16:09 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1600131309 | 9/12/2016 01:09 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1600131337 | 9/12/2016 04:09 | | THEFT OF VEHICLE | CONTACT MADE, NO PAPERWORK | ROWE, TORII #17074 |
| E1600132246 | 9/13/2016 17:09 | | THREATENING | OFFENSE REPORT | SMITH, ALISSANDRA #16910 |
| E1600132424 | 9/14/2016 02:09 | | THEFT OF VEHICLE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600132429 | 9/14/2016 03:09 | | INJURED OR SICK PERSON | ASSIST FIRE DEPARTMENT | BASTIN, CHRISTOPHER #16581 |
| E1600132777 | 9/14/2016 14:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600133417 | 9/15/2016 16:09 | 287 | FIELD CONTACT | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1600133521 | 9/15/2016 19:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LA BRANT, DONALD #8917 |
| E1600133597 | 9/15/2016 22:09 | 125 | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | RAMSAY, JUSTIN #15093 |
| E1600133875 | 9/16/2016 13:09 | | UNWANTED GUESTS | CONTACT MADE, NO PAPERWORK | SPIWAK, ADAM #15729 |
| E1600134127 | 9/16/2016 23:09 | | TRESPASSING | FIELD INTERVIEW CARD | CLONTZ, DANNY #16886 |
| E1600134680 | 9/18/2016 02:09 | | BURGLARY VEHICLE | CONTACT MADE, NO PAPERWORK | ANSELL, DYLAN #17089 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600134907 | 9/18/2016 16:09 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600135254 | 9/19/2016 09:09 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600135300 | 9/19/2016 10:09 | | LOOSE ANIMALS | UNABLE TO LOCATE | HANEY, ANTHONY #9971 |
| E1600135811 | 9/20/2016 10:09 | | STOLEN VEHICLE RECOVERY | OFFENSE REPORT | MCLEOD, BRET #11368 |
| E1600136074 | 9/20/2016 20:09 | | MISCONDUCT INVOLVING WEAPON | CONTACT MADE, NO PAPERWORK | LEWIS, LEROY #15542 |
| E1600136099 | 9/20/2016 21:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600136664 | 9/21/2016 19:09 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600136749 | 9/21/2016 22:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600137446 | 9/23/2016 00:09 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600137476 | 9/23/2016 01:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600137484 | 9/23/2016 01:09 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1600137487 | 9/23/2016 02:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600137865 | 9/23/2016 18:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600137905 | 9/23/2016 19:09 | 272 | INVESTIGATE UNKNOWN TROUBLE | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600138053 | 9/24/2016 02:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600138336 | 9/24/2016 18:09 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | ELKHANNOUSSI, BADR #16856 |
| E1600138813 | 9/25/2016 20:09 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FIKEJS, STEPHANIE #16890 |
| E1600140335 | 9/28/2016 14:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600140451 | 9/28/2016 19:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600140907 | 9/29/2016 14:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600141009 | 9/29/2016 18:09 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1600141023 | 9/29/2016 19:09 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600141059 | 9/29/2016 21:09 | | FIELD CONTACT | ASSIST OTHER AGENCY | QUEENAN, JOEL #16320 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600141103 | 9/29/2016 23:09 | 288 | INSANE PERSON | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600141170 | 9/30/2016 03:09 | 288 | INSANE PERSON | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600141462 | 9/30/2016 17:09 | 275 | DV/UNLAWFUL IMPRISONMENT | OFFENSE REPORT | QUEENAN, JOEL #16320 |
| E1600141759 | 10/1/2016 08:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600142187 | 10/2/2016 06:10 | | TRESPASSING | FIELD INTERVIEW CARD | HUBBUCH, JAMISON #12524 |
| E1600142208 | 10/2/2016 08:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600142228 | 10/2/2016 09:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600142445 | 10/2/2016 18:10 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600143046 | 10/4/2016 01:10 | | CHECK WELFARE | FIELD INTERVIEW CARD | FELDER, SYLVIA #17297 |
| E1600143331 | 10/4/2016 13:10 | | THEFT FROM VEHICLE | CONTACT MADE, NO PAPERWORK | FIKEJS, STEPHANIE #16890 |
| E1600144855 | 10/7/2016 08:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600145038 | 10/7/2016 15:10 | | FIELD CONTACT | FIELD INTERVIEW NRU | LEWIS, LEROY #15542 |
| E1600145354 | 10/8/2016 08:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600145488 | 10/8/2016 16:10 | | STOLEN VEHICLE RECOVERY/FOJ | OFFENSE REPORT | SEIDL, ALLAN #16321 |
| E1600145812 | 10/9/2016 04:10 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1600145886 | 10/9/2016 09:10 | 268 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | SCHMUCK, ROBERT #11194 |
| E1600146007 | 10/9/2016 15:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600146656 | 10/11/2016 01:10 | | FIELD CONTACT | NO ACTION | GALLAGHER, BRIAN #14243 |
| E1600146954 | 10/11/2016 14:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600147018 | 10/11/2016 16:10 | 290 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | GOITIA, DAVID #11807 |
| E1600147200 | 10/12/2016 00:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600148091 | 10/13/2016 15:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1600148340 | 10/14/2016 02:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600148344 | 10/14/2016 02:10 | | POSS OF NARCOTICS | OFFENSE REPORT | COLLINS, SCOTT #15178 |
| E1600148922 | 10/15/2016 08:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600149100 | 10/15/2016 18:10 | 141 | HIT AND RUN, NON-INJURY | CONTACT MADE, NO PAPERWORK | JOHNSON, ANDREW #17518 |
| E1600149701 | 10/17/2016 01:10 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | PLAISTED, ROBERT #17193 |
| E1600149735 | 10/17/2016 04:10 | | TRESPASSING | UNABLE TO LOCATE | FELDER, SYLVIA #17297 |
| E1600149885 | 10/17/2016 12:10 | | FOUND MISSING PERSON | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1600149916 | 10/17/2016 13:10 | | NARCOTICS | OFFENSE REPORT | CANO, ANTHONY #12534 |
| E1600150663 | 10/18/2016 20:10 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600150677 | 10/18/2016 21:10 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | TOLBERT, LACEY #13338 |
| E1600151176 | 10/19/2016 16:10 | | TRESPASSING | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1600151438 | 10/20/2016 07:10 | | DV/ASSAULT | OFFENSE REPORT | REYNOLDS, BRIAN #13324 |
| E1600152003 | 10/21/2016 11:10 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | DOWNEY, WILLIAM #6824 |
| E1600152171 | 10/21/2016 17:10 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | MABRY, MITCHELL #16908 |
| E1600152254 | 10/21/2016 20:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | LA BRANT, DONALD #8917 |
| E1600152398 | 10/22/2016 02:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600153539 | 10/24/2016 14:10 | | RECOVERY OF VEHICLE | OFFENSE REPORT | ZYGMONT, WESLEY #11372 |
| E1600153573 | 10/24/2016 15:10 | | ATTEMPT TO CONTACT | NO ACTION | , ATL CALL (FROM CAD) #9000 |
| E1600153798 | 10/25/2016 02:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | LECHUGA, LAURA #17436 |
| E1600154193 | 10/25/2016 19:10 | | TRESPASSING | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1600154774 | 10/26/2016 20:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1600154869 | 10/27/2016 02:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600156135 | 10/29/2016 15:10 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | SPIWAK, ADAM #15729 |
| E1600156197 | 10/29/2016 18:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600156374 | 10/30/2016 01:10 | 279 | FALSE INFO | OFFENSE REPORT | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036870

| | | | | | |
|---|---|---|---|---|---|
| E1600156503 | 10/30/2016 10:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600156594 | 10/30/2016 15:10 | | TRAFFIC STOP | NO ACTION | ZYGMONT, WESLEY #11372 |
| E1600156690 | 10/30/2016 19:10 | | POSSESSION OF DANGEROUS DRUGS | CONTACT MADE, NO PAPERWORK | STERRETT, ROBERT #12245 |
| E1600157129 | 10/31/2016 20:10 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | DOERR, GLENN #15123 |
| E1600157308 | 11/1/2016 07:11 | 124 | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT | CONNER, TIMOTHY #12880 |
| E1600157533 | 11/1/2016 12:11 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | TOLBERT, LACEY #13338 |
| E1600157600 | 11/1/2016 14:11 | | FIELD CONTACT | FIELD INTERVIEW NRU | LINDSEY, MARK #15543 |
| E1600157639 | 11/1/2016 16:11 | | INVESTIGATE UNKNOWN TROUBLE | COMPL/ALARM COMPANY CALLED TO CANCEL | KOEHLER, GLENN #14881 |
| E1600158017 | 11/2/2016 09:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | REBHOLZ, JOHN #12374 |
| E1600158418 | 11/3/2016 00:11 | | SUSPICIOUS PERSON/CIRCUMSTANCE | UNABLE TO LOCATE | ANSELL, DYLAN #17089 |
| E1600158649 | 11/3/2016 11:11 | 124 | DV/STRANGULATION | OFFENSE REPORT | REBHOLZ, JOHN #12374 |
| E1600159445 | 11/4/2016 23:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | HALLIER, ERIC #17503 |
| E1600159897 | 11/5/2016 23:11 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600159953 | 11/6/2016 03:11 | | NARCOTICS | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600159997 | 11/6/2016 07:11 | | FIELD CONTACT | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
| E1600160299 | 11/7/2016 01:11 | 122 | STOLEN VEHICLE | OFFENSE REPORT | FELDER, SYLVIA #17297 |
| E1600160340 | 11/7/2016 05:11 | | RECOVERY OF VEHICLE | SUPPLEMENTAL REPORT | FELDER, SYLVIA #17297 |
| E1600160646 | 11/7/2016 20:11 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | ITRI, GENNARO #16920 |
| E1600161385 | 11/9/2016 08:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1600161703 | 11/9/2016 22:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LEWIS, LEROY #15542 |
| E1600161939 | 11/10/2016 10:11 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | REBHOLZ, JOHN #12374 |
| E1600162194 | 11/10/2016 19:11 | | POSSESSION OF DRUG PARAPHERNALIA | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1600162647 | 11/11/2016 20:11 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | LEWIS, LEROY #15542 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036871

| | | | | | |
|---|---|---|---|---|---|
| E1600163236 | 11/13/2016 02:11 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | HORNBAKER, KYLE #17072 |
| E1600164354 | 11/15/2016 12:11 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1600164802 | 11/16/2016 10:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600164831 | 11/16/2016 11:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1600165171 | 11/17/2016 01:11 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1600166305 | 11/19/2016 12:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600166750 | 11/20/2016 10:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600167016 | 11/21/2016 00:11 | 283 | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | CLONTZ, DANNY #16886 |
| E1600168130 | 11/23/2016 05:11 | | TRESPASSING | COMPL/ALARM COMPANY CALLED TO CANCEL | SOLOMON, ROBERT #11760 |
| E1600168666 | 11/24/2016 01:11 | | FIELD CONTACT | FIELD INTERVIEW CARD | BASTIN, CHRISTOPHER #16581 |
| E1600170361 | 11/27/2016 19:11 | | POWER POLE DOWN | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600170660 | 11/28/2016 13:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | KULAGA, DAVID #11193 |
| E1600171162 | 11/29/2016 13:11 | | THEFT | UNABLE TO LOCATE | JOHNSON, PHILLIP #12682 |
| E1600171335 | 11/29/2016 19:11 | | BURGLARY FROM VEHICLE | OFFENSE REPORT | SMITH, ALISSANDRA #16910 |
| E1600171627 | 11/30/2016 11:11 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1600172854 | 12/2/2016 22:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600173628 | 12/4/2016 15:12 | 137 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600174624 | 12/6/2016 16:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600174879 | 12/7/2016 03:12 | | TRAFFIC STOP | OFFENSE REPORT | GALLAGHER, BRIAN #14243 |
| E1600175067 | 12/7/2016 14:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1600175339 | 12/8/2016 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600175780 | 12/8/2016 21:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1600175889 | 12/9/2016 02:12 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600176093 | 12/9/2016 13:12 | | INJURED OR SICK PERSON | ASSIST FIRE DEPARTMENT | SCHMUCK, ROBERT #11194 |
| E1600176177 | 12/9/2016 16:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1600176359 | 12/10/2016 00:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600176451 | 12/10/2016 07:12 | 120 | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | GLADDEN, JASON #12532 |
| E1600177526 | 12/12/2016 15:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600178000 | 12/13/2016 15:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600178206 | 12/13/2016 23:12 | | MISDEMEANOR WNT OUTSTANDING | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1600178271 | 12/14/2016 03:12 | | TRESPASSING | FIELD INTERVIEW CARD | BUTCHER, BRITTANY #17191 |
| E1600178709 | 12/14/2016 23:12 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1600178722 | 12/14/2016 23:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600178909 | 12/15/2016 09:12 | | FRAUDULENT USE OF CREDIT CARD | OFFENSE REPORT | KLINE, JASON #17523 |
| E1600179344 | 12/16/2016 07:12 | 259 | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | ORTEGA, RUBEN #11261 |
| E1600179796 | 12/16/2016 23:12 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW CARD | CARROLL, JOSHUA #16003 |
| E1600180334 | 12/18/2016 03:12 | | TRESPASSING | OFFENSE REPORT | FELDER, SYLVIA #17297 |
| E1600180380 | 12/18/2016 07:12 | | THEFT | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1600180513 | 12/18/2016 15:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1600180746 | 12/19/2016 02:12 | | SUSPICIOUS VEHICLE | FIELD INTERVIEW CARD | GALLAGHER, BRIAN #14243 |
| E1600180931 | 12/19/2016 11:12 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1600181073 | 12/19/2016 16:12 | 288 | OVERDOSE VICTIM | CONTACT MADE, NO PAPERWORK | FIKEJS, STEPHANIE #16890 |
| E1600181495 | 12/20/2016 13:12 | 280 | INSANE PERSON | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1600181561 | 12/20/2016 16:12 | 136 | OVERDOSE VICTIM | ASSIST FIRE DEPARTMENT | ATEN, BRIAN #15250 |
| E1600181801 | 12/21/2016 03:12 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036873

| | | | | | |
|---|---|---|---|---|---|
| E1600181943 | 12/21/2016 10:12 | | INSANE PERSON | CONTACT MADE, NO PAPERWORK | KLINE, JASON #17523 |
| E1600182255 | 12/21/2016 21:12 | 110 | INJURED OR SICK PERSON | FIELD INTERVIEW CARD | DULANEY, MARCEL #16440 |
| E1600182322 | 12/22/2016 00:12 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | COOPER, JARED #9769 |
| E1600182746 | 12/22/2016 21:12 | | POSSESSION OF DRUG PARAPHERNALIA | CONTACT MADE, NO PAPERWORK | LA BRANT, DONALD #8917 |
| E1600182837 | 12/23/2016 01:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1600182849 | 12/23/2016 02:12 | 263 | THEFT | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1600182996 | 12/23/2016 12:12 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | GLADDEN, JASON #12532 |
| E1600183151 | 12/23/2016 18:12 | | THREAT | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1600183331 | 12/24/2016 01:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1600183496 | 12/24/2016 13:12 | | CRIMINAL DAMAGE | OFFENSE REPORT | SAYLOR, JAMES #16782 |
| E1600183503 | 12/24/2016 13:12 | | STOLEN VEHICLE | OFFENSE REPORT | SPIWAK, ADAM #15729 |
| E1600183530 | 12/24/2016 15:12 | 274 | DRUGS | OFFENSE REPORT | SAYLOR, JAMES #16782 |
| E1600183616 | 12/24/2016 20:12 | | ARMED ROBBERY | OFFENSE REPORT | SALYERS, MATTHEW #17073 |
| E1600183876 | 12/25/2016 12:12 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1600184072 | 12/26/2016 00:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | GALLAGHER, BRIAN #14243 |
| E1600184478 | 12/26/2016 23:12 | | SUSPICIOUS VEHICLE | FIELD INTERVIEW CARD | ROBERTSON, PAUL #14759 |
| E1600185953 | 12/29/2016 16:12 | | THEFT | OFFENSE REPORT | , ATL CALL (FROM CAD) #9000 |
| E1600186438 | 12/30/2016 15:12 | | NARCOTICS | FIELD INTERVIEW NRU | LINDSEY, MARK #15543 |
| E1600186805 | 12/31/2016 09:12 | 272 | REFUSING TO PROVIDE TRUE NAME | OFFENSE REPORT | KLINE, JASON #17523 |
| E1700000142 | 1/1/2017 03:01 | 130 | DV/AGGRAVATED ASSAULT | OFFENSE REPORT | BROYLES, JOSHUA #16871 |
| E1700000567 | 1/2/2017 06:01 | | INJURED ANIMALS | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700000779 | 1/2/2017 15:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700001613 | 1/4/2017 11:01 | | SOLICITING/PROSTITUION | OFFENSE REPORT | COKING, JAMES #6897 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036874

| | | | | | |
|---|---|---|---|---|---|
| E1700001634 | 1/4/2017 11:01 | | SOLICITING PROSTITUTION | OFFENSE REPORT | COKING, JAMES #6897 |
| E1700001687 | 1/4/2017 13:01 | | SOLICITING/PROSTITUTION | OFFENSE REPORT | COKING, JAMES #6897 |
| E1700001709 | 1/4/2017 14:01 | | SOLICITING/PROSTITUTION | OFFENSE REPORT | COKING, JAMES #6897 |
| E1700001872 | 1/4/2017 20:01 | | MISCONDUCT INVOLVING WEAPONS | OFFENSE REPORT | QUEENAN, JOEL #16320 |
| E1700001896 | 1/4/2017 21:01 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CAMPBELL, RANDALL #15587 |
| E1700002263 | 1/5/2017 13:01 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | SOLOMON, ROBERT #11760 |
| E1700002923 | 1/6/2017 20:01 | 134 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | THOMPSON, ASHLEY #16704 |
| E1700003279 | 1/7/2017 18:01 | | RPT OF MARIJUANA | UNABLE TO LOCATE | QUEENAN, JOEL #16320 |
| E1700003399 | 1/8/2017 00:01 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700004370 | 1/10/2017 07:01 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700004791 | 1/11/2017 00:01 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1700006815 | 1/14/2017 23:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700006875 | 1/15/2017 02:01 | 275 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1700007230 | 1/15/2017 22:01 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700007648 | 1/16/2017 20:01 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700007709 | 1/17/2017 00:01 | 118 | STRONG ARMED ROBBERY | UNABLE TO LOCATE | FAIR, LANCE #16781 |
| E1700008226 | 1/18/2017 03:01 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700008664 | 1/18/2017 18:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700008683 | 1/18/2017 18:01 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | LARSEN, KRISTOPHER #16907 |
| E1700008774 | 1/18/2017 22:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700008796 | 1/18/2017 23:01 | 132 | SEXUAL ASSAULT | OFFENSE REPORT | COLLINS, SCOTT #15178 |
| E1700008855 | 1/19/2017 04:01 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | CASTIGLIONE, AUSTIN #16850 |
| E1700009329 | 1/19/2017 22:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036875

| | | | | | |
|---|---|---|---|---|---|
| E1700009496 | 1/20/2017 07:01 | 283 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | ANSELMO, ROBERT #12533 |
| E1700009706 | 1/20/2017 17:01 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1700009880 | 1/21/2017 00:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700010140 | 1/21/2017 16:01 | | INCORRIGIBLE JUVENILE | CONTACT MADE, NO PAPERWORK | ANDERKIN, JOSHUA #17198 |
| E1700010171 | 1/21/2017 17:01 | | SOLICITING | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1700010196 | 1/21/2017 19:01 | 250 | MISSING JUVENILE | OFFENSE REPORT | HAEFFNER, SCOTT #13772 |
| E1700010287 | 1/21/2017 23:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700010913 | 1/23/2017 12:01 | | MISSING PERSON | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700011702 | 1/25/2017 02:01 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1700012445 | 1/26/2017 08:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | HALLIER, ERIC #17503 |
| E1700012552 | 1/26/2017 11:01 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | COMPARAN, GILBERTO #10594 |
| E1700012596 | 1/26/2017 12:01 | | SOLICITING/PROSTITUTION | OFFENSE REPORT | MITCHELL, TARA #16441 |
| E1700012638 | 1/26/2017 13:01 | | SOLICITING PROSTITUTION | OFFENSE REPORT | MITCHELL, TARA #16441 |
| E1700012639 | 1/26/2017 13:01 | | COURT ORDER SERVICE REQUEST | UNABLE TO LOCATE | GASTON, SEAN #10458 |
| E1700012874 | 1/27/2017 00:01 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700013306 | 1/27/2017 20:01 | | TRESPASSING | UNABLE TO LOCATE | JOHNSON, ANDREW #17518 |
| E1700013385 | 1/28/2017 00:01 | | THEFT OF MEANS | OFFENSE REPORT | CLUBB, JONATHAN #16439 |
| E1700013827 | 1/29/2017 01:01 | | SUBJ DISTURBING/HARASSING | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700014244 | 1/30/2017 03:01 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1700014271 | 1/30/2017 05:01 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | HANEY, ANTHONY #9971 |
| E1700014401 | 1/30/2017 12:01 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700014869 | 1/31/2017 09:01 | | COURT ORDER SERVICE REQUEST | UNABLE TO LOCATE | GASTON, SEAN #10458 |
| E1700015461 | 2/1/2017 10:02 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036876

| | | | | | |
|---|---|---|---|---|---|
| E1700015752 | 2/1/2017 15:02 | 121 | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700016454 | 2/2/2017 23:02 | 290 | INJURED OR SICK PERSON | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700016503 | 2/3/2017 01:02 | | FIELD CONTACT | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700016978 | 2/3/2017 23:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700017037 | 2/4/2017 01:02 | 122 | ATTEMPT SUICIDE | CONTACT MADE, NO PAPERWORK | CASTIGLIONE, AUSTIN #16850 |
| E1700017238 | 2/4/2017 13:02 | 281 | THEFT | CONTACT MADE, NO PAPERWORK | PRICE, RANDY #15180 |
| E1700017476 | 2/5/2017 00:02 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | CARLO, RICARDO #15952 |
| E1700018465 | 2/7/2017 00:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700019603 | 2/8/2017 23:02 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | BASTIN, CHRISTOPHER #16581 |
| E1700019736 | 2/9/2017 08:02 | 106 | THREAT | CONTACT MADE, NO PAPERWORK | LIVINGSTON, JENNIFER #12223 |
| E1700019940 | 2/9/2017 15:02 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1700020079 | 2/9/2017 20:02 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | RAMSAY, JUSTIN #15093 |
| E1700020505 | 2/10/2017 16:02 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1700020664 | 2/10/2017 22:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700020762 | 2/11/2017 02:02 | | SUBJ DISTURBING/HARASSING | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700021216 | 2/12/2017 01:02 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700024000 | 2/17/2017 01:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700024059 | 2/17/2017 06:02 | | POSSESSION OF NARCOTIC DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1700024499 | 2/17/2017 23:02 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700025284 | 2/19/2017 18:02 | | TRAFFIC STOP | FIELD INTERVIEW CARD | FERNANDEZ, MICHAEL #15225 |
| E1700025917 | 2/21/2017 02:02 | | RECOVERY OF VEHICLE/FOJ TOLLESON | GANG ACTIVITY OFFENSE REPORT | FAIR, LANCE #16781 |
| E1700026101 | 2/21/2017 11:02 | 266 | FOUND PROPERTY | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
| E1700026234 | 2/21/2017 15:02 | | CODE 5/SURVEILLANCE | CONTACT MADE, NO PAPERWORK | POCKNELL, THOMAS #13787 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036877

| | | | | | |
|---|---|---|---|---|---|
| E1700026807 | 2/22/2017 14:02 | | AGGRAVATED IDENTITY THEFT | OFFENSE REPORT NRU | PITTMAN, JEFFREY #12718 |
| E1700027132 | 2/23/2017 02:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700027681 | 2/23/2017 23:02 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700027737 | 2/24/2017 02:02 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700028093 | 2/24/2017 17:02 | | POSSESSION OF MARIJUANA | OFFENSE REPORT NRU | PITTMAN, JEFFREY #12718 |
| E1700030610 | 3/1/2017 18:03 | | THEFT | OFFENSE REPORT | VENERACION, RODRIGO #14403 |
| E1700032253 | 3/4/2017 17:03 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | SPIWAK, ADAM #15729 |
| E1700032452 | 3/5/2017 00:03 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700032727 | 3/5/2017 18:03 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700032865 | 3/6/2017 02:03 | 132 | NARCOTICS | OFFENSE REPORT | FELDER, SYLVIA #17297 |
| E1700033143 | 3/6/2017 15:03 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700033715 | 3/7/2017 16:03 | | DANGEROUS DRUGS | OFFENSE REPORT NRU | TOLBERT, LACEY #13338 |
| E1700033846 | 3/7/2017 21:03 | 128 | UNWANTED GUESTS | FIELD INTERVIEW CARD | BROYLES, JOSHUA #16871 |
| E1700033857 | 3/7/2017 22:03 | | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | BASTIN, CHRISTOPHER #16581 |
| E1700033897 | 3/8/2017 00:03 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1700034056 | 3/8/2017 09:03 | | POSSESSION OF MARIJUANA | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1700034345 | 3/8/2017 16:03 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700034682 | 3/9/2017 08:03 | | CRIMINAL DAMAGE | CONTACT MADE, NO PAPERWORK | COMPARAN, GILBERTO #10594 |
| E1700036501 | 3/13/2017 07:03 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700036731 | 3/13/2017 15:03 | | INVESTIGATE UNKNOWN TROUBLE | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1700036784 | 3/13/2017 17:03 | | INVESTIGATE UNKNOWN TROUBLE | UNABLE TO LOCATE | SHOOP, BRIAN #10598 |
| E1700037386 | 3/14/2017 22:03 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | HALLIER, ERIC #17503 |
| E1700037798 | 3/15/2017 16:03 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | HAEFFNER, SCOTT #13772 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036878

| | | | | |
|---|---|---|---|---|
| E1700037892 | 3/15/2017 19:03 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700037935 | 3/15/2017 20:03 | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700038414 | 3/16/2017 20:03 | SUSPICIOUS VEHICLE | GANG ACTIVITY NO OFFENSE REPORT | JOHNSTON, WILLIAM #8134 |
| E1700038533 | 3/17/2017 01:03 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700039231 | 3/18/2017 10:03 | HIT AND RUN, NON-INJURY | ACCIDENT | GUTIERREZ, PETER #16139 |
| E1700044094 | 3/27/2017 19:03 | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW NRU | LEWIS, LEROY #15542 |
| E1700044801 | 3/29/2017 02:03 | FOUND MISSING PERSON | CONTACT MADE, NO PAPERWORK | HAJEK, JAMES #15007 |
| E1700045976 | 3/31/2017 01:03 | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700046263 | 3/31/2017 14:03 | INJURED OR SICK PERSON | CONTACT MADE, NO PAPERWORK | MABRY, MITCHELL #16908 |
| E1700046572 | 4/1/2017 03:04 | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | BASTIN, CHRISTOPHER #16581 |
| E1700046780 | 4/1/2017 15:04 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | KUEFER, WESLEY #16905 |
| E1700048393 | 4/4/2017 19:04 | SUSPICIOUS VEHICLE | FIELD INTERVIEW CARD | ATEN, BRIAN #15250 |
| E1700048402 | 4/4/2017 20:04 | INTENSIVE PATROL (PREVENTATIVE) | DUPLICATE CALL RECEIVED | FIKEJS, STEPHANIE #16890 |
| E1700048405 | 4/4/2017 20:04 | STOLEN VEHICLE RECOVERY FOJ | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1700048977 | 4/5/2017 17:04 | TRESPASSING | UNABLE TO LOCATE | ATEN, BRIAN #15250 |
| E1700049042 | 4/5/2017 20:04 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700049202 | 4/6/2017 05:04 | THEFT OF VEHICLE | FIELD INTERVIEW CARD | POWERS, WILLIAM #13142 |
| E1700050338 | 4/8/2017 01:04 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700050825 | 4/9/2017 04:04 | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700051809 | 4/11/2017 04:04 | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700052749 | 4/12/2017 17:04 | STOLEN VEHICLE RECOVERY FOJ | OFFENSE REPORT | MARTINEZ, FRANCISCO #17707 |
| E1700052893 | 4/12/2017 23:04 | TRESPASSING | UNABLE TO LOCATE | VALENZUELA, PATRICK #9090 |
| E1700053030 | 4/13/2017 08:04 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036879

| | | | | | |
|---|---|---|---|---|---|
| E1700054996 | 4/17/2017 03:04 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700055702 | 4/18/2017 11:04 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1700055889 | 4/18/2017 18:04 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1700056140 | 4/19/2017 09:04 | | BACK UP, ASSIST | CONTACT MADE, NO PAPERWORK | BAXTER, CODY #17638 |
| E1700056176 | 4/19/2017 10:04 | | SOLICITING | OFFENSE REPORT | , OTHER AGENCY REPORT #0 |
| E1700057326 | 4/21/2017 14:04 | | SUBJ DISTURBING/HARASSING | UNABLE TO LOCATE | JOHNSON, ANDREW #17518 |
| E1700057945 | 4/22/2017 22:04 | | POSSESSION OF NARCOTICS | OFFENSE REPORT | BROYLES, JOSHUA #16871 |
| E1700057988 | 4/22/2017 23:04 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | BROYLES, JOSHUA #16871 |
| E1700058159 | 4/23/2017 10:04 | | STOLEN VEHICLE RECOVERY FOJ | OFFENSE REPORT | JOHNSON, PHILLIP #12682 |
| E1700058905 | 4/24/2017 22:04 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700061499 | 4/29/2017 16:04 | | ASSAULT | OFFENSE REPORT | HAEFFNER, SCOTT #13772 |
| E1700061883 | 4/30/2017 11:04 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700062454 | 5/1/2017 18:05 | | SUBJ DISTURBING/HARASSING | COMPL/ALARM COMPANY CALLED TO CANCEL | HICKMAN, JOSHUA #17623 |
| E1700063073 | 5/2/2017 19:05 | | FIGHT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700063705 | 5/3/2017 22:05 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700063720 | 5/3/2017 23:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700064023 | 5/4/2017 13:05 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT | QUEENAN, JOEL #16320 |
| E1700064174 | 5/4/2017 19:05 | 134 | FOUND MISSING PERSON | CONTACT MADE, NO PAPERWORK | DULANEY, MARCEL #16440 |
| E1700064287 | 5/5/2017 01:05 | | FIELD CONTACT | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700064315 | 5/5/2017 03:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700065019 | 5/6/2017 11:05 | 282 | P.R. CONTACT | COMPL/ALARM COMPANY CALLED TO CANCEL | CALDERON, JAMES #15251 |
| E1700065198 | 5/6/2017 19:05 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | MABRY, MITCHELL #16908 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036880

| | | | | | |
|---|---|---|---|---|---|
| E1700065513 | 5/7/2017 13:05 | | UNATTENDED DEATH | OFFENSE REPORT | DOERR, GLENN #15123 |
| E1700066161 | 5/8/2017 19:05 | | CIVIL ISSUE | CONTACT MADE, NO PAPERWORK | FERNANDEZ, MICHAEL #15225 |
| E1700066263 | 5/9/2017 01:05 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700066555 | 5/9/2017 16:05 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1700066681 | 5/9/2017 21:05 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW NRU | SCHNEIDER, MATTHEW #12251 |
| E1700067269 | 5/11/2017 00:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700067323 | 5/11/2017 03:05 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700067535 | 5/11/2017 11:05 | | THEFT OF VEHICLE | UNABLE TO LOCATE | ELKHANNOUSSI, BADR #16856 |
| E1700067710 | 5/11/2017 17:05 | | THEFT OF VEHICLE | CONTACT MADE, NO PAPERWORK | MABRY, MITCHELL #16908 |
| E1700067781 | 5/11/2017 21:05 | | TRESPASSING | OFFENSE REPORT | QUEENAN, JOEL #16320 |
| E1700067883 | 5/12/2017 03:05 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | YATES, AADAM #13508 |
| E1700067888 | 5/12/2017 04:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700068292 | 5/12/2017 21:05 | | RPT OF MARIJUANA | FIELD INTERVIEW NRU | LINDSEY, MARK #15543 |
| E1700068526 | 5/13/2017 08:05 | 274 | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | DOE, JOHN #13263 |
| E1700069384 | 5/15/2017 07:05 | | STOLEN VEHICLE RECOVERY | OFFENSE REPORT | JOHNSON, PHILLIP #12682 |
| E1700069399 | 5/15/2017 08:05 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW CARD | CONNER, TIMOTHY #12880 |
| E1700069869 | 5/16/2017 04:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SINGER, ELAINE #10643 |
| E1700069911 | 5/16/2017 08:05 | | THEFT FROM VEHICLE | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700070317 | 5/16/2017 21:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1700070406 | 5/17/2017 01:05 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700070422 | 5/17/2017 02:05 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | LECHUGA, LAURA #17436 |
| E1700071273 | 5/18/2017 13:05 | | MISDEMEANOR WNT OUTSTANDING | FIELD INTERVIEW NRU | LINDSEY, MARK #15543 |
| E1700071755 | 5/19/2017 11:05 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700071756 | 5/19/2017 11:05 | | DANGEROUS DRUGS | OFFENSE REPORT | ESH, WILLIAM #15006 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036881

| | | | | | |
|---|---|---|---|---|---|
| E1700071791 | 5/19/2017 12:05 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | SCHNEIDER, MATTHEW #12251 |
| E1700072485 | 5/20/2017 23:05 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | HANSEN, KYLE #17522 |
| E1700072799 | 5/21/2017 18:05 | | ASSAULT | CONTACT MADE, NO PAPERWORK | FIKEJS, STEPHANIE #16890 |
| E1700072917 | 5/21/2017 23:05 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | FELDER, SYLVIA #17297 |
| E1700073110 | 5/22/2017 09:05 | | STOLEN VEHICLE | OFFENSE REPORT | CONNER, TIMOTHY #12880 |
| E1700073365 | 5/22/2017 19:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700073412 | 5/22/2017 22:05 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW CARD | SINGER, ELAINE #10643 |
| E1700073810 | 5/23/2017 14:05 | | FIGHT | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700074003 | 5/23/2017 20:05 | | CHECK WELFARE | FIELD INTERVIEW CARD | BAXTER, CODY #17638 |
| E1700074029 | 5/23/2017 22:05 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1700075023 | 5/25/2017 18:05 | | AGGRAVATED ASSAULT | OFFENSE REPORT | MABRY, MITCHELL #16908 |
| E1700075189 | 5/26/2017 01:05 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700075464 | 5/26/2017 15:05 | | FIELD CONTACT | OFFENSE REPORT NRU | TOLBERT, LACEY #13338 |
| E1700075471 | 5/26/2017 15:05 | | FIELD CONTACT | NO ACTION | , ATL CALL (FROM CAD) #9000 |
| E1700076218 | 5/27/2017 22:05 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | COLLINS, SCOTT #15178 |
| E1700077484 | 5/30/2017 08:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700077573 | 5/30/2017 10:05 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | SCOTT, PHILLIP #17603 |
| E1700077740 | 5/30/2017 15:05 | | TRESPASSING | UNABLE TO LOCATE | ATEN, BRIAN #15250 |
| E1700078449 | 5/31/2017 16:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700078452 | 5/31/2017 16:05 | | 911 HANGUP, CHECK WELFARE | UNABLE TO LOCATE | FIKEJS, STEPHANIE #16890 |
| E1700078585 | 5/31/2017 20:05 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | TOLBERT, LACEY #13338 |
| E1700078603 | 5/31/2017 21:05 | | SUSPICIOUS VEHICLE | FIELD INTERVIEW NRU | TOLBERT, LACEY #13338 |
| E1700078684 | 6/1/2017 00:06 | | STOLEN VEHICLE RECOVERY/FOJ | SUPPLEMENTAL REPORT | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1700078731 | 6/1/2017 02:06 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | FROHLICH, MARK #15388 |
| E1700079320 | 6/2/2017 01:06 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700079511 | 6/2/2017 10:06 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | COMPARAN, GILBERTO #10594 |
| E1700079723 | 6/2/2017 18:06 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | BURGETT, ZACHARY #17070 |
| E1700081829 | 6/7/2017 01:06 | | THEFT | OFFENSE REPORT | MARTINEZ, FRANCISCO #17707 |
| E1700082333 | 6/7/2017 23:06 | | ATTEMPT SUICIDE | OFFENSE REPORT | ANSELL, DYLAN #17089 |
| E1700082531 | 6/8/2017 10:06 | | 911 HANGUP, CHECK WELFARE | CONTACT MADE, NO PAPERWORK | HANEY, ANTHONY #9971 |
| E1700082733 | 6/8/2017 16:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1700082804 | 6/8/2017 19:06 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1700082908 | 6/9/2017 02:06 | | FALSE INFO | OFFENSE REPORT | COLLINS, SCOTT #15178 |
| E1700083307 | 6/9/2017 19:06 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | MABRY, MITCHELL #16908 |
| E1700083851 | 6/10/2017 22:06 | 278 | FAMILY FIGHT/DOMESTIC VIOLENCE | UNABLE TO LOCATE | CARROLL, JOSHUA #16003 |
| E1700083952 | 6/11/2017 01:06 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | KULAGA, DAVID #11193 |
| E1700084004 | 6/11/2017 03:06 | 121 | INJURED OR SICK PERSON | FIELD INTERVIEW CARD | CARROLL, JOSHUA #16003 |
| E1700084054 | 6/11/2017 07:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700084087 | 6/11/2017 09:06 | 127 | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700084477 | 6/12/2017 04:06 | 129 | THEFT | CONTACT MADE, NO PAPERWORK | HALLIER, ERIC #17503 |
| E1700084623 | 6/12/2017 11:06 | 103 | OVERDOSE VICTIM | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
| E1700084769 | 6/12/2017 17:06 | 274 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | SHOOP, BRIAN #10598 |
| E1700085254 | 6/13/2017 15:06 | | TRESPASSING | FIELD INTERVIEW CARD | STANFIELD, BRIAN #10239 |
| E1700085646 | 6/14/2017 10:06 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | THRASHER, CLIFFORD #12250 |
| E1700085877 | 6/14/2017 17:06 | | FRAUD | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700085878 | 6/14/2017 18:06 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036883

| | | | | | |
|---|---|---|---|---|---|
| E1700085943 | 6/14/2017 21:06 | | SUSPICIOUS PERSON/CIRCUMSTANCE | GANG ACTIVITY NO OFFENSE REPORT | JOHNSTON, WILLIAM #8134 |
| E1700086235 | 6/15/2017 09:06 | | FRAUD | OFFENSE REPORT | NICHOLAS, CODY #16998 |
| E1700086585 | 6/16/2017 01:06 | | CHECK WELFARE | FIELD INTERVIEW CARD | ANSELL, DYLAN #17089 |
| E1700086893 | 6/16/2017 18:06 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | QUEENAN, JOEL #16320 |
| E1700087268 | 6/17/2017 11:06 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | PRICE, RANDY #15180 |
| E1700087595 | 6/18/2017 02:06 | | THEFT | OFFENSE REPORT | HALLIER, ERIC #17503 |
| E1700088262 | 6/19/2017 15:06 | | PAPERWORK | FIELD INTERVIEW CARD | HORSLEY, JEFFREY #8684 |
| E1700089152 | 6/21/2017 09:06 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700089336 | 6/21/2017 16:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700089424 | 6/21/2017 20:06 | | DANGEROUS DRUGS | OFFENSE REPORT NRU | LEWIS, LEROY #15542 |
| E1700090841 | 6/24/2017 11:06 | | FOUND PROPERTY | CONTACT MADE, NO PAPERWORK | NICHOLAS, CODY #16998 |
| E1700091472 | 6/25/2017 16:06 | | RECOVERY OF VEHICLE | UNABLE TO LOCATE | ATEN, BRIAN #15250 |
| E1700092431 | 6/27/2017 15:06 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | MCLEOD, BRET #11368 |
| E1700093564 | 6/29/2017 21:06 | | DISORDERLY CONDUCT | OFFENSE REPORT | ANSELL, DYLAN #17089 |
| E1700093820 | 6/30/2017 11:06 | | SUBJ DISTURBING/HARASSING | COMPL/ALARM COMPANY CALLED TO CANCEL | PENROSE, JUSTIN #13709 |
| E1700093890 | 6/30/2017 14:06 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700094208 | 7/1/2017 00:07 | | POSSESSION OF MARIJUANA | CONTACT MADE, NO PAPERWORK | VASQUEZ, GABRIEL #9942 |
| E1700094255 | 7/1/2017 02:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | COLLINS, SCOTT #15178 |
| E1700094561 | 7/1/2017 19:07 | | FIELD CONTACT | DUPLICATE CALL RECEIVED | STEWART, RANDY #12255 |
| E1700095305 | 7/3/2017 08:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | MAROTTA, MICHAEL #12537 |
| E1700095371 | 7/3/2017 11:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700095403 | 7/3/2017 12:07 | 263 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700096278 | 7/5/2017 05:07 | | FIGHT | CONTACT MADE, NO PAPERWORK | HUBBUCH, JAMISON #12524 |

6/4/2019 9:46:20 AM

| E1700096728 | 7/5/2017 22:07 | | THREATS | OFFENSE REPORT | COLLINS, SCOTT #15178 |
|---|---|---|---|---|---|
| E1700097100 | 7/6/2017 17:07 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | BURGETT, ZACHARY #17070 |
| E1700097762 | 7/7/2017 22:07 | | INVESTIGATE UNKNOWN TROUBLE | UNABLE TO LOCATE | CARROLL, JOSHUA #16003 |
| E1700098490 | 7/9/2017 11:07 | | THREAT | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700098578 | 7/9/2017 16:07 | | SHOPLIFTING | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700100750 | 7/13/2017 18:07 | | SUSPICIOUS PERSON/CIRCUMSTANCE | DUPLICATE CALL RECEIVED | VASQUEZ, GABRIEL #9942 |
| E1700100751 | 7/13/2017 18:07 | 126 | NARCOTICS OVERDOSE | OFFENSE REPORT | QUEENAN, JOEL #16320 |
| E1700100778 | 7/13/2017 18:07 | | MISSING PERSON | UNABLE TO LOCATE | CASTIGLIONE, AUSTIN #16850 |
| E1700102265 | 7/16/2017 15:07 | | FELONY FLIGHT | OFFENSE REPORT | ATEN, BRIAN #15250 |
| E1700102285 | 7/16/2017 17:07 | | PRIV. PROPERTY, NON-INJURY | FIELD INTERVIEW CARD | DAUKAS, JEFF #12233 |
| E1700103284 | 7/18/2017 16:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1700103400 | 7/18/2017 21:07 | | POSSESSION OF DANGEROUS DRUGS | FIELD INTERVIEW NRU | LEWIS, LEROY #15542 |
| E1700103853 | 7/19/2017 16:07 | | FIELD CONTACT | FIELD INTERVIEW NRU | PITTMAN, JEFFREY #12718 |
| E1700103980 | 7/19/2017 22:07 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW NRU | LEWIS, LEROY #15542 |
| E1700104693 | 7/21/2017 10:07 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | LOPEZ, PAUL #15389 |
| E1700104797 | 7/21/2017 14:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |
| E1700104998 | 7/21/2017 23:07 | | AGG ASSAULT/OFFICER | OFFENSE REPORT | COLLINS, SCOTT #15178 |
| E1700105654 | 7/23/2017 11:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700105953 | 7/24/2017 01:07 | | UNWANTED GUESTS | CONTACT MADE, NO PAPERWORK | HALLIER, ERIC #17503 |
| E1700106435 | 7/25/2017 01:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CLONTZ, DANNY #16886 |
| E1700106691 | 7/25/2017 14:07 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1700107320 | 7/26/2017 19:07 | | ASSAULT WITH A DEADLY WEAPON | OFFENSE REPORT NRU | LEWIS, LEROY #15542 |
| E1700108663 | 7/29/2017 13:07 | | FOUND PROPERTY | FIELD INTERVIEW CARD | MABRY, MITCHELL #16908 |
| E1700109180 | 7/30/2017 14:07 | | FIELD CONTACT | ASSIST FIRE DEPARTMENT | JOHNSON, PHILLIP #12682 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036885

| | | | | | |
|---|---|---|---|---|---|
| E1700109193 | 7/30/2017 15:07 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700109208 | 7/30/2017 16:07 | | THEFT | FIELD INTERVIEW CARD | ATEN, BRIAN #15250 |
| E1700109292 | 7/30/2017 20:07 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | KUEFER, WESLEY #16905 |
| E1700109371 | 7/31/2017 00:07 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700109774 | 7/31/2017 21:07 | 128 | OVERDOSE VICTIM | ASSIST FIRE DEPARTMENT | DOERR, GLENN #15123 |
| E1700110118 | 8/1/2017 14:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700110941 | 8/3/2017 04:08 | 277 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | BASTIN, CHRISTOPHER #16581 |
| E1700110946 | 8/3/2017 04:08 | | TRESPASSING | FIELD INTERVIEW CARD | BASTIN, CHRISTOPHER #16581 |
| E1700111348 | 8/3/2017 21:08 | 125 | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | JOHNSON, ANDREW #17518 |
| E1700111459 | 8/4/2017 02:08 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | SAUCEDA, MIGUEL #17774 |
| E1700111472 | 8/4/2017 03:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700111682 | 8/4/2017 14:08 | | DV/ASSAULT | OFFENSE REPORT NRU | PITTMAN, JEFFREY #12718 |
| E1700111990 | 8/5/2017 02:08 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | FROHLICH, MARK #15388 |
| E1700112265 | 8/5/2017 16:08 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | MCCORT, KEVIN #16872 |
| E1700112344 | 8/5/2017 19:08 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | JOHNSTON, WILLIAM #8134 |
| E1700112552 | 8/6/2017 03:08 | | DRUNK | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700112666 | 8/6/2017 09:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700112727 | 8/6/2017 12:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CUNNINGHAM, JAMES #10595 |
| E1700112934 | 8/6/2017 20:08 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ANSELL, DYLAN #17089 |
| E1700113360 | 8/7/2017 16:08 | | INJURED ANIMALS | CONTACT MADE, NO PAPERWORK | AHERN, JOSEPH #15122 |
| E1700114705 | 8/10/2017 02:08 | 110 | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700115486 | 8/11/2017 13:08 | 272 | POSSESION OF NARCOTIC DRUGS | OFFENSE REPORT | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036886

| | | | | | |
|---|---|---|---|---|---|
| E1700116808 | 8/14/2017 00:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PENROSE, JUSTIN #13709 |
| E1700118043 | 8/16/2017 08:08 | | THEFT OF CREDIT CARD | OFFENSE REPORT | JOHNSON, PHILLIP #12682 |
| E1700118634 | 8/17/2017 11:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | TERRELL, LAMYAA #17789 |
| E1700120246 | 8/20/2017 11:08 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700121783 | 8/23/2017 02:08 | 291 | POSSESSION OF NARCOTICS | OFFENSE REPORT | PENROSE, JUSTIN #13709 |
| E1700122125 | 8/23/2017 15:08 | | DRUNK | FIELD INTERVIEW CARD | SEIDL, ALLAN #16321 |
| E1700122323 | 8/23/2017 23:08 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | PENROSE, JUSTIN #13709 |
| E1700122888 | 8/25/2017 01:08 | | FIGHT | FIELD INTERVIEW CARD | ARMSTRONG, JONATHAN #16894 |
| E1700122906 | 8/25/2017 02:08 | | TRESPASSING | FIELD INTERVIEW CARD | ARMSTRONG, JONATHAN #16894 |
| E1700124328 | 8/27/2017 22:08 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700128916 | 9/5/2017 05:09 | | ASSAULT | OFFENSE REPORT | LANCASTER, BRAD #16906 |
| E1700129175 | 9/5/2017 13:09 | 136 | UNATTENDED DEATH | OFFENSE REPORT | TERRELL, LAMYAA #17789 |
| E1700129768 | 9/6/2017 11:09 | | SUSPICIOUS VEHICLE | FIELD INTERVIEW NRU | LINDSEY, MARK #15543 |
| E1700129928 | 9/6/2017 15:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1700130001 | 9/6/2017 18:09 | 130 | SUBJ DISTURBING/HARASSING | FIELD INTERVIEW CARD | JOHNSTON, WILLIAM #8134 |
| E1700130181 | 9/7/2017 04:09 | | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | CLUBB, JONATHAN #16439 |
| E1700130532 | 9/7/2017 16:09 | | FELONY WARRANT OUTSTANDING | CONTACT MADE, NO PAPERWORK | MCCORT, KEVIN #16872 |
| E1700130964 | 9/8/2017 11:09 | | THEFT OF MEANS | OFFENSE REPORT | COMPARAN, GILBERTO #10594 |
| E1700132284 | 9/10/2017 22:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PLEDGER, KEITH #15801 |
| E1700132342 | 9/11/2017 00:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PENROSE, JUSTIN #13709 |
| E1700132931 | 9/12/2017 01:09 | | POSSESSION OF DRUG PARAPHERNALIA | OFFENSE REPORT | FAIR, LANCE #16781 |
| E1700132955 | 9/12/2017 02:09 | | TRESPASSING | UNABLE TO LOCATE | LANCASTER, BRAD #16906 |
| E1700133994 | 9/13/2017 14:09 | 272 | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT NRU | PITTMAN, JEFFREY #12718 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1700134025 | 9/13/2017 14:09 | | DANGEROUS DRUGS | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700135638 | 9/16/2017 11:09 | | SUSPICIOUS CIRCUMSTANCES | OFFENSE REPORT | CONTRERAS, MICHAEL #14242 |
| E1700135949 | 9/17/2017 00:09 | | INSANE PERSON | CONTACT MADE, NO PAPERWORK | FAIR, LANCE #16781 |
| E1700135975 | 9/17/2017 01:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700136974 | 9/18/2017 22:09 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT | PENROE, JUSTIN #13709 |
| E1700137193 | 9/19/2017 11:09 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1700137688 | 9/20/2017 11:09 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1700139740 | 9/24/2017 03:09 | | LIQUOR VIOLATION | OFFENSE REPORT | FAIR, LANCE #16781 |
| E1700139846 | 9/24/2017 11:09 | | CHECK WELFARE | ASSIST FIRE DEPARTMENT | CONNER, TIMOTHY #12880 |
| E1700140179 | 9/25/2017 03:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | LANCASTER, BRAD #16906 |
| E1700141093 | 9/26/2017 23:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700142670 | 9/29/2017 21:09 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1700142838 | 9/30/2017 03:09 | 257 | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700143447 | 10/1/2017 10:10 | 282 | DV/ASSAULT | OFFENSE REPORT | JOHNSON, PHILLIP #12682 |
| E1700143464 | 10/1/2017 11:10 | | MISDEMEANOR WNT OUTSTANDING | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700143650 | 10/1/2017 20:10 | 126 | INCORRIGIBLE JUVENILE | CONTACT MADE, NO PAPERWORK | AHERN, JOSEPH #15122 |
| E1700144837 | 10/4/2017 01:10 | | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | BUTCHER, BRITTANY #17191 |
| E1700145620 | 10/5/2017 15:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700145803 | 10/5/2017 21:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | ROWE, TORII #17074 |
| E1700145888 | 10/6/2017 02:10 | 126 | INSANE PERSON | CONTACT MADE, NO PAPERWORK | KING, MARCUS #17000 |
| E1700147006 | 10/8/2017 05:10 | | INVESTIGATE UNKNOWN TROUBLE | ASSIST FIRE DEPARTMENT | ARMSTRONG, JONATHAN #16894 |
| E1700147414 | 10/9/2017 02:10 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | LANCASTER, BRAD #16906 |
| E1700148078 | 10/10/2017 11:10 | 134 | DEAD BODY | ASSIST FIRE DEPARTMENT | SANDOVAL, ANTHONY #17963 |
| E1700148172 | 10/10/2017 15:10 | 280 | TRESPASSING | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |

6/4/2019 9:46:20 AM

| | | | | | |
|---|---|---|---|---|---|
| E1700148284 | 10/10/2017 18:10 | 288 | DV STRANGULATION | OFFENSE REPORT | SEIDL, ALLAN #16321 |
| E1700149125 | 10/12/2017 11:10 | | POSSESSION OF DANGEROUS DRUGS | OFFENSE REPORT | SAUCEDA, MIGUEL #17774 |
| E1700150785 | 10/15/2017 14:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | MCCORT, KEVIN #16872 |
| E1700155464 | 10/24/2017 07:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | SANDOVAL, ANTHONY #17963 |
| E1700157680 | 10/27/2017 22:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700157729 | 10/28/2017 00:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700157793 | 10/28/2017 04:10 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700158305 | 10/29/2017 02:10 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700158430 | 10/29/2017 12:10 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700158721 | 10/30/2017 00:10 | | INVESTIGATE UNKNOWN TROUBLE | CONTACT MADE, NO PAPERWORK | TURNER, MAXWELL #17430 |
| E1700159502 | 10/31/2017 11:10 | 259 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | HANEY, ANTHONY #9971 |
| E1700159997 | 11/1/2017 09:11 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | CATUNA, BRYAN #17960 |
| E1700160065 | 11/1/2017 11:11 | 141 | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | OSTIN, MICHAEL #8728 |
| E1700160094 | 11/1/2017 12:11 | | ACCIDENT, NON-INJURY | ACCIDENT | SCHRAGEL, DAVID #15228 |
| E1700160365 | 11/1/2017 21:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | LEWIS, LEROY #15542 |
| E1700160368 | 11/1/2017 21:11 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | JOHNSTON, WILLIAM #8134 |
| E1700160405 | 11/1/2017 22:11 | | POSSESSION OF DRUG PARAPHERNALIA | OFFENSE REPORT | PENROSE, JUSTIN #13709 |
| E1700160458 | 11/2/2017 02:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700160697 | 11/2/2017 13:11 | | DRUG PARAPHENALIA | FIELD INTERVIEW CARD | ATEN, BRIAN #15250 |
| E1700160895 | 11/2/2017 20:11 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700160992 | 11/3/2017 02:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700161518 | 11/4/2017 01:11 | | DRUNK | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700161551 | 11/4/2017 04:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700161730 | 11/4/2017 14:11 | | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | DULANEY, MARCEL #16440 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036889

| E1700162228 | 11/5/2017 13:11 | 273 | SUBJ DISTURBING/HARASSING | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
|---|---|---|---|---|---|
| E1700162453 | 11/6/2017 00:11 | | TRESPASSING | FIELD INTERVIEW CARD | PENROSE, JUSTIN #13709 |
| E1700163380 | 11/7/2017 15:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700164079 | 11/8/2017 15:11 | | SUBJ DISTURBING/HARASSING | COMPL/ALARM COMPANY CALLED TO CANCEL | AHERN, JOSEPH #15122 |
| E1700165412 | 11/11/2017 00:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700165473 | 11/11/2017 04:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | CARROLL, JOSHUA #16003 |
| E1700165562 | 11/11/2017 09:11 | 129 | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | HAEFFNER, SCOTT #13772 |
| E1700166590 | 11/13/2017 14:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700166786 | 11/13/2017 22:11 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | ALLOWAY, JEFFREY #15779 |
| E1700166833 | 11/14/2017 00:11 | | DISPLAYING FICTITIOUS PLATES | OFFENSE REPORT | VALENZUELA, PATRICK #12094 |
| E1700166921 | 11/14/2017 07:11 | | RECOVERED STOLEN VEHICLE FOJ | OFFENSE REPORT | JOHNSON, PHILLIP #12682 |
| E1700167106 | 11/14/2017 13:11 | | WAGON WANTED | CONTACT MADE, NO PAPERWORK | BAH, BOUBACAR #17818 |
| E1700167126 | 11/14/2017 13:11 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW CARD | CONNER, TIMOTHY #12880 |
| E1700167300 | 11/14/2017 17:11 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700167465 | 11/14/2017 23:11 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | PENROSE, JUSTIN #13709 |
| E1700168100 | 11/16/2017 04:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700168125 | 11/16/2017 06:11 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700168739 | 11/17/2017 04:11 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700168862 | 11/17/2017 10:11 | | RECOVERY OF VEHICLE | CONTACT MADE, NO PAPERWORK | JONES, JASON #14688 |
| E1700169747 | 11/18/2017 23:11 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LANCASTER, BRAD #16906 |
| E1700169833 | 11/19/2017 03:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700171637 | 11/22/2017 08:11 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700172061 | 11/23/2017 00:11 | | CRIMINAL TRAFFIC VIOLATION | FIELD INTERVIEW CARD | VALENZUELA, PATRICK #12094 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036890

| | | | | | |
|---|---|---|---|---|---|
| E1700173606 | 11/26/2017 08:11 | | FIELD CONTACT | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
| E1700173671 | 11/26/2017 11:11 | | TRESPASSING | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
| E1700175118 | 11/28/2017 22:11 | | SUBJECT WITH A GUN | CONTACT MADE, NO PAPERWORK | LANCASTER, BRAD #16906 |
| E1700175134 | 11/28/2017 23:11 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | PENROSE, JUSTIN #13709 |
| E1700176008 | 11/30/2017 14:11 | 127 | TRESPASSING | FIELD INTERVIEW CARD | DOE, JOHN #13263 |
| E1700176013 | 11/30/2017 14:11 | | TRESPASSING | DUPLICATE CALL RECEIVED | HAEFFNER, SCOTT #13772 |
| E1700176311 | 12/1/2017 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700176340 | 12/1/2017 05:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700176654 | 12/1/2017 17:12 | 272 | FAMILY FIGHT/DOMESTIC VIOLENCE | CONTACT MADE, NO PAPERWORK | EGOIAN, JACK #15609 |
| E1700176898 | 12/2/2017 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700177394 | 12/3/2017 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700177885 | 12/4/2017 00:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PENROSE, JUSTIN #13709 |
| E1700178980 | 12/5/2017 23:12 | | POSSESSION OF DRUG PARAPHENALIA | OFFENSE REPORT | PENROSE, JUSTIN #13709 |
| E1700179412 | 12/6/2017 17:12 | | SUBJ DISTURBING/HARASSING | CONTACT MADE, NO PAPERWORK | BOUSMAN, RACHAEL #9897 |
| E1700179591 | 12/7/2017 01:12 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | ZYGMONT, WESLEY #11372 |
| E1700179615 | 12/7/2017 03:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700179992 | 12/7/2017 17:12 | | CHECK WELFARE | UNABLE TO LOCATE | EGOIAN, JACK #15609 |
| E1700180217 | 12/8/2017 04:12 | | INTENSIVE PATROL (PREVENTATIVE) | NO ACTION | BARGER, JUSTIN #15175 |
| E1700180790 | 12/9/2017 04:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700181043 | 12/9/2017 16:12 | | DRUGS | FIELD INTERVIEW CARD | ELKHANNOUSSI, BADR #16856 |
| E1700181206 | 12/9/2017 21:12 | 524 | CHECK WELFARE | CONTACT MADE, NO PAPERWORK | ELKHANNOUSSI, BADR #16856 |
| E1700181585 | 12/10/2017 14:12 | 6 | TRESPASSING | CONTACT MADE, NO PAPERWORK | JOHNSON, PHILLIP #12682 |
| E1700182409 | 12/12/2017 01:12 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LOESCHER, NATHAN #13411 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036891

| | | | | | |
|---|---|---|---|---|---|
| E1700183040 | 12/13/2017 06:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700183345 | 12/13/2017 18:12 | 116 | FRAUD | CONTACT MADE, NO PAPERWORK | STANFIELD, BRIAN #10239 |
| E1700184055 | 12/15/2017 01:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BRILL, JOSHUA #16583 |
| E1700184073 | 12/15/2017 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700185627 | 12/18/2017 07:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700186329 | 12/19/2017 10:12 | 122 | INJURED OR SICK PERSON | ASSIST FIRE DEPARTMENT | HUBBUCH, JAMISON #12524 |
| E1700186374 | 12/19/2017 12:12 | | DOG SEIZURE | OFFENSE REPORT | JOHNSON, PHILLIP #12682 |
| E1700187047 | 12/20/2017 16:12 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LINDSEY, MARK #15543 |
| E1700187134 | 12/20/2017 19:12 | | FIELD CONTACT | CONTACT MADE, NO PAPERWORK | PITTMAN, JEFFREY #12718 |
| E1700187145 | 12/20/2017 19:12 | | DV ASSAULT | OFFENSE REPORT | DULANEY, MARCEL #16440 |
| E1700187806 | 12/22/2017 03:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700188103 | 12/22/2017 15:12 | | TRESPASSING | CONTACT MADE, NO PAPERWORK | ELKHANNOUSSI, BADR #16856 |
| E1700189395 | 12/25/2017 08:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1700189512 | 12/25/2017 16:12 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | MCCORT, KEVIN #16872 |
| E1700189831 | 12/26/2017 13:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1700190178 | 12/27/2017 07:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1700190201 | 12/27/2017 07:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | CONNER, TIMOTHY #12880 |
| E1700190382 | 12/27/2017 14:12 | | FIELD CONTACT | FIELD INTERVIEW CARD | JOHNSON, PHILLIP #12682 |
| E1700190423 | 12/27/2017 15:12 | 126 | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | SEIDL, ALLAN #16321 |
| E1700190636 | 12/28/2017 03:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700190775 | 12/28/2017 10:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ANDERSON, BRYAN #11307 |
| E1700190926 | 12/28/2017 14:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ATEN, BRIAN #15250 |
| E1700191408 | 12/29/2017 14:12 | | FELONY WARRANT OUTSTANDING | FIELD INTERVIEW NRU | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

| E1700191644 | 12/29/2017 22:12 | | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700191759 | 12/30/2017 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | BARGER, JUSTIN #15175 |
| E1700191987 | 12/30/2017 15:12 | 126 | TRESPASSING | CONTACT MADE, NO PAPERWORK | DULANEY, MARCEL #16440 |
| E1700192128 | 12/30/2017 20:12 | 217 | SUSPICIOUS PERSON/CIRCUMSTANCE | CONTACT MADE, NO PAPERWORK | SALYERS, MATTHEW #17073 |
| E1700192155 | 12/30/2017 21:12 | 275 | P.R. CONTACT | CONTACT MADE, NO PAPERWORK | SALYERS, MATTHEW #17073 |
| E1700192217 | 12/30/2017 23:12 | | SUSPICIOUS PERSON/CIRCUMSTANCE | FIELD INTERVIEW CARD | HUNT, DOUGLAS #14322 |
| E1700192270 | 12/31/2017 01:12 | | SUSPICIOUS VEHICLE | CONTACT MADE, NO PAPERWORK | LANCASTER, BRAD #16906 |
| E1700192273 | 12/31/2017 02:12 | | INTENSIVE PATROL (PREVENTATIVE) | CONTACT MADE, NO PAPERWORK | ARMSTRONG, JONATHAN #16894 |
| E1700192315 | 12/31/2017 06:12 | | TRAFFIC STOP | CONTACT MADE, NO PAPERWORK | SCHNEIDER, MATTHEW #12251 |

## Incident Reports

| Incident | Date Time | Apt | Primary Offense | Officer |
|---|---|---|---|---|
| I16002867 | 1/6/2016 22:01 | 138 | | LARSEN, KRISTOPHER #16907 |
| I16005426 | 1/13/2016 02:01 | | THEFT-MEANS OF TRANSPORTATION | MCLEOD, BRET #11368 |
| I16007020 | 1/16/2016 11:01 | | THEFT/ALL OTHERS  OVER $250 | MISNER, GERALD #15179 |
| I16009755 | 1/22/2016 01:01 | | DANGEROUS DRUG-POSS/USE | YATES, AADAM #13508 |
| I16012135 | 1/26/2016 22:01 | | THEFT/ALL OTHERS $50--$249 | RAMSAY, JUSTIN #15093 |
| I16012977 | 1/28/2016 12:01 | | | HUBBUCH, JAMISON #12524 |
| I16014347 | 1/30/2016 00:01 | | THEFT/ALL OTHERS  OVER $250 | GELLMAN, RACHEL #14572 |
| I16019851 | 2/10/2016 22:02 | | DUI-LIQUOR/DRUGS/VAPORS/COMBO | SMITH, JARROD #13699 |
| I16020702 | 2/12/2016 11:02 | | MARIJUANA-POSSESS/USE | PITTMAN, JEFFREY #12718 |
| I16020704 | 2/12/2016 11:02 | | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I16022744 | 2/16/2016 15:02 | | THEFT/ALL OTHERS  OVER $250 | TURSKI, CHRISTOPHER #14529 |
| I16022862 | 2/16/2016 19:02 | | ASSAULT-INTENT/RECKLESS/INJURE | CARFAGNA, NICOLINO #15252 |

6/4/2019 9:46:20 AM

| | | | | |
|---|---|---|---|---|
| I16026235 | 2/22/2016 00:02 | 124 | THEFT/ALL OTHERS  OVER $250 | LIVINGSTON, JENNIFER #12223 |
| I16030320 | 3/1/2016 23:03 | | NARCOTIC DRUG-POSSESS/USE | BASTIN, CHRISTOPHER #16581 |
| I16030337 | 3/1/2016 23:03 | | POSS WPN BY PROHIB PERSON | YATES, AADAM #13508 |
| I16033599 | 3/7/2016 16:03 | 293 | | KULB, STEVEN #12430 |
| I16034220 | 3/9/2016 15:03 | | MARIJUANA-POSSESS/USE | FERNANDEZ, MICHAEL #15225 |
| I16035657 | 3/12/2016 00:03 | | | COLLINS, SCOTT #15178 |
| I16037720 | 3/16/2016 08:03 | | CRIMINAL DAMAGE-DEFACE | KULB, STEVEN #12430 |
| I16039281 | 3/18/2016 22:03 | 121 | ASSAULT-TOUCHED TO INJURE | SINGER, ELAINE #10643 |
| I16043810 | 3/28/2016 03:03 | | DRUG PARAPHERNALIA-POSSESS/USE | HUNTER, KEITH #16887 |
| I16044282 | 3/28/2016 22:03 | 137 | DISORDERLY CONDUCT-FIGHTING | FAIR, LANCE #16781 |
| I16050921 | 4/10/2016 19:04 | | DANGEROUS DRUG-POSS/USE | ATEN, BRIAN #15250 |
| I16051057 | 4/11/2016 01:04 | | CARRY WPN-COMMISION FELONY CRM | PEREZ, DANIEL #16909 |
| I16051601 | 4/11/2016 18:04 | | | ZARAGOZA, SAMANTHA #13340 |
| I16052552 | 4/13/2016 09:04 | 112 | | LARSEN, KRISTOPHER #16907 |
| I16052736 | 4/14/2016 07:04 | | UNLAW MEANS TRANSP-PASSENGER | MCLEOD, BRET #11368 |
| I16063360 | 5/3/2016 15:05 | | | ATEN, BRIAN #15250 |
| I16066239 | 5/9/2016 05:05 | | ASSAULT-INTENT/RECKLESS/INJURE | CLUBB, JONATHAN #16439 |
| I16068340 | 5/12/2016 23:05 | | | KUEFER, WESLEY #16905 |
| I16072788 | 5/21/2016 19:05 | | CRIMINAL DAMAGE-DEFACE | RATLIFF, TREVOR #17222 |
| I16077415 | 5/30/2016 20:05 | | DISORDERLY CONDUCT-FIGHTING | ATEN, BRIAN #15250 |
| I16080145 | 6/4/2016 18:06 | | CRIMINAL DAMAGE-DEFACE | LARSEN, KRISTOPHER #16907 |
| I16084407 | 6/13/2016 11:06 | | | JONES, JASON #14688 |
| I16088860 | 6/21/2016 22:06 | 131 | AA/DEADLY WEAPON/BODILY FORCE | FAIR, LANCE #16781 |
| I16089354 | 6/22/2016 17:06 | | NARCOTIC DRUG-POSSESS/USE | LEWIS, LEROY #15542 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036894

| | | | | |
|---|---|---|---|---|
| I16090013 | 6/23/2016 18:06 | 140 | | LARSEN, KRISTOPHER #16907 |
| I16090188 | 6/24/2016 07:06 | | THEFT-MEANS OF TRANSPORTATION | MCLEOD, BRET #11368 |
| I16092645 | 6/29/2016 03:06 | | NARCOTIC DRUG-POSSESS/USE | BRILL, JOSHUA #16583 |
| I16096702 | 7/6/2016 14:07 | | MARIJUANA-POSSESS/USE | DAVIDGE, JOHN #15637 |
| I16099316 | 7/11/2016 23:07 | | | ROWE, TORII #17074 |
| I16099696 | 7/12/2016 16:07 | 277 | DANGEROUS DRUG-POSS/USE | TOLBERT, LACEY #13338 |
| I16100208 | 7/6/2016 15:07 | | THEFT/ALL OTHERS UNDER $50 | DIRKS, SHAWN #13103 |
| I16102244 | 7/17/2016 13:07 | 118 | THEFT/FROM BUILDING UNDER $50 | MISNER, GERALD #15179 |
| I16105875 | 7/25/2016 04:07 | | THEFT-MEANS OF TRANSPORTATION | CLUBB, JONATHAN #16439 |
| I16106904 | 7/27/2016 04:07 | | DANGEROUS DRUG-POSS/USE | ANDERSON, BRYAN #11307 |
| I16107893 | 7/28/2016 21:07 | | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I16108025 | 7/29/2016 05:07 | 287 | THEFT/ALL OTHERS  OVER $250 | SORENSON, ERIK #16783 |
| I16108219 | 7/29/2016 14:07 | | NARCOTIC DRUG-POSSESS/USE | PITTMAN, JEFFREY #12718 |
| I16110391 | 8/2/2016 21:08 | | MARIJUANA-POSSESS/USE | SCHNEIDER, MATTHEW #12251 |
| I16112371 | 8/6/2016 18:08 | | AGG ASSULT DISFIGURES/IMPARES | QUEENAN, JOEL #16320 |
| I16116588 | 8/15/2016 05:08 | | THEFT-MEANS OF TRANSPORTATION | MCLEOD, BRET #11368 |
| I16117898 | 8/17/2016 14:08 | 125 | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I16118348 | 8/18/2016 11:08 | | | COKING, JAMES #6897 |
| I16126328 | 9/2/2016 02:09 | | | CARROLL, JOSHUA #16003 |
| I16129100 | 9/7/2016 20:09 | | DANGEROUS DRUG-POSS/USE | LA BRANT, DONALD #8917 |
| I16130231 | 9/9/2016 19:09 | | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I16132246 | 9/13/2016 17:09 | 137 | THREAT-INTIM W/INJ-DMGE PROP | SMITH, ALISSANDRA #16910 |
| I16135811 | 9/20/2016 10:09 | | THEFT-MEANS OF TRANSPORTATION | MCLEOD, BRET #11368 |
| I16136074 | 9/20/2016 20:09 | | POSS WPN BY PROHIB PERSON | PITTMAN, JEFFREY #12718 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036895

| | | | | |
|---|---|---|---|---|
| I16141023 | 9/29/2016 19:09 | | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I16141462 | 9/30/2016 17:09 | 275 | UNLAWFUL IMPRISONMENT | QUEENAN, JOEL #16320 |
| I16145488 | 10/8/2016 16:10 | | | SEIDL, ALLAN #16321 |
| I16148344 | 10/14/2016 02:10 | 138 | NARCOTIC DRUG-POSSESS/USE | COLLINS, SCOTT #15178 |
| I16149916 | 10/17/2016 13:10 | | NARC DRUG-POSSESS OR SELL | CANO, ANTHONY #12534 |
| I16150663 | 10/18/2016 20:10 | | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I16151438 | 10/20/2016 06:10 | | ASSAULT-INTENT/RECKLESS/INJURE | REYNOLDS, BRIAN #13324 |
| I16153539 | 10/24/2016 14:10 | | | ZYGMONT, WESLEY #11372 |
| I16154193 | 10/25/2016 19:10 | | CRIM TRESP 3RD DEG/PROPERTY | ATEN, BRIAN #15250 |
| I16156374 | 10/30/2016 01:10 | 279 | OBSTRUCTION-REFUSE TRUE NAME | COLLINS, SCOTT #15178 |
| I16156690 | 10/30/2016 19:10 | | DANGEROUS DRUG-POSS/USE | ATEN, BRIAN #15250 |
| I16157308 | 11/1/2016 07:11 | | DANGEROUS DRUG-POSS/USE | CONNER, TIMOTHY #12880 |
| I16158649 | 10/31/2016 21:10 | 124 | AGG ASLT - IMPEDE BREATHING | REBHOLZ, JOHN #12374 |
| I16160299 | 11/7/2016 01:11 | | | FELDER, SYLVIA #17297 |
| I16162194 | 11/10/2016 19:11 | | DRUG PARAPHERNALIA-POSSESS/USE | SCHNEIDER, MATTHEW #12251 |
| I16171335 | 11/29/2016 19:11 | | BURGLARY 3RD DEGREE | SMITH, ALISSANDRA #16910 |
| I16174879 | 12/7/2016 03:12 | | DRIVE W/LIC SUSP/REVOKE/CANC | GALLAGHER, BRIAN #14243 |
| I16178909 | 12/11/2016 10:12 | | FRAUDULENT USE OF CREDIT CARD | KLINE, JASON #17523 |
| I16179791 | 12/16/2016 23:12 | | POSS WPN BY PROHIB PERSON | CARROLL, JOSHUA #16003 |
| I16180334 | 12/18/2016 03:12 | | CRIM TRESP 3RD DEG/PROPERTY | FELDER, SYLVIA #17297 |
| I16182746 | 12/22/2016 21:12 | | DRUG PARAPHERNALIA-POSSESS/USE | SCHNEIDER, MATTHEW #12251 |
| I16183496 | 12/24/2016 13:12 | | CRIMINAL DAMAGE-DEFACE | SAYLOR, JAMES #16782 |
| I16183503 | 12/24/2016 13:12 | | | SPIWAK, ADAM #15729 |
| I16183530 | 12/24/2016 15:12 | 274 | MARIJUANA-POSSESS/USE | SAYLOR, JAMES #16782 |
| I16183616 | 12/24/2016 20:12 | | | SALYERS, MATTHEW #17073 |

6/4/2019 9:46:20 AM

| | | | | |
|---|---|---|---|---|
| I16185953 | 12/28/2016 11:12 | | | , ON LINE REPORT #30 |
| I16186805 | 12/31/2016 09:12 | 272 | OBSTRUCTION-REFUSE TRUE NAME | KLINE, JASON #17523 |
| I17000142 | 1/1/2017 03:01 | 130 | ASSAULT-INTENT/RECKLESS/INJURE | BROYLES, JOSHUA #16871 |
| I17001613 | 1/4/2017 11:01 | | PROSTITUTION | COKING, JAMES #6897 |
| I17001634 | 1/4/2017 11:01 | | PROSTITUTION | COKING, JAMES #6897 |
| I17001687 | 1/4/2017 13:01 | | PROSTITUTION | COKING, JAMES #6897 |
| I17001872 | 1/4/2017 20:01 | | CARRY DEADLY WPN-FAIL TO ADMIT | QUEENAN, JOEL #16320 |
| I17010196 | 1/21/2017 19:01 | 250 | MISSING JUVENILE | HAEFFNER, SCOTT #13772 |
| I17012596 | 1/26/2017 12:01 | | PROSTITUTION | COKING, JAMES #6897 |
| I17012638 | 1/26/2017 13:01 | | PROSTITUTION | COKING, JAMES #6897 |
| I17013385 | 1/22/2017 00:01 | | UNLAW MEANS TRANSP-PASSENGER | HANSEN, KYLE #17522 |
| I17019940 | 2/9/2017 14:02 | | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I17024059 | 2/17/2017 06:02 | | NARCOTIC DRUG-POSSESS/USE | SCHNEIDER, MATTHEW #12251 |
| I17026807 | 2/22/2017 14:02 | | THEFT/CONTROLS KNOWING STOLEN | PITTMAN, JEFFREY #12718 |
| I17028093 | 2/24/2017 17:02 | | MARIJUANA-POSSESS/USE | PITTMAN, JEFFREY #12718 |
| I17030610 | 3/1/2017 01:03 | | THEFT/ALL OTHERS  OVER $250 | VENERACION, RODRIGO #14403 |
| I17032865 | 3/6/2017 02:03 | | MARIJUANA-POSSESS/USE | FELDER, SYLVIA #17297 |
| I17033715 | 3/7/2017 16:03 | | DANGEROUS DRUG-POSS/USE | TOLBERT, LACEY #13338 |
| I17034056 | 3/8/2017 09:03 | | MARIJUANA-POSSESS/USE | SCHNEIDER, MATTHEW #12251 |
| I17034682 | 3/9/2017 08:03 | | CRIMINAL DAMAGE-DEFACE | CANO, ANTHONY #12534 |
| I17044801 | 3/29/2017 02:03 | | | HAJEK, JAMES #15007 |
| I17048405 | 4/4/2017 20:04 | | | ATEN, BRIAN #15250 |
| I17052749 | 4/12/2017 17:04 | | | MARTINEZ, FRANCISCO #17707 |
| I17055889 | 4/18/2017 18:04 | | DANGEROUS DRUG-POSS/USE | ATEN, BRIAN #15250 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036897

| | | | | |
|---|---|---|---|---|
| I17056176 | 4/19/2017 10:04 | | PROSTITUTION | COKING, JAMES #6897 |
| I17057945 | 4/22/2017 22:04 | | NARCOTIC DRUG-POSSESS/USE | BROYLES, JOSHUA #16871 |
| I17058159 | 4/23/2017 10:04 | | | JOHNSON, PHILLIP #12682 |
| I17061499 | 4/29/2017 16:04 | | ASSAULT-TOUCHED TO INJURE | HAEFFNER, SCOTT #13772 |
| I17064023 | 5/4/2017 13:05 | 132 | CRIMINAL TRESPASS 2ND DEG | QUEENAN, JOEL #16320 |
| I17065513 | 5/6/2017 18:05 | | DEAD BODY/UNATTENDED DEATH | DOERR, GLENN #15123 |
| I17066555 | 5/9/2017 16:05 | | NARCOTIC DRUG-POSSESS FOR SALE | SCHNEIDER, MATTHEW #12251 |
| I17067781 | 5/11/2017 21:05 | | CRIM TRESP 3RD DEG/PROPERTY | QUEENAN, JOEL #16320 |
| I17069384 | 5/15/2017 07:05 | | | JOHNSON, PHILLIP #12682 |
| I17071756 | 5/19/2017 11:05 | | OBSTR GOVT OPERNS-PUB SERVANT | ESH, WILLIAM #15006 |
| I17071791 | 5/19/2017 12:05 | 282 | DANGEROUS DRUG-POSS/USE | SCHNEIDER, MATTHEW #12251 |
| I17072799 | 5/21/2017 18:05 | | ASSAULT-INTENT/RECKLESS/INJURE | BAXTER, CODY #17638 |
| I17073110 | 5/9/2017 15:05 | | | CONNER, TIMOTHY #12880 |
| I17075023 | 5/25/2017 18:05 | 129 | AGG ASLT - IMPEDE BREATHING | MABRY, MITCHELL #16908 |
| I17078684 | 6/1/2017 00:06 | | | COLLINS, SCOTT #15178 |
| I17081829 | 6/7/2017 01:06 | | THEFT/ALL OTHERS  OVER $250 | MARTINEZ, FRANCISCO #17707 |
| I17082333 | 6/7/2017 23:06 | 275 | ATTEMPTED SUICIDE | ANSELL, DYLAN #17089 |
| I17082908 | 6/9/2017 02:06 | | FALSE REPORT TO LAW ENFORCE | COLLINS, SCOTT #15178 |
| I17086235 | 6/4/2017 23:06 | | FRAUDULENT SCHEMES/ARTIFICES | NICHOLAS, CODY #16998 |
| I17087595 | 6/18/2017 02:06 | | THEFT/ALL OTHERS  OVER $250 | HALLIER, ERIC #17503 |
| I17089424 | 6/21/2017 20:06 | | DANGEROUS DRUG-POSS/USE | TOLBERT, LACEY #13338 |
| I17092762 | 6/28/2017 08:06 | | THEFT-MEANS OF TRANSPORTATION | POCKNELL, THOMAS #13787 |
| I17093564 | 6/29/2017 21:06 | | DISORDERLY CONDUCT-FIGHTING | ANSELL, DYLAN #17089 |
| I17096728 | 7/5/2017 22:07 | | THREAT-INTIM W/INJ-DMGE PROP | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

| | | | | |
|---|---|---|---|---|
| I17100751 | 7/13/2017 18:07 | 126 | NARCOTIC DRUG-POSSESS/USE | QUEENAN, JOEL #16320 |
| I17102265 | 7/16/2017 15:07 | | UNLAW FLIGHT FROM LAW ENF VEH | ATEN, BRIAN #15250 |
| I17103400 | 7/18/2017 21:07 | | DANGEROUS DRUG-POSS/USE | TOLBERT, LACEY #13338 |
| I17104998 | 7/21/2017 23:07 | | AGG ASLT-OFFICER | COLLINS, SCOTT #15178 |
| I17107320 | 7/26/2017 19:07 | | AGG ASLT-OFFICER | LEWIS, LEROY #15542 |
| I17111682 | 8/4/2017 14:08 | | ASSAULT-INTENT/RECKLESS/INJURE | PITTMAN, JEFFREY #12718 |
| I17115486 | 8/11/2017 13:08 | 272 | NARCOTIC DRUG-POSSESS/USE | COLLINS, SCOTT #15178 |
| I17118043 | 8/13/2017 00:08 | | THEFT CREDIT CARD-CONTROL | JOHNSON, PHILLIP #12682 |
| I17121783 | 8/23/2017 01:08 | 291 | NARCOTIC DRUG-POSSESS/USE | PENROSE, JUSTIN #13709 |
| I17129175 | 9/5/2017 13:09 | 136 | DEAD BODY/UNATTENDED DEATH | ANDERSON, BRYAN #11307 |
| I17130964 | 9/8/2017 11:09 | | | COMPARAN, GILBERTO #10594 |
| I17132931 | 9/12/2017 01:09 | | DRUG PARAPHERNALIA-POSSESS/USE | FAIR, LANCE #16781 |
| I17133994 | 9/13/2017 14:09 | 272 | MARIJUANA-POSSESS/USE | PITTMAN, JEFFREY #12718 |
| I17135638 | 9/16/2017 11:09 | | | CONTRERAS, MICHAEL #14242 |
| I17136974 | 9/18/2017 22:09 | | DANGEROUS DRUG-POSS/USE | PENROSE, JUSTIN #13709 |
| I17139740 | 9/24/2017 03:09 | | LIQUOR-POSS OPEN CONT IN VEH | FAIR, LANCE #16781 |
| I17143447 | 10/1/2017 10:10 | 282 | ASSAULT-INTENT/RECKLESS/INJURE | JOHNSON, PHILLIP #12682 |
| I17148284 | 10/10/2017 18:10 | 288 | AGG ASLT - IMPEDE BREATHING | SEIDL, ALLAN #16321 |
| I17149125 | 10/12/2017 11:10 | | DANGEROUS DRUG-POSS/USE | ANDERSON, BRYAN #11307 |
| I17160047 | 11/1/2017 10:11 | | DANGEROUS DRUG-POSS/USE | POCKNELL, THOMAS #13787 |
| I17160405 | 11/1/2017 22:11 | | DRUG PARAPHERNALIA-POSSESS/USE | PENROSE, JUSTIN #13709 |
| I17166833 | 11/14/2017 00:11 | | KNOWINGLY DISPLAY FLS LIC PLT | VALENZUELA, PATRICK #12094 |
| I17166921 | 11/14/2017 07:11 | | UNLAW MEANS TRANSP-PASSENGER | JOHNSON, PHILLIP #12682 |
| I17168939 | 11/17/2017 09:11 | | THEFT/ALL OTHERS UNDER $50 | DOE, JOHN #13263 |
| I17178980 | 12/5/2017 23:12 | | DRUG PARAPHERNALIA-POSSESS/USE | PENROSE, JUSTIN #13709 |

6/4/2019 9:46:20 AM

| I17186374 | 12/19/2017 12:12 | 276 | | JOHNSON, PHILLIP #12682 |
| I17187145 | 12/20/2017 17:12 | 293 | ASSAULT-INTENT/RECKLESS/INJURE | DULANEY, MARCEL #16440 |
| I18001446 | 12/20/2017 00:12 | | TAKING IDENTITY OF ANOTHER | MCCORT, KEVIN #16872 |

### Field Interviews

| FI | Date Time | Apt | Contact Type | Officer |
|---|---|---|---|---|
| F16015717001 | 2/3/2016 07:02 | | | KING, MARCUS #17000 |
| F16018621001 | 2/9/2016 09:02 | | | ROOKS, JORDAN #17143 |
| F16019750001 | 2/11/2016 15:02 | | | SMITH, ALISSANDRA #16910 |
| F16038507001 | 3/17/2016 17:03 | | | PITTMAN, JEFFREY #12718 |
| F16044215001 | 3/29/2016 05:03 | 137 | | FAIR, LANCE #16781 |
| F16051159001 | 4/12/2016 05:04 | | | BASTIN, CHRISTOPHER #16581 |
| F16059241001 | 4/26/2016 06:04 | | | HANEY, ANTHONY #9971 |
| F16064619001 | 5/5/2016 18:05 | | | SCHNEIDER, MATTHEW #12251 |
| F16061356001 | 4/29/2016 18:04 | | | DAVIDGE, JOHN #15637 |
| F16081673001 | 6/7/2016 19:06 | | | TOLBERT, LACEY #13338 |
| F16089852001 | 6/23/2016 15:06 | | | LARSEN, KRISTOPHER #16907 |
| F16090642001 | 6/25/2016 00:06 | | | COLLINS, SCOTT #15178 |
| F16091158001 | 6/29/2016 02:06 | 242 | | FAIR, LANCE #16781 |
| F16094111001 | 7/1/2016 18:07 | | | JOHNSTON, WILLIAM #8134 |
| F16089574001 | 6/23/2016 05:06 | 130 | | SINGER, ELAINE #10643 |
| F16096860001 | 7/6/2016 21:07 | | | PITTMAN, JEFFREY #12718 |
| F16096947001 | 7/7/2016 01:07 | | | COLLINS, SCOTT #15178 |
| F16099728001 | 7/12/2016 19:07 | 262 | | LEWIS, LEROY #15542 |
| F16104279001 | 7/21/2016 13:07 | | | WINFIELD, RYAN #9975 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036900

| | | | | |
|---|---|---|---|---|
| F1610667200 1 | 7/26/2016 16:07 | | | SCHNEIDER, MATTHEW #12251 |
| F1611141400 1 | 8/4/2016 17:08 | | | SCHNEIDER, MATTHEW #12251 |
| F1611242200 1 | 8/7/2016 00:08 | | | SEIDL, ALLAN #16321 |
| F1611245000 1 | 8/6/2016 22:08 | | | BUSTOZ, JOHN #6896 |
| F1611550400 1 | 8/12/2016 19:08 | 279 | | SCHNEIDER, MATTHEW #12251 |
| F1611510800 1 | 8/12/2016 00:08 | | | COLLINS, SCOTT #15178 |
| F1611508300 1 | 8/11/2016 22:08 | | | COLLINS, SCOTT #15178 |
| F1611818000 1 | 8/18/2016 03:08 | 275 | | CARROLL, JOSHUA #16003 |
| F1611816700 1 | 8/18/2016 02:08 | | | COLLINS, SCOTT #15178 |
| F1612733300 1 | 9/4/2016 03:09 | 290 | | ANSELL, DYLAN #17089 |
| F1612733300 2 | 9/4/2016 02:09 | 290 | | CARROLL, JOSHUA #16003 |
| F1612979000 1 | 9/8/2016 23:09 | | | COLLINS, SCOTT #15178 |
| F1613341700 1 | 9/15/2016 16:09 | 287 | | SCHNEIDER, MATTHEW #12251 |
| F1613412700 1 | 9/16/2016 23:09 | | | CLONTZ, DANNY #16886 |
| F1613833600 1 | 9/24/2016 20:09 | | | THOMPSON, ASHLEY #16704 |
| F1614110300 1 | 9/29/2016 23:09 | | | COLLINS, SCOTT #15178 |
| F1613748700 1 | 9/23/2016 02:09 | 125 | | COLLINS, SCOTT #15178 |
| F1614218700 1 | 10/2/2016 09:10 | | | HUBBUCH, JAMISON #12524 |
| F1614503800 1 | 10/7/2016 15:10 | | | LEWIS, LEROY #15542 |
| F1614581200 1 | 10/11/2016 05:10 | | | LECHUGA, LAURA #17436 |
| F1615117600 1 | 10/19/2016 16:10 | | | PITTMAN, JEFFREY #12718 |
| F1615760000 1 | 11/1/2016 15:11 | | | LINDSEY, MARK #15543 |
| F1615999700 1 | 11/6/2016 07:11 | | | JOHNSON, PHILLIP #12682 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036901

| | | | | |
|---|---|---|---|---|
| F16168666001 | 11/24/2016 01:11 | | | BASTIN, CHRISTOPHER #16581 |
| F16180746001 | 12/19/2016 02:12 | | | GALLAGHER, BRIAN #14243 |
| F16178271001 | 12/14/2016 03:12 | | | BUTCHER, BRITTANY #17191 |
| F16182849001 | 12/23/2016 02:12 | | | COLLINS, SCOTT #15178 |
| F16182255001 | 12/21/2016 21:12 | 110 | | DULANEY, MARCEL #16440 |
| F17009706001 | 1/20/2017 17:01 | | | SCHNEIDER, MATTHEW #12251 |
| F17009706002 | 1/20/2017 20:01 | | | SCHNEIDER, MATTHEW #12251 |
| F17013827001 | 1/29/2017 01:01 | | | COLLINS, SCOTT #15178 |
| F17016503001 | 2/3/2017 01:02 | | | COLLINS, SCOTT #15178 |
| F17020762001 | 2/11/2017 02:02 | 125 | | COLLINS, SCOTT #15178 |
| F17025893001 | 2/21/2017 00:02 | | | GALLAGHER, BRIAN #14243 |
| F17033846001 | 3/7/2017 22:03 | 128 | | BROYLES, JOSHUA #16871 |
| F17026101001 | 2/21/2017 11:02 | | | JOHNSON, PHILLIP #12682 |
| F17044094001 | 3/27/2017 19:03 | | | LEWIS, LEROY #15542 |
| F17049202001 | 4/6/2017 05:04 | | | POWERS, WILLIAM #13142 |
| F17050825001 | 4/9/2017 04:04 | | | COLLINS, SCOTT #15178 |
| F17064287001 | 5/5/2017 01:05 | 286 | | COLLINS, SCOTT #15178 |
| F17066681001 | 5/9/2017 21:05 | | | SCHNEIDER, MATTHEW #12251 |
| F17069399001 | 5/15/2017 08:05 | | | CONNER, TIMOTHY #12880 |
| F17070422001 | 5/17/2017 03:05 | | | SALYERS, MATTHEW #17073 |
| F17071273001 | 5/19/2017 08:05 | | | LINDSEY, MARK #15543 |
| F17075189001 | 5/26/2017 01:05 | | | COLLINS, SCOTT #15178 |
| F17078603001 | 5/31/2017 21:05 | | | TOLBERT, LACEY #13338 |

| | | | | |
|---|---|---|---|---|
| F1707621800 1 | 5/27/2017 22:05 | | | COLLINS, SCOTT #15178 |
| F1707972300 1 | 6/2/2017 18:06 | | | BURGETT, ZACHARY #17070 |
| F1708400400 1 | 6/11/2017 03:06 | 121 | | CARROLL, JOSHUA #16003 |
| F1710228500 1 | 7/16/2017 17:07 | | | DAUKAS, JEFF #12233 |
| F1710398000 1 | 7/19/2017 22:07 | | | TOLBERT, LACEY #13338 |
| F1708462300 1 | 6/12/2017 11:06 | | | JOHNSON, PHILLIP #12682 |
| F1710866300 1 | 7/29/2017 16:07 | 279 | | MABRY, MITCHELL #16908 |
| F0001424307 8 | 8/2/2017 22:08 | | | GALLAGHER, BRIAN #14243 |
| F1711226500 1 | 8/5/2017 16:08 | | | MCCORT, KEVIN #16872 |
| F1712288800 1 | 8/25/2017 01:08 | | | ARMSTRONG, JONATHAN #16894 |
| F1712290600 1 | 8/25/2017 02:08 | 110 | | ARMSTRONG, JONATHAN #16894 |
| F1712292200 1 | 8/25/2017 04:08 | | | BARGER, JUSTIN #15175 |
| F1713000700 1 | 9/6/2017 18:09 | 130 | | JOHNSTON, WILLIAM #8134 |
| F1712212500 1 | 8/23/2017 12:08 | | | SEIDL, ALLAN #16321 |
| F1714588800 1 | 10/6/2017 02:10 | | | BARGER, JUSTIN #15175 |
| F1715078500 1 | 10/15/2017 15:10 | | | MCCORT, KEVIN #16872 |
| F1716245300 1 | 11/6/2017 04:11 | | | PENROSE, JUSTIN #13709 |
| F1717367100 1 | 11/27/2017 11:11 | | | JOHNSON, PHILLIP #12682 |
| F1717360600 1 | 11/26/2017 08:11 | | | JOHNSON, PHILLIP #12682 |
| F1716222800 1 | 11/5/2017 13:11 | | | JOHNSON, PHILLIP #12682 |
| F1717600800 1 | 11/30/2017 15:11 | | | DOE, JOHN #13263 |
| F1718104300 1 | 12/9/2017 17:12 | | | SMITH, ALISSANDRA #16910 |
| F1719140800 1 | 12/29/2017 14:12 | | | COLLINS, SCOTT #15178 |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036903

| F17190382001 | 12/27/2017 14:12 | | | JOHNSON, PHILLIP #12682 |

| Accident Reports | | | | |
|---|---|---|---|---|
| **Accident** | **Date Time** | **Apt** | **Officer** | |

6/4/2019 9:46:20 AM

CoG_WHEATCROFT 036904

# *EXHIBIT 4*



**Page 1**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya )
Chapman, as husband and wife, and )
on behalf of minors J.W. and B.W., )
                ) Case No.:
   Plaintiffs,    ) 2:18-cv-02347-SMB
                )
vs.              )
                )
City of Glendale, a municipal )
entity; Matt Schneider, in his )
official and individual )
capacities; Mark Lindsey, in his )
official and individual )
capacities; and Michael Fernandez, )
in his official and individual )
capacities,         )
                )
   Defendants.    )
                )

DEPOSITION OF OFFICER MARK JOSEPH LINDSEY

Chandler, Arizona
June 5, 2019
10:00 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234

PREPARED FOR:

(COPY)

**Page 2**

I N D E X

WITNESS          PAGE
OFFICER MARK JOSEPH LINDSEY

EXAMINATION BY MS. BROADDUS    4
EXAMINATION BY MR. POPOLIZIO   242
FURTHER EXAMINATION BY MS. BROADDUS   257
FURTHER EXAMINATION BY MR. POPOLIZIO   263
FURTHER EXAMINATION BY MS. BROADDUS   270

E X H I B I T S

Deposition
Exhibits   Description      Marked

10   Arizona Peace Officer Standards and   45
    Training Board, Courtroom Testimony
    and Pretrial Interviews in Child
    Abuse Cases course, Bates No.
    CoG_WHEATCROFT 003228
    (1 page)

11   Certificate of Completion, Bates   45
    No. CoG_WHEATCROFT 003234
    (1 page)

12   Glendale Police Department General   106
    Order, Bates Nos. CoG_WHEATCROFT
    001764-001770 (7 pages)

13   Glendale Police Department General   121
    Order, Bates Nos. CoG_WHEATCROFT
    001771-001779 (9 pages)

14   Google map (1 page)     146

15   Hand drawn diagram (1 page)   167

16   Taser Pulse Log Evaluation, Bates   231
    Nos. CoG_WHEATCROFT 001670-001674
    (5 pages)

17   AXON Taser report, Bates No.   231
    CoG_WHEATCROFT 001231 (1 page)

**Page 3**

DEPOSITION OF OFFICER MARK JOSEPH LINDSEY
was taken on June 5, 2019, commencing at 10:00 a.m. at the
law offices of MARC J. VICTOR, P.C., ATTORNEYS FOR
FREEDOM, 3185 South Price Road, Chandler, Arizona, before
MONICA S. BERRY, RPR, a Certified Reporter in the State of
Arizona.

COUNSEL APPEARING:
  MARC J. VICTOR, P.C.
  ATTORNEYS FOR FREEDOM
  By:  MS. JODY L. BROADDUS
  3185 South Price Road
  Chandler, Arizona  85248
  On behalf of Plaintiffs

  JONES, SKELTON & HOCHULI, P.L.C.
  By:  MR. JOSEPH J. POPOLIZIO
  40 North Central Avenue
  Suite 2700
  Phoenix, Arizona  85004
  On behalf of Defendants

ALSO PRESENT:
  Ms. Kathy Thomas and Ms. Hillary Zagara, Glendale
  Risk Management
  Ms. Julie Wanner, paralegal to Mr. Popolizio
  Ms. Alexz Thompson, paralegal to Ms. Broaddus

**Page 4**

OFFICER MARK JOSEPH LINDSEY,
a witness herein, having been first duly sworn by the
Certified Reporter to speak the truth and nothing but the
truth, was examined and testified as follows:

EXAMINATION
BY MS. BROADDUS:

Q.  Please state your full name for the record.

A.  **Mark Joseph Lindsey.**

Q.  Have you had your deposition taken before?

A.  **I have not been through a full deposition like
this before, no, ma'am.**

Q.  I'm going to go through some ground rules.  I'm
sure your attorney's spoken to you, but --

A.  **Uh-huh.**

Q.  -- I don't want to get into what he says, but --

A.  **Absolutely.**

Q.  -- just a few things.  Number one is the court
reporter is going to be taking down everything that's said
in the room.

A.  **Uh-huh.**

Q.  And to make sure that we're all on the same page
and to make her job a lot easier, we'll have only one
person speak at a time.  Do you understand?

A.  **I do.**

5

1   Q.   Another thing is, in normal conversation, which a
2   lot of times these depositions seem like they're normal
3   conversation, we're still in a court proceeding.  You're
4   under oath --
5       A.   Uh-huh.
6       Q.   -- obligated to testify truthfully.  Do you
7   understand that?
8       A.   I do.
9       Q.   And also, because she is taking everything down
10  that's said, sometimes things -- I see and understand what
11  you're saying with a nod of the head or an uh-huh or an
12  huh-uh, but those don't come out very clear when I try to
13  read the transcript later.  So if that happens, I'm not
14  trying to be rude.  I'll just ask you to clarify your
15  answer so we have a clear record.  Okay?
16      A.   Absolutely.
17      Q.   The next thing is if you don't understand one of
18  my questions, let me know, and I'll try and rephrase it or
19  make it an understandable question, but attorneys do ask
20  stupid questions.  It's just a matter of how we do things
21  sometimes.  Okay?
22      A.   Okay.
23      Q.   Your attorney's going to be making objections for
24  the record, and you're still going to answer the question
25  even though he may make an objection unless he tells you

6

1   not to answer.  Okay?
2       A.   Okay.
3       Q.   And you're doing a good job, like I said, with
4   all the verbal responses and making sure one person speaks
5   at a time.  You're going to be able to anticipate some of
6   my questions or what I'm going to say, but I'm going to
7   ask that you wait until I'm finished completely with my
8   question before you start your answer.  And I'll do the
9   same.  Sometimes it happens, but I'll try to do the same,
10  that I let you complete your answer before I start my next
11  question.  Okay?
12      A.   Okay.
13      Q.   Are you currently married?
14      A.   Yes, I am.
15      Q.   How long have you been married?
16      A.   Just celebrated 15 years.
17      Q.   Congratulations?
18      A.   Thank you.
19      Q.   Do you have any children?
20      A.   I do.
21      Q.   How many?
22      A.   I have one biological daughter and then two
23  stepchildren.
24      Q.   How old are your kids?
25      A.   My biological daughter just turned 22.  My

7

1   stepdaughter just turned 28, and I have a stepson who is
2   34.
3       Q.   Do any of the children live with you?
4       A.   My biological daughter just moved back in.  She
5   was attending Grand Canyon University; just graduated, so
6   she's temporarily back home until she finds her own place.
7       Q.   She graduated?
8       A.   Yes, absolutely.
9       Q.   All right.  What kinds of things do you like to
10  do for fun?
11      A.   I exercise.  I'm very active.  I do a lot of
12  training.  I participate in races such as Ironmans and
13  triathlons and everything else like that.  My relaxation
14  time is probably golf.  I like to get out on the course
15  and golf and just get away for a little bit.
16      Q.   Understandably.  Do you like to take vacations?
17      A.   I do, yep.
18      Q.   What is your educational background?
19      A.   I attended community college here in the Valley.
20  I did attend ASU.  My major was at that time education.
21  My senior year I switched my majors to business to find
22  out that all of my credits weren't going to transfer.  So
23  I do have college credit, but I do not have a college
24  degree.
25      Q.   Did you get a degree from the community college?

8

1       A.   I haven't received a degree from the community
2   college yet either.
3       Q.   Which one did you go?
4       A.   Which one didn't I go to is a better question.
5            I went to Phoenix College, Paradise Valley
6   Community College, Scottsdale Community College and
7   Glendale Community College.
8       Q.   When, approximately, was the last time you took a
9   college course?
10      A.   About three years ago, and I did take some online
11  courses through the University of Phoenix to try and
12  finish my degree.
13      Q.   And you're still working towards that?
14      A.   Still working towards a degree, correct.
15      Q.   And you are certified as a police officer; is
16  that correct?
17      A.   Yes, ma'am.
18      Q.   When did you become certified?
19      A.   I graduated the Arizona Law Enforcement Academy
20  in October of 2008.
21      Q.   When you went to the academy, did you already
22  have an agency that you would be working with?
23      A.   Yes.  I was hired on by Glendale.
24      Q.   Have you worked for any other law enforcement
25  agencies?

(Pages 5 to 8)

2

17

1   Q.   Did you have any written examinations with that?
2   **A.   No, ma'am.**
3   Q.   Was it the same process?
4   **A.   Yes, ma'am.**
5   Q.   Have you ever been charged with any crimes --
6   well, let me rephrase that.
7          Have you been charged with any felonies or
8   misdemeanors?
9   **A.   No, ma'am.**
10  Q.   In the last ten years have you been charged with
11  any traffic offenses?
12  **A.   Ten years?  No, ma'am.**
13  Q.   Fair to say since you've become a police officer
14  you've not been charged with any offense.  Is that a fair
15  statement?
16  **A.   That is a fair statement.**
17  Q.   Have you ever been a party to another lawsuit
18  other than this one?
19  **A.   I had an incident back in -- I'm not going to be**
20  **able to recall the actual date, but there was an incident**
21  **that I had during a call for service where there was a**
22  **lawsuit that was opened, yes, ma'am.**
23  Q.   Do you recall what the complaint was in that
24  lawsuit?
25  **A.   It was a use of force.**

18

1   Q.   Do you recall what they were claiming that you
2   did wrong?
3   **A.   That there was just the use of force.**
4   Q.   Did they say what kind of force?
5   **A.   There was a fight that incurred [verbatim]**
6   **between me and another individual.  He tried to hit me**
7   **over the head with a bottle.  I then did an open-hand**
8   **strike on him, and during that time I got cut on the hand**
9   **and he got cut on the nose.**
10  Q.   Did you use your Taser?  Do you recall?
11  **A.   No.**
12  Q.   I've read some of the stuff about that, and it
13  sounds like he was physically combative and tried to kick
14  you in the groin?
15  **A.   Yes.**
16  Q.   He wasn't able to do so, correct?
17  **A.   No, ma'am.**
18  Q.   That would be quite painful.
19  **A.   Yes, ma'am.**
20  Q.   Did you review any documents to prepare for your
21  deposition today?
22  **A.   I did have a chance to sit with lawyers and**
23  **discussed this a little bit yes, ma'am.**
24  Q.   What documents did you -- I don't want to know
25  anything about your conversations with your attorney, just

19

1   what documents you looked at.
2   **A.   I was able to review policy that we have here, go**
3   **through defensive tactic situations.**
4   Q.   Did you review any videos?
5   **A.   I have reviewed some of the video, yes, ma'am.**
6   Q.   Which videos did you review?
7   **A.   I reviewed my body-cam video, the Motel 6**
8   **body cam -- or not body cam, but the Motel 6 video, and**
9   **then Officer Matt Schneider's body-cam video.**
10  Q.   How long ago did you review those?
11  **A.   About a week ago.**
12  Q.   Did you review any audio recordings?
13  **A.   No, ma'am.**
14  Q.   Did you review any summaries of any audio
15  recordings or any interviews that you did?
16  **A.   No, ma'am.**
17  Q.   Did you review the police report?
18  **A.   No, ma'am.**
19  Q.   Prior to just seeing these documents and the
20  videos, approximately last week, when was the last time
21  that you had looked at any videos regarding this matter?
22  **A.   Probably several months prior.**
23  Q.   And why would you look at them several months
24  ago?
25          MR. POPOLIZIO:  Form.

20

1          THE WITNESS:  They're just videos that
2   either have popped up on social media -- I haven't
3   deliberately gone in to log in to see anything.  It's just
4   been what's publicly been out there.
5   BY MS. BROADDUS:
6   Q.   Did you have any discussions with any other
7   officers about your deposition today?
8   **A.   No, ma'am.**
9   Q.   You mentioned in the media -- a lot of this stuff
10  came out in the media about February of this year,
11  correct?
12  **A.   That's about right.**
13  Q.   Did you have any discussions with any officers
14  about the publication of the video?
15  **A.   No, ma'am.**
16  Q.   Did you have any meetings with anyone within the
17  police department regarding the videos since the videos
18  were aired?
19  **A.   No meetings, no, ma'am.**
20  Q.   So you've been a police officer approximately ten
21  years; is that correct?
22  **A.   Just celebrated 11.**
23  Q.   What would you say, while you were a member of
24  NRS, that your police duties were?
25  **A.   The Neighborhood Response Squad was a proactive**

21

1  squad.  We were kind of the dump-all, if you will, for all
2  of the problems within the neighborhoods or in the
3  surrounding areas.  We were tasked from doing community
4  projects to business checks to high patrol in high-crime
5  area and be proactive with it.
6      Q.  What do you mean by community projects?
7      A.  We would go to the Boys and Girls Clubs and
8  participate in activities with them.  We would be a part
9  of the business community meetings.  We would be a part of
10  citizen meetings.
11          There was a time that I orchestrated a
12  downtown business gathering, if you will, because there
13  was a lot of complaints coming in of certain things,
14  whether it was the homeless or the street vendors or
15  things like that that were kind of taking over the
16  downtown area.  So I organized a meeting of all the
17  businesses so they could come in and express their
18  frustrations and then find a solution within the NRS team
19  of how we would go about and deal with these issues to --
20      Q.  When did --
21      A.  -- to ensure that they were satisfied.
22      Q.  And I apologize.  I didn't mean to try to
23  interrupt you.
24      A.  Not a problem.
25      Q.  When did you do that?

22

1      A.  That was probably late 2016 or early 2017.
2      Q.  When you did that, when you met with the business
3  owners and you went back with the NRS, what kind of
4  solutions did you come up to help remedy some of these
5  problems?
6      A.  We came up with solutions to increase patrol
7  within that area.  We decided to engage our bike patrol
8  again at certain times of the day.  NRS -- or not NRS, but
9  the Glendale Police Department used to have a full-time
10  bike patrol, and the downtown businesses really liked that
11  because we were showing that we were there pretty much
12  whenever needed.
13          So we'd picked certain times, certain days,
14  certain hours that we would say we're going to just go on
15  bikes in the area, A, because that satisfied what they
16  wanted to see, and then it also put us in the community as
17  kind of a better light.
18          So we just kind of came up with several
19  different ideas that was going to let the businesses know
20  that we heard what they were saying and then try to deploy
21  those in those areas.
22      Q.  Another thing that you mentioned that NRS does is
23  business checks.  What does that mean?
24      A.  Business checks was I would go into the downtown
25  businesses such as Allstate, and I would go in there and I

23

1  would talk to the business owner and see how things were
2  going, see if there was any issues that that business had,
3  whether it be from, again, transients or traffic or people
4  just loitering in their area.
5          So it was a way for us to connect to a
6  business; provide them with a business card that gave them
7  our personal information, that if they ever had an issue
8  that they could call us personally, and we would try to
9  take care of it, versus call in to the dispatch, have a
10  patrol officer come out, take them off of the street to
11  where they can't provide coverage for the streets or the
12  beats.  That's kind of what the Neighborhood Response
13  Squad was more famous for, was taking the issues that
14  patrol could avoid to allow them to go do their job and us
15  go do that.
16      Q.  With the Neighborhood Response Squad, is that
17  something that covered all of Glendale or was it only
18  certain areas that you guys worked in?
19      A.  We were actually reassigned what was called the
20  85301 squad, which was the zip code of 85301.  Research
21  had shown that 85301 was -- that zip code had a lot of
22  high calls for service, a lot of paperwork being taken out
23  of those zip codes.
24          Again, the purpose for the Neighborhood
25  Response Squad was to kind of alleviate those extra calls

24

1  for service for patrol to allow them to go do what they
2  needed to do.
3          So we were the south side NRS squad, but we
4  were also known as the 85301 squad.
5      Q.  So there was a north side NRS squad, correct?
6      A.  Yes, ma'am.
7      Q.  Did they handle the north side of 85301 or
8  another area?
9      A.  No.  85301 was strictly ours.  The north side NRS
10  squad, if you could take the city and divide it into two,
11  being Orangewood the dividing line, Orangewood and north
12  was for the north side NRS.  Orangewood and south was for
13  the south side NRS.
14      Q.  How many officers are total in -- let's say 2016,
15  2017, how many officers were assigned to NRS?
16      A.  I think there was six of us.
17      Q.  And that's for the full NRS, not just north --
18  that's both north and south?
19      A.  No, I'm sorry.  That's just south side.  Each
20  squad had five or six, depending on movement and depending
21  on, you know, being able to fill a body or something like
22  that.
23      Q.  So just in some -- total NRS was approximately,
24  depending on the day and who was going in and out, 10 to
25  12 officers, correct?

29

1    A. Specifically 85301, no.
2    Q. Are you familiar with Glendale's policies and
3  procedures for use of force?
4    A. Yes, ma'am.
5    Q. Are you familiar with their policies for arrests?
6    A. Yes, ma'am.
7    Q. And do you have discretion as to whether or not
8  to abide by those policies?
9    A. I'm not sure I understand that question.
10   Q. Sure. The policies set forth some parameters as
11  an officer that you should abide by, correct?
12   A. Corrects.
13   Q. Do you have discretion to be able to go and
14  exceed those parameters?
15   A. On certain calls, yes.
16   Q. Do you have any responsibilities or duties or are
17  there any policies and procedures for Glendale if you
18  witness another officer engage in something that would be
19  a violation of those policies?
20   A. Yes.
21   Q. What is your obligation?
22   A. To -- if we're seeing a -- a violation, it is to
23  try and spotlight that violation and interject if need be.
24   Q. Do you have any duties to report it to anyone?
25   A. Yes. If we see a violation, we have a duty to

30

1  report it to a supervisor.
2    Q. What would happen if there was a violation that
3  was reported to a supervisor? What's the process that
4  happens?
5    A. That supervisor would have to do their
6  research -- their statistic finding, their fact-finding --
7  to find out if the violation was a valid violation and
8  then take appropriate action from there as a supervisor.
9    Q. What kind of appropriate action would they take?
10       MR. POPOLIZIO: Form.
11  BY MS. BROADDUS:
12   Q. What are the options that they have?
13   A. It's -- it is kind of a wide variety of answers
14  on that one because if it's somebody's first time, then it
15  may be a coaching issue. If it's something that has been
16  a coaching issue in the past, and it's a continuous
17  action, then it may be a written warning. It may be a
18  department investigation. Depending on the violation and
19  how bad the violation, it could be a removal from -- from
20  the department or a removal from the -- the specialty that
21  they're in. Or from patrol, it could be just time off.
22       So it -- there's multiple answers to that
23  question.
24   Q. Okay. So a supervisor, if they're informed of a
25  situation involving an officer that may be a violation of

31

1  the policy, they have some discretion on how they want to
2  handle it. Is that a fair statement?
3        MR. POPOLIZIO: Form; foundation.
4        THE WITNESS: Yes.
5  BY MS. BROADDUS:
6    Q. And if they like an officer and they're young and
7  they want to help them succeed, they might be willing to
8  just work with them with maybe some additional training,
9  correct?
10       MR. POPOLIZIO: Form; foundation.
11       THE WITNESS: I wouldn't be able to answer
12  that.
13  BY MS. BROADDUS:
14   Q. Have you ever worked in a supervisory position?
15   A. No, ma'am.
16   Q. Are you required to take a certain number of
17  hours of training annually as a Glendale police officer?
18   A. Yes, ma'am.
19   Q. And what is your understanding of what training
20  is required?
21   A. We, every year, are required to go through what's
22  called AOT, which is Advanced Officer Training. It is
23  a -- used to be a weeklong class that's now condensed due
24  to patrol issues and everything else like that. But it is
25  classes that refresh us on certain policies, certain

32

1  tactics, defense tactics, shooting -- shooting scenarios,
2  and it's mandated that we go through that training.
3    Q. And you mentioned it used be weeklong and now
4  it's condensed. Do you know when that switched?
5    A. I believe it switched in 2010.
6    Q. It sounds like there's different types of -- I've
7  seen a lot of different training over the years for the
8  AOT training. It looks like sometimes they touched on
9  different topics for different years. Is that your
10  understanding?
11   A. Correct.
12   Q. For example, for 2018 it sounds like the training
13  was geared towards firearms, high-risk vehicle stops, 405
14  man takedown -- four-to-five man takedown and first aid.
15  Does that sound about right?
16   A. Yes.
17   Q. So it seems like every year firearms is an
18  important part of the training, correct?
19   A. Yes.
20   Q. What is generally the firearms training that you
21  receive?
22   A. It usually is scenario-based-type shooting,
23  whether it puts us in high-stressful situations or a
24  judgment shoot, whether or not we do shoot or whether we
25  don't shoot. And then skills shooting. You know,

33

1  refining our skills with our firearms to -- from shooting
2  small targets to shooting moving targets.  It's all to
3  redefine our skills.
4      Q.  Other than the training that you received through
5  AOT training, is there a certain number of hours or a
6  certain number of times that you're supposed to go to the
7  firing range to practice shooting?
8      A.  We are not required to.  We have to -- we do have
9  to qualify once a year.
10     Q.  Who does the qualifications?
11     A.  Our range master.
12     Q.  Now, I saw in December of 2018 it looks like
13  there was a class for high-risk vehicle stops.  What did
14  that include?
15         MR. POPOLIZIO:  Form.
16         THE WITNESS:  In December there -- that
17  was -- I think I went through Advanced Officer Training.
18  That was my AOT week.
19             AOT starts at the beginning of the year and
20  kind of goes until mid-June.  They take the summer months
21  off because of the heat, because all of our training is
22  outside.  And then they start it back up, and they start
23  it back up probably late August and carry over through
24  till the end of December.
25             You're required within that year's time to

34

1  sign up for Advanced Officer Training.  I signed up for
2  Advanced Officer Training in December of 2018.  So that
3  high-risk stop would have been -- if this is what we're
4  talking about -- my required training that I went through
5  in AOT.
6  BY MS. BROADDUS:
7      Q.  What do you recall from that training for the
8  high-risk vehicle stops?
9      A.  We just went through the tactics of doing a
10  high-risk stop from how far we want vehicles to the
11  vehicle, how we're calling individuals out from that
12  vehicle, tactical approaches, safety to the public, safety
13  to us.
14     Q.  Do you know who decides what topics are going to
15  be for the annual training?
16     A.  I personally do not know.
17     Q.  Do you have any input or do you ever make any
18  recommendations, hey, this might be an area that we might
19  need some more training on?  Do you ever make any
20  recommendations like that?
21     A.  I personally have not, no.
22     Q.  Do you know any other officers that may have?
23     A.  To my knowledge, no.
24     Q.  It's something that someone higher up decides?
25     A.  Correct.

35

1      Q.  You have a big notebook in front of you and I'm
2  going to have you -- it has exhibits that we used in
3  Officer Fernandez's deposition.  So I want to go through a
4  couple things with you.
5      A.  Okay.  Absolutely.
6      Q.  I'm going to have you go to the first tab.  Well,
7  let me ask one clarification question.
8             Since you've been an officer, every year
9  you've gone through the AOT training, correct?
10     A.  Yes, ma'am.
11     Q.  There hasn't been any years you did not complete
12  the training, correct?
13     A.  No, ma'am.
14     Q.  I'm going to have you go to tab 1.  You'll notice
15  at the bottom of the first page, bottom right-hand side
16  it's says Wheatcroft and then it has a number.  And it
17  says 002595.  Do you see that?
18     A.  Yes, ma'am.
19     Q.  That's what we refer to as a Bates number, and
20  it's a way to identify pages specifically.  So you'll
21  notice this one ends in 95.  The next one ends in 96.
22     A.  Yep.
23     Q.  I'm going to have you turn to the page that ends
24  in 601.  You'll see at the top of the page it's says, "All
25  Taser deployments 15 seconds or longer will require

36

1  immediate medical evaluation."
2             Is that your understanding of what the
3  practice is for Glendale?
4      A.  Yes, ma'am.
5      Q.  It talks about -- it has some bullet points here,
6  and it says, "Repeated or multiple" -- I'm sorry --
7  "Repeated and multiple applications."
8             Do you see that?
9      A.  Yes, ma'am.
10     Q.  So is it your understanding that if there are
11  repeated and multiple applications that immediate medical
12  attention or evaluation would be required?
13     A.  It needs to be provided.
14     Q.  And so each one of these bullet points -- the
15  next one talks about a cycling time that exceeds 15
16  seconds.  And the last one says, "Simultaneous
17  applications by more than one CEW."
18             Those are additional times that you would --
19  medical attention would be required, correct?
20     A.  Medical attention would need to be provided, yes,
21  ma'am.
22     Q.  And just for clarification, can you tell me what
23  CEW is?
24     A.  I've got to be honest with you.  I don't know.
25     Q.  I'll have you go to the next page.  It's Bates

(Pages 33 to 36)

9

69

1  training officer, I would try to tell my officers in
2  training the two most volatile calls for service are
3  domestic violence and traffic stops because you have the
4  unknowns out there.  You have the emotions of a domestic
5  violence situation, and you have the unknown of what's
6  inside of a vehicle.
7      We, as officers, are to assume that whatever
8  is in that vehicle can harm or kill us without the
9  unknown.  If we have an individual who is not complying
10  with our request to keep their hands where we can see
11  them, then there's a safety issue.  We have to assume that
12  if a person is not wanting to comply with our request that
13  there could be something more in that vehicle that can
14  harm us.
15      Q.  That's true of every stop, correct?
16      A.  Yes.  Whether I'm pulling over a 16-year-old or
17  a 70-year-old, it's the same that we go through.
18      Q.  You just mentioned right now if you made a
19  request to someone to keep their hands where you can see
20  them and they do, that's being compliant, correct?
21          MR. POPOLIZIO:  Form.
22          THE WITNESS:  Yes.
23  BY MS. BROADDUS:
24      Q.  If they do that, and they listen to the command
25  to keep their hands where you can see them, does that

70

1  allow an officer to go ahead and forcibly use some type of
2  resistance against them?
3          MR. POPOLIZIO:  Form.
4          THE WITNESS:  If they are complying with
5  that demand, then no.
6  BY MS. BROADDUS:
7      Q.  Is a passenger in a car supposed to assume they
8  know what the officer wants?
9      A.  I can't answer that question.  I can't -- I can't
10  answer what a passenger would assume.
11      Q.  Okay.  So you would expect that a passenger, if
12  an officer gives the person some kind of directive or a
13  request, that the person would comply with that request,
14  true?
15      A.  We would hope so, yes.
16      Q.  Let me go on to the next one.  I'm going to have
17  you pull up an exhibit.
18      A.  Sure.
19      Q.  I'm going to have you go to tab 5, Exhibit 5.
20      A.  Tab 5?
21      Q.  Yes.
22          (An off-the-record discussion ensued.)
23  BY MS. BROADDUS:
24      Q.  I'm just going to have you look at that
25  generally, first.

71

1      A.  The whole thing or where it says generally?
2      Q.  Well, I'll start at the top.
3      A.  Okay.
4      Q.  At the top of the page it says it's a
5  Neighborhood Response Unit general order for the Glendale
6  Police Department.
7      A.  Yes, ma'am.
8      Q.  Are you familiar with this document?
9      A.  Yes, ma'am.
10      Q.  And you've seen this before?
11      A.  Yes, ma'am.
12      Q.  And you're familiar with these practices,
13  correct?
14      A.  Yes, ma'am.
15      Q.  I'm going to have you go to page 2 of this, which
16  is Bates numbered 464.  Do you see this?
17      A.  Make sure I'm on the one right one.  464, yes,
18  ma'am.
19      Q.  There's some subsections on here.  And towards
20  the bottom there's a subsection C.  Do you see that?
21      A.  Yes, ma'am.
22      Q.  And it talks about problem-solving in the
23  community and knock and talks.  Do you see that?
24      A.  Yes, ma'am.
25      Q.  And under subsection 2 of section C, it says,

72

1  "Knocks and talks are simply defined as obtaining
2  voluntary consent to enter a person's residence, asking
3  for and obtaining voluntary" -- I apologize -- "voluntary
4  consent to search their home, vehicle, person and/or
5  possessions."
6          Do you see that?
7      A.  Yes, ma'am.
8      Q.  And it also says knock and talks will be used
9  only if probable cause for a search warrant does not
10  exist, correct?
11      A.  Correct.
12      Q.  So as part of your Neighborhood Response Squad,
13  you'll do these exercises called knock and talks where
14  you'd go into the community and just go and try to talk to
15  people; is that true?
16      A.  Usually our knock and talks are based on leads
17  that came into the Glendale Police Department's either
18  drug hotline or crime hotline.
19      Q.  So you have some kind of information that would
20  lead you to believe or be suspicious that it could be some
21  type of illegal activity going on, correct?
22      A.  Yes, ma'am.
23      Q.  And in those situations you have to obtain
24  voluntary consent before you can do any searches, correct?
25      A.  That is correct.

73

1    Q.   And that's even after you have a suspicion,
2  correct?
3    **A.   That is correct.**
4    Q.   I'll have you turn to the next page.  And
5  under -- there's a subsection A at the top, and then
6  there's a subsection B that begins, "Consent searches."
7         Do you see that?
8    **A.   Subsection B, "Consent searches," yes, ma'am.**
9    Q.   It says, "Consent searches must be voluntary and
10 cannot be obtained by force, threats, tricks, promises,
11 intimidation or by exertion of authority."
12        Do you see that?
13   **A.   Yes, ma'am.**
14   Q.   Is that your understanding in general as a police
15 officer, that any consent must be given for a search --
16 unless there's a search warrant obviously or a -- but
17 generally you cannot obtain consent by using force?
18        MR. POPOLIZIO:  Form.
19        THE WITNESS:  That is correct.
20 BY MS. BROADDUS:
21   Q.   That's a practice that's frowned upon by the
22 police department, correct?
23   **A.   Yes.**
24   Q.   Do you get in trouble if you use force to try and
25 get someone to give information when they didn't need to?

74

1        MR. POPOLIZIO:  Form.
2        THE WITNESS:  Yes.
3  BY MS. BROADDUS:
4    Q.   I'm going to have you go to the next exhibit,
5  which is Exhibit No. 6.  Are you familiar with this
6  document?
7    **A.   Yes, ma'am.**
8    Q.   And this is the response to resistance policy for
9  the Glendale Police Department, correct?
10   **A.   Yes, ma'am.**
11        MR. POPOLIZIO:  Jody, not to interrupt your
12 flow, but can we take a short break?
13        MS. BROADDUS:  Absolutely.
14        MR. POPOLIZIO:  Thank you.
15        (The deposition was at recess from 11:19 to
16 11:29 a.m.)
17 BY MS. BROADDUS:
18   Q.   Right before the break we were -- I was having
19 you look at Exhibit 6, which is Glendale's policies and
20 procedures for response to resistance, correct?
21   **A.   Yes, ma'am.**
22   Q.   I'm going to have you go to page Bates numbered
23 436 at the bottom.
24   **A.   Okay.**
25   Q.   Under subsection 4 on that page it says, "Tasers

75

1  should only be used against subjects who are exhibiting
2  active aggression."
3         Do you see that?
4    **A.   Yes, ma'am.**
5    Q.   Is that your understanding of what the policy
6  requires?
7    **A.   Yes, ma'am.**
8    Q.   And so if there's this passive resistance, Tasers
9  should not be used in general?
10   **A.   There's a -- there's a different level of it.  So
11 if we have a noncompliant subject we can bring the Taser
12 out as a tool on our belt, if you will, to gain control of
13 the situation.  It doesn't mean that we have to deploy the
14 Taser, but we can bring the Taser out as a tool to help
15 control the situation.**
16        **What this reads here is "Taser should be
17 used only against who are exhibiting active aggression
18 [verbatim]."**
19        **So that's the deployment of the Taser.**
20   Q.   Thank you for the clarification.
21        We'll get to that in second.  Let's turn to
22 the next page.  Subsection D begins -- it says, "In cases
23 of passive resistance, unless the use is reasonable and
24 necessary under the circumstances and a lesser means of
25 control/force has been attempted and failed."

76

1         And if you go back -- it's talking about
2  Taser being deployed if you look under the subsection.
3    **A.   Uh-huh.**
4    Q.   So what is your understanding of that?
5         MR. POPOLIZIO:  Form.
6         Go ahead.
7         THE WITNESS:  "In case of passive resistance
8  unless" -- let me just read it back so I can make sure I
9  understand it -- "the use is reasonable and necessary
10 under the circumstances and a lesser means of
11 control/force has been attempted and failed."
12        As an example for that, when there is -- if
13 we attempt to go hands-on with somebody to control a
14 situation, their muscles are tensed up, they attempt to
15 pull away, they attempt to get out of our control hold,
16 that's where it takes it from passive resistance to
17 psychological intimidation.  They're escalating their
18 response to us, which is then, in return, going to
19 escalate our response to them.  So the level of our use of
20 Taser can increase with their increase of their
21 aggression.
22        So, again, from passive resistance to
23 somebody going up and me trying to control the -- for
24 instance, I'm just trying to control the arm -- I've got
25 my hand on their shoulder to say, hey, relax.  And in that

77

1  moment as I'm touching their shoulder or I'm holding onto
2  it, I can feel the muscle tensing up, I can feel them
3  pulling away from me, that's where it takes it from
4  passive-aggressive to psychological intimidation, which
5  means that they're escalating the situation.  We try to
6  use their means and we try to control their means on how
7  they dictate it.
8  BY MS. BROADDUS:
9      Q.   Just so I understand, if someone is passively
10 resisting and they increase the level of resistance to
11 psychological intimidation, which is a different level of
12 resistance, then Taser deployment would be appropriate
13 under those circumstances?
14     **A.   Yes, ma'am.**
15     Q.   If they're just purely in passive resistance, is
16 that something that you would use -- deploy a Taser for --
17          MR. POPOLIZIO:  Form.
18 BY MS. BROADDUS:
19     Q.   -- without them escalating?
20          MR. POPOLIZIO:  Form.
21          THE WITNESS:  If I've got somebody who is
22 sitting with their legs crossed and their hands on their
23 knees and being compliant, there would be no reason to
24 bring a Taser out.
25

78

1  BY MS. BROADDUS:
2      Q.   And under this same section, and just for
3  clarification, it begins on the page before under
4  subsection 7.  It says, "The Taser should not be deployed
5  under any of the following circumstances," and then
6  there's subsections which continue on to the next page,
7  correct?
8      **A.   Correct.**
9      Q.   Under subsection F on that page, it says, "To
10 threaten or to gain information from a suspect," correct?
11     **A.   That's correct.**
12     Q.   And so my understanding is it would be
13 inappropriate and a violation of this policy if someone
14 were to threaten or attempt to gain information from a
15 suspect by using a Taser.
16          MR. POPOLIZIO:  Form.
17 BY MS. BROADDUS:
18     Q.   Deploying a Taser.  Let me rephrase that.
19          MR. POPOLIZIO:  Form.
20          THE WITNESS:  Depending on the situation,
21 again.  Depending on whether or not we are getting at the
22 first stage of verbal compliance, whether or not we are
23 aware of everything that is in our surroundings.
24 Let's take it back to a traffic stop.  If
25 I've got a middle console and somebody's continuing to go

79

1  over to that middle console -- I have an unknown in that
2  middle console, and I've asked that individual to stop
3  reaching towards that middle console, and they're
4  continuing to reach to that middle console, and I put my
5  hand on their shoulder and I say, hey -- because the
6  window is down -- and I say, hey, please don't continue to
7  reach that middle console, I don't know what's in that
8  middle console, and that individual continues to go to
9  that middle console, it then takes it to a different
10 level.  The game has changed at that point in time because
11 the individual is not complying with my direct command to
12 not go to that middle console.
13          There could be a weapon in there.  There
14 could be something that could harm the people in the
15 vehicle, harm me, harm themselves.  So we have to control
16 that situation.  So if that means that we need to bring
17 the Taser out and say, I've asked you once, I've asked you
18 twice not to reach for that middle console, the Taser is a
19 psychological intimidation weapon that we can use to try
20 and gain the compliance of that individual.
21          And to go back and answer your question, at
22 any point in time a game can change within a traffic stop
23 or even a consensual stop if the individual is not
24 complying with what we're asking for.
25

80

1  BY MS. BROADDUS:
2      Q.   So in this particular -- and this section
3  specifically talks about deployment, not threatening, by
4  the way.
5      **A.   Correct.**
6      Q.   Just for clarification.
7      **A.   Correct.**
8      Q.   So under your scenario where you have someone who
9  keeps reaching for something and maybe -- or touching the
10 center console, something that makes you uncomfortable as
11 a police officer, if you direct them to stop reaching for
12 it and they do, are they compliant at that point?
13     **A.   If they stop reaching for it, yes, they are being**
14 **compliant.**
15     Q.   And under those circumstances, if they stopped
16 reaching for that based on your instruction, it would be
17 inappropriate to use a Taser to threaten that person,
18 correct?
19     **A.   I would reholster my Taser at that time.**
20     Q.   And it would be inappropriate to use a Taser at
21 that point, correct?
22     **A.   Correct.**
23     Q.   Under subsection 8 on the same page, it says, "No
24 officer shall playfully, maliciously, recklessly or
25 intentionally misuse the Taser in a display of power or

89

1    noncompliance depending on the situation.
2         If we are in an open orange grove where
3    there's areas for an escape or an officer's safety, then
4    that's one thing.  If we are in a house dealing with a
5    domestic violence situation, that changes the game.  If
6    we're doing a traffic stop, that changes the game.
7         So it just depends on the scenario and the
8    situation.
9    Q.   When we're talking about -- let's go back up to
10   the passive section again because it talks about where the
11   suspect -- and it has various things.  It says, displays
12   no acts of assault, threat, verbal noncompliance and never
13   resist any control of the officer.
14        You had mentioned officer safety would be a
15   reason to be concerned, but this talks about where there's
16   no threat or verbal noncompliance.  So where would the
17   officer safety be under the passive aspect?
18   A.   Again, the first line here that says, "Suspect
19   fails to obey a command or direction of the officer."
20   If an officer is asking an individual to
21   stop reaching into a bag or stop reaching into a pocket or
22   stop reaching into the middle console or reaching towards
23   the middle console, that's where the subject is disobeying
24   the command or the direction of an officer.  And that's
25   where the officer's safety comes into play.

90

1    Q.   Under psychological intimidation it also has
2    different methods of control.  You can also threaten the
3    Taser use, correct?
4    A.   Correct.
5    Q.   But again, under psychological intimidation it
6    does not allow for the deployment of a Taser at the pure
7    level of psychological intimidation?
8    A.   To deploy a Taser, correct.  There is a
9    difference between a deployment and the threatening of the
10   use.
11   Q.   Is it fair to say that from the first three
12   categories we've talked about -- passive, verbal
13   noncompliance and psychological intimidation -- that
14   employment of a Taser is not appropriate if the level
15   hasn't escalated beyond those?
16        I'm talking about deployment specifically.
17   A.   Correct.
18   Q.   Under the next section it talks about physical,
19   and then in parentheses it says "defensive resistance."
20        Do you see that?
21   A.   I do.
22   Q.   What is your understanding of what that this?
23   A.   The physical defense resistance is if somebody is
24   physically either trying to resist arrest, resist a
25   control hold or actively fighting with us.

91

1    Q.   Trying to pull away from you?
2    A.   Or trying to pull away from us.
3    Q.   Under this level of force, this is not where
4    they're trying to assault an officer or trying to attack
5    the officer.
6    A.   Correct.
7    Q.   They're just trying to get away, correct?
8    A.   Correct.
9         May I interject for just a second?
10   Q.   Sure.
11   A.   If you go back to where it says the methods of
12   control, under passive it says display Taser.
13   Q.   Correct.
14   A.   Under verbal noncompliance it says display Taser.
15   Where we get to psychological intimidation and where we
16   get to physical defense resistance, it no longer says
17   display Taser.  It says that we are able to use the Taser.
18   That's where a deployment is able to be used.
19        So when we have somebody in the
20   psychological intimidation factor, we have reached that
21   level of resistance, Taser is, per our policy, able to be
22   deployed.  That's why the written differently up
23   in the upper two, is display versus Taser.
24   Q.   And maybe I just need to correct that because
25   I think I -- we stated that incorrectly before.

92

1         So it's only under passive and verbal
2    noncompliance where Taser deployment is inappropriate?
3    A.   Correct.
4    Q.   And then from that point on things get into
5    psychological intimidation or physical defense resistance,
6    then a Taser may be deployed depending upon the
7    circumstances, correct?
8    A.   Depending on the circumstances, yes.
9    Q.   The next section is active aggression.  What is
10   your understanding of that?
11   A.   The only way I can describe it is you're in a
12   fight.  They're either pushing you, you're trying to gain
13   control of them, they are resisting you at any point in
14   time.  It's just -- basically it's a physical act between
15   the two of you.
16   Q.   And under active aggression, that's where the
17   aggression is actually geared towards the officer as
18   opposed to maybe trying to resist to get away, correct?
19   A.   Correct.
20   Q.   Under active aggression you're allowed to use a
21   Taser or have Taser deployment if necessary, correct?
22   A.   Yes.
23   Q.   Under aggravated active aggression, is the next
24   section, what is your understanding of the difference
25   between aggravated active aggression and active

105

1    investigative stop begins at that time.
2        Q.   And you mentioned going to either the passenger
3    or driver's side of the vehicle.  What makes that
4    determination for you?
5        A.   Traffic, conditions, officer safety.
6        Q.   What do you mean by officer safety when you're
7    approaching?
8        A.   If an officer has to put himself in front of a
9    vehicle to make his approach, that's an unsafe approach.
10   The person who is driving that vehicle at any point in
11   time can put that vehicle in drive and run the officer
12   over.  So if an officer feels that his approach to a
13   driver's side is going to put himself in harm's way, he'll
14   make a passenger side approach.
15           Or if you're on a busy street, as we've seen
16   in recent history where officers have been killed, they
17   may make a passenger approach because of the traffic
18   conditions.
19       Q.   When you're doing an investigative stop such
20   as someone for traffic violation and you're approaching
21   the passenger side of the vehicle, do you have the
22   conversation with the passenger or the driver?  Or are
23   you trying to communicate with?
24       A.   Usually you start off by explaining to the driver
25   the purpose of the traffic stop.

106

1        Q.   Then what's the next step?
2        A.   If you're the solo officer, then you're
3    continuing with the purpose of the traffic stop and try to
4    get identification from that driver and try to get
5    identification from those occupants in the vehicle.
6            If you have multiple officers on a traffic
7    stop, the role, again, becomes instead of a contact/cover,
8    you may have two contact officers, and one is talking to
9    one party, the other officer is talking to another party.
10       Q.   At some point are you supposed to call the
11   dispatch?
12       A.   Again, it depends on the situation.  If we have
13   time to radio into dispatch of our traffic stop, then time
14   allows, then yes.  There are times where vehicles will
15   sometimes force a stop; whether it's in the middle of the
16   street or whether it's in a parking lot, they'll force a
17   stop.  Which, at that point in time, scene security and
18   scene safety for that officer is first and foremost.
19           So it's not a general rule that you have to
20   put it out right at the beginning.  It's preferable, but
21   situations may change and dictate how an officer will put
22   out a traffic stop.  A vehicle's action will control what
23   an officer will do.
24           (Deposition Exhibit No. 12 was marked for
25   identification.)

107

1    BY MS. BROADDUS:
2        Q.   You've been handed a document that's been marked
3    as Exhibit 12, and it's another Glendale Police Department
4    General Order.  And this one is for vehicle stops.  Do you
5    see that?
6        A.   Yes, ma'am.
7        Q.   Are you familiar with this document?
8        A.   Yes, ma'am.
9        Q.   When was the last time you reviewed this
10   document?
11       A.   I would have reviewed it about a week ago.
12       Q.   Is it your understanding that this is the current
13   policies and procedures for stopping a vehicle for the
14   City of Glendale?
15       A.   Yes, ma'am.
16       Q.   And this was the same policy and procedure that
17   was in place in 2017, correct?
18       A.   To my knowledge, yes, ma'am.
19       Q.   The first section on this page is 23.301 for
20   vehicle stops, and it talks about general information.  Do
21   you see that?
22       A.   Yes, ma'am.
23       Q.   And earlier you talked about for the different
24   types of stops, and this has actually three sections.  The
25   first one says investigative and non-felony, which we've

108

1    talked about.
2        A.   Yes, ma'am.
3        Q.   The second one is high risk or known risk.  Do
4    you see that?
5        A.   Yes, ma'am.
6        Q.   And then it has a section 3, and it talks about
7    if reasonable to do so, the officer should conduct a
8    pre-stop investigation.  Do you see that?
9        A.   Yes, ma'am.
10       Q.   How is that different than an investigative stop
11   or a high-risk stop?
12           If it is.  It might just be a different
13   subsection of this.
14       A.   To read that, what they're trying to say there,
15   if it's in my interpretation, is if it's reasonable --
16   again, I'm going to use my example of a blue Ford Taurus
17   leaving the scene of what is to believe a crime had just
18   been committed [verbatim].  If reasonable, we'd have to do
19   research on that vehicle before we make the stop.  If it's
20   not reasonable, we will make the stop based upon the --
21   the totality of the circumstance.
22       Q.   We've talked about each of these, and under
23   investigative and non-felony stop it has two subsections:
24   A reason to do so if there was a criminal act committed or
25   about to be committed, not a mere hunch, that we've talked

121

1    Q.   So I want to make sure I understand this.  If an
2  officer believes there's a threat of their safety in any
3  way in a vehicle --
4    A.   **Or the safety of the occupants inside that**
5  **vehicle.**
6    Q.   -- then they are entitled to identification from
7  everyone in that vehicle.  Is that your position?
8    A.   **We're entitled to control the scene.**
9    Q.   When controlling the scene, is that mandatory,
10  that every passenger in that vehicle has to provide
11  identification?
12    A.   **We try to get not identification but true name.**
13    Q.   Is it required by the law that they have to
14  provide that?
15    A.   **No.**
16    Q.   It's not illegal for them not to provide their
17  ID?
18    A.   **Not their ID, no.**
19         **(Deposition Exhibit No. 13 was marked for**
20  **identification.)**
21  BY MS. BROADDUS:
22    Q.   You've been handed a document that's been marked
23  as Exhibit 13.  It says at the top of the page, "Glendale
24  Police Department General Order, Laws of Arrest."
25         Do you see that?

122

1    A.   **Yes, ma'am.**
2    Q.   Underneath that it has a revision date of
3  November 26th of 2018.  Do you see that?
4    A.   **Yes.**
5    Q.   Do you know if and when and how these laws of
6  arrest or policies and procedures for laws of arrest
7  changed in November of 2018?
8    A.   **I wouldn't know why they would have changed.**
9    Q.   Have you reviewed this document recently?
10    A.   **This document, no, not recently.**
11    Q.   On the first page of this document under section
12  24.001 it has different types of arrests.  Do you see
13  that?
14    A.   **Yes, ma'am.**
15    Q.   And it talks about the custodial arrest.  Do you
16  see that?
17    A.   **Yes, ma'am.**
18    Q.   And there's custodial arrest without a warrant,
19  correct?
20    A.   **Correct.**
21    Q.   And there's arrest with a warrant, correct?
22    A.   **Correct.**
23    Q.   On the next page it talks about arrests with a
24  warrant, civil?
25    A.   **Correct.**

123

1    Q.   Those are all different types of arrests that
2  you're aware of?
3    A.   **Yes, ma'am.**
4    Q.   There's the next section that says, "Field
5  Interview/Volunteer Contact."
6         Do you see that?
7    A.   **Yes, ma'am.**
8    Q.   That's not an arrest, correct?
9    A.   **That is correct.**
10    Q.   So even though this general policies and
11  procedures is called laws of arrests, it also talks about
12  other types of contacts with people, correct?
13    A.   **Yes.**
14    Q.   Under subsection E under "Field
15  Interview/Voluntarily Contact" --
16    A.   **Uh-huh.**
17    Q.   -- the first section talks about a situation
18  where there's no reasonable suspension and no probable
19  cause.
20    A.   **Correct.**
21    Q.   That's when an officer thinks that they want to
22  investigate something and they want to talk to somebody,
23  correct?
24    A.   **Correct.**
25    Q.   That's not an arrest, correct?

124

1    A.   **Correct.**
2    Q.   And that's not a detainment either, correct?
3    A.   **Correct.**
4    Q.   Under subsection 2 it says, "The officer has no
5  power to restrain a person from walking or driving away."
6         Do you see that?
7    A.   **Yes.**
8    Q.   And "The individual has no obligation to answer
9  questions or remain," true?
10    A.   **That's correct.**
11    Q.   So my understanding is for a field interview or
12  for voluntary contact under the guidelines for Glendale
13  officers, if there's no reasonable suspension and no
14  probable cause, then an individual is not obligated to
15  provide any answers or to stay or remain?
16         MR. POPOLIZIO:  Form.
17         THE WITNESS:  I'm not sure if I understand.
18  I mean, I understand the question as it's read, but I'm
19  not understanding the question that's behind it.
20  BY MS. BROADDUS:
21    Q.   Okay.  Well, let me say this:  If it's a field
22  interview or a voluntary contact, you have no -- and
23  there's no reasonable suspicion and no probable cause, you
24  cannot detain that person, fair?
25    A.   **Fair.**

125

1    Q.   And they don't have to answer questions either?

2    A.   Correct.

3    Q.   Under the next subsection, subsection F, which is

4  on page 1773 --

5    A.   Uh-huh.

6    Q.   -- subsection F talks about an investigative

7  detention or stop.  Do you see that?

8    A.   Yes.

9    Q.   And that talks about if there's a reasonable

10  suspicion grounded in specific and articulable facts.

11        Do you see that?

12    A.   Yes.

13    Q.   So what is your understanding of the difference

14  between a field interview or voluntary contact and an

15  investigative detention?

16    A.   Investigative detention would be a description of

17  a person wearing a blue shirt with a white hat walking

18  down the street, which was the same description that was

19  given from an earlier call or a call that's in progress;

20  an officer who sees an individual who is matching that

21  description as being an investigative detention stop.  At

22  that point in time, based on the totality of the

23  circumstances and based on the totality of the description

24  that was given, to at least stop and do an investigative

25  research at that time.

126

1    Q.   And under subsection F on this page you will see

2  under subsection 3 it says, "Refusal to cooperate, answer

3  questions or to produce identification does not alone

4  establish probable cause to arrest, but such refusal may

5  be considered along with other facts as an element to

6  adding to probable cause."

7        Do you see that?

8    A.   Yes.

9    Q.   So is it fair to say that just -- if someone just

10  doesn't want to provide identification, if there's nothing

11  further, then there's no probable cause to arrest?

12    A.   We have to have a reasonable suspicion to keep

13  that person there.

14    Q.   When a vehicle is stopped and there are

15  passengers in the vehicle, they're just merely passengers

16  and have not done anything, and there's nothing unusual

17  about the stop, it's a routine minor traffic stop, is a

18  passenger in the vehicle, if you want to question him, do

19  they fall under a field interview, voluntary contact or as

20  an investigative detention?

21    A.   We are doing an investigative detention at that

22  time of the vehicle and everything that's inside that

23  vehicle.

24    Q.   Does that mean including the passengers?

25    A.   Including passengers.

127

1    Q.   But the passengers are still free to leave,

2  correct?

3    A.   Correct, unless reasonable suspicion develops of

4  why we need to detain that passenger.

5    Q.   Can you detain a passenger to conduct an

6  investigation if you have no reasonable suspicion that

7  they've done anything?

8    A.   If a passenger's 100 percent compliant and

9  nothing leads to that passenger being involved in anything

10  or hiding anything, then no.

11    Q.   And when you say compliant, is that compliant of

12  any order or a lawful order?

13    A.   I'm going to say lawful order.

14    Q.   I'm going to have you go to page 1774.  And

15  towards the top of the page there's a subsection I, and it

16  says "General Guidelines for arrest."

17        Do you see that?

18    A.   Yes, ma'am.

19    Q.   It has different things about what an officer

20  should do in making an arrest, correct?

21    A.   Yes.

22    Q.   Under subsection A it says, "Only the restraint

23  necessary to assure a safe custody and safety of the

24  officer and public shall be employed."

25        Do you see that?

128

1    A.   Yes.

2    Q.   And it says, "In other words, only the amount of

3  force which is reasonable and necessary shall be

4  employed," correct?

5    A.   Correct.

6    Q.   And under subsection C states that "In case of a

7  injury, apparent illness or other medical condition, the

8  officer shall see the arrested people receives medical

9  attention" -- I'm sorry -- "medical attention."

10        Do you see that?

11    A.   Uh-huh.

12    Q.   Is that your understanding of what the practice

13  is?

14        MR. POPOLIZIO:  Objection; form.

15        THE WITNESS:  We are to provide medical

16  attention to them.  Whether an individual accepts that

17  medical attention is up to them.  They have the right to

18  refuse medical treatment.

19  BY MS. BROADDUS:

20    Q.   Other than this document that's been marked as

21  Exhibit 6, are you aware of any other written policies or

22  procedures that relate in any way to detention?

23        (An off-the-record discussion ensued.)

24  BY MS. BROADDUS:

25    Q.   I just asked you a question.  I'm referring to

129

1  Exhibit 13 dealing with the laws of arrest.  Are you aware
2  of any other policies or procedures relating to
3  detentions?
4     **A.  I'm not aware of any others.**
5     Q.  Are you aware of any other policies or procedures
6  that relate in any way to questioning passengers in a
7  vehicle?
8     **A.  I'm not aware of any others.**
9     Q.  Are you aware of any other policies or procedures
10 that are written that relate to either vehicle stops or
11 detention of passengers in a vehicle other than what we've
12 talked about?
13    **A.  No.**
14    Q.  What do you think would happen to you if you
15 violated the policies and procedures of Glendale?
16       MR. POPOLIZIO:  Form; foundation.
17       THE WITNESS:  Your question is:  What do I
18 think would happen to me?
19 BY MS. BROADDUS:
20    Q.  Yes.  Do you think you'd be disciplined?
21       MR. POPOLIZIO:  Same objection.
22       THE WITNESS:  I think that the City has an
23 obligation to investigate it to its fullest degree.  And
24 if it is a pattern that hasn't been corrected, then, yes,
25 to answer that question.

130

1  BY MS. BROADDUS:
2     Q.  So my understanding is if there's a violation,
3  then you would expect to be investigated, correct?
4     **A.  Correct.  Whether disciplined or not is another**
5  **story.**
6     Q.  Do you know what the process is for being
7  investigated?
8     **A.  It depends on a lot of different things.  It**
9  **depends on the supervisor.  It depends on past history,**
10 **past discipline, the nature of the purpose for this**
11 **discipline.  We have things which is a department**
12 **investigation or we have log notations.  There's different**
13 **aspects to it.**
14    Q.  Do you know whether there are any set guidelines
15 as to what sanctions or punishments or discipline should
16 be applied for certain violations?
17       MR. POPOLIZIO:  Form; foundation.
18       THE WITNESS:  I'm not aware of any.
19 BY MS. BROADDUS:
20    Q.  Do you know who decides what sanction or
21 discipline is going to be applied, if any?
22       MR. POPOLIZIO:  Form.
23       THE WITNESS:  I don't.
24 BY MS. BROADDUS:
25    Q.  Do you have any say as to whether there was a

131

1  violation or whether -- what discipline, if any, should be
2  applied if you were engaged in activity that may or may
3  not be -- let me stop that.  I'll start over.
4        If you were being investigated for an
5  alleged violation of the policies and procedures and you
6  were being investigated, do you have any discretion or do
7  you have any input as to what your discipline would be, if
8  any?
9     **A.  No.**
10    Q.  Have you ever had a claim filed against you other
11 than the lawsuit that we talked about earlier?
12    **A.  A claim, no.**
13    Q.  Have you ever had a complaint lodged or
14 registered against you in any -- as your capacity as a
15 police officer?
16    **A.  A complaint from?**
17    Q.  Anyone.
18    **A.  Anyone?  I'm sure I have.**
19    Q.  I've gone through your file.  I'm going to ask
20 you about a couple of things.
21    **A.  Sure.**
22    Q.  In 2011 you received a memo of correction for a
23 lost cell phone?
24    **A.  Uh-huh.**
25    Q.  Do you remember that?

132

1     **A.  I do.**
2     Q.  What is a memo of correction?
3     **A.  A memo of correction is the level that a**
4  **supervisor decided to take, that it was a first offense,**
5  **no prior history or any other discipline.  So it was just**
6  **a log notation that it was needing to be done.  My**
7  **supervisor at that time, Sergeant Bousman, was the one who**
8  **did it.**
9        MR. POPOLIZIO:  Your friend.
10       THE WITNESS:  She was the one who brought me
11 in, had a conversation with me, and said that, you know,
12 against this policy you lost a cell phone, which is the
13 property of the City.  So I'm writing you up for it.  It's
14 just a -- it was just more or less a
15 don't-let-it-happen-again-type situation.
16 BY MS. BROADDUS:
17    Q.  And do you know whether Sergeant Bousman -- is
18 she a sergeant still?
19    **A.  She's a lieutenant.**
20    Q.  Lieutenant.  Oh.  Is Lieutenant Bousman -- do you
21 know whether she had any discretion as to whether she
22 could have just provided training instead of doing a memo
23 of correction?
24    **A.  Yes.**
25    Q.  Did she tell you why she decided on a memo of

133

1  correction as opposed to just maybe training?
2      A.  Oh, no, not to my knowledge, not that I can
3  recollect.
4      Q.  There was a notation in one of the reports that
5  there was also an incident involving missing court back in
6  2011, but it doesn't look like you received anything
7  specific about that.
8      A.  It was a bad week for me because I had a lost a
9  cell phone and missed court at the same -- pretty much the
10  same week, and Sergeant Bousman at that time handled both
11  situations and we covered it at the same time.
12      Q.  And just for clarification, the memo of
13  correction only talks about the lost cell phone.  It
14  doesn't talk about missing court, correct?
15      A.  Correct.
16      Q.  So she didn't include that in the memo of
17  correction?
18      A.  Correct.
19      Q.  So she had some discretion in deciding what would
20  be in the report and what wouldn't?
21      A.  Correct.
22      Q.  Did you think that was fair?
23      A.  Yes.
24      Q.  In 2012 you were exonerated on a complaint that
25  was made against you for a response to resistance.  You

134

1  had a combative suspect at the jail, 4th Avenue Jail, and
2  I guess the Surprise police were involved.  Do you recall
3  that incident?
4      A.  Yeah.  We were called to our detention after an
5  inmate had assaulted our detention officers.  Because our
6  detention officers were now victims in a crime, they could
7  not transport this individual down to the 4th Avenue Jail.
8  So they requested a unit to transfer them down.
9          I was riding as a two-person unit with
10  another officer that day so we answered up for it.  When
11  we got down to the jails, we took him down to 4th Avenue.
12  He was combative in the back of the patrol car as we were
13  going down, and he was combative as we are trying to get
14  him into the 4th Avenue Jail.  He spit in one of our
15  officer's face.
16          When we got him down into a holding cell, he
17  was requested to come out and go through medical, which is
18  a normal technique when we're down there.  He refused to
19  come out of the cell.  He wanted us to come to him.  That
20  is a safety violation on all aspects.
21          Continued to refuse so we were forced to go
22  in there and try and grab him.  As we went to go try to
23  grab him, he attempted to spit on the officer again, at
24  which point in time we grounded him, which is a technique
25  that we have as far as a control hold.  As we grounded

135

1  him, he received a laceration over his eye that required
2  medical attention.
3          4th Avenue refused him at that point in
4  time, and we had to take him to a hospital where he
5  received, I believe, a couple of stitches for the
6  laceration above his eye.
7      Q.  You were exonerated on that one too?
8      A.  Yes, I was.
9      Q.  So they did an investigation and found that there
10  was no wrongdoing on your part?
11      A.  Correct.
12      Q.  And that was in 2012.  Do you know who did the
13  investigation?
14      A.  Officer Sergeant -- or not officer, but Sergeant
15  Aron Victor at that time.
16      Q.  Was that your supervisor at the time?
17      A.  He was not my direct supervisor.  He was just a
18  supervisor that was on the lineup that day.
19      Q.  So was Rachael Bousman your supervisor back in
20  2011?
21      A.  No.
22      Q.  She was just doing the investigation?
23      A.  She may have been a part of the -- no, she wasn't
24  a part of PSU at that time.  I don't know why Rachael
25  Bousman's name is on that one.

136

1      Q.  In 2014 you had another incident where someone
2  complained about resistance.  It sounds like it was a
3  family fight.  There were four officers involved.
4      A.  Uh-huh.
5      Q.  And you were also exonerated in that situation,
6  correct?
7      A.  Yes, I was.
8      Q.  And they did a full investigation and figured you
9  did no wrongdoing?
10      A.  Correct.
11      Q.  Do you know who did the investigation for that?
12      A.  It started off with my direct supervisor, which
13  was Sergeant Starret.
14      Q.  Did it go to PSU?
15      A.  It did go to PSU.
16      Q.  In another situation you had a complaint in 2014,
17  use of force complaint involving a Taser situation.  I'm
18  just trying to jog your memory.  It involved counterfeit
19  money.
20      A.  Yes.
21      Q.  And you were exonerated in that one as well?
22      A.  Yes, I was.
23      Q.  Do you know who did the investigation for that?
24      A.  In 2014 I believe my sergeant was
25  Sergeant Washington at that time, but I may be wrong.

137

```
1    Q.  Did that go to PSU?
2    A.  Yes, it did.
3    Q.  Do you know whether -- we talked about the fight
4  down at the 4th Avenue Jail.
5    A.  Uh-huh.
6    Q.  Did that go to the PSU?
7    A.  I believe it did.
8    Q.  Did the incident involving the lost cell phone go
9  to PSU?
10   A.  No, it did not.
11   Q.  Are you aware of any other complaints that were
12  made against you as a police officer other than the ones
13  we talked about?
14   A.  Not to my knowledge.
15   Q.  Are you aware of any officers that have ever
16  complained about you?
17   A.  No.
18   Q.  Do you think you were treated fairly in the
19  investigations that were made against you in regards to
20  these complaints?
21   A.  Yes.
22   Q.  Have you ever heard anyone call or refer to Matt
23  as Strong-Arm Schneider?
24   A.  Never.
25   Q.  As a result of the events involving the
```

138

```
1  Wheatcrofts from everything that happened that day, were
2  you ever instructed or directed or recommended to undergo
3  any additional training?
4    A.  No.
5    Q.  Do you know if the NRS squad was -- underwent any
6  additional training after that related to this incident?
7    A.  Not to my knowledge.
8    Q.  Back in July of 2017 who was your supervisor?
9    A.  Sergeant Donny Labrant.
10   Q.  Was he your supervisor the whole time that you
11  were at NRS?
12   A.  Yes, he was.
13   Q.  Did you ever work with Sergeant Labrant as a
14  patrol officer?
15   A.  No, I did not.
16   Q.  Was your first time working with him when you
17  became a member of PSU -- or, I'm sorry -- NRS?
18   A.  Yeah, that was my first encounter with him.
19   Q.  Prior to working with the NRS, had you worked
20  with any other officers that were in NRS when you were on
21  patrol?
22   A.  Officer Lewis.  He and I went through the academy
23  together and kind of followed each other's careers from
24  squad to squad from time to time.
25        Officer Jeff Pittman was my third-phase
```

139

```
1  officer in training.  So when I was in my officer in
2  training right out of the academy he was my third-phase
3  field training officer.
4    Q.  Did you ever work with Officer Schneider prior to
5  working with him at NRS?
6    A.  No.
7    Q.  When you were a patrol officer did you ever -- as
8  you can recall, did you ever respond to any instances that
9  Officer Schneider was involved?
10   A.  No.
11   Q.  With NRS, within the group, the 10 to 12 officers
12  that were in the NRS, were there officers that didn't want
13  to work with each other at times?
14   A.  I'm sure at times, yes.
15   Q.  Were there ever any conflicts between any of the
16  officers that you were aware of?
17   A.  When I came into the squad I was made aware of
18  some conflicts prior to me coming in, but I kind of came
19  in and kept my nose on the grind and did my own thing.
20   Q.  Is there a level of seniority among the officers
21  in NRS?
22   A.  The only seniority that we have is by badge
23  number and time served on NRS.
24   Q.  Is there anyone who takes the lead of the NRS
25  members?
```

140

```
1    A.  We're all self-sufficient.
2    Q.  There's been some testimony from the other day
3  that Officer Schneider and Officer Pittman were pretty
4  close friends.  Is that your understanding?
5    A.  They worked together a lot.
6    Q.  Do you know if they are friends outside of work?
7    A.  To my knowledge, yes.
8    Q.  Do you ever hang out with members of the NRS
9  squad outside of work for fun-related work activities?
10   A.  Officer Lewis and I used to be friends and would
11  hang out from time to time.
12   Q.  You say used to be.  Are you not friends with him
13  anymore?
14   A.  We took career paths that were different.  We
15  both had different agendas in our careers which led us to
16  different paths.
17   Q.  You just don't work together as much?
18   A.  Correct.
19   Q.  Are there any particular officers within NRS that
20  you were close to?
21   A.  I was fairly close with all of them.  Like I
22  said, when I came in, I just came in and did my job.  I
23  rode with Office Pittman.  I rode with Officer Schneider.
24  I rode with Tolbert, and I rode with Officer Lewis, and I
25  rode with all of the individuals on my squad.
```

141

1    Q.   You seem to get along well with all of them?
2    **A.   Uh-huh.**
3    Q.   Is that a yes?
4    **A.   I play well with people, yes.**
5         MS. BROADDUS:  I'm going to go a little bit
6    longer and then we'll take another break.  Okay?
7         MR. POPOLIZIO:  Okay.
8    BY MS. BROADDUS:
9    Q.   Is that all right with you?
10   **A.   Uh-huh.**
11   Q.   I want to talk about the Wheatcroft incident
12   specifically that was in July of 2017 at the Motel 6.
13   What were you doing before you guys were behind the motel?
14        And by "you guys" I mean you and Officer
15   Schneider.  You were in the same vehicle.  What were you
16   guys doing before that?
17   **A.   With the NRS squad we have certain areas that we**
18   **would dedicate as a squad to go to work, to be able to**
19   **work.  They were kind of high-crime areas.  So with NRS,**
20   **we're just kind of your typical patrol officers until a**
21   **project comes up.  So we were on that day just patrolling**
22   **the downtown area.**
23   Q.   Had you had any stops just prior to this?
24   **A.   I wouldn't be able to answer that, to be honest**
25   **with you.  It was towards the later part of our afternoon,**

142

1    **so...**
2    Q.   Is it fair to say as you sit here today you don't
3    recall if you were involved in another act --
4    **A.   Correct.**
5    Q.   -- before this stop?
6    **A.   Before that stop, correct.**
7    Q.   If you were going to be getting a room at the
8    Motel 6, if that's all you could afford and decided you
9    wanted to stay there, you would agree that you would
10   probably park in the parking lot, wouldn't you?
11   **A.   Uh-huh.  Yes.**
12   Q.   And there's nothing illegal about that, correct?
13   **A.   Nothing illegal about parking in the parking lot.**
14   Q.   And there's nothing suspicious necessarily about
15   getting a room at the motel?
16        MR. POPOLIZIO:  Form.
17        THE WITNESS:  There's nothing suspicious,
18   no.
19   BY MS. BROADDUS:
20   Q.   And there's nothing illegal or suspicious about
21   using money to pay for a hotel room, correct?
22        MR. POPOLIZIO:  Form.
23        THE WITNESS:  No.
24   BY MS. BROADDUS:
25   Q.   And there's absolutely nothing illegal about

143

1    parking into a parking spot, correct?
2         MR. POPOLIZIO:  Form.
3    BY MS. BROADDUS:
4    Q.   In the parking lot.
5    **A.   There's nothing illegal about parking in a**
6    **parking lot.**
7         **We have a, kind of a partnership with the**
8    **management of Motel 6.  Motel 6 is a high-crime area.**
9    **Those crimes involve drug deals, gang activities, stolen**
10   **vehicles, burglaries from vehicles, family fights,**
11   **overdoses.**
12        **So the Motel 6 and the Glendale Police**
13   **Department kind of -- I don't want to say created a**
14   **partnership, but we had what was called a blanket trespass**
15   **form.  That blanket trespass form, which is signed by**
16   **management, authorizes the Glendale Police Department to**
17   **make contact with individuals within their facility, which**
18   **includes the parking lot, to ensure that the occupants**
19   **that are staying at that motel are safe.  It gives us the**
20   **right to make an arrest, if need be, without having to**
21   **contact the motel management.  It kind of is an**
22   **authorization form for us to take any police actions**
23   **that's needed.  The reason why they have that is because**
24   **of the high crime and the high-call volume that comes in**
25   **and out of their Motel 6.**

144

1         **So to elaborate on that, if I see an**
2    **individual walking down the street or walking down the**
3    **parking lot, Motel 6 is authorizing us to at least stop**
4    **and talk to them, find out if they're staying there, find**
5    **out if -- if they are staying there what room they're**
6    **staying in, find out the purposes for their reasons being**
7    **there.**
8    Q.   Would you agree that it sounds like it's probably
9    not one of the more enticing places that someone would
10   want to stay, is this Motel 6 in Glendale?
11   **A.   During Glendale Glitters, which is a holiday**
12   **event that we hold at the downtown area, we would**
13   **sometimes often go through the Motel 6, and if we'd see**
14   **people who were -- you just know that they're kind of lost**
15   **and looking for a place to stay.  We would educate them on**
16   **the area and educate them on the purpose for us being**
17   **there.  Because they would always approach us and ask, why**
18   **do we see so many police officers in this parking lot?  Is**
19   **this safe?**
20        **And we would educate them of the reasons why**
21   **we were there.**
22   Q.   So you would probably not expect to see somebody
23   there who could afford to stay somewhere nicer or in a
24   better area?
25   **A.   No.  We've had people who could afford better**

153

1  A.  Correct.
2  Q.  Could you see -- from when you were turning into
3  the back alley could you see traffic on Glenn Drive that
4  was west of 59th Avenue?
5  A.  No.
6  Q.  So you couldn't see the Ford Taurus, correct?
7  A.  I never saw the Ford Taurus in that area, no.
8  Q.  And you couldn't see whether there was any other
9  traffic over there, true?
10  A.  True.
11  Q.  And Officer Schneider was with you, correct?
12  A.  Correct.
13  Q.  From your location where you were coming from
14  going south on 59th Avenue, is there any way for you or
15  Officer Schneider to see traffic on Glenn Drive between
16  59th Avenue and the turn-in for the motel parking lot?
17       MR. POPOLIZIO:  Objection:  Form;
18  foundation.
19       THE WITNESS:  I can only answer for myself
20  and say as a passenger I did not see any other traffic.
21  BY MS. BROADDUS:
22  Q.  There's a big building there, correct?
23  A.  Correct.
24  Q.  And you can't see through the building, true?
25  A.  True.

154

1  Q.  When the Ford Taurus turned in and you first saw
2  it, you didn't see any moving traffic at that point,
3  correct?
4  A.  Can you repeat the question?
5  Q.  Sure.  When you first saw the Ford Taurus, you
6  didn't see any other traffic moving, did you?
7       MR. POPOLIZIO:  Form.
8       THE WITNESS:  No.
9  BY MS. BROADDUS:
10  Q.  Did you see any other traffic at all other than
11  parked vehicles?
12  A.  My focus was down the back alleyway.
13       As a two-person unit with the NRS squad,
14  what we would do is, as I kind of explained prior, is
15  my -- my scope is a little bit different than the driver's
16  scope.
17       In this back alleyway we have several
18  dumpsters that we have got drug deals going down.  We have
19  several parking lots over here where we have had broken-in
20  vehicles, drug deals going down, transients coming in and
21  out.
22       As we're heading back down this alleyway, my
23  focus is down here.  My vision and my focus is down here
24  to see if I see anything down here.
25  Q.  All right.  And I just want to clarify because I

155

1  know what you're saying when you say "down here," but when
2  we read it later we're not going to know.
3  A.  Okay.
4  Q.  So I'm just going to clarify.
5  A.  Uh-huh.
6  Q.  What you're saying is when you entered the back
7  alley on the north side of the motel --
8  A.  Correct.
9  Q.  -- that when you turned in there's a parking area
10  off to your left after you pass the building, correct?
11  A.  Correct.
12  Q.  If you keep going forward there's several
13  dumpsters and other areas that you patrol routinely
14  because of high crimes that happen -- or a lot of crime
15  that happens there, correct?
16  A.  Correct.
17  Q.  So when you said you were down here, you're
18  talking about behind the building that has the circle in
19  it, the swimming pool, correct?
20  A.  My focus is to the west of the entryway parking
21  lot.
22  Q.  What drew your attention to the Ford Taurus?
23  A.  I didn't have an attention drawn to it.  Officer
24  Schneider said that he observed a traffic violation.
25  Q.  What did he tell you he saw?

156

1  A.  He said he saw the car turning without a blinker.
2  Q.  And did he explain to you how he saw that?
3  A.  No.  He just said that he saw the violation.
4  Q.  Did you recognize the Ford Taurus from anywhere?
5  A.  No.
6  Q.  And my understanding, after reading some of the
7  interviews, is Matt say, "Hey, let's check them out."  Is
8  that your understanding?
9  A.  I believe he made the statement, and I can't say
10  verbatim what it was, but, I'm going to stop this vehicle.
11  Q.  And I think you mentioned earlier that as soon as
12  there's something going to happen you activate your body
13  camera as soon as you know there is going to be something
14  going on pretty much, correct?
15  A.  Correct.
16  Q.  So when Officer Schneider mentioned to you, hey,
17  let's check out this vehicle, whatever you're going to do,
18  you activate your body camera, correct?
19  A.  Correct.
20  Q.  When you first pulled up to the car, lights and
21  sirens were not activated, correct?
22  A.  Correct.
23  Q.  Do you know why?
24  A.  Because the car dictated us to take a stop
25  quicker than what was normal for a traffic stop to be

157

1   initiated.
2       Q.   What do you mean by it dictated that?
3       A.   The car appeared to want to take left-hand turn
4   into a spot where there was an open spot.  It changed
5   directions and it immediately backed up into a parking
6   spot.  That, to us, is kind of an indication, if you will,
7   that there may be something more going on.  We have stolen
8   vehicles that try to hide license plates.  Because of
9   their quick evasive moves, it kind of pushed our evasive
10   moves up a little bit, which, again, didn't activate the
11   lights or -- or that.  But the traffic stop was initiated
12   at that time.
13       Q.   There were obviously other cars in the parking
14   lot, correct?
15       A.   Yes, there was.
16       Q.   Is it fair to say you don't really know why they
17   backed in?
18       A.   It's fair to say.
19       Q.   And it may have been their intention to back in
20   the whole time.  You just don't know as you sit here,
21   true?
22       A.   True.
23       Q.   So when you said that you thought they were going
24   to park off to the other side and backed in, you don't
25   know whether they were actually ever intending on parking

158

1   on the other side or whether they were planning on backing
2   in the whole time?
3       MR. POPOLIZIO:  Form.
4       THE WITNESS:  It appeared as if the car past
5   the parking spot that it ended up backing into.  It
6   appeared as if that car was making an evasive turn into a
7   left-hand spot.  When we were parallel with that vehicle,
8   the vehicle changed its directions of its wheel causing it
9   to reverse.  He was already past that spot so had to make
10   evasive moves to get back into a spot versus a fluid
11   motion.
12   BY MS. BROADDUS:
13       Q.   So you're saying his backing in wasn't very
14   fluid?
15       A.   It wasn't very fluid.
16       Q.   But you would agree that you'd have to pass the
17   parking spot before you could back into it, true?
18       A.   True.
19       Q.   Did you assume that there was something illegal
20   going with that vehicle?
21       A.   Repeat the question, please.
22       Q.   Sure.  Did you assume that there was something
23   going on that was illegal with the vehicle or the
24   passenger in the vehicle?
25       A.   I assumed that Officer Schneider observed a

159

1   traffic violation and that was the purpose for the stop.
2       Q.   You did not see any traffic violation.  Is that a
3   fair statement?
4       A.   I personally did not, no.
5       Q.   When you first arrived at the vehicle and were
6   getting out of your car, did you have any reasonable
7   suspicion of illegal activity?
8       A.   At that time, no.
9       Q.   No probable cause either at that time, correct?
10       A.   Well, we have the traffic violation.
11       Q.   And you were relying on Matt Schneider for that,
12   correct?
13       A.   Correct.
14       Q.   Because you did not see anything?
15       A.   Personally I did not.
16       Q.   Did you make any assumption as to whether or not
17   they were going to be getting a room there?
18       A.   Based on my conversation off of the traffic stop
19   at that time.
20       Q.   Is it fair to say that when you arrived there and
21   were getting out of your car and you saw this vehicle with
22   people in it, that you didn't know they were just going
23   there to have some quality family time together with the
24   kids?
25       A.   I can't say that's -- yeah, I can't say yes or no

160

1   on that.
2       Q.   You didn't know?
3       A.   I don't know.
4       Q.   You didn't know that they went to the candy store
5   right before that to get candy for the kids so the kids
6   could go swimming?
7       MR. POPOLIZIO:  Form; foundation.
8       THE WITNESS:  No.
9   BY MS. BROADDUS:
10       Q.   Would you agree that the passengers in the
11   vehicle are citizens that Glendale police officers are
12   obligated to protect and serve?
13       A.   Yes.
14       Q.   Why do you think so?
15       A.   Because whether you're a passenger or a driver or
16   a pedestrian or a cyclist, a jogger, a walker, if you're
17   in the city of Glendale we're there to protect and serve
18   you.
19       Q.   Do you personally know why Matt went directly to
20   the passenger side of the vehicle?
21       A.   It was the safer approach.
22       Q.   Did you have any conversations with him about
23   that?
24       A.   No.  But it's through the training that we go
25   through.  Through the training that we receive at the

161

1   **Arizona Law Enforcement Academy and through the continuous**
2   **training that we do on vehicle approaches, we are taught**
3   **to not walk in front of the vehicle because that presents**
4   **a hazard to us as officers.  So we take the direct line.**
5       Q.   You mentioned earlier the car was backed in,
6   correct?
7       **A.   Correct.**
8       Q.   And that's not uncommon for people to back into
9   parking spots, true?
10      **A.   It's not uncommon.**
11      Q.   And actually, are you aware of studies that have
12  said it's actually a safer way to park because you can
13  see, when you're leaving, more stuff than when you're
14  backing out?
15          MR. POPOLIZIO:  Objection:  Form;
16  foundation.
17          THE WITNESS:  I've never seen those studies.
18  BY MS. BROADDUS:
19      Q.   Do you get calls as a police officer for parking
20  lot mishaps?  Do you respond to those?
21          MR. POPOLIZIO:  Form.
22          THE WITNESS:  We respond to them, but we
23  don't take them because they're private property.
24  BY MS. BROADDUS:
25      Q.   Would you say that the majority of those parking

162

1   lot incidents involving vehicles are from somebody backing
2   out and hitting somebody?
3           MR. POPOLIZIO:  Form; foundation.
4           THE WITNESS:  We take all the calls for
5   service.  I can't pinpoint how many we take because of
6   people backing out.  I don't have --
7   BY MS. BROADDUS:
8       Q.   But you have seen that?
9       **A.   I have seen that, yes.**
10      Q.   When you went up to the -- well, when you
11  approached the car, what was the first -- what did you
12  notice about the car?  Anything?  Anything that stood out?
13      **A.   The fact that he wasn't able to successfully back**
14  **into his spot without some difficulties, and that the**
15  **driver appeared to be nervous to me.**
16      Q.   He appeared what?
17      **A.   Nervous to me.**
18      Q.   Okay.  What was your intention when you
19  approached the vehicle?
20      **A.   To ask for the driver's license from the occupant**
21  **of the driver's side.**
22      Q.   And did you?
23      **A.   Yes.**
24      Q.   And did he provide you with a driver's license?
25      **A.   No, he did not.  He said he does not have a**

163

1   driver's license.
2       Q.   Did he provide you with anything?
3       **A.   He said he had an identification card on him**
4   **only.**
5       Q.   Did he provide you with that ID card?
6       **A.   To my knowledge, yes.  That indication to me that**
7   **he does not have a driver's license means one of two**
8   **things.  That means that he's never been issued a valid**
9   **driver's license, which is required by ADOT to drive, or**
10  **he has had his driver's license suspended, which takes**
11  **this from a civil traffic stop to a criminal stop, because**
12  **driving on a suspended license is a Class I misdemeanor.**
13      Q.   And you didn't know at that time which it was,
14  correct?
15      **A.   No.  I just know that he did not have a driver's**
16  **license, which again, allows us to, if we wanted to --**
17  **it's at the discretion of an officer -- to tow that**
18  **vehicle because there is no valid driver's license.**
19      Q.   That's all because of the actions of the driver,
20  correct?
21      **A.   Correct.**
22      Q.   When you were communicating with the driver of
23  the car and getting the information, could you hear the
24  conversations between Officer Schneider and
25  Mr. Wheatcroft?

164

1       **A.   I could hear conversation happening.  I could not**
2   **hear the exact words that were being exchanged between the**
3   **two of them at the very start.**
4       Q.   What do you mean by "at the very start"?  Did you
5   start hearing things later?
6       **A.   I started hearing Matt saying, stop tensing up,**
7   **stop reaching in for the bag.  I even asked the driver at**
8   **that time how he knew the passenger and why the passenger**
9   **was being -- I don't know the exact words that I was**
10  **using, but more or less resistant.**
11      Q.   Did you know why -- based on what you were
12  hearing and seeing, did you know what Matt was
13  communicating about?
14      **A.   We as officers who work together on a daily basis**
15  **know each other's tones, we know each other's faces.  I**
16  **had worked alongside Matt long enough to know that his**
17  **voice reflection had changed from being, hey, this is the**
18  **traffic violation to stop reaching into a bag.  Those are**
19  **some of the cues that we as officer pick up on from time**
20  **to time, especially those officers that have worked**
21  **together side by side.**
22          **When I started hearing his voice reflection**
23  **change a little bit was the reason why I had asked the**
24  **driver how he knew the individual and why was the**
25  **individual acting the way he was acting.**



165

1    Q.  Do you know why Matt's voice was changing at that
2  time?
3    A.  Because he had asked him a couple of times not to
4  reach into, I believe, a backpack.
5    Q.  Did you see Mr. Wheatcroft reach into any
6  backpack?
7    A.  My focus was on the driver, still trying to get
8  information from the driver.  Anya Chapman, who was in the
9  back seat, requested that she step out because it was hot.
10  I granted her that access to step out.  So my attention at
11  that point in time was to an occupant who was outside of
12  the vehicle and the driver who is still yet to be
13  identified.
14    Q.  So you did not see Mr. Wheatcroft reach into any
15  backpack?
16    A.  I could only hear Officer Schneider say stop
17  reaching into it.
18    Q.  But you didn't see it?
19    A.  I didn't see it.
20    Q.  Before you went over to the passenger side of the
21  car, did you see Mr. Wheatcroft do anything illegal?  Did
22  you witness anything?
23    A.  I just continued to hear Officer -- to answer
24  your question, no, but I continued to hear Officer
25  Schneider saying, stop tensing up and stop reaching for

166

1  it.
2      Officer Schneider requested my assistance on
3  that side based on the totality of circumstances with him
4  being noncompliant.
5    Q.  You're saying he was noncompliant.  Why are you
6  saying he was noncompliant?
7    A.  Because he was continuously reaching for an
8  unknown object, in our opinion, in a bag that we don't
9  know what's inside.  He had already indicated that he did
10  not have a driver's license on him or an ID on him.  So at
11  that point in time, he continuously reaches for his bag or
12  for the middle console.  It's the unknown to us.  He's
13  already identified to us that he doesn't have an
14  identification.  So what else would he be possibly
15  reaching for?
16      That's kind of what goes through our heads.
17    Q.  So you didn't actually see him reaching anything,
18  correct?
19    A.  No.
20    Q.  Is it fair to say you don't know whether he
21  complied when he stopped reaching, when Officer Schneider
22  said to stop reaching?
23      Is it a fair statement that you do not know
24  whether he did or not?
25    A.  I'm going off the verbal conversation that he is

167

1  having with the individual to say, stop doing what you're
2  doing.  So it is a fair statement to say that there was
3  something going on.  I just didn't see what was happening.
4      But I put my trust in an officer who's
5  saying, stop reaching for something, as to be a possible
6  threat.
7    Q.  So you were relying on Officer Schneider and what
8  he was saying for what your actions were?  Is that what
9  you're saying?
10    A.  Correct.
11      MS. BROADDUS:  I think now would be a good
12  time for a break.
13      MR. POPOLIZIO:  Sure.
14      (The deposition was at lunch recess from
15  1:20 to 2:57 p.m.)
16  BY MS. BROADDUS:
17    Q.  Back on the record.
18      Earlier we were talking about -- and I had
19  you make a diagram that is in front of you.  It's on a
20  yellow piece of paper.  Do you see that?
21    A.  Yes.
22    Q.  I'm going to go ahead and have this one marked as
23  well as an exhibit.
24      (Deposition Exhibit No. 15 was marked for
25  identification.)

168

1  BY MS. BROADDUS:
2    Q.  Officer Lindsey, before the break we were talking
3  about some of the events that were happening that day in
4  July of 2017.
5    A.  Uh-huh.
6    Q.  And at some point you were -- well, you were
7  originally at the driver's side of the vehicle, correct?
8    A.  Correct.
9    Q.  And at some point you went around to the
10  passenger side, correct?
11    A.  Correct.
12    Q.  Why did you go to the passenger side of the
13  vehicle?
14    A.  At the request of Officer Schneider.
15    Q.  Did he tell you?  Did he wave to you?
16    A.  He said that this guy is getting -- this guy
17  is -- I don't know the exact words he was saying, but more
18  or less this guy's tensing up.  I think he's going to try
19  and fight.  So at that point in time I transitioned from
20  the driver's side over to the passenger side to assist.
21    Q.  And at that point did Officer Schneider already
22  have his hands on the passenger?
23    A.  He had a control hold on him.
24    Q.  The car door was open at that point?
25    A.  Yes.

169

1    Q.  Do you know why the car door was open?
2    A.  He was attempting to gain compliance and control
3    of him to stop having him reach wherever he was reaching
4    into.  So he had opened up the door to try to gain that
5    compliance.
6    Q.  Is that something he told you?
7    A.  No.
8    Q.  And what do you base that testimony on?
9    A.  Just off of practices and past calls.
10   Q.  I want to play some video.
11   A.  Uh-huh.
12   Q.  We're going to start with -- actually, it's your
13   body-cam video.
14   A.  Okay.
15   Q.  Start at 25.
16        MS. THOMPSON:  Seconds?
17        MS. BROADDUS:  And we're starting it at 25
18   seconds in.  20 seconds in is fine.
19        MS. THOMPSON:  All right.
20        (Video played.)
21   BY MS. BROADDUS:
22   Q.  So this is your body cam; is that correct?
23   A.  Yes.
24   Q.  I'm just going to have you watch this for a
25   second.  And you just got out of the car, correct?

170

1    A.  Yes.
2    Q.  And you're walking towards the car, correct?
3    A.  Yes.
4    Q.  Do you know why you're stopping right there and
5    not going directly to the passenger's side?
6    A.  I'm trying to assess the situation.  He's already
7    up there making contact with -- with the vehicle.  There's
8    still a few unknowns that are occurring.
9        MS. BROADDUS:  Keep playing it.
10        (Video played.)
11   BY MS. BROADDUS:
12   Q.  Do you know why you were waving at Officer
13   Schneider at that point?
14   A.  I was waving at the kids in the back seat.
15   Q.  Okay.
16        (Video played.)
17   BY MS. BROADDUS:
18   Q.  At this point you're just -- you testified
19   earlier he didn't have a driver's license, but he had an
20   ID and he gave you his ID; is that correct?
21   A.  I believe so, yes.
22   Q.  Do you know what you're writing at this point?
23   A.  I'm writing down -- I'm not writing anything at
24   that point in time.  I'm just going to be writing his
25   name.

171

1        I don't believe he's provided me with an ID
2    card yet.  If we want to rewind it, we can, but I don't
3    believe he's provided me with an ID yet.
4        MS. BROADDUS:  Keep playing.
5        (Video played.)
6    BY MS. BROADDUS:
7    Q.  Are you filling out a form or are you using your
8    notepad at this point?
9    A.  I'm using what's called a -- he does have his ID
10   there so I'm writing down his name.
11   Q.  So we are stopped at a minute 43 in, and you can
12   see just kind of a corner of a card.  You believe that's
13   his ID card?
14   A.  That's his identification card right there.
15   Q.  So you're writing down his identification?
16   A.  I'm writing down his name, correct.
17   Q.  Are you writing that on your notepad or on a --
18   A.  A three-by-five card.
19   Q.  And what do you do with a three-by-five card?
20   A.  Well, the ID has to be provided back to the
21   individual.  So I write the name down so when I go do
22   either my report or my field interview or my log notation,
23   or whatever, I have the name and information.
24        What's not on driver's licenses is sometimes
25   corrected addresses.  Sometimes there's an address on an

172

1    identification card that is not the right address.  Social
2    Security numbers are not on identification cards nor are
3    phone numbers.  So we use our three-by-five cards to write
4    down important information.  So when we go back and
5    document that contact with that individual we've got full
6    information.
7    Q.  This is for the driver of the vehicle who
8    supposedly did the violation for the turn signal, correct?
9    A.  Correct.
10   Q.  And were you planning on writing him a ticket?
11   A.  At that point in time I don't -- I can't say that
12   I was planning or not planning to write him a ticket.  It
13   was a -- at that point in time, in our history when we see
14   somebody who has just provided us with an identification
15   only card, that means one of two things, usually.  That
16   means that they have never received a proper driver's
17   license or that they have had their driver's license
18   suspended.
19        So it takes it, the traffic stop, from a
20   civil situation to a criminal situation.  Doesn't mean
21   that an arrest is going to be made or a ticket is going to
22   be issued.  It just takes it to that next level.
23   Q.  And is something like a -- a situation like this
24   where someone only has an ID and doesn't have a driver's
25   license, is that something you would normally take some

173

1    kind of action for, either arresting them or writing them
2    a citation?
3        **A.  If, during my investigation, I find out that the**
4    **individual has a suspended license, I have the discretion**
5    **of either issuing a citation, which is a criminal**
6    **citation, or I have the decision of making an arrest.  We**
7    **can do either/or.**
8        Q.  If you give them a citation, do you normally
9    include the turn signal violation as well?
10       **A.  Yes.**
11       Q.  So if you gave him a ticket for a turn signal
12   violation and for, let's say, not having a driver's
13   license or proper identification, would you be the officer
14   that would go to court?
15       **A.  Well, actually, in this situation here, since**
16   **Officer Schneider was the one who originally saw the**
17   **traffic violation, I would have him write out the citation**
18   **if he chose to do the criminal cite with that as well,**
19   **because he would have to be the one who goes to court and**
20   **testifies on the traffic violation.  I would only be able**
21   **to testify that in my conversation with him that I came**
22   **across him being with either a suspended or no license.**
23       Q.  So it's fair to say that you wouldn't be able to
24   testify about an alleged turn signal violation, but you
25   could testify about the identification issue?

174

1        **A.  Correct.**
2        Q.  Before Officer Schneider put his hands on the
3    passenger, did you -- well, did you actually see when he
4    started putting his hands on the passenger?
5        **A.  No, not the original time.**
6        Q.  Did you see -- what is your understanding as to
7    why Officer Schneider put his hands on the passenger?
8        **A.  At several requests to stop reaching into a bag.**
9    **At that point in time, there's a -- you can only**
10   **speculate, but the individual who was not complying with**
11   **that is not complying for a certain reason.  We don't know**
12   **what the reason is, but we have to assume that whatever is**
13   **inside that bag is going to harm us.**
14       **So what we try to do is control the**
15   **situation as quick as we can up front so it doesn't**
16   **escalate to a situation that gets out of control.  So if**
17   **we can go hands-on with somebody to get the situation**
18   **under control right away, we would rather do it that way.**
19   **It creates less injury to everybody.**
20       MS. BROADDUS:  Let's go to the motel video.
21       THE WITNESS:  And I don't know if I'm able
22   to interject or not, but at about time 54 you asked why I
23   was walking up so slow, and I didn't get a chance to
24   answer that.
25       MS. BROADDUS:  Go ahead.

175

1        THE WITNESS:  If we could go back to the 54
2    mark, please.
3        (Video played.)
4        THE WITNESS:  The question is -- and if you
5    can please pause it here for me.
6        The question is why was I walking up so
7    slow.  Many different factors; you've got still the
8    unknown with traffic coming in.
9        As I approach it is not normal for doors to
10   open up.  I have a back passenger door opening up, and I
11   have a driver's side door opening up.  That creates what
12   we call a fatal funnel.  If I get in too close into a
13   situation, into a person, into a house, into a vehicle
14   stop, if I get too close into that, it's called a fatal
15   funnel.  At that point in time I'm in a no-win situation
16   if a gun pops out.  I'm in a gun battle at that time.  And
17   I'm too close where I can't get the distance from me.
18       So on our approach, if the vehicle doors had
19   remained closed, it's a normal traffic stop.  Where it
20   took it from a non-normal traffic stop in my mind and my
21   mind-set from my training, is that when two doors open up
22   and people try to get out of the vehicle, I'm now in that
23   fatal funnel where I have no point of return.
24       So as I approach and I see two doors open
25   up, it makes me stop in my tracks, assess the situation.

176

1    It makes me kind of do a head count of who's in that
2    vehicle, and then it also makes me open up my eyes a
3    little bit more for my whereabouts and my surroundings.
4    Because if someone was to pop out of that vehicle and have
5    a gun or come charge at me, if I'm right up on that door,
6    I'm too close.
7        So that was the -- that was the purpose for
8    my ease approach, if you will.
9        Q.  So you were being more vigilant when you
10   approached?
11       **A.  Correct.**
12       Q.  Do you know whether or not the car was on or off
13   when you approach?
14       **A.  I believe it was still on.**
15       MS. BROADDUS:  I'm going to switch videos.
16   Let's go to Schneider's video, please.
17       MS. THOMPSON:  Okay.
18       (Video played.)
19   BY MS. BROADDUS:
20       Q.  So at this point there's silence still --
21       **A.  We're still in that buffer zone.**
22       Q.  Gotcha.  And right now we're at the 30-second
23   mark, and that's when you said the buffer zone ends, the
24   audio starts, correct?
25       **A.  From the time that I hit the button on my body**

177

1  cam, it starts recording from that time, but it goes back
2  30 seconds for a buffer zone where there's no volume.
3      The purpose for that is if, let's say, I
4  come up on a consensual or even on an investigative stop,
5  I come up to somebody and the fight is immediately on,
6  just because I've hit that timer, that may not catch the
7  reason why the fight came on.  So it goes back 30 seconds
8  as far as the recording is concerned so they can capture
9  what led up to that incident.  So that's why there's this
10  30-second buffer.
11      Q.  So there's a 30-second buffer from -- I'm a
12  little confused, because I think you said earlier when an
13  event starts both the recording and the audio, when you
14  hit the bottom the audio starts 30 seconds in.
15      A.  Correct.  The audio -- as soon as that button is
16  pressed, it goes live.  The camera system will roll back
17  30 seconds and capture video only, not audio to -- to
18  capture -- and the purpose for that is, hypothetically
19  let's say I get into a shooting.  And right after the
20  shooting I hit my camera to record my interaction with
21  this individual and they come to me and say, why did you
22  shoot this individual?  And I say, "Well, they pulled a
23  gun out on me."  30 seconds are played back so they can
24  see whether or not that gun was pulled out on me.
25      Q.  So is your camera recording the whole time?

178

1      A.  It's not recording the whole time, no.  The only
2  time it's recording is, again, when you hit that button,
3  it starts the live recording at that point in time, but
4  with a 30-second buffer backwards.
5          (Video played.)
6  BY MS. BROADDUS:
7      Q.  Now we are at the 56-second mark.  Earlier you
8  had testified that when you walk up to a car after a stop
9  one of the things you point out is what the issue is,
10  correct?
11      A.  Uh-huh.
12      Q.  Is that a yes?
13      A.  Yes.  Sorry.
14      Q.  So Officer Schneider here says, Hey, when you
15  pull in, turn your turn signal on, correct?
16      A.  Correct.
17      Q.  And we can only assume because you can't see from
18  the video that he must be talking to the driver, not the
19  passenger?
20      A.  Correct.
21          (Video played.)
22  BY MS. BROADDUS:
23      Q.  So at that point -- we're at 1:14, but a few
24  seconds before you hear Mr. Wheatcroft ask, why do we need
25  to provide ID?  Did you hear that?

179

1      A.  Yes.
2      Q.  Is it a fair statement up to this point there was
3  no need to provide an ID?
4      A.  At that point in time, no.
5          (Video played.)
6  BY MS. BROADDUS:
7      Q.  Now we're at 1:22 mark, and Officer Schneider is
8  at the rear of the car.  Can you please explain why --
9  your understanding why he went to the rear of the car.
10      A.  Correct.  The suspicious activity that kind of
11  arose with this is, again, the vehicle pulling in back --
12  although there is no law that says you can't back into a
13  vehicle [verbatim], it prevents us from running a plate or
14  at least being able to put a plate out to the dispatchers
15  to say this is what we're out with.
16          If we put out a plate to dispatch, they're
17  able to run it for us real quick and let us know if it's a
18  valid plate, if it's a stolen car, or whatnot.
19          Because the vehicle backed in, we weren't
20  able to see the license plate.  So Officer Schneider
21  walked to the back of the vehicle so he could at least
22  look at the plate and put the plate out over dispatch and
23  let dispatch know what we were doing.
24      Q.  And you would agree so far -- we're at the 1:22;
25  I'm going to go back to 1:16.

180

1          When he goes back to the back of the car so
2  far Johnny has not done anything that would require him to
3  provide any identification for the officer, correct?
4      A.  That is correct.  And at that point in time
5  Johnny also has the ability -- if he doesn't want to be a
6  part of this traffic stop anymore, that he has the ability
7  to get out of the vehicle.
8      Q.  Right now we're at 1:26 where Officer Schneider
9  is still at the back of the vehicle.  Other than
10  requesting ID, Officer Schneider has not made any demands
11  or request to Mr. Wheatcroft?
12      A.  No, but that is a common question that we ask
13  everybody on a traffic stop or when we dealing with
14  somebody, is, do you have any identification on you?  That
15  is a common question that we ask.
16      Q.  Would you agree so far that Johnny has not been
17  noncompliant?
18      A.  At this point in time he's been compliant.
19          (Video played.)
20  BY MS. BROADDUS:
21      Q.  So now we're at the 1:35 second and the only
22  thing we heard him say between that time is, "Hold on a
23  minute," correct?
24      A.  Correct.  But I don't -- I would not be able to
25  depict who he's talking to, because Anya Chapman is

185

1   wearing a seat belt in the parking lot, correct?
2          MR. POPOLIZIO:  Form.
3          THE WITNESS:  It is to my knowledge that
4   this is one continuous motion from a public drive -- or a
5   public street into a private drive.  So it wasn't them in
6   just a parking lot hanging out, which would then say he
7   did not have to have his seat belt.  But because the
8   vehicle was in one swift motion from the private -- from
9   the street to a private drive, it is one continuous
10  motion, again, to my knowledge, and I'm not a traffic guy,
11  that would be my understanding.
12  BY MS. BROADDUS:
13      Q.  At what point when you enter a parking lot are
14  you allowed to take your seat belt off if you're on
15  private property?
16      A.  I can't answer that.  I don't know what
17  parameters there is.
18      Q.  The vehicle was in park, correct?
19      A.  Correct.
20      Q.  And they're in a parking spot, correct?
21      A.  Correct.
22      Q.  It would make sense that if you're parking and
23  getting in -- and you park your vehicle -- and you stop a
24  vehicle and you're intending to go into a building that
25  you would take your seat belt off, correct?

186

1       A.  Correct.
2       Q.  And you couldn't see the male or female parts of
3   this, correct, of the seat belt?
4       A.  That is correct.
5           (Video played.)
6           THE WITNESS:  Right there he's crunching
7   over.  He's not looking at the officer.  He's disengaged
8   with his conversation with the officer.
9   BY MS. BROADDUS:
10      Q.  Why is Officer Schneider opening the car door?
11      A.  Because of his actions.
12      Q.  Did he do anything illegal?
13      A.  The reasonable suspicion that he is trying to
14  evade an officer by not looking at him, by hunching over,
15  by already reaching into a bag.  It's the totality of the
16  circumstance.  Although Officer Schneider said only
17  once -- had to say it once, don't reach in that bag, it's
18  the totality of the situation.  It is the original
19  reaching into the bag.  It is then the actions of him.  It
20  is the turning away from him.  It is the crouching over.
21  So it's not just one action.  It's the totality of
22  everything that, again, creates an officer safety.
23      Q.  Officer Schneider is more or less behind the
24  door, correct?
25      A.  He has the fatal funnel, correct.

187

1       Q.  Right.  So for Johnny to be facing him, he would
2   have to actually be up and turning around.
3       A.  Well, when he was originally talking to him, he
4   was slighted that way, at an angle, talking to him.  And
5   then he moved his body position in a way where
6   Officer Schneider is no longer able to see a full spectrum
7   of what is there.  Again, a gun could be in a waistband.
8   A gun could be under the seat.  A gun can be in the map
9   pocket of the door.  It could be anywhere --
10      Q.  It could be in the back seat?
11      A.  It could be in the back seat, correct.
12      Q.  It could be someone else in the back seat doing
13  something?
14      A.  And if Wheatcroft was reaching into the back
15  seat, it would be a different story, but he's not.  He is
16  lunging in a forward motion.
17      Q.  Is he doing anything illegal at this point?
18          MR. POPOLIZIO:  Form.
19          THE WITNESS:  Nothing illegal, but he's
20  being suspicious.
21  BY MS. BROADDUS:
22      Q.  Is he noncompliant at this point?
23      A.  Yes.  There's a verbal noncompliant because he is
24  asking him that he can do this one of two ways, the easy
25  way or the hard way.  His actions here start to raise the

188

1   level of noncompliant.  He's turning his body away from
2   him.  His -- his voice -- his voice escalation.  His
3   actions here -- it's not getting into psychological
4   intimidation, but it is getting into the noncompliant
5   situation.
6       Q.  So so far Johnny's been sitting in the car in the
7   passenger seat.  He's indicated he doesn't want to talk to
8   the officer and give information, correct?
9       A.  Correct.
10      Q.  And the officer asked him not to reach in his
11  backpack, and he complied with putting his backpack down,
12  correct?
13          MR. POPOLIZIO:  Form.
14          THE WITNESS:  Correct.
15  BY MS. BROADDUS:
16      Q.  And now you're saying that because he's leaning
17  forward and has his back towards the officer, that this is
18  now reasonable suspicion for the officer to open the car
19  door?
20      A.  There is at this point in time reasonable
21  suspicion that we need to control the situation before it
22  escalates, yes.
23          (Video played.)
24  BY MS. BROADDUS:
25      Q.  You just heard Officer Schneider say, I don't

189

1   want you to stuff anything down in the seat.  In this
2   frame you can see that Johnny's hands are not stuffing
3   anything down the side of the seat.  They're actually
4   holding money, correct?
5           MR. POPOLIZIO:  Objection; form.
6           THE WITNESS:  I don't know if that's money.
7           MR. POPOLIZIO:  Let the record reflect that
8   in the last question that was asked we were at 2:22 --
9           MS. BROADDUS:  Correct.
10          MR. POPOLIZIO:  -- in the freeze frame.
11  BY MS. BROADDUS:
12      Q.  Now I'm going to freeze the frame at 2:26.  And
13  Johnny has both hands in view, correct?
14      A.  Correct.
15      Q.  And you see something in his left hand?
16      A.  Correct.
17      Q.  Could you tell what that was when you watched the
18  video?
19      A.  It appeared to be money.
20      Q.  So so far he's listened to everything the officer
21  said, correct?
22          MR. POPOLIZIO:  Form.
23          THE WITNESS:  No.
24  BY MS. BROADDUS:
25      Q.  The officer asked him not to stuff anything down

190

1   the seat.  He said okay.  You see his hands, correct?
2       A.  Correct.
3       Q.  He's complying, correct?
4       A.  The actions that he is taking is what's
5   escalating the situation.
6       Q.  Officer Schneider's actions, correct?
7       A.  No.
8       Q.  Why at this point -- is Johnny being detained at
9   this point?
10      A.  No, he is not being detained at that point.  What
11  he is doing at that point in time is creating a tactical
12  advantage for him so he can see inside that vehicle to
13  ensure that Mr. Wheatcroft is not reaching for anything
14  that may harm him or anybody else inside that vehicle.
15      Q.  So he could do that with any passengers in the
16  car, correct?
17          If somebody was leaning forward in a car in
18  this situation, any person who's leaning forward in a car
19  in this position, an officer has a right to go ahead and
20  open up the door and grab the person, correct?
21          MR. POPOLIZIO:  Form.
22          THE WITNESS:  You're asking any situation.
23  I can't answer that question.
24          (Video played.)
25

191

1   BY MS. BROADDUS:
2       Q.  So far the officer has not given him any
3   instructions to get out of the car, correct?
4       A.  We don't have to have somebody get out of the car
5   to control the situation.
6       Q.  He's got one foot outside the car, correct?
7       A.  Correct.
8       Q.  He's got a hand -- he's got one hand on his knee,
9   correct?
10      A.  Correct.
11      Q.  He's got a seat belt still over his shoulder,
12  correct?
13      A.  Correct.
14      Q.  And he's still got his other hand in sight,
15  correct?
16      A.  Correct.
17      Q.  And at this point we're at 2:28 and Officer
18  Schneider is putting a Taser on him, correct?
19      A.  Correct.
20      Q.  Why is he putting a Taser on him?
21      A.  Because he's reached that verbal noncompliance,
22  which is where we're able to display a Taser for the use
23  of this traffic stop.
24      Q.  And the verbal noncompliance is because he leaned
25  forward and had his back towards the officer, correct?

192

1       A.  Correct.  When he originally had his --
2           (Video played.)
3           THE WITNESS:  When he originally had his
4   attention focused on Officer Schneider while talking to
5   him and then diverted his attention otherwise.
6   BY MS. BROADDUS:
7       Q.  And he didn't have to cooperate with the officer.
8   He didn't have to talk to him, did he?
9       A.  No.
10      Q.  And still up to this point he doesn't have to
11  talk to him, correct?
12      A.  No.
13          (Video played.)
14          THE WITNESS:  Can we pause that for a
15  second?
16  BY MS. BROADDUS:
17      Q.  And so at this point we're at 2:36 where Officer
18  Schneider says, relax your arm, correct?
19      A.  Correct.
20          As you'll see right there, Officer Schneider
21  has his arm on his back triceps area.  It's kind of one of
22  our control holds when we've got somebody in a vehicle.
23  It is a way of us at least grabbing onto that.
24          Just prior to that, probably at about 2:34,
25  you see the tense motion and the muscle reflexion on his

193

1  right arm.  We feel that.  That's a feeling that we can
2  gauge whether or not somebody is either, A, ready to try
3  to fight us, try to get out of our hold or nervousness.
4  Those are all key clues that we go into that just, again,
5  add to the totality of the situation.  We can actually see
6  his arm and his muscles flex up.
7      Q.  Well, he has an officer who has just threatened
8  to take him down to the station for not having his ID,
9  who's opening up his car door and has a Taser on his neck.
10  Is that grounds to be nervous?
11          MR. POPOLIZIO:  Form; foundation.
12          THE WITNESS:  He didn't have his Taser on
13  his neck.
14          (Video played.)
15          THE WITNESS:  It's on his shoulder.
16          (Video played.)
17  BY MS. BROADDUS:
18      Q.  All right.  We're at 2:55 and at this point
19  Officer Schneider has accused Johnny of putting something
20  in his backpack and stuffing something down in the seat,
21  correct?
22      A.  Correct.
23      Q.  And both times when Johnny was asked to do
24  something with either of those he said he wasn't and his
25  hands were in clear view, correct?

194

1      A.  Correct.
2      Q.  And at this point Officer Schneider has
3  reholstered his Taser, correct?
4      A.  He has de-escalated at that time, correct.
5      Q.  That's a de-escalation tactic?
6      A.  Correct.
7      Q.  As then as you can see in this picture his left
8  arm -- Officer Schneider's left arm or hand is still on
9  Johnny's -- now the back of his right arm and his --
10  clarification -- Officer Schneider's right arm is reaching
11  for Johnny's wrist, correct?
12      A.  That is a control hold form that we go into, yes.
13      Q.  Okay.
14          (Video played.)
15  BY MS. BROADDUS:
16      Q.  Is that control hold painful?
17      A.  No.
18          (Video played.)
19  BY MS. BROADDUS:
20      Q.  All right.  We're at 3:01, and Officer Schneider
21  has now pulled Johnny's wrist back towards Officer
22  Schneider and is pushing his arm and shoulder area
23  forward.  Do you see that?
24      A.  Yes.
25      Q.  Is that a painful move?

195

1      A.  It is a pain compliance form.  It's not a painful
2  move necessarily, but it is a pain compliance form.
3      Q.  Okay.  So a pain compliance form, what does that
4  mean?
5      A.  We're trying to gain control of the situation
6  before it gets out of control.
7      Q.  So you say it's pain compliance.  Are you trying
8  to get him to comply with something?
9      A.  If he decides to fight at that point in time, if
10  he decides to reach for a weapon at that point in time,
11  we've got a hold on him that we can increase the pain if
12  we need to to control the situation or push him away to
13  gain distance between us and the vehicle.
14      Q.  So far he's still complied with the officer's
15  requests.  All his verbal requests that he's made,
16  Johnny's complied with those, correct?
17          MR. POPOLIZIO:  Form.
18          THE WITNESS:  Based on the reasonable
19  suspicion that is -- something is going on with him
20  putting something in between the seat, putting something
21  in a backpack.  Officer Schneider's reasonable suspicion
22  of that is something else is going on, his attitude with
23  his verbal noncompliance.  Again, it's the totality of the
24  situation versus one incident of a situation.
25

196

1  BY MS. BROADDUS:
2      Q.  That wasn't my question.  My question was:  At
3  this point so far has Johnny complied with all of Officer
4  Schneider's verbal commands?
5          MR. POPOLIZIO:  Objection; form.
6          THE WITNESS:  No.
7  BY MS. BROADDUS:
8      Q.  What verbal command did he not comply with?
9      A.  Well, he first asked him not to reach into
10  something.
11      Q.  He asked him not to reach into his backpack,
12  correct?
13      A.  Correct.
14      Q.  And Johnny put his backpack down, correct?
15      A.  Correct.
16      Q.  Is that complying with the officer's request?
17          MR. POPOLIZIO:  Form.
18          THE WITNESS:  With that one request, yes.
19  BY MS. BROADDUS:
20      Q.  So he complied with that one.
21          What request did Johnny not comply with --
22  verbal request that Officer Schneider made that Johnny did
23  not comply with?
24      A.  Verbally he's complying.  Physically he's not.
25      Q.  And physically is because he turned his back on

197

1  the Officer correct?
2      A.  Correct.
3          (Video played.)
4  BY MS. BROADDUS:
5      Q.  At this one point we're at 3:12, and now there's
6  another Taser on Johnny's arm.  Do you see that?
7      A.  Uh-huh.
8      Q.  Do you know whose Taser that is?
9      A.  That is my Taser.
10     Q.  Why did you put a Taser on his arm?
11     A.  Because he is now getting into a possible active
12 aggression situation.  It's the -- we've now moved into
13 the psychological intimidation, which is allowing me to
14 use a Taser as a form of a complying and gaining control
15 of the traffic stop.  We're controlling the situation.
16     Q.  So far pretty much the only thing that you've
17 agreed to that Johnny has done wrong is he turned his back
18 on the police officer, correct?
19         MR. POPOLIZIO:  Form.
20         THE WITNESS:  No, I am not agreeing to that.
21 BY MS. BROADDUS:
22     Q.  Okay.  What could Johnny have done differently up
23 to this point to prevent you from putting a Taser on him?
24     A.  Provided his name to us.
25     Q.  And he is not required to by law, correct?

198

1      A.  No, but you asked me what could he have done.
2      Q.  So he would have to give up his rights to able to
3  avoid getting into this situation by this time, right?
4          MR. POPOLIZIO:  Form.
5          THE WITNESS:  Or just comply with the
6  traffic stop.  It's not a rights issue.  It's just a
7  comply with the traffic stop.
8  BY MS. BROADDUS:
9      Q.  So if an officer asked you to do something to --
10 I'm sorry.
11         If an officer requests something in a
12 traffic stop and you don't want to do it, you don't have
13 to do it --
14     A.  But that was not the original question you asked.
15     Q.  No.  I was going off your response.
16     A.  Okay.
17     Q.  So your response was that he would -- if he
18 wanted to avoid this he could have provided his ID?
19     A.  Correct.
20     Q.  And he didn't provide his ID, which he's not
21 legally required to do, correct?
22     A.  Correct.
23     Q.  So by doing something he was legally not required
24 to do, he is now in a situation where there's a Taser on
25 him, correct?

199

1      A.  It was because of the actions leading up to that.
2      Q.  And his actions were turning his back on the
3  officer, correct?
4      A.  The -- just the totality of everything.  You're
5  asking me one instance.  It's the totality of everything.
6  It's the original reaching into a bag.  Yes, he complied,
7  but it's the original reaching into the bag.  Then it is
8  the reaching -- stuffing something down in between a seat.
9  It is the -- the verbal, why are we here?  It's the
10 totality.
11         You're asking me to pinpoint a single
12 situation, and I can't do that because it's the totality
13 of everything that has brought it to his attention.
14     Q.  Is it fair to say that you never saw Johnny
15 reaching into his backpack?  Correct?
16     A.  I never saw that.
17     Q.  And you never saw Johnny reaching in between the
18 seats, correct?
19     A.  That is correct.
20     Q.  So you're relying on Officer Schneider's words
21 that he's saying, correct?
22     A.  Correct.
23     Q.  And in the video you do not see Johnny stuffing
24 anything between the seats, correct?
25         MR. POPOLIZIO:  Form.

200

1          THE WITNESS:  Body cameras do not catch
2  everything.
3  BY MS. BROADDUS:
4      Q.  Fair enough.  But you do not see in the body
5  camera where Johnny's stuffing something down in the
6  seats, correct?
7      A.  That is correct.
8      Q.  So that could have been something that never
9  happened, correct?
10         MR. POPOLIZIO:  Form; foundation.
11         THE WITNESS:  I can't answer that.
12 BY MS. BROADDUS:
13     Q.  So you don't know?
14     A.  It is not an answerable question.
15     Q.  So far you're relying on Schneider and what he's
16 saying for your basis for putting a Taser on
17 Mr. Wheatcroft, correct?
18     A.  He said, "He is going to fight."
19     Q.  And that is why you came over and put a Taser on
20 him --
21     A.  That is correct.
22     Q.  -- because that is what Officer Schneider stated?
23     A.  Correct.
24     Q.  We're still at the 3:12 point, and Johnny
25 Wheatcroft still has the seat belt around him, correct?

201

1    A.   Correct.
2         MR. POPOLIZIO:  Form.
3         (Video played.)
4    BY MS. BROADDUS:
5    Q.  We are now at 3:15, and Officer Schneider now has
6    grabbed Johnny's head and is pushing it forward.  Do you
7    see that?
8    A.   Yes.
9    Q.  What is that move for?
10   A.   It is an -- it's a control -- it's to get him
11   away from facing us.  It is to gain compliance of the
12   hold.
13   Q.  Are you trying to get him out of the car?
14   A.   We're trying to gain compliance at this point in
15   time.
16   Q.  What does compliance mean at this point in time?
17   A.   Well, he's still moving around.  He's still --
18   again, when we've got our hands on somebody and we feel
19   the muscles tensing up or we feel that body separating
20   from our grip or from our presence -- to use it as an
21   analogy, if I've got my fist up against my hand right
22   here, I feel tension in my forearm.  If I remove my hand
23   from my fist, there's no longer tension in that forearm.
24        To us, when we have our hands on somebody
25   and that tension is being released or partly released,

202

1    that's an indication to us that somebody is trying to get
2    away from our hold.  That's when we have to take action
3    and try and get that hold into a better situation so it
4    prevents any further actions.
5         So at this point in time, his actions are
6    still in an effect of a nonverbal and now getting into a
7    psychological intimidation to where we need to gain
8    control of that.
9         And I'm sorry if you didn't think that that
10   was the right thing to say, but I'm trying to tell you how
11   it is and the reason why we're there.
12   Q.  Well, you have a situation where it's an alleged
13   turn signal violation.  You have a gentleman in the front
14   seat passenger side who knows he doesn't have to provide
15   his ID and doesn't.  He's got an officer who opens up the
16   door and grabs him and then puts him in a painful arm bar
17   and now is shoving his head forward, and he's had a Taser
18   threatened on him twice and he has no clue why.
19        MR. POPOLIZIO:  Objection:  Form;
20   foundation.
21   BY MS. BROADDUS:
22   Q.  Because he doesn't know what the officers are
23   thinking.
24        MR. POPOLIZIO:  Same objection.
25

203

1    BY MS. BROADDUS:
2    Q.  Do you think it's reasonable for him to tense up
3    in that situation?
4         MR. POPOLIZIO:  Same objection.
5         THE WITNESS:  I think if he complied at the
6    very beginning we wouldn't be here.
7    BY MS. BROADDUS:
8    Q.  Right.  If he would have provided his name,
9    correct?
10   A.   Correct.
11        (Video played.)
12   BY MS. BROADDUS:
13   Q.  At this point Johnny is now out of the car.  He's
14   still wrapped in the seat belt.  He's being pushed up
15   against the seat of the car.  Do you see that?
16   A.   Yes.
17   Q.  And this is the point -- I'm sorry, I'm at
18   3:19 -- where you will be tasing him, correct?
19   A.   No.
20        (Video played.)
21   BY MS. BROADDUS:
22   Q.  Johnny was just tased a couple of times.  Is that
23   you doing the tasing?
24   A.   No.  He was drive stunned.
25   Q.  I'm sorry.  So he was drive stunned, which is a

204

1    form of tasing, correct?
2    A.   It is a form of pain compliance, correct.
3    Q.  And you drive stunned him twice, correct?
4    A.   Correct.
5         (Video played.)
6    BY MS. BROADDUS:
7    Q.  We're now at 3:25, and I believe this is the
8    point where you fell backwards, correct?
9    A.   This is where I got hit in the head, yes.
10   Q.  My question is:  You fell backwards?
11   A.   Yes.
12        (Video played.)
13   BY MS. BROADDUS:
14   Q.  At this point we're at 3:25.  Johnny's sitting on
15   the ground, correct.
16   A.   Correct.
17   Q.  He's wrapped in a seat belt, correct?
18   A.   Correct.
19   Q.  What threat is he at this point when he's on the
20   ground, you see both of his hands, seat belt's wrapped
21   around his legs?
22   A.   As you'll see in this video right here, I can see
23   a brown bag that he originally was going into, which is
24   still the unknown.  His seated position, he is at a
25   vantage point with his right hand next to the seat where

205

1    any kind of weapon can be grabbed.  We still have the
2    unknown of what's in the backpack.  We are to assume that
3    whatever is in that backpack is going to hurt or kill us.
4         So what we have to do is try to gain
5    distance from that, which Officer Schneider did.  He took
6    several steps back at that point in time to gain some
7    distance.
8    Q.  Okay.  And then we'll go ahead and go forward.
9         (Video played.)
10   BY MS. BROADDUS:
11   Q.  We're now at 3:38, and you saw Officer Schneider
12   shoot a dart Taser --
13   A.  Uh-huh.
14   Q.  -- at Mr. Wheatcroft, correct?
15   A.  Uh-huh.
16   Q.  Is that yes?
17   A.  Yes.  Sorry.
18   Q.  Then you see at this point Officer Fernandez step
19   in, correct?
20   A.  Yes.
21   Q.  So Johnny's been tased several times here,
22   correct?
23   A.  Tased once, to my knowledge, because the drive
24   stun is different.
25   Q.  Okay.  So you're treating them differently.

206

1    You're saying a drive stun is not a tase?
2    A.  No.  A Taser is when it is deployed versus a
3    drive stun.
4    Q.  Okay.
5    A.  The probes have been deployed, and that's the
6    tasing.
7    Q.  So drive stun you don't consider to be tasing?
8    A.  I don't, no.
9    Q.  I just want to understand your terminology.
10   A.  Correct.
11   Q.  So at this point still the same thing.  Johnny
12   didn't provide identification, correct?  And that's why
13   we're at this point, correct?
14   A.  No.  We're at this point because of his starting
15   off with nonverbal compliance into physical -- or
16   psychological intimidation.
17   Q.  Because he leaned forward in his seat and had his
18   back to the officer, correct?
19   A.  Because of his actions leading up to it; reaching
20   into the bag, reaching into a --
21        (Video played.)
22   MS. BROADDUS:  Sorry.
23   THE WITNESS:  -- compartment between the
24   seat and a middle console, and the actions that he took
25   with his body language moving away from officers.

207

1    MR. POPOLIZIO:  Because the video
2    interrupted, did you get that?
3         THE COURT REPORTER:  I did.  Thank you.
4         THE WITNESS:  Also in this video you'll see
5    that the Taser has been deployed.  If a Taser has been
6    effective, and that means both probes are connected, it
7    actually locks the body up.  The body is not locked up.
8    He is still flailing around on the ground, which means
9    that a probe, although it may be in, is not making the
10   correct connection between the two probes and the spread.
11   BY MS. BROADDUS:
12   Q.  So you just keep tasing?
13   A.  Well, the tasing at that point in time is
14   ineffective.
15        (Video played.)
16   BY MS. BROADDUS:
17   Q.  At this point you're on the ground.  Do you have
18   any recollection of events from this point until -- well,
19   of all the things that are happening or were you fuzzy at
20   this point?
21   A.  All I could hear at that point in time is Officer
22   Schneider saying stay on the ground.  Other than that, I
23   have the fight or flight mentality.
24        In the academy we are taught that no fight
25   is a good fight, and that if I can't win a fight then I

208

1    might as well be dead.
2         And in that situation I'm on the ground
3    where my body is telling me one thing, my mind is telling
4    me another.  The two are not connecting.
5    Q.  Did you see Johnny at any point or were you able
6    to focus on Johnny at any point to see what he was doing
7    from this point on?
8    A.  No.
9    Q.  So if somebody said he was kicking or flailing or
10   anything like that, you would have no -- you can't testify
11   as to that?
12   A.  I can't testify to that.
13   Q.  Did you think Johnny was being combative?
14   A.  It rose to that level, yes.
15   Q.  And at what point did he start being combative?
16   A.  He became combative after I got knocked out.
17   Q.  So you don't have any firsthand knowledge of
18   that, correct?
19   A.  No, no.
20   Q.  So during your entire dealings with Johnny he was
21   not combative, correct?
22   A.  Correct, just noncompliant.
23   Q.  I'm going to be switching videos.  This is a
24   motel surveillance video from Motel 6.  Okay?
25   A.  Okay.

213

```
 1        Q.   Did you suspect those vehicles of any illegal
 2   activity?
 3        A.   As we drive through, the vehicles that are backed
 4   in, we'll actually get out on foot and we will walk behind
 5   and we'll get the plate, and we'll go run the plate to
 6   make sure that it isn't stolen.  Motel 6 is notorious for
 7   having stolen vehicles.
 8        Q.   So at this point you can see the full cruiser,
 9   correct?
10        A.   Correct.
11        Q.   And I'm actually going to go back a second.  I'm
12   starting at 10.  Okay?
13        A.   Uh-huh.  Yes.
14        Q.   And we're going to see the car come in, and you
15   see his wheels turn to the right a little and then start
16   turning to the left and they stop, correct?
17        A.   Correct.
18        Q.   And there's --
19             MR. POPOLIZIO:  Form.
20             What stops?
21             Just so I'm clear on the question.
22             MS. BROADDUS:  Well, let me go further then.
23             MR. POPOLIZIO:  Okay.
24   BY MS. BROADDUS:
25        Q.   So now we're at 16 seconds in, correct, and you
```

214

```
 1   can see the police cruiser?
 2        A.   Yes.
 3        Q.   Did you make eye contact with the driver?
 4        A.   Did I make contact with the driver?
 5        Q.   Eye contact.
 6             At this point in the video where your
 7   cruiser is down at the end in the back alley still, it
 8   hasn't made its turn, could you see the driver of the
 9   vehicle?
10        A.   No, I can't see the driver from this video.
11        Q.   Could you see the passengers?
12        A.   No, I can't see the passengers.
13             MR. POPOLIZIO:  Okay.  Before we go any
14   further, when I asked about the clarification as to
15   whether -- I think you said whether the wheels were
16   stopped or was stopped, you said you'd go back.  We didn't
17   go back, and I don't know what the question is about,
18   though.  It was confusing.
19             Was it stopped in this freeze frame or did
20   the car in this video as we're looking at it right now at
21   16 seconds in come to a complete stop?
22             MS. BROADDUS:  No.  We're at 16 seconds in
23   is where I stopped this.
24             MR. POPOLIZIO:  So that --
25
```

215

```
 1   BY MS. BROADDUS:
 2        Q.   I will take it back so you guys can see where the
 3   vehicle actually -- it pulls in.  We're at 15.  It doesn't
 4   actually stop.  It starts -- and it starts reversing and
 5   backing all the way in --
 6             MR. POPOLIZIO:  At 19.
 7   BY MS. BROADDUS:
 8        Q.   -- into a parking spot.  It's got all four tires
 9   backed in and aligned in the parking spot.  And we're at
10   34 seconds.  Do you see that?
11        A.   Yes.
12        Q.   When they were backing up did it seem like they
13   were racing?
14        A.   There appeared to be an evasive move, yes,
15   because the vehicle was canted what appeared to be going
16   into the parking spot that is available right there on the
17   left-hand side.  When we became parallel with that
18   vehicle, it canted its wheels the other way and did a
19   reverse.  That is the -- that is the suspicious activity
20   that also creates a purpose here.
21        Q.   And you don't know.  He might have been intending
22   on backing up the whole time.  He just pulled forward and
23   then saw that spot and decided to back in, correct?
24             MR. POPOLIZIO:  Form; foundation.
25             THE WITNESS:  Correct.
```

216

```
 1   BY MS. BROADDUS:
 2        Q.   And you also see that there's a gap between the
 3   two cars where I think you're talking about, between like
 4   a small black SUV and car that's backed in.  Is that the
 5   spot you thought he was going to be pulling into?
 6        A.   Yes.
 7        Q.   And you can kind of see that the tires of the car
 8   that are the closest to us are -- it's next to a blocked
 9   off parking area, correct?
10        A.   If you're referring to the handicapped spot, then
11   yes.
12        Q.   You don't know as you sit here right now how far
13   that car is on that white line on the other parking side,
14   correct?
15        A.   Correct.
16        Q.   So that car might have been taking up a little
17   more space than it should have and maybe that car didn't
18   think it could fit there.
19             MR. POPOLIZIO:  Objection --
20   BY MS. BROADDUS:
21        Q.   You don't know, correct?
22             MR. POPOLIZIO:  Objection:  Form;
23   foundation.
24             THE WITNESS:  Correct.
25
```

217

BY MS. BROADDUS:

Q.  We are now at 36 seconds in, and it looks like Officer Schneider's door is opening, correct?

**A.  Correct.**

Q.  And the other car, there's already somebody who's opened up the back seat car door on the Taurus, correct?

**A.  Correct.  And if we were to play the video in full motion, I believe that that door opened up, and it looked like somebody was trying to get out of that vehicle before the car came to a complete stop.**

Q.  I'll take it back.  I'm going to take it back to 30 seconds.  So we're at 32 seconds, and the car door, it just looks like it starts opening while the police cruiser is --

**A.  Correct.**

Q.  -- approaching, correct?

**A.  Correct.**

Q.  And I'm continuing to play it right now --

**A.  Yep.**

Q.  -- and I'll have questions.

So here we're at 39 seconds and you exited the vehicle, correct?

**A.  Correct.**

Q.  And you see that the Taurus, there is a back driver's side door open, correct?

218

**A.  Correct.**

Q.  And the car is stopped, at least in a position in that parking spot, the Taurus is, correct?

**A.  Correct.**

Q.  I stopped at 44 seconds because you had testified earlier that, you know, you saw the car door open, which is a red flag for you so you're going to approach in a vigilant manner, correct?

**A.  Correct.**

Q.  You just stopped there for a second.  We're at 57 seconds and you just looked off to the right.  Do you know what you were looking at?

**A.  Just prior to that I looked off to the left because when we first came in there was an individual getting in that car that was now leaving that also caught my attention.  I looked off to the right because I know that's an entrance into the facility, so I wanted to make sure that no cars were trying to come in where we were at.**

Q.  Is it fair to say you didn't see any other cars that wanted to come in?

**A.  That is correct.**

Q.  All right.  Now we're at a minute ten in, and you are at this point at the driver's side door, and you reached it a few seconds earlier, just for clarification.

And is this the point where you started

219

asking for identification from the driver?

**A.  Yes.**

Q.  Prior to approaching this car, did you recognize any of the passengers?

**A.  No.**

Q.  Did you recognize the driver?

**A.  No.**

Q.  Prior to this date in July of 2017, did you know who Johnny Wheatcroft was?

**A.  No.**

Q.  Did you know Anya Chapman?

**A.  No.**

Q.  Did you know Shawn Blackburn, who was the driver?

**A.  No.**

Q.  I assume you didn't know the children that were in the back either, correct?

**A.  No.**

Q.  Correct?

**A.  Correct.**

Q.  Since you didn't know who they were, you had no idea what any of their histories were.  Is that a fair statement?

**A.  That's a fair statement.**

Q.  You don't if they had ever been engaged in any illegal activity in their past, correct?

220

**A.  No.**

Q.  And you didn't know if anybody had any warrants out for their arrest, correct?

**A.  No.**

Q.  And you didn't know if they all maybe had clean records; is that true?

**A.  This is true.**

Q.  So is it fair to say that any actions that you took that day were not based on any information regarding -- well, let me go back.  Let me start over.  Okay.

You've learned that -- have you learned that Johnny has had a criminal history since this incident?

**A.  Yes, I have.**

Q.  And is it fair to say that any of Johnny's criminal history did not impact what your actions were that day?

MR. POPOLIZIO:  Form.

THE WITNESS:  I would say that there's a level of suspicion that raises up when we see somebody who's got prison tattoos.

BY MS. BROADDUS:

Q.  Did you see his tattoos?

**A.  I personally did not, but I'm only going off of, again, the totality of Officer Schneider and his dealing**

221

1  with him.
2      Q.  So it's fair to say that you didn't know anything
3  about any criminal history of anybody in the car when you
4  were dealing with anyone that day?
5      **A.  I did not.**
6      Q.  And it's fair to say that any criminal history
7  that he had did not impact any of your actions that day.
8  Is that a fair statement?
9      **A.  That's a fair statement.**
10     Q.  When you were a member of NRS, did guys have any
11 discussions as a unit following this incident regarding
12 the Wheatcrofts, or involving the Wheatcrofts?
13         Did you have any discussions on policies or
14 maybe how to handle situations differently?
15     **A.  We did not, no.**
16     Q.  Would you have done anything differently that
17 day?
18         MR. POPOLIZIO:  Form.
19 BY MS. BROADDUS:
20     Q.  Knowing what you know now, would you do anything
21 differently?
22     **A.  Ducked.**
23     Q.  Is that it?
24     **A.  Yes.**
25     Q.  Would you have tried to de-escalate the

222

1  situation?
2      **A.  No.**
3      Q.  Would you have questioned Officer Schneider about
4  the basis for the traffic stop?
5      **A.  No.**
6      Q.  You've seen the video now, and you know there are
7  questions on whether he could see a turn signal, correct?
8      **A.  Correct.**
9      Q.  You don't have to use your turn signal, true?
10         You can use your arm.
11     **A.  Correct.**
12     Q.  And you actually can use it from -- the law on
13 turn signals is a turn signal has to be 100 feet before
14 you execute your turn, correct?
15     **A.  Correct.**
16     Q.  Not during your turn, correct?
17     **A.  But in that questioning to the driver when he**
18 **said, just use your turn signal next time, he agreed.  He**
19 **didn't say I used my arm.  He didn't say he used an**
20 **alternative turn signal.  He agreed that he didn't have**
21 **his turn signal on.**
22     Q.  That was after the fact, correct?
23         That's after the car -- you'd already
24 approached the vehicle, correct?
25     **A.  That was after Officer Schneider told him, next**

223

1  time you turn, you're supposed to use your turn signal.
2      Q.  I'm trying to get the basis for the stop in the
3  first place.
4      **A.  Okay.  Uh-huh.**
5      Q.  So as a basis for a stop, you have to have a
6  reasonable suspicion that a crime has occurred or is
7  occurring, correct?
8          MR. POPOLIZIO:  Form.
9          THE WITNESS:  Correct.
10 BY MS. BROADDUS:
11     Q.  It's your understanding Officer Schneider said
12 that there was a turn signal violation, correct?
13     **A.  Correct.**
14     Q.  When you saw the vehicle -- when you first saw
15 this vehicle, it was already under the arches at the
16 motel.  Is that a fair statement?
17     **A.  That's a fair statement.**
18     Q.  And you knew that you were on the backside of the
19 building, correct?
20     **A.  What was that?**
21     Q.  You were on the back side of the motel building,
22 correct?
23     **A.  Yes.**
24     Q.  And you can't see through the building, correct?
25     **A.  That is correct.**

224

1      Q.  So you cannot see Glenn Drive from 59th Avenue to
2  where the turn is, correct?
3      **A.  At certain points behind the building you cannot,**
4  **but when you get just past the building you can see.**
5      Q.  Okay.  So the turn signal would have had to have
6  been on between the corner at 59th Avenue and the turn at
7  Glenn -- from Glenn Drive into the motel, correct?
8          MR. POPOLIZIO:  Form.
9          THE WITNESS:  Repeat the question, please.
10 BY MS. BROADDUS:
11     Q.  Sure.  Any turn signal that would need to be used
12 to turn into the motel would have to be used between
13 59th -- when you were on Glenn Avenue -- from 59th Avenue
14 on Glenn until you turn to the motel, correct?
15     **A.  Correct.**
16     Q.  And from what your testimony was earlier, you
17 could not see that area, correct?
18     **A.  I wasn't looking through that area.  I was --**
19 **again, as we previously talked, my focus was down the back**
20 **alleyway, the north side of it.**
21         So you're asking me to answer a question
22 that I can't answer.
23     Q.  But you knew that he said that he saw a turn
24 signal violation, correct?
25     **A.  Officer Schneider said he saw a violation,**

229

```
1   BY MS. BROADDUS:
2       Q.  And you would back him 100 percent for these
3   events that took place that day?
4           MR. POPOLIZIO:  Form.
5           THE WITNESS:  I'd work with him tomorrow, if
6   that's what you're asking.
7   BY MS. BROADDUS:
8       Q.  No.  I'm asking you if you would back the events
9   that he did that day.
10          MR. POPOLIZIO:  Form.
11          THE WITNESS:  Yes.
12          MS. BROADDUS:  I'm going back to your body
13  cam.
14          (Video played.)
15  BY MS. BROADDUS:
16      Q.  In your body-cam footage I'm at two minutes and
17  50 seconds in, and it looks like this is the point where
18  you start going around the vehicle to the passenger side.
19  Does that look about right?
20      A.  Yes.
21      Q.  So when you first arrived to the passenger side,
22  Officer Schneider already has Johnny Wheatcroft in an arm
23  bar, correct?
24      A.  Correct.
25          (Video played.)
```

230

```
1   BY MS. BROADDUS:
2       Q.  At this point we're at three minutes and one
3   second and you say you have a Taser on him, correct?
4       A.  Correct.
5       Q.  Which is the policy; you're supposed to identify
6   that there's a Taser on someone, correct?
7       A.  Correct.
8       Q.  And could you see what Johnny was doing at this
9   point?
10      A.  My view was blocked at that point in time.
11          (Video played.)
12  BY MS. BROADDUS:
13      Q.  At this point we're at 3:07 and you just saw
14  Officer Schneider push his head forward, correct?
15      A.  Correct.
16      Q.  And you can't really see much more because you're
17  behind Officer Schneider, correct?
18      A.  We're in a very tight spot there with the door,
19  correct.
20          (Video played.)
21  BY MS. BROADDUS:
22      Q.  We are at 3:09, and now Officer Schneider still
23  has a hold of Johnny, and you come up to the other side
24  and you have your Taser out, correct?
25      A.  Correct.
```

231

```
1           (Video played.)
2   BY MS. BROADDUS:
3       Q.  Did you hear Johnny say he was stuck?
4       A.  No, I did not.
5       Q.  I will play it back a little bit.
6           (Video played.)
7   BY MS. BROADDUS:
8       Q.  So Johnny is in the seat belt at this point and
9   you're tasing him, correct?
10          MR. POPOLIZIO:  Form.
11          THE WITNESS:  I'm drive stunning him.
12  BY MS. BROADDUS:
13      Q.  You're drive stunning him while he's seat belted
14  and Officer Schneider has a hold of him, correct?
15          MR. POPOLIZIO:  Form.
16          THE WITNESS:  He's not seat belted
17  completely in.
18  BY MS. BROADDUS:
19      Q.  He's wrapped up in the seat belt.  Do you see
20  that?
21          MR. POPOLIZIO:  Form.
22          THE WITNESS:  Yes.
23          (Deposition Exhibit Nos. 16 and 17 were
24  marked for identification.)
25
```

232

```
1   BY MS. BROADDUS:
2       Q.  You have documents that have been placed in front
3   of you.  I'm looking at Exhibit No. 16 first, which is the
4   Taser Pulse Log Evaluation.  Do you see that?
5       A.  Yes, ma'am.
6       Q.  And on page 1 under the events section it says,
7   "Sequence 1, armed."
8           Do you see that?
9       A.  Yes, ma'am.
10      Q.  And my understanding is that's when you first
11  armed your Taser device, correct?
12      A.  To the best of my knowledge, yes.
13      Q.  And I'm going to have you go to page 2.  And page
14  2 at the top of the page, it says, "Sequence 2, arc
15  activation."
16          Do you see that?
17      A.  Yes.
18      Q.  And it says, "Both C1 and C2."
19          What does that mean?
20      A.  I don't know what -- I don't know what the codes
21  are on this.
22      Q.  And it says underneath that, "Duration, 1
23  second."
24          Do you see that?
25      A.  Correct.
```

233

1    Q.   Then if you turn to the next page, there's a
2  photograph of you -- well, it has a picture of your arm
3  with the Taser on Johnny.
4         Do you see that?
5    A.   Yes.
6    Q.   And towards the upper left it says, "Sequence 2,"
7  correct?
8    A.   Yes.
9    Q.   And I'll have you turn to the next page.  It
10  says, "Sequence 3" at the top of the page, and it says
11  "Duration, 1 second."
12        Do you see that?
13    A.   Yes.
14    Q.   And if you turn to the next page after that
15  there's another photograph of the tasing on sequence 3.
16        Do you see that?
17    A.   Yes.
18    Q.   And then underneath the photograph it says,
19  "Sequence 4 Safed."  Do you know what that means?
20    A.   I do not.
21    Q.   Under the photograph there's some bullet points,
22  and the second one says, "Total time activated through ARC
23  switch" -- and it's ARC -- "equals 2 seconds."
24        Do you see that?
25    A.   Yes.

234

1    Q.   And underneath that it has the total completed
2  connection time, .4 seconds, correct?
3    A.   Correct.
4    Q.   Do you know what that means?
5    A.   To the best of my ability that would mean that
6  the total time between both arcs was two seconds.
7    Q.   I'm going to have you look at Exhibit 12 -- I'm
8  sorry -- 17.  I can't read my own handwriting.
9         Have you seen this document before?
10    A.   Yes, I have.
11    Q.   What is your understanding of what this is?
12    A.   That at 19:11 hours and 22 seconds is when the
13  Taser was turned on.  At 19 hours 11 seconds and
14  23 seconds there was a one-second duration arc.  At
15  19:11:24 there was another one-second arc.  And that at
16  19:11:38 is the safe mode, which is when I believe and
17  understand that the Taser was finally turned off.  So the
18  16 seconds in my recollection is the total time that the
19  Taser was turned on.
20    Q.   And according to this there were two separate
21  times when you drove stunned, correct?
22    A.   Whenever we do a drive stun we have the Taser
23  connected -- or not connected but touching the body.  When
24  there is a separation between the Taser and the body, the
25  Taser's ineffective.  So in the initial drive stun when he

235

1  moved, the Taser was let off and then reengaged.
2    Q.   It sounds like there was a total of two seconds
3  of tasing.  You're not sure, as you sit here today, how
4  much of that was actually continuous tasing?
5    A.   Correct.
6         MS. BROADDUS:  I'm going to take a
7  five-minute break.  Okay?
8         MR. POPOLIZIO:  Sure.
9         (The deposition was at recess from 4:07 to
10  4:20 p.m.)
11  BY MS. BROADDUS:
12    Q.   Back on the record.
13         At some point you were -- I think you said
14  you were hit by a bag or something.  Hit by something?
15    A.   I was hit by something.
16    Q.   At that point Johnny was already being tased,
17  correct, a couple of times?
18         MR. POPOLIZIO:  Form.
19         THE WITNESS:  No.  At that point in time he
20  had only been drive stunned by me.
21  BY MS. BROADDUS:
22    Q.   I'm showing you another video.  This is from
23  Officer Pittman.  We're starting -- and I think this is
24  when you were in the hospital after the events.  Okay?
25    A.   Uh-huh.

236

1    Q.   Actually, before we start that, did you have a
2  conversation with Officer Pittman before the video
3  started?
4    A.   No.
5    Q.   So he came into the room, and then you just
6  waited for him to activate his camera and then you started
7  the interview?
8    A.   Yes.
9         (Video played.)
10  BY MR. BROADDUS:
11    Q.   Do you know why you were laughing at that point?
12    A.   As officers, when we're put in high stressful
13  situations, and then we have somebody that we know and
14  trust and have come to trust with our families' lives, and
15  they come in and ask the question, what happened, it's a
16  natural reaction.
17    Q.   So it was just a reaction that you had in
18  response to his saying what happened?
19    A.   Yes.
20    Q.   You didn't think anything that happened that day
21  was funny, did you?
22    A.   No.
23    Q.   I'm going to a different exhibit in your
24  notebook, Exhibit 7, please.  It's at tab 7.  Tab 7 is a
25  police report.  Have you ever seen this document before?

237

1    A. Not in its totality, no.
2    Q. You've seen bits and pieces?
3    A. I think so, yes.
4    Q. When is the last time you think you saw parts of
5  this?
6    A. The last time I would have seen it would have
7  been shortly after this incident occurred.
8    Q. And my understanding is you did not prepare any
9  reports or narratives to be included with the police
10 report?
11   A. No. Because I was listed in this report as a
12 victim, I did not have any part in the report writing.
13   Q. I'm going to have you turn to Bates number that
14 is 50, please, five zero. At the upper right-hand side of
15 the page it has a name underlined, Joe Flosman.
16      Do you see that?
17   A. Yes, ma'am.
18   Q. Do you know who that is?
19   A. Yes, I do.
20   Q. Who is that?
21   A. He is one of our sergeants who investigates
22 homicide.
23   Q. Did he do an interview with you in September
24 regarding this incident?
25   A. Yes, he did.

238

1    Q. You'll see after the first paragraph and sentence
2  it says, "Interview of Officer M. Lindsey."
3      Do you see that?
4    A. After the second interview, interview -- yes, I
5  do.
6    Q. Was that the first time you had been interviewed
7  other than at the hospital regarding this incident?
8    A. Yes.
9    Q. And it says it took place on September 1st of
10 2017. Does that sound about right?
11   A. It sounds about right.
12   Q. I'm going to have you go down -- do you see a --
13 it's kind of like the paragraph -- second to the last
14 paragraph at the bottom of the page, the last line of the
15 sentence, and it's the paragraph right above that, and it
16 says, "Officer Lindsey stated that in the past they had
17 seen vehicles abruptly stop and back into places that were
18 suspicious and were common behavior for stolen vehicle" --
19   A. Yes.
20   Q. -- "suspects" --
21   A. Yes.
22   Q. -- correct?
23      Is that something you mentioned to Officer
24 Flosman?
25   A. Yes.

239

1    Q. And I'm going to go up from there
2  three seconds -- or three sentences, and there's a
3  sentence that says, "He made mention to me that he didn't
4  see a blinker. He said, you know, see what happens.
5  Let's try and stop this vehicle."
6      Did you see that?
7    A. Let me get to that point here.
8    Q. And I apologize. It's --
9      MR. POPOLIZIO: Do you see where we are?
10     THE WITNESS: I'm trying to follow it. It's
11 broken up by lines. "He made mention to me that he didn't
12 see a blinker. He said, you know, we -- you know, know
13 what happens. Let's try and stop this vehicle."
14 BY MS. BROADDUS:
15   Q. Do you see that?
16   A. Uh-huh.
17   Q. Do you recall Officer Schneider saying that to
18 you?
19   A. I think he said something to the fact of, let's
20 stop this vehicle, yes.
21   Q. I'm going to have you turn to the next page,
22 which is Bates number 51.
23   A. Uh-huh.
24   Q. And in the first line it begins, "A blinker
25 violation," and there's a period. After that it says, "He

240

1  said, let's at least try to stop and talk to them."
2      Do you see that?
3    A. Yes.
4    Q. And the next line says, "That's what brought his
5  attention to it."
6      And I assume he's meaning that's what
7  brought your attention to the situation, to the vehicle?
8    A. Yes.
9    Q. I'm going to have you go to page Bates number 53.
10 Are you there?
11   A. Yes, ma'am.
12   Q. And I know it's difficult to kind of figure out
13 where paragraphs start and stop. And there's a sentence
14 that's about three-quarters around -- three-quarters
15 around the bottom of the page. And I'll tell you where
16 I'm looking, there's a line that begins probably about
17 eight to ten lines up, it says, "I asked Officer Lindsey."
18   A. Uh-huh.
19   Q. I asked Officer Lindsey, all that you knew was
20 Matt said he didn't see -- use -- that he didn't use their
21 blinker. "We are going to contact this vehicle," and
22 Officer Lindsey said correct.
23      Do you see that?
24   A. Yes.
25   Q. So you were relying on Officer Lindsey for what

241

1 he was saying that day in terms of what your actions were.
2 Is that a fair statement?
3   **A.  You're referring to Officer Schneider?**
4   Q.  I'm sorry, Officer Schneider.  I apologize.
5   **A.  That's okay.**
6   Q.  I'm looking at you and talking to you.  I
7 apologize.
8   **A.  That's okay.**
9     MR. POPOLIZIO:  He has that effect on
10 people.
11 BY MS. BROADDUS:
12   Q.  Are you aware that there was a question as to the
13 department when they were looking at this as to whether
14 there was actually a legitimate basis for the stop?
15     MR. POPOLIZIO:  Foundation; form.
16     THE WITNESS:  Yes, they were questioning
17 that.
18 BY MS. BROADDUS:
19   Q.  Did they talk to you about that specifically?
20   **A.  I believe they asked if I saw the violation, and**
21 **I said no.**
22   Q.  Did you ever see any of the motel video other
23 than the one that we looked at today?
24   **A.  No -- well, I should say yes.  When we first**
25 **originally looked at that video when I was with Sergeant**

242

1 **Flosman, we watched the video up and to the point where I**
2 **made contact at the front door -- or at the driver's side**
3 **door.  After that I didn't see the video from there.**
4   Q.  Okay.  And that's a fair point.  I didn't show
5 the whole video of the motel --
6   **A.  Correct.**
7   Q.  -- from that angle, correct?
8   **A.  Correct.**
9   Q.  And that's what you're talking about.  There was
10 more to that particular angle that was in that video,
11 correct?
12   **A.  Correct.**
13   Q.  Did you see any other videos that were not from
14 that angle?
15   **A.  No.**
16     MS. BROADDUS:  All right.  I don't have any
17 more questions for you.  Thank you.
18     THE WITNESS:  Thank you.
19     MR. POPOLIZIO:  Give me about five minutes,
20 and I think I'll have a few.
21
22         EXAMINATION
23 BY MR. POPOLIZIO:
24   Q.  Officer Lindsey, I'm just going to ask you a few
25 follow-up questions.

243

1     Let's look at Exhibit 16 first.  It's right
2 in front of you.
3   **A.  Uh-huh.**
4   Q.  If you look at the page with Bates label
5 Wheatcroft 001674.  It's a photo.
6   **A.  Okay.**
7   Q.  Now, you drive stunned Mr. Wheatcroft how many
8 times?
9   **A.  Two times.**
10   Q.  If you look down on this page under the photo a
11 few sentences down, do you see where it says, "Total time
12 of competed connection with 50 plus microcoulombs of
13 charge"?
14     Do you see that?
15   **A.  Yes.**
16   Q.  What does it indicate?
17     MS. BROADDUS:  Object to form; foundation.
18     THE WITNESS:  Equals --
19 BY MR. POPOLIZIO:
20   Q.  What does this page indicate?
21     You can read.
22     MS. BROADDUS:  Same.
23     THE WITNESS:  It indicates the total time of
24 connection with the Taser.
25 BY MR. POPOLIZIO:

244

1   Q.  Now, my question is that -- well, let me ask you
2 this:  You answered questions with regard to this exhibit
3 under the examination of Ms. Broaddus, correct?
4   **A.  Yes.**
5   Q.  And all my question was was for you to read for
6 me there under where it says, "Total time of completed
7 connection with 50 plus microcoulombs of charge," there's
8 an equal sign, and after that it says what?
9   **A.  .4 seconds.**
10   Q.  Okay.  Thank you.
11     Now, during your questioning a little while
12 ago you were asked -- let me get to it first.
13     While I'm doing that, when you approached
14 the vehicle, the Taurus, initially it was still running,
15 correct?
16   **A.  To my knowledge, yes.**
17   Q.  Do you remember at any point in time -- do you
18 remember the point in time when and if the vehicle was
19 shut off?
20   **A.  I don't.**
21   Q.  But it was at some point?
22   **A.  At some point in time it was.**
23   Q.  I think you were asked a question, whether there
24 had to be reasonable suspicion of a crime -- that a crime
25 occurred to conduct a traffic stop.  Do you recall that?

245

1    A.  Yes.
2    Q.  Do you need reasonable suspicion for -- that a
3  crime occurred to conduct a traffic stop?
4    A.  You also -- it doesn't have to necessarily be a
5  crime.  It can be a civil violation as well.
6    Q.  Do you need probable cause that a crime had
7  occurred or was about to occur if -- excuse me.  Let me
8  strike that.
9        Do you need probable cause of a crime
10 related to that vehicle to stop the vehicle to effect a
11 traffic stop?
12   A.  No.
13   Q.  So you can stop a vehicle for suspicion of a
14 civil traffic violation?
15   A.  Yes.
16   Q.  You were also asked some questions about camera
17 angles of this particular camera at Motel 6 that we saw
18 some video footage today.  Do you remember that?
19   A.  Yes.
20   Q.  Do you know if there are any other cameras at
21 Motel 6?
22   A.  Not to my knowledge.  I don't know.
23   Q.  Did you know if there were any other cameras at
24 Motel 6 on the left side of the vehicle, as Ms. Broaddus
25 asked you questions, which would be the west side?

246

1    A.  No.
2    Q.  Do you know if there are any other cameras on
3  that building?
4    A.  No.
5    Q.  If there were -- well, you just don't know?
6    A.  Correct.
7    Q.  So if there were, though, you don't know what
8  they would reveal, do you?
9    A.  I would not know.
10   Q.  Because you've never seen them?
11   A.  Correct.
12   Q.  Or any other footage --
13   A.  Correct.
14   Q.  -- from Motel 6?
15   A.  Correct.
16   Q.  Now, you were also asked about your falling
17 backwards.
18   A.  Yes.
19   Q.  Do you remember that?
20   A.  Yes.
21   Q.  You didn't merely fall, correct?
22   A.  Correct.
23   Q.  You didn't trip over your feet, did you?
24   A.  No.
25   Q.  You didn't stumble and then fall?

247

1    A.  No.
2    Q.  Why did you fall?
3    A.  I was hit with an object from inside the vehicle.
4    Q.  Did you see the object coming?
5    A.  No.
6    Q.  At that time did you know what the object was?
7    A.  No.
8    Q.  Do you know who hit you with the object?
9    A.  No.
10   Q.  What happened when you got hit with the object?
11   A.  I fell backwards.
12   Q.  Do you remember falling backwards?
13   A.  No.
14   Q.  What do you remember about being hit with the
15 object?
16   A.  I don't remember anything.  I just remember a
17 flash come up in front of me and hit me.
18   Q.  And then what happened?
19   A.  I fell back.
20   Q.  After that did you start coming to at all?
21   A.  Yes.
22   Q.  Describe for me how you felt at that point.
23   A.  Groggy.
24   Q.  That's it?
25   A.  I felt out of sorts.  I could see sort of what

248

1  was happening, but it just wasn't registering with what
2  was happening.  So I could see something happening.  I
3  just couldn't put the two and two together of what exactly
4  was happening.
5    Q.  Did you want to get up?
6    A.  Yes.
7    Q.  Could you?
8    A.  Everything in my body told me to get up.
9    Q.  Could you?
10   A.  No.
11   Q.  Was that the fight or flight instinct that you
12 talked about earlier in your testimony?
13   A.  Yes.
14   Q.  There were several times, at least, throughout
15 your testimony where Ms. Broaddus referred to the seat
16 belt being wrapped around Mr. Wheatcroft.  Do you remember
17 that?
18   A.  Yes.
19   Q.  And being that he had his seat belt on?
20   A.  Yes.
21   Q.  That he had his seat belt around him?
22   A.  Yes.
23   Q.  Did you see at all either -- well, first, on the
24 scene that day, did you see Johnny Wheatcroft's seat belt
25 ever engaged, as you said, the male part of the seat belt

249

1  engaged to the female part?
2     A.  No.
3     Q.  In the video footage that you watched today, did
4  you ever see the seat belt that Mr. Wheatcroft had around
5  his right shoulder ever fully engaged?
6     A.  No.
7     Q.  And that means fully engaged by the buckle being
8  in the -- the male part, the buckle, being in the female
9  part of the seat belt?
10    A.  Yes.
11    Q.  And you never saw that?
12    A.  No.
13    Q.  In any video that you've ever watched about
14 this -- because we didn't watch the video through in its
15 entirety, I don't believe; we stopped and started -- did
16 you ever see at any point Mr. Wheatcroft's seat belt
17 actually engaged?
18    A.  No.
19    Q.  Earlier in your testimony -- let's get to my
20 notes on that.
21       We were actually looking at the video, and
22 it was about 20 seconds in or thereafter, shortly
23 thereafter, and you were questioned about why you stopped
24 before you went to the driver's side of the Taurus.  Do
25 you remember that?

250

1     A.  Yes.
2     Q.  And you did pause there before you approached the
3  driver's side of the vehicle; is that right?
4     A.  Yes.
5     Q.  When I say "there," I mean in the parking lot at
6  Motel 6.
7     A.  Yes.
8     Q.  You testified earlier that you did that because
9  you were assessing the situation, right?
10    A.  Yes.
11    Q.  And that there were still unknowns occurring.  Do
12 you remember that?
13    A.  Yes.
14    Q.  But at least in my head when I was listening to
15 that -- I think the line of questioning went to whether
16 you waved at Officer Schneider, but I wasn't straight on
17 what the unknowns were that were occurring.  So could you
18 tell me what -- as you paused before you approached the
19 driver's door of the Taurus as it was parked in that spot,
20 what were these unknowns that were occurring that you were
21 assessing?
22    A.  With Motel 6, Motel 6 being a high-crime area, we
23 always kind of have to be vigilant with what is in the
24 area, the surrounding areas.  Just before my approach
25 there was a SUV-type vehicle that was pulling out.  I kept

251

1  an eye on that to make sure that that wasn't part of any
2  of the stuff that we were on or associated with it, just
3  to keep an eye with them.
4        As I walked up, both the back door on the
5  driver's side was opened up, along with the front door
6  opening up.
7        Before approaching the vehicle in its
8  capacity, I want to make sure that I kind of do a head
9  count real quick just to do a quick assessment of how many
10 people are in that vehicle.  I also don't know why doors
11 are opening up.  When a door is opened up and somebody is
12 trying to exit the vehicle, it's usually an indication
13 that they're trying to divert our attention to what's
14 inside that vehicle so we can pay attention to that
15 instead.  With two doors opening up, my attention was
16 diverted to them, but instead of going up to the door and
17 putting myself in harm's way for that fatal funnel, that
18 we say, I wanted to make sure that they weren't going to
19 come at me, jump at me, pull a weapon on me.  It was
20 strictly for an officer safety approach on that.
21    Q.  You said the doors opened?
22    A.  Yes.
23    Q.  And that they were doors of the driver's side of
24 the vehicle?
25    A.  Yes.

252

1     Q.  And did the back passenger door of the driver's
2  side of the vehicle open before it stopped?
3     A.  Yes.
4     Q.  And did you learn at any point who was in the
5  back seat of the Ford Taurus?
6     A.  After my approach and talking to them, a female
7  asked if she could step out, which I granted her
8  permission to step out.  So she did.  And I learned her
9  name was Anya Chapman.
10    Q.  And she indicated she wanted to get out because
11 she was hot?
12    A.  Yes.
13    Q.  Did it occur to you at all that there might have
14 been another reason for a request of a passenger in the
15 back seat of the vehicle to remove him or herself from the
16 vehicle?
17    A.  It's usually to divert attention from something
18 else inside the vehicle.
19    Q.  Is that in your experience as a police officer
20 who has conducted traffic stops on vehicles?
21    A.  Yes.
22    Q.  And how many traffic stops have you conducted on
23 vehicles in your career?
24    A.  I don't have a solid number.  We can say a range
25 between -- in my 11 years, anywhere -- probably around a

253

1    **hundred.**
2    Q.  Now, when you first were in the passenger side of
3    the -- is it a Tahoe?
4    **A.  Yes.**
5    Q.  That's what you referred to in this deposition as
6    the cruiser?
7    **A.  Correct.**
8    Q.  When you first turned in -- when Officer
9    Schneider, actually, turned the vehicle into the parking
10    lot --
11    **A.  Uh-huh.**
12    Q.  -- of Motel 6, he had indicated to you, as you
13    have already testified, that there was a nonuse of a
14    turning signal, correct?
15    **A.  Correct.**
16    Q.  Would that provide the basis for stopping the
17    vehicle?
18    **A.  Yes.**
19    Q.  Even though they were turning into private
20    property?
21    **A.  Yes.**
22    Q.  So at that point, the approach to the vehicle was
23    based on that, to your knowledge, correct?
24    **A.  Correct.**
25    Q.  Now, at that point, in addition to the -- well,

254

1    strike that.
2         For a traffic stop are you allowed to speak
3    to the occupants of the vehicle?
4    **A.  Yes.**
5    Q.  Even if they're not driving the vehicle?
6    **A.  Yes.**
7    Q.  Are you allowed to ask their names?
8    **A.  Yes.**
9    Q.  Could you ask them for ID?
10    **A.  Yes.**
11    Q.  And you testified they don't have to provide it,
12    though?
13    **A.  Correct.**
14    Q.  And unless there's some reason that an occupant
15    might have to provide ID or a name, otherwise a passenger
16    doesn't have to; is that right?
17    **A.  That is correct.**
18    Q.  But when you also were conversing with the driver
19    of the Taurus, you found that that driver didn't have a
20    license, correct?
21    **A.  That is correct.**
22    Q.  What did that change?
23    **A.  It changes from a civil traffic violation to a**
24    **possible criminal violation because of his suspended**
25    **license.  That's a Class I misdemeanor.**

255

1    Q.  Does it change your approach to anything or
2    anybody within the car?
3    **A.  At that point in time the vehicle is seized and**
4    **the contents within inside of the vehicle are seized for a**
5    **temporary time.**
6    Q.  Do you have control over anything else in that
7    vehicle?
8    **A.  I have control of the property in that vehicle at**
9    **that time.  It doesn't mean that it's going to be a**
10    **forever detainment, but at that point in time we have the**
11    **right to identify what's inside that vehicle.**
12    Q.  Now, at a certain time, a certain point when you
13    were on the driver's side of the vehicle, did you hear
14    anything that, again, changed the situation a little bit?
15    **A.  I heard Officer Schneider saying, stop tensing**
16    **up.**
17    Q.  And why would that change the situation?
18    **A.  It's telling me as a backup officer that the**
19    **individual that the other officer's engaging with is not**
20    **complying with either commands or tensing up, which is**
21    **reason for a kind of a heightened awareness of the**
22    **situation.**
23    Q.  Now, during this particular stop, while you were
24    on the driver's side of the vehicle -- and we watched
25    video about this today -- and Officer Schneider was on the

256

1    passenger side of the vehicle, did any of
2    Mr. Wheatcroft's -- well, were any of Mr. Wheatcroft's
3    actions concerning?
4    **A.  Yes.**
5    Q.  What was the concern?
6    **A.  His noncompliance.**
7    Q.  In what way?
8    **A.  Officer Schneider's dealing with him on several**
9    **different things, whether it was reaching into a backpack**
10    **reaching down between the seats, in the middle console;**
11    **his -- his demeanor with Officer Schneider and his**
12    **escalation.**
13    Q.  Escalation of what?
14    **A.  Of his demeanor and his actions.**
15    Q.  When you approached the passenger side of the
16    vehicle -- when you came around from the driver's side to
17    the passenger side, was Mr. Wheatcroft actually resisting
18    when you came over to the passenger side?
19    **A.  Officer Schneider had him in a control hold, and**
20    **it appeared as if Mr. Wheatcroft was still trying to get**
21    **away from the control hold.**
22    Q.  Would that be active resistance?
23    **A.  Yes.**
24    Q.  When you were there at Motel 6 that day around
25    the car and dealing with anyone at the scene, okay --

257

1      A.  Uh-huh.
2      Q.  -- were your actions at all motivated because
3  Mr. Wheatcroft questioned Officer Schneider?
4      A.  No.
5      Q.  Exercised his First Amendment right to question
6  Officer Schneider?
7      A.  No.
8      Q.  Did you do anything at the scene because
9  Mr. Wheatcroft said anything?
10     A.  No.
11         MR. POPOLIZIO:  I think that's all I have,
12  at least for now.
13
14         FURTHER EXAMINATION
15  BY MS. BROADDUS:
16     Q.  I'm just going to follow up on a couple of
17  questions that he asked, so I'm going to jump around a
18  little bit.
19         You were asked whether the Taurus was
20  running or not.  Do you have an independent recollection
21  today whether or not the car was actually running when you
22  first approached the car?
23     A.  No.
24     Q.  You're just assuming.  Is that a fair statement?
25     A.  Yes.

258

1      Q.  You were also asked about the seat belt that
2  Johnny -- whether it was engaged or not engaged.
3         Did you actually see whether or not it was
4  engaged, that the male part was in the female part?
5      A.  No.
6      Q.  Did you look to see?
7      A.  No.
8      Q.  So you don't know whether or not there was
9  actually the male-to-female engagement on the actual part?
10         MR. POPOLIZIO:  Objection; form.
11         THE WITNESS:  From the angle that I had, the
12  vantage point, it did not appear that it was.
13  BY MS. BROADDUS:
14     Q.  But you actually didn't see it, correct?
15     A.  I did not physically see it.
16     Q.  We had some conversation earlier that sometimes
17  when I use the word "Taser," for you it does not include
18  the phrase "drive stun," correct?
19     A.  Correct.
20     Q.  And I asked you earlier on if you had ever been
21  tased, and you said you had not, correct?
22     A.  Correct.
23     Q.  Have you ever been drive stunned?
24     A.  I have been in a fight where the lines crossed
25  over me in the fight.  So I have had that voltage go

259

1  through me.  I have not had the probes actually inside me.
2  But during a fight I have had the lines come across me and
3  incapacitate me during a fight.
4      Q.  Did that incapacitate you for a period of time?
5      A.  For a quick second, yes.
6      Q.  Was it painful?
7      A.  Not painful, but just uncomfortable.
8      Q.  And where were you at -- where did this crossing
9  take place on your body.
10     A.  Across my arms and my back.
11     Q.  So it's fair to say you've never been tased or
12  drive stunned in the testicles, correct?
13     A.  Correct.
14     Q.  And you were talking about traffic stops, and
15  you've done numerous of them over the years.  Is that a
16  fair statement?
17     A.  Yes.
18     Q.  You've been an officer for almost 11 years.
19  Would you say about a hundred a year?
20     A.  Please don't quote me on that, but --
21     Q.  Ballpark?
22     A.  Ballpark.
23         MR. POPOLIZIO:  Over 11 years?
24         THE WITNESS:  11 years.
25

260

1  BY MS. BROADDUS:
2      Q.  So a hundred a year for 11 years is a ballpark
3  average?
4         MR. POPOLIZIO:  Form.
5  BY MS. BROADDUS:
6      Q.  Or a hundred stops over 11 years?
7      A.  Correct.
8      Q.  So it's over your 11 years you've probably done
9  about hundred stops total?
10     A.  Correct.
11     Q.  Did you ever stop anyone for failure to use a
12  turn signal?
13     A.  Yes.
14     Q.  How many times?
15     A.  I couldn't recall.
16     Q.  And you testified earlier you don't really know
17  what the statute says as to what a turn signal --
18     A.  Verbatim, no.
19     Q.  Were you aware that there were charges against
20  Anya Chapman and Johnny Wheatcroft?
21     A.  What kind of charges?
22     Q.  As a result of these offenses there were criminal
23  charges?
24     A.  Yes.
25     Q.  And they were dismissed as to Johnny, correct?

273

1      I, the undersigned, say that I have read the
2  foregoing transcript of testimony taken June 5, 2019, and
3  I declare, under penalty of perjury, that the foregoing is
4  a true and correct transcript of my testimony contained
5  therein.
6
7          EXECUTED this _____ day of _____, 2019.
8
9
10
11
12          _____
           OFFICER MARK JOSEPH LINDSEY
13
14
15
16
17
18
19
20
21
22
23
24
25

274

1  STATE OF ARIZONA        )
                          ) ss.
2  COUNTY OF MARICOPA      )
3          BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   questions propounded to the witness and the answers of the
5  witness thereto were taken down by me in shorthand and
   thereafter transcribed through computer-aided
6  transcription under my direction; that the foregoing is a
   true and correct transcript of all proceedings had upon
7  the taking of said proceedings, all done to the best of my
   skill and ability.
8
9          I CERTIFY that I am in no way related to nor
   employed by any of the parties hereto nor am I in any way
10 interested in the outcome hereof.
11          (X) Review and signature was requested.
           ( ) Review and signature was waived.
12          ( ) Review and signature was not requested.
13          I CERTIFY that I have complied with the ethical
   obligations set forth in ACJA Sections 7-206(F)(3) and
14 7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
   this 1st day of July, 2019.
15
16          _____
17          MONICA S. BERRY, RPR, CR
           Certified Reporter
           Arizona CR No. 50234
18
19     *   *   *   *   *   *
20          I CERTIFY that Berry & Associates, LLC has
   complied with the ethical obligations set forth in ACJA
21 Sections 7-206(J)(1)(g)(1) and (6).
22
23          _____
24          BERRY & ASSOCIATES, LLC
           Registered Reporting Firm
           Arizona RRF No. R1033
25

(Pages 273 to 274)                                      69

*EXHIBIT 5*

## Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya            )
Chapman, as husband and wife, and   )
on behalf of minors J.W. and B.W.,    )
                                                      )
        Plaintiffs,            ) Case No.:
                                      ) 2:18-cv-02347-MTL
vs.                                  )
                                      )
City of Glendale, a municipal       )
entity; Matt Schneider, in his       )
official and individual               )
capacities; Mark Lindsey, in his    )
official and individual               )
capacities; and Michael Fernandez,  )
in his official and individual       )
capacities,                          )
                                      )
        Defendants.          )
                                      )

DEPOSITION OF MATTHEW WILLIAM SCHNEIDER

Phoenix, Arizona
June 1, 2020
9:15 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:
MR. JOSEPH J. POPOLIZIO
ATTORNEY AT LAW
(COPY)

## Page 2

I N D E X

WITNESS                                    PAGE
MATTHEW WILLIAM SCHNEIDER


EXAMINATION MS. BROADDUS          5


E X H I B I T S
Deposition
Exhibits     Description                Marked
43     Thumb drive of Officer Schneider's   180
       body-worn camera video

44     Thumb drive of Officer Lindsey's    180
       body-worn camera video
45     Thumb drive of the Motel 6         180
       surveillance camera video

46     City of Glendale Loyalty Oath,
       Bates No. CoG_WHEATCROFT 000828    25
       (1 page)

47     Performance Management Program     58
       Core Competency and Goal Review,
       Bates Nos. CoG_WHEATCROFT
       000756-764  (9 pages)
48     Performance Management Program     63
       Core Competency and Goal Review,
       Bates Nos. CoG_WHEATCROFT
       000704-708  (5 pages)

49     Performance Management Program     64
       Goal Setting & Review Worksheet,
       Bates Nos. CoG_WHEATCROFT
       000668-675  (8 pages)

## Page 3

EXHIBITS MARKED (CONTINUED)
50     Performance Management Program     68
       Goal Setting & Review Worksheet,
       Bates Nos. CoG_WHEATCROFT
       000645-655  (11 pages)

51     Performance Management Program     71
       Goal Setting & Review Worksheet,
       Bates Nos. CoG_WHEATCROFT
       000630-634; 638-643; 635-637
       (14 pages)

52     AXON report, Bates Nos.            128
       CoG_WHEATCROFT 003346-3363
       (18 pages)

53     Defendants' Response to Plaintiffs'  177
       Fourth Request for Production
       (5 pages)

54     Defendants' Response to Plaintiffs'  178
       Second Set of Non-Uniform
       Interrogatories  (4 pages)



QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
        PAGE      LINE
        11        2
        12        2
        13        9
        15        9
        16        13
        17        2
        32        2
        33        20
        35        16
        50        10

## Page 4

DEPOSITION OF MATTHEW WILLIAM SCHNEIDER was
taken on June 1, 2020, commencing at 9:15 a.m. at the law
offices of JONES, SKELTON & HOCHULI, P.L.C., 40 North
Central Avenue, Suite 2700, Phoenix, Arizona, before
MONICA S. BERRY, RPR, a Certified Reporter in the State of
Arizona.

COUNSEL APPEARING:
        MARC J. VICTOR, P.C.
        ATTORNEY FOR FREEDOM
        By:  MS. JODY L. BROADDUS
        3185 South Price Road
        Chandler, Arizona  85248
        On behalf of Plaintiffs

        JONES, SKELTON & HOCHULI, P.L.C.
        By:  MR. JOSEPH J. POPOLIZIO
        40 North Central Avenue
        Suite 2700
        Phoenix, Arizona  85004
        On behalf of Defendants

        MITCHELL STEIN CAREY CHAPMAN
        By:  MR. BARRY MITCHELL
        One Renaissance Square
        2 North Central
        Suite 1450
        Phoenix, Arizona  85004
        On behalf of Matthew William Schneider

ALSO PRESENT:

        Ms. Kathy Thomas and Ms. Dianne Shoemake, City of
        Glendale
        Ms. Julie Wanner, paralegal to Mr. Popolizio
        Ms. Alexz Thompson, paralegal to Ms. Broaddus

Page 41

1  Q. What type of things did you say that he did to
2  spin or that he lied about?
3  MR. POPOLIZIO: Form.
4  THE WITNESS: I mean, just the tasing in the
5  balls; how I on purpose pulled his pants down; how many
6  times I tased him; that I lied about the traffic stop, I
7  lied about the demanding his identification.
8  BY MS. BROADDUS:
9  Q. What do you mean, lied about demanding his
10  identification?
11  A. You'd have to ask him that. I don't --
12  Q. Well, you said it was a lie. I guess I'm trying
13  to figure out what the lie was that you did or did not
14  demand identification.
15  A. No, just the reason for it.
16  Q. I guess I'm confused. What do you mean by that?
17  A. He had said the reason I demanded his
18  identification was because he had his seat belt on, but
19  you could clearly see in the video that he did not.
20  Q. So it's your position that you were asking him
21  for identification because he didn't have his seat belt on
22  in the parking lot?
23  A. Yes, ma'am.
24  Q. When did you first realize he didn't have a seat
25  belt on in the parking lot?

Page 42

1  A. When I was approaching him on foot.
2  Q. Do you know when he took his seat belt off or
3  unhooked it?
4  MR. POPOLIZIO: Form.
5  THE WITNESS: No.
6  BY MS. BROADDUS:
7  Q. He could have unhooked it at any time between the
8  time he was on the property until you came up to the car,
9  correct?
10  MR. POPOLIZIO: Form; foundation.
11  THE WITNESS: Sure, he could have.
12  BY MS. BROADDUS:
13  Q. And that wouldn't have been a violation of any
14  laws, correct, because that's private property?
15  MR. POPOLIZIO: Form; foundation.
16  THE WITNESS: I think I'm able to articulate
17  that I had reasonable suspicion that he didn't have his
18  seat belt on.
19  BY MS. BROADDUS:
20  Q. Okay. Why did you stop the car in the first
21  place?
22  A. Turn signal violation.
23  Q. What was the violation?
24  A. Turn signal violation.
25  Q. What's required for a turn signal violation?

Page 43

1  A. That you signal prior to a turn at 100 feet.
2  Q. You know there's more requirements, right?
3  A. Okay.
4  Q. You're aware that it has to impact traffic, to be
5  actually a violation, correct, under Arizona law?
6  MR. POPOLIZIO: Form.
7  Go ahead.
8  THE WITNESS: I didn't realize that.
9  BY MS. BROADDUS:
10  Q. So you didn't know the seat belt law in Arizona.
11  Is that a fair statement?
12  MR. POPOLIZIO: Form.
13  THE WITNESS: Seat belt law and the turn
14  signal laws are different. We were just speaking about
15  the turn signal violation.
16  BY MS. BROADDUS:
17  Q. Well, is it fair to say you didn't know what the
18  turn signal laws were in Arizona when you stopped this
19  vehicle?
20  MR. POPOLIZIO: Form.
21  THE WITNESS: No. I think I have an
22  understanding of them.
23  BY MS. BROADDUS:
24  Q. And did you see the vehicle 100 feet before the
25  turn?

Page 44

1  A. No, ma'am.
2  Q. So you wouldn't have known if there was a turn
3  signal on at any point during that time?
4  A. Prior to me seeing the vehicle, no.
5  Q. And you don't know if there's any other traffic
6  on the roadway where the vehicle was before it turned into
7  the motel?
8  A. No, ma'am.
9  Q. And you weren't aware that the turn signal
10  violation applies only when other traffic may be affected
11  by the movement?
12  MR. MITCHELL: Objection.
13  MR. POPOLIZIO: Form.
14  THE WITNESS: I did not know that.
15  BY MS. BROADDUS:
16  Q. I read in your reviews that you liked to stay up
17  to date on what the current laws are in other matters
18  relating to what's current in law enforcement; is that
19  correct?
20  A. Yes, ma'am.
21  Q. Okay. But you didn't with regard to the seat
22  belt -- I'm sorry -- with regard to the turn signals; is
23  that correct?
24  A. I believe I did.
25  Q. Well, actually, there's a -- do you read the

Page 45

```
1   cases or just the statutes, or how do you get your
2   information on the laws that you try to keep up on?
3      A.  Usually --
4          MR. POPOLIZIO:  Form.
5          THE WITNESS:  I mean, usually the statute.
6   I have read case law in the past.
7   BY MS. BROADDUS:
8      Q.  You weren't aware that there was actually a
9   specific case on point that said that if a violation was
10  to be suspected there must have been traffic -- there must
11  have been some possibility that traffic would be affected
12  by the movement.  You're not aware of that as the law in
13  Arizona?
14         MR. POPOLIZIO:  Form and foundation.
15         Could we have the case that you just read
16  from stated on the record?
17         THE WITNESS:  I -- I didn't know that's what
18  the case law said, no.
19  BY MS. BROADDUS:
20     Q.  And you weren't aware of that the statute for a
21  turn signal violation required that it impact other
22  traffic or affect other traffic on the roadway, correct?
23         MR. POPOLIZIO:  Form.
24         THE WITNESS:  I didn't know that detail was
25  in there.
```

Page 46

```
1   BY MS. BROADDUS:
2      Q.  Were you aware that you don't have to wear your
3   seat belt on private property?
4          MR. POPOLIZIO:  Form.
5          THE WITNESS:  That's correct.
6   BY MS. BROADDUS:
7      Q.  And when you approached the vehicle, was it still
8   moving?
9      A.  The vehicle?
10     Q.  Yes.
11     A.  When I approached it in my vehicle or on foot?
12     Q.  On foot.
13     A.  No.  I think it was -- I think it was parked.
14     Q.  Okay.
15     A.  Or stopped, I mean.
16     Q.  When you saw the vehicle turning into the Motel 6
17  parking lot, could you see the passenger and driver of
18  the vehicle?
19     A.  No.
20     Q.  So you couldn't tell if they were wearing their
21  seat belt or not when you saw the turn?
22     A.  No, ma'am.
23     Q.  So the only thing is that when you got to the car
24  that was already stopped, passenger had already unbuckled
25  his seat belt, correct?
```

Page 47

```
1          MR. POPOLIZIO:  Form.
2          MR. MITCHELL:  Objection; form.
3          THE WITNESS:  I didn't know that he had
4   unbuckled it or not.  I realized when I was approaching
5   the vehicle on foot that he was hugging his seat belt.
6   BY MS. BROADDUS:
7      Q.  When you approached the vehicle you made some
8   comment about, throw your turn signal on when you turn,
9   correct?
10     A.  I believe it was something like that, yes.
11     Q.  Why didn't you make the same statement to the
12  passenger, hey, you need to wear your seat belt?
13     A.  I didn't do a good job articulating that at that
14  time.
15     Q.  Are you familiar with the motel where this
16  incident occurred?
17     A.  Yes, ma'am.
18     Q.  And had you been there on prior occasions?
19     A.  Yes, ma'am.
20     Q.  Had you made other arrests in that parking lot
21  before?
22     A.  Yes, ma'am.
23     Q.  On how many occasions, approximately?
24     A.  Dozens.
25     Q.  Before you made the stop on this vehicle what
```

Page 48

```
1   were you doing?
2      A.  I don't know.
3      Q.  Did you have another vehicle stop?  Do you know?
4      A.  No, ma'am.
5      Q.  You don't recall; is that a fair statement?  Or
6   do you know?
7      A.  No, I didn't have another vehicle stopped.
8      Q.  Were you talking with any other people that were
9   on the roadway?
10     A.  No, ma'am.
11     Q.  What was your position for going in the back
12  alley of the parking lot?
13     A.  For going in the back alley?
14         That was usually the direction we patrolled
15  the complex.
16     Q.  So you randomly went in through that parking --
17  into the parking lot.  Is that a fair statement?
18     A.  Yes, ma'am.
19     Q.  Have you ever been charged with a crime, a
20  misdemeanor or felony?
21     A.  No, ma'am.
22     Q.  Have you ever been charged with a traffic
23  offense?
24     A.  I think I've gotten a traffic ticket before.
25     Q.  Did you get a traffic ticket while you were
```

1    employed as a City of Phoenix police officer?
2        A.  I was never a City of Phoenix police officer.
3        Q.  I'm sorry, City of Glendale.  I apologize.
4        A.  I don't believe so.
5        Q.  Are you aware of any current investigations that
6    the City of Glendale is doing with regard to you?
7        A.  No, ma'am.
8        Q.  Have you spoken with the FBI at all regarding
9    this incident?
10       A.  No, ma'am.
11       Q.  And you're aware that they're doing an
12   investigation; is that true?
13       A.  Yes, ma'am.
14       Q.  Have you had any -- you or any of your
15   representatives had any communications with the FBI, as
16   far as you know?
17       A.  I have not.  I don't know about anybody else.
18       Q.  Who notified you that there was an investigation
19   being done by the FBI?
20           MR. MITCHELL:  Objection.  We're just
21   getting close to attorney-client communication, and I want
22   to be careful here.
23           You can answer that question.
24           THE WITNESS:  It was Chief Briggs.
25   ///

1            BY MS. BROADDUS:
2        Q.  And your counsel has a point.  I don't want to
3    know about any conversations that you've had with your
4    attorneys specifically.  This is people other -- so you
5    learned from Chief Briggs that the FBI was doing an
6    investigation, correct?
7        A.  Yes, ma'am.
8        Q.  Did the FBI request an interview with you?
9        A.  Yes, ma'am.
10       Q.  And you rejected that interview or declined; is
11   that right?
12           MR. MITCHELL:  Objection.
13           I'm going to instruct you not to answer the
14   question.
15           BY MS. BROADDUS:
16       Q.  So you indicated you were requested to do an
17   interview by the FBI, correct?
18       A.  Yes, ma'am.
19       Q.  And I believe you said to date you haven't done
20   an interview, is that correct, with the FBI?
21       A.  Correct.
22       Q.  How long ago did they request an interview?
23       A.  I know it was in March of -- I think it was last
24   year, March of 2019.
25       Q.  And you're aware that the AZPOST has initiated an

1    investigation regarding you, correct?
2        A.  Yes, ma'am.
3        Q.  Have you had any communications with AZPOST
4    regarding the investigation?
5        A.  One of my attorneys has, yes.
6        Q.  Outside of your communications with the
7    attorneys -- I don't want to know what you've talked about
8    with your attorneys, but outside of that, have you had any
9    communications with AZPOST unrelated to your attorneys as
10   to the proceedings?
11       A.  I have not, no.
12       Q.  And that was a really bad question.
13           Fair statement would be that you didn't have
14   any communications with AZPOST outside -- that did not
15   involve your attorneys, correct?
16       A.  That's correct.
17       Q.  Do you know if that investigation is ongoing?
18       A.  I believe it's still open, but as far as I know
19   it's over with.
20       Q.  Are you aware of any other investigations against
21   you other than by the FBI and Arizona POST?
22       A.  No, ma'am.
23       Q.  Did you receive any positive feedback or
24   recognition from the City of Glendale relating to your
25   actions involving the Wheatcroft family?

1            MR. POPOLIZIO:  Form.
2            THE WITNESS:  Positive feedback?
3            BY MS. BROADDUS:
4        Q.  Or recognition, yes.
5        A.  No.  No recognition.  I would say that my chiefs
6    and supervisors have told me that they appreciate me
7    continuing to come to work every day and do my job with
8    integrity.  But other than that, no.
9        Q.  Did they criticize you at all for the way you
10   handled it?
11       A.  No, ma'am.
12       Q.  Have you ever been disciplined by the City of
13   Glendale?
14       A.  Yes, ma'am.
15       Q.  How many times?
16       A.  Several.
17       Q.  When was the most recent time that you were
18   disciplined by the City of Glendale?
19       A.  This case.
20       Q.  And my understanding of that was you were
21   suspended for three days in connection with that, and that
22   suspension was in September of 2018.  Does that sound
23   correct?
24           MR. POPOLIZIO:  Form.
25           THE WITNESS:  Yes.

Page 53

```
 1    BY MS. BROADDUS:
 2       Q.  Did you have any discussions with Chief St. John
 3    regarding your suspension?
 4       A.  I did.
 5       Q.  What was your conversation with him about that?
 6       A.  It was the appeal process.  And, I mean, it was
 7    basically just talking about the discipline process and --
 8    and it was my appeal right.  I don't really know much what
 9    else to say about it.
10       Q.  So once you were handed a suspension where they
11    indicated there was going to be discipline, did you appeal
12    immediately thereafter?
13       A.  There's a process that you have to go through.
14    You have to submit a memo to request an appeal, and then
15    you get scheduled for a date.
16       Q.  Did you submit a memo?
17       A.  I did.
18       Q.  Who did you submit the memo to?
19       A.  I think it was the chief's secretary.  And I
20    don't know if it was a memo or an e-mail.  I think it was
21    a memo.
22       Q.  Then what happens after you submit the memo?
23       A.  The chief's secretary schedules you for a meeting
24    with the chief.
25       Q.  Is that what happened in your case?  You
```

Page 54

```
 1    submitted the memo and then you got a meeting with the
 2    chief?
 3       A.  Yes, ma'am.
 4       Q.  What happened at that meeting with the chief?
 5       A.  We talked about the case.  I basically just told
 6    my side of the story, and that was really the end of the
 7    meeting.  I don't remember what day that fell on, but I
 8    remember that it was towards the end of a week.  And he,
 9    the chief, had called me the following week while I was at
10    home and told me that he was going to uphold the three-day
11    suspension.
12       Q.  Are you aware of the suspensions and the
13    disciplines for each type of action that is in violation
14    of Glendale's policies and procedures?  Are you a part of
15    that at all?
16          MR. POPOLIZIO:  Form.
17          THE WITNESS:  I don't think I have any part
18    of that.
19    BY MS. BROADDUS:
20       Q.  There's a chart of basically sanctions.  That's
21    something you don't deal with.  Is that a fair statement?
22       A.  That's correct.
23       Q.  Have you ever seen it?
24       A.  Yes, but it's been like several years.
25       Q.  Do you know why you didn't receive a sanction
```

Page 55

```
 1    that was within the range of discipline for the actions
 2    that you were found to be in violation of?
 3          MR. POPOLIZIO:  Form; foundation.
 4          THE WITNESS:  I have no clue.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 56

```
 1
 2
 3
 4       Q.  My records indicate that in June of 2008 you were
 5    suspended for one day for destruction of a citizen's
 6    private property or personal property.  Do you recall
 7    that?
 8       A.  Yes, ma'am.
 9       Q.  Can you tell me about that.
10       A.  That was the first search warrant that I had ever
11    written, and at the conclusion of the case it's -- the
12    process is done differently now, but I was given a blue
13    packet with various items on it that were seized from the
14    search warrant, one of those items being a surveillance
15    camera system.  The owner of that camera system had been
16    arrested for possession of dangerous drugs for sale, and
17    it was -- I was under the impression that at the
18    conclusion of the case that he wasn't allowed to have the
19    camera system back, which, in essence, I guess would have
20    aided him in the sale of illegal drugs.  So I authorized
21    that item for destruction, and I ended up getting a
22    one-day suspension.
23       Q.  A month earlier than that you also had another
24    one-day suspension for failing to follow a supervisor's
25    direct order relating to a pocketknife incident, correct?
```

## Page 57

1    A.  Yes, ma'am.
2    Q.  Other than those incidents, have you ever been
3    disciplined by the City?
4    A.  I believe so, yes.
5    Q.  What other times?
6    A.  I had made an arrest -- and this was well before
7    2008, I would say.  I lost a suspect's keys out of his
8    personal property.  They were found the next day in the
9    center console of my patrol vehicle.  I believe that was
10    a -- I believe that was a memo of correction.
11            My first or second year after I had gotten
12    hired, myself and another officer had taken a school bus
13    down a street to get to a perimeter position, and that
14    incident, I believe it was also a memo of correction, and
15    I also got a commendation for thinking outside the box.  I
16    think that's it.
17    Q.  We've talked about six different instances where
18    you've had some form of discipline by the City.  Do you
19    recall any other incidents where you may have been
20    disciplined by the City?
21    A.  I don't.
22    Q.  As a result of the events that occurred at the
23    Motel 6, were you instructed or requested to undergo any
24    additional training?
25    A.  After the discipline was issued or before?

## Page 58

1    Q.  At any time as a result of those events that
2    happened at Motel 6 were you ever instructed to undergo
3    any additional training?
4    A.  No, ma'am.
5    (Deposition Exhibit No. 47 was marked for
6    identification.)
7    BY MS. BROADDUS:
8    Q.  You've been handed a document that's been marked
9    as Exhibit 47.  At the top of the page it says,
10    "Performance Management Program Core Competency and Goal
11    Review."
12            Do you see that?
13    A.  I do.
14    Q.  In that upper section it has the review period,
15    and on this one it says July 1st of 2007 to June 30th,
16    2008.
17            Do you see that?
18    A.  Yes, ma'am.
19    Q.  Below that it has a supervisor's name, and here
20    it says Sergeant Marc Mccauslin.
21            Do you see that?
22    A.  Yes, ma'am.
23    Q.  Was he your sergeant during that period of time?
24    A.  Yes.
25    Q.  And there's some boxes that can be checked on

## Page 59

1    this first page and there's a section that says, "Action
2    required."  The box under that says, "Merit increase."
3            Do you see that?
4    A.  I do.
5    Q.  Was there anytime you did not receive a merit
6    increase during your employment with the City of Glendale
7    as part of your annual review?
8    A.  No, ma'am.
9    Q.  I'll have you go to the second page of this
10    document, please.  And by the way, at the very bottom
11    right-hand side of the page there's numbers.  Those are
12    the Bates numbers, and on the second page it has 757 at
13    the bottom.
14            Do you see that?
15    A.  Yes, ma'am.
16    Q.  So if I refer to one of those Bates numbers,
17    that's the number there.  They are in consecutive order,
18    okay?
19    A.  Okay.
20    Q.  On this second page of this document there are
21    various boxes, and about the fourth box, fifth box down it
22    has, "Comments."  And it begins with your name, Matt with
23    a comma.
24            Do you see that?
25    A.  Yes, ma'am.

## Page 60

1    Q.  It says you received discipline after a fellow
2    officer was injured as a result of your having a
3    pocketknife out and open.  You received additional
4    discipline after destroying a person's personal property
5    that was seized.
6            Do you see that?
7    A.  Yes, ma'am.
8    Q.  Those are the two matters we had just talked
9    about, correct?
10    A.  Correct.
11    Q.  I'm going to have you go to the page that at the
12    bottom it says 759 as the Bates number.
13    A.  Okay.
14    Q.  In the comment section, which is the second box,
15    it says again, "Matt, you received discipline for failing
16    to follow an order which resulted in a fellow officer
17    being injured.  You subsequently received a one-day
18    suspension.  You also received notice of intent to suspend
19    after you destroyed property."
20            Again, those are the same two incidents we
21    talked about, correct?
22    A.  Yes, ma'am.
23    Q.  I'd like to go to Bates number 763.  At the top
24    of the page it says, "Employee self-appraisal."
25            Do you see that?

## Page 77

1        MR. POPOLIZIO:  Foundation.

2        THE WITNESS:  I don't.

3  BY MS. BROADDUS:

4    Q.  Did you get a review for the 2017 to '18 period

5  of time?

6    A.  I did.

7    Q.  Did that review address the incident that

8  involved the incident that occurred at Motel 6?

9    A.  I don't know if it did or not.

10   Q.  Do you recall any review that you had that

11  addressed that issue?

12   A.  I believe it would have been my last review, but

13  I don't know what the dates were on that.

14   Q.  How would you say that Sergeant LaBrant

15  supervised you?

16       MR. MITCHELL:  Objection; form.

17       MR. POPOLIZIO:  Form.

18       THE WITNESS:  I would say that he supervised

19  me like everybody else in the squad.

20  BY MS. BROADDUS:

21   Q.  And how was that?  What did he do to supervise

22  you?

23   A.  What did he do?

24       I mean, as long as -- as long as you were

25  doing your job, he approved of it.  We would typically sit

## Page 78

1  down at the beginning of shift and go around the circle,

2  and if anybody had any pending investigations going on or

3  anything that they wanted to work in particular, in my

4  experience he would weigh those out and determine what we

5  were going to do for that day or that week or, I guess,

6  that moment in time on some points.

7    Q.  Would he go out on your shifts with you guys?

8    A.  Yes.

9    Q.  How often did he go out with you?

10   A.  Daily.

11   Q.  From the time that you began with the NRS until

12  you left that, did your duties change at all?

13   A.  Yeah, I'd say they did.

14   Q.  How did they change?

15   A.  Like I said I -- when -- when I started -- or

16  when Sergeant Rohkohl came to our squad we were more

17  enforcement-driven.  That turned into about a year's

18  period where we worked a lot of undercover investigations

19  and buying drugs.

20       Once Sergeant Rohkohl left, that portion of

21  our job kind of faded a little bit and we did a lot more

22  community-driven events.  We did do some surveillance

23  under Sergeant Shoop, but it wasn't as much as we had done

24  in the past.

25       And then once Sergeant LaBrant came, that

## Page 79

1  was, again, more enforcement-driven, less undercover work

2  or surveillance but more -- I mean, for lack of a better

3  term, boots on the street, trying to find out who was out

4  there on the street committing the crimes.

5    Q.  Did your job duties change within NRS after the

6  Motel 6 incident?

7    A.  No.

8    Q.  Did Sergeant LaBrant have any meetings with NRS

9  to discuss the incident that occurred at Motel 6?

10   A.  I don't believe so, no.

11   Q.  In your review it talks about you taking

12  basically a leadership role training and helping out other

13  officers, correct?

14   A.  Yes, ma'am.

15   Q.  Would you report any issues to your supervisor

16  regarding any people that you were supervising?

17   A.  I wouldn't say I was directly supervising them.

18  I never held that type of authority.  But, yes, if there

19  was something that blatantly stuck out, yes, I would bring

20  it to a supervisor's attention.

21   Q.  Have you had to do that on occasion with NRS?

22   A.  Yes.

23   Q.  Are you certified to teach law enforcement in any

24  particular area?

25   A.  Not in any particular area, no.

## Page 80

1    Q.  Were you ever certified to teach?

2    A.  I was.

3    Q.  What were you certified as?

4    A.  General instructor.

5    Q.  When was that?

6    A.  I don't recall.

7    Q.  Was it during just a certain period of time that

8  you were with Glendale or was it --

9    A.  Yeah, I would say -- it was during my time in

10  NRS.  I know that.  That's when I went through general

11  instructor school.

12   Q.  When you were in the academy were you trained on

13  use of force?

14   A.  I was.

15   Q.  Since the academy have you been trained on use of

16  force?

17   A.  Yes, ma'am.

18   Q.  How often?

19   A.  Usually about every year.

20   Q.  Is that part of the annual training provided by

21  the City of Glendale?

22   A.  Yes, ma'am.

23   Q.  Did you receive any other training on use of

24  force other than by anyone other than Glendale or as part

25  of the academy training?

Page 81

```
 1        A.  No, ma'am.
 2        Q.  So is it fair to say that during your 17 years
 3    with the City of Glendale all your training on use of
 4    force has been provided by Glendale?  Correct?
 5        A.  Yes, ma'am.
 6        Q.  Are you familiar with Glendale's use of force
 7    policies?
 8        A.  Yes.
 9        Q.  What about their arrest policies?
10        A.  Yes.
11        Q.  And NRS's policies, the ones specifically for
12    that unit?
13        A.  Yes.
14        Q.  As well as vehicle stop policies?
15        A.  Yes, ma'am.
16        Q.  Do you have discretion as to whether to follow
17    the policies?
18        A.  Do I have discretion?
19        Q.  Yes.
20        A.  I'd say the policies are merely a guideline.  But
21    in general, yes, you try to follow policy.
22        Q.  If you don't follow the policies can you be
23    disciplined by the City?
24        A.  Yes.
25        Q.  So if you choose to exercise discretion under the
```

Page 82

```
 1    policy you could be disciplined, correct?
 2        MR. POPOLIZIO:  Form.
 3        THE WITNESS:  I suppose you could, yes.
 4    BY MS. BROADDUS:
 5        Q.  As part of your annual training during your
 6    17 years with Glendale, did they ever provide you with any
 7    training on de-escalation tactics?
 8        A.  Yes.
 9        Q.  How often?
10        A.  I don't know.
11        Q.  Did you receive any de-escalation training by
12    anyone other than Glendale during your 17-year tenure with
13    them?
14        A.  No, ma'am.
15        Q.  What is your understanding of de-escalation?
16        A.  I mean, in a basic term, just knowing how to talk
17    to people.
18        Q.  What does that mean?
19        A.  I don't know how to make it any simpler than that
20    other than knowing how to communicate back and forth with
21    somebody.
22        Q.  What's the purpose of it?
23        A.  To de-escalate a situation.
24        Q.  You don't want to inflame the matter more to make
25    things more volatile.  Is that a fair statement?
```

Page 83

```
 1        A.  Yes, ma'am.
 2        Q.  So de-escalation is a way to try and prevent
 3    something from becoming volatile?
 4        A.  Yes.
 5        Q.  When you were with the City of Glendale did they
 6    train you on how to promote de-escalation?
 7        A.  I -- I don't know if they did or not.
 8        Q.  What type of training was provided?  What kind of
 9    suggestions were provided by the City of Glendale to help
10    de-escalation?
11        A.  I don't recall really anything specific.  I know
12    we had gone through de-escalation training in our AOT,
13    which is our yearly training.  Like I said, I don't
14    remember offhand what exactly it was.
15        Q.  As part of the de-escalation training, if you
16    have an officer who's involved in a matter, and obviously
17    your adrenaline can get going, is part of the
18    de-escalation to have that officer step aside and someone
19    else kind of come in and help keep control of the matter?
20        MR. POPOLIZIO:  Form.
21        THE WITNESS:  It can be, yes.
22    BY MS. BROADDUS:
23        Q.  Is that something that Glendale promotes, to have
24    officers help other officers to make sure that they don't
25    do something to escalate a problem?
```

Page 84

```
 1        MR. POPOLIZIO:  Form.
 2        THE WITNESS:  I don't know if that was ever
 3    specifically talked about.  I think that's just more of a
 4    human nature thing to do.
 5    BY MS. BROADDUS:
 6        Q.  So you don't recall receiving any training on an
 7    officer taking steps to prevent another officer from
 8    engaging in any particular type of activity?
 9        MR. POPOLIZIO:  Form.
10        THE WITNESS:  I don't.
11    BY MS. BROADDUS:
12        Q.  Do you think it's important that if an officer
13    sees another officer engaging in something that could be
14    questionable, to stop them from doing it?
15        MR. POPOLIZIO:  Form.
16        THE WITNESS:  Yes.
17    BY MS. BROADDUS:
18        Q.  Do you think that that officer has an obligation
19    to the community to do that?
20        MR. POPOLIZIO:  Form.
21        THE WITNESS:  Yes.
22    BY MS. BROADDUS:
23        Q.  How were the duties of the NRS officers different
24    from regular patrol officers?
25        A.  We are more -- we're not tied to the radio, so we
```

BY MS. BROADDUS:

1   Q.  Do you ever ask the person to get out of the car?

3   A.  Yes.

4   Q.  Is that one of the first things you do to try and

5   use a de-escalation tactic to have them get out of the

6   car --

7       MR. POPOLIZIO:  Form.

8   BY MS. BROADDUS:

9   Q.  -- with their hands where you can see them?

10      MR. POPOLIZIO:  Form.

11      THE WITNESS:  I wouldn't -- no, I wouldn't

12  say that's how -- I wouldn't say that's how officers do

13  it, no.

14  BY MS. BROADDUS:

15  Q.  Under what circumstances would you not ask a

16  passenger to get out of the car when you want to have them

17  removed from the car?

18  A.  I mean, you're going to ask them to get out of

19  the car, but you don't just typically have them walk out

20  nonchalant.  That's not typically the safest thing to do.

21  Q.  Do you communicate with the passenger to let them

22  know what you're doing?

23  A.  Yeah.  When circumstances are present, yes, you

24  do.

25  Q.  Did you ever tell Mr. Wheatcroft to get -- or ask

1   him to get out of the car?

2   A.  I believe I did.

3   Q.  We'll watch the video shortly.  I'm just going to

4   tell you you never asked him to get out of the car.  You

5   never told him that you were removing him from the car.

6   You never gave him any instructions.

7   A.  Okay.

8       MR. POPOLIZIO:  Form.

9   BY MS. BROADDUS:

10  Q.  When you have that situation, how is a person

11  supposed to know what to do?

12      MR. POPOLIZIO:  Form; foundation.

13  BY MS. BROADDUS:

14  Q.  If you don't give them any instructions and you

15  don't tell them what you want?

16      MR. POPOLIZIO:  Form; foundation.

17      THE WITNESS:  I think I did tell him.

18  BY MS. BROADDUS:

19  Q.  When do you believe you told him?

20  A.  We'll see it in the video.

21  Q.  Why did you approach the passenger's side of the

22  vehicle that day?

23  A.  Couple of reasons.  One, it was the path to least

24  resistance.  Second was it doesn't make any sense for me

25  to walk in front of my patrol vehicle and in front of the

1   vehicle that we stopped.  You know, there's just a safety

2   issue there with getting run over or pinned between cars.

3   Q.  I believe you testified earlier the reason that

4   you were approaching the vehicle was because you believed

5   that there was no turn signal -- there was a turn signal

6   violation, correct?

7   A.  Yes, ma'am.

8       MR. MITCHELL:  Objection; form.

9       MR. POPOLIZIO:  Join.

10  BY MS. BROADDUS:

11  Q.  And you've seen the videos of -- the surveillance

12  videos where your vehicle was and where the car entered,

13  correct?

14  A.  Yes, ma'am.

15  Q.  And there's pretty -- there's an archway at one

16  of the entrances, correct?

17  A.  Yes, ma'am.

18  Q.  And the archway is where the Ford Taurus in this

19  case came through, correct?

20  A.  Yes, ma'am.

21  Q.  And it came through from -- is it Glenn Street?

22  Is that correct?

23  A.  Yes.

24  Q.  So it came off of Glenn, turned into the parking

25  lot, went under the arches, correct?

1   A.  Yes, ma'am.

2   Q.  What's the distance between the arches and the

3   street?

4       MR. POPOLIZIO:  Form; foundation.

5       THE WITNESS:  Oh, I have no idea.

6   BY MS. BROADDUS:

7   Q.  Is it more than a car length?

8       MR. POPOLIZIO:  Foundation.

9       THE WITNESS:  I honestly have no idea.

10  BY MS. BROADDUS:

11  Q.  You earlier testified you had been at the

12  property on many occasions, but as you sit here today, you

13  don't know how far it is, correct?

14      MR. POPOLIZIO:  Form.

15      THE WITNESS:  That's correct.

16  BY MS. BROADDUS:

17  Q.  What's passive resistance?

18  A.  I believe passive resistance, and I'd have to

19  refer to the policy to read verbatim from it, but that can

20  be construed as somebody who doesn't necessarily want to

21  do what you're telling them to do.  It's not necessarily

22  physical resistance.

23  Q.  If an officer requests something from someone

24  they see on the street, a civilian, and that person

25  doesn't want to comply, they're not legally obligated to

Page 97

```
 1    comply, can you use passive resistance on them -- can you
 2    use resistance on them?
 3            MR. POPOLIZIO:  Form.
 4            THE WITNESS:  Can I use resistance on them?
 5    BY MS. BROADDUS:
 6       Q.  Can an officer?
 7       A.  I don't know what that means, can I use
 8    resistance on them.
 9       Q.  Can you use any level of force on someone who
10    hasn't done anything wrong?
11            MR. POPOLIZIO:  Form.
12            THE WITNESS:  It depends.
13    BY MS. BROADDUS:
14       Q.  If a person doesn't want to ask (sic) a question
15    by an officer, and they're not legally obligated to answer
16    that question, can you use force against that person?
17            MR. POPOLIZIO:  Form.
18            THE WITNESS:  For that reason in and of
19    itself, no.
20    BY MS. BROADDUS:
21       Q.  What types of control can you use for someone
22    who's engaged in passive resistance?
23       A.  I'd say control holds, maybe threaten the use of
24    a Taser or OC spray.
25            And like I said, I'd have to read the policy
```

Page 98

```
 1    verbatim to be able to quote it.
 2       Q.  When you approached the vehicle -- which you
 3    pulled over for a traffic violation, correct?
 4       A.  Yes, ma'am.
 5       Q.  -- for failure to use a turn signal, other than
 6    making a passive comment about using a turn signal when
 7    entering -- when executing a turn, did you have any other
 8    communications with the driver?
 9       A.  I don't believe so, no.
10       Q.  So your focus was on the passenger, correct?
11       A.  Well, Officer Lindsey was contacting the driver,
12    I believe.
13       Q.  And Officer Lindsey, you're aware, never saw any
14    turn signal violation, correct?
15       A.  I'm aware of that, yes.
16       Q.  Why did you go hands on with Johnny Wheatcroft?
17       A.  Because he started reaching down into the center
18    console.
19       Q.  Did you ask him not to?
20       A.  I did.
21       Q.  And did he stop when you asked him not to?
22       A.  Into the center console, no.
23       Q.  He kept reaching after you said, don't reach into
24    the console?
25            MR. POPOLIZIO:  Form.
```

Page 99

```
 1    BY MS. BROADDUS:
 2       Q.  You're saying that he continued to reach in
 3    there?
 4       A.  I'd have to watch the video, but, I mean,
 5    everything happened so quickly.  That was not the first
 6    time that he had reached into something.
 7       Q.  What else did he reach into?
 8       A.  A backpack.
 9       Q.  And you asked him not to reach into a backpack,
10    correct?
11       A.  I did.
12       Q.  And did he say -- did he agree or did he say no?
13    What did he do?
14       A.  No, he agreed.
15       Q.  Did he reach back into the backpack?
16       A.  No.
17       Q.  And then you say he reached into a console?
18       A.  Yes.
19       Q.  Do you know what was in his hands?
20       A.  I have no idea.
21       Q.  Don't you think as an officer it would be
22    important to know what's in somebody's hands when you're
23    approaching a vehicle?
24       A.  Ideally, yes.
25       Q.  Do you recall him having a soda in one hand?
```

Page 100

```
 1       A.  No.
 2       Q.  Do you recall him having money in the other
 3    hand?
 4       A.  No.
 5       Q.  As an officer, you would want to know what's in
 6    his hands, correct?
 7            I mean, if he had a weapon, that would be a
 8    concern to you, correct?
 9       A.  Absolutely.
10       Q.  And I'll just tell you, when we watch the video
11    you're going to see that he had cash, some dollar bills,
12    in one hand and a soda in the other hand, which you took
13    from him.  Okay?
14       A.  Okay.
15            MR. MITCHELL:  Objection; form.
16            MR. POPOLIZIO:  Join.
17    BY MS. BROADDUS:
18       Q.  And from the time that you approached the door,
19    he had that cash in his left hand.  Okay?
20            MR. POPOLIZIO:  Form.
21    BY MS. BROADDUS:
22       Q.  Were you aware of that?
23            MR. POPOLIZIO:  Form.
24            THE WITNESS:  Okay.
25    ///
```

## Page 101

BY MS. BROADDUS:

1   Q.  Were you aware that even after you said he was
2   stuffing things in the seats he still had that cash in his
3   hand?  Were you aware of that?
4   A.  No.
5   Q.  Were you aware that he had the cash in his hand
6   after he was tased, pulled out of the car, put on the
7   ground, put in a prone position, was tased again, and he
8   still had that cash his hand?  Were you aware of that?
9   MR. MITCHELL:  Form.
10  MR. POPOLIZIO:  Join.
11  THE WITNESS:  No.
12  BY MS. BROADDUS:
13  Q.  And so you're saying you perceived a threat from
14  Johnny; is that correct?
15  A.  Absolutely.
16  Q.  What was the threat?
17  A.  I mean, do you want to go through the whole
18  video?
19  Q.  I'll go through the whole video, but I'm trying
20  to understand why you went hands on with someone who had
21  something in their hand the entire time -- cash -- and as
22  an officer who's trained to watch for details would have
23  seen that he had cash in his hand the entire time; that
24  nothing was stuffed anywhere; that he listened to you when

## Page 102

1   you said not to get in the bag, not to stuff anything; he
2   said okay; and then you went hands on with him.  I'm
3   trying to figure out why you went hands on with him at
4   that time.
5   MR. MITCHELL:  Objection to form.
6   MR. POPOLIZIO:  Is that a question?
7   MS. BROADDUS:  Yeah.  I'm asking why he went
8   hands on at that time.
9   MR. POPOLIZIO:  Form.
10  THE WITNESS:  Okay.  Johnny had reached into
11  the bag.  He had initially complied and put the bag down.
12  I actually even think he said he was sorry.
13  Shortly after that he had turned his body
14  and looked up at me and began reaching into the center
15  console.  Whether there was a gun, a knife, a grenade, I
16  don't know what's in that center console.
17  Shortly after that is when I had a
18  semi-control hold on his right arm.  He's still seated in
19  that front passenger seat.  He still has access to not
20  only the backpack but the center console.  There are five
21  total people in the vehicle.  I clearly had not checked
22  his waistband or anything like that, or his pockets, his
23  pants.  I mean, he had access to everything in that
24  vehicle.  I don't know what's in that vehicle.
25  My job is to go home to my family at the end

## Page 103

1   of the night, and that's what I had to do.
2   BY MS. BROADDUS:
3   Q.  Do you think what you did was right that day?
4   A.  I do.
5   Q.  Now, let's talk about that.  Why did you --
6   asked him for his identification.  What was the purpose
7   for asking him for his identification?
8   A.  Identifying him.
9   Q.  Okay.  Do you think he had the right to refuse to
10  identify himself?
11  A.  I don't.
12  Q.  Why?
13  A.  Because he didn't have a seat belt on.
14  Q.  So he had his seat belt over his shoulder,
15  correct?
16  A.  Correct.
17  Q.  But it wasn't latched in the -- hooked.  Is that
18  what you're saying?
19  (Ms. Wanner left the conference room.)
20  THE WITNESS:  Yes, ma'am.
21  BY MS. BROADDUS:
22  Q.  So when you approached the car a seat belt was
23  partially on him, correct?
24  MR. POPOLIZIO:  Form.
25  THE WITNESS:  No.

## Page 104

1   BY MS. BROADDUS:
2   Q.  It wasn't partially over him?
3   A.  No, ma'am.  It's either on or it's off.
4   Q.  So the seat belt was over his shoulder, correct?
5   A.  He was hugging the seat belt.
6   Q.  He what?
7   A.  He was hugging the seat belt.
8   Q.  You don't know what -- he was hugging?  What do
9   you mean, he was hugging his seat belt?
10  MR. MITCHELL:  Form.
11  MR. POPOLIZIO:  Form.
12  THE WITNESS:  He was hugging the seat belt.
13  It was over his right shoulder not buckled.
14  BY MS. BROADDUS:
15  Q.  So you don't know if he was taking it off or
16  putting it on.  Is that a fair statement?
17  A.  I don't know what he was doing with it.
18  Q.  But the car was -- as you already said, it was
19  already stopped at that point, correct?
20  MR. POPOLIZIO:  Form.
21  MR. POPOLIZIO:  Form.
22  THE WITNESS:  Yes, ma'am.
23  BY MS. BROADDUS:
24  Q.  So you have a car that you said didn't have a
25  turn signal.  You don't really care about what the

Page 105

```
 1    driver's doing.  You go to the passenger side.  Your only
 2    communications are really with the passenger.  I mean, it
 3    certainly seems that you were really looking for something
 4    to -- or trying to create some kind of issue with this
 5    passenger.
 6           Is that kind of your MO, to kind of push
 7    people to the extremes when you approach a car like that?
 8           MR. POPOLIZIO:  Objection; form.
 9           THE WITNESS:  You're wrong.
10    BY MS. BROADDUS:
11        Q.  Okay.  Do you normally take that kind of steps
12    with someone over a seat belt violation?
13           MR. POPOLIZIO:  Form.
14           THE WITNESS:  What -- what steps?
15    BY MS. BROADDUS:
16        Q.  Threatening with a Taser, threatening to take
17    them him to jail because they don't want to provide an
18    identification.
19           MR. POPOLIZIO:  Form.
20    BY MS. BROADDUS:
21        Q.  Is that normally what you do when somebody has a
22    seat belt violation for a car that's already parked in a
23    parking lot?
24           MR. POPOLIZIO:  Form.
25           THE WITNESS:  In this instance, yes, that's
```

Page 106

```
 1    what I did.
 2    BY MS. BROADDUS:
 3        Q.  And you think those are appropriate actions for a
 4    police officer?
 5           MR. POPOLIZIO:  Form.
 6           THE WITNESS:  I do.
 7    BY MS. BROADDUS:
 8        Q.  Did you think that Johnny had committed other
 9    crimes?  Were you looking for something in his car that
10    day?  Were you looking for him to maybe have drugs or
11    something?
12           MR. POPOLIZIO:  Form.
13           THE WITNESS:  I know there was a trespassing
14    authorization on form -- or on file with the City.  But
15    whether or not he had committed a crime, I don't know.
16    BY MS. BROADDUS:
17        Q.  The trespass warning allows -- doesn't tell you
18    to harass customers who are lawfully to be there, correct?
19           MR. POPOLIZIO:  Form.
20           THE WITNESS:  No, that's not what the form
21    says.
22    BY MS. BROADDUS:
23        Q.  Okay.  And were you aware of the events that took
24    place that day that -- why Johnny was there?
25           MR. POPOLIZIO:  Form.
```

Page 107

```
 1           THE WITNESS:  I have no clue.
 2    BY MS. BROADDUS:
 3        Q.  So it's fair to say that you didn't know that
 4    Johnny had just picked up his kids, took them to a candy
 5    store, brought them to the motel with his wife so they
 6    could have family day because that's what they could
 7    afford.  You weren't aware of that, correct?
 8           MR. POPOLIZIO:  Form.
 9           THE WITNESS:  No.  I was not, no.
10    BY MS. BROADDUS:
11        Q.  And you weren't aware that that cash in his hand
12    was to pay for the room so they could have quality time
13    together as a family there, were you?
14           MR. POPOLIZIO:  Form.
15           THE WITNESS:  No.
16    BY MS. BROADDUS:
17        Q.  And instead, these two kids see both their
18    parents arrested, correct?
19           This is their family day.  This is what they
20    get to see, correct?
21           MR. MITCHELL:  Form.  We're getting --
22           MR. POPOLIZIO:  Form.
23           MR. MITCHELL:  -- really close to a 30 (d)
24    issue where you are asking questions only for the purpose
25    of annoying and insulting this individual.  You are not
```

Page 108

```
 1    eliciting information that leads to discoverable important
 2    information, and I'm not going to let it go on.
 3           MR. POPOLIZIO:  Join.
 4           MS. BROADDUS:  Well, I just wanted to make
 5    sure he was aware of these things or he wasn't.  And I
 6    certainly can ask those questions.
 7           MR. MITCHELL:  Absolutely unacceptable.  You
 8    are not going to ask those questions.
 9           MS. BROADDUS:  I can ask those questions.
10           MR. MITCHELL:  Absolutely not.  We're
11    getting very close to 30 (d).
12           MS. BROADDUS:  And I'm trying to get
13    information from this witness as to what he knew and what
14    he didn't know.
15           MR. POPOLIZIO:  But you can't do in
16    violating the rule.
17           MS. BROADDUS:  I'm not violating the rule.
18    I disagree with you that.
19           MR. POPOLIZIO:  That's our position.
20           MS. BROADDUS:  I disagree with you on that.
21    BY MS. BROADDUS:
22        Q.  I'd like you to go to Exhibit No. 6, please.
23        A.  Okay.
24        Q.  And I'm going to have you go to the page that is
25    marked as Bates No. 450.
```

Page 109

```
1        A.  Okay.
2        Q.  You talked about -- we've talked briefly about
3   the types of resistance and methods of control.  Have you
4   seen this chart before?
5        A.  Yes.
6        Q.  And the first type of resistance is passive.  Do
7   you see that?
8        A.  Yes, ma'am.
9        Q.  And in passive it says, "Suspect fails to obey
10  any command or direction of the officer.  Displays no acts
11  of assault, threat, nonverbal compliance, and never
12  resists control attempt of the officer."
13            Do you see that?
14       A.  I do.
15            (Ms. Wanner entered the conference room.)
16  BY MS. BROADDUS:
17       Q.  In that first sentence where it says, "Suspect
18  fails to obey any command or direction," is that accurate?
19       A.  I believe so.
20       Q.  So if an officer asks someone to do something
21  that is not a lawful command, that person is still
22  obligated to do it under what this rule says?
23            MR. POPOLIZIO:  Form.
24            THE WITNESS:  I don't see that it says
25  lawful command anywhere.
```

Page 110

```
1   BY MS. BROADDUS:
2        Q.  Okay.  So it would include, suspect could fail to
3   obey any unlawful command and still be subject to this --
4   it would be considered this type of resistance, correct?
5   If it's overbroad and just says any command, correct?
6            MR. POPOLIZIO:  Form.
7            THE WITNESS:  I -- I don't know.
8   BY MS. BROADDUS:
9        Q.  Do you rely on this chart to guide you as to how
10  you are going to -- what levels of force you're going to
11  use?
12       A.  Do I rely on it?
13       Q.  Yes.
14       A.  I guess to an extent.  I mean, it is our policy
15  and it is a guideline.  I think more importantly what I'm
16  feeling at the time and my judgment, you know, so I can go
17  home safe at the end of my shift, that's what I rely on
18  most.
19       Q.  When you approached the vehicle that day, was
20  Johnny Wheatcroft free to leave?
21       A.  No.
22       Q.  Why was he not free to leave?
23       A.  Because I have the right to seize that vehicle
24  for an appropriate amount of time.  We conducted a traffic
25  stop on the vehicle.
```

Page 111

```
1        Q.  Could he have gotten out of the car and walked
2   away?
3        A.  Yeah, I suppose he could have.
4        Q.  Would that have been unlawful if he would have
5   gotten out of the car and walked away?
6            MR. POPOLIZIO:  Form.
7            THE WITNESS:  I believe so, yes.
8   BY MS. BROADDUS:
9        Q.  Why?
10       A.  Because he was in violation of a seat belt
11  violation -- seat belt law.
12       Q.  Did you ever cite him for not wearing a seat
13  belt?
14       A.  No.
15       Q.  Have you seen the police report in this case?
16       A.  I've seen bits and pieces of it.
17       Q.  Did you see anything where he was ever charged
18  with not wearing a seat belt?
19       A.  No.
20       Q.  Were you aware he wasn't charged with that?
21       A.  I mean, I would assume he wasn't charged with
22  that.
23       Q.  Why would you assume that?
24       A.  I didn't write him any tickets.
25       Q.  Do you know who wrote citations for him?
```

Page 112

```
1        A.  I don't know if anybody did or not.
2        Q.  Do you know if the driver was cited for not using
3   a turn signal?
4        A.  I have no clue.
5        Q.  After you left the area that day at the Motel 6
6   where did you go?
7        A.  We probably went to lunch, but I -- I don't --
8   have no clue.
9        Q.  When did you start your shift that day?
10       A.  I mean, I'd have to look at the time clock, but
11  we typically started at 1:00 p.m.
12       Q.  And this happened -- do you know what time this
13  happened?
14            Let me ask you that.
15       A.  Dinnertime; 5:00, 6:00, 7:00 o'clock.  I don't
16  recall what the exact time was.
17       Q.  And you think you went to lunch after that?
18       A.  Probably.
19       Q.  Where did you go after you went to lunch?
20       A.  Either back out on the street or to the station
21  or QT for a restroom break or -- I mean, there's a number
22  of places where we would frequent.
23       Q.  How long were you at the scene before you left?
24       A.  I have no clue.  Maybe an hour.
25       Q.  With your body-cam footage, do you upload that
```

Page 113

```
1    from your vehicle or do you do that at the station?
2        A.  At the station.
3        Q.  When did you upload the videos in this case?
4        A.  I believe at the end of my shift.
5        Q.  Did you have straight shift hours?
6        A.  I don't know what that means.
7        Q.  Did you have set hours?
8        A.  Yes.  For the most part, yeah.
9        Q.  What were your general hours?
10       A.  Usually 1:00 to 11:00 p.m.
11       Q.  So at the end of the shift did you upload all
12   your videos that day or just certain ones?  Or how did you
13   decide?
14       A.  No.  Typically we just take our -- the physical
15   camera and dock it.  We have docking stations.  And it
16   starts drawing the video into -- into AXON.
17       Q.  Then what happens after you load the video?  Then
18   what do you do?
19       A.  That's it.
20       Q.  Do you ever go back and look at the videos?
21       A.  Yes.
22       Q.  How often?
23       A.  It depends.
24       Q.  Did you go back and look at the videos in this
25   case?
```

Page 114

```
1        A.  I believe so, yes.
2        Q.  Why would you believe you went back and looked at
3    the videos?
4        A.  It was probably at the direction of a supervisor.
5    I know I watched the video in my internal investigation,
6    yeah.
7        Q.  After some point -- between the time that you
8    upload the video until there was an internal
9    investigation, which looks like it was about three months
10   later that you had that interview, during that time could
11   you look at your video at any time or did they put any
12   restriction on you from accessing it?
13       A.  I have no idea.
14       Q.  Did you prepare any report relating to the
15   Wheatcroft matter?
16       A.  No, ma'am.
17       Q.  Who prepared the report?  Who was put in charge?
18       A.  It was either Lacey Tolbert or Roy Lewis.  I
19   don't know who took the original.
20       Q.  My understanding, it was Officer Lewis that took
21   the lead.
22       A.  Okay.
23       Q.  Do you have any reason to dispute that?
24       A.  No.
25       Q.  Did you ever speak with Officer Lewis about the
```

Page 115

```
1    events?
2        A.  I don't think that I did outside of when he
3    arrived on scene.
4        Q.  After that, when you went back that night and
5    uploaded the video, did you do any further investigation?
6        A.  I did.
7        Q.  And why did you do a further investigation?
8        A.  It was the next day.  It was -- Lieutenant
9    Montgomery had asked me at what point I had observed the
10   turn signal.  I had gone back to the Motel 6, it was the
11   next afternoon, to review video.
12       Q.  Who was with you?
13       A.  Jeff Pittman.
14       Q.  Did you tell Officer Lewis or Officer Tolbert
15   that you were going back to the motel?
16       A.  I don't know if I did or not.
17       Q.  After you went to the motel, did you follow up
18   with either Officer -- well, did you follow up with
19   Officer Lewis at all regarding the motel video?
20       A.  I don't think I followed up with him.  I think I
21   spoke again with Lieutenant Montgomery.
22       Q.  But you didn't get a copy of the video, correct?
23       A.  I did not, no.
24       Q.  And you're saying that there's a video that has
25   been disclosed in this lawsuit, surveillance video from
```

Page 116

```
1    the motel, you're saying -- did you review that video
2    while you were at the motel?
3        A.  I think that was one of the videos I reviewed,
4    yes.
5        Q.  How many videos did you look at the motel?
6        A.  I know that there was at least one other one from
7    a different angle, but I believe that's -- I believe
8    that's it.  There could have been more, but I don't -- I
9    don't recall.
10       Q.  And in that video you watched from a different
11   angle, did you see the Taurus make a turn?
12       A.  Yes.
13       Q.  Did you see any other traffic on the roadway?
14       A.  No, ma'am.
15       Q.  Do you know whether he used a turn signal?
16       A.  It didn't appear like it in the video.
17       Q.  Do you know whether he used a hand signal out of
18   his window or anything?
19       A.  It didn't appear that he did.
20       Q.  Could you see the window from that angle to know
21   if he was doing that?
22       A.  Yeah.  It was more of a wide angle.  I think the
23   camera was on the -- it was on the west building, but it
24   was the far northeast corner of the west building looking
25   in a south or kind of southeast direction.
```

Page 133

1  AXON it comes off of our camera.  So we can't plug our
2  camera in the next day and review videos because it's
3  basically removed from our camera and put into whatever
4  database they use.
5  BY MS. BROADDUS:
6      Q.  So then Item 15 above that talks about the
7  automatic deletion, those two are kind of -- they're like
8  a millisecond apart, but it looks like those two things
9  are related.  Would that be correct?
10      A.  Yes.  I believe Item 16, when it gets marked as a
11  felony, and I could be wrong on the time frame, but I
12  think when you categorize something as a felony, it saves
13  for a hundred years or something like that.
14      Q.  Why did you mark it as a felony?
15      A.  Because there were felony arrests made.
16      Q.  Do you know who did the arrests?
17      A.  I don't know who actually made the arrests.  I
18  know -- we had talked earlier about Officer Lewis took the
19  original, so I would assume that it would probably be him.
20      Q.  And who told you that there was going to be
21  felonies?
22          Because you had to enter this.  I'll just
23  explain.  At some point you went back and entered felony
24  in there.  Did you have a conversation with somebody about
25  a felony?

Page 134

1      A.  Well, there were felony charges at the scene that
2  we had arrested people.  So that's what that video would
3  be categorized as.
4      Q.  Now, it looks like you -- there were several
5  events up through number 20 that all happened around
6  between midnight and 1:00 o'clock.  The next entry is at
7  11:00 o'clock in the morning.  Do you recall coming back
8  in and accessing the video?
9      A.  I don't, no.
10      Q.  It looks like entry numbers 21 through 26 are all
11  approximately within the same period of time.  The
12  activity indicates there's buffering and that the record's
13  accessed and it was streamed.  Do you know why that would
14  have been done?
15      A.  I -- I don't.
16      Q.  It looks like then again on entry number 30 at
17  4:00 o'clock in the afternoon you again accessed the
18  video.  Do you recall why you would have accessed it
19  again?
20      A.  No, ma'am, I don't.
21      Q.  I'm going to have you go to the Bates numbered
22  page on the same exhibit, 3349.
23      A.  Okay.
24      Q.  Line number 60 there, it says the 28th of July,
25  so two days later, at 7:00 o'clock in the morning.  It has

Page 135

1  that you had accessed the video and it was streamed.  Do
2  you recall doing that two days afterward?
3      A.  No, ma'am, I don't.
4      Q.  Do you recall why -- any reason you would go in
5  two days afterwards to access that information?
6      A.  No, ma'am.
7      Q.  Prior to arriving on the scene that day at
8  Motel 6 did you know who Johnny Wheatcroft was?
9      A.  No, ma'am.
10      Q.  Did you know who Anya Chapman was?
11      A.  No, ma'am.
12      Q.  Do you ever recall coming across their names
13  through any other prior investigations that you had done?
14      A.  No, ma'am.
15      Q.  You didn't know any of the Wheatcroft children.
16  Is that fair to say?
17      A.  No, ma'am, I did not.
18      Q.  What about the driver, Shawn Blackburn; did you
19  know him prior to that day?
20      A.  No, ma'am.
21      Q.  Is it fair to say that since you didn't know
22  any -- either Johnny or Anya, that you were unaware of any
23  prior criminal history?
24      A.  That's correct.
25      Q.  So anything you did that day had nothing to do

Page 136

1  with any history that they may have had, correct?
2      A.  No, ma'am.
3      Q.  I'm going to have Alexz pull up a video.  This is
4  the body cam from Officer Lindsey.
5          MR. POPOLIZIO:  That's 44.
6  BY MS. BROADDUS:
7      Q.  It's up on the screen, and it's at about
8  19:20 seconds in.  This has been disclosed in the lawsuit.
9  It has inside a police vehicle.  It has Officer Lindsey
10  getting out of the car.
11          (Video played.)
12  BY MS. BROADDUS:
13      Q.  All right.  We stopped it at the 40-second point.
14  I don't know if it's actual seconds or not.  My
15  understanding is that is you off to the left on the
16  screen.
17          Do you see that?
18      A.  I do.
19      Q.  And you see an entrance to the Motel 6.
20          Do you see that?
21      A.  I do.
22      Q.  And there's a roadway.  Is that Glenn Drive?
23      A.  Yes, ma'am.
24      Q.  And you'll see there's a sidewalk between the
25  parking lot area and the roadway, correct?

Page 137

1    A.  Yes, ma'am.
2    Q.  And then from the parking lot by the sidewalk up
3  to where the arch point is there's a -- I guess you could
4  say a block curb that's painted yellow.
5        Do you see that?
6    A.  I do.
7    Q.  Do you know what the distance is between the curb
8  and the arch?
9        MR. POPOLIZIO:  Form.
10       THE WITNESS:  I don't.
11  BY MS. BROADDUS:
12    Q.  You'd say it's at least a car length.  Would you
13  agree?
14       MR. POPOLIZIO:  Form.
15       THE WITNESS:  From the yellow curb to the
16  arch?
17  BY MS. BROADDUS:
18    Q.  From the sidewalk to the arch.
19       MR. POPOLIZIO:  Form.
20       THE WITNESS:  Oh, I -- I don't know.  I
21  don't know how far it is.
22  BY MS. BROADDUS:
23    Q.  You can't say one way or another whether it's at
24  least a car length?
25    A.  Not based off of a video, no, ma'am, I can't.

Page 138

1    Q.  What about your experience and all of the times
2  that you've been at the parking lot in this motel; do you
3  have any understanding of whether that's at least a car
4  length between Glenn Drive and the archway?
5    A.  I would have to be out there.
6        MS. THOMPSON:  Surveillance?
7        MS. BROADDUS:  Yes.
8        We're going to switch videos.  We're going
9  to the Motel 6 surveillance video.  We're going to slow it
10  down just a little bit.
11       (Video played.)
12  BY MS. BROADDUS:
13    Q.  Have you seen the Motel 6 surveillance video
14  before?
15    A.  Yes, ma'am.
16    Q.  And this appears to be consistent with that; is
17  that true?
18       MR. POPOLIZIO:  Form.
19       THE WITNESS:  Yes, ma'am.
20  BY MS. BROADDUS:
21    Q.  Would you -- it's very slow.
22       (Video played.)
23  BY MS. BROADDUS:
24    Q.  All right.  At this point we've stopped at the
25  14-second point.  I'm just going to refer to it as

Page 139

1  seconds.  And you see under the archway, you see the front
2  end of the Taurus coming up to the arches.
3        Do you see that?
4    A.  I do.
5    Q.  And from this video it looks like the front end
6  is probably either right at or underneath the arch; is
7  that correct?
8        MR. POPOLIZIO:  Form.
9        THE WITNESS:  It's hard to tell off of this
10  video.
11  BY MS. BROADDUS:
12    Q.  Would you agree that it's no longer on Glenn
13  Drive?
14       MR. POPOLIZIO:  Form.
15       THE WITNESS:  I wouldn't agree with that.
16  BY MS. BROADDUS:
17    Q.  You don't know whether or not do you say it is
18  on Glenn Drive at this point?
19    A.  No.  You can't see whether it is or is not on
20  Glenn Drive.
21    Q.  Based on your experience, would that indicate to
22  you that the car is no longer on Glenn Drive?
23    A.  I -- I don't know.
24    Q.  Do you see the police cruiser that you were in at
25  this point?

Page 140

1    A.  No, ma'am.
2        MS. BROADDUS:  Okay.  Go a little bit
3  further.
4        (Video played.)
5  BY MS. BROADDUS:
6    Q.  At this point you see the cruiser.  Do you see
7  that?
8    A.  Yes, ma'am.
9    Q.  And the car is all the way through the arches; is
10  that correct?
11    A.  Yes, ma'am.
12    Q.  Is this when you saw the turn signal?
13    A.  I can't tell you where I saw the turn signal on
14  this particular video.  I -- I just know that when I came
15  around the corner I had seen the vehicle without a turn
16  signal on and told Mark Lindsey at that point that they
17  had not used their turn signal.
18    Q.  Could the car have already completed its turn by
19  the time you saw it, which would indicate why you wouldn't
20  have seen a turn signal?
21       MR. POPOLIZIO:  Form; foundation.
22       MR. MITCHELL:  Form.
23       THE WITNESS:  I suppose it's possible, but I
24  remember thinking to myself and knowing what I saw, and
25  that's why I made a traffic stop.

Case 2:18-cv-02347-MTL   Document 246-1   Filed 03/26/21   Page 136 of 228

### Page 141

1  BY MS. BROADDUS:
2      Q.  Let's go to the next video.  We're going to go to
3  your body-cam footage.
4      A.  Okay.
5          (Video played.)
6  BY MS. BROADDUS:
7      Q.  At this point it's driving along, and you're on
8  the back side of the parking lot, correct?  You're getting
9  ready to turn towards the area where the arch is, correct?
10     A.  Yes, ma'am.
11         (Video played.)
12 BY MS. BROADDUS:
13     Q.  At this point -- we're stopping at the 36-second
14 part.  You've just opened your door and are getting out of
15 the vehicle, correct?
16     A.  Yes, ma'am.
17     Q.  And the Taurus is backed into the parking spot.
18 Do you see that?
19     A.  I do.
20         MS. BROADDUS:  Go ahead.
21         (Video played.)
22 BY MS. BROADDUS:
23     Q.  At this point you've asked everybody in the car
24 for their ID, correct?
25     A.  I asked them if they had their ID on them, yes,

### Page 142

1  ma'am.
2      Q.  Who in the car, if anyone, was required to
3  provide an ID?
4      A.  The driver and the front-seat passenger.
5      Q.  You've testified about earlier that it's because
6  he didn't have his seat belt latched; is that correct?
7          MR. POPOLIZIO:  Form.
8          THE WITNESS:  Yes, ma'am.
9  BY MS. BROADDUS:
10     Q.  Did you see Johnny at any point when the vehicle
11 was on the roadway that would indicate his seat belt was
12 not latched while he was on any roadway?
13     A.  I don't know.  I just remember when I was
14 approaching the vehicle on foot I had seen that his seat
15 belt was not on.
16     Q.  It was unlatched, correct?
17     A.  Yes, ma'am.
18     Q.  It was over his shoulder, correct?
19     A.  Over his right shoulder, yes, ma'am.
20         (Video played.)
21 BY MS. BROADDUS:
22     Q.  At this point you went to the back -- we're at
23 1 minute, 38 seconds.  You went to the back of the vehicle
24 and called in a license plate, correct?
25     A.  Yes, ma'am.

### Page 143

1      Q.  And then you went back to the passenger side,
2  correct?
3      A.  I did.
4      Q.  What was the purpose of running the license
5  plate?
6      A.  Just to check to see if the vehicle was stolen or
7  not.
8          MS. BROADDUS:  Go ahead.
9          (Video played.)
10 BY MS. BROADDUS:
11     Q.  Right there you just heard -- we're stopping at
12 1:45.  You heard an exchange.  You asked Johnny not to
13 reach into his bag, and he agreed with you that he
14 wouldn't, correct?
15     A.  Yes, ma'am.
16         MS. BROADDUS:  Okay.  Go ahead.
17         (Video played.)
18 BY MS. BROADDUS:
19     Q.  At that point you asked him for his ID.  He
20 questioned why.  And when you asked -- he asked why he had
21 to have it, you said because it was a traffic stop,
22 correct?
23     A.  Yes, ma'am.
24     Q.  Did you ever at any time tell him it had anything
25 to do with the seat belt?

### Page 144

1      A.  No, I didn't.
2          (Video played.)
3  BY MS. BROADDUS:
4      Q.  There, when you had to explain why he had -- you
5  said as a passenger he had to provide ID.  Do you recall
6  that?
7      A.  I do.
8      Q.  That's not accurate, correct?
9          MR. POPOLIZIO:  Form.
10         THE WITNESS:  No.  That in and of itself is
11 not accurate.  I could have done a better job articulating
12 why I was asking for his ID.
13         (Video played.)
14 BY MS. BROADDUS:
15     Q.  So at that point you say you can take him down to
16 the station.
17         Can you arrest someone for not wearing their
18 seat belt?
19     A.  For that, no.
20     Q.  So that would be incorrect, that you could take
21 him down to the station because he's not wearing his seat
22 belt, correct?
23         MR. MITCHELL:  Form.
24         MR. POPOLIZIO:  Form.
25         THE WITNESS:  That's incorrect.

36 (Pages 141 to 144)

Page 145

```
 1   BY MS. BROADDUS:
 2       Q.  I'm sorry?
 3       A.  I would disagree with that.
 4       Q.  So you can take them down to the station because
 5   someone is not wearing a seat belt?
 6           MR. POPOLIZIO:  Form.
 7           THE WITNESS:  No, that's not what I said.
 8   BY MS. BROADDUS:
 9       Q.  Well, explain, please.
10       A.  I believed he was in violation of the seat belt,
11   the Title 28 violation.  And when you are in violation of
12   a traffic statute, I would have the right to -- and he
13   doesn't have ID, I would have the right to take him and
14   fingerprint him for identification purposes.
15       Q.  And that's all based on the assumption that you
16   did not see him wearing a seat belt, correct?
17           MR. POPOLIZIO:  Form.
18           THE WITNESS:  I wouldn't call it an
19   assumption, but, yes, because he didn't have a seat belt
20   on.
21           MS. BROADDUS:  Go ahead.
22           (Video played.)
23           MS. THOMPSON:  Do you want me to restart it?
24           MS. BROADDUS:  Yes, please.
25           (Video played.)
```

Page 146

```
 1   BY MS. BROADDUS:
 2       Q.  It's a little fuzzy on the video.  We were
 3   stopping right at the point where you were opening up the
 4   car door, so we'll begin at that point.
 5       A.  Yes, ma'am.
 6           MS. THOMPSON:  I'm just going to let it play
 7   until we get back there.
 8           (Video played.)
 9           MS. BROADDUS:  Stop there.
10   BY MS. BROADDUS:
11       Q.  At this point you've opened up the car door,
12   correct?
13       A.  Yes, ma'am.
14       Q.  What was the purpose of opening the car door?
15       A.  Either to take Johnny out of the vehicle -- I
16   believe I have a right to do that, to seize the occupants
17   and for my safety.  Not only my safety, but everybody else
18   in the vehicle as well as the other officers in the area.
19       Q.  What has Johnny done to create a situation that
20   you feel officer safety was an issue?
21           You asked him not to reach in a bag.  He
22   said okay.  You don't say anything about reaching into
23   anything else or reaching anywhere at this point.
24       A.  Right.
25       Q.  What was it that had you concerned about officer
```

Page 147

```
 1   safety at this point?
 2       A.  I don't know what's in that vehicle.  And just
 3   through my experience of talking with people throughout
 4   the years and being an officer for 15 years at this point,
 5   I had an idea of where this conversation was going.
 6       Q.  But at this point you've opened up the door?
 7       A.  Yes, ma'am.
 8       Q.  Are you saying -- what type of resistance was
 9   Johnny displaying at this point?
10       A.  I would say just verbal noncompliance.
11       Q.  And how is that -- how was he noncompliant?
12       A.  Just we were going back and forth with each
13   other.  He was questioning me, which is fine, and he's
14   allowed to do.  He had already -- and I know you had said
15   he had complied with the backpack, and he did, but that
16   backpack is still at his feet.  There are several other
17   people in the vehicle.  I had to do what I thought was in
18   the best interest of everybody at that point in keeping
19   all of us safe.
20           MS. BROADDUS:  All right.  Go ahead.
21           (Video played.)
22   BY MS. BROADDUS:
23       Q.  At this point you've made a comment about Johnny
24   stuffing something down in the seats.  Did you hear that?
25       A.  I did.
```

Page 148

```
 1       Q.  And you can see both of Johnny's hands at this
 2   point, correct?
 3           MR. POPOLIZIO:  Form.
 4           THE WITNESS:  Yes.
 5   BY MS. BROADDUS:
 6       Q.  And you see he has a soda in one hand, correct,
 7   in his right hand?
 8       A.  Yes, ma'am.
 9       Q.  And you see in the other hand there's some money?
10   Do you see that?
11       A.  It looks like a bag is in his hand.
12       Q.  But you also see the money?
13       A.  If you were asking me at face value if I could
14   make out what that is, I cannot make out what that is in
15   his hand --
16       Q.  And you --
17       A.  -- off of the video.
18       Q.  I'm sorry.  I didn't mean to interrupt you.
19           And you don't have any independent
20   recollection of what you saw in his hand that day.  Is
21   that a fair statement?
22       A.  That's fair.
23           MS. BROADDUS:  Go ahead.
24           (Video played.)
25   ///
```

Page 149

```
 1    BY MS. BROADDUS:
 2        Q.  At this point you're manipulating
 3    Mr. Wheatcroft's arm.
 4            Do you see that?
 5        A.  Yes.
 6        Q.  What was the purpose of doing that?
 7        A.  I was going to have him exit the vehicle to
 8    remove him from whatever he had placed down in the center
 9    console.
10        Q.  You're making that assumption even though you saw
11    that he had something in his hand the whole time, correct?
12            MR. POPOLIZIO:  Form.
13            THE WITNESS:  That's not an assumption.
14    That's a judgment move on my part.  And through my
15    experience I believed that he had stuffed something or
16    possibly grabbed something from the center console area.
17    BY MS. BROADDUS:
18        Q.  And you would agree up to this point you've never
19    asked Mr. Wheatcroft to step out of the car, correct?  You
20    haven't heard that?
21        A.  No, ma'am.
22            MS. BROADDUS:  Go ahead.
23            (Video played.)
24    BY MS. BROADDUS:
25        Q.  Up until this point did you -- you mentioned
```

Page 150

```
 1    earlier that when you walked up to the vehicle you saw
 2    that the seat belt was draped over his shoulder, correct?
 3        A.  Yes, ma'am.
 4        Q.  And you knew it was still there when you started
 5    the arm bar, correct?
 6            MR. POPOLIZIO:  Form.
 7            THE WITNESS:  That wasn't one of my concerns
 8    at that point in time.
 9    BY MS. BROADDUS:
10        Q.  Wouldn't it make it difficult to have him get out
11    of the car if that was around his arm?
12        A.  Not if he came out willing, no, ma'am, it
13    wouldn't have.
14            MS. BROADDUS:  Go ahead.
15            (Video played.)
16    BY MS. BROADDUS:
17        Q.  At that point you hear him say that he's stuck,
18    and he's still in the seat belt.  Did you do anything to
19    tell him to get out of the car?
20            MR. MITCHELL:  Form.
21            MR. POPOLIZIO:  Form.
22            THE WITNESS:  At that point, no.
23    BY MS. BROADDUS:
24        Q.  So so far -- and he is just being tased for the
25    first time -- or first couple times right there.  You saw
```

Page 151

```
 1    that, correct?
 2        A.  Yes, ma'am.
 3        Q.  And that was by Officer Lindsey; is that correct?
 4        A.  I believe so, yes.
 5        Q.  Why was he being tased?
 6            MR. POPOLIZIO:  Form.
 7            THE WITNESS:  He's actively resisting at
 8    that point.
 9    BY MS. BROADDUS:
10        Q.  Was there any warning or anything said to him
11    about him getting tased prior to doing that?
12            MR. POPOLIZIO:  Form.
13            THE WITNESS:  I think there was plenty of
14    warning.  I don't remember if we had said anything about
15    him being tased.  I'd have to watch the video as a whole
16    and not pause it every couple of seconds.
17    BY MS. BROADDUS:
18        Q.  So far in this video, Mr. Wheatcroft is in the
19    vehicle, you approached the vehicle, he didn't want to
20    provide his ID, you open up the door and he's being tased.
21    You asked him not to reach in his backpack earlier.  He
22    said he wouldn't, and you didn't see him reach into the
23    backpack again, correct?
24            MR. POPOLIZIO:  Form.
25            THE WITNESS:  Correct.
```

Page 152

```
 1    BY MS. BROADDUS:
 2        Q.  What could Mr. Wheatcroft have done differently
 3    up to this point to avoid being tased?
 4            MR. POPOLIZIO:  Form; foundation.
 5            THE WITNESS:  To avoid being tased?
 6            I mean, he didn't have to actively resist
 7    us.  The whole scene as whole was hectic with everybody in
 8    the vehicle.  I mean, he was -- he was pretty upset.  He
 9    was pretty angry.
10    BY MS. BROADDUS:
11        Q.  So you open up the door, and you put him in the
12    arm bar, correct?
13            MR. POPOLIZIO:  Form.
14            THE WITNESS:  That was not an arm bar, but
15    it was a control hold.
16    BY MS. BROADDUS:
17        Q.  You put him in a control hold.  Was he resisting
18    when you were putting him in a control hold?
19        A.  I would say it was at the beginning stages,
20    absolutely.
21        Q.  And how was he resisting?
22        A.  Flexing his arm.
23        Q.  When you were talking about this control hold,
24    what's the purpose of the control hold?
25        A.  The purpose for that particular control hold was
```

Page 153

1  so he couldn't lunge back into the vehicle and grab
2  something that I wasn't aware of.
3      Q.  Isn't it true that that particular control hold
4  is also considered a pain compliance method?
5      A.  That one?
6      Q.  With your arm -- with an arm bent that way?
7      A.  No.
8      Q.  So there's no pain inflicted with that?
9      A.  With that, I would say no.
10         MS. BROADDUS:  Keep going.
11         (Video played.)
12         MS. THOMPSON:  I'm going to pause it.  I
13  think the audio is getting ahead of the video.  I'm
14  pausing it.  Give me second.
15         MS. BROADDUS:  We'll stop the video for a
16  minute just because we're having some video difficulties.
17         MS. THOMPSON:  Okay.
18  BY MS. BROADDUS:
19      Q.  When did you first learn that Mr. Wheatcroft made
20  a complaint about you?
21      A.  I believe it was later that night.
22      Q.  It was the same night that it happened?
23      A.  Yes, ma'am.
24      Q.  What did you hear?  What was the complaint that
25  he had made?

Page 154

1      A.  I -- that was the basis of it.  I just heard that
2  he had filed a complaint.
3      Q.  Did he tell you what the issues were, or did you
4  learn what -- did someone tell you what the issues were?
5      A.  I was advised that he was going to file a
6  complaint against me, and that was pretty much it.
7      Q.  Do you remember who told you he would be filing a
8  complaint?
9      A.  I think it was Sergeant Gallagher.
10      Q.  Once you were told that he was going to be filing
11  a complaint, does that change what your duties are related
12  to that particular investigation?
13      A.  Not that I know of, no.
14      Q.  Did you ever see a copy of the complaint?
15      A.  I believe so, yes.
16      Q.  Are you aware that that night he complained that
17  you had tased him in the testicles?
18      A.  I don't remember what exactly it said unless I
19  were to read it.
20      Q.  Are you aware that he claimed that you kicked him
21  in the testicles?
22      A.  I was.
23      Q.  And you admitted doing that, correct?
24      A.  I did.
25      Q.  And you kicked him in the testicles while he was

Page 155

1  handcuffed, correct?
2         MR. MITCHELL:  Form.
3         MR. POPOLIZIO:  Form.
4         THE WITNESS:  I didn't know at that time
5  that he was handcuffed.
6  BY MS. BROADDUS:
7      Q.  When did you learn he was handcuffed?
8      A.  I don't remember him ever going in the handcuffs.
9      Q.  Isn't that something that you'd want to know as a
10  police officer when you're dealing with a suspect, is
11  whether they're in handcuffs or not?
12      A.  In an ideal situation, yes.
13      Q.  This happened in July of 2017.  Do you remember
14  what the weather was like that day?
15      A.  I mean, I grew up in Arizona.  I'd assume that it
16  was hot, but I don't remember anything other than that.
17      Q.  Do you know what the temperature of the pavement
18  was, that black pavement in the parking lot?
19         MR. POPOLIZIO:  Form; foundation.
20         THE WITNESS:  No.
21  BY MS. BROADDUS:
22      Q.  Do you ever receive any training through the City
23  of Glendale at all when dealing with suspects who may be
24  placed on hot pavement in Arizona?
25      A.  I don't remember receiving any training on that,

Page 156

1  no.
2      Q.  As growing up in Arizona you know it gets pretty
3  hot, correct?
4      A.  Yes, it does.
5      Q.  People don't even want to have people walk their
6  pets because it gets so hot, correct?
7      A.  Correct.
8      Q.  It certainly would be a concern having someone
9  being -- laying on the hot asphalt.  Would you agree?
10         MR. POPOLIZIO:  Form; foundation.
11         THE WITNESS:  Yes, ma'am.
12  BY MS. BROADDUS:
13      Q.  With regard to the events that occurred that day,
14  do you take any responsibility for what happened?
15         MR. POPOLIZIO:  Form; foundation.
16         THE WITNESS:  I did the best job that I
17  could do that day.
18  BY MS. BROADDUS:
19      Q.  Do you blame the Wheatcrofts?
20         MR. POPOLIZIO:  Form.
21  BY MS. BROADDUS:
22      Q.  Let me be specific.  Do you blame Johnny for what
23  happened that day?
24      A.  I think he could have reacted in a more civilized
25  manner, but that's not my determination to make.

Page 157

```
 1        Q.  Do you believe your actions -- well, do you
 2   believe what you have called Johnny as -- that he could
 3   have been more civil or acted in a more civilized manner
 4   as the basis for why you acted the way you acted?
 5        A.  Absolutely not.
 6        Q.  Are you aware the charges against Johnny were
 7   dismissed?
 8        A.  I am.
 9        Q.  Do you know why they were dismissed?
10        A.  No, ma'am.
11        Q.  Were you involved in anything to do with the
12   dismissal of the charges?
13        A.  No, ma'am.
14        Q.  You never asked for them to be dismissed?
15        A.  No, ma'am.
16        Q.  Did you ask them that they be prosecuted?
17        A.  I don't have a say in that, ma'am.
18        Q.  Did you make a claim as a victim as to the
19   incident involving Johnny?
20        A.  I did.
21        Q.  What was the basis for you to claim you were a
22   victim?
23        A.  Being kicked several times by him.
24        Q.  And when you said kicked, was that when -- before
25   he was laying on the ground or after he was laying on the
```

Page 158

```
 1   ground?
 2        A.  Both.
 3        Q.  And you've seen the video.  Have you seen in the
 4   video where he's kicked you?
 5        A.  At one point, yes.
 6        Q.  Do you dispute that you tased Mr. Wheatcroft in
 7   the testicles?
 8        A.  I do.
 9        Q.  Why is that?
10        A.  Because I didn't tase him in the testicles.
11        Q.  He's claimed since the very beginning that you
12   did, that you did tase him in the testicles.  So it's fair
13   to say you dispute that?
14        A.  I absolutely do.
15        Q.  Have you had any conversations with
16   Mr. Wheatcroft since the events that day?
17        A.  No, ma'am.
18        Q.  What were you aiming for when you tased
19   Mr. Wheatcroft where he says you tased him in the
20   testicles?
21             MR. MITCHELL:  Form.
22             MR. POPOLIZIO:  Form.
23             THE WITNESS:  What was I aiming for?
24   BY MS. BROADDUS:
25        Q.  Yes.
```

Page 159

```
 1        A.  I would say lower right buttocks or like lower
 2   thigh, just wherever the large muscle group is.
 3        Q.  Where do you think you tased him?
 4        A.  In that area.
 5        Q.  Which area?
 6        A.  The lower right thigh -- or I'm sorry.  The upper
 7   right thigh or lower butt area on his right side.
 8        Q.  Did you ever go undergo a polygraph test
 9   regarding the incident that happened at Motel 6?
10        A.  No, ma'am.
11        Q.  Has anyone ever asked you to?
12        A.  No, ma'am.
13        Q.  At some point you received a notice of
14   investigation; is that correct?
15        A.  Yes, ma'am.
16        Q.  Do you recall who gave you the notice of
17   investigation?
18        A.  I believe it was Sergeant Matt Moody.
19        Q.  Did he give it to you in person?
20        A.  Yes, ma'am.
21        Q.  I'm going to have you go to Exhibit 31.  Is this
22   the notice that you were provided by Sergeant Moody?
23        A.  I believe so, yes.
24        Q.  Did you have any conversation with Sergeant Moody
25   when you received this?
```

Page 160

```
 1        A.  I believe so, yes.
 2        Q.  What do you recall from that conversation?
 3        A.  I don't know if this was the day of the interview
 4   that I had with him or not.  So I don't recall what
 5   exactly we talked about.  If it was the day of the
 6   interview, he asked me basically what happened.
 7        Q.  I'm going to have you go to the next exhibit
 8   which is Exhibit 32.
 9        A.  Okay.
10        Q.  This is a notice to suspend without pay for 30
11   working hours.  Do you see that?
12        A.  Yes, ma'am.
13        Q.  How did you receive this?
14        A.  I believe it was in person as well.
15        Q.  And who provided this to you?
16        A.  It was Commander Blanco.
17        Q.  Did you have a conversation with Commander Blanco
18   when you received this?
19        A.  A very brief one.
20        Q.  What do you recall from that conversation?
21        A.  Not much.  He just explained the process, the
22   appeal process, and I think that was it.
23        Q.  After you received this -- and it's dated
24   September 26th, 2018.  Does that sound about right when
25   you received it?
```

Page 161

```
 1       A.  That's -- yes.
 2       Q.  And your signature is on the last page of this
 3   document at Bates 1696.  Is that your signature?
 4       A.  Yes, ma'am.
 5       Q.  And then after you receive this, is that when you
 6   began the appeal process?
 7       A.  Yes, ma'am.
 8       Q.  And you've read this notice before, correct?
 9       A.  This notice?
10       Q.  Yes.
11       A.  Yes, ma'am.
12       Q.  Were there points that you disagreed with in
13   here?
14       A.  I would have to read it all like verbatim again.
15   It's been a long time, but I believe so.  I'd say that's a
16   fair statement.
17       Q.  Do you know what you were disciplined for?
18       A.  It was a use of force policy violation.
19       Q.  Did you disagree or agree with the decision of
20   the department as to the discipline for that?
21       A.  I disagreed.
22       Q.  As you sit here today do you believe you should
23   not have been disciplined?
24       A.  I do.
25       Q.  Do you believe you acted in conformity with what
```

Page 162

```
 1   Glendale's policies and procedures are?
 2       A.  In the best way that I could have, yes, ma'am.
 3       Q.  There's Glendale's policies and procedures that
 4   are written and then there are just practices that
 5   officers have just as a general routine.
 6           Do you find that officers within Glendale
 7   have a tendency to act similar to the way you act or do
 8   you think you handle your job differently than most other
 9   officers?
10           MR. POPOLIZIO:  Form; foundation.
11           THE WITNESS:  I mean, I'm not going to
12   compare myself to most other officers, but I think --
13   depending upon what circumstances are presented to you, I
14   think everybody probably acts -- reacts a little bit
15   different.
16           I felt like that day and what was presented
17   to me, I felt like I kept my composure the best I could.
18   BY MS. BROADDUS:
19       Q.  Have you discussed the video with other officers?
20       A.  I have.
21       Q.  And has it been your experience that the other
22   officers have agreed that you were acting consistent with
23   Glendale's policies and procedures or that you were not
24   acting within their policies and procedures?
25           MR. POPOLIZIO:  Form.
```

Page 163

```
 1           THE WITNESS:  I mean, in my experience, I
 2   think the people that I've talked to have agreed that I
 3   did the right thing.
 4   BY MS. BROADDUS:
 5       Q.  So would you agree that the consensus from your
 6   perspective, what you've talked with other people, that
 7   they would agree that your actions that day were
 8   consistent with Glendale's policies and procedures and
 9   practices?
10           MR. POPOLIZIO:  Form; foundation.
11           THE WITNESS:  I'd agree with that.
12   BY MS. BROADDUS:
13       Q.  Are you aware of any officers who have ever been
14   disciplined by the City of Glendale for excessive use of
15   force?
16       A.  Yes, ma'am.
17       Q.  How many are you aware of?
18       A.  Oh, I have no idea.
19       Q.  Were those before or after your incident?
20       A.  Both.
21       Q.  Who do you recall from before?
22       A.  I don't recall really anybody before.  But I know
23   I've talked to people who have been in trouble for policy
24   violations for use-of-force-related stuff, but I don't
25   have any names off the top of my head.
```

Page 164

```
 1       Q.  When you talked with those people, did they --
 2   they were still with the department, correct?
 3       A.  Yes, ma'am.
 4       Q.  So even though there was an issue on the use of
 5   force, they still kept their jobs as police officers,
 6   correct?
 7       A.  Yes, ma'am.
 8       Q.  Are you aware of anyone who was ever demoted for
 9   use of force?
10       A.  Demoted for use of force.  I don't believe so.
11       Q.  Since the incident there's been a couple of
12   publicized officers with Glendale for use of force.  One
13   of them's Officer Carroll and Sergeant Aldridge.  My
14   understanding is neither one is with the department along
15   with you; is that correct?
16       A.  Yes, ma'am.
17       Q.  Did you ever have any conversations with Officer
18   Carroll about the events relating to the Wheatcroft case?
19       A.  No, ma'am.
20       Q.  Did you have any conversations with Sergeant
21   Aldridge regarding the Wheatcroft incident?
22       A.  No, ma'am.
23       Q.  Did you ever see those videos of Officer Carroll
24   and Sergeant Aldridge?
25       A.  Bits and pieces, but I don't typically watch the
```

Page 173

1    A.  No, ma'am.
2    Q.  What about the written reprimand for -- I'm
3  sorry, not the written reprimand, the one-day suspension
4  for failing to follow an order?
5    A.  No, ma'am.
6    Q.  What about the bus incident that happened?
7    A.  I don't know that I feel one way or the other
8  about that incident.
9    Q.  You were disciplined for that, correct, relating
10  to the bus incident?
11    A.  Yes, ma'am.
12    Q.  But then at the same time they're telling you
13  that -- they were giving you accolades for thinking
14  outside the box, correct?
15    A.  Yes, ma'am.
16    Q.  Do you see that as getting mixed messages to your
17  job and what you're able to do?
18    A.  I don't know how to answer that question.
19    Q.  But in other words, you were given an accolade
20  for doing something that was against the policies,
21  correct?
22        MR. POPOLIZIO:  Form.
23        THE WITNESS:  I was, yes.
24  BY MS. BROADDUS:
25    Q.  When you opened up the car door for the vehicle,

Page 174

1  what was your intention?
2    A.  To take Johnny out of the vehicle.
3    Q.  Was that to arrest him or to detain him?
4    A.  To detain him at that point.
5    Q.  What was the purpose for the detainment?
6    A.  He didn't have his identification.  He had
7  reached twice into the vehicle, so part of what plays into
8  that is officer safety.
9    Q.  Well, we watched the video.  Only one time he had
10  reached for something prior to that, to the point you
11  opened up the door, where you asked him not to reach into
12  his bag --
13    A.  Yes, ma'am.
14    Q.  -- and now you opened up the door.  So you said
15  there were two incidents that he was reaching for
16  something, but it was only one at that point, correct?
17    A.  At that point, yes.
18    Q.  And you met with Officer Moody during his
19  investigation of this matter, correct?
20    A.  I did.
21    Q.  During that investigation you guys talked about
22  the turn signal issue, correct?
23    A.  Yes, ma'am.
24    Q.  And are you aware that Sergeant Moody went out to
25  the scene to that area and determined there was no way you

Page 175

1  could have seen a turn-signal violation?
2    A.  I was not aware of that.
3    Q.  Are you aware that after you saw the -- when
4  you were talking with Sergeant Moody that you had no
5  further explanation and that it looks terrible, meaning
6  the video?
7    A.  Yes, ma'am.
8    Q.  Do you still stand by that position?
9    A.  Yes.
10    Q.  Would you agree that the video indicates you
11  would not be able to see a turn-signal violation?
12        MR. POPOLIZIO:  Form; foundation.
13        THE WITNESS:  It's hard to tell looking at
14  that video what I could and could not see.  I can tell you
15  that I can today right now put myself in the driver's seat
16  of the Tahoe driving through the Motel 6 complex, and when
17  I turned around the corner, I thought to myself, the
18  vehicle didn't use a turn signal -- or didn't use its turn
19  signal, and that's why I made the stop.
20  BY MS. BROADDUS:
21    Q.  As you sit here today, you don't recall seeing a
22  turn signal, correct?
23    A.  I remember thinking to myself that I did not see
24  the turn signal, and that's why --
25    Q.  And it may have already turned off, correct?

Page 176

1        MR. POPOLIZIO:  Form; foundation.
2        THE WITNESS:  I suppose.
3  BY MS. BROADDUS:
4    Q.  When you were having your conversation with
5  Officer Moody, do you recall that he -- I'll read a quote
6  from Sergeant Moody.  "I explained to Schneider that his
7  BWC shows Johnny is wearing his seat belt properly."
8        Were you aware --
9        MR. POPOLIZIO:  What exhibit is that?
10        MS. BROADDUS:  This is Exhibit 20 at page
11  1716, the fourth paragraph down.
12        THE WITNESS:  1716?
13  BY MS. BROADDUS:
14    Q.  Yes.  In the fourth paragraph, the second
15  sentence from the last -- and I'm counting that skinny
16  little paragraph as a paragraph so it's actually the next
17  paragraph up.
18    A.  Oh, sorry.
19    Q.  The second to the last sentence, "I explained to
20  Schneider that his BWC shows Johnny is wearing his seat
21  belt properly."
22    A.  Okay.
23    Q.  Do you recall having that conversation with
24  Sergeant Moody?
25    A.  I do.

Page 181

```
 1              (Deposition Exhibit Nos. 43, 44, and 45 were
 2    marked for identification.)
 3              (The deposition concluded at
 4              2:00 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 182

```
 1              I, the undersigned, say that I have read the
 2    foregoing transcript of testimony taken June 1, 2020, and
 3    I declare, under penalty of perjury, that the foregoing is
 4    a true and correct transcript of my testimony contained
 5    therein.
 6
 7              EXECUTED this _____ day of _____, 2020.
 8
 9
10
11
12              _____
                  MATTHEW WILLIAM SCHNEIDER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 183

```
 1    STATE OF ARIZONA        )
                             ) ss.
 2    COUNTY OF MARICOPA      )
 3              BE IT KNOWN that the foregoing proceedings were
      taken before me; that the witness before testifying was
 4    duly sworn by me to testify to the whole truth; that the
      questions propounded to the witness and the answers of the
 5    witness thereto were taken down by me in shorthand and
      thereafter transcribed through computer-aided
 6    transcription under my direction; that the foregoing is a
      true and correct transcript of all proceedings had upon
 7    the taking of said proceedings, all done to the best of my
      skill and ability.
 8
                I CERTIFY that I am in no way related to nor
 9    employed by any of the parties hereto nor am I in any way
      interested in the outcome hereof.
10
                (X) Review and signature was requested.
11              ( ) Review and signature was waived.
                ( ) Review and signature was not requested.
12
                I CERTIFY that I have complied with the ethical
13    obligations set forth in ACJA Sections 7-206(F)(3) and
      7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
14    this 17th day of December, 2020.
15
16              _____
                  MONICA S. BERRY, RPR, CR
17                Certified Reporter
                  Arizona CR No. 50234
18
19         *    *    *    *    *    *
20              I CERTIFY that Berry & Associates, LLC has
      complied with the ethical obligations set forth in ACJA
21    Sections 7-206(J)(1)(g)(1) and (6).
22
23              _____
                  BERRY & ASSOCIATES, LLC
24                Registered Reporting Firm
                  Arizona RRF No. R1033
25
```

# *EXHIBIT 6*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya )
Chapman, as husband and wife, )
and on behalf of minors J.W. )
and B. W., )
)
            Plaintiffs, )
)
    vs. )   No. 2:18-cv-02347-MTL
)
City of Glendale, a municipal )
entity; Matt Schneider, in his )
official and individual )
capacities; Mark Lindsey, in )
his official and individual )
capacities; and Michael )
Fernandez, in his official and )
individual capacities, )
)
            Defendants. )
_____ )

**THE DEPOSITION OF SHAWN BLACKBURN**

Phoenix, Arizona
August 31, 2020
9:13 a.m.

(ORIGINAL)
**PREPARED FOR:**                    **REPORTED BY:**
                                     Herder & Associates
                                     Marty Herder, CCR, CSR
DISTRICT COURT                       Certified Court Reporter
                                     AZ-CR No. 50162

---

**I N D E X**

Examination By:                              Page:

Mr. Popolizio                                   4

Ms. Broaddus                                  279


**E X H I B I T S**

No. 45   CD disk of video                     133

No. 63   Photographs                          210

---

    THE DEPOSITION OF SHAWN BLACKBURN,

Taken at 9:13 a.m., on August 31, 2020, at the Law Offices

of JONES SKELTON & HOCHULI, PLC, 40 North Central Avenue,

Suite 2700, Phoenix, Arizona, 85004, before Marty Herder,

Certified Court Reporter, pursuant to the Rules of Civil

Procedure.


**COUNSEL APPEARING:**

For the Plaintiffs:

ATTORNEYS FOR FREEDOM
BY:  Jody L. Broaddus, Esq.
3185 South Price Road
Chandler, Arizona  85248


For the Defendants:

JONES SKELTON & HOCHULI, PLC
BY:  Joseph J. Popolizio, Esq.
40 North Central Avenue
Suite 2700
Phoenix, Arizona 85004


Also present:  Diane Shoemake
               Julie Wanner

---

                    Phoenix, Arizona
                    August 31, 2020
                    9:13 a.m.


            SHAWN BLACKBURN,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:


            E X A M I N A T I O N

BY MR. POPOLIZIO:

    Q.   Could you state your full name for the record,

please.

    **A.   Shawn Wayne Blackburn.**

    Q.   What is your date of birth, Mr. Blackburn?

    **A.   8-27-82.**

    Q.   And my name is Joe Popolizio.

         I'm an attorney here with Jones Skelton & Hoculi.

    I represent the City of Glendale and three

officers who were sued in this action, Michael Fernandez,

Mark Lindsey, and Matthew Schneider.

         I'm going to sit here and ask you some questions

today?

    **A.   Okay.**

    Q.   So, I just want to get a little bit of background

about you.  Okay?

         Are you married?

13

1    A.   Silver.

2    Q.   Because I really can't tell.  So it's a silver

3  Ford Taurus.

4    A.   Yes.

5    Q.   What year is it?

6    A.   I forget the year.  I don't even have it anymore.

7    Q.   Okay.

8    A.   I couldn't tell you really.

9         I think it's a -- I think it's an '02.

10   Q.   Could be an '02.  Could it be an '04?

11   A.   I don't think it was that new.

12   Q.   In any event, you got rid of it sometime after

13  that incident?

14   A.   Yes.

15   Q.   Do you remember when -- did you sell it?

16   A.   Yes.

17   Q.   And do you remember about what time you sold that

18  car?

19   A.   I don't remember.  I don't recall.

20   Q.   Do you remember to whom you sold the car?

21   A.   No.  I didn't know.

22   Q.   Do you still have any maintenance records for that

23  car?

24   A.   No.

25   Q.   Any invoices for repairs or anything like that?

14

1    A.   No.

2    Q.   And when you drove that car, the silver Ford

3  Taurus into the parking lot at the Motel 6 that date, you

4  actually parked it in a spot in the parking lot at Motel 6;

5  correct?

6    A.   Yes.

7    Q.   And that Motel 6 had -- has two parking lots;

8  right?

9    A.   One in front, one in the middle.

10   Q.   So when you're talking about the one in the front

11  and one in the middle, which is the one you pulled into?

12   A.   I parked in the middle.

13   Q.   And that is the parking lot near the office of the

14  motel?

15   A.   Yeah.

16   Q.   And when you pulled into the parking lot at

17  Motel 6 on the date of the incident, you had some passengers

18  with you; right?

19   A.   Yes.

20   Q.   So you had Johnny Wheatcroft with you; right?

21   A.   Yes.

22   Q.   And he was in the front passenger seat of that

23  vehicle; correct?

24   A.   Correct.

25   Q.   And then in the back seat Anya Chapman was seated

15

1  in the back seat; right?

2    A.   Back passenger, yes.

3    Q.   The back passenger seat behind the driver; is that

4  right?

5    A.   No, the passenger seat behind the passenger side.

6    Q.   Okay.

7         So you believe that she was seated behind

8  Mr. Wheatcroft?

9    A.   Yes.

10   Q.   Are you sure of that?

11   A.   I'm not for certain, no.

12   Q.   But she was in the back seat passenger area;

13  right?

14   A.   Yes, she was in the back seat.

15   Q.   Who else was in the back sheet with her?

16   A.   Her two children.

17   Q.   Do you remember their names?

18   A.   I don't recall their names.

19   Q.   And they were two boys; right?

20   A.   Yes.

21   Q.   Do you remember how old the boys were?

22   A.   I don't know how old they were.  I know the older

23  one -- I would be guessing if I told you.

24   Q.   Does Jonathan Wheatcroft ring any bells with

25  regard to the names of one of the children?

16

1    A.   I think that's the older one.

2    Q.   How about Brody Wheatcroft?

3    A.   Yes, that's the younger one.

4    Q.   Sometimes we just need to be prompted a little

5  bit.

6    A.   Yes.

7    Q.   I didn't ask you at the beginning.  Do you recall

8  where the children were seated in the back seat of your car

9  when you pulled into the parking lot of Motel 6?

10   A.   Honestly I don't know where they were situated in

11  the back seat.  I know Johnny was sitting next to me in

12  front, but that's all I know.

13   Q.   Now, I didn't ask you this at the beginning, but

14  I'll ask you this now.  Have you ever had your deposition

15  taken before in a civil matter, like this?

16   A.   No.

17   Q.   Have you ever been a party to a civil lawsuit,

18  ever sued anybody or ever been sued?

19   A.   No.

20   Q.   Here today you're not represented by any attorney;

21  right?

22   A.   No.

23   Q.   And you're not represented by any attorney with

24  regard to this lawsuit; right?

25   A.   No.

57

1    A.   I don't know if he did or not.  I don't recall.

2    Q.   So you might have spoken to officers at the actual

3    scene of the incident; right?

4    A.   Right.

5    Q.   And you're saying that you did speak with officers

6    at the scene of the incident; right?

7    A.   I believe so.

8    Q.   Was one of the officers with whom you spoke an

9    Officer Lewis?

10   A.   I don't recall.

11        MR. POPOLIZIO:  Hold on one second.

12        (Brief pause.)

13        MR. POPOLIZIO:  Going to take a short break.

14        (Brief recess taken.)

15   BY MR. POPOLIZIO:

16   Q.   Before we took a break, we were talking about the

17   interview that occurred at the Glendale Police Department

18   immediately after this incident.  Okay?

19   A.   Okay.

20   Q.   I wasn't thinking of the scene when I was asking

21   you questions about your interview.  I was thinking about

22   the interview that occurred at the department.

23        All right?

24   A.   Okay.

25   Q.   You understand that all now?

58

1    A.   Yes.

2    Q.   But the officer that interviewed you you're saying

3    was at the scene also?

4    A.   I had two interviews.

5    Q.   I'm talking just at the police department.

6    A.   That's what I'm speaking of too.

7    Q.   Yeah, the first one, the first interview I'm

8    talking about.

9    A.   Okay.

10   Q.   Was the first interview that you had done by an

11   officer that you saw at the scene also?

12   A.   Yeah, one of the officers.

13   Q.   Okay.  And that's I think we were -- I was getting

14   confused.  I won't say we.

15   A.   Okay.

16   Q.   So when you had that interview, the first

17   interview immediately after the incident, at Glendale Police

18   Department, were you informed that drugs were found in your

19   car?

20   A.   It was said, yes.

21   Q.   And do you know what type of drug was found in

22   your car?

23   A.   Yes.

24   Q.   What?

25   A.   I believe they found a --

59

1        MS. BROADDUS:  Object to form.

2        THE WITNESS:  They found methamphetamines in the

3    back seat.

4    BY MR. POPOLIZIO:

5    Q.   And you were told that by whom?

6    A.   I read it on the police report.

7    Q.   During that interview were you informed that drugs

8    were found in your car?

9    A.   I believe so, yes.

10   Q.   And do you know whose methamphetamine it was that

11   was found in your car?

12   A.   No.

13        MS. BROADDUS:  Object to form.

14   BY MR. POPOLIZIO:

15   Q.   Was it yours?

16   A.   No.

17   Q.   And you told the police officer who interviewed

18   you at the police department immediately after the incident

19   that night that the drugs weren't yours; right?

20   A.   Right.

21   Q.   Are you sure that the drugs in your car weren't

22   yours?

23   A.   Yes.

24   Q.   In fact, during your interview, immediately after,

25   at the station, conducted by this Glendale police officer,

60

1    you were pretty adamant that the drugs found in your car

2    were not yours.

3    A.   Yeah.  They were not mine.

4    Q.   And how could you be sure that those drugs were

5    not yours, Mr. Blackburn?

6    A.   Because I didn't have drugs and I wasn't doing

7    drugs at the time.

8    Q.   Do you have any idea whose drugs this

9    methamphetamine found in your car belongs to?

10   A.   I don't.

11        MS. BROADDUS:  Object to form.

12   BY MR. POPOLIZIO:

13   Q.   Do you have any idea how this methamphetamine got

14   into your car?

15   A.   No.

16   Q.   There was some discussion during the interview

17   whether it could have been there for a long period of time,

18   but you just didn't know it was there; do you recall that?

19   A.   I don't recall it.

20   Q.   Okay.

21        So, before the date of the incident, how long

22   before the date of the incident had it been since you had

23   used methamphetamine?

24        MS. BROADDUS:  Object to form.

25        THE WITNESS:  It was a while.  I couldn't tell you

1      A.    Yes.

2            MS. BROADDUS:  Form.

3    BY MR. POPOLIZIO:

4      Q.    So, that's why you were pretty sure that those

5    drugs weren't yours in the car; right?

6      A.    Yeah, they weren't my drugs.

7      Q.    Because you were clean; correct?

8      A.    Yes.

9      Q.    And you were getting yourself tested; correct?

10           MS. WANNER:  It's time to call.

11           MR. POPOLIZIO:  Okay.  It's time to call in to the

12   judge.

13           THE WITNESS:  Okay.

14           (Whereupon, a call was placed to the court.)

15           MR. POPOLIZIO:  Hello.

16           COURT CLERK:  Good morning.  Who just joined the

17   call?

18           MR. POPOLIZIO:  Joe Popolizio and Jody Broaddus

19   and everybody else who is present here for the deposition of

20   Shawn Blackburn.

21           COURT CLERK:  Okay.  So I have Jody Broaddus,

22   Joseph Popolizio.

23           MR. POPOLIZIO:  Yes.

24           COURT CLERK:  Any other counsel?

25           MR. POPOLIZIO:  No.  My paralegal Julie Wanner,

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

1    Mr. Blackburn, and a representative of the City of Glendale

2    Diane Shoemake, and of course our esteemed court reporter

3    Marty Herder.

4            COURT CLERK:  Thank you for the roll call.  We're

5    just waiting to get set up in the courtroom here, so it will

6    be just a moment before we get started.

7            MR. POPOLIZIO:  Thank you.

8            (Brief pause.)

9            COURT CLERK:  Now on the record, Case No.

10   CV18-2347, Wheatcroft, et al., versus City of Glendale, et

11   al., before the court for a discovery dispute hearing.

12           Counsel, if you could please announce your

13   presence again for our record.

14           MR. POPOLIZIO:  Joseph Popolizio on behalf of

15   defendants.

16           MS. BROADDUS:  And Jody Broaddus on behalf of the

17   plaintiffs.

18           THE COURT:  Good morning.  I can hear you both

19   pretty good.  If I need you to repeat something, I'll just

20   say so.  If my court reporter has an issue, she may ask you

21   to repeat something.

22           So I'm going to ask you both to speak slowly and

23   as clearly as you can.

24           So, I have the notice.  I took a look at it.

25   Mr. Popolizio, would you like to give me a little

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

1    bit of information as to why you require my assistance?

2            MR. POPOLIZIO:  Yes, Your Honor, and as a

3    preliminary matter I wanted to check, is it -- if it is

4    appropriate to have our court reporter also record this,

5    because I know that the court has one going on too.  So I

6    just wanted to check with the court with regard to that.

7            THE COURT:  Okay.  And then let me ask you this,

8    could you hear me okay on your end?

9            MR. POPOLIZIO:  Yes, because we put the volume up

10   to the maximum.

11           THE COURT:  Okay.  So go ahead, please.

12           MR. POPOLIZIO:  So, Your Honor, Mr. Blackburn is

13   being deposed today.

14           He is a witness to the incident, the subject

15   incident of this lawsuit.

16           He is not a party to this lawsuit, and that's

17   pretty clearly established both by just the pleadings in

18   this case but also in deposition testimony today.

19           Early on in his deposition, and before even I

20   asked the questions which comprise the excerpt that was just

21   filed with you, I asked Mr. Blackburn whether he was

22   represented with regard to this matter, this action.

23           He said no.

24           I also asked him whether he was represented with

25   regard to this particular deposition.

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

1            He definitively said no again.

2            It is clear from what he has said that he is not

3    represented by Ms. Broaddus with regard to this particular

4    incident.

5            To be clear, I'm not interested in any other

6    matter for which he may have consulted Ms. Broaddus, civil

7    or criminal.  I'm interested in the conversations he had

8    with regard to this, to this incident, in the context of the

9    claims presented by plaintiff in this particular litigation.

10           Mr. Blackburn would be the holder of the

11   privilege, as you know.  However, he has clearly stated that

12   there is no attorney-client relationship between, between

13   him and Ms. Broaddus.

14           Again, I'm not here to pry into any other matter

15   he may have consulted her for.

16           Conversely, Your Honor, I asked him questions

17   about communications from my office.  And if there was any

18   details discussed with him with regard to this action from

19   anybody at my office, including me or any representative of

20   mine.

21           And he said, no, it was just, you know, scheduling

22   and whatnot.

23           So there seems to be a difference between the

24   communications here as what I sent Your Honor in that there

25   are details of what occurred, you know, and the facts that

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

81

BY MR. POPOLIZIO:

Q.   And when you mean close, you mean close in time to
the incident?

A.   Right.

Q.   It may not have been the day before, but it was
that summer?

A.   Right, yes.

Q.   And when I asked you before whether you had been
told there were drugs, methamphetamine, found in your car,
you said that you had read that there was; right?

A.   Yeah.

Q.   Where did you read that there were drugs found in
your car?

A.   On the police report.

Q.   So how did you get a copy of the police report?

A.   I had one -- I believe I got one from the police
department.

Q.   You went on your own to get it?

A.   I believe so.

Q.   And that's where you read it?

A.   Yeah.

Q.   Did you read that police report in preparation for
your deposition today?

A.   No.

Q.   When was the last time you read that police

82

report?

A.   It's been a while.  It's whenever, whenever I was
able to get one, I believe.  I'm not sure how long after the
incident.

Q.   Was it a month after the incident?  What was the
period of time after the incident that you went and obtained
the police report?

A.   I don't think it was a month after.  Maybe a few
months.

Q.   It wasn't like a year after the incident?

A.   I don't believe so, no.

Q.   So, do you remember -- do you still have this
report?

A.   Somewhere.

Q.   Do you remember how thick it was?

A.   Yeah, I don't know, just. . .

Q.   About an inch thick you're indicating?

A.   I think so.

Q.   Did you read the entire thing?

A.   I don't believe I read it all.  No.

Q.   Okay.
But somewhere in there you read that there were
drugs found in your car?

A.   Yeah.

Q.   But as you sit here today do you have an

83

independent recollection of whether an officer who
interviewed you at the station after this incident had
informed you that you -- that there had been drugs found in
your car?

A.   Yes.  He did.

Q.   And you do remember that?

A.   I remember him saying that there were drugs in the
car, yes.

Q.   And do you remember if he asked if those drugs
were yours?

MS. BROADDUS:  Object to form.

THE WITNESS:  Yes, I'm sure.

BY MR. POPOLIZIO:

Q.   And you denied that they were; right?

MS. BROADDUS:  Object to form.

THE WITNESS:  Yes.

BY MR. POPOLIZIO:

Q.   And you also were told that the drugs found in
your car was methamphetamine; is that correct?

A.   Yes.

Q.   And during your interview, we're talking at the
station, the first one, immediately after this incident,
that night when you were at the station, you were asked
by the police officer whether you'd be -- well, scratch
that.

84

During the interview at the station immediately
after the incident, the officer asked you if you had taken a
urine test that night, would it be positive.
Do you recall that?

A.   No.

MS. BROADDUS:  Form.

BY MR. POPOLIZIO:

Q.   But if you did take a -- you just don't recall
whether he asked you that or not?

A.   I don't recall the conversation.

Q.   But if you did take a urine test that night to see
if you had drugs in your system, what do you believe it
would have shown?

A.   Negative.

MS. BROADDUS:  Object to form.

BY MR. POPOLIZIO:

Q.   Negative?

A.   Yes.

Q.   And that would mean that -- what you mean by
negative, that there would be no proof of any drugs in your
system at that time?

A.   Yes.

Q.   Because you hadn't been using drugs; right?

A.   No.

Q.   It's a simple question, but were you surprised



129

```
1      A.   No.
2      Q.   No stops at a candy store?
3      A.   No.
4      Q.   Or a Circle K?
5      A.   No.
6      Q.   You went from the mother-in-law's house right to
7  this particular Motel 6?
8      A.   Yes.
9      Q.   It's not too far away from the mother-in-law's
10 house; right?
11     A.   Yeah, it's right down the street.  It's a few
12 miles away.
13     Q.   It's not going to take you a long time to get from
14 the mother-in-law's house to the Motel 6, is it?
15     A.   No.
16     Q.   And it didn't take you a long time that day, did
17 it?
18     A.   No.
19     Q.   So you went straight to the Motel 6 from the
20 mother-in-law's house; right?
21     A.   Yes.
22     Q.   And you had the four of them in your car.
23     A.   Yes.
24     Q.   Now, this vehicle of yours, you said it was your
25 vehicle; right?
```

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

130

```
1      A.   Yes.
2      Q.   So you owned that vehicle; right?
3      A.   Correct.
4      Q.   Was it registered in your name?
5      A.   Yes.
6      Q.   Was it insured at the time?
7      A.   I don't believe it was.
8      Q.   What makes you think that you don't believe it
9  was?
10     A.   I don't think it was, no.
11     Q.   And on that vehicle it had only a rear license
12 plate; correct?
13     A.   Yes.
14     Q.   There's no license plate in the front; right?
15     A.   No.
16     Q.   Now, at the time of this incident, the date of the
17 in the incident, your license was suspended; right?
18     A.   Yes.
19     Q.   What was it suspended for?
20          MS. BROADDUS:  Object to form.
21          THE WITNESS:  It was from a misdemeanor DUI.
22 BY MR. POPOLIZIO:
23     Q.   When did that misdemeanor DUI occur?
24     A.   I don't recall the year.
25     Q.   How long had you had a suspended license?
```

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

131

```
1      A.   I've had a suspended license for quite some time,
2  since like 2012, I think.  I just barely got it renewed a
3  few months ago.
4      Q.   So from 2012 until a point that you got it renewed
5  a few months before, was your license suspended during that
6  whole time period?
7      A.   Yes.
8      Q.   So it was suspended on the date of the incident;
9  right?
10     A.   Yes.
11     Q.   But the car, the Taurus that you were driving that
12 day, was registered in your name; right?
13     A.   Yes.
14     Q.   Okay.
15          So when you interacted with the police that day at
16 Motel 6, you did not have a valid driver's license at that
17 point; right?
18     A.   No.
19     Q.   It was suspended?
20     A.   Yes.
21     Q.   Did you have another form of ID on you?
22     A.   I believe I had an ID, yes.
23     Q.   What type of ID was that?
24     A.   Just a regular identification card, an Arizona
25 identification card.
```

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

132

```
1      Q.   And you didn't have your driver's license on you?
2      A.   No.
3      Q.   So when the officer asked you for an ID, you
4  provided the officer with the Arizona ID?
5      A.   Yeah.
6      Q.   So, all right, you know what, let's -- we have a
7  video of Motel 6.  So let's watch the video.
8           And before we do that, have you ever seen the
9  Motel 6 video of you turning in and whatnot?
10     A.   Yes.
11     Q.   And when did you see that?
12     A.   I seen it on the news when it first came out.
13     Q.   Are you saying you saw the excerpt that was shown
14 on the news?
15     A.   Yes.
16     Q.   That's the only time you've seen it was on the
17 news?
18     A.   I think I YouTube'd it a couple times.
19     Q.   So whatever is available on YouTube or through the
20 local news, that's what you've seen of it; right?
21     A.   Yes.
22     Q.   Have you ever discussed the Motel 6 video with
23 anyone?
24     A.   Nobody that knew.  I discussed it with a couple
25 people, a couple friends of mine, but they don't know
```

© Herder & Associates  (480)481-0649
www.CourtReportersAz.com

161

1    A.   I don't recall him saying that.

2    Q.   Just don't remember that?

3    A.   No.

4    Q.   So you know there was an issue of whether you

5    had used your turn signal to turn into this parking lot;

6    right?

7    A.   Right.

8    Q.   And you were interviewed after this incident

9    occurred; correct?

10   A.   Yes.

11   Q.   And you were asked whether you had used your turn

12   signal to turn into the parking lot; right?

13        MS. BROADDUS:  Object to form.

14        THE WITNESS:  I'm going to say I don't recall the

15   conversation, but I'm sure he asked me that.

16   BY MR. POPOLIZIO:

17   Q.   And do you recall if you told the officer that you

18   didn't recall whether you used your turn signal or not?

19   A.   I don't remember.

20   Q.   You don't remember any conversation about a turn

21   signal?

22   A.   No.

23   Q.   Or whether you had used it?

24   A.   No.

25   Q.   Okay.

162

1    Q.   So when you came in under the archway, and you

2    explained how you maneuvered your car, not going to make you

3    go through the whole thing, but you explained how you

4    maneuvered your car; right?

5    A.   Yeah.

6    Q.   Before you backed in, when was the first time that

7    you saw the police vehicle in or around that parking lot?

8    A.   I want to say in the middle of me going to the

9    left, before I, before I was in reverse.

10   Q.   That was the first time that you saw the police

11   officer?

12   A.   Yes.

13   Q.   Right?  That's what you're saying?

14   A.   Yes.

15   Q.   But you weren't looking for a police officer;

16   right?

17   A.   No reason to.

18   Q.   And you hadn't seen a police officer before you

19   spotted at that point; right?

20   A.   No.

21   Q.   You hadn't?

22   A.   No.

23   Q.   When did you decide to back into that spot?

24   A.   Before I, before I came around -- when I came

25   around and I seen it was open, before I made the left,

163

1    that's what's made me go to the left before I backed into that

2    spot.

3    Q.   Did you back in the spot so that your rear license

4    plate would not be visible?

5    A.   No.

6         That wasn't my reasoning for backing up, no.

7    Q.   All right.

8         What I'm asking you is, were you trying to make

9    your rear license plate less visible?

10   A.   No.

11   Q.   But, if the license plate was run, it would come

12   back to you as the owner; right?  Because you were the

13   owner?

14   A.   Right.

15   Q.   And your motivation for pulling into that space,

16   from what I understand, is because it was close to the

17   office; right?

18   A.   Right.

19   Q.   But it was no closer to the office as you agreed

20   than the other space that was available; right?

21   A.   Yes.

22   Q.   And the other space that was available, you

23   wouldn't -- nobody would have to walk across the parking lot

24   to the office door; right?

25   A.   No, they wouldn't.

164

1    Q.   They would just get on the sidewalk and walk to

2    the door; is that right?

3    A.   Yeah, walk to the door, yeah.

4    A.   Let me cross some of these off.

5    A.   Too bad they weren't pages.

6    Q.   I want them to be too.

7         And just so I can be clear, you don't remember one

8    of the officers, specifically the officer that approached

9    the passenger side of the vehicle, ask or say to you, do me

10   a favor, when you turn into the parking lot can you use your

11   turn signal?

12   A.   I don't recall.  I'm not saying he didn't,

13   but. . .

14   Q.   You just don't remember.  He could have, but you

15   don't remember?

16   A.   Yeah.

17   Q.   And when you were interviewed, you don't recall

18   whether the issue of the turn signal came up?

19   A.   I don't recall that either.

20   Q.   But when you were interacting with the officers at

21   the scene, when the stop was made, okay, do you remember

22   hearing anybody in the car saying anything about your having

23   used your turn signal to pull in?

24   A.   No.

25   Q.   No one said something like that?

285

```
1    give the apartment number.

2            MR. POPOLIZIO:  What's the apartment number?

3            THE WITNESS:  No. 4.

4            MR. POPOLIZIO:  So will you -- we know you're

5    looking for a house, if you all of a sudden something comes

6    in and you're moving, we're going to need to know where it

7    could be mailed to you.  Okay?

8            THE WITNESS:  Okay.  Yes.

9            MR. POPOLIZIO:  Okay.  Make sure that you contact

10   our office and the court reporter and say, I'm moving, here's

11   my new address, or you can e-mail or do whatever.

12           All right?

13           THE WITNESS:  All right.

14           MR. POPOLIZIO:  You will read and sign then;

15   correct?

16           THE WITNESS:  Correct.

17           MR. POPOLIZIO:  So thank you very much for your

18   patience and your time, and I know it was a long day, but it

19   is now over, so have a good night.  Thank you.

20           (Whereupon, the deposition concluded at 4:44 p.m.)

21

22           _____

23                 SHAWN BLACKBURN

24

25                * * * * *
```

286

```
1    STATE OF ARIZONA    )
                         ) SS
2    COUNTY OF MARICOPA  )

3                    C E R T I F I C A T E

4           BE IT KNOWN that the foregoing proceedings were taken
     before me; that the witness before testifying was duly
5    sworn by me to testify the whole truth; that the 285
     foregoing pages are a full, true and accurate record of the
6    proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
7    thereafter reduced to print under my direction.

8           I CERTIFY that I am in no way related to any of the
     parties hereto nor am I in any way interested in the
9    outcome hereof.

10
     [x]  Review  and  signature was requested.
11   [ ]  Review  and  signature was waived.
     [ ]  Review  and  signature not required.
12
            I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206.

14          Dated this 3rd day of September, 2020,
            Chandler, Arizona.
15

16

17          _____

18          C. Martin Herder, CSR, CCR
            Certified Reporter
19          Arizona CCR No. 50162

20          It is FURTHER CERTIFIED that Herder & Associates,
     Registered Reporting Firm, has complied with the ethical
21   obligations set forth in ACJA 7-206.

22

23          _____
            Registered Reporting Firm
24          Arizona RRF No. R1145

25
```



*EXHIBIT 7*



**Page 1**

IN THE UNTIED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya )
Chapman, as husband and wife, and )
on behalf of minors J.W. and B.W., )
)
    Plaintiffs, ) Case No.:
) 2:18-cv-02347-SMB
vs. )
)
City of Glendale, a municipal )
entity; Matt Schneider, in his )
official and individual )
capacities; Mark Lindsey, in his )
official and individual )
capacities; and Michael Fernandez, )
in his official and individual )
capacities, )
)
    Defendants. )
)

DEPOSITION OF OFFICER MICHAEL FERNANDEZ

Chandler, Arizona
June 3, 2019
9:54 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:

(COPY)

**Page 2**

I N D E X
WITNESS                                    PAGE
OFFICER MICHAEL FERNANDEZ

EXAMINATION BY MS. BROADDUS            5
EXAMINATION BY MR. POPOLIZIO         169
FURTHER EXAMINATION BY MS. BROADDUS   189
FURTHER EXAMINATION BY MR. POPOLIZIO  192

E X H I B I T S
Deposition
Exhibits   Description              Marked
1    Defensive Tactics, 2015, Taser/X2,   28
     Bates Nos. CoG_WHEATCROFT
     002595-002603 (9 pages)
2    2014 AOT Taser, Bates Nos.          33
     WHEATCROFT 002434-002450
     (17 pages)
3    2013 Defensive Tactics AOT, Bates   37
     Nos. CoG_WHEATCROFT 002384-002407
     (24 pages)
4    Sworn AOT 2012 Check-Off Sheet,     38
     Bates Nos. CoG_WHEATCROFT
     002343-002356 (14 pages)
5    Glendale Police Department General  50
     Order, Neighborhood Response Unit,
     Bates Nos. CoG_WHEATCROFT
     000463-000466 (4 pages)
6    Glendale Police Department General  74
     Order, Bates Nos. CoG_WHEATCROFT
     000427-000462 (36 pages)
7    Glendale Police Department Report  107
     Inventory Cover Page for Report No.
     17 107320, Bates Nos.
     CoG_WHEATCROFT 000001-000060
     (60 pages)
     (60 pages)

**Page 3**

(EXHIBITS MARKED CONTINUED)

8    AXON Taser information, Bates No.   162
     C0G_WHEATCROFT 001743
     (1 page)

9    Taser Pulse Log Evaluation, Bates   162
     Nos. CoG_WHEATCROFT 001668-001669
     (2 pages)

* * * * *

**Page 4**

DEPOSITION OF OFFICER MICHAEL FERNANDEZ was
taken on June 3, 2019, commencing at 9:54 a.m. at the law
offices of MARC J. VICTOR, P.C., ATTORNEYS FOR FREEDOM,
3185 South Price Road, Chandler, Arizona, before MONICA S.
BERRY, RPR, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:

MARC J. VICTOR, P.C.
ATTORNEYS FOR FREEDOM
By:  MS. JODY L. BROADDUS
3185 South Price Road
Chandler, Arizona  85248
On behalf of Plaintiffs

JONES, SKELTON & HOCHULI, P.L.C.
By:  MR. JOSEPH J. POPOLIZIO
40 North Central Avenue
Suite 2700
Phoenix, Arizona  85004
On behalf of Defendants

ALSO PRESENT:

Ms. Kathy Thomas, Glendale risk and safety analyst
Ms. Julie Wanner, paralegal to Mr. Popolizio
Ms. Alexz Thompson, paralegal to Ms. Broaddus

21

1      **A.  Correct.**
2      Q.  When you were a patrol officer in 2017, before
3  you -- while you were still a patrol officer, what were
4  your general duties as an officer?
5      **A.  Responding to calls for service, traffic**
6  **enforcement.  Just being visible in a patrol vehicle.**
7      Q.  Did you normally have a marked vehicle when you
8  were a patrol officer?
9      **A.  Always.**
10     Q.  And always in your uniform?
11     **A.  Always.**
12     Q.  And just for clarification, when you're working,
13  correct, as opposed to when you're at home hanging out?
14     **A.  Correct.  Yeah.**
15     Q.  Are you familiar with Glendale's policies for
16  police officers?
17     **A.  The entire policy and procedure manual?**
18     Q.  Well, as an officer, are you supposed to know the
19  policies and procedures for an officer.
20         MR. POPOLIZIO:  Form.
21         THE WITNESS:  I think it's over 2,000 pages.
22  I think I have a decent understanding of some of it.
23  BY MS. BROADDUS:
24     Q.  Do you receive training on those pages of those
25  policies and procedures or are you just expected to read

22

1  those?  Do you know?
2         MR. POPOLIZIO:  Form.
3         THE WITNESS:  While in FTO, when you first
4  start, there's certain parts that you are required to
5  read, and then you receive training annually on different
6  aspects, yes.
7  BY MS. BROADDUS:
8      Q.  Do you have discretion as a police officer to
9  abide -- as to whether or not you can abide by the
10  policies?
11     **A.  Do I have discretion on whether I can abide by**
12  **policies?**
13     Q.  Glendale's policies and procedures.
14     **A.  No.**
15     Q.  So if it's written down, that's what you're
16  supposed to do.  Is that a fair statement?
17     **A.  You're supposed to try, yes.**
18         **(Ms. Thompson left the conference room.)**
19  BY MS. BROADDUS:
20     Q.  So what are your responsibilities if you witness
21  another officer violate the policies and procedures?
22     **A.  It would be a case-by-case situation.**
23     Q.  And what do you mean by that?
24     **A.  If it's low and slowly evolving and you have a**
25  **chance to intervene or speak to the officer or give**

23

1  direction, then you can do that.  If something is
2  quickly -- it's a dynamic situation and there's something
3  happening, you may not have the time or the availability
4  to address it.
5      Q.  So if someone is doing something that you would
6  question, it's something that you would try to correct at
7  that time.  Is that a fair statement?
8         MR. POPOLIZIO:  Form.
9         THE WITNESS:  Again, it's going to be a
10  case-by-case situation.
11  BY MS. BROADDUS:
12     Q.  Are you required to report any violations to your
13  supervisor or to anyone else?
14         MR. POPOLIZIO:  Form.
15         THE WITNESS:  I would say yes.
16         (Ms. Thompson entered the conference room.)
17  BY MS. BROADDUS:
18     Q.  Who would you report a violation to?
19     **A.  If not your immediate supervisor, one that's**
20  **available or one that would be on scene.**
21     Q.  Have you ever reported another officer for
22  violating policies?
23     **A.  Yes.**
24     Q.  How many times?
25     **A.  One time.**

24

1      Q.  And what type of situation did that involve?
2      **A.  I thought an officer was using excessive force**
3  **too often.**
4      Q.  How long ago was it that you reported that
5  individual?
6      **A.  Maybe four years.**
7      Q.  And that's when you were on patrol; is that --
8      **A.  Yes.**
9      Q.  Was it another patrol officer?
10     **A.  Yes.**
11     Q.  It was not Officer Lindsey or Officer Schneider;
12  is that correct?
13     **A.  It was not.**
14     Q.  Who's in charge of training the police officers
15  for the City of Glendale?
16     **A.  Who's in charging of training?**
17     Q.  Yes.
18     **A.  Well, we have a training unit.  I think the**
19  **training -- one of the training sergeants is Mark**
20  **Malinsky.**
21     Q.  How often are you -- are you required to get
22  training?
23     **A.  We have what we call AOT, which is annual officer**
24  **training.**
25     Q.  Is that a mandatory requirement for a police

25

1   officer?
2       A.  It is.
3       Q.  And since you've been a police officer with the
4   City of Glendale has AOT training been in place?
5       A.  Yes.
6       Q.  And are you required to take a certain number of
7   hours outside of AOT training, or is it just the AOT
8   training that's mandatory?
9       A.  I don't think you're required to receive training
10  outside of those hours, no.
11      Q.  With the AOT training, is that something provided
12  by the City of Glendale?
13      A.  Yes.
14      Q.  Now, with regard to training that you do -- let
15  me go a step back.
16          Do you do training outside of AOT training?
17      A.  Do I?
18      Q.  Yes.
19      A.  Yes.
20      Q.  Why would you do training outside of AOT
21  training?
22      A.  To enhance my ability level.
23      Q.  The training that you do, are those classes or
24  courses that are provided by a third party or is it by
25  Glendale or both?

26

1       A.  Most often by a third party, sometimes by
2   Glendale.
3       Q.  How do you find out about what type of courses
4   are available to you?
5       A.  There's a training page where they announce
6   different trainings that are available, and sometimes it's
7   just through word of mouth or be on different e-mail --
8   e-mails.
9       Q.  Does Glendale ever send e-mails about, hey,
10  there's a training event coming up in case you're
11  interested?
12      A.  Yes.
13      Q.  Obviously there's different areas of training
14  that are available.  If it's something that you're not
15  interested in, you don't take that class.  Is that a fair
16  statement?
17      A.  Yes.
18      Q.  What types of classes are the types that interest
19  you the most?
20      A.  I do a lot of gang investigations, interview
21  interrogation and drug investigation classes.
22      Q.  Has that been consistent throughout your career
23  as police officer?
24      A.  Yes.
25      Q.  Those are the areas that you find interesting

27

1   that you'd like to learn more about?
2       A.  Yes.
3       Q.  Are you aware of any classes that -- or training
4   that Glendale's required you or any other officers to take
5   outside of AOT training?
6           MR. POPOLIZIO:  Form.
7           THE WITNESS:  If you go to a specialty unit,
8   if you go to investigations and you're in child crimes,
9   there's going to be a lot of specifics to that.  So
10  depending on what you do, yes, there could be specific
11  training that you need to do, yes.
12  BY MS. BROADDUS:
13      Q.  Did you have to go through any specific training
14  for joining the NRS group?
15      A.  I don't know if there's been any required, but
16  I've done a lot of training since I've come to NRS that's
17  been made available to me.
18      Q.  And you mentioned earlier you had to take a test,
19  the oral test that you took.  But outside of that you
20  didn't have to take any special classes to become a member
21  of the NRS unit, correct?
22      A.  No.
23      Q.  Is that a true statement or --
24      A.  No, I did not need to take any special classes.
25      Q.  And I apologize.  It was kind of a double

28

1   negative on the question there.
2           I want to go through a couple of training
3   materials.
4           (Deposition Exhibit No. 1 was marked for
5   identification.)
6   BY MS. BROADDUS:
7       Q.  All right.  In front of you you have a document
8   that's been marked as Exhibit 1.  And on the front page it
9   says, "Defensive Tactics, 2015, Taser/X2."  Do you see
10  that?
11      A.  Yes.
12      Q.  Is this a document that -- and you can look
13  through it and let me know if you've seen this document
14  before.
15      A.  It looks familiar, yes.
16      Q.  It's my understanding that this is a document
17  that was related to AOT training for 2015.  Does this look
18  like something you may have received during the AOT
19  training in 2015?
20      A.  Probably through a PowerPoint.  Probably not an
21  actual document.
22      Q.  So you don't receive the actual documents when
23  you sit in the class for the AOT training.  They'll put a
24  PowerPoint on and you'll see items that look like
25  Exhibit 1, correct?

41

1  Q.  Any aspect.
2  **A.  In making an arrest?**
3  Q.  Yes.
4  **A.  I'd say -- in some form of current capacity I**
5  **would say yes.**
6  Q.  With your firearms training, are you required to
7  go to a range a certain number of times a year or for a
8  certain number of hours a year?
9  **A.  There's -- there's several optional hand --**
10  **firearms trainings, and I go to a lot of them.  And**
11  **there's some that I think are required.  Because I**
12  **personally go to quite a few, I don't know which ones are**
13  **the ones that I choose to go to or the ones that are**
14  **required.  I think there's one or two that are required**
15  **every year, yes, for every officer.**
16  Q.  Is that part of the AOT training, then, if it's
17  required, or is it outside of that?
18  **A.  It could be outside of AOT.**
19  Q.  Does the NRS have any additional training on an
20  annual basis other than the AOT training?
21  **A.  We do different things to train, yes.**
22  Q.  Like what?
23  **A.  For example, last Friday we did building**
24  **clearing, how to effectively clear a building.**
25  Q.  What other types of training do you guys receive

43

1  **A.  We went through some medical training by a**
2  **firefighter.  So he's not a police officer.**
3  Q.  Was that through the Glendale firefighters?
4  **A.  Yes, yes.**
5  Q.  Do you have to sign off on any documents to show
6  that you went through NRS training?
7  **A.  Some of the trainings we do I don't think there's**
8  **a document that we sign to show that we were there.**
9  Q.  Are you provided documents as part of the
10  training that you receive?
11  **A.  Not necessarily.**
12  Q.  But sometimes you do?
13  **A.  Sometimes.**
14  Q.  With regard to training -- let me go back a
15  second.
16      With regard to the policies and procedures
17  for the City of Glendale, do you have access to those at
18  any time as a police officer?
19      MR. POPOLIZIO:  Form.
20      THE WITNESS:  Policies and procedures?
21  BY MS. BROADDUS:
22  Q.  Correct.
23  **A.  Yes.**
24  Q.  If you wanted to look up any particular policy
25  and procedure what would you do?

42

1  together as a unit?
2  **A.  A lot of different things that are fugitive**
3  **apprehension-related, vehicle-related or how to remove**
4  **people from vehicles effectively.**
5  Q.  Since you've been with NRS, has that been
6  consistent, that you receive training every year for the
7  NRS specifically?
8  **A.  Yes.**
9  Q.  Who provides that training?
10  **A.  Typically it's orchestrated through your**
11  **sergeant or -- orchestrated.**
12  Q.  Now, is it classroom-type training or is it on
13  the field, or how is that training set up?
14  **A.  Depending on the topic it'll be both.**
15  Q.  Is it mandatory for NRS officers?
16  **A.  As long as you're working that day that's --**
17  **you'll be going to it, so yes.**
18  Q.  So if you were not scheduled to work that day and
19  they were doing a particular training on an area, if you
20  weren't working that day would you have to make up that
21  training?
22  **A.  It would depend what the training was.**
23  Q.  Do you have outside or third parties that are not
24  police officers come in to help with the training for the
25  NRS division?

44

1  **A.  I'd go to our intranet and look at it.**
2  Q.  That's a computer program, correct?
3  **A.  Yeah, just like the internal Glendale Internet.**
4  **Isn't it called intranet?  Doesn't most places have**
5  **intranet?**
6  Q.  When you sign in to that, you can pull up any of
7  the policies and procedures that exist; is that true?
8  **A.  Yes.**
9  Q.  Do you do that very often?
10  **A.  Like anything else, you do it less as time goes**
11  **when you have more of a working understanding of your job**
12  **functions.**
13  Q.  As part of your AOT training, have you ever
14  received de-escalation type classes or courses or
15  training?
16  **A.  I would say yes.**
17  Q.  I think I saw somewhere there was a class called
18  verbal judo.  Did you participate in that?
19  **A.  I did.**
20  Q.  What do you recall from that class?
21  **A.  Giving you more insight on how to talk to people**
22  **and de-escalation techniques.**
23  Q.  Was that something that was part of your AOT
24  training, do you recall?
25  **A.  No.**

73

1    Q.   Can you use deadly force?
2    **A.   Of course not.**
3    Q.   Another area of resistance is called physical or
4   defensive resistance.  Are you familiar with that?
5    **A.   I am.**
6    Q.   What is your understanding of what that is?
7    **A.   Defensive resistance is usually when they're**
8   **trying not to allow you to effect the arrest, they're**
9   **pulling away, pushing away, doing things where they're not**
10  **actively aggressive towards an officer but they're not**
11  **allowing you to detain or control them.**
12   Q.   What type of response can you use -- level of
13  force can you use against someone who is engaging in
14  physical defensive resistance?
15   **A.   Almost anything up to lethal.**
16   Q.   What's active aggression, which is another form
17  of resistance?
18   **A.   That's where somebody is using active physical**
19  **force or violence against an officer.**
20   Q.   What type of a response can you use or level of
21  force can you use against someone who is engaging in
22  active aggression?
23   **A.   Every use of force up to and including lethal.**
24   Q.   What is aggravated active aggression?
25   **A.   They are actively trying to potentially kill an**

74

1   **officer.**
2    Q.   What level of force can you use against someone
3   who is engaging in active aggression -- sorry --
4   aggravated active aggression?
5    **A.   Up to and including lethal.**
6    Q.   Have you had to use lethal force?
7    **A.   No.**
8        (Deposition Exhibit No. 6 was marked for
9   **identification.)**
10  BY MS. BROADDUS:
11   Q.   You have a document that's been placed in front
12  of you.  It's Exhibit 6.  At the top it says, "Glendale
13  Police Department General Order."  It talks about response
14  to resistance.  Have you seen this document before?
15   **A.   I have.**
16   Q.   And is this the use of force order and policies
17  for the City of Glendale?
18   **A.   They are.**
19   Q.   Have you ever compared these policies and
20  procedures for Glendale with anyone else's?  Have you ever
21  talked to anyone from any other police -- any other
22  officers from other forces or anything?
23       MR. POPOLIZIO:  Form.
24       THE WITNESS:  No.
25

75

BY MS. BROADDUS:
1   BY MS. BROADDUS:
2    Q.   Do you think the guidelines for the City of
3   Glendale are reasonable for a police officer?
4        MR. POPOLIZIO:  Form; foundation.
5        THE WITNESS:  I'm not sure I'm in a position
6   to judge them.
7   BY MS. BROADDUS:
8    Q.   Well, you've been an officer for 12 years.  Are
9   there policies and procedures you think need to be
10  changed?
11       MR. POPOLIZIO:  Form; foundation.
12       THE WITNESS:  Not in response to resistance,
13  no.
14  BY MS. BROADDUS:
15   Q.   Do you think that the policies that they have in
16  response to resistance are what a reasonable officer would
17  do under the circumstances?
18       MR. POPOLIZIO:  Form.
19       THE WITNESS:  I would say so.
20  BY MS. BROADDUS:
21   Q.   On the first page it has a section 23.002.  It
22  talks about philosophy under subsection A and about -- it
23  says:  the philosophy of the Glendale Police Department is
24  to use only the amount of force or control necessary to
25  conduct lawful police safety activities in the mission of

76

1   the Department.
2        Do you see that?
3    **A.   I do.**
4    Q.   And not the next sentence but the sentence after
5   says:  Employees will only use the amount of force/control
6   reasonably necessary to overcome this resistance, protect
7   properties and save lives.
8        Do you see that?
9    **A.   I do.**
10   Q.   Do you think that's a reasonable objective?
11   **A.   I do.**
12   Q.   The next sentence says:  "Under no circumstances
13  will the force/control be greater than necessary to
14  achieve lawful objectives.
15       Do you see that?
16   **A.   I do.**
17   Q.   So there has to be a lawful objective to use any
18  type of use for control.  Would you agree?
19   **A.   Yes.**
20   Q.   I'm going to have you go to the page number
21  that's Bates 0436.  Under subsection 4 on this page it
22  says:  Tasers should only be used against subjects who are
23  exhibiting active aggression (physical intimidation) or
24  who are actively resisting (defensive resistance, active
25  aggression, aggravated active aggression or attempt to

81

1    A.  No.
2    Q.  Other than the one that we talked about earlier
3  with passive that you guys still use a Taser if they're
4  resisting passively under certain circumstances that you
5  talked about, like if you were trying to get them in a
6  car?
7        MR. POPOLIZIO:  Form.
8        THE WITNESS:  I would say yes.  Yes.  To
9  your statement, yes.
10       MS. BROADDUS:  We're going to take a short
11  break.
12       (The deposition was at recess from 11:22 to
13  11:35 a.m.)
14  BY MS. BROADDUS:
15   Q.  As you know, we're here today about the
16  Wheatcroft family, correct?
17   A.  Yes, ma'am.
18   Q.  Just want to have an understanding that we --
19  when we say the Wheatcrofts, we're talking about the whole
20  family.  If I identify them specifically, I'll let you
21  know.  Okay?
22   A.  Okay.
23   Q.  You've seen the reports, you heard your
24  interviews.  One of the things that you talked about in
25  your interview is that Johnny Wheatcroft was kicking and

82

1  thrashing.  Do you recall that?
2    A.  I do.
3    Q.  And what did you mean by that, that he's kicking
4  and thrashing?
5    A.  Kicking and thrashing.  Kicking his feet and
6  thrashing his legs about.
7    Q.  Was he doing that the whole time?
8    A.  From --
9        MR. POPOLIZIO:  Form.
10       THE WITNESS:  My apologies.
11       From the point that I got around to the
12  passenger side he seemed to be the entire time, yes.
13  BY MS. BROADDUS:
14   Q.  Just for clarification, you arrived on the scene,
15  you went up to where Schneider was talking with the
16  passenger, Mark Lindsey had not come around yet, or did he
17  come around to the passenger side of the vehicle --
18       MR. POPOLIZIO:  Form.
19  BY MS. BROADDUS:
20   Q.  -- when you first arrived?
21       MR. POPOLIZIO:  Form.
22  BY MS. BROADDUS:
23   Q.  If you recall.
24   A.  Because after looking at a video recently, he
25  went to the passenger side just as I was going to the

83

1  driver's side.
2    Q.  So you were over on the driver's side, and then
3  there was some commotion and you came over to the
4  passenger side, and you remained over on that side the
5  rest of the time, correct?
6    A.  Once I saw Sergeant Lindsey get knocked out, yes,
7  I went to the passenger side.
8    Q.  Was it when you went over to the other side of
9  the car to the passenger side when you saw him kicking and
10  thrashing?
11   A.  Yes.
12   Q.  You didn't see him kicking or thrashing before
13  you went over to that side -- the passenger side of the
14  car, correct?
15   A.  I couldn't see.
16   Q.  What do you think would happen to you as an
17  officer if you violated the use of force policies for
18  Glendale?
19       MR. POPOLIZIO:  Objection:  Form;
20  foundation.
21       Go ahead.
22       THE WITNESS:  In what way?
23  BY MS. BROADDUS:
24   Q.  Well, if you violated -- well, we went through
25  what all the use of force guidelines are for the City of

84

1  Glendale, correct?
2    A.  Yes.
3    Q.  And if you --
4        MR. POPOLIZIO:  Form.
5  BY MS. BROADDUS:
6    Q.  -- violated those use of force policies, do you
7  think you would be disciplined by the department?
8    A.  I'm sure it would depend on the circumstances and
9  the severity, but I would say yes.
10  BY MS. BROADDUS:
11   Q.  Has anyone filed a complaint or a claim against
12  you in your professional capacity?
13   A.  A complaint, yes.
14   Q.  And those are internal complaints with the
15  department?
16   A.  Yes.
17   Q.  No one's filed a lawsuit against you other than
18  this case, correct?
19   A.  Correct.
20   Q.  Do you know how many times?
21   A.  At least two -- at least two formal complaints.
22   Q.  What's the difference between a formal and an
23  informal complaint?
24   A.  I guess an informal complaint would be where
25  somebody calls and talks to your supervisor and maybe

85

1    isn't happy with something that happened.
2           A formal complaint to where they go down and
3    get interviewed and go through the formal complaint
4    process.
5        Q.   What is your understanding of what the informal
6    complaint process is?
7        A.   Typically your boss will handle it.
8        Q.   And they talk to you about whatever the situation
9    was.  Is that a fair statement?
10          MR. POPOLIZIO:  Form; foundation.
11          THE WITNESS:  They do.
12   BY MS. BROADDUS:
13       Q.   Do you usually get disciplined if it's just an
14   informal complaint?
15       A.   No.
16       Q.   If it's a formal complaint, what is your
17   understanding of the process of how a formal complaint is
18   handled by the City of Glendale?
19       A.   It gets investigated by either your immediate
20   supervisor or by our PSU, our professional standards unit.
21   They'll investigate it and decide if there needs to be any
22   type of discipline.
23       Q.   And you've actually had to go through that
24   process.  Is that a fair understanding?
25       A.   I have.

86

1        Q.   Do you get an opportunity to contest what their
2    position is?
3        A.   You do.
4        Q.   I'd like to go through just a few things I have
5    seen in your file, and I'm not going to pull out a bunch
6    of documents, so I'll just ask you about these.
7        A.   Okay.
8        Q.   We'll start with old and come to new.  Okay?
9        A.   Sure.
10       Q.   Back in 2009 you had three matters, and I'll
11   roughly summarize them.
12       A.   Okay.
13       Q.   There was an unlawful detention and search of
14   containers without a warrant or consent, and you got a
15   memo of correction.  Do you recall that?
16       A.   Can you give me like the synopsis of it.
17       Q.   There was a business and there were some
18   employees that were there, not City employees but...
19       A.   It was a Sunday night at about 10:00 o'clock, and
20   they were stacking vehicles into an 18-wheeler end on end
21   making homemade ramps, and we suspected that the vehicles
22   were possibly stolen.  So I went into the back of an
23   18-wheeler to get the VINs to verify they weren't stolen.
24       Q.   And you ended up getting a memo of correction
25   just because there wasn't a warrant or consent, correct?

87

1        A.   Correct.
2        Q.   Also in 2009 there was a conduct unbecoming
3    charge that was made against you.  Apparently people
4    thought you were rude and argumentative, condescending and
5    patronizing.  It was unlawfully detained people in a
6    vehicle and attempted to search without a lawful basis.
7    And you also received a memo of correction for that.  Do
8    you recall that?
9           MR. POPOLIZIO:  Form.
10          THE WITNESS:  Yes.  There was a -- I did a
11   traffic stop.  I called the K-9 officer to do a free-air
12   sniff of the vehicle.  The K-9 officer removed the people
13   from the vehicle, not me, and they ended up -- yeah.
14   BY MS. BROADDUS:
15       Q.   And the last one in 2009 was a vehicle collision.
16   You had to do some discipline training.  Do you recall
17   that?
18       A.   In 2009?
19       Q.   Or, actually, I apologize.  It happened in 2008,
20   but the disciplinary stuff happened the next near in 2009.
21       A.   A collision?
22          I don't remember.  Does it say -- do you
23   have any more specifics on the collision?
24       Q.   No, I don't have that with me, but I can get that
25   on our next break.

88

1        A.   I don't remember being in a collision in 2008.
2        Q.   Okay.  We'll go to -- the next situation was in
3    2011.  You also received another memo of correction for a
4    vehicle pursuit.  Do you recall that?
5        A.   Oh, I think myself and five or six officers
6    pursued a vehicle that had just carjacked somebody, and
7    they told us we shouldn't have.
8        Q.   And then another time in 2011 you had a memo of
9    correction for unbecoming conduct.  I guess you had a
10   dispute with a neighbor.  There was a dog situation.
11       A.   Yes.  My neighbor's dogs got very close to my
12   son, and I told him to keep his dogs restrained or he was
13   going to get a citation.
14       Q.   And that happened when you were not on duty,
15   correct?
16       A.   I was just coming home from training.
17       Q.   And you were still disciplined for that?
18       A.   I was.
19       Q.   In 2013, there was a citizen complaint that was
20   filed against you.  There was a civil standby that you
21   were there for, some kind of family fight.  Officer didn't
22   want to -- or I'm sorry.  The individual didn't want to
23   come towards you, and you grabbed him and put your cuffs
24   on him, searched his pockets, got his keys and gave them
25   to the girlfriend.  Do you recall that?

89

1      A.  I do.
2      Q.  And it looks like they sustained three
3  allegations on that, that you should have removed the
4  cuffs and you didn't soon enough?
5      A.  Correct.
6      Q.  And that you went hands-on while he was in cuffs,
7  which is outside the resistance policies?
8      A.  No.  There was no like physical confrontation.
9  It was just that I took the keys out of his pocket while
10  he was in handcuffs.
11      Q.  And that was another -- that was --
12      A.  Right.  It's --
13      Q.  No reason to search or seize property?
14      A.  Correct.
15      Q.  You were actually suspended for that for
16  24 hours?
17      A.  I was.
18      Q.  And then in 2014 there was another complaint.  It
19  was a family fight.  Sounds like some people were --
20  dispute over a kid and the grandparents.  Do you recall
21  that?
22      A.  I do.
23      Q.  They alleged that you had a failure to conduct a
24  thorough investigation.
25      A.  Correct.

90

1      Q.  And you were actually suspended for three days.
2  You're aware of that?
3      A.  I am.
4      Q.  Do you know why that suspension of three days,
5  that none of those other things were in your personnel
6  file?
7          MR. POPOLIZIO:  Form; foundation.
8          THE WITNESS:  Why I was suspended for three
9  days?
10  BY MS. BROADDUS:
11      Q.  No.  Why that particular instance -- the three
12  from 2009, the two from 2011, and the one from 2013 --
13  were not in your personnel file, but this one from 2014
14  was.  Do you know why that is?
15          MR. POPOLIZIO:  Form; foundation.
16          THE WITNESS:  I don't.
17  BY MS. BROADDUS:
18      Q.  You had two more incidents that were brought up
19  against you.  Another one was in 2015, another family
20  fight, and you actually tased someone who used empty -- or
21  hard empty hand strikes.  Do you recall that?
22      A.  I do.
23      Q.  And that one was rendered justified and within
24  policy, correct?
25      A.  Correct.

91

1      Q.  And then there's another incident in 2015.  This
2  is kind of a disturbance call in a trailer park, and there
3  was a gentleman running around in his underwear and you
4  used force and you were exonerated.  Do you recall that?
5      A.  Yes.
6      Q.  Are there any other complaints or situations or
7  someone made a complaint against you that you're aware of?
8      A.  Not that I know of.
9      Q.  Are you aware any other officers having any
10  complaints against you?
11      A.  Officers?
12      Q.  Yes.
13      A.  No.
14      Q.  Every year you undergo an annual evaluation,
15  correct?
16      A.  Yes.
17      Q.  And it's my understanding that the year goes
18  from -- is it July through June?  Is that --
19      A.  Correct.
20      Q.  And a lot of times in your reviews they've noted
21  these situations where someone had made a complaint
22  against you, correct?
23      A.  Correct.
24      Q.  And if you were suspended, they would note that
25  in your annual review, correct?

92

1      A.  Correct.
2      Q.  Do you know why Officer Schneider didn't have his
3  suspension in his reviews?
4          MR. POPOLIZIO:  Form; foundation.
5  BY MS. BROADDUS:
6      Q.  If you know.
7      A.  I have no idea.
8      Q.  You realize he was suspended, correct?
9      A.  I do.
10      Q.  Do you know how Matt Schneider got the nickname
11  Strong Arm Schneider?
12      A.  I've never heard that, ever.
13      Q.  Really?
14      A.  Never.
15      Q.  Do you know if Glendale has a set of guidelines
16  for what sanctions or punishments are going to be rendered
17  against an officer who has some kind of disciplinary
18  infraction?
19          MR. POPOLIZIO:  Form.
20          THE WITNESS:  I believe there is, yes.
21  BY MS. BROADDUS:
22      Q.  Have you ever seen it?
23      A.  No.
24      Q.  Is there a lot of discretion on whether someone's
25  going to be disciplined or not?

93

1          MR. POPOLIZIO:  Form; foundation.
2          THE WITNESS:  I believe there is.
3   BY MS. BROADDUS:
4      Q.  Do you know who decides whether someone's going
5   to be disciplined or not for a situation?
6      **A.  I think ultimately the assistant chief decides**
7   **discipline.  That's my understanding.**
8      Q.  Based on your experience with the complaints that
9   were made against you, do you think you were treated
10  fairly by the department?
11         MR. POPOLIZIO:  Form.
12         THE WITNESS:  Reference what?
13  BY MS. BROADDUS:
14     Q.  To the complaints that were made against you in
15  any disciplinary action that was taken against you.
16         MR. POPOLIZIO:  Form.
17         THE WITNESS:  Yes.
18  BY MS. BROADDUS:
19     Q.  You think it was fair?
20     **A.  Yes.**
21     Q.  You think some of the situations, that you felt
22  you acted properly and were still disciplined?
23     **A.  I could say that's a fair statement of my**
24  **opinion, yes.**
25     Q.  Do you trust Glendale's investigations of claims

94

1   made against officers?
2          MR. POPOLIZIO:  Form; foundation.
3          THE WITNESS:  Generally, yes.
4   BY MS. BROADDUS:
5      Q.  Has there ever been a situation where you saw an
6   officer that was disciplined that you didn't think
7   deserved it?
8      **A.  Yes.**
9      Q.  Do you know why they were disciplined if you
10  didn't think they deserved it?
11         MR. POPOLIZIO:  Form.
12         THE WITNESS:  Not always, no.
13  BY MS. BROADDUS:
14     Q.  As a result of the events involving the
15  Wheatcrofts, were you advised or suggested to undergo any
16  additional training?
17         MR. POPOLIZIO:  Form.
18         THE WITNESS:  No.
19  BY MS. BROADDUS:
20     Q.  Was NRS, the whole department, did they receive
21  additional training after the incident involving the
22  Wheatcrofts or any of the matters relating to it?
23         MR. POPOLIZIO:  Form.
24         THE WITNESS:  Not that I can recall.
25

95

1   BY MS. BROADDUS:
2      Q.  Prior -- well, the incident took place on
3   July 27th of 2017, just to give you a reference.  Did you
4   know any of the Wheatcroft family members prior to that
5   time?
6      **A.  No.**
7      Q.  Had you had any interactions with any of them
8   prior to --
9      **A.  I don't think so.**
10     Q.  What about the driver of the car?  His name was
11  Shawn Blackburn.  Did you have any experiences with him
12  prior to the July 2017 incident?
13     **A.  After the incident I think there was some**
14  **documentation or something where I had had some contact**
15  **with somebody in that car, but I didn't remember at that**
16  **point, and I don't remember now.  I don't know who it was.**
17  **I don't know which occupant, but it seems like somebody**
18  **said during one of my interviews that I had a contact with**
19  **one of them but I didn't remember it.**
20     Q.  When you were there that day on July 26th of
21  2017, they didn't look familiar?  You didn't have any
22  recollection of coming across any of them prior to that?
23     **A.  Not at all.**
24         THE COURT REPORTER:  I'm sorry.  Is it the
25  26th or 27th?

96

1          MS. THOMPSON:  26th.
2          (An off-the-record discussion ensued.)
3   BY MS. BROADDUS:
4      Q.  When you were working as a patrol officer back in
5   July of 2017, did you have a partner you would ride with
6   or did you normally go alone?
7      **A.  Typically alone.**
8      Q.  And on that date, on July 26th of 2017, were you
9   driving alone that day?
10     **A.  I was.**
11     Q.  Who was your direct supervisor at that time?
12     **A.  Should have been Kevin Kellogg.**
13     Q.  Do you know how many other officers reported to
14  that supervisor?
15     **A.  Seven, eight.**
16         **Just to clarify, I'm not 100 percent sure I**
17  **was working for Kellogg at that time.  I think I was, but**
18  **I'm not positive.**
19     Q.  Fair enough.
20     **A.  Because around July is when we changed shifts.**
21  **They changed spots.  So I could have been not working for**
22  **him, but I think I was.**
23     Q.  Fair enough.  Thank you for the clarification.
24         Did you do your reports at the police
25  station?

101

1  Q.  Did you think it was necessary to go to Motel 6
2  that day?
3  A.  Two of the officers on that squad, Officers Lewis
4  and Lindsey, I was and am very good friends with, and I
5  just went to check on Officer Lindsey.
6  Q.  But that was before you knew something had
7  happened, correct?
8  A.  Correct.
9  Q.  Were you concerned something was going to happen?
10  A.  No.  You asked if it was necessary to go by.
11  It's very common to go check on your buddies, so to speak.
12  Q.  When you went to Motel 6 that day after you heard
13  there was a traffic stop, did you know when the call was
14  made in that it was Officer Schneider and Lindsey?
15  A.  Yes.
16  Q.  How did you know that?
17  A.  I knew that they were riding together, so I knew
18  once Schneider voiced that he was there, I knew that
19  Lindsey was there.
20  Q.  Have you ever been on the scene when
21  Officer Schneider has arrested someone before?
22  A.  I'm sure I have.
23  Q.  Does the City of Glendale have a policy for body
24  cameras, when you're supposed to activate them and when
25  you don't need to activate them?

102

1  A.  Yes.
2  Q.  What is your understanding of what that policy
3  is?
4  A.  Anytime you're making contact with the public in
5  a police function you should have your body camera on.
6  Q.  What happens if you violate that policy?
7  A.  If you have a reasonable explanation, you're just
8  told to make sure to have it on next time.
9  Q.  That's what happened in your situation that day,
10  correct?
11  A.  I did.  I was -- I was coming from our main
12  station.  I just had my camera switched off.  There's a
13  good chance I probably was using the restroom, and I just
14  didn't get a chance to turn it on.
15  Q.  When did you realize it wasn't on?
16  A.  After the incident ended and I looked down at my
17  camera.
18  Q.  Does it have an indicator light?
19  A.  It does.
20  Q.  Do you normally turn on your camera when you get
21  in your car or when you get to a scene?  Or what's your
22  normal practice?
23  A.  Usually turn it on once I get out of my car and I
24  realize something's happening, I'm going to have contact
25  with the public.

103

1  Q.  When you first arrived, what did you see?
2  A.  The first thing that caught my attention was
3  Officer Lindsey raising his arm and kind of gesturing for
4  me to get over there.
5  Q.  What did you see when you got over there?
6  A.  I saw Officer Schneider having some kind of
7  conflict or some kind of confrontation with the front seat
8  passenger of a vehicle.
9  Q.  Did you ask any questions to find out what that
10  conflict was?
11  A.  I didn't.
12  Q.  Do you normally?
13  A.  In a dynamic fast-moving situation where things
14  are actively happening, never.
15  Q.  When you first arrived where was Officer Lindsey?
16  A.  I remember him in my head to be near the driver's
17  side front door.
18  Q.  Do you know why he went to the other side of the
19  vehicle?
20  A.  To help --
21  MR. POPOLIZIO:  Foundation.
22  THE WITNESS:  To help Officer Schneider.
23  BY MS. BROADDUS:
24  Q.  When did you find out the basis for the traffic
25  stop?

104

1  A.  After everything was over.
2  Q.  Did that concern you?
3  MR. POPOLIZIO:  Form.
4  THE WITNESS:  Did what concern me?
5  BY MS. BROADDUS:
6  Q.  That the traffic stop was for an alleged failure
7  to use a turn signal and it escalated into something where
8  a gentleman was tased 11 times.
9  MR. POPOLIZIO:  Form.
10  THE WITNESS:  Did the basis concern me?
11  BY MS. BROADDUS:
12  Q.  Did it concern you that the basis for the traffic
13  stop was an alleged failure to use a turn signal?
14  A.  No.
15  Q.  When you got there -- I just want to make sure I
16  understand -- was Schneider already engaged with the
17  passenger of the vehicle?
18  A.  Yes.
19  Q.  Can you tell me what happened, what you saw?
20  A.  So as I'm walking up, I begin jogging when Mark
21  gives me a gesture to get over here.  As I'm kind of
22  jogging up to the vehicle I see Mark, or Officer Lindsey,
23  quickly walk or jog over to the passenger side.  When I
24  saw that, I realized that there was still a driver and
25  that there were occupants in the rear, so I went to the

105

1   driver's side to watch them and watch their actions.
2       Q.  Did you personally see any basis for
3   Officer Schneider to put his hands on the passenger?
4           MR. POPOLIZIO:  Form.
5           THE WITNESS:  I -- I did not see what was
6   transpiring between them, no.
7   BY MS. BROADDUS:
8       Q.  Did you see the witness -- or I'm sorry.
9           Did you see the passenger engage in any
10  illegal activity before Schneider put his hands on him?
11      A.  What --
12          MR. POPOLIZIO:  Form.
13          THE WITNESS:  What passenger?
14  BY MS. BROADDUS:
15      Q.  The front seat passenger.  Did you see Johnny
16  Wheatcroft engage in any illegal activity before Schneider
17  put his hands on him?
18          MR. POPOLIZIO:  Form.
19          THE WITNESS:  I couldn't see what was
20  happening between them.
21  BY MS. BROADDUS:
22      Q.  So you didn't see any illegal activity by Johnny
23  Wheatcroft at that point, correct?
24          MR. POPOLIZIO:  Form.
25          THE WITNESS:  No.

106

1   BY MS. BROADDUS:
2       Q.  Prior to Officer Schneider putting his hands on
3   the passenger, did you personally have any probable cause
4   or reasonable suspicion to detain Johnny Wheatcroft?
5           MR. POPOLIZIO:  Form.
6           THE WITNESS:  Say again.
7   BY MS. BROADDUS:
8       Q.  Sure.  Prior to Officer Schneider putting his
9   hands on Johnny Wheatcroft, did you personally have any
10  probable cause or reasonable suspicion to detain Johnny?
11          MR. POPOLIZIO:  Form.
12          THE WITNESS:  Me personally, no.
13  BY MS. BROADDUS:
14      Q.  Did you ever hear Officer Schneider or
15  Officer Lindsey tell Johnny Wheatcroft to get out of the
16  vehicle?
17          MR. POPOLIZIO:  Form.
18          THE WITNESS:  I don't remember hearing it.
19  BY MS. BROADDUS:
20      Q.  Do you know why Officer Schneider put his hands
21  on the passenger?
22          MR. POPOLIZIO:  Foundation.
23  BY MS. BROADDUS:
24      Q.  If you know.
25      A.  At that point, no.

107

1       Q.  Did you prepare any report or any narratives
2   regarding this incident involving the Wheatcrofts?
3           MR. POPOLIZIO:  Form.
4           THE WITNESS:  I did not because I was listed
5   as a victim.  So my statement was taken by another
6   officer.
7   BY MS. BROADDUS:
8       Q.  Is that common practice for the City of Glendale?
9       A.  Yes.
10          (Deposition Exhibit No. 7 was marked for
11  identification.)
12  BY MS. BROADDUS:
13      Q.  You've been handed a document that's been marked
14  as Exhibit No. 7.  Have you seen this before?
15      A.  I have not.
16      Q.  You did not review the police report prior to
17  your deposition today.  Is that a fair statement?
18      A.  Correct.  I can't open it.  No, no.  We can't --
19  I can't open it up in our internal system.  I can't read
20  the report.
21      Q.  Do you know why?
22      A.  There's certain reports that are highlighted as
23  being sensitive and officers cannot open them without a
24  supervisor's approval.
25      Q.  So this one was marked as a sensitive report in

108

1   some way?
2       A.  Correct.
3       Q.  I want to have you turn to Bates No. 000017.  And
4   this is part of the police report, the Glendale police
5   report.  And towards the top of the page it says, "Victim
6   3," and it has your name.  Do you see that?
7       A.  It does.  I do.
8       Q.  Do you know why you were listed as a victim?
9       A.  Wheatcroft was charged with aggravated assault
10  from when he was kicking and thrashing, and I was kicked
11  during the process.  I was listed as a victim.
12      Q.  I'm going to have you go to page 23, please.
13  This is a summary of -- well, it starts about partway down
14  the page.  There's a bunch of pound signs or hashtags
15  signs.  I guess it depends on how old you are.  Then it
16  says, "Interview of Officer Fernandez."
17          Do you see that?
18      A.  I do.
19      Q.  This is not something you prepared, correct?
20      A.  I did not.
21      Q.  It's a summary of someone else's version of what
22  you had said, correct?
23      A.  Correct.
24      Q.  In the first paragraph underneath where you
25  start, the last sentence says, "Officer Fernandez said he

109

1  was going to respond as a back-up unit."
2        Do you see that?
3  A.  I do.
4  Q.  Is it typical to have a backup unit for a traffic
5  stop?
6  A.  It's very common if you're driving by or in the
7  area to check on an officer that's conducting a traffic
8  stop, yes.
9  Q.  I'm going to have to turn to the next page, which
10  is Bates marked 24.  The first full paragraph, the last
11  sentence says, "Officer Fernandez closed both doors and
12  told the people not to move."
13        Why did you do that?
14  A.  I didn't know what was going on at the time.  I
15  could see that both officers were in a physical
16  confrontation with the passenger.  So I kept both doors
17  closed to keep anyone from getting out and getting
18  involved.
19  Q.  The next sentence says, "Officer Fernandez
20  believed the interaction with Officer Schneider was
21  becoming more aggressive with the front seat passenger."
22        Do you see that?
23  A.  I do.
24  Q.  What did you think was -- how did you think the
25  gentleman was becoming more aggressive?

110

1        I'm sorry.  Yeah.  How did you think
2  Officer Schneider was becoming more aggressive with the
3  front seat passenger?
4  A.  Just becoming --
5        MR. POPOLIZIO:  Form.
6        THE WITNESS:  Becoming more verbally
7  aggressive, giving him commands, yelling at somebody.
8  BY MS. BROADDUS:
9  Q.  What commands was he giving him?
10  A.  I don't know specifically what.  I can't remember
11  right this second -- or I don't remember today exactly
12  what I heard him saying.
13  Q.  The fifth paragraph down -- and I'll read the
14  first part dealing with Officer Fernandez, but this one
15  says, "Officer Hernandez said he saw Taser probes coming
16  from Johnny so he believed a previous deployment had not
17  been effective."
18        Do you see that?
19  A.  I do.
20  Q.  Where do you see those probes?
21  A.  Well, I just saw like probes and wires coming
22  out.
23  Q.  Did you know where the probes or wires were on
24  Johnny's body?
25  A.  No.

111

1  Q.  What was Johnny doing when you fired your Taser?
2  A.  When I fired it he was still on the floor kicking
3  and thrashing and he wasn't detained.
4  Q.  And then the last sentence of that it says that
5  Johnny basically stopped fighting momentarily.  Do you see
6  that?
7  A.  Yes.
8  Q.  So he stopped -- according to you he had stopped
9  doing something.  Do you know what made him start again?
10  A.  Do I know what made him start again?
11        MS. BROADDUS:  Yes.
12        MR. POPOLIZIO:  Form; foundation.
13  BY MS. BROADDUS:
14  Q.  Because the next sentence says he "would fight,
15  kick and thrash around but then stop when the Taser was
16  used."
17        Do you see that?
18  A.  Yes.
19  Q.  So I just want to understand.  Your testimony is
20  that throughout the whole event Johnny was kicking and
21  thrashing.  Is that your testimony?
22        MR. POPOLIZIO:  Form.
23        THE WITNESS:  I would say that's a fair
24  statement, yes.
25

112

1  BY MS. BROADDUS:
2  Q.  Do you think he was kicking or thrashing because
3  he was being tased?
4        MR. POPOLIZIO:  Form; foundation.
5        THE WITNESS:  If you're kicking and
6  thrashing, then the Taser isn't effective.
7  BY MS. BROADDUS:
8  Q.  Are you saying that if someone is being tased
9  they won't kick or thrash?
10  A.  If the Taser's working, it's impossible for you
11  to kick or thrash.
12  Q.  What happens to the body when they're being
13  tased?
14  A.  It's called neuromuscular incapacitation.  Your
15  body locks up to where you cannot move if you're getting
16  the desired effect.
17  Q.  You were able to eventually get him handcuffed,
18  correct?
19  A.  Yes.
20  Q.  After he was handcuffed was he continuing to kick
21  and thrash?
22  A.  Yes.  Yes.
23  Q.  Did you try and find out when you first got there
24  why things were escalating between Officer Schneider and
25  Johnny Wheatcroft?

113

1    A.  When I first got there?
2    Q.  Yes.
3    A.  No.
4    Q.  Why not?
5    A.  It was a fast-moving, dynamic situation.  That's
6 not the time where you stop and ask an officer what's
7 going on.
8    Q.  Did you make any assumptions about the people in
9 the vehicle?
10    A.  Assumptions about people in the vehicle?
11    Q.  Yes.
12    A.  How do you mean?
13    Q.  Well, did you assume they were doing something
14 illegal?
15    A.  Yes.
16    Q.  Why?
17    A.  Because of the actions of the other officers on
18 scene.
19    Q.  Did you assume there was probable cause or that
20 there was some kind of reasonable suspicion of some kind
21 of illegal activity found by the officers?
22        MR. POPOLIZIO:  Form.
23        THE WITNESS:  Yes.
24 BY MS. BROADDUS:
25    Q.  And like you said, just because they were there

114

1 involved with the passengers, correct?
2    A.  Yes.
3    Q.  Did you make any assumption that they might be
4 trying to get a room at the motel?
5    A.  I never made any assumptions about them getting a
6 room.
7    Q.  You saw there were kids in the car, correct?
8    A.  I did.
9    Q.  As you sit here today, is it fair to say that
10 when you were there that day that you didn't know that the
11 family was going there to have a family day, that they
12 went to the candy store right before that so the kids
13 could go swimming?  You didn't know that when you arrived
14 on the scene, did you?
15        MR. POPOLIZIO:  Form.
16        THE WITNESS:  I didn't know that that day,
17 and I still don't know that to be true.
18 BY MS. BROADDUS:
19    Q.  Would you agree that the people in the car were
20 regular citizens that Glendale was obligated to serve and
21 protect?
22        MR. POPOLIZIO:  Form.
23        THE WITNESS:  Regular citizens?
24        They're regular citizens.
25

115

1 BY MS. BROADDUS:
2    Q.  Do you believe as a police officer that they're
3 entitled to -- that an officer is to serve and protect
4 them as well?
5        MR. POPOLIZIO:  Form.
6        THE WITNESS:  Of course.
7 BY MS. BROADDUS:
8    Q.  Is it common for a Glendale officer who arrives
9 at the scene after something's already started that he'll
10 back up the other officers?
11    A.  Yes.
12    Q.  That's a custom and practice that you normally
13 see as a police officer, correct?
14    A.  Yes.
15    Q.  And it's rare for you to ever see someone --
16 something going on with a police officer where you pull
17 the officer off someone else; is that true?
18        MR. POPOLIZIO:  Form.
19        THE WITNESS:  That's not true.
20 BY MS. BROADDUS:
21    Q.  Have you ever pulled an officer off a suspect?
22    A.  I have.
23    Q.  How many times?
24    A.  Twice that I know of.
25    Q.  Why would you do that?

116

1    A.  The person was in handcuffs, and they didn't pose
2 a threat, and they just needed to be picked up and put in
3 a car.
4    Q.  Have you seen other officers do that, take
5 another officer off the scene, or stop them from using
6 some level of force?
7        MR. POPOLIZIO:  Form.
8        THE WITNESS:  Not that I can recall right
9 now.
10 BY MS. BROADDUS:
11    Q.  It's something that you believe in, though, true?
12        MR. POPOLIZIO:  Form.
13        THE WITNESS:  Yes.
14 BY MS. BROADDUS:
15    Q.  I want to ask you about some of the videos.  You
16 saw the motel video, correct?
17    A.  I did.
18    Q.  When you saw the motel video, did you question
19 the basis for the stop?
20    A.  No.
21    Q.  It didn't bother you that Schneider's police
22 vehicle was behind the wall when the other car would have
23 turned the corner --
24        MR. POPOLIZIO:  Form; foundation.
25

121

1    Q.  Do you know whether he's kicking at this point?
2        MR. POPOLIZIO:  Form.
3        THE WITNESS:  I'm not there, but I'm not
4    sure.
5        MS. BROADDUS:  Okay.  Go ahead.  Stop.
6        (Video played.)
7    BY MS. BROADDUS:
8    Q.  At that point -- you just saw the video -- did
9    you see Johnny kicking anybody?
10       MR. POPOLIZIO:  Form.
11       THE WITNESS:  I couldn't see what he was
12   doing.
13   BY MS. BROADDUS:
14   Q.  I'm sorry?
15   A.  I couldn't see what Johnny was doing.
16   Q.  We'll slow it down just a pinch.
17       (Video played.)
18   BY MS. BROADDUS:
19   Q.  You can see his feet there, correct?
20   A.  Yes.
21       MS. BROADDUS:  Stop.
22   BY MS. BROADDUS:
23   Q.  So that's the point when Mark fell, correct, at
24   the end of that?
25       MR. POPOLIZIO:  Form.

122

1        THE WITNESS:  Yes.
2    BY MS. BROADDUS:
3    Q.  When you saw that video did you see him kicking
4    anyone?
5        MR. POPOLIZIO:  Form.
6        THE WITNESS:  It didn't look like he was
7    kicking him.
8        MS. BROADDUS:  Go to the next one.
9        (Video played.)
10   BY MS. BROADDUS:
11   Q.  That's when you first come back to the other side
12   of the vehicle, correct?
13   A.  Yes.
14   Q.  What did you see?
15   A.  I saw that Officer Lindsey had fallen and wasn't
16   getting up.  And I saw Officer Schneider in a physical
17   confrontation with Johnny Wheatcroft.
18   Q.  When you came around, did you already see the
19   probes from -- and the wires -- I believe that you
20   testified earlier, when you came around the car you saw
21   that the Taser was ineffective, that you saw the probes
22   and wires.  Do you recall that testimony?
23       MR. POPOLIZIO:  Form.
24       THE WITNESS:  Yes.
25

123

1    BY MS. BROADDUS:
2    Q.  So either Officer Lindsey or Officer Schneider
3    had already deployed something that was -- with the
4    prongs, correct?
5    A.  I believe so, yes.
6        MS. BROADDUS:  Go ahead.
7        (Video played.)
8    BY MS. BROADDUS:
9    Q.  Is that the point when you deployed the Taser?
10   A.  I think right there when my hand extends is
11   where --
12       MR. POPOLIZIO:  Belated form.
13       MS. BROADDUS:  I'm sorry.  I had that
14   playing and it was kind of loud.
15       THE WITNESS:  I think as my arm extends is
16   when I deployed my Taser.
17       MS. BROADDUS:  Go to the next one.  We're at
18   what?
19       MS. THOMPSON:  Four minutes in.
20       (Video played.)
21       MS. BROADDUS:  Can you put that regular
22   speed, please.
23       MS. THOMPSON:  Yes.
24       (Video played.)
25       MS. BROADDUS:  Turn the volume down.  Stop.

124

1    BY MS. BROADDUS:
2    Q.  Do you recall the kid tapping you on the
3    shoulder?
4    A.  I don't.
5    Q.  Did you see that in the video?
6    A.  I did.
7    Q.  Do you know if he said anything to you?
8    A.  I don't remember.
9    Q.  Do you know why he would have been tapping you on
10   the shoulder like that?
11       MR. POPOLIZIO:  Form; foundation.
12       THE WITNESS:  Not sure.
13       MS. BROADDUS:  Go ahead.
14       (Video played.)
15   BY MS. BROADDUS:
16   Q.  I want you to watch his feet again.  Do you see
17   his feet and kicking and thrashing at all?
18       You haven't seen it in the video so for,
19   correct?
20   A.  Yeah, I can't see his feet.
21       MS. BROADDUS:  Go ahead.
22       (Video played.)
23       MS. BROADDUS:  Stop.
24   BY MS. BROADDUS:
25   Q.  You see his feet together right there.  He

169

1        MS. BROADDUS:  Okay.
2        MR. POPOLIZIO:  -- to see how much I don't
3    have to ask.
4        (The deposition was at recess from 1:21 to
5    1:38 p.m.)
6             EXAMINATION
7    BY MR. POPOLIZIO:
8        Q.   Officer Fernandez, I have a few questions for
9    you, and I hope that I don't have too many questions, but
10   I'd like to start off by asking you, when you were
11   restraining Johnny Wheatcroft on the ground, you were up
12   near his upper body; is that correct?
13       A.   Yes.
14       Q.   You were near his head?
15       A.   Yes.
16       Q.   When you were retraining Mr. Wheatcroft on the
17   ground, did you ever pull your service weapon and point it
18   at his head?
19       A.   No, of course not.
20       Q.   When Mr. Wheatcroft was on the ground and you
21   were restraining him, describe for me how he was acting
22   physically.
23       A.   He was kicking and thrashing, moving about while
24   on the ground.
25       Q.   Did you have to exert any effort to hold

170

1    Mr. Wheatcroft down on the ground?
2        A.   Yes.  I was physically using my body weight to
3    try to hold him down.
4        Q.   Were you using your hands in any way?
5        A.   I was holding him down on his arms and shoulders
6    to try to keep him from moving.
7        Q.   Was he trying to move?
8        A.   He was moving and kicking and just -- it seemed
9    like he was trying to push up.
10       Q.   Push up off the ground?
11       A.   Correct.
12       Q.   You deployed your Taser in this instance,
13   correct?
14       A.   Yes.
15       Q.   And you did it a single time; is that right?
16       A.   Yes.
17       Q.   When you deployed your Taser, was that before or
18   after Officer Lindsey was knocked out?
19       A.   After.
20       Q.   You saw a bit of video here today during your
21   deposition; is that right?
22       A.   Yes.
23       Q.   And you saw the Motel 6 video, correct?
24       A.   Yes.
25       Q.   And you also saw excerpts of Officer Schneider's

171

1    video, correct?
2        A.   Yes.
3        Q.   You didn't see much of Officer Lindsey's video,
4    though, did you?
5        A.   No.
6        Q.   Were you concerned when Officer Lindsey was
7    knocked to the ground?
8        A.   Yes.
9        Q.   When you came around from the driver's side of
10   the vehicle to the passenger side of the vehicle after he
11   was knocked down, did you see him on the ground?
12       A.   I did.
13       Q.   What was he doing?
14       A.   He was laying on the back -- on his back not
15   moving with a dazed look on his face.
16       Q.   There was some examination about Mr. Wheatcroft
17   and the seat belt on the passenger, or near the passenger
18   seat of the vehicle in which he was in, correct?
19       A.   Yes.
20       Q.   And when you could see in the video that there was a
21   Mr. Wheatcroft's -- or strike that.
22            You could see in the video that there was a
23   seat belt in the front passenger seat of the car that
24   Mr. Wheatcroft was in, correct?
25       A.   Yes.

172

1        Q.   And when you saw that, you could see it around
2    his right shoulder; is that right?
3        A.   Yes.
4        Q.   In any of this video that you watched today,
5    could you see whether that seat belt was engaged, the male
6    buckle part engaged in the female part of the seat?
7        A.   No.
8        Q.   Now, of course the videos that you saw -- except
9    for the Motel 6 video any other video that you saw here
10   today was footage from body-worn cameras, correct?
11       A.   Correct.
12       Q.   Mostly from Officer Schneider we watched, right?
13       A.   Yes.
14       Q.   Some from Officer Lindsey; is that right?
15       A.   Yes.
16       Q.   Body-worn cameras, I just wanted to ask you, when
17   they're turned on, do they catch everything that happens
18   on scene?
19       A.   No, they don't.
20       Q.   And not to be coy, but it's going to sound this
21   way, can body-worn cameras, can they film through a car
22   door?
23       A.   No.
24       Q.   So if you come onto a scene and your body-worn
25   camera is on, or multiple officers have them on, and there

173

1  is a struggle between an officer or officers and a
2  suspect, would those cameras necessarily catch every part
3  of the struggle between the officers?
4  **A.  No.**
5  Q.  In this instance when you watch videos from
6  Officer Schneider's body-worn camera, could you catch
7  every kick from Mr. Wheatcroft?
8  **A.  No.**
9  Q.  Every part of his struggle at the scene?
10  **A.  No.**
11  Q.  Could you see every part of what Mr. Wheatcroft
12  was doing at the scene?
13  **A.  No.**
14  Q.  And that was when he -- even when he was engaged
15  with Officer Schneider; is that right?
16  **A.  Correct.**
17  Q.  How about when he was engaged with you; could you
18  see his entire body at all times?
19  **A.  No.**
20  Q.  And we're talking about, of course, what was seen
21  in the videos today?
22  **A.  Yes.**
23  Q.  You understand that, right?
24  **A.  Yes.**
25  Q.  So, I mean, generally you can't see from these

174

1  body-worn camera footage that you saw today everything
2  that transpired on the scene; is that right?
3  **A.  Correct.**
4  Q.  You said -- well, strike that.
5       When you came onto the scene you said you
6  kind of jogged over; is that right?
7  **A.  Yes.**
8  Q.  I believe you said something along the lines of
9  you made an assumption that there might be something
10  illegal going on; is that right?
11  **A.  Correct.**
12  Q.  Would you generally make an assumption that
13  something illegal might be going on because other officers
14  are just talking to somebody?
15  **A.  No.**
16  Q.  What made you have that feeling or assumption
17  that something might be going on when you approached the
18  officers and the Taurus in which Johnny Wheatcroft was in?
19  **A.  Just the way Officer Lindsey motioned me over,**
20  **the way I saw him jog to the other side, the elevated**
21  **tones.  There was obviously some kind of argument or**
22  **altercation happening between, you know, Schneider and**
23  **the -- and Mr. Wheatcroft.  But there was just an elevated**
24  **sense of urgency in the air.**
25  Q.  You know, at the very beginning of your

175

1  deposition I think you were asked whether you held any
2  licenses or certifications.  Do you hold any licenses or
3  certifications?
4  **A.  I'm certified to be a police officer in Arizona.**
5  Q.  So let's look at Exhibits 8 and 9 for a second,
6  okay?  You remember looking at these during your
7  examination by Ms. Broaddus, correct?
8  **A.  I do.**
9  Q.  If you look at Exhibit 8 it says that the
10  duration of your deployment of your Taser was five
11  seconds.
12  **A.  Correct.**
13  Q.  Look at Exhibit 9 for me, please, and look at
14  page 2.
15  **A.  Okay.**
16  Q.  Do you see there's kind of a chart or a graph?
17  **A.  Yes.**
18  Q.  Under that there is a sentence.  Do you see that?
19  **A.  Yes.**
20  Q.  Now, on Exhibit 8 it says that your Taser
21  deployment was five seconds in duration; is that right?
22  **A.  Yes.**
23  Q.  But look under the chart on Exhibit 9, and we're
24  talking about Bates page Bates numbered Wheatcroft 001669.
25  It states, in part:  Approximately 60 microcoulombs of

176

1  charge indicates a completed connection for approximately
2  the first 1.5 seconds.
3       Do you see that?
4  **A.  Yes, sir.**
5  Q.  Did I read that right?
6  **A.  1.75?**
7  Q.  Yes.
8  **A.  Yes.**
9  Q.  And then after that it says, "and then the charge
10  dropped to zero microcoulombs from seconds 1.75 to 4.75
11  when the connection was reestablished for the
12  last .25 seconds."
13       Do you see that?
14  **A.  Yes.**
15  Q.  So at least according to this, what it says here,
16  is that there was a completed connection from your Taser
17  to Mr. Wheatcroft for approximately the first 1.5 seconds;
18  is that right?
19       MS. BROADDUS:  Object to form.
20       THE WITNESS:  Yes.
21  BY MR. POPOLIZIO:
22  Q.  1.75 seconds; is that right?
23  **A.  Yes.**
24  Q.  And then after that, from 1.75 to 4.75, at least
25  what this says right here, the charge dropped to zero; is

177

1  that right?
2      A.  Yes.
3      Q.  And then it was reestablished, though, correct?
4      A.  Yes.
5      Q.  For .25 seconds, was the reestablished time,
6  according to this; is that right?
7      A.  Correct.
8      Q.  So according to this evaluation, the Taser pulse
9  log evaluation, which is Exhibit 9, it indicates that from
10 second 1.75 to 4.75 Mr. Wheatcroft was receiving zero
11 charge from your Taser; is that right.
12         MS. BROADDUS:  Object to form and
13 foundation.
14 BY MR. POPOLIZIO:
15     Q.  At least according to this, that's what it says
16 here, correct?
17     A.  That's what it appears, yes.
18     Q.  Could you look at Exhibit 6, please.  Are you
19 there?
20     A.  Yes.
21     Q.  Could you look at page 000451, please.  It's a
22 chart.
23     A.  Okay.
24     Q.  Are you there?
25     A.  Yes.

178

1      Q.  I believe, and I might be wrong, but I believe
2  during your examination by Ms. Broaddus you indicated that
3  if someone was exhibiting active aggression, then lethal
4  force could not be used; is that right?
5      A.  I initially said it could, and then I redacted
6  that statement and said it could not.
7      Q.  If you look on page 000451 under active
8  aggression -- do you see where I am?
9      A.  Yes.
10     Q.  -- the second column in the middle -- and I'm
11 looking to the right of the part of the table that says,
12 "Active aggression."
13         Do you see that?
14     A.  Yes.
15     Q.  The very last thing that's noted is what?
16     A.  Lethal impact.
17     Q.  So if someone is exhibiting active aggression you
18 can use lethal force; is that right?
19     A.  Yes.
20     Q.  Depending on the circumstances, though, right?
21     A.  Correct.
22     Q.  And that's what use of force under this policy is
23 about, isn't that right, the totality of the
24 circumstances?
25     A.  Correct.

179

1      Q.  So what an officer like yourself would be obliged
2  to use a reasonable amount of force under the
3  circumstances then and there presented to you; is that
4  right?
5      A.  Correct.
6      Q.  And that is the use of force under the
7  circumstances presented to the officer is under -- well,
8  it is stage five, the reasonable belief of the officer; is
9  that right?
10     A.  Yes.
11     Q.  Look at, of this exhibit, page 000430, please.
12 And at the top it says, "Reasonable belief."
13         Do you see that?
14     A.  Yes.
15     Q.  And it's in the definitional section of this
16 exhibit, Exhibit 7 (sic), which is the Glendale Police
17 Department General Order Response to Resistance; is that
18 right?
19     A.  Yes.
20     Q.  And it says, "P, Reasonable Belief:  The
21 conclusion based upon facts and/or totality of the
22 circumstances that a reasonable police officer would
23 believe to be true"; is that right?
24     A.  Yes.
25     Q.  So when a police officer goes to use reasonable

180

1  force, it is based on the totality of the circumstances
2  and what that police officer's reasonable belief is,
3  correct?
4      A.  Yes.
5      Q.  Now, look at the first page of this policy.
6  Remember -- and specifically under 23.002 where it says
7  "Philosophy."  Do you see that?
8      A.  Yes.
9      Q.  Ms. Broaddus read a couple of sentences from the
10 first paragraph with the capital letter A, Response to
11 Resistance.  Do you remember that?
12     A.  Yes.
13     Q.  And she read the first sentence.  Do you remember
14 that?
15     A.  Yes.
16     Q.  And she skipped the second sentence and went to
17 the third sentence.  Do you remember that?
18     A.  Yes.
19     Q.  The second sentence reads, "The method of
20 force/control used is predicated on the circumstances of
21 the contact and the amount of resistance presented by the
22 suspect."  Okay.  Did I generally read that correctly?
23     A.  Yes.
24     Q.  Aside from my stuttering?
25     A.  Yes.

185

1    A.  No.
2    Q.  Was it available in the set of circumstances on
3  the date of this incident when you deployed your Taser?
4    A.  No.
5    Q.  Officer Fernandez, are traffic stops -- strike
6  that.
7          You've been an officer for how long?
8    A.  11 and a half years.
9    Q.  And in your experience as an officer, are traffic
10  stops a concern for you?
11    A.  They're very inherently dangerous.
12    Q.  Why?
13    A.  You don't know who's in the vehicle.  You don't
14  know what they have access to.  You don't know what their
15  intentions are.
16    Q.  Did you have any idea when you were around the
17  vehicle in which the Wheatcrofts were in and their friend,
18  the driver, did you know what was inside that vehicle?
19    A.  No.
20    Q.  Would it concern you if you had approached the
21  vehicle and Mr. Wheatcroft was reaching down in a bag?
22        MS. BROADDUS:  Object to form.
23        THE WITNESS:  Yes.
24  BY MR. POPOLIZIO:
25    Q.  Why?

186

1    A.  Again, you don't know what -- what's in the
2  vehicle.  You don't know what he's reaching for.  You
3  don't know if he has a weapon.  You don't know what his
4  intentions are if he was able to get to a weapon.
5    Q.  And is that a general concern of officers when
6  they approach a vehicle, that there would be a weapon
7  inside?
8        MS. BROADDUS:  Object to form.
9        THE WITNESS:  Every time.
10  BY MR. POPOLIZIO:
11    Q.  Is that your concern when you approach a vehicle?
12    A.  Yes.
13    Q.  Now, you saw Mr. Wheatcroft have some sort of a
14  dollar bill or money in his -- I believe his right hand.
15  Did you see that in the video?
16    A.  Left hand, yes.
17    Q.  When you saw that, now, if someone has something
18  like that in their hands, would you still be concerned
19  that they could access a weapon in the vehicle?
20    A.  Yes.
21    Q.  Why?
22    A.  They can quickly drop it and grab something else.
23    Q.  When you came around to the passenger side of the
24  vehicle, it was after Officer Lindsey had been knocked
25  out; is that right?

187

1    A.  Yes.
2    Q.  And why did you come from the driver's side to
3  the passenger side of the vehicle?
4    A.  At that time I thought Officer Wheatcroft was the
5  one that knocked out Officer Lindsey.
6    Q.  Did you say Officer Wheatcroft?
7    A.  Mr. Wheatcroft.
8    Q.  Okay.  So you were concerned that Officer --
9  excuse me -- I was going to say it -- that Mr. Wheatcroft
10  had knocked out Officer Lindsey?
11    A.  Yes.
12    Q.  And it didn't matter who knocked out
13  Officer Lindsey to you as to whether you were going to
14  come from the driver's side to the passenger side of the
15  vehicle?
16    A.  If I thought that the front seat driver -- the
17  driver of the vehicle had done something, I would have
18  stayed over there.
19    Q.  But was he doing anything, the driver?
20    A.  No.
21    Q.  So you came around to the passenger side to
22  assist Officer Schneider?
23    A.  Correct.
24    Q.  When you came to that side of the vehicle and you
25  saw Mr. Wheatcroft, did you hear Officer Schneider's Taser

188

1  being used?
2    A.  I don't remember what I heard right that second.
3    Q.  Have you seen anybody under the effect of a
4  Taser?
5    A.  Yes.
6    Q.  What happens?
7    A.  They lock up.
8    Q.  Did Mr. Wheatcroft lock up?
9    A.  No.
10    Q.  Did he lock up under Officer Schneider's
11  deployment of his Taser?
12    A.  No.
13        MS. BROADDUS:  Object to form.
14  BY MR. POPOLIZIO:
15    Q.  And how do you know?
16    A.  He was still moving and thrashing about.
17    Q.  What about when you deployed your Taser?
18    A.  I got the desired effect.  He did lock up
19  momentarily.
20    Q.  He did lock up momentarily?
21    A.  He did.
22    Q.  And what did you do?
23    A.  I holstered my Taser and put him in handcuffs.
24        MR. POPOLIZIO:  Thank you.
25        MS. BROADDUS:  All right.  I have a few

189

1    follow-ups.
2
3            FURTHER EXAMINATION
4    BY MS. BROADDUS:
5    Q.  Were you ever in the military?
6    A.  No.
7    Q.  You were asked about the money in hand when
8    Mr. Wheatcroft was in the car and whether he could still
9    access a weapon.
10           You never saw him in the front seat of the
11   car with the money in hand, did you?
12   A.  When I first got there I believe he was still in
13   the front of the vehicle.
14   Q.  Did you see that he had money in his hand?  Did
15   you see his hands?
16   A.  I couldn't see what he was holding in his hands.
17   Q.  You made an assumption that Mr. Wheatcroft is the
18   person that injured Officer Lindsey, correct?
19   A.  Initially, yes.
20   Q.  And you went over to the other side of the car
21   and you assumed the man you saw sitting between the car
22   and the car door was the person that injured another
23   officer.  Is that a fair statement?
24   A.  Yes.
25   Q.  And you see in the video where he's sitting

190

1    there -- I understand you say he was thrashing about.  You
2    see the video where he's sitting there when Officer
3    Schneider steps back and deploys his Taser towards his
4    chest.  And then you shot your Taser because you did not
5    believe it was working; is that correct?
6    A.  Correct.
7    Q.  And this is a person that you assumed has hurt
8    your coworker or friend, correct?
9            MR. POPOLIZIO:  Form.
10           THE WITNESS:  Yes.
11   BY MS. BROADDUS:
12   Q.  Were you upset your friend got hurt?
13   A.  No.
14   Q.  You weren't upset that Officer Lindsey was
15   injured?
16   A.  I was concerned.
17   Q.  You were saying that when you were pinning him to
18   the ground after he was handcuffed that he was trying
19   to -- it sounds like you said he was trying to lift
20   himself off the ground?
21   A.  He was kicking and thrashing and moving.
22   Q.  And this was in July of 2017, correct?
23   A.  Correct.
24   Q.  Do you know what the temperature of that pavement
25   was that day?

191

1    A.  No idea.
2    Q.  It would be pretty hot, though, do you think?
3    A.  I'm not sure.
4    Q.  You're not sure?  Have you ever tried to lay on
5    the pavement in July in Arizona?
6            MR. POPOLIZIO:  Form.
7            THE WITNESS:  Can't say that I have.
8    BY MR. POPOLIZIO:
9    Q.  I don't blame you.  I wouldn't want to either.
10           You're aware that the pavement can cause
11   burns, correct?
12   A.  I am.
13   Q.  You know, they tell people not to walk their dogs
14   without pads because they could burn their pads, correct?
15   A.  Correct.
16   Q.  And you had this man laying on the ground pinned
17   to the ground, correct?
18           MR. POPOLIZIO:  Form.
19           THE WITNESS:  I was holding him on the
20   ground, yes.
21   BY MR. POPOLIZIO:
22   Q.  On the pavement?
23   A.  Uh-huh.  Yes.
24           MS. BROADDUS:  All right.  I don't have
25   anything further.

192

1            MR. POPOLIZIO:  Just a follow-up.
2
3            FURTHER EXAMINATION
4    BY MR. POPOLIZIO:
5    Q.  When you came around to the passenger side of the
6    vehicle and deployed your Taser, did you do it in
7    retaliation for what had happened to Officer Lindsey?
8    A.  Absolutely not.
9    Q.  Why did you deploy your Taser?
10   A.  Mr. Wheatcroft was still an active threat.  At
11   that point I thought he was -- I thought he was the one
12   that had caused an officer to fall back.  He wasn't
13   detained in handcuffs.  He was still an active threat to
14   myself and Officer Schneider.
15   Q.  And at that time did you know what was in the
16   car?
17   A.  No idea.
18   Q.  Were there any other people in the car at that
19   time that you deployed your Taser?
20   A.  Yes.
21   Q.  Were there two adults?
22   A.  Yes.
23   Q.  And there were two children, too, correct?
24   A.  Yes.
25   Q.  Were you ever struck in any way by Mr. Wheatcroft

193

1   during your interaction with him?
2       **A.   I thought I felt like I got kicked at some point**
3   **during the entire altercation.**
4           MR. POPOLIZIO:  Thank you.
5           Are you done?
6           MS. BROADDUS:  I don't have anything
7   further.
8           MR. POPOLIZIO:  He'll read and sign.
9               (The deposition concluded at
10               2:08 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

195

1   STATE OF ARIZONA      )
                          ) ss.
2   COUNTY OF MARICOPA    )
3       BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    questions propounded to the witness and the answers of the
5   witness thereto were taken down by me in shorthand and
    thereafter transcribed through computer-aided
6   transcription under my direction; that the foregoing is a
    true and correct transcript of all proceedings had upon
7   the taking of said proceedings, all done to the best of my
    skill and ability.
8
9       I CERTIFY that I am in no way related to nor
    employed by any of the parties hereto nor am I in any way
10  interested in the outcome hereof.
11          (X) Review and signature was requested.
            ( ) Review and signature was waived.
            ( ) Review and signature was not requested.
12
13      I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA Sections 7-206(F)(3) and
14  7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
    this 21st day of June, 2019.
15
16      _____
17          MONICA S. BERRY, RPR, CR
                Certified Reporter
18            Arizona CR No. 50234
19      *    *    *    *    *    *
20      I CERTIFY that Berry & Associates, LLC has
    complied with the ethical obligations set forth in ACJA
21  Sections 7-206(J)(1)(g)(1) and (6).
22
23      _____
24          BERRY & ASSOCIATES, LLC
                Registered Reporting Firm
            Arizona RRF No. R1033
25

194

1       I, the undersigned, say that I have read the
2   foregoing transcript of testimony taken June 3, 2019, and
3   I declare, under penalty of perjury, that the foregoing is
4   a true and correct transcript of my testimony contained
5   therein.
6
7       EXECUTED this _____ day of _____, 2019.
8
9
10
11
12
        _____
        OFFICER MICHAEL FERNANDEZ
13
14
15
16
17
18
19
20
21
22
23
24
25

# *EXHIBIT 8*

# *Filed Under Partial Seal*

Transcript of the Testimony of

# Anya Chapman

January 13, 2021

Wheatcroft v. City of Glendale

## Herder & Associates Court Reporters

Phone:  480-481-0649

Info@CourtReportersAZ.com

www.CourtReportersAz.com

Anya Chapman      Wheatcroft v. City of Glendale        1/13/2021

---

**69**

```
 1   add a number.
 2       A.  Okay.
 3       Q.  Here's a copy.  It's the Plaintiffs' 11th
 4   Supplemental Responses to Mandatory Initial Discovery
 5   Project.
 6       Do you see that?
 7       A.  Yeah.
 8       Q.  Okay.
 9       And on the second page you're listed as a witness.
10       Do you see your name there?
11       A.  Uh-hmm.
12       Q.  Okay.  And --
13       A.  I'm sorry, yes.
14       Q.  Yes.  There you go.  All right.  You caught
15   yourself.  That's good.
16       All right.  It says, in part, it says:  Anya
17   Chapman is expected to testify as to the circumstances,
18   manner, causation, and results of the incident.
19       Do you see that?
20       A.  Yes.
21       Q.  I didn't read that full sentence.  It says:  And
22   her damages.  But you no longer have any claims in this so
23   I'm not going to be covering that.  Okay?
24       A.  Okay.
25       Q.  But I want to look at and talk about some of the
```

**70**

```
 1   results of -- of this incident.  Okay?
 2       A.  Okay.
 3       Q.  So, now, one result is that you knocked out a
 4   police officer on the date of this incident; right?
 5           MS. BROADDUS:  Object to form.
 6           THE WITNESS:  Yes.
 7   BY MR. POPOLIZIO:
 8       Q.  Okay.
 9       And to do so, it was because you hit him with a
10   bag of soft drinks?
11       A.  Yes.
12       Q.  Okay.
13       And -- okay.
14       And when you hit him with the bag of soft drinks,
15   the soft drinks bag -- the bag filled with soft drinks hit
16   him in the head.
17           MS. BROADDUS:  Object to form.
18   BY MR. POPOLIZIO:
19       Q.  Is that right?
20           MS. BROADDUS:  Foundation.
21           THE WITNESS:  Yes.
22   BY MR. POPOLIZIO:
23       Q.  Okay.
24       So another result is -- well, another result of
25   your hitting the officer on his head with a bag of soft
```

**71**

```
 1   drinks is that you were arrested; right?
 2       A.  Yes.
 3       Q.  We already established that earlier; right?
 4       A.  Correct.
 5       Q.  And you were charged with aggravated assault --
 6       A.  Uh-hmm.  Yes.
 7       Q.  -- of a police officer; right?
 8       A.  Yes.
 9       Q.  And then you pled guilty to aggravated assault;
10   correct?
11       A.  Yes.
12       Q.  And then you were incarcerated due to that; right?
13       A.  Yes.
14       Q.  And do you know how long you were incarcerated
15   after your arrest?
16       A.  103 days I believe.
17       Q.  And was that in the Maricopa County jail?
18       A.  Yes.  Estrella jail, yes.
19       Q.  Okay.
20       By the way, do you know the name of the officer
21   that you hit in the head with the bag of soft drinks?
22       A.  Lindsey, I believe.
23       Q.  Okay.  All right.
24       So another result of this incident is that you
25   were separated from your children; right?
```

**72**

```
 1       A.  Yes.
 2       Q.  And that's when you were arrested; right?
 3       A.  Yes.
 4       Q.  And then you went to Estrella jail?
 5       A.  Yes.
 6       Q.  Now, we already established -- and we're talking
 7   about your children, you had four; right?
 8       A.  Uh-hmm, yes.
 9       Q.  But, and then but two of them are plaintiffs in
10   this action, [Pursuant to [Doc. 114]; Defendants Intend On Filing This Portion Under Seal.]
11       A.  Correct.
12       Q.  And you were separated from them when you were an
13   inmate -- or, yeah, when you were in Maricopa County jail;
14   right?
15       A.  Yes.
16       Q.  All right.
17       Now, let me cross some things out here.
18       A.  Am I -- can I -- am aloud to say that really
19   initially I didn't really -- I didn't hit the cop.  They
20   just claim that I did.  And the only reason why I pled
21   guilty is so I could come home.
22       Q.  We'll get to that.
23       A.  Okay.  I'm like, because I'm saying, yeah, but, I
24   mean, I -- that's what, yes, I got arrested for, but really,
25   no, I didn't hit the cop.
```

**18 (Pages 69 to 72)**

333

1    Q.  Okay.
2        So you realize that there have been -- we even
3    looked at one -- mandatory initial disclosures given in this
4    case; right.
5        Remember the first exhibit that you saw today?
6    A.  Yes.
7    Q.  And it had various things in it; right?
8    A.  Yes.
9    Q.  Among those things it's listed like who's going to
10   testify to what; right?
11   A.  Right.
12   Q.  Do you recall, did you review the mandatory
13   initial discovery responses before they were -- before they
14   went out from your attorney?
15   A.  I don't recall, to be honest.
16   Q.  But you verified them; right?
17   A.  Yeah, I talked to her about them.  Yes.
18   Q.  And you signed something?
19   A.  Yes.
20   Q.  Okay.  To verify that this was true and accurate
21   to the best of your knowledge?
22   A.  To the best -- yes.
23   Q.  I could be wrong, okay, but this is the first time
24   I'm hearing anything about you unbuckling Johnny
25   Wheatcroft's seat belt.  Okay?

334

1    A.  Okay.
2    Q.  Can I ask you, do you know why I'm just hearing
3    this today for the first time?
4        MS. BROADDUS:  Form.
5        THE WITNESS:  I have no idea.  Because that's the
6    whole -- that's the whole -- that was the whole incident
7    with the bag.  That's how it all, like, initiated, was --
8    BY MR. POPOLIZIO:
9    Q.  Did you --
10   A.  -- from the seat belt.
11   Q.  -- did you ever tell any -- during any interview
12   with Glendale police that you reached over and unbuckled
13   your husband's seat belt?
14   A.  Yeah, I. . .
15   Q.  You did.  You're sure?
16   A.  I believe so.
17   Q.  So --
18   A.  I mean, I can't -- I don't recall really honestly.
19       So I -- that was my intentions was to unbuckle
20   that seat belt.  That's what I -- that's what I went to do.
21   But the seat belt, the bag got stuck in the seat belt.
22   Q.  Do you remember if you -- it's -- do you recall
23   telling any officer that?
24   A.  No.
25   Q.  Okay.

335

1        All right.  So, so I asked you, do you have any --
2    do you have any reason or could you explain to me how come
3    I'm learning about this today for the first time?
4        MS. BROADDUS:  Object to form.
5        THE WITNESS:  I have no idea.
6        I mean, I don't.
7    BY MR. POPOLIZIO:
8    Q.  Did you review the complaint that was filed in
9    this action before it was -- it was served on defendants?
10   A.  Yeah.
11   Q.  Okay.
12       Do you recall anywhere in that complaint where it
13   says that you unbuckled a seat belt?
14   A.  It should, yeah.
15   Q.  You do?  Are you sure on that?
16   A.  Pretty sure.
17   Q.  Okay.
18   A.  I mean, honestly I can't recall.  I don't -- I
19   don't remember to be honest.
20   Q.  Okay.
21       MR. POPOLIZIO:  All right.  Play the -- play the
22   video, please, Julie.
23       (Video played.)
24       MR. POPOLIZIO:  Stop.
25

336

BY MR. POPOLIZIO:
2    Q.  So we're stopping at 19:30:38.
3        At this point you're back inside the car; right?
4    A.  Correct.
5    Q.  And at this point, is that when you have kind of
6    moved between the two seats?
7    A.  Yeah.
8    Q.  Okay.
9        Did you see yourself there?
10   A.  Yeah.
11   Q.  Okay.
12       MR. POPOLIZIO:  Go ahead.
13       MS. WANNER:  19:31:38 was the --
14       MR. POPOLIZIO:  Yes.
15       MS. WANNER:  -- time stamp?
16       (Video played.)
17       MR. POPOLIZIO:  Stop.
18   BY MR. POPOLIZIO:
19   Q.  We've just stopped at 19:31:43.
20       And you were watching the video from the start
21   until this stopped right now; right?
22   A.  Correct.
23   Q.  Okay.
24       And when you were -- when you were watching that
25   video, were you looking in the -- through the windshield of

**Anya Chapman      Wheatcroft v. City of Glendale      1/13/2021**

---

337

```
 1   the car?
 2      A.  Yes.
 3      Q.  Okay.
 4          And you saw something white move by; right?
 5      A.  Yeah, and I saw something white fly out.
 6      Q.  Right.  We'll get to that.
 7          So first you saw something white within the --
 8   within the vehicle kind of move by the windshield; correct?
 9      A.  Correct.
10      Q.  Going from the driver's -- well, going from like
11   the middle of the windshield towards the passenger door;
12   right?
13      A.  Correct.
14      Q.  Was that the bag that had the soft drinks in it?
15      A.  I believe so, yes.
16      Q.  Okay.
17          And that went from -- that went from, say, the
18   middle of the front compartment to the opening area of the
19   driver, of the, excuse me, the passenger's front door;
20   correct?
21      A.  Correct.
22          MS. BROADDUS:  Object to form, foundation.
23   BY MR. POPOLIZIO:
24      Q.  And you were the person who swung that bag in that
25   direction; right?
```

338

```
 1          MS. BROADDUS:  Objection; form.  Foundation.
 2          THE WITNESS:  Yeah.  Yes.
 3   BY MR. POPOLIZIO:
 4      Q.  And when you did so, you hit Officer Lindsey with
 5   that bag; right?
 6      A.  But the bag was stunk on the seat belt also.
 7   It --
 8      Q.  I didn't ask you that.
 9          Just answer my question.
10      A.  Okay.
11      Q.  When you swung the bag --
12      A.  Okay.
13      Q.  -- that was filled with the Dr. Pepper sodas --
14      A.  Okay.
15      Q.  -- it hit Officer Lindsey?
16      A.  Yes.
17      Q.  Do you remember where it hit him?
18      A.  No.  I didn't even know it hit anybody at that
19   point.
20      Q.  And so let me ask you, why did you -- why did you
21   swing the bag in that direction?
22      A.  It was a kind of like, like I said, I swung it.
23   It all was all, like, all in, like -- it was so fast, but I
24   was like, he's not going to fight.  I'm like, stop.
25          And then that's when it just got tangled up and
```

339

```
 1   whipped around.
 2      Q.  So you -- you're on video, but you -- you just
 3   showed -- you just showed us that you took your arms and
 4   kind of --
 5      A.  Like he --
 6      Q.  -- just put them out to the side?
 7      A.  Right.
 8      Q.  And when you did that, you flung the the, bag
 9   with the four Dr. Peppers in it in a direction of
10   Officer Lindsey?
11          MS. BROADDUS:  Object to form.
12          THE WITNESS:  Correct.
13   BY MR. POPOLIZIO:
14      Q.  And it hit him?
15      A.  Yes.
16          MS. BROADDUS:  Object to form, foundation.
17   BY MR. POPOLIZIO:
18      Q.  And when you also mentioned when, when you did
19   that, I said did you ask -- I asked you, did you see
20   something white on the video, you said yes, you actually saw
21   two things; right?
22      A.  Correct.
23      Q.  And the second thing that you saw was kind of a
24   white-ish object that flew in the air outside the vehicle,
25   the passenger's side of the vehicle; right?
```

340

```
 1      A.  Correct.
 2      Q.  Towards the back of the vehicle?
 3      A.  Correct.
 4      Q.  Okay.
 5          Do -- did you see if -- did you see from this
 6   video if that object hit anybody or anything?
 7      A.  I didn't -- I didn't see it.  I didn't notice.
 8          MR. POPOLIZIO:  Can we back it up just a little?
 9          THE WITNESS:  I just seen it fling.
10          (Video played.)
11          MR. POPOLIZIO:  And I want you to watch for that
12   object.  Okay?
13          (Video played.)
14          MR. POPOLIZIO:  Okay.  Stop.
15   BY MR. POPOLIZIO:
16      Q.  Did you see the object come out of the -- out of
17   the vehicle?
18      A.  Yes.
19      Q.  Okay.
20          Did you see what it hit this time?
21      A.  The roof?
22      Q.  You didn't see that it hit Officer Lindsey in the
23   head?
24      A.  So what -- I mean, did the bag hit him or the
25   object --
```

**341**

1     Q. I asked you to concentrate on that white bottle,
2 so did you see the bottle hit him in the head?
3     A. No, I didn't.
4     Q. Okay.
5     Did you see him fall backwards?
6     A. Yes.
7     Q. Okay.
8     And he fell to the rear of the car; right?
9     A. Correct.
10     MR. POPOLIZIO: And -- okay.
11     And this was we stopped at 19:31:48?
12     MS. WANNER: Forty-three.
13     MR. POPOLIZIO: Forty-three. My eyes.
14     Okay.
15     Start -- start the video again.
16     (Video played.)
17     MR. POPOLIZIO: Okay. Stop.
18 BY MR. POPOLIZIO:
19     Q. I should have asked you, but were you watching
20 yourself during that time?
21     A. Uh-hmm.
22     Q. Okay.
23     We stopped the video at 19:32:01.
24     And when you -- when we watched, when you watch
25 yourself in the video, you were leaning well into the front

**342**

1 compartment of the car; right?
2     A. Yeah, by this time, yes.
3     Q. And you're kind of -- you have your -- your front
4 arm and -- or arms on the passenger's seat where your
5 husband was seated?
6     A. Yes.
7     Q. And at this point he's outside of the car?
8     A. Right.
9     Q. And you're inside the car looking out the
10 passenger door; right?
11     A. Correct.
12     Q. Did you see anything white there?
13     A. No.
14     Q. Okay.
15     MR. POPOLIZIO: Could you back it up just a few
16 frames?
17     (Video played.)
18     MR. POPOLIZIO: There.
19 BY MR. POPOLIZIO:
20     Q. Were you watching yourself?
21     We stopped at 19:32:00.
22     A. Yes.
23     Q. Okay.
24     And that time when you watched yourself did you
25 see something white?

**343**

1     A. In my hand? Yes.
2     Q. Yes. And that was -- that was the bag; right?
3     A. Correct.
4     Q. Okay.
5     Now that bag at this point was on the front
6 passenger's seat; right?
7     A. I thought it was around my wrist.
8     Q. Right. Was it hanging in the air on your wrist?
9 Were you holding it up in the air at all times?
10     A. No, I had it down. I was like this.
11     Q. Okay.
12     So was it resting on the seat?
13     A. Or the middle console, yeah.
14     Q. Okay.
15     Was it still connected to your wrist at that time?
16     A. I didn't -- I believe so.
17     Q. Do you -- do you recall?
18     A. I don't recall, really.
19     Q. And so it was the act of swinging the bag that hit
20 Officer Lindsey in the head that you were arrested for?
21     MS. BROADDUS: Object to form.
22 BY MR. POPOLIZIO:
23     Q. Right?
24     A. Yes, I guess it is.
25     Q. And you were arrested for assaulting

**344**

1 Officer Lindsey with that bag of soft drinks; right?
2     A. Yeah, a deadly weapon they called it.
3     Q. Okay.
4     A. But, yes.
5     That's crazy.
6     Q. And it may be crazy but maybe it's the law.
7     But you pled guilty to that charge; right?
8     A. Yes, I did.
9     Q. Okay.
10     So, let me just. . .
11     Bear with me.
12     MR. POPOLIZIO: Okay. Let's go to
13 Officer Schneider's body worn camera footage.
14     Once we get that, I'm going to get a drink.
15     MS. WANNER: Officer Schneider's body worn camera
16 video has previously been marked as Exhibit 43.
17     (Deposition Exhibit No. 43 was marked for
18 identification.)
19     MR. POPOLIZIO: Just start it from the beginning.
20     (Video played.)
21     MR. POPOLIZIO: Stop.
22 BY MR. POPOLIZIO:
23     Q. So we, we played from the beginning to 56 -- oh,
24 which way are we going?
25     MS. WANNER: Fifty-six seconds.

**345**

1    BY MR. POPOLIZIO:
2        Q.  Fifty-six seconds into the -- into the video.
3        So you saw the officer -- you saw from the view of
4    Officer Schneider's camera he approached your vehicle;
5    right?
6        A.  Correct.
7        Q.  And when he did, he actually said, how you guys
8    doing or something like that, how you all, how you guys
9    doing or something to that effect; right?
10       A.  Correct.
11       Q.  And he then asked if you were staying there.
12       A.  Correct.
13       Q.  All right.
14       You heard your husband say we're about to get a
15   room; right?
16       A.  Correct.  Sorry.
17       Q.  And then he, he actually said to the driver, you
18   heard him say, hey, you know, when you turn in here, man,
19   just make sure you turn your turn signal on for us.
20       A.  Correct.
21       Q.  You heard that on the video; right?
22       A.  Correct.
23       MS. BROADDUS:  Object to form, foundation.
24   BY MR. POPOLIZIO:
25       Q.  Do you remember hearing that that day?

**346**

1        A.  Yes.
2        Q.  It might not have recounted it perfectly, but
3    that's what Officer Schneider said.
4        A.  Correct.
5        Q.  And you just heard that; right?
6        A.  Yes.
7        Q.  Now, when Officer Schneider made that statement,
8    you know, telling the driver, hey, when you turn in here,
9    could you throw your turn signal on, or something to that
10   effect, could you use your turn signal, nobody in the car
11   said he did have his signal on; right?
12       A.  Correct.
13       MS. BROADDUS:  Object to form.
14   BY MR. POPOLIZIO:
15       Q.  Okay.
16       You didn't hear Shawn Blackburn say, but I did put
17   my signal on.
18       Right?
19       A.  No, I didn't.
20       Q.  Okay.
21       And you didn't say, hey, he did use his turn
22   signal.
23       Right?
24       A.  Well, no, I didn't say that.
25       Q.  Okay.

**347**

1        And you didn't hear your husband say anything to
2    that effect either; right?
3        A.  Correct.
4        Q.  Okay.
5        MR. POPOLIZIO:  Could you go back to 55, because
6    that's what's in my notes.
7        Start there.
8        (Video played.)
9        MR. POPOLIZIO:  Stop.
10   BY MR. POPOLIZIO:
11       Q.  So we stopped at a minute, four seconds.
12       And Officer Schneider asked, in this way, he said,
13   nobody has their ID on them?
14       Did you hear that?
15       A.  Yes.
16       Q.  Do you remember hearing him say that that day?
17       A.  Yes.
18       Q.  And you heard someone say no?
19       A.  Correct.
20       Q.  And who's that?
21       A.  That was Johnny.
22       Q.  Okay.
23       And then but you said that you -- that you had ID;
24   right?
25       A.  Yeah, in my hand.  I had my ID ready to go, on me.

**348**

1        Q.  Okay.  All right.
2        And Officer Lindsey is speaking with the driver,
3    Shawn Blackburn, at this point; right?
4        A.  I don't -- I don't even know if he said anything
5    to him.  I don't know.
6        Q.  Okay.
7        So at least at this point you said that you had ID
8    because you had it in your hand?
9        A.  Correct.
10       Q.  And look in the back of the vehicle, there, where
11   you would be sitting, do you see that, behind Mr. Blackburn?
12       A.  Correct.  I see it.
13       Q.  Is that your hand there?
14       A.  Yeah.
15       Q.  Is that your hand with your ID?
16       A.  I believe so.  It looks like it.
17       Q.  Okay.
18       MR. POPOLIZIO:  All right.  Start, Julie.
19       (Video played.)
20       MR. POPOLIZIO:  Stop there, Julie.
21   BY MR. POPOLIZIO:
22       Q.  So we stopped the video at one minute, 21 seconds.
23       You heard Officer Schneider ask, nothing in the
24   car that shouldn't be, something like that; right?
25       A.  Correct.

377

```
 1        Q.  Okay.
 2            But as you saw this today, you saw that your
 3    unbuckling the seat belt was impossible --
 4        A.  Right, correct.  I never noticed that before.
 5        Q.  Okay.  It was already unbuckled?
 6        A.  Right.  I didn't -- I never noticed that.  Out of
 7    all the times I've seen that, I've never noticed that.
 8        Q.  So at some point, we're go to watch some more, you
 9    reentered the vehicle; right?
10        A.  Yes.
11        Q.  Okay.  And as you reenter the vehicle, you see
12    that your husband is, is struggling with the officers?
13        A.  Yes.
14        Q.  Okay.
15        A.  Or Lindsey had told me to sit -- to get back in
16    the vehicle.  I had asked him, what, do I stand here or do
17    you want me to get back in?  He told me to get back in.
18        Q.  You asked him that?
19        A.  Yes.  And that's when he told me to just go ahead
20    and get back in there.
21        Q.  Okay.
22            MR. POPOLIZIO:  All right.  So let's play the
23    video, Julie.
24            (Video played.)
25            MR. POPOLIZIO:  Stop.
```

378

```
 1    BY MR. POPOLIZIO:
 2        Q.  So at this point you are in between the seats of
 3    the front seats; right?
 4        A.  Correct.
 5        Q.  And you entered the vehicle and got between the
 6    front seats; right?
 7        A.  Yes.
 8        Q.  And we stopped this at -- this video at
 9    three minutes and 19 seconds.
10            Now, before we stopped the video, did you -- did
11    you watch what you did?
12        A.  Yeah, I -- I didn't. . .
13        Q.  Yes or no.  Did you watch yourself on the video?
14        A.  Yes, yes, yes, yes.
15        Q.  Okay.
16            So when you watch yourself on the video, did you
17    see yourself reach for something?
18        A.  No.
19        Q.  Okay.
20            MR. POPOLIZIO:  Back it up to 3:15, please, Julie.
21    If we could play 315 to 319 slowly.
22            (Video played.)
23    BY MR. POPOLIZIO:
24        Q.  Did you watch yourself that time?
25        A.  I saw my arm go forward, yes.
```

379

```
 1        Q.  Okay.  You reached forward; right?
 2        A.  Well, I went forward.  I wasn't -- I mean, I
 3    don't -- I don't remember what I was doing really, but I
 4    seen my arm going forward, yes.
 5        Q.  We stopped at the -- the, the video at 3:18;
 6    right?
 7        A.  Okay.
 8        Q.  Okay.
 9            So, you saw yourself -- you see yourself.  You're
10    in -- you're in the, in the middle of the two front seats;
11    right?
12        A.  Correct.
13        Q.  And when we started at 3:15 to this point on 3:18,
14    you saw yourself take your right arm and reach with your
15    right arm to the front, into the front compartment of the
16    vehicle.
17            Do you see that?
18        A.  Yes.
19        Q.  Okay.
20            Now, the seat belt right now as you see at 3:18,
21    where we're stopped, it's coming from where it's attached to
22    the car over your husband's back and then down on his, like,
23    right shoulder area; right?
24        A.  Correct.
25        Q.  Do you see it?
```

380

```
 1        A.  Yeah.
 2        Q.  Do you see that?
 3        A.  Yes.
 4        Q.  Okay.  Now, again --
 5        A.  My legs are getting tired.  Sorry.
 6            MR. POPOLIZIO:  You can bring the seat -- or does
 7    she need to stand up, Ms. Videographer?  She needs to stand
 8    up; right?
 9            THE VIDEOGRAPHER:  I don't know if she's going to
10    be able to see.
11            MR. POPOLIZIO:  Okay.  That's all right.  Okay.
12            THE WITNESS:  I'll bear through it.
13            MR. POPOLIZIO:  Okay.
14            So, Julie, could you -- could you back it up to
15    3:15 again.
16            And let's watch -- focus on you, please, Anya.
17            MS. WANNER:  Decreased speed again?
18            MR. POPOLIZIO:  Yeah, on 3:15.  Bring it to 3:19.
19            (Video played.)
20            THE WITNESS:  Yes, I see me reaching.
21    BY MR. POPOLIZIO:
22        Q.  So you saw yourself reaching with your right --
23    with your right arm; right?
24        A.  Correct.
25        Q.  Into the front compartment of the vehicle; right?
```

**Anya Chapman      Wheatcroft v. City of Glendale        1/13/2021**

---

381

1     A.  Correct.
2     Q.  Towards the area of your husband?
3     A.  Yes.
4     Q.  Okay.
5          And that would be the passenger side of the
6     vehicle?
7     A.  Correct.
8     Q.  And as we stopped at 3:19, you can see your right
9     arm there in the top left corner of the video; right?
10    A.  Correct.
11    Q.  So, as you reached into that front compartment
12    area towards your husband, do -- do you recall now what you
13    reached for?
14    A.  I guess that's how the bag ended up on my hand,
15    but I -- I don't remember doing that.
16    Q.  Okay.
17         Now, when you reached -- well, we just played the
18    video from 3:15 to 3:19; right?
19    A.  Correct.
20    Q.  And you watched yourself, as I asked you; right?
21    A.  Yes.
22    Q.  Thank you for doing that.
23         And when you saw yourself reaching, did you see
24    yourself -- do you see where you were looking?
25    A.  No.

---

382

1     Q.  Okay.
2          MR. POPOLIZIO:  Let's back it up to 3:15, please,
3     and play it slowly to 3:19.
4          (Video played.)
5     BY MR. POPOLIZIO:
6     Q.  Okay.
7          Did you see your -- watch yourself in that?
8     A.  Yeah.  I was -- it looks like I was grabbing the
9     bag.
10    Q.  Okay.
11         That's what I was going to ask you.  You were
12    looking down towards the, the area where the bag was; right?
13    A.  Correct.
14    Q.  Okay.
15         MR. POPOLIZIO:  Julie, let's play.  I'll tell you
16    when to stop.
17         You can play at normal speed.
18         (Video played.)
19         MR. POPOLIZIO:  Stop.
20    BY MR. POPOLIZIO:
21    Q.  So, you watched that and you heard the tasers;
22    right?
23    A.  (No oral response.)
24    Q.  Now, at that point, you know, as that happened and
25    your husband's outside the vehicle, you're -- your upper

---

383

1     torso is all the way in the seat area where he was sitting;
2     right?
3     A.  Right.
4     Q.  Okay.
5          MR. POPOLIZIO:  Could you back it up to 3:47, and
6     play it slowly to 3:49.
7          Watch yourself.
8          (Video played.)
9     BY MR. POPOLIZIO:
10    Q.  Now, we stopped at 3:49.  We started at 3:47.
11         And at this point your upper body is in -- in the
12    front compartment of the vehicle; right?
13    A.  Correct.
14    Q.  Okay.
15         And you were at 3:49 clearly visible from your
16    right profile; right?
17    A.  Yes.
18    Q.  Okay.
19         And you're looking -- well, let, let me put it
20    this way.
21         Your husband -- well, let me ask you.  What are
22    you looking at?
23    A.  I really don't remember.
24    Q.  What is your hand on?
25    A.  My hand is on the seat and the bag.

---

384

1     Q.  Is on what, the seat and the bag?
2     A.  The seat and the bag, yeah.
3     Q.  Okay.  The plastic bag?
4     A.  Yes.
5     Q.  Okay.
6          You don't recall what you're -- what you're
7     looking for?
8     A.  No.  I don't recall.
9     Q.  Okay.
10         At this point, are you reaching for something?
11    A.  I don't know what I'm doing.  I mean, I don't
12    remember what I'm doing.  I, I don't know.
13         MR. POPOLIZIO:  Julie, just play like two seconds
14    more.
15         (Video played.)
16         MR. POPOLIZIO:  Stop.
17    BY MR. POPOLIZIO:
18    Q.  Did you see that -- did you see what you were
19    doing at that point?
20    A.  I still don't.  I'm still not understanding what
21    I'm doing.
22         MR. POPOLIZIO:  Let's back it up, please.  And
23    back it up to 3:47 slowly, please.
24         I'll tell you when to stop.
25         (Video played.)

---

**Anya Chapman      Wheatcroft v. City of Glendale      1/13/2021**

---

385

1        MR. POPOLIZIO:  Stop.
2    BY MR. POPOLIZIO:
3        Q.  Did you see yourself reach with your right hand?
4        A.  Yeah.
5        Q.  And where were you reaching?
6        A.  It looks like I was reaching by his head.
7        Q.  Well, past his head, it appears.  Right?  Do you
8    see your arm?
9        A.  Yeah.
10       Q.  Are you reaching into your husband's bag?
11       A.  No.
12       Q.  Let me, let me --
13       A.  Never even put my head in that bag.
14       Q.  Let me point exactly --
15       A.  I know that for a fact.
16       Q.  -- to you.
17          This is you; right?
18       A.  Yeah.
19       Q.  This is your arm?
20       A.  Yes.
21       Q.  It's your arm?
22       Q.  What's this?
23       Q.  That's his head.
24       A.  Okay.
25       Q.  What's this over here?

---

386

1        A.  The bag is way over there.
2        Q.  Okay.
3        A.  My hand is right here, I guess.
4        Q.  Your hand is past your husband's head; right?
5        A.  Okay.
6        Q.  Towards his bag?
7        A.  Yes.
8        Q.  Okay.
9           Now, when your hand was there, did you reach for
10    something, Anya?
11       A.  No.
12       Q.  Did you place your hand in your husband's bag?
13       A.  Absolutely not.
14       Q.  Did -- why could you tell me was your hand that
15    far forward beyond your husband?
16       A.  I don't know.  I really can't say, because I don't
17    know.
18       Q.  Could you tell me what you were looking at?
19       A.  I don't know.
20          But I never stuck my hand in my -- in his bag
21    ever.  So I -- I know that for a fact.
22       Q.  Did you reach into any area into the front console
23    area of the vehicle?
24       A.  No.  No, I did not.
25          I mean, I can't -- honestly I can't tell you what

---

387

1    I'm doing right there, but never did I reach for anything or
2    put my hand in anything.
3           The only thing I had my hand on was that white bag
4    in the front passenger seat.
5        Q.  After you got in?
6        A.  Yeah, when I was right there.  It was just before
7    that.
8        Q.  Now, when -- you know there was methamphetamine
9    found in this vehicle; right?
10       A.  I -- well, I'm aware of that now, but at the time,
11    no, I was not aware.
12       Q.  Did you reach for methamphetamine?
13       A.  No.
14       Q.  Okay.
15          Did you take methamphetamine from the front of
16    this vehicle --
17       A.  No.
18       Q.  -- into the back seat?
19       A.  Absolutely not.
20       Q.  Okay.
21          Play, play, Julie, you can play -- play it slowly
22    and I'll tell you when to stop.
23          (Video played.)
24          MR. POPOLIZIO:  You can stop.
25          I thought I would be able to see a little bit more

---

388

1    of Anya, but I wasn't able to.
2           Could you bring it, for the sake of time, to like
3    4:10?
4           (Video played.)
5           MR. POPOLIZIO:  Stop.
6    BY MR. POPOLIZIO:
7        Q.  So, we stop -- we started at 4:10 and then we
8    stopped it at 4:12; right?
9        A.  (No oral response.)
10       Q.  You're again in the front seat; right?
11       A.  Right.  Yes.
12       Q.  And here it looks like you're looking towards
13    Officer Schneider; right?
14       A.  Yes.
15       Q.  And you have your -- your right arm extended, your
16    palm up; right?
17       A.  Correct.
18       Q.  Your left hand is where?
19       A.  On the seat.
20       Q.  Doing what?
21       A.  Holding a Dr. Pepper can.
22       Q.  Okay.
23          Did you have a Dr. Pepper can in your hand when
24    you entered?
25       A.  Yeah, remember I had it the whole time, holding it

---

**Anya Chapman      Wheatcroft v. City of Glendale          1/13/2021**

---

**397**

1    Q.  And then you were brought down to the ground;
2    right?
3    A.  Correct.
4    Q.  And arrested?
5    A.  Yes.
6    Q.  You're handcuffed down there?
7    A.  Yes.
8    Q.  Okay.
9        So at that point when that's happening, as you're
10   being brought out of the car and then arrested,
11   handcuffed -- right?
12   A.  Yes.
13   Q.  You're not watching over what's happening with
14   your husband; right?
15   A.  No.
16       MS. BROADDUS:  Object to form.
17       THE WITNESS:  I just hear it.
18   BY MR. POPOLIZIO:
19   Q.  Right.  Because you can't see it.
20   A.  Right.
21   Q.  Because you can't see through the car.
22   A.  Well, also he knocked my glasses off my face.
23   Q.  And you lost your glasses.
24   A.  Yes.
25   Q.  And we've established today, when you talked,

---

**398**

1    you're legally blind, that's why you're standing here
2    watching the video and we're standing up.
3    A.  Yeah.
4    Q.  Okay.
5    A.  And maybe that's why I'm seeing things I ain't
6    seen before.
7    Q.  Yeah.
8        So, you don't know what's going on -- visually you
9    don't know what's going on on the passenger side of the
10   vehicle between your husband and the officers at this time?
11   A.  No.  Just -- no, just what I can hear, not
12   visually.
13   Q.  So, right, you just hear.
14   A.  Yes.
15   Q.  Okay.
16       And it's a lot -- it's a commotion; right?
17   A.  A lot.
18   Q.  Okay.
19       So when you're on the other side of the vehicle
20   after losing your glasses and, and, and being handcuffed by
21   another officer -- right?
22   A.  Correct.
23   Q.  You don't see your husband being tased in the
24   testicles; right?
25       MS. BROADDUS:  Object to form, foundation.

---

**399**

1        THE WITNESS:  Yeah, I seen -- I -- when I got
2    brought around, because they had me standing right there,
3    finally, because finally he gave me my glasses, but I saw
4    them pull his pants down and tase him.  Like, and that's --
5    just as I -- when I came around the car, I was standing at
6    the back of the other car.
7    BY MR. POPOLIZIO:
8    Q.  And, and when you say you saw this, did you see
9    your husband's testicles?
10   A.  No.  I just saw his bare butt.
11   Q.  Did you see his anus?
12   A.  His butt hole?
13   Q.  Yes.
14   A.  No.
15   Q.  Did you see the space between his testicles and
16   his anus?
17   A.  I did not, no.
18   Q.  Okay.  Did --
19   A.  But like --
20   Q.  I got to ask you this.  Did you see his penis?
21   A.  No, because it was flat down on the ground.
22   Q.  Okay.
23       So all you saw, what you're saying is, you saw his
24   butt?
25   A.  Pants.  I saw his pants down, yes.

---

**400**

1    Q.  Okay.
2        MR. POPOLIZIO:  Let's play the video.  You can
3    play at normal speed.
4        (Video played.)
5        MR. POPOLIZIO:  Go ahead, what did you say?
6        THE WITNESS:  I said that's the cop.  That -- I
7    thought it was when I was coming out of the car, but I knew
8    that I had got snagged.  See, I don't even remember being in
9    that corner at all like that, so. . .
10   BY MR. POPOLIZIO:
11   Q.  We stopped the video at 5:03.
12   A.  Correct.
13   Q.  Okay?
14       And when you watched this, you saw you were on the
15   other side of the car; right?
16   A.  Yeah.
17   Q.  And your husband is on the ground here --
18   A.  Correct.
19   Q.  -- right?
20   A.  Yes.
21       MR. POPOLIZIO:  Start the video again.  Play a few
22   seconds.  I will tell you when to stop.
23       (Video played.)
24       MR. POPOLIZIO:  Stop.
25       Could we move back, Julie, to where we could see

---

**100  (Pages 397 to 400)**

**Anya Chapman**      **Wheatcroft v. City of Glendale**      **1/13/2021**

| | 409 |
|---|---|
| 1 | right? |
| 2 | A.  Correct. |
| 3 | Q.  When you were coming out, did you see a lot of |
| 4 | police officers? |
| 5 | A.  Yes. |
| 6 | Q.  Did you see SWAT? |
| 7 | A.  Yes. |
| 8 | Q.  Do you remember how many vehicles you saw? |
| 9 | A.  When I stepped out, there was probably about -- |
| 10 | right then there was probably about four of them maybe right |
| 11 | then. |
| 12 |       SWAT was pulling up. |
| 13 | Q.  Okay.  And you saw a vehicle that said SWAT or |
| 14 | something? |
| 15 | A.  Yeah, it was one of them big, old like armored |
| 16 | truck looking things. |
| 17 | Q.  And you were -- did you have to get your kids out |
| 18 | of the house? |
| 19 | A.  The -- the cop let my mom go in and get the rest |
| 20 | of the kids from upstairs. |
| 21 | Q.  And where were you when your mom went back into |
| 22 | the house to get the kids? |
| 23 | A.  Outside. |
| 24 | Q.  And when you said to get -- your mom went in to |
| 25 | get the kids, [Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.] |

| | 410 |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  And were they sleeping? |
| 3 | A.  Yes. |
| 4 | Q.  About what time did this occur? |
| 5 | A.  This was probably about 11:00 or midnight, I |
| 6 | think. |
| 7 | Q.  Okay. |
| 8 |       And so you were outside.  Where were you when your |
| 9 | mom went back into the house to get the kids? |
| 10 | A.  Outside with my dad. |
| 11 | Q.  Whereabouts? |
| 12 | A.  At my mom's car in the driveway. |
| 13 | Q.  Okay.  And then the kids came out? |
| 14 | A.  Yes. |
| 15 | Q.  And then what did you guys do? |
| 16 | A.  Then they made us -- after everyone came out, they |
| 17 | made us move away from the front of the house towards the |
| 18 | end of the driveway. |
| 19 | Q.  Okay. |
| 20 | A.  And then that's where we all gathered and sat |
| 21 | down. |
| 22 | Q.  At the end of your driveway? |
| 23 | A.  Yes. |
| 24 | Q.  While SWAT was there? |
| 25 | A.  Yes. |

| | 411 |
|---|---|
| 1 | Q.  And the kids were there? |
| 2 | A.  Yes. |
| 3 | Q.  Did you hear SWAT calling any -- calling out any |
| 4 | commands to Joseph O'Connor? |
| 5 | A.  Yeah.  We -- I heard him -- I heard them saying, |
| 6 | Joe, come out Joe, or whatever you guys say. |
| 7 | Q.  And the kids were there too with you? |
| 8 | A.  Yes. |
| 9 | Q.  And they were there while SWAT was giving these |
| 10 | commands? |
| 11 | A.  Yes. |
| 12 | Q.  And were you there with the kids when windows were |
| 13 | broken out of the home? |
| 14 | A.  None of us were right there.  We were all down the |
| 15 | street at the end of the block. |
| 16 | Q.  So at some point you moved? |
| 17 | A.  Yes.  They moved us, yes. |
| 18 | Q.  Okay. |
| 19 |       But you were there enough to hear commands from |
| 20 | police for Joseph O'Connor to come out? |
| 21 | A.  Yes. |
| 22 | Q.  Okay. |
| 23 |       And your kids were with you -- right with you when |
| 24 | you heard that; right? |
| 25 | A.  Correct. |

| | 412 |
|---|---|
| 1 | Q.  Okay. |
| 2 |       And then when you moved down the street? |
| 3 | A.  Right. |
| | [Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.] |

**413**

Pursuant to [Doc. 114], Defendants Intend On Filing This Portion Under Seal.

```
5        Q.  Is it pretty traumatic for the kids that their
6    uncle was arrested for murder that night?
7        A.  They didn't know what --
8        MS. BROADDUS:  Object to form.
9        THE WITNESS:  They didn't know what it was for at
10   that time.
11   BY MR. POPOLIZIO:
12       Q.  Okay.  But they knew he was arrested; right?
13       A.  Correct.
14       Q.  They knew that SWAT was there --
15       A.  Yes.
16       Q.  -- right?
17       I mean, would you agree with me it would be pretty
18   scary for a kid to have that occur and, you know, and the
19   uncle to be the subject of the arrest?
20       MS. BROADDUS:  Object to form.
21       THE WITNESS:  Yeah.  But, yeah, but they didn't
22   see any of that, of the uncle getting, you know, all they
23   heard was, again, the cops being belligerent.
24   BY MR. POPOLIZIO:
25       Q.  But they show the -- they heard the show of force?
```

**414**

```
1        A.  Yes.
2        Q.  And you're saying the cops were belligerent;
3    right?
4        A.  Yes.
5        Q.  But they were also after a murder suspect;
6    correct?
7        A.  Well, they were belligerent with us.  They weren't
8    telling us what it was for or anything.  So at this point in
9    time we weren't aware of what they were even there for.
10       Q.  Okay.
11       A.  So we didn't know that it was a murder suspect at
12   that point, you know what I mean, so they were belligerent
13   to us for nothing at that point.
14       Q.  Well --
15       A.  I mean, to us at that point is what I'm saying.
16       Q.  Sure.
17       But would you, would you agree that they probably
18   needed to move your kids out as quickly as possible?
19       A.  Well, well, yes.
20       Q.  Okay.
21       So, did you speak with your kids about their
22   speaking with CPS, what they spoke about with CPS after that
23   Joseph O'Connor incident?
24       A.  Yes.
25       Q.  Okay.  And what did they tell you?  Did they tell
```

**415**

```
1    you anything?
2        A.  They said that CPS came to them, lied to them,
3    told them that they were there to help give them some beds.
4    And then, and then they brought up they said to them, so I
5    heard something happened over the weekend, and then they
6    were seeing what kid, you know, basically would feed or, you
7    know, hook the line.  And then after that my kids refused to
8    talk to them.
9        Q.  Were -- were you -- was the household itself, your
10   mom's house, in need of beds to accommodate everybody who
11   was living there?
12       A.  Well, we'd had beds, bunk beds and stuff, but it's
13   just they thought with that many kids, you know, I mean, we
14   needed more beds.  But really all the kids had somewhere to
15   sleep.
16       Q.  Okay.  Did each kid have a bed?
17       A.  Yeah.
18       Q.  Okay.
19       So there was another time when CPS spoke with your
20   kids; right?
21       A.  Yes.
22       Q.  And was that when you were pregnant with Acari?
23       A.  Yes, after I had Acari.
24       Q.  After you had Acari?
25       A.  Yes.
```

**416**

```
1        Q.  Okay.
2        And did CPS come to speak with your kids
3    because -- well, let me ask you, let me backtrack there.
4        Was it when you were pregnant with Acari or when
5    you had Acari?
6        A.  After -- it was when I had him.
7        Q.  Okay.
8        Do you know why CPS came to speak with your kids
9    then?
10       MS. BROADDUS:  Object to form.
11       THE WITNESS:  Yes.
12   BY MR. POPOLIZIO:
13       Q.  Why is that?
14       A.  Because I had methamphetamines in my system and
15   the baby was exposed to methamphetamines also.
16       Q.  Okay.  You had methamphetamine in your system.
17   And that was detected how?
18       A.  Through a blood or urine, or I'm not -- however
19   the doctors do it.
20       Q.  Okay.  So did you visit your OBG -- OB/GYN?
21       A.  Regularly?
22       Q.  Yeah.
23       A.  Yes.
24       Q.  And you had blood taken?
25       A.  Yeah.
```

**104  (Pages 413 to 416)**

**425**

1    BY MR. POPOLIZIO:
2      Q.  Because he said something to that effect to
3    Officer Spiwak on video?
4      A.  Correct.  Which he says that -- I mean, and these
5    are his words.  He's the one that said that that cop is
6    lying, that he never that.  So I don't know.
7      Q.  I know.  But I don't have time right now.  But the
8    video of your son, if he said that, would indicate
9    whether --
10     A.  But -- right.
11     Q.  -- he actually said that --
12     A.  I never seen it.  But, yes, you're correct.
13     Q.  Last couple of questions.
14         Number one, when you were at the scene here at
15   Motel 6 --
16     A.  Yes.
17     Q.  -- did you ever see anybody point a gun to your
18   husband's head?
19         MS. BROADDUS:  Object to form.
20         THE WITNESS:  It sure -- it looked like a gun,
21   that's for sure, right to his head.
22   BY MR. POPOLIZIO:
23     Q.  Where?
24     A.  Right on the top right here like this.
25     Q.  When?

**426**

1      A.  Some -- I mean, it could not have even been a gun.
2    I mean, I don't know.  But from -- you know, like I say, I'm
3    kind of blind, so but from what we saw, or from what I saw
4    and from what the boys think that they saw, it looked like
5    he -- he had a taser and then he had the other gun like.
6      Q.  In the car or -- when your husband was in the car
7    or out of the car?
8      A.  Like, in -- as they were like in between.
9      Q.  In --
10     A.  Coming out, you know.
11     Q.  But you can't -- but you can't say that you saw an
12   actual firearm, a gun that shoots bullet, put to your
13   husband's head?
14     A.  No, not that I recall.
15     Q.  Okay.
16         And your husband has written -- do you know if
17   your husband has written your sons?  Did I ask you that?
18     A.  I'm not -- yeah.
19     Q.  From jail?
20     A.  I wasn't sure if he has or not.
21     Q.  Okay.
22     A.  As far as I know, he hasn't wrote anybody.
23         MR. POPOLIZIO:  Okay.
24         She'll read and sign?
25         MS. BROADDUS:  Yup, we'll read and sign.

**427**

1          MR. POPOLIZIO:  Thank you.  Thank you.  Long day.
2          THE VIDEOGRAPHER:  This concludes today's
3    deposition.
4          Off the record at 6:21.
5          (Whereupon, the deposition concluded.)
6
7
8          _____
9                      ANYA CHAPMAN
10
11                    * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**428**

1    STATE OF ARIZONA   )
                        ) SS
2    COUNTY OF MARICOPA )
3              C E R T I F I C A T E
4      BE IT KNOWN that the foregoing proceedings were taken
     before me; that the witness before testifying was duly
5    sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true and accurate record of the
6    proceedings, all done to the best of my skill and ability;
     that the proceedings were taken down by me in shorthand and
7    thereafter reduced to print under my direction.
8      I CERTIFY that I am in no way related to any of the
     parties hereto nor am I in any way interested in the
9    outcome hereof.
10
       [x] Review  and  signature was requested.
11     [ ] Review  and  signature was waived.
       [ ] Review  and  signature not required.
12
       I CERTIFY that I have complied with the ethical
13   obligations set forth in ACJA 7-206.
14        Dated this 25th day of January, 2021,
          Chandler, Arizona.
15
16
17        _____
          C. Martin Herder, CSR, CCR
18        Certified Reporter
          Arizona CCR No. 50162
19
20     It is FURTHER CERTIFIED that Herder & Associates,
     Registered Reporting Firm, has complied with the ethical
21   obligations set forth in ACJA 7-206.
22
23
24        _____
          Registered Reporting Firm
25        Arizona RRF No. R1145

# *EXHIBIT 9*

# *Non-Electronic Exhibit - CD and Filed Under Seal*

# *EXHIBIT 10*

**1**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya )
Chapman, as husband and wife, and )
on behalf of minors J.W. and B.W., )
)
Plaintiffs, )
) Case No.:
vs. ) 2:18-cv-02347-SMB
)
City of Glendale, a municipal )
entity; Matt Schneider, in his )
official and individual )
capacities; Mark Lindsey, in his )
official and individual )
capacities; and Michael Fernandez, )
in his official and individual )
capacities, )
)
Defendants. )

DEPOSITION OF SERGEANT JERRY DEE MCDANIEL
Chandler, Arizona
December 11, 2019
9:58 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:

(COPY)

---

**2**

I N D E X

WITNESS                                    PAGE
SERGEANT JERRY DEE MCDANIEL


EXAMINATION BY MS. BROADDUS          4
EXAMINATION BY MR. POPOLIZIO          143
FURTHER EXAMINATION BY MS. BROADDUS   169


E X H I B I T S

Deposition
Exhibits   Description                Marked

41     Glendale Police department memo    47
       dated 11/30/17, Bates Nos.
       CoG_WHEATCROFT 001699-1700
       (2 pages)

---

**3**

1        DEPOSITION OF SERGEANT JERRY DEE MCDANIEL
2   was taken on December 11, 2019, commencing at 9:58 a.m. at
3   the law offices of MARC J. VICTOR, P.C., ATTORNEYS FOR
4   FREEDOM, 3185 South Price Road, Chandler, Arizona, before
5   MONICA S. BERRY, RPR, a Certified Reporter in the State of
6   Arizona.
7
8   COUNSEL APPEARING:
9       MARC J. VICTOR, P.C.
        ATTORNEYS FOR FREEDOM
10      By: MS. JODY L. BROADDUS
        3185 South Price Road
11      Chandler, Arizona  85248
        On behalf of Plaintiffs
12
13      JONES, SKELTON & HOCHULI, P.L.C.
        By: MR. JOSEPH J. POPOLIZIO
14      2901 North Central Avenue
        Suite 800
15      Phoenix, Arizona  85012
        On behalf of Defendants
16
17
18  ALSO PRESENT:
19      Ms. Kathy Thomas and Ms. Dianne Shoemake, City of
        Glendale
20      Ms. Julie Wanner, paralegal to Mr. Popolizio
        Ms. Alexz Thompson, paralegal to Ms. Broaddus
21      Mr. Jeffeory G. Hynes, Ed.D, Glendale Community
        College
22
23
24
25

---

**4**

1            SERGEANT JERRY DEE MCDANIEL,
2   a witness herein, having been first duly sworn by the
3   Certified Reporter to speak the truth and nothing but the
4   truth, was examined and testified as follows:
5
6                   EXAMINATION
7   BY MS. BROADDUS:
8       Q.  Will you please state your full name for the
9   record.
10      **A.  Jerry Dee McDaniel.**
11      Q.  Have you ever had your deposition taken before?
12      **A.  I have.**
13      Q.  How many times approximately?
14      **A.  Six.**
15      Q.  When's the most recent one you probably did?
16      **A.  It was either last year or the year before.  I**
17  **can't recall.**
18      Q.  I'm going to go through a few ground rules.
19  They're probably the same, but just to make sure we're on
20  the --
21      **A.  That's fine.**
22      Q.  -- same page.
23          The court reporter is going to be taking
24  down everything said in the room, and with a lot of
25  people, it's very important that only one person speaks at

---

(Pages 1 to 4)                                        1

53

1 would say four to six times, maybe.  But you would have to
2 ask professional standards.  They're the ones that
3 actually put on the board.
4    Q.  I'm going to have you -- we've got this big
5 notebook in front of you.  I'm going to have you go to
6 Exhibit 6, please.
7    **A.  Yes, ma'am.**
8    Q.  I'm glad you brought your glasses.
9    **A.  Yes, ma'am.**
10    Q.  Exhibit 6, at the top of the page it says,
11 "Glendale Police Department General Order."  And
12 underneath that it says, "Response to resistance."
13       Do you see that?
14    **A.  Yes, ma'am.**
15    Q.  This one has a date issued, date and -- revision
16 date.  And the revision date is -- looks like it's
17 February 7th of 2017.  Do you see that?
18    **A.  Yes, ma'am.**
19    Q.  You've mentioned that this has been revised
20 recently, correct?
21    **A.  Yes, ma'am.**
22    Q.  Do you recall if that revision recently would
23 have been the only other revision since February of 2017?
24    **A.  I don't recall, ma'am.**
25    Q.  Do you recall revisions before February of 2017?

54

1    **A.  I'm sure we had revisions before then, yes,**
2 **ma'am.**
3    Q.  My understanding is this is Glendale's response
4 to resistance policies; is that correct?
5    **A.  Yes, ma'am.**
6    Q.  Are there any other written policies or
7 procedures for use of force or response to resistance
8 other than this particular document that's been marked as
9 Exhibit 6?
10    MR. POPOLIZIO:  Form.
11    THE WITNESS:  Our policies are like 1600
12 pages.  I'm sure if you go through those, there's stuff
13 that would reference to force or response used by officers
14 in other areas, firearms for one.
15 BY MS. BROADDUS:
16    Q.  Do you know if there's another specific one for
17 Taser use outside of this report?
18    A.  I believe --
19    MR. POPOLIZIO:  Form.
20    THE WITNESS:  I believe that the Taser is in
21 this part of the response to resistance policy, but I have
22 to look.
23 BY MS. BROADDUS:
24    Q.  And just because I know what you're pointing to,
25 you're pointing to Exhibit 6; is that correct?

55

1    **A.  Correct, Exhibit 6.**
2    Q.  Okay.  And when I read it later I want to make
3 sure I understand.  Okay?
4    **A.  Yes, ma'am.**
5    Q.  Would you expect a reasonable officer to try --
6 that they try to comply with what the response to
7 resistance general order states?
8    MR. POPOLIZIO:  Form; foundation.
9    THE WITNESS:  Yes.
10 BY MS. BROADDUS:
11    Q.  Do officers have discretion as to whether or not
12 they're going to follow the policies and procedures set
13 forth in the response to resistance?
14    MR. POPOLIZIO:  Form; foundation.
15    THE WITNESS:  They have discussion within
16 the policy, but not outside of the policy, ma'am.
17 BY MS. BROADDUS:
18    Q.  So the policy -- for example, for passive
19 resistance there's different types of force that may be
20 used, correct?
21    A.  Yes, ma'am.
22    Q.  An officer would have discretion to use those
23 specific types of force, correct?
24    **A.  Yes, ma'am.**
25    Q.  They don't have discretion to just use any force.

56

1 The discretion is limited to what the policy allows,
2 correct?
3    **A.  Yes, ma'am.**
4    Q.  When you're doing training of officers, do you go
5 through the policies and procedures with them on an annual
6 basis?
7    **A.  It's 1600 pages, ma'am.  That would be no.**
8    Q.  Well, I'm talking about response to resistance
9 only.
10    **A.  We would go through part of the policy, yes,**
11 **ma'am.**
12    Q.  Do you know if there's any training that's
13 provided regarding deescalation tactics?
14    **A.  Yes, ma'am.**
15    Q.  Are there any written policies and procedures
16 within the Glendale Police Department that you're aware of
17 that addresses deescalation tactics?
18    **A.  I don't know if I've ever read in policy**
19 **deescalation.  It could be in there.  Again, it's 1600**
20 **pages.  It's commonsense deescalation and we do train**
21 **deescalation.**
22    Q.  Deescalation is part of the training that's
23 provided.  Is that provided annually or --
24    **A.  It's part of -- we do a lot of scenario-type**
25 **training, and in the scenario-type training we have --**

69

1    **A.  I have not, no, ma'am.**
2    Q.  Recently you've been disclosed by the City of
3    Glendale in this case as a witness.  And other than what
4    we've talked about, do you have any independent knowledge
5    of the incident that occurred on July 26th of 2017?
6    MR. POPOLIZIO:  Form.
7    THE WITNESS:  You mean outside of the videos
8    that I have and everything?
9    BY MS. BROADDUS:
10   Q.  Yes.
11   **A.  No, ma'am.**
12   Q.  Part of your investigation indicates that your
13   report may be based on meetings or conversations,
14   memorandum and interviews.
15   Other than what you've already testified to,
16   are you aware of any other meetings or conversations or
17   memoranda that you prepared or that you reviewed to
18   prepare your report?
19   MR. POPOLIZIO:  Form.
20   THE WITNESS:  This report was prepared off
21   of the day that Sergeant Moody and Sergeant Johnson came
22   in and talked to me and three videos.  Never -- never --
23   this report was authored prior to my discussions back with
24   Sergeant Moody or with Assistant Chief Briggs or with
25   Chief St. John at the time.  This report was already

70

1    authored, or this -- it's not a report, ma'am.  This is a
2    memo.  This memo was already authored.
3    BY MS. BROADDUS:
4    Q.  Earlier we had talked about training.  You still
5    have Exhibit 6 in front of you, which is the policies and
6    procedures for response to resistance.
7    When you are training officers on response
8    to resistance, do you rely on any other Glendale policies
9    and procedures with regard to just training on response to
10   resistance?
11   **A.  Yes, ma'am.**
12   Q.  What other materials?
13   **A.  That would depend on the training that we're**
14   **doing.**
15   Q.  And I apologize if I've already asked you this.
16   Do you do training for law of arrest or vehicle stops?
17   MR. POPOLIZIO:  Form.
18   THE WITNESS:  You're getting specific in an
19   area that I want to try to explain this to you.  Do I --
20   have I done training on how to do a traffic stop?  Yes.
21   Have we done training on how to handcuff a subject and
22   take them into custody?  Yes.  Double-locking the cuffs.
23   Maybe how to do what we call a sport technique or
24   something along those lines.  We do that training.  But do
25   I have a classroom course that we talk about laws of

71

1    arrest, that we talk about -- what was the other one,
2    ma'am?  I'm sorry.
3    MS. BROADDUS:  Vehicle stops.
4    THE WITNESS:  Vehicle stops, no.  My
5    training is all hands-on training, not classroom training.
6    BY MS. BROADDUS:
7    **Q.  Do you know if there is classroom training on**
8    **those topics?**
9    **A.  Yes.  Yes, but not outside of the academy, that**
10   **I'm aware of, that we've done for some time.**
11   **Q.  When you're doing your training of officers, do**
12   **you ever refer to Glendale's policies and procedures for**
13   **laws of arrest or vehicle stops?**
14   **A.  I think we talked about this already.  I don't**
15   **bring the laws of arrest policy up like I would the**
16   **response to resistance in my training.  Do we have**
17   **scenarios in which we have them go through the arrest**
18   **application?  Yes.**
19   Q.  Just briefly earlier we talked about passive
20   resistance just as in the form of an example.  And my
21   understanding, that is one type of resistance; is that
22   correct?
23   **A.  Yes, ma'am.**
24   Q.  What are the other types of resistance?
25   **A.  So I don't make a mistake, may I look in this**

72

1    **book?**
2    Q.  Sure.  And by the way, the bottom number on this
3    page -- of each page, if you look on the first page
4    there's a number that says 427.  If you want to go to page
5    460 -- I'm sorry -- 450.  My glasses aren't very good.  I
6    think I need new ones.
7    **A.  Yes, ma'am.**
8    Q.  So we're looking at Exhibit 6.  We are at the
9    page that's Bates numbered 450 at the bottom, and it
10   appears to be a chart that begins on that page and it goes
11   into the next page and partially into the following page
12   after that.  Do you see that?
13   **A.  Yes, ma'am.**
14   Q.  In this chart it has different types of
15   resistance.  Is this what you would rely on to determine
16   the different types of resistance that a suspect would
17   engage in?
18   MR. POPOLIZIO:  Form.
19   BY MS. BROADDUS:
20   Q.  Or could engage in?
21   MR. POPOLIZIO:  Form.
22   THE WITNESS:  It is the resistance addressed
23   by the suspect, and then the force that may be applied by
24   the officer, yes, ma'am.
25   ///

101

1    **A.  If I -- I'm going to paraphrase.  It sounds like**
2    **he apologized.**
3        Q.  Okay.  And in your report that you have, and you
4    have that in front of you, which is Exhibit 41, in the
5    second paragraph on that page --
6    **A.  Yes, ma'am.**
7        Q.  -- it starts at 14:33.  Do you see that?
8    **A.  Yes, ma'am.**
9        Q.  What do you base that number, 14:33, on?
10   **A.  The time of day.**
11       Q.  So did you get that off this video?
12   **A.  There should be a time or date stamp somewhere on**
13   **that.  Yes, ma'am.  There it is.  14:32 is what you have**
14   **up there right now.**
15       Q.  So yours is just military time, and you're
16   looking at the upper right -- just to the left of that
17   yellow triangle where it says T 20:32:44; is that correct?
18   **A.  The AXON symbol?  What you're calling the yellow**
19   **triangle?**
20       Q.  Yes.
21   **A.  Yes.**
22       Q.  So I'll start the video again.  We're at 1:44.
23           (Video played.)
24   BY MS. BROADDUS:
25       Q.  I'm stopping now at the 2:08 point, and you heard

102

1    an exchange between Officer Schneider and the front-seat
2    passenger who is Mr. Wheatcroft.  I presume you now know
3    that, but I'm just clarifying that.  Okay?
4    **A.  Yes, ma'am.**
5        Q.  During that exchange you heard Officer Schneider
6    request an identification, correct?
7    **A.  Yes, ma'am.**
8        Q.  And the passenger did not want to provide his ID,
9    correct?
10   **A.  Yes, ma'am.**
11       Q.  And so far would you agree that you are unaware
12   of any circumstance that would require the passenger to
13   provide ID at this point?
14   **A.  At this point I don't know why he would have to**
15   **provide it, no, ma'am.**
16       Q.  And just because he's a passenger of a vehicle,
17   that's not reason alone for a passenger to be required to
18   provide ID, correct?
19           MR. POPOLIZIO:  Form; foundation.
20           THE WITNESS:  Not for what I know on this
21   traffic stop, no, ma'am.
22           (Video played.)
23   BY MS. BROADDUS:
24       Q.  I'm stopping here at 2:13, and we're continuing
25   on from where we left off.  And what we've heard so far is

103

1    Officer Schneider asked him not to reach for anything.  He
2    apologized, said okay.  And then he asked -- Officer
3    Schneider asked for identification.  The gentleman said --
4    asked why he needed to provide it.
5        And at this point you're going to be seeing
6    Officer Schneider -- what's happening is you just heard a
7    click, which I presume is the door handle, but we'll know
8    in a second when we move on, but he's going to be opening
9    up the door.
10       At this point have you seen anything that
11   the front-seat passenger has done that would be considered
12   reasonable grounds to think he's committed a crime?
13           MR. POPOLIZIO:  Form; foundation.
14   BY MS. BROADDUS:
15       Q.  That you've seen.
16   **A.  No, ma'am.**
17       Q.  I'm going to continue to play.  We're at the 2:13
18   point.
19           (Video played.)
20   BY MS. BROADDUS:
21       Q.  So I'm stopping at the 2:25 mark.  And there you
22   saw Officer Schneider open up the door, correct?
23   **A.  Yes, ma'am.**
24       Q.  And then he asked the passenger not to put
25   anything in the seats, correct?

104

1    **A.  Correct.**
2        Q.  And as far as you could see, you didn't see the
3    individual stuff anything in the seats.  You're just
4    relying on what Officer Schneider is saying, correct?
5    **A.  Yeah.  The angle of the camera doesn't provide**
6    **everything that Officer Schneider is seeing.  I'm just**
7    **working off of what his verbiage is, and Officer Schneider**
8    **tells him to quit stuffing something into the seat and**
9    **then again tells him one more time, quit putting something**
10   **in the seat.**
11       Q.  All right.  At this point you also see in the
12   lower left-hand corner where Officer Schneider has his
13   hands on the passenger, correct?
14   **A.  Yes, he does.**
15       Q.  So far we've confirmed that the individual in the
16   car has not done anything that would indicate that there's
17   reasonable suspicion that he's engaged in any crime,
18   correct?
19           MR. POPOLIZIO:  Form; foundation.
20           THE WITNESS:  I don't have probable cause.
21   Could there be reasonable suspicion of an odor of
22   something that Officer Schneider saw?
23           This is a high-crime area.  Him stuffing
24   stuff between the seat, his experience could be pushing
25   him that he was stuffing a weapon in there or he was

105

1  stuffing drugs.  That's very common in our line of work to
2  see people putting stuff between the seats or underneath
3  the seat to try to hide it from our physical view.
4       Again, I can't tell everything that Officer
5  Schneider's doing, so it's not unreasonable for an officer
6  to think that there's something suspicious going on in
7  this car.
8  BY MS. BROADDUS:
9       Q.  At this point you can see both the gentleman's --
10  the passenger's -- both of his hands, correct?
11      A.  At this point in time, yes, ma'am.
12      Q.  You can see there's something in his left hand.
13  You can't really tell what it is from this particular
14  frame.  Is that a fair statement?
15      A.  I'm pretty sure it was money from what I saw
16  earlier.
17      Q.  I believe you're correct.  It's kind of fuzzy in
18  this freeze frame, right?
19      A.  In this freeze frame I couldn't tell you what it
20  is, no, ma'am.
21      Q.  So I'm going to continue on.  At this point we're
22  at the 2:25 mark.
23      By the way, just let me ask you, up until
24  this point has the passenger been compliant?
25      A.  Reasonably.  I would say yes.

106

1       (Video played.)
2  BY MS. BROADDUS:
3       Q.  At this point we're stopping at the 2:29 mark,
4  and you see Officer Schneider take out his Taser.  He
5  still has his left hand on the passenger's arm, but you
6  see him put the Taser on him.
7       And you just testified earlier that you did
8  not see anything to indicate that the passenger was
9  noncompliant or reasonably noncompliant at that point,
10  correct?
11      MR. POPOLIZIO:  Form.
12      THE WITNESS:  What I said, I didn't see
13  anything that he was doing, but I don't know what Officer
14  Schneider is seeing at this point in time.  His words is
15  he's not being compliant.  He's, you know, arguing back
16  about the ID thing.
17  BY MS. BROADDUS:
18      Q.  Which we understand that he did not need to
19  provide, correct?
20      A.  Correct.
21      Q.  So at this point would you consider this to be a
22  threatened use of a Taser?
23      A.  Correct.
24      Q.  And this would fall under -- which level of
25  resistance would authorize the officer to use a passive

107

1  level of resistance at this point?
2       A.  I feel that he was in verbal noncompliance for
3  what was being said.  Because there's other things that
4  were being said between the two of them.  Officer
5  Schneider could be taking what he's saying as verbal
6  noncompliance.
7       Q.  But so far he's listened to everything the
8  officer said.  Don't reach in the bag.  He apologized,
9  said okay.
10      A.  But he reached in again, ma'am.  He reached in
11  again.  That's why Officer Schneider said it again.  To
12  me, that's verbal noncompliance.
13      Q.  Well, he only said that once, from what I heard.
14      A.  He says it twice.  He said, quit reaching between
15  the seats.
16      Q.  Oh, that's -- I was going to get to that.  So
17  once he said he was reaching into his bag, the passenger
18  said, okay.  And then at the next point he says, hey,
19  don't stuff anything down in the seat.  Is that what
20  you're referring to?
21      A.  Correct.  To me, that's one of the -- he's
22  reaching in the areas that are confined, and I would not
23  want somebody to be doing that.
24      Q.  So at one point Officer Schneider says, don't
25  reach in the bag.  We don't see in the video where he

108

1  reaches into another bag, correct?
2       A.  I've never seen him reach into a bag, if I
3  remember, going through this video, ma'am.
4       Q.  Fair statement.  And then he asked him not to
5  stuff anything in the seats.  And then since that time we
6  have not seen anything in the video to show that he's been
7  stuffing anything in the seats since that point, correct?
8       MR. POPOLIZIO:  Form.
9       THE WITNESS:  I couldn't see his hands
10  almost most of the time on the video.  When Officer
11  Schneider was saying that, I couldn't see his hands.  I'm
12  going off what Officer Schneider is saying of his
13  observations.
14  BY MS. BROADDUS:
15      Q.  So at this point we're at the 2:29 mark and we're
16  going to continue to play.
17      A.  Yes, ma'am.
18      (Video played.)
19  BY MS. BROADDUS:
20      Q.  I'm stopping at the 2:54 point now.  And at this
21  point you've seen Officer Schneider at this point, now
22  he's just reholstering his Taser, correct?
23      A.  Correct.
24      Q.  And would you consider that a deescalation
25  tactic?

109

1     **A.  Yes, ma'am.**
2     Q.  During that exchange he said that he didn't want
3  the suspect, Mr. Wheatcroft, to fight, correct?
4     **A.  I think he asked Mr. Wheatfield (sic) if he was**
5  **going to fight.**
6     Q.  And he said he wasn't going to, correct?
7     **A.  Mr. Wheatfield (sic)?**
8     Q.  Wheatcroft.
9     **A.  Oh, I'm sorry.**
10        **I believe that's what he said.  We'd have to**
11  **play it back for me to tell you exactly, but I believe**
12  **that's what he said.**
13     Q.  At this point we're going to go forward from the
14  2:54 point.
15        (Video played.)
16  BY MS. BROADDUS:
17     Q.  Stopping at the 3:03 point, and at this time you
18  saw from Officer Schneider, once he reholstered his Taser,
19  he then takes Johnny's arm and turns into a particular
20  maneuver, correct?
21     **A.  Is Johnny Mr. Wheatfield (sic)?**
22     Q.  Yes.
23     **A.  Wheatcroft?**
24     Q.  Wheatcroft, yes.
25     **A.  He did grab ahold of Mr. Wheatcroft's right**

110

1  **wrist, and he still had like a C-clamp on his right elbow.**
2     Q.  At this point you still haven't seen anything
3  that Mr. Wheatcroft has done that would indicate to you
4  that he is engaged in any -- or that there's any
5  reasonable suspicion that he's engaged in any crime,
6  correct?
7        MR. POPOLIZIO:  Form.
8        THE WITNESS:  I would -- there's some
9  reasonable suspicion going on because he keeps pushing
10  between the seats.  There's no probable cause at this
11  point in time, but there's reasonable suspicion that
12  something's going on by what Officer Schneider is saying.
13  Not by what I'm seeing, because I've never seen -- I've
14  looked at this video so many times.  I can't ever recall
15  seeing him in between the seats or anything because the
16  video doesn't show everything.
17        But going off of what Officer Schneider is
18  saying, for me, at 30 years, if somebody's stuffing
19  something between the seats, and I tell them not to and
20  they continue to do it, for me there's a reasonable
21  suspicion to believe there is something going on in that
22  car.
23  BY MS. BROADDUS:
24     Q.  And so you hear Officer Schneider saying, hey,
25  don't stuff anything in the seats.  And you hear

111

1  Mr. Wheatcroft, the front-seat passenger, saying he
2  wasn't.  Did you hear that?
3     **A.  I heard him apologize the first time for reaching**
4  **in, yeah.  Then I heard him -- yes.  I believe when he**
5  **said about the stuffing the seat, yeah, he looks up and**
6  **says, I wasn't, uh-huh.**
7     Q.  So at this point you're taking the officer's word
8  over what the individual is saying, correct?
9     **A.  That would be correct.  Most people, when they're**
10  **stuffing drugs or something or going in between the seats,**
11  **are not going to tell you that they're doing that.  Yes,**
12  **I'm taking the officer's word.**
13     Q.  I'm going to continue on from the 3:03 point.
14     **A.  Yes, ma'am.**
15        **(Video played.)**
16  BY MS. BROADDUS:
17     Q.  Stopping at the 3:24 point, and at that point
18  you've seen where Mr. Wheatcroft is in the vehicle,
19  Officer Schneider asked him not to do a few things.  He
20  said he wasn't doing them or he apologized for doing them,
21  and then you saw Officer Schneider threaten a Taser, put
22  his Taser back in, and then put Johnny in an arm bar,
23  correct?
24        MR. POPOLIZIO:  Form.
25        THE WITNESS:  He never put him in an arm

112

1  bar.
2  BY MS. BROADDUS:
3     Q.  I'm sorry.  What is that maneuver called where he
4  takes his arm and twists it?
5     **A.  That -- what he had him in was a no maneuver.**
6  **What he did was grab onto his wrist and had a C-clamp on**
7  **his elbow.  We don't train this.  This is just -- it's a**
8  **grab.  That's not -- that's not an OCCS hold, O'Donnell**
9  **continuous control system hold.  He's got ahold of him,**
10  **but he didn't put him in any wrist lock, any pain**
11  **compliance at all.  He just had his wrist in one hand and**
12  **his elbow with like a C-clamp, which is more of an escort**
13  **after you have somebody in cuffs.**
14     Q.  And then he's pushing his head with his other
15  hand, correct?
16     **A.  You'd have to back that up.  I'd have to look at**
17  **that again, ma'am.**
18     Q.  Sure.
19        (Video played.)
20  BY MS. BROADDUS:
21     Q.  At that point did you see where he pushed his
22  head forward?
23     **A.  I saw where his touched his head.  I don't know**
24  **if he pushed it.  It was very short and quick, ma'am, but**
25  **he did have his hand on his head.**

113

1  Q.  So at this point -- and this is when the first
2  tase begins, correct, from what you've seen?
3  **A.  Officer Lindsey's tasing?**
4  Q.  Yes.
5  **A.  Yes, ma'am.**
6  Q.  Up to this point you've indicated that Johnny was
7  compliant with what you had heard?
8  MR. POPOLIZIO:  Form.
9  BY MS. BROADDUS:
10  Q.  In terms of what Officer Schneider asked him to
11  do.
12  What could Mr. Wheatcroft have done
13  differently to avoid being in the situation where he's
14  being tased now?
15  MR. POPOLIZIO:  Form; foundation.
16  THE WITNESS:  He could have provided his
17  name.  He could have provided an ID to the officer.
18  BY MS. BROADDUS:
19  Q.  Anything else?
20  **A.  He could have cooperated with the officer.  As**
21  **the officer was grabbing ahold of him, he could have**
22  **just -- whatever the officer is asking him to do, do what**
23  **the officer said.**
24  Q.  I'd like to look at your report.  In the first
25  paragraph it says -- at 14:33 you talk about Officer

114

1  Schneider removing his Taser.  And then the second
2  sentence goes on to say that the suspect's actions and
3  words could be interpreted as noncompliant.
4  Do you see that?
5  **A.  I do.**
6  Q.  Is that before or after he was Tased?
7  **A.  That was before, ma'am.**
8  Q.  And as we sit here today, you're saying that his
9  actions of either reaching in the bag or putting something
10  in between the seats and then the officer telling him not
11  to and then him not providing his ID, is that what you
12  consider to be noncompliant?
13  MR. POPOLIZIO:  Form.
14  THE WITNESS:  I would consider Officer
15  Schneider told him one time not to reach in, he does it
16  again, to heighten awareness on this situation for Officer
17  Schneider to want to detain him at this point in time.
18  BY MS. BROADDUS:
19  Q.  So Officer Schneider asked him not to reach into
20  his bag?
21  **A.  Correct.**
22  Q.  And then he asked him not to stuff something in
23  the seat, correct?
24  **A.  He told him to stop stuffing something in the**
25  **seat, yeah.**

115

1  Q.  Correct.  So he never reached into his bag again.
2  You never heard Officer Schneider say that again, correct?
3  **A.  I don't remember him saying that again.**
4  Q.  In your report in the third paragraph down, it
5  starts at 13 -- I'm sorry -- 14:34 hours, "Officer
6  Schneider was attempting to place the male suspect into
7  custody.  The video clearly shows the male suspect
8  resisting Officer Schneider."
9  Have we gotten to that point in the
10  video?
11  **A.  Yes, ma'am.  We're probably a little bit past it**
12  **right here.**
13  Q.  At what point is the suspect -- did you believe
14  that he began clearly showing that he was resisting?
15  **A.  Go ahead and back it up, please.**
16  Q.  Sure.
17  (Video played.)
18  BY MS. BROADDUS:
19  Q.  I'm stopping at the 2:48 point where you see --
20  this is where the threatened use of the Taser.  Do I need
21  to go back further?
22  **A.  No, ma'am.**
23  Q.  So we'll start going forward from the 2:48 point.
24  (Video played.)
25  THE WITNESS:  Right there.

116

1  BY MS. BROADDUS:
2  Q.  So at that point -- we're at the 3:01 point and
3  you said, "Right there."  What did you see in the video
4  that indicated to you that the suspect was clearly
5  resisting?
6  **A.  There's two things.  One, he's pulling away a**
7  **little bit from the officer because you can see the hand**
8  **move.  He's complaining about pain, and there's absolutely**
9  **no pain compliance being put on him at this point in time.**
10  **He starts going "ow, ow, ow" when there's nothing there**
11  **that causes pain, unless he's got a broken arm or a broken**
12  **wrist, which I don't know.**
13  Q.  But that could be -- he could be in actual pain.
14  You just don't know?
15  **A.  Yeah, I wasn't there to see what -- the feel of**
16  **the grip.  I wasn't there to feel his wrist or his elbow.**
17  **But looking at this, I don't see where he would be in**
18  **pain.**
19  Q.  And you said you thought he was pulling away; is
20  that correct?
21  **A.  Yeah.  Go ahead and back up just a little bit.**
22  Q.  We're at -- starting again at the 2:43 point.
23  (Video played.)
24  THE WITNESS:  Right there.
25  ///

BY MS. BROADDUS:

Q. So you see his elbow drop a little, correct? Is that what you're seeing?

A. Right. He's pulling somewhere, yeah.

Q. And you're assuming that he's pulling because his elbow dropped; is that correct?

A. Pulling or pushing, yes, ma'am.

Q. And you don't know whether that was Officer Schneider pulling or pushing his elbow, true?

A. It did not appear to be that was officer -- if you back it up, it doesn't seem at that point in time he had control of his elbow when he went back down. That's my observation.

Q. So at this point you have a vehicle that's been stopped.

A. Yes, ma'am.

Q. And the passenger in the vehicle is not required to show identification, correct?

A. Yes, ma'am.

Q. Officer Schneider opens up his door and continues to have a dialogue with his passenger, correct?

A. Yes, ma'am.

Q. Is the passenger free to go at any time up to this point?

MR. POPOLIZIO: Form.

THE WITNESS: I don't know what Officer Schneider is seeing, what he's stuffing between the seats. It would have -- it would be a question you'd have to ask Officer Schneider, what he was observing at that point in time.

BY MS. BROADDUS:

Q. If there was no basis -- no reasonable basis to assume that any crime had been committed or was being committed, do you believe the passenger had the right to leave up until this point?

MR. POPOLIZIO: Form.

THE WITNESS: Are you asking me that question --

MS. BROADDUS: Yes.

THE WITNESS: -- if he was --

He would have the right to leave.

BY MS. BROADDUS:

Q. We're going to continue to play.

(Video played.)

BY MS. BROADDUS:

Q. Stopping at the 2:36 point. At this point Mr. Wheatcroft's been tased a couple of times. And you see at this point he's almost on the ground or on the ground kind of in the doorjamb area between the car and the car door. Do you see that?

MR. POPOLIZIO: Form.

THE WITNESS: He's been drive stunned a couple times. And, yes, he's sitting between -- I would say on the ground in the -- yeah, I would say in the hinge area of the vehicle.

MS. BROADDUS: I'm going a little bit further.

(Video played.)

BY MS. BROADDUS:

Q. I stopped at the 3:27 point. At this point you see Officer Schneider deploy a Taser at Mr. Wheatcroft, correct?

A. Yes, ma'am.

Q. And you see that Mr. Wheatcroft is still -- he's entangled in the seat belt. Did you see that?

A. Yes, ma'am.

Q. At this point what did Johnny do that would warrant him being tased at this point?

A. He resisted the efforts of both officers by resisting the arrest. He -- at this point in time, the second officer is -- looks like from the video that I saw he's have knocked unconscious. So now we have an escalation of the situation that's going on. Officer Schneider is by himself at this point in time, and he's trying to gain control of the situation by detaining

him.

Q. At this point what Mr. Wheatcroft has done is -- when you're saying he's resisting, that's when Officer Schneider had his hands on him, correct?

A. On the resisting part?

Q. Yes.

A. When he started pulling away, yes, ma'am.

Q. Why was -- what's your understanding as to why Officer Schneider was putting his hands on Mr. Wheatcroft in the first place?

A. I'm assuming he was detaining him.

Q. And at no point did he tell him that, did he?

A. I don't recall that he did, ma'am.

Q. How is a passenger in a car to know what they are to do or not to do when they are pulled over by a police officer?

A. Well, I'm going to go back to common sense. Common sense is we've watched how many videos in reference to cops, right? People watch Cops, people watch movies. There's actually PSAs out there -- I know there was one in California because I heard about that -- of what to do. I think it would be common sense that people would not be reaching into objects.

I have been a police officer for 30-some years. I don't like to call it a normal traffic stop or a

121

1  regular traffic stop, but on a traffic stop that -- I
2  would use the word mundane -- that people do what they're
3  told to do.  When you walk up to cars now, guys have
4  their -- people have their hands on their wheels just to
5  show that they're not a danger to the officer.
6       So, to me, it's common sense.  Now,
7  currently I've lived in this world for 30 years too.  But
8  to me it's common sense what to do and what not to do in
9  reference to a traffic stop and how to act at a traffic
10  stop.
11       Q.   And that's based on your experience that you've
12  had over the last several decades of being a police
13  officer, true?
14       A.   Yes, ma'am.
15       Q.   So you have certain expectations as a police
16  officer as to what a person should or should not be doing
17  in a vehicle?
18       A.   How they should react, yes, ma'am.
19       Q.   And if Mr. Wheatcroft believed that he had not
20  been doing anything wrong, would there be any reason why
21  he could not reach into his bag to get something?
22       MR. POPOLIZIO:  Form; foundation.
23       THE WITNESS:  There's nothing against the
24  law reaching into a bag, however, that's not something a
25  normal person is going to do.  They just don't reach into

122

1  stuff.  Even people going into center consoles anymore
2  will literally tell you, hey, my registration is in the
3  central console.  Okay.  Go ahead.  Go get it.  They tell
4  you they -- they tell you what they're going to do because
5  they -- how long has television been out there?  They see
6  what's going on and they hear what's going on, and they're
7  trying to be helpful to the police officers.
8  BY MS. BROADDUS:
9       Q.   So in a situation like this where Mr. Wheatcroft
10  did not have an obligation to not reach in his bag, he
11  could put things in between the seats, he could refuse to
12  provide his ID, are you saying that warrants the kind of
13  conduct that he's -- Officer Schneider and Officer Lindsey
14  have done so far?
15       MR. POPOLIZIO:  Objection; form.
16       THE WITNESS:  I think that warrants Officer
17  Schneider to be safe on the scene and to detain him at
18  that point in time.
19  BY MS. BROADDUS:
20       Q.   Do you believe Officer Schneider escalated this
21  situation up to this point?
22       A.   No, ma'am.
23       Q.   He approached the passenger side of the vehicle,
24  correct?
25       A.   Yes, ma'am.

123

1       Q.   And the traffic stop was, have you heard,
2  purportedly for a turn signal violation?  Correct?
3       A.   I've heard that, yes, ma'am.
4       Q.   And that would have nothing to do with the
5  passenger, correct?
6       A.   That would be correct.
7       Q.   So you have Officer Schneider approaching a
8  citizen who has not engaged in any wrongful conduct,
9  threatened him with a Taser, wants his identification, and
10  then tries to pull him out of the car, correct?
11       MR. POPOLIZIO:  Objection; form.
12       THE WITNESS:  He did -- he did go up and ask
13  for an ID.  He did approach the passenger.  The passenger
14  reached into the backpack.  Officer Schneider told him not
15  to.  He then starts reaching -- according to what Officer
16  Schneider's saying, because again, I didn't see it --
17  between the seats.  That's going to heighten Officer
18  Schneider's awareness of what's going on.
19       This area is also a very high-crime rate
20  area known for drug use, known for drug sales, known for
21  prostitution.  That's going to heighten Officer
22  Schneider's awareness of what's going on in the vehicle,
23  what he can see and smell, which I couldn't see everything
24  going on nor can I smell it.  Would that heighten his
25  awareness to bring him out of the vehicle and detain him?

124

1  Yes.
2  BY MS. BROADDUS:
3       Q.   And that's -- it's irrelevant what the passenger
4  is saying, correct?
5       MR. POPOLIZIO:  Form.
6       THE WITNESS:  What passenger?  Mr. --
7  BY MS. BROADDUS:
8       Q.   This particular one.
9       A.   -- Wheatcroft?
10       Q.   He said he wasn't doing those things that Officer
11  Schneider said he did.
12       A.   A lot of people that are committing crimes tell
13  you that they're not doing anything.  Again, it's the
14  totality of the circumstances that are going on.
15       Q.   I'm going to continue to play.
16       (Video played.)
17  BY MS. BROADDUS:
18       Q.   Stopping at this point.  We're at the 4:06 mark.
19  And you've heard and seen a lot of things happen.
20       Did you hear a lot of the screaming of the
21  kids in the background?
22       A.   Yes, ma'am.
23       Q.   At this point you see Mr. Wheatcroft is in
24  handcuffs; is that correct?
25       A.   Yes, ma'am.

129

1       MR. POPOLIZIO:  Form; foundation.
2       THE WITNESS:  The officer did not manhandle
3   him.  The officer took him into custody.  But I can see
4   where a child would be upset seeing their father being
5   arrested, absolutely.
6   BY MS. BROADDUS:
7       Q.  You said that were putting him in custody.  What
8   was he being put in custody for?
9       A.  At that point in time he was resisting the
10  arrest.
11      Q.  I'm going to continue to play.
12          (Video played.)
13  BY MS. BROADDUS:
14      Q.  I'm stopping at the 4:55 point.  In your report
15  you note that he is -- Mr. Wheatcroft is prone on the
16  ground.  I believe you have that --
17      A.  Yes, ma'am, at 14:36.
18      Q.  Yes.  So we're just the same in your report that
19  we are in the video, correct?
20      A.  A little bit further, because we're still at
21  14:35, but he stayed prone on the ground, and you'll see
22  that in 14:36.
23      Q.  And based on your report, you end up saying that
24  the male suspect is complying with Officer Fernandez.  Do
25  you see that in your report?

130

1       A.  Correct.
2           (Video played.)
3   BY MS. BROADDUS:
4       Q.  I'm going to stop at the 5:03 point.  I'm going
5   to back it up a little bit, if you don't mind.
6       A.  Where are we going back to, ma'am?
7       Q.  I'm starting back at 4:35 just to go through it
8   again --
9       A.  Yes, ma'am.
10      Q.  -- because things happen pretty quickly.
11          (Video played.)
12  BY MS. BROADDUS:
13      Q.  I'm stopping at this 4:38 point because until
14  then, the last thing we saw was Mr. Wheatcroft on the
15  ground, and he was laying there prone with his feet
16  together, correct?
17      A.  I think that comes up after this.
18          (Video played.)
19      THE WITNESS:  I thought it was further ahead
20  than that.
21  BY MS. BROADDUS:
22      Q.  Yeah, so we're at the 4:55 point.  And at some
23  point we're going to see where his feet are moving.  And I
24  want to know if you see what caused his feet to move.  If
25  you could watch for that, please.  Okay?

131

1           (Video played.)
2   BY MS. BROADDUS:
3       Q.  Stopping at the 5:04 point, you saw
4   Mr. Wheatcroft's feet moving at that point, correct?
5       A.  Yes, ma'am.
6       Q.  Do you know what caused his feet to move?
7       A.  I can't tell you specifically what caused his
8   feet to move.  I can give you my examination as to what my
9   expectation was as to why his feet moved.
10      Q.  Is it fair to say that you don't know because
11  there's no video of it whether Mr. Wheatcroft randomly was
12  kicking his feet or whether something happened to cause
13  him to kick his feet?
14      A.  True.
15      Q.  Okay.  Let's go a little further.  We're starting
16  at the 5:04 point, and at this point we're going to go
17  forward and you're going to see Officer Schneider pull
18  down Mr. Wheatcroft's pants.
19          (Video played.)
20  BY MS. BROADDUS:
21      Q.  At this point, we're at the 5:06 point -- mark,
22  and you can see that -- you could start to hear the Taser
23  clicking.  Do you hear that?
24      A.  I did, ma'am.
25      Q.  And you see Mr. Wheatcroft's pants are pulled

132

1   down, true?
2       A.  Yes, ma'am, his shorts.
3       Q.  I'm sorry.  Yes, his shorts.
4       A.  Yes, ma'am.
5       Q.  And his money is still in his hand.  Do you see
6   that?
7       A.  Yeah.  He doesn't want to let that go, does he,
8   ma'am?
9       Q.  And it looks like his fingers are extended and
10  he's -- I'll just continue to play.
11          (Video played.)
12  BY MS. BROADDUS:
13      Q.  Could you tell by your review of that video
14  exactly where he is being tased?
15      A.  It appeared that he was being tased in the upper
16  thigh.
17      Q.  Mr. Wheatcroft says he was testified [verbatim]
18  in the testicles.
19          Do you have anything independently to say
20  that he was not?
21      MR. POPOLIZIO:  Form.
22      THE WITNESS:  No, ma'am.
23          (Video played.)
24  BY MS. BROADDUS:
25      Q.  I'm going to stop this video for a moment.

145

1    MS. BROADDUS:  Object to form; foundation.
2    THE WITNESS:  I think the way the vehicle
3  stopped -- but the officers actually walking up towards
4  that vehicle would make me believe that they were going to
5  be contacted in that vehicle.
6  BY MR. POPOLIZIO:
7    Q.  When you mean contacted, they were going to talk
8  to the people in it?
9    A.  Right.  They were, yes, sir.
10   Q.  This Motel 6, you testified -- actually, to a
11  question that said, are you familiar with the motel, you
12  said, oh, yes.  Do you remember that?
13   A.  Yes, sir.
14   Q.  How are you familiar with this particular Motel 6
15  in Glendale?
16   A.  I've worked for Glendale for almost 22 years.
17  I've worked nothing but the south side, except for four
18  weeks of my career.
19        This motel is notorious, would be the word
20  that I would use, for drug deals, drug action,
21  prostitution, gang activities.  We've had homicide -- let
22  me back that up.  I don't know if we had a homicide there.
23  We've had shootings there.  I don't know if they died from
24  those shootings.  We've had stabbings there.  We've
25  recently had a rape there.  It's just a motel that seems

146

1  to perpetuate crime.
2    Q.  Do you know if there's a blanket trespass
3  agreement between Motel 6 and Glendale P.D.?
4    A.  Yes, sir.
5    Q.  And that's at this particular motel?
6    A.  I believe that's the only Motel 6 inside the city
7  limits.  But there is a blanket trespass at that Motel 6.
8    Q.  At the time of this incident was the blanket
9  trespass agreement in effect?
10       MS. BROADDUS:  Object to form; foundation.
11       THE WITNESS:  I can't tell you whether it
12  was, but I don't know of any time that one wasn't.
13  BY MR. POPOLIZIO:
14   Q.  And how does a blanket trespass agreement,
15  specifically this one here at Motel 6, how does it work?
16   A.  If we make contact with somebody in the parking
17  lot that is either not residing there or not -- I guess
18  you'd call them a guest in a room, we find out from
19  management that they're not supposed to be there.  And at
20  that time it can either be an automatic submittal or an
21  arrest.  It could be -- obviously, you could detain them
22  to find this information out, or you would escort them off
23  the property.
24   Q.  Under this agreement you can approach individuals
25  on the premises and ask them if they're staying there,

147

1  right?
2    A.  Yes.
3       MS. BROADDUS:  Object to form and
4  foundation.
5       THE WITNESS:  Yes.
6  BY MR. POPOLIZIO:
7    Q.  During your examination earlier you were asked
8  about the movement of Johnny Wheatcroft's legs.  Do you
9  remember that?
10       When he was on the ground.
11   A.  In the seat belt?
12   Q.  No.  Let's go -- that's not what I'm going to
13  focus on.
14       So when his shorts came down, at that point,
15  around that point when he was on the ground after he was
16  cuffed --
17   A.  Yes, sir.
18   Q.  -- you were asked questions about why he moved
19  his legs, specifically what caused him to move his legs.
20  Do you remember that?
21   A.  Yes, sir.
22   Q.  And you said something to the effect that you can
23  give your examination of what caused him to move his legs.
24  Do you recall that?
25   A.  Yes, sir.

148

1    Q.  What did you mean by that?  Could you tell me
2  what you were going to say.
3    A.  When I was --
4       MS. BROADDUS:  Form; foundation.
5       MR. POPOLIZIO:  Go ahead.
6       MS. BROADDUS:  Go ahead.
7       THE WITNESS:  When I was doing my video
8  overview -- well, I actually had two screens set up.  I'm
9  watching the screens simultaneously; the Motel 6 screen,
10  Officer Schneider's screen.  At the moment -- first of
11  all, earlier when Officer Schneider was telling the female
12  to get out of the car because she struck Officer Lindsey
13  in the head, Mr. Wheatcroft said initially, no, she
14  didn't, and then she didn't mean to do that.  He seemed to
15  be upset that his wife was now being contacted with the
16  police.
17       She moves over to what would be the east
18  wall, and then Officer -- or Mr. Wheatcroft's on the
19  ground with Officer Fernandez.  Officer Lewis shows up,
20  and Officer Schneider provides him with a briefing of what
21  needs to be done.  He needs the female to be detained for
22  aggravated assault on a police officer.  Officer Lewis
23  goes over to detain the female.
24       As I'm watching the video, the moment he
25  picks up the female to detain her was the same moment that

149

1  Mr. Wheatcroft's legs swept back and struck Officer
2  Schneider.
3  BY MR. POPOLIZIO:
4      Q.   When an officer is about to detain someone, does
5  the officer have to tell the individual who's about to be
6  detained that they're about to be detained?
7      A.   No.  In our training we would prefer them not to
8  tell them that.
9      Q.   Why?
10     A.   We would prefer the officer to have control over
11  the suspect before telling them that so that it's less of
12  an opportunity for an altercation to occur.
13     Q.   What do you mean by altercation?  Do you mean
14  something physical to occur between that individual who's
15  about to be detained and the officer?
16     A.   Correct.
17     Q.   Now, with regard to Officer Schneider's opening
18  the door to the Taurus, you remember from your view of the
19  video that there's a certain point in time that Officer
20  Schneider opens the passenger door?  Do you recall that?
21     A.   He does, sir.
22     Q.   Is it okay -- given your experience and that
23  you've trained -- and I know that you don't like to use
24  the word "expert," but given your experience as a police
25  officer of almost 30 years --

150

1      A.   Almost 30 years.
2      Q.   -- and as a police officer who's trained officers
3  on defensive tactics and everything that you've told us,
4  is it okay for Officer Schneider to open the door at that
5  point in time?
6          MS. BROADDUS:  Object to form; foundation.
7          THE WITNESS:  It is reasonable for an
8  officer, if he wants to get a better view -- because of
9  what he's seeing happening inside that car, to get a
10  better view, it would be reasonable for an officer to open
11  that door.
12  BY MR. POPOLIZIO:
13     Q.   I believe at the 2:59 mark when the video was
14  stopped, you testified that around that point Officer --
15  excuse me -- Mr. Wheatcroft would have the right to leave.
16  Do you remember that?
17     A.   I believe what was asked of me, would he -- would
18  the passenger be allowed to leave if -- if he had not
19  broken a law or something along those lines.  And I said,
20  yes, a passenger of a vehicle can leave a traffic stop.
21     Q.   After Mr. Wheatcroft reached into his bag,
22  according to what Officer Schneider said, okay, and then
23  reached between the seats or stuffed something between the
24  seats, according to what Officer Schneider said, did
25  Mr. Wheatcroft at that point have the right to leave?

151

1      A.   I believe that a reasonable police officer would
2  believe there's a suspicion of a crime.  I would have
3  believed the same, and I would not have allow him to leave
4  at that point in time.
5      Q.   Does officer safety come into play at that point
6  also?
7      A.   Absolutely.
8          MS. BROADDUS:  Form.
9  BY MR. POPOLIZIO:
10     Q.   How so?
11     A.   Well, reaching into a bag, there could be a
12  weapon in the bag.  That's a common place people put
13  weapons, is in bags.  Also, between the seat is an
14  extremely common place, between the console and the seat.
15  That's an extremely common place for handguns, knives to
16  be kept.
17     Q.   Well, let me just follow up on what you just
18  said.
19          When you train officers at Glendale, do you
20  train officers to be aware of the possibility that weapons
21  could be in a car that they stopped?
22     A.   Yes.  We train -- we train them to watch the
23  hands.  That's your priority out there, watch the
24  suspect's hands.  That's what's going to hurt you first,
25  is the hands.

152

1          On top of that, when we train where there's
2  different areas where somebody can reach to, what the
3  common places are of reaching in a car, we also teach
4  where weapons could be placed on a person.  And we
5  actually did that in 2018.  It might even be this year
6  that we're doing that.  In fact, it is this year, 2019,
7  where, in one of our trainings that we're going to
8  advanced officer training, it's called a sport technique
9  where you're taking somebody out of a car that's not being
10  -- that's not compliant.  It's a compliance technique.
11  Otherwise, the person is completely compliant.
12          But we want to have control over them.  I
13  told you that earlier, that we want to have control of
14  somebody before we tell them they're under arrest.  So we
15  put them in a position where we put them in a wrist lock,
16  we bring them out of the car, we handcuff them.
17          And part of that scenario when I developed
18  it was to hide weapons on the person in the car, so that
19  they do a complete pat-down and find those weapons.
20          So we not only teach in the compartment but
21  on the person to do that.
22     Q.   Go back to when Officer Schneider opened the door
23  to the Taurus, do you recall if Johnny Wheatcroft did
24  anything with his right foot?
25     A.   Yeah, he stepped out of the car.

153

1      Q.   Was he asked to do that from your review of the
2   video?
3      A.   No, sir.
4      Q.   Did you hear any command for him to do that?
5      A.   No, sir.
6      Q.   Is that significant to you as an officer with
7   your experience and also as a trainer of officers?
8      A.   Yes.  That would heighten my awareness that
9   either he's going to try to get out of the car on me
10  before I'm ready.  It gives him the ability to have
11  balance on the ground.  And that balance on the ground is
12  not what I'm wanting at this point in time because I don't
13  have control of him.
14     Q.   Now, in your review of the video footage, you
15  reviewed Officer Schneider's body-worn camera footage,
16  right?
17     A.   Yes.
18     Q.   You reviewed the Motel 6 footage of this
19  incident, right?
20     A.   Yes, sir.
21     Q.   You reviewed footage from the body-worn camera of
22  Officer Lindsey, right?
23     A.   Yes, sir.
24     Q.   Officer Lindsey's body-worn camera was somewhat
25  limited, though?

154

1      A.   Extremely limited, sir.
2      Q.   And that was because why?
3           MS. BROADDUS:  Object to form.
4           THE WITNESS:  He was basically hit in the
5   head with an object and was basically out of the picture.
6   His body-worn camera, for the most part, was showing me
7   the sky or the ground.
8   BY MR. POPOLIZIO:
9      Q.   But in the other video footage, the Motel 6
10  footage and the body-worn camera footage of Officer
11  Schneider that you reviewed, according to what we saw in
12  video footage, did Johnny Wheatcroft's physical resistance
13  have to be overcome at any time?
14          MS. BROADDUS:  Object to form; foundation.
15          THE WITNESS:  Yes.
16  BY MR. POPOLIZIO:
17     Q.   How so?
18     A.   At a point in time when Officer Schneider was
19  detaining him, it was clear to me that he was resisting.
20  You could see him pulling.  Officer Schneider even
21  mentions in the video -- which is what I stated earlier.
22  I look for things that I hear, things that I don't hear.
23          Officer Schneider clearly said, "He's
24  tensing up."  That's an indication of fight or flight that
25  we're going -- we're going to get in an altercation at

155

1   this point in time.  At that point in time, he's going to
2   be detained as he starts resisting.
3           There was no arm bar put on him to control
4   him in the car.  The Taser was applied to try to gain
5   compliance by the two drive stuns by Officer Lindsey.
6   Officer Lindsey then was out of the picture.  The two
7   drive stuns -- and then shortly after that he was laying
8   behind the other vehicle that you saw in the video parked
9   beside the suspect's vehicle.
10          The scene is now completely out of control.
11  We have an officer down.  I don't know if Officer Lindsey
12  really saw how that happened.  I don't know.  I
13  couldn't -- you can't see it unless you watch the Motel 6
14  video.  You can't see from Officer Lindsey's -- or Officer
15  Schneider's video.
16          But the suspect that they're trying to
17  detain is still not detained.  That's when the Taser was
18  applied, the probes were deployed.  Didn't have the effect
19  that they were expecting it to have, even though you could
20  clearly hear him holding down the Taser.  And the Taser
21  was not acting appropriately.  You could hear in the
22  background of the video it's clicking; click, click,
23  click.  That's not how a Taser should sound.
24          We do train to cuff under power.  That is
25  what appeared to be trying to happen with

156

1   Officer Fernandez when he came up there, is to cuff under
2   power.  It limits the resistance that you can have
3   cuffing.
4           They were able to get him over, but you can
5   clearly see him still resisting some of what's going on
6   with Officer Fernandez, but I can't tell how much.  You
7   heard Officer Fernandez say a few things, but the video of
8   Officer Schneider at that point in time covered it up.
9   And then ultimately he was handcuffed.  But at some point
10  in time the resistance had to be overcome by the officers
11  to detain him.
12     Q.   During this particular traffic stop -- I'll call
13  it the stop of the Taurus in this incident -- do your
14  officers have a right to be safe at a stop?
15          MS. BROADDUS:  Object to form.
16          THE WITNESS:  Yes, sir.
17  BY MR. POPOLIZIO:
18     Q.   Could you explain that to me.
19     A.   Well, everybody has a right to be safe.  They
20  have a right to conduct an investigation safely.  If an
21  officer feels that there's something going on in the car
22  that's unsafe, that officer has a right to remove that
23  person from what he feels is the environment he's unsafe
24  in.
25          And that's what I think Officer Schneider

157

1   had a right to do.  Mr. Wheatcroft, I think, had reached
2   into a bag.  You can actually see in the one video --
3   again, I don't know what Officer Schneider saw because I
4   don't see his -- I cannot see what he's looking at, but on
5   the one video you can see where Mr. Wheatcroft is actually
6   holding up the bag in the Motel 6 video.
7        Now, at that point in time Officer Schneider
8   is in the back of car, but he may have been able to see
9   it.  I don't know.  He clearly sees him reaching into the
10  bag.  He clearly says, quit reaching between the seats.
11       We know this is a dangerous area.  We know
12  that suspects put weapons -- they put things in bags, they
13  put things in between seats.  It's going to heighten his
14  awareness.  And if that was me on the traffic stop, I
15  would have also removed Mr. Wheatcroft from that car.
16  Q.   From your review of the video footage of this
17  incident, did you see anything in the video footage that
18  you reviewed that would indicate that any officer on the
19  scene used a Taser to make Mr. Wheatcroft produce his ID?
20  A.   None, sir.
21       MS. BROADDUS:  Object to form.
22       THE WITNESS:  Sorry.
23  BY MR. POPOLIZIO:
24  Q.   Given your review of the video footage of this
25  incident, did you hear anything that would indicate that

158

1   any officer on the scene was using his Taser to make
2   Mr. Wheatcroft produce his ID?
3        MS. BROADDUS:  Object to form.
4        THE WITNESS:  No, sir.
5   BY MR. POPOLIZIO:
6   Q.   When Officer Schneider told Mr. Wheatcroft not to
7   reach in his bag, okay, was that a lawful command?
8   A.   Yes.
9   Q.   Why?
10  A.   He's got a right to be safe with that vehicle
11  during that stop.
12  Q.   How about when Officer Schneider told
13  Mr. Wheatcroft not to stuff anything between the seat; was
14  that a lawful command?
15  A.   Yes, sir.
16  Q.   Why?
17  A.   Again, he has a right to be safe at that stop.
18  Q.   Does this go to what you were talking about a
19  little earlier about what may be in a vehicle?
20  A.   Correct.  There could be weapons or anything that
21  they're stuffing or trying to -- they may already be
22  stuffed in there and they're trying to get access to it.
23  Q.   And here you have how many adults in the vehicle?
24  A.   Three adults.
25  Q.   Do you know how many children were in the

159

1   vehicle?
2   A.   I do now, yes, sir.
3   Q.   How many?
4   A.   There was two.
5   Q.   Let me ask you this:  You've been an officer for
6   almost three decades?
7   A.   Yes.
8   Q.   How many traffic stops do you think you've
9   conducted?
10  A.   Thousands.
11  Q.   When you conduct a traffic stop, are you ever
12  concerned about what might be in the vehicle?
13  A.   Absolutely, sir.
14  Q.   Do you always know what could be in a vehicle
15  that you approach?
16  A.   No, sir.
17  Q.   Do you train officers to think about worst-case
18  scenarios of what might be in a vehicle that they conduct
19  a traffic stop on?
20       MS. BROADDUS:  Object to form.
21       THE WITNESS:  We train officers in every
22  situation, or try to get them in as many different
23  situations as you can.  Anywhere from a lethal force
24  encounter to a passive, to the point where they're so
25  passive all they'll do is crack the window and throw their

160

1   paperwork out the window.  So we train all those gamuts in
2   between.
3   BY MR. POPOLIZIO:
4   Q.   With regard to what's been referred to as your
5   report, which is Exhibit 41, but I know you've referred to
6   it as your memo.
7   A.   It is a memo, sir.
8   Q.   Okay.  So with regard to your memo, you said that
9   you authored that memo after you had reviewed the video
10  footage that was provided to you regarding this incident,
11  right?
12  A.   Yes, sir.
13  Q.   And you reviewed that footage for eight hours or
14  so?
15  A.   The total time from when I sat down, the video,
16  going through policy was eight hours by the time I was
17  done writing this thing.
18  Q.   When you completed your memo, it was after that
19  when you talked to certain individuals at Glendale Police
20  Department, right?
21  A.   Yes.  This memo was complete prior to talking to
22  anybody else.
23  Q.   And you said you talked to Sergeant Moody, right?
24  A.   I recall talking to Sergeant Moody, yes, sir.
25  Q.   About your findings?

161

1    A.  Yes, sir.
2    Q.  Chief -- then Chief St. John?
3    A.  Correct, sir.
4    Q.  And was it Assistant Chief Briggs?
5    A.  I recall having a conversation with Assistant
6  Chief Briggs, and I do believe it was on this incident.
7    Q.  After you had those -- anybody else, by the way?
8  Sorry.
9    A.  I don't recall at this point in time talking to
10  anybody else.  But what I would say is Sergeant Johnson
11  may have been there when I was talking to Sergeant Moody.
12  But my priority was to Sergeant Moody because he was the
13  investigating sergeant.
14    Q.  After you completed this memo that's marked as
15  Exhibit 41 to your deposition, and then you spoke to the
16  individuals that you've just indicated to whom you spoke,
17  did you change this memo in any way?
18    A.  No, sir.
19    Q.  Did anybody tell you to change this memo?
20    A.  No, sir.
21    Q.  You're a master Taser instructor?
22    A.  Yes, sir.
23    Q.  What does that entail?
24    A.  To become a master Taser instructor you have to
25  fill out an application.  In that application you have to

162

1  have trained at least 12, what they call user classes, to
2  put in the application.  The application has to be
3  accepted by AXON or the subsidiary of becoming a master.
4        Taser master school is a five-day school.
5  The first time you go through Taser school, at least when
6  I went through it originally, you had to get Tased.  It
7  was part of the process of becoming a master.
8        You go through how -- the entire policy.
9  You have to do instruction back to other master -- what
10  they call senior master instructors.  You have to give
11  teach-backs to them.  You go through a ton of drills.  You
12  have to do teach-back on all the drills, on the weapon
13  system for the user end -- on the user end, and then they
14  have to sign off that you are now a master Taser.
15    Q.  At Glendale Police Department are you the only
16  master Taser instructor?
17    A.  No, sir.
18    Q.  So there are others, actually, since you answered
19  no.  So how many others?
20    A.  There's a total of three master Taser instructors
21  at Glendale.
22    Q.  Including you?
23    A.  Including me, yes.
24    Q.  So who are the two others?
25    A.  An officer that used to work for me, Detective --

163

1  not detective -- Officer Brian Ong.  He is my lead
2  defensive tactics instructor.  And Sergeant Pat Beumler is
3  the other master Taser instructor.
4    Q.  Do you three provide Taser instructions to
5  officers at the Glendale Police Department?
6    A.  The three of us are -- we train all the
7  instructors.  There's approximately 20 additional Taser
8  instructors at the Glendale Police Department.  We train
9  all 20 Taser instructors to then help us train the rest of
10  the 430 officers of the Glendale Police Department.
11    Q.  Earlier in your deposition there was some
12  discussion about other instructors at Glendale Police
13  Department asking about the functionality of Officer
14  Schneider's Taser during this incident.  Do you recall
15  that?
16    A.  Yes, sir.
17    Q.  So I think I testified, and correct me if I'm
18  wrong, that the discussions about Officer Schneider's
19  Taser was about whether it was working properly; is that
20  right?
21    A.  That was the main discussion, yes, sir.
22    Q.  From what you could see and hear on the video
23  footage that you reviewed regarding this incident, is
24  there anything from your view of that that would lead you
25  to believe that Officer Schneider's Taser wasn't

164

1  functioning properly?
2        MS. BROADDUS:  Object to form; foundation.
3  BY MR. POPOLIZIO:
4    Q.  Go ahead.
5    A.  Yes, sir.
6    Q.  And what is that?
7        MS. BROADDUS:  Same objection.
8        THE WITNESS:  In the one part of the video,
9  and I don't know exactly what area of that video it was,
10  you can clearly hear the Taser going click, click, click,
11  click.  That means that the Taser is not working properly.
12  The Tasers have a rattling sound.  A low-pitch rattling
13  sound or a muffled rattling sound means that energy is
14  being delivered.  A high-pitch rattling sound -- I'm using
15  rattling as a verbiage here; it's electrical current --
16  would mean that the Taser is not providing energy into a
17  subject.
18        The click, click, clicking is an indication
19  to me that there's something wrong with the condenser
20  inside the Taser itself or with the battery not having
21  enough energy to keep the Taser operating properly.
22  BY MR. POPOLIZIO:
23    Q.  Now, in order to do this memo that's marked as
24  Exhibit 41 to your deposition, you didn't review Taser
25  logs, right?

165

1    A.  **To do this memo?**
2    Q.  Yes.
3    A.  **No, sir.  I was not provided Taser logs.**
4    Q.  Subsequent to your authoring this memo, which is
5    Exhibit 41 to your deposition, did you have a chance to
6    review the Taser logs with regard to the Tasers used in
7    this incident?
8         MS. BROADDUS:  Object to form.
9    BY MR. POPOLIZIO:
10   Q.  Did you?
11   A.  **Yes, sir.  During the FBI interview that I had,**
12   **they actually had Taser logs and asked me to look at them**
13   **at that point in time.  That was the first time that I saw**
14   **the Taser logs.**
15   Q.  Did you look at them at their request?
16   A.  **At their request.**
17   Q.  Did you share your thoughts with the FBI with
18   regard to what these Taser logs showed?
19   A.  **Yes, sir.**
20   Q.  What did you share with them?
21        MS. BROADDUS:  Object to form and
22   foundation.
23   BY MR. POPOLIZIO:
24   Q.  I think you know what you shared with them so go
25   ahead.

166

1         MS. BROADDUS:  Same objection.
2         THE WITNESS:  On the initial -- the initial
3    probe deployment, Officer Schneider's -- and I'm going off
4    of memory here, sir; I believe it was the first second and
5    a half that showed on the pulse rate logs that he was
6    within 50 to 60 microcoulombs, which is delivering energy.
7    After that, he had dropped way below there, or to zero,
8    which means that there was no energy being delivered to
9    the subject in question.
10   BY MR. POPOLIZIO:
11   Q.  **And that was for from Schneider's --**
12   A.  **That was Schneider's log.  Sir, I don't remember**
13   **seeing anything but Schneider's logs.**
14   Q.  **Okay.  That was shown to you by the FBI?**
15   A.  **Yes, sir.**
16   Q.  **Now, let me ask you, earlier you said that you**
17   **didn't capture any still shots from the video that you**
18   **reviewed; is that right?**
19   A.  **I did not capture any still shots.**
20   Q.  **Is there a reason why you did not do that?**
21   A.  **Yeah.  When you're looking at the video you can't**
22   **still shot it and make a decision on the still shot.  When**
23   **you're talking about reasonability here, you're looking at**
24   **the totality of the incident that's at hand.  I can slow**
25   **it down and back it up to see if I'm hearing or seeing**

167

1    **what I'm seeing.  But you have to look at the totality of**
2    **everything that's going on at that time, not a moment in**
3    **time, but the totality of what has occurred.**
4    Q.  **Did there come a time when you actually saw a**
5    **still shot of any portion of this video?**
6    A.  **That was provided to me by the FBI.**
7    Q.  **What the was still shot that they showed you?**
8    A.  **Mr. Wheatcroft was laying on the ground.  He**
9    **was -- it was when his back was in the doorframe of the**
10   **car.  His feet were towards Officer Schneider.  The probe**
11   **had been -- or the Taser had been deployed and the probes**
12   **were out of the Taser.  Laying immediately to his west was**
13   **one of the probes.**
14   Q.  **When you mean west, you mean left?**
15   A.  **Left, yeah.  If I'm laying this way, it would**
16   **have been to his left right here.**
17        **It was circled, and they asked me what that**
18   **was, and I told them that was a Taser probe.**
19   Q.  **Just for clarification of the record, a Taser**
20   **probe is what?**
21   A.  **A Taser probe is -- it looks like a straight fish**
22   **hook, if you can think about it that way.  It's barbed.**
23   **So it's got about this long of a shank, about that long of**
24   **a barb that's straight, and it looks very similar to a**
25   **fish hook, a barb but not rounded.  So that when it goes**

168

1    **into somebody it kind of stays in them.  It gives a little**
2    **tug so it will stay into them.**
3         **I would say -- I'd have the exact number if**
4    **I had my Taser book with me -- it's roughly a half an**
5    **inch.**
6    Q.  **The fact that a Taser probe was found on the**
7    **ground to the left of Mr. Wheatcroft, as a master Taser**
8    **instructor, is that significant to you?**
9         MS. BROADDUS:  Object to form; foundation.
10   BY MR. POPOLIZIO:
11   Q.  **Go ahead.**
12   A.  **Yes.**
13   Q.  **What is the significance of that?**
14        MS. BROADDUS:  Same objections.
15   BY MR. POPOLIZIO:
16   Q.  **Okay.  Go ahead.**
17   A.  **Without the two probes being in -- connected to**
18   **the person, no energy will -- You don't have**
19   **your positive and negatives to touch each other.**
20   Q.  **Dumb question, but I'm going to ask it.**
21   **What's the significance of no energy being delivered?**
22   A.  **You won't have neuromuscular incapacitation.  You**
23   **don't have pain compliance.  There's nothing going on.**
24        MR. POPOLIZIO:  Thank you for now.  We'll
25   see if I have follow-up on anything that Ms. Broaddus

177

1    Q.  Do you think that happened in this case, where
2  Officer Schneider escalated to a high-risk vehicle stop?
3          MR. POPOLIZIO:  Form.
4          THE WITNESS:  This was not a high-risk
5  vehicle stop, ma'am.
6  BY MS. BROADDUS:
7    Q.  Did it escalate into one?
8    **A.  Not that I saw, ma'am.**
9    Q.  Earlier you talked about the Motel 6 being a
10 high-crime area.  Do you recall that?
11   **A.  Yes, ma'am.**
12   Q.  When you're patrolling, do you just assume that
13 all members of the public in those areas are criminals?
14   **A.  Absolutely not, ma'am.**
15         MS. BROADDUS:  All right.  Those are all the
16 questions I have.  Thank you.
17         MR. POPOLIZIO:  He'll read and sign.
18             (The deposition concluded at
19              3:40 p.m.)
20
21
22
23
24
25

178

1         I, the undersigned, say that I have read the
2  foregoing transcript of testimony taken December 11, 2019,
3  and I declare, under penalty of perjury, that the
4  foregoing is a true and correct transcript of my testimony
5  contained therein.
6
7         EXECUTED this _____ day of _____, 2020.
8
9
10
11
12         _____
              SERGEANT JERRY DEE MCDANIEL
13
14
15
16
17
18
19
20
21
22
23
24
25

179

1  STATE OF ARIZONA      )
                          ) ss.
2  COUNTY OF MARICOPA     )
3         BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   questions propounded to the witness and the answers of the
5  witness thereto were taken down by me in shorthand and
   thereafter transcribed through computer-aided
6  transcription under my direction; that the foregoing is a
   true and correct transcript of all proceedings had upon
7  the taking of said proceedings, all done to the best of my
   skill and ability.
8
9         I CERTIFY that I am in no way related to nor
   employed by any of the parties hereto nor am I in any way
10 interested in the outcome hereof.
11         (X) Review and signature was requested.
           ( ) Review and signature was waived.
12         ( ) Review and signature was not requested.
13         I CERTIFY that I have complied with the ethical
   obligations set forth in ACJA Sections 7-206(F)(3) and
   7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
14 this 20th day of January, 2020.
15
16         _____
17           MONICA S. BERRY, RPR, CR
             Certified Reporter
18           Arizona CR No. 50234
19         *   *   *   *   *   *   *
20         I CERTIFY that Berry & Associates, LLC has
   complied with the ethical obligations set forth in ACJA
21 Sections 7-206(J)(1)(g)(1) and (6).
22
23         _____
24           BERRY & ASSOCIATES, LLC
             Registered Reporting Firm
25           Arizona RRF No. R1033

# *EXHIBIT 11*



Ralph D. Harris
Direct Line: 602.234.9924
Direct Fax: 602.343.7924
RHarris@bcattorneys.com

June 17, 2019

VIA U.S. MAIL AND EMAIL: jody@attorneysforfreedom.com

Jody L. Broaddus, Esq.
3185 S. Price Road
Chandler, AZ 85248

Re:   Johnny Wheatcroft, et al. v. City of Glendale, et al.
      U. S. District Court Civil Action No. 2:18-cv-02347

Dear Ms. Broaddus,

We represent S & H Hospitality, LLC ("S&H"). You recently served two subpoenas that pertain to an incident that previously occurred at the Hotel 6 owned by S&H. For clarity we attach them. One of those subpoenas was to "H & S Hospitality, LLC" which we will assume was intended to be issued to S&H. The other of those subpoenas was to Motel 6 – Glendale, which is not a valid legal entity but is, rather, a location. The subpoenaed documents requested by both subpoenas are the same. We will respond to your requests on behalf of S&H. Without waiving any objections for ambiguity and overbreadth, our client's response is as follows:

A.      We have an existing Blanket trespassing agreement with Glendale Police, since 2016. However, previous year agreements were destroyed upon signing of each new subsequent agreement. Thus, we only have documentation for our most recent agreement, which we will produce by attaching it to this letter response to the subpoenas. This agreement is in force from August 30, 2018 to August 30, 2019. We do not have any other agreements with Glendale police or other law enforcement agencies.

B.      The blanket trespass referenced in section A, above, is the only document we have available that would potentially be responsive to request B.

C.      We have no relevant surveillance footage. Glendale police called the hotel directly to request all video recordings of the footage on July 27, 2017. Our DVR does not record more than 10-14 days, so it is not possible at this time to recover any video footage more than 7 days old.

D.      Officer Tiffany Ngalula from Glendale Police Department sent us an email on February 12, 2019, requesting a signed copy of our existing and



WHEATCROFT000036                                    BCATTORNEYS.COM

Jody L. Broaddus, Esq.
June 17, 2019
Page 2

valid Blanket Trespass agreement applicable during the date of July 26, 2017.
We called her back, and let her know we did not have the documentation and
that it was destroyed. Her email is attached.

     E.    We have not had any communication with the Federal Bureau of
Investigation.

     F.    No records exist in our possession for the police incident that
occurred on July 26, 2017 at approximately 7:30 pm, other than an email
discussed in section D from Officer Tiffany Ngalula.

Sincerely,

Ralph D. Harris

RDH:mw
Attachments
cc:    S & H Hospitality, LLC

WHEATCROFT000037

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Arizona

| | |
|---|---|
| Johnny Wheatcroft, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  2:18-cv-02347 |
| City of Glendale, et al. | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Motel 6 - Glendale (7116 N. 59th Ave., Glendale, AZ 85301)

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: 3185 South Price Road<br>Chandler, Arizona 85248 | Date and Time:<br><br>06/17/2019 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| CLERK OF COURT | OR | |
|---|---|---|
| _____<br>*Signature of Clerk or Deputy Clerk* | | _____<br>*Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*          Plaintiff
Johnny Wheatcroft _____, who issues or requests this subpoena, are:
Jody L. Broaddus, 3185 S. Price Rd., Chandler, AZ 85248, jody@attorneysforfreedom.com, 480-455-5229

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Scanned with CamScanner

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

WHEATCROFT000039   Scanned with CamScanner

**Exhibit A**
**Attachment to Subpoena**

You are requested to produce and deliver to the Attorneys For Freedom Law Firm any and all records that you have in your possession concerning *Wheatcroft, et al, v. City of Glendale, et al.*, docket number 2:18-cv-02347, United States District Court, as listed below:

A.  Any agreement of any kind between Motel 6 and the City of Glendale, Glendale Police Department or any other law enforcement agency, representative, or individual with regard to Glendale, Arizona from 2016 to present.

B.  Any document indicating any "blanket trespass" authorization for Glendale Police Department officers from 2016 to present.

C.  All surveillance footage of the exterior of the premises (7116 North 59th Avenue, Glendale, Arizona 85301) captured from 7:00 p.m. to 8:00 p.m. on July 26, 2017.

D.  All communications, including emails, phone calls, texts, notes, letters, or messages of any sorts, with the City of Glendale, Glendale Police Department or any other law enforcement agency, representative, or individual with regard to Glendale, Arizona and the police incident that occurred on July 26, 2017 at approximately 7:30 p.m.

E.  All communications, including emails, phone calls, texts, notes, letters, or messages of any sorts, with the Federal Bureau of Investigations with regard to the police incident that occurred on July 26, 2017 at approximately 7:30 p.m.

F.  Any document relating in any way to the police incident that occurred on July 26, 2017 at approximately 7:30 p.m.

WHEATCROFT000040 Scanned with CamScanner

WHEATCROFT000041

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Arizona

| Johnny Wheatcroft, et al., | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   2:18-cv-02347 |
| City of Glendale, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      H & S Hospitality, LLC (Stat Agent: Hiren Patel, 7116 N. 59th Ave., Glendale, AZ 85301)

*(Name of person to whom this subpoena is directed)*

☑ *Production:* YOU ARE COMMANDED to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: 3185 South Price Road<br>Chandler, Arizona 85248 | Date and Time:<br>06/17/2019 10:00 am |
|---|---|

☐ *Inspection of Premises:* YOU ARE COMMANDED to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

| CLERK OF COURT | OR | |
|---|---|---|
| _____ | | _____ |
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Plaintiff
Johnny Wheatcroft , who issues or requests this subpoena, are:
Jody L. Broaddus, 3185 S. Price Rd., Chandler, AZ 85248, jody@attorneysforfreedom.com, 480-455-5229

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

WHEATCROFT000049

Scanned with CamScanner

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  (A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Scanned with CamScanner

**Exhibit A**
**Attachment to Subpoena**

You are requested to produce and deliver to the Attorneys For Freedom Law Firm any and all records that you have in your possession concerning *Wheatcroft, et al, v. City of Glendale, et al.*, docket number 2:18-cv-02347, United States District Court, as listed below:

A.   Any agreement of any kind between Motel 6 and the City of Glendale, Glendale Police Department or any other law enforcement agency, representative, or individual with regard to Glendale, Arizona from 2016 to present.

B.   Any document indicating any "blanket trespass" authorization for Glendale Police Department officers from 2016 to present.

C.   All surveillance footage of the exterior of the premises (7116 North 59th Avenue, Glendale, Arizona 85301) captured from 7:00 p.m. to 8:00 p.m. on July 26, 2017.

D.   All communications, including emails, phone calls, texts, notes, letters, or messages of any sorts, with the City of Glendale, Glendale Police Department or any other law enforcement agency, representative, or individual with regard to Glendale, Arizona and the police incident that occurred on July 26, 2017 at approximately 7:30 p.m.

E.   All communications, including emails, phone calls, texts, notes, letters, or messages of any sorts, with the Federal Bureau of Investigations with regard to the police incident that occurred on July 26, 2017 at approximately 7:30 p.m.

F.   Any document relating in any way to the police incident that occurred on July 26, 2017 at approximately 7:30 p.m.

Scanned with CamScanner

WHEATCROFT000045



## Trespassing Enforcement Authorization Form

**Property Address:** 7116 N 59th AVE

**Property Description:** MOTEL 6

I Hiren Patel am the owner of record, resident or designated agent over the above property.

You can reach me by calling _____ or _____, or my designee

Hiren Patel at phone # 623-939-9431 email: Motel6glendale@gmail.com

I hereby give authority to each and every police officer of the **Glendale Police Department** to act as my agent in enforcing the trespassing laws at the above property in accordance with ARS 13-1502 thru 13-1504. Trespassers include those who are not on the premises to visit or conduct lawful business with the management or a resident of the premises. A person commits Criminal Trespass by knowingly:

1. Entering or remaining unlawfully on any real property after a reasonable request to leave the property by the owner or any person having lawful control over the property and/or
2. Are on the premises after a reasonable notice prohibiting entry

By signing, I acknowledge that I agree to assist with prosecution of any individual found in violation of trespassing on my property.

**I understand that I am responsible for ensuring that appropriate signs are posted and maintained in order for officers to enforce trespassing.** The signs must be placed in a conspicuous location on the property and must have the **Arizona Revised Statutes code 13-1502-A1** printed on them.

In the event that I sell the above property, and/or no longer have lawful control, **I will notify the Glendale Police Department in writing at 6835 N. 57th Drive, Glendale, AZ 85301, ATTENTION: Police Communications**

**I acknowledge this form is valid for a period of one year from the date of signature and that I must re-new the trespassing enforcement authorization form by contacting a police representative.**

Hiren Patel
**Property Owner/Designee (print)**

8/30/18
**Date**

_C. McClung 5176_
**Owner/Designee Signature**

**Police Representatives Name and ID Number**

8/30/18
**Date**

**Date**

|            Office Use Only            |
| DR_____        Chips_____ |
| Grid_____   Beat_____   CAD_____ |

City of Glendale Police* 6835 N. 57th Drive, Glendale AZ 85301*(623) 930-3000
Revised 03/08/2017

WHEATCROFT000046

WHEATCROFT000047

Gmail - Blanket Trespass Form for Glendale PD                    https://mail.google.com/mail/u/0?ik=a0450a4837&view=pt&sea...

 Gmail                                        HIREN PATEL <hiren.patel1515@gmail.com>

## Blanket Trespass Form for Glendale PD
1 message

**Ngalula, Tiffany** <TNgalula@glendaleaz.com>                          Tue, Feb 12, 2019 at 2:09 PM
To: "glendaleinn@yahoo.com" <glendaleinn@yahoo.com>, "hiren.patel1515@gmail.com"
<hiren.patel1515@gmail.com>
Cc: "Roth, John" <JRoth@glendaleaz.com>

Good afternoon,

I just got off the phone with Juanita. She advised the best way to get a hold of you would be to email as you just left
the motel. I had Sgt. Jarrod Smith attempting to assist me in getting a copy of the blanket trespass form that was
valid during the date of 7/26/2017. I believe it would have been two forms ago. So not this current year, nor last
year's, but the previous year for the Motel 6 property located at 7116 N. 59th Ave. Please email me a copy as soon
as you can. Thank you so much for your assistance.


*Respectfully,*

*Officer Tiffany Ngalula #13507*

*Public Information Officer*

*Glendale Police Department*

**6835 N. 57th Drive**

*Glendale, AZ 85301*

**tngalula@glendaleaz.com**

**Police_pio@glendaleaz.com**

*Tues-Fri 7am-5pm*

*Office: (623) 930-3276*

*Cell: (623) 694-5333*

*On Call: (602) 888-3908*

WHEATCROFT000048

# *EXHIBIT 12*

# *Non-Electronic Exhibit - CD and Filed Under Seal*

# *EXHIBIT 13*

# *Non-Electronic Exhibit - CD and Filed Under Seal*

# *EXHIBIT 14*

1  Joseph J. Popolizio, Bar #017434
   Justin M. Ackerman, Bar #030726
2  Ian C. Beck, Bar #035599
   JONES, SKELTON & HOCHULI, P.L.C.
3  40 North Central Avenue, Suite 2700
   Phoenix, Arizona 85004
4  Telephone: (602) 263-1700
   Fax: (602) 200-7876
5  jpopolizio@jshfirm.com
   jackerman@jshfirm.com
6  ibeck@jshfirm.com

7  Attorneys for Defendants

8

9                    UNITED STATES DISTRICT COURT

10                         DISTRICT OF ARIZONA

11  Johnny Wheatcroft and Anya Chapman, as          NO. 2:18-cv-02347-MTL
    husband and wife, and on behalf of minors J.W.
12  and B.W.,                                       **DECLARATION OF MATTHEW
                                                    SCHNEIDER**
13                                     Plaintiffs,

14              v.

15  City of Glendale, a municipal entity; Matthew
    Schneider, in his official and individual
16  capacities; Mark Lindsey, in his official and
    individual capacities; and Michael Fernandez, in
17  his official and individual capacities,

18                                     Defendants.

19

20          I, Matt Schneider, make the following Declaration:

21          1.      I am over the age of 18 years and have personal knowledge to testify to

    the matters set forth in this Declaration.
22
            2.      This Declaration is intended solely to supplement the testimony given
23
    in my deposition on June 1, 2020.
24
            3.      As more fully set forth in my deposition in this matter, I was a City of
25
    Glendale Police Officer on the date of the incident giving rise to this action.
26
            4.      The attached video, taken from my body camera, is a true and accurate
27
    depiction of my encounter with Plaintiffs on the evening of July 26, 2017, as captured
28
    9243999.1

1   through my body camera.   [Schneider bodycam Video 1 (CoG_WHEATCROFT 00383),
2   attached as **Exhibit A**].

3        5.     While my body camera video is attached as Exhibit A generally shows
4   video evidence of my encounter with Plaintiffs, at certain points during Exhibit A, it is
5   difficult to see each and every action occurring between Mr. Wheatcroft and me due to
6   rapidly changing body movements and/or shifting camera angles during the altercation.
7   During those particular portions of the physical confrontation with Mr. Wheatcroft, I provide
8   an account of what occurred, to the best of my recollection.

9        6.     When I walked up to the Ford Taurus parked in the Motel 6 on July 26,
10   2017, I observed Mr. Wheatcroft being evasive, hunched over, and attempting to reach his
11   hand into his backpack at his feet.

12        7.     Upon seeing this conduct, I became highly concerned for my safety and
13   that of those around me, including the minor children, because I did not know what was
14   inside the vehicle; Mr. Wheatcroft's repeated furtive movements were making me concerned
15   he would reach for a weapon or other unseen dangerous object.

16        8.     When I opened the door to the Ford Taurus after Mr. Wheatcroft
17   reached into his backpack and into other areas of the vehicle, I did so to remove Mr.
18   Wheatcroft solely due to safety concerns and concern for the safety of those around me, and
19   not because Mr. Wheatcroft refused to provide his identification or name.

20        9.     After I opened the door to the Ford Taurus and Mr. Wheatcroft put his
21   foot outside the car door, which caused me to have a heightened awareness of his actions and
22   increase my concern that Mr. Wheatcroft was a threat because I had not ordered him to get
23   out of the vehicle, nor did I have control over him when he put his foot on the pavement.
24   That is why I instructed Mr. Wheatcroft to keep his foot in the vehicle at this time.

25        10.     After I holstered my Taser and after Mr. Wheatcroft told me he was not
26   going to fight with me, he continued to tense his arm, actively resist my attempt to place him
27   in a control hold, and began to shout profanities.

28

1        11.    After I saw Anya Chapman knock out Officer Lindsey, I used my Taser

2  in dart mode against Mr. Wheatcroft in an attempt to control an out of control situation and

3  in to avoid further injury to myself and those around me.

4        12.    After Anya Chapman was being taken into custody, Mr. Wheatcroft

5  began fighting with me and the other Officers on scene with renewed vigor and anger. This

6  included the multiple kicks that I received which can be seen on my body worn camera at

7  2:36:00z-2:36:10z.

8        13.    During the roughly three minute encounter I had with Johnny

9  Wheatcroft, it was a dynamic and fast moving situation that did not afford me time to

10  deliberate.

11        14.    My entire intent behind every action I took with Mr. Wheatcroft was to

12  ensure the safety of myself and those around me.

13        15.    I had absolutely no intent to cause either of the minor children any

14  emotional distress or harm during my encounter with Johnny Mr. Wheatcroft on July 26,

15  2017 or otherwise.

16        16.    I had absolutely no intent to purposefully interfere with the familial

17  association rights of the Plaintiffs.  All actions I took during my encounter with the Plaintiffs

18  were related to legitimate law enforcement objectives, including but not limited to officer

19  safety concerns.

20        17.    I was regularly supervised by the City of Glendale.  Sgt. LaBrant was my

21  supervisor at the time of the incident.  On the day of the incident, however, Sgt. LaBrant was

22  on vacation, so Sargent Rachel Bousman and Lieutenant Nicholas Susurus were on scene as

23  supervisors on the day of the incident.

24        18.    During my entire confrontation with Mr. Wheatcroft, my intent was to

25  gain control over a chaotic and violent situation that Mr. Wheatcroft and his wife, Anya

26  Chapman created.  I did not have a pre-conceived intent or vendetta at any time prior to or

27  during my confrontation with Mr. Wheatcroft.  Rather, I acted with what I believed was my

28

1  lawful authority to control a non-responsive and violent suspect who was resisting my lawful

2  commands and his lawful arrest.

3           19.     I declare under penalty of perjury that the foregoing is true and correct.

4

5  Date: 3/25/2021                          By: _____

6                                               Matthew Schneider

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9243999.1                                    4

# *EXHIBIT A*

# *Non-Electronic Exhibit - CD*