# INDEX TO EXHIBITS

**Wheatcroft v. City of Glendale, et al**
**No. 2:18-cv-02347-MTL**

| EXHIBIT | DESCRIPTION | |
|---|---|---|
| 1 | Deposition of Johnny Wheatcroft | |
| 2 | Officer Tolbert's Body Camera Video | Non-Electronic Exhibit - CD |
| 3 | Motel 6 Location History Report | |
| 4 | Deposition of Mark Lindsey | |
| 5 | Deposition of Matthew Schneider | |
| 6 | Deposition of Shawn Blackburn | |
| 7 | Deposition of Michael Fernandez | |
| 8 | Deposition of Anya Chapman | Filed Under Partial Seal |
| 9 | Officer Schneider's Body Camera Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 10 | Deposition of Jerry McDaniel | |
| 11 | Motel 6's Response to Plaintiffs' Subpoena Duces Tecum | |
| 12 | Officer Lindsey Body Camera Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 13 | Motel 6 Surveillance Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 14 | Matthew Schneider's Declaration | |
| 15 | Darko Babic Declaration/Report | |
| 16 | Michael Fernandez's Declaration | |
| 17 | Blake McClelland Declaration/Report | |
| 18 | Mark Lindsey's Declaration | |
| 19 | Glendale Fire Department Records | Filed Under Seal |

9265126.1

| 20 | Deposition of Robin Nash | Filed Under Seal |
|----|--------------------------|------------------|
| 21 | Deposition of J.W. | Filed Under Seal |
| 22 | Deposition of B.W. | Filed Under Seal |
| 23 | Scene Photographs of Methamphetamines | |
| 24 | Deposition of Roy Lewis | |
| 25 | Criminal Complaint | |
| 26 | Indictment | |
| 27 | Order Dismissing Complaint | |
| 28 | Minute Entry Regarding Anya Chapman's Plea Agreement | |
| 29 | Glendale Police Department's General Order-23.000 | |
| 30 | Deposition of Richard St. John | |
| 31 | Deposition of Brandon Blanco | |
| 32 | Deposition of Earl Montgomery | |
| 33 | Deposition of Donald LaBrant | |
| 34 | Training Records | |
| 35 | Arizona Post Certifications | |
| 36 | Mark Lindsey's Employment Application | |
| 37 | Matthew Schneider's Employment Application | |
| 38 | Michael Fernandez's Employment Application | |
| 39 | Scene Photographs of Soda/Scale | |
| 40 | Officer Fernandez's Pulse Log Evaluation | |

9265126.1

*EXHIBIT 15*

Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
Ian C. Beck, Bar #035599
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona  85004
Telephone:  (602) 263-1700
Fax:  (602) 200-7876
jpopolizio@jshfirm.com
jackerman@jshfirm.com
ibeck@jshfirm.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya Chapman, as
husband and wife, and on behalf of minors
J.W. and B.W.,

                              Plaintiffs,

v.

City of Glendale, a municipal entity; Matt
Schneider, in his official and individual
capacities; Mark Lindsey, in his official and
individual capacities; and Michael Fernandez,
in his official and individual capacities,

                              Defendants.

NO. 2:18-cv-02347-MTL

**DECLARATION OF DARKO
BABIC, M.S.**

I, ~~Dakro~~ Darko Babic, make the following Declaration:

1.     I am over the age of 18 years old and competent to testify to the matters set forth in this Declaration.

2.     I have prepared an expert witness report dated November 6, 2020, in the above captioned matter, attached hereto as Exhibit A, which is a true and accurate copy of my report.

3.     The opinions expressed therein are offered to a reasonable, or higher, degree of engineering, professional, and/or scientific certainty and/or probability within my

9244151.1

1    field of expertise as an engineering expert.

2               4.       My Curriculum Vitae is attached hereto as Exhibit B, which is a true

3    and accurate copy of my Curriculum Vitae at the time I authored my expert report in this

4    matter.

5                5.       I declare under penalty of perjury that the opinions in Exhibit A are

6    true to the best of my knowledge and belief.

7              I declare under penalty of perjury that the foregoing is true and correct.

8              Executed on : *March* 2 2 , 2021

9

10                              By:

11                             Darko Babic

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# *EXHIBIT A*

*Forensic Failure Engineering (FFE), LLC*



**Wheatcroft, et al v. City of Glendale, et al, NO. 2:18-cv-02347-MTL**

*CoG_WHEATCROFT 059115*

# Wheatcroft, et al v. City of Glendale, et al

Prepared for:

Joseph J. Popolizio, Esq.
Jones, Skelton & Hochuli, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, AZ 85004

Prepared by:

Darko Babic, M.S.
Forensic Failure Engineering &
Scientific Consulting, LLC
3791 W Barcelona Dr.
Chandler, Arizona 85226

November 6, 2020

190160.000 1120 DBRPT1

CoG_WHEATCROFT 059116

# Contents

Page

**List of Figures**      **ii**

Standard of Review      1

Introduction      1

Bases for Opinions      1

Case-Specific Materials Reviewed      2

Exhibits      4

Background      5

Review of the Available Videos      5

Review of the Taser Logs      6

Review of ECD Operation and Metal Probes      7
     Review of ECD Operation      7
     Metal Probes and Arcing Location      10

Wire Testing and Fracture Evaluation      13

Study of Damage Induced on Metal Probes by ECD Discharge      18

Inspection of Received Evidence      32

Analysis      38

Opinions of Darko Babic      42

Additional References      44

i

CoG_WHEATCROFT 059117

# List of Figures

Page

Figure 1.    Simplified schematic of a human body connected to a TASER ECD through the wires (metal probes not shown), and the equivalent electrical circuit depicting the electrical configuration of such completed circuit connection.    7

Figure 2.    X26 ECD – Note the two fixed electrodes at the tip of the ECD unit.  When a cartridge is inserted at the front of the unit, the cartridge also has two fixed electrodes.  These allow the unit to be used in "drive-stun" mode after the cartridge had been expended.    9

Figure 3.    X2 ECD – Note the two cartridges instead of one cartridge in X26.  Each cartridge can establish an electrical arc between the two electrodes as shown. fixed electrodes at the tip of the ECD unit.    9

Figure 4.    Typical TASER ECD metal probe used in X26 ECD. In this instance, the barb is turned to the left (hook facing left).    11

Figure 5.    Axon zinc probe with the yellow cap and slightly different barb shape.    12

Figure 6.    Wire location and retention on the zin probes.    12

Figure 7.    Force – Displacement graph for the wire tested at the lowest loading rate – 0.039 in/min.    15

Figure 8.    Force – Displacement graph for the wire tested at the intermediate loading rate – 1.97 in/min.    16

Figure 9.    Force – Displacement graph for the wire tested at the highest loading rate – 174.6 in/min.    16

Figure 10.    Condition of the broken wire ends for sample 1-25-2-L – slowest loading rate.  Note the significant stretch of the insulation material (between the yellow arrows – millimeter scale at the bottom).    17

Figure 11.    Condition of the wire tips for sample 1-25-1-L – highest loading rate.  Note the less pronounced stretch of the insulation material (between the yellow arrows).    18

Figure 12.    Surface appearance inside the transverse hole after a five (5) second discharge duration through the completed circuit.  The transverse hole axis is vertical in this image, while the observed hole going into the paper is the smaller longitudinal hole.    20

Figure 13.    Surface profilometry measurement on the sample from Figure 12 – five (5) second discharge duration.  The undisturbed areas are indicated by the reddish orange areas, while the deeper pitted sections are depicted by the

ii

CoG_WHEATCROFT 059118

blue-green areas.  The color chart shows the depth of the depressions in the surface of the affected area. ..... 21

Figure 14.  Surface appearance inside the transverse hole after a ten (10) second discharge duration.  The obvious whitish pit shown just above the longitudinal half-tunnel is the damaged area. The long axis of the transverse hole is oriented approximately horizontally.  Note the two surfaces at the top and bottom of the image, which were created by removing (cutting) the bottom end of the probe.  Despite removing the bottom of the hole the evidence remained intact. ..... 22

Figure 15.  Surface profilometry measurement on the sample from Figure 14 – ten (10) second discharge duration.  The pitted area is more than 20 micrometers deeper than the surface of the surrounding metal. ..... 23

Figure 16.  Surface appearance inside the transverse hole after a fifteen (15) second discharge duration. ..... 24

Figure 17.  Surface profilometry measurement on the sample from Figure 16 – fifteen (15) second discharge duration. ..... 25

Figure 18.  Surface appearance inside the transverse hole after a thirty (30) second discharge duration. ..... 26

Figure 19.  Surface profilometry measurement on the sample from Figure 18 – thirty (30) second discharge duration. ..... 27

Figure 20.  Surface appearance inside the transverse hole after a forty five (45) second discharge duration. ..... 28

Figure 21.  Surface profilometry measurement on the sample from Figure 20 – forty five (45) second discharge duration. ..... 29

Figure 22.  Surface profilometry volume measurements of the holes and peaks over the area identified to have sustained arcing damage.  The first one or two positions in the sample label indicate the duration of ECD discharge. ..... 29

Figure 23.  Surface appearance on the zin probe, in the area of the wire tip restrained by the yellow cap, after approximately 1.5 second discharge duration. ..... 31

Figure 24.  Surface appearance on the zin probe, in the area of the wire tip restrained by the yellow cap, after approximately 5 second discharge duration. ..... 32

Figure 25.  Appearance of cartridge 1A. ..... 33

Figure 26.  Appearance of cartridge 2A. ..... 33

Figure 27.  Appearance of cartridge 1B. ..... 34

Figure 28.  Appearance of cartridge 2B. ..... 34

Figure 29.  Appearance of the surface morphology changes on cartridge 2A. ..... 36

Figure 30.   Probe resting on the ground near Mr. Wheatcroft (screenshot from Officer
Schneider's body cam video.                                                        37

Figure 31.   Appearance of the surface morphology changes on cartridge 2B.          38

Figure 32.   Moment when two probes deployed by Office Schneider struck Mr.
Wheatcroft.                                                                          39

Figure 33.   Location of the sequence 11 drive stun application by Officer Schneider.   41

iv

*CoG_WHEATCROFT 059120*

## Standard of Review

All statements and opinions herein are to a reasonable, or higher, degree of engineering, professional, and/or scientific certainty and/or probability.

## Introduction

At the request of Mr. Joseph J. Popolizio of Jones, Skelton & Hochuli, P.L.C., I have investigated an incident involving Mr. Johnny Wheatcroft, his wife Anya Chapman, their minor children J.W. and B.W., and Shawn Blackburn.  On July 26, 2017, Officer Matthew Schneider and Officer Mark Lindsey approached a vehicle parked in a motel parking lot in which Mr. Johnny Wheatcroft was a passenger seated on the front right, with his wife, Mrs. Chapman, and children also passengers seated in the rear. Mr. Blackburn was the driver of the vehicle.  Officers Schneider and Lindsey were joined by Officer Michael Fernandez.  After a brief initial encounter, Officers attempted to subdue Mr. Wheatcroft and, in the process, used their X2 Taser Electrical Discharge Devices (ECDs).  Mr. Wheatcroft alleged that he was unlawfully treated and that his constitutional rights were violated.

## Bases for Opinions

I am a Principal at Forensic Failure Engineering, LLC (FFE), where I specialize in engineering analysis of structural, dynamic, and materials issues, with specific expertise and experience investigating material behavior under various conditions including electrical arcing, as well as product design and various system issues.  I have a Bachelor of Science in Mechanical Engineering and a Master of Science in Materials Science and Engineering, both from the Arizona State University.  I recently served as a Chairman of the Arizona Chapter for American Society of Materials International, responsible for providing information to the public related to structural and materials issues.  In addition, I peer review scientific papers for various journals and societies including the Journal of Testing and Evaluation and the Society of Automotive Engineers.  I served on the American Society of Mechanical Engineers Committee for High Pressure Piping Code B31.3, where I was responsible for design, safety, testing requirements, and material selection for ultra-high purity high-pressure systems.

1

CoG_WHEATCROFT 059121

Using optical microscopy and scanning electron microscopy (SEM), I have personally examined more than 500 TASER ECD probes subjected to various electrical discharge durations when the circuit was completed between the barbed probes.  Also, using a surface profilometer capable of detecting and characterizing the unevenness of a surface, I have evaluated the changes in surface morphology for various delivered discharge durations.  These technologies and forensic analyses are generally accepted in the fields of mechanical, materials, and electrical engineering.

Attached, as Appendix A, is a true and correct copy of my curriculum vitae.  I am over 18 years of age.  A list of cases in which I have provided expert testimony over the past 5 years is attached as Appendix B.  FFE currently charges $385 per hour for my services.

My opinions in this matter are based upon the following and are to a reasonable, or higher, degree of scientific certainty and/or probability:

1) My education, training, and experience.

2) My evaluation of Wheatcroft incident case materials, including fact witness statements and interviews, office and surveillance videos and still frames, and various reports.

3) My inspection and analysis of the subject TASER X2 ECDs including the metal probes and wires that were reportedly dispatched towards Mr. Wheatcroft, and my evaluation of exemplar probes tested.

I may have supplemental opinions after further discovery process provides additional details about the allegations and the foundations upon which the Plaintiffs based their allegations.

## Case-Specific Materials Reviewed

The following Wheatcroft case/incident specific materials were reviewed and considered in forming my opinions that are set forth in this report:

**Compiled list of materials received:**

1. Second Amended Complaint

2

*CoG_WHEATCROFT 059122*

2. Defendants' Answer to Plaintiffs' Second Amended Complaint
3. Defendants' First Supplemental Response to Plaintiffs' Request for Production No. 3
4. Defendants' Response to Mandatory Initial Discovery Pilot Program Requests, plus Exhibits
5. Defendant's Response to Plaintiff's Non-Uniform Interrogatories
6. Defendants' Response to Plaintiffs' First Set of Requests for Admissions to City of Glendale, Matt Schneider, Mark Lindsey, and Michael Fernandez
7. Defendants' Response to Plaintiff's Request for Production
8. Defendants' Response to Plaintiff's Second Request for Production
9. Defendants' Response to Plaintiff's Third Request for Production
10. Plaintiffs' Responses to the Mandatory Initial Discovery Project, plus Exhibits
11. Summary of Incident by Sgt. Matt Moody #14758
12. Taser Pulse Log Evaluations of:
    a. Ofc. Fernandez #15225
    b. Ofc. Lindsey #15543
    c. Ofc. Schneider #12251
13. Officer Fernandez's Axon Time Sync Report, Bates No. CoG_WHEATCROFT 001744
14. Officer Fernandez's Axon Taser Download Report, Bates No. CoG_WHEATCROFT 001743
15. Officer Lindsey's Axon Time Sync Report, Bates No. CoG_WHEATCROFT 002235
16. Officer Schneider's Axon Taser Time Sync Report, Bates No. CoG_WHEATCROFT 002233
17. Officer Schneider's Taser Report, Bates No. CoG_WHEATCROFT 002232
18. Officer Schneider's Axon Taser Report, Bates Nos. CoG_WHEATCROFT 002213-CoG_WHEATCROFT 002214.
19. Officer Lindsey's Axon Taser Report, Bates No. CoG_WHEATCROFT 002157.
20. Scene Photographs: Bates numbers CoG_WHEATCROFT 000112-000371
21. Videos
    a. Motel 6 Video Surveillance footage from July 26, 2017, Bates No. CoG_WHEATCROFT 000372
    b. Officer Lindsey's Body-Worn Camera Footage from July 26, 2017, Bates No. CoG_WHEATCROFT 000380
    c. Officer Schneider's Body-Worn Camera Footage from July 26, 2017, Bates No. CoG_WHEATCROFT 000383.
22. Audio Recordings
    a. Audio recording of Officer Fernandez's Criminal Interview, Bates No. CoG_WHEATCROFT 002238.
    b. Audio recording of Officer Fernandez's Professional Standards Unit Interview, Bates No. CoG_WHEATCROFT 002239.
    c. Audio recording of Officer Lewis's Professional Standards Unit Interview, Bates No. CoG_WHEATCROFT 002240.
    d. Audio recording of Officer Lindsey's Criminal Interview, Bates No. CoG_WHEATCROFT 002242.

CoG_WHEATCROFT 059123

     e.  Audio Recording of Officer Lindsey's Professional Standards Unit Interview, Bates No: CoG_WHEATCROFT 002243.

     f.  Audio Recording of Lieutenant Montgomery's Professional Standards Unit Interview, Bates No: CoG_WHEATCROFT 002244.

     g.  Audio Recording of Officer Pittman's Professional Standards Unit Interview, Bates No: CoG_WHEATCROFT 002246.

     h.  Audio Recording of Officer Schneider's Professional Standards Unit Interview, Bates No: CoG_WHEATCROFT 002250.

     i.  Audio Recording of Officer Tolbert's Professional Standards Unit Interview, Bates No: CoG_WHEATCROFT 002251.

23. Depositions of:
     a.  Officer Michael Fernandez w/Exhibits
     b.  Officer Mark Lindsey w/Exhibits

24. Sergeant Jerry's McDaniel's Memorandum re Officer Schneider's Response to Resistance, Bates Nos: CoG_WHEATCROFT 002159-CoG_WHEATCROFT 002160

25. Plaintiffs' Notice of Claim dated June 22, 2018

26. Plaintiffs' Notice of Claim dated February 21, 2019

27. Glendale Police Department General Order: Bates Numbers WHEATCROFT000004-000027

28. Glendale Police Department Supplementary Reports: Bates Numbers CoG_WHEATCROFT 000001-000060.

29. Correspondence from Attorneys for Freedom Law Firm and Notice of Claims: Bates Numbers WHEATCROFT000001-000003

30. Videos of Wheatcroft Interviews by:
     a.  Sgt. Gallagher
     b.  Officer Tolbert

31. Video of Blackburn interview by Officer Lewis

32. Depositions of:
     a.  Roy Lewis
     b.  Matthew Schneider
     c.  B.W.
     d.  J.W
     e.  Shawn Blackburn
     f.  B.W. (2nd)

33. Signature and Correction Page for Matthew Schneider

## Exhibits

All information, any and all of the underlying foundational or support materials and documents, and/or any portion thereof within this document or any of its references or attachments are to be considered important exhibits with regard to this case and this report. All photos, probes, wires,

4

analyses, PDF files, images, videos, recordings, testing, methods, procedures, etc. are all to be considered exhibits that are hereby fully incorporated and an integral part of this report and may be used at any time during any aspect of proceedings associated with this case including, but not limited to, deposition and/or trial as exhibits to aid in my testimony, presentation, explanation, or for any other purpose.

# Background

## Review of the Available Videos

According to analysis of the videos performed by FFE, the following is the sequence of events that took place during the subject incident:

1. Office Schneider approached a vehicle in which Mr. Wheatcroft was a passenger seated at the front right. During a brief initial interaction Officer Schneider attempted to persuade Mr. Wheatcroft to comply with Officer's commands by placing a Taser X2 ECD device against Mr. Wheatcroft's body but did not deploy it in either a probe or drive stun modes. Mr. Wheatcroft complied at that point.

2. A few moments later Office Schneider and Officer Lindsey attempted to place handcuffs on Mr. Wheatcroft with Officer Lindsey deploying his Taser X2 device in a drive stun mode.

3. During the attempted handcuffing of Mr. Wheatcroft, Mrs. Anya Chapman who is Mr. Wheatcroft's wife and was seated in the rear seat, struck Officer Lindsey on his head. Officer Lindsey fell to the ground as a result of getting struck.

4. Officer Schneider stepped away at that point and deployed his Taser X2 ECD in a probe mode towards Mr. Wheatcroft. The video indicates that one of the probes became detached from Mr. Wheatcroft and landed on the ground near him.

5. Soon after, Officer Fernandez deployed his Taser X2 device in the probe mode towards Mr. Wheatcroft.

6. No officer deployed another cartridge in the probe mode towards Mr. Wheatcroft.

7. Several moments later Mr. Wheatcroft was handcuffed but was still resisting, at which point Officer Schneider administered his ECD in a drive stun mode below Mr. Wheatcroft's left buttocks.

5

8.  Soon after Mr. Wheatcroft stopped resisting, the officers removed four ECD probes from Mr. Wheatcroft's body, which indicates that Mr. Wheatcroft interacted with the probe that missed him and was resting on the ground after the initial ECD deployment in the probe mode by Officer Schneider.

9.  On July 27, 2017, Mr. Wheatcroft was interviewed by Officer Lacey Tolbert while he was in jail, which was recorded on Officer Tolbert's body cam footage.  During the interview Mr. Wheatcroft stated: "*He intentionally kicked me in my balls and then he even f\*\*\*\*\*\* tased me right down there on purpose, intentionally. Kept it going for a minute.  I was like fine, tase me with them wires they don't hurt, they don't hurt at all. They are annoying and s\*\*\**".

## Review of the Taser Logs

-  The log for the X2 Taser with serial number X29000CTY, which belonged to Officer Lindsey, indicates that it was discharged two times during the subject incident:
    o  Sequence 2: At 19:11:23 (device time) for 1 second.
    o  Sequence 3: At 19:11:24 (device time) for 1 second.
-  The log for the X2 Taser with serial number X29000CH6, which belonged to Officer Fernandez, indicates that it was discharged one time during the subject incident:
    o  Sequence 2: At 19:32:11 (device time) for 5 seconds.
-  The log for the X2 Taser with serial number X29000CDK, which belonged to Officer Schneider, indicates that it was discharged eight times during the subject incident:
    o  Sequence 4: 19:31:47 (device time) for 15 seconds.
    o  Sequence 5: 19:31:52 (device time) for 10 seconds.
    o  Sequence 6: 19:32:06 (device time) for 3 seconds.
    o  Sequence 7: 19:32:11 (device time) for 1 second.
    o  Sequence 8: 19:32:12 (device time) for 6 seconds.
    o  Sequence 9: 19:32:18 (device time) for 5 seconds.
    o  Sequence 10: 19:32:26 (device time) for 1 second.
    o  Sequence 11: 19:33:26 (device time) for 4 seconds.

6

# Review of ECD Operation and Metal Probes

## Review of ECD Operation



Figure 1.     Simplified schematic of a human body connected to a TASER ECD through the wires (metal probes not shown), and the equivalent electrical circuit depicting the electrical configuration of such completed circuit connection.

