INDEX TO EXHIBITS

**Wheatcroft v. City of Glendale, et al**
**No. 2:18-cv-02347-MTL**

| EXHIBIT | DESCRIPTION | |
|---|---|---|
| 1 | Deposition of Johnny Wheatcroft | |
| 2 | Officer Tolbert's Body Camera Video | Non-Electronic Exhibit - CD |
| 3 | Motel 6 Location History Report | |
| 4 | Deposition of Mark Lindsey | |
| 5 | Deposition of Matthew Schneider | |
| 6 | Deposition of Shawn Blackburn | |
| 7 | Deposition of Michael Fernandez | |
| 8 | Deposition of Anya Chapman | Filed Under Partial Seal |
| 9 | Officer Schneider's Body Camera Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 10 | Deposition of Jerry McDaniel | |
| 11 | Motel 6's Response to Plaintiffs' Subpoena Duces Tecum | |
| 12 | Officer Lindsey Body Camera Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 13 | Motel 6 Surveillance Video | Non-Electronic Exhibit - CD & Filed Under Seal |
| 14 | Matthew Schneider's Declaration | |
| 15 | Darko Babic Declaration/Report | |
| 16 | Michael Fernandez's Declaration | |
| 17 | Blake McClelland Declaration/Report | |
| 18 | Mark Lindsey's Declaration | |
| 19 | Glendale Fire Department Records | Filed Under Seal |

9265126.1

| 20 | Deposition of Robin Nash | Filed Under Seal |
|---|---|---|
| 21 | Deposition of J.W. | Filed Under Seal |
| 22 | Deposition of B.W. | Filed Under Seal |
| 23 | Scene Photographs of Methamphetamines | |
| 24 | Deposition of Roy Lewis | |
| 25 | Criminal Complaint | |
| 26 | Indictment | |
| 27 | Order Dismissing Complaint | |
| 28 | Minute Entry Regarding Anya Chapman's Plea Agreement | |
| 29 | Glendale Police Department's General Order-23.000 | |
| 30 | Deposition of Richard St. John | |
| 31 | Deposition of Brandon Blanco | |
| 32 | Deposition of Earl Montgomery | |
| 33 | Deposition of Donald LaBrant | |
| 34 | Training Records | |
| 35 | Arizona Post Certifications | |
| 36 | Mark Lindsey's Employment Application | |
| 37 | Matthew Schneider's Employment Application | |
| 38 | Michael Fernandez's Employment Application | |
| 39 | Scene Photographs of Soda/Scale | |
| 40 | Officer Fernandez's Pulse Log Evaluation | |

# *EXHIBIT 23*



CoG_WHEATCROFT 000126



CoG_WHEATCROFT 000137



CoG_WHEATCROFT 000138

*EXHIBIT 24*

1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya          )
Chapman, as husband and wife, and   )
on behalf of minors J.W. and B.W.,  )
                                    )
        Plaintiffs,                 )
                                    ) Case No.:
vs.                                 ) 2:18-cv-02347-SMB
                                    )
City of Glendale, a municipal       )
entity; Matt Schneider, in his      )
official and individual             )
capacities; Mark Lindsey, in his    )
official and individual             )
capacities; and Michael Fernandez,  )
in his official and individual      )
capacities,                         )
                                    )
        Defendants.                 )
                                    )

DEPOSITION OF DETECTIVE ROY JOSEPH LEWIS

Chandler, Arizona
January 8, 2020
10:04 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:

(COPY)

---

2

I N D E X

WITNESS                                    PAGE
DETECTIVE ROY JOSEPH LEWIS


        EXAMINATION BY MS. BROADDUS          4
        EXAMINATION BY MR. POPOLIZIO        50
        FURTHER EXAMINATION BY MS. BROADDUS    99
        FURTHER EXAMINATION BY MR. POPOLIZIO  109
        FURTHER EXAMINATION BY MS. BROADDUS  111
        FURTHER EXAMINATION BY MR. POPOLIZIO  112


        E X H I B I T S

Deposition
Exhibits    Description              Marked
    42      Color photograph, Bates No.      113
            CoG_WHEATCROFT 000136
            (1 page)

---

3

DEPOSITION OF DETECTIVE ROY JOSEPH LEWIS was
taken on January 8, 2020, commencing at 10:04 a.m. at the
law offices of MARC J. VICTOR, P.C., ATTORNEY FOR FREEDOM,
3185 South Price Road, Chandler, Arizona, before MONICA S.
BERRY, RPR, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:
    MARC J. VICTOR, P.C.
    ATTORNEYS FOR FREEDOM
    By: MS. JODY L. BROADDUS
    3185 South Price Road
    Chandler, Arizona  85248
    On behalf of Plaintiffs

    JONES, SKELTON & HOCHULI, P.L.C.
    By: MR. JOSEPH J. POPOLIZIO
    40 North Central Avenue
    Suite 2700
    Phoenix, Arizona  85004
    On behalf of Defendants

    ROBAINA & KRESIN, PLLC
    By: MR. EDMUNDO P. ROBAINA
    5343 North 16th Street
    Suite 200
    Phoenix, Arizona  85016
    On behalf of Detective Roy Joseph Lewis


ALSO PRESENT:
    Ms. Kathy Thomas and Ms. Dianne Shoemake, City of
    Glendale
    Ms. Julie Wanner, paralegal to Mr. Popolizio
    Ms. Alexz Thompson, paralegal to Ms. Broaddus
    Mr. Nathan Sheeley, intern for Ms. Broaddus

---

4

DETECTIVE ROY JOSEPH LEWIS,
a witness herein, having been first duly sworn by the
Certified Reporter to speak the truth and nothing but the
truth, was examined and testified as follows:


                EXAMINATION
BY MS. BROADDUS:
    Q.  Will you please state your name for the record.
    A.  Roy Lewis.
    Q.  Have you ever had your deposition taken before?
    A.  Don't think so.  I've had lots of interviews.
    Q.  I'll go through a few ground rules with you.  The
court reporter here is going to be taking down everything
said by everyone in this room.  And to make her job a lot
easier and to make sure we have a clear record, it's
important that only one person speaks at a time.  Okay?
    A.  Yes.
    Q.  So I will ask you a question.  If you can wait
until I'm finished asking before you start answering --
you might be able to anticipate what I'm going to say, but
if you'll wait until I finish, and then I'll wait until
you finish your answer before I begin the next one.  It'll
make it a lot easier for her to transcribe.  Okay?
    A.  Yes.
    Q.  We can take a break if you need to.  We can take

85

1      MS. BROADDUS:  Object to form.
2      THE WITNESS:  No.
3  BY MR. POPOLIZIO:
4      Q.   Why would you not agree that that's a fair
5  statement?
6      A.   So Sergeant LaBrant was not on the squad
7  initially when I got down there.  He came on a few months
8  afterwards.  We had a different supervisor at the time.
9          When I got down there, Officer Schneider
10 never worked with me, never tried to ride in the same car
11 with me, never tried to teach me anything.  He didn't
12 really want anything to do with me.
13         And then when I started to encounter things
14 in investigations where he was not contributing to the
15 investigation because it wasn't his case, that he didn't
16 really put that much effort forth.  And I've got a problem
17 with that.
18         He -- you know, there's things that I
19 experienced that -- one of those examples I just gave,
20 that he -- he just didn't -- he didn't put forth the
21 effort that others put forth on other people's
22 investigations, if that makes sense.
23     Q.   Okay.  After this incident when you were at the
24 jail did you take photographs of Johnny Wheatcroft?
25     A.   Yes.

86

1      Q.   What was the purpose of taking photographs of
2  Johnny Wheatcroft?
3      A.   To document the Taser marks, the Taser probes,
4  where they were deployed to make sure that it's
5  documented.
6      Q.   And you did that?
7      A.   Yes.
8          MS. BROADDUS:  Object to form.
9  BY MR. POPOLIZIO:
10     Q.   Meaning you took photographs of Johnny
11 Wheatcroft, correct?
12     A.   I took pictures of him, his tattoos, and his --
13 the marks where the Taser was deployed on his back, or
14 wherever they were.  I did not take pictures of
15 his private areas.
16     Q.   Why is that?
17     A.   I couldn't tell you.
18     Q.   When you were with Johnny Wheatcroft and taking
19 pictures of him, did he ask for -- to be given any medical
20 attention?
21         MS. BROADDUS:  Object to form.
22         THE WITNESS:  He had already received
23 medical attention on the scene.
24 BY MR. POPOLIZIO:
25     Q.   But when you were with him, did he request

87

1  medical attention?
2      A.   I don't remember.  I don't remember if he
3  requested it a second time.  The fire department was there
4  because of Officer Lindsey being unconscious.  When
5  they're there, they're going to talk to everybody on the
6  scene so they don't have to come back out.  I.
7          Don't remember if he made that specific
8  request the second time.  If he did, I probably would have
9  called for the fire department to come back and talk to
10 him.
11     Q.   Do debriefings occur after every incident?
12     A.   They do not.  They should.  They do not.
13     Q.   And that's common throughout police work, right,
14 they don't occurred after every incident?
15         MS. BROADDUS:  Object to form.
16         THE WITNESS:  Yes.  A major incident
17 typically there's a debriefing.  Sergeant LaBrant was not
18 big on debriefing, to talk about things that could have
19 potentially gone wrong.
20 BY MR. POPOLIZIO:
21     Q.   And when debriefings do occur, when do they
22 occur?
23     A.   Depending on the scale of the incident.  If it's
24 an officer-involved shooting it may be months later.  If
25 it's just a, you know, we've got a bank robber, we set up

88

1  a perimeter and we're searching for somebody, they will
2  often do a debrief immediately after the fact to talk
3  about certain issues.
4      Q.   I know it's been some time since you've been on
5  patrol, but to make a traffic stop pursuant to Title 28,
6  do you need reasonable suspicion?
7      A.   Yes.
8      Q.   You don't necessarily need probable cause,
9  though, right?
10     A.   Correct.
11     Q.   You also on the night of this incident
12 interviewed Shawn Blackburn, the driver of the Taurus?
13     A.   Yes.
14     Q.   And you interviewed him down at the jail, right?
15     A.   Yes.
16     Q.   There was some discussion with regard to drugs
17 that were found in his vehicle, right?
18     A.   Yes.
19     Q.   And that discussion you had with Mr. Blackburn?
20     A.   Yes.
21     Q.   What type of drugs were found in the vehicle?
22         MS. BROADDUS:  Object to form.
23         THE WITNESS:  Methamphetamine.
24 BY MR. POPOLIZIO:
25     Q.   How do you know that methamphetamine was found in

89

```
1    the vehicle?
2            MS. BROADDUS:  Same objection.
3            THE WITNESS:  I believe I was in -- took
4    custody of it from that -- from that car.
5    BY MR. POPOLIZIO:
6       Q.  Do you remember in what form the methamphetamine
7    was?
8            MS. BROADDUS:  Object to form.
9            THE WITNESS:  It's a crystalline substance.
10   BY MR. POPOLIZIO:
11      Q.  Was it in a box?
12      A.  It was in a baggie.
13          I didn't understand what you were asking.
14      Q.  It wasn't a great question so I understand that.
15          So it was in a bag?
16      A.  Yes.
17      Q.  What type of bag?
18      A.  A ziplock bag.
19      Q.  Was it see-through?
20      A.  Yes.
21      Q.  It's clear so you could see what was in it?
22      A.  Yes, similar to a sandwich baggie.
23      Q.  Did that baggie appear to be soiled, dirty on the
24   outside?
25          MS. BROADDUS:  Object to form.
```

90

```
1            THE WITNESS:  I don't know.  I'd have to
2    look at the photographs of it.
3    BY MR. POPOLIZIO:
4       Q.  Do you know where it was found?
5            MS. BROADDUS:  Same objection.
6    BY MR. POPOLIZIO:
7       Q.  The baggie.
8            MS. BROADDUS:  Form and foundation.
9            THE WITNESS:  Yes.
10   BY MR. POPOLIZIO:
11      Q.  Where was it found?
12           MS. BROADDUS:  Form.
13           THE WITNESS:  It was under or -- on the
14   driver's side under or in between the seats.  I'm not
15   exactly sure.  I think it was under the driver's seat.
16   BY MR. POPOLIZIO:
17      Q.  Do you know how far under the seat it was?
18      A.  I'd have to look at the photographs to refresh my
19   recollection.
20      Q.  Well, I don't have a hard copy, but I have a
21   photograph here on the computer that's been disclosed in
22   this action as CoG_Wheatcroft 000137 [verbatim].  Do you
23   see this photograph I'm showing on the computer screen?
24      A.  Yes, I do.
25      Q.  Do you see anything in there that might be drugs?
```

91

```
1            MS. BROADDUS:  Object to form.
2            THE WITNESS:  Yes.
3    BY MR. POPOLIZIO:
4       Q.  What's that?
5       A.  It's the clear plastic baggie of methamphetamine.
6       Q.  Do you recognize this, as case agent of this
7    investigation, as a photo that was taken as a result of
8    this investigation of the incident, which is the subject
9    of this action?
10           MS. BROADDUS:  Object to form.
11           THE WITNESS:  Yes.
12   BY MR. POPOLIZIO:
13      Q.  And does this photo depict a bag, clear bag with
14   a white substance in it?
15           MS. BROADDUS:  Same objection.
16           THE WITNESS:  Yes.
17   BY MR. POPOLIZIO:
18      Q.  Do you know if this photo was taken -- well, do
19   you know who took this photo?
20      A.  I think I took the photo, but I'm not completely
21   sure.
22      Q.  Do you know if this photo was taken of this white
23   powder substance in the plastic baggie where it was found?
24           MS. BROADDUS:  Object to form; foundation.
25           THE WITNESS:  I don't know.
```

92

```
1    BY MR. POPOLIZIO:
2       Q.  Do you know what seat it was found behind?
3       A.  Yes.
4            MS. BROADDUS:  Object to form.
5    BY MR. POPOLIZIO:
6       Q.  Which seat?
7       A.  The driver's seat.
8       Q.  Of the Taurus?
9       A.  Yes.
10      Q.  At least from this picture as we see it here, is
11   it under the seat or is the behind the seat?
12           MS. BROADDUS:  Same objection.
13           THE WITNESS:  I don't know if the seat was
14   moved forward for the purposes of that photograph or if
15   the seat was left in its original condition.  I don't
16   remember.
17   BY MR. POPOLIZIO:
18      Q.  When you interviewed Anya Chapman, you asked her
19   in what seat she was in the Taurus when the traffic stop
20   occurred; is that right?
21      A.  Yes.
22      Q.  What did she tell you?
23      A.  She was in the backseat.
24      Q.  The backseat behind the driver's side or the --
25      A.  I don't remember.  I think she was behind the
```

113

1      A.  Oh, I don't know if I did ask her that because
2   she wasn't driving.
3      Q.  We'll rely on your interview.
4      A.  Yeah, that's fine.
5          MR. POPOLIZIO:  That's great.  Thank you.
6          MS. BROADDUS:  Nothing further.
7          THE WITNESS:  All right.
8          MR. ROBAINA:  Read and sign.
9          (Deposition Exhibit No. 42 was marked for
10  identification.)
11                  (The deposition concluded at
12                  12:41 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

114

1          I, the undersigned, say that I have read the
2   foregoing transcript of testimony taken January 8, 2020,
3   and I declare, under penalty of perjury, that the
4   foregoing is a true and correct transcript of my testimony
5   contained therein.
6
7          EXECUTED this _____ day of _____, 2020.
8
9
10
11
12          _____
                DETECTIVE ROY JOSEPH LEWIS
13
14
15
16
17
18
19
20
21
22
23
24
25

115

1   STATE OF ARIZONA       )
                           ) ss.
2   COUNTY OF MARICOPA     )
3          BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    questions propounded to the witness and the answers of the
5   witness thereto were taken down by me in shorthand and
    thereafter transcribed through computer-aided
6   transcription under my direction; that the foregoing is a
    true and correct transcript of all proceedings had upon
7   the taking of said proceedings, all done to the best of my
    skill and ability.
8
9          I CERTIFY that I am in no way related to nor
    employed by any of the parties hereto nor am I in any way
10  interested in the outcome hereof.

11          (X) Review and signature was requested.
            ( ) Review and signature was waived.
            ( ) Review and signature was not requested.
12
13          I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA Sections 7-206(F)(3) and
14  7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
    this 27th day of January, 2020.
15
16          _____
17              MONICA S. BERRY, RPR, CR
                Certified Reporter
18              Arizona CR No. 50234

19       *    *    *    *    *    *
20          I CERTIFY that Berry & Associates, LLC has
    complied with the ethical obligations set forth in ACJA
21  Sections 7-206(J)(1)(g)(1) and (6).
22
23          _____
24              BERRY & ASSOCIATES, LLC
                Registered Reporting Firm
                Arizona RRF No. R1033
25

*EXHIBIT 25*



WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

David R Foster
Deputy County Attorney
Bar ID #: 022441
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 372-7350
mcaoptd@mcao.maricopa.gov
MCAO Firm #: 00032000
Attorney for Plaintiff

DR 17107320 - Glendale Police Department
Manistee Justice Court
**VACATE**
0131668931
0131668937

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA, RCC-DOWNTOWN

THE STATE OF ARIZONA,

     Plaintiff,

vs.

ANYA ANN CHAPMAN,
aka Anya Chapman

JOHNNY WHEATCROFT  ✓
aka John Wheatcroft, Teddy Wheatcloft,

     Defendants.

CR2017·134395·001

CR22017·134395·002 ✓

DIRECT COMPLAINT

**COUNT 1:** AGGRAVATED ASSAULT, A
CLASS 2 FELONY Dangerous (Anya Ann
Chapman)
**COUNT 2:** AGGRAVATED ASSAULT, A
CLASS 5 FELONY (Johnny Wheatcroft)
**COUNT 3:** RESISTING ARREST, A
CLASS 6 FELONY (Anya Ann Chapman
and Johnny Wheatcroft)

**IN CUSTODY**

**DCO**

CoG_WHEATCROFT 036828

The complainant herein personally appears and, being duly sworn, complains on information and belief against ANYA ANN CHAPMAN, JOHNNY WHEATCROFT, charging that in Maricopa County, Arizona:

**COUNT 1:**

ANYA ANN CHAPMAN, on or about July 26, 2017, using a bludgeon to wit: plastic bag containing bottles and cans, a deadly weapon or dangerous instrument, intentionally, knowingly, or recklessly did cause a physical injury to Mark Lindsey, a peace officer engaged in official duties, in violation of A.R.S. §§ 13-1203, 13-1204, 13-3105, 13-701, 13-702, and 13-801.

The State further alleges that the offense charged in this count is a dangerous felony because the offense involved the discharge, use, or threatening exhibition of a bludgeon to wit: plastic bag containing bottles and cans, a deadly weapon or dangerous instrument, in violation of A.R.S. §§ 13-105 and 13-704.

**COUNT 2:**

JOHNNY WHEATCROFT, on or about July 26, 2017, knowing, or having reason to know, that Matthew Schneider was a peace officer, or a person summoned and directed by a peace officer engaged in the execution of any official duties or if the assault resulted from the execution of the peace officer's official duties, knowingly did touch Matthew Schneider, a peace officer engaged in official duties, with the intent to injure, insult or provoke him, in violation of A.R.S. §§ 13-1203, 13-1204, 13-701, 13-702, and 13-801.

**COUNT 3:**

ANYA ANN CHAPMAN AND JOHNNY WHEATCROFT, on or about July 26, 2017, intentionally prevented or attempted to prevent Glendale Police Officer(s) Mark Lindsey and/or Matthew Schneider and/or Michael Fernandez, a person(s) reasonably known to him/her to be a peace officer(s), acting under color of his/their official authority, from effecting an arrest by using or threatening to use physical force against the peace officer(s), in violation of A.R.S. §§ 13-2508, 13-301, 13-302, 13-303, 13-304, 13-701, 13-702, and 13-801.

2

CoG_WHEATCROFT 036829

/s/ David R Foster
Deputy County Attorney

**IN CUSTODY**

Agency: Glendale Police Department

Complainant

Subscribed and sworn upon information and belief this ___ day of July, 2017.

DRF/jm

3

CoG_WHEATCROFT 036830

IN THE _____ MANISTEE JP (GLENDALE) _____ COURT

STATE OF ARIZONA, COUNTY OF MARICOPA

PAGE 1 OF 3

****DRAFT****                    RELEASE QUESTIONNAIRE

Notice: Unless a specific Form IV is sealed or ordered redacted by the Court, all Form IVs are public records of the Court or Clerk at the time they are provided to the Court and will be released in their entirety upon request.

DEFENDANT'S NAME JOHNNY WHEATCROFT _____ DOB [REDACTION] BOOKING NO. _____

ALIAS(ES) _____                                    CASE NO. _____

**A. GENERAL INFORMATION**

Charges
1 Cts. 13-1204A8A AGG ASLT-OFFICER F5
1 Cts. 13-2508A RESISTING ARREST F6

Pursuant to A.R.S. §41-1750 ten-print fingerprints were
taken of the arrested person? ☒ Yes ☐ No
      If yes, PCN = _____

Pursuant to A.R.S. §13-610 one or more of the above
charges requires the arresting agency to secure a DNA
sample from the arrested person? ☒ Yes ☐ No

If yes, does the defendant have a valid DNA sample on
file with AZDPS? ☒ Yes ☐ No

      If no, Arresting Agency has taken required
      sample? ☐ Yes ☒ No

Offense Location: 7116 N 59TH AVE
Offense Date: 2017-07-26
Arrest Location: 7116 N 59TH AVE
Date: 2017-07-26 Time: 19:32

**B. PROBABLE CAUSE STATEMENT**
1.  Please summarize and include the facts which establish
    probable cause for the arrest:
ON 7/26/17 AT 1930 HOURS, THE DEFENDANT WAS FOUND TO
BE A PASSENGER IN A VEHICLE STOPPED FOR A VALID
TRAFFIC VIOLATION. THE VEHICLE PULLED INTO THE MOTEL
6 PARKING LOT LOCATED AT 7116 N. 59TH AVENUE IN GL-
ENDALE, ARIZONA AND QUICKLY BACKED INTO A PARKING
SPACE. THE DEFENDANT WAS ASKED FOR HIS IDENTIFICA-
TION AND HE BEGAN ARGUING WITH THE OFFICER THAT HE
DID NOT NEED TO PROVIDE IT. THE OFFICER OBSERVED THE
MALE REACHING INTO A BACKPACK WITH UNKNOWN CONTENTS
AND TOLD THE DEFENDANT TO STOP GOING INTO THE BAG.
THE DEFENDANT THEN TURNED HIS BACK TOWARDS THE OF-
FICER WHERE THE DEFENDANT'S HANDS COULD NOT BE SEEN.
THE OFFICER GRABBED A HOLD OF THE DEFENDANT WHO THEN
BEGAN TRYING TO GET AWAY FROM THE OFFICER IN THE
CAR. THE DEFENDANT KICKED AT MULTIPLE OFFICERS CAUS-
ING THE DEFENDANT TO BE TASED AND DRIVE-STUNNED MUL-
TIPLE TIMES. AT LEAST ONE OFFICER WAS REPEATEDLY
KICKED IN THE LOWER EXTREMITIES. THE DEFENDANT'S
'WIFE' WAS SITTING IN THE BACKSEAT WHERE TWO OF
THEIR SCHOOL-AGED CHILDREN WERE SITTING WITH HER.
WHILE THE OFFICERS WERE STRUGGLING WITH THE DEFEND-
ANT TO GET HIM OUT OF THE CAR AND ONTO THE GROUND,
THE DEFENDANT'S WIFE TOOK A GROCERY BAG WITH MUL-
TIPLE FULL CANS AND BOTTLES OF SODA AND SWUNG IT AT
ONE OF THE OFFICER'S FACES. THIS BAG OF ITEMS HIT
THE OFFICER NEAR HIS LEFT EYE/TEMPLE AREA AND ULTI-
MATELY CAUSED HIM TO FALL BACKWARDS ONTO THE GROUND.
THE OFFICER STRUCK HIS HEAD ON A PARKING CURB CAUS-
ING HIM TO LOSE CONSCIOUSNESS AND ULTIMATELY LED TO
A TRANSPORT TO THE HOSPITAL. THE DEFENDANT WAS ULTI-
MATELY ABLE TO BE RESTRAINED AFTER REPEATED ATTEMPTS
AT RESISTING THE ARREST. ONE OF THE VICTIM OFFICERS
BELIEVED THE DEFENDANT WAS ACTIVELY TRYING TO FIGHT
WITH OFFICERS AND INTENTIONALLY KICKING THEM. POST
MIRANDA, THE DEFENDANT ADMITTED HE HAD FAILED TO
INITIALLY PROVIDE THE OFFICER WITH HIS IDENTIFICA-

**C. OTHER INFORMATION (Check if applicable)**

1.  ☐ Defendant is presently on probation, parole or any
    other form of release involving other charges or convictions:
    Explain:

2.  List any prior:
    Arrests? PODD,TOMOT, BURG, BURG TOOLS, PODP

    Convictions? SAA

    F.T.A.'s? PHOENIX SHOPLIFTING

3.  Is there any indication the defendant is:
    ☒ An Alcoholic?                    ☐ An Addict?
    ☐ Mentally disturbed?              ☒ Physically Ill?
4.  ☐ Defendant is currently employed
    With whom

    How long:
5.  Where does the defendant currently reside? [REDACTION]
    _____ [REDACTION] _____
    With whom GIRLFRIEND
    How long: _____ years ____6____ months _____ days
6.  What facts indicate the defendant will flee if released?
    Explain:

-7.  What facts does the state have to oppose an unsecured
    release? Explain:

**D. CIRCUMSTANCES OF THE OFFENSE (Check if applicable)**

1.  ☐ Firearm or other weapon was used
    Type:

    ☒ Someone was injured by the defendant

    ☒ Medical attention was necessary
    Nature of injuries: OFFICER TRANSPORTED TO THE HOSPITAL

2.  ☐ Someone was threatened by the defendant
    Nature and extent of threats:

3.  Did the offense involve a child victim? ☐ Yes ☒ No
    If yes, was DCS notified? ☐ Yes ☒ No
4.  If property offense, value of property taken or damaged:

DEFENDANT'S NAME JOHNNY WHEATCROFT          DOB 1979-11-13 BOOKING NO.

****DRAFT****                              CASE NO.                         Page 2 of 3

TION. THE DEFENDANT SAID HE WAS NOT TRYING HURT OR
RESIST BEING ARRESTED. HE SAID ANY FLAILING OR KICK-
ING THAT WAS OCCURRING WAS A RESULT OF HIM BEING
TASED MULTIPLE TIMES BY THE POLICE. THE DEFENDANT
INSISTED HE WAS NOT TRYING TO FIGHT WITH THE POLICE.
THE DEFENDANT HAS SEVERAL PRIOR ARRESTS FOR BURG-
LARY, DRUGS, AND THEFT RELATED OFFENSES. HE HAS ALSO
SERVED FIVE AND A HALF YEARS IN THE ARIZONA DEPART-
MENT OF CORRECTIONS.

☐ Property was recovered

5. Name(s) of co-defendant(s): ANYA CHAPMAN;

DEFENDANT'S NAME JOHNNY WHEATCROFT

DOB **REDACTION** BOOKING NO.

****DRAFT****

CASE NO. _____ Page 3 of 3

**E. CRIMES OF VIOLENCE**
1. Relationship of defendant to victim:

☐ Victim(s) and defendant reside together

2. How was the situation brought to the attention of the police?
☒ Victim   ☐ Third Party   ☒ Officer observed

3. ☐ There are previous incidents involving these same parties
Explain:

4. Is defendant currently the subject of:
☐ An order of protection   ☐ Any other court order

☐ Injunction against harassment

Explain:

**F. DOMESTIC VIOLENCE ISSUES (Check if applicable)**
Defendant's actions

☐ Threats of homicide/suicide/bodily harm

☐ Control/ownership/jealousy issues   ☐ Crime occurs in public

☐ Prior history of DV   ☐ Kidnapping

☐ Frequency/intensity of DV increasing   ☐ Depression

☐ Access to or use of weapons   ☐ Stalking behavior

☐ Violence against children/animals

☐ Multiple violations of court orders

**G. CIRCUMSTANCES OF THE ARREST (Check if applicable)**
1. Did the defendant attempt to:

☒ Avoid arrest   ☒ Resist arrest   ☐ Self Surrender ☐

Explain: THE DEF WAS KICKING AT OFFICERS WHEN THEY TRIED
TO GRAB A HOLD OF HIM
DEF RESISTED ARRESTED NUMEROUS TIMES

2. ☐ Defendant was armed when arrested
Type:

3. ☐ Evidence of the offense was found in the defendant's possession
Explain:

4. Was the defendant under the influence of alcohol or drugs at the time of the offense?
☐ Yes   ☐ No   ☒ Unk

**H. DRUG OFFENSES**
1. If the defendant is considered to be a drug dealer, please state the supporting facts:

2. What quantities and types of illegal drugs are directly involved in the offense?

☐ Drug field test completed

☐ Defendant admission of drug type
Approximate monetary value: $
3. Was any money seized?
☐ Yes   ☐ No
Amount:  $

**I. ADDITIONAL INFORMATION**
1. Military Service:

Has the defendant served in the military services of the United States? ☐ Yes   ☒ No   ☐ Unknown

If yes, currently on active duty? ☐ Yes   ☐ No

Branches Served in: _____
(AF - Air Force AR - Army CG - Coast Guard MC - Marine Corp
MM - Merchant Marines NG - National Guard NV - Navy
RS - Reserves)

2. Is the defendant homeless?
☐ Yes   ☒ No   ☐ Unknown

3. Do you need the court to provide an interpreter to help communicate and to understand what is being said?
☐ Yes   ☒ No

If yes, what language:

*Pursuant to AO 2003-046, the oath has been administered pursuant to the law and required procedures.*

determined

Judicial Officer

**If a fugitive arrest, a Form IVA must also be completed**

I certify that the information presented is true to the best of my knowledge.

| R. LEWIS/15542 | AZ0071300/623-930-3000 | 2017-07-26 |
|---|---|---|
| ARRESTING OFFICER/SERIAL NUMBER | ARREST AGENCY/DUTY PHONE NUMBER | DATE |
| 17107320/AZ0071300 | | |
| DEPARTMENTAL REPORT NO. | DEPARTMENTAL REPORT NO. | DEPARTMENTAL REPORT NO. |

CoG_WHEATCROFT 036833

# *EXHIBIT 26*

MICHAEL K. JEANES. CLERK
BY _____ DEP
S. Hambrico
FILED
17 AUG -4 PM 4:29

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

David R Foster
Deputy County Attorney
Bar ID #: 022441
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 372-7350
mcaoptd@mcao.maricopa.gov
MCAO Firm #: 00032000
Attorney for Plaintiff

DR 17107320 - Glendale Police Department
1668931
1668937

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,

Plaintiff,

vs.

ANYA ANN CHAPMAN, (001)
aka Anya Chapman

JOHNNY WHEATCROFT (002) ✓
aka John Wheatcroft, Teddy Wheatcloft,

Defendants.

CR2017-134395-001

CR2017-134395-002 ✓

INDICTMENT
698 GJ 662

**COUNT 1:** AGGRAVATED ASSAULT, A CLASS 2 FELONY DANGEROUS (ANYA ANN CHAPMAN)
**COUNT 2:** AGGRAVATED ASSAULT, A CLASS 5 FELONY (JOHNNY WHEATCROFT)
**COUNT 3:** RESISTING ARREST, A CLASS 6 FELONY (ANYA ANN CHAPMAN AND JOHNNY WHEATCROFT)

CoG_WHEATCROFT 036851

The Grand Jurors of Maricopa County, Arizona, accuse ANYA ANN CHAPMAN, JOHNNY WHEATCROFT, on August 4, 2017, charging that in Maricopa County, Arizona:

**COUNT 1**:

ANYA ANN CHAPMAN, on or about July 26, 2017, using a bludgeon to wit: plastic bag containing bottles and cans, a deadly weapon or dangerous instrument, intentionally, knowingly, or recklessly did cause a physical injury to Mark Lindsey, a peace officer engaged in official duties, in violation of A.R.S. §§ 13-1203, 13-1204, 13-3105, 13-701, 13-702, and 13-801.

The State further alleges that the offense charged in this count is a dangerous felony because the offense involved the discharge, use, or threatening exhibition of a bludgeon to wit: plastic bag containing bottles and cans, a deadly weapon or dangerous instrument, in violation of A.R.S. §§ 13-105 and 13-704.

**COUNT 2**:

JOHNNY WHEATCROFT, on or about July 26, 2017, knowing, or having reason to know, that Matthew Schneider was a peace officer, or a person summoned and directed by a peace officer engaged in the execution of any official duties or if the assault resulted from the execution of the peace officer's official duties, knowingly did touch Matthew Schneider, a peace officer engaged in official duties, with the intent to injure, insult or provoke him, in violation of A.R.S. §§ 13-1203, 13-1204, 13-701, 13-702, and 13-801.

**COUNT 3**:

ANYA ANN CHAPMAN AND JOHNNY WHEATCROFT, on or about July 26, 2017, intentionally prevented or attempted to prevent Glendale Police Officer(s) Mark Lindsey and/or Matthew Schneider and/or Michael Fernandez, a person(s) reasonably known to him/her to be a peace officer(s), acting under color of his/their official authority, from effecting an arrest by using or threatening to use physical force against the peace officer(s), in violation of A.R.S. §§ 13-2508, 13-301, 13-302, 13-303, 13-304, 13-701, 13-702, and 13-801.

CoG_WHEATCROFT 036852

_A true bill_

("A True Bill")

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

David R Foster
Deputy County Attorney

DRF/jm

Date: August 4, 2017

FOREPERSON OF THE GRAND JURY



*EXHIBIT 27*

FILED
10/03/17 9:29 an
MICHAEL K. JEANES, Clerk
By _____
Deputy

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Alan M Cechanowicz
Deputy County Attorney
Bar ID #: 028863
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 506-5851
mcaoctd@mcao.maricopa.gov
MCAO Firm #: 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,

     Plaintiff,

vs.

JOHNNY WHEATCROFT,
aka JOHN WHEATCROFT
aka JOHNY WHEATCROFT
aka TEDDY WHEATCLOFT

     Defendant.

CR2017-134395-002

**ORDER**

Upon Motion by the State of Arizona, it is ordered dismissing CR2017-134395-002 against

JOHNNY WHEATCROFT without prejudice.

Dated October  3 , 2017.

_____
JUDGE OF THE SUPERIOR COURT

# *EXHIBIT 28*

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/06/2017 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2017-134395-001 DT                          10/25/2017

CLERK OF THE COURT
HONORABLE GREG S. COMO                K. Hampton
Deputy

STATE OF ARIZONA                  ALAN CECHANOWICZ

v.

ANYA ANN CHAPMAN (001)            KYLE T GREEN

PLEA AGREEMENT/CHANGE OF PLEA

9:50 a.m.

Courtroom CCB 801

State's Attorney:        Michael Denney for Alan Cechanowicz
Defendant's Attorney:    Kyle Green
Defendant:               Present

Court Reporter, Tara Kramer, is present.

A record of the proceedings is also made digitally.

The Court reviews the Plea Agreement with Defendant. The Court advises Defendant of
the range of possible sentence and the availability of probation, and any special conditions of
sentencing and probation. The Court advises Defendant of all pertinent constitutional rights and
rights of review.

Defendant enters a plea of Guilty to the following:

OFFENSE: Count 1 (As Amended) Aggravated Assault

CoG_WHEATCROFT 036803

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2017-134395-001 DT                                    10/25/2017

       Class 4 Felony
       A.R.S. § 13-1203, 13-1204, 13-301, 13-302, 13-303, 13-304, 13-701, 13-702, 13-610, 13-901.03, and 13-801
       Date of Offense: 07/26/2017
       Non Dangerous - Non Repetitive

       IT IS ORDERED deferring acceptance of the plea until the time of sentencing, to allow for compliance with victim rights.

       IT IS ORDERED setting acceptance of plea and sentencing for **11/27/2017 at 8:30 a.m.** before this division.

       IT IS FURTHER ORDERED setting a Status Conference Re: Release Conditions for **11/01/2017 at 8:30 a.m.** before this division.

       IT IS FURTHER ORDERED that the following will be deemed submitted at the time of sentencing: Motion To Dismiss Count 3 and allegation of dangerousness as reflected in the Plea Agreement.

       IT IS ORDERED the Adult Probation Department shall prepare a Presentence Report, and that Defendant shall report to the Adult Probation Department if not in custody.

       Defense counsel has requested to be present for any interview(s) of the Defendant.

       IT IS ORDERED vacating any pending dates.

       IT IS FURTHER ORDERED affirming prior custody orders.

       9:58 a.m.  Matter concludes.

CoG_WHEATCROFT 036804

# EXHIBIT 29

| Glendale Police Department<br>General Order | | |
|---|---|---|
| Response to Resistance | | 23.000 |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>1 of 36 |

## 23.001 Purpose

A. The policies of the Glendale Police Department regarding the use of physical force, less lethal and lethal weapons and equipment, deadly force, and discharging firearms will be set forth in this order.  Each sworn officer, employee, and police recruit will have access to this order and will be instructed in these applicable policies before employing any of the weapons or tactics set forth herein.  Only department-issued or approved weapons, equipment, and chemical agents will be authorized.

B. These policies are intended to provide guidance to employees in carrying out public safety activities and the mission of the department.  They are definitely not intended to be standards of conduct that, if breached, expose employees to civil liability because to do so would seriously undermine the department's ability and motivation for writing policy and severely restrict employee discretion.

## 23.002 Philosophy

A. Response to Resistance:  It is the philosophy of the Glendale Police Department to use only the amount of force or control reasonably necessary to conduct lawful public safety activities and the mission of the department.  The method of force/control used is predicated on the circumstances of the contact and the amount of resistance presented by the suspect.  Employees will only use the amount of force/control reasonably necessary to overcome this resistance, protect property, and save lives.  Under no circumstances will the force/control used be greater than necessary to achieve lawful objectives.  Deadly force should not be used unless an employee reasonably believes it is necessary to protect the employee or other persons from imminent danger of death or serious physical injury.

B. Use of Physical Control/Force and Less Lethal Weapons:
It is the philosophy of the department to use only the amount of control/force necessary to conduct lawful public safety activities and missions of the department.  The type and method of control/force will be only that which is reasonable and necessary based upon the circumstances.

C. Use of Deadly Physical Force:  It is the philosophy of the department to use deadly physical force only to overcome an attack, which could produce serious physical injury or death to the employee or to another person, where no other means are reasonably available to overcome the attacker.  Any other

CoG_WHEATCROFT 000427

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 2 of 36 |
|---|---|---|---|

use of deadly physical force will be presumed to be a deviation of policy and as such, the employees must substantiate the necessity for the use of the weapon and/or force.

