**Marc J. Victor, SBN 016064**
**Jody L. Broaddus, SN 020122**
ATTORNEYS FOR FREEDOM
3185 South Price Road
Chandler, Arizona 85248
Phone: (480) 755-7110
Fax: (480) 857-0150
Marc@AttorneyForFreedom.com
Jody@AttorneyForFreedom.com
*Attorneys for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT

### IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Johnny Wheatcroft and Anya Chapman, as husband and wife, and on behalf of minors J. W. and B. W., <br><br>                              Plaintiffs, <br><br> v. <br><br> City of Glendale, a municipal entity; Matt Schneider, in his official and individual capacities; Mark Lindsey, in his official and individual capacities; and Michael Fernandez, in his official and individual capacities; <br><br>                              Defendants. | Case No.: 2:18-cv-02347-SMB <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Oral argument requested. |

Pursuant to Fed. R. Civ. P. 56, Plaintiff Johnny Wheatcroft ("Plaintiff"), individually and on behalf of minors J.W. and B.W. (the "Minor Plaintiffs")(collectively, "Plaintiffs"), respectfully submits their response in opposition to Defendants' Motion for Summary Judgment [Doc. 245].

This response is supported by the following memorandum of points and authorities, as well as Plaintiffs' controverting and separate statement of facts filed on this same date. For ease of reference, Plaintiffs' Controverting and Separate Statements of Fact are referred to as "PSOF."

### MEMORANDUM OF POINTS AND AUTHORITIES

### I. <u>RELEVANT FACTUAL BACKGROUND.</u>

On July 26, 2017, Plaintiffs went to a Motel 6 to get a room to enjoy family time together. PSOF 19. Plaintiff was a front seat passenger in a Ford Taurus (the "vehicle"), the Minor Plaintiffs were in the back seat with their mother Anya Chapman, and Shawn Blackburn ("Blackburn") was the driver. PSOF 20. After the vehicle backed into a parking spot, but before they exited the vehicle, Plaintiffs were approached by Defendants Schneider ("Schneider") and Lindsey ("Lindsey"), who were officers with Defendant Glendale ("Glendale"). PSOF 21. Schneider, who claimed there was a turn signal violation and the first officer to approach the car, directly went to the front seat passenger, not the driver who purportedly did not use a turn signal. PSOF 22. When asked, Plaintiff informed Schneider they were getting a room at the hotel. PSOF 23.

Schneider demanded identification from everyone in the vehicle and Plaintiff asked why he needed to provide identification since he had done nothing wrong. PSOF 24. Schneider falsely told him that he was required to provide it because he was a passenger in a vehicle. PSOF 25. Schneider then retaliated by threatening to take Plaintiff to the police station even though Plaintiff had not committed any crime or reasonably suspected of any illegal activity. PSOF 26.

Schneider told Plaintiff not to reach into his bag or stuff anything between the seats even though Plaintiff had not done so, and Plaintiff complied by not reaching in his bag or stuffing anything between the seats even after Schneider's request. PSOF 27. Schneider reached inside the vehicle and opened the passenger door to remove Plaintiff from the vehicle. PSOF 28. As Plaintiff placed his foot outside to exit the vehicle, Schneider instructed him not to exit the vehicle, then placed a taser between Plaintiff's neck and right shoulder and asked if he was going to fight, and Plaintiff confirmed he was not going to fight. PSOF 29. Schneider holstered his taser, then grabbed and twisted Plaintiff's arm behind his back while pushing his shoulder forward, causing Plaintiff significant pain. PSOF 30. The move is called an armbar and is intended to cause pain. PSOF 31.

While Plaintiff was still restrained by the seat belt, Lindsey assisted Schneider to physically remove Plaintiff from the vehicle. PSOF 32. Lindsey placed his taser on Plaintiff while Schneider

shoved Plaintiff's head down toward his lap while his arm still twisted behind his back, causing Plaintiff additional pain. PSOF 33. Lindsey then tased Plaintiff several times in the back, even though Plaintiff was still tangled and restrained in his seatbelt and his arm was contorted behind his back by Schneider. PSOF 34. The Minor Plaintiffs were screaming and watching in horror as these events transpired and repeatedly asked the officers to stop.  PSOF 35. As Schneider and Lindsey continued to assault Plaintiff, Anya moved her torso area into the area between the front seats. PSOF 36. A water bottle came from the back seat toward the officers, then fell to the ground where Lindsey slipped on it and fell.  PSOF 37.

As Plaintiff was seated on the ground tangled in the seatbelt with his back leaning on the open car door, Schneider backed up about 5 or 6 feet then launched his taser in dart-mode at Plaintiff's chest as Plaintiff was idly sitting in a non-threatening manner on the ground. PSOF 38-39. Despite seeing Schneider deploy his taser at Plaintiff, Defendant Fernandez ("Fernandez") did nothing to protect Plaintiff. PSOF 40. Rather, Fernandez applied his taser to Plaintiff. PSOF 40. Fernandez then rolled Plaintiff over so his face was in the front passenger's seat with his knees on the asphalt and handcuffed with his hands behind his back. PSOF 41.

Schneider continued to sporadically tase Plaintiff even though Plaintiff's hands were handcuffed behind his back. PSOF 42. Fernandez then attempted to drag Plaintiff toward the rear of the vehicle, while Plaintiff and the other passengers in the vehicle repeatedly stated that Plaintiff was caught in the seatbelt. PSOF 43. Eventually, Minor J.W. climbed over into the front seat area and released his father from the seatbelt. Schneider then commanded minor J.W. to get out of the vehicle and J.W., frozen in fear, hysterically broke down into tears and collapsed into the passenger seat.  PSOF 44-45.

As Plaintiff was prone and handcuffed on the ground, Schneider kicked him in the testicles twice then pulled down his shorts and tased his testicles. PSOF 48. Plaintiff remained handcuffed on the ground, as officers began to forcibly remove the taser prongs embedded in his skin, causing

Plaintiff to scream in agony. PSOF 49. Schneider then placed his taser on Plaintiff's penis and screamed, "Keep fighting and you're going to get it again! You want it again? Shut your mouth! I'm done fucking around with you!" PSOF 50. Officers then lifted Plaintiff to his feet and continued to pull out the taser prongs, as he continued to scream in agony, as Schneider told him "relax, stop being a big baby." PSOF 50-51. Glendale's officers then placed Plaintiff in a patrol vehicle and transported him to Jail.  PSOF 51.

None of the officers made any attempt or took any steps to intervene and protect Plaintiff from Schneider, Lindsey, and Fernandez's excessive force, despite their duty and knowledge to do so.  PSOF 52. Plaintiff was not engaged in any crime, there were no articulable facts that he had engaged in any crime, and he did not impose any immediate threat to the officers. PSOF 53. He was complying with the officers' commands and not resisting. PSOF 54. Yet, Defendants wrongfully arrested and charged Plaintiff with aggravated assault, a class 5 felony, and resisting arrest, a class 6 felony, and he remained in jail for several months before the charges were dismissed by the prosecution.   PSOF 55.

Defendants never activate their lights or siren, as required for a traffic stop under Glendale's policies and procedures. PSOF 56. Defendants could not have seen any alleged turn signal violation as they were on the back side of the building without a view of the vehicle either approaching the turn, making the turn, or determining whether any traffic would have been affected by a turn signal. PSOF 57. Defendants' expert, who has never testified at trial or in a deposition (prior to this case) and who has only been retained as expert on a few occasions and solely by Defendants' attorney, testified he disagreed with both Arizona court and federal court cases that clearly state a turn signal violation requires other traffic to be affected. PSOF 58. Schneider admittedly did not see the vehicle at any time prior to the turn and did not see any other traffic that could have been affected by a turn maneuver. PSOF 59-60. Glendale had a practice of stopping vehicles for turn signal violations even when the elements were not met. PSOF 61.

Schneider has an extensive history of violating policies and procedures. PSOF 62. Also, he will "just give up and go to the taser" even when it is against Glendale's policies. PSOF 63. Further, Schneider has a pattern of dishonesty. PSOF 64. Even Assistant Police Chief Rich LeVander stated "None of Matt's [Schneider's] excuses hold water with me." PSOF 65.

To justify their actions, Defendants rely on a trespass agreement that was not in effect until over a year after the subject incident, and such agreement only authorizes the Defendants to enforce trespass laws.  PSOF 66-67. There is no evidence that Plaintiffs were ever requested to leave the property at any time or that they were not lawfully on the premises. PSOF 68. Thus, Defendants were not, and could not be, enforcing trespassing laws. PSOF 69.

Police Chief Rick St. John was the decision maker for Glendale as to its policies and procedures for police officers. PSOF 70. Glendale, including its mayor, issued various press releases stating their officers are held to the highest professional standards and that they reviewed the officers' conduct, yet it only disciplined one officer for one wrongful act while condoning and approving the other numerous wrongful acts. PSOF 71.

