1   Joseph J. Popolizio, Bar #017434
    Justin M. Ackerman, Bar #030726
2   Ian C. Beck, Bar #035599
    JONES, SKELTON & HOCHULI, P.L.C.
3   40 North Central Avenue, Suite 2700
    Phoenix, Arizona 85004
4   Telephone: (602) 263-1700
    Fax: (602) 200-7876
5   jpopolizio@jshfirm.com
    jackerman@jshfirm.com
6   ibeck@jshfirm.com

7   Attorneys for Defendants

8
                    UNITED STATES DISTRICT COURT
9
                        DISTRICT OF ARIZONA
10

11  Johnny Wheatcroft and Anya Chapman, as      NO. 2:18-cv-02347-MTL
    husband and wife, and on behalf of minors J.W.
12  and B.W.,                                   DEFENDANTS' REPLY IN
                                                SUPPORT OF THEIR MOTION
13                          Plaintiffs,          FOR SUMMARY JUDGMENT

14              v.

15  City of Glendale, a municipal entity; Matt
    Schneider, in his official and individual
16  capacities; Mark Lindsey, in his official and
    individual capacities; and Michael Fernandez, in
17  his official and individual capacities,

18                          Defendants.

19

20

21

22

23

24

25

26

27

28

9422067.1

1    Summary judgment is warranted on all of Plaintiffs' claims in this action.

2    **I.    THE STATE OF THE RECORD FOLLOWING PLAINTIFFS' RESPONSE.**

3    Before addressing the merits of any of the arguments before the Court,

4    Defendants want to make clear what the state of the record is, including what facts Plaintiffs

5    improperly contest and, thus, are uncontested. In this regard, Plaintiffs' Response to

6    Defendants' Summary Judgment Motion ("Response"), Response to Defendants Statement

7    of Facts ("RDSOF"), and Plaintiffs' Additional Statements of Fact ("PSOF") repeatedly

8    violate not only the Federal Rules of Civil Procedure, but also the local rules.

9    First, Plaintiffs' Response, RDSOF, and PSOF repeatedly cite to and rely on

10   the three videos the parties submitted to the Court (i.e., Schneider's body camera ("SBC"),

11   Lindsey's body camera ("LBC"), and the Motel 6 surveillance video ("M6V"). Importantly,

12   Plaintiffs' citations to these videos fail to include ***any timestamps***.[1] Plaintiffs' repeated

13   reference to all three videos depicting the incident without any guidance as to what portion of

14   the video they are referring is akin to referring to the full length of a deposition without any

15   reference to a page or line number. This conclusory and indeterminate pleading is expressly

16   precluded by the Federal Rules of civil procedure and local rules,[2] especially given

17   Defendants' painstaking efforts to provide precise citations to the videos at issue. *See Indep.*

18   *Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs,

19   hunting for truffles buried in briefs."); *see also Orr v. Bank of America*, 285 F.3d 764, 775 (9th

20   Cir. 2002) ("Judges need not paw over the files without assistance from the parties.").

21   Moreover, Plaintiffs' nonspecific references to all three videos and assertions that they "speak

22

23   _____

       [1] *See* Doc. 261, RDSOF ¶¶ 14, 16, 26, 28-30, 34-36, 40-45, 49-53, 55-59, 65, 67-74, 76-

24   91, 93, 115, 116-118; *id.* at PSOF ¶¶ 2, 8, 9-16, 21-23, 25-30, 32-54, 56, 57, 59, 64, 68, 69, 74.

       [2] *See* Fed.R.Civ.P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely

25   disputed must support the assertion by: citing to *particular parts of materials in the record….*")

       (emphasis added); LRCiv 56.1(e) ("Memoranda of law filed in …opposition to a motion for

26   summary judgment … must include citations to the specific paragraph in the statement of

       facts that supports assertions made in the memoranda regarding any material fact on which

27   the party relies in …opposition to the motion."); LRCiv. 56.1(b) (a party opposing a

       statement of fact or providing a controverting statement of fact must cite the "specific

28   admissible portion of the record").

                                          1

for themselves", without any timestamps, entirely deprives Defendants of a meaningful opportunity to reply to Plaintiffs' broad, generic allusions. For this reason alone, the Court must disregard all arguments in Plaintiffs' Response, RDSOF, and PSOF which Plaintiffs attempt to support with the wholly deficient, improper reference to Plaintiffs' Ex. 1-3.

Second, most of Plaintiffs' RDSOF and PSOF cite Wheatcroft's testimony as support. But the video evidence in this action repeatedly demonstrates that Wheatcroft lied under oath. This Court, the Ninth Circuit, and the Supreme Court have clearly held that a non-moving party's sworn testimony cannot contradict or create an issue of material fact for what is depicted on video in evidence.[3] *See Spencer v. Aaron Pew, et al.*, 2021 WL 927661, at *5 (D. Ariz. Mar. 11, 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *Scott v. County of San Bernardino*, 903 F.3d 943, 952 (9th Cir. 2018); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Finally, compounding Plaintiffs' inadequate objections to DSOF, Plaintiffs' 82 PSOF are riddled with improper legal arguments and compound facts.[4] LRCiv 56.1(b) "does not permit explanation and argument supporting the party's position to be included in the . . . statement of facts," and requires arguments to be in the response, within page limits. *Marceau v. Int'l Broth. of Elec. Workers,* 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009). A party's failure to comply with this rule is sufficient grounds for this Court to disregard its statement of facts. *See Pruett v. Arizona*, 606 F. Supp. 2d 1065, 1075 (D. Ariz. 2009). Here, Plaintiffs' 80+ page PSOF is replete with improper argument based on speculative doubt and bare assertions, and devoid of material facts. Plaintiffs also often cite sources that do not raise a material dispute, followed by more argument. While Defendants completed a bootless errand to demonstrate

---

[3] Defendants note that Plaintiffs made no objection to the use of the three videos at issue and, indeed, submitted them to the Court in support of their own arguments.

[4] *See e.g.,* PSOF ¶ 9 (*five* argumentative sentences not facts, all attacking Schneider's credibility, claiming he is "dishonest" and created "a false record"), PSOF ¶13 (*four* sentences arguing the traffic stop was invalid), PSOF ¶ 17 (*four* sentences arguing about the meth found in the car), PSOF ¶ 25 (arguing Schneider "falsely" told Plaintiff to provide identification); PSOF ¶ 52 (asserting officers did not intervene to protect Plaintiff "despite their duty and knowledge to do so"); *see also* PSOF ¶¶ 1-8, 10, 12-13, 18, 26, 48, 51, 52-55, 64, 68, 69.

1   no material facts are even disputed, the Court does not have that same obligation or the time

2   and resources to do so. Plaintiffs must not be allowed to "heav[e] the entire contents of a pot

3   against the wall in hopes that something will stick." *Indep. Towers of Wash.*, 350 F.3d at 929.

4   Upon revealing that Plaintiffs have not presented a material factual dispute, Defendants now

5   address the merits of the issues before the Court.

6   **II.     WHEATCROFT'S § 1983 WRONGFUL ARREST CLAIM FAILS.**

7       **A.     The Officers Validly Conducted An Initial *Terry* Stop.**

8       Plaintiffs do not contest that *if* Schneider had reasonable suspicion that

9   Blackburn turned into the Motel 6 without a turn signal, then a *Terry* stop was appropriate.

10   [Response at 6-7]. Rather, Plaintiffs argue that it is uncertain that Schneider was in a position

11   to see whether Blackburn used his turn signal. Yet, Plaintiffs cannot meaningfully contest the

12   sworn testimony of Schneider, the only person in a position to see Blackburn turn into the

13   Motel 6 parking lot without using a signal. [DSOF ¶¶ 4-5].  This is also corroborated by the

14   video evidence which clearly depicts Blackburn turn into the parking lot without a turn signal

15   active [*See* M6V at 19:28:28-46] and Blackburn's failure to assert he used a turn signal.

16       In error, Plaintiff cites to testimony of another officer to attempt to inject

17   doubt about whether Schneider could see a turn signal and whether a *Terry* stop was

18   appropriate. [RDSOF at ¶¶ 4-5; PSOF ¶ 2].[5] This simply misses the point. First, this officer

19   was not in Schneider's car on the day of the incident and has no foundation to state what

20   Schneider saw. In any event, whether Schneider actually saw the turn signal does not

21   undermine his sworn testimony that he had seen what he ***believed*** was the lack of a turn

22   signal. This, in and of itself, created *reasonable suspicion* to conduct a brief *Terry* stop as "a

23   police officer is not required to have absolute certainty, or even probable cause, that

24   wrongdoing has occurred," *U.S. v. Willis*, 431 F.3d 709, 714-15 (9th Cir. 2005), "rather, the

25   officer is required to have merely reasonable suspicion." *Sanchez v. Arpaio,* CV-09-1150-PHX-

26   _____

27       [5] Plaintiffs citation to Flosman's deposition testimony in PSOF ¶ 2 fails to contradict what Schneider observed.  Flosman merely testified that it was "unlikely" Schneider could have seen the car turn into the parking lot – but not impossible. (Plaintiffs' Ex. 15 at 48).  In

28   addition, his report (which is inadmissible hearsay) repeated the same.  (Plaintiffs' Ex. 16).

LOA, 2010 WL 3938353, at *6 (D. Ariz. Oct. 5, 2010). Schneider was only required to have "specific, articulable facts which, taken together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Michael R.,* 90 F.3d 340, 346 (9th Cir. 1996).

Such reasonable suspicion clearly existed when Schneider observed what he believed was a lack of a turn signal, which was only further solidified when no one in the vehicle, including the driver, asserted a turn signal was made upon his initial questioning. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("A traffic violation, such as a malfunctioning or inoperative taillight, provides reasonable, founded suspicion for a brief investigatory stop."); *State v. Salcido,* 238 Ariz. 461, 464, ¶ 7 (2015) ("a traffic stop may be based on an officer's articulable suspicion that the person has committed a traffic violation."). Indeed, Plaintiff admits that Blackburn did not even remember using a turn signal and that no one contested he did when Schneider questioned them about it. [RDSOF at ¶¶ 8-9].

Finally, Plaintiff also errs in arguing that the lack of turn signal did not amount to a traffic violation. Again, Arizona law requires an individual to use a turn signal "continuously" for at least one hundred feet before turning, not just at any point in the hundred feet before turning. A.R.S. § 28-754(B).  Indeed, the Court in *Salcido* also made clear that an individual is required to use a turn signal even where the only traffic near the vehicle is a police officer's vehicle. *See Salcido*, 238 Ariz. at 465, ¶ 13.[6] Indisputably, Plaintiff was turning into a parking lot containing other vehicles. [M6V at 19:28:01]. Two pedestrians can be seen walking in the parking lot toward the Motel 6 office seconds before Blackburn pulled into it; another pedestrian was getting into a car as Blackburn pulled in and exiting the motel as the officers made initial contact. [M6V at 19:28:00-19:29:19]. Moreover, Schneider and

---

[6] Plaintiffs' citation to *U.S. v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) is inapposite. [Response at 6-7]. Mariscal is an almost 20 year old case that fails to address the portion of A.R.S. § 28-754(B) at issue.  Moreover, it cannot override Arizona's Supreme Court 2015 decision in *Salcido* interpreting the same statute.  In any event, there was "some possibility that traffic would be affected" when Blackburn turned into the Motel 6 parking lot given the number of cars parked in the parking lot as well as the presence of the officers in their patrol vehicle.

Lindsey were in a patrol vehicle just down the alley from Plaintiff as they turned in. Thus, the parking lot and Schneider's vehicle clearly required Blackburn to use his turn signal "continuously" as he turned into the Motel 6 parking lot, which Schneider testified under oath he believed did not occur. Therefore, reasonable suspicion existed to conduct a temporary *Terry* stop based on Schneider's belief a traffic violation had occurred as a matter of law and undisputed facts.[7]

**B.      Reasonable Suspicion Ripened Into An Officer Safety Concern Moments After The Traffic Stop Occurred.**

Regardless of the initial reason for the traffic stop, __*seconds*__ after Schneider returned from running the license plate, ***and before Schneider asked Wheatcroft specifically for his name***, an officer safety concern occurred – namely Wheatcroft's reaching into a bag at his feet. [SBC at 2:32:33-40].[8] Once Wheatcroft reached into his bag after he had already stated he lacked ID, there was reasonable suspicion based on articulable facts that criminal activity was afoot, as well as an officer safety concern that further justified Schneider's need for Wheatcroft's name and questioning during the temporary *Terry* stop. Defendants note that Plaintiffs' Response *fails* to respond to the officer safety concern and case law set forth in Defendants' Motion, thereby waiving any such argument to the contrary.

Plaintiffs also did not address the legion of case authority cited in Defendants' Motion on how the Ninth Circuit and United States Supreme Court have repeatedly recognized an officer's right to request a vehicle occupant's identification. [Doc. 245 at 9-10]. Moreover, Plaintiff cannot reasonably contest that the Motel 6 was in a known high crime

---

[7] Finally, the officers' not activating their lights or siren has no impact on whether Wheatcroft's constitutional rights were violated. Plaintiffs' Response cites no authority providing that an individual is constitutionally entitled to such acts by police officers to justify a *Terry* stop, nor are Defendants aware that any exist.

[8] Based entirely on his own self-serving testimony, Wheatcroft attempts to argue that he did not reach into a bag at any point during the traffic stop [PSOF ¶¶ 9, 11, 27], the video evidence plainly shows him reaching and holding the bag that was right at his feet as Schneider approached him. [SBC at 2:32:38-42]. Wheatcroft is also heard apologizing for reaching into his bag. [SBC at 2:32:39-41]. Then Wheatcroft is seen moving his hand near the center console and the seats a second time. [SBC at 2:33:19-22]. As addressed above, this video evidence trumps any sworn testimony of any party, including Wheatcroft.

area [DSOF ¶ 11][9] or that the officers also had observed Blackburn suddenly back into a parking space, which heightened their suspicions of criminal activity (a suspect maneuver in this high crime location to hide a stolen car). [DSOF ¶ 10].[10] Finally, a blanket trespass agreement was in effect at the time of the incident, which allows the officers to speak with and request the identities of the individuals present in the Motel 6 lot. [DSOF ¶¶ 12-13].[11]

These facts stand in stark contrast to the inapposite cases in Plaintiffs' Response where an officer arrested an individual *solely* because they failed to provide their identification. *See e.g., U.S. v. Landeros,* 913 F.3d 862, 870 (9th Cir. 2019); *Melendres,* 989 F. Supp. 2d at 906; *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.,* 542 U.S. 177, 188 (2004); and *Brown v. Texas,* 443 U.S. 47, 51–52 (1979).[12]

**C.**   **Schneider Had Authority to Remove Wheatcroft From the Vehicle.**

Wheatcroft and Schneider's conversation briefly continued after Wheatcroft's initial reach for roughly 40 seconds.[13] [SBC at 2:32:40-2:33:23]. During this time, Wheatcroft

---

[9] Plaintiffs object to DSOF 11 and add PSOF ¶ 4 arguing that there is "no evidence whether the number of crimes in the area were uncommon for the population in that area…" and that civic events occur across the street from the Motel. However, DSOF ¶ 11 provided sworn testimony from Officers Schneider, Lindsey, and McDaniel that the Motel 6 was a known high crime area for drug activity and violence, and undersigned counsel provided a Location History Report demonstrating *over 1,127 calls* to the Motel 6 between January 2016 and December 27, 2017. Doc. 246-1 (Ex. 3). Plaintiffs offer only speculation to contradict that the Motel 6 was in a high crime area when Defendants clearly present deposition testimony and demonstrative evidence for DSOF ¶ 11.

[10] Plaintiffs object to DSOF ¶ 10 and add PSOF ¶ 3 on the basis of Blackburn's testimony. However, Blackburn's purported intent on how he parked does not contradict how the officers *perceived* Blackburn's actions and how they appeared to be suspicious.

[11] Plaintiffs object to DSOF ¶¶ 12-13, and add PSOF ¶ 5 on the basis that the blanket trespass agreement cited was not from the year of the incident. The original of that document was inadvertently destroyed. However, all officers testified that the agreement existed at the time of the stop and, they were aware of it its authority to permit them to inquire whether individuals were staying on the property.

[12] Defendants do not rely on the trespass agreement as a basis for their actions after asking if Wheatcroft was staying at the Motel 6, but only as a basis to make the initial traffic stop in addition to the observed traffic violation.

[13] Schneider's conversation with Wheatcroft occurred while Lindsey was questioning Blackburn to obtain his license and insurance information (which he did not have). [Ex. 12 at 2:32:16-2:34:15; DSOF ¶¶ 31-32]. Lindsey did not stop his inquiry until Schneider attempted to remove Wheatcroft from the vehicle due to officer safety concerns and Wheatcroft actively resisted. [Id.]. Thus, contrary to Plaintiffs arguments, Schneider's conversation with Wheatcroft and subsequent request for identification did not prolong the stop whatsoever.

6

became increasingly agitated, refused commands, and attempted again to place his hands out of Schneider's sight.[14] [*Id.*]. Again, both Schneider and Lindsey testified they had legitimate safety concerns about weapons, dangerous items inside the vehicle, and Wheatcroft's furtive movements. [DSOF ¶¶ 26, 35].[15] Moreover, during this interaction, Schneider placed his hands on Wheatcroft and felt him tense up. [**Ex. 9**[16], SBC at 2:32:40-2:33:23].[17]

Based on these acts, the initial hand movement noted above, and the known high crime area the officers were in, Schneider had authority to temporarily remove Wheatcroft from the vehicle due to specific, articulable officer safety concerns. *Arizona v. Johnson*, 555 U.S. 323, 330–31 (2009); *Maryland v. Wilson*, 519 U.S. 408, 414 (1997); *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).

### D.    Schneider Had Probable Cause To Arrest Wheatcroft After He Resisted Schneider's Control And Later Fought With the Officers.

As addressed below in Defendants' excessive force analysis, as a matter of undisputed facts and law, Wheatcroft refused to obey lawful commands to stop resisting officer control to remove him from the vehicle, actively resisted officer control, and violently assaulted the officers after he was handcuffed by kicking them. These crimes, which are felonies, were complete the moment Wheatcroft resisted (even passively), delayed or obstructed the officers in discharging or attempting to discharge any legal duty of their office and created, *at a minimum*, sufficient probable cause for his arrest. A.R.S. §§ 13-2508(A), (B), 13-1204(A)(8)(a); *State v. Barker*, 227 Ariz. 89, 90, ¶ 7 (App. 2011) ("An arrest occurs when a person's "freedom of movement is curtailed."); *id.* at 91, ¶ 10 ("an individual need not be specifically advised he is under arrest in order to be guilty of resisting arrest.").

---

[14] To the extent Wheatcroft testified to the contrary, please review Schneider's body camera at **Ex. 9**, SBC at 2:32:40-2:33:23.

[15] Plaintiffs' objections to PSOF ¶¶ 26 and 35 (by referencing PSOF ¶ 9-12 and all three videos) does not actually provide evidence to support those objections or otherwise materially contest the evidence provided in PSOF ¶¶ 26 and 35.

[16] Unless otherwise indicated "Ex" refers to the exhibits submitted with DSOF.

[17] Wheatcroft also cannot contest what Schneider felt, he can argue he did not tense up but he cannot dispute what Schneider felt on his arm during the encounter. Moreover, again, the video evidence disproves Wheatcroft's testimony as the video clearly shows his harm tensing up. [*See* SBC at 2:33:24-38].

9422067.1

E.     **The Officers Are Entitled To Qualified Immunity.**

Plaintiffs' Response butchers the qualified immunity standard. [*See* Response at 12-14; 19-21]. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Thus, the second step in the qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 194-95 (2001). "The 'clearly established' standard ... requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590. "This requires a high 'degree of specificity.'" *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1229 (D. Ariz. 2019). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.*   Moreover, it is **Plaintiff** (not Defendants) who "bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Merritt*, 425 F. Supp. at 1230 (D. Ariz. 2019) (citing *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)).

Here, no case put the Officers on notice that their initial *Terry* stop of the vehicle was unconstitutional.[18] Again, Plaintiff's reference to *U.S. v. Mariscal*, 285 F.3d 1127, 1133 (9th Cir. 2002) is inapposite – there was traffic involving the police vehicle, other cars in the parking lot, and pedestrians in Motely 6 lot as Blackburn pulled into it necessitating a turn signal under Arizona law. Schneider's belief that he did not see Blackburn use a turn signal generated reasonable suspicion for a stop. Thus, qualified immunity is proper for the initial stop for this reason alone, and Plaintiffs' Response cites no other authority to the contrary.

---

[18] Plaintiffs' reference to *Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011) is inapposite. That case was highly fact specific to the facts of that case, did not involve a turn signal, and as set forth above, even if there was a mistake of fact, it was reasonable under the circumstances particularly given that no occupant of the car asserted that a turn signal was used when questioned by Schneider.

9422067.1

In addition, no case with any similar facts put Schneider on notice that he could not ask for Wheatcroft's name or that he would violate Wheatcroft's rights by temporarily detaining him for officer safety concerns. *See e.g., Wesbrock v. Ledford*, 464 F. Supp. 3d 1094, 1105 (D. Ariz. 2020) (noting qualified immunity may apply for arrest of suspect where Glendale Defendants had a reasonably arguable basis for believing, even after their investigation, that there was probable cause to arrest Plaintiff for trespassing (A.R.S. § 13-1502(A)(1)) and/or for refusing to provide his name after advisement by a peace officer (A.R.S. § 13-2412(A)). As addressed above, Plaintiffs' cited cases (*Brown, Melendres, and Duran*) all involved officers arresting an individual *solely* because they failed to provide information are a far cry from the facts of this case (i.e., turn signal violation, car suspiciously backing in, dangerousness of a traffic stop, Wheatcroft reaching into his bag when he said he had no ID, high crime area known for violence and drug use, Wheatcroft was becoming increasingly upset at simple questioning, and tensed his arm and began resisting Schneider's control). Thus, those cases are not sufficiently factually similar to put the officers on notice that their conduct would have violated Wheatcroft's constitutional rights.

Finally, after Wheatcroft refused to obey officer commands and became violent and fought with the Officers, probable cause existed for his arrest, as both the Grand Jury and Magistrate Judge concluded.[19] No case put the officers on notice they lacked probable cause under Arizona law to arrest Wheatcroft. A.R.S. §§ 13-2508; 13-1204(A)(8)(a); *Reed v. Lieurance*, 863 F.3d 1196, 1204-05 (9th Cir. 2017) ("[I]f an officer makes an arrest without probable cause, he or she may be entitled to qualified immunity as long as it is reasonably arguable that there was probable cause for the arrest.").

---

[19] Again, Plaintiffs' case authority is inapposite. *Rice v. Morehouse*, 989 F.3d 1112, 1127 (9th Cir. 2021) involved entirely passive resistance. As addressed more fully below, Wheatcroft's resistance was clearly active during the majority of his encounter.

9

III.   **WHEATCROFT'S FOURTH AMENDMENT EXCESSIVE FORCE CLAIM FAILS AGAINST THE INDIVIDUAL DEFENDANT OFFICERS FOR EACH OF THEIR RESPECTIVE USES OF FORCE.** [20]

A.   **Each Officer's Individual Uses Of Force Were Objectively Reasonable Under *Graham*.** [21]

*Graham* requires this Court do conduct an analysis of **each** use of force by **each** individual officer. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017) ("the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional."). Thus, Defendants painstakingly addressed the individual officer's uses of force over nine pages of their Motion. [Doc. 245 at 16-25]. Wheatcroft's two-page perfunctory response (largely filled with block quotes and parenthetical citations to inapposite authorities) does not address the required, specific and individualized analysis for each officer's use of force. [Response at 17:19-19:16]. This is not sufficient to survive summary judgment and amounts to waiver. *E.E.OC. v. Walgreen Co.*, CIV–05–1400–PCT–FJM, 2007 WL 926914, at *9 n.2 (D. Ariz. Mar. 26, 2007) ("We deem plaintiff's failure to respond to this argument a consent to the granting of summary judgment on this ground.") (citing LRCiv 7.2(i)). For this reason alone, the Court must grant summary judgment on Wheatcroft's Fourth Amendment Claims. In any event, even if he addressed Defendants arguments regarding the specific uses of force that each Officer applied, Wheatcroft still could cannot demonstrate their uses of force were objectively unreasonable under *Graham*. [22]

1.   **Schneider's "Escort Hold" Was Objectively Reasonable.**

First, Wheatcroft makes no attempt to address Defendant's authority that Schneider did not use unreasonable force to initially place Wheatcroft in an escort hold

---

[20] Plaintiffs' Response concedes that Wheatcroft cannot maintain a Fourteenth Amendment excessive force claim by failing to argue one exists. *See* Doc. 245 at 14, n. 11.

[21] Defendants note that they provide the Court (where relevant) the exact time stamps of the video evidence demonstrating the factual basis of their argument in their Motion and Reply, despite Plaintiffs' failure to satisfy their burden to do so. *Arpin v. Santa Clara Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (Plaintiff bears the burden of proving that the force used was unreasonable).

[22] Wheatcroft also fails to argue that **any other uses of force are at issue** or relevant to the *Graham* analysis other than the ones identified by Defendants. [*See* Response at 14-21].

10

(which was not an arm bar) to remove him from the vehicle. *See e.g., Fuller v. Cty. of Orange*, 276 F. App'x 675, 680 (9th Cir. 2008) ("[P]lacing [the plaintiff] in a rear wristlock did not constitute an unreasonable use of force."); *Bettis v. Bean*, 2015 WL 5725625, at *13 (D. Vt. Sept. 29, 2015) (recognizing that "[t]he rear wrist lock is a minimal use of force that generally does not pose a significant risk of injury").[23] As set forth above, there are no disputed facts that the stop itself occurred in a high crime area, Wheatcroft shifted his hands on two occasions (one to put his hands into his backpack when he already said he had no ID and another into the center console area when he had no reason to do so), and became increasingly agitated upon Schneider's request for his name. Wheatcroft's movements within the vehicle caused the Officers great concern because they did not know what was in his hands, his backpack (which remained at his feet), or what was otherwise accessible in the vehicle. This, in combination with the dangerous nature of a traffic stop and the area in which it occurred, justified Schneider's minimally invasive use of force (i.e., to engage Wheatcroft's arm in an escort hold to control him and ensure that he would not reach for anything in any other area of the car, and to safely, temporarily, remove him from the vehicle). There was no Fourth Amendment violation for this act. *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment.").

### 2.    Schneider's Taser Display Was Objectively Reasonable.

Contrary to Wheatcroft's testimony, once Officer Schneider opened the door and attempted to remove Wheatcroft from the vehicle due to officer safety concerns, he immediately displayed physical resistance, tensed his arm, and pulled away from Schneider. [**Ex. 9**, SBC at 2:33-21-2:33:59]. That is why Schneider drew his taser and asked whether Wheatcroft was going to fight. [**Ex. 9**, SBC at 2:33:28-2:33:53]. Wheatcroft said he would not and Schneider holstered his Taser and attempted to grab Wheatcroft's wrist and place him in

---

[23] *See also, Lee v. Hefner*, 136 F. App'x 807, 813 (6th Cir.2005); *Wilson v. Stallard*, 2010 WL 3291798, at *8 (W.D.Va. Aug. 19, 2010), aff'd, 403 F. App'x 797 (4th Cir.2010); *Johnson v. Nwankwo*, 2004 WL 1660375, at *1 (N.D.Tex. July 23, 2004); *Bermudez v. Kelly*, 1998 WL 798893, at *3 (N.D.Cal. Nov. 9, 1998).

a control hold. [**Ex.9**, SBC at 2:33:42-53]. This minimal display of force, which did not inflict any pain on Wheatcroft, was objectively reasonable given the totality of the circumstances.

### 3. Lindsey's Drive Stuns After Wheatcroft Actively Resisted Were Objectively Reasonable.

After Schneider holstered his Taser and attempted to gain control of Wheatcroft, Wheatcroft began to shout profanities and again actively resist Schneider's escort hold and attempt to remove him from the vehicle. [**Ex. 9,** at 2:33:55-2:34:19]. Schneider repeatedly commanded Wheatcroft to stop tensing up, yet despite Wheatcroft's denial that he was not, Schneider's body camera clearly shows striations in Wheatcroft's right arm as he tensed up and resisted Schneider's control. [**Ex. 9,** at 2:33:55-2:34:19]. Again, in real time, Schneider, upon feeling Wheatcroft's arm tense in resistance to Schneider's attempted control, relayed to Lindsey that Wheatcroft was "gonna fight." [**Ex. 9,** at 2:33:59; **Ex. 4,** Lindsey Depo. at 168:15-20, 200:15-21]. Schneider's body camera also clearly reveals Wheatcroft struggling with the officers for over 25 seconds before Lindsey came over to assist Schneider and initially drive stun Wheatcroft. [**Ex. 9,** at 2:33:54-2:34:19]. Specifically, the following occurred: while Schneider held Wheatcroft's right bicep and grabbed onto Wheatcroft's right wrist, Wheatcroft pushed his arm back and continued to fight Schneider's attempt to control his right arm. [**Ex. 9,** at 2:33:56-2:34:01]. Once Wheatcroft's arm was behind his back, he continued to struggle, moving his arm back and forth, as Schneider gave repeated commands to stop struggling and to relax. [**Ex. 9,** at 2:34:01-2:34:19; **Ex. 12**, 2:34:09-2:34:16]. Finally, Lindsey warned Wheatcroft that he had a Taser on his shoulder, but that did not stop Wheatcroft's active resistance. [**Ex. 12**, at 2:34:16-23].

Thus, only after Wheatcroft displayed clear ***active resistance*** and he ignored Lindsey's clear ***warning*** he would be Tased, did Lindsey drive stun Wheatcroft to obtain his compliance.[24] This use of force did not violate Wheatcroft's Fourth Amendment rights as a

---

[24] Wheatcroft fails to address Defendants' cases on active resistance cited in Defendants' Motion at page 18-19. *See e.g., Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001) (arrestee who physically interfered with officer's arrest was actively resisting).

matter of law and undisputed facts.[25] *Ceyala v. Toth*, 2020 WL 5868427, at *3 (D. Ariz. Oct. 2, 2020)*; Bynum v. City of N. Las Vegas,* 217CV02102APGVCF, 2020 WL 8483837, at *7 (D. Nev. Aug. 31, 2020) (no excessive force where officer gave two warnings before using taser in drive stun mode after suspect continued to resist); *Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012) ("if the officer warned the offender that he would employ force, but the suspect refused to comply, the government has an increased interest in the use of force.").

### 4.      The Officers' Dart Mode Taser Use Was Objectively Reasonable.

#### a.      Lindsey Did Not Slip On A Water Bottle, He Was Knocked Out By Anya When She Hit Him With A Bag Full Of Soda.

Despite Wheatcroft's patently false testimony to the contrary, the record demonstrates no reasonable juror could believe that after Lindsey's drive stun, Anya Chapman did not violently assault and knock out Lindsey.[26] Anya Chapman testified under oath that she intentionally struck Lindsey. [**Ex. 8** at 70:3-21, 336:2-339:15, 381:11-15, 382:6-13; Ex. 39]. A Grand Jury indicted Anya for aggravated assault on Lindsey; Anya pled guilty to that charge. [**Ex. 8** at 343:19-344:8; Ex. 28]. Lindsey also testified Anya struck him. [**Ex. 4** at 204:7-11]. Finally, most importantly, Anya's strike is caught on both Lindsey and Schneider's body worn cameras [**Ex. 12**, at 2:34:29-34; **Ex. 9**, at 2:34:20-35; **Exs. A, B**] and the Motel 6 surveillance video. [*See* **Ex. 13**, at 19:31:41-19:31:44; **Ex. C**]. *Castro v. Martin*, 2021 WL 1853363, at *1 n.1 (9th Cir. May 10, 2021) ("Where, as here, there is video evidence

---

[25] Wheatcroft's testimony cannot refute the video evidence, and he provides no reference to the video evidence to the contrary. Therefore, his objections to DSOF ¶¶ 40-45, 49-50, and 115-118 are improper.

[26] Plaintiffs argue that Lindsey slipped on a water bottle and was not struck by Anya. [*See* RDSOF ¶ 55-56, PSOF ¶ 37]. This theory is based entirely on Wheatcroft's testimony in this matter that video evidence clearly refutes.  Moreover, Wheatcroft testifies to facts he could not possibly have seen. Wheatcroft was in no position to see outside the vehicle (and thus Lindsey's alleged slip on a water bottle) as he was on his knees with his head facing down, into the seat of the car, resisting the officers, and being Tased by Lindsey. [**Ex. 9**, SBC at 2:34:19-2:34:23].  Wheatcroft's argument in this regard straddles the line of Rule 11. In any event, no reasonable juror could possibly believe this occurred given the overwhelming evidence in the record.  *See also* **Exs. A, B, and C.**  But Wheatcroft is correct in one regard, a water bottle was involved.  As the Court can see from **Exs. A, B, and C** a water bottle was thrown from the back-passenger window and hit Lindsey as he was *already falling down* from Anya's strike (making it impossible that he slipped on it).

13

documenting the events in question, courts should not accept an account that is blatantly contradicted by the video") (quotation omitted).

### b.      Schneider's Dart Mode Tase Was Objectively Reasonable.

Anya's assault on Lindsey, during the heat of the officers' struggle with Wheatcroft, injected a new layer of violence and chaos into an already escalating situation. It was only at this point, finding himself outnumbered and having just seen his partner violently assaulted and knocked out by Anya that Schneider resorted to the use of his Taser in dart-mode against Wheatcroft. Faced with two violent adults, this use of force was objectively reasonable under the totality of the circumstances.

### c.      Fernandez's Dart Mode Tase Was Objectively Reasonable.

Just after Schneider deployed his Taser in dart mode, Fernandez came to his assistance from the other side of the car. He reasonably believed that Wheatcroft was the one who knocked out Lindsey, not Anya Chapman.[27] Fernandez also observed Schneider deploy his Taser in dart mode but that it was ineffective at incapacitating Wheatcroft. That was because Schneider's Taser was, undisputedly, defective both in failing to connect both probes with Wheatcroft, and also to deliver the appropriate charge.[28] Under these circumstances, Fernandez's split-second decision to use his Taser in dart mode was objectively reasonable.

---

[27] Undisputedly, Fernandez was on the other side of the car as Schneider and Lindsey were attempting to remove Wheatcroft from it. [RDSOF ¶¶ 47-48 (admitting DSOF ¶ 47-48)]. Plaintiffs also agree that Fernandez came around the car to assist Lindsey after realizing Lindsey was rendered unconscious. [RDSOF ¶ 64 (admitting DSOF ¶ 64)]. Yet Plaintiffs object that Fernandez did not see who struck Officer Lindsey and that he thought it was Wheatcroft (Anya Chapman) who assaulted him. [RDSOF ¶ 66 (disputing DSOF ¶ 66)]. Plaintiffs authority for this is Fernandez's deposition a p. 153, Plaintiffs' gross mischaracterization of testimony as he was not testifying as to what he saw in the moment of the encounter, but his comment later on with the benefit of knowing who actually knocked Lindsey out. *See* also **Ex. 7** at 192:5-17 (clearly testifying Fernandez thought Wheatcroft knocked out Lindsey when he came around the car). Thus, the Court must disregard Plaintiff's objection to DSOF ¶ 66.

[28] Plaintiffs' objections to DSOF ¶ 59-61 fail to provide any rebuttal to not only the physical evidence on scene showing both taser probes did not connect with Wheatcroft, but also Defendants' expert Darko Babic's testimony that there was a battery problem with Schneider's Taser. Indeed, Plaintiff admits it was not until Fernandez's use of a Taser in dart mode that Wheatcroft finally locked up. RDSOF ¶ 68 (Admitting DSOF ¶ 78). Thus, these paragraphs are undisputed for purposes of summary judgment.   Moreover, Wheatcroft's failure to object to Defendants' causation argument constitutes waiver. [Doc. 245 at 22].

**5.      Schneider's Drive Stun Just As Wheatcroft Was Handcuffed Was Objectively Reasonable.**

After Wheatcroft locked up momentarily after Fernandez Tased him in dart mode, permitting Fernandez to get in position to handcuff him. [**Ex. 9,** at 2:34:37-2:345:05]. However, despite receiving a Tasing in dart mode, Wheatcroft continued to resist Fernandez's commands and control to provide his hands to be handcuffed. [**Ex. 9,** at 2:36:01]. Specifically, the following occurred, as avowed by Fernandez in his Declaration, and confirmed by Schneider's body camera:

- Right before, during, and right after Fernandez handcuffed Wheatcroft, he was still actively resisting his attempts to control him and remove him from the vehicle. [**Ex. 9**, at 2:34:38-2:35:25; **Ex. 16** at ¶ 8].
- Fernandez repeatedly commanded Wheatcroft to "turn over" and to "stop" but he did not comply.  [**Ex. 9**, at 2:34:37-2:34:48; **Ex. 16** at ¶ 9].
- Fernandez then had to physically turn Wheatcroft over to place him in handcuffs, while he continued to actively resisted. [**Ex. 9**, at 2:34:37-2:35:06; **Ex. 16** at ¶ 10].
- After Fernandez turned Wheatcroft over, he repeatedly commanded Wheatcroft to "give me your hands", but he did not comply with that lawful command. [**Ex. 9**, at 2:34:47-2:34:49; **Ex. 16** at ¶ 11].
- Fernandez could feel Wheatcroft actively resisting his efforts to restrain and control him. [**Ex. 9**, at 2:35:01-2:35:09; **Ex. 16** at ¶ 13].

During this struggle, Schneider drive stunned Wheatcroft in the shoulder.  [**Ex. 9,** at 2:35:06].[29]  Due to the fluidity of the situation, Schneider did not know that Fernandez had finally handcuffed Wheatcroft when he drive-stunned Wheatcroft. [**Ex. 5**, Schneider Depo. at 155:4-12].[30]  Under these circumstances and Wheatcroft's continued active resistance, Schneider's drive stun was objectively reasonable. *Wade v. Fresno Police Department*, 2012 WL 253252 (E.D. Calif. 2012) (finding even where a suspect is handcuffed and resisting, use of drive stun mode is not excessive force); *Ceyala*, 2020 WL 5868427, at *3; *Bynum*, 2020 WL 8483837, at *7; *Sanders*, 409 Fed. Appx. at 290.

---

[29] As a result, the Court must disregard Plaintiffs' objections to DSOF ¶¶ 69-71 (which again rely on vague references to the video evidence in the record). Moreover, PSOF ¶ 9-16 do not, in any way, address the facts stated in DSOF ¶¶ 69-70.  *See* RDSOF ¶¶ 69-70.

[30] Plaintiffs' objection to DSOF ¶ 72 is improper.  Plaintiffs cited authority for objection is merely a perfunctory reference to Schneider's Body Camera (with no time reference) and Plaintiffs' own PSOF ¶ 9 (which fails to address this very specific and nuanced point). Thus, DSOF ¶ 72 must be deemed uncontroverted.

15

### 6. Schneider's Reflexive Strike and Drive Stun After Wheatcroft Began Kicking Was Objectively Reasonable.

No reasonable juror can believe that, after Wheatcroft was removed from the vehicle and placed on the ground, he did not flail his feet and actually strike Schneider while handcuffed, as plainly depicted on Schneider's body camera.[31] [**Ex. 9**, at 2:36:00-2:36:10]. Based on Wheatcroft's renewed aggression, Schneider reflexively kicked Wheatcroft in the groin. This was objectively reasonable under the totality of the circumstances. *Buckley*, 292 Fed. Appx. at 795 ("The district court's suggestion that Plaintiff had been fully secured because he was handcuffed is mistaken: Plaintiff was not bound at the feet (so, he could both run and kick), he was moving around on the ground … and he would not comply with the deputy's repeated instructions..."). Wheatcroft then continued to attack and resist control, at which point Schneider drive stunned Wheatcroft in the buttocks area (not his penis).[32] This act was also objectively reasonable under the circumstances given Wheatcroft's continued assaultive behavior, continued resistance, and refusal to submit to officer control. *See e.g., Wade*, 2012 WL 253252; *Sanders*, 409 Fed. Appx. at 290; *Devoe v. Rebant*, 2006 WL 334297, at *6 (E.D. Mich. Feb. 13, 2006).

\*\*\*

In sum, each individual officer's respective uses of force against Wheatcroft were objectively reasonable under *Graham*.[33] Again, *Wheatcroft made absolutely no effort in his*

---

[31] Despite Schneider's body camera clearly depicting Wheatcroft resisting the officers while handcuffed and on the ground, Plaintiffs dispute DSOF ¶ 77-78. Again, Wheatcroft's testimony cannot change facts and evidence in the record. [**Ex. 9**, at 2:36:00-2:36:10].

[32] There is no evidence Wheatcroft was Tased in the testicles other than his unfounded, self-serving testimony that it occurred. Schneider testified that he was aiming for Wheatcroft's buttock or thigh when he Tased Wheatcroft while he was on the ground. [Ex. 5, Schneider Depo. at 158:6-159:7]. Schneider's body camera also shows the Tasing *did not* occur on Wheatcroft's genitals. [Ex. 9, SBC at 2:36:01-2:36:10]. Anya Chapman and Wheatcroft testified that they could not see a Tasing of Wheatcroft's genitals in their review of the video. [**Ex. 8**, Chapman Depo. at 399:1-25; **Ex. 1**, Wheatcroft Depo. at 441:24-442:9]. Finally, Wheatcroft admitted that he declined to seek treatment for any injuries, including those allegedly to his testicles, scrotum, or other parts of his body after the incident at a hospital. [RDSOF ¶ 95 (admitting DSOF ¶ 95)]. As a result, Plaintiffs' objections to DSOF ¶ 82-83 must be disregarded by the Court.

[33] Plaintiffs also appear to argue a provocation theory against the Officers as a basis for the Fourth Amendment excessive force claim. [*See* Response at 19:1-7]. The Supreme Court has clearly rejected this theory of liability. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539

*Response to address any of these respective uses of force on an individualized basis, as required by Graham and its progeny.* Nevertheless, Schneider, Lindsey, and Fernandez are each entitled to summary judgment on Wheatcroft's Fourth Amendment § 1983 claims as a matter of law and undisputed facts because there were no Fourth Amendment violations in their use of force.

### B.   The Defendant Officers Are Entitled To Qualified Immunity For Their Respective Uses of Force.[34]

Defendants will not repeat the qualified immunity case law cited in the previous section, except to note, again, that it in the Fourth Amendment context the Supreme Court has made clear Plaintiff must provide a specific case on point with substantially similar facts and that it is Plaintiffs' burden to provide such a case.

### 1.   No Prior Case Put Schneider and Lindsey On Notice That Their Removal of Wheatcroft From The Vehicle Using an "Escort Hold" Violated His Constitutional Rights.

Plaintiff cites no authority to dispute that an escort hold, which places an arm behind a suspect's back, is trivial use of force. [Response at 19-21]; *see e.g., Fuller,* 276 F. App'x at 680; *Bettis*, 2015 WL 5725625, at *13. It is also undisputed that Wheatcroft created officer safety concerns by reaching into his backpack despite claiming to not have identification. Therefore, existing case law at the time of this stop clearly justified Schneider's minimal use of force to remove to place Wheatcroft's arm into an escort hold to remove him from the vehicle in a controlled fashion to finish the traffic stop and attempt to avoid any violence toward themselves or those in the vehicle. Plaintiffs' Response cite no authority otherwise. Officer Schneider is, therefore, entitled to qualified immunity for this use of force.

---

(2017); *see also Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1112 (D. Or. 2020) (same). Furthermore, Plaintiffs' argument that officers, other than the named Defendants, failed to intervene is also improper. [Response at 19:8-16]. By the time back up officers arrived, there was no use of force in which to possibly intervene. [*See* **Ex. 9**, at 2:36:20-2:38:16]. Moreover, even if they *could* have intervened, there would be no need to intervene in *justified* uses of force as set forth above. In short, there was no opportunity to intervene in the brief, rapidly evolving circumstances of their encounter with Wheatcroft.

[34] Defendants renew their waiver objection to Wheatcroft's response to Defendants' qualified immunity arguments as Wheatcroft fails to address Defendants' specific, targeted analysis of each use of force with regard to qualified immunity just has he did with regard to his failure to respond to Defendants' excessive force arguments. [*See* Response at 19-21].

### 2. No Prior Case Put Schneider On Notice That Threatening The Use of His Taser Violated Wheatcroft's Constitutional Rights.

Plaintiff does not provide a case at all that the display of a Taser constitutes a use of force, or that a prior case with sufficiently similar facts put Schneider on notice that it would be unconstitutional to display his Taser after Wheatcroft actively resisted his initial efforts to remove him from the vehicle. Because it was Wheatcroft's burden to provide such authority, and he has failed to do so, Schneider is entitled to qualified immunity for this act. *Merritt*, 425 F. Supp. 3d at 1230; *Shafer*, 868 F.3d at 1118.

### 3. No Prior Case Put Lindsey On Notice That A Drive Stun Into Wheatcroft's Shoulder Following Active Resistance Violated His Constitutional Rights.

As set forth above, as a matter of undisputed facts, Wheatcroft displayed active, not passive resistance and was warned multiple times he would be Tased by Lindsey before he actually drive stunned him. Thus, any argument by Wheatcroft that prior cases that only involved passive resistance, such as *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) and *Silva v. Chung*, 740 F. App'x 883, 886 (9th Cir. 2018), somehow put Lindsey on notice that he could not drive stun Wheatcroft after he actively resisted their control and warned him he would be tased are inapposite. Indeed, existing law established that the use of a Taser in drive stun mode was constitutionally permissible when a suspect was actively resisting, as Wheatcroft was in this case. *See e.g., Ceyala*, 2020 WL 5868427, at *3; *Bynum*, 2020 WL 8483837, at *7; *Marquez*, 693 F.3d at 1175; *Mattos v. Agarano*, 661 F.3d 433, 452 (9th Cir. 2011) (en banc) (officer's use of taser in drive-stun mode did not violate clearly established Fourth Amendment law).

### 4. No Prior Case Put Schneider On Notice That The Use Of A Taser In Dart Mode Violated Wheatcroft's Constitutional Rights.

As already addressed above, Schneider witnessed Anya violently assault and knock out Lindsey and Wheatcroft was continuing to resist his control before he resorted to using his taser in dart mode against Wheatcroft. Unlike other cases, it was much more than speculation for Schneider to believe he was going to be outnumbered and fighting both Anya and Wheatcroft at the same time. *C.f., Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir.2001)

18

("[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011); *Gravelet-Blondin*, 728 F.3d at 1093. Given the totality of circumstances, and the fact that Schneider needed to gain control over the circumstances while he was faced with at least two suspects displaying active aggression towards him, his use of a taser in dart mode did not violate any clearly established rights. Certainly, no prior case put it "beyond debate" that the use of a taser in dart mode under these particular circumstances was unconstitutional.

Indeed, as of the time of the incident giving rise to this action, only **two** published cases in the Ninth Circuit addressed the use of a Taser, *see e.g., Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) and *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (consolidating two appeals), with only one (*Bryan*) addressing the use of a Taser in dart mode. Neither are factually similar to the circumstances here. *Bryan* involved an officer using a taser in dart mode against an unarmed, non-threatening suspect whose back was turned from the officer when he used his Taser. 603 F.3d at 805. *Mattos* is similarly inapposite. The portion of *Mattos* addressing the Brooks defendant only involved the use of a drive stun against a pregnant driver who refused to sign a traffic ticket and did not involve any active resistance. The portion of *Mattos* addressing the Mattos defendant involved the use of a taser in dart-mode against an individual who stood between officers and someone they were trying to arrest, but did not actively resist their efforts or pose any violence toward them.[35]

Without providing another case squarely stating that an officer's Taser dart-mode taser use was unconstitutional after a third party violently assaulted and incapacitated a fellow police officer, the existing case law from the Supreme Court and Ninth Circuit failed to put officer Schneider on notice that his use of force was unconstitutional. He is entitled to

---

[35] Wheatcroft's reference to *Silva v. Chung,* 740 F. App'x 883, 885-86 (9th Cir. 2018) and *Gravelet-Blondin*, 728 F.3d at 1093 are also inapposite. *Silva* is not only unpublished but also involved a use of a Taser in dart mode against an individual in his back, who was walking in the middle of the street (and thus did not have access to a vehicle or unknown weapons), was unarmed, did not actively resist the officers, and never posed a threat to the officers. The same is true with *Gravelet-Blondin,* as the suspect in that case was only passively resisting arrest.

qualified immunity for his use of a taser in dart mode – particularly where his use of a taser failed to actually *cause* Wheatcroft the implicating effects of a dart mode taser use because both probes did not connect and his Taser had battery issues.

### 5. No Prior Case Put Fernandez On Notice That The Use Of A Taser In Dart Mode Violated Wheatcroft's Constitutional Rights.

For all the same reasons that Schneider is entitled to qualified immunity, so is Fernandez. But even more so, Fernandez acted with the reasonable, but mistaken, belief that it was Wheatcroft who assaulted and knocked out Lindsey. Moreover, Fernandez had just witnessed Schneider attempt to use his taser in dart mode and that it did not achieve its intended result, to incapacitate Wheatcroft.[36] Under these circumstances, no case put Fernandez on notice (and Wheatcroft cites none) that it was "beyond debate" his use of a taser under these circumstances would violate Wheatcroft's constitutional rights.

### 6. No Prior Case Put Schneider On Notice That His Post-Handcuffing Acts Violated Wheatcroft's Constitutional Rights.

Wheatcroft's only argument addressing Schneider's actions after he was handcuffed involves his use of a groin kick. [Response at 20:18-21]. Again, this occurred after Wheatcroft was handcuffed but just after he saw his wife being arrested and he began kicking Schneider and Fernandez while on the ground. Plaintiff cites a 2008 case out of the D.C. Circuit, *Johnson v. D.C.,* 528 F.3d 969, 976 (D.C. Cir. 2008) to argue against qualified immunity in this regard. Not only does this out of jurisdiction case fail to provide sufficient notice for qualified immunity purposes, but it is also factually inapposite. *Johnson* involved an *officer kicking another officer* (whom he had mistaken his identity for a fleeing suspect to robbery) in the groin while he was on the ground in a prone position after he raised his hands, turned away from the other officer, and fell onto the floor. *Id.* at 972. Here, Wheatcroft was not in a prone position, was actively resisting the officers, and had just kicked both of them. Even if

---

[36] Again, the facts would only later corroborate this observation given that Schneider's' taser did not connect both probes into Wheatcroft and that his Taser was suffering from battery issues – both facts that Wheatcroft fails to properly dispute.

*Johnson* was controlling precedent (which it is not), it did not put Schneider on notice his conduct would violate Wheatcroft's constitutional rights.

Wheatcroft also fails to provide any case addressing Tasing of a suspect while handcuffed. *See Sanders*, 409 Fed. Appx. at 290 ("It is not clearly established that a police officer is prohibited from momentarily tasering an uncooperative handcuffed arrestee who—after multiple warnings—refuses to comply…"). For this reason alone, the Court should give Schneider qualified immunity for both his use of a taser against Wheatcroft just as he was handcuffed, and later on his buttocks after he began violently kicking the officers. [Response at 19-21].[37] Moreover, this Court has held that repeated Tasings are constitutionally permissible where a suspect continues to actively resist and kick the officers. *See Marquez*, 693 F.3d at 1175 (holding that although the Taser showed 22 trigger pulls for total of 123 seconds of activation, the physical evidence only confirmed nine Taser applications, which when utilized on actively resisting and kicking suspect was found to be objectively reasonable). Qualified immunity is, therefore, required for Schneider's post-handcuffing conduct.

## IV.   WHEATCROFT'S FIRST AMENDMENT RETALIATION CLAIM FAILS.

Wheatcroft's arguments fail for the simple reason as stated above, that probable cause existed for his arrest. *See Hunt v. City of Boulder City*, 2020 WL 1548469, at *2 (9th Cir. Apr. 1, 2020) (citing *Nieves v. Bartlett*, 139 S.Ct. 1715, 1724 (2019)) ("When there is probable cause for an arrest, a First Amendment retaliation claim fails as a matter of law."). Wheatcroft's Response, despite all his efforts, fails to contradict this simple principle.[38]

In any event, Wheatcroft continues to fundamentally misstate the record in an effort to maintain his frivolous First Amendment retaliation claim. Contrary to Wheatcroft's continued assertions, as already addressed above, Schneider did not remove Wheatcroft from

---

[37] Once again, Plaintiffs' cited cases discussing qualified immunity in the context of a duty to intervene [Response at 21] are also inapposite given there was no opportunity to do so by the other non-named officers on scene and that the force used was constitutional.

[38] Plaintiff cites *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1947 (2018) in an effort to fight this principle. But Plaintiff misquotes and misapplies the holding of *Lozman*. The Supreme Court in that opinion unambiguously stated that "If there was probable cause, the [First Amendment Retaliation] case ends."

the vehicle because of his failure to provide identification nor did any officer use force on him for the same. Rather, their respective uses of force were based on officer safety concerns and/or responded to Wheatcroft's and Anya's various forms of resistance and violence. As a result, there was no "substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

The undisputed facts of this case also stand in stark contrast to those cited by Plaintiffs[39], all of which involved an officer who arrested an individual and/or used force against that individual based solely on an individual's protected speech who was not actively resisting arrest or control. And for that same reason, these cases fail to establish that Schneider or any other officer is not entitled to qualified immunity on Wheatcroft's First Amendment claim. Indeed, Wheatcroft was **required**, but failed, to provide a case demonstrating a First Amendment violation where a suspect who asserted protected speech (i.e., a refusal to not disclose their identity), but due to an officer safety issue is removed from the vehicle, then actively resists that removal, and Officers use force and later arrest as a result of *that* conduct. Qualified immunity is, therefore, warranted.

## V.   WHEATCROFT'S MALICIOUS PROSECUTION CLAIM FAILS.

### A.   Probable Cause Bars Malicious Prosecution.

It is undisputed that probable cause, as a matter of law, defeats a malicious prosecution claim. *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994). Again, as already set forth above, there was probable cause to arrest Wheatcroft. In addition, Wheatcroft's indictment defeats his malicious prosecution claim as a matter of law. The Court in *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1216-18 (D. Ariz. 2019), held after a lengthy analysis of Arizona law and other jurisdictions that "an indictment creates a presumption of probable cause for purposes of a malicious prosecution claim."  Moreover, while *Merritt* held that

---

[39] *I.e., Lopez v. City of Glendora,* 811 F. App'x 1016, 1018–19 (9th Cir. 2020), *Vohra v. City of Placentia,* 683 F. App'x 564, 567 (9th Cir. 2017), *Beck v. City of Upland,* 527 F.3d 853, 871 (9th Cir. 2008), *Duran v. City of Douglas, Ariz.,* 904 F.2d 1372, 1378 (9th Cir. 1990), *Ferguson v. City of New York,* 2018 WL 3626427, at * 6 (E.D.N.Y. July 30, 2018), *Martin v. Mez,* No.2:20-CV-855-JAM-JDP, 2020 WL 5909059, at *2 (E.D.Cal. Oct. 6, 2020),

probable cause could be rebutted if the indictment was "induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith", there is no evidence of any of that here. *Id.* at 1218. Here, the true bill by the grand jury conclusively established probable cause for Wheatcroft's arrest. Wheatcroft has presented only speculation that his indictment was "induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."[40] Accordingly, summary judgment on Wheatcroft's malicious prosecution claim is required.[41] *Id.* at 1219 ("If Plaintiff fails to come forward with such evidence, his post-indictment claims cannot survive summary judgment.").

Finally, "[a]n individual seeking to bring a malicious prosecution claim must generally establish that the prior proceedings terminated in such a manner as to indicate his innocence." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004). For the termination of a proceeding to be considered favorable, it generally must involve a "determination on the merits." *Jaisinghani v. Byrne*, 120 Fed.Appx. 47, 49 (9th Cir. 2005). However, a termination "short of a complete trial on the merits" may serve as a favorable termination *only* "if it reflects the opinion of the prosecuting party or the court that the action *lacked merit* or would result in a decision in favor of the defendant." *Awabdy*, 368 F.3d at 1068) (emphasis added). Here, there is no evidence Wheatcroft's charges lacked merit or would result in a decision in his favor.  Just that a county prosecutor declined to charge. Therefore, summary judgment is appropriate on Wheatcroft's malicious prosecution claim. *Milke v. City of Phx.*, 2016 WL 5339693, *10 (D. Ariz. Jan 8, 2016) (without evidence establishing "the criminal prosecution was terminated because the plaintiff was innocent, the malicious prosecution case could not proceed.").

---

[40] Plaintiffs' argument that "evidence shows the officers provided false information to include the police report" is not tethered to any fact or citation to the record and cannot be relied by the Court. [*See* Response at 11:14-12:3, 24:9-12]. In addition, Plaintiffs admit they do not know what information was provided to the Grand Jury and, as a result, have no basis in fact to argue information was omitted.  But even so, such testimony is absolutely privileged from liability.  *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) ("a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony.").

[41] Defendants did not "wrongfully arrest" or "charge" Wheatcroft with aggravated assault as PSOF ¶ 55 states (which cites to DSOF ¶¶ 100, 102 as factual support).

**B.**     **Beyond Speculation, Wheatcroft Fails To Establish Malice.**

Plaintiffs also cannot establish that any officer exhibited malice toward Wheatcroft or the Minor Plaintiffs. "Malice is present where the defendant initiate[d] or procure[d] the proceedings . . . primarily for a purpose other than that of bringing an offender to justice[.]" *West v. City of Mesa*, 128 F.Supp.3d 1233, 1246 (D. Ariz. 2015) (citation omitted). "[M]alice and the lack of probable cause are separate elements of the tort of malicious prosecution. Evidence of lack of probable cause allows, at most, a mere inference, but not a necessary one, of malice." *Shelburg v. City of Scottsdale Police Dep't*, 2010 WL 3327690 at *10 (D. Ariz. Aug. 23, 2010). Here, as the body-cam footage of the incident shows, the officers did not harbor any overt ill-will or disdain for Wheatcroft sufficient to establish that malice existed. The incident involved a rapidly evolving interaction that lasted less than three minutes. None of the officers involved previously knew any of the occupants of the vehicle. There was no malice or intent to deprive any individual of their constitutional rights. As such, Plaintiffs' malicious prosecution claim fails for this additional reason.

**C.**     **The Officers Are Entitled To Qualified Immunity.**

Plaintiffs' Response argues it was Defendants obligation to provide authority establishing that Wheatcroft's rights were clearly established based on cases predating the subject incident with substantially similar facts. That is incorrect – it is Plaintiffs' burden to do so and Plaintiffs failed in this regard.[42]  Qualified immunity should apply to this claim.

**VI.**     **THE 14TH AMENDMENT FAMILIAL ASSOCIATION CLAIM FAILS.**

It cannot be reasonably disputed that the incident at issue involving Wheatcroft and the Defendant officers occurred in less than a three-minute timespan. [**Ex. 9,** SBC at 2:33:28-2:36:09]. Under these circumstances, where the officers did not have time to deliberate, "a use of force shocks the conscience *only* if the officer[] had a 'purpose to harm'

---

[42] Plaintiffs' references to *Gonzalez v. City of Santa Monica*, 88 F. App'x 161, 163 (9th Cir. 2004) and *Harris v. Roderick*, 126 F.3d 1189, 1199 (9th Cir.1997) are inapposite as there is absolutely no evidence (nor is any cited in any PSOF), other than speculation from Plaintiffs' counsel (which is not fact), that Schneider, Lindsey, and Fernandez "voluntarily provided false information, and deliberately set in motion a series of events that they anticipated, or should have anticipated, would lead to the arrest, indictment, and charges against Plaintiff."

9422067.1

the decedent for reasons unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (emphasis added).[43]

Here, Plaintiffs need more than speculation as to improper motive to survive summary judgment, but that all they present. *Id.* at 798. Absolutely no facts exist to demonstrate the officers acted with any purpose to harm for reasons unrelated to legitimate law enforcement objectives. It is undisputed that none of the officers knew any Plaintiff prior to the incident at issue. [RDSOF ¶ 7]. Moreover, it cannot be reasonably disputed that the officers were instantaneously reacting to an evolving and chaotic situation, especially after Wheatcroft actively resisted their control, Anya Chapman knocked out Lindsey, and Wheatcroft again became aggressive as he was handcuffed and kicked the officers. Plaintiffs argue the use of force was "unreasonable" and "shocks the conscience" – but again that is not the standard under the Fourteenth Amendment. Rather, the Court looks only to whether the force was unrelated to legitimate law enforcement objectives. Again, all of the officers' uses of force were reactions to the evolving, chaotic encounter with Wheatcroft/Chapman.[44]

Plaintiffs also argue the Defendant Officers are not entitled to qualified immunity because the officers created or exposed them to a danger they would not have otherwise faced. [*See* Response at 28 (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 and 1065-66 (9th Cir. 2006), *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 974 (E.D. Cal. 2017)]. However, not only is there no evidence the Officers "created" any danger, but the Supreme Court expressly rejected such an argument as a matter of law. *Mendez*, 137 S. Ct. 1539. Moreover, both cases are factually inapposite. *Kennedy* is not a familial association case. And *Kaur*, which involved officers who shot a non-dangerous, non-fleeing, possibly mentally ill, suspected misdemeanant numerous times after that person may have said "don't shoot", is a

---

[43] Plaintiffs' objection to DSOF ¶ 89 is without merit as the only evidence offered in RDSOF ¶ 89 is a general reference to the video evidence in the record.

[44] Plaintiffs' attempt to rehash a multitude of demonstrably false facts (i.e., Wheatcroft was cooperative in exiting the vehicle, his pants were pulled down so Schneider could Tase him in the testicles, etc.) as a basis for their familial association claim fails for all the reasons already addressed above.

far cry from the facts of this case. Aside from those two inapposite, distinguishable cases, Plaintiffs fail to provide any other authority to put the officers on notice that their actions would violate Plaintiffs' Fourteenth Amendment familial association rights. As a result, the individual Defendant Officers are entitled to qualified immunity on this claim.

## VII.   **WHEATCROFT'S *MONELL* CLAIM FAILS.**[45]

As set forth above, because there is no constitutional violation of any Plaintiffs' rights, the Defendants are entitled to qualified immunity. Thus, the *Monell* claim fails. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).[46]

### A.   **Rick St. John Did Not Ratify The Individual Defendants' Conduct.**

Here, as set forth above, there was no unconstitutional decision that Chief St. John could ratify, and Plaintiffs' *Monell* claim fails for this reason alone. But ratification, asserted as a basis for municipal liability, requires Plaintiffs to show that the authorized policymaker approved both a subordinate's decision and the basis for that decision. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (Plaintiff must show that the triggering decision was the product of a "conscious, affirmative choice" to ratify the conduct in question.).[47] Plaintiff presents rank speculation but no evidence that the authorized policymaker for the City of Glendale, Chief Rick St. John, approved and ratified the actions of the Defendant officers.[48]

Rather, Plaintiffs merely argue: (1) Chief St. John reviewed the incident and the reports arising out of the incident and (2) failed to reprimand or discharge Lindsey,

---

[45] Plaintiffs fail to address Defendants' *Monell* argument based on the City's failure to train or supervise. [Doc. 245 at 32-33]. Thus, summary judgment is required on these claims.

[46] Plaintiffs' reference to Ninth Circuit authority, all of which are inapposite, cannot trump the United States' Supreme Court holdings in *Heller* and *Monell*. [*See* Resp. at 29:4-17].

[47] *See also Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (citation omitted); *Krause v. County of Mohave*, CV-17-08185-PCT-SMB, 2020 WL 2541728, at *15 (D. Ariz. May 19, 2020), aff'd, 20-16189, 2021 WL 1667042 (9th Cir. Apr. 28, 2021).

[48] Plaintiffs argue that Chief St. John is the policy maker for the City of Glendale as to its policies and procedures for police officers. PSOF ¶ 70. As a result, only St. John can "ratify" the conduct at issue. Therefore, that the City of Glendale, via its Mayor, issued press releases does not speak for Chief St. John nor can it be a basis for ratification. *See* PSOF ¶ 71-72, Plaintiffs' Ex. 29-31. Moreover, Defendants encourage the Court to read the press releases in Plaintiffs' Ex. 29-31, as none of them ratify the officers' conduct.

26

Schneider, and Fernandez for all of their actions.[49] Again, the Ninth Circuit has repeatedly stated that the failure to reprimand is not a "conscious, affirmative choice" to ratify the conduct in question. *See e.g., Krause v. County of Mohave*, CV-17-08185-PCT-SMB, 2020 WL 2541728, at *15 (D. Ariz. May 19, 2020), aff'd, 20-16189, 2021 WL 1667042 (9th Cir. Apr. 28, 2021) ("Defendants are correct—Plaintiff's cursory conclusion that Sherriff Schuster "rubber stamped" the MCSO internal investigation, [] does not establish that the outcome of the County's review of the shooting 'was the product of a conscious, affirmative choice to ratify the [unconstitutional] conduct.'")  Plaintiffs' ratification argument, therefore, fails.

Finally, Plaintiffs' reliance on *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020) and *Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 979 (N.D. Cal. 2017), aff'd in part, dismissed in part, 897 F.3d 1125 (9th Cir. 2018) is also misplaced. Both *Silva* and *Hernandez* involved a Police Chief that ratified defendant officer' acts by publicly approving of their conduct and the basis for it. Here, the record is devoid of any statements from Chief St. John regarding the incident or approving of the conduct and the officers' basis for that conduct. Accordingly, Plaintiffs ratification *Monell* argument fails.

### B.    The City of Glendale Had No Policy To Violate Constitutional Rights.

Plaintiffs' other *Monell* argument regarding the City's policies is nonsensical. [*See* Response at 32:3-15]. Plaintiffs argue that the initial traffic stop under the particular facts of this case was improper.[50] As addressed above, there is no evidence that the City ratified that conduct. Moreover, a single instance of a policy violation (even if one had occurred) is not a *Monell* claim. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000). In *City of Canton*, 489 U.S. at 390-91, the Supreme Court made clear: (1)"that a particular officer may be unsatisfactorily trained or supervised will not alone suffice to fasten liability on the city, for

---

[49] This argument is not even supported by the record. Plaintiffs PSOF ¶ 70, citing to page 36 of St. John's deposition, is not included in Plaintiffs' Exhibit 7. Nor do any of the pages included in Exhibit 7 reference St. John's approval of the officers' incident conduct.

[50] As already addressed above, *Mariscal* is inapposite as there was significant traffic that would have been affected given the pedestrians and cars parked and moving about in the Motel 6 parking lot as Blackburn pulled into it without a turn signal.

the officer's shortcomings may have resulted from factors other than the faulty training program"; (2) liability will not attach where an otherwise sound program has "occasionally been negligently administered"; (3) liability cannot be based on allegations that the injury could have been avoided if an officer had better or more training or supervision, because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program"; and (4) "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or legal basis for holding the city liable." Thus, Plaintiffs fail to establish that Glendale had a "policy to violate constitutional rights" or that it had a policy or procedure for "stopping vehicles without a proper basis under the law." Plaintiffs' conclusory and speculative *Monell* argument fails.

## VIII.   THE MINOR PLAINTIFFS' STATE LAW CLAIMS FAIL.

### A.     Common law Qualified Immunity Bars The Minor Plaintiffs' Claims.

"Common law qualified immunity generally provides public officials, including police officers, limited protection from liability when 'performing an act that inherently requires judgment or discretion.'" *Spooner v. City of Phoenix*, 435 P.3d 462, 466 (App. 2018) (quoting *Chamberlain v. Mathis*, 729 P.2d 905, 909 (1986)). Thus, an officer performing a discretionary act within the scope of his public duties may be liable only if grossly negligent. *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1231 (D. Ariz. 2019). Here, Plaintiff *failed to plead or prove* gross negligence. Therefore, summary judgment is appropriate for this reason alone.

### B.     The Minor Plaintiffs' IIED Claim Fails.

The facts of this case establish that the Defendants' conduct was not extreme and outrageous. Defendants will not reiterate the facts of the encounter which have been addressed in their excessive force analysis above. However, suffice it to be said, the facts involving the officers' reactions to Wheatcroft's active resistance, Anya's assault on Lindsey, and Wheatcroft's renewed aggression and striking while he was handcuffed utterly fail to rise to the enormously high level required under Arizona law for extreme and outrageous conduct. Moreover, there is absolutely no evidence in the record that the individual Defendant Officers' conduct *intended* to cause the minor Plaintiffs' emotional distress.

1    Plaintiffs' argument that conduct becomes extreme and outrageous simply because it occurs
2    in front of a minor is improper finds no support under Arizona law. Specifically, Plaintiffs
3    cite no case that minor plaintiffs, solely because they are minors, are "uniquely susceptible to
4    emotional distress"[51] under Arizona law. Nor is there any evidence that either minor Plaintiff
5    were in a "weakened emotional state" or that the Defendant Officers knew of this fact.

6    ███████████████████████████████████████

7    ███████████████████████████████████████████

8    ███████████████████████████████████████████

9    ███████████████████████████████████████████

10   ███████████████████████████████████████████

11   ███████████████████████████████████████  ██████  ████

12   ███████████████████████████████████████████

13   ██████████████████████████████  ████████  ██████

14   ██████  ████████  ████████████████████████

15   ████████████  ██████  ████████████████████

16   ███████████████████████████████████████████

17   ███████████████████████████████████████████

18   ███████████████████████████████████████████

19   ███████████████████████████████████████████

20   ████████████████████████████    That is not severe emotional distress as required
21   under existing and controlling Arizona law.[52]

22       **C.   The Minor Plaintiffs' NIED Claim Fails.**

23

24

_____

25       [51] Plaintiffs' reference to Ninth Circuit authorities, such as *Gravelet-Blondin v. Shelton,*
26   728 F.3d 1086 (9th Cir. 2013), which arose out of the Western District of Washington, do
     not state the law *in Arizona* for an IIED claim and are, therefore, inapposite.

27       [52] █████████████████████████████████████████
28   █████████████████████████████████████████

                                    29

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ████████████████████████████████████████

### D.    The Minor Plaintiffs' Loss of Consortium Claim Fails.

Loss of consortium is a derivative claim. *Barnes v. Outlaw*, 192 Ariz. 283, 285–86, ¶ 8 (1998). Here, such a claim fails for all the reasons stated above, as the individual Defendants did not act improperly in their conduct involving any of the Plaintiffs in this action. Moreover, the minor Plaintiffs also cannot backdoor a loss of consortium claim based on the alleged Wheatcroft's alleged assault and battery. Not only was such conduct not directed towards the minor Plaintiffs, but Wheatcroft's state law claims have long been precluded due to his failure to comply with A.R.S. § 12-820.01 and would otherwise fall under Arizona's justification statutes. *See* A.R.S. §§ 13-404, -409, -413.[53] In any event, as set forth above, Plaintiffs' state law claims fail and, therefore, their loss of consortium claims.

## IX.    PUNITIVE DAMAGES ARE NOT WARRANTED.

Punitive damages are unavailable against the individual Officers because Plaintiffs' § 1983 claims fail, as explained *supra*. Moreover, this record is utterly devoid of any evidence that any of the Officers acted with an "evil motive" or "callous indifference" to warrant punitive damages under § 1983. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Finally, punitive damages are unavailable under state law. *See* A.R.S. § 12-820.04.

## X.    CONCLUSION.

Based on the foregoing, the Court should grant summary judgment in all Defendants' favor on all of Plaintiffs' claims.

---

[53] Plaintiffs' reliance on *Martin v. Staheli*, 248 Ariz. 87 (App. 2019), and *Villareal v. State, Dep't of Transp.*, 160 Ariz. 474, 481, 774 P.2d 213, 220 (1989) are inapposite. Neither of those cases involved a minor asserting a claim that was barred by their parent under Arizona's notice of claim statute.

9422067.1

DATED this 20th day of May, 2021.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Joseph J. Popolizio
    Joseph J. Popolizio
    Justin M. Ackerman
    Ian C. Beck
    40 North Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Marc J. Victor
Jody L. Broaddus
Attorneys for Freedom
3185 South Price Road
Chandler, Arizona 85248
Marc@AttorneyForFreedom.com
Jody@AttorneyForFreedom.com
Attorneys for Plaintiffs


/s/Karen Gawel

31

9422067.1