Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
Ian C. Beck, Bar #035599
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1741
Fax: (602) 200-7876
jpopolizio@jshfirm.com
jackerman@jshfirm.com
ibeck@jshfirm.com

Attorneys for Defendants City of Glendale,
Matt Schneider, Mark Lindsey, and Michael
Fernande

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Johnny Wheatcroft and Anya Chapman, as husband and wife, and on behalf of minors J.W and B.W.,<br><br>Plaintiffs,<br><br>v.<br><br>City of Glendale, a municipal entity; Matt Schneider, in his official and individual capacities; Mark Lindsey, in his official and individual capacities; and Michael Fernandez, in his official and individual capacities,<br><br>Defendants. | No. 2:18-cv-02347-MTL<br><br>**DEFENDANTS' NOTICE OF SUPPLEMENTAL LEGAL AUTHORITY** |

On October 18, 2021, the Supreme Court of the United States issued written opinions in *Rivas-Villegas v. Cortesluna*, U.S., No. 20-159 and *City of Tahlequah v. Bond*, U.S., No. 20-1668, affirming that police officers are entitled to qualified immunity when no clear precedent puts them on notice that their actions violate a clearly established constitutional right.

On October 29, 2021, the United States District Court for the District of Arizona issued a written opinion in *Baker v. Unknown Snow*, 2021 WL 5040321, CV-19-

9839644.1

1   02287 (Oct. 29, 2021), affirming that reasonable suspicion of a traffic violation may justify

2   an investigatory stop of a vehicle and that police officers are entitled to qualified immunity

3   when no clear precedent puts them on notice that their actions violate a clearly established

4   constitutional right.

5         Copies of those opinions are attached.

6         DATED this 3rd day of November, 2021.

7                  JONES, SKELTON & HOCHULI, P.L.C.

9               By /s/ Ian C. Beck

10                 Joseph J. Popolizio
                     Justin M. Ackerman

11                 Ian C. Beck
                     40 N. Central Avenue, Suite 2700

12                 Phoenix, Arizona 85004
                     Attorneys for Defendants City of

13                 Glendale, Matt Schneider, Mark Lindsey,
                     and Michael Fernande

9839644.1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document to the following non-CM/ECF participants:

Marc J. Victor
Jody L. Broaddus
Attorneys for Freedom
3185 South Price Road
Chandler, Arizona 85248
Marc@AttorneyForFreedom.com
Jody@AttorneyForFreedom.com
Attorneys for Plaintiffs


/s/ Lisa Drapeau

9839644.1

Cite as: 595 U. S. ____ (2021)          1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

## DANIEL RIVAS-VILLEGAS *v.* RAMON CORTESLUNA

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–1539.   Decided October 18, 2021

PER CURIAM.

Petitioner Daniel Rivas-Villegas, a police officer in Union City, California, responded to a 911 call reporting that a woman and her two children were barricaded in a room for fear that respondent Ramon Cortesluna, the woman's boyfriend, was going to hurt them.  After confirming that the family had no way of escaping the house, Rivas-Villegas and the other officers present commanded Cortesluna outside and onto the ground.  Officers saw a knife in Cortesluna's left pocket.  While Rivas-Villegas and another officer were in the process of removing the knife and handcuffing Cortesluna, Rivas-Villegas briefly placed his knee on the left side of Cortesluna's back.  Cortesluna later sued under Rev. Stat. §1979, 42 U. S. C. §1983, alleging, as relevant, that Rivas-Villegas used excessive force.  At issue here is whether Rivas-Villegas is entitled to qualified immunity because he did not violate clearly established law.

The undisputed facts are as follows.  A 911 operator received a call from a crying 12-year-old girl reporting that she, her mother, and her 15-year-old sister had shut themselves into a room at their home because her mother's boyfriend, Cortesluna, was trying to hurt them and had a chainsaw.  The girl told the operator that Cortesluna was "'always drinking,'" had "'anger issues,'" was "'really mad,'" and was using the chainsaw to "'break something in the house.'"  *Cortesluna* v. *Leon,* 979 F. 3d 645, 649 (CA9 2020).  A police dispatcher relayed this information along with a description of Cortesluna in a request for officers to respond.

Per Curiam

Rivas-Villegas heard the broadcast and responded to the scene along with four other officers. The officers spent several minutes observing the home and reported seeing through a window a man matching Cortesluna's description. One officer asked whether the girl and her family could exit the house. Dispatch responded that they "'were unable to get out'" and confirmed that the 911 operator had "'hear[d] sawing in the background'" and thought that Cortesluna might be trying to saw down the door. *Cortesluna* v. *Leon*, 2018 WL 6727824, *2 (ND Cal., Dec. 21, 2018).

After receiving this information, Rivas-Villegas knocked on the door and stated loudly, "'police department, come to the front door, Union City police, come to the front door.'" *Ibid.* Another officer yelled, "'he's coming and has a weapon.'" *Ibid.* A different officer then stated, "'use less-lethal,'" referring to a beanbag shotgun. *Ibid.* When Rivas-Villegas ordered Cortesluna to "'drop it,'" Cortesluna dropped the "weapon," later identified as a metal tool. *Ibid.*

Rivas-Villegas then commanded, "'come out, put your hands up, walk out towards me.'" 979 F. 3d, at 650. Cortesluna put his hands up and Rivas-Villegas told him to "'keep coming.'" *Ibid.* As Cortesluna walked out of the house and toward the officers, Rivas-Villegas said, "'Stop. Get on your knees.'" *Ibid.* Plaintiff stopped 10 to 11 feet from the officers. Another officer then saw a knife sticking out from the front left pocket of Cortesluna's pants and shouted, "'he has a knife in his left pocket, knife in his pocket,'" and directed Cortesluna, "'don't put your hands down,'" "'hands up.'" 2018 WL 6727824, *2. Cortesluna turned his head toward the instructing officer but then lowered his head and his hands in contravention of the officer's orders. Another officer twice shot Cortesluna with a bean-bag round from his shotgun, once in the lower stomach and once in the left hip.

After the second shot, Cortesluna raised his hands over his head. The officers shouted for him to "'get down,'"

Per Curiam

which he did.  Another officer stated, "'left pocket, he's got a knife.'"  *Ibid.*  Rivas-Villegas then straddled Cortesluna. He placed his right foot on the ground next to Cortesluna's right side with his right leg bent at the knee.  He placed his left knee on the left side of Cortesluna's back, near where Cortesluna had a knife in his pocket. He raised both of Cortesluna's arms up behind his back.  Rivas-Villegas was in this position for no more than eight seconds before standing up while continuing to hold Cortesluna's arms.  At that point, another officer, who had just removed the knife from Cortesluna's pocket and tossed it away, came and handcuffed Cortesluna's hands behind his back.  Rivas-Villegas lifted Cortesluna up and moved him away from the door.

Cortesluna brought suit under 42 U. S. C. §1983, claiming, as relevant here, that Rivas-Villegas used excessive force in violation of the Fourth Amendment.  The District Court granted summary judgment to Rivas-Villegas, but the Court of Appeals for the Ninth Circuit reversed.  979 F. 3d, at 656.

The Court of Appeals held that "Rivas-Villegas is not entitled to qualified immunity because existing precedent put him on notice that his conduct constituted excessive force." *Id.,* at 654.  In reaching this conclusion, the Court of Appeals relied solely on *LaLonde* v. *County of Riverside*, 204 F. 3d 947 (CA9 2000).  The court acknowledged that "the officers here responded to a more volatile situation than did the officers in *LaLonde*."  979 F. 3d, at 654.  Nevertheless, it reasoned: "Both *LaLonde* and this case involve suspects who were lying face-down on the ground and were not resisting either physically or verbally, on whose back the defendant officer leaned with a knee, causing allegedly significant injury.  *Ibid.*

Judge Collins dissented.  As relevant, he argued that "the facts of *LaLonde* are materially distinguishable from this case and are therefore insufficient to have made clear to every reasonable officer that the force Rivas-Villegas used

Per Curiam

here was excessive." *Id.,* at 664 (internal quotation marks omitted).

We agree and therefore reverse. Even assuming that controlling Circuit precedent clearly establishes law for purposes of §1983, *LaLonde* did not give fair notice to Rivas-Villegas. He is thus entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White* v. *Pauly*, 580 U. S. ___, ___ (2017) (*per curiam*) (slip op., at 6) (internal quotation marks omitted). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix* v. *Luna*, 577 U. S. 7, 11 (2015) (*per curiam*) (internal quotation marks omitted). Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U. S., at ___ (slip op., at 6) (alterations and internal quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau* v. *Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*) (internal quotation marks omitted).

"[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U. S., at 12 (alterations and internal quotation marks omitted). Whether an officer has used excessive force depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham* v. *Connor*, 490 U. S. 386, 396 (1989); see

Per Curiam

also *Tennessee* v. *Garner*, 471 U. S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force"). However, *Graham*'s and *Garner*'s standards are cast "at a high level of generality." *Brosseau*, 543 U. S., at 199. "[I]n an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Ibid.* But this is not an obvious case. Thus, to show a violation of clearly established law, Cortesluna must identify a case that put Rivas-Villegas on notice that his specific conduct was unlawful.

Cortesluna has not done so. Neither Cortesluna nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here. Instead, the Court of Appeals relied solely on its precedent in *LaLonde*. Even assuming that Circuit precedent can clearly establish law for purposes of §1983, *LaLonde* is materially distinguishable and thus does not govern the facts of this case.

In *LaLonde*, officers were responding to a neighbor's complaint that LaLonde had been making too much noise in his apartment. 204 F. 3d, at 950–951. When they knocked on LaLonde's door, he "appeared in his underwear and a T-shirt, holding a sandwich in his hand." *Id.,* at 951. LaLonde testified that, after he refused to let the officers enter his home, they did so anyway and informed him he would be arrested for obstruction of justice. *Ibid.* One officer then knocked the sandwich from LaLonde's hand and "grabbed LaLonde by his ponytail and knocked him backwards to the ground." *Id.,* at 952. After a short scuffle, the officer sprayed LaLonde in the face with pepper spray. At that point, LaLonde ceased resisting and another officer, while handcuffing LaLonde, "deliberately dug his knee into LaLonde's back with a force that caused him long-term if not permanent back injury." *Id.,* at 952, 960, n. 17.

The situation in *LaLonde* and the situation at issue here

Per Curiam

diverge in several respects.  In *LaLonde*, officers were responding to a mere noise complaint, whereas here they were responding to a serious alleged incident of domestic violence possibly involving a chainsaw.   In addition, LaLonde was unarmed.  Cortesluna, in contrast, had a knife protruding from his left pocket for which he had just previously appeared to reach.  Further, in this case, video evidence shows, and Cortesluna does not dispute, that Rivas-Villegas placed his knee on Cortesluna for no more than eight seconds and only on the side of his back near the knife that officers were in the process of retrieving.  LaLonde, in contrast, testified that the officer deliberately dug his knee into his back when he had no weapon and had made no threat when approached by police.  These facts, considered together in the context of this particular arrest, materially distinguish this case from *LaLonde*.

   "Precedent involving similar facts can help move a case beyond the otherwise hazy borders between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful."  *Kisela* v. *Hughes*, 584 U. S. ___, ___ (2018) (*per curiam*) (slip op., at 5) (internal quotation marks omitted).  On the facts of this case, neither *LaLonde* nor any decision of this Court is sufficiently similar.  For that reason, we grant Rivas-Villegas' petition for certiorari and reverse the Ninth Circuit's determination that Rivas-Villegas is not entitled to qualified immunity.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

CITY OF TAHLEQUAH, OKLAHOMA, ET AL. *v.* AUSTIN
P. BOND, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF
DOMINIC F. ROLLICE, DECEASED

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 20–1668.   Decided October 18, 2021

PER CURIAM.

On August 12, 2016, Dominic Rollice's ex-wife, Joy, called
911. Rollice was in her garage, she explained, and he was
intoxicated and would not leave. Joy requested police as-
sistance; otherwise, "it's going to get ugly real quick." 981
F. 3d 808, 812 (CA10 2020). The dispatcher asked whether
Rollice lived at the residence. Joy said he did not but ex-
plained that he kept tools in her garage.

Officers Josh Girdner, Chase Reed, and Brandon Vick re-
sponded to the call. All three knew that Rollice was Joy's
ex-husband, was intoxicated, and would not leave her
home.

Joy met the officers out front and led them to the side
entrance of the garage. There the officers encountered Rol-
lice and began speaking with him in the doorway. Rollice
expressed concern that the officers intended to take him to
jail; Officer Girdner told him that they were simply trying
to get him a ride. Rollice began fidgeting with something
in his hands and the officers noticed that he appeared nerv-
ous. Officer Girdner asked if he could pat Rollice down for
weapons. Rollice refused.

Police body-camera video captured what happened next.
As the conversation continued, Officer Girdner gestured
with his hands and took one step toward the doorway, caus-
ing Rollice to take one step back. Rollice, still conversing
with the officers, turned around and walked toward the
back of the garage where his tools were hanging over a

Per Curiam

workbench.  Officer Girdner followed, the others close be-
hind.  No officer was within six feet of Rollice.  The video is
silent, but the officers stated that they ordered Rollice to
stop.  Rollice kept walking.  He then grabbed a hammer
from the back wall over the workbench and turned around
to face the officers.  Rollice grasped the handle of the ham-
mer with both hands, as if preparing to swing a baseball
bat, and pulled it up to shoulder level.  The officers backed
up, drawing their guns.  At this point the video is no longer
silent, and the officers can be heard yelling at Rollice to
drop the hammer.

 He did not.  Instead, Rollice took a few steps to his right,
coming out from behind a piece of furniture so that he had
an unobstructed path to Officer Girdner.  He then raised
the hammer higher back behind his head and took a stance
as if he was about to throw the hammer or charge at the
officers.  In response, Officers Girdner and Vick fired their
weapons, killing Rollice.

 Rollice's estate filed suit against, among others, Officers
Girdner and Vick, alleging that the officers were liable un-
der 42 U. S. C. §1983, for violating Rollice's Fourth Amend-
ment right to be free from excessive force.  The officers
moved for summary judgment, both on the merits and on
qualified immunity grounds.  The District Court granted
their motion.  *Burke* v. *Tahlequah*, 2019 WL 4674316, *6
(ED Okla., Sept. 25, 2019).  The officers' use of force was
reasonable, it concluded, and even if not, qualified immun-
ity prevented the case from going further.  *Ibid.*

 A panel of the Court of Appeals for the Tenth Circuit re-
versed.  981 F. 3d, at 826.  The Court began by explaining
that Tenth Circuit precedent allows an officer to be held li-
able for a shooting that is itself objectively reasonable if the
officer's reckless or deliberate conduct created a situation
requiring deadly force.  *Id.,* at 816.  Applying that rule, the
Court concluded that a jury could find that Officer Girdner's

Per Curiam

initial step toward Rollice and the officers' subsequent "cornering" of him in the back of the garage recklessly created the situation that led to the fatal shooting, such that their ultimate use of deadly force was unconstitutional. *Id.,* at 823. As to qualified immunity, the Court concluded that several cases, most notably *Allen* v. *Muskogee*, 119 F. 3d 837 (CA10 1997), clearly established that the officers' conduct was unlawful. 981 F. 3d, at 826. This petition followed.

We need not, and do not, decide whether the officers violated the Fourth Amendment in the first place, or whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment. On this record, the officers plainly did not violate any clearly established law.

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson* v. *Callahan*, 555 U. S. 223, 231 (2009). As we have explained, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia* v. *Wesby*, 583 U. S. ___, ___ –___ (2018) (slip op., at 13–14) (quoting *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986)).

We have repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g.*, *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 742 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 583 U. S., at ___ (slip op., at 14) (quoting *Saucier* v. *Katz*, 533 U. S. 194, 202 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer

4                 CITY OF TAHLEQUAH *v.* BOND

Per Curiam

confronts." *Mullenix* v. *Luna*, 577 U. S. 7, 12 (2015) (*per curiam*) (internal quotation marks omitted).

The Tenth Circuit contravened those settled principles here. Not one of the decisions relied upon by the Court of Appeals—*Estate of Ceballos* v. *Husk*, 919 F. 3d 1204 (CA10 2019), *Hastings* v. *Barnes*, 252 Fed. Appx. 197 (CA10 2007), *Allen*, 119 F. 3d 837, and *Sevier* v. *Lawrence*, 60 F. 3d 695 (CA10 1995)—comes close to establishing that the officers' conduct was unlawful. The Court relied most heavily on *Allen*. But the facts of *Allen* are dramatically different from the facts here. The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. 119 F. 3d, at 841. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer. We cannot conclude that *Allen* "clearly established" that their conduct was reckless or that their ultimate use of force was unlawful.

The other decisions relied upon by the Court of Appeals are even less relevant. As for *Sevier*, that decision merely noted in dicta that deliberate or reckless preseizure conduct can render a later use of force excessive before dismissing the appeal for lack of jurisdiction. See 60 F. 3d, at 700–701. To state the obvious, a decision where the court did not even have jurisdiction cannot clearly establish substantive constitutional law. Regardless, that formulation of the rule is much too general to bear on whether the officers' particular conduct here violated the Fourth Amendment. See *al-Kidd*, 563 U. S., at 742. *Estate of Ceballos*, decided after the shooting at issue, is of no use in the clearly established inquiry. See *Brosseau* v. *Haugen*, 543 U. S. 194, 200, n. 4 (2004) (*per curiam*). And *Hastings*, an unpublished decision, involved officers initiating an encounter with a potentially suicidal individual by chasing him into his bedroom, screaming at him, and pepper-spraying him. 252 Fed.

Per Curiam

Appx., at 206. Suffice it to say, a reasonable officer could miss the connection between that case and this one.

Neither the panel majority nor the respondent has identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity.

The petition for certiorari and the motions for leave to file briefs *amici curiae* are granted, and the judgment of the Court of Appeals is reversed.

*It is so ordered.*

2021 WL 5040321
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Joshua Baker, et al., Plaintiff,

v.

Unknown Snow, et al., Defendants.

No. CV-19-02287-PHX-DWL
|
10/29/2021

**ORDER**

**\*1**  In this civil rights action under 42 U.S.C. § 1983, Plaintiff Todd Brown ("Plaintiff") alleges that Phoenix Police Department ("PPD") Officers Snow and Mesquita (together, "Defendants") violated his Fourth Amendment rights during a traffic stop. Now pending before the Court is Defendants' motion for summary judgment. (Doc. 56.) For the following reasons, the motion is granted.

**BACKGROUND**

I. Underlying Facts
The facts set forth below are derived from the parties' separate statements of facts (Docs. 57, 64)[1] and from the video of the events in question (Doc. 60). Although the Court has generally construed the facts in the light most favorable to Plaintiff, as the non-movant, and resolved factual disputes in his favor, "we do not accept a non-movant's version of events when it is 'clearly contradict[ed]' by a video in the record." *Hernandez v. City of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)).

On February 15, 2018, Plaintiff, Joshua Baker ("Baker"), and a third person were riding in a car driven by Baker. (Doc. 64 ¶ 1.) Plaintiff was the front seat passenger. (*Id.* ¶ 2.) As the car pulled up to a stoplight at the intersection of 16th Street and Southern, Defendants—who are members of the PPD gang unit—pulled up behind them in an unmarked unit. (Doc. 57 ¶¶ 2-7; Doc. 64 ¶¶ 16-20.) The stop occurred in an area that Defendants "considered to be a high gang activity area." (Doc. 64 ¶ 23.) After Officer Mesquita noticed dark window tinting on Baker's car, Officer Snow ran the license

plate and discovered it was suspended. (Doc. 57 ¶¶ 8-10; Doc. 64 ¶¶ 21-24.)

When the light changed, Defendants began tailing Baker's car. (Doc. 57 ¶¶ 11-16; Doc. 64 ¶¶ 26-33.) At some point, Officer Mesquita turned on the unit's flashing lights and sirens to initiate a traffic stop, although the lights and sirens did not remain activated the entire time. (Doc. 57 ¶11; Doc. 64 ¶¶ 29-31, 35, 37.) The officers followed Baker's car for 3-5 minutes before he turned into a parking lot in front of a recreation center where Plaintiff worked. (Doc. 57 ¶¶ 12-14; Doc. 64 ¶ 32-33.) As Defendants were following Baker's car, it "obeyed all traffic signals, made no unsafe lane changes, caused no other vehicles to have to brake or swerve, did not make any obvious evasive maneuvers, and entered the parking lot at...in a safe a proper manner." (Doc. 64 ¶ 34.) Nevertheless, according to the officers, "[t]he prolonged time and distance that Baker's vehicle continued traveling without stopping for [their] vehicle caused them to be concerned about the intentions of the occupants of Baker's vehicle; Snow believed the failure to stop for their police vehicle could be indicative of future behavior." (Doc. 57 ¶ 13.)[2]

**\*2**  As Baker slowed to a stop in front of the building where Plaintiff worked, the officers got out of their unit and approached Baker's car. (Doc. 57 ¶ 19; Doc. 64 ¶¶ 42, 46.) The parties dispute the precise sequence of the events that followed. According to Defendants, Officer Snow was questioning Plaintiff, who was seated in the passenger seat, when "Baker's vehicle moved forward, which caused Snow to be further concerned about his safety and about the occupants' intentions towards his attempt to make contact with them." (Doc. 57 ¶ 21.) Defendants further contend that, "[w]hile Snow was at Plaintiff's side with the vehicle passenger door open, Snow requested Plaintiff to keep his hands visible and to stop moving, but Plaintiff reached his hand onto the dash and across the vehicle multiple times." (*Id.* ¶ 22.) According to Defendants, it was only after these developments occurred that "Snow had Plaintiff exit the vehicle" and then handcuffed Plaintiff and had Plaintiff sit on the curb "for officer safety reasons." (*Id.* ¶¶ 23-24.)

Meanwhile, Plaintiff contends that as he was opening the passenger door, he encountered Officer Snow "with his gun drawn, [who] told him to put his hands on the dash." (Doc. 67 ¶¶ 6, 9.)[3]  Plaintiff further contends that, "[a]t the same time" he was interacting with Officer Snow outside the passenger door, Baker "was being pulled from the vehicle and slammed against the car by another officer, all before he could even put

the vehicle in park." (*Id.* ¶ 7.) According to Plaintiff, "[t]his caused the vehicle to roll forward forcing [Plaintiff] to have to reach over and put the car in park." (*Id.* ¶ 8.) Plaintiff further contends that, after he was told to exit the vehicle and handcuffed, he "immediately began to inquire as to why he was being arrested only to be repeatedly told he was trying to run" and that Officer Snow also attempted to ask him about gang affiliations. (*Id.* ¶¶ 12-13.)

The Court has reviewed the videotape of the incident. (Doc. 60.) Although it doesn't reveal exactly what was going on inside Baker's car during the encounter, it does reveal that Baker's car came to a stop at the 1:03 mark of the video; that Plaintiff began opening the passenger door at the 1:05 mark, just as Officers Mesquita and Snow were exiting their police unit and beginning to walk toward Baker's car; that after the officers reached Baker's car, they initially allowed Baker and Plaintiff to remain inside, speaking with each of them through open doors while the car remained stationary; that such discussions continued until the 1:32 mark of the video, when Baker's car lurched forward; that after Baker's car stopped following the forward lurch, Officer Mesquita removed Baker from the car and handcuffed him across the trunk and back windshield; and that Plaintiff then exited Baker's car at the 1:58 mark, after which he was handcuffed and made to sit on a nearby curb. In the Court's view, this video evidence clearly contradicts Plaintiff's assertion that the officers pulled Baker from the car "before he could even put the vehicle in park," thereby causing the car to lurch forward. The video reveals that Baker had ample opportunity to place the car in park—indeed, it was stationary for nearly 30 seconds (1:03 to 1:32) before it lurched forward—and that Officer Mesquita did not remove Baker from the car until after it had stopped for a second time. Accordingly, the Court does not credit Plaintiff's evidence on these specific points. *Hernandez*, 989 F.3d at 743.

When Officers Snow and Mesquita made their initial contact with the occupants of Baker's car, they smelled marijuana. (Doc. 57 ¶ 28; Doc. 64 ¶ 47.)[4] As a result, they decided to search the car, the trunk, and the backpacks inside the car. (Doc. 57 ¶ 28; Doc. 64 ¶ 48.) Plaintiff "was also personally searched, including having the waistband of his gym shorts pulled forward to view his genital area." (Doc. 64 ¶ 50.) Additionally, the car's window tint was tested, and the officers further investigated the status of the car's registration, as well as Baker's learner's permit. (Doc. 57 ¶¶ 26-27.) After the officers failed to find any drugs, they cited Baker for the improper window tint and the suspended registration. (Doc.

57 ¶ 29; Doc. 64 ¶ 51.) Plaintiff was not charged or cited. (Doc. 64 ¶ 54.)

**\*3** As noted, the encounter took place outside Plaintiff's place of employment. (Doc. 64 ¶ 55-56.) Plaintiff was "kept handcuffed in front of his job, near the main entrance for over thirty minutes," during which time "people were coming and going and [Plaintiff] was being viewed by all the individuals that entered and exited through the doors, his coworkers, and the children he was assigned to work with there at the rec center." (*Id.*) Plaintiff contends that, because of this encounter, he "was embarrassed and humiliated, feared for his job, [was] concerned that his reputation with his fellow workers and the kids at the center had been damaged" and his "sense of security and freedom" were negatively affected. (*Id.* ¶¶ 58-61.)

In April 2018, Baker was found responsible for the tinting and registration offenses in Phoenix municipal court. (Doc. 57 ¶ 31.)

## II. Procedural History

On January 15, 2019, Plaintiff and Baker initiated this action by filing the complaint in state court. (Doc. 1 at 5.)

On April 9, 2019, Defendants, along with then-defendant PPD, removed the action to federal court. (Doc. 1.)

On June 6, 2019, PPD was dismissed with prejudice pursuant to the parties' stipulation. (Doc. 7.)

During the discovery process, Defendants repeatedly attempted to depose Baker without success. Accordingly, on April 16, 2021, Baker's claims were dismissed with prejudice. (Doc. 55.)

On May 14, 2021, Defendants filed the pending summary judgment motion. (Doc. 56.)

On June 29, 2021, Plaintiff filed a response. (Doc. 63.)[5]

On July 21, 2021, Defendants filed a reply. (Doc. 67.)

…

…

**DISCUSSION**

## I. Summary Judgment Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If...[the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**\*4** …

…

## II. The Parties' Arguments

In the complaint, Plaintiff alleges that Defendants "violated 42 U.S.C. § 1983 by depriving [him] of [his] right to be free from unlawful search and seizure as secured by the constitution." (Doc. 1 at 7.) However, in their summary judgment papers, the parties only address, in any meaningful fashion, whether Defendants' *seizure* of Plaintiff was lawful. Plaintiff does not, in contrast, develop any argument that the *searches* conducted during the course of the seizure may provide an independent pathway to liability.

As for the seizures, Defendants contend they were justified in conducting the initial investigatory stop of Baker's car based on the window-tinting violation and their knowledge that the registration was suspended; that they developed officer-safety concerns based on Baker's failure to pull over for 3-5 minutes despite their use of spotlights and emergency flashing lights; that their safety concerns were further exacerbated when Baker's car lurched forward in the parking lot after initially stopping; that although their initial suspicions were only directed toward Baker, they developed independent suspicion as to Plaintiff based on the smell of marijuana emanating from the car; and that the resulting investigative detention of Plaintiff was reasonable. (Doc. 56 at 1-2, 4-7.) According to Defendants, these factors demonstrate that their seizure of Plaintiff was lawful, but at a minimum they are entitled to qualified immunity because "Plaintiff cannot point to binding precedent that clearly establishes the right at issue on the date in question under similar circumstances." (*Id.* at 7.) Finally, Defendants also seek summary judgment on the alternative ground that Plaintiff cannot provide evidence of his alleged emotional distress damages. (*Id.*)

Plaintiff opposes Defendants' motion. (Doc. 63.) Unfortunately, most of Plaintiff's response consists of reciting the facts (*id.* at 1-5), identifying general legal principles related to the Fourth Amendment and qualified immunity (*id.* at 5-8), and identifying general legal principles related to the summary judgment standard (*id.* at 10). In contrast, Plaintiff offers very little discussion of how the law applies to the facts of this case. On that issue, Plaintiff merely contends that the seizure was unconstitutional because the "governmental interest in apprehending him for the alleged misdemeanor of the person driving the vehicle" was slim, the officers acted excessively during the encounter by taking him "from the car at gun point and [holding him] against his will in handcuffs for more than thirty minutes," and he "was never investigated for suspected criminal act." (*Id.* at 8-9.) Plaintiff argues that summary judgment is not appropriate under these circumstances because "[c]learly in a case in which the Plaintiff is alleging that his 4th Amendment rights were violated as a result of an unlawful stop, illegal seizure, and illegal search, this is an instance in which the facts must be sorted through and examined to determine if

any justification existed and if the intrusion outweighed the alleged justification" and "[t]he caselaw is clear that this is a duty of the Jury and not the Court." (*Id.* at 11.) Notably, in the section of his response entitled "Qualified Immunity," Plaintiff makes no effort to identify a previous case involving similar facts in which a Fourth Amendment violation was found. (*Id.* at 5-8.) Finally, in response to Defendants' arguments concerning damages, Plaintiff contends that his deposition testimony is sufficient to create a triable issue of fact. (*Id.* at 9-10.)

**\*5**  In reply, Defendants reiterate their position that the initial vehicle stop was lawful because they had probable cause that Baker had committed multiple violations of the traffic code (tinting and registration) and that Plaintiff's subsequent "investigatory detention was reasonable" because it "was related to the suspicion Plaintiff was engaged in criminal behavior related to the odor of marijuana, and not merely to the violations suspected of by the vehicle's owner and/or driver." (Doc. 67 at 2-3.)

III. Analysis

The Court will begin with Defendants' invocation of the qualified immunity doctrine. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Thus, "[w]hen an officer asserts qualified immunity as a defense,...[courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).

As for the second prong, a government official's conduct violates "clearly established" law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (cleaned up). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable

government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. City of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular — not to define clearly established law at a high level of generality.") (internal quotation marks omitted); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law....Except in the rare case of an 'obvious' instance of constitutional misconduct..., Plaintiffs must *identify* a case where an officer acting under similar circumstances...was held to have violated the Fourth Amendment. In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful.") (cleaned up). Additionally, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp*, 871 F.3d at 911. *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

**\*6**  "Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.' " *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct."). [6]

Here, there is a strong argument that Defendants are entitled to summary judgment under the first prong of the qualified immunity test, on the ground that their challenged conduct was lawful. Regarding the stop of Baker's car, the Fourth Amendment protects against "unreasonable searches and seizures" by the government, and " 'its protections extend to brief investigatory stops of persons...that fall short of traditional arrest.' " *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable

suspicion to believe that criminal activity may be afoot." *Id.* (citations and internal quotation marks omitted). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir. 2000). "In evaluating the validity of a [*Terry*] stop..., [courts] must consider the totality of the circumstances—the whole picture." *United States v. Sokolow,* 490 U.S. 1, 8 (1989) (internal quotation marks omitted). Significantly, reasonable suspicion of a violation of the traffic code may justify an investigatory stop of a car. *See, e.g., Kansas v. Glover,* 140 S. Ct. 1183, 1188 (2020) (officer's knowledge that the registered owner of the truck had a revoked license "provided more than reasonable suspicion to initiate the stop"); *Whren v. United States,* 517 U.S. 806, 819 (1996) ("[T]he officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment...."); *United States v. Diskin,* 845 F. App'x 598, 599 (9th Cir. 2021) ("[T]he stop was lawful because the car was circulating with an expired license plate."). The undisputed evidence establishes that Defendants possessed such reasonable suspicion here, by virtue of Baker's window-tinting and registration violations. Thus, the initial stop of the car was lawful.

**\*7** The somewhat closer question concerns the legality of the detention of Plaintiff after the initial stop of Baker's car. As noted, Plaintiff was confronted by an armed officer and ultimately forced to sit, handcuffed, on a curb located just outside his workplace (and in view of his co-workers) for more than 30 minutes before being released. In Plaintiff's view, this humiliating treatment was excessive and unconstitutional because he wasn't even suspected of committing the tinting and registration offenses that precipitated the encounter.

Although the Court is sympathetic to Plaintiff's position, he ignores Defendants' undisputed evidence that they detected the smell of marijuana after opening the door to Baker's car, which in turn caused them to develop reasonable suspicion that Plaintiff (and not just Baker) had committed a drug-related offense. There is a strong argument that the presence of this reasonable suspicion justified the ensuing investigative detention of Plaintiff. *See, e.g., United States v. Johnson,* 2007 WL 186655, \*8 (D. Nev. 2007) ("Officer Hank had reasonable suspicion to make a *Terry* stop to investigate the strong odor of marijuana and smoke he observed emanating from the group of four people with whom Johnson was standing. Although defense counsel

emphasized in cross examination that no one was cited or arrested for possession of marijuana that evening, and no marijuana was seized,...Officer Hank [still] had reasonable suspicion that criminal activity was afoot at the time he seized Johnson in the parking lot and initiated an investigatory detention."). [7] Although Plaintiff was handcuffed during much of the sequence, Plaintiff does not argue that this transformed the investigative detention into an arrest and handcuffing does not, in any event, automatically result in such a transformation. *Washington v. Lambert,* 98 F.3d 1181, 1186 (9th Cir. 1996) ("[P]ointing a weapon at a suspect and handcuffing him...will not *automatically* convert an investigatory stop into an arrest that requires probable cause."); *Porter v. Vignau,* 756 F. App'x 729, 730-31 (9th Cir. 2019) (holding that plaintiff waived any false-arrest claim by failing to raise it at summary judgment and emphasizing that the use of handcuffs is "only relevant to a determination of whether or not the act of handcuffing transformed a *Terry* stop into an arrest without probable cause, not whether the *Terry* stop itself was unreasonable"). Additionally, Defendants have proffered undisputed evidence that they developed officer-safety concerns based on Baker's failure to immediately pull over and on the lurching movement of Baker's car after it initially stopped.

Although the parties' summary judgment briefing suggests that Plaintiff's § 1983 claim rises and falls with the legality of Defendants' seizure of Plaintiff—Plaintiff does not develop any independent challenge to the searches that occurred during the course of the seizure—the analysis set forth above suggests that any search-related claim would fail even if it weren't forfeited. Defendants correctly contend (Doc. 56 at 5), and Plaintiff does not dispute, that Plaintiff lacks standing to challenge the search of Baker's car. *See, e.g., United States v. Pulliam,* 405 F.3d 782, 786 (9th Cir. 2005) ("As a passenger with no possessory interest in the car Richards was driving, Pulliam has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car.") (citation and internal quotation marks omitted). In a related vein, although Plaintiff's separate statement alludes to a search of backpacks that were present in Baker's car (Doc. 64 ¶ 48), the separate statement does not state that *Plaintiff's* backpack was searched as part of this process. Plaintiff would not have standing to challenge a search of others' backpacks. [8] Finally, as for the search of Plaintiff's person, it occurred after Defendants had developed reasonable suspicion (based on the marijuana odor) to conduct an investigative detention of Plaintiff. And "[i]n connection with an otherwise lawful investigative detention

under *Terry*, an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that the persons with whom he [or she] is dealing may be armed and presently dangerous." *United States v. Brown*, 996 F.3d 998, 1007 (9th Cir. 2021) (citations and internal quotation marks omitted). Here, Defendants developed officer-safety concerns based on the length of the pursuit and the lurching-forward of Baker's vehicle midway through the stop and Plaintiff does not argue, in his summary judgment response, that the search of his person exceeded the permissible bounds of a search incident to a *Terry* stop.

**\*8** For all of these reasons, Defendants are likely entitled to summary judgment under the first prong of the qualified immunity test. Nevertheless, it is unnecessary to form any conclusive judgments about the constitutionality of their conduct. *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (noting that district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"); *Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("[A] longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (citations omitted). This is because Defendants are entitled to summary judgment under the second prong of the qualified immunity test, which addresses whether there was "prior case law that articulates a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful." *Sharp*, 871 F.3d at 911. Here, Plaintiff has made no effort whatsoever to identify such a case. Instead, his response brief is filled with citations to factually inapposite cases intended to establish generic and uncontroversial Fourth Amendment principles. For example, Plaintiff cites *Hesterberg v. United States*, 71 F. Supp. 3d 1018 (N.D. Cal. 2014), in the portion of his brief addressing whether there was a "Fourth Amendment Violation" (Doc. 63 at 8-9), but that case addressed "whether it was objectively

reasonable," for purposes of state-law claims for battery and negligence, for "National Park Service Ranger Sarah Cavallaro to tase Plaintiff..., who indisputably posed no danger to Ranger Cavallaro, the public, or himself, but had refused Cavallaro's command not to leave the scene after she had already warned him about walking his dog off leash and he had complied." *Hesterberg*, 71 F. Supp. 3d at 1020. Those facts are not remotely similar to the facts of this case. Given this backdrop, and because the Court has been unable to identify a prior case that "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in [Defendants'] place, that what [they are] doing violates federal law," *Shafer*, 868 F.3d at 1117, Defendants are entitled to qualified immunity. [9]

…

…

…

…

Accordingly,

**IT IS ORDERED** that:

(1) Defendants' motion for summary judgment (Doc. 56) is **granted**.

(2) The Clerk shall enter judgment accordingly and terminate this action. Dated this 29th day of October, 2021.

**All Citations**

Slip Copy, 2021 WL 5040321

## Footnotes

1    In the Rule 16 scheduling order, the Court informed the parties that "Local Rule of Civil Procedure 56.1 is suspended, except for subsection (d)....In other words, the parties may not file separate statements of facts or separate controverting statements of facts, and instead must include all facts in the motion, response, or reply itself." (Doc. 17 at 5-6.) Unfortunately, the parties ignored this instruction and filed separate statements of facts in support of their respective summary judgment submissions. Because both parties followed this approach, the Court will rely on their separate statements.

2    While following Baker's car, the officers called for backup and requested support from an air unit. (Doc. 57 ¶ 16; Doc. 64 ¶ 39.) This request was inconsistent with the relevant PPD operations order, which limited the use of air units to situations involving high-speed driving and other evasive actions. (Doc. 64 ¶¶ 40-41.)

3    Defendants don't dispute that Officer Snow initially pointed his service weapon at Plaintiff during the encounter —they merely note that, "[b]y the time Plaintiff exited Baker's vehicle, Snow no longer had his service gun pointing at him." (Doc. 57 ¶¶ 34-35.)

4    Although Plaintiff presents a variety of marijuana-related evidence in his separate statement—including that no marijuana was ultimately found in Baker's car, that neither he nor the other two occupants had smoked marijuana in the car or before getting into the car, and that Defendants didn't ask any marijuana-related questions during the encounter (Doc. 64 ¶¶ 51-53)—Plaintiff doesn't dispute Defendants' contention that they detected the odor of marijuana during the encounter. Nor does Plaintiff dispute that the odor of marijuana was, in fact, emanating from Baker's car. Thus, for summary judgment purposes, the Courts accepts as undisputed Defendants' contention that they detected the odor of marijuana.

5    Plaintiff requested oral argument, but this request is denied because the issues are fully briefed and argument would not aid the decisional process. *See* LRCiv 7.2(f).

6    Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These opinions are difficult to reconcile. *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed...error in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity issues presented in this appeal....[T]he applicable—and well-settled—rule [in the Ninth Circuit] is that the plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (cleaned up).

7    *Cf. United States v. Laird*, 511 F.2d 1039, 1040 (9th Cir. 1975) ("[T]he odor of marijuana emanating from the trunk of Laird's vehicle provided the requisite probable cause for a search."); *United States v. Beard*, 708 F.3d 1062, 1066 (8th Cir. 2013) ("Goodman's search of the vehicle and seizure of the marijuana were lawful under the automobile exception because he smelled raw marijuana immediately after Beard rolled down his car window."); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.").

8    Alternatively, even if Plaintiff's backpack had been searched, it may have been permissible for Defendants to conduct a warrantless search of the backpack under the circumstances. *See, e.g.*, *United States v. Roubideaux*, 357 F. App'x 801, 802 (9th Cir. 2009) (concluding that officers were "justified" in conducting a "warrantless search of Roubideaux's car and backpack" where the officers developed probable cause that such a search would reveal "the presence of drugs"); *United States v. Reeves*, 604 F. App'x 823, 827 (11th Cir. 2015) ("Because Scott had probable cause to search the car for narcotics ...Scott lawfully accessed the trunk and the backpack...[and] was permitted to search any part of the backpack in which drugs may be found...."); *United States v. Green*, 2020 WL 3057136, *1 (C.D. Ill. 2020) ("[T]he Trooper made a valid traffic stop for improper lane usage and failure to signal. The Trooper making the stop had the drug sniffing dog with him and immediately conducted the open air sniff...[which] provided a probable cause to search for contraband in the trunk without a warrant. The scope of the permissible search included containers in the trunk such as the backpack.") (citations omitted).

9    Given this conclusion, it is unnecessary to address Defendants' challenge to the sufficiency of Plaintiff's damages evidence.

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.