Handheld TASER Electronic Control Devices (ECDs) are commonly used by law enforcement and military.  A handheld TASER ECD consists of a handle portion that generates the electrical discharge pulses and a cartridge portion that, when the ECD achieves an intact completed electrical circuit delivers the electrical energy to a subject.  The tip of the unit is designed such that a cartridge can be attached to it mechanically, but also so that electrical continuity can be established between the unit and the cartridge[1].  An ECD cartridge contains metal probes, each of which are typically attached to 20 to 35 feet of folded, small diameter insulated wire.   The wires attach at the other end to the cartridge and thereby the ECD unit.  When the unit is fired, the metal probes are propelled from the cartridge by means of pressurized gas stored within the cartridge. As the metal probes are propelled outward from the unit, the wires unfold and maintain electrical contact between the metal probes and the cartridge/ECD unit.  As soon as the metal probes with pointed tips either penetrate the subject's skin, or come simultaneously into sufficiently close proximity to the subject's skin, an electrical circuit is established between the two (positive and

---

[1] A small air gap exists between the electrical contacts of the cartridge and the handle.  The voltage is sufficient to enable the electrical discharge to bridge this air gap.

190160.000 1120 DBRPT1

CoG_WHEATCROFT 059127

negative) terminals on the unit, i.e. when in sufficiently close cumulative proximity to both metal probes the subject's body can provide the connection between the two probes, Figure 1.

When in probe deployment mode, with sufficient probe spread, and intact electrical circuit established that includes the probes and the subject's body, an ECD is designed to deliver an electric current to a subject's body with the purpose of temporarily incapacitating the subject. Activation of the ECD trigger not only dispatches the metal probes from the cartridge, but it also delivers a burst of energy at the output of the unit and potentially to the subject. For example, a TASER X26 ECD (Figure 2), is rated to deliver approximately a 1,200 V peak pulse at an approximate pulse rate of 19 pulses a second with each pulse lasting less than 150 microseconds. Another ECD type, TASER X2 (Figure 3), is designed to deliver a similar pulse as X26 with electrical charge of $63 \pm 9$ microcoulombs (µC). Axon, manufacturer of X2 ECD, specifies the target charge level for X2 ECD between 54 and 72 microcoulombs also at approximately 19 pulses per second. In case of the X2, if the connection with the target is lost the pulse rate drops to 8 pulses per second.

With an electrical circuit established between the two metal probes and the subject's body the energy flows in and out of the subject's body through two thin insulated wires connected on one end to the two metal probes and on the other end to the cartridge/unit. The diameter of the metal wire with insulation is approximately 370 micrometers (370 millionths of a meter, or approximately 0.015 inches), while the diameter of the metal wire alone is approximately 0.127 microns (approximately 0.005 inches). The type of attachment utilized between the wires and the metal probes creates an air gap between the wire tip and the metal probe, which must be simultaneously bridged on both the positive and negative sides to complete and then maintain the electrical circuit. Due to the high voltage pulse, the air gap is bridged by an electrical arc which develops between the wire tip and the metal probe. This arcing activity results in visible changes (witness marks) to the wire tip and the surface of the metal probe exposed to the arcing. The presence of such surface morphology changes provides physical evidence indicating that the electrical circuit between the two metal probes was closed (an electrical circuit was established), and that energy was likely delivered to the subject's body.

8

CoG_WHEATCROFT 059128



Figure 2.    X26 ECD – Note the two fixed electrodes at the tip of the ECD unit.  When a cartridge is inserted at the front of the unit, the cartridge also has two fixed electrodes.  These allow the unit to be used in "drive-stun" mode after the cartridge had been expended.



Figure 3.    X2 ECD – Note the two cartridges instead of one cartridge in X26.  Each cartridge can establish an electrical arc between the two electrodes as shown. fixed electrodes at the tip of the ECD unit.

Alternatively, the absence of such arcing witness marks on either or both of the two metal probes indicates that the electrical circuit was never closed (an electrical circuit was never established) between the metal probes, and that the energy released by the ECD therefore never reached the

9

CoG_WHEATCROFT 059129

subject's body.  In this latter case, the energy created by the ECD must go somewhere and most likely becomes discharged as an electrical arc between the two fixed electrodes at the tip of the ECD cartridge as long as the expended cartridge remains attached to the ECD.  This latter type of discharge would also occur if the probe electrical circuit becomes interrupted for any number of reasons, including the wire breakage.  However, if the cartridge becomes dislodged from the X26 ECD, the electrical discharge would occur in the form of an arc between the two fixed electrodes at the tip of the ECD, a so called "drive stun".  The ECD can also be used in "drive-stun" mode if an expended cartridge remains in place on the ECD and the front of the cartridge is placed in direct contact with the subject.

When the probes are deployed, the X26 ECD automatically delivers a series of pulses for a minimum of 5 seconds.  The operator can stop the ECD discharge at any time by engaging the safety.  A subsequent trigger and quick release pull will generate an additional 5 seconds of stimulation.  For trigger holds longer than 5 seconds, the ECD will deliver the pulses for as long as the trigger is actuated by the operator.  It is important to note that the data logged in the X26 ECD only records the duration of the trigger pull.  It does not indicate if the probes were a part of the electrical circuit (i.e. if the probes contacted the target), or if the circuit was actually completed or interrupted at any point during the discharge.  The log also does not make a distinction between the "drive stun" and the probe mode.

## Metal Probes and Arcing Location

A typical metal probe fired from a TASER ECD is made out of nickel coated aluminum, Figure 4.  It consists of the barb (a sharp, straight barbed projection similar to a fish-hook facing left in Figure 4) attached to the tip of the cylindrical probe body.  The bottom end of the probe body has a cylindrical longitudinal hole through which the wire is pulled. The wire is then pulled through a larger transverse hole where it is retained by a knot tied on the wire itself approximately three to four millimeters (mm) from the wire's tip. This knot prevents the wire from being pulled back through the smaller longitudinal hole.  The tip of the wire is generally oriented towards the tip of the probe (typically between 10 and 2 o'clock when looking towards the tip of the probe and down at the transverse hole).  For the purpose of analysis, by observing the orientation of the barb

10

CoG_WHEATCROFT 059130

(facing left or facing right), it can be determined which side of the transverse hole (top or bottom) is being observed.



Figure 4.      Typical TASER ECD metal probe used in X26 ECD. In this instance, the barb is turned to the left (hook facing left).

190160.000 1120 DBRPT1

**CoG_WHEATCROFT 059131**

Another type of probe manufactured by Axon is made of zinc has a yellow cap at the non-barbed end (Figure 5). The yellow cap crimps the wire to the probe which eliminates the need for a wire knot (Figure 6). Similar to the above-mentioned nickel-plated probe type, electrical arc forms between the wire tip and the probe when an electrical circuit had been established between the two deployed probes.



Figure 5.    Axon zinc probe with the yellow cap and slightly different barb shape.



Figure 6.    Wire location and retention on the zinc probes.

12

CoG_WHEATCROFT 059132

As mentioned earlier, electrical arcing occurs on nickel-plated probes between the wire tip and the cylindrical surface of the transverse hole when the probes are a part of the intact ECD electrical circuit.  Based on the typical orientation of the wire tip contained within the transverse hole, the area that most likely will experience arcing is located between 10 and 2 o'clock inside the transverse hole (closer to the tip of the probe which corresponds to 12 o'clock).  Previous testing indicates that arcing can occur at various elevations (top, middle, bottom) within the transverse hole depending on the location of the wire tip, but that it always will be confined to the leading portion of the hole surface.  During all previous testing, arcing has never been observed at the rear surface of the hole (closer to the bottom of the probe corresponding to 6 o'clock).

In the case of the zinc probes, the electrical arcing occurs at the bottom of the probe and around the area of the wire tip.  FFE and Axon subjected the zinc probes with yellow caps to various durations of electrical discharge durations to evaluate surface morphology changes resulting from electrical arcing.

## Wire Testing and Fracture Evaluation

Wires from several TASER ECD cartridges were tested to determine their strength and to evaluate the resulting condition of the broken wire in the Woodward case, especially the appearance of the wire tip.  Wires from 35-foot and 25-foot cartridges were tested.  The labeling of each sample (the sample ID) provides information about each wire's origin.  For example, the sample identified as 1-25-2-L was taken from the first cartridge (first digit), the cartridge had 25 feet of wire (second and third digits), the wire sample was the second one to be collected (fourth digit), and the sample was collected from the left chamber with folded wire (last position in the sample ID).  The testing was performed at several loading rates to evaluate the effect of the loading rate on the ultimate wire load and wire/insulation condition at the fracture location.  Slower loading rate tests were conducted on an Instron tensile frame with capstan grips, while the faster loading rate tests were conducted on an MTS Mini Bionix II tensile frame, also with capstan grips.  Capstan grips were used to grab onto the wire without causing unrealistic stress concentrations at the grips, and thus to avoid underestimating the fracture force.  Results of the wire tests are shown in Table 1 and Table 2.

13

CoG_WHEATCROFT 059133

Table 1.  Wire testing results for slower load rates.

| Sample ID | Initial Failure Load (lb) | Final Failure Load (lb) | Loading Rate (in/min) |
|---|---|---|---|
| 1-25-2-L | 1.64 | 1.29 | 0.039 |
| 1-35-2-L | 1.73 | 1.53 | 1.97 |
| 2-25-2-L | 1.63 | 1.44 | 1.97 |
| 2-35-4-R | 1.74 | 1.70 | 1.97 |
| 3-25-4-R | 1.51 | 1.27 | 1.97 |
| 3-35-2-L | 1.68 | 1.47 | 1.97 |
| Average | 1.66 | 1.48 | |

Table 2.  Wire testing results for faster load rates.

| Sample ID | Initial Failure Load (lb) | Final Failure Load (lb) | Loading Rate (in/min) |
|---|---|---|---|
| 1-25-1-L | 2.00 | 1.07 | 174.6 |
| 2-25-4-R | 1.92 | 1.04 | 174.6 |
| 3-25-2-L | 1.96 | 1.00 | 174.6 |
| 1-35-3-L | 1.99 | 1.04 | 174.6 |
| 2-35-5-R | 2.08 | 1.13 | 174.6 |
| 3-35-3-L | 1.99 | 1.07 | 174.6 |
| Average | 1.99 | 1.06 | |

It was observed that the ECD wires have distinct force – displacement graphs regardless of the loading rate, which can be seen in Figure 7, Figure 8, and Figure 9.  The first peak in each graph is associated with the force needed to break the metal wire and to extend the insulation material

14

CoG_WHEATCROFT 059134

for that break to occur.  At the point of metal wire fracture, the force was transferred to insulation material only, thus the observed drop in force.  After the metal wire had fractured and the force had dropped, the insulation continued to stretch until it finally fractured as well. Thus, the second peak was associated with the final fracture of the insulation material alone.  Regardless of the loading rate, the force needed to fracture the insulation (second peak) was always lower than the force at which the metal wire fractured (first peak).

The data indicate that the force at which the metal wire fractured was fairly constant for lower loading rates and was approximately 1.6 pounds (lbf).  However, it was slightly higher at approximately 2 lbf for the highest loading rate available (174.6 in/min).  Considering instead the insulation material, the fracture force at the highest loading rate (approximately 1 lbf) was lower than the corresponding force recorded in the slower loading rate tests (approximately 1.5 lbf).



Figure 7.       Force – Displacement graph for the wire tested at the lowest loading rate – 0.039 in/min.

15

CoG_WHEATCROFT 059135



Figure 8.       Force – Displacement graph for the wire tested at the intermediate loading rate
– 1.97 in/min.



Figure 9.       Force – Displacement graph for the wire tested at the highest loading rate –
174.6 in/min.

16

CoG_WHEATCROFT 059136

After each test, the broken wire ends were examined to observe their condition.  In every test conducted, the insulation material had stretched and extended beyond the fractured metal ends at the fracture location (Figure 10, Figure 11).  This prevented subsequent direct contacts with the metal wire from occurring.  Thus, if the newly fractured ECD wire were to become a part of an electrical circuit capable of delivering an electric charge, the electricity would have to bridge the air gap created by the stretched insulation material.  In other words, arcing would have to occur, and visible evidence of this would be created, such as melted insulation or charred material.

Although the ECD wire demonstrated some rate sensitivity, the fracture force remained low for this type of wire.  Thus, it is reasonable to assume that a wire could fracture if pulled or tugged while a person is struggling or rolling onto the wires.  Such fractured wires are unlikely to complete an electrical circuit without leaving visible evidence in the form of arcing witness marks.



Figure 10.    Condition of the broken wire ends for sample 1-25-2-L – slowest loading rate. Note the significant stretch of the insulation material (between the yellow arrows – millimeter scale at the bottom).

CoG_WHEATCROFT 059137



Figure 11.      Condition of the wire tips for sample 1-25-1-L – highest loading rate.  Note the
                less pronounced stretch of the insulation material (between the yellow arrows).

## Study of Damage Induced on Metal Probes by ECD Discharge

Because ECD electrical arcs result in extremely hot gases of plasmas, typically over 10,000 degrees Fahrenheit, changes to the metal surface of the probes subjected to electrical arcing are to be expected.  All the exposed probes displayed small, but visible differences to the surface morphology such as small pits, molten and re-solidified material, and microscopic craters.  Such surface morphology changes (i.e. damage to the surface) can be used to not only establish that the electrical circuit had been completed between the wire tip and the surface of the probe, but also to relate the resulting damage to the electrical discharge duration.

I have evaluated more than 500 exemplar metal probes previously subjected to known ECD discharge durations of 5, 10, 15, 30, or 45 seconds.  The examined exemplar probes were a part of an electrical circuit that was established either through living subjects or through a 600 Ω (ohm) resistor.  No visible differences were observed between the probes discharged through the living subjects and the probes discharged through the 600 Ω resistor.  The 600 Ω resistor was used because according to current literature it is the closest to actual human living subjects (Dawes

18

**CoG_WHEATCROFT 059138**

DM, Ho JD, Kroll MW, Miner JR. Electrical characteristics of an electronic control device under a physiologic load: a brief report. Pacing Clin Electrophysiol. Mar 2010; 33(3):330-6.).

Optical microscopy, scanning electron microscopy (SEM), and surface profilometry were used in evaluating the tested probes.  Optical microscopy aided in determining the general area within the transverse hole that was exposed to arcing.  SEM was used to evaluate the changes in surface morphology and identify the areas where arcing had disturbed the surface of the hole.  It is important to note that when performing SEM analysis, the wires (with knot) had to be removed from the probes since the polymeric wire insulation could charge the SEM and thus disrupt the analysis and obstruct the imaging.  For this reason, optical analysis was made more efficient and clearer by removing the wires beforehand.

Initially, optical and SEM analyses were performed with the probes intact.  Samples were tilted to allow the arc-affected surfaces within the transverse hole to be observed.  However, it was subsequently determined that it could become difficult to access and evaluate the arcing area if arcing had taken place deep within the transverse hole.  To resolve this potential problem, a method was devised to section the transverse hole and thus allow for more direct access to the arcing area.  Once the area of arcing was identified and documented without modifying the probes, the probes were marked for cutting in such a way that the cut did not disturb or destroy the arcing area (evidence).  In general, the cutting removed the bottoms of the probes which allowed for direct access to the arcing area.  For example, in Figure 14, two cutting surfaces that were created during the removal of the bottom of the probe are visible at the top and bottom of the image, however, the area of arcing was preserved and the evidence remained intact.  Combining optical and SEM analyses allowed for reliable evidence identification as well as its preservation.

Although SEM analysis had already provided a general indication on the extent of arcing, induced surface damage, and its relation to the ECD intact circuit discharge duration, surface profilometry was also utilized to evaluate and quantify the extent of the disturbance in the areas exposed to arcing.  Such coupling between SEM and surface profilometry analyses provided for the means to relate the surface morphology changes to the duration of ECD discharge in analyzed samples.

Surface profilometry was correlated with SEM images for each of the five tested discharge durations.  From these SEM images, it was visually determined that shorter discharge durations

CoG_WHEATCROFT 059139

produced less apparent damage to the surface of the transverse hole, while longer discharge durations visually produced more pronounced damage. Surface profilometry analysis also confirmed that the damage for shorter discharge durations was indeed less pronounced than the damage for longer discharge durations. Quantitatively, the measurements obtained using surface profilometry indicated that the volume of the disturbed material increased with an increasing discharge time in the analyzed samples.



Figure 12.    Surface appearance inside the transverse hole after a five (5) second discharge duration through the completed circuit. The transverse hole axis is vertical in this image, while the observed hole going into the paper is the smaller longitudinal hole.

20

CoG_WHEATCROFT 059140



Figure 13.    Surface profilometry measurement on the sample from Figure 12 – five (5) second discharge duration.  The undisturbed areas are indicated by the reddish orange areas, while the deeper pitted sections are depicted by the blue-green areas.  The color chart shows the depth of the depressions in the surface of the affected area.

21



SEM HV: 20.00 kV   WD: 31.18 mm                VEGA\\ TESCAN
View field: 3.65 mm   SEM MAG: 70 x      1 mm
SEM MAG: 70 x   Date(m/d/y): 02/16/11         Performance in nanospace

Figure 14.   Surface appearance inside the transverse hole after a ten (10) second discharge
duration.  The obvious whitish pit shown just above the longitudinal half-tunnel is
the damaged area. The long axis of the transverse hole is oriented
approximately horizontally.  Note the two surfaces at the top and bottom of the
image, which were created by removing (cutting) the bottom end of the probe.
Despite removing the bottom of the hole the evidence remained intact.

190160.000 1120 DBRPT1

CoG_WHEATCROFT 059142



Figure 15.    Surface profilometry measurement on the sample from Figure 14 – ten (10) second discharge duration.  The pitted area is more than 20 micrometers deeper than the surface of the surrounding metal.

23

CoG_WHEATCROFT 059143



| SEM HV: 20.00 kV | WD: 28.63 mm | | VEGA\\ TESCAN |
| View field: 3.65 mm | SEM MAG: 70 x | 1 mm | |
| SEM MAG: 70 x | Date(m/d/y): 02/16/11 | | Performance in nanospace |

Figure 16.    Surface appearance inside the transverse hole after a fifteen (15) second discharge duration.

24



Figure 17.    Surface profilometry measurement on the sample from Figure 16 – fifteen (15) second discharge duration.

25

*CoG_WHEATCROFT 059145*



| SEM HV: 20.00 kV | WD: 35.04 mm | | VEGA\\ TESCAN |
| View field: 3.65 mm | SEM MAG: 70 x | 1 mm | |
| SEM MAG: 70 x | Date(m/d/y): 01/18/11 | | Performance in nanospace |

Figure 18.    Surface appearance inside the transverse hole after a thirty (30) second discharge duration.

26

CoG_WHEATCROFT 059146



Figure 19.    Surface profilometry measurement on the sample from Figure 18 – thirty (30) second discharge duration.

190160.000 1120 DBRPT1

CoG_WHEATCROFT 059147



| SEM HV: 20.00 kV | WD: 34.97 mm | | VEGA\\ TESCAN |
| View field: 3.64 mm | SEM MAG: 70 x | 1 mm | |
| SEM MAG: 70 x | Date(m/d/y): 01/18/11 | | Performance in nanospace |

Figure 20.    Surface appearance inside the transverse hole after a forty five (45) second discharge duration.

28

CoG_WHEATCROFT 059148



Figure 21.    Surface profilometry measurement on the sample from Figure 20 – forty five (45) second discharge duration.



Figure 22.    Surface profilometry volume measurements of the holes and peaks over the area identified to have sustained arcing damage.  The first one or two positions in the sample label indicate the duration of ECD discharge.

29

**CoG_WHEATCROFT 059149**

Surface profilometry measurements were performed over an area sufficiently large to encompass the area damaged by arcing.  Upon data collection, the global curvature of the transverse hole was removed, i.e. the image was "flattened", and the area defining the changes in the surface morphology was selected.  A reference plane was then fitted to everything else surrounding the area exhibiting arcing damage.  Finally, the volume of the crater and the surrounding material peaks created during the arcing event were quantified.  As shown in Figure 22, the extent of damage observed and quantified on the surface of the transverse hole is directly proportional to the duration of intact circuit ECD discharge for the samples examined.  The appearance of that damage also confirms that more energy was delivered for longer discharge durations.  Analyses methods based on the aforementioned findings assist in determining the ECD discharge duration. However, some sample preparation may be needed to access the evidence without disturbing it, such as the removal of the probe bottom.

190160.000 1120 DBRPT1

**CoG_WHEATCROFT 059150**



Figure 23.    Surface appearance on the zin probe, in the area of the wire tip restrained by
the yellow cap, after approximately 1.5 second discharge duration.

31

*CoG_WHEATCROFT 059151*



Figure 24.    Surface appearance on the zin probe, in the area of the wire tip restrained by the yellow cap, after approximately 5 second discharge duration.

## Inspection of Received Evidence

FFE received two Taser X2 cartridges (cartridge #1 with serial number C62037CCA, and cartridge #2 with serial number C6201MN5H), each containing two metal probes (a total of 4 probes), and sections of Taser wire.  The received probes were not all identical: two probes had a center hole where the wire knot is located, while the other two probes had a different wire attachment method which uses a plastic yellow cap to crimp the wire to the probe.

32

CoG_WHEATCROFT 059152



Figure 25.      Appearance of cartridge 1A.



Figure 26.      Appearance of cartridge 2A.

33

CoG_WHEATCROFT 059153



Figure 27.      Appearance of cartridge 1B.



Figure 28.      Appearance of cartridge 2B.

34

CoG_WHEATCROFT 059154

I inspected the four metal probes:

1. Probe labeled 1A – probe with a center hole that has a bent barb.

2. Probe labeled 2A – probe with a center hole that has a straight barb.

3. Probe labeled 1B – probe with a yellow cap that retains the wire in the vicinity of the probe.  This probe has a straight barb, and what appears to be blood residue on its surface.

4. Probe labeled 2B – probe with a yellow cap that retains the wire in the vicinity of the probe.  This probe has a straight barb and no apparent residue on its surface.

Both received cartridges were discharged, which deployed the probes towards Mr. Wheatcroft consistent with the Officer's actions observed in various incident videos.  Wire sections were still attached to the cartridges.

The received metal probes were inspected using optical microscopy as well as Scanning Electron Microscopy (SEM).  Three of the four inspected probes did not contain tissue of any kind at the time of my inspection.  The fourth probe had what appeared to be blood residue on its exterior.  Before analyzing the probe with residue, FFE documented the condition of this probe, collected and preserved samples of the residue.

Examination of the probe surfaces under higher magnification revealed changes in surface morphology consistent with arcing damage in all probes.  While the two probes with the center hole, had arcing damage areas spread around the surface of the transverse hole, the arcing damage observed on the zinc probes was more localized around the wire tip.  The differences in the arcing damage spread is the result of the different wire restraint design between the two probe types.  The design of the wire attachment in the probes with the transverse hole allows the wire tip to float inside the transverse hole.  Conversely, the design of the wire attachment in the zinc probe with yellow cap does not allow for significant movement of the wire tip.

In the case of the probes with the transverse hole, which likely were deployed by Officer Schneider, the existence of several arcing damage areas is an indication that electrical arcing occurred either over several discharges or that the electrical circuit was intermittent during a particular discharge.  In other words, every time the circuit was established, the arcing damaged different areas on the surface of the transverse hole.  Such a sequence of varying conductivity is

35

CoG_WHEATCROFT 059155

possible only if the knotted wire tip inside the transverse hole moves between the two arcing events, which is consistent with the reported physical activity associated with Mr. Wheatcroft's struggle with the officers. The evidence is also consistent with reports that Mr. Wheatcroft was largely unaffected by the ECD discharges since various areas of arcing damage are consistent with a discharge duration of less than one second or between 1 to 2 seconds for each intermittent arcing event (Figure 31).



Figure 29.    Appearance of the surface morphology changes on cartridge 2A.

In addition, the evidence indicates that probes 1A and 2A have dissimilar surface morphology changes even though they were deployed from the same cartridge at the same time. The difference in the amount of surface morphology changes between those two probes is consistent with probe 1A missing Mr. Wheatcroft when Officer Schneider deployed his X2 ECD. Consistent with

36

*CoG_WHEATCROFT 059156*

evidence, the body cam video clearly shows that one of the probes deployed by Officer Schneider missed Mr. Wheatcroft and landed on the ground near him (Figure 30). Therefore, probe 1A was likely the probe that detached from Mr. Wheatcroft, and as a result was not part of any electrical circuits initially. Conversely, probe 2A likely struck Mr. Wheatcroft or was in sufficient proximity to his body, and therefore participated in subsequent drive stuns administered by Officer Schneider which resulted in greater area of arcing damage as compared to probe 1A. The evidence also indicates that probe 1A ultimately connected with Mr. Wheatcroft's body, which likely occurred during the struggle while Mr. Wheatcroft was rolling on the ground. Once probe 1A was attached or in sufficient proximity to Mr. Wheatcroft's body it became a part of subsequent drive stun applications.



Figure 30.    Probe resting on the ground near Mr. Wheatcroft (screenshot from Officer Schneider's body cam video.

The evidence observed on the two zinc probes with yellow wire retaining cap is consistent with a single electrical discharge event. Based on the evidence and location of the yellow capped probes on Mr. Wheatcroft's body, which could be observed on the body came video, the two zinc probes were likely deployed by Officer Fernandez. The surface morphology changes observed on the zinc yellow cap probes are consistent with the electrical discharge duration of approximately 1 to 2 seconds (Figure 31).

37

*CoG_WHEATCROFT 059157*



Figure 31.        Appearance of the surface morphology changes on cartridge 2B.

## Analysis

Based on the analysis of the probes, review of the body camera videos from all three officers, Motel 6 surveillance video, review of the logs recorded in all three X2 ECDs used during the subject incident, and the review of the pulse logs for all three X2 ECDs contained in Detective Sergeant Patrick Buemler's reports, FFE reconstructed the events and related X2 discharge durations.  For clarity, Axon body cam timestamp for Officer Schneider is used only.  Officer Schneider's Axon body cam reports Zulu time, which is depicted by the letter "Z" to the right of the timestamp.  Zulu time represents Greenwich Mean Time (GMT).

38

The first X2 ECD deployment was performed by Officer Mark Lindsey at "T02:34:19Z" reported on Officer Schneider's body cam. The duration of discharge during this drive stun deployment was approximately 0.4 seconds per the taser pulse log. The second drive stun deployment by Officer Lindsey occurred at "T02:34:20Z", and it lasted also approximately a little more than 0.2 seconds per the pulse log. This is consistent with the X2 report that lists two discharge sequences, sequences 2 and 3, of 1 second each since the report only lists durations in 1 second intervals. Based on the taser pulse log Officer Lindsey's X2 ECD was operating appropriately and delivering approximately 19 pulses per second as designed. Based on the video footage, it appears that the drive stun deployment performed by Officer Lindsey had an effect on Mr. Wheatcroft judging by his body motions.

During the X2 drive stub deployment by Officer Lindsey, Mrs. Chapman struck Officer Lindsey in the head with a bag containing what appeared to be soda cans. As Officer Lindsey fell to the ground Officer Schneider stepped back and deployed his X2 ECD in the probe mode. The timestamp for that deployment is "T02:34:26Z". Two probes can be seen on Mr. Wheatcroft's sleeve (yellow arrows in Figure 32).



Figure 32.        Moment when two probes deployed by Office Schneider struck Mr. Wheatcroft.

190160.000 1120 DBRPT1

*CoG_WHEATCROFT 059159*

The probe deployment by Office Schneider was recorded in the X2 ECD log as sequence 4, with duration of 15 seconds, and starting at 19:31:47. Since X2 log reports the start time of a sequence, the end of this 15 second cycle occurs at 19:32:02. However, the log also recorded sequence 5 with duration of 10 seconds that started at 19:31:52, which overlaps with the sequence 4 duration. Further analysis of the X2 operation, the log report, and the pulse log, showed that Officer Schneider likely activated the "Arc" button before 5 seconds from sequence 4 expired, which prompted the X2's data recorder to record a new sequence, sequence 5, because the power was applied to the second cartridge. In other words, the 10-second duration of sequence 5 represents the last 10 seconds of sequence 4, i.e. the two sequences overlap and are not two separate deployment events. This is consistent with the appearance of the pulse logs in Detective Sergeant Buemler's pulse log report.

Th pulse logs for Officer Schneider's X2 ECD indicate that the device was not operating appropriately as it was not delivering 19 pulses per second but approximately 5 pulses per second, which could be heard in the videos as a slow crackling sound. The pulse rate consistly drops further to approximately 3 pulses per second. The operating characteristics of the X2 prioritize charge buildup to pulse rate. The problems with delivering the design intended pulse rate of 19 pulses per second is an indication that Officer Schneider's X2 device likely has a battery problem.

Although the pulse log shows that a charge was delivered in the first two seconds of sequence 4 via 9 pulses over a 2 second period, this data is not reliable to determine where the charge from these 2 seconds was delivered. Moreover, the video shows that the bottom probe separated from Mr. Wheatcroft and came to rest on the ground near him within a fraction of a second after deployment (comparing timestamps in Figure 30 and Figure 32 above shows that the bottom probe fell to the ground within a fraction of a second). Therefore, it would be impossible to deliver an electrical discharge of 2 seconds while one of the probes is not connected to Mr. Wheatcroft. In other words, the recorded 2 second discharge consisting of 9 pulses was not delivered to Mr. Wheatcroft.

Officer Schneider's pulse log also indicates that the sequence 5, which activated cartridge 2, was likely discharging through the air at the front of the cartridge. The following sequences recorded,

CoG_WHEATCROFT 059160

sequences 6 and 7 with durations of 3 and 1 seconds, respectively, show further deterioration of the battery with no charge delivered to Mr. Wheatcroft.

Sequence 8 recorded in Officer Schneider's X2 lasted 6 seconds per the log report. The pulse data shows further deterioration of battery performance, especially at cartridge 2 (bay 2). Correlating the sequences to the Axon body cam video footage indicates that sequence 8 was a drive stun application, which continued into sequence 9, which lasted 5 seconds per the log report. However, based on the video footage Mr. Wheatcroft reacted only after sequence 10 was administered by Officer Schneider, which lasted approximately 1 second.

The last sequence administered by Officer Schneider was sequence 11, which lasted 4 seconds per the log report. Based on the video footage, sequence 11 was administered to the lower left buttock area on Mr. Whitecroft's body. The yellow arrow in Figure 33 indicates the position of Officer Schneider's X2 ECD while he was administering sequence 11 drive stun.



Figure 33.    Location of the sequence 11 drive stun application by Officer Schneider.

It should be noted that the log report for Officer Schneider shows the duration for sequence 12 of 105 seconds. This should not be confused with electrical discharge duration. The X2 ECD

41

CoG_WHEATCROFT 059161

monitors the time between the "Armed" event and the next "Safe" event and reports the total time between the two events.  Therefore, Mr. Wheatcroft was not subjected to an electrical discharge in sequence 12 of 105 seconds.

The third officer who deployed his X2 ECD was Officer Michael Fernandez.  Based on Officer Schneider's body cam video, Officer Fernandez deployed his X2 ECD in the probe mode towards Mr. Wheatcroft at approximately "T02:34:30Z".  The log report recorded sequence 2 duration of 5 seconds, which was also recorded in the pulse log.  However, the taser pulse log for Officer Fernandez's X2 ECD indicates that cartridge 1 delivered approximately 1.5 to 2 seconds of electrical discharge likely to Mr. Wheatcroft.  This discharge duration is consistent with the analysis of the electrical arcing witness marks on the zinc probes with the yellow cap.  Therefore, Mr. Wheatcroft did not receive the whole 5 seconds of electrical discharge during Office Fernandez's probe deployment.

## Opinions of Darko Babic

Based upon my education, training, and experience in the areas of mechanical-material engineering, my testing, and the materials reviewed to date, I have reached the following opinions and hold each of them to a reasonable, or higher, degree of engineering certainty and/or probability.

1.  Although the log report for Officer Schneider states for sequence 12 the duration of 105 seconds, this is not the time that represents the total duration of all electrical arcing sequences during the subject incident.  In fact, it is the total real time between the "Armed" event and a subsequent "Safe" event and does not represent in any way electrical discharges.

2.  While Officers Schneider, Lindsey, and Fernandez deployed their X2 ECD during the subject incident, the electrical discharges delivered to Mr. Wheatcroft were only a fraction of the added time between all the sequences and at a lower pulse rate for Officers Schneider and Fernandez than the design intended.  Although Officer Fernandez deployed his X2 ECD in the probe mode with duration of 5 seconds, the electrical charge was only

42

**CoG_WHEATCROFT 059162**

delivered between approximately 1.5 and 2 seconds.   Similarly, Officer Schneider deployed his X2 ECD in both, the probe and drive stun modes, with total added time of 45 seconds for all sequences.  However, the electrical charge delivered to Mr. Wheatcroft was sporadic, consistent with an intermittent circuit, and only likely lasted approximately between 4 and 5 seconds in total between all sequences.  Two drive stun sequences delivered by Officer Lindsey delivered less than one second of electrical charge to Mr. Wheatcroft and likely approximately 0.6 seconds and approximately total 11 pulses.

3.  The probe mode deployment by Officer Schneider did not have any effect on Mr. Wheatcroft because no electrical charge was delivered.  In addition, "Arc" mode deployment of electrical charge does not appear to have delivered any charge to Mr. Wheatcroft except for the two drive stun sequences, sequence 10 and sequence 11. Sequence lasted less than 1 second and delivered 4 pulses during that time. Sequence 11 had intermittent connection on both cartridge bays.  Cartridge bay 1 in total attempted to deliver electrical charge for approximately 4 seconds but had an intermittent connection, resulting in the total charge delivery duration of approximately 2 seconds based on the pulse log while delivering 10 pulses over that time.  Cartridge bay 2 also attempted to deliver electrical charge for approximately 4 seconds but had an intermittent connection, resulting in the total delivery duration of approximately 1.5 seconds based on the pulse log while delivering 9 pulses over that time.  Both of these sequences delivered lower pulse rate than intended by the design because Officer Schneider's X2 ECD was malfunctioning likely as result of an unknown battery problem.  The short total duration of electrical charge that was delivered to Mr. Wheatcroft by Officer Schneider, and especially no discharge delivered to Mr. Wheatcroft when Officer Schneider attempted to administer probe mode deployment is consistent with Mr. Wheatcroft's statement that the wires did not hurt him.

The foregoing opinions and conclusions are based on the information available to me at this time.  I reserve the right to consider any information that may become available at a later date, and, if necessary, author a supplemental report.

190160.000 1120 DBRPT1

**CoG_WHEATCROFT 059163**

## Additional References

1. Knoll, Max (1935). "Aufladepotentiel und Sekundäremission elektronenbestrahlter Körper". *Zeitschrift für technische Physik* **16**: 467–475.

2. Von Ardenne, Manfred (1939). "Das Elektronen-Rastermikroskop. Theoretische Grundlagen" (in German). *Zeitschrift für Physik* **108** (9–10): 553–572.

3. Von Ardenne, Manfred (1938). "Das Elektronen-Rastermikroskop. Praktische Ausführung" (in German). *Zeitschrift für technische Physik* **19**: 407–416.

4. Stout, K. J.; Blunt, Liam (2000). *Three-Dimensional Surface Topography* (2nd ed.). Penton Press. p. 22. ISBN 9781857180268.

5. Wyant R. The Advanced TASER M26, X26: Forensic Considerations. AFTE Journal. Fall 2004; 36(4).

6. Wyant R, Geil K. Examination of the Probe-Knot Junction to Estimate Duration of Electronic Control Devices (TASER) Exposures. AFTE Journal. Summer 2010; 42(3).

7. Schmiederer B, Chesene AD, Schmidt P, Brinkmann B. Specific Traces in a stun gun deployment. Int J Legal MEd. 2005; 119(4):207-212.

8. Kudo A, Wyant R. Wire to Determine Duration of Short Circuit. Association of Firearm and Toolmark Examiners Journal. Fall 2008; 4(40):348.

9. Wyant R, Hinz A. Examination of Electronic Control Device Probes to Determine Duration of Application American Academy of Forensic Science Scientific Assembly February 2009.

190160.000 1120 DBRPT1

**CoG_WHEATCROFT 059164**

CoG_WHEATCROFT 059165

# *APPENDIX A*

*CoG_WHEATCROFT 059166*

 **FORENSIC FAILURE ENGINEERING, LLC**

*8205 S Priest Dr., #11480, Tempe AZ, 85284*

*Phone: (480) 941-6598; Email: darko@ffe-sc.com*

**Darko Babic, M.S.**
**Principal**

**Professional Profile**

Mr. Babic is a Principal member of FFE's material analysis and mechanical engineering practice. He specializes in mechanical design, accident reconstruction, and failure analysis. Mr. Babic performs corrosion, fatigue, and fracture mechanics analyses of mechanical and electro-mechanical systems and components, as well as full-scale and laboratory testing, instrumentation, and data acquisition. Mr. Babic is experienced in metallurgical and polymer failure analyses using macroscopic and microscopic techniques for fracture surface, weld quality, case hardening, heat treatment, and microstructure characterization. He makes extensive use of finite element modeling (FEA) to evaluate structural, thermal, and fluid behavior.

He has extensive experience investigating various types of accidents and solving complex multidisciplinary problems in: industrial systems and turbomachinery (e.g. refineries, boilers, pressure vessels, piping systems, pumps, valves, gas and steam turbine components, generators, compressors, wind powered turbines, internal combustion engines, electric and hydraulic motors), heavy machinery and equipment (e.g. aerial lifts, forklifts, cranes, balers, lift gates and platforms, elevators, presses, pipe and rebar benders, steel and wooden structures), vehicle and aeronautical accidents (e.g. cars, small and large trucks, boats, airplanes, and helicopters; including vehicle parts and mechanisms such as seat belts, suspension, steering, transmission, tires and wheels, etc.), medical devices/implants (e.g. hip and knee joints, stents), and consumer products (e.g. power tools, cable pullers, playground structures, chairs and tables, various sports equipment, cribs, baby carriers, electronic equipment, plumbing and reverse osmosis systems). These analyses were typically related to the root cause investigations or product recall. Within those investigations Mr. Babic performed analyses to characterize system design, performance, materials and fracture modes, fire cause and origin, FEA regarding stress, thermal, or fluid effects, system dynamics, as well as analyses of mechanical, hydraulic, electrical, and control systems.

Mr. Babic has performed research in the behavior of materials including: surface morphology changes as a result of electrical arcing, characterization of wheel attachments to vehicles (lug nuts, wheels and hubs) and the wheel-tire assembly, oxidation in fires, powder metallurgy alloys, sintered material analysis, fluid-structure interaction, material and fracture surface characterization, material imperfection analysis, fatigue and creep of materials, nucleation and propagation of cracks, and stress corrosion cracking and environmentally assisted cracking.

Prior to forming FFE, Mr. Babic spent eight years working for a leading failure analysis company, where he performed numerous engineering analyses on various products and systems,

CoG_WHEATCROFT 059167

and expert witness testimony. In his prior roles, Mr. Babic evaluated and developed enabling technologies in semiconductor manufacturing such as supercritical carbon dioxide cleaning methods and atomic layer deposition.  He is experienced in clean room protocols and safety procedures.  Mr. Babic is also experienced in vehicle design, testing, and analysis.  He has participated in a racecar series and has direct experience with race preparation, vehicle systems, as well as vehicle dynamics and mechanics.

**Academic Credentials and Professional Honors**

M.S., Materials Science and Engineering, Arizona State University, 2002
B.S., Mechanical Engineering, Arizona State University (*magna cum laude*), 2000

Arizona State Regents Scholarship, awarded to international students with the highest academic merit, 1998–2000; Dean's Honor List, 1996–2000; Tau Beta Pi National Honor Society

**Patents**

- US20060065189A1 & WO2006039314A1:  Method and system for homogenization of supercritical fluid in a high pressure processing system.
- US20060065288A1 & WO2006039317A1:  Supercritical fluid processing system having a coating on internal members and a method of using.
- US20060065636A1:  Method and system for controlling a velocity field of a supercritical fluid in a processing system.
- US20060070640A1 & WO2006039321A1:  Method and system for injecting chemistry into a supercritical fluid.
- US20060130966A1:  Method and system for flowing a supercritical fluid in a high pressure processing system.
- US20060134332A1:  Precompressed coating of internal members in a supercritical fluid processing system.
- US20060266289A1 & WO2006078666A2:  Reaction system for growing a thin film.

**Publications**

Frank, T., Babic, D., and Williams, P., "Condition of the Motorcycle Steering Head Assembly after Crash Testing," SAE Technical Paper 2012-01-0619, 2012, doi:10.4271/2012-01-0619.

Babic D, Hinz A, Arora A, Peralta P. Estimation of TASER® ECD Discharge Duration Based on Surface Morphology Changes. Proceedings of the American Academy of Forensic Sciences 12-1, 64th Annual Scientific Meeting, Atlanta, GA, 2012.

Colwell, J. and Babic, D., "A Review of Oxidation on Steel Surfaces in the Context of Fire Investigations," SAE Int. J. Passeng. Cars - Mech. Syst. 5(2):1002-1015, 2012.

Babic D, Chawla N, Williams JJ, Polasik SJ, Marucci M, Narasimhan KS.  Effect of copper and nickel alloying additions on the tensile and fatigue behavior of sintered steels.  Advances in Powder Metallurgy and Particulate Materials 2002; 5:104–112.



*CoG_WHEATCROFT 059168*

Soetanto D, Babic D, Kuo CY.  Stabilization of human standing posture using functional neuromuscular stimulation.  Journal of Biomechanics 2001; 34:1589–1597.

Wu L, Xu Y, Wang F-Y, Lin YT, Li PZ, Liu WJ, Mirchandani PB, Babic D, Kuo CY. Supervised learning of longitudinal driving behavior for intelligent vehicles using neuro-fuzzy networks:  Initial experimental results.  International Journal of Intelligent Control and Systems 1999; 3:443–463.

**Selected Presentations**

Babic D, Challenges in Aftermarket Wheel Design and Manufacturing, SEMA, 2017.

Babic D, Hinz A, Arora A, Peralta P. Estimation of TASER® ECD Discharge Duration Based on Surface Morphology Changes. American Academy of Forensic Sciences, 64th Annual Scientific Meeting, Atlanta, GA, 2012.

Babic D, Arora, A., Martens, J. AC & DC Adapter Safety Considerations, Presentation, 2011 IEEE Symposium on Product Compliance Engineering, IEEE Product Safety Engineering Society (PSES), San Diego, CA, 2011.

Babic, D. Finite Element Analysis as a Part of Failure Analysis, Constitutive Modeling, Non-linear Behavior. Failure Analysis Class Lectures at Arizona State University, 2011.

Babic D, Arora, A., Scientific Investigative Techniques, Presentation, NALI Mid-Winter Conference, National Association of Legal Investigators (NALI), Phoenix, AZ, 2010.

Babic D, Arora, A. Expected Environmental Conditions in Automotive Applications – Temperature Distribution in a Polymeric Dash Board, Presentation, 2009 IEEE Symposium on Product Compliance Engineering, IEEE Product Safety Engineering Society (PSES), Toronto, Canada, 2009.

Babic D, Chawla N, Williams JJ, Polasik SJ, Marucci M, Narasimhan KS.  Effect of Copper and Nickel Alloying Additions on the Tensile and Fatigue Behavior of Sintered Steels.  World Congress for Powder Metallurgy and Particulate Materials, Orlando, FL, 2002.

**Professional Affiliations**
- American Academy of Forensics Sciences – Presenter
- ASM International (Former Arizona Chapter Chair and Vice-Chair)
- American Society of Mechanical Engineers
  - Committee for High Pressure Piping Code B31.3, Task Group H – High Pressure Ultra High Purity Systems – Former Member
- Semiconductor Equipment and Materials International (SEMI), Former Contributing Member to the High Pressure Task Force
- Society of Automotive Engineers
- ASME – FIRST Robotics Competition Mentoring Program

*CoG_WHEATCROFT 059169*





# Forensic Failure Engineering, LLC

**8205 S. Priest Dr. #11480, Tempe, AZ 85284; (480)-941-6598**

Fee Schedule

## Darko Babic, M.S.

Consultation on litigation matters                                    $385/hour

- ♦ Applies to all project activities, including material review, analysis, testing, and travel.
- ♦ An initial review up to 3 hours will be conducted once materials are received. The initial review will include a feasibility study and preparation of budget and time estimates. Charges for review will be billed regardless of whether further work commences.

Deposition and trial testimony, including wait time          $500/hour

- ♦ Depositions require a minimum 3-hour pre-payment received two business days prior to scheduled date of deposition. A 1-hour cancellation fee will be assessed if the deposition is cancelled within 24 hours of scheduled deposition time.

## Additional Fees and Expenses

Administrative and non-technical assistance                    $95/hour

- ♦ Includes non-technical assistance at inspections, testing, material summaries and indexing, *etc…*

Professional and technical assistance                            @ Rate

- ♦ Additional support may be obtained on litigation matters to assist with material review, inspections, case analysis, testing, and review of written reports. Individuals will be billed commensurate with experience and area of expertise.

Expenses

| | |
|---|---|
| ♦ Black & White/Color Photocopies | $0.10/$1.00 per page |
| ♦ Transportation, Lodging, Meals | Cost plus 10% |
| ♦ Mileage | Federal standard allowance |
| ♦ Digital Camera Equipment | $50.00 per project |
| ♦ High Definition Video Equipment | $100.00 per project |
| ♦ Thermal, pressure, force sensors | $100 per project |
| ♦ Torque sensor | $200 per project |
| ♦ Miscellaneous tools | $80 per project |
| ♦ Scanning electron microscope (SEM) | $180 per hour |
| ♦ Optical microscope | $70 per hour |
| ♦ Materials, Supplies and Test Equipment | Cost/Rental cost plus 10% |
| ♦ Outside laboratory tests | Cost plus 10% to 20% |
| ♦ Evidence Storage | Per quoted rate |
| ♦ Miscellaneous other expenses | Per quoted rate |

The above rates represent the fees charged by FFE for work performed within the continental United States. These fees are modified annually on or about January 1, or otherwise at the discretion of FFE. For projects conducted outside the continental United States, premium rates may be applied to adjust for cost-of-living differentials. Premium rates may also be applied when, at the client's request, work is to be accomplished in such a way as to increase costs to FFE. This may occur due to schedule constraints or planned inefficiencies. Premium rates for this work shall be no less than 15% greater than the hourly rates quoted above. Payment is required in U.S. dollars within thirty (30) days after receipt of invoice, or interest charges of 2% per month will be applied along with a monthly service fee of $75.

0001.000 0120 DBSF1

CoG_WHEATCROFT 059170

# *APPENDIX B*

*CoG_WHEATCROFT 059171*

Deposition and Trial Testimony
by Darko Babic, M.S.

Darko Babic, M.S. has given testimony by deposition or trial in the following matters:

January 28, 2014     **GuideOne v. EcoWater**
Trial Testimony
United States District Court, Central District of California.
No: SACV 12-115-JST (JPRx)

February 28, 2014     **Bell v. Harbor Freight**
Deposition
Superior Court of the State of Arizona in and for the County of
Maricopa
No: CV2012-011867

April 30, 2014     **Todd v. Gold Strike**
Deposition
District Court, Clark County, Nevada
No: A-12-656996-C

February 19, 2015     **People v. Tarasuk**
Trial Testimony
Superior Court, Placer County, California
No: 62-115893

September 2, 2015     **O'Neill v. Arizona Grand Senior Living**
Deposition
Superior Court of the State of Arizona in and for the County of
Maricopa
No: CV2014-052357

June 21, 2016     **Silva v. Hotspur Sports Company**
Deposition
United States District Court for the District of Colorado
No: 14-cv-02921-CSB

August 31, 2016     **Wilhelm v. Byron Epp**
Deposition
Superior Court of the State of Arizona in and for the County of
Maricopa
No: CV2015-000557

*CoG_WHEATCROFT 059172*

July 13, 2017          ***Wilhelm v. Byron Epp***
                       Deposition
                       Superior Court of the State of Arizona in and for the County of
                       Maricopa
                       No: CV2015-000557

August 1, 2017         ***Mohrwise v. Club at Encanterra***
                       Deposition
                       Superior Court of the State of Arizona in and for the County of
                       Pinal
                       No: CV2016-00353

December 6, 2017       ***U.S.A. v. Michael Slager***
                       Sentencing Trial Testimony
                       District Court of the United States, District of South Carolina
                       Charleston Division
                       No: 2:16-cr-00378-DCN

October 24, 2018       ***Anderson v. Wal-Mart Stores, Inc.***
                       Trial Testimony
                       United States District Court, District of South Dakota Southern
                       Division
                       No: 4:15-cr-04180-KES

October 25, 2018       ***People v. Mark Bessner***
                       Trial Testimony
                       State of Michigan, 3rd Judicial District
                       No: 18-923-01-FC

March 7, 2019          ***Marco Crane v. Greenfield***
                       Deposition
                       United States District Court, District of Arizona
                       No: CV 17-CV-01836-GMS

April 11, 2019         ***Westchester et al. v. Lithe Technology***
                       Deposition
                       Superior Court of the State of Arizona in and for the County of
                       Pima
                       No: C20170819

April 24, 2019         ***Neviaser v. Hampton***
                       Deposition
                       In the Circuit Court, Fourth Judicial Circuit, In and For Duval
                       County, Florida
                       Case No.: 2010-CA-007327
                       Division: CV-F

*CoG_WHEATCROFT 059173*

May 3, 2019            **Farmers (Ansell) v. Toto USA**
Deposition
District Court Clark County, Nevada
Case No. A-17-762101-C
Department 19

May 16, 2019          **Kelley v. DT**
Deposition
State of Michigan in the Circuit Court for The County of Wayne
Case No.16-014062-NI

June 19, 2019          **Hicham Krikib v. City of Chandler**
Deposition
In the Superior Court of the State of Arizona in and for the County
of Maricopa
Case No.: CV2018-090878

August 20, 2019      **Westchester v. Lithe Technology, LLC**
Trial Testimony
Superior Court of the State of Arizona, County of Pima
Case No.: C20170819

October 1, 2019       **American Claims Management, Inc. (Isaac) v. Mansfield**
Deposition
In the Circuit Court for James City County/Williamsburg, Virginia
Case No. CL18-270

January 28, 2020     **Axelrod v. Ajo Bikes**
Arbitration
Superior Court of the State of Arizona, County of Pima
Case No. C20163056

February 21, 2020    **Hartford (Hensley) v. Mansfield**
Deposition
In the Superior Court for the State of Arizona in and for the
County of Maricopa
Case No.: CV2019-053425

September 10, 2020   **Acosta v. Adanac**
Deposition
Superior Court of Arizona, Maricopa County
Case No.: CV2018-003943

September 18, 2020    ***Allen Aviation (Miner) v. Murphy Ventures***
Deposition
In the Superior Court, State of Arizona, County of Maricopa
Case No.: CV2019-003469

October 22, 2020    ***Marco Crane v. Greenfield***
Trial Testimony
United States District Court District of Arizona
Case No. CV 17-CV-01836-GMS

*CoG_WHEATCROFT 059175*



*EXHIBIT B*



**FORENSIC FAILURE ENGINEERING, LLC**

8205 S Priest Dr., #11480, Tempe AZ, 85284

Phone: (480) 941-6598; Email: darko@ffe-sc.com

**Darko Babic, M.S.**
**Principal**

**Professional Profile**

Mr. Babic is a Principal member of FFE's material analysis and mechanical engineering practice. He specializes in mechanical design, accident reconstruction, and failure analysis. Mr. Babic performs corrosion, fatigue, and fracture mechanics analyses of mechanical and electro-mechanical systems and components, as well as full-scale and laboratory testing, instrumentation, and data acquisition. Mr. Babic is experienced in metallurgical and polymer failure analyses using macroscopic and microscopic techniques for fracture surface, weld quality, case hardening, heat treatment, and microstructure characterization. He makes extensive use of finite element modeling (FEA) to evaluate structural, thermal, and fluid behavior.

He has extensive experience investigating various types of accidents and solving complex multidisciplinary problems in: industrial systems and turbomachinery (e.g. refineries, boilers, pressure vessels, piping systems, pumps, valves, gas and steam turbine components, generators, compressors, wind powered turbines, internal combustion engines, electric and hydraulic motors), heavy machinery and equipment (e.g. aerial lifts, forklifts, cranes, balers, lift gates and platforms, elevators, presses, pipe and rebar benders, steel and wooden structures), vehicle and aeronautical accidents (e.g. cars, small and large trucks, boats, airplanes, and helicopters; including vehicle parts and mechanisms such as seat belts, suspension, steering, transmission, tires and wheels, etc.), medical devices/implants (e.g. hip and knee joints, stents), and consumer products (e.g. power tools, cable pullers, playground structures, chairs and tables, various sports equipment, cribs, baby carriers, electronic equipment, plumbing and reverse osmosis systems). These analyses were typically related to the root cause investigations or product recall. Within those investigations Mr. Babic performed analyses to characterize system design, performance, materials and fracture modes, fire cause and origin, FEA regarding stress, thermal, or fluid effects, system dynamics, as well as analyses of mechanical, hydraulic, electrical, and control systems.

Mr. Babic has performed research in the behavior of materials including: surface morphology changes as a result of electrical arcing, characterization of wheel attachments to vehicles (lug nuts, wheels and hubs) and the wheel-tire assembly, oxidation in fires, powder metallurgy alloys, sintered material analysis, fluid-structure interaction, material and fracture surface characterization, material imperfection analysis, fatigue and creep of materials, nucleation and propagation of cracks, and stress corrosion cracking and environmentally assisted cracking.

Prior to forming FFE, Mr. Babic spent eight years working for a leading failure analysis company, where he performed numerous engineering analyses on various products and systems,

and expert witness testimony. In his prior roles, Mr. Babic evaluated and developed enabling technologies in semiconductor manufacturing such as supercritical carbon dioxide cleaning methods and atomic layer deposition. He is experienced in clean room protocols and safety procedures. Mr. Babic is also experienced in vehicle design, testing, and analysis. He has participated in a racecar series and has direct experience with race preparation, vehicle systems, as well as vehicle dynamics and mechanics.

**Academic Credentials and Professional Honors**

M.S., Materials Science and Engineering, Arizona State University, 2002
B.S., Mechanical Engineering, Arizona State University (*magna cum laude*), 2000

Arizona State Regents Scholarship, awarded to international students with the highest academic merit, 1998–2000; Dean's Honor List, 1996–2000; Tau Beta Pi National Honor Society

**Patents**

- US20060065189A1 & WO2006039314A1: Method and system for homogenization of supercritical fluid in a high pressure processing system.
- US20060065288A1 & WO2006039317A1: Supercritical fluid processing system having a coating on internal members and a method of using.
- US20060065636A1: Method and system for controlling a velocity field of a supercritical fluid in a processing system.
- US20060070640A1 & WO2006039321A1: Method and system for injecting chemistry into a supercritical fluid.
- US20060130966A1: Method and system for flowing a supercritical fluid in a high pressure processing system.
- US20060134332A1: Precompressed coating of internal members in a supercritical fluid processing system.
- US20060266289A1 & WO2006078666A2: Reaction system for growing a thin film.

**Publications**

Frank, T., Babic, D., and Williams, P., "Condition of the Motorcycle Steering Head Assembly after Crash Testing," SAE Technical Paper 2012-01-0619, 2012, doi:10.4271/2012-01-0619.

Babic D, Hinz A, Arora A, Peralta P. Estimation of TASER® ECD Discharge Duration Based on Surface Morphology Changes. Proceedings of the American Academy of Forensic Sciences 12-1, 64th Annual Scientific Meeting, Atlanta, GA, 2012.

Colwell, J. and Babic, D., "A Review of Oxidation on Steel Surfaces in the Context of Fire Investigations," SAE Int. J. Passeng. Cars - Mech. Syst. 5(2):1002-1015, 2012.

Babic D, Chawla N, Williams JJ, Polasik SJ, Marucci M, Narasimhan KS. Effect of copper and nickel alloying additions on the tensile and fatigue behavior of sintered steels. Advances in Powder Metallurgy and Particulate Materials 2002; 5:104–112.



Soetanto D, Babic D, Kuo CY.  Stabilization of human standing posture using functional neuromuscular stimulation.  Journal of Biomechanics 2001; 34:1589–1597.

Wu L, Xu Y, Wang F-Y, Lin YT, Li PZ, Liu WJ, Mirchandani PB, Babic D, Kuo CY. Supervised learning of longitudinal driving behavior for intelligent vehicles using neuro-fuzzy networks:  Initial experimental results.  International Journal of Intelligent Control and Systems 1999; 3:443–463.

**Selected Presentations**

Babic D, Challenges in Aftermarket Wheel Design and Manufacturing, SEMA, 2017.

Babic D, Hinz A, Arora A, Peralta P. Estimation of TASER® ECD Discharge Duration Based on Surface Morphology Changes. American Academy of Forensic Sciences, 64th Annual Scientific Meeting, Atlanta, GA, 2012.

Babic D, Arora, A., Martens, J. AC & DC Adapter Safety Considerations, Presentation, 2011 IEEE Symposium on Product Compliance Engineering, IEEE Product Safety Engineering Society (PSES), San Diego, CA, 2011.

Babic, D. Finite Element Analysis as a Part of Failure Analysis, Constitutive Modeling, Non-linear Behavior. Failure Analysis Class Lectures at Arizona State University, 2011.

Babic D, Arora, A., Scientific Investigative Techniques, Presentation, NALI Mid-Winter Conference, National Association of Legal Investigators (NALI), Phoenix, AZ, 2010.

Babic D, Arora, A. Expected Environmental Conditions in Automotive Applications – Temperature Distribution in a Polymeric Dash Board, Presentation, 2009 IEEE Symposium on Product Compliance Engineering, IEEE Product Safety Engineering Society (PSES), Toronto, Canada, 2009.

Babic D, Chawla N, Williams JJ, Polasik SJ, Marucci M, Narasimhan KS.  Effect of Copper and Nickel Alloying Additions on the Tensile and Fatigue Behavior of Sintered Steels.  World Congress for Powder Metallurgy and Particulate Materials, Orlando, FL, 2002.

**Professional Affiliations**
- American Academy of Forensics Sciences – Presenter
- ASM International (Former Arizona Chapter Chair and Vice-Chair)
- American Society of Mechanical Engineers
  - Committee for High Pressure Piping Code B31.3, Task Group H – High Pressure Ultra High Purity Systems – Former Member
- Semiconductor Equipment and Materials International (SEMI), Former Contributing Member to the High Pressure Task Force
- Society of Automotive Engineers
- ASME – FIRST Robotics Competition Mentoring Program



 **Forensic Failure Engineering, LLC**

*8205 S. Priest Dr. #11480, Tempe, AZ 85284; (480)-941-6598*

Fee Schedule

### Darko Babic, M.S.

Consultation on litigation matters                                    $335/hour

- ♦ Applies to all project activities, including material review, analysis, testing, and travel.
- ♦ An initial review up to 3 hours will be conducted once materials are received. The initial review will include a feasibility study and preparation of budget and time estimates. Charges for review will be billed regardless of whether further work commences.

Deposition and trial testimony, including wait time            $475/hour

- ♦ Depositions require a minimum 3-hour pre-payment received two business days prior to scheduled date of deposition. A 1-hour cancellation fee will be assessed if the deposition is cancelled within 24 hours of scheduled deposition time.

### Additional Fees and Expenses

Administrative and non-technical assistance                  $85/hour

- ♦ Includes non-technical assistance at inspections, testing, material summaries and indexing, *etc…*

Professional and technical assistance                            @ Rate

- ♦ Additional support may be obtained on litigation matters to assist with material review, inspections, case analysis, testing, and review of written reports. Individuals will be billed commensurate with experience and area of expertise.

Expenses

- ♦ Black & White/Color Photocopies       $0.10/$1.00 per page
- ♦ Transportation, Lodging, Meals         Cost plus 10%
- ♦ Mileage                                Federal standard allowance
- ♦ Digital Camera Equipment               $50.00 per project
- ♦ High Definition Video Equipment        $100.00 per project
- ♦ Thermal, pressure, force sensors       $100 per project
- ♦ Torque sensor                          $200 per project
- ♦ Miscellaneous tools                    $80 per project
- ♦ Scanning electron microscope (SEM)     $180 per hour
- ♦ Optical microscope                     $70 per hour
- ♦ Materials, Supplies and Test Equipment Cost/Rental cost plus 10%
- ♦ Outside laboratory tests               Cost plus 10% to 20%
- ♦ Evidence Storage                       Per quoted rate
- ♦ Miscellaneous other expenses           Per quoted rate

The above rates represent the fees charged by FFE for work performed within the continental United States. These fees are modified annually on or about January 1, or otherwise at the discretion of FFE. For projects conducted outside the continental United States, premium rates may be applied to adjust for cost-of-living differentials. Premium rates may also be applied when, at the client's request, work is to be accomplished in such a way as to increase costs to FFE. This may occur due to schedule constraints or planned inefficiencies. Premium rates for this work shall be no less than 15% greater than the hourly rates quoted above. Payment is required in U.S. dollars within thirty (30) days after receipt of invoice, or interest charges of 2% per month will be applied.

*EXHIBIT 16*

1   Joseph J. Popolizio, Bar #017434
    Justin M. Ackerman, Bar #030726
2   Ian C. Beck, Bar #035599
    JONES, SKELTON & HOCHULI, P.L.C.
3   40 North Central Avenue, Suite 2700
    Phoenix, Arizona  85004
4   Telephone:  (602) 263-1700
    Fax:  (602) 200-7876
5   jpopolizio@jshfirm.com
    jackerman@jshfirm.com
6   ibeck@jshfirm.com

7   Attorneys for Defendants

8
                    **UNITED STATES DISTRICT COURT**
9
                         **DISTRICT OF ARIZONA**
10

11  Johnny Wheatcroft and Anya Chapman, as        NO. 2:18-cv-02347-MTL
    husband and wife, and on behalf of minors J.W.
12  and B.W.,                                     **DECLARATION OF MICHAEL**
                                                  **FERNANDEZ**
                                   Plaintiffs,
13
              v.
14
    City of Glendale, a municipal entity; Matthew
15  Schneider, in his official and individual
    capacities; Mark Lindsey, in his official and
16  individual capacities; and Michael Fernandez, in
    his official and individual capacities,
17
                                  Defendants.
18

19
            I, Michael Fernandez, make the following Declaration:
20
            1.      I am over the age of 18 years and have personal knowledge to testify to
21
    the matters set forth in this Declaration.
22
            2.      This Declaration is intended solely to supplement the testimony given
23
    in my deposition on June 3, 2019.
24
            3.      As more fully set forth in my deposition in this matter, I was a City of
25
    Glendale Police Officer on the date of the incident giving rise to this action.
26
            4.      The attached video, taken from Officer Matthew Schneider's body
27
    camera ("SBC"), is a true and accurate depiction of my encounter with Plaintiffs on the
28
    9259610.1

evening of July 26, 2017, as captured through his body camera. [Schneider bodycam Video 1 (CoG_WHEATCROFT 00383), attached as **Exhibit A**].

       5.    While the body camera video attached as Exhibit A generally shows video evidence of my encounter with Plaintiffs, at certain points during Exhibit A, it may be difficult to see each and every action occurring between Mr. Wheatcroft and me due to rapidly changing body movements and/or shifting camera angles during the altercation, particularly where my body was between Officer Schneider and Mr. Wheatcroft.   During those particular portions of the physical confrontation with Mr. Wheatcroft, I provide an account of what occurred, to the best of my recollection.

       6.    During the roughly two and a half minute encounter I had with Johnny Wheatcroft, it was a dynamic and fast moving situation that did not afford me time to deliberate. [*See* Ex. A at 2:34:31-2:36:58].

       7.    My entire intent behind every action I took with Mr. Wheatcroft was to ensure the safety of myself and those around me.

       8.    Right before, during, and right after I handcuffed Mr. Wheatcroft, he was still actively resisting my attempts to control him and remove him from the vehicle.  This occurred during 2:34:38-2:35:25 of Schneider's Body Camera. [Ex. A at 2:34:38-2:35:25].

       9.    As can be partially seen and heard in this portion of Officer Schneider's Body Camera, I repeatedly commanded Mr. Wheatcroft at least three times to "turn over" and to "stop" which he did not comply.  [Ex. A at 2:34:37-2:34:48].

      10.    I then had to physically turn Mr. Wheatcroft over to place handcuffs on his hands, while he continued to actively resist my efforts to handcuff him.  [Ex. A at 2:34:37-2:35:06].

      11.    While I turned Mr. Wheatcroft over, I repeatedly commanded Mr. Wheatcroft to "give me your hands", but he did not comply with that lawful command.  [Ex. A at 2:34:47-2:34:49].

12.     While Mr. Wheatcroft can be heard on Officer Schneider's Body Camera of stating "ok, ok" in response to my commands, he continued to actively resist my efforts to handcuff him.  [Ex. A at 2:34:47-2:35:06].

13.     I could feel Mr. Wheatcroft actively resisting my efforts to restrain and control him.  [Ex. A at 2:35:01-2:35:09].

14.     I had absolutely no intent to cause either of the minor children any emotional distress or harm during my encounter with ~~Johnny~~ Mr. Wheatcroft on July 26, 2017 or otherwise.

15.     I had absolutely no intent to purposefully interfere with the familial association rights of the Plaintiffs.  All actions I took during my encounter with the Plaintiffs were related to legitimate law enforcement objectives, including but not limited to officer safety concerns.

16.     I was regularly supervised by the City of Glendale. Sgt. Kevin Kellogg was my supervisor on the date of the incident.

17.     During my entire confrontation with Mr. Wheatcroft, my intent was to gain control over a chaotic and violent situation that Mr. Wheatcroft and his wife, Anya Chapman created.  I did not have a pre-conceived intent or vendetta at any time prior to or during my confrontation with Mr. Wheatcroft.  Rather, I acted with what I believed was my lawful authority to control a non-responsive and violent suspect who was resisting my lawful commands and his lawful arrest.

18.     I declare under penalty of perjury that the foregoing is true and correct.

Date: ___3/25/21___          By: _____
                                   Michael Fernandez

9259610.1                              3

# *EXHIBIT A*

# *Non-Electronic Exhibit - CD*

*EXHIBIT 17*

1   Joseph J. Popolizio, Bar #017434
    Justin M. Ackerman, Bar #030726
2   Ian C. Beck, Bar #035599
    JONES, SKELTON & HOCHULI, P.L.C.
3   40 North Central Avenue, Suite 2700
    Phoenix, Arizona  85004
4   Telephone:  (602) 263-1700
    Fax:  (602) 200-7876
5   jpopolizio@jshfirm.com
    jackerman@jshfirm.com
6   ibeck@jshfirm.com

7   Attorneys for Defendants

8

               **UNITED STATES DISTRICT COURT**
9
                   **DISTRICT OF ARIZONA**
10

| | |
|---|---|
| Johnny Wheatcroft and Anya Chapman, as husband and wife, and on behalf of minors J.W. and B.W., | NO. 2:18-cv-02347-MTL |
|                  Plaintiffs, | **DECLARATION OF BLAKE MCCLELLAND, Ph.D.** |
|     v. | |
| City of Glendale, a municipal entity; Matt Schneider, in his official and individual capacities; Mark Lindsey, in his official and individual capacities; and Michael Fernandez, in his official and individual capacities, | |
|                  Defendants. | |

20       **I, Blake McClelland**, make the following Declaration:

21           1.    I am over the age of 18 years old and competent to testify to the

matters set forth in this Declaration.

23           2.    I have prepared an expert witness report dated November 6, 2020, in

the above captioned matter, attached hereto as Exhibit A, which is a true and accurate copy

of my report.

26           3.    The opinions expressed therein are offered with a reasonable degree of

police practices/law enforcement professional certainty within my field of expertise as police

9244194.1

1    practices expert.

2           4.     My Curriculum Vitae is attached hereto as Exhibit B, which is a true

3    and accurate copy of my Curriculum Vitae at the time I authored my report in this matter.

4           5.     I declare under penalty of perjury that the opinions in Exhibit A are

5    true to the best of my knowledge and belief.

6           I declare under penalty of perjury that the foregoing is true and correct.

7           Executed on : *March 22*        , 2021

8

9                                    By: *Blake R. McClelland*

10                                        Blake McClelland

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9244194.1                              2



*EXHIBIT A*

# Blake A. McClelland

Phone (602) 763-2830
E-mail:
Blake.McClelland@Cox.net

November 6, 2020

Joseph J. Popolizio, Partner
Jones, Skelton & Hochuli, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, AZ 85004

**Re:     Wheatcroft, et al. v. City of Glendale, et al.**
        **United States District Court Case Number: 2:18-cv-02347-MTL**

Dear Mr. Popolizio:

In formulating my opinions on this case, I have reviewed the following materials:

1.  Glendale Police Department Offense Report 17-107320; Assault with a Deadly Weapon, Authored by Officer Roy Lewis #15542. Bates Nos. CoG_WHEATCROFT 000001-000060.

2.  Glendale Police Department Evidence Chain of Custody Report for Incident 17-107320. Bates Nos. CoG_WHEATCROFT 000061-000062.

3.  Glendale Police Department Vehicle Removal Report for Incident 17-107320, Authored by Officer B.A. Aten #15280. Bates No. CoG_WHEATCROFT 000063.

4.  Taser Report for Officer Schneider #12251; July 26, 2017. Incident 17-107320. Bates No. CoG_WHEATCROFT 000064.

5.  Taser Report for Officer Fernandez #15225; July 26, 2017. Incident 17-107320. Bates Nos. CoG_WHEATCROFT 000065-000067.

6.  Glendale Police Department Property Room Property Slip for Incident 17-107320. Bates Nos. CoG_WHEATCROFT 000068-000070.

7.  Glendale Police Department CAD History Report for Incident 17-107320. Bates Nos. CoG_WHEATCROFT 000071-000073.

8.  Glendale Police Department Arrest Sheet for Anya Chapman; Arrest date: July 26, 2017. Bates Nos. CoG_WHEATCROFT 000074-000081.

CoG_WHEATCROFT 059075

9.   Glendale Police Department Arrest Sheet for Johnny Wheatcroft; Arrest date: July 26, 2017.
     Bates Nos. CoG_WHEATCROFT 000082-000089.

10.  Glendale Police Department Booking Sheet for Anya Chapman; Arrest date: July 26, 2017.  Bates
     Nos. CoG_WHEATCROFT 000090-000093.

11.  Glendale Police Department Booking Sheet for Johnny Wheatcroft; Arrest date: July 26, 2017.
     Bates Nos. CoG_WHEATCROFT 000094-000097.

12.  Glendale Police Department Calls for Service Sheet for Incident 17-107320.  Call date: July 26,
     2017.  Bates Nos. CoG_WHEATCROFT 000098-000102.

13.  Glendale Police Department Inmate Tracking Sheet for Anya Chapman for Incident 17-107320.
     Bates Nos. CoG_WHEATCROFT 000103-000107.

14.  Glendale Police Department Inmate Tracking Sheet for Johnny Wheatcroft for Incident 17-
     107320.  Bates Nos. CoG_WHEATCROFT 000108-000111.

15.  Glendale Police Department Photographs from Incident 17-107320.  (260 page pdf file).  Bates
     Nos. CoG_WHEATCROFT 000112-000371.

16.  Glendale Police Department Photographs from Incident 17-107320 (Unredacted).  Bates Nos.
     CoG_WHEATCROFT 000112-000371.

17.  Motel 6 Video Surveillance Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000372.

18.  Glendale Police Department Audio Dispatch from July 26, 2017.  Bates No. CoG_WHEATCROFT
     000373.

19.  Glendale Police Officer Brian Aten's Body-Worn Camera Footage from July 26, 2017.  Bates No.
     CoG_WHEATCROFT 000374.

20.  Glendale Police Officer Glenn Doerr's Body-Worn Camera Footage from July 26, 2017.  Bates No.
     CoG_WHEATCROFT 000375.

21.  Glendale Police Officer Michael Fernandez's Body-Worn Camera Footage from July 26, 2017.
     Bates No. CoG_WHEATCROFT 000376.

22.  Glendale Police Officer Glenn Koehler's Body-Worn Camera Footage from July 26, 2017.  Bates
     No. CoG_WHEATCROFT 000377.

23.  Glendale Police Officer Roy Lewis's Body-Worn Camera Interview with Shawn Blackburn from
     July 26, 2017.  Bates No. CoG_WHEATCROFT 000378.

24.  Glendale Police Officer Roy Lewis's Body-Worn Camera Interview with Anya Chapman from July
     26, 2017.  Bates No. CoG_WHEATCROFT 000379.

*CoG_WHEATCROFT 059076*

25. Glendale Police Officer Mark Lindsey's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000380.

26. Glendale Police Officer Jeffrey Pittman's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000381.

27. Glendale Police Officer Jeffrey Pittman's Body-Worn Camera Interview with Officer Mark Lindsey from July 26, 2017.  Bates No. CoG_WHEATCROFT 000382.

28. Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017. Bates No. CoG_WHEATCROFT 000383.

29. Glendale Police Officer Adam Spiwak's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000384.

30. Glendale Police Officer Lacey Tolbert's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000385.

31. Glendale Police Officer Lacey Tolbert's Body-Worn Camera Interview with Johnny Wheatcroft from July 26, 2017.  Bates No. CoG_WHEATCROFT 000386.

32. Glendale Police Officer Gabe Vasquez's Body-Worn Camera Footage from July 26, 2017.  Bates No. CoG_WHEATCROFT 000387.

33. Glendale Sergeant Joe Flosman's Audio Recorded Interview with Anya Chapman from footage from August 23, 2017.  Bates No. CoG_WHEATCROFT 000388.

34. Glendale Sergeant Gallagher's Body-Worn Camera Interview with Johnny Wheatcroft from July 27, 2017.  Bates No. CoG_WHEATCROFT 000389.

35. Glendale Police Department General Order 20.170 regarding Departmental Property Management.  Bates Nos. CoG_WHEATCROFT 000390-000394.

36. Glendale Police Department General Order 21.470 regarding Uniform Regulations.  Bates Nos. CoG_WHEATCROFT 000395-000421.

37. Glendale Police Department General Order 21.500 regarding Body Armor (Ballistic Vests).  Bates Nos. CoG_WHEATCROFT 000422-000426.

38. Glendale Police Department General Order 23.000 regarding Response to Resistance.  Bates Nos. CoG_WHEATCROFT 000427-000462.

39. Glendale Police Department General Order 21.900 regarding Neighborhood Response Unit. Bates Nos. CoG_WHEATCROFT 000463-000466.

40. Glendale Officer Mark Lindsey's Human Resource File.  Bates Nos. CoG_WHEATCROFT 000467-000614.

CoG_WHEATCROFT 059077

41. Glendale Officer Matt Schneider's Human Resource File.  Bates Nos. CoG_WHEATCROFT 000615-000832.

42. Officer Michael Fernandez's Human Resource File.  Bates Nos. CoG_WHEATCROFT 000833-001218.

43. Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 001219-001763.

44. Glendale Police Department General Order 23.300 regarding Vehicle Stops.  Bates Nos. CoG_WHEATCROFT 001764-0011770.

45. Glendale Police Department General Order 24.000 regarding Laws of Arrest.  Bates Nos. CoG_WHEATCROFT 001771-001779.

46. Glendale Officer Schneider's 07/01/2017—06/30/2018 Goal Setting & Review Worksheet.  Bates Nos. CoG_WHEATCROFT 001780-001792.

47. Glendale Officer Schneider's 02/11/2018 Midpoint Review.  Bates Nos. CoG_WHEATCROFT 001793-001794.

48. Glendale Officer Fernandez's April 30, 2013 Commendation.  Bates Nos. CoG_WHEATCROFT 001795-001803.

49. Glendale Officer Fernandez's May 12, 2016 Commendation.  Bates Nos. CoG_WHEATCROFT 001804-001807.

50. Glendale Officer Fernandez's December 1, 2017 Commendation.  Bates Nos. CoG_WHEATCROFT 001808-001811.

51. Glendale Officer Lindsey's July 11, 2013 Commendation.  Bates Nos. CoG_WHEATCROFT 001812-001816.

52. Glendale Officer Lindsey's January 8, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001817-001819.

53. Glendale Officer Lindsey's June 3, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001820-001823.

54. Glendale Officer Lindsey's May 12, 2016 Commendation.  Bates Nos. CoG_WHEATCROFT 001824-001827.

55. Glendale Officer Schneider's March 23, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001828-001830.

56. Glendale Officer Schneider's May 19, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001831-001832.

4

CoG_WHEATCROFT 059078

57.  Glendale Officer Schneider's June 15, 2011 Commendation.  Bates No. CoG_WHEATCROFT 001833.

58.  Glendale Officer Schneider's July 5, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001834-001835.

59.  Glendale Officer Schneider's October 28, 2011 Commendation.  Bates Nos. CoG_WHEATCROFT 001836-001837.

60.  Glendale Officer Schneider's July 15, 2013 Commendation.  Bates Nos. CoG_WHEATCROFT 001838-001850.

61.  Glendale Officer Schneider's March 7, 2014 Commendation.  Bates Nos. CoG_WHEATCROFT 001851-001864.

62.  Glendale Officer Schneider's November 27, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001865-001871.

63.  Glendale Officer Schneider's December 31, 2015 Commendation.  Bates Nos. CoG_WHEATCROFT 001872-001876.

64.  Glendale Officer Schneider's August 18, 2017 Commendation.  Bates Nos. CoG_WHEATCROFT 001877-001879.

65.  Glendale Officer Schneider's May 5, 2017 Commendation.  Bates Nos. CoG_WHEATCROFT 001880-001881.

66.  Glendale Officer Schneider's December 31, 2018 Commendation.  Bates Nos. CoG_WHEATCROFT 001882-001883.

67.  Glendale Officer Schneider's July 24, 2018 Commendation.  Bates Nos. CoG_WHEATCROFT 001884-001894.

68.  Glendale Officer Fernandez's Departmental Investigation #2013-063, re Use of Force.  Bates Nos. CoG_WHEATCROFT 001895-001930.

69.  Glendale Officer Fernandez's Departmental Investigation #2015-012 re Use of Force.  Bates Nos. CoG_WHEATCROFT 001931-001966.

70.  Glendale Officer Fernandez's Departmental Investigation #2015-060 re Use of Force.  Bates Nos. CoG_WHEATCROFT 001967-001976.

71.  Glendale Officer Lindsey's Departmental Investigation #2012-081 re Use of Force.  Bates Nos. CoG_WHEATCROFT 001977-002001.

72.  Glendale Officer Lindsey's Departmental Investigation #2014-040 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002002-002039.

*CoG_WHEATCROFT 059079*

73.   Glendale Officer Lindsey's Departmental Investigation #2014-061 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002040-002100.

74.   Glendale Officer Schneider's Departmental Investigation #2014-032 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002101-002129.

75.   Glendale Officer Schneider's Departmental Investigation #2017-073 re Use of Force.  Bates Nos. CoG_WHEATCROFT 002130-002163.

76.   Glendale Police Department's 2012 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002164-002362.

77.   Glendale Police Department's 2013 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002363-002426.

78.   Glendale Police Department's 2014 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002427-002523.

79.   Glendale Police Department's 2015 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002524-002622.

80.   Glendale Police Department's 2016 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002623-002757.

81.   Glendale Police Department's 2017 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002758-002960.

82.   Glendale Police Department's 2018 Advanced Officer Training.  Bates Nos. CoG_WHEATCROFT 002961-003203.

83.   Glendale Officer Fernandez's Training File.  Bates Nos. CoG_WHEATCROFT 003204-003223.

84.   Glendale Officer Lindsey's Training File.  Bates Nos. CoG_WHEATCROFT 003224-003297.

85.   Glendale Officer Schneider's Training File.  Bates Nos. CoG_WHEATCROFT 003298-003339.

86.   Glendale Officer Lindsey's Body-Worn Camera Audit Log.  Bates Nos. CoG_WHEATCROFT 003340-003345.

87.   Glendale Officer Schneider's Body-Worn Camera Audit Log.  Bates Nos. CoG_WHEATCROFT 003346-003363.

88.   City of Glendale Email Communications with the FBI.  Bates Nos. CoG_WHEATCROFT 003364-003376.

89.   Glendale Officer Fernandez's Departmental Investigation #2014-022 re Attentiveness to Duty. Bates Nos. CoG_WHEATCROFT 003377-003412.

*CoG_WHEATCROFT 059080*

90. Glendale Officer Fernandez's Departmental Investigation #2014-039 re Orders and Directives. Bates Nos. CoG_WHEATCROFT 003413-003443.

91. Glendale Officer Fernandez's Departmental Investigation #2015-032 re Review of Accidents. Bates Nos. CoG_WHEATCROFT 003444-003450.

92. Glendale Officer Lindsey's Departmental Investigation #2016-064 re Vehicle Pursuits.  Bates Nos. CoG_WHEATCROFT 003451-003460.

93. Glendale Officer Schneider's Departmental Investigation #2013-066 re Review of Accidents. Bates Nos. CoG_WHEATCROFT 003461-003467.

94. Glendale Officer Schneider's Department Investigation #2017-055 re Workplace Harassment. Bates Nos. CoG_WHEATCROFT 003468-003981.

95. Glendale Police Department's Professional Standard Unit's 2015 Annual Report.  Bates Nos. CoG_WHEATCROFT 003982-003993.

96. Glendale Police Department's Professional Standard Unit's 2016 Annual Report.  Bates Nos. CoG_WHEATCROFT 003994-004006.

97. Glendale Police Department's Professional Standard Unit's 2017 Annual Report.  Bates Nos. CoG_WHEATCROFT 004007-004018.

98. Glendale Police Department's 2015 Response to Report.  Bates Nos. CoG_WHEATCROFT 004019-004023.

99. Glendale Police Department's 2016 Response to Report.  Bates Nos. CoG_WHEATCROFT 004024-004035.

100. Glendale Police Department's 2017 Response to Report.  Bates Nos. CoG_WHEATCROFT 004036-004046.

101. Chief's Directive from Chief Rick St. John dated June 26, 2019 re Response to Resistance Reporting.  Bates No. CoG_WHEATCROFT 004080.

102. Glendale Police Department's General Order 22.050 re Functional Requirements.  Bates Nos. CoG_WHEATCROFT 004082-004083.

103. Officer Lacey Tolbert's Goal Setting & Review Worksheet from July 1, 2016-June 30, 2017 and May 10, 2017 Comments Regarding Annual Review.  Bates Nos. CoG_WHEATCROFT 004084-004106.

104. Sergeant Don LaBrant's May 10, 2018 Memorandum to Lieutenant Montgomery and Commander Blanco re Officer Lacey Tolbert.  Bates No. CoG_WHEATCROFT 004107.

105. Motel 6 Video Surveillance Screenshot from July 26, 2017.  Bates No. CoG_WHEATCROFT 004108.

*CoG_WHEATCROFT 059081*

106. Motel 6 Video Surveillance Screenshot Taken on or about September 1, 2017.  Bates No. CoG_WHEATCROFT 004109.

107. Deposition Transcript of Glendale Officer Michael Fernandez w/Exhibits.

108. Deposition Transcript of Glendale Officer Mark Lindsey w/Exhibits.

109. Deposition Transcript of Glendale Officer Lacey Tolbert w/Exhibits.

110. Deposition Transcript of Glendale Police Chief Rick St. John w/Exhibits.

111. Deposition Transcript of Glendale Sergeant Donald LaBrant w/Exhibits.

112. Deposition Transcript of Glendale Sergeant Matthew Moody w/Exhibits.

113. Deposition Transcript of Glendale Lieutenant Earl Montgomery w/Exhibits.

114. Deposition Transcript of Glendale Commander Brandon Blanco w/Exhibits.

115. Deposition Transcript of Glendale Assistant Chief Rich LeVander w/Exhibits.

116. Deposition Transcript of Glendale Sergeant Joseph Flosman w/Exhibits.

117. Deposition Transcript of Glendale Officer Jeffrey Pittman.

118. Deposition Transcript of Glendale Chief Chris Briggs.

119. Expert Report of Dr. Jeffeory G. Hynes.  Bates Nos. CoG_WHEATCROFT 000272-000305.

120. Officer Schneider's March 29, 2017 Body-Worn Camera Footage Associated with Glendale Police Departmental Report No. I17044932.  Bates Nos. CoG_WHEATCROFT 004110-004111.

121. Emails Responsive to Plaintiffs' Third Request for Production of Documents.  Bates Nos. CoG_WHEATCROFT 004112-009807.

122. Additional Emails Responsive to Plaintiffs' Third Request for Production of Documents.  Bates Nos. CoG_WHEATCROFT 009808-017993.

123. Johnny Wheatcroft's Records from University of Phoenix.  Bates Nos. CoG_WHEATCROFT 018067-018227.

124. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2005-009896.  Bates Nos. CoG_WHEATCROFT 036650-036651.

125. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2006-121971.  Bates Nos. CoG_WHEATCROFT 036652-036653.

CoG_WHEATCROFT 059082

126. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2013-426915. Bates No. CoG_WHEATCROFT 036654.

127. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2014-001088. Bates Nos. CoG_WHEATCROFT 036655-036658.

128. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2014-106681. Bates Nos. CoG_WHEATCROFT 036659-036660.

129. Johnny Wheatcroft's Maricopa County Superior Court Criminal Court Docket re CR2018-106681. Bates Nos. CoG_WHEATCROFT 036661-036665.

130. Maricopa County Superior Court Criminal Docket re Johnny Wheatcroft.  Bates No. CoG_WHEATCROFT 036666.

131. Public Access to Court Information Docket re Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036667-036668.

132. Johnny Wheatcroft's Criminal Court Docket re M-0741-4580018.  Bates No. CoG_WHEATCROFT 036669.

133. Johnny Wheatcroft's Criminal Court Docket re M-0741-4688688.  Bates No. CoG_WHEATCROFT 036670.

134. Johnny Wheatcroft's Criminal Court Docket re M-0741-4720093.  Bates No. CoG_WHEATCROFT 036671.

135. Johnny Wheatcroft's Criminal Court Docket re M-0741-4724304.  Bates No. CoG_WHEATCROFT 036672.

136. Johnny Wheatcroft's Criminal Court Docket re M-0741-4778974.  Bates No. CoG_WHEATCROFT 036673.

137. Johnny Wheatcroft's Criminal Court Docket re M-0741-5127495.  Bates No. CoG_WHEATCROFT 036674.

138. Johnny Wheatcroft's Criminal Court Docket re M-0741-5235126.  Bates No. CoG_WHEATCROFT 036675.

139. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2005-009896.  Bates Nos. CoG_WHEATCROFT 036676-036679.

140. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2006-121971.  Bates Nos. CoG_WHEATCROFT 036680-036683.

141. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2013-426915.  Bates Nos. CoG_WHEATCROFT 036684-036685.

CoG_WHEATCROFT 059083

142. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2014-001088.  Bates Nos. CoG_WHEATCROFT 036686-036692.

143. Johnny Wheatcroft's Public Access to Court Information Criminal Court Docket re CR2014-106681.  Bates Nos. CoG_WHEATCROFT 036693-036695.

144. Correspondence from Dr. Jeffeory G. Hynes' re Defendants' Subpoena for Expert Job File.  Bates Nos. CoG_WHEATCROFT 036696-036709.

145. Anya Chapman's Maricopa County Adult Probation Presentence Investigation Report dated November 16, 2017.  Bates Nos. CoG_WHEATCROFT 036744-036752.

146. Glendale Police Department's Blank Blanket Trespassing Enforcement Authorization Form.  Bates No. CoG_WHEATCROFT 036802.

147. Maricopa County Superior Court Minute Entry dated October 25, 2017 re Anya Chapman's Change of Plea to Aggravated Assault.  Bates Nos. CoG_WHEATCROFT 036803-036804.

148. City of Glendale Fire Department's Records re Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036805-036811.

149. Johnny Wheatcroft's Employment File from PGM2, LLC, doing business as CMS/Morrell, Commodity Management Services, LLC and CMS, LLC.  Bates Nos. CoG_WHEATCROFT 036812-036827.

150. Maricopa County Attorney's Office Criminal Complaint re CR2017-134395-001 and CR2017-134395-002, Against Anya Ann Chapman and Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036828-036833.

151. Maricopa County Superior Court Docket re CR2017-134395.  Bates Nos. CoG_WHEATCROFT 036834-036836.

152. Empire Metal Products, Inc.'s Declaration of Custodian of Records.  Bates No. CoG_WHEATCROFT 036837.

153. EZ Metals, LLC's Declaration of Custodian of Records.  Bates No. CoG_WHEATCROFT 036838.

154. Glendale Police Department's General Order re Laws of Arrest with December 09, 2016 Revision Date.  Bates Nos. CoG_WHEATCROFT 036839-036847.

155. Johnny Wheatcroft's Employment File from Green World Recycling Inc.  Bates Nos. CoG_WHEATCROFT 036848-036850.

156. Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036851-036853.

157. Glendale Police Department's Location History Report for Motel 6.  Bates Nos. CoG_WHEATCROFT 036854-036904.

CoG_WHEATCROFT 059084

158. Glendale Police Department's Trespassing Enforcement Authorization Form for Motel 6 dated August 30, 2018.  Bates No. CoG_WHEATCROFT 036905.

159. Maricopa County Attorneys' Office Order of Dismissal re Johnny Wheatcroft.  Bates No. CoG_WHEATCROFT 036906.

160. Johnny Wheatcroft's Employment Information from Raytek Lighting, LLC.  Bates Nos. CoG_WHEATCROFT 036907-036908.

161. Maricopa County Attorneys' Office Motion and Order to Dismiss re Johnny Wheatcroft.  Bates Nos. CoG_WHEATCROFT 036910-036911.

162. Dr. Jeffeory G. Hynes' Notes from Sergeant Jerry McDaniel's Deposition.  Bates Nos. CoG_WHEATCROFT 036913-036924.

163. Maricopa County Superior Court's October 3, 2017 Minute Entry re Johnny Wheatcroft.  Bates No. CoG_WHEATCROFT 036925.

164. Johnny Wheatcroft's ADOC Medical Records.  Bates Nos. CoG_WHEATCROFT 036927-037562.

165. Johnny Wheatcroft's Correctional Health Services Medical Records.  Bates Nos. CoG_WHEATCROFT 037563-037968.

166. Anya Chapman's Maricopa County Adult Probation File.  Bates Nos. CoG_WHEATCROFT 038693-038789.

167. Glendale Police Department Incident Report #18025107.  Bates Nos. CoG_WHEATCROFT 038790-038829.

168. Glendale Police Department Dash Camera Footage re Incident Report #18025107.  Bates No. CoG_WHEATCROFT 038830.

169. Glendale Police Department Body Camera Footage re Incident Report #18025107.  Bates No. CoG_WHEATCROFT 038831.

170. Glendale Police Department's Audio Recorded Interview of Anya Chapman re Incident Report #18025107.  Bates No. CoG_WHEATCROFT 038832.

171. Phoenix Police Department Photographs re Departmental Report #2018-01405322.  Bates Nos. CoG_WHEATCROFT 039621-041336.

172. Phoenix Police Departmental Report #2018-01405322.  Bates Nos. CoG_WHEATCROFT 041337-041588.

173. Johnny Wheatcroft's Records from Arizona Department of Corrections Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 041592-042075.

CoG_WHEATCROFT 059085

174. Manistee Justice Court Case No. CC2019-098267, Robin L. Nash v. Anya A. Chapman.  Bates Nos. CoG_WHEATCROFT 042078-042085.

175. Johnny Wheatcroft's Maricopa County Adult Probation File.  Bates Nos. CoG_WHEATCROFT 055387-055518.

176. City of Phoenix Police Department Custodian of Records Declaration.  Bates No. CoG_WHEATCROFT 055519.

177. City of Phoenix Police Department Departmental Reports Involving Johnny Wheatcroft and/or Anya Chapman Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 055520-055930.

178. City of Phoenix Police Department Photographs re Departmental Report 2013-01783673 Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 055931-056073.

179. Anya Chapman's Records from Maricopa County Sheriff's Office Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 056074-056168.

180. Johnny Wheatcroft's Records from Maricopa County Sheriff's Office Received in Response to Defendants' Subpoena Duces Tecum.  Bates Nos. CoG_WHEATCROFT 056169-056578.

181. Glendale Police Department's Location History Report for 4530 West Myrtle Avenue.  Bates Nos. CoG_WHEATCROFT 056579-056580.

182. Glendale Police Department's 911 Call Detail for 4530 West Myrtle Avenue.  Bates Nos. CoG_WHEATCROFT 056581-056602.

183. Glendale Police Department Incident Report No. 17084200.  Bates Nos. CoG_WHEATCROFT 056603-056628.

184. Glendale Police Department Incident Report No. 17085068.  Bates Nos. CoG_WHEATCROFT 056629-056638.

185. Glendale Police Department Incident Report No. 17173854.  Bates Nos. CoG_WHEATCROFT 056639-056649.

186. Glendale Police Department Incident Report No. 18088651.  Bates Nos. CoG_WHEATCROFT 056650-056656.

187. Glendale Police Department Incident Report No. 20039176.  Bates Nos. CoG_WHEATCROFT 056657-056663.

188. Glendale Police Department Incident Report No. 20040072.  Bates Nos. CoG_WHEATCROFT 056664-056670.

189. Deposition Transcript of Robin Nash.

*CoG_WHEATCROFT 059086*

190. Deposition Transcript of B.W. (Juvenile name withheld).

191. Deposition Transcript of J.W. (Juvenile name withheld).

192. Deposition Transcript of Officer Matthew Schneider.

193. Deposition Transcript of B.W. (2nd) and Exhibits.

194. Deposition Transcript of Shawn Blackburn and Exhibits.


## Personal Background

I have thirty-four (34) years of experience with the Phoenix Police Department.  I have served in numerous assignments from Police Officer to Assistant Police Chief.  Some of my assignments have included (but are not limited to) patrol operations, investigations, tactical operations (SWAT), internal affairs, auditing, planning, and training.  I have been involved in approximately two thousand (2,000) internal investigations that examined police employees' conduct and performance.  I have interviewed and trained hundreds of police officers, supervisors, and command-level personnel.  I served as the Chairman of the Use of Force and Disciplinary Review Boards that evaluated the actions of police officers and supervisors.  I have led empirical research projects designed to improve the efficiency and effectiveness of police operations.

I honorably retired from the Phoenix Police Department in August 2016 and assumed a full-time faculty position at Arizona State University (ASU) in the School of Criminology and Criminal Justice.  I am the Director of the Master of Arts program, and I hold a Ph.D. in Public Administration from ASU.  I have taught classes in criminal investigations, public policy, criminology, statistics, and police use of force.  I provide subject matter expert consultation to the CNA Corporation (Arlington, VA), assisting them with research funded by the United States Department of Justice.

Through my work experience, training, and academic qualifications, I am familiar with the nationally recognized "best practices" regarding police procedures, investigations, training, and use of force.  Additional information regarding my qualifications and background can be found in Addendum 1 of this report.

CoG_WHEATCROFT 059087

**Case Details**

*Unless otherwise noted, the following information is contained in the Glendale Police Department Offense Report 17-107320; Assault with a Deadly Weapon, Authored by Officer Roy Lewis #15542. The juvenile witness's names have been redacted from these reports and "Witness JW" and "Witness BW" will be used when referring to them.*

On July 26, 2017 at 1932 hours, Glendale Police **Officers Matt Schneider and Mark Lindsey** were on routine patrol in the area of the Motel 6 hotel at 7116 North 59th Avenue. The officers were riding in a fully marked Chevrolet Tahoe, and both officers were wearing Glendale Police uniforms. Officer Schneider was driving, and Officer Lindsey was in the passenger seat.

Officer Schneider and Lindsey are members of the Glendale Police Neighborhood Response Squad (NRS). This squad is deployed in addition to the regular patrol officers to provide additional police resources in high crime areas. The NRS squad also apprehends fugitives, and conducts investigations into street-level drug and criminal activity. The Motel 6 where the officers were patrolling was known for a high level of criminal activity that included drug offenses, violent crimes, and property crimes. Because of the high incidence of crime at this location, the management of the Motel 6 had signed an Authority to Arrest Trespassers agreement with the Glendale Police Department[1].

While driving through the alley north of the Motel 6, Officer Schneider observed a silver Ford Taurus turn northbound into the hotel parking lot (from Glenn Drive) without using a turn signal. Officer Schneider turned into the hotel parking lot and could see the Ford Taurus had backed into a parking space very quickly. Officer Lindsey observed the vehicle attempt to pull into an open spot, but it changed directions and immediately backed in. This raised the officer's suspicion, because stolen vehicles try to hide their license plates.[2]

Without using the police car's overhead lights, Officer Schneider initiated a traffic stop in the parking lot of the hotel by pulling in front of the parked vehicle and contacting the occupants.

Officer Schneider went to the passenger side of the vehicle and contacted Johnny Wheatcroft, while Officer Lindsey went to the driver's side of the vehicle and contacted Shawn Blackburn. There was also an adult female in the back seat (Anya Chapman) and two children (Witness JW and Witness BW).

Officer Schneider asked Johnny if he was staying at the Motel 6, then Schneider asked him for identification. Officer Schneider also told the occupants of the car they were being stopped because they did not signal while turning into the motel parking lot. The two men in the front seats of the Taurus (Johnny Wheatcroft and Shawn Blackburn) did not have identification, so Officer Schneider walked to the rear of the car to see the license plate. Officer Schneider called in a "Code-6" on his police radio. This provided dispatch with the license plate number and his location.

Officer Schneider returned to the front passenger window of the Taurus and, once again, asked everyone in the car if they had identification. Officer Schneider also warned Johnny Wheatcroft to not reach into a brown backpack that was on the floor by his (Wheatcroft's) legs. Wheatcroft then turned away from Schneider, facing towards the center console.

CoG_WHEATCROFT 059088

According to Glendale Incident report 17-107320, Officer Schneider believed Johnny Wheatcroft was sticking his hand between the seat and console.  At this point Officer Schneider did not know if there were any weapons in the vehicle, so he opened the car door and initiated contact with Johnny Wheatcroft.

*(Additional details of this contact and the analysis of the Body Worn Camera videos will be evaluated in the Opinions section of this report.)*

As Officer Schneider opened the car door, Johnny Wheatcroft brought his right leg out of the vehicle. Officer Schneider grabbed Johnny's right arm, and felt it tense up.  Officer Schneider warned Johnny to stop tensing his arm, and at this point Officer Schneider believed that Johnny was trying to resist and pull away from him.  Officer Schneider unholstered his Taser and told Johnny he was going to be Tased if he chose to fight with officers.  Johnny Wheatcroft seemed to calm down, so Officer Schneider re-holstered his Taser and tried to control Johnny's right arm.

Officer Schneider struggled with Johnny, so Officer Lindsey came to the passenger side of the Taurus to help.  Officer Schneider related that he could hear crying in the back seat, and the adult female (Anya Chapman) was yelling profanities.

Officer Schneider tried to control Johnny Wheatcroft's right arm, but he continued resisting, so Officers Lindsey and Schneider used their Tasers to control him.  Officer Schneider related that Johnny was kicking his legs and making it difficult to restrain him.

While the officers were struggling with Johnny Wheatcroft, Officer Schneider related that he saw a bag being flung forward from the back seat of the car.  Officer Schneider saw Officer Lindsey fall backwards, and it appeared that Officer Lindsey was unconscious on the ground.  Officer Schneider learned later that Anya had swung a bag full of soft drinks and hit Officer Lindsey in the head.

Officer Schneider then radioed for urgent back-up.  **Officer Fernandez** had arrived and assisted Officer Schneider attempt to restrain Johnny Wheatcroft.  Officer Schneider related that Johnny continued to kick and thrash at the officers.  Officer Schneider deployed his Taser (probes) and also drive-stunned Johnny Wheatcroft to gain control of him.  Officers **Roy Lewis, Lacey Tolbert, Adam Spiwak, Jeffrey Pitman, and Glen Doerr** responded to the scene and assisted with taking Anya Chapman into custody and securing the scene.

Ultimately, Johnny Wheatcroft was taken out of the car and onto the ground.  Officer Schneider related that Johnny continued fighting on the ground, and was initially hung up in the seatbelt of the passenger seat.  Once Johnny was free from the seatbelt, he continued kicking at Officer Schneider, striking him in his (Schneider's) legs.  Officer Schneider related that even after Johnny was in handcuffs, he was still trying to kick at officers.  Johnny Wheatcroft was drive-stunned by Officer Schneider and he (Wheatcroft) calmed down and discontinued fighting.

Once the scene was stabilized, an investigation was conducted into this incident.  Glendale Officer Roy Lewis wrote the original offense report, making the following assignments:

*Officer Lacey Tolbert-* Conducted interviews with Officers Schneider and Fernandez (who were listed as victims of aggravated assault).

*Officer Jeffrey Pittman-* Conducted an interview of victim Officer Lindsey.

CoG_WHEATCROFT 059089

*Officer Aten-* Completed the paperwork required for the tow of the Ford Taurus.

*Officer Adam Spiwak-* Spoke with the children involved in the incident and arranged for a family member to pick them up.  Officer Spiwak also notified Arizona Child Protective Services (CPS) about the incident.

*Officers Fernandez and Doerr -* Transported Johnny Wheatcroft and Shawn Blackburn (driver of the Taurus) to the police station.

*Officer Lewis-* Interviewed Anya Chapman and Shawn Blackburn.  Also transported Anya Chapman to the Glendale City Jail.


Johnny Wheatcroft was treated by Glendale Fire Unit E150 (A Shift).  His chief complaint was shortness of breath, not pain. It should be noted that Johnny Wheatcroft did not complain about any injuries to his testicles, scrotum, or other parts of his body that may have been injured by the Tasers.  Johnny denied hospitalization.

During his investigation, Officer Roy Lewis collected and impounded evidence from the crime scene. The evidence included two Taser cartridges, 3 bottles and 1 can of Dr. Pepper, a backpack with cell phones and jewelry, $56.00 in U.S. Currency, a usable amount of a crystalline substance, black and gray bolt cutters, and yellow bolt cutters.

Johnny Wheatcroft was charged with Aggravated Assault on a Police Officer (ARS 13-1204.A.8) and Resisting Arrest (13-2508.A.1).  Anya Chapman was charged with Aggravated Assault on a Police Officer (ARS 13-1204.A.8).

On August 28, 2017, Sergeant Joe Flosman downloaded the body camera footage from Officers Fernandez, Schneider, and Lindsey.  He reviewed the footage and documented the details of the incident in his supplement to Glendale Incident Report 17-107320[3].  Table 1 paraphrases his observations:

**Table 1**

| Video Time Stamp | Activity |
|---|---|
| 2:31:01Z | Camera footage begins.  There is a 30 second delay in the sound.  Officer Schneider is driving into the Motel 6 parking lot. |
| 2:31:33Z | Officer Schneider exits his patrol vehicle and walks to the passenger side of the Taurus.  Schneider asks the occupants if they are staying at the motel.  He then asks the occupants "Do you guys have your ID's on you, real quick?"  Officer Schneider tells the driver the reason for the stop by saying: "Hey, when you turn in here man, just make sure you throw on your signal for us." <br><br> Officer Schneider is told that they don't have IDs, so he asks the occupants of the car for anything with their name on it.  Johnny Wheatcroft makes an inaudible response, and Officer Schneider replies "All of you."  Officer Schneider then asks if there is anything in the vehicle that they shouldn't have. |

16

Officer Schneider then puts out (over the police radio) their location and license plate information.

Johnny Wheatcroft is holding a brown backpack.  Officer Schneider asks Johnny not to reach into the backpack since he has no identification and therefore no reason to look in the backpack.  Officer Schneider asks for Johnny's name, and Johnny asks why is he required to give it.  Officer Schneider responds that if he is a passenger in a vehicle, he is required to present it.  Johnny responds that he has one, but doesn't want to give it to Officer Schneider because he hasn't done anything wrong.  Officer Schneider tells Johnny Wheatcroft that he (Schneider) can take Johnny to the police station and fingerprint Johnny because of the traffic stop.

Officer Schneider puts his field interrogation (FI) cards and pen back in his pocket and tells Johnny Wheatcroft: "We can do this one of two ways."

Johnny Wheatcroft holds up his right hand and says, "Okay, relax for a minute please."

Officer Schneider states: "I don't want you stuffing anything down in between the seats like you're doing."

Johnny replies: "Stop please."  At this point Officer Schneider draws his Taser and grabs Johnny's right arm.  Officer Schneider tells Johnny "Here's the deal.  If you tense up, listen to me, listen to me.  Relax your arm."

There is a short conversation between Officer Schneider and Johnny Wheatcroft.  Officer Schneider asks Johnny if he is going to fight, and Johnny says "No".  Officer Schneider then re-holstered his Taser and placed Johnny in an arm hold.  Officer Schneider stated (to Officer Lindsey) "He's going to fight, dude".

Officer Lindsey came to the passenger side of the vehicle to help Officer Schneider.  The body camera footage shows Officer Schneider attempting to control Johnny Wheatcroft with an arm hold on his right arm.  A Taser comes into view from Officer Lindsey contacting Johnny's right arm and shoulder area.

Johnny Wheatcroft says "I'm not doing nothing."  The passenger seatbelt is still attached and across Johnny's upper torso.  As Officer Schneider is attempting to gain control of Johnny, Johnny states: "What the fuck's wrong with you."  Johnny then leans forward (while still seated in the car).

Sergeant Flosman relates that at this point in the body camera video, Johnny is still wearing his seatbelt, and it is wrapped around his upper torso and his lower legs behind his knees.  There is shouting going on, as Officer Lindsey moves around to the back side of Johnny.

CoG_WHEATCROFT 059091

| | |
|---|---|
| 2:34:20 | Officer Lindsey deploys a drive stun to the center of Johnny's back.  Johnny turns toward his left, falling into a sitting position now facing Officer Lindsey and Schneider.  There is continual screaming. |
| 2:34:22 | From the back seat of the Taurus, Anya Chapman swings a white grocery bag at Officer Lindsey and hits him in the head.  Officer Lindsey goes out of view, and Officer Schneider backs up several feet and deploys his Taser (probes).<br><br>At this point Officer Fernandez comes into the camera view and goes "hands on" with Johnny attempting to get him away from the open car door.  Officer Fernandez appears to be struggling with Johnny Wheatcroft who seems to be caught in the seatbelt. |
| 2:34:47 | Officer Fernandez gets Johnny Wheatcroft into handcuffs, but it appears as though Johnny is still tangled up in the seatbelt and Taser wires. |
| 2:35:01 | Officer Schneider deploys a drive-stun with his Taser between Johnny's shoulder blades.  Sergeant Flosman notes that at one point in the body camera footage you can see the seatbelt wrapped around Johnny's lower legs and knees.  Officer Fernandez is attempting to get Johnny up on his feet and pulled away from the open car door. |
| 2:35:06 | Johnny Wheatcroft is on his knees facing the interior of the Taurus.  He is handcuffed at this time and Officer Fernandez is holding Johnny's left arm near the triceps area.  Officer Schneider, with his Taser in his right hand, drive-stuns Johnny between the shoulder blades for several seconds. |
| 2:35:32 | As Johnny is being moved backwards away from the car door, his son comes out of the back seat and removes Johnny's legs from the seatbelt.  Officer Fernandez moves Johnny to the back of the Taurus near an SUV parked next to it.<br>As Officer Schneider is dealing with the child, Sergeant Flosman noted that someone in the background of the video could be heard saying "Ow Ow Bro!"  Officer Schneider directs Officer Lewis to take a female (Anya Chapman) into custody for assaulting Officer Lindsey.  Officer Schneider still has his Taser in his hand. |
| 2:36:00 | Officer Fernandez is off-camera dealing with Johnny who is now face-down and handcuffed next to the SUV.  Johnny then says "Hey Hey", and appears to be kicking his lower legs.  Officer Schneider's body camera footage turns towards Johnny and Officer Fernandez is observed kneeling beside Johnny.  Officer Schneider places his Taser in the butt-cheek area of Johnny and drive-stuns him in the buttocks.  The Taser is at a right angle to Johnny's left buttocks partially on the left buttocks and partially in the intergluteal cleft.  Sergeant Flosman also notes that there is a lot of commotion, and an unknown officer can be heard saying "Stop, stop it."  Johnny Wheatcroft can be heard saying "Ow" over and over. |

CoG_WHEATCROFT 059092

| 2:36:42 | Officer Fernandez and another officer are still attempting to get Johnny under control when Officer Schneider places his Taser near Johnny's waist area and yells "Keep fighting and you're going to get it again.  You want it again?  Shut your mouth.  I am done fucking around with you."<br><br>Officer Schneider then disengages with Johnny and starts briefing other officers that have arrived on-scene. |
|---------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

On September 1, 2017 **Glendale Detective Diana Lopez #13611** supplemented Glendale Police Department Offense Report #17-107320.  She noted that the County Attorney filed charges of Aggravated Assault and Resisting Arrest on Johnny Wheatcroft.  In a separate supplemental report, Detective Lopez noted that the charges of Aggravated Assault and Resisting Arrest were filed on Anya Chapman.

On August 4, 2017 a Grand Jury was convened and "A True Bill" finding was sustained on Anya Chapman for Aggravated Assault, and on Johnny Wheatcroft for Aggravated Assault and Resisting Arrest[4].

On October 3, 2017 the complaint against Johnny Wheatcroft was dismissed by the Maricopa County Attorney without prejudice[5].  Anya Chapman pled guilty to the assault.

**Opinions**

After reviewing the previously listed case-specific information, I will offer my opinions regarding the arrests of Johnny Wheatcroft and Anya Chapman.  In addition to the materials reviewed, my opinions are based on my knowledge, experience, education, and training.  In analyzing the reasonableness of the officer's actions, I will also examine best practices in police operations.  I am also mindful that the jury is the ultimate finder of fact, and that all legal issues are resolved by the court.

I provide the following opinions along with supporting information:

1.  ***Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the Motel 6 property located at 7116 North 59th Avenue is a high crime location that should be taken into consideration when evaluating this incident.***

    When evaluating the actions of police officers, it is important to examine the context in which an incident occurs.  Police officers are trained to handle a variety of circumstances, and very often the location of the incident dictates the response, tactics, and actions.  The arrest of Johnny Wheatcroft and Anya Chapman occurred in the parking lot of the Motel 6 at 7116 North 59th Avenue.  This Motel 6 is located near downtown Glendale and is just north of the intersection of North 59 Avenue and NW Grand Avenue (Arizona Highway 60).

19

According to the Location History Report[6], this Motel 6 has been the location of a wide range of criminal activity.  These crimes include, but are not limited to:

- Theft
- Loud music disturbing
- Subject Disturbing/Harassing
- Unwanted Guests
- Trespassing
- Domestic Violence
- Attempt Suicide
- Possession of Dangerous Drugs
- Possession of Marijuana
- Assault
- Suspicious Vehicles
- Stolen Vehicles
- Misconduct Involving Weapons
- Soliciting (Prostitution)
- Felony Flight

Due to the high volume of criminal activity, Officers from the Glendale Police Department, with the cooperation of the Motel 6 management, completed a *Trespassing Enforcement Authorization Form*[7].  This agreement gives every police officer of the Glendale Police Department the authority to act as an agent of the Motel 6 in enforcing the trespassing laws on the property in accordance with ARS 13-1502 through 13-1504.  It has been my experience that "Authority to Arrest" trespass forms are used for high crime areas that have been adversely affected by frequent drug dealing, foot traffic, and disturbances.  The agreement demonstrates that the Motel 6 management does not tolerate trespassing, and that they will aid in the prosecution of offenders.

This incident began with Officers Schneider and Lindsey on routine patrol in the area of the Motel 6, which is a known high crime location.  The officers are members of the Glendale Police Neighborhood Response Squad (NRS), whose primary responsibility is to patrol these high crime areas.  Since the Motel 6 had a *Trespassing Enforcement Authorization Form* on file, officers will routinely check on suspected trespassers.

The criminal activity surrounding the Motel 6 was a significant factor that guided the officer's tactics and actions.  According to Officer Schneider's statements, he observed the Ford Taurus pull into the Motel 6 parking lot without signaling.  When initiating the traffic stop, Officer Schneider activated his spotlight.  Although it was daylight when the traffic violation occurred, activating a spotlight can distract the occupants of the car and improve the level of officer safety when approaching.

CoG_WHEATCROFT 059094

*(The vehicle stop and subsequent arrest of Johnny Wheatcroft and Anya Chapman will be examined in the next section of this report)*

Once the Ford Taurus was parked, Officers Schneider and Lindsey did not know whether the occupants of the car were trespassers or whether they had a bona fide reason for being in the hotel parking lot. It is my opinion that *regardless* of the traffic stop, Officers Schneider and Lindsey should have contacted the occupants of the Ford Taurus to determine their reason for being at the hotel. The Ford Taurus was backed into a parking spot, with two adult males in the front seats. Stolen vehicles are often backed into parking spaces so that the license plate is hidden from the traffic lane. Two adult men sitting in a parked car at that location may also be indicative of a drug transaction.

Since the *Trespassing Enforcement Authorization Form* had been signed by the Motel 6 manager, Officers Schneider and Lindsey did not need probable cause or reasonable suspicion to contact and talk with the occupants of the Ford Taurus. Taking into consideration the criminal history of this location, the way the Taurus was backed into the parking spot, and two men sitting in the front seats, sufficient suspicion existed that they may be trespassing. The vehicle had also just committed a traffic offense, and the passenger did not appear to be wearing his seatbelt.

2. ***Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the vehicle stop of the Ford Taurus, initiated by Officers Schneider and Lindsey, was reasonable and consistent with normal police practice.***

Officer Schneider observed the Ford Taurus pull into the Motel 6 parking lot from West Glenn Avenue without signaling. Officer Schneider then pulled his police vehicle into the parking lot from the north alleyway where the officers observed the Taurus make a suspicious move. Officer Lindsey related in his deposition[8] that the car appeared to want to make a left-hand turn into a spot where there was an open spot, but it changed directions and immediately backed up into a parking spot. Officer Schneider stopped his police car perpendicular to the front of the Ford Taurus.

Backing quickly into a parking space would raise an officer's level of suspicion. It is common practice for auto theft suspects to try to obscure a vehicle's license plate from an officer's view. Criminal suspects also try to hide expired, missing, or fraudulent license plates as well.

The location in the parking lot where Shawn Blackburn chose to park the Taurus would also raise suspicions. According to the Motel 6 video[9], there were numerous empty parking spots in the parking lot. The fact that Shawn Blackburn parked on the very end was unusual, because there were several other more readily available spots. Shawn Blackburn claimed he parked in that spot because it was closest to the office.[10]

CoG_WHEATCROFT 059095

Officer Schneider exited the police car and approached the passenger side of the Ford Taurus, where Johnny Wheatcroft was sitting. Officer Lindsey exited and approached the driver's side of the car, and contacted Shawn Blackburn. The officer's approach to the Taurus is consistent with sound police practice when considering officer safety. Officer Schneider contacting the passenger side of the Taurus eliminated the need to cross in front of the Taurus. It is extremely dangerous for officers to walk between a violator's car and a police car. If the driver of a stopped vehicle tries to flee in their vehicle, an officer can get pinned between the suspect vehicle and the police car. Police Officers are trained to avoid the area between vehicles.

Upon contact with Johnny Wheatcroft, Officer Schneider says:

"How ya'll doin? You guys staying here?"[11]

"Hey, when you turn in here man, make sure you throw on your turn signal for us."[12]

Schneider also says "Nothing in the car that shouldn't be? Right, anybody?"[13]

Once Officer Schneider looked into the Ford Taurus, it became apparent (from his body worn camera video) that several people, including children, were in the car. The presence of children in the car does not eliminate or reduce the amount of risk involved in a traffic stop. It has been my experience that the presence of children often creates situations where adults act more aggressively so they do not "look bad" in front of their children. Adults have also been known to hide contraband and weapons on juveniles because they are less likely to be "frisked" or searched by the police.

According to Officer Schneider's deposition testimony, he believed that Johnny Wheatcroft was not wearing his seatbelt. Officer Schneider said "He (Wheatcroft) was hugging the seat belt. It was over his right shoulder not buckled".[14]

It is my opinion that Officers Schneider and Lindsey had sufficient reasons to stop the Ford Taurus, and talk with the occupants. The Motel 6 is a high crime location, and it was Officer Schneider's perception that the driver (Shawn Blackburn) did not activate his turn signal, thus committing a traffic violation. It was also unknown whether the occupants of the Taurus were trespassing on the Motel 6 property. Reasonable suspicion of a traffic violation and trespassing offense were present. As previously described, the Motel 6 had a *Trespassing Enforcement Authorization* agreement with the Glendale Police Department.

It was later determined that Shawn Blackburn was driving on a suspended license, and he did not have automobile insurance on the Taurus at the time of this incident. Methamphetamine was found in the car, along with burglary tools (bolt cutters and screwdriver). Also found in the car were credit cards bearing other people's names, fraudulent Social Security cards, and multiple cell phones.

On August 4, 2017 a Grand Jury was convened and "A True Bill" finding was sustained on Anya Chapman and Johnny Wheatcroft.[15] The purpose of a grand jury is to determine whether probable cause exists and to decide whether someone should be formally charged with a crime. This indictment demonstrates that the Officers had sufficient cause to stop the vehicle. If the

CoG_WHEATCROFT 059096

Grand Jury deemed the stop illegal or without cause, a true bill finding would not have been returned.

3. *Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that sufficient probable cause existed to arrest Johnny Wheatcroft for Resisting Arrest and Aggravated Assault on a Police Officer, and Anya Chapman for Aggravated Assault on a Police Officer.*

Officers Schneider and Lindsey stopped the Ford Taurus in the parking lot of the Motel 6 for a traffic violation and suspicion of trespassing.  According to my review of Officer Schneider's body camera video and other documentation, it is my opinion that there was sufficient probable cause to arrest Johnny Wheatcroft for Resisting Arrest and Aggravated Assault on a Police Officer.  There was also probable cause to arrest Anya Chapman for Aggravated Assault on a Police Officer.  Table 2 is a summary of the events during the vehicle stop.

**Table 2**

| Video Time Stamp[16] | Activity |
|---|---|
| 2:31:39 | Officer Schneider approaches the passenger side of the car and asks the occupants if they stay at the hotel.  He also asks everyone for identification. |
| 2:32:01 | Officer Schneider has a brief conversation with Johnny Wheatcroft.  Johnny tells Officer Schneider that he does not have identification. |
| 2:32:20 | Officer Schneider calls in the license plate and location of the stop. |
| 2:32:40 | Officer Schneider asks Johnny Wheatcroft to not reach into the bag inside the car.  Officer Schneider asks Johnny for his name, but Johnny refuses and asks why he has to give Schneider his name. |
| 2:33:14 | Officer Schneider opens the car door to contact Johnny Wheatcroft.  Schneider again tells Johnny not to stuff anything between the seats.  Johnny tries to step out, but Officer Schneider tells him to get his foot back into the car. |
| 2:33:26 | Officer Schneider takes a can out of Johnny's right hand and places it on the roof of the car.  At this point Officer Schneider is holding Johnny's right tricep area with his left hand. |

CoG_WHEATCROFT 059097

| | |
|---|---|
| 2:33:28 | Officer Schneider warns Johnny Wheatcroft to not tense up. Schneider draws his Taser and places it on Johnny's right shoulder. Johnny appears to calm down, so Officer Schneider re-holsters the Taser. |
| 2:34:06 | Officer Schneider grabs Johnny's right wrist at which time Johnny begins to struggle and pull away. |
| 2:34:18 | Officer Lindsey comes to the passenger side of the vehicle to help Officer Schneider. Johnny Wheatcroft struggles with the officers. |
| 2:34:20 | Officer Lindsey drive-stuns Johnny Wheatcroft in the back. These drive-stuns were very short in duration (.2 seconds each). |
| 2:34:22 | Anya Chapman hits Officer Lindsey in the head with a bag containing cans of soda. |
| 2:34:25 | Officer Schneider steps back and deploys his Taser (with probes). |
| 2:34:37 | Officer Fernandez arrives and attempts to control Johnny Wheatcroft. Officer Fernandez attempts to handcuff Johnny. Officer Schneider drive-stuns Johnny. |
| 2:35:05 | Officer Fernandez successfully handcuffs Johnny Wheatcroft. |
| 2:35:06 | Officer Schneider drive-stuns Johnny Wheatcroft. |
| 2:35:11 | Johnny Wheatcroft is removed from the car and lifted to his feet. He is tangled in the seatbelt, so he is laid on the ground next to the Ford Taurus. Johnny's son untangles his legs. |
| 2:35:42 | Officer Schneider tries to get Johnny's son to come out of the car. Officer Schneider assures the boy that he is okay. |
| 2:36:01 | Johnny Wheatcroft can be seen kicking his legs at the officers. Officer Schneider delivers a kick to Johnny's groin area. |
| 2:36:07 | Officer Schneider delivers a drive-stun with his Taser to Johnny's buttocks area. |
| 2:36:09 | Johnny Wheatcroft and Anya Chapman are in custody. |

Table 2 documents the events leading up to the arrest of Johnny Wheatcroft and Anya Chapman. Several areas of this incident will be emphasized to demonstrate that sufficient probable cause existed to arrest both persons. Johnny Wheatcroft and Anya Chapman will be examined individually.

CoG_WHEATCROFT 059098

*Johnny Wheatcroft*

When Officer Schneider approached the Ford Taurus, Johnny Wheatcroft was sitting in the front passenger seat.  Officer Schneider asked whether Johnny and the occupants of the car were staying at the Motel 6.

Officer Schneider then asked Johnny for identification, which he did not have.  In high crime areas, it is standard police procedure to ask all the occupants of a stopped vehicle for identification.  Since a *Trespassing Enforcement Authorization Form* was on file with the Motel 6, the occupants of the car were also suspected of trespassing.

Johnny Wheatcroft became argumentative with Officer Schneider when asked for his identification.  Johnny asked several times why he was being stopped, and Officer Schneider attempted to explain it to him.  Concerned for his own safety, Officer Schneider asked Johnny to not reach into the bag that was on the floor of the car.  At this point, it is my opinion that Johnny Wheatcroft posed a significant threat to Officers Schneider and Lindsey.  Johnny Wheatcroft was argumentative and making furtive movements by reaching into the backpack.  Officer Schneider even said to Johnny that without identification, he had no reason for going into the backpack.

When detaining individuals, police officers are allowed to use physical force to ensure their own safety.  The following is an excerpt from the *Terry v. Ohio* Supreme Court case:

*"An officer justified in believing that an individual whose suspicious behavior he is investigating at close range is armed may, to neutralize the threat of physical harm, take necessary measures to determine whether that person is carrying a weapon."[17]*

Officer Schneider opened the car door and tried to gain Johnny's compliance by threatening him with his Taser and controlling (Johnny's) right arm.  Officer Schneider again told Johnny to not stuff anything between the seats.  Officer Schneider also told Johnny to relax and keep his foot inside the car.  Under these circumstances, it is reasonable for Officer Schneider to remove Johnny from the car, to distance him from any possible weapons or contraband.  Officers are not compelled to first ask subjects to exit the vehicle before attempting to remove them.

Johnny then tensed up and appeared to fight Officer Schneider's attempts to control his movements.  Johnny was physically combative, and once the violent struggling occurred, there was probable cause to believe that Johnny was resisting the officers.  Further evidence of the assault and resisting arrest can be seen while Johnny Wheatcroft is on the ground kicking at the officers.

As previously stated in this report, a Grand Jury was convened and "A True Bill" finding was sustained on Johnny Wheatcroft and Anya Chapman[18].  This indictment demonstrates that the Officers had sufficient probable cause to make an arrest.  If the Grand Jury considered the stop illegal or without probable cause, a true bill finding would not have been returned.

CoG_WHEATCROFT 059099

*Anya Chapman*

Anya Chapman was sitting in the back seat of the Ford Taurus when it was stopped by Officers Schneider and Lindsey.  Officer Lindsey contacted the driver's side of the vehicle and spoke with Shawn Blackburn and Anya Chapman while Officer Schneider contacted Johnny Wheatcroft on the passenger side of the vehicle.  Anya stepped out of the vehicle while Officer Lindsey spoke to Shawn Blackburn.

After several seconds, it became apparent to Officer Lindsey that Officer Schneider was having difficulty with Johnny, so Officer Lindsey went around to the passenger side of the vehicle.

During the struggle with Johnny Wheatcroft, Anya hit Officer Lindsey in the head with a bag filled with several cans of soda.  Officer Lindsey fell backwards, unconscious, onto his back, with his body worn camera facing the blue sky.[19]

After Johnny Wheatcroft was arrested, Anya was ordered to the ground, handcuffed, and taken into custody without any problems.  Ordering suspects to "prone out" is a common practice when arresting violent offenders.  Anya had demonstrated her willingness to assault police officers, so it is my opinion that putting her on the ground was reasonable under these circumstances.

Officer Lindsey was treated and released at a nearby hospital for his injuries.  Anya Chapman was booked into jail and ultimately pled guilty to the offenses.[20]


4. ***Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that the amount of force used by Officers Schneider, Lindsey, and Fernandez to arrest Johnny Wheatcroft was reasonable under the circumstances.***


In order to evaluate the officers' use of force during the arrest of Johnny Wheatcroft, each officer will be examined individually.  Officer Schneider, Lindsey, and Fernandez each participated in the arrest of Johnny Wheatcroft.  My assessment of the officer's actions takes into consideration my law enforcement experience, Glendale Police Department policies, court decisions, and constitutional policing best practices.

Glendale Police Department General Order 23.000 provides officers with guidelines for using physical force when making arrests.  The following is an excerpt from the *Purpose* section of the policy (23.001):

*"These policies are intended to provide guidance to employees in carrying out public safety activities and the mission of the department. They are definitely not intended to be standards of conduct that, if breached, expose employees to civil liability because to do so would seriously undermine the department's ability and motivation for writing policy and severely restrict employee discretion."  (Page 1)*

The following is an excerpt from the *Philosophy* section of the same policy:

CoG_WHEATCROFT 059100

*"Response to Resistance: It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department. The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect." (Page 1)*

The *Graham v. Connor*[21] Supreme Court case also provides guidance when evaluating police use of force.  It says:

*"The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*

Glendale Police Department General Order 23.007 also provides a table[22] that outlines what method of control is appropriate for the type of resistance demonstrated by the suspect.  This table will be referenced throughout my evaluation of the officers' actions.

### Officer Matt Schneider

Officer Schneider was the primary officer during the arrest of Johnny Wheatcroft.  Table 3 describes my assessment of the type of resistance demonstrated by Johnny Wheatcroft, the method of control used by Officer Schneider, and the determination whether it meets the requirements of Glendale Police Department General Order 23.000.

**Table 3**

| Suspect's Actions (Wheatcroft) | Type of Resistance (Wheatcroft) | Method of Control (Schneider) | Compliant with GPD Policy? |
|---|---|---|---|
| While being detained, suspect becomes argumentative with Schneider. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence Verbal Commands | Yes |
| Suspect refuses to quit reaching into backpack. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence Verbal Commands Display Taser | Yes |
| While in the car, suspect tightens arm and tries to pull away. | Verbal Non-Compliance Physical (Defensive Resistance) | Officer Presence Verbal Commands Soft-Empty Hands Taser Use | Yes |
| While handcuffed on the ground, suspect kicks Schneider. | Verbal Non-Compliance Active Aggression | Officer Presence Verbal Commands Soft-Empty Hands Hard-Empty Hands (kick) Taser Use | Yes |

27

Officer Schneider reacted to several types of physical resistance during the traffic stop with Johnny Wheatcroft. These areas will be examined below:

*Vehicle Approach*- Officers Schneider and Lindsey stopped the Ford Taurus during daylight hours. Both officers were in uniform and driving a marked police car. It is reasonable to assume that the occupants of the Taurus knew they were the police, so the method of control used by Officer Schneider during the approach was *Officer Presence*.

*Initial contact with Johnny Wheatcroft*- While detaining Johnny Wheatcroft, Officer Schneider used verbal commands and persuasion to compel Johnny to provide identification and to quit reaching into the backpack that was next to his legs. Johnny Wheatcroft did not comply.

*Removing Johnny Wheatcroft from the vehicle*- It was appropriate for Officer Schneider to remove Johnny Wheatcroft from the vehicle. This is a common officer safety measure that is done to separate suspects from weapons and contraband. Glendale Police Department General Order 23.300 allows officers to remove subjects from vehicles. The policy states:

*"Depending on the circumstances, the officer may allow the operator and any other occupants to remain in the vehicle or to exit the vehicle during the stop[23]*

*Opening the Door and grabbing Johnny Wheatcroft's right arm*- Johnny Wheatcroft was not complying with Officer Schneider's request to quit reaching into the backpack. He continued to make furtive movements, so Officer Schneider made the decision to remove him from the vehicle. Johnny Wheatcroft had a can of soda in his right hand, which Officer Schneider removed and placed on the roof of the car. Removing the can from Johnny's hand is also an officer safety measure, because if a suspect chooses to resist, the soda can or other contents held in their hands can become weapons.

When Officer Schneider reached into the vehicle, he grabbed Johnny Wheatcroft by the right arm. In my review of Officer Schneider's body-worn camera video, this appears to be an *escort* hold, not a *control* hold. Escort holds are designed to guide someone along, and not be pain-compliant. The resistance demonstrated by Johnny Wheatcroft at this time was Passive, and Verbal Non-compliance.

*Johnny Wheatcroft tenses his arm and struggles with Officer Schneider*- When Officer Schneider grabbed Johnny's right arm, Johnny tensed up and tried to twist away from Officer Schneider. At this point, Johnny was displaying Physical (Defensive resistance) against Officer Schneider. Officer Schneider responded by threatening to use his Taser, but then de-escalated the situation momentarily and re-holstered his Taser. Johnny Wheatcroft resumed struggling, so Officer Lindsey delivered two drive-stuns to Johnny's back. Officer Schneider also used Soft-Empty Hands by pulling Johnny's arm behind his back. Officer Lindsey, while helping Officer Schneider, was struck in the head by Anya Chapman (Officer Lindsey's use of force will be evaluated separately). The strike to the head by Anya Chapman incapacitated Officer Lindsey, thus eliminated his ability to assist Officer Schneider with the arrest of Johnny Wheatcroft.

CoG_WHEATCROFT 059102

*Officers Schneider and Fernandez remove Johnny Wheatcroft from the Taurus*- As Officers Fernandez and Schneider struggle with Johnny Wheatcroft, they take him out of the car onto the ground.  He is handcuffed, but continues to resist the officers' commands.  Since Johnny Wheatcroft is still resisting and Officer Schneider is unaware that he is handcuffed, Officer Schneider delivers a drive-stun to Johnny's right shoulder area.  Johnny Wheatcroft gets tangled in the seat belt, and his son (JW) asks the officers several times to stop.  JW reaches down and releases Johnny's feet.  At this point in the confrontation, Officer Schneider again tries to de-escalate the situation by asking JW to exit the car and get in front of the car.  Officer Schneider tries to assure the child that everything is okay, but JW stays in the car.

During the confrontation, eleven-year-old JW asks the officers several times to stop, but none of the officers acknowledged the boy's request.  Under these circumstances, it would be unreasonable for the officers to consider the boy's request because the officers were in the middle of dealing with the violent actions of Johnny Wheatcroft.

The officers laid Johnny Wheatcroft on the ground between the Taurus and another parked car.  He was placed face-down on the asphalt, where he continued to kick at the officers.  Placing suspects on the ground is a common practice among police officers to gain control of violent subjects.  The ground offers stability, and there is a less likely chance of injuries from a fall.  This incident occurred in July, so the asphalt was probably hot, but due to the close quarters between the cars and Johnny Wheatcroft's resistance, the officers had limited choices as to where Johnny could be placed.

*Johnny Wheatcroft kicks Officer Schneider*- While on the ground between the cars, Johnny Wheatcroft can be seen kicking at Officer Schneider.[24] This is *Active Aggression* as defined by Glendale Police Policy.  Officer Schneider delivers a kick, which would be a Hard-Empty Hands Control method.  This is reasonable under the circumstances, and within Glendale's policies.  Officer Schneider also Tases Johnny Wheatcroft in the right buttocks.

When Officer Schneider Tases Johnny in the buttocks, it appears as though Johnny's pants have slipped down and the Taser is touching bear skin.  It also appears that the Taser target is the right or left buttocks, not the genitals or the perineum area.  At no time is the scrotum, testicles, or any male genitalia visible.

According to Officer Schneider's Taser report[25] the total time activated either through trigger use or drive-stun was forty-five (45) seconds.  The photos in the Taser report show that one probe missed Johnny completely and was lying on the ground next to him.  From the body worn camera video that was reviewed, it did not appear as though Johnny Wheatcroft was incapacitated by the Tasers.  Johnny Wheatcroft did not appear to stop fighting during the Taser deployment, and the Tasers seemed to be ineffective.

Following the Taser deployments, the probes were removed from Johnny Wheatcroft and the Taser cartridges were impounded as evidence.  According to the Glendale Police *Response to Resistance Policy 23.00,* officers are allowed to remove the probes as long as they have not penetrated a sensitive/soft tissue area[26].  Removing Taser probes is standard police procedure, and is not considered inhumane or torture.

CoG_WHEATCROFT 059103

*Officer Mark Lindsey*

Officer Lindsey was riding with Officer Schneider when they stopped Johnny Wheatcroft (and the other occupants of the Ford Taurus) at the Motel 6.  Table 4 describes my assessment of the types of resistance demonstrated by Johnny Wheatcroft, the method of control used by Officer Lindsey, and the determination whether it meets the requirements of Glendale Police Department General Order 23.000.

**Table 4**

| Suspect's Actions (Wheatcroft) | Type of Resistance (Wheatcroft) | Method of Control (Lindsey) | Compliant with GPD Policy? |
|---|---|---|---|
| While being detained, suspect becomes argumentative with Schneider. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence | Yes |
| Suspect refuses to quit reaching into backpack. | Passive Verbal Non-Compliance Psychological Intimidation | Officer Presence | Yes |
| While in the car, suspect tightens arm and tries to pull away. | Verbal Non-Compliance Physical (Defensive Resistance) | Officer Presence Verbal Commands Soft-Empty Hands Taser Use (Two drive-stuns) | Yes |
| While handcuffed on the ground, suspect kicks Schneider. | Verbal Non-Compliance Active Aggression | (Officer Lindsey has been incapacitated and can no longer control the resistance of Wheatcroft.) | Not applicable |

When Officers Schneider and Lindsey stopped the Ford Taurus, Officer Lindsey went to the driver's side of the vehicle and Officer Schneider went to the passenger side.  Officer Lindsey's body worn camera video depicts him talking with Shawn Blackburn,[27] asking him basic questions about his identification card.  After approximately two minutes, Officer Lindsey recognizes that Officer Schneider is arguing with the passenger of the vehicle, Johnny Wheatcroft.  Officer Lindsey goes to the passenger side of the vehicle to help Officer Schneider.  From Officer Lindsey's body camera, it can be seen that Officer Schneider is struggling with Johnny Wheatcroft, trying to get him under control.  At this point, Officer Lindsey is observing *Physical (Defensive Resistance)* by Johnny Wheatcroft.

Officer Lindsey delivers two drive-stuns with his Taser to Johnny's shoulder area.  This response is appropriate under the circumstances, and is allowed by Glendale Police Department policy.

CoG_WHEATCROFT 059104

During the struggle with Johnny Wheatcroft, Officer Lindsey was struck in the head by Anya Chapman, wielding a plastic bag filled with full cans of soda. Officer Lindsey falls backward and is rendered unconscious for a short time. The assault on Officer Lindsey ended his participation in the arrest of Johnny Wheatcroft and Anya Chapman.

According to Officer Lindsey's Taser Report[28], the total time activated during the drive-stuns was one second, and the completed connection was just over .2 seconds.


### Officer Michael Fernandez

Over the police radio, Officer Fernandez heard Officers Schneider and Lindsey conduct a traffic stop at the Motel 6. He responded to their location to back-up the officers.

When Officer Fernandez arrived, he saw that Officers Schneider and Lindsey had a silver Ford Taurus stopping in the parking lot. Officer Lindsey waved Officer Fernandez over to his location. According to Glendale Incident Report 17-107320[29] Officer Fernandez initially went to the driver's side of the Taurus, but then ran to the passenger side of the car when he saw Officer Lindsey get knocked backwards.

Officer Fernandez helped Officer Schneider take Johnny Wheatcroft into custody. At no time did the officers communicate regarding the reasons for the arrest or the charges. It would have been unreasonable to communicate the reasons for the arrest since Officer Schneider was actively engaged in a physical struggle with Johnny.

Officer Fernandez said he saw Taser probes coming from Johnny, so he believed a previous deployment had not been effective. Officer Fernandez then deployed his Taser at Johnny. Officer Fernandez believed his deployment was effective, because it seemed to lock-up Johnny's movements, causing him to stop fighting.

At this point during the arrest of Johnny Wheatcroft, he was displaying *Physical (Defensive Resistance)* towards the officers. Officer Fernandez's use of a Taser to control this type of resistance is within Glendale Police policies.

Officer Fernandez successfully handcuffed Johnny Wheatcroft and laid him between the parked cars. Officer Fernandez related that Johnny Wheatcroft was kicking and thrashing despite being handcuffed. According to Glendale Police policy, kicking at police officers would be classified as an *Active Aggression* type of resistance.

Officer Fernandez secured Johnny Wheatcroft on the ground, and after the drive-stun to the buttocks by Officer Schneider, he quit fighting with the officers.

According to Officer Fernandez's Taser Report[30], the total time activated by trigger pull was five (5) seconds.

CoG_WHEATCROFT 059105

**5. *Under the presented series of facts, and to the extent a jury finds these facts credible and occurred as stated, it is my opinion that City of Glendale provided Officers Schneider, Lindsey, and Fernandez with an appropriate level of training and supervision.***

I have reviewed the personnel records and prior disciplinary histories of Officers Schneider, Lindsey, and Fernandez.  These personnel records included commendations, performance reviews, and previous incidents of misconduct.

None of the files I reviewed would indicate a failure to supervise or properly discipline these officers.  I did not find any of the officers to have a proclivity towards violent behavior, or a history of negative contacts with the community.  In fact, the officers had numerous commendations that documented their exemplary performance over the years.

I also reviewed the training records of Officers Schneider, Lindsey, and Fernandez.  Table 5 describes the relevant training that they received prior to this incident.  *(It should be noted that this table is not all-inclusive of the training the officers received)*

**Table 5**

| Officer | Topic | Date |
|---------|-------|------|
| Fernandez | 2017 Advanced Officer Training (Firearms, CPR, Defensive Tactics, Baton and Taser Recertification, De-escalation Training) | 04/19/17 |
| Schneider | Body Worn Camera Training | 08/11/16 |
| Schneider Lindsey Fernandez | 2016 Advanced Officer Training (Firearms, Driving, Defensive Tactics) | 05/24/16 02/16/16 02/16/16 |
| Schneider Lindsey Fernandez | 2015 Advanced Officer Training (Taser, Firearms, Defensive Tactics, CPR, Gas Mask Fit Testing) | 10/01/15 04/02/15 10/06/15 |
| Schneider Lindsey Fernandez | 2014 Advanced Officer Training (Taser, Defensive Tactics, First Aid, Tactical Driving, Trauma Kit Training) | 09/05/14 10/01/14 11/17/14 |
| Fernandez | Verbal Judo | 08/08/14 |
| Schneider Lindsey Fernandez | 2013 Advanced Officer Training (Firearms, Driving, Defensive Tactics, Taser | 04/30/13 04/30/13 01/22/13 |
| Schneider | X2 Transition Training (Taser) | 12/11/12 |

32

In addition to the training described in Table 5, Officers Schneider, Lindsey, and Fernandez are certified by the Arizona Peace Officer Standards and Training (AZPOST) Board to be police officers in the State of Arizona. The AZPOST Basic Peace Officer Course (police academy training) is 585 hours of mandated training. Officers must complete all of the academy requirements, and pass a comprehensive final exam to become AZPOST certified. Officers Schneider, Lindsey, and Fernandez also attended advanced officer training throughout their careers.

During the arrest of Johnny Wheatcroft, the officers used several expletives while struggling with him and trying to control his actions. Although the use of swear words may seem unprofessional, it is common practice for officers to use "shock language" during violent encounters with suspects. Shock language is meant to emphasize the urgency of the command, and is generally accepted by police management.

Following the arrest of Johnny Wheatcroft, the Glendale Police Department Professional Standards Unit (PSU) investigated the incident. Sergeant Matt Moody completed the written investigation, and he sustained three allegations against Officer Schneider. One of the allegations was a violation of the Glendale Police Department *Response to Resistance* policy. Sergeant Moody provides the following justification in his report:

*"After Johnny was handcuffed near the passenger compartment by Fernandez, he was in a crouched position, not resisting, and Schneider delivered a one second drive-stun to his back. Schneider advised he thought Johnny was actively fighting, however BWC video shows he was not. Schneider's first kick to Johnny's groin was reactionary to being kicked in the legs by Johnny, and is justifiable. However, the second kick to Johnny's groin was not necessary as Johnny was handcuffed in the fetal position and giving up. Schneider contests the second kick and states that it wasn't a kick at all.[31]*

Sergeant Moody also alleged that Officer Schneider violated the Vehicle Stops policy (General Order 23.301) and the Laws of Arrest policy (General Order 24.000). During the Discipline Review process, these sustained allegations were reviewed by the chain of command and changed to *Not Sustained* and *Exonerated.* Below is an excerpt from the PSU report:

*"In the Discipline Review process, Assistant Chiefs LeVander and Briggs differed in their findings on the sustained allegations. In Sergeant Moody's findings, he sustained on all three listed allegations. While A/C Briggs agreed with Sergeant Moody's findings to Sustain on all the listed allegations; A/C LeVander decided the allegations as follows:*
*• Allegation #1: G.O. 23.002 Response to Resistance- SUSTAINED*
*• Allegation #2: G.O. 23.301 Vehicle stops- NOT SUSTAINED*
*• Allegation #3: G.O. 24.000 Laws of Arrest- EXONERATED"*
*Because Gateway Division falls under Chief LeVander, the determination of findings are consistent with his decision, and have been updated to reflect the change.[32]*


It is my opinion that the allegation that Officer Schneider violated the *Response to Resistance* policy should also be unfounded in the PSU report and subsequent disciplinary actions. At the time Officer Schneider delivered the drive-stun, Johnny Wheatcroft was still non-compliant and

CoG_WHEATCROFT 059107

Officer Schneider did not know that Johnny had already been handcuffed.  It was a dynamic, fluid situation, and a one-second burst from a Taser does not rise to the level of "excessive" when dealing with a violent, combative person.  The excerpt from the PSU investigation indicates that there were differing opinions among the Assistant Chiefs as to the merits of the stop and arrest of Johnny Wheatcroft.  Also, the *Graham v. Connor* Supreme Court case emphasizes that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight.

Despite the disagreement among the Glendale Police Chiefs on two out of three of the allegations against Officer Schneider, he was disciplined for violating the *Range of Response* policy and was suspended for three (3) working days.

### Summation/Conclusions

I have reviewed numerous documents associated with this incident and have found that Officers Schneider and Lindsey had sufficient suspicion to stop and talk with the occupants of the Ford Taurus in the parking lot of the Motel 6.  While detained, Johnny Wheatcroft aggravated the situation by reaching into a backpack, and not complying with Officer Schneider's commands.  Johnny Wheatcroft made the decision to fight the officers, and was subsequently Tased and lawfully arrested.  Johnny Wheatcroft was arrested for violent crimes, not for the mere lack of identification or for exercising his First Amendment rights.

Although the scene of the arrest was very chaotic, the officer's actions were reasonable under the circumstances.  The actions of Glendale Police Officers Schneider, Lindsey, and Fernandez, based on the information known to them at the time, was consistent with contemporary law enforcement policies, practices, and training.

This report is based on my law enforcement training and experience in evaluating police officers' conduct, investigations, police policies, practices, and training, and my opinions are made to a reasonable degree of police practices/law enforcement professional certainty.  This report should not be interpreted as offering any legal opinion.  This report is submitted in accordance with Rule 26 of the Federal Rules of Civil Procedure, and I reserve the right to amend my opinions if additional evidence or information is discovered.

Respectfully Submitted,

*Blake A. McClelland*

Blake A. McClelland

CoG_WHEATCROFT 059108

**Publications**

Coldren, J., Shultz, A., LaRochelle, J., and McClelland,B. (2017). *Collaborative Reform Initiative: Interim Final Report of the Philadelphia Police Department*. Washington, DC: United States Department of Justice, Office of Community Oriented Policing Services.

Rodriguez-King, D., Saloom, C., and McClelland, B. (2014). *Collaborative Reform Model: A Review of Use of Force Policies, Processes, and Practices in the Spokane Police Department*. Washington DC: United States Department of Justice, Office of Community Oriented Policing Services.

**Previous Expert Witness Cases**

Not Applicable. *(In the last four years, none of my previous expert witness cases have required testimony or deposition.)*

**Fee Schedule**

| | |
|---|---|
| Case review and report preparation: | $200.00 per hour |
| Deposition and court testimony: | $1200.00 for up to 4 hours; $250.00 per hour after 4 hours |
| Travel and related expenses: | 100% reimbursement |

35

CoG_WHEATCROFT 059109

**Endnotes**

[1] Trespassing Enforcement Authorization Form (Bates No. 036802)

[2] Deposition Transcript of Officer Lindsey (Page 157, Lines 3-10)

[3] Glendale Police Incident Report 17-107320 pages 46-48.  (Bates Nos. 000046-000048)

[4] Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  (Bates Nos. 036851-036853)

[5] Maricopa County Attorneys' Office Order of Dismissal re Johnny Wheatcroft.  (Bates No. 036906)

[6] Glendale Police Department's Location History Report for Motel 6.  (Bates Nos. 036854-036904)

[7] Trespassing Enforcement Authorization Form (Bates No. 036802)

[8] Deposition Transcript of Officer Lindsey (Page 157, Lines 3-10)

[9] Motel 6 Video Surveillance Footage from July 26, 2017.  (Bates No. 000372)

[10] Deposition Transcript of Shawn Blackburn and Exhibits.  (Page 150, Line 6)

[11] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Time stamp 0:00:40)

[12] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Time stamp 0:00:53)

[13] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Time stamp 0:01:06)

[14] Deposition Transcript of Officer Matthew Schneider (Page 104, Line 12)

[15] Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  (Bates Nos. 036851-036853)

[16] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Axon Time Stamps used)

[17] Terry v. Ohio, 392 U.S. 1 (1968)

[18] Maricopa County Attorneys' Office Indictment Against Anya Ann Chapman and Johnny Wheatcroft.  (Bates Nos. 036851-036853)

[19] Glendale Police Officer Mark Lindsey's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000380, Axon Time Stamp 2:34:31)

CoG_WHEATCROFT 059110

[20] Maricopa County Superior Court Minute Entry dated October 25, 2017 re Anya Chapman's Change of Plea to Aggravated Assault.  (Bates Nos. 036803-036804)

[21] *Graham v. Connor* Supreme Court 1989, No. 87-6571

[22] Glendale Police Department General Order 23.000 regarding Response to Resistance.  (Bates Nos. 000450-000451)

[23] Glendale Police Department General Order 23.300 regarding Vehicle Stops.  (Bates No. 001765)

[24] Glendale Police Officer Matthew Schneider's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000383, Axon Time Stamp 2:36:01)

[25] Officer Schneider's Taser Report is contained in Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  (Bates Nos. 001675-001691)

[26] Glendale Police Department General Order 23.000 regarding Response to Resistance.  (Bates Nos. 000438-000439)

[27] Glendale Police Officer Mark Lindsey's Body-Worn Camera Footage from July 26, 2017.  (Bates No. 000380)

[28] Officer Lindsey's Taser Report is contained in Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  (Bates Nos. 001670-001674)

[29] Glendale Police Incident Report 17-107320 page 24.  (Bates No. 000024)

[30] Officer Fernandez's Taser Report is contained in Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft.  (Bates Nos. 001668-001669)

[31] Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft. (Bates No. 002202)

[32] Glendale Police Department Professional Standards Unit Investigative File regarding the July 26, 2017 Incident involving Johnny Wheatcroft. (Bates No. 002205)

CoG_WHEATCROFT 059111

# *EXHIBIT B*

**ADDENDUM 1 (Personal Resume)**

Phone (602) 763-2830
E-mail:
Blake.McClelland@Cox.net

# Blake A. McClelland

| **Education** | 1997-2002 | Arizona State University | Tempe, AZ |

**Doctor of Philosophy (Ph.D.)**
- School of Public Affairs with an emphasis on Organizational Theory and Behavior.

| | 1994-1997 | Arizona State University | Tempe, AZ |

**Master of Public Administration (M.P.A.)**
- School of Public Affairs with an emphasis on Organizational Theory and Behavior.

| | 1976-1983 | Arizona State University | Tempe, AZ |

**Bachelor of Science (B.S.)**
- College of Business Administration with an emphasis on Personnel Management.

| **Professional Experience** | 2016-present | Arizona State University | Tempe, AZ |

**Lecturer**
- Director of the Master of Arts program in Criminal Justice.
- Full-time faculty member in the School of Criminology and Criminal Justice.  Instructor for *CRJ302 Research Methods, CRJ308 Advanced Criminological Theory, CRJ303 Statistical Analysis, CRJ306 Race, Ethnicity, and Crime,* and *CRJ494 Police Use of Force.*
- Also teaches graduate-level classes *CRJ510 Criminal Justice Planning and Program Evaluation,* and *CRJ511 Applied Data Analysis in Criminal Justice.*  These classes are required in the Master of Science program in Criminal Justice.
- Instructor for the *Certified Public Manager (CPM)* curriculum in the Bob Ramsey Executive Education Department in the School of Public Affairs. Conducts classes in public policy and ethics.

*CoG_WHEATCROFT 059112*

1982-2016            Phoenix Police Department            Phoenix, AZ

**Police Commander/Assistant Chief (Retired)**

- Thirty-four years' experience with the Phoenix Police Department. Promoted through the ranks and has held command-level positions at the Lieutenant, Commander, and Assistant Chief ranks.
- Assignments have included (but are not limited to) patrol operations, investigations, SWAT, internal affairs, auditing, strategic planning, training, hiring, and others.
- Successful track record of leadership, good judgment, innovation, and reasonable risk-taking.  I have held numerous command positions, the largest being 1,412 employees (sworn officers, supervisors, and civilians) with a budget of $120 million dollars.
- Commanded the Planning and Research Bureau that was responsible for the statistical analyses of crime trends and other organizational problems.
- Conducted or led empirical research projects designed to measure the Patrol Division staffing levels and manpower needs.  Also conducted staffing studies of the Communications Bureau and Special Assignments Unit (SWAT Team)
- Served as Chairman of the Use of Force Board and Disciplinary Review Board that evaluate the actions of police officers and supervisors.


2005-present     U.S. Department of Justice            Washington, D.C.

**Consultant, National Institute of Justice**

- Member of the National Institute of Justice (NIJ) Consultant Database.
- Participated as a practitioner reviewer of grant applications for the *FY 2011 NIJ Research and Evaluation in Crime Control and Prevention* solicitation. (June 2011)
- Participated as a practitioner reviewer of grant applications for the *FY 2010 Research on Policing* solicitation. (May 2010)
- Conducted a peer review of the Police Foundation Study titled: *The Impact of Shift Length on Performance, Health, Quality of Life, Sleep, Fatigue, and Extra-Duty Employment.* (NIJ Grant # 2005-FS-BX-0057)

CoG_WHEATCROFT 059113

2013-present    CNA Corporation                            Arlington, VA

**Subject Matter Expert, Consultant**

- Research team member specializing in police investigations, use of force and training.
- Funded by the U.S. Department of Justice, Community Oriented Policing Services (COPS) to conduct a *Collaborative Reform Process* for the Spokane, Washington Police Department.
- The review of the Spokane Police Department included their use of force policies, investigative protocols, community outreach, and other areas.
- Co-authored the initial publication that is available on the Department of Justice website.  Presently conducting a review of Spokane's progress toward achieving the recommendations from the initial report.
- Research team member assisting with the compliance monitoring of the Philadelphia Police Department.

**Professional memberships**

- Center for Violence Prevention and Community Safety, Arizona State University (Advisory Board member)
- American Society for Public Administration (Former Board Member, Arizona Chapter)
- FBI National Academy Association (member)
- Police Executive Research Forum (member)
- National Tactical Officers Association (member)

**Professional Accomplishments and Training**

- Graduate of the FBI National Academy, Quantico Virginia, March 2000.
- Certified by Arizona Peace Officers Standards and Training (AZPOST) Board to teach Defensive Tactics, Firearms, Impact Weapons, Physical Fitness, and High Risk Vehicle Stops.
- Trained in the use of the National Incident Management System (NIMS) and the Incident Command System (ICS) by the Phoenix Fire Department.
- Distinguished Service Award, February 2005, for providing a leadership role in the Violence Impact Project.
- Medal of Lifesaving, June 1994, for saving the life of a heart attack victim.

CoG_WHEATCROFT 059114

# *EXHIBIT 18*

1   Joseph J. Popolizio, Bar #017434
2   Justin M. Ackerman, Bar #030726
    Ian C. Beck, Bar #035599
3   JONES, SKELTON & HOCHULI, P.L.C.
    40 North Central Avenue, Suite 2700
    Phoenix, Arizona  85004
4   Telephone:  (602) 263-1700
    Fax:  (602) 200-7876
5   jpopolizio@jshfirm.com
    jackerman@jshfirm.com
6   ibeck@jshfirm.com

7   Attorneys for Defendants

8
                  **UNITED STATES DISTRICT COURT**
9
                      **DISTRICT OF ARIZONA**
10

11  Johnny Wheatcroft and Anya Chapman, as          NO. 2:18-cv-02347-MTL
    husband and wife, and on behalf of minors J.W.
12  and B.W.,                                       **DECLARATION OF MARK
                                                    LINDSEY**
13                                   Plaintiffs,

14         v.

15  City of Glendale, a municipal entity; Matthew
    Schneider, in his official and individual
16  capacities; Mark Lindsey, in his official and
    individual capacities; and Michael Fernandez, in
17  his official and individual capacities,

18                                   Defendants.

19

20         I, Mark Lindsey, make the following Declaration:

21         1.     I am over the age of 18 years and have personal knowledge to testify to

22  the matters set forth in this Declaration.

23         2.     This Declaration is intended solely to supplement the testimony given in

24  my deposition on June 5, 2019.

25         3.     As more fully set forth in my deposition in this matter, I was a City of

26  Glendale Police Officer on the date of the incident giving rise to this action.

27         4.     The attached video, taken from my body camera, is a true and accurate

28  depiction of my encounter with Plaintiffs on the evening of July 26, 2017, as captured through

9255004.1

my body camera.  [Lindsey bodycam Video 1 (CoG_WHEATCROFT 000380), attached as **Exhibit A**].

5.      While my body camera video attached as Exhibit A generally shows video evidence of my encounter with Plaintiffs, at certain points during Exhibit A, it is difficult to see each and every action occurring between Mr. Wheatcroft, Anya Chapman, and me due to rapidly changing body movements and/or shifting camera angles during the altercation. During those particular portions of the physical confrontation with Mr. Wheatcroft, I provide an account of what occurred, to the best of my recollection.

6.      During the roughly twenty (20) second encounter I had with Johnny Wheatcroft, it was a dynamic and fast moving situation that did not afford me time to deliberate.  [*See* Ex. A at 2:34:11-2:34:31].

7.      My entire intent behind every action I took with Mr. Wheatcroft was to ensure the safety of myself and those around me.

8.      I had absolutely no intent to cause either of the minor children any emotional distress or harm during my encounter with Johnny Mr. Wheatcroft on July 26, 2017 or otherwise.

9.      I had absolutely no intent to purposefully interfere with the familial association rights of the Plaintiffs.  All actions I took during my encounter with the Plaintiffs were related to legitimate law enforcement objectives, including but not limited to officer safety concerns.

10.     I was regularly supervised by the City of Glendale.  Sgt. LaBrant was my supervisor at the time of the incident.  On the day of the incident, however, Sgt. LaBrant was on vacation, so Sargent Rachel Bousman and Lieutenant Nicholas Susurus were on scene as supervisors on the day of the incident.

11.     During my entire confrontation with Mr. Wheatcroft, my intent was to gain control over a chaotic and violent situation that Mr. Wheatcroft and his wife, Anya Chapman created.  I did not have a pre-conceived intent or vendetta at any time prior to or during my confrontation with Mr. Wheatcroft.  Rather, I acted with what I believed was my

1  lawful authority to control a non-responsive and violent suspect who was resisting my lawful

2  commands and his lawful arrest.

3          12.    I declare under penalty of perjury that the foregoing is true and correct.

4

5  Date: 03/23/2021                   By: *Mark Lindsey*

6                                       Mark Lindsey

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# *EXHIBIT A*

# *Non-Electronic Exhibit - CD*

# *EXHIBIT 19*

# *Filed Under Seal*

# *EXHIBIT 20*

# *Filed Under Seal*

# *EXHIBIT 21*

# *Filed Under Seal*

# *EXHIBIT 22*

# *Filed Under Seal*