In situations where the employee must overcome an attack that the employee reasonably believes would produce serious physical injury or death to the employee or another person, the employee may resort to any method to overcome the attack. Once the situation has stabilized and the threat of serious physical injury or death is past, the employee must once again immediately resort to approved less-lethal force tactics.

## 23.003 Definitions

A. **Deadly or Lethal Physical Force:** Any control tactic or response to resistance, which by its design or intended use could produce serious physical injury or death to an employee or to another person. Deadly force <u>does not include</u> the discharge of a firearm for training or qualification, hunting or sporting events, test firing in the Crime Lab, dispatching of injured animals, or SWAT tactical extinguishing of lights or any other circumstances or situations as directed by a member of senior staff.

B. **Deadly Force Incident:** All instances in which an officer uses deadly force/control in the line of duty or when acting in a law enforcement capacity.

C. **Deadly Weapon:** Anything designed for lethal use in a lethal manner, including a firearm.

D. **Dangerous Instrument:** means anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury.

E. **Empty Hand Control:** A method of control employed by officers without the aid of equipment or weapons. There are two subcategories called "soft empty hand techniques" and "hard empty hand techniques".

F. **Hard Empty Hand Techniques:** The subcategory in the *"empty hand control"* that includes kicks, punches, or other striking techniques such as a brachial stun, or other strikes to key motor points that have a moderate chance of injury.

CoG_WHEATCROFT 000428

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 3 of 36 |

G. **Soft Empty Hand Techniques:**  The subcategory in the *"empty hand control"* that includes escort control holds, touch pressure points, and take down techniques that have a minimal chance of injury.

H. **Less Lethal Extended Range Launcher:**  Less Lethal launcher that deploys a launched kinetic impact round.

I. **Impact Weapons:**  Authorized department equipment for which the officer has received training in techniques for striking an aggressive violator.  This method of control/force includes tools like the FN 303less lethal extended range launcher, side handle baton, straight baton, and expandable baton.

J. **Intermediate Weapons:**  The method of control employed by officers that include the use of authorized or improvised weapons for which the officer has been trained.  Some of the weapons are OC, TASER, impact weapon strikes, FN 303, less lethal extended range launcher, light and sound diversion device, and canines.

K. **Less Lethal:**  The application of force and/or tactics, that when properly applied, are not likely to result in death or serious physical injury.  Approved less lethal weapons include:   Less lethal extended range launchers, FN303, 37mm munitions, chemical weapons, noise flash diversion devices, and Taser. Only those techniques that are taught by AZPOST, Academy, and department instructors should be used.

L. **Officer Presence:**  The method of control/force which includes the mere presence of an officer in uniform and/or identified by a badge, police identification, police vehicle, or other form of police identification such as a raid jacket.

M. **Oleoresin Capsicum (OC):**  Authorized department organically based pepper spray/foam, less lethal weapon.

N. **Preclusion:**  Elimination of all lesser means of control/force.  The lesser means of control/force have been tried and they have not been effective, or the type of resistance is greater than the method of control/force.

O. **Progression of Force/Control:**  Increasing the amount of control/force used until a level is reached, which enables the employee to control the subject and/or situation in a safe manner.

| Glendale Police Department General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 4 of 36 |

P. **Reasonable Belief:** The conclusion based upon facts and/or totality of the circumstances that a reasonable police officer would believe to be true.

Q. **Serious Physical Injury:** Any physical injury, which causes serious and permanent disfigurement, serious impairment of health, or loss or protracted impairment of the function of any bodily organ or limb.

R. **Response to Resistance Reporting:** The inclusion in a department offense report narrative and check box sections of the specific actions of a violator, which resulted in the method of control/s by the officer. The officer will also accurately document their actions taken to overcome the type of resistance of the violator, to effect the arrest, or to protect life or prevent injury. Lastly, the narrative should include a description of the observable injuries and the injuries claimed by the violator.

S. **Verbal Control/Force:** The method of control/force that includes instruction or direction from an officer in the form of verbal statements or commands.

**23.004 Methods of Response to Resistance (examples)**

A. **Officer Presence:** Presence is established through the identification of authority, which includes, but is not limited to, the mere presence of an officer in uniform, identification by a badge, police ID, police vehicle, and/or raid jacket. The presence of a canine is also an example of officer presence.

B. **Verbal Control - Persuasion, Negotiation, or Command:** Includes instruction or direction from an officer in the form of a verbal statement(s) or command(s). An example of Verbal control is an officer's communication with a subject that results in the officer controlling the actions of the subject.

C. **Chemical Agents:** The use of chemical agents is considered a less lethal tactic. Oleoresin Capsicum (Cayenne Pepper) is a less lethal weapon designed to disrupt the intended thought process, with no lasting after effects. Oleoresin Capsicum is commonly referred to as OC, MACE, and pepper spray/foam.

D. **Soft Empty Hand Techniques:** Includes control/force and restraint defensive less lethal tactics that have a minimal chance of injury. Soft empty hand techniques include, but are not limited to:

1. Wrist Locks

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 5 of 36 |
|---|---|---|---|

    2. Joint Locks
    3. Pressure Points

E. **Conducted Electrical Weapon**:  The use of a TASER is considered a less lethal tactic.  It is designed for pain compliance or confuses the signals going from the brain to the voluntary muscles and thereby achieves incapacitation without harming the human body.

    1. Taser:  Less than lethal defensive tactics may be used in situations that are consistent with departmental training guidelines, to include:

        a. Threaten Use of Taser
        b. Display (laser/arc)
        c. Drive Stun
        d. Three Point Drive Stun
        e. Deployment

F. **Hard Empty Hand**:  Arrest tactics that are considered less lethal tactics, referred to as personal weapons.  Examples of hard empty hand arrest tactics are as follows:

    1. Fist, Palm Heel, Knee, and Elbow Strikes
    2. Shin, Bicycle, Hip Thrust, and Snap Kicks

These techniques have a probability of injury and should be avoided unless all lesser means of force/control and procedures have been attempted, or are not possible or reasonable; to prevent injury to the officer and the subject(s) involved.  Employees should not purposely strike suspects in the <u>face or head</u>, except in situations where the suspect has become assaultive/aggressive toward the officer, due to the high probability of injury.

G. **Intermediate Weapons - Less Lethal Defensive Tactics**:

    1. <u>Police Baton (Straight or Expandable)</u>:  A police baton may be used if empty-hand control techniques have failed, are not possible, or a baton is necessary and reasonable under the circumstances.  Passive resistance or resistance such as a prisoner's refusal to enter a police vehicle or holding room, let go of a railing, etc. is not sufficient in and of itself to justify the use of baton strikes.  A police baton will permit officers to defend themselves or others in situations where the use of deadly force may not be justified or necessary.  When the use of the baton is warranted, officers

CoG_WHEATCROFT 000431

| Glendale Police Department<br>General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued<br>02-02-00 | | Revision Date<br>02-07-17 | Page<br>6 of 36 |

will attempt to impact the suspect per policy.  Employees will not
purposely strike or jab suspects on the head, neck, sternum, spine, groin,
or kidneys unless faced with a deadly force situation.

2.  Flashlights:  Flashlights are not designed as an impact weapon, however, a
flashlight may be used in a baton-like manner if empty-hand control
techniques have failed or are not possible under the circumstances and a
baton is not readily available.  Employees will not purposely strike or jab
suspects on the head, neck, sternum, spine, groin, or kidneys unless faced
with a deadly force situation.

3.  Less Lethal Launched Kinetic Impact Round:  Less-lethal tactic where an
impact projectile similar to a flexable baton or rubber baton, etc. is fired
from a departmental less lethal extended range launcher.  Less lethal can
be fired in situations that are suitable to departmental training guidelines.

4.  FN303:  Less Lethal extended range launcher tactic, or PAVA/OC
delivery mechanism may be deployed in situations that are suitable to
departmental training guidelines.

5.  Canines:  Canines, properly employed, are considered a less-lethal tactic.
Police canines will not be used in any circumstances where a strong
potential exists for discrediting the department.

    a.  Canines may be used to search for or apprehend felony suspects when
    use of other methods is impractical, or when public or officer safety is
    threatened sufficiently to justify this method of force.  Canines may be
    used to search for misdemeanor suspects, however, the animal will
    remain leashed unless officer safety is threatened.

    b.  Whenever time and circumstances permit, a verbal warning will be
    given to a suspect before unleashing the canine to conduct a search.
    An announcement identifying police authority and giving directions to
    the suspect should be made in addition to stating that the canine will
    be released if the suspect fails to comply.

    c.  Detailed procedures for canine use are found in Operations Order
    #51.150.

H.  **Deadly Force**:  In situations where the employee must overcome an attack
that the employee reasonably believes would produce serious physical injury

CoG_WHEATCROFT 000432

| **Glendale Police Department**<br>**General Order** | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>7 of 36 |

or death to the employee or another person, the employee may resort to any method to overcome the attack (see #23.002.C).  Examples:

1. Police Vehicles:  Use of police vehicles against persons could be considered use of deadly force, if the vehicle was used as a method of control/force as outlined in #23.004.H.

2. Discharging of Firearms:  Lethal defensive tactics may be used in situations that are consistent with Departmental training guidelines.

**23.005 Guidelines on use of Response to Resistance and Less-Lethal Weapons**

A. **Oleoresin Capsicum[OC}:**  Oleoresin capsicum (OC) may be used when physical force is necessary and justified to subdue a person who is threatening, resisting, rioting, interfering with an arrest, or to prevent the possibility of injury to any person.  OC may also be used to ward off threatening dogs or other animals and in tactical building entries such as search warrants.

   1. All uniformed officers below the rank of Lieutenant and civilian detention employees will be trained in the use of OC.

   2. Other civilian employees and certified officers above the rank of sergeant may receive training in the use of OC.

   3. Once the employee is departmentally trained and issued OC, it becomes mandatory equipment, unless the employee receives written permission/direction from their Division Commander indicating that the OC may not be worn.  This document will be permanently stored in the employee's personnel file, and forwarded to the Training Unit.

   4. Sworn employees in plainclothes may carry approved OC as readily available as their weapon.

   5. Carrying OC is optional for department employees assigned to undercover operations.

B. **Use of Oleoresin Capsicum Spray/Foam**:  Employees using the issued OC spray/foam will direct a one-second burst into the face of the suspect.  The suspect should then be immediately handcuffed and moved to a well-ventilated area.

CoG_WHEATCROFT 000433

| **Glendale Police Department** **General Order** | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 8 of 36 |

1. Use of Stream:  Minimum application distance is 24 to 36 inches, as the Oleoresin Capsicum may not atomize at shorter distances and the maximum accuracy distance is 12 feet.

2. Use of Foam:  Minimum application distance is 24 to 36 inches, as the Oleoresin Capsicum may not atomize at shorter distances and the maximum accuracy distance is 4-8 feet.

3. Decontamination:  Warm water can be used to flush the eyes without rubbing.  Suspects should recover within 45 minutes; however, intense sensation of skin burning may persist 30 to 90 minutes after exposure to OC.  If water is not readily available, the Fire Department will be summoned to the scene.

4. Salve or ointments should not be used on affected areas.

5. Employees who have used OC will not leave a suspect unattended and will continue to provide post-use care of the suspect until the suspect has recovered from the effects of the OC.

6. Should a suspect exposed to OC complain or display any severe or abnormal reaction to OC at any time, the Fire Department will be immediately summoned to the scene.

7. Employees will avoid laying suspects on their stomach in a prone position for any length of time as this can contribute to positional asphyxiation.

C. **Tactical Size Oleoresin Capsicum Spray**

1. Only officers and supervisors of SIU, SWAT, MFF and Canine Officers, in addition to Patrol Supervisors, will be authorized to carry department-issued tactical size OC spray (example – Mark 9).  Supervisors may give tactical size OC spray to an officer to deploy in a tactical field force situation.

2. Employees using tactical size OC spray will direct a 1-second burst into the face of the suspect from a minimum distance of 15 feet.  The suspect should then be immediately handcuffed and moved to a well-ventilated area.  Decontamination procedures for tactical size OC spray are the same as those used for the issued OC spray/foam.

| **Glendale Police Department** **General Order** | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 9 of 36 |

3. Employees using tactical size OC spray in a riot control situation should direct the spray face level, from a minimum distance of 15 feet, into the crowd until the desired effect is achieved.

D. **Tactical Chemical Agents**

1. Chemical agents (example-CS gas) are man-made chemical or organic mixtures that are designed to cause lachrymation (uncontrollable tearing), irritation, inflammation, or a combination of any of the three. Chemical agents are minute solid particles that are deployed in a variety of munitions, including spray, grenade, 37mm, and other conventional delivery systems. Decontamination procedures for chemical agents are the same as those used for the issued OC spray/foam.

2. Tactical chemical agents by design are considered less-lethal weapons. There is, however, a possibility of serious allergic reaction in some people. Small children or persons with respiratory health problems can develop serious illness after exposure.

3. A CID Sergeant, Patrol Sergeant, SWAT Sergeant, or higher-ranking department supervisor may authorize use of tactical chemical agents.

E. **Conducted Electrical Weapons:** This policy establishes guidelines for the training, use, and documentation of the Taser.

1. The only authorized conducted electrical weapon will be Department issued Tasers. The units will be carried on the duty belt or approved outer vest carrier (molly system only) in a department issued holster. In either case, the device will be located on the support side of the officer. No officer will be permitted to carry the device on duty without successful completion of a training program.

2. On successful completion of the Taser End User Course, the Taser will be issued equipment and mandatory to carry unless assigned in a non-uniform capacity.

3. Definitions:

   a. "Deployment" – Defined as the actual firing of probes from the Taser at an intended target at a range likely to cause N.M.I. [Neuromuscular Incapacitation].

| Glendale Police Department<br>General Order | |
|---|---|
| Response to Resistance | 23.000 |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>10 of 36 |

    b.  "Use" – Defined as utilizing a conducted electrical weapon in a drive-stun capacity to gain compliance by placing the Taser either indirect physical contact or 2 to 3 inches from the intended target with or without probe deployment.   The Three Point Drive Stun, is defined as deploying probes directly into the intended target from 2 to 3 inches, followed up with a drive-stun to create N.M.I.

    c.  "Threatened Use" – Defined as the display of a Taser's electrical arc or of the red targeting laser dot in an effort to gain compliance. Threatened use may also include a verbal warning.

4.  Tasers should be used only against subjects who are exhibiting active aggression (physical intimidation) or who are actively resisting (defensive resistance, active aggression, aggravated active aggression, or attempt to injure self) in a manner that, in the officer's judgement, is likely to result in injuries to themselves or others.   Caution should be used on prolonged exposure with the Taser.

5.  When deciding whether or not to deploy the Taser, officers shall consider the risk of secondary injury caused by the sudden incapacitation of the subject.  If the risk of serious physical injury is greater than the need to incapacitate, the officer will not use the Taser.  Fleeing should not be the sole justification for Taser deployment.

6.  The Taser will only be used against a "vulnerable person" when the need for immediate restraint is evident.  For the purpose of this policy, a "vulnerable person" is defined as elderly persons, pregnant females, small children, and any other person with a suspected or known medical condition that increases the risk of secondary injury due to falling during incapacitation.

7.  The Taser should not be deployed under any of the following circumstances:

    a.  Near FLAMMABLE GASSES or LIQUIDS.

    b.  DRUG HOUSES where ether is suspected to be in use.

    c.  Against a DEADLY WEAPON unless lethal coverage is presented by another officer or during a rapidly escalated situation where

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 11 of 36 |

insufficient time exists to utilize other force options and the Taser is readily available.

   d.   In cases of PASSIVE RESISTANCE unless:

- The use is reasonable and necessary under the circumstances.
- A lesser means of control/force has been attempted and failed.

   e.   The risk of secondary injury is greater than the need to make an immediate arrest.  For example, the subject is in an elevated position that could lead to a significant fall, or in a location that could lead to the suspect becoming submerged under water, or the subject is operating a motor vehicle.

   f.   To threaten or attempt to GAIN INFORMATION from a suspect.

   g.   Against a restrained subject (handcuffed, TARPed, or otherwise restricted) unless physical resistance has to be overcome and the need to overcome the physical resistance by use of the device is reasonable and necessary.  This is due to the higher likelihood of secondary injury presented by the restraint.

   h.   To wake up a suspected intoxicated individual.

   i.   As a "PROD"

8.  No officer shall playfully, maliciously, recklessly, or intentionally misuse the Taser in a display of power or against an individual as a punitive measure.  Violation of this policy will result in disciplinary action.

9.  The actual deployment and/or use of the Taser will normally require an arrest and a supervisor being made aware of the deployment as soon as practical.

10.  The Taser should only be used in accordance to training guidelines and should not be aimed at the head and neck area of a suspect.  The primary target for the Taser probe deployment will be the frontal lower center mass of an individual.  The back of an individual is still the preferred target area.  **Chest shots should be avoided when possible**.  Secondary targets will include other major muscle groups on the legs and arms.

CoG_WHEATCROFT 000437

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 12 of 36 |

11.  Post treatment and medical requirements for the Taser:

    a.  If the probes have penetrated the skin, officers will remove the probes following training techniques and guidelines.

- If the probe(s) penetrated a sensitive/soft tissue area such as the face, neck, head, or female/male genitalia, medical personnel will remove the probes (paramedic, nurse, EMT, or a physician).

- Once the probes are removed, pictures will be taken of the affected area as well as any secondary injuries from the Taser application.

- The probes, wires and cartridge will be logged into property as BIO-HAZARD evidence on all deployments.  The cartridge, probes and wire will be logged in a paper bag in as close to post-deployment condition as possible for measurement of spooled and unspooled wire (Officers should not wrap wire around cartridge).

- Document treatment in departmental report.

    b.  Medical requirements:

- Whenever the Taser is deployed or used on a person, that person's medical condition will be monitored to ensure the person recovers from the deployment or use.  If the person has not completely recovered within minutes of the Taser being deactivated, emergency medical personnel will be called to the scene to evaluate the subject.

- If the Taser is deployed or used on a "vulnerable person" as defined by this policy, emergency medical personnel will be called to the scene to evaluate the condition of the "vulnerable person."

- All Taser deployments 15 seconds or longer will require an immediate medical evaluation.

      i.  Repeated and multiple applications.

      ii.  Cycling time that exceeds 15 seconds in duration, whether the time is consecutive or cumulative.

| Glendale Police Department<br>General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>13 of 36 |

      iii.     Simultaneous applications by more than one Taser.

12. Reporting requirements

    a.    Anytime the Taser is deployed, used, or threatened (with the exception of the use of the red targeting laser dot) an offense report will be completed listing the person who was subjected to the device as the suspect.

    b.    The officer who actually deploys, uses, or threatens to use the Taser will document the use of force on either an offense report or a supplemental report utilizing the provided use of force checkboxes and detailing the use of force in a narrative.

    c.    After the deployment or use of the Taser, the officer will have the deployment or use information downloaded from the Taser. This download must be completed before the end of the officer's work-week. A copy of this downloaded information will be submitted to the Records Unit as a support document to the original offense report.

F. **TARP (Total Appendage Restraint Procedure)**

1. The restraint will be a Department issued restraint and will be used in accordance with current training practices. No officer will be permitted to carry the device on duty without successful completion of a training program.

2. If the TARP restraint is used:

    a.    <u>NEVER</u> place the suspect in a "hog-tied" position, where the feet are cinched tightly to the suspect's hands.

    b.    Once the TARP restraint has been utilized, the individual will be placed in an upright, sitting position if possible. Officers are reminded of the dangers of positional asphyxia. Any exceptions to this would be transportation by a medical unit only.

    c.    A supervisor will be notified when a TARP restraint has been used, as will any transporting units, or detention personnel, if the suspect is booked into jail.

| Glendale Police Department<br>General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>14 of 36 |

d.  The incident will be documented appropriately in the narrative section of the DR, referring to the restraint as a <u>TARP (Total Appendage Restraint Procedure)</u>.  The reference to "hobble" and "hog-tying" are in-correct terms and should not be utilized to describe the TARP restraint.

G.  **Prisoner Restraints**

  1.  Use of Restraints:

    a.  To prevent injury or destruction of property by a combative or belligerent prisoner, a department issued leg restraint may be used.

    b.  Hog-tying, a procedure where the restraint has been wrapped around a prisoners feet, and then cinched tightly to the prisoners hands, behind their back, should not be used.

    c.  A medical unit may be summoned to transport those prisoners who are a risk factor because of their medical condition, or who cannot be restrained in a safe and practical manner, in accordance with current training practices.

H.  **Spit Sock Hood (SSH)** - This policy provides the guidelines for the proper use of the Spit Sock Hood and the circumstances in which its application is authorized.

  1.  Policy

    a.  In response to police and detention officers being potentially exposed to bodily fluids from being spat upon, the Department authorizes the use of the Spit Sock Hood (SSH).  The SSH is designed to be placed over the head of an in-custody suspect who is spitting or threatening to spit at officers or other police personnel.  The SSH deters them from spitting but is thin enough to allow the suspect to breath freely and communicate. It may also prevent the transmission of blood borne diseases, such as HIV, Hepatitis B or C, in the event blood was present in their saliva/spit.

  2.  Guidelines for use of the Spit Sock Hood (SSH)

| Glendale Police Department General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 15 of 36 |

a.  It will only be used for a suspect that is in custody and actively spitting, has spat on an officer or other person, or threatens to spit on an officer or another person.

b.  When the SSH is being put on or taken off, caution should be taken to stay out of the breathing zone and officers are to wear personal protective equipment, including nitrile gloves and eye protection.

c.  The SSH is to be taken off as soon as it safe to do so.

d.  The SSH is not to be used on any person that is unconscious, vomiting, profusely bleeding from the nose or mouth, or is in respiratory distress. In these circumstances, officers should protect their mucous membranes (eyes and mouth) by wearing eye wear or a full face shield.

e.  Special precautions, including calling for emergency medical support, should be taken in situations where the suspect is exhibiting behavioral and psychological problems potentially associated with recent drug/alcohol use or due to a mental health issue.

f.  Anyone wearing a SSH will be continuously monitored and will not be left attended.

g.  Use of the SSH is not considered a use of force, however, your supervisor is to be notified and use of the SSH shall be documented into the arrest report; include details such as if the suspect spat on the officer or if they were about to spit on the officer.

h.  For patrol personnel, the SSH is to be kept in the police vehicle and will not be issued to the individual officer. There will be a supply of the SSH's at the detention facility.

i.  After a SSH is used it is to be placed in a biohazard bag and disposed of per departmental policy.

I.  **Police Baton General Information**

1.  Police batons should only be used when elevated methods of control are necessary and justified under the circumstances, and lesser means of control have been precluded.  Any use of the baton not specifically

| Glendale Police Department General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 16 of 36 |
| --- | --- | --- | --- |

allowed or permitted will have to be justified by the officer based on the circumstances that exist.

2. Employees may carry batons at their discretion. Employees who elect to carry batons must satisfactorily complete a basic baton course, (straight, side-handle, or expandable) taught by a department impact weapons instructor, or have been previously certified while in the academy. Employees not previously certified in basic baton may receive training on duty. If they are unable to complete the training during their assigned shift, an authorized off-duty-training program may be utilized.

3. The certification for Side-Handle, Straight, and Expandable Batons will be an AZ POST/GPD approved course of instruction, and re-certification will be by a qualified instructor every two years thereafter. The re-certification will consist of a written test (80% passing score) and a proficiency test at an acceptable level.

J. **Straight Baton:** Officers may carry straight batons at their discretion. When the straight baton is carried the baton and the method of carry will comply with department uniform policies and the documentation of certification will comply with GPD Directives.

K. **Expandable Baton:** Officers may carry the expandable baton at their own discretion. When the expandable baton is carried the baton and method of carry will comply with department uniform policy and the documentation of certification will comply with GPD Directives.

L. **Side-Handle Baton:** Officers may carry the side-handle baton at their own discretion. When the side-handle baton is carried the baton and the method of carry will comply with department uniform policies and the documentation of certification will comply with GPD Directives.

M. **Use of Police Impact Weapon:** When the police impact weapon is used, it will be used in accordance to the training the officer received in the Police Academy and/or Continued Officer Training provided by/or authorized by the Glendale Police Department. When used properly, it is an effective defensive tool for police use when dealing with unarmed assailants and has proven to be an effective tool in self-defense where the use of a firearm may not be justified or expedient.

| Glendale Police Department<br>General Order | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued<br>02-02-00 | | Revision Date<br>02-07-17 | Page<br>17 of 36 |
|---|---|---|---|

1. <u>The Primary Striking Points</u> are nerve groupings located in the large muscle groups:

   - RADIAL NERVE          (Outside forearm)
   - MEDIAN NERVE          (Inside forearm)
   - COMMON PERONEAL      (Outside thigh)
   - FEMORAL NERVE        (Inside thigh above knee)
   - TIBIAL NERVE          (Top of calf)

2. <u>The Secondary Anatomical Striking Points</u> are generally a less-lethal technique, but may be subject to "serious injury"; Consequently, caution should be used in applying force:

   - SHIN
   - INSTEP
   - KNEE JOINT
   - ACHILLES TENDON
   - ELBOW
   - INSIDE OF WRIST
   - BACK OF HAND
   - LOWER ABDOMEN

3. <u>Serious Injury Anatomical Striking Points</u> are areas that have a higher potential for serious injury and/or death **(Caution and justification must be used when striking these areas). As a general rule, unless lethal force is necessary, avoid striking the head and neck areas:**

   - TEMPLE
   - THROAT
   - HOLLOW BEHIND EAR
   - BACK OF NECK
   - COLLARBONE
   - SOLAR PLEXUS
   - BRIDGE OF NOSE
   - UPPER LIP
   - EYES
   - EARS
   - JAW
   - KIDNEY
   - TAIL BONE (COCCYX)

CoG_WHEATCROFT 000443

| Glendale Police Department |||
| General Order |||
| Response to Resistance || 23.000 |
| Date Issued | Revision Date | Page |
| 02-02-00 | 02-07-17 | 18 of 36 |

- GROIN (TESTES)
- SPINE

M. **Flashlights:**  Flashlights are not designed as an impact weapon, however, a flashlight may be used in a baton-like manner if empty-hand control techniques have failed or are not possible under the circumstances, and <u>a baton is not readily available</u>.  If a flashlight is used as an impact weapon, its use is governed under this policy, and the tactics will follow the training received for a police baton.

N. **FN 303 Less Lethal Launcher**

1. The FN 303 Less Lethal Launcher will only be carried and operated by certified operators.  The operator must attend an FN 303 Operators Course that is authorized by the Training Unit. Only certified and current Instructors on the FN 303 will instruct the course.  Officers attending the FN 303 Operators Course must pass a written test (90%) and the qualification course (90%).

2. FN 303 operators must re-qualify (90%) every year with their issued launcher.

3. FN 303 operators must complete yearly skills training.

4. No employee will be exposed to the FN 303 launcher for the purpose of practical demonstration.

5. Always treat the FN 303 as if it is loaded and operational.

6. Point the muzzle in a safe direction at all times.

7. Keep your trigger finger straight along the frame until your sights are on the target and you have decided to deploy.

8. Never deploy the FN 303 at any person without a lawful objective/purpose.

9. <u>Deployment of the FN 303</u> - When deploying the FN 303, shot placement is crucial to prevention of serious injury, therefore:

| Glendale Police Department<br>General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>19 of 36 |

a.  Depending upon the distance between the operator and subject, FN 303 projectiles must be targeted at a person's torso or extremities. NEVER TARGET THE HEAD OR NECK.

b.  Although classified as less-lethal, the potential exists for less-lethal projectiles to inflict injury when they strike the face, eyes, neck, spine, and groin.  Therefore, officers deploying the FN 303 will avoid intentionally striking those areas.

c.  An operator should maintain a reactionary zone of 3-6 feet between the operator and the subject.  If deploying the FN 303 in close combat situations (3-12 feet) between the operator and the subject, the recommended primary target area is the subject's thighs (NOT CENTER MASS).

d.  Subject Factors:  children, elderly persons, malnourished and / or persons with specific medical conditions, and developing fetuses may be more prone to bone fracture and injury of soft tissues of the thorax and abdomen from blunt force trauma.

e.  Operators should deploy two rounds and then re-evaluate the threat. Then if needed, deploy additional rounds.  Most individuals tend to bend over and turn after being struck with a projectile.  Be prepared to aim lower on follow-up rounds in order to avoid the head and neck.

f.  When deploying the FN 303, give loud verbal commands and allow a few seconds for the projectiles to take effect before the team moves in to make an apprehension.

9.  Special precautions should be taken in situations where the suspect is exhibiting behavioral and psychological problems potentially associated with recent drug/alcohol use or due to a mental health issue.

10.  Whenever the FN 303 is used against a subject, a supervisor will be notified. Subjects that have been struck with an FN 303 projectile will be examined for any injuries sustained and rendered first aid.  Request paramedics to respond if needed. Supervisors will ensure that all reports are completed prior to the officer's end of shift and should notify the Shift Commander of the deployment.

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 20 of 36 |
|---|---|---|---|

### 23.006 Reporting/Documenting Response to Resistance Incidents Within DI and/or Departmental Report (offense report):

A. Response to resistance investigations will be broken down into the following categories:

**Category 1** - PSU will conduct the investigation:

- Use of deadly force

- In custody deaths

- Any strike to the head with an impact weapon

- Use of force which results in the person who the force was used against being admitted to the hospital.

- Other incidents at the discretion of the chief of police, particularly those which have a potential for significant liability.

**Category 2** - PSU must be contacted to determine who will complete the administrative investigation:

- Response to resistance which results in serious injuries, including but not limited to broken bones, dislocated joints, or lacerations which require stitches.

- Force used by an organized squad in a crowd control or riotous situation

- Any allegations of inappropriate or excessive use of force

**Category 3** - Must be documented on a use of force form by a supervisor who did not witness of take part in the use of force:

- Hard empty hand strikes and/or kicks
- All Taser deployments
- All FN 303 deployments
- All baton strikes
- All cap-stun usage
- When a firearm is displayed to gain compliance

CoG_WHEATCROFT 000446

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 21 of 36 |
|---|---|---|---|

- SWAT/MFF less lethal impact/gas deployments

1. Any employee who uses force outlined above, or who becomes aware of an excessive force allegation, will ensure that a Patrol Sergeant is immediately notified.

2. A Patrol Sergeant will respond to the scene to determine what type of investigation needs to take place.  It is the responsibility of the responding sergeant to initiate the appropriate inquiry at that time.  Referring the matter to another supervisor or delaying the start of the investigation is not acceptable.

3. The Shift Commander will be notified of all excessive force allegations or response to resistance investigations that are initiated during the shift.  The Shift Commander is responsible for notifying the following staff members of the allegation via email before the end of their shift.

   a. Assistant Chief of Police who oversees the involved division(s).

   b. Commander who oversees the involved unit(s).

   c. Professional Standards Unit (category 3 investigations only, as category 1 and 2 investigations requires they be notified immediately).

B. Any time there is an injury or an alleged injury as a result of a method of force/control used by department personnel, employees will do the following:

1. Examine any person claiming injury and render first aid

2. Request paramedics to respond to the scene if needed

3. Notify a supervisor

4. Special precautions should be taken in situations where the suspect is exhibiting behavioral and psychological problems potentially associated with recent drug/alcohol use or due to a mental health issue.

C. Departmental Report (Offense Report):  Employees will document all methods of force/control deployed and the types of suspect resistance in the following manner within the Offense Report.

| Glendale Police Department<br>General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>22 of 36 |

1. Employees will include in a departmental offense report all methods of control used, as well as when, how, and why methods of control were escalated or de-escalated. This includes the check box and narrative sections of the offense report.

2. Employees will include in a departmental offense report all types of resistance used by a suspect. This includes the check box and narrative sections of the offense report.

3. Documentation of the totality of the circumstances faced by the employee is extremely important at the time the original report is completed. Facts such as lighting conditions, call information, officer perception of the facts, and overall suspect actions should be included in the departmental report.

4. In those incidents where a criminal investigator responds to the incident and conducts an interview with the affected employee, the criminal investigator's report will take the place of the affected employee's documentation.

D. Employees will contact a supervisor when any of the following occurs as it relates to methods of control:

1. When injury or alleged injury to a suspect occurs
2. Allegation of excessive force/control
3. Citizen complaint

- <u>Responsibilities of the involved employee</u>: Determine seriousness or potential seriousness of the injury and immediately notify the radio dispatcher of the need for emergency medical aid and a supervisor. If uninjured and not in need of medical aid, the employee will remain at the scene until advised otherwise by supervisory personnel.

E. A Supervisor will be contacted as soon as possible after the use of any of the following:

1. Less lethal extended range launcher or FN 303 deployment Incidents:

   a. The Shift Commander will be immediately notified of all incidents involving the deployment of the FN 303 (see G.O.#23.005).

CoG_WHEATCROFT 000448

| Glendale Police Department<br>General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |

| Date Issued<br>02-02-00 | | Revision Date<br>02-07-17 | Page<br>23 of 36 |
| --- | --- | --- | --- |

    b.  Documentation is completed per 23.006.A.

2.  Use of <u>chemical agents</u>:

    a.  Employee/supervisor ensures suspect has been decontaminated.
    b.  Documentation is completed per 23.006.A.

3.  Use of a <u>TARP</u> restraint:

    a.  To prevent injury, leg restraints or department issued TARP restraint may be used in conjunction with the handcuffs, in order to minimize the movements of belligerent or combative prisoners.

    b.  A supervisor will be contacted to evaluate the suspect's potential for SCDS (sudden in custody death syndrome).

        •  A supervisor will respond to the scene or to the booking area (whatever is the most practical) to conduct the evaluation.

    c.  Documentation is completed per 23.006.A.

4.  <u>Canines</u>:

    a.  Exceptions:  Any Glendale Police Canine injury will be investigated by a Canine Unit Supervisor.  The supervisor will submit additional documentation utilizing the standard Bite Report format.

    b.  In addition, the Canine Unit Supervisor will complete the Response to Resistance/ Prisoner Injury Report.

5.  <u>Taser</u>:

    a.  Any usage, except for the threatened use of a Taser.
    b.  Documentation is completed per 23.006.A.

6.  <u>Deadly Force</u>:

    a.  All incidents will be investigated by the Professional Standards Unit, involved employee's supervisor, and in some cases, the Investigations Division.

CoG_WHEATCROFT 000449

| Glendale Police Department General Order | |
| --- | --- |
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 24 of 36 |

23.007 Types of Resistance and Methods of Control: (Table Displaying)

| Types of Resistance | Methods of Control | |
| --- | --- | --- |
| **Passive:** (Suspect fails to obey any command or direction of the officer, displays no acts of assault, threat, verbal non-compliance and never resists control attempt of the officer) | Verbal commands Soft Empty Hands Display Taser | Threaten OC Threaten Taser |
| **Verbal Non-Compliance:** (Acts where suspect voices their unwillingness to obey officer's commands or the conveying of verbal threats) | Verbal Commands Soft Empty Hands Display Taser OC | Threaten OC Threaten Impact Weapon Threaten Taser Threaten FN 303 Threaten use of K-9 |
| **Psychological Intimidation:** (Physical acts or non-verbal cues indicating the suspect's attitude or readiness to resist. Officer may perceive actions as threatening in nature) | Verbal Commands Soft Empty Hands Taser OC Spray FN 303 Extended Range Less Lethal Impact | Threaten OC Threaten Impact Weapon Threaten Taser Threaten  FN 303 Threaten use of K-9 |
| **Physical (Defensive resistance):** (Physical acts of fleeing or escaping suspect attempts to resist arrest without assaulting officer) | Verbal Commands Soft Empty Hands OC Taser FN 303 Extended Range Less Lethal Impact Hard Empty Hands  (Avoid | Threaten OC Threaten Impact Weapon Threaten Taser Threaten FN 303 Threaten use of K-9 |

CoG_WHEATCROFT 000450

| Glendale Police Department  General Order | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued  02-02-00 | Revision Date  02-07-17 | Page  25 of 36 |

| | | |
|---|---|---|
| | head/neck)  Use of K-9  (felony) | |
| **Active Aggression:**  (Physical acts of assault on an officer) | Verbal Commands  Soft Empty Hands  OC  Hard Empty Hands  Impact Weapons  Taser  FN 303  Use of K-9  Extended Range Less Lethal Impact | Threaten OC  Threaten Impact Weapon  Threaten Taser  Threaten FN 303  Threaten use of K-9  Threaten Deadly Force |
| **Aggravated Active Aggression:**  (Attempts to severely injure or kill officer) | Verbal Commands  Soft Empty Hands  OC Spray  Hard Empty Hands  Impact Weapons  Taser  FN 303  Use of K-9  Deadly Force | Threaten OC  Threaten Impact Weapon  Threaten Taser  Threaten FN 303  Threaten use of K-9  Threaten Deadly Force |
| **Attempt to Injure Self:**  (Subject who poses a threat only to themselves and no other person) | Verbal Commands  Soft Empty Hands  OC Spray  Hard Empty Hands  Impact Weapons | Threaten OC  Threaten Impact Weapon  Threaten Taser  Threaten FN 303  Threaten use of K-9 |

CoG_WHEATCROFT 000451

| Glendale Police Department General Order | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 26 of 36 |

| | Taser FN 303 Use of K-9 | |
|---|---|---|
| | | |

### 23.008 General Information / Shooting Incidents

    A.  A shooting incident shall be defined as the <u>discharge of any firearm by a department employee</u>.

    B.  Exceptions include (not requiring a Shooting Review Board):

        1.  Off duty recreational purposes

        2.  Training

        3.  Dispatching of injured animals

        4.  Extinguishing of lights to obtain a tactical advantage at the direction of a supervisor

        5.  Any reason deemed sufficient by a member of senior staff

    C.  <u>NOTE</u>:  Although the shooting out of lights will not be considered a shooting incident, the on call duty officer should be notified prior to this being done, if possible, or immediately afterwards.

    D.  Non-injury accidental discharges not involving a police action and shootings involving animals, will not normally be investigated by Professional Standards, but will be investigated by the employee's supervisor.  If an accidental discharge occurs while the employee is performing a police function and a citizen or suspect is in close proximity, the Investigations Division and Professional Standards Unit will conduct investigations.

    E.  The deployment of a Shotgun Launched Kinetic Impact Round or FN 303 rounds will not normally be investigated as a shooting, but instead will be considered a "use of force" incident.

CoG_WHEATCROFT 000452

| **Glendale Police Department**<br>**General Order** | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued<br>02-02-00 | | Revision Date<br>02-07-17 | Page<br>27 of 36 |
|---|---|---|---|

### 23.009 Immediate Investigation of Officer Involved Shooting

A.  Responsibility of the involved employee(s):

   1.  Determine the extent of injuries, if any, and render appropriate first aid.

   2.  Immediately notify the radio dispatcher of the shooting, advising of any injuries and the need for emergency medical attention.

   3.  The involved employee should protect and secure the weapon used for examination and submit the weapon only to the appropriate investigator.

   4.  The involved employee will not discuss the situation with anyone except supervisory and/or investigative personnel. Officers may consult legal advisers of their choice to provide guidance to them.

   5.  Involved Officers will be provided the opportunity to contact their family members as soon as possible.

   6.  Involved Officers may choose a peer or union representative to be assigned to the officer immediately following the incident to provide support.  Involved officers should not discuss the events of the situation with their peer or union representative as these conversations are not confidential and are subject to disclosure.

B.  Responsibility of the first responding Patrol Supervisor

   1.  Immediately obtain an overview of what occurred from the involved officer(s)

      a.  Identify involved Shooter and Witness Officers.

      b.  Locate and secure scene and potential evidence.

      c.  Ensure the safety of the public.

      d.  Gather information and make first responding officers available for briefing of investigations personnel upon their arrival.

   2.  Sergeants shall send an officer to the hospital with any persons who are injured as a result of the incident.

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 28 of 36 |

3. If deemed necessary, the Sergeant or Shift Lieutenant may elect to have the involved officer(s) removed from the scene by another supervisor and taken to the nearest police facility prior to the arrival of investigators. If this is not practical, they should be taken to another appropriately private and safe remote location.

4. After initial contact Involved Officers should be separated and advised not to discuss the incident until contacted by an investigator. Another supervisor should be assigned to stand-by with the officers until contacted by investigations personnel.

C. Responsibilities of Shift Lieutenant:

1. Respond immediately to the scene, assume command, and gather preliminary information.

2. Notify on call Duty Commander of the incident and the preliminary information.

3. Notify the on call Investigations supervisor.

4. Notify the Professional Standards Unit.

5. Notify the Department Legal Advisor. Response of the Legal Advisor to the scene will depend upon the particular circumstances, but is mandatory if injuries are involved.

D. Responsibility of Duty Commander

1. The Duty Commander will notify the Chief, the Assistant Chiefs, the affected Division Commander, the on-call GPOC representative, the on-call Critical Incident Stress Management (CISM) team member, and the PIO.

2. The Duty Commander will then respond to the scene for the purpose of providing pertinent information to the involved officer. This information should include, but is not limited to, an explanation of how the investigation(s) should proceed and the services available through Victim Assistance.

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 29 of 36 |

3. The Duty Commander will oversee the entire investigation and will be responsible for the dissemination of all reports, i.e. Glendale Police Significant Incident Report. This will ensure that the distribution of information is accurate and complete before informing the agency as a whole.

## 23.010 Criminal Investigation of Officer Involved Shooting

A. For those incidents that occur within the city of Glendale, the Death Investigations/Violent Crimes Squad shall conduct the criminal investigation of officers involved in any discharge of their firearms and/or if a person dies while in the custody or control of an employee or officer and the use of force by the employee may be a proximate cause of the death. The focus of the investigation is to determine any criminal conduct of all involved persons and submitting the facts through the appropriate legal process for review and potential charges.

B. For incidents that occur outside of the city of Glendale, the Law Enforcement Agency who has jurisdiction will conduct the criminal investigation.

C. The on-call Investigation Supervisor, upon notification of the shooting incident, will notify an appropriate number of investigators and have them respond to the scene.

D. The Homicide/Death Investigations Squad Supervisor, or in their absence the on-call Investigation Supervisor, will respond to the scene and assume command of the scene.

E. All officer involved shootings will be investigated in accordance with the procedures set forth in the directives concerning the responsibilities of Investigations regarding Death Investigations. It should be noted that if another agency investigates one of our officers their policies and procedures will be followed concerning the investigation.

F. Responding investigators will conduct an on scene briefing with first responding supervisors and officers to determine the scope and direction of the investigation.

1. Identify involved shooting officers and witnesses.

2. Locate and identify scene and potential evidence.

| Glendale Police Department General Order | |
|---|---|
| Response to Resistance | 23.000 |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 30 of 36 |
|---|---|---|---|

G. Assigned investigators will contact and advise involved officers of the course and protocol of the investigation prior to the officer being released from duty.

   1. Investigators will direct photos of all involved officer(s).

   2. Investigators will conduct a weapons check and a count of all ammunition of all weapons available to the involved officer(s).

H. As soon as it is appropriate a walk-through of the scene to conduct an overview interview will be conducted with the involved officers. A second interview may be conducted away from the scene at a later date.

I. Investigators should make every effort to expedite the completion of the criminal investigation and keep the involved officers informed of the outcome as soon as possible.

J. All reports, photos and any other documents relating to an officer involved shooting incident will be retained indefinitely, regardless of the disposition of the criminal investigation. Physical evidence can only be disposed of after written notification is received from the City Attorney and/or all State of Arizona Statute requirements have been satisfied.

## 23.011 Administrative Investigation of Officer Involved Shooting

A. An Administrative Investigation is conducted to determine if the conduct of the involved employee is consistent with departmental policy and procedures, and this investigation will be subordinate to any criminal investigation.

B. The Assistant Chief will designate the Primary Administrative Investigator.

C. The Administrative Investigation will be conducted in accordance with the procedures set forth in the directives concerning Police Internal Investigations/Class "A" (Alleged Criminal Activity).

## 23.012 Post Lethal Force Trauma and Employee Welfare

A. Philosophy
   1. The Glendale Police Department recognizes that the most stressful event to be endured in a police career is involvement in a police shooting or other use of lethal force.

CoG_WHEATCROFT 000456

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |

| Date Issued 02-02-00 | | Revision Date 02-07-17 | Page 31 of 36 |
|---|---|---|---|

2. The purpose of this policy is to provide guidance for supporting the employees who were directly involved in a lethal force incident, in order to ensure their well being, as much as possible. These procedures will be referred to as the "administrative post-lethal force process" and are intended to compliment the guidelines contained in the *Employee Line-Of-Duty Checklists,* should the incident command system associated with these checklists be activated.

B. Applicability

   1. The contents of this order apply, but are not necessarily limited to the following situations:

     a. A Police Officer or armed Detention Officer discharged his or her weapon at another person.

     b. A Police Officer or Detention Officer employs lethal force by other means.

     c. A Police Officer or Detention Officer has clearly been subjected to an attack perpetrated by a person or persons with the intent to kill.

   2. The provisions of this order also apply to other police employees who are witness to the use of lethal force and/or those who provide first aid to an injured police employee. This includes Communications personnel (normally the channel one dispatcher) who are involved in a lethal force incident by virtue of direct radio contact with involved officers, or personnel who were providing close support to that dispatcher during the time the incident was transpiring.

C. Immediate Concerns

   1. The Critical Incident Stress Management (CISM) Coordinator, or designee, shall be contacted by the Scene Commander and will respond to the location as dictated by the unique dynamics of the incident, such as where the involved employees have been assembled.

   2. Involved employees will be briefed on the administrative post lethal force process as described below, provided with written information containing pertinent information (to which they may want to refer at a later time), and

| Glendale Police Department General Order | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 32 of 36 |

assisted in arranging their transportation home at the completion of their duties, if such assistance is desired.

D.   Administrative Post-Lethal Force Process

   1.   There are three phases in the administrative post-lethal force process:

      a.   <u>Decompression</u> - As soon as possible, involved employees will be afforded time away from work in order to process emotions to which they have may have been exposed, and to reassure family members and friends who might have been affected by the incident.

      b.   <u>Check up</u> - Prior to returning to duty, employees placed on administrative duty, or otherwise directed by their chain-of-command, must attend a mandatory visit with a licensed psychologist, contracted by the Department.

      c.   <u>Return to Duty</u> - The supervisor(s) of affected employees (as outlined in paragraph 5b) should be briefed on how to recognize PTSD symptoms by the Employee Assistance and Support Coordinator or Police Psychologist.  Supervisors are to report to the Police Psychologist subsequent behaviors, which may indicate ongoing emotional distress.

   2.   <u>Decompression:  Administrative Leave</u>

      a.   Any employee involved in a lethal force incident, as described above in paragraph B.1, will be placed on administrative leave following the completion of all necessary interviews.

      b.   Employees placed on administrative leave will continue to receive their pay and benefits, as if they were at work.

      c.   The period of administrative leave will initially be a minimum of 3 duty days, to commence at the start of the involved employee's next duty day.

      d.   Employees placed on administrative leave as a result of their involvement in an incident covered by this order may request an extension of administrative leave, which may be approved by their Division Commander, or designee, who will then;

CoG_WHEATCROFT 000458

| Glendale Police Department General Order | |
|---|---|
| Response to Resistance | 23.000 |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 33 of 36 |

- Notify the involved employee's supervisor(s)
- Notify the Patrol Scheduler (if applicable)
- Notify their respective Assistant Chief

e.  Employees placed on administrative leave under this order are not required to stay at home.  They will be asked provide their preferred contact information so that they may be contacted in order to facilitate both the investigative and administrative processes that follow lethal force incidents.

3.  Check Up:  A Mandatory Appointment

a.  While on administrative leave, and normally as soon after the incident as reasonably possible, the CISM Coordinator, or designee, will advise all involved employees on how to make an appointment with the licensed psychologist contracted by the Department.  Each employee will be provided with the psychologist name; address; phone number; and website to assist with scheduling their visit. It is the employee's responsibility to make this appointment.   The criteria for psychologists selected for this role shall include:

- Law enforcement experience and/or exposure that has been significant enough to create an advanced awareness of the nature and special requirements of the police profession - its dangers, activities, requirements for service, and even its jargon.

- Specialization in stress related illnesses, including but not necessarily limited to, Post Traumatic Stress Disorder.

b.  Wherever possible, the appointment will be scheduled at a time most convenient for the employee, but subject to the availability of services.

- It is the employee's responsibility to schedule the appointment with the psychologist within 24 hours of being placed on Admin Leave.

- Failure to schedule an appointment in a timely manner may impact the Division Commander's decision to extend the Admin Leave and may require the employee to use personal leave time until the appointment has been scheduled and attended.

| Glendale Police Department General Order | |
|---|---|
| Response to Resistance | 23.000 |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 34 of 36 |

- An employee will not be returned to regular duty unless they have kept the mandatory appointment. If an employee refuses to attend they may be reassigned to other duties, at the Department's discretion, pending further review.

c. The purpose of this appointment shall be strictly for the employee's wellness.

d. Involved employees may elect to continue visits with the designated psychologist. The first six of these additional appointments shall be provided at no cost to the employee. Members of the employee's immediate family may also use these benefits; however, the total number of paid visits per family, including the involved employee, shall not exceed six.

e. The psychologist will email the Assistant Chiefs and the Manager over Personnel Management to confirm the employee's attendance at the mandatory appointment. The appropriate Assistant Chief will notify the employee's Commander upon receipt of the email. Personnel Management will maintain a copy of the email.

f. The content of an employee's conversations with the psychologist will be kept confidential, in accordance with ARS 36-517.02.

- The only exception to confidentiality is when a client discloses information that indicates a clear and imminent danger to self or others.

- In any case when a client's condition indicates a clear and imminent danger to self or others, potential victims and appropriate authorities must be informed.

- Should an involved employee disclose information as outlined above, the Division Commander shall be notified and take all reasonable and immediately necessary steps in order to inform any affected party of possible danger, inform the chain-of-command, and determine any further actions to protect all parties.

4. <u>Extended Administrative Leave</u> - Administrative leave may be extended by the Division Commander for a time not to exceed 4 additional duty days when;

| Glendale Police Department General Order | |
|---|---|
| **Response to Resistance** | **23.000** |
| Date Issued 02-02-00 | Revision Date 02-07-17 | Page 35 of 36 |

- An appointment with the psychologist cannot be obtained prior to the employee's scheduled return to duty.

- The employee requests additional time for reasons of mental health or preparedness for duty.

a. If after a reasonable interval of administrative leave, an employee is not ready to return to full duty, the possibility of modified duty in an appropriate capacity may be explored.

b. Employees desiring additional time off past the maximum allowed Admin Leave time will have the option of using personally accrued leave time (vacation, compensatory time, sick).

c. Prior to exercising any of the options outlined above, the employee will be required to speak with their Division Commander about their plan for getting themselves to a point where they are ready to return to their regular duty assignment. The plan should include;

- A second mandatory meeting with the psychologist

- An estimated timeline describing the process for getting back to a regular duty assignment

- Detailed information on what will be done in the event the initial plan cannot be achieved

5. Return to Duty

a. Preparation – When applicable, the Rangemaster will contact the officer on Admin Leave and work with them to schedule them for re-qualification.  The employee must re-qualify prior to going back to their regular duty assignment.

b. The CISM Coordinator, or designee, will contact the supervisors of involved employees and provide information about recognizing symptoms of Post-Traumatic Stress Disorder (PTSD) and other possible stress reactions that include the following:

- Supervisors should be attentive to any increase in an involved employee's use of sick, vacation, or compensatory time.

| Glendale Police Department<br>General Order | | |
|---|---|---|
| **Response to Resistance** | | **23.000** |
| Date Issued<br>02-02-00 | Revision Date<br>02-07-17 | Page<br>36 of 36 |

- Supervisors should also be on alert for an employee's involvement in disciplinary issues which would have been considered a deviation from their behavior prior to the incident.  Incidents should be documented and monitored through the AIMS system.

- Should trend in leave usage or discipline patterns be noted, supervisors should attempt to ascertain the reason for the change. If an involved employee is having difficulty as the result of the incident in which they were involved, an offer of help should be extended and the CISM Coordinator or contracted psychologist should be contacted for advice pertaining to resources available.

CoG_WHEATCROFT 000462

# *EXHIBIT 30*

**1**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya           )
Chapman, as husband and wife, and    )
on behalf of minors J.W. and B.W.,   )
                                     ) Case
        Plaintiffs,                  ) No.:
                                     ) 2:18-cv-02347-SMB
vs.                                  )
                                     )
City of Glendale, a municipal        )
entity; Matt Schneider, in his       )
official and individual              )
capacities; Mark Lindsey, in his     )
official and individual              )
capacities; and Michael Fernandez,   )
in his official and individual       )
capacities,                          )
                                     )
        Defendants.                  )
                                     )


DEPOSITION OF RICHARD BRANDON ST. JOHN

Chandler, Arizona
October 3, 2019
9:10 a.m.


REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:

(COPY)

**2**

I N D E X
WITNESS                              PAGE
RICHARD BRANDON ST. JOHN

EXAMINATION BY MS. BROADDUS              4
EXAMINATION BY MR. POPOLIZIO          196
FURTHER EXAMINATION BY MS. BROADDUS   205

E X H I B I T S

Deposition
Exhibits   Description                Marked

21   Annual review for Officer Matt       55
     Schneider, Bates Nos.
     CoG_WHEATCROFT 000782-796
     (15 pages)
22   Goal Setting & Review Worksheet,    156
     Bates Nos. CoG_WHEATCROFT
     001780-1792 (13 pages)
23   Letter dated July 25th, 2018 to     166
     various addresses from Ms. Jody
     Broaddus, Bates Nos.
     WHEATCROF000001-3
     (3 pages)
24   Glendale P.D. Response to           168
     Resistance Report, Bates Nos.
     CoG_WHEATCROFT 001236-1287
     (52 pages)
25   Chief's directive, Bates No.        210
     CoG_WHEATCROFT004080  (1 page)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
        PAGE              LINE
        178               21

**3**

1          DEPOSITION OF RICHARD BRANDON ST. JOHN was
2   taken on October 3, 2019, commencing at 9:10 a.m. at the
3   law offices of MARC J. VICTOR, P.C., ATTORNEYS FOR
4   FREEDOM, 3185 South Price Road, Chandler, Arizona, before
5   MONICA S. BERRY, RPR, a Certified Reporter in the State of
6   Arizona.
7
8   COUNSEL APPEARING:
9       MARC J. VICTOR, P.C.
        ATTORNEYS FOR FREEDOM
10      By:  MS. JODY L. BROADDUS
        3185 South Price Road
11      Chandler, Arizona  85248
        On behalf of Plaintiffs
12
13      JONES, SKELTON & HOCHULI, PLC
        By:  MR. JOSEPH J. POPOLIZIO
14      40 North Central Avenue
        Suite 2700
15      Phoenix, Arizona  85004
        On behalf of Defendants
16
17
18  ALSO PRESENT:
19      Ms. Kathy Thomas and Ms. Dianne Shoemake, City of
        Glendale
20      Mr. Ian Beck, clerk to Mr. Popolizio
        Ms. Alexz Thompson, paralegal to Ms. Broaddus
21
22
23
24
25

**4**

1          RICHARD BRANDON ST. JOHN,
2   a witness herein, having been first duly sworn by the
3   Certified Reporter to speak the truth and nothing but the
4   truth, was examined and testified as follows:
5
6                  EXAMINATION
7   BY MS. BROADDUS:
8       Q.  Please state your full name.
9       A.  Richard Brandon St. John.
10      Q.  And you go by Rick; is that correct?
11      A.  That is correct.
12      Q.  Is it okay if I call you Rick today?
13      A.  Yes, please.
14      Q.  Have you ever had your deposition taken before?
15      A.  I had a deposition for a tow contract that the
16  City of Glendale awarded.  It was contested.  It was a
17  very brief deposition, certainly nothing like this
18  incident.
19      Q.  I'll just go through a few ground rules.  It's
20  really important that only one person speaks at a time so
21  the court reporter can take down everything that's being
22  said and not have people talking over each other.  Okay?
23      A.  Yes.
24      Q.  For that reason I'll ask that you wait until I
25  finish asking my question before you start answering, and

17

1  supervised you during your career?
2    **A.  Yes.**
3    Q.  Who would that have been?
4    **A.  You would like the full list?**
5    Q.  Are there quite a few?
6    **A.  Yes.**
7    Q.  Okay.  Do you know why people that were your
8  supervisor were not looked at for the chief position or
9  whether they were?
10    **A.  At the time that I was --**
11    MR. POPOLIZIO:  Foundation.
12    Go ahead.
13    THE WITNESS:  Sorry.
14    At the time that I was selected as the
15  interim chief, I had been the assistant chief for
16  approximately four and a half years.  The other assistant
17  chief position had been held by other gentlemen who
18  retired in those positions.
19    Chris Briggs was the other assistant chief
20  at the time that I was made the interim chief, and he had
21  only been in position for a little over a year, if I
22  recall.  And very typically in an organization, the most
23  senior assistant chief is afforded the opportunity to take
24  on the interim chief role until the City can make a
25  decision on how they're going to fill the chief's

18

1  position.
2  BY MS. BROADDUS:
3    Q.  Did you have any discussions with the City as to
4  how they were going to fill the chief position?
5    **A.  I -- the city manager and I did talk, yes.**
6    Q.  I want to go to the time period -- the incident
7  involving the Wheatcrofts took place in July of 2017.  Is
8  that your understanding as well?
9    **A.  Yes.**
10    Q.  And when I talk about the Wheatcroft incident,
11  there was an incident at a Motel 6 involving the
12  Wheatcroft -- part of the Wheatcroft family and some
13  officers with the City of Glendale.  So I want to make
14  sure, if I say the Wheatcroft incident, you understand
15  that's what I'm talking about.  Fair?
16    **A.  Yes.**
17    Q.  At the time when the Wheatcroft incident occurred
18  in July of 2017, did you have anyone that supervised you?
19    **A.  The city manager.**
20    Q.  When you were police chief in July of 2017, what
21  were your general duties?
22    **A.  I'm trying to figure out how I want to articulate**
23  **this.**
24    **My general responsibilities, as I took them,**
25  **the assistant chiefs ran the day-to-day operations of the**

19

1  police department.  My responsibility was to look at how
2  we were structured and how we were accomplishing our
3  mission and what our long-term strategies were to help
4  keep our community safe, essentially.  And then I was
5  working with other city departments to accomplish that
6  mission as well.
7    Q.  As police chief, you were responsible for the
8  police department.  Is that a fair statement?
9    **A.  Yes.**
10    Q.  Were you responsible for making sure the officers
11  were trained and supervised?
12    **A.  Yes.**
13    Q.  Were you responsible for the hiring or
14  termination of officers?
15    **A.  Yes.**
16    Q.  If an officer was going to be terminated, is that
17  something that would always go through you?
18    **A.  Yes.**
19    Q.  And I'd like to understand a little bit about
20  that.  If there was an officer who was considered possibly
21  going to be terminated, who would bring that to your
22  attention?
23    **A.  I thought Joe was going to say something.  I**
24  **apologize.**
25    MR. POPOLIZIO:  I was just looking at the

20

1  cat.
2    THE WITNESS:  Typically it was brought to my
3  attention by one of the assistant chiefs, one or both of
4  the assistant chiefs.
5  BY MS. BROADDUS:
6    Q.  And what would you do when they would come to
7  you?  Was it something that was written?  Was it something
8  that was a discussion that you had?
9    **A.  So if I may, I'll explain the process for our**
10  **internal investigations that lead to discipline.  When**
11  **something happens that requires an internal investigation**
12  **there are several ways that investigation can be started.**
13  **It can be from an outside complaint, an internal**
14  **complaint, or it can be brought to the attention of the**
15  **police department in some other way, an anonymous**
16  **complaint, if you will.**
17    **There are processes that we go through to**
18  **ensure that we're in compliance with the officer bill of**
19  **rights, which means the officer who is the subject of the**
20  **complaint is notified of the complaint, notified of the**
21  **allegation, and then the complaint is assigned to an**
22  **investigator.  Depending on whether there's a criminal**
23  **element attached to the complaint, it may be first**
24  **assigned to the investigations division where a sergeant**
25  **in investigations conducts a criminal investigation.  That**

33

1  the graveyard sergeant, that sergeant had a relationship
2  with the employee whose son was being accused of the
3  crime, so she felt that it was best if she not take part
4  in assisting either the City of Gilbert or City of
5  Chandler with their investigation.  She gave to it to me
6  as the lieutenant and I handled the incident.
7      Q.  Do you recall any other times that you were
8  disciplined by the City of Glendale?
9      A.  None that I'm aware of or can recall.
10     Q.  Did you personally do any investigation into the
11 Wheatcroft matter?
12     A.  No.
13     Q.  Did you personally do any investigation into
14 Schneider's actions other than what you've already told me
15 regarding the incident?
16     A.  May I ask a clarifying question?
17     Q.  Sure.
18     A.  By "investigation," would that include reviewing
19 the criminal, reviewing the internal, and then asking
20 questions about what was written?
21     Q.  You know, let me go back, because I think that's
22 actually a good point.
23         At some point did the investigation
24 involving Officer Schneider related to the incident, did
25 that get up through the chain of command to you?

34

1      A.  After Officer Schneider had his appeal meeting
2  with me, yes.
3      Q.  Do you recall when the appeal meeting was that he
4  had?
5      A.  I do not.  I do not recall the date.
6      Q.  Do you recall what aspect that Officer Schneider
7  was appealing?
8      A.  He was appealing the three-day suspension, asking
9  for a lower suspension.
10     Q.  Did you agree to that?
11     A.  No.
12     Q.  As a police chief, did you keep yourself apprised
13 of what the Arizona laws and federal laws were that would
14 impact your officers' duties?
15     A.  Yes.
16         MR. POPOLIZIO:  Form.
17         THE WITNESS:  I'm sorry.
18 BY MS. BROADDUS:
19     Q.  And how did you do that?
20     A.  In the police department we have a legal advisor
21 who's part of the group of legal advisors that meet in the
22 Valley that my legal advisor brings to my attention case
23 law and/or new laws that come about that impact the way we
24 do our business in the police department.  And we discuss
25 how we get that information into the patrol divisions,

35

1  into various areas of our department and so everyone is
2  informed.
3          I also receive, at different meetings and
4  conferences, updates from other attorneys on case law
5  that's occurring in the district courts, for example, and
6  has potential impact on how we do business in the City of
7  Glendale.
8      Q.  Do you recall ever going to any of these
9  conferences or getting any information as to Arizona law
10 with regard to blinker or turn signal violations?
11         MR. POPOLIZIO:  Form.
12         THE WITNESS:  No.
13 BY MS. BROADDUS:
14     Q.  Given your extensive police enforcement career
15 and your understanding of the Wheatcroft incident, do you
16 think you have a good understanding of what crimes are
17 felonies versus misdemeanors?
18         MR. POPOLIZIO:  Form.
19         THE WITNESS:  I understand the Arizona
20 Revised Statutes and how they classify misdemeanors and
21 felonies.
22 BY MS. BROADDUS:
23     Q.  And based on everything you've seen and reviewed,
24 as you sit here today, do you believe that
25 Officer Schneider committed a felony with regard to the

36

1  incident involving the Wheatcrofts?
2          MR. POPOLIZIO:  Form; foundation.
3          THE WITNESS:  Are you asking for my opinion?
4  BY MS. BROADDUS:
5      Q.  Yes, I'm asking for your opinion.
6          If you, as a police officer with your
7  extensive history and as police chief, if you feel that
8  Officer Schneider committed a felony in connection with
9  the incident?
10         MR. POPOLIZIO:  Form; foundation.
11         THE WITNESS:  No.
12 BY MS. BROADDUS:
13     Q.  Who's in charge of setting up the City of
14 Glendale's policies and procedures for police officers?
15     A.  Ultimately the police chief has final say on any
16 policy changes or procedural changes that are documented
17 in our policy and procedures manual.
18     Q.  During the time that you were either the interim
19 police chief or police chief, did you make any changes to
20 the policies and procedures for police officers?
21         MR. POPOLIZIO:  Form.
22         THE WITNESS:  Yes.
23 BY MS. BROADDUS:
24     Q.  Did you make any changes for any policies or
25 procedures on the laws of arrest?

**37**

1          MR. POPOLIZIO:  Form.
2          THE WITNESS:  No, not that I recall.
3   BY MS. BROADDUS:
4       Q.  Did you make any changes to any of the policies
5   and procedures relating to use of force?
6          MR. POPOLIZIO:  Form.
7          THE WITNESS:  If I can explain, both for
8   laws of arrest and for response to resistance, is what we
9   call our use of force policy, we have an accredited
10  agency.  And as part of our accreditation we have to do
11  reviews of our response to resistance and full series of
12  policies that exist.  There were likely revisions made to
13  the response to resistance policy, laws of arrest policy
14  by way of updating those policies so they better reflect
15  the current build of our organization.
16         I mentioned in a previous answer that the
17  Neighborhood Response Squad was at one time referred to as
18  the Neighborhood Response Unit.  That requires policy
19  change.  And those minor revisions were most likely done
20  in my three-year time as the police chief to both the laws
21  of arrest policy and the response to resistance policy.
22  BY MS. BROADDUS:
23      Q.  The police officers, do they have discretion
24  whether to follow the policies and procedures for the
25  Glendale police?

**38**

1          MR. POPOLIZIO:  Form.
2          THE WITNESS:  Discretion is given to
3   officers in the performance of their duties.  If an
4   officer feels that they need to violate policy in order to
5   accomplish the greater good on any particular call for
6   service, they are given the latitude to have that
7   discussion with their supervisors and make the best
8   decision for whatever incident they're dealing with and
9   the specific circumstances of that incident.  So the
10  policy manual does say at the very beginning that policy
11  is a guideline.
12  BY MS. BROADDUS:
13      Q.  What are chief directives?
14      A.  Chief's directives are intended to bridge the gap
15  between when you find out that there's a deficiency in
16  either a process, a procedure or a policy that needs to be
17  bridged, there's a gap that needs to be bridged, but we
18  don't want to wait until the policy goes through its
19  complete rewrite and review process.
20         So a chief's directive is intended to bridge
21  that gap until the policy can be rewritten to reflect the
22  change.
23      Q.  Other than the chief's directives to bridge the
24  gap, are there other methods that you would have used as a
25  police chief to try to bridge that gap between those

**39**

1   policies other than the chief's directives?
2       A.  We can also use training.
3       Q.  Who prepares the chief's directives?
4       A.  I have an officer that works in accreditation.
5   He will typically create the first draft of a chief's
6   directive.  And then I review -- or the chief of police
7   reviews the draft, makes any word adjustments or changes
8   that they feel necessary, and then it's finalized.
9       Q.  Does the assistant chief ever prepare a chief's
10  directive or assistant chief's directives?
11      A.  There are no assistant chief's directives.  But
12  the accreditation officer reports to an assistant chief.
13  And so I'm sure there is some conversation between that
14  officer and the assistant chief when a chief's directive
15  is being drafted.  And having sat in that assistant chief
16  role, I can tell you that that is common.
17      Q.  Other than training and the chief's directives,
18  are there any other written documents or memos or
19  anything else that are provided to police officers as to
20  policies and procedures?
21         MR. POPOLIZIO:  Form.
22         THE WITNESS:  So our legal advisor at times
23  will also put training together.  I would say that it
24  falls in the realm of training.  And so maybe I'm
25  overstating this, but the legal advisor will put

**40**

1   information together in an e-mail and send that out to the
2   entire department.
3   BY MS. BROADDUS:
4       Q.  And that's something that's a common business
5   practice within the police department, is to have the
6   legal advisor provide information to the officers to help
7   them with their duties; is that fair?
8       A.  Yes.
9       Q.  How are the chief's directives distributed to all
10  the officers?
11      A.  They are sent out, I believe, from the chief's
12  e-mail by one of the admin support staff as a new chief's
13  directive.  And there they are briefed on in the various
14  divisions, units and squads.
15      Q.  During the time that you were either interim
16  police chief or the actual police chief, did you prepare
17  chief's directives?
18      A.  Yes.
19      Q.  And approximately during the time period that you
20  were police chief or interim police chief, how many would
21  you say you did?
22      A.  Perhaps three, four, maybe five.
23      Q.  Did you ever do any chief's directives as to
24  Taser use?
25      A.  Not that I recall.

53

1  Officer Fernandez?
2      **A.  No.**
3      Q.  Did you ever work in the same unit or division
4  with Officer Lindsey?
5      **A.  No.**
6      Q.  Did you ever work in the same division or unit
7  with Officer Schneider?
8      **A.  I did.**
9      Q.  And when was that?
10     **A.  2003, I believe.  2003, 2004 I was a patrol**
11 **sergeant out of the Gateway patrol division working swing**
12 **shift, and Officer Schneider was on a sister squad.  So**
13 **Officer Schneider didn't report directly to me.  He**
14 **reported to another sergeant.**
15     **But then -- I just remembered -- the next**
16 **bid year -- so every July officers bid for position,**
17 **sergeants bid for position in the patrol division.  I took**
18 **a position out of the Foothills patrol division working**
19 **swing shift with a partial weekend off -- which was**
20 **nice -- and Officer Schneider bid to my squad, and he**
21 **remained on my squad for a very short period of time,**
22 **maybe a couple of months, and then Officer Schneider moved**
23 **to a different position down south, I believe, out of the**
24 **Gateway patrol division.**
25     Q.  Do you ever recall Officer Schneider ever coming

54

1  to you directly with any issues that he had had or was
2  having?
3          MR. POPOLIZIO:  Form.
4          THE WITNESS:  Not that I recall.
5  BY MS. BROADDUS:
6      Q.  How would you describe your relationship with
7  Officer Schneider?
8      **A.  I would say that we were friendly.  We had a good**
9  **working relationship.**
10     Q.  Did you ever do anything with Officer Schneider
11 outside of employment with the City of Glendale?
12     **A.  Yes.**
13     Q.  What types of things did you do?
14     **A.  Very early in his career he got married, and I**
15 **was invited to his wedding, and I attended with my wife.**
16     Q.  Is that the only time?
17     **A.  That I can recall, yes, unless you would count --**
18 **I don't know if Matt played in that.  We had a kickball**
19 **tournament when I was an assistant chief.  So each**
20 **division put a team together, and we went out to the local**
21 **high school and had a round-robin kickball tournament.  I**
22 **suppose that might be considered outside of work.  And if**
23 **Matt was there, I was also there.**
24     **Oh, and we played basketball after work.**
25 **During those -- that 2003 to 2004 time period, we -- the**

55

1  **local high school gave us keys to the indoor gym, and the**
2  **swing shift, there were several on the swing shift that**
3  **played basketball after work on -- I think it was Thursday**
4  **nights.  It might have been Friday nights.**
5          **Is this a good point to take a break?**
6          MS. BROADDUS:  This is actually a really
7  good point to take a break.
8          THE WITNESS:  Okay.  Thank you.
9          (The deposition was at recess from 10:19 to
10 10:30 a.m.)
11         (Deposition Exhibit No. 21 was marked for
12 identification.)
13 BY MS. BROADDUS:
14     Q.  Earlier we were talking about the Neighborhood
15 Response Unit.  Who was in charge of that department?
16     **A.  The Neighborhood Response Unit, so when I worked**
17 **on the squad?  Is that what you're asking?**
18     Q.  Let me go during the time that you were police
19 chief, who was -- I guess it's the Neighborhood
20 Response --
21     **A.  Squad.**
22     Q.  -- Squad now.  Okay.
23     **A.  Yes.**
24     Q.  So during the time that you were the police chief
25 who was responsible for the Neighborhood Response Squad?

56

1      **A.  Sergeant Brian Shoop, S-H-O-O-P.  And then**
2  **Sergeant Don LaBrant, L-A-B-R-A-N-T.**
3      Q.  Were they working together or were they at
4  different times?
5      **A.  They were at different times.  Sergeant Shoop was**
6  **first and then Sergeant LaBrant.**
7      Q.  And do you know why it switched from Sergeant
8  Shoop to LaBrant?
9      **A.  Sergeant Shoop promoted.  He is now Lieutenant**
10 **Shoop.**
11     Q.  As the lead for the Neighborhood Response Squad,
12 what would the sergeant's duties be?
13     **A.  The sergeant's duties would be to direct the**
14 **day-to-day activities of the squad to oversee the**
15 **functions of the squad to include reviewing reports that**
16 **were generated by the squad and conducting any necessary**
17 **training, scheduling that training, and making sure that**
18 **the squad was equipped to do their job.**
19     Q.  Did they go out on calls?
20     **A.  Yes.**
21     Q.  Was that routine or was that only in special
22 circumstances?
23     **A.  It is a matter of routine that sergeants in the**
24 **patrol division, and the Neighborhood Response Squad is in**
25 **the patrol division, work in the field with the officers**

57

1  they supervise.
2    Q.  Earlier we also talked about certain disarray
3  that was within the Neighborhood Response Squad, and that
4  was during the time -- was it both during Shoop's time or
5  LaBrant's or just one of them?
6        MR. POPOLIZIO:  Form.
7  BY MS. BROADDUS:
8    Q.  If you know.
9    A.  I believe it was during both time periods.
10   Q.  And with the issues that were raised about the
11 disarray within the squad, is that something that you
12 would expect the sergeants to bring to your attention?
13       MR. POPOLIZIO:  Form.
14       THE WITNESS:  No.
15 BY MS. BROADDUS:
16   Q.  Who would they bring -- if anything, what would
17 their role be to try and resolve that issue?
18       MR. POPOLIZIO:  Form.
19       THE WITNESS:  The sergeant is the first
20 stop, I would say, for complaints amongst officers on the
21 same squad.  My hope is that a sergeant should be able to
22 deal with those issues, particularly when they deal with
23 personality conflicts or conflicts over how to perform the
24 job duties.  But if the sergeant can't handle it on his or
25 her own, then they would bring their lieutenant into the

58

1  discussion.
2  BY MS. BROADDUS:
3    Q.  So it was up to the sergeant whether or not it
4  would need to go to a higher level.  Is that a fair
5  statement?
6        MR. POPOLIZIO:  Form.
7        THE WITNESS:  I would say so, yes.
8  BY MS. BROADDUS:
9    Q.  I'm going to hand you a document that's been
10 marked as Exhibit 21.  And I'll have you go ahead and just
11 look through it briefly.
12   A.  Would you like me to review the entirety or just
13 my portion?
14   Q.  Just to thumb through it.  I'll ask you some
15 questions about it --
16   A.  Sure.
17   Q.  -- and I'll get to your point specifically.  Is
18 that fair?
19   A.  Yes.
20   Q.  Do you recognize this document?
21   A.  I do.
22   Q.  What is your understanding of what it is?
23   A.  I believe this is the annual review for Officer
24 Matt Schneider from the date of July 1st, 2004, through
25 June 30th, 2005.  Although the document says 4, it would

59

1  be for that fiscal year.
2    Q.  And are these performance reviews or annual
3  reviews, those are all done for all officers; is that
4  correct?
5    A.  Yes.
6    Q.  And you're listed as a supervisor on the first
7  page.  Do you see that?
8    A.  Yes.
9    Q.  Does that mean that you were a supervisor for
10 Matt Schneider during part of this time?
11   A.  Yes.
12   Q.  What is the purpose of doing the annual reviews?
13   A.  As a City, all employees get an annual review.
14 And the purpose would be to provide feedback on their
15 performance over the past year to help guide and instruct
16 them in any future goals they may have, career goals, or
17 to make any corrections on how they're performing their
18 jobs and make them aware of those needed corrections.
19   Q.  With the annual reviews, once these documents are
20 completed, do they go to the police chief or do they go to
21 a different department?
22   A.  So if I may ask, are you asking about today or
23 2004, 2005?
24   Q.  I'll ask you about both.  Has the policy changed
25 during that time?

60

1    A.  I'm not aware of a policy that directs where
2  final review of these documents, annual documents go.
3  This document that I'm looking at from 2004 to 2005 has
4  the lieutenant's signature, but it does not have a
5  signature spot for anyone above lieutenant.  So back in
6  2004, 2005 I don't know if these documents made it all the
7  way up to the police chief.
8        Today's standard is that an assistant chief
9  signs off on all performance evaluations.
10   Q.  Do you know when that started with the assistant
11 chief was signing off?
12   A.  I do not recall.
13   Q.  During the time that you were police chief, that
14 was the policy; is that correct?
15   A.  Correct.
16   Q.  Were they ever brought to your attention as
17 police chief?
18       MR. POPOLIZIO:  Form.
19       THE WITNESS:  Were they ever?  Yes.  I
20 believe there was a circumstance or two over my tenure as
21 the police chief where someone was going to receive a
22 rating that we believed would necessitate them being moved
23 out of a specialized unit for performance.  And because
24 the labor association can sometimes disagree with those
25 kinds of moves, I am often made aware that the labor

153

1 tenure is we've had both extremes.
2     Q.   And my understanding in reading some of the --
3 I've read a lot of the annual reviews for officers,
4 including the officers in this situation, and from what
5 I'm gathering, the people who did the reports on Schneider
6 felt he was well liked in the department.  Is that your
7 understanding?
8     A.   Having not read the same annual evaluations that
9 you're speaking of, I know that there are people that like
10 Matt and I know that there are people that don't like
11 Matt.
12     Q.   Does Matt have the respect of the seniors
13 officers?
14          MR. POPOLIZIO:  Form; foundation.
15          THE WITNESS:  Matt is a senior officer, I
16 would say.  And I think some of his peers at his level,
17 time on the department, I mean, appreciate and others have
18 less of an appreciation.
19 BY MS. BROADDUS:
20     Q.   And in a lot of the documents that I've read I
21 came across some information that indicates that
22 Officer Schneider was one of the highest producers for the
23 department.  Is that your understanding?
24          MR. POPOLIZIO:  Form.
25          THE WITNESS:  Having not seen that document

154

1 I don't know what they're referring to.
2 BY MS. BROADDUS:
3     Q.   In a lot of the reviews it refers to
4 Officer Schneider as having one of the highest number of
5 arrests and convictions.  Were you aware of that?
6     A.   No.
7     Q.   Do you have someone in the department who tracks
8 that information?
9     A.   I suppose each squad would track and then
10 lieutenants can track their shifts, sector lieutenant
11 could track.  So I guess what I'm saying is I believe
12 there's a mechanism for that in the patrol divisions.  I
13 don't know that there's any mandate for it to be tracked.
14 We track the number of arrests that we make per year and
15 some general stats, but we don't track how many arrests
16 Officer A made versus every other officer in the
17 department, if that makes sense.
18     Q.   What's your relationship with Sergeant LaBrant?
19     A.   Sergeant LaBrant and I worked together on the
20 same Neighborhood Response Unit back in 1999 until 2002, I
21 believe.  We worked together for three years.
22     Q.   Do you ever associate with him outside of work?
23     A.   Did I or do I?
24     Q.   Let's start with did you.
25     A.   Yes.  So as a squad we had functions together;

155

1 Christmas party, celebration of a child's birthday, the
2 birth of a child.  We were all at the age where we were
3 having kids and doing those kinds of things.  So, yeah,
4 there were occasions that we got together outside of work,
5 but it was usually as a squad.
6          Sergeant LaBrant and I never engaged with
7 each other, like going to a baseball game just the two of
8 us or anything like that or going out to dinner with just
9 our families.
10     Q.   What about now?
11     A.   No.
12     Q.   No relationship with him?
13     A.   No.
14     Q.   What about Sergeant Shoop; what was your
15 relationship like with him?
16     A.   Sergeant Shoop and I worked on the Neighborhood
17 Response Unit together from 2003 to 2000 -- from July of
18 2003 until May of 2003 -- no, July of 2002 until May of
19 2003 when I promoted to sergeant and left the squad.
20 Sergeant Shoop and I became friends in that time period.
21 We've gone hunting together a couple times with our kids.
22 Hunting and camping maybe four, five, six times, and I
23 think -- I think that's it.
24     Q.   I'm going to pronounce another sergeant's name,
25 and I apologize if I butcher it, and I'll spell it after

156

1 I'm done, Sergeant Rohkohl.  It's R-O-H-K-O-H-L.
2     A.   And you got it correct, yes.  Well done.
3     Q.   Must be my bohemian background.
4          Is he still a part of the police department?
5     A.   I have not seen Sergeant Rohkohl since I've been
6 back as a contract employee, but I have not heard that
7 he's retired.  I know he's getting close so I don't -- I
8 think he's still there, but I haven't seen him.
9     Q.   My understanding is during different periods of
10 time Officer Schneider had each of these sergeants as a
11 supervisor, and I'm talking about Sergeant LaBrant,
12 Sergeant Shoop and Sergeant Rohkohl.  Were you aware of
13 that?
14     A.   Yes.
15     Q.   Did Sergeants LaBrant, Shoop or Rohkohl ever come
16 to you with any issues regarding Officer Schneider?
17     A.   No.
18     Q.   Did any of those sergeants ever have any
19 discussions with you about Schneider in general?
20     A.   No.
21     Q.   Did you ever talk to Sergeant LaBrant about any
22 issues relating to Officer Schneider in connection with
23 the Wheatcroft matter?
24     A.   No.
25     Q.   And my understanding is is at the time of the

157

1  events involving the Wheatcrofts, which was in July of
2  2017, Sergeant LaBrant was Officer Schneider's supervisor.
3  Is that your understanding?
4      A.  Yes.
5           (Deposition Exhibit No. 22 was marked for
6  identification.)
7  BY MS. BROADDUS:
8      Q.  A document has been handed to you that's been
9  marked as Exhibit No. 22, and towards the top it says,
10 "Goal Setting & Review Worksheet."  Do you see that?
11     A.  Yes.
12     Q.  And if you look at the officer being reviewed, it
13 says Matt Schneider.  And the review period time is from
14 July 1st, 2017, to June 30th of 2018.  Do you see that?
15     A.  Yes.
16     Q.  And at the time of the review it looks like
17 Officer Schneider's supervisor was Sergeant Moreno,
18 correct?
19     A.  Yes.
20     Q.  And that's because he changed supervisors during
21 that period of time, true?
22     A.  My understanding, yes.
23     Q.  I'm going to have you go to the page that's
24 marked Bates No. 1782 at the bottom.  At the top of the
25 page there's comments, and the first section indicates

158

1  it's a comment by Sergeant LaBrant.  Do you see where I
2  am?
3      A.  Yes.
4      Q.  I'm going to go ahead and read the second -- I'll
5  read the first two sentences.  "Officer Schneider worked
6  on the NRS/85301 squad from 7/1/2017 through 12/30/2017."
7           Do you see that?
8      A.  Yes.
9      Q.  It says, "During this time Officer Schneider
10 demonstrated all of the Department's Core Values."
11          Do you see that?
12     A.  Yes.
13     Q.  You can look through everything he said, and I'm
14 going to ask you a question, but here's specifically what
15 my question will be so you know what to look for:  Do you
16 see anything in Sergeant's LaBrant view that relates or
17 bring up any issues regarding the Wheatcroft incident?
18          MR. POPOLIZIO:  Form; foundation.
19          THE WITNESS:  No.
20 BY MS. BROADDUS:
21     Q.  And the Wheatcroft incident would have occurred
22 during that period of time, correct?
23     A.  Correct.
24     Q.  I'm going to have you go to the page that's
25 marked 1786 at the bottom.  In the last box towards the

159

1  bottom of the page it says -- "Review comments" -- it has
2  another section by Sergeant LaBrant, and I'll read that.
3  It says, "Officer Schneider treated everyone he has
4  contacted with dignity and respect."
5           Do you see that?
6      A.  Yes.
7      Q.  And I'll just tell you, I've reviewed this whole
8  review, and there is no mention of anything related to the
9  Wheatcroft incident.  Is that common, that if there's an
10 incident involving an officer it's not brought up in their
11 review?
12     A.  The common practice that we're trying to fix
13 right now -- that actually, I should say, we were trying
14 to fix and now Interim Chief Briggs is trying to fix, is
15 the timing of when a sustained allegation is documented in
16 an officer's performance evaluation.
17          So this Wheatcroft investigation, and I
18 think I alluded to it earlier in the deposition, got
19 stagnated because the other investigation was moving along
20 at the same time.  So you had the criminal that moved into
21 the internal, and then there was another internal
22 reference to the hostile work environment that was occurring
23 at the same time.
24          So as those investigations -- or interviews
25 are being done and things are coming to a close and now

160

1  there's these decisions that are being made between Chief
2  LeVander; Chief Briggs; our human resource department, who
3  was a big part of the internal investigation into the
4  hostile work environment.  As you know, Title 7, the EEOC
5  complaint, HR is going to take the lead on that with our
6  investigators.
7           So there was a lot of coordinating that was
8  happening and trying to figure out what discipline needed
9  to occur first and how -- whether one aggravated another.
10 Those kinds things were being worked through, as I
11 understand it.
12          And so the point in time between the
13 completion of internal investigation into the Wheatcroft
14 incident and when Officer Schneider was actually served
15 discipline -- I believe Officer Schneider wasn't even
16 served discipline until the next summer.  So he worked for
17 LaBrant from July of 2001 to December 31st of that same
18 year, but I don't think Officer Schneider got any -- he
19 got notice of discipline until that following summer.
20          And the practice in the police department at
21 the time, and may still be the practice, is you don't
22 document deficiencies until you have a sustained finding
23 with administered discipline.  And we're finding -- the
24 labor association is finding that that's problematic
25 because attached with major discipline is a time period

197

1  staff and I were on the same page as far as response to
2  resistance with what was a violation and what wasn't.
3  There was maybe a one-off here and there of someone that
4  disagreed.  But that conversation could be handled within
5  the chain of command.  It didn't necessarily necessitate a
6  department-wide training.
7       Q.  Earlier in your testimony you -- very early on in
8  your testimony there were some questioning about whether
9  you were responsible for training of officers.
10      A.  Yes.
11      Q.  Do you remember that?
12          And hiring of officers, right?
13      A.  Yes.
14      Q.  And supervision?
15      A.  Yes.
16      Q.  With regard to the hiring of officers, could you
17  just give me a general overview about how officers are
18  hired and the chief's role in the hiring process?
19      A.  So I'm going to start with recruiting.  So I had
20  a strategy to recruit individuals that lived and
21  understood the West Valley.  Not that I wouldn't hire
22  someone from the East Valley or from out of state, but our
23  recruiting effort was for people that understood the
24  culture of the West Valley because it's uniquely different
25  than the culture of the East Valley or Central Phoenix.

198

1  And certainly from state to state, you know, the cultural
2  nuances vary.
3          So our recruiting efforts centered in the
4  West Valley.  And when we bring people into a hiring
5  process, they fill out an initial application.  They take
6  a written test, they take a physical agility test, and
7  then we rank them.  And they're ranked based on certain
8  criteria.  And it used to be those criteria were whether
9  they had military experience or a degree, either an
10  associate's degree or a bachelor's degree, would give you
11  a higher score.
12          And the reason why is that -- the primary
13  two reasons people fail the academy is they can't handle
14  the stress, so if you've been in the military and you've
15  been through boot camp, you can probably handle the police
16  academy.
17          Number two reason people fail out of the
18  academy is academics.  If you have some college
19  experience, whether it's an associate's degree or a
20  bachelor's degree, you're more likely to be successful in
21  the academy.
22          What I said was, I can inoculate you to
23  stress in the pre-academy environment and we can make sure
24  that you're academically sound.  What I can't do is force
25  you to fall in love with the City of Glendale and West

199

1  Valley culture.
2          So after you go through your ranking we
3  bring you in for interviews.  After interviews, if you're
4  successful, you have a meeting with the chief -- assistant
5  chief, rather, or perhaps a commander, then if you're
6  successful there, you have a medical and a psychological
7  evaluation.  Provided you're successful there, your packet
8  goes to the police chief for final signature and you're
9  hired.
10      Q.  Was that generally the process when you were
11  hired as an officer?
12      A.  I believe so, yes.
13      Q.  And do you know if it's the -- was the general
14  process when Officer Schneider was hired as an officer?
15      A.  I believe so, yes.
16      Q.  And Officer Lindsey?
17      A.  Yes.
18      Q.  And Officer Fernandez?
19      A.  Yes.
20      Q.  With regard to the responsibility of the chief of
21  the training of the officers of Glendale Police
22  Department, could you explain that process to me, that
23  responsibility.
24      A.  So as the police chief -- well, I didn't convene
25  the committee.  The committee was already convened, but I

200

1  oversaw the committee responsible for putting training
2  together on an annual basis.  That committee was comprised
3  of subject matter experts in various fields, labor
4  association representation, and then supervision
5  throughout the department.  That committee makes
6  recommendations to the assistant chiefs.  I had
7  conversations with the assistant chiefs about what we were
8  training on from year to year, and then what we were
9  training on between advanced officer training dates.
10          So we have 18 events of officer training
11  dates a year.  They're spread out, with the exception of I
12  think mid-May through mid-September, because of the heat.
13  A lot of activities are outside.  So from mid-September
14  through mid-May of the following year we have 18 dates
15  everybody's required to attend.  But we also do ongoing
16  training via what I believe is still called iSpring.  Then
17  the legal advisor still puts things out.
18          So there's a continual push of training
19  materials into the department on all different aspects of
20  our job.
21      Q.  And during your course as the chief of the police
22  of Glendale Police Department, did the Glendale Police
23  Department train its officers with regard to Taser use?
24      A.  Yes.
25      Q.  Use of force training?

201

1    **A.  Yes.**
2    Q.  With regard to supervision of officers, as chief
3    of police you don't supervise officers on a day-to-day
4    basis one-on-one, correct?
5    **A.  Correct.**
6    Q.  That's up to the sergeants who supervise police
7    officers, correct?
8    **A.  I would say there's a chain of command**
9    **responsible --**
10   Q.  And what is that chain of command?
11   **A.  Officer to sergeant, sergeant to lieutenant,**
12   **lieutenant to commander, commander to assistant chief,**
13   **assistant chief to the chief.**
14   Q.  So that's the hierarchy, so to speak?
15   **A.  That's the hierarchy.**
16   Q.  So you don't know everything that goes on in
17   every unit on a daily basis --
18   **A.  Correct.**
19   Q.  -- as police chief?
20   **A.  Correct.**
21   Q.  But if there are things that are brought to your
22   attention, it might be through a disciplinary process --
23   **A.  Yes.**
24   Q.  -- for example?
25        There was some discussion earlier in your

202

1    deposition with regards to e-mails.  Do you recall that?
2    **A.  Yes.**
3    Q.  Did you request any e-mails related to this
4    incident, the Wheatcroft incident?
5    **A.  No.**
6    Q.  Why not?
7    **A.  The review that I did on the incident involved**
8    **the facts that were found in the criminal investigation**
9    **and the internal investigation, as well as any notes that**
10   **I took or information that I had gathered, I should say --**
11   **because I typically don't take notes in the appeal**
12   **meetings -- from Officer Schneider himself that he**
13   **believes was additional information I need to have.**
14        **I have never, and I can't imagine a time**
15   **that I would request e-mails that may have been written**
16   **and been part of some communication at some other level of**
17   **the investigation.**
18        **As I said before, the assistant chiefs are**
19   **responsible for making the discipline decision, for making**
20   **sure that it's consistent, that the discipline decision**
21   **meets our chart of sanctions.  They're responsible for**
22   **overseeing and guiding the investigation.  So if anybody**
23   **would need to review e-mails, I think it would happen at**
24   **lower levels.**
25        **When it rises to my level, mine is more of a**

203

1    **due process examination and final determination on**
2    **discipline.**
3    Q.  Did you request any e-mails related to this
4    investigation of the Wheatcroft incident?
5    **A.  No.**
6    Q.  For the same reasons you just described?
7    **A.  Correct.**
8    Q.  There was some discussion earlier with regard to
9    the purging of discipline within an officer's file.  Do
10   you recall that?
11   **A.  Yes.**
12   Q.  And then you would ultimately, as police chief,
13   have to sign off on any request to purge discipline from
14   someone's file?
15   **A.  Yes.**
16   Q.  Did you sign off on any purging of discipline
17   from Officer Schneider's file?
18   **A.  No.**
19   Q.  Officer Fernandez's file?
20   **A.  No.**
21   Q.  Officer Lindsey's file?
22   **A.  No.**
23   Q.  And you watched some snippets of video earlier in
24   your deposition.  Do you recall that?
25   **A.  Yes.**

204

1    Q.  And it was from the standpoint of Officer
2    Schneider's body-worn camera, right?
3    **A.  Yes.**
4    Q.  In at least what you saw, the parts of the video
5    that you saw here today, do you recall if
6    Officer Schneider approached the vehicle and said
7    something to the effect of, hey, brother, when you turn in
8    to -- when you turn in here, could you use your turn
9    signal, something like that?
10   **A.  Yes.**
11   Q.  When you watched the video of that interaction
12   between Officer Schneider and the occupants of the
13   vehicle, did anybody in the vehicle protest?  And what I
14   mean in that, is state that the driver had used his turn
15   signal?
16        MS. BROADDUS:  Object to form.
17        MR. POPOLIZIO:  Go ahead.
18        THE WITNESS:  You can't see what the
19   occupants are doing, I think because Officer Schneider is
20   leaned over so the camera is facing lower than where you
21   can see the occupants.  But you don't hear any objection.
22   Or I didn't hear any objection, I should say.
23   BY MR. POPOLIZIO:
24   Q.  Did you hear anything on the video from anybody
25   on scene claim that the driver of the vehicle used a hand

213

1  Exhibit 25, were these already existing in the previous
2  version of this response to resistance reporting?
3      **A.  Yes.**
4      Q.  So a supervisor would be required to -- if there
5  were kicks that were reported, they had to document that,
6  correct?
7      **A.  Yes.**
8      Q.  And it also talks about Taser deployments,
9  correct?
10     **A.  Yes.**
11     Q.  And just for clarification, what are FN 303
12  deployments?
13     **A.  The FN 303 is a platform for deploying what looks**
14  **like a paintball full of pepper spray.**
15     Q.  What is Cap-Stun usage?
16     **A.  That's chemical spray or pepper spray.**
17         MS. BROADDUS:  That's all the questions I
18  have for you.
19         MR. POPOLIZIO:  He'll read and sign.
20         (The deposition concluded at
21           4:12 p.m.)
22
23
24
25

214

1          I, the undersigned, say that I have read the
2  foregoing transcript of testimony taken October 3, 2019,
3  and I declare, under penalty of perjury, that the
4  foregoing is a true and correct transcript of my testimony
5  contained therein.
6
7          EXECUTED this _____ day of _____, 2019.
8
9
10
11
12         _____
           RICHARD BRANDON ST. JOHN
13
14
15
16
17
18
19
20
21
22
23
24
25

215

1  STATE OF ARIZONA    )
                        ) ss.
2  COUNTY OF MARICOPA   )
3      BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   questions propounded to the witness and the answers of the
5  witness thereto were taken down by me in shorthand and
   thereafter transcribed through computer-aided
6  transcription under my direction; that the foregoing is a
   true and correct transcript of all proceedings had upon
7  the taking of said proceedings, all done to the best of my
   skill and ability.
8
9      I CERTIFY that I am in no way related to nor
   employed by any of the parties hereto nor am I in any way
10 interested in the outcome hereof.
11     (X) Review and signature was requested.
       ( ) Review and signature was waived.
       ( ) Review and signature was not requested.
12
       I CERTIFY that I have complied with the ethical
13 obligations set forth in ACJA Sections 7-206(F)(3) and
   7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
14 this 22nd day of October, 2019.
15
16     _____
17         MONICA S. BERRY, RPR, CR
           Certified Reporter
18         Arizona CR No. 50234
19     *   *   *   *   *   *
20     I CERTIFY that Berry & Associates, LLC has
   complied with the ethical obligations set forth in ACJA
21 Sections 7-206(J)(1)(g)(1) and (6).
22
23     _____
24         BERRY & ASSOCIATES, LLC
           Registered Reporting Firm
25         Arizona RRF No. R1033

*EXHIBIT 31*

**1**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya           )
Chapman, as husband and wife, and  )
on behalf of minors J.W. and B.W.,  )
                                                    )
        Plaintiffs,            ) Case No.:
                                   ) 2:18-cv-02347-SMB
vs.                              )
                                   )
City of Glendale, a municipal      )
entity; Matt Schneider, in his      )
official and individual          )
capacities; Mark Lindsey, in his    )
official and individual          )
capacities; and Michael Fernandez,  )
in his official and individual      )
capacities,                     )
                                   )
        Defendants.            )
                                   )

DEPOSITION OF COMMANDER BRANDON CRUZ BLANCO

Chandler, Arizona
November 12, 2019
9:03 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:

(COPY)

**2**

1         I N D E X
2  WITNESS                          PAGE
3  COMMANDER BRANDON CRUZ BLANCO
4
5
    EXAMINATION BY MS. BROADDUS        4
6
7
8
9         E X H I B I T S
   Deposition
10 Exhibits   Description          Marked
11    36     Document entitled Glendale Police    21
            Department - The mission of the
12          Glendale Police Department is to
            protect the lives and property of
13          the people we serve, Bates Nos.
            WHEATCROFT000049-000052
14          (4 pages)
15    37     Evidence Audit Trail, Bates No.      46
            CoG_WHEATCROFT 003340-3363
16          (24 pages)
17
18
19
20
21
22
23
24
25

**3**

1        DEPOSITION OF COMMANDER BRANDON CRUZ BLANCO
2  was taken on November 12, 2019, commencing at 9:03 a.m. at
3  the law offices of MARC J. VICTOR, P.C., ATTORNEYS FOR
4  FREEDOM, 3185 South Price Road, Chandler, Arizona, before
5  MONICA S. BERRY, RPR, a Certified Reporter in the State of
6  Arizona.
7
8  COUNSEL APPEARING:
9     MARC J. VICTOR, P.C.
      ATTORNEYS FOR FREEDOM
10    By:  MS. JODY L. BROADDUS
      3185 South Price Road
11    Chandler, Arizona  85248
      On behalf of Plaintiffs
12
13    JONES, SKELTON & HOCHULI, P.L.C.
      By:  MR. JOSEPH J. POPOLIZIO
14    40 North Central Avenue
      Suite 2700
15    Phoenix, Arizona  85004
      On behalf of Defendants
16
17
18  ALSO PRESENT:
19    Ms. Kathy Thomas and Ms. Dianne Shoemake, City of
      Glendale
20    Ms. Julie Wanner, paralegal to Mr. Popolizio
      Ms. Alexz Thompson, paralegal to Ms. Broaddus
21
22
23
24
25

**4**

1        COMMANDER BRANDON CRUZ BLANCO,
2  a witness herein, having been first duly sworn by the
3  Certified Reporter to speak the truth and nothing but the
4  truth, was examined and testified as follows:
5
6              EXAMINATION
7  BY MS. BROADDUS:
8     Q.  Will you please state your full name for the
9  record.
10    A.  Yes.  It's Brandon Cruz Blanco.
11    Q.  And is it all right if I call you Commander?
12    A.  You can call me Brandon.
13    Q.  Brandon, okay.  Thank you.
14        Have you ever had your deposition taken
15  before?
16    A.  I'm pretty sure I have criminal, but not civil,
17  yeah.
18    Q.  I'll go through a few ground rules just briefly
19  just to make things go a little smoother.  The court
20  reporter is going to be taking down everything that's said
21  in the room, and to make her job a lot easier, it's
22  important that we don't talk over each other.  So I'll ask
23  that you wait until I finish asking my question before you
24  begin answering, even though you may be able to anticipate
25  what I'm going to say.  Okay?

13

1   talking about is during the 2017 time frame, July and
2   thereafter.  And at that time you would have been the
3   commander of the Gateway patrol division, correct?
4   **A.   Yes.**
5   Q.   What were your duties as a Gateway patrol
6   commander?
7   **A.   Basically overseeing all operations of the**
8   **Gateway division, patrol division.**
9   Q.   What's included in the Gateway patrol
10   division?
11   **A.   We have -- of course you have patrol.  You have**
12   **community action team members which include sworn and**
13   **civilian staffing.  Then you have the Gateway**
14   **investigations team which investigates property crimes.**
15   **They're detectives.  That also has civilian staffing**
16   **attached to it.**
17   **Then we have the Gateway NRS Squad,**
18   **Neighborhood Response Squad, which is primarily sworn.**
19   **And then I had some civilian staff, like admin support.**
20   Q.   Who was your direct supervisor in 2017?
21   **A.   That I reported to?**
22   Q.   Yes.
23   **A.   It was Chief LeVander.**
24   Q.   Was he an assistant chief or --
25   **A.   Yes.**

14

1   Q.   Do you know how many at that time, in
2   approximately July of 2017 -- you were a commander of the
3   Gateway patrol division and Assistant Chief LeVander was
4   your supervisor.  Were there other commanders that were at
5   the same level that you were?
6   **A.   Yes.  There's four other -- there's four other**
7   **commanders over other divisions within the police**
8   **department.**
9   Q.   And is one of those other divisions the criminal
10   investigations division?
11   **A.   Yes.**
12   Q.   So you've worked for two of the four divisions;
13   is that correct?
14   **A.   Two of the five, yes.  Well, as a commander.**
15   Q.   When you were overseeing the Gateway patrol
16   division as commander, were you responsible for hiring or
17   terminating employees?
18   **A.   I have a role in it but wasn't primarily**
19   **responsible.**
20   Q.   What would have been your role?
21   **A.   If an employee was -- you said terminated or**
22   **suspended?**
23   **I would get -- I would get the discipline**
24   **and either have some input -- and then oftentimes I would**
25   **be in the room when they were served that discipline with**

15

1   HR and PSU.
2   Q.   Were you ever responsible for hiring officers?
3   **A.   No.**
4   **You mean hiring like brand-new?**
5   Q.   Or lateral.
6   **A.   No.  Not entry level positions, no.**
7   Q.   If there was a lateral that came into the
8   department, is that somebody that you would have any say
9   over whether you were going to be hiring them or not?
10   **A.   So we're talking -- for me, lateral means a new**
11   **officer getting hired.  I wouldn't have any responsibility**
12   **for hiring them.**
13   Q.   As commander of the Gateway patrol division, did
14   you have any supervisory role over training of the police
15   officers?
16   **A.   I would have -- training would come across my**
17   **desk.  So if an officer or detective wanted to go to a**
18   **with-cost training, I would see that and either approve it**
19   **or deny it.  Oftentimes we had advanced officer training**
20   **within the department that I don't -- I don't really have**
21   **any input.  If I see some concerns, I might have some**
22   **input but...**
23   Q.   So my understanding is there's annual training
24   that all officers are required to participate in; is
25   that --

16

1   **A.   Yes.**
2   Q.   And if there was something outside of that you
3   thought needed to be addressed, you could take steps so
4   that there could be some additional type of training or
5   information provided to the people on your team?
6   MR. POPOLIZIO:  Objection; form.
7   THE WITNESS:  I -- I could if I -- if I saw
8   something, you know.  But it would be in a room where I
9   would, you know, tell the other commanders, hey, I'm
10   seeing this, and we'd come up with something and go to our
11   training division, but that's not very often.
12   BY MS. BROADDUS:
13   Q.   You mentioned that as the commander of the
14   Gateway patrol decision one of your duties was to oversee
15   all of these other divisions that were part of the Gateway
16   patrol division, correct?
17   **A.   I would be responsible for the unit.  The**
18   **divisions are large.  The units are small.**
19   Q.   So you have responsibility over the units,
20   correct?
21   **A.   Well, I have responsibility over the lieutenants**
22   **that managed the unit within -- it was a chain of command.**
23   **Officers report to sergeants.  Sergeants report to the**
24   **lieutenants, lieutenants report to the commanders.**
25   Q.   As commander of the Gateway patrol division, were

17

1  you ever out on the streets doing investigations or active
2  in patrolling?
3          MR. POPOLIZIO:  Form.
4          THE WITNESS:  Absolutely I would because I
5  wore a uniform.  It was a uniform-based position, so I
6  would oftentimes go out to calls.
7  BY MS. BROADDUS:
8      Q.  Would you go out with the members of the units
9  that were below you?
10     A.  Yeah.  Oftentimes I would, yeah.  But throughout
11  the whole organization I would go up north, I would be on
12  calls where investigations was on.
13     Q.  Have you ever been charged with a misdemeanor or
14  a felony?
15     A.  No, I don't think so.  Not a felony, of course,
16  but I don't even think a misdemeanor.
17     Q.  Did you review any documents to prepare for your
18  deposition today?
19     A.  Yes.
20     Q.  What did you review?
21     A.  I reviewed reports of the initial investigation,
22  the use of force investigation.  I reviewed some ARS stuff
23  and a few other reports.
24     Q.  Did you review any videos?
25     A.  Yes, I have.

18

1      Q.  Which videos did you review?
2      A.  The incident, the traffic stop with Schneider.
3      Q.  My understanding is there's Officer Lindsey's
4  body-cam footage.  There is also Officer Schneider's
5  body-cam footage as well as a motel surveillance.  Did you
6  look at all three of those?
7          MR. POPOLIZIO:  Form.
8          THE WITNESS:  Just prior to this, I don't
9  think I looked at Lindsey's, but I did look at Schneider's
10  and the motel.  Well, one -- one viewpoint of the motel
11  video.
12  BY MS. BROADDUS:
13     Q.  You mentioned use of force.  Is that also called
14  response to resistance?
15     A.  Yes.
16     Q.  So if you say use of force you also -- it falls
17  under the realm of response to resistance, correct?
18     A.  Yes.  That's the policy, is the response to
19  resistance.
20     Q.  Did you have any discussions with anyone other
21  than your attorney to prepare for your deposition today?
22     A.  No.
23     Q.  Did you talk with any other officers or anyone
24  who's been deposed in this case?
25     A.  No.

19

1      Q.  Have you ever been a party to a lawsuit?
2      A.  I probably have.  I just don't recall.
3      Q.  In looking online I see that there was one case
4  that was filed in 2000, approximately.  It was in federal
5  court, a civil rights case.  The plaintiff's name was Tina
6  Acosta, and she brought a lawsuit against the City of
7  Glendale, and you were one of the many officers that were
8  included.  I'll give you a little background of what the
9  case was about, but I just want to know if you recall --
10     A.  Okay.
11     Q.  -- anything about this.
12         It was a civil rights claim based on a
13  search warrant.  Apparently there was an issue relating to
14  counterfeit bills that were being generated in the
15  community.  Were you aware -- does that sound familiar to
16  you at all?
17     A.  No, not -- no.
18     Q.  There was another lawsuit in 2001.  It was
19  initially filed in Maricopa County Superior Court.  It was
20  moved to federal court.  Another civil rights case with
21  lots of parties; a whole bunch of plaintiffs, a bunch of
22  defendants, the State and County, Glendale, numerous
23  officers from the department, including you.  Does that
24  sound familiar?
25     A.  No.

20

1      Q.  Have you ever been disciplined by the City of
2  Glendale?
3      A.  Yes.
4      Q.  How many times?
5      A.  Geez.  How many times?  A handful -- a couple.
6      Q.  When was the most recent time?
7      A.  It was probably -- I'm just guessing here,
8  probably it was when I was a sergeant over street crimes
9  So maybe '08.
10     Q.  What do you recall about what -- why you were
11  disciplined?
12     A.  Because one of my detectives misplaced a little
13  small piece of evidence, couldn't find it.  He got
14  disciplined, and I ultimately got disciplined because I
15  was failing to supervise.
16     Q.  Prior to that what were you also disciplined for?
17     A.  I don't remember, to be honest.
18     Q.  Do you remember any of the other incidents in
19  which you were disciplined?
20     A.  Like formally disciplined, I don't recall.  I
21  don't -- it's been rare.
22     Q.  You believe it might have been a number of times
23  over the years?
24     A.  Oh, geez.
25         MR. POPOLIZIO:  Form.

25

1 BY MS. BROADDUS:
2     Q.   With the word "diverse," it says, "The men and
3 woman of Glendale Police Department are highly qualified
4 and diverse."
5          Do you know what diverse is supposed to mean
6 with regard to the men and women of the Glendale Police
7 Department?
8     **A.   Yes, absolutely.**
9     Q.   What does it mean?
10    **A.   It's just people from different backgrounds.**
11    Q.   Okay.  And the last part where it talks about
12 committed to creating a community where everyone can feel
13 safe, what is your understanding of that?
14    **A.   Well, I would hope that the public would feel**
15 **safe that they're patrolling their city.**
16    Q.   And if you read the next sentence, it sounds like
17 that as part of that is to maintain the trust and
18 confidence of the people that are served, correct?
19    **A.   Yes.**
20    Q.   Do you believe that this accurately describes the
21 mission of the Glendale Police Department?
22         MR. POPOLIZIO:  Form.
23         THE WITNESS:  Yes, I do.
24 BY MS. BROADDUS:
25    Q.   Thank you.

26

1          What is your understanding as to when a
2 Glendale police officer may arrest a citizen?
3     **A.   When they have probable --**
4          MR. POPOLIZIO:  Form.
5          THE WITNESS:  I'm sorry.
6          MR. POPOLIZIO:  Go ahead.
7          THE WITNESS:  When they have probable cause.
8 BY MS. BROADDUS:
9     Q.   What is probable cause?
10    **A.   That they have enough information, evidence that**
11 **a crime is committed and that this particular person**
12 **committed the crime.**
13    Q.   Does Glendale provide any training to its
14 officers to ensure that probable cause exists before an
15 arrest is made?
16    **A.   Yes.**
17    Q.   And is that a part of the annual training or is
18 that specialized training?
19    **A.   Well, the initial training is in the academy.**
20 **And then throughout your career it's just ongoing**
21 **training.  We read bulletins.  You read legal bulletins.**
22 **You get training through inside sources, outside sources.**
23    Q.   Other than the annual training that Glendale
24 officers are required to take, are they required to take
25 other training outside of the mandatory annual training?

27

1     **A.   No.**
2     Q.   And do you know whether the annual training
3 provides training to officers regarding probable cause?
4     **A.   Every year?  You're talking the advance officer**
5 **training?**
6     Q.   Yes.
7     **A.   Sometimes it does, sometimes it doesn't.  It just**
8 **depends on what the hot topics are every year.**
9     Q.   Is it fair to say that a Glendale police officer
10 cannot arrest someone without probable cause?
11    **A.   Cannot arrest, true.**
12    Q.   Does an officer have discretion as to whether --
13 whether to arrest someone if probable cause does not
14 exist?
15         MR. POPOLIZIO:  Form; foundation.
16         THE WITNESS:  Can you rephrase that for me?
17 BY MS. BROADDUS:
18    Q.   Sure.  If there is not probable cause, does a
19 Glendale officer have discretion as to whether they can
20 still arrest that person?
21    **A.   No, not if there's no probable cause.**
22    Q.   Is that part of Glendale's policies and
23 procedures?
24    **A.   I would have to read it.  I'm sure it's somewhere**
25 **in there.**

28

1     Q.   Is that a mandatory policy?
2     **A.   Well, the way I'm understanding, is it**
3 **mandatory -- an arrest can be made when there's --**
4 **probable cause exists.**
5     Q.   So if there's not probable cause, an officer
6 cannot use their own discretion and arrest them anyway,
7 correct?
8          MR. POPOLIZIO:  Form.
9          THE WITNESS:  When you're saying arrest to
10 me, it's physically arresting.  Now, you can detain
11 individuals without probable cause.
12 BY MS. BROADDUS:
13    Q.   Sure.  But I'm talking about arresting someone.
14    **A.   Can you -- I'm confused on the question.**
15    Q.   Does Glendale have a mandatory policy that an
16 officer cannot arrest someone unless there is probable
17 cause?
18    **A.   I don't know if it's specifically mandatory, but**
19 **it's pretty clear you can't arrest someone if there's no**
20 **probable cause.**
21    Q.   If it's not mandatory, does that mean an officer
22 does have discretion anyway to arrest someone if there's
23 not probable cause?
24         MR. POPOLIZIO:  Form.
25         THE WITNESS:  No.  You can only make an

**29**

1 arrest if there's probable cause.
2 BY MS. BROADDUS:
3    Q.  And you understand if a person is arrested
4 without probable cause it may be a violation of the
5 citizen's civil rights?
6       MR. POPOLIZIO:  Form; foundation.
7       THE WITNESS:  Yes.
8 BY MS. BROADDUS:
9    Q.  Where did you learn that?
10    A.  Where did I learn it?
11    I can't give you a specific where I learned
12 it, but it's through college, through academy, through
13 ongoing training.
14    Q.  Is it common sense, do you think, for police
15 officers to know that you can violate a person's civil
16 rights if you arrest them without probable cause?
17       MR. POPOLIZIO:  Form; foundation.
18       THE WITNESS:  For me personally it's common
19 sense, but I don't know about...
20 BY MS. BROADDUS:
21    Q.  Would you expect your officers that are under
22 your command would have that same common sense to know
23 that they can't arrest someone without probable cause?
24       MR. POPOLIZIO:  Form.
25       THE WITNESS:  Yes, I would hope so.

**30**

1 BY MS. BROADDUS:
2    Q.  With regard to the people that were under your
3 command, who would train those officers as to the elements
4 needed for a traffic stop?
5    A.  Who would train them?
6       Well, the initial training is done at the
7 academy.  And then like I said, it's ongoing training
8 through the -- within the police department but also
9 outside.
10    Q.  What is your understanding as to what the
11 elements are that are required to stop someone for a turn
12 signal violation?
13    A.  We have to have reasonable suspension that that
14 person did not use their signal properly when they turned.
15    Q.  Is that the only requirement, that they didn't
16 use a turn signal?
17       MR. POPOLIZIO:  Form.
18       THE WITNESS:  Can you ask that again?
19 BY MS. BROADDUS:
20    Q.  Sure.  And I'll go to where I'm exactly going to
21 be going with this, is, Arizona law requires the basis for
22 a traffic violation for a turn signal violation requires
23 that a turn signal not be used when it could affect other
24 traffic on the roadway.
25       Are you aware that the statute requires not

**31**

1 only the failure to use a turn signal but also that there
2 is other traffic on the roadway that would have to be
3 affected by the failure to use a turn signal?
4    A.  Yes.  I believe -- yeah, that's part of it, but
5 also I believe it says about 100 feet prior to their turn.
6    Q.  So is it fair to say that for a turn signal
7 violation a person would have to not use a turn signal
8 within 100 feet of the -- executing a turn and that there
9 can't -- there's no other traffic -- or there needs to be
10 other traffic on the roadway that would need to be
11 affected by the failure to use that turn signal, correct?
12       MR. POPOLIZIO:  Form.
13       THE WITNESS:  So for the turn signal, the
14 officer has to have reasonable suspicion that a turn
15 signal was not used 100 feet prior to the turn and that it
16 was affected by other traffic.
17 BY MS. BROADDUS:
18    Q.  Okay.  Thank you.
19    Who trains the Glendale police officer about
20 when force or resistance can be used?
21    A.  Our -- well, initially, once again, it's in the
22 academy, but then we have a training division, training
23 unit that does the ongoing training.
24    Q.  And that is part of the annual training that
25 officers are required to undergo, correct?

**32**

1       MR. POPOLIZIO:  Form.
2       THE WITNESS:  Oftentimes it is.  Sometimes
3 use of force is not part of that.
4 BY MS. BROADDUS:
5    Q.  Is the annual training mandatory?
6       MR. POPOLIZIO:  Form.
7       THE WITNESS:  Advanced officer training is
8 mandatory.
9 BY MS. BROADDUS:
10    Q.  Do officers have discretion whether they can
11 decide not to attend that and still remain a police
12 officer with the City of Glendale?
13       MR. POPOLIZIO:  Form.
14       THE WITNESS:  The advanced officer training
15 is mandatory.  On occasions officers will miss the
16 training but then they have to make it up.
17 BY MS. BROADDUS:
18    Q.  Does the City of Glendale have any mandatory
19 policies or procedures as to when an officer can use force
20 or resistance?
21    A.  Yes.
22    Q.  And what are those mandatory policies and
23 procedures?
24    A.  So to answer the question, to use physical force
25 the officer -- it's in the policy you can only use the

81

1          THE WITNESS:  Not specific, just general.
2    Maybe my supervisor, maybe our legal advisor.
3    BY MS. BROADDUS:
4        Q.  What do you recall from that conversation?
5        A.  That they were just going to start doing
6    interviews, but that was probably a month ago.
7        Q.  Are you aware of any other matters involving NRS
8    that have been referred to the County Attorney's Office
9    regarding an officer's conduct?
10         MR. POPOLIZIO:  Form.
11         THE WITNESS:  No.
12   BY MS. BROADDUS:
13       Q.  Are you aware of any other matters involving the
14   City of Glendale that were referred to the FBI?
15         MR. POPOLIZIO:  Form.
16         THE WITNESS:  No.  Not off the top of my
17   head, no.
18   BY MS. BROADDUS:
19       Q.  Are you aware of any other officers that are
20   being looked into by AZPOST?
21         MR. POPOLIZIO:  Form.
22         THE WITNESS:  Currently or have there been
23   in the past?
24   BY MS. BROADDUS:
25       Q.  Either way.

82

1        A.  Well, during my tenure there's been officers
2    looked into by AZPOST.
3        Q.  And currently you're aware that AZPOST is looking
4    into Officer Schneider, Officer Aldridge -- I'm sorry
5    Sergeant Aldridge as well as Officer Carroll, correct?
6          MR. POPOLIZIO:  Form; foundation.
7          THE WITNESS:  Carroll's not an officer.
8    He's been terminated.  But I haven't heard about Aldridge,
9    that AZPOST was looking into that.
10   BY MS. BROADDUS:
11       Q.  The City of Glendale has certain officers that
12   appeared on a show called TV Cops.  You're aware of that,
13   correct?
14       A.  Yes.
15       Q.  Did you have any role in that in any way?
16       A.  Well, they've been at our agency twice.
17       Q.  Did you ever have any communications with them
18   directly?
19       A.  So when I was a patrol lieutenant, they were at
20   our agency, and I would see them in briefings, and I would
21   recommend the officers that they would be riding with.
22       Q.  Officer Schneider was one of the officers who was
23   involved with the TV show Cops that was aired on one of
24   their episodes.  Were you involved in the decision to have
25   Officer Schneider be the officer that they would be

83

1    working with?
2        A.  I think that was the second time they were with
3    us, and I don't remember specifically saying they should
4    ride with Schneider, no.
5        Q.  Are you aware of any training that Glendale
6    provides to its officers to ensure that they don't use
7    excessive force when using a Taser or a drive stun?
8          MR. POPOLIZIO:  Form.
9          THE WITNESS:  We're constantly going through
10   training on Taser, the use of Taser.  It's ongoing.  In
11   fact, last week they were given more training by Taser.
12   BY MS. BROADDUS:
13       Q.  Are there certain body parts that are recommended
14   that are not to be Tased?
15       A.  Yeah, but that's changed over the years.
16   We've -- when they first came out, and then those
17   recommendations have been revised constantly.  It's
18   ongoing.
19       Q.  When you were commander of the Gateway division,
20   did you do anything to ensure that the officers' reports
21   were complete and accurate?
22       A.  Did I do anything specifically?
23          No, it's up -- the sergeant reads the
24   reports, approves them.  If there's any concerns, then
25   it's brought to the lieutenant's level.  So there has to

84

1    be levels before I'm brought into the discussion.
2        Q.  In terms of chain of command, my understanding is
3    there's the officers, sergeant, lieutenant and then
4    commanders.  Is that correct --
5        A.  Yes.
6        Q.  -- generally?
7        A.  Generally, yes.
8        Q.  Would you agree that there needs to be a high
9    level of trust among the officers?
10         MR. POPOLIZIO:  Form.
11         THE WITNESS:  Absolutely.
12   BY MS. BROADDUS:
13       Q.  Why is that?
14       A.  Well, they have to be trusted amongst their
15   peers, their supervisors, the community because you've got
16   to gain trust from everybody.
17       Q.  And why?  Why do you think that's important?
18       A.  Because you've got to work together to resolve
19   problems, solve crime, arrest subjects that are committing
20   these crimes.
21       Q.  What are some of the ways that officers create
22   issues regarding trust between other officers?
23         MR. POPOLIZIO:  Form; foundation.
24         THE WITNESS:  There's a bunch of different
25   ways.  I mean, I don't know.  More specifically, if you're

93

```
 1          (The deposition was at recess from 10:59 to
 2   11:06 a.m.)
 3          MR. POPOLIZIO:  He'll read and sign.
 4          (The deposition concluded at
 5           11:06 a.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17                    * * * * *
18
19
20
21
22
23
24
25
```

95

```
 1   STATE OF ARIZONA     )
                          ) ss.
 2   COUNTY OF MARICOPA   )
 3          BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     questions propounded to the witness and the answers of the
 5   witness thereto were taken down by me in shorthand and
     thereafter transcribed through computer-aided
 6   transcription under my direction; that the foregoing is a
     true and correct transcript of all proceedings had upon
 7   the taking of said proceedings, all done to the best of my
     skill and ability.
 8
 9          I CERTIFY that I am in no way related to nor
     employed by any of the parties hereto nor am I in any way
10   interested in the outcome hereof.
11          (X) Review and signature was requested.
            ( ) Review and signature was waived.
12          ( ) Review and signature was not requested.
13          I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA Sections 7-206(F)(3) and
14   7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
     this 15th day of December, 2019.
15
16   _____
17          MONICA S. BERRY, RPR, CR
            Certified Reporter
18          Arizona CR No. 50234
19   *   *   *   *   *   *   *
20          I CERTIFY that Berry & Associates, LLC has
     complied with the ethical obligations set forth in ACJA
21   Sections 7-206(J)(1)(g)(1) and (6).
22
23   _____
24          BERRY & ASSOCIATES, LLC
            Registered Reporting Firm
25          Arizona RRF No. R1033
```

94

```
 1          I, the undersigned, say that I have read the
 2   foregoing transcript of testimony taken November 12, 2019,
 3   and I declare, under penalty of perjury, that the
 4   foregoing is a true and correct transcript of my testimony
 5   contained therein.
 6
 7          EXECUTED this _____ day of _____, 2019.
 8
 9
10
11
12   _____
         COMMANDER BRANDON CRUZ BLANCO
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*EXHIBIT 32*



1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya      )
Chapman, as husband and wife, and   )
on behalf of minors J.W. and B.W.,  )
                                )  Case No.:
        Plaintiffs,             )  2:18-cv-02347-SMB
                                )
vs.                             )
                                )
City of Glendale, a municipal      )
entity; Matt Schneider, in his     )
official and individual            )
capacities; Mark Lindsey, in his   )
official and individual            )
capacities; and Michael Fernandez,  )
in his official and individual      )
capacities,                     )
                                )
        Defendants.             )
                                )

DEPOSITION OF LIEUTENANT EARL RALPH MONTGOMERY, III

Chandler, Arizona
November 6, 2019
9:05 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234
PREPARED FOR:

(COPY)

---

2

I N D E X

WITNESS                                PAGE
LIEUTENANT EARL RALPH MONTGOMERY, III


EXAMINATION BY MS. BROADDUS          4
EXAMINATION BY MR. POPOLIZIO        127
FURTHER EXAMINATION BY MS. BROADDUS  170
FURTHER EXAMINATION BY MR. POPOLIZIO 193


E X H I B I T S

Deposition
Exhibits   Description              Marked

33   City of Glendale Police Department   49
     Notice of Investigation, Bates No.
     CoG_WHEATCROFT 003494  (1 page)

34   A Memorandum from the Glendale       52
     Police Department, Bates No.
     CoG_WHEATCROFT 004107  (1 page)

35   Glendale Police Department          177
     Trespassing Enforcement
     Authorization Form, Bates No.
     WHEATCROFT000046  (1 page)

---

3

1       DEPOSITION OF LIEUTENANT EARL RALPH
2   MONTGOMERY, III was taken on November 6, 2019, commencing
3   at 9:05 a.m. at the law offices of MARC J. VICTOR, P.C.,
4   ATTORNEY FOR FREEDOM, 3185 South Price Road, Chandler,
5   Arizona, before MONICA S. BERRY, RPR, a Certified Reporter
6   in the State of Arizona.
7
8   COUNSEL APPEARING:
9       MARC J. VICTOR, P.C.
        ATTORNEYS FOR FREEDOM
10      By:  MS. JODY L. BROADDUS
        3185 South Price Road
11      Chandler, Arizona  85248
        On behalf of Plaintiffs
12
13      JONES, SKELTON & HOCHULI, P.L.C.
        By:  MR. JOSEPH J. POPOLIZIO
14      40 North Central Avenue
        Suite 2700
15      Phoenix, Arizona  85004
        On behalf of Defendants
16
17
18
19  ALSO PRESENT:
20      Ms. Kathy Thomas, City of Glendale
        Ms. Julie Wanner, paralegal to Mr. Popolizio
21      Ms. Alexz Thompson, paralegal to Ms. Broaddus
22
23
24
25

---

4

1       LIEUTENANT EARL RALPH MONTGOMERY, III,
2   a witness herein, having been first duly sworn by the
3   Certified Reporter to speak the truth and nothing but the
4   truth, was examined and testified as follows:
5
6              EXAMINATION
7   BY MS. BROADDUS:
8       Q.  Will you please state your name for the record.
9       A.  Early R. Montgomery, III.
10      Q.  And what do you go by generally?
11      A.  At work?
12      Q.  What do you want me to call you?
13      A.  Well, my nickname is Monty, but people call me
14   Earl at work.  And I prefer, just to keep it professional,
15   Lieutenant Montgomery is what I'm used to.
16      Q.  All right.  And have you had your deposition
17   taken?
18      A.  You know, if I have it's been a very long time.
19      Q.  More than ten years, do you think?
20      A.  Yeah.
21      Q.  I'll go through a few ground rules.  The court
22   reporter is going to be taking down everything said in the
23   room.  To make her job a lot easier, I'll ask that you
24   wait until I finish asking my question before you answer,
25   and I'll hopefully do the same to you, wait until you're

17

```
 1      A.  Yes.
 2      Q.  What were those circumstances?
 3      A.  Based on need or availability.  But if it was a
 4  search warrant, a high-profile search warrant, of course
 5  if an officer was injured, or if there was anything that
 6  would have any interest to the media, anything of that
 7  sort.
 8      Q.  As lieutenant of the Gateway -- is it section or
 9  sector?
10      A.  Sector.
11      Q.  When you were a lieutenant there, were you
12  responsible for hiring or firing officers?
13      A.  No.
14      Q.  As lieutenant were you -- in the same position
15  were you responsible for training police officers at that
16  time --
17      A.  No.
18      Q.  -- that were within your command?
19      A.  No.  We ensured that the protocol that we had in
20  place was followed.  We had a training protocol for the
21  Neighborhood Response Squad.  Then Sergeant Shoop had
22  revised it when I came into the unit.  And so it's similar
23  to what I referenced earlier about somebody graduating the
24  police academy and getting field training.  This is a
25  training element for that squad.
```

18

```
 1      Q.  I've noticed during your career there's a couple
 2  of times where you've gone -- you've been in recruitment
 3  training.  You've been in unit training, and you kind of
 4  have gone back to that several times.  Is that an area
 5  that was of interest to you?
 6      A.  Uh-huh.
 7      Q.  Is that a yes?
 8      A.  Yes.
 9      Q.  Why was that an interest to you?
10      A.  Well, that's one of the things that I didn't get
11  to earlier in your question.  I was a field training
12  officer.  In addition to a recruit training officer I was
13  also a field training sergeant.  So training has always
14  stayed with me.
15      Q.  Do you think that's an important part of -- or an
16  important aspect of the Glendale Police Department, to
17  have proper training?
18      A.  Yes.
19      Q.  In 2017, around the July time, who was
20  responsible for the training of police officers within
21  your division?
22      A.  I'm not quite sure.  I want to say Sergeant Jerry
23  McDaniel would have been field training for the entire
24  department.  And like I said, for the squad, it would have
25  been the sergeant for the Neighborhood Response Squad.
```

19

```
 1      Q.  What kind of training would the sergeant -- or
 2  the Neighborhood Response Squad, what kind of training
 3  were they required to provide?
 4      A.  There was an outline that we had to follow
 5  certain things that we -- just like in field training for
 6  any new officers, certain things that we wanted to have
 7  them experience and get experience with.
 8      Q.  Now, is that outline you mentioned for like the
 9  sergeant would use for training NRS, is that something
10  that is -- something created by the sergeant or is that
11  coming from higher up that --
12      A.  I'm not sure where it originated.  It preexisted,
13  predated me when I came into that unit.  And then like I
14  said, when I came in I asked Sergeant Shoop to revise,
15  make sure it was up to date, and he did.
16      Q.  Do you know if he made any revisions to you?
17      A.  I think he made some minor revisions.  I don't
18  remember, it's been so long.
19      Q.  Is that something that the sergeant would access
20  through the computer system to pull up that online
21  training outline?
22      A.  I don't know if it was something that he had
23  electronic or not.  I recall having a book of some sort
24  that we would have for each officer with their name on it.
25      Q.  Did you review any documents to prepare for your
```

20

```
 1  deposition today?
 2      A.  Yes.
 3      Q.  What did you review?
 4      A.  I reviewed my audio recording for my professional
 5  standards interview of the Motel 6 investigation.  I
 6  reviewed the evaluations.  I reviewed a portion of Officer
 7  Lacey Tolbert's deposition.  I reviewed the response to
 8  resistance related to the Taser incident.  And then I
 9  believe that's it.
10      Q.  When you were looking at evaluations, which
11  evaluations were you looking at?
12      A.  Officer Tolbert and Officer Schneider.
13      Q.  Did you prepare either of those evaluations that
14  you were looking at?
15      A.  No.
16      Q.  Did you review any videos?
17      A.  No, not in preparation.  On my own I've been
18  privy to some of those videos because of my assignment in
19  training.
20      Q.  Generally there's the body cam -- and I'm going
21  to be referring to the Wheatcroft incident which took
22  place in July of 2017.
23      A.  Uh-huh.
24      Q.  I just want to have the same understanding as
25  you.  Is that your understanding as well?
```

45

1  police report that indicates he ever went back to Motel 6
2  or looked at any video.  Are you aware of that?
3          MR. POPOLIZIO:  Objection:  Form;
4  foundation.
5          THE WITNESS:  My counsel advised me of that.
6  BY MS. BROADDUS:
7     Q.  You don't have to get into your --
8          MR. POPOLIZIO:  Yes, please.
9  BY MS. BROADDUS:
10     Q.  -- conversations.  I don't want to know what your
11  attorney has told you.
12     A.  I didn't recall.  It's been some time.
13     Q.  Would that have been something you would expect
14  to be in a report, something as important that you're
15  going to base an opinion on this officer, but he never
16  even prepared a report or a narrative or included any such
17  information until much later when there was an
18  investigation of an officer?
19          MR. POPOLIZIO:  Form; foundation.
20          THE WITNESS:  Can you rephrase that?
21  BY MS. BROADDUS:
22     Q.  Sure.  Did it cause you some concern that Officer
23  Pittman never reported his observation of this turn signal
24  violation from a different camera perspective but never
25  prepared any report regarding that?

46

1     A.  He should have.
2     Q.  When you were -- how did you learn that Officer
3  Pittman had -- that he was saying that he observed a no --
4  a turn signal violation, or that he saw that?  How did you
5  learn that he went down and looked at the video?
6          MR. POPOLIZIO:  Form.
7          THE WITNESS:  Later through conversation I
8  had, I believe it was with Commander Blanco.  I don't
9  remember where it came from.  It could have been even
10  Sergeant Moody when he interviewed me.  But I didn't have
11  any direct knowledge of it.
12  BY MS. BROADDUS:
13     Q.  With regard to Allegation No. 3, you state
14  exonerated.  Do you see that?
15     A.  Yes.
16     Q.  And you indicate in your report that he went
17  hands on after Johnny repeatedly reached into a backpack
18  after being directed by Schneider not to do so.  Do you
19  see that?
20     A.  Yes.
21     Q.  Where did you learn that Mr. Wheatcroft was
22  repeatedly reaching into a backpack after Schneider told
23  him not to?
24     A.  When we were -- Commander Blanco and I were
25  reviewing the body cams the following week after the

47

1  incident.
2     Q.  Why don't we -- we've been going for just a
3  little while now.  I'm going to get into another area so
4  why don't we take a few-minute break.  Is that okay?
5          MR. POPOLIZIO:  That's fine.
6          (The deposition was at recess from 9:58 to
7  10:08 a.m.)
8  BY MS. BROADDUS:
9     Q.  As a lieutenant that's supervising various
10  squads, do you keep yourself familiarized with changes in
11  laws and rules that would impact either your duties or
12  your officers' duties?
13     A.  Yes.
14     Q.  How do you do that?
15     A.  Legal updates that are provided from our legal
16  advisor primarily.
17     Q.  You've been a police officer for a significant
18  amount of time.  I believe since '97 --
19     A.  Yes.
20     Q.  -- is that correct?
21          Is it fair to say that based on your
22  experience and training that you have a fairly good
23  understanding of crimes that are felonies and
24  misdemeanors?
25     A.  Yes.

48

1     Q.  And based on your review of the events that
2  happened at Motel 6 at the end of July of 2017, do you
3  believe whether Officer Schneider or any of the officers
4  that were there that day engaged in any felonies?
5          MR. POPOLIZIO:  Form; foundation.
6          THE WITNESS:  I'm not understanding the
7  question completely.  Could you rephrase?
8  BY MS. BROADDUS:
9     Q.  Sure.  Given your experience as a police officer
10  and all your training and as a lieutenant and as a
11  supervisor and your knowledge of the laws and what you've
12  learned over the years, do you believe that Officer
13  Schneider or any of the other officers that were at the
14  Motel 6 the day that that happened, do you believe any of
15  those officers engaged in any felonies that day?
16          MR. POPOLIZIO:  Form; foundation.
17          THE WITNESS:  The sustained allegation that
18  I mentioned, which would be tasing while somebody is
19  handcuffed, could be interpreted as an aggravated assault.
20  BY MS. BROADDUS:
21     Q.  And I don't want to make a presumption, but in
22  your experience is an aggravated assault, would that be a
23  felony?
24     A.  Yes.
25     Q.  If you have an officer who engaged in a felony

85

1 BY MS. BROADDUS:
2    Q.  I'm stopping at the 4:32 point, which is close to
3 where we stopped it earlier --
4    **A.  Yeah.**
5    Q.  -- before we went back.  You mentioned there was
6 something else that you saw?
7    **A.  Yeah.  There was a Taser misfire, an indication**
8 **of a slow click that it wasn't connected.  So that**
9 **original tase -- at some point what I was hearing before**
10 **the secondary, which you had asked me about, I was -- I**
11 **just picked up the clicking, which is an indicating tone**
12 **that it's not connecting.**
13    Q.  And we're stopped at the 4:32 point.  You can see
14 Johnny's legs are still in the seat belt, correct?
15    **A.  I do.**
16    Q.  I'm going to play a little bit further from here.
17       (Video played.)
18 BY MS. BROADDUS:
19    Q.  Stopping at the 4:55 point, and you've seen
20 Johnny's -- you see a child in the car that takes the seat
21 belt off Johnny.  It's his son.  Were you aware of that,
22 that it was his son?
23    **A.  No, but I did see what you had...**
24    Q.  Okay.  And at this point I stopped, you see
25 Johnny on the ground, he's facedown.  He's still in cuffs,

86

1 correct?
2    **A.  Yes.**
3    Q.  And he has his feet -- his legs laying together
4 and his feet are touching each other, it looks like, on
5 the ground, correct?
6    **A.  It appears that way, yes.**
7    Q.  Up until this point do you see -- as your
8 position as a training officer and -- or training
9 lieutenant, I apologize --
10    **A.  That's okay.**
11    Q.  -- do you see anything in this video that you
12 think would be important to relay to officers in terms of
13 training to avoid situations like this?
14       MR. POPOLIZIO:  Form.
15       THE WITNESS:  We train constantly related to
16 scenarios and, you know, Taser deployments.  It's
17 required.  So we do that annually.
18 BY MS. BROADDUS:
19    Q.  Did you see in this video -- that you saw
20 specifically that you would want to address with officers
21 to make sure that similar situations don't happen?
22       MR. POPOLIZIO:  Form.
23       THE WITNESS:  Tasing with somebody in
24 handcuffs can be a concern.  Somebody can still hurt you
25 while handcuffed.  But that would be a point that I would

87

1 like to clarify in training.
2 BY MS. BROADDUS:
3    Q.  You think it's also important that training on
4 the basis of providing identification of -- I apologize.
5       Do you think it's also important for
6 training on situations when officers can require
7 identifications from a passenger in a vehicle?
8    **A.  Yes.  And I did that with my squads after this**
9 **incident.**
10    Q.  Was that something you did before or after this
11 incident?
12    **A.  Something I did after.**
13    Q.  Was that because you were not part of the
14 training at that point or was it because of what you've
15 learned in this video that officers might need training on
16 this issue?
17       MR. POPOLIZIO:  Form.
18       THE WITNESS:  Because we do briefing and --
19 you know, relevant topics that come up.  That's what
20 briefing is for.  So I sought clarification from a legal
21 advisor and decided to brief my squad on it, answer
22 questions because they had questions.
23 BY MS. BROADDUS:
24    Q.  So after this incident occurred in the light of
25 what you had seen in this video, did you feel it was

88

1 important, based on your review of this, to have a
2 briefing about the basis for providing identification?
3       MR. POPOLIZIO:  Form.
4       THE WITNESS:  Only after the conversation
5 had taken place with the legal advisor and he had brought
6 that subject up.
7       MS. BROADDUS:  I'm going to play it a little
8 bit further.
9       (Video played.)
10       MS. BROADDUS:  I'm going to go back.  I
11 apologize.
12       (Video played.)
13 BY MS. BROADDUS:
14    Q.  At this point I stopped -- I apologize.  I
15 stopped at the 5:05 point, and did you -- you can still
16 see in Johnny's hand there's still money in his hand.  Do
17 you see that?
18    **A.  Yeah.  I can see something that looks like that,**
19 **yeah.**
20    Q.  And you can see that his pants are pulled down?
21    **A.  Yeah --**
22       MR. POPOLIZIO:  Form.
23       THE WITNESS:  -- that just occurred.
24 BY MS. BROADDUS:
25    Q.  And there's a Taser that's being applied by

93

1   vehicle.  It's difficult for me to understand.
2   BY MS. BROADDUS:
3      Q.   This is the surveillance video that we're now
4   showing from Motel 6.  I stopped it at the 12-second mark.
5          First of all, are you familiar with this
6   Motel 6?
7      A.   Yes.
8      Q.   As part of your patrol did you ever go to this
9   Motel 6?
10     A.   Didn't exist when I was on patrol.  It was
11  called -- I think it was a Best Western at the time that I
12  was in patrol.
13     Q.   And you see on the right side of the video
14  there's like an archway?
15     A.   Yes.
16     Q.   Do you see that?
17         And at this point of the video you can see
18  this tiny little nose that's going to be the car that's
19  coming through that we'll be playing.  Okay?
20     A.   Yes.
21     Q.   But you see that little part of the car there?
22     A.   Yes.
23     Q.   Okay.  And on the back alley you will be seeing
24  the patrol vehicle come through.  But at this point you
25  don't see it, correct?

94

1          MR. POPOLIZIO:  Form.
2          THE WITNESS:  I do not see it at this point.
3   BY MS. BROADDUS:
4      Q.   I've stopped it at the 13-second point.  And do
5   you see -- about two-thirds, maybe half of the silver car
6   that's coming through the archway, do you see that?
7          MR. POPOLIZIO:  Form.
8   BY MS. BROADDUS:
9      Q.   Or about a third to half.
10         MR. POPOLIZIO:  Form.
11         THE WITNESS:  Yes, I see about a third.
12  BY MS. BROADDUS:
13     Q.   At this point you can see the nose or the grille
14  area of the patrol vehicle, correct?
15     A.   Yes, I do.  It's hard to pick out.  Yes, I see
16  it.
17     Q.   In your training that you provide to officers do
18  you give them training as to what the laws are and the
19  basis they need to do a traffic stop?
20     A.   Yes.  The academy does and field training does,
21  and then we do ongoing training, yes.
22     Q.   Are you familiar with the Arizona statute for a
23  turn signal?
24     A.   Yes.
25     Q.   At this point you see the patrol vehicle behind

95

1   the building correct?
2      A.   Yes.
3          MR. POPOLIZIO:  Form.
4   BY MS. BROADDUS:
5      Q.   And according to Officer Schneider, he saw the
6   failure to use a turn signal by the driver of the car,
7   correct?
8      A.   Correct.
9      Q.   There's nothing in the report at all about the
10  traffic on the roadway, correct?
11         MR. POPOLIZIO:  Form.
12  BY MS. BROADDUS:
13     Q.   You don't hear anything about that?
14         MR. POPOLIZIO:  Form.
15         THE WITNESS:  Which report are you referring
16  to?
17  BY MS. BROADDUS:
18     Q.   Well, for a turn signal violation it's not just
19  the use of a turn signal whether there's a true violation
20  of the statute.  There has to be a violation of a turn
21  signal or failure to use a turn signal when there's other
22  vehicles on the roadway that could be affected, correct?
23         MR. POPOLIZIO:  Form.
24         THE WITNESS:  Correct.
25

96

1   BY MS. BROADDUS:
2      Q.   So my question is, is when you're looking at the
3   basis for Officer Schneider's stop, it's not only the
4   failure to use a turn signal, but also the other element
5   is it has to impact or affect other vehicles on the
6   roadway, true?
7          MR. POPOLIZIO:  Form.
8          THE WITNESS:  Per statute.
9   BY MS. BROADDUS:
10     Q.   And have you seen anything in this case through
11  your review of documents, your conversations with anyone
12  that you've had that would indicate whether there was any
13  traffic on Glenn that would be affected by the vehicle
14  turning into the Motel 6?
15         MR. POPOLIZIO:  Form; foundation.
16         THE WITNESS:  This particular perspective of
17  the video doesn't clearly show any of that.
18  BY MS. BROADDUS:
19     Q.   But you know if the officers are behind the
20  building or on the other side of the building that would
21  be impossible to see the roadway from where they are,
22  correct?
23         MR. POPOLIZIO:  Form; foundation.
24         THE WITNESS:  From this perspective in this
25  video, yes.

105

1   comes to mind.  But we use others from other agencies.
2   BY MS. BROADDUS:
3      Q.   Are you aware of any other agencies that have
4   used any of the videos or body-cam footage or that
5   surveillance in their training?
6      **A.   I'm not aware of it.**
7      Q.   During your tenure with Glendale, did you ever
8   provide training other than when you were -- well, let me
9   go back.
10          During your tenure with Glendale, did you
11   ever provide training to Officers Schneider, Lindsey or
12   Fernandez?
13          MR. POPOLIZIO:  Form.
14          THE WITNESS:  Officer Lindsey and Fernandez
15   came through my training squad when I was a field training
16   sergeant.  No, I'm sorry.  I don't know if Fernandez did.
17   I know Lindsey did.  No, Fernandez did not, pretty sure he
18   did not.  But not Schneider, no.  I'd have to research on
19   Fernandez, but I know that Officer Mark Lindsey came
20   through the field training squad when I was a field
21   training sergeant.
22      I know -- you asked about Schneider also.
23   Schneider is a no.  And I'm not sure about Fernandez.  I'm
24   thinking no on Fernandez.  I'm pretty sure.  In fact, I'd
25   have to verify, but I can remember the time that -- I

106

1   remember seeing him on the street.  I would indicate no to
2   Fernandez, but I'd have to check the records.
3   BY MS. BROADDUS:
4      Q.   My understanding is that Glendale has annual
5   training required for all officers, correct?
6      **A.   Yes.**
7      Q.   Are you part of the training as provided in that
8   annual training?
9      **A.   I steer it.  The training sergeant and officers
10   are the ones that put it together.**
11      Q.   Have you ever worked with Officer Schneider
12   directly?
13      **A.   Prior to this assignment, no.**
14      Q.   What about Officers Lindsey or Fernandez?
15      **A.   Lindsey came through the training squad, as I
16   indicated.**
17          **Not directly with Fernandez that I can
18   recall.  But you'll bleed over where you have -- as a
19   sergeant you respond to other scenes, and other officers
20   that aren't on your squad, will, you know, appear on that
21   scene.  And I remember him being on a few scenes over
22   time.**
23      Q.   How would you describe your relationship with
24   Officer Schneider?
25      **A.   Professional.**

107

1      Q.   Do you ever do anything outside of work with
2   Officer Schneider?
3      **A.   No.**
4      Q.   Have you ever done anything with Officers Lindsey
5   or Fernandez outside of work?
6      **A.   No.  I gave Officer Lindsey Cardinals football
7   tickets to take his grandson.  I didn't attend, but no.**
8      Q.   Did Officer Schneider ever come to you when you
9   were his lieutenant with any issues that he had regarding
10   any other officers or with regard to his duties as a
11   police officer?
12          MR. POPOLIZIO:  Form.
13          THE WITNESS:  I don't recall him coming to
14   me.
15   BY MS. BROADDUS:
16      Q.   Did anyone ever come to you other than Officer
17   Tolbert regarding issues that they had with regard to
18   Officer Schneider?
19      **A.   No, I don't recall any.**
20      Q.   As lieutenant of various officers, do you have
21   access to their disciplinary history?
22      **A.   I'm trying to recall.  You have access to their
23   file, their working file, and there's an HR file.  So if
24   something was in the short term, it could be in their
25   working file.  It may not be.  It depends on how long ago**

108

1   it was.
2          **And then our electronic system has changed a
3   couple of times.  I'm not sure of the retention on that
4   either, or if you can even -- how far you can go back to
5   look things up.**
6      Q.   When you were lieutenant over the Gateway sector
7   did you feel that it was important to know any
8   disciplinary history of the officers that you were -- that
9   were under your charge?
10      **A.   Depends on what it was and how soon.**
11      Q.   Is it something that you checked into when you
12   became a lieutenant?
13      **A.   When I came into the unit Sergeant Shoop was the
14   sergeant, and we sat down, as I do with every new
15   assignment, and just talk about the strengths and
16   weaknesses.  Nothing was brought to my attention.**
17      Q.   When you did have that sit-down to figure out
18   strengths and weaknesses, did Officer Schneider's name
19   ever come up?
20      **A.   Pretty much everybody's name came up because we
21   spoke about everybody individually, not just a question
22   general.  We went officer to officer.  So, yes, we spoke
23   about him.**
24      Q.   What do you recall speaking about and what was
25   said?

193

1       MR. POPOLIZIO:  Form --
2       THE WITNESS:  Not --
3       MR. POPOLIZIO:  -- foundation.
4       THE WITNESS:  -- in that reference, no.
5       MS. BROADDUS:  That's all I have.
6
7              FURTHER EXAMINATION
8   BY MR. POPOLIZIO:
9       Q.   Just a couple of follow-ups.
10           If a vehicle is moving, are you required to
11  be seat belted if you are the front seat passenger --
12           MS. BROADDUS:  Object to form.
13  BY MR. POPOLIZIO:
14      Q.   -- in that moving vehicle?
15      **A.   Yes.**
16      Q.   Does that matter, whether it's on private or
17  public property?
18      **A.   I honestly don't know.  I know it's required on**
19  **public property.**
20      Q.   With regard to Exhibit 35 --
21      **A.   Uh-huh.**
22      Q.   -- this is the trespassing enforcement
23  authorization form that was discussed a few minutes ago,
24  right?
25      **A.   Yes.**

194

1       Q.   Now, it says in that first line -- do you see
2   that first full paragraph -- "I hereby give authority to
3   each and every police officer of the Glendale Police
4   Department to act as my agent in enforcing the trespassing
5   laws at the property in accordance with A.R.S. 13-1502
6   through 13-1504."
7            Did I read that correctly?
8       **A.   Yes.**
9       Q.   Okay.  So one way for a police officer of the
10  Glendale Police Department to determine whether an
11  individual might be trespassing at Motel 6 is to actually
12  contact the individual as the agent of Motel 6; is that
13  right?
14      **A.   Yes.**
15           MR. POPOLIZIO:  Thank you.  I have no more
16  questions.
17           THE WITNESS:  Okay.
18           MS. BROADDUS:  I have nothing further.
19           MR. POPOLIZIO:  He will read and sign.
20           (The deposition concluded at
21                2:13 p.m.)
22
23
24
25

195

1            I, the undersigned, say that I have read the
2   foregoing transcript of testimony taken November 6, 2019,
3   and I declare, under penalty of perjury, that the
4   foregoing is a true and correct transcript of my testimony
5   contained therein.
6
7            EXECUTED this _____ day of _____, 2019.
8
9
10
11
12            _____
             LIEUTENANT EARL RALPH MONTGOMERY, III
13
14
15
16
17
18
19
20
21
22
23
24
25

196

1   STATE OF ARIZONA      )
                          ) ss.
2   COUNTY OF MARICOPA    )
3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    questions propounded to the witness and the answers of the
5   witness thereto were taken down by me in shorthand and
    thereafter transcribed through computer-aided
6   transcription under my direction; that the foregoing is a
    true and correct transcript of all proceedings had upon
7   the taking of said proceedings, all done to the best of my
    skill and ability.
8
9        I CERTIFY that I am in no way related to nor
    employed by any of the parties hereto nor am I in any way
10  interested in the outcome hereof.
11       (X) Review and signature was requested.
         ( ) Review and signature was waived.
         ( ) Review and signature was not requested.
12
13       I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA Sections 7-206(F)(3) and
    7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
14  this 2nd day of December, 2019.
15
16       _____
17           MONICA S. BERRY, RPR, CR
             Certified Reporter
18           Arizona CR No. 50234
19       *   *   *   *   *   *   *
20       I CERTIFY that Berry & Associates, LLC has
    complied with the ethical obligations set forth in ACJA
21  Sections 7-206(J)(1)(g)(1) and (6).
22
23       _____
24           BERRY & ASSOCIATES, LLC
             Registered Reporting Firm
25           Arizona RRF No. R1033

# *EXHIBIT 33*

**1**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

Johnny Wheatcroft and Anya )
Chapman, as husband and wife, and )
on behalf of minors J.W. and B.W., )
                         )
    Plaintiffs,       ) Case No.:
                ) 2:18-cv-02347-SMB
vs.            )
                )
City of Glendale, a municipal   )
entity; Matt Schneider, in his  )
official and individual       )
capacities; Mark Lindsey, in his  )
official and individual       )
capacities; and Michael Fernandez, )
in his official and individual   )
capacities,           )
                )
    Defendants.    )
                )

DEPOSITION OF SERGEANT DONALD JAMES LABRANT
Chandler, Arizona
October 14, 2019
9:59 a.m.

REPORTED BY:
MONICA S. BERRY, RPR
Certified Reporter
Certificate No. 50234

PREPARED FOR:

(COPY)

**2**

I N D E X

WITNESS                     PAGE
SERGEANT DONALD JAMES LABRANT

EXAMINATION BY MS. BROADDUS     4
EXAMINATION BY MR. POPOLIZIO   156
FURTHER EXAMINATION BY MS. BROADDUS  215

E X H I B I T S
Deposition
Exhibits   Description      Marked
26    Memo dated 4/11/18 to Staff from  119
    Sergeant D. LaBrant, Bates Nos.
    CoG_WHEATCROFT 003498-003499
    (2 pages)

27    Memo dated 6/26/18 to Donald    124
    LaBrant from Rich LeVander, Bates
    Nos. CoG_WHEATCROFT 003522-003527
    (6 pages)

28   Glendale Police Department General  151
    Order Chart of Sanctions, Bates No.
    CoG_WHEATCROFT 004083  (1 page)

**3**

1         DEPOSITION OF SERGEANT DONALD JAMES LABRANT
2  was taken on October 14, 2019, commencing at 9:59 a.m. at
3  the law offices of MARC J. VICTOR, P.C., ATTORNEYS FOR
4  FREEDOM, 3185 South Price Road, Chandler, Arizona, before
5  MONICA S. BERRY, RPR, a Certified Reporter in the State of
6  Arizona.
7
8  COUNSEL APPEARING:
9     MARC J. VICTOR, P.C.
      ATTORNEYS FOR FREEDOM
10    By:  MS. JODY L. BROADDUS
      3185 South Price Road
11    Chandler, Arizona  85248
      On behalf of Plaintiffs
12
13    JONES, SKELTON & HOCHULI, P.L.C.
      By:  MR. JOSEPH J. POPOLIZIO
14    40 North Central Avenue
      Suite 2700
15    Phoenix, Arizona  85004
      On behalf of Defendants
16
17
18
19  ALSO PRESENT:
      Ms. Kathy Thomas and Ms. Dianne Shoemake, City of
20  Glendale
      Ms. Julie Wanner, paralegal to Mr. Popolizio
21    Ms. Alexz Thompson, paralegal to Ms. Broaddus
22
23
24
25

**4**

1          SERGEANT DONALD JAMES LABRANT,
2  a witness herein, having been first duly sworn by the
3  Certified Reporter to speak the truth and nothing but the
4  truth, was examined and testified as follows:
5
6             EXAMINATION
7  BY MS. BROADDUS:
8    Q.  Please state your full name for the record.
9    **A.  Donald James LaBrant.**
10    Q.  And have you ever had your deposition taken
11  before?
12    **A.  No.**
13    Q.  I'll go through just a few ground rules just to
14  make things go a little smoother.  The court reporter is
15  going to be taking down everything said in the room, so
16  it's important that only one person speaks at a time.
17  Makes her job really hard if everyone's talking over each
18  other.  Okay?
19    **A.  Yes.**
20    Q.  And that's going to be the second rule.  I can
21  see you.  I know when you're nodding your head.  I may
22  know an uh-huh or huh-uh, but when I read it later, I
23  might not remember what your response was.  So I may just
24  ask to clarify, "Is that yes or a no?"  Okay?
25    **A.  Yes.**

9

1    was changed to the Neighborhood Response Squad?
2    **A.  I don't know when they changed the title.  Maybe**
3    **five or six years later.**
4    Q.  Do you know why they changed the title?
5    **A.  No idea.**
6    Q.   When they changed the title, did it change the
7    scope of work that the Neighborhood Response Unit was
8    doing?
9    **A.  No.  Basically the name changed, I believe, and I**
10   **think it was June of '99 that I went over to the NRS.**
11   **Basically when they changed it, you had a north squad and**
12   **you had a south squad.  As the city expanded and grew a**
13   **little bit more westbound, the south side squad had**
14   **testing, and they split that squad.  And the city council**
15   **and other political entities wanted like a downtown or**
16   **east side area, basically east of Grand.  And then the**
17   **second downtown or south side squad was pretty much**
18   **activities west of Grand, which was to include the area**
19   **that later would be Westgate.**
20   Q.   How many squads are there currently within NRS?
21   **A.  It went back to two.**
22   Q.  Do you know when that happened?
23   **A.  No.**
24   Q.   Would it have been before 2017, do you believe?
25   **A.  Oh, yes.  It was probably -- time flies.  Maybe**

10

1    **ten years ago.  And that was due to staffing issues and/or**
2    **maybe them considering starting a bike unit as we got the**
3    **Cardinal stadium.  So that's why it -- it was a personnel**
4    **thing.  So three went back.  Hey, we had one for 20 -- or**
5    **for ten years.  Let's utilize our resources for the**
6    **entertainment district and that's -- so ten years would be**
7    **a good guess.**
8    Q.   And I believe when you first went in you were an
9    officer.  Did that title change during the time that you
10   were with NRS or NRU?
11   **A.  No.**
12   Q.   Are you still considered an officer?
13   **A.  Sergeant.**
14   Q.   When did you become sergeant?
15   **A.  Six and a half years ago.**
16   Q.   Is that a position you had to test for?
17   **A.  Yes.  I think, actually, October will be seven**
18   **years.**
19   Q.    Between the time that you were first hired with
20   the NRU until now that you're a -- are you currently a
21   sergeant?
22   **A.  Yes.**
23   Q.   Has your title changed at all during that time
24   other than becoming a sergeant?
25   **A.  No.**

11

1    Q.   Did you work for any other units or divisions at
2    any time?
3    **A.  No.**
4    Q.   So it's fair to say that since joining the NRU
5    about 20 years ago you've consistently worked with either
6    NRU or NRS?
7    **A.  Yes.  It was a total of 14 years.  One year with**
8    **the academy in training, three years in patrol, 14 years**
9    **with NRS/NRU downtown squad.  And then coming up on seven**
10   **as a sergeant.**
11   Q.   How did your job duties differ from when you were
12   an officer as opposed to when you were a sergeant?
13   **A.  For patrol or for NRS?**
14   Q.   For NRS.
15   **A.  You may have understood political ramifications**
16   **of doing community service, calls for service that were**
17   **dictated by city council.  You have a better understanding**
18   **of, hey, this squad needs help so we're going to go here**
19   **for two days and then we're going to go to another area.**
20   **And then you have maybe a sector lieutenant saying, hey,**
21   **here's going to be our plan for a month.  We're going to**
22   **do something out at Westgate for a Christmas plan.  But**
23   **then an event happens, whether it's a homicide, a string**
24   **of armed robberies or burglaries, and all of the sudden**
25   **we're off that detail.  And it can be a daily change.**

12

1    **As a supervisor you're looking at the bigger**
2    **picture because generally -- I'll try to talk slow -- you**
3    **have more experience and now you're a little more**
4    **political savvy.**
5    **As an officer on the squad, you're**
6    **basically, hey, Sarge wants us to do this task today.  I**
7    **thought we were doing this other one?  Nope.  That task**
8    **has changed.**
9    **So being a moderator between tasks given and**
10   **tasks completed.  But then secondary to that is we don't**
11   **just try to hit the area and leave.  You do a little bit**
12   **of documentation or -- which can be written or verbal, and**
13   **say, hey, lieutenant, this is what we did in this area.**
14   **Because if it's a city council request or a commander**
15   **request, obviously the lieutenant will want to relay that**
16   **information back up.**
17   **So as supervisor, you would input**
18   **information, work a task, and then you'd have to give an**
19   **analysis of what you did or just an informational update,**
20   **something that you didn't do as an officer within the**
21   **group.  You just kind of went to where you were told.**
22   Q.   So is it fair to say that one of the main
23   differences between an officer of NRS and a sergeant of
24   NRS is the sergeant is more of a supervisor position?
25   **A.  Yeah, low -- low-management position.**

13

1    Q.   When you were an officer with NRS, after it went
2  back to the two divisions, north and south, did you work
3  for both divisions?
4    **A.   No.**
5    Q.   Was there one that you normally worked in?
6    **A.   South side, or out of Gateway.**
7    Q.   As sergeant, are you assigned to one of the two
8  divisions, north or south?
9    **A.   Yes.  The -- you could call it south side or you**
10 **could call it the Gateway division.**
11   Q.   When you became sergeant of NRS -- within NRS,
12 were you assigned to Gateway at that point?
13   **A.   Yes.**
14   Q.   Have you always been with Gateway as sergeant?
15   **A.   Yes.**
16   Q.   About how many officers are currently a member of
17 Gateway south division?
18   **A.   Generally it's six.**
19   Q.   When you say generally, is that just people
20 moving in and out over the years?
21   **A.   At one time we were at that time five, but we**
22 **were going to be supplemented by two gang officers.  One**
23 **was reassigned for investigation purposes and we were six.**
24 **So were we technically seven or were we five and two and**
25 **one came over to us -- basically always the number's about**

14

1  **six.**
2    Q.   So the events we're going to be talking about
3  happened in -- relating to the officers, Glendale and the
4  Wheatcroft family took place in July of 2017.  Is it fair
5  to say that you were the sergeant of the Gateway division
6  of NRS at that time?
7    **A.   Yes.**
8    Q.   And do you recall who the officers were in your
9  division back in July of 2017?
10   **A.   Yes.**
11   Q.   Who were they?
12   **A.   I'm going to go around the room.  Myself, Officer**
13 **Schneider, Officer Lindsey, Officer Pittman, Officer**
14 **Lewis, Officer Tolbert and Officer Johnston.**
15   Q.   Were officers -- was Officer Fernandez, was he
16 ever part of your division?
17   **A.   Yes.**
18   Q.   When was he part of your division?
19   **A.   I want to say that he came over late fall of**
20 **2017.**
21   Q.   Is he still -- and he's no longer with that
22 division, correct?
23   **A.   He is with that division.**
24   Q.   Okay.  As sergeant do you have any say as to
25 which officers are part of your division?

15

1    **A.   We have an oral board testing process.  The one**
2  **that I sat on, there was myself, and I think one was a**
3  **lieutenant.  It was right about the same time -- I think**
4  **there was -- there was three of us.  We had a sergeant, a**
5  **lieutenant and an officer.**
6    Q.   Who's currently the sergeant with regard to the
7  north division of NRS?
8    **A.   Sergeant Aron Aldridge.**
9    Q.   Back in July of 2017 do you know who the sergeant
10 was at that time?
11   **A.   Of north?**
12   Q.   Yes.
13   **A.   Sergeant Aldridge.  He's been there for probably**
14 **more than ten years.**
15   Q.   Any other sergeants that were part of NRS in 2017
16 to the present?
17   **A.   No.  Sergeant Aldridge was up north, and I was**
18 **sergeant down south.**
19   Q.   What is Sergeant Shoop's role with NRS?
20   **A.   I replaced him.**
21   Q.   When did you replace Sergeant Shoop?
22   **A.   I'd say June of 2016.**
23   Q.   When you came in to NRS as sergeant and you
24 replaced Sergeant Shoop, did you have any conversations
25 with Sergeant Shoop about their direction of NRS or any

16

1  issues relating to the members of NRS?
2    **A.   Yes.**
3    Q.   Tell me what you recall from that conversation.
4    **A.   There was a squad divide.**
5      MR. POPOLIZIO:  Excuse me.  Is there any way
6  we can get the Michael Jackson lower?
7      (An off-the-record discussion ensued.)
8  BY MS. BROADDUS:
9    Q.   As sergeant with NRS, are you responsible for the
10 training of any of the officers within NRS?
11   **A.   You can do in-house training and give direction,**
12 **but most training, if you call it official training, is**
13 **going be done by somebody out of the training division.**
14   **So, for example, I'm not training them on**
15 **how to drive cars.  That would be somebody out at the**
16 **track.  I'm not training them on how to shoot.  Have we**
17 **gone out to the range to work drills?  Yes.  But as far as**
18 **official training or documented training, that would come**
19 **from our training division.**
20   Q.   Since you became supervisor -- I'm sorry --
21 sergeant within NRS, what in-house training have you
22 provided?
23   **A.   At that time there was a training manual for**
24 **procedures on how to do knock-and-talks, outlines on that.**
25 **But when I got there, everybody was past that time.  While**

17

1  I was in there, eventually we had two new officers,
2  Officer Collins and Officer Fernandez.  So they did a real
3  brief FTO with a -- with one of the officers, and I
4  believe it was Jeff Pittman, where they would check off,
5  hey, I did a knock-and-talk.  So it might be something
6  that a patrol officer wouldn't have.  How to write a
7  search warrant would be something that a patrol officer
8  might not have experience at.
9          Even as far as doing different community
10 events, because a lot of times in patrol if they came on
11 swing shift they hadn't -- really actually had access to
12 community events because we're going call to call.
13     Q.  Within the Gateway division of NRS, I believe you
14 mentioned it's currently six officers.  During your time
15 there, are those officers that are under you that are part
16 of that unit, is there a hierarchy among them that they
17 have seniority over the others?
18     A.  One of the big concepts within NRS, is it's a
19 team.  But obviously if you have somebody that's been
20 there for three years and we have another officer that's
21 been there for a long time, but there's -- there's not a
22 rank structure of corporal number one, number two, number
23 three.  Anybody and everybody equally should have a say on
24 how we're going to do things, and that's how we try to
25 manage.

18

1          I know at the beginning of the week I'd go
2  around the table and ask, hey, what would you like to get
3  done?  And they'd say, I'd like to pick up this guy.  He's
4  got a felony warrant.  And then I go to the next person
5  and say, hey, what would you like to get done?  Hey,
6  patrol gave me information on a drug house.  And go around
7  the table that way.
8          And whatever looked like it was maybe going
9  to be the fastest or easier, maybe we'd start with that
10 just because we get pulled so many different directions.
11         So that's kind of at the discretion of the
12 squad or the supervisor.  If one project was going to take
13 longer, but you could knock out three other projects,
14 you'd probably go with the easiest first.
15     Q.  During your time that you've been a sergeant with
16 NRS, did you ever assign a particular officer as the
17 leader of NRS under you?
18     A.  No.
19     Q.  Did you review any documents to prepare for your
20 deposition today?
21     A.  Yes.
22     Q.  What did you review?
23     A.  I reviewed my PSU interview reference workplace
24 complaint.  I reviewed Officer Tolbert's deposition.  I
25 reviewed my annual review in, I'll say, May of 2017 from

19

1  Officer Tolbert, and I reviewed her rebuttal to that --
2  her rebuttal to the annual eval.  And then I reviewed her
3  complaint that she made to the City, which was a separate
4  document.
5     Q.  Did you review any of the other depositions that
6  were taken in this case other than Officer Tolbert?
7     A.  No.
8     Q.  Did you review any videos?
9     A.  No.
10    Q.  Did you review the police report relating to the
11 Wheatcroft incident?
12    A.  I did.
13    Q.  Did you review any of the internal affairs
14 investigation relating to Officer Schneider as it relates
15 to the Wheatcroft matter?
16    A.  I don't believe -- I don't believe so.
17    Q.  Have you ever seen the videos?
18        And when I talk about the Wheatcroft matter
19 I'm talking about the incident that occurred in July of
20 2017.  I want to make sure we have the same understanding.
21 Is that your understanding as well?
22    A.  Yes.
23    Q.  Did you review -- when was the last time -- well,
24 let me ask you first, have you seen the video, the
25 body-cam footage relating to the Wheatcroft incident?

20

1     A.  No.
2     Q.  Have you seen any of the surveillance videos from
3  the motel?
4     A.  Not as I'm viewing the surveillance videos.  All
5  the videos that I saw, for the first time I saw them was
6  actually the first time it was on the news.
7         MR. POPOLIZIO:  It was on the what?
8         THE WITNESS:  On the news.
9  BY MS. BROADDUS:
10    Q.  And I believe that was back in like February-ish
11 of this year.  Does that sound --
12    A.  Prior to that I had no viewing.  It was an
13 investigation that was above me at that time so...
14    Q.  After you saw -- what was your initial reaction
15 when you saw the videos on the news?
16        MR. POPOLIZIO:  Objection; form.
17        Go ahead.
18        THE WITNESS:  Concern for Mark Lindsey who
19 was knocked out.  And I really didn't have any other
20 objections to the video.
21 BY MS. BROADDUS:
22    Q.  Did you have any concerns other than the concern
23 for Mark Lindsey as to how the officers conducted
24 themselves that day?
25    A.  Absolutely not.

33

```
 1   going to answer that question how you're asking it to how
 2   I'm understanding that you're asking it.
 3          If officers are turning in a report, it
 4   needs to be done to the best of their ability.  By
 5   completely omitting something that's in regards to the
 6   report, that would be wrong.
 7   BY MS. BROADDUS:
 8      Q.  As sergeant and supervisor of officers of NRS, do
 9   you have any duty to ensure that your officers are
10   complying with the policies and procedures on doing their
11   reports?
12      A.  Yes.
13      Q.  What do you do to make sure that they're
14   complying with what the rules require?
15      A.  Well, when I read reports -- you read the report,
16   see if it has the reason that they went out with them.
17   Generally if the crime that they were arrested for, if it
18   has all the elements that's needed for the crime, whether
19   it's possession of this or whether there's reasonable
20   suspicion, and just make sure that the report is -- I
21   can't always say accurate, because if I wasn't at the
22   scene, but the report has all the elements of the crime,
23   reason for the stop, is well-written and gives an account
24   for what had happened.
25      Q.  If you learned that after you reviewed a report
```

34

```
 1   that there was other information that the officer failed
 2   to include that would have been relevant, do you take any
 3   steps to make sure that it gets added or is that something
 4   that would be -- you discuss with the officers or is some
 5   disciplinary process that that officer would go through?
 6          MR. POPOLIZIO:  Form; foundation.
 7          THE WITNESS:  It would have to depend -- I
 8   mean, that's kind of a broad question.  What's the crime?
 9   What's the details missing?
10          For example, you know, last week I read an
11   officer's report and it just -- the report ended.  And I
12   read it and said, this doesn't read well.  Did you read
13   the suspect Miranda?
14          Well, no.
15          Well, why don't you do a supplement saying
16   why you didn't read the suspect -- I didn't read the
17   suspect Miranda because she was mad at me and didn't want
18   to talk to me anyways.  It makes a better and more
19   accurate and clear report.  So on that case I had him
20   write a supplement to clean this up so it reads well, it's
21   more complete.
22          If I wasn't there, there might be something
23   omitted that I don't know about.  But if their reports are
24   inaccurate, they need to make corrections on it, whether
25   that's -- that would go pretty much through a supplemental
```

35

```
 1   report.
 2   BY MS. BROADDUS:
 3      Q.  Do officers have discretion reporting the use of
 4   force or resistance -- response to resistance?
 5      A.  No.
 6      Q.  That's a required -- it's mandatory?
 7      A.  Yes.
 8      Q.  When an officer is considered a victim in a
 9   situation, do they continue to investigate whatever the
10   allegations are, the underlying matter?
11          MR. POPOLIZIO:  Form; foundation.
12          THE WITNESS:  No.  They're treated as a
13   victim.  They won't have anything to do with that,
14   investigating that case.
15   BY MS. BROADDUS:
16      Q.  Is it department policy that they allow that
17   to happen, that they allow the investigation to take place
18   and they don't continue to investigate?
19      A.  Yes.
20      Q.  In this matter involving the Wheatcrofts, Officer
21   Schneider and Officer Pittman had indicated that they went
22   to the motel sometime after the incident happened to
23   review surveillance footage.  Do you know why they would
24   not have made any supplemental reports or reported that
25   information or documented that information anywhere?
```

36

```
 1          MR. POPOLIZIO:  Form; foundation.
 2          THE WITNESS:  I really didn't have anything
 3   to do with the investigation or read into that
 4   investigation during that time frame.  So I...
 5   BY MS. BROADDUS:
 6      Q.  What you just mentioned, that consistent with
 7   policies and procedures with Glendale, since Officer
 8   Schneider listed himself as a victim he should not have
 9   been continuing to investigate by going to the hotel; is
10   that true?
11          MR. POPOLIZIO:  Form.
12          THE WITNESS:  If part of the investigation
13   was missing something and he had new information, he may
14   have been seeing if there was a certain camera angle and
15   then letting somebody else know.  He wouldn't write a sup
16   to it himself.
17   BY MS. BROADDUS:
18      Q.  In this situation he went out, even though he was
19   listed as a victim, to go look at video, and he never did
20   any supplemental reports on that.  Is that something
21   that's against policy and procedure with Glendale?
22          MR. POPOLIZIO:  Form and foundation.
23          THE WITNESS:  Not necessarily, if he's
24   looking to find some kind of evidence that is going to
25   clear or change up a question.  Because Motel 6 has many
```

(Pages 33 to 36)

9

## 37

1  cameras.  Some of them may work.  Some of them may not
2  work.  It depends on, you know, this one's out and they
3  didn't fix it or they fixed it.
4      I can tell you that when you walk into the
5  office there's a large-screen TV, and it's divided up into
6  boxes.  So if you asked me if there was a north camera, I
7  don't know, but you could find that out.  So if he was
8  looking for something that he could give to
9  investigations, that wouldn't be against policy.
10 BY MS. BROADDUS:
11     Q.  But it should have been something that should
12 have been reported, correct?
13         MR. POPOLIZIO:  Form.
14         THE WITNESS:  If he went out there to look
15 for a camera angle and it wasn't there, does he need to do
16 a supplement?  I'd say no.
17 BY MS. BROADDUS:
18     Q.  In this situation, Officers Schneider and Pittman
19 contend that this video showed evidence to support their
20 position that there was no turn signal.  Isn't that
21 something that would have been important to include in the
22 report?
23         MR. POPOLIZIO:  Form.
24         THE WITNESS:  If there was another camera
25 angle that could have shown the stop and it wasn't

## 38

1  collected, yeah, that's something that they probably
2  should have wrote a sup to or at least made somebody that
3  was doing an investigation aware of.
4  BY MS. BROADDUS:
5      Q.  And were you aware that Officer Schneider did not
6  report the response to resistance regarding his kicks or
7  stomps on Mr. Wheatcroft?
8          MR. POPOLIZIO:  Form; foundation.
9          THE WITNESS:  He wouldn't have been the one
10 to do that.  It would have had to have somebody
11 investigating the crime at that point where he's going to
12 be under in investigation and he wouldn't do his own use
13 of force.
14 BY MS. BROADDUS:
15     Q.  But if he didn't tell someone that that happened
16 then they couldn't report it, true?
17         MR. POPOLIZIO:  Form.
18         THE WITNESS:  Depends on where you're at in
19 the investigation.
20 BY MS. BROADDUS:
21     Q.  Well, Officer Schneider, and him relaying his
22 version of what happened to the investigating officer, he
23 should have reported any kicks or stomps on a suspect,
24 correct?
25         MR. POPOLIZIO:  Form.

## 39

1          THE WITNESS:  As far as I know he did.
2  BY MS. BROADDUS:
3      Q.  But he would be required to do that.  That's part
4  of policy, true?
5      A.  If he used some force, as soon as practical.  If
6  you're saying within the first minute of the scene or
7  first five minutes of the scene, it's not practical.  If
8  you're talking to an investigator later, yes, that would
9  be the most practical time to contact a supervisor,
10 investigator.
11     Q.  As sergeant do you have any obligation to report
12 failures or violations of City of Glendale's policies and
13 procedures?
14     A.  Yes.
15     Q.  Who do report them to?
16     A.  Well, depending on -- you're always going to let
17 your supervisor above you know, but if you have a policy
18 that's broken and it requires a departmental
19 investigation, then that would go more to like maybe a PSU
20 issue, profession standards unit.
21     Q.  When you got back from your vacation, was this
22 matter already in PSU?
23     A.  Yes.
24     Q.  Have you ever suspected that an officer was not
25 being honest in preparing their report?

## 40

1      A.  No.
2      Q.  Do you always take the officer's word as to their
3  version of events?
4          MR. POPOLIZIO:  Form.
5          THE WITNESS:  I'd say most cases, yes.
6  BY MS. BROADDUS:
7      Q.  What types of cases wouldn't you take the
8  officer's word?
9          MR. POPOLIZIO:  Form; foundation.
10         THE WITNESS:  I don't know.
11 BY MS. BROADDUS:
12     Q.  Well, if you saw a video that was inconsistent
13 with the officer's reporting, would that be an issue that
14 you would be concerned about?
15     A.  That could be a concern, yes.
16     Q.  Is that something that you would feel you would
17 be obligated to address with the officer and possibly
18 report to a higher level?
19     A.  Yeah, through a --
20         MR. POPOLIZIO:  Form.
21         THE WITNESS:  I'm sorry.  If there was
22 policy violations, yes.
23 BY MS. BROADDUS:
24     Q.  Have you ever reported an officer for being
25 dishonest --

41

1    **A.  No.**
2    Q.  -- in their reporting?
3    **A.  No, sorry.**
4    Q.  As sergeant of the Neighborhood Response Unit,
5  did you ever provide any directives or instructions to
6  your officers regarding the use of Tasers?
7    **A.  We have annual officer training, which is called**
8  **AOT.  Most AOTs -- I'm not saying all of them -- will**
9  **touch base on the training as far as, you know, one year**
10  **it might be baton and chemical agents and the next year it**
11  **might be tasering.**
12      **But generally on a lot of those equipment on**
13  **our bat belt, that's covered in our annual officer**
14  **training.  There's also -- you'll have in-house videos or**
15  **readdressing uses of the Taser or cap stun or baton train.**
16      **Did I take the squad out and show them, this**
17  **is the Taser, this is -- no, I didn't do that.**
18    Q.  Did you ever have any discussions with your unit
19  as to appropriate times to use or not use your Taser?
20    **A.  No.**
21    Q.  Did you ever have any discussions with any of
22  your officers as to potential excessive use of Tasers?
23    **A.  No.**
24    Q.  Did you ever have any conversations with your
25  officers regarding probable cause for stopping a vehicle?

42

1    **A.  No.**
2    Q.  Did you ever have any conversations with your
3  officers about deescalation tactics?
4    **A.  No.**
5    Q.  And just for clarification, when I'm asking those
6  questions about these conversations, it was either before
7  or after this Wheatcroft incident.
8      So anytime that you were a sergeant you
9  never had any of those discussions about those topics.  Is
10  that a fair statement?
11    MR. POPOLIZIO:  Form.
12    THE WITNESS:  I will say -- because
13  generally when you're talking about different routine
14  police training issues, yeah, we didn't go over when
15  you're supposed to use your cap stun or not.  Most of the
16  people on the squad have been officers for five to
17  ten years.
18      There were memos put out reference Taser
19  training.  And basically what was brought out was the --
20  our chart on escalating factors and when we could use cap
21  stun, when we could use the Taser, when we could use the
22  baton and various trainings were put out on that, when we
23  could use lethal force or not lethal force.  So there was
24  discussions in reference this incident.
25  ///

43

1  BY MS. BROADDUS:
2    Q.  Were those memos or those discussions before or
3  after this Wheatcroft incident?
4    **A.  Besides annual officer training where the Taser**
5  **was -- the retraining on that, that came out after the**
6  **Wheatcroft incident.**
7    Q.  After this incident involving the Wheatcrofts,
8  did you, as sergeant, take any steps to try to prevent
9  similar situations?
10    MR. POPOLIZIO:  Form.
11    THE WITNESS:  No.
12  BY MS. BROADDUS:
13    Q.  Did you receive any e-mails regarding the
14  Wheatcroft incident?
15    **A.  I do not know.**
16    Q.  If you did, would those be something you would
17  keep in your e-mail or do you delete them after you get
18  them?
19    **A.  Not right after, but every couple months I clean**
20  **out my computer.  So it would not be on there now.**
21    Q.  What would you say that you do as sergeant to
22  monitor the members of the Neighborhood Response Unit?
23    **A.  Well, the Neighborhood Response Unit is a**
24  **specialized uniform patrol unit where we go to problem**
25  **areas or do whatever command staff or go to areas where**

44

1  **command staff -- I try to be out on the street as much as**
2  **possible.  So I'll say that I monitor my people by being**
3  **out on the street with them.**
4    Q.  Do you ever correct any of the officers from
5  anything they may be doing that you might think is
6  questionable as to whether they fall within policy?
7    **A.  I haven't observed that.  A lot of my experience**
8  **comes on the tactical side.  So if somebody approached a**
9  **house wrong or didn't use any officer safety issues, I**
10  **would address that with them.  But if there is a subject**
11  **that needs to be addressed, I'll address it with them.**
12    Q.  When did you first learn about some kind of
13  disarray or problems within the Neighborhood Response
14  Unit?
15    MR. POPOLIZIO:  Form.
16    THE WITNESS:  Well before I joined that
17  squad.
18  BY MS. BROADDUS:
19    Q.  How would you describe your relationship with
20  Officer Schneider?
21    **A.  Work associate, but more than just an associate.**
22  **I'm friends with him at work.**
23    Q.  Do you ever do things with Officer Schneider
24  outside of work?
25    **A.  Never.**

57

1                    (Video played.)
2    BY MS. BROADDUS:
3       Q.   This is the video of the hotel, and it's playing
4    right now.  I'm going to stop it in a second here.  This
5    is video surveillance from Motel 6.  And in this video you
6    see a car that -- we're at 12 seconds in, and you see a
7    vehicle on the right-hand side, a silver vehicle that has
8    just -- the nose is about at the arches at the motel.  Do
9    you see that?
10      A.   Yes.
11      Q.   Are you familiar with this location?
12      A.   Yes.
13      Q.   And my understanding is this is the Motel 6.  Are
14   you familiar with that archway to come in?
15      A.   Yes.
16      Q.   What's the street that that vehicle would have
17   been coming in on?
18      A.   Glenn.
19      Q.   And at this point Officers Schneider and Lindsey
20   are in a patrol vehicle on the other side of the building.
21   You can barely see the nose of the vehicle.  Do you see
22   that?
23      A.   Can you pull it one frame further, maybe.
24                   (Video played.)
25   ///

58

1    BY MS. BROADDUS:
2       Q.   Okay.  I'll certainly play it, but in this one
3    you can barely see something, correct?
4       A.   It's right by the trash cans, the trash dumpster
5    up there.
6       Q.   I'm now stopped at the 13-second point, and you
7    can see the front portion of the patrol vehicle in the
8    back alley, correct?
9       A.   Yes.
10      Q.   And you see the vehicle's already completed its
11   turn, true?
12                   MR. POPOLIZIO:  Form.
13   BY MS. BROADDUS:
14      Q.   The silver vehicle.
15                   MR. POPOLIZIO:  Form.
16                   THE WITNESS:  Yes.
17   BY MS. BROADDUS:
18      Q.   And are you familiar with this building?
19           Is there a way to see Glenn Street from the
20   back alley where the patrol vehicle is?
21                   MR. POPOLIZIO:  Form.
22                   THE WITNESS:  You can.  If you're on the
23   side of the building you can see south to Glenn.
24   BY MS. BROADDUS:
25      Q.   So you would have to beyond the building.  You

59

1    can't see through the building, correct?
2       A.   Correct.
3       Q.   And at this point when the nose of the vehicle --
4    you can't tell from this video from this angle whether
5    it's even parallel with the edge of the building, correct?
6                    MR. POPOLIZIO:  Form.
7    BY MS. BROADDUS:
8       Q.   The patrol vehicle I'm talking about.
9                    MR. POPOLIZIO:  Form; foundation.
10                   THE WITNESS:  The vehicle is on the north
11   side of the building, is what I see.
12   BY MS. BROADDUS:
13      Q.   Yeah, the patrol vehicle.
14      A.   Yeah, I see that.
15      Q.   You notice there's several vehicles in the
16   parking lot, true?
17      A.   Yes.
18      Q.   And, for example, there's one just to -- just a
19   little bit to the right of the Taurus that's coming in
20   through the archways.  It's kind of parked over the white
21   line.  Do you see that?
22           It's a dark vehicle.
23      A.   Yes.
24      Q.   A little further up there's a handicapped space
25   on that same side, a vehicle that's backed in, correct?

60

1       A.   Yes.
2       Q.   And on the other side there's also another
3    handicapped parking space, and next to that there's
4    another vehicle that's backed in, true?
5       A.   Yes.
6       Q.   All right.  Apparently have an issue here.  We'll
7    switch to another video.  Hold on just a second here.
8    I've got to pull up the other -- sorry guys.
9            Where's the other videos?
10           (An off-the-record discussion ensued.)
11   BY MS. BROADDUS:
12      Q.   We'll come back to this.  I've got plenty of
13   questions to come back to.
14           You mentioned earlier you're familiar with
15   Glendale policies and procedures.  What do you do to
16   ensure that your officers within your division are
17   complying with policies and procedures?
18                   MR. POPOLIZIO:  Form; foundation.
19                   THE WITNESS:  I try to ride with most
20   officers and observe their behaviors, make sure --
21   policies are general rules.  So if I get an ABL hit, which
22   is a speed hit, then I review the video, address that with
23   my supervisor and see what direction -- if they want to do
24   a DI, a log notation.
25           So for policies I try to monitor my

61

1   employees' work when I'm not with every employee every
2   moment they're at work.
3   BY MS. BROADDUS:
4       Q.  As sergeant of the Neighborhood Response Unit, do
5   you believe you have a duty to ensure that your officers
6   are not violating rights of citizens?
7           MR. POPOLIZIO:  Form.
8           THE WITNESS:  Yes.
9   BY MS. BROADDUS:
10      Q.  When there is a situation involving use of Tasers
11  my understanding is that there's a policy within Glendale
12  that the parts of the body that are tased are required to
13  be photographed.  Are you aware of that?
14      **A.  Yes.**
15      Q.  And as sergeant of NRS do you do anything to
16  follow up to make sure that happens?
17      **A.  I don't view photographs.  There's a Taser**
18  **worksheet that's supposed to be filled out.  We go into a**
19  **different system where now it falls under use of force;**
20  **you say the person's name, location, DR and where they**
21  **were tased, and the Tasers are downloaded by different**
22  **individuals responsible for that.**
23      Q.  Who fills out the Taser worksheet?
24      **A.  The Taser worksheet, when they download it, the**
25  **video, that's going to be a guy that has specialized**

62

1   **training from Taser.**
2       Q.  So it's not the investigating officer who fills
3   out at worksheet as to what parts -- body parts were
4   tased?
5       **A.  I don't believe so.**
6       Q.  On the day of the incident when Mr. Wheatcroft
7   was arrested, he informed the officers he was tased in the
8   testicles, perineum area.  Do you know why no one ever
9   photographed the Taser marks --
10          MR. POPOLIZIO:  Form.
11  BY MS. BROADDUS:
12      Q.  -- or the Taser area?
13          MR. POPOLIZIO:  Form; foundation.
14          THE WITNESS:  I wasn't there.
15  BY MS. BROADDUS:
16      Q.  Do you ever have any discussions with the
17  officers within NRS as to policies and procedures as to
18  what body parts can or should be tased or should not be
19  tased?
20          MR. POPOLIZIO:  Form.
21          THE WITNESS:  That's covered in our annual
22  AOT by a certified Taser instructor.
23  BY MS. BROADDUS:
24      Q.  But you have never done any independent training,
25  correct?

63

1       A.  No.
2       Q.  Is a passenger in a vehicle required to talk to
3   officers?
4           MR. POPOLIZIO:  Form; foundation.
5           THE WITNESS:  Depends on the situation.
6   BY MS. BROADDUS:
7       Q.  If a person who is not engaged in any illegal
8   activity and there's no probable cause to suspect that
9   person of any criminal activity, does that person have to
10  speak to a police officer?
11          MR. POPOLIZIO:  Form; foundation.
12          THE WITNESS:  If the person's not committing
13  a crime, no, he's a passenger in a vehicle; however,
14  conversation was spurred, from the video that I saw,
15  reference a lot of his body movement.
16  BY MS. BROADDUS:
17      Q.  I'm confused.  Are you saying that body movement
18  would require someone to speak to an officer?
19      **A.  Yeah.  I would address body movement, and if they**
20  **failed to -- you have to control the situation.  So if you**
21  **have a passenger, and they're not complying with what you**
22  **tell them to do, then it's a safety issue.**
23      Q.  And my question is a little bit different.  My
24  question is that, does that person have to speak to the
25  officer?

64

1       **A.  If he doesn't want to speak to you and there's no**
2   **reason that he has to speak to you, then I would say no.**
3       Q.  Does Glendale have any policies or procedures for
4   handling someone, civilian who does not want to talk to
5   the police?
6           MR. POPOLIZIO:  Form.
7           THE WITNESS:  I couldn't tell you what the
8   policy would be on that offhand.
9   BY MS. BROADDUS:
10      Q.  Are you aware of any policy?
11      **A.  No, I am not aware.**
12      Q.  What is your understanding as to situations as to
13  when a passenger is required to provide identification?
14      **A.  My understanding is if they're not wearing their**
15  **seat belt, that would be a violation.  And later on if**
16  **something's discovered in a car, you could interview them**
17  **because there's different areas in the car.  I mean, if**
18  **something's found that's illegal in the car, you'd**
19  **probably have a conversation with everybody that was in**
20  **the car.**
21      Q.  And a passenger only has to provide -- disclose
22  what their identification is.  They don't have to actually
23  provide a copy of their identification, correct?
24      **A.  I believe -- I believe it's name and date of**
25  **birth.**

113

1   force by any officers of NRS at any time other than the
2   ones you've mentioned?
3      **A.**  No.
4      Q.  Was Officer Carroll a member of NRS?
5      **A.**  No.
6      Q.  Did you have any supervision over Officer
7   Carroll?
8      **A.**  No.
9      Q.  Did you work with him?
10     **A.**  No.
11     Q.  Do you know what division he was a part of?
12     **A.  He was mostly up at Foothills.  And then like the**
13  **last six months of his career, four months he was down at**
14  **Gateway.**
15     Q.  Were you involved in any investigation of Officer
16  Carroll?
17     **A.**  No.
18     Q.  And I believe you said Sergeant Aldridge was part
19  of NRS, correct?
20     **A.  He was Gate -- or not Gateway.  He was north side**
21  **Foothills supervisor.**
22     Q.  Are you aware of any allegations of excessive
23  force by Sergeant Aldridge?
24     **A.  Yes.**
25     Q.  And I'll refer to it as an incident involving a

114

1   person on a bike who had gotten off the bike and Sergeant
2   Aldridge tased him.  Is that the incident that you're
3   referring to?
4      **A.  Yes.**
5      Q.  Are you aware of any other incidents involving
6   allegations of excessive force involving Sergeant
7   Aldridge?
8      **A.**  No.
9      Q.  Were you involved in the decision for Cops to
10  come in to video and film?
11     **A.  Absolutely not.**
12     Q.  Did you have any role in reviewing the broadcasts
13  or the footage before it aired?
14     **A.**  No.
15     Q.  Did you have any say into which officers would be
16  a part of the Cops TV who would be filmed?
17     **A.**  No.
18     Q.  Do you know who --
19     **A.  Well, we try to spread it around for the squad.**
20  **You know, if somebody's on vacation and it was going to**
21  **be -- technically they were going to ride for a few days.**
22  **But there isn't any chart or graph or, you're going to**
23  **ride this day, you're going to ride this day.**
24     Q.  Recently in the media there was a video published
25  by one of the news crews related to the Cops footage that

115

1   was not aired originally.  And there was a statement made
2   by Officer Schneider that talked about when a suspect
3   runs, and he says, "This is what happens when I run out of
4   steam, Dude.  I just give up and go to the Taser."
5         Were you aware that he had said that?
6      **A.  Is it like a snippet of the show or something**
7   **afterwards?**
8      **I didn't see any of the snippets.**
9      Q.  So you were unaware that he had said that?
10     **A.  Huh-uh.**
11     Q.  Is that a no?
12     **A.**  No.
13     Q.  Has he ever said anything to you or has there
14  been anyone that reported to you about Officer Schneider
15  going to the Taser when he just runs out of steam when
16  he's following someone?
17     **A.**  No.
18     Q.  How do you feel Officer Schneider's reputation
19  was with NRS when you were supervising him?
20        MR. POPOLIZIO:  Form.
21        THE WITNESS:  His reputation is he's a hard
22  worker.
23  BY MS. BROADDUS:
24     Q.  My understanding is he was one of the highest
25  producers for the department; is that true?

116

1         MR. POPOLIZIO:  Form.
2         THE WITNESS:  I would say he would be top
3   five officers in the department if you're looking at
4   arrests and contacts and not just reports taken, what we
5   call 6s.
6   BY MS. BROADDUS:
7      Q.  Did anyone ever come to you as sergeant as to any
8   issues regarding Officer Schneider, other than Officer
9   Tolbert?
10     **A.**  No.
11     Q.  Did anyone ever come to you about any issues
12  relating to Officers Lindsey or Fernandez?
13     **A.  Would you repeat the question, please.**
14     Q.  Sure.  Did anyone ever come to you when you were
15  sergeant of NRS as to any issues relating to
16  Officer Lindsey or Officer Fernandez?
17     **A.  Not Officer Lindsey.  And Fernandez had some use**
18  **of force before he came.  So I don't know if that's what**
19  **you're talking about, or the fact he had had a close**
20  **relationship with Roy Lewis.  And that later came out that**
21  **some comments were made by Officer Fernandez.**
22     Q.  As sergeant of NRS, did you have any concerns
23  about use of force or response to resistance by the
24  officers?
25     **A.**  No.

161

163

6    Q.   Now, just remind me real quickly, how many years
7  were you a member of the Neighborhood Response Squad, or
8  NRS, in total?
9    **A.   14.**
10    Q.   And how many of those years did you spend as a
11  sergeant?
12    **A.   14 plus two, so 16 total.**
13    Q.   In NRS?
14    **A.   Yes.**
15    Q.   So you were a sergeant --
16    **A.   For two years.  I was a member for 14.  Sorry I**
17  **interrupted you.**
18    Q.   And when you were a sergeant in NRS, that was
19  over the Gateway NRS, correct?
20    **A.   Yes.**
21    Q.   And when you were the sergeant over at NRS, you
22  supervised the officers who were members of that squad,
23  right?
24    **A.   Yes.**
25    Q.   I mean, you explained earlier.  That's what

162

164

1  sergeants do, right?  They supervise officers?
2    **A.   Yes.**
3    Q.   And you, I think, categorized yourself as a --
4  how did you say it, first line?
5    **A.   I'm a first-line supervisor.**
6    Q.   Now, during that time at NRS as a sergeant you
7  supervised Matt Schneider, correct?
8    **A.   Yes.**
9    Q.
10
11
12
13
14    Q.   NRS -- just so I can get it right, the purpose of
15  NRS or the mission of NRS is what?
16    **A.   NRS is a specialized uniform squad that aids**
17  **patrol, aids upper staff and, you know, people within the**
18  **city, the council, for problems.  We go to geographical**
19  **areas that have problems or higher amount of crime.  We're**
20  **basically adding -- we're multiplying the number of**
21  **officers than a usual beat officer.  We're specialized to**
22  **go to an area, fight crime, and then the next week it**
23  **could be something else.  We may go to a different area**
24  **and then a different area.  And it's dictated by crime**
25  **stats.  It's dictated by lieutenants, commanders and chief**

173

1  foundation.
2        THE WITNESS:  No.
3  BY MR. POPOLIZIO:
4    Q.  I'm asking only about what you may have observed.
5    A.  No.
6    Q.  You understood that, right?
7    A.  Yes.
8    Q.  During your time as supervisor of NRS, did any
9  officer ever complain that Officer Schneider used
10 excessive force on an individual, you know, during his
11 shift?
12   A.  No.
13       MS. BROADDUS:  Object to form and
14 foundation.
15 BY MR. POPOLIZIO:
16   Q.  And again, I'm asking you if anybody came to you
17 to complain.  You understood that, right?
18   A.  That he used excessive force on a suspect?
19   Q.  Yes.
20   A.  No.
21   Q.  He did not?
22   A.  No.
23   Q.  No one complained to you about that?
24   A.  No.
25   Q.  Now, during your time as supervisor of NRS, do

174

1  you know if Officer Schneider had any excessive force
2  complaints against him by members of the public?
3    A.  Minus the --
4    Q.  Aside from the Wheatcroft incident.
5    A.  He hasn't had any excessive force -- uses of
6  force his entire career.
7    Q.  Aside from the one that's the subject incident of
8  this lawsuit?
9    A.  Correct.
10       MS. BROADDUS:  Belated objection to
11 foundation.
12 BY MR. POPOLIZIO:
13   Q.  How do you know that, that he hasn't had any
14 other excessive force complaints against him except for
15 the Wheatcroft incident?
16   A.  While doing ratings, we can look back or question
17 PSU that, do they have anything in their file over the
18 last three years?
19       And in reference this, I asked Officer
20 Schneider, "When's the last time you got in trouble?"  And
21 he says, "When Sean Hardesty got stabbed in the hand
22 during our horseplay incident ten years ago."
23   Q.  We talked about that earlier in the deposition --
24 or, actually, you did with Attorney Broaddus, right?
25   A.  Yes.  So part of that's on my knowledge of people

175

1  in the PD and part of that is he told me.  So I don't have
2  any reason to believe that he's going to make a big deal
3  if somebody had a use of force claim years ago.
4    Q.  Aside from the Wheatcroft incident and excessive
5  force complaint in general, during your time as supervisor
6  of NRS, do you know if Officer Schneider had any
7  complaints for any reason against him by members of the
8  public?
9    A.  No, not aware.
10   Q.  As the supervisor, would you be aware of
11 something like that?  If a complaint was made by a member
12 of the public against one of your officers on your squad,
13 would you be told about it?
14       MS. BROADDUS:  Object to form; foundation.
15       THE WITNESS:  Depends how far back you're
16 talking.  If somebody had a complaint from seven years
17 ago, I might not know it.
18       I know that Officer Fernandez had had some
19 complaints.
20 BY MR. POPOLIZIO:
21   Q.  I'm talking about during your time as supervisor
22 of NRS when you were supervising Matt Schneider.
23   A.  No.
24   Q.  You had no knowledge of any other complaints
25 against him by members of the public during that time

176

1  period aside from Mr. Wheatcroft's complaint?
2    A.  No complaints.
3    Q.  Now, as supervisor of NRS, the sergeant
4  first-line supervisor, are you responsible to ensure that
5  your officers receive training?
6    A.  Yes.  I'm responsible to make sure that they go
7  to the annual officer's training, and if other trainings
8  become available that they may want to go for.  For
9  example, if somebody wants to go on SWAT, I may let them
10 spend a day with SWAT, whether they flex their time or
11 just do it as a duty day.
12       But trainings during certain periods of time
13 are low due to budgetary constraints.  So sometimes
14 there's a lot of trainings and sometimes there's not very
15 many; depends on what year it is.
16   Q.  This annual officer training, is that what they
17 called AOT?
18   A.  Required by every officer in the department.
19   Q.  Would your squad sometimes train together?
20   A.  If we were to go out to the range, absolutely,
21 we'd go out together.  We wouldn't generally go out
22 individually.
23   Q.  Did Officer Schneider ever refuse to train with
24 NRS, your squad?
25   A.  No.

189

1    policy?
2        A.  I think they're compelled under the law.  Yes,
3    departmental policy.
4        Q.  Are they compelled -- well, explain to me, why,
5    as a police officer, would you be compelled to report
6    alleged violations of an individual's rights by an
7    officer?
8        A.  If officers are doing illegal acts and another
9    officer brings that to the attention, you need to have an
10   investigation because you don't want that behavior,
11   whether it was unintentional, intentional -- say the
12   officer didn't know.  You bring them up, have a
13   conversation.  If they don't realize what they're doing,
14   if it's a newer officer or something changed, then you go
15   to fix that through training and education.
16            If it's intentional, then that's against the
17   law and against civil rights.  As a supervisor I've got to
18   protect the City and the City's interest against lawsuits
19   and --
20       Q.  As an officer --
21       A.  -- morally.
22       Q.  As an officer you took an oath to uphold the
23   constitution of the United States; is that right?
24       A.  Yes.
25       Q.  Arizona constitution?

190

1        A.  Yes.
2        Q.  The laws of the state of Arizona?
3        A.  Yes.
4        Q.  Specifically during your supervision of NRS did
5    Lacey Tolbert ever come to you to complain that NRS
6    officers were violating people's constitutional rights
7    with regard to consent searches?
8            MS. BROADDUS:  Object to form.
9            THE WITNESS:  No.
10   BY MR. POPOLIZIO:
11       Q.  Did she come to you to complain that any officer
12   in NRS was violating any constitutional right, to her
13   knowledge, of any individual that they encountered?
14           MS. BROADDUS:  Object to form.
15           THE WITNESS:  No.
16   BY MR. POPOLIZIO:
17       Q.  During your time as supervisor of NRS, did Lacey
18   Tolbert ever come to you to complain that officers in the
19   NRS were violating people's constitutional rights when it
20   came to pat-downs?
21       A.  No.
22           MS. BROADDUS:  Object to form.
23   BY MR. POPOLIZIO:
24       Q.  Do you know what I mean by a pat-down?
25       A.  What's that?

191

1        Q.  Do you know what I mean by a pat-down?
2        A.  Yes.
3        Q.  Okay.  What's a pat-down?
4        A.  Pat-down is you're checking for weapons and
5    you're not going into people's pockets or -- you're
6    checking for weapons.
7            MR. POPOLIZIO:  Now, let me take one moment.
8            (An off-the-record discussion ensued.)
9            MR. POPOLIZIO:  I think we're going to have
10   to make this next part confidential.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

192

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

225

```
1          I, the undersigned, say that I have read the
2   foregoing transcript of testimony taken October 14, 2019,
3   and I declare, under penalty of perjury, that the
4   foregoing is a true and correct transcript of my testimony
5   contained therein.
6
7          EXECUTED this _____ day of _____, 2019.
8
9
10
11
12          _____
             SERGEANT DONALD JAMES LABRANT
13
14
15
16
17
18
19
20
21
22
23
24
25
```

226

```
1   STATE OF ARIZONA          )
                               ) ss.
2   COUNTY OF MARICOPA        )
3          BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    questions propounded to the witness and the answers of the
5   witness thereto were taken down by me in shorthand and
    thereafter transcribed through computer-aided
6   transcription under my direction; that the foregoing is a
    true and correct transcript of all proceedings had upon
7   the taking of said proceedings, all done to the best of my
    skill and ability.
8
9          I CERTIFY that I am in no way related to nor
    employed by any of the parties hereto nor am I in any way
    interested in the outcome hereof.
10
           (X) Review and signature was requested.
11         ( ) Review and signature was waived.
           ( ) Review and signature was not requested.
12
           I CERTIFY that I have complied with the ethical
13  obligations set forth in ACJA Sections 7-206(F)(3) and
    7-206(J)(1)(g)(1) and (2).  DATED at Scottsdale, Arizona,
14  this 5th day of December, 2019.
15
16          _____
             MONICA S. BERRY, RPR, CR
17           Certified Reporter
             Arizona CR No. 50234
18
19      *    *    *    *    *    *
20         I CERTIFY that Berry & Associates, LLC has
    complied with the ethical obligations set forth in ACJA
21  Sections 7-206(J)(1)(g)(1) and (6).
22
23          _____
             BERRY & ASSOCIATES, LLC
24           Registered Reporting Firm
             Arizona RRF No. R1033
25
```

# EXHIBIT 34

| | | | MODULE 3 | | MODULE 4 | | | |
|---|---|---|---|---|---|---|---|---|
| **Revised as of 12-14-12**<br><br>**SWORN AOT  2012 Check off Sheet** | | | FIREARMS | DT | CONTACT COVER | ACTIVE SHOOTER - CLASS | ACTIVE SHOOTER - PRACTICAL | |
| | Total # Employees NOT Completed | | | | Training Unit Only | | | |
| | Total # Employees Completed | | | | | | | |
| **Lt's and Above** | | | | | | | | |
| REDACTED | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 40% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | NO | | | | | | 0% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 13% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |
| | | Yes | 1 | 1 | | | | 33% |

CoG_WHEATCROFT 002343

REDACTED

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |

REDACTED

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | NO | 1 | 1 | 1 | 1 | 1 | 33% |
| | | NO | 1 | 1 | 1 | 1 | 1 | 33% |
| | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |

| 15225 | Fernandez, Michael | | NO | | | | | | 0% |
|---|---|---|---|---|---|---|---|---|---|

REDACTED

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 47% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |

CoG_WHEATCROFT 002347

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Sgt | NO | | | | | | 0% |
| | | | NO | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | NO | 1 | 1 | | | | 80% |
| REDACTED | | | YES | 1 | 1 | 1 | 1 | 1 | 60% |
| | | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 60% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| 15543 | Lindsey, Mark | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| REDACTED | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 47% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| REDACTED | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | | NO | | | 1 | 1 | 1 | 20% |

8

| REDACTED | | Y/N | | | | | | % |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | NO | | | | | | 0% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | YES | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| REDACTED | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| 12251  Schneider, Matthew | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| REDACTED | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 47% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 100% |
| | | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | Sgt | Yes | 1 | 1 | 1 | 1 | 1 | 33% |
| | | YES | 1 | 1 | 1 | 1 | 1 | 33% |

CoG_WHEATCROFT 002353

# Glendale Police Department
## 2012 AOT



CoG_WHEATCROFT 002358

# Taser Update

- Taser Download
- Pre-Shift Spark Test (muscle memory)
- New Tactical Reload
- Two Hand Hold (Pro's and Con')
  Drive Stun vs. Deployment
- 15 sec deployment
  (Police Executive Research Form Recommendation)

CoG_WHEATCROFT 002359

# Foot Pursuits

- When
- Where
- Why
- Suspect Info
- Ability
- Dangers



CoG_WHEATCROFT 002360

# In Custody Deaths
## Excited Delirium

- What is it?
- History
- Assessment
- Behavioral Cues
- High Risk Individual's
- Action Steps

CoG_WHEATCROFT 002361

# Handcuffing
# Let's do it Well

- OCCS Hold and Cuff

- Faulkner Search to Cuff

- Two Officer Cuff

- OCCS Prone

CoG_WHEATCROFT 002362



CoG_WHEATCROFT 002266

# 2012 DT / AOT Objectives

- TASER Download (Done day prior)
- TASER Review
- Foot Pursuits
- Excited Delirium
- 2010 / 2011 AOT / DT Review

CoG_WHEATCROFT 002268



*Revised ?*

# GLENDALE POLICE

# SWORN 2013 AOT TRACKER

| | Module I | | |
|---|---|---|---|
| | Firearms Practical | Defensive Tactics | CPR-Fit Testing |
| | INSERT DATE COMPLETED BELOW-HIGHLIGHT GREEN WHEN COMPLETED | | |
| **COMMAND STAFF (Lt's and above)** | | | |
| REDACTED | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |
| | 2/13/13 | 2/13/13 | 2/13/13 |

CoG_WHEATCROFT 002408

**REDACTED**

| | | |
|---|---|---|
| 9/24/13 | 9/24/13 | 9/24/13 |
| 10/16/13 | 10/16/13 | 10/16/13 |
| 4/30/13 | 4/30/13 | 4/30/13 |
| 12/2/13 | 12/2/13 | 12/2/13 |
| 2/27/13 | 2/27/13 | 2/27/13 |
| 12/19/13 | 12/19/13 | 12/19/13 |
| 2/27/13 | 2/27/13 | 2/27/13 |
| 2/14/13 | 2/14/13 | 2/14/13 |
| 2/14/13 | 2/14/13 | 2/14/13 |
| 2/14/13 | 2/14/13 | 2/14/13 |
| 4/30/13 | 4/30/13 | 4/30/13 |
| 2/27/13 | 2/27/13 | 2/27/13 |
| 4/23/13 | 4/23/13 | 4/23/13 |

E

| | | |
|---|---|---|
| 12/19/13 | 12/19/13 | 12/19/13 |
| 4/5/13 | 4/5/13 | 4/5/13 |
| 2/27/13 | 2/27/13 | 2/27/13 |
| 10/16/13 | 10/16/13 | 10/16/13 |
| 12/19/13 | 12/19/13 | 12/19/13 |
| 3/7/13 | 3/7/13 | 3/7/13 |
| 12/19/13 | 12/19/13 | 12/19/13 |
| 3/7/13 | 3/7/13 | 3/7/13 |
| 4/5/13 | 4/5/13 | 4/5/13 |
| 2/14/13 | 2/14/13 | 2/14/13 |

F

**135** 15225 Fernandez, Michael

**REDACTED**

| | | |
|---|---|---|
| 1/22/13 | 1/22/13 | 1/22/13 |
| 4/5/13 | 4/5/13 | 4/5/13 |
| 4/5/13 | 4/5/13 | 4/5/13 |
| 10/16/13 | 10/16/13 | 10/16/13 |
| 12/19/13 | 12/19/13 | 12/19/13 |
| 4/10/13 | 4/10/13 | 4/10/13 |
| 2/14/13 | 2/14/13 | 2/14/13 |

G

CoG_WHEATCROFT 002412

REDACTED

| | Col1 | Col2 | Col3 |
|---|---|---|---|
| | 2/27/13 | 2/27/13 | 2/27/13 |
| | 10/16/13 | 10/16/13 | 10/16/13 |
| Sgt | 12/2/13 | 12/2/13 | 12/2/13 |
| | 1/22/13 | 1/22/13 | 1/22/13 |
| **L** | | | |
| | 4/30/13 | 4/30/13 | 4/30/13 |
| Left Employment | N/A | N/A | N/A |
| | 3/19/13 | 3/19/13 | 3/19/13 |
| Sgt | 1/22/13 | 1/22/13 | 1/22/13 |
| | 4/10/13 | 4/10/13 | 4/10/13 |
| | 1/22/13 | 1/22/13 | 1/22/13 |
| | 11/18/13 | 11/18/13 | 11/18/13 |
| | 1/22/13 | 1/22/13 | 1/22/13 |

| 217 | 15543 | Lindsey, Mark | | | |
|---|---|---|---|---|---|

REDACTED

| | Col1 | Col2 | Col3 |
|---|---|---|---|
| | 4/30/13 | 4/30/13 | 4/30/13 |
| | 9/6/13 | 9/6/13 | 9/6/13 |
| | 11/1/13 | 11/1/13 | 11/1/13 |
| Sgt | 10/1/13 | 10/1/13 | 10/1/13 |
| | 11/7/13 | 11/7/13 | 11/7/13 |
| | 12/2/13 | 12/2/13 | 12/2/13 |
| | 10/31/13 | 10/31/13 | 10/31/13 |
| | 3/19/13 | 3/19/13 | 3/19/13 |
| | 11/18/13 | 11/18/13 | 11/18/13 |
| | 11/13/13 | 11/13/13 | 11/13/13 |
| | 10/1/13 | 10/1/13 | 10/1/13 |
| | 11/13/13 | 11/13/13 | 11/13/13 |
| **M** | | | |
| | 11/1/13 | 11/1/13 | 11/1/13 |
| Sgt | 4/10/13 | 4/10/13 | 4/10/13 |
| | 3/7/13 | 3/7/13 | 3/7/13 |
| | 11/7/13 | 11/7/13 | 11/7/13 |
| | 9/24/13 | 9/24/13 | 9/24/13 |
| Sgt | 1/16/13 | 1/16/13 | 1/16/13 |
| | 12/2/13 | 12/2/13 | 12/2/13 |

8

CoG_WHEATCROFT 002415

REDACTED

| | | |
|---|---|---|
| 12/16/13 | 12/16/13 | 12/16/13 |
| 4/5/13 | 4/5/13 | 4/5/13 |
| 12/19/13 | 12/19/13 | 12/19/13 |
| 11/13/13 | 11/13/13 | 11/13/13 |
| 4/10/13 | 4/10/13 | 4/10/13 |
| **Sgt** 4/5/13 | 4/5/13 | 4/5/13 |
| 12/16/13 | 12/16/13 | 12/16/13 |

S

| | | |
|---|---|---|
| 4/5/13 | 4/5/13 | 4/5/13 |
| **Sgt** 11/13/13 | 11/13/13 | 11/13/13 |
| 11/1/13 | 11/1/13 | 11/1/13 |
| 12/2/13 | 12/2/13 | 12/2/13 |
| 11/1/13 | 11/1/13 | 11/1/13 |
| 2/14/13 | 2/14/13 | 2/14/13 |
| 2/27/13 | 2/27/13 | 2/27/13 |
| 11/18/13 | 11/18/13 | 11/18/13 |

312 | 12251 | Schneider, Matthew

| | | |
|---|---|---|
| 4/30/13 | 4/30/13 | 4/30/13 |
| 12/16/13 | 12/16/13 | 12/16/13 |
| 4/10/13 | 4/10/13 | 4/10/13 |
| 3/19/13 | 3/19/13 | 3/19/13 |
| 4/5/13 | 4/5/13 | 4/5/13 |
| 11/18/13 | 11/18/13 | 11/18/13 |
| 10/31/13 | 10/31/13 | 10/31/13 |
| 10/16/13 | 10/16/13 | 10/16/13 |
| **Sgt** 10/31/13 | 10/31/13 | 10/31/13 |
| 4/10/13 | 4/10/13 | 4/10/13 |
| 4/10/13 | 4/10/13 | 4/10/13 |
| 12/2/13 | 12/2/13 | 12/2/13 |
| 4/10/13 | 4/10/13 | 4/10/13 |
| 12/16/13 | 12/16/13 | 12/16/13 |
| 12/19/13 | 12/19/13 | 12/19/13 |
| 3/19/13 | 3/19/13 | 3/19/13 |
| 3/19/13 | 3/19/13 | 3/19/13 |

REDACTED

CoG_WHEATCROFT 002418

# Glendale Police Department
## CALENDAR SCHOOL ROSTER

Class Title:    AOT - Advanced Officer Training
Hours:          10
Date(s):        1/22/2013   to   1/22/2013
Location:       GRPSTC/11550 W. Glendale Ave, Glendale,AZ,85307
Facilitator(s): Sgt. M. Malinski, Sgt. J. McDaniel

I verify the students below attended all blocks of instruction as indicated by their initials in the appropriate boxes.

instructor/Facilitator signature:

*Students - Please print your information below and initial under the appropriate day/s of attendance. (DO NOT USE AN "X".)*



| | Last four of SSN | NAME | ID# | AGENCY | RANK | M | T | W | Th | F |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | REDACTED | | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |
| 5. | | | | | | | | | | |
| 6. | | | | | | | | | | |
| 7. | REDACTED | M. FERNANDEZ | 15225 | '' | '' | | MA | | | |
| 8. | REDACTED | | | | | | | | | |
| 9. | | | | | | | | | | |
| 10. | | | | | | | | | | |
| 11. | | | | | | | | | | |
| 12. | | | | | | | | | | |
| 13. | | | | | | | | | | |
| 14. | | | | | | | | | | |
| 15. | | | | | | | | | | |

CoG_WHEATCROFT 002422



# Glendale Police Department
## CALENDAR SCHOOL ROSTER

Class Title:  AOT - Advanced Officer Training
Hours:        10
Date(s):      4/30/2013  to  4/30/2013
Location:     GRPSTC/11550 W. Glendale Ave, Glendale,AZ,85307
Facilitator(s): Sgt. J. McDaniel / Sgt. M. Malinski / Firearms and DT Staff

I verify the students below attended all blocks of instruction as indicated by their initials in the appropriate boxes.

Instructor/Facilitator signature:

*Students - Please print your information below and underline initial under the appropriate day/s of attendance. (DO NOT USE AN "X".)*

| | Last four of SSN | NAME | ID# | AGENCY | RANK | M | T | W | Th | F |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | REDACTED | REDACTED | | | | | | | | |
| 2. | | | | | | | | | | |
| 3. | | | | | | | | | | |
| 4. | | | | | | | | | | |
| 5. | REDACTED | Mark Lindsey | 15543 | " | " | | M | | | |
| 6. | REDACTED | REDACTED | | | | | | | | |
| 7. | | | | | | | | | | |
| 8. | | | | | | | | | | |
| 9. | | | | | | | | | | |
| 10. | | | | | | | | | | |
| 11. | | | | | | | | | | |
| 12. | | | | | | | | | | |
| 13. | REDACTED | Matthew Schneider | 12251 | GPD | DFC | | M | | | |
| 14. | REDACTED | | | | | | | | | |
| 15. | | | | | | | | | | |

CoG_WHEATCROFT 002423

# 2013 Advanced Officer Training
# &
# Catalog



Welcome to the Glendale Regional Public Safety Training Center

## Glendale Police Department Training Unit

CoG_WHEATCROFT 002363



# Session One

**(January - April)**

Range: 3 hrs
- •Glock Skills
- •Judgment Shoot

Driving Track: 3 hrs
- •Pursuit Driving
- •Backing Skills
- •Diverted Attention

Defensive Tactics: 3 hrs
- •Strikes, Kicks
- •Weapon Ballistics
- •Baton
- •TASER





CoG_WHEATCROFT 002365

# Session Two

**(May - August)**



Range: 3 hrs
•Movement Drills [every shot counts]

Indoors
All Hazards: 6 hrs
•CPR
•Fit Test
•Blood Born Pathogens
•Hazard Materials

Other Classes?







CoG_WHEATCROFT 002366

# Session Three

**(September - December)**



Range: 3 hrs
•Combat Drills

Table Top/Leadership Exercise

Defensive Tactics Scenarios
•TASER Deployments





CoG_WHEATCROFT 002367

# 2013 Training Catalog



# Catalog ideas for 2013:

Advanced Defensive Tactics/Red Man Drills:
Tactical Handgun:
Interview and Interrogations:
Accident Investigation:
Gang Identification:
Child Crimes Investigations:
Use of force/Report writing:
????

CoG_WHEATCROFT 002368



CoG_WHEATCROFT 002370



# Overview:

- Response to Resistance

- Strikes and Kicks

CoG_WHEATCROFT 002372



# Hand On Defensive Tactics Refresher

- Force Matrix

- Neutral Stance

- Strikes

- Kicks

CoG_WHEATCROFT 002375



CoG_WHEATCROFT 002384



# Overview:

- TASER Overview, Deployment and Download

CoG_WHEATCROFT 002386



# 2014 AOT MASTER ROSTER

| | Module I | | |
|---|---|---|---|
| | Firearms Practical | Tactical Driving | First Aid/Trauma Kit |
| | INSERT DATE COMPLETED BELOW-HIGHLIGHT GREEN WHEN COMPLETED | | |
| REDACTED | 3/20/14 | 3/20/14 | 3/20/14 |
| **MODIFIED DUTY** | | | |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | | | |
| | 4/29/14 | 4/29/14 | 4/29/14 |
| | | | |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| **RETIRED** | | | |
| | 4/29/14 | 4/29/14 | 4/29/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |
| | 3/20/14 | 3/20/14 | 3/20/14 |

1

CoG_WHEATCROFT 002504

# REDACTED

| | | | |
|---|---|---|---|
| | 2/27/14 | 2/27/14 | 2/27/14 |
| | 5/7/14 | 5/7/14 | 5/7/14 |
| | 10/29/14 | 10/29/14 | 10/29/14 |
| | 10/1/14 | 10/1/14 | 10/1/14 |
| | 9/5/14 | 9/5/14 | 9/5/14 |
| | 4/3/14 | 4/3/14 | 4/3/14 |
| **Sgt** | 12/2/14 | 12/2/14 | 12/2/14 |
| **Sgt** | 3/18/14 | 3/18/14 | 3/18/14 |
| | 12/16/14 | 12/16/14 | 12/16/14 |
| | 10/29/14 | 10/29/14 | 10/29/14 |
| | 9/5/14 | 9/5/14 | 9/5/14 |
| | 11/6/14 | 11/6/14 | 11/6/14 |
| | 4/22/14 | 4/22/14 | 4/22/14 |
| | 9/10/14 | 9/10/14 | 9/10/14 |
| | 10/1/14 | 10/1/14 | 10/1/14 |
| | 12/16/14 | 12/16/14 | 12/16/14 |
| | 3/18/14 | 3/18/14 | 3/18/14 |
| | 1/21/14 | 1/21/14 | 1/21/14 |
| | 3/18/14 | 3/18/14 | 3/18/14 |
| | 12/10/14 | 12/10/14 | 12/10/14 |
| | 3/27/14 | 3/27/14 | 3/27/14 |
| | 12/16/14 | 12/16/14 | 12/16/14 |
| | 2/19/14 | 2/19/14 | 2/19/14 |
| | 9/5/14 | 9/5/14 | 9/5/14 |
| | 3/27/14 | 3/27/14 | 3/27/14 |
| | 9/5/14 | 9/5/14 | 9/5/14 |
| 15225 Fernandez, Michael | 11/17/14 | 11/17/14 | 11/17/14 |
| | 5/7/14 | 5/7/14 | 5/7/14 |
| | 5/7/14 | 5/7/14 | 5/7/14 |
| | 11/17/14 | 11/17/14 | 11/17/14 |
| | 1/21/14 | 1/21/14 | 1/21/14 |

# REDACTED

5

**K**

REDACTED

| Status | | | |
|---|---|---|---|
| | 12/10/14 | 12/10/14 | 12/10/14 |
| | 4/29/14 | 4/29/14 | 4/29/14 |
| | 11/17/14 | 11/17/14 | 11/17/14 |
| Sgt | 4/29/14 | 4/29/14 | 4/29/14 |
| Sgt | 12/2/14 | 12/2/14 | 12/2/14 |
| NEW HIRE | | | |
| | 2/27/14 | 2/27/14 | 2/27/14 |
| Sgt | 12/2/14 | 12/2/14 | 12/2/14 |
| RETIRED | | | |
| | 10/29/14 | 10/29/14 | 10/29/14 |
| MODIFIED DUTY | | | |
| Sgt | 12/16/14 | 12/16/14 | 12/16/14 |
| | 2/27/14 | 2/27/14 | 2/27/14 |
| | | | |
| Sgt | 12/2/14 | 12/2/14 | 12/2/14 |
| RETIRING DEC, 2014 | | | |
| Sgt | 3/18/14 | 3/18/14 | 3/18/14 |
| | 12/16/14 | 12/16/14 | 12/16/14 |
| | 3/18/14 | 3/18/14 | 3/18/14 |
| | 11/17/14 | 11/17/14 | 11/17/14 |
| | 11/6/14 | 11/6/14 | 11/6/14 |
| | 10/1/14 | 10/1/14 | 10/1/14 |
| | 3/7/14 | 3/7/14 | 3/7/14 |
| | 10/29/14 | 10/29/14 | 10/29/14 |
| Sgt | 12/16/14 | 12/16/14 | 12/16/14 |
| | 4/29/14 | 4/29/14 | 4/29/14 |
| | 12/10/14 | 12/10/14 | 12/10/14 |
| | 11/6/14 | 11/6/14 | 11/6/14 |
| | 4/3/14 | 4/3/14 | 4/3/14 |
| | 10/29/14 | 10/29/14 | 10/29/14 |
| | 2/19/14 | 2/19/14 | 2/19/14 |
| | 3/27/14 | 3/27/14 | 3/27/14 |

15543   Lindsey, Mark

REDACTED

CoG_WHEATCROFT 002511

REDACTED

| | | |
|---|---|---|
| 12/16/14 | 12/16/14 | 12/16/14 |
| 11/17/14 | 11/17/14 | 11/17/14 |
| 12/16/14 | 12/16/14 | 12/16/14 |
| 9/5/14 | 9/5/14 | 9/5/14 |
| 12/2/14 | 12/2/14 | 12/2/14 |
| 9/5/14 | 9/5/14 | 9/5/14 |
| 1/21/14 | 1/21/14 | 1/21/14 |
| 11/17/14 | 11/17/14 | 11/17/14 |
| 11/6/14 | 11/6/14 | 11/6/14 |
| 11/17/14 | 11/17/14 | 11/17/14 |
| 10/1/14 | 10/1/14 | 10/1/14 |
| 12/16/14 | 12/16/14 | 12/16/14 |
| 10/16/14 | 10/16/14 | 10/16/14 |
| 10/16/14 | 10/16/14 | 10/16/14 |
| 9/5/14 | 9/5/14 | 9/5/14 |
| 3/18/14 | 3/18/14 | 3/18/14 |
| 3/27/14 | 3/27/14 | 3/27/14 |
| 9/5/14 | 9/5/14 | 9/5/14 |
| 10/29/14 | 10/29/14 | 10/29/14 |
| 12/16/14 | 12/16/14 | 12/16/14 |
| 10/29/14 | 10/29/14 | 10/29/14 |
| 10/16/14 | 10/16/14 | 10/16/14 |
| 10/1/14 | 10/1/14 | 10/1/14 |
| 12/16/14 | 12/16/14 | 12/16/14 |
| 9/5/14 | 9/5/14 | 9/5/14 |
| 4/3/14 | 4/3/14 | 4/3/14 |
| 11/6/14 | 11/6/14 | 11/6/14 |
| 3/7/14 | 3/7/14 | 3/7/14 |
| 11/6/14 | 11/6/14 | 11/6/14 |
| 10/16/14 | 10/16/14 | 10/16/14 |

12251  Schneider, Matthew

REDACTED

CoG_WHEATCROFT 002514



# Glendale Police Department
## CALENDAR SCHOOL ROSTER/BF

Class Title:  Advanced Officer Training (AOT)
Hours:       0700-1700 Hrs.
Date(s):     Friday, September 5, 2014
Location:    GRPSTC
Facilitator(s: Training Unit
Instructor(s: Sgt. M. Malinski, Sgt. J. McDaniel, Firearms, Driving, Defensive
Tactics, and Health/Safety Training Staff

I verify the students below attended all blocks of instruction as indicated by their initials in the appropriate boxes.

Instructor/Facilitator signature:

*Students - Please verify social security number, spelling of your name and initial the sign-in sheet each day*

|  | Last four of SSN | NAME | ID# | AGENCY | RANK | F |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | REDACTED | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |
| 6. | | | | | | | | | | | |
| 7. | | | | | | | | | | | |
| 8. | | | | | | | | | | | |
| 9. | REDACTED | Matt Schneider | 12257 | GPD | OFC | | | | | | |
| 10. | REDACTED | | | | | | | | | | |
| 11. | | | | | | | | | | | |
| 12. | | | | | | | | | | | |
| 13. | | | | | | | | | | | |
| 14. | | | | | | | | | | | |
| 15. | | | | | | | | | | | |

## Glendale Police Department
### CALENDAR SCHOOL ROSTER

| Class Title: | AOT - Advanced Officer Training |
| Hours: | 10 |
| Date(s): | 10/1/2014  to  10/1/2014 |
| Location: | GRPSTC/11550 W. Glendale Ave, Glendale, AZ, 85307 |

Facilitator(s): Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff

I verify the students below attended all blocks of instruction as indicated by their initials in the appropriate boxes.

Instructor/Facilitator signature:

*Students - Please print your information below and underline initial under the appropriate day/s of attendance. (DO NOT USE AN "X".)*



| | Last four of SSN | NAME | ID# | AGENCY | RANK | W |
|---|---|---|---|---|---|---|
| 1. | REDACTED | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | REDACTED | | | | | |
| 8. | | MARK LINDSEY | 15543 | GPD | OFC | ML |
| 9. | REDACTED | | | | | |
| 10. | | | | | | |
| 11. | | | | | | |
| 12. | | | | | | |
| 13. | | | | | | |
| 14. | | | | | | |
| 15. | | | | | | |

CoG_WHEATCROFT 002520



## Glendale Police Department
### CALENDAR SCHOOL ROSTER

| Class Title: | AOT - Advanced Officer Training |
|---|---|
| Hours: | 10 |
| Date(s): | 11/17/2014   to   11/17/2014 |
| Location: | GRPSTC/11550 W. Glendale Ave, Glendale,AZ,85307 |
| Facilitator(s): | Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff |

I verify the students below attended all blocks of instruction as indicated by their initials in the appropriate boxes.

Instructor/Facilitator signature:

*Students - Please print your information below and initial under the appropriate day/s of attendance. (DO NOT USE AN "X".)*

| | Last four of SSN | NAME | ID# | AGENCY | RANK | M |
|---|---|---|---|---|---|---|
| 1. | REDACTED | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | REDACTED | Michael Fernandez | 15225 | GPD | OFC | ✓ |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| 11. | | | | | | |
| 12. | | | | | | |
| 13. | | | | | | |
| 14. | | | | | | |
| 15. | | | | | | |

CoG_WHEATCROFT 002522

# 2014 Advanced Officer Training



# GLENDALE POLICE DEPARTMENT TRAINING UNIT

CoG_WHEATCROFT 002427

# AOT: One 10-Hour Session



**AOT Includes:**

1) firearms practical
2) tactical driving
3) Defensive tactics
4) gas mask fit testing
5) first aid
6) trauma kit training

CoG_WHEATCROFT 002429

# Firearms range and driving track



**firearms range and driving track:**

**Range: 2.5 hrs**
 **1) Glock Skills**
 **2) vehicle combat drills**

**Driving track 2.5 hrs**
 **1) challenge course**
        **includes:**
     **a) high speed driving**
     **b) backing**
     **c) cone weaves**
     **d) turning/cornering**
     **e) collision avoidance**



CoG_WHEATCROFT 002430



# DEFENSIVE TACTICS

- **REALITIES OF TIME AND DISTANCE**
  - **TIME AND DISTANCE RULE**
- **ZONES**
  - **DANGER**
  - **ATTACK**
  - **KILL**
- **GUN RETENTION**
  - **FRONT**
  - **REAR**
- **KNIFE DEFENSE**
  - **HIGH BLOCK**
  - **LOW BLOCK**

  **TASER**



CoG_WHEATCROFT 002431

# First aid and trauma kit training



**First aid**
   **Includes:**

**Tourniquets, pressure dressings, and chest seals**

**Trauma kit training**
   **includes:**

**What items are included in the trauma kit and their application**
**Where trauma kits are stored**
**Replacement of used items**

**Gas mask fit testing**



CoG_WHEATCROFT 002432



CoG_WHEATCROFT 002451

# Review And Objective

- Realities of Time and Distance
  - Time and Distance Rule
- Zones
  - Danger
  - Attack
  - Kill
- Gun Retention
  - Front
  - Rear
  - Draw Position
- Knife defense
  - High  Block
  - Low Block

CoG_WHEATCROFT 002453



2014 AOT TASER

CoG_WHEATCROFT 002434

# Good TASER usage, tactics and commands. Watch for behavior change



CoG_WHEATCROFT 002436



# 2015 AOT MASTER ROSTER

REDACTED

| | Module I | | |
|---|---|---|---|
| | Firearms | ESC | CPR |
| INSERT DATE COMPLETED BELOW-HIGHLIGHT GREEN WHEN COMPLETED | | | |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 11/16/15 | 11/16/15 | 11/16/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |
| | 3/24/15 | 3/24/15 | 3/24/15 |

1

CoG_WHEATCROFT 002604

| | | | | | |
|---|---|---|---|---|---|
| REDACTED | | | 12/2/15 | 12/2/15 | 12/2/15 |
| F | REDACTED | | 11/6/15 | 11/6/15 | 11/6/15 |
| 15225 | Fernandez, Michael | | 10/6/15 | 10/6/15 | 10/6/15 |
| REDACTED | | | 12/2/15 | 12/2/15 | 12/2/15 |
| | | | 12/2/15 | 12/2/15 | 12/2/15 |
| | | | 2/18/15 | 2/18/15 | 2/18/15 |
| | | Sgt | 4/21/15 | 4/21/15 | 4/21/15 |
| | | | 5/6/15 | 5/6/15 | 5/6/15 |
| | | | 4/2/15 | 4/2/15 | 4/2/15 |
| | | | | | |
| | | Sgt | 5/6/15 | 5/6/15 | 5/6/15 |
| | | Sgt | RETIRED | RETIRED | RETIRED |
| | | | 12/2/15 | 12/2/15 | 12/2/15 |
| | | | 11/16/15 | 11/16/15 | 11/16/15 |
| | | | 9/22/15 | 9/22/15 | 9/22/15 |
| | | | 11/12/15 | 11/12/15 | 11/12/15 |
| | | | 5/19/15 | 5/19/15 | 5/19/15 |
| | | | 9/11/15 | 9/11/15 | 9/11/15 |
| | | | 4/2/15 | 4/2/15 | 4/2/15 |
| | | | 11/16/15 | 11/16/15 | 11/16/15 |
| | | | 2/24/15 | 2/24/15 | 2/24/15 |
| | | | 11/12/15 | 11/12/15 | 11/12/15 |
| | | | 9/22/15 | 9/22/15 | 9/22/15 |
| | | | 5/19/15 | 5/19/15 | 5/19/15 |
| | | | 11/6/15 | 11/6/15 | 11/6/15 |
| | | | 2/18/15 | 2/18/15 | 2/18/15 |
| | | | 11/6/15 | 11/6/15 | 11/6/15 |
| | | | 1/14/15 | 1/14/15 | 1/14/15 |
| | | | 5/6/15 | 5/6/15 | 5/6/15 |
| | | | 3/13/15 | 3/13/15 | 3/13/15 |
| | | | 10/6/15 | 10/6/15 | 10/6/15 |

CoG_WHEATCROFT 002609

REDACTED

| | | | |
|---|---|---|---|
| | 4/2/15 | 4/2/15 | 4/2/15 |
| | 11/16/15 | 11/16/15 | 11/16/15 |
| | 2/18/15 | 2/18/15 | 2/18/15 |
| | 12/15/15 | 12/15/15 | 12/15/15 |
| | 3/13/15 | 3/13/15 | 3/13/15 |
| | 3/13/15 | 3/13/15 | 3/13/15 |
| | 4/28/15 | 4/28/15 | 4/28/15 |
| | 2/18/15 | 2/18/15 | 2/18/15 |
| | 4/21/15 | 4/21/15 | 4/21/15 |
| | 12/15/15 | 12/15/15 | 12/15/15 |
| Sgt | 4/21/15 | 4/21/15 | 4/21/15 |
| Sgt | 5/19/15 | 5/19/15 | 5/19/15 |
| | 9/11/15 | 9/11/15 | 9/11/15 |
| | 10/15/15 | 10/15/15 | 10/15/15 |
| Sgt | 5/6/15 | 5/6/15 | 5/6/15 |
| | 11/12/15 | 11/12/15 | 11/12/15 |
| | 3/13/15 | 3/13/15 | 3/13/15 |
| Sgt | 11/16/15 | 11/16/15 | 11/16/15 |
| | 4/2/15 | 4/2/15 | 4/2/15 |
| Sgt | 4/21/15 | 4/21/15 | 4/21/15 |
| | 11/16/15 | 11/16/15 | 11/16/15 |
| Sgt | 2/24/15 | 2/24/15 | 2/24/15 |
| | 1/14/15 | 1/14/15 | 1/14/15 |
| | 9/11/15 | 9/11/15 | 9/11/15 |
| | 4/2/15 | 4/2/15 | 4/2/15 |
| | 2/24/15 | 2/24/15 | 2/24/15 |
| | 10/6/15 | 10/6/15 | 10/6/15 |
| 15543  Lindsey, Mark | 4/2/15 | 4/2/15 | 4/2/15 |
| | 3/30/15 | 3/30/15 | 3/30/15 |
| | 11/6/15 | 11/6/15 | 11/6/15 |
| Sgt | 11/16/15 | 11/16/15 | 11/16/15 |

REDACTED

8

CoG_WHEATCROFT 002611

# REDACTED

| | | | |
|---|---|---|---|
| REDACTED | 4/28/15 | 4/28/15 | 4/28/15 |
| | 11/12/15 | 11/12/15 | 11/12/15 |
| | 2/18/15 | 2/18/15 | 2/18/15 |
| | 4/2/15 | 4/2/15 | 4/2/15 |
| Sgt | 10/1/15 | 10/1/15 | 10/1/15 |
| | 3/30/15 | 3/30/15 | 3/30/15 |
| | 9/22/15 | 9/22/15 | 9/22/15 |
| | 10/6/15 | 10/6/15 | 10/6/15 |
| | 12/15/15 | 12/15/15 | 12/15/15 |
| | 2/18/15 | 2/18/15 | 2/18/15 |
| | 11/6/15 | 11/6/15 | 11/6/15 |
| | 3/30/15 | 3/30/15 | 3/30/15 |
| | 3/30/15 | 3/30/15 | 3/30/15 |
| | 1/14/15 | 1/14/15 | 1/14/15 |
| | 11/12/15 | 11/12/15 | 11/12/15 |
| | 5/6/15 | 5/6/15 | 5/6/15 |
| Sgt | 12/2/15 | 12/2/15 | 12/2/15 |
| Sgt | 4/21/15 | 4/21/15 | 4/21/15 |
| | 12/15/15 | 12/15/15 | 12/15/15 |
| | 12/15/15 | 12/15/15 | 12/15/15 |
| | 4/2/15 | 4/2/15 | 4/2/15 |
| Sgt | 2/18/15 | 2/18/15 | 2/18/15 |
| | 4/28/15 | 4/28/15 | 4/28/15 |
| | 11/12/15 | 11/12/15 | 11/12/15 |
| | 1/14/15 | 1/14/15 | 1/14/15 |
| | 3/13/15 | 3/13/15 | 3/13/15 |
| | 4/2/15 | 4/2/15 | 4/2/15 |
| | 2/18/15 | 2/18/15 | 2/18/15 |
| | 2/24/15 | 2/24/15 | 2/24/15 |
| 12251 Schneider, Matthew | 10/1/15 | 10/1/15 | 10/1/15 |
| REDACTED | 2/18/15 | 2/18/15 | 2/18/15 |



# Glendale Police Department
## CALENDAR SCHOOL ROSTER

**Class Title:** Advanced Officer Training

**Hours:** 10

**Date(s):** 4/2/2015  to  4/2/2015

**Location:** GRPSTC/11550 W. Glendale Ave, Glendale,AZ,85307

**Facilitator(s):** Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff

Welcome to the Glendale Regional Public Safety Training Center

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | | REDACTED | | | |
| 2. | | | | | |
| 3. | 4-2-45 | Lindsay Marck | 15543 | G | G |
| 4. | | REDACTED | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |



**Glendale Police Department**
CALENDAR SCHOOL ROSTER

Class Title:  **Advanced Officer Training**

Hours:  **10**

Date(s):  **10/1/2015   to   10/1/2015**

Location:  **GRPSTC/11550 W. Glendale Ave, Glendale,AZ,85307**

Facilitator(s): **Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff**

Welcome to the Glendale Regional Public Safety Training Center

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | 10-1-15 | MATT SCHNEIDER | 1225? | Glendale | SFC |
| 2. | | REDACTED | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |

# Glendale Police Department
## CALENDAR SCHOOL ROSTER

**Class Title:** Advanced Officer Training

**Hours:** 10

**Date(s):** 10/6/2015  to  10/6/2015

**Location:** GRPSTC/11550 W. Glendale Ave, Glendale,AZ,85307

**Facilitator(s):** Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff



Welcome to the Glendale Regional Public Safety Training Center

|     | Date     | NAME                  | ID#   | AGENCY | RANK |
|-----|----------|-----------------------|-------|--------|------|
| 1.  | REDACTED |                       |       |        |      |
| 2.  |          |                       |       |        |      |
| 3.  |          |                       |       |        |      |
| 4.  |          |                       |       |        |      |
| 5.  |          |                       |       |        |      |
| 6.  |          |                       |       |        |      |
| 7.  |          |                       |       |        |      |
| 8.  |          |                       |       |        |      |
| 9.  | 10/6/15  | M. FERNANDEZ          | 15225 | GPD    | OFC  |
| 10. | REDACTED |                       |       |        |      |
| 11. |          |                       |       |        |      |
| 12. |          |                       |       |        |      |
| 13. |          |                       |       |        |      |
| 14. |          |                       |       |        |      |
| 15. |          |                       |       |        |      |

# 2015 Advanced Officer Training



## GLENDALE POLICE DEPARTMENT TRAINING UNIT

CoG_WHEATCROFT 002533

# AOT: One 10-Hour Session



AOT Includes:
  1) firearms practical
  2) tactical driving
  3) Defensive tactics
  4) C.P.R.
  5) gas Mask Fit Testing

CoG_WHEATCROFT 002534



# FIREARMS

**FIREARMS RANGE:**

**CLASSROOM:**

1) **POWERPOINT PRESENTATION:** Active Shooter/Bounding
2) Safety brief



**Drills on three ranges:**

1) Steel Challenge/Multiple Targets with small interactive hit zones
2) Multiple Assailant Drill
3) Multiple turning paper targets
4) Bounding Drill
5) Two officers engage an active shooter behind a vehicle



CoG_WHEATCROFT 002535

# TACTICAL DRIVING



Driving track 2.5 hrs.:

  1) ELECTONIC STABILITY
        CONTROL

      A) Class lecture/video
        B) Track Talk
        C) Practical

  2) Escape maneuver (update)

        A) AZPOST CHANGE
        B) practical



CoG_WHEATCROFT 002536

# Defensive tactics



## DEFENSIVE TACTICS:

1) Taser Policy Change
   1) 23.005E

Taser refresh and deployment of x2

Baton strikes, methods of carry, and retention techniques

Multiple assailants



CoG_WHEATCROFT 002537

# CARDIO-PULMONARY RESUSCITATION TRAINING



## C.P.R.

### GAS MASK FIT TESTING



CoG_WHEATCROFT 002538



# Defensive Tactics 2015

**Baton**

CoG_WHEATCROFT 002558



# BATON RECERTIFICATION

CoG_WHEATCROFT 002559



**GLENDALE POLICE DEPARTMENT**

# ELECTRONIC STABILITY CONTROL
AND
# NEW ESCAPE MANEUVER

**AOT 2015**

DRIVING INSTRUCTOR STAFF

CoG_WHEATCROFT 002540



# Defensive Tactics 2015

## TASER/X2

CoG_WHEATCROFT 002595

# Review and Objectives

- **TASER Policy**
- **Baton Re-Certification**
- **Realities of Multiple Attackers**
- **Advantages of Multiple Attackers**
- **Disadvantages of Multiple Attackers**
- **Gaining the Edge**
- **Multiple Opponent Tactics The 3-S's**
  - **Shielding**
  - **Spreading**
  - **Structures**
- **Mind Set**
- **Striking and Multiple Attackers**

CoG_WHEATCROFT 002597



# 2016 MASTER ROSTER

## ROSTER

| | Module I | | | |
|---|---|---|---|---|
| | Firearms | Pursuits & Roadblock | Def. Tactics | First Aid/Wounds |
| | INSERT DATE COMPLETED BELOW- HIGHLIGHT GREEN WHEN COMPLETED | | | |
| **STAFF** (LT AND ABOVE) | | | | |
| REDACTED | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | RETIRED | RETIRED | RETIRED | RETIRED |
| | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 12/13/16 | 12/13/16 | 12/13/16 | 12/13/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |
| | RETIRED | RETIRED | RETIRED | RETIRED |
| | 3/23/16 | 3/23/16 | 3/23/16 | 3/23/16 |

CoG_WHEATCROFT 002694

REDACTED

REDACTED

| | | | | |
|---|---|---|---|---|
| | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | MODIFIED | MODIFIED | MODIFIED | MODIFIED |
| | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | 2/16/16 | 2/16/16 | 2/16/16 | 2/16/16 |
| | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | 5/19/16 | 5/19/16 | 5/19/16 | 5/19/16 |
| | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| Sgt | 12/13/16 | 12/13/16 | 12/13/16 | 12/13/16 |
| | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| | 4/14/16 | 4/14/16 | 4/14/16 | 4/14/16 |
| Sgt | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | 11/7/16 | 11/7/16 | 11/7/16 | 11/7/16 |
| | FMLA | FMLA | FMLA | FMLA |
| | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | 12/13/16 | 12/13/16 | 12/13/16 | 12/13/16 |
| | 12/13/16 | 12/13/16 | 12/13/16 | 12/13/16 |
| | 2/29/16 | 2/29/16 | 2/29/16 | 2/29/16 |
| | 3/7/16 | 3/7/16 | 3/7/16 | 3/7/16 |
| | 11/7/16 | 11/7/16 | 11/7/16 | 11/7/16 |
| | 2/16/16 | 2/16/16 | 2/16/16 | 2/16/16 |
| | 11/16/16 | 11/16/16 | 11/16/16 | 11/16/16 |
| | 2/29/16 | 2/29/16 | 2/29/16 | 2/29/16 |
| | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| | 11/1/16 | 11/1/16 | 11/1/16 | 11/1/16 |
| | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| | 2/29/16 | 2/29/16 | 2/29/16 | 2/29/16 |
| | MODIFIED | MODIFIED | MODIFIED | MODIFIED |
| | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |
| | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | 4/8/16 | 4/8/16 | 4/8/16 | 4/8/16 |

15225  Fernandez, Michael

6

CoG_WHEATCROFT 002699

# REDACTED

| | | | | |
|---|---|---|---|---|
| | 12/13/16 | 12/13/16 | 12/13/16 | 12/13/16 |
| | 11/16/16 | 11/16/16 | 11/16/16 | 11/16/16 |
| | 12/7/16 | 12/7/16 | 12/7/16 | 12/7/16 |
| | 12/7/16 | 12/7/16 | 12/7/16 | 12/7/16 |
| | 11/1/16 | 11/1/16 | 11/1/16 | 11/1/16 |
| | 4/8/16 | 4/8/16 | 4/8/16 | 4/8/16 |
| | | | | |
| | 4/14/16 | 4/14/16 | 4/14/16 | 4/14/16 |
| | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |
| | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| Sgt | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |
| Sgt | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |
| | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | 11/7/16 | 11/7/16 | 11/7/16 | 11/7/16 |
| Sgt | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | 4/14/16 | 4/14/16 | 4/14/16 | 4/14/16 |
| Sgt | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| | | | | |
| Sgt | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | 3/7/16 | 3/7/16 | 3/7/16 | 3/7/16 |
| Sgt | 2/16/16 | 2/16/16 | 2/16/16 | 2/16/16 |
| | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | 5/24/16 | 5/24/16 | 5/24/16 | 5/24/16 |
| 15543  Lindsey, Mark | 2/16/16 | 2/16/16 | 2/16/16 | 2/16/16 |
| | 11/1/16 | 11/1/16 | 11/1/16 | 11/1/16 |
| | 11/7/16 | 11/7/16 | 11/7/16 | 11/7/16 |
| Sgt | 10/3/16 | 10/3/16 | 10/3/16 | 10/3/16 |
| | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |

# REDACTED

CoG_WHEATCROFT 002701

| | 12251 | Schneider, Matthew | | | | | |
|---|---|---|---|---|---|---|---|
| REDACTED | | | | 5/24/16 | 5/24/16 | 5/24/16 | 5/24/16 |
| | | | | 11/16/16 | 11/16/16 | 11/16/16 | 11/16/16 |
| | | | | 5/19/16 | 5/19/16 | 5/19/16 | 5/19/16 |
| | | | | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| | | | | 5/2/16 | 5/2/16 | 5/2/16 | 5/2/16 |
| | | | | 4/14/16 | 4/14/16 | 4/14/16 | 4/14/16 |
| | | | Sgt | 3/7/16 | 3/7/16 | 3/7/16 | 3/7/16 |
| | | | | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |
| | | | | 4/20/16 | 4/20/16 | 4/20/16 | 4/20/16 |
| | | | | 10/18/16 | 10/18/16 | 10/18/16 | 10/18/16 |
| | | | Sgt | 4/14/16 | 4/14/16 | 4/14/16 | 4/14/16 |
| | | | | 2/29/16 | 2/29/16 | 2/29/16 | 2/29/16 |
| | | | | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | | | | 12/7/16 | 12/7/16 | 12/7/16 | 12/7/16 |
| | | | | 4/8/16 | 4/8/16 | 4/8/16 | 4/8/16 |
| | | | | 11/7/16 | 11/7/16 | 11/7/16 | 11/7/16 |
| | | | | 5/24/16 | 5/24/16 | 5/24/16 | 5/24/16 |
| | | | | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | | | Sgt | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | | | | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | | | | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | | | | 11/1/16 | 11/1/16 | 11/1/16 | 11/1/16 |
| | | | | 9/28/16 | 9/28/16 | 9/28/16 | 9/28/16 |
| | | | | 1/27/16 | 1/27/16 | 1/27/16 | 1/27/16 |
| | | | Sgt | RETIRED | RETIRED | RETIRED | RETIRED |
| | | | | 2/16/16 | 2/16/16 | 2/16/16 | 2/16/16 |
| | | | Sgt | 5/24/16 | 5/24/16 | 5/24/16 | 5/24/16 |
| | | | | 10/26/16 | 10/26/16 | 10/26/16 | 10/26/16 |
| | | | Sgt | 11/7/16 | 11/7/16 | 11/7/16 | 11/7/16 |
| | | | | 5/19/16 | 5/19/16 | 5/19/16 | 5/19/16 |
| | | | Sgt | 11/1/16 | 11/1/16 | 11/1/16 | 11/1/16 |
| | | | Sgt | 10/3/16 | 10/3/16 | 10/3/16 | 10/3/16 |
| | | | | 10/3/16 | 10/3/16 | 10/3/16 | 10/3/16 |

12

## Glendale Police Department
### CALENDAR SCHOOL ROSTER

**Class Title:** Advanced Officer Training (AOT)

**Hours:** 10

**Dates(s):** 2/16/2016   to   2/16/2016

**Location:** Glendale Regional Public Safety Training Center

**Facilitator(s):** Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff



Welcome to the Glendale Regional Public Safety Training Center

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | REDACTED | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | 2/16/16 | MARK LINDSEY | 15543 | GPD | OFC |
| 9. | 2/16/16 | MICHAEL FERNANDEZ | 15225 | " | " |
| 10. | REDACTED | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |

## Glendale Police Department
### CALENDAR SCHOOL ROSTER

| Class Title: | Advanced Officer Training (AOT) |
|---|---|
| Hours: | 10 |
| Dates(s): | 5/24/2016  to  5/24/2016 |
| Location: | Glendale Regional Public Safety Training Center |
| Facilitator(s): | Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff |



Welcome to the Glendale Regional Public Safety Training Center

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | REDACTED | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | 5-24-16 | M. SCHNEIDER | 12251 | GPD | OFC |
| 12. | REDACTED | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |

# 2016 ADVANCED OFFICER TRAINING



## GLENDALE POLICE DEPARTMENT TRAINING UNIT

CoG_WHEATCROFT 002623

# AOT:  ONE 10-HOUR SESSION



## AOT INCLUDES:

1) FIREARMS PRACTICAL
2) TACTICAL DRIVING
3) DEFENSIVE TACTICS
4) FIRST AID/WOUND CARE
5) GAS MASK FIT TESTING

CoG_WHEATCROFT 002624



# FIREARMS

FIREARMS RANGE:

TASK, CONDITIONS, STANDARDS

1-2-3 DRILL

HOLSTER BOX DRILL





CoG_WHEATCROFT 002625

# TACTICAL DRIVING



DRIVING TRACK 2.5 HRS.:

1)   VEHICLE PURSUITS
2)   ROADBLOCKS

CLASSROOM PRESENTATION

PRACTICAL DRIVING:

        VEHICLE PURSUIT





CoG_WHEATCROFT 002626



# DEFENSIVE TACTICS

### DEFENSIVE TACTICS:

DEFENSIVE TACTICS: INSTRUCTING OFFICERS IN THE UPDATED OCCS HOLDS PER AZPOST

TASER: REVIEW TARGETING THE BACK OF A SUBJECT WHEN DEPLOYING THE TASER, HOW TASER BAYS WORK SEPARATELY FROM ONE ANOTHER.

BOX DRILLS:
WORKING ON SKILLS IN USING THE TASER AND HOW EACH BAY WORKS SEPARATELY FROM ONE ANOTHER.
10-52 ARREST, LOOKING HOW OFFICER USES COMMAND PRESENCE, POSITION OF ADVANTAGE, GRADIENT HAND POSITIONING AND HAND CUFFING TECHNIQUE.
HANDS IN POCKET: HOW AN OFFICER APPROACHES AND REMOVES HANDS OUT OF A SUBJECTS POCKET WHO POSSIBLE HAS A GUN.



CoG_WHEATCROFT 002627

# First Aid / Legal Issues /



# Moving Patients

### First Aid:

First Responder – Legal and Ethical Issues

This lesson will provide the responder with a refresher in legal and ethical duties as they relate to the first responder providing first–aid. These include moral and ethical obligations, types of consent, refusals, negligence, abandonment, and confidentiality.

First Responder – Tactical Medical Care Review

This lesson will provide the responder with a refresher on controlling bleeding, applying a pressure dressing, and applying a tourniquet. There will be a practical portion to this.

First Responder – Moving Patients

This lesson will provide the responder with a refresher on different types of patient moves in a tactical  situation. It will cover three basic moves that can be applied based on the situation. There will be a practical portion to this.





CoG_WHEATCROFT 002628



# 2016 AOT DT OCCS

Advanced Officer Training
Defensive Tactics
O'Donnell Continuous Control System

CoG_WHEATCROFT 002630

# Watch out For Hands in Pockets



CoG_WHEATCROFT 002632

# Objective

- **Hands in Pockets**

- **To provide officers with certain pain compliance techniques which lend themselves to the effective control of the individual physically resisting arrest**

- **To provide officers with certain physical control techniques, which can be used in passive resistance situations and also as an effective means of controlling a restrained or unrestrained individual from point to point?**

- **To provide officers with a simple yet affective technique with multiple applications and the ability to apply it from any position or angle utilizing the same basic hand grab.**

CoG_WHEATCROFT 002633

# OCCS Update



CoG_WHEATCROFT 002638





**GLENDALE POLICE DEPARTMENT**

# VEHICLE PURSUITS

**AND**

# ROADBLOCKS

**2016 AOT**

**DRIVING INSTRUCTOR STAFF**

CoG_WHEATCROFT 002728



# 2017 MASTER ROSTER

## ROSTER

| | | Module I | | | |
|---|---|---|---|---|---|
| | | Firearms | CPR | DT/TASER /Baton | De-Escalation |
| | | INSERT DATE COMPLETED BELOW-HIGHLIGHT GREEN WHEN COMPLETED | | | |
| STAFF | *(LT AND ABOVE)* | | | | |
| REDACTED | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | | | | |
| | Sgt | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |
| | | RETIRED | RETIRED | RETIRED | RETIRED |
| | | 3/22/17 | 3/22/17 | 3/22/17 | 3/22/17 |

CoG_WHEATCROFT 002943

REDACTED

| | | | | |
|---|---|---|---|---|
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | | | | |
| | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |
| | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |
| | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |

15225  Fernandez, Michael

REDACTED

| | | | | |
|---|---|---|---|---|
| | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |
| | 3/6/17 | 3/6/17 | 3/6/17 | 3/6/17 |
| **Sgt** | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | 5/23/17 | 5/23/17 | 5/23/17 | 5/23/17 |
| | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |
| | | | | |
| **Sgt** | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | 1/20/17 | 1/20/17 | 1/20/17 | 1/20/17 |
| | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | 2/21/17 | 2/21/17 | 2/21/17 | 2/21/17 |
| | 4/7/17 | 4/7/17 | 4/7/17 | 4/7/17 |
| | 3/6/17 | 3/6/17 | 3/6/17 | 3/6/17 |
| | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |
| | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | | | |
| | 3/3/17 | 3/3/17 | 3/3/17 | 3/3/17 |
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |
| | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | 11/15/17 | 11/15/17 | 11/15/17 | 11/15/17 |
| | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |

6

CoG_WHEATCROFT 002948

| | | | | | |
|---|---|---|---|---|---|
| REDACTED | | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| 15543 | Lindsey, Mark | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | | 2/21/17 | 2/21/17 | 2/21/17 | 2/21/17 |
| | | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | **Sgt** | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | 11/15/17 | 11/15/17 | 11/15/17 | 11/15/17 |
| | | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |
| | | 9/15/17 | 9/15/17 | 9/15/17 | 9/15/17 |
| | | 3/3/17 | 3/3/17 | 3/3/17 | 3/3/17 |
| | | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | 3/3/17 | 3/3/17 | 3/3/17 | 3/3/17 |
| | | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | | | | | |
| | | 2/21/17 | 2/21/17 | 2/21/17 | 2/21/17 |
| | | 2/8/17 | 2/8/17 | 2/8/17 | 2/8/17 |
| | **Sgt** | 2/21/17 | 2/21/17 | 2/21/17 | 2/21/17 |
| | | 11/15/17 | 11/15/17 | 11/15/17 | 11/15/17 |
| | | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |
| | **Sgt** | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |
| | | 11/6/17 | 11/6/17 | 11/6/17 | 11/6/17 |
| | | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | | 3/6/17 | 3/6/17 | 3/6/17 | 3/6/17 |
| | | 11/15/17 | 11/15/17 | 11/15/17 | 11/15/17 |
| | **Sgt** | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | 10/24/17 | 10/24/17 | 10/24/17 | 10/24/17 |
| | | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |
| | | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | **Sgt** | 2/8/17 | 2/8/17 | 2/8/17 | 2/8/17 |
| | | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |

9

CoG_WHEATCROFT 002951

**REDACTED**

| | | | | |
|---|---|---|---|---|
| | | 9/20/17 | 9/20/17 | 9/20/17 | 9/20/17 |
| | | 11/15/17 | 11/15/17 | 11/15/17 | 11/15/17 |
| | | 1/20/17 | 1/20/17 | 1/20/17 | 1/20/17 |
| | | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |

12251 | Schneider, Matthew

**REDACTED**

| | | | | |
|---|---|---|---|---|
| | | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | | 4/7/17 | 4/7/17 | 4/7/17 | 4/7/17 |
| | | 9/15/17 | 9/15/17 | 9/15/17 | 9/15/17 |
| | | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | | 9/20/17 | 9/20/17 | 9/20/17 | 9/20/17 |
| | | 9/20/17 | 9/20/17 | 9/20/17 | 9/20/17 |
| | | 11/6/17 | 11/6/17 | 11/6/17 | 11/6/17 |
| | | 1/26/17 | 1/26/17 | 1/26/17 | 1/26/17 |
| Sgt | 3/6/17 | 3/6/17 | 3/6/17 | 3/6/17 |
| Sgt | 5/1/17 | 5/1/17 | 5/1/17 | 5/1/17 |
| | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| Sgt | 11/6/17 | 11/6/17 | 11/6/17 | 11/6/17 |
| | 3/6/17 | 3/6/17 | 3/6/17 | 3/6/17 |
| | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | 12/12/17 | 12/12/17 | 12/12/17 | 12/12/17 |
| | 5/1/17 | 5/1/17 | 5/1/17 | 5/1/17 |
| | 5/23/17 | 5/23/17 | 5/23/17 | 5/23/17 |
| Sgt | 9/20/17 | 9/20/17 | 9/20/17 | 9/20/17 |
| | 4/19/17 | 4/19/17 | 4/19/17 | 4/19/17 |
| | 2/8/17 | 2/8/17 | 2/8/17 | 2/8/17 |
| | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |
| | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | 11/30/17 | 11/30/17 | 11/30/17 | 11/30/17 |
| | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |
| Sgt | 10/11/17 | 10/11/17 | 10/11/17 | 10/11/17 |
| | 12/6/17 | 12/6/17 | 12/6/17 | 12/6/17 |

12



## Glendale Police Department
### CALENDAR SCHOOL ROSTER

**Class Title:** Advanced Officer Training (AOT)

**Hours:** 10

**Date(s):** 4/19/2017   to   4/19/2017

**Location:** Glendale Regional Public Safety Training Center

**Facilitator(s):** Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff

Welcome to the Glendale Regional Public Safety Training Center

|  | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | | REDACTED | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |

## Glendale Police Department
### CALENDAR SCHOOL ROSTER

| Course title: | Advanced Officer Training | | Date: | 4/19/2017  to  4/19/2017 | |

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 16. | 4-19-17 | Michael Fernandez | 1523 | GPD | OFC |
| 17. | | REDACTED | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22. | | | | | |
| 23. | | | | | |
| 24. | | | | | |
| 25. | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32. | | | | | |
| 33. | | | | | |
| 34. | | | | | |

# Glendale Police Department
## CALENDAR SCHOOL ROSTER

**Class Title:** Advanced Officer Training (AOT)

**Hours:** 10

**Date(s):** 12/12/2017 to 12/12/2017

**Location:** Glendale Regional Public Safety Training Center

**Facilitator(s):** Sgt. Malinski, Sgt. McDaniel, Firearms, Driving, DT, and Health and Safety Staff



Welcome to the Glendale Regional Public Safety Training Center

|  | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | REDACTED | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | 12/12/17 | MATT Schneider | 12251 | GPD | OFC |
| 8. | REDACTED | | | | |
| 9. | | | | | |
| 10. | 12/12/17 | MARK Linosey | 15543 | GPD | OFC |
| 11. | REDACTED | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |

CoG_WHEATCROFT 002959

# 2017 ADVANCED OFFICER TRAINING



## GLENDALE POLICE DEPARTMENT TRAINING UNIT

CoG_WHEATCROFT 002758

# AOT:  ONE 10-HOUR SESSION



## AOT INCLUDES:

1) FIREARMS PRACTICAL
2) CPR
3) DEFENSIVE TACTICS
4) BATON/TASER CERT.
5) DE-ESCALATION TRAINING

CoG_WHEATCROFT 002759

# FIREARMS



B RANGE: SHOOTING ON THE MOVE
AT VARIOUS ANGLES/IDENTIFYING
TARGETS (NO SHOOT)

C RANGE: ZIG ZAG
MOVEMENT/SHOOTING STEEL AND
PEPPER POPPERS

D RANGE: "RUNNING MAN"
(SHOOTING AT A MOVING TARGET)





CoG_WHEATCROFT 002760

# CARDIO PULMONARY RESUSCITATION



CPR:

STANDARD CPR TRAINING

REFRESHER TO THE CHANGES THAT OCCURRED WITH THE 2015 CPR GUIDELINES.





CoG_WHEATCROFT 002761

# DEFENSIVE TACTICS



DEFENSIVE TACTICS:

TASER UPDATE

TASER DOWNLOAD
TRAINING

BATON RECERTIFICATION

DT PRACTICALS:
1) "HIGH GEAR" SCENARIOS



CoG_WHEATCROFT 002762

# De-escalation Training



Verbal communication

Conflict resolution

"Slow it" acronym

Applications of force:

"It's not can I, but should I?"



CoG_WHEATCROFT 002763

SLIDESHOW

# Basic Life Support

## BLS for Healthcare Providers and Professional Rescuers





We Make Protecting and Saving Lives Easy®

CoG_WHEATCROFT 002829



# 2017
# Baton Re-Certification AOT

Presented by: DT Staff

CoG_WHEATCROFT 002765



•Baton Recertification

OVERVIEW:

CoG_WHEATCROFT 002767



# Conflict Resolution

Presented by: Glendale Police Training Unit

CoG_WHEATCROFT 002798



# 2017 Defensive Tactics AOT

Presented by: DT Staff

CoG_WHEATCROFT 002790

# Response to Resistance Chart



CoG_WHEATCROFT 002791

# OCCS HOLD

- Basic Hold



CoG_WHEATCROFT 002792

# TASER USAGE

- Have a plan B-C-D



CoG_WHEATCROFT 002793

# ATTACK THE ATTACK

- Close Quarter Combat



CoG_WHEATCROFT 002794

# CREATE DISTANCE

- Impact Push
- Tactical Retreat



CoG_WHEATCROFT 002795



# 2018 MASTER ROSTER

## ROSTER

| | Module I | | | |
|---|---|---|---|---|
| | Firearms | HRVS | 4-5 Man Takedown | First Aid |
| | INSERT DATE COMPLETED BELOW- HIGHLIGHT GREEN WHEN COMPLETED | | | |

| STAFF      (LT AND ABOVE) | | | | |
|---|---|---|---|---|
| REDACTED | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 1/17/18 | 1/17/18 | 1/17/18 | 1/17/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | | | | |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |
| | 10/4/18 | 10/4/18 | 10/4/18 | 10/4/18 |

CoG_WHEATCROFT 003187

**REDACTED**

**REDACTED**

| | | | | | |
|---|---|---|---|---|---|
| | | 2/15/18 | 2/15/18 | 2/15/18 | 2/15/18 |
| | | SIGNED | UP | | |
| | | | | | |
| | | 1/17/18 | 1/17/18 | 1/17/18 | 1/17/18 |
| | | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| 15225 | Fernandez, Michael | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | | 3/8/18 | 3/8/18 | 3/8/18 | 3/8/18 |
| | | 2/15/18 | 2/15/18 | 2/15/18 | 2/15/18 |
| | | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | | 10/23/18 | 10/23/18 | 10/23/18 | 10/23/18 |
| | Sgt | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | | 2/6/18 | 2/6/18 | 2/6/18 | 2/6/18 |
| | | SIGNED | UP | | |
| | | | | | |
| | | SIGNED | UP | | |
| | Sgt | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | | 2/6/18 | 2/6/18 | 2/6/18 | 2/6/18 |
| | | SIGNED | UP | | |
| | | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | | 5/3/18 | 5/3/18 | 5/3/18 | 5/3/18 |
| | | 3/27/18 | 3/27/18 | 3/27/18 | 3/27/18 |
| | | 10/23/18 | 10/23/18 | 10/23/18 | 10/23/18 |
| | | 2/27/18 | 2/27/18 | 2/27/18 | 2/27/18 |
| | | 10/23/18 | 10/23/18 | 10/23/18 | 10/23/18 |
| | | SIGNED | UP | | |
| | | SIGNED | UP | | |
| | | 4/18/18 | 4/18/18 | 4/18/18 | 4/18/18 |
| | | 12/19/18 | 12/19/18 | 12/19/18 | 12/19/18 |
| | | SIGNED | UP | | |
| | | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | | 3/27/18 | 3/27/18 | 3/27/18 | 3/27/18 |

CoG_WHEATCROFT 003192

# REDACTED

| | 15543 | Lindsey, Mark |
|---|---|---|

# REDACTED

| Label | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|
| | 9/13/18 | 9/13/18 | 9/13/18 | 9/13/18 |
| | SIGNED | UP | | |
| | 1/30/18 | 1/30/18 | 1/30/18 | 1/30/18 |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | 2/27/18 | 2/27/18 | 2/27/18 | 2/27/18 |
| | SIGNED | UP | | |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| Sgt | LONG | TERM | INJURY | |
| | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| Sgt | 1/17/18 | 1/17/18 | 1/17/18 | 1/17/18 |
| | SIGNED | UP | | |
| | 9/25/18 | 9/25/18 | 9/25/18 | 9/25/18 |
| | 2/27/18 | 2/27/18 | 2/27/18 | 2/27/18 |
| | 2/15/18 | 2/15/18 | 2/15/18 | 2/15/18 |
| | SIGNED | UP | | |
| | 4/18/18 | 4/18/18 | 4/18/18 | 4/18/18 |
| | 2/27/18 | 2/27/18 | 2/27/18 | 2/27/18 |
| | 3/27/18 | 3/27/18 | 3/27/18 | 3/27/18 |
| Sgt | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| Sgt | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | SIGNED | UP | | |
| | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | 2/27/18 | 2/27/18 | 2/27/18 | 2/27/18 |
| | 5/29/18 | 5/29/18 | 5/29/18 | 5/29/18 |
| | 4/4/18 | 4/4/18 | 4/4/18 | 4/4/18 |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | 4/18/18 | 4/18/18 | 4/18/18 | 4/18/18 |
| Sgt | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | 10/23/18 | 10/23/18 | 10/23/18 | 10/23/18 |

CoG_WHEATCROFT 003195

# REDACTED

| | 12251 | Schneider, Matthew | | | |

# REDACTED

| Rank | Col 1 | Col 2 | Col 3 | Col 4 |
|---|---|---|---|---|
| | 1/30/18 | 1/30/18 | 1/30/18 | 1/30/18 |
| | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| | 4/4/18 | 4/4/18 | 4/4/18 | 4/4/18 |
| | 2/15/18 | 2/15/18 | 2/15/18 | 2/15/18 |
| | 5/18/18 | 5/18/18 | 5/18/18 | 5/18/18 |
| | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | 1/30/18 | 1/30/18 | 1/30/18 | 1/30/18 |
| | 2/27/18 | 2/27/18 | 2/27/18 | 2/27/18 |
| | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| | 12/10/18 | 12/10/18 | 12/10/18 | 12/10/18 |
| | 10/23/18 | 10/23/18 | 10/23/18 | 10/23/18 |
| Sgt | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| Sgt | SIGNED | UP | | |
| | 4/18/18 | 4/18/18 | 4/18/18 | 4/18/18 |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| Sgt | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | 5/3/18 | 5/3/18 | 5/3/18 | 5/3/18 |
| | 1/17/18 | 1/17/18 | 1/17/18 | 1/17/18 |
| | SIGNED | UP | | |
| | 4/4/18 | 4/4/18 | 4/4/18 | 4/4/18 |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| | SIGNED | UP | | |
| | 2/6/18 | 2/6/18 | 2/6/18 | 2/6/18 |
| Sgt | 3/8/18 | 3/8/18 | 3/8/18 | 3/8/18 |
| | 10/10/18 | 10/10/18 | 10/10/18 | 10/10/18 |
| | 9/13/18 | 9/13/18 | 9/13/18 | 9/13/18 |
| | SIGNED | UP | | |
| | 4/24/18 | 4/24/18 | 4/24/18 | 4/24/18 |
| | 9/25/18 | 9/25/18 | 9/25/18 | 9/25/18 |
| | 12/5/18 | 12/5/18 | 12/5/18 | 12/5/18 |
| Sgt | 4/18/18 | 4/18/18 | 4/18/18 | 4/18/18 |
| | 1/30/18 | 1/30/18 | 1/30/18 | 1/30/18 |
| Sgt | 3/8/18 | 3/8/18 | 3/8/18 | 3/8/18 |

12

# Glendale Police Department
## CALENDAR SCHOOL ROSTER

| | |
|---|---|
| **Class Title:** | 2018 Advanced Officer Training (AOT) |
| **Hours:** | 10 |
| **Date(s):** | 5/18/2018 |
| **Location:** | Glendale Regional Public Safety Training Center |
| **Facilitator(s):** Sgt. Malinski, Sgt. McDaniel, Firearms, HRVS, DT, and Health and Safety Staff | |

Welcome to the Glendale Regional Public Safety Training Center

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | 5/18/18 | MATT SCHNEIDER | 12251 | GLENDALE | OFC |
| 2. | | | | | |
| 3. | | REDACTED | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |



# Glendale Police Department
## CALENDAR SCHOOL ROSTER

| Class Title: | 2018 Advanced Officer Training (AOT) |
| Hours: | 10 |
| Date(s): | 12/5/2018 |
| Location: | Glendale Regional Public Safety Training Center |
| Facilitator(s): | Sgt. Malinski, Sgt. McDaniel, Firearms, HRVS, DT, and Health and Safety Staff |

Welcome to the Glendale Regional Public Safety Training Center

| | Date | NAME | ID# | AGENCY | RANK |
|---|---|---|---|---|---|
| 1. | REDACTED | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | 12/5/18 | MARK LINDSEY | 15543 | GPD | DET. |
| 11. | | REDACTED | | | |
| 12. | '' | M. FERNANDEZ | 15225 | '' | OFC |
| 13. | REDACTED | | | | |
| 14. | | | | | |
| 15. | | | | | |

# 2018 AOT
# OCCS Handshake Cuffing



CoG_WHEATCROFT 002963

# Objectives

➢ **Excited Delirium**
- **What is it**
- **Four Phases**
- **Who is at Risk**
- **Behavioral Cues**
- **Signs**
- **A Medical Crisis**

➢ **Case Law**
- **Hill vs. Miracle**

➢ **4 and 5 Officer Takedown**
- **Plan of Action**
- **Responsibilities of Officers**
- **Documentation**

CoG_WHEATCROFT 002965



# Conflict Resolution

Presented by: Glendale Police Training Unit

CoG_WHEATCROFT 002986

# 2018 AOT
# HIGH RISK VEHICLE STOPS



Presented by:
GPD Training Staff

CoG_WHEATCROFT 003026

# Objectives

- **What is a High Risk Stop**

- **Glendale Police Department High Risk Stop Policy**

- **Positioning**

- **Officer Responsibilities  and Other Units**

- **Clearing Vehicle**

- **Legal Considerations**

CoG_WHEATCROFT 003027