As a result of the repeated trauma, Plaintiff sustained serious injuries, including penile functionality issues. PSOF 73. The horrifying events transpired just a few feet from the Minor Plaintiffs, who were terrified, screaming, and traumatized by the officers' atrocious conduct. PSOF 74. JW had bruising on his arm due to Schneider forcefully grabbing him to pull him out of the vehicle. PSOF 75.

Due to the incident, the Minor Plaintiffs have been afraid to leave their house, they have anxiety when they see a cop, and they 'freak out' when their mom leaves the house because they think the cops will beat her up. PSOF 76. They would not even go outside to play basketball because they were too scared, and they experienced violent nightmares. PSOF 77. To this day, the Minor Plaintiffs are terrified of cops and they now have lost respect for authority. PSOF 78. BW is scared and becomes anxious when he see someone who resembles the officers who tortured his

dad. PSOF 79. BW is still terrified cops are going to tase him, and he will duck down when he sees and officer so they don't see him because he is so scared. PSOF 80. Also, their attitudes have changed, and J.W. has had issues with school including getting suspended. PSOF 81.

## II.  LEGAL ARGUMENT.

**A.  The Evidence Supports a Claim for Wrongful Arrest under § 1983.**

As established herein, the evidence establishes Defendants wrongfully seized and arrested Plaintiff in violation of his constitutional rights.

**1.  There Was No Reasonable Suspicion for a *Terry* Stop.** Defendants seek summary judgment based on the false premise that Defendants engaged in a *Terry* stop. "Under the Fourth Amendment, government officials may conduct an investigatory stop of a vehicle only if they possess 'reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *U.S. v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000). Defendants' claim of a turn signal violation does not warrant an investigative stop as Schneider did not, and could not, see a turn signal violation because he did not even see the vehicle until *after* it completed its turn into the Motel parking lot. Thus, no reasonable suspicion or any particularized and objective basis for suspecting a turn signal violation existed. *See U.S v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002):

> The case at hand is somewhat different from those which have come before because it is not entirely clear that Officer Garrett made a mistake about the law of Arizona, but as far as the record shows it is clear that if he did understand the law, the facts known to him could not justify a traffic stop. We will explain.
>
> While it is commonly thought that a person must give a turn signal of some kind when he turns his vehicle, that is not quite true in Arizona. What Arizona law actually provides is that "[a] person shall not so turn any vehicle without giving an appropriate signal in the manner provided by this article in the event any other traffic may be affected by the movement." Ariz.Rev.Stat. § 28–754(A). Plainly, if a violation was to be suspected, there must have been traffic, and there must have been some possibility that the traffic would be "affected by the movement" of the Crown Victoria when it made its right-hand turn off of McDowell Road. The government does not argue to the contrary. Yet there was not a shard of evidence that any vehicle other than the Crown Victoria itself was affected by the right turn.

*See also* A.R.S. § 28–754 (providing a turn signal shall be used when other traffic may be affected by the movement and shall be used continuously for at least one hundred feet before the turn).

Any claim Schneider did not know the law for turn signals cannot amount to reasonable suspicion. *See U.S. v. Mariscal*, 285 F.3d at 1130 ("If an officer simply does not know the law, and makes a stop based upon objective facts that cannot constitute a violation, his suspicions cannot be reasonable."). Because no particularized or objective facts existed for suspecting a traffic violation, the traffic stop was a violation of the Fourth Amendment. *Id.* at 1133 (9th Cir. 2002)("we conclude that where, as here, the objective facts of record demonstrate that no officer could have a reasonable suspicion that the driver of a vehicle had violated a traffic law, the traffic stop was a violation of the Fourth Amendment.").

Additional evidence confirms Defendants' interaction with the vehicle and its passengers was not the product of a purported traffic stop. Specifically, Defendants did not activate lights or a siren as required for a traffic stop under Glendale's policies and Schneider directly approached the front seat passenger, asked if they were staying at the motel, and requested identification from all the passengers. Based on this conduct, as well as the evidence confirming Schneider could not have seen a traffic violation, a jury could reasonably find Defendants were not engaged in a traffic stop but were purposefully violating Plaintiffs' Fourth Amendment rights.

Because there was no lawful vehicle stop, Plaintiffs were unlawfully seized in violation of their Fourth Amendment rights. *Brendlin v. California*, 551 U.S. 249, 249 (2007)("When police make a traffic stop, a passenger in the car, like the driver, is seized for Fourth Amendment purposes and so may challenge the stop's constitutionality.").

2.  **The Trespass Agreement Does Not Authorize Constitutional Violations.** There is no legal authority to support Defendants' position that a private trespass agreement for events on private property authorizes a *Terry* stop.  Further, the trespass form disclosed by Defendants was not in effect until over a year after the subject incident. Even assuming an agreement existed,

- 7 -

such agreement only authorizes the officers to *enforce* trespassing laws under A.R.S.§ 13-1502(A). Neither A.R.S.§ 13-1502(A) nor the trespass agreement give Defendants authority to unilaterally investigate or interrogate guests, search their vehicles, or violate their constitutional rights. Here, Plaintiffs were getting a room at the Motel. Plaintiffs were never requested to leave the property and were lawfully on the premises. Thus, Defendants were not enforcing trespassing laws under A.R.S.§ 13-1502(A).

Any such agreement cannot be the basis for forming articulable suspicion of criminal activity. *See People v. Thompson*, 787 N.E.2d 858, 865 (2003), stating as to a trespass agreement:

> The trial court stated a police-citizen encounter cannot be both a community-caretaking stop and a *Terry* stop at the same time because "the rights are distinctly different." The interagency agreement gave the officers authority under certain circumstances to perform a community-caretaking encounter and nothing more. Therefore, the interagency agreement cannot be the basis for forming a reasonable articulable suspicion of criminal activity.

A trespass agreement does not justify intrusion on a person's Fourth Amendment Rights. *See People v. Beverly*, 845 N.E.2d 962, 974 (2006)("The officers testified that they were interested in defendant's vehicle because of the trespass agreement. Nevertheless, although the officers had reason to want to approach and question defendant, the agency agreement did not justify intrusion upon fourth amendment rights."). *See also Stoner v. State of Cal.*, 376 U.S. 483, 490 (1964)("a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." [citation omitted] "That protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel.").

Finally, the trespass agreement is irrelevant as Plaintiffs are not claiming they were wrongfully arrested for violation of the trespass agreement, and Defendants were not engaged in enforcement of any trespass law. Defendants cite no legal authority that would support their implication that a trespass agreement allows officers to violate a citizen's constitutional rights.

**3.**    **Arizona Does Not Require A Passenger to Provide Identification.** Defendants claim they were authorized to request identification because they made a *Terry* stop. As

established above, there was no *Terry* stop.  Even *assuming* a lawful traffic stop, Arizona law does not require a passenger to provide identification unless there is reasonable suspicion the passenger committed an unlawful offense. *See* A.R.S. § 28-1595(c). If passengers were required to provide identification in any vehicle stop, then A.R.S. § 28-1595(c) would be wholly superfluous. Moreover, the law is clear that a passenger is not required to provide identification during a *Terry* stop when the reason for the stop is a minor traffic violation unless there is a reasonable suspicion of a crime by the passenger. *See U.S. v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019):

> As explained above, the officers insisted several times that Landeros identify himself after he initially refused, and detained him while making those demands. At the time they did so, the officers had no reasonable suspicion that Landeros had committed an offense. Accordingly, <u>the police could not lawfully order him to identify himself.</u> His repeated refusal to do so thus did not, as the government claims, constitute a failure to comply with an officer's lawful order, Ariz. Rev. Stat. Ann. § 28-622(A). There was therefore no justification for the extension of the detention to allow the officers to press Landeros further for his identity.

*See also Melendres v. Arpaio*, 989 F. Supp. 2d 822, 906 (D. Ariz. 2013):

> Yet, stopping a driver for a traffic violation provides no "reason to stop or detain the passengers." *Maryland v. Wilson*, 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). The deputy cannot prolong the stop to investigate a passenger unless the deputy through his or her observations obtains particularized reasonable suspicion that the passenger is committing a violation that the deputy is authorized to enforce. *See United States v. Cortez*, 449 U.S. 411, 417–18.

*See also Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 177, 188 (2004)("Under these principles, an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop.").

Defendants' position that suspicion existed because the driver backed the vehicle into a parking space is without merit. It is not illegal to back into a parking spot. At best, Blackburn purportedly failed to use a turn signal and backed into a parking spot, neither of which implicates any wrongdoing by Plaintiff that would require him to provide identification under Arizona law. Moreover, Defendants' claim that of a high-crime area does not amount to reasonable suspicion of criminal activity. *See Brown v. Texas*, 443 U.S. 47, 51–52 (1979):

The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct. Officer Venegas testified at appellant's trial that the situation in the alley "looked suspicious," but he was unable to point to any facts supporting that conclusion. There is no indication in the record that it was unusual for people to be in the alley. The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood. When pressed, Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity. The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees.

\* \* \*

But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

**4.**     **No Lawful Authority Existed to Remove Plaintiff from the Vehicle.** Defendants argue they were authorized to remove Plaintiff from the vehicle due to a *Terry* stop. As stated above, there was no *Terry* Stop.  If we assume there was a valid traffic stop, Defendants would not be authorized to simply employ force to remove passengers. They could *order* passengers to exit a vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 412 (1997)("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). However, that did not happen in this matter. There was never any order or instruction for Plaintiff to exit the vehicle, and Schneider explicitly instructed Plaintiff to stay in the vehicle. The video footage speaks for itself, and a jury could reasonably conclude Schneider was attempting to provoke a situation so he could use excessive force.

**5.**     **No Probable Cause Existed to Arrest Plaintiff.** Defendants' position that probable cause existed because a grand jury returned an indictment is without merit. *See Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1210 (D. Ariz. 2019) ("Defendants argue that the grand jury's probable cause finding in this case defeats all of Plaintiff's claims, including his false arrest claims. Doc. 264 at 11. The Court does not agree."). The inquiry is whether Plaintiff's arrest was, based on undisputed facts, supported by probable cause at the time of his arrest. *Id.* at 1211("The Court

accordingly must decide whether Plaintiff's arrest was, as a matter of undisputed fact, supported by probable cause at the time of his arrest.").

Here, Defendants claim probable cause existed based on disputed facts occurring *after* Schneider went "hands on" with Plaintiff, *i.e.* Defendants were arresting him for resisting arrest before any purported resisting arrest occurred. The evidence confirms there was no basis to use any force against Plaintiff who was complying with the officers. A jury could reasonably conclude Defendants' use of force was unlawful and excessive and they were purposefully attempting to create a situation to use excessive force. A jury could also find Plaintiff did not use force or, even if he did, he would have been justified in using force. *See* A.R.S. § 13-404(B)(2)("B. The threat or use of physical force against another is not justified:" . . . (2) To resist an arrest that the person knows or should know is being made by a peace officer or by a person acting in a peace officer's presence and at his direction, whether the arrest is lawful or unlawful, **unless the physical force used by the peace officer exceeds that allowed by law**")(emphasis added).

The video evidence contradicts information in the police report, and there is no evidence as to what information was provided to the grand jury as the process is confidential. *See* A.R.S. § 13-2812(A)("A person commits unlawful grand jury disclosure if the person knowingly discloses to another the nature or substance of any grand jury testimony or any decision, result or other matter attending a grand jury proceeding, except in the proper discharge of official duties, at the discretion of the prosecutor to inform a victim of the status of the case or when permitted by the court in furtherance of justice."). *See also Samaritan Health Sys. v. Superior Ct. In & For Cty. of Maricopa*, 182 Ariz. 219, 221(App. 1994)("We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."). Probable cause does not exist when it is based on an officer's false statements. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918(2017)("But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a

police officer's false statements. Then, too, a person is confined without constitutionally adequate justification."). Here, evidence shows the officers provided false information to include the police report. Thus, a jury could reasonably conclude no probable cause existed to arrest Plaintiffs.

      **6.**      <u>**Defendants are not Entitled to Qualified Immunity.**</u> Qualified immunity does not exist if an official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017)("Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "). This does not require case law directly on point for a right to be clearly established. *Id.* ("While this Court's case law 'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.' "). As to summary judgment on qualified immunity, facts and inferences are viewed in the light most favorable to the non-moving party. *See Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021)("In qualified-immunity cases, 'we view the facts in the light most favorable to the nonmoving party.' ").

      Defendants violated clear established law. In *U.S. v. Mariscal*, 285 F.3d 1127, 1133 (9th Cir. 2002), the officer stopped a vehicle who did not use a turn signal. The Ninth Circuit Court stated "Plainly, if a violation was to be suspected, there must have been traffic, and there must have been some possibility that the traffic would be 'affected by the movement' " which did not exist in that case. *Id.* at 1131. Given the lack of evidence of other traffic that would be affected, "no officer could have a reasonable suspicion that the driver of a vehicle had violated a traffic law, the traffic stop was a violation of the Fourth Amendment." *Id.* at 1133.

      Schneider confirmed he was unaware of any other traffic that would have been affected and he did not see the vehicle for the 100 feet before the turn, so he could not have seen any purported turn signal violation. Given *Mariscal*, Defendants were on notice that the traffic stop would be a violation of the Fourth Amendment. Thus, Defendants are not entitled to qualified

immunity. *See Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011):

> Because we hold that **Officer Estrada's mistake of fact was not reasonable, he is not entitled to qualified immunity.** Officer Estrada asks us to conclude that it is a reasonable mistake to believe that windows that are rolled down and that cannot be viewed at all are in fact rolled up and tinted. This we cannot do. **The qualified immunity standard is not so deferential to officers that it will allow a "chimera created by [an officer's] imaginings [to] be used against the driver.**" *Mariscal*, 285 F.3d at 1130; *see Bingham*, 341 F.3d at 946–48 (denying summary judgment on the basis of qualified immunity where the plaintiff testified that he had broken no traffic laws, but officer testified that he had seen the plaintiff drive across lane lines). **Construing the facts in the light most favorable to Plaintiff, we must assume that Officer Estrada could not have seen Plaintiff's front car windows at all and that, indeed, the two made eye contact through the open windows. That being so, it would not be reasonable for Officer Estrada to believe that he had seen illegally tinted front windows.** [Emphasis added.]

Also, Plaintiff was not legally obligated to provide identification, as there was no reasonable suspicion he was engaged in any illegal activity. Thus, detaining or arresting Plaintiff for failing to provide identification is a clear violation of Plaintiff's Fourth Amendment rights. *See Brown v. Texas*, 443 U.S. 47, 52 (1979)("But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits."); *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 906 (D. Ariz. 2013)(holding the detention of passengers to investigate their identity when not reasonably related to the driver's traffic infraction implicates the Fourth Amendment and raises constitutional concerns); and *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990), which states:

> The only remaining issue, then, is whether the rights here in question were so clearly established that officer Aguilar should have known he was acting illegally when he initiated the traffic stop. We believe they were. If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air. No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property.

Further, the video evidence confirms Plaintiff was not resisting. Even assuming he was

engaging passive resistance, Defendants would not be entitled to qualified immunity. *See Rice v. Morehouse*, 989 F.3d 1112, 1127 (9th Cir. 2021), which states:

> In contrast, here, taking Rice's version of the events as true, Rice was engaged in mere passive resistance. To be sure, **Rice repeatedly declined to provide his license and other documents to Murakami and to exit his car**. But Rice gave Murakami his name, rolled down the window, and attempted to gather his license before he was pulled out of his car. **Rice also unlocked the car and did not physically resist arrest before he was taken to the ground**. Although Rice was upset and insistent in wanting to speak with Murakami's supervisor, Rice did not swear or threaten any of the officers. Thus, like the plaintiff in *Gravelet-Blondin*— and unlike the plaintiff in Emmons—**Rice was "perfectly passive, engaged in no resistance, and did nothing that could be deemed particularly bellicose.**" *Gravelet-Blondin*, 728 F.3d at 1092 (internal quotation marks omitted). Accordingly, **the line of cases discussed in *Gravelet-Blondin* clearly established the law long before Morehouse's and Shaffer's take-down of Rice**.
> V. CONCLUSION
> Viewing the facts, as we must, in the light most favorable to Rice, **we conclude that a reasonable jury could find that Rice engaged in passive resistance and that Morehouse's and Shaffer's take-down of Rice involved unconstitutionally excessive force.** Furthermore, **because the right to be free from "the application of non-trivial force for engaging in mere passive resistance" was clearly established before December 2011**, Morehouse and Shaffer are not immune from suit. [Emphasis added.]

Finally, qualified immunity does not apply as to the trespass agreement since any duties under a private agreement would be outside the performance of public duties and policy reasons that would justify qualified immunity. *See Bracken v. Okura*, 869 F.3d 771, 778 (9th Cir. 2017):

> Chung has not shown that the policies underpinning qualified immunity warrant invoking the doctrine here. In detaining Bracken, Chung did not act "in performance of public duties" or to "carry[ ] out the work of government." *Filarsky*, 566 U.S. at 389–90, 132 S.Ct. 1657 (emphasis added) (*citing Richardson*, 521 U.S. at 409–11, 117 S.Ct. 2100). He does not contend, for example, that he was preventing Bracken from committing a crime. Instead, Chung—acting on behalf of the hotel, at the hotel's direction and while being paid by the hotel—aided the hotel in realizing its goal of issuing Bracken a warning. Thus, shielding Chung from suit would not advance the policies underlying qualified immunity. *See id.* at 389–91, 132 S.Ct. 1657. We hold that qualified immunity is not available to Chung.

**B.**   **The Evidence Supports a Claim for Excessive Force under § 1983.**

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted

sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.2005). *See also Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)("[T]his court has often held that in police misconduct cases, summary judgment should only be granted 'sparingly' because such cases often turn on credibility determinations by a jury.").

The evaluation of an excessive force claim under § 1983 involves the analysis of three factors: "First, a court must evaluate the "the type and amount of force inflicted;" "Second, the court considers the government's interest in using force, relying upon (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety, and (3) whether the suspect was resisting arrest or attempting escape;" and "the court then balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion." *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 990 (D. Ariz. 2012).

1.    **The type and amount of force inflicted.** Defendants employed various types and amounts of force against Plaintiff including verbal threats, a painful armbar, repeated taser and drive stuns, kicks to his testicles, and threatened taser use on his penis. The 9th Circuit has recognized taser use qualifies as an intermediate level of force that involves a significant and intrusive level of force that results in, among other things, physiological effects, high levels of intense pain, foreseeable risk of physical injury, and disorientation that continue even after the electrical current has ended. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013)("the intrusion on Blondin's Fourth Amendment interests—the discharge of a taser in dart mode upon him—involved an intermediate level of force with "physiological effects, [ ] high levels of pain, and foreseeable risk of physical injury."); *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)(*dissenting* "The pain is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves. Beyond the experience of pain, tasers result in "immobilization, disorientation, loss of balance, and weakness," even after the electrical current has ended."). Intermediate force is considered a significant intrusion of a

person's liberty interests. *See also Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011)("As such, both are regarded as "intermediate force" that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests.").

        2.    **The severity of the crime, whether the suspect posed an immediate threat to the officers' or public's safety, and whether the suspect was resisting arrest**. As established above, there was no basis for the traffic stop and no reasonable suspicion or probable cause that Plaintiff committed any crime. He was merely a passenger in a car that was illegally stopped for a made-up turn signal violation. Plaintiff did not pose an immediate threat and he was not resisting or attempting escape. Despite the lack of any basis to employ any force, Defendants immediately began grabbing Plaintiff, threatening to use a taser, forcing a painful armbar, kicking him in the testicles, and repeatedly and relentlessly tasing and drive stunning him.

        3.    **The balance of the gravity of the intrusion on the individual against the government's need for that intrusion**. There was no reasonable basis for any intrusion against Plaintiff. While there was no evidence of a seatbelt violation, even assuming *arguendo* there was, such violation does not warrant the use of force employed by the officers. *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1166 (9th Cir. 2011)(holding the balance does not favor the government when force was significant and the governmental interest in the use of that force was minimal when considering a seatbelt violation). Although Plaintiff was not trespassing, trespassing is not a serious offense that would warrant the egregious level of force used by the officers. *See Davis v. City of Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007)("Trespassing and obstructing a police officer, as those offenses were committed by Davis, are by no means such serious offenses as to provide an officer with a reasonable basis for subduing a person by the means employed by Officer Miller."). As established above, the intrusion upon Plaintiff's liberty interests was significant. Defendants' interest in torturing Plaintiff with excessive force is lacking, especially given Plaintiff did not commit a crime, the lack of any reasonable basis to employ intermediate force, and lack

of any indication of dangerousness to the officers that would justify the severe use of force. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1166 (9th Cir. 2011):

> The intermediate force used by Wells indisputably constituted a significant intrusion upon Young's liberty interests. In assessing the countervailing governmental interest that we must balance against that intrusion, as explained above, all three factors traditionally used to assess the government's interest weigh against a finding that the force used in this case was reasonable. First, the "immediate threat to safety of the officer or others," *Miller*, 340 F.3d at 964, was negligible: Wells has never argued that Young posed any sort of safety threat prior to his use of pepper spray, and to the extent that he argued in the district court that his baton blows were justified by fears for his safety, such arguments would, at most, suffice to raise a jury question as to whether it was reasonable for him to fear an assault from a man who had failed to wear his seatbelt and was armed only with broccoli and a tomato—a man who had not in any way threatened him or indicated any propensity for violent behavior. Second, the crimes involved in Young's traffic stop were non-violent misdemeanors committed in a manner that gave no indication of dangerousness to Wells or others, and thus not sufficiently "severe" to justify the use of significant force. Finally, Young was not actively resisting arrest or attempting to flee. As well, while not included among the factors we traditionally consider, the fact that Wells could have feasibly employed less intrusive measures prior to his use of force suggests that the government's interest in the use of significant force was extremely limited, if not altogether non-existent.
> Having determined that the force allegedly used against Young was significant and that the governmental interest in the use of that force minimal, we conclude that, taking the facts in the light most favorable to Young, the force used by Wells was excessive in violation of the Fourth Amendment.

*See also Johnson v. D.C.,* 528 F.3d 969, 975 (D.C. Cir. 2008)("This tips the balance toward illegality. Bruce's alleged kick to the groin of a prone man, which caused great personal harm to Johnson without any corresponding public benefit, violated the Fourth Amendment.").

**4.     Defendants' Use of Force Was Unreasonable**. Defendants did not address the balances of intrusions in their brief, but they argue their actions were reasonable. Defendants concede the following uses of force were used against Plaintiff: (1) the armbar, which they call an escort hold, (2) Schneider's initial threatened use of a taser, (3) Lindsey's drive stuns, (4) Schneider's taser use via dart mode, (5) Fernandez's taser use via dart mode, (6) Schneider's two kicks to Plaintiff's testicles, (7) Schneider's drive stun to Plaintiff's back after Plaintiff was handcuffed, and (8) Schneider's drive stun to Plaintiff's testicles after Plaintiff was handcuffed on the ground. Defendants also acknowledge these uses of force arising from a purported traffic

stop "may appear to be excessive."[1] Thus, Defendants seek summary judgment despite recognizing a jury could reasonably conclude the uses of force were excessive.

The evidence confirms there was no reason to use force against Plaintiff, as he had not engaged in any crime, there was no reasonable basis to suspect him of any crime, he was complying with the officers' commands, he did not constitute an immediate threat, and he was not resisting. *See Espinosa v. City & Cty. of San Francisco,* 598 F.3d 528, 538 (9th Cir. 2010)

> According to the officers, Sullivan was resisting arrest and posed a high risk to their safety. Still, Sullivan had not been accused of any crime. He was not a threat to the public and could not escape. He had not initially caused this situation. He had not brandished a weapon, spoken of a weapon, or threatened to use a weapon. Sullivan, in fact, did not have a weapon. Viewing the evidence in the light most favorable to the plaintiffs, defendants have failed to show that there are no questions of fact regarding whether the use of deadly force was reasonable.

Given the evidence, Defendants' self-serving statements of an immediate threat to the safety of the officers may be rejected by the jury. *See Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1011, 1012 (9th Cir. 2017)("Lastly, while it is true that '[i]f the person is armed ... a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat,' **a reasonable jury could find that Andy turned naturally and non-aggressively in light of the overall context**." … "We nonetheless denied summary judgment on plaintiff's excessive force claim because the only evidence of Cruz's threatening gesture was the officers' self-serving testimony, and because there was circumstantial evidence that could permit a reasonably jury to find 'that the officers lied.'"). *See also Est. of Anderson v. Marsh,* No. 19-15068, 2021 WL 139733 (9th Cir. Jan. 15, 2021):

> The district court then identified several bases on which a jury could conclude, on the evidence in the record, that Anderson "did not make a sudden, furtive reach for the passenger side of [his] car," and therefore that he did not pose an immediate threat to anyone when he was shot. Because of this factual dispute, the district court concluded that "[a] reasonable jury could find Officer Marsh's use of deadly force ... was excessive."

---

[1] *See* Defendants' Motion for Summary Judgment [Doc. 245] at p. 14, lines 12-15.

A jury can also reasonably conclude Defendants tried to provoke a situation where force would be needed. Thus, assuming Plaintiff used force in response to provocation, Defendants would be still liable for their use of force associated with Plaintiff's response to the provocation. *See Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 538–39 (9th Cir. 2010)("If an officer intentionally or recklessly violates a suspect's constitutional rights, then the violation may be a provocation creating a situation in which force was necessary and such force would have been legal but for the initial violation.").

Further, "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). "An officer who fails to intervene when a fellow officer uses excessive force would be responsible, just as the fellow officer, for violating the Fourth Amendment's requirement that police may use only such force as is objectively reasonable under the circumstances." *Farmer v. Las Vegas Metro. Police Dep't,* 423 F. Supp. 3d 1008, 1018 (D. Nev. 2019). Defendants Schneider, Lindsey, and Fernandez failed to intervene when each of the officers were violating Plaintiff's constitutional rights. A jury could reasonably conclude that the officers owed duties to intercede to protect the Plaintiffs from the other officers' constitutional violations.

**5.** __Defendants are not entitled to qualified immunity.__ Summary judgment on qualified immunity is not warranted when the evidence and inferences therefrom, viewed in the light most favorable to Plaintiffs, show that Defendants' conduct violates a clearly established federal right. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007)("Defendants are entitled to such relief only if the facts alleged and evidence submitted, resolved in Blankenhorn's favor and viewed in the light most favorable to him, show that their conduct did not violate a federal right; or, if it did, the scope of that right was not clearly established at the time."). Case law need not be directly on point for a right to be clearly established. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017). Defendants may still be on notice their conduct violates

established law even in novel factual situations. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013)("We bear in mind, however, that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.' ").

"The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013). The right to be free from excessive taser use, including using a taser in dart mode, was clearly established as of 2010. *Id.* at 1096("they support our determination that, though the specific level of force involved in using a taser was not clear until 2010, it was well known as of 2008 that a taser in dart mode constitutes more than trivial force. Sgt. Shelton is therefore not entitled to qualified immunity."). *See Silva v. Chung*, 740 F. App'x 883, 886 (9th Cir. 2018):

> *Officer Chung's use of his Taser violated clearly established law.* In *Bryan v. MacPherson,* **we held that one deployment of the Taser X26 in dart-mode against a belligerent individual who was unarmed, non-threatening, and apprehended for a minor traffic violation, was excessive**. 630 F.3d 805. Here, **Haleck was met with even greater Taser force, and was not belligerent**. In *Brooks v. City of Seattle*, one of the two underlying cases in *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc), **this court, sitting en banc, held that multiple Taser deployments on an individual who no longer poses even a potential threat to the officers' or others' safety, much less an "immediate threat," was unconstitutional.** *Mattos*, 661 F.3d at 444 (citing Deorle, 272 F.3d at 1280). Here, Haleck was unarmed and never posed even a potential threat to Officer Chung or Officer Critchlow, because Haleck, unlike Brooks, never had access to even a potential weapon, such as a car.

The right to be free from kicks to the groin was clearly established as of 2008. *See Johnson v. D.C.,* 528 F.3d 969, 976 (D.C. Cir. 2008)("Bruce is not entitled to qualified immunity if the cases show that his kicking [in the groin] violated the Fourth Amendment, because 'a reasonably competent public official should know the law governing his conduct.' ").  Finally, Defendants are not entitled to qualified immunity for failing to intervene as it is clearly established. *See Farmer v. Las Vegas Metro. Police Dep't*, 423 F. Supp. 3d 1008, 1019 (D. Nev. 2019)("The Ninth Circuit has consistently held that an officer's duty to intervene with the use of excessive force by another officer is clearly established."), *citing Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th

Cir. 2000). *See also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."), *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927–28 (11th Cir. 2000)("Considering that the law on excessive force and on the duty to intervene under these circumstances was clearly established, we accept that no reasonable officer would believe that either the amount of force used in these circumstances or the failure to intervene was objectively reasonable. Therefore, Defendants are not entitled to judgment as a matter of law on the grounds of qualified immunity."), and *Sanchez v. Hialeah Police Dep't*, 357 F. App'x 229, 233 (11th Cir. 2009)("We likewise conclude that Officer Garrido is not entitled to qualified immunity from Sanchez's claim that Officer Garrido, despite being in clear view and restrainable range, failed to intervene and stop Officer Del Nodal's use of excessive force.").

**C.**  **The Evidence Supports Plaintiff's Retaliation under § 1983.**

"To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity;1 and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). Here, Plaintiff engaged in protected speech, *i.e.* questioning why he needed to provide identification when he did nothing wrong. In response, Schneider threatened to arrest him and take him to the police station, which would chill a person of ordinary firmness from engaging in such protected activity. Thus, Plaintiff was subjected to adverse action including excessive force and arrest. *See Ferguson v. City of New York*, No. 17-CV-4090 (BMC), 2018 WL 3626427, at p. 6 (E.D.N.Y. July 30, 2018), which states:

> A private citizen plaintiff bringing a First Amendment retaliation claim based on his criticism of a public official must show that "(1) he has an interest protected by the

First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.' " *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (*quoting Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ). In this context, the plaintiff must show that he suffered an "actual chill" of his speech because of the public official's retaliation. *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011). As plaintiff notes, **"[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."** *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (*quoting Hill*, 482 U.S. at 461).

Plaintiff testified at his deposition that, **in response to his complaint about Officer Dugan asking for his identification only after he asked for the officer's badge number, Officer Sanchez "slammed his hand against plaintiff's shoulder" and told him that "we can do this the easy** way or the hard way" and **"you can either you get me your ID or you can go to jail."** Plaintiff alleged that he stopped complaining and provided his identification because he was afraid of being taken to jail and of being struck a second time. Officer Sanchez denies that he pushed or threatened plaintiff.

As noted above, **"[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."** *Posr*, 180 F.3d at 415 (*quoting Hill*, 482 U.S. at 461)**. Plaintiff's complaint about only having to provide his information after he asked Officer Dugan for his badge number (implying that Officer Dugan did not have a good reason to ask for plaintiff's identification) is the type of verbal criticism or challenge covered by the First Amendment**. [Emphasis added.]

*See Martin v. Mez*, No.2:20-CV-855-JAM-JDP, 2020 WL 5909059, at p.2 (E.D.Cal. Oct. 6, 2020):

Liberally construed, the plaintiff's allegations, for purposes of screening, state a cognizable First Amendment retaliatory arrest claim against the individual defendants. Plaintiff specifically alleges that he was arrested after, and in retaliation for, refusing to produce identification. ECF No. 1 at 2; *see Abdel-Shafy v. City of San Jose*, 2019 WL 570759, at * 8 (N.D. Cal. Feb. 12, 2019) (assuming, without deciding, that the plaintiff has a First Amendment right to not provide police officers with identifying information); *Karmo v. Borough of Darby*, 2014 WL 4763831, at *5 (E.D. Pa. Sept. 25, 2014) (holding that allegation that plaintiff "was detained and assaulted by officers as a result of lawful refusal to produce identification" was sufficient to state a First Amendment retaliation claim).

Based on the evidence, a jury could reasonably conclude that, despite having no lawful reason for demanding identification or using force, Schneider immediately threatened to take Plaintiff to jail and then implemented unlawful force. *See Lopez v. City of Glendora,* 811 F. App'x 1016, 1018–19 (9th Cir. 2020):

Finally, we affirm the district court as to Lopez's retaliation claim. Retaliation requires Lopez to prove "that (1) the officer's conduct 'would chill or silence a

person of ordinary firmness from future First Amendment activities,' and (2) the officer's desire to chill speech was a 'but-for cause' of the adverse action." *Sharp v. County of Orange*, 871 F.3d 901, 919 (9th Cir. 2017). **A jury could reasonably conclude that Kodadek's excessive use of force was retaliatory because it immediately followed Lopez's request** for a female officer to pat her down and she was, at most, passively resisting at the time. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1022–23 (9th Cir. 2015); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990). **These cases condemning "any action to punish or deter" a suspect's speech were clearly established law at the time of the incident.** *Duran*, 904 F.2d at 1378. [Emphasis added.]

*See also Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990):

> At the same time, because Aguilar claims that he had no retaliatory motive-that he honestly believed Duran's actions indicated that criminal activity might be afoot-the district court's grant of summary judgment in favor of Duran on this issue was also error. There remains a material issue of fact, therefore, whether Aguilar intended to hassle Duran as punishment for exercising his First Amendment rights. To the extent the trier of fact determines that officer Aguilar stopped Duran in retaliation for Duran's method of expressing his opinion, this would constitute a separate constitutional violation that could form the basis of liability under section 1983.

As established above, no probable cause existed to arrest Plaintiff or to engage in excessive force against him. Even assuming probable cause existed for the arrest, it does not preclude a retaliation claim. *See Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1955 (2018) ("Lozman need not prove the absence of probable cause to maintain a claim of retaliatory arrest against the City."). Moreover, Defendants are not entitled to qualified immunity as case law clearly establishes qualified immunity does not protect officers who retaliate in response to protected speech. *See Vohra v. City of Placentia,* 683 F. App'x 564, 567 (9th Cir. 2017)("Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech."). *See also Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008):

> Arresting someone in retaliation for their exercise of free speech rights was violative of law clearly established at the time of Beck's arrest. By 1990, it was "well established ... that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows - or should know - that much."

**D.**    **The Evidence Supports a Claim for Malicious Prosecution.**

- 23 -

For malicious prosecution, Plaintiff must show the Defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right. *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). "Malicious prosecution actions are not limited to suits against prosecutors, but may be brought against other persons who have wrongfully caused the charges to be filed." *See Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1183, 1195 (D. Ariz. 2008). Defendants claim probable cause precludes Plaintiff's malicious prosecution claim. However, as established above, probable cause did not exist, and summary judgment is not warranted.

Also, evidence in this matter establishes Defendants provided false information in reporting the matter, including, among other things, Plaintiff was refusing to comply, was combative, was resisting, and was repeatedly kicking the officers throughout the entire interaction. Defendants' reports also failed to include that the officers used excessive force against Plaintiff. In denying summary judgment against an officer for malicious prosecution, the court in *Blankenhorn v. City of Orange*, 485 F.3d 463, 483-84 (9th Cir. 2007) stated:

> Thus, **the information in those reports was the only basis for the resisting-arrest charges.** Again, Blankenhorn submitted more than mere conclusory allegations of falsehood by submitting the declaration of a witness, Garcia, that directly contradicted the police reports. **A reasonable jury drawing all justifiable inferences from the video and witness statements in Blankenhorn's favor could conclude that Blankenhorn did not act as Nguyen and Ross alleged and, thus, that the reports included intentionally false information.** If so, Blankenhorn would overcome the presumption of prosecutorial independence. *See Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir.1989) (plaintiff overcame presumption where prosecutor had no information but police reports and plaintiff presented evidence, in addition to his own testimony, of false information in the reports); *see also Barlow*, 943 F.2d at 1137 (*discussing Borunda*).
>
> Moreover, Nguyen's purposeful omission that he punched Blankenhorn is relevant to whether there was probable cause to charge him with resisting arrest. **If the prosecutor knew Nguyen used excessive force, there would likely be little or no basis for charging him with resisting arrest as was done here.** [Emphasis added.]

*See also Dirks v. Martinez,* 414 F. App'x 961, 963 (9th Cir. 2011):

> As to the claim against the deputies, the district court noted that there remain material, factual disputes underlying Dirks' malicious prosecution claim against

Martinez and Partida. A jury will have to determine whether they wrongfully caused charges to be filed against Dirks, knowing that there was no probable cause, by making false allegations against him and creating false police reports. *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir.2004). Further, the district court was correct in finding that the deputies failed to show that the termination of the criminal case against Dirks was anything other than a favorable dismissal on the merits. We affirm the district court's denial of summary judgment for the deputies on the malicious prosecution claim.

The evidence establishes malice existed as there was no basis for the alleged traffic stop, Schneider desired to go hands-on, the excessive amount of force, and Defendants' overall intent to 'shake down' the passengers in the vehicle without any lawful basis to do so. Further, malice may be inferred from the lack of probable cause. *See Ready v. City of Mesa*, 89 F. App'x 14, 18 (9th Cir. 2004)("because malice 'can be inferred from a lack of probable cause' there is a genuine issue of material fact as to malice as well."). A jury may find malice and the intent to deprive Plaintiff of his constitutional rights. *See Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d at 1211:

> Similarly, **if a jury finds that Keen recklessly fabricated evidence and finds that probable cause to prosecute homicide charges was lacking, a reasonable jury could also infer malice and intent to deprive Keen of constitutional rights**. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (stating that malice may be found based upon a statement that was known to be false or was made with reckless disregard for the truth). Because genuine issues of fact exist, Plaintiffs' malicious prosecution claim should also properly be resolved by a jury. Summary judgment is therefore denied on Plaintiffs' § 1983 malicious prosecution claim against Keen.

Next, Defendants summarily claim qualified immunity, but provide no legal support for their position. Based on the evidence and genuine issues of material fact, immunity does not apply. *See Gonzalez v. City of Santa Monica*, 88 F. App'x 161, 163 (9th Cir. 2004):

> The district court also erred in granting summary judgment with respect to the malicious prosecution claim. Reading Gonzalez's complaint under the standard of Fed.R.Civ.P. 8(a), as we must, he alleges the elements of malicious prosecution as well as the requisite intent to deprive him of his constitutional rights. *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir.1987). The defendants are not protected by the absolute immunity that usually attaches to involvement in a prosecution, as they are the complaining witnesses. *Harris v. Roderick*, 126 F.3d 1189, 1199 (9th Cir.1997). While "the exercise of prosecutorial judgment will usually insulate investigating officers from liability," *Poppell v. City of San Diego*, 149 F.3d 951, 962 (9th Cir.1998), there is an exception to this rule for instances in which officers knowingly submit false information. *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.1981). Since a jury could find, under Gonzalez's version of the facts, that the

officers engaged in malicious prosecution, the district court should not have granted summary judgment as to that claim.

Moreover, Schneider, Lindsey, and Fernandez are not entitled to qualified immunity because they were complaining victims as to the charges, they voluntarily provided false information, and deliberately set in motion a series of events that they anticipated, or should have anticipated, would lead to the arrest, indictment, and charges against Plaintiff. *See Harris v. Roderick*, 126 F.3d 1189, 1199 (9th Cir.1997)(holding the officers were not entitled to immunity because they were the complaining victims, provided false information, and deliberately set in motion a series of events leading to the arrest, indictment, and trial against the plaintiff).

**E.** **The Evidence Supports a § 1983 Claim for Violations of Familial Association.**

"It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that '[t]he state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983.' " *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001). *See also Hardwick v. Cty. of Orange*, 980 F.3d 733, 740–41 (9th Cir. 2020):

> "Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). "That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Id.* Moreover, "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]."

For a familial association claim, Plaintiffs must show that a government official's conduct shocks the conscience. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). When actual deliberation is practical, then an officer's deliberate indifference amounts to a shock of the conscience. *Id.* at 554("Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."). If deliberation is not practical, the Fourteenth Amendment is violated when the evidence indicates the officer acted with a purpose to harm unrelated to legitimate law enforcement objectives. *See Tan Lam v. City of Los Banos*, 976 F.3d

986, 1003 (9th Cir. 2020)("If actual deliberation was not practical, we cannot conclude that Acosta violated the Fourteenth Amendment unless substantial evidence indicates that he acted 'with a purpose to harm unrelated to legitimate law enforcement objectives.' ").  However, if the officer creates the very situation then resorts to force, his motives must be addressed in light of "reasonable" law enforcement objectives. *See Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008)("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation. His motives must then be assessed in light of the law enforcement objectives that can reasonably be found to have justified his actions.").

As established above, a jury can reasonably conclude there was no reason to use any force against Plaintiff, Defendants' actions were unreasonable, and Defendants were not engaging in legitimate law enforcement objectives.  This is especially true since Defendants argue they were acting pursuant to a trespass agreement, as opposed to Arizona law. Moreover, deliberation was practical as established by the evidence and, therefore, Defendants' deliberate indifference amounts to a shock of the conscience. *See Wilkinson v. Torres,* 610 F.3d at 554("Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."). Deliberate indifference is established when a defendant knew of, but disregarded, a substantial risk of harm. *See Irish v. Fowler*, 979 F.3d 65, 74 (1st Cir. 2020)("To show deliberate indifference, the plaintiff "must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk of serious harm ... and disregarded that risk.").

Here, Defendants knew of the substantial risk of harm in using excessive force and unlawfully arresting and jailing a person when no grounds existed, but disregarded that risk by wrongfully torturing, arresting, and jailing Plaintiff. A review of the video of Defendants' actions alone shocks the conscience, especially given there was no lawful basis to stop the vehicle, Schneider could not have seen a turn signal violation, Schneider threatened to arrest Plaintiff for asking why he needed to provide identification, Schneider's immediate use of force in response

to Plaintiff's questioning as to why he had to provide identification, Schneider's opening the door to remove Plaintiff from the vehicle and then becoming abusive as Plaintiff was attempting to cooperate by exiting the vehicle, and pulling down Plaintiff's shorts and tasing him in the testicles. Indeed, Plaintiffs were not engaged in any unlawful activities, and the jury can reasonably find Defendants purposefully focused on, attacked, and tortured Plaintiff who was a mere passenger in the car and was not posing any threat to the officers. Thus, not only does this evidence shock the conscience but it confirms Defendants were not acting for legitimate law enforcement purposes. Moreover, Defendants' claim of split-second decisions is wholly meritless, especially given Defendants created the very situation.

Again, Defendants summarily claim qualified immunity, but provide no legal authority to support their position. Qualified immunity does not exist where the officers create or expose persons, such as the Plaintiffs, to a danger they would not have otherwise faced. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 and 1065-66 (9th Cir. 2006):

> However, "[i]n order to find that the law was clearly established ... we need not find a prior case with identical, or even 'materially similar' facts. Our task is to determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful."
>
> * * *
>
> It is beyond dispute that in September 1998, it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced. This court first recognized the theory of state-created danger liability almost ten years before the events in this case in Wood.

*See also Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 974 (E.D. Cal. 2017), which denied qualified immunity as to a familial association claim stating:

> Having already concluded that a jury could find that the Officer Defendants' conduct "shocked the conscience," even under the "purpose to harm" standard, the Court turns to whether the Officer Defendants are entitled to qualified immunity simply because it is unclear which constitutional provisions their conduct would offend. They are not. "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.' " *al-Kidd*, 563 U.S. at 743, 131 S.Ct. 2074. Thus, "qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.' " *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)

(emphasis added). However, qualified immunity does not give an officer who engages in conduct that was patently unconstitutional when committed a get-out-of-liability-free card because there is "some lingering ambiguity" as to which constitutional provision "applies in this precise context," or whether he has managed to violate several constitutional provisions at once.

## E. The Evidence Supports a § 1983 *Monell* Claim.

Defendants argue that there is no municipal liability based on their erroneous position the officers should not be liable. As established above, the officers are liable under various legal theories for violating Plaintiffs' constitutional rights. Moreover, the officers' individual liability for constitutional violations does not preclude a *Monell* claim against Glendale. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019)("municipal defendants may be liable under § 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights."); *Fairley v. Luman*, 281 F.3d 913, 917 at n.4 (9th Cir. 2002)("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983," regardless of whether their exoneration is "on the basis of qualified immunity, because they were merely negligent, or for other failure of proof."); and *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1142 (9th Cir. 2012)("We have repeatedly held that '[i]f a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983.' ").

"In order to establish liability for governmental entities under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). "This does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). Further, "[m]unicipal liability may also attach where evidence of 'widespread practice ... is so permanent is well settled as to constitute a 'custom or usage' with the force of law'" . . . "or when 'inadequacy of police training ... amounts

to deliberate indifference to the rights of persons.'" *Krause v. Cty. of Mohave*, No. CV-17-08185-PCT-SMB, 2020 WL 2541728, at p. 13 (D. Ariz. May 19, 2020).

      **1.**    **Ratification.** A ratification claim under *Monell* exists when the authorized policymakers approve a subordinate's decisions. *See Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 979 (N.D. Cal. 2017)("Under Ninth Circuit law, a plaintiff states a claim under *Monell* if the plaintiff alleges that the 'authorized policymakers approve a subordinate's decision and the basis for it.' "). The approval of a subordinate's decision to violate constitutional rights amounts to ratification chargeable to the municipality. *See Adame v. City of Surprise*, No. CV-17-03200-PHX-GMS, 2018 WL 3209388, at p. 3 (D. Ariz. June 29, 2018)("The Ninth Circuit has 'found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation.' "). A policy or custom may be inferred if, after the incident, the officials took no steps to reprimand or discharge the officers or if they failed to admit the officers' conduct was in error. *Id.* ("Specifically, '[p]olicy or custom may be inferred if, after the [incident] ... officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error.' ").

      Here, Glendale approved and ratified the actions of its officers. Chief St. John, who is the policymaker for the police department, reviewed the incident, including Sgt. Moody's report confirming the lack of any basis for the traffic stop, the inability of Schneider to see any purported traffic violation, the lack of any basis to request Plaintiffs' identification, the violations of policies requiring police lights for an alleged stop, violations of policy for kicking Plaintiff in the testicles twice, the lack of any basis for an alleged seatbelt violation, violations of the laws of arrest, and the excessive force used by officers. Despite review, no steps were taken to reprimand or discharge Lindsey and Fernandez for their constitutional violations, and no steps were taken to reprimand or discharge Schneider for most of his multiple constitutional violations. Glendale condoned all but one single use of excessive force by Schneider and ignored the other constitutional violations

including other excessive uses of force, including application of the painful armbar, repeated threats of taser uses, the numerous tasings and drive stuns, and the kicks to Plaintiff's testicles, as well as the illegal traffic stop. Thus, the evidence establishes a *Monell* claim. *See Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020):

> Here, two pieces of evidence suggest the existence of such a policy. First, Chief Rosales, an official policymaker for SPPD, reviewed and approved of the officers' conduct. In a deposition, she testified that she reviewed "the reports," "the audio," "the incident history, the call history," and "the canine and use of force policy" before "sign[ing] off on the incident" because she "believe[d] that it was within policy and training." Second, San Pablo's own expert opined that both the officers' entry into the plaintiffs' home and their decision to deploy the police canine were "reasonable, lawful, ... and consistent with ... departmental policies and procedures." Accordingly, there is a triable issue of fact as to the existence of a municipal policy under *Monell* and San Pablo's liability under § 1983. We reverse the district court's grant of summary judgment.

Glendale's public approval of its officers' action also establishes ratification. *See Hernandez v. City of San Jose,* 241 F. Supp. 3d at 979:

> Nevertheless, the City Defendants argue that Garcia's statements approving of police officers' actions merely "show a police chief fulfilling his role as the public face for his department." *Id.* However, this argument shows precisely why Garcia's statements approving of the police officers' actions can give rise to liability under *Monell*. Acting as the public face of the police department, and with knowledge of "his officers' actions at the rally and the reasons for them," *id.* Garcia allegedly made "statements ... tending to show that [he] endorsed or approved the unconstitutional conduct of individual officers." *Dorger v. City of Napa*, 2012 WL 3791447, at *5 (N.D. Cal. Aug. 31, 2012). Under Ninth Circuit law, this "evinces ratification" and therefore is sufficient to plausibly allege that the police officers' actions constituted municipal policy. *Id.*; *see also Christie*, 176 F.3d at 1240 (holding that *Monell* liability is appropriate if a representative of the municipality "affirmatively approved" of the allegedly unconstitutional conduct").

Glendale publicly approved of, condoned, and ratified the actions of Schneider, Lindsey, and Fernandez. Glendale issued various press releases stating their officers are held to the highest professional standards and that they reviewed the officers' conduct, yet it only disciplined one officer for one wrongful act while condoning and approving the other numerous wrongful acts. These public statements establish Glendale's ratification and condonation of the wrongful acts of Schneider, Lindsey, and Fernandez. In addition, Glendale has continued to publicly affirm the

officers' actions in the Answer to the Complaint and throughout this lawsuit, including the pending summary judgment motion itself, through its position that the officers did no wrong.

      **2.**      <u>**Defendant Had a Policy to Violate Constitutional Rights.**</u> Arizona statutory law and case law clearly set forth the requirements for a traffic stop and when identification can be requested from a passenger. Despite those requirements, the officers understood, and Glendale condoned, the practice of stopping vehicles for turn signal violations even when the elements were not met. This is further bolstered by Defendant's expert who testified that case law in both Arizona courts and federal cases was wrong in holding a turn signal violation under Arizona law requires other traffic to be affected by the turn movement. Thus, a jury can reasonably conclude Glendale's policies and practices for stopping vehicles without a proper basis under the law and in violation the Fourth Amendment. *See U.S. v. Mariscal*, 285 F.3d at 1133 (stating as to stopping a vehicle for a turn signal violation when there is no other traffic that would be affected, "At the end of that process, we conclude that where, as here, the objective facts of record demonstrate that no officer could have a reasonable suspicion that the driver of a vehicle had violated a traffic law, the traffic stop was a violation of the Fourth Amendment.").

**F.**      <u>**The Evidence Supports the Minors' Emotional Distress Claims.**</u>

      For intentional infliction of emotional distress: "first, the conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of the defendant's conduct." *Sweet v. City of Mesa, No.* CV-17-00152-PHX-GMS, 2019 WL 3532187, at p. 8 (D. Ariz. Aug. 2, 2019) *citing Ford v. Revlon, Inc.,* 734 P.2d 580, 585 (Ariz. 1987). As established above, Defendants' conduct was extreme and outrageous and shocks the conscience. A jury can reasonably conclude there was no reason to use any force against Plaintiff. Further, the video footage speaks for itself, and a jury could reasonably conclude Schneider was extreme and

outrageous, especially given Plaintiff was not engaged in any illegal activity and there was no reasonable or articulable suspicion he was involved in any criminal activity.

As to whether conduct is extreme or outrageous, Arizona considers a plaintiff's particular susceptibility to emotional distress. *See Mintz v. Bell Atl. Sys. Leasing Int'l, Inc*., 183 Ariz. 550, 554 (App. 1995)("Mintz properly argues that a relevant factor in determining outrageousness is defendant's knowledge that plaintiff is particularly susceptible to emotional distress.") and *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1208–09 (9th Cir. 2016)("Arizona courts have traditionally considered 'defendant's knowledge that the plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental condition.' "). Conduct can be classified as outrageous and extreme conduct given the Minor Plaintiffs' particular susceptibility to emotional distress, even if the conduct may not be sufficiently outrageous if directed at another person.  *See Stoker v. Hartford Life & Accident Ins. Co*., 355 F. Supp. 3d 893, 900 (D. Ariz. 2019)("Although such conduct may not be sufficiently outrageous if directed at another person, viewed through the lens of Plaintiff's weakened emotional state, the Court finds that Hartford's alleged conduct can be classified as outrageous and extreme. At the least, reasonable minds can disagree as to whether Hartford's conduct is outrageous.").

Plaintiffs J.W. and B.W. are minors who qualify as uniquely susceptible to emotional distress by virtue of witnessing their father being tortured by Defendants. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1100 (9th Cir. 2013)("Here, Ms. Blondin was uniquely susceptible to emotional distress in observing the tasing of her husband by virtue of being his wife.").

Based on the evidence, a jury can reasonably conclude Defendants either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from their conduct. *See Tekle v. U.S.*, 511 F.3d 839, 856 (9th Cir. 2007):

> Where reasonable persons may differ, the trier of fact is to determine whether " 'the conduct has been sufficiently extreme and outrageous to result in liability.'
> * * *

The court stated that the agency's actions "were intentional and done with the foreseeable consequence that the [plaintiffs] would suffer severe emotional distress once they discovered the truth." *Id.*

\*    \*    \*

In light of the conclusion in Cross that a collection agency's abuse of its fiduciary duty, which adversely affected the plaintiffs' financial interests, could support a claim for intentional infliction of emotional distress, we conclude that reasonable minds could differ as to whether the conduct alleged here by Tekle was sufficiently extreme and outrageous to support such a claim. We therefore reinstate Tekle's intentional infliction of emotional distress claim.

The horrifying events transpired in front of the Minor Plaintiffs, who were terrified, screaming, and traumatized by the officers' atrocious conduct. Indeed, the Minor Plaintiffs were just a few feet from the officers' the unlawful attacks and wrongful conduct against their father. Moreover, minor JW was physically injured and had bruising on his arm as a result of Schneider forcefully grabbing him to pull him out of the vehicle. After the incident, the Minor Plaintiffs are afraid to leave their house, they have anxiety when they see a cop, and they 'freak out' when their mom leaves the house because they think the cops will beat her up. They would not even go outside to play basketball because they were too scared. They also experienced violent nightmares. To this day, the Minor Plaintiffs are terrified of cops and they now have lost respect for authority. Further, BW is scared and becomes anxious when he see someone who resembles the officers who tortured his dad. BW is still terrified cops are going to tase him, and he will duck down when he sees and officer so they don't see him because he is so scared. Also, their attitudes have changed, and J.W. has had issues with school including getting suspended.

Further, a claim of negligent infliction of emotional distress exists when either (a) "when someone witnesses an injury to a closely related person," or (b) "a plaintiff's shock or mental anguish developed solely from a threat to the plaintiff's personal security without witnessing an injury to another person." *See Loos v. Lowe's HIW, Inc.*, 796 F. Supp. 2d 1013, 1020 (D. Ariz. 2011). Defendants argue the negligent infliction of emotional distress claim fails for the same reasons as stated in their argument as to intentional infliction of emotional distress. Therefore, to avoid duplication, Plaintiffs incorporate their argument above. Also, while Defendants argue

against emotional distress due to no medical treatment, it is not required for an emotional distress claim. *See Ball v. Prentice*, 162 Ariz. 150, 152, 781 P.2d 628, 630 (App. 1989):

> However, he testified at his deposition that **he suffered extreme shock from the accident and continues to suffer loss of sleep, emotional agitation, tension, headaches, fear and anger, feelings of victimization and other physical and emotional abnormalities. Ball has not sought any treatment from third parties to correct his claimed injuries**.

> DAMAGES FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

> Ball alleges in his negligence complaint that as a result of the accident, he suffered property damage and personal injuries and that he continues to suffer from mental anguish that may be permanent. **We cannot accept Prentice's argument that because Ball received only minor physical injuries in the collision he cannot as a matter of law recover for any physical harm resulting from the emotional distress. The nature, severity and extent of his injuries and whether they are supported by medical or other expert witnesses is a question for the trier of fact.** [Emphasis added.]

The Minor Plaintiffs have sustained physical and mental injuries, and they continue to experience anxiety and on-going issues as a result of Defendants' wrongful conduct. Therefore, the evidence supports their emotional distress claims.

## G.   The Evidence Supports the Minors' Consortium Claims.

As established above, the Minor Plaintiffs have established viable state law claims for emotional distress. In addition, because of the tortious acts of Defendants, the Minor Plaintiffs' loss of consortium claims remain viable. To explain, a child bringing a consortium claim must establish its parent was injured by the tortious conduct of a defendant. *See Villareal v. State, Dep't of Transp.*, 160 Ariz. 474, 481 (1989)("To bring a consortium claim, the child/plaintiff must show that the defendant injured the child's parent in a manner that would subject the defendant to liability under ordinary tort principles."). In other words, "all elements of the underlying cause must be proven before the claim can exist." *Barnes v. Outlaw*, 192 Ariz. 283, 286, ¶ 8 (1998).

There can be no question that a statute of limitations for a loss of consortium claim is tolled when minors are involved. *See* A.R.S. § 12-502. A unique situation arises when a minor's loss of consortium claim exists but the injured parent cannot bring a claim, which can result from the

death of a parent or when a parent's claim may be barred by a statute of limitations when the child reaches the age of 18. In *Martin v. Staheli*, 248 Ariz. 87 (App. 2019), the Court analyzed whether the children can bring a consortium claim after the two-year statute of limitations period expired for a parent to bring an action for medical negligence when that parent later died for reason unrelated to the medical negligence claim.  In *Martin*, the defendants argued that because the parent's underlying negligence claim was dismissed, as it did not survive the parent's death, the children did not have consortium claim as it was derivative to the negligence claim. *Id*. at 92, ¶18. In remanding the case, the Court stated the lower court could either allow the children's consortium claim to be allowed to be asserted in the case or "the children may commence a new case—now, within two years of each child turning 18 under A.R.S. § 12-502, or anytime in between. *Id*. at 96-97, ¶38. Thus, minors may assert a consortium claim even though the injured parent no longer had a claim. *Id. See also Villareal v. State, Dep't of Transp.,* 160 Ariz. 474, 481, 774 P.2d 213, 220 (1989)("Minor children suffering injury may wait to bring an action [for loss of consortium] until after they become eighteen years old, and the applicable statute of limitations runs from their eighteenth birthday." . . . "Because a child's loss of consortium claim is derivative of the parent's personal injury claim, we hold that defendants may require joinder of the claims by appropriate motion to the trial court." . . . "If the defendant does not request joinder, or if joinder is not feasible, the normal statute of limitations rules will apply.").

The Minor Plaintiffs' consortium claim is predicated on Defendants' tortious acts, including the abuse, assault/battery, and wrongful arrest of Plaintiff. "To establish a battery claim, a plaintiff must prove that the defendant intentionally caused a harmful or offensive contact with the plaintiff to occur." *Johnson v. Pankratz*, 196 Ariz. 621, 623, ¶ 6 (App. 2000). Defendants repeatedly and intentionally attacked Plaintiff by means of a painful arm bar, tasing and drive stuns, and kicking his testicles, which establishes a tort claim for battery. In addition, a state-law claim for "wrongful arrest in Arizona requires the defendant detain the plaintiff without legal

authority or consent." *Gavigan v. Pima Cty.*, No. CV 02-212-TUC-RCC, 2007 WL 9724346, at p. 2 (D. Ariz. Nov. 15, 2007). As set forth above, the evidence confirms Plaintiff was wrongfully arrested. Therefore, the evidence supports the Minor Plaintiffs' consortium claim.

**H.      The Evidence Supports the Claim for Punitive Damages.**

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Malicious, wanton, or oppressive acts or omissions are within the boundaries for assessing punitive damages and fostering deterrence and punishment.  *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).  "[P]unitive damages are allowed under § 1983 'when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.' " *Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 926 (D. Ariz. 2019). "[E]gregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive." *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 538 (1999).

The egregious and outrageous acts of against Schneider, Lindsey, and Fernandez are established above and warrant punitive damages. *See Binkovich v. Barthelemy*, 672 F. App'x 648, 650–51 (9th Cir. 2016)("Viewing all evidence in favor of Plaintiff, substantial evidence supported the jury's finding that Defendant evidenced 'callous indifference' in pushing Plaintiff against a wall and, without warning, sweeping his legs out from under him, when he presented no threat to the safety of the officers or others. *See id*. Because 'reasonable minds might accept [this evidence] as adequate to support [the jury's] conclusion,' ").

<strong>CONCLUSION</strong>

For the reasons set forth herein, Plaintiffs respectfully request Defendants' request for summary judgment be denied.

/   /   /

RESPECTFULLY SUBMITTED this 3rd day of May, 2021.

ATTORNEYS FOR FREEDOM

By: */s/ Jody L. Broaddus*
      Jody L. Broaddus, Esq.
      Marc J. Victor, Esq.
      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically transmitted the foregoing to the Clerk's office using the CM/ECF system for filing and transmittal of the foregoing filing to the following registrants, and a copy was also sent by first class mail to:

Joseph J. Popolizio
Justin M. Ackerman
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004

By: */s/ Heather Wilson*