**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Johnny Wheatcroft, et al., | No. CV-18-02347-PHX-MTL |
| Plaintiffs, | **ORDER (Temporarily Sealed)** |
| v. | |
| City of Glendale, et al., | |
| Defendants. | |

On July 26, 2017, Glendale Police Department Officers Schneider, Lindsey, and Fernandez arrested Johnny Wheatcroft in the parking lot of a Motel 6. (Doc. 8 ¶¶ 12, 14, 38.) Wheatcroft filed suit against the Officers and the City of Glendale ("Defendants"), alleging claims under 42 U.S.C. § 1983, municipal liability, and state law emotional distress and loss of consortium. (*Id.* at 8, 10, 12, 13, 17.) Currently pending before the Court are Defendants' Motions for Summary Judgment (Docs. 245 and 274 (redacted version)) and partial *Daubert* Motion (Doc. 243). Also pending is Plaintiffs' Motion Regarding Testimonial Evidence. (Doc. 284.) The Court rules as follows.[1]

## I.    FACTUAL BACKGROUND

The facts set forth below are taken from the parties' separate statement of facts (Docs. 246, 261) and from the body camera recordings of the incident. Although the Court has generally construed the facts in the light most favorable to the Plaintiffs, as the non-

---

[1] The Court held oral argument on Defendants' motions for summary judgment on January 28, 2022. (Doc. 286.) As to the other motions, both parties have fully briefed the issues and oral argument would not have aided the Court's decisional process. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *see also* LRCiv 7.2(f); Fed. R. Civ. P. 78(b).

movant, and resolved factual disputes in their favor, the Court "do[es] not accept a non-movant's version of events when it is 'clearly contradict[ed]' by a video in the record." *Hernandez v. City of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)).

On July 26, 2017, just as the sun began to set, Officers Matt Schneider and Mark Lindsey were in together in their patrol vehicle when Officer Schneider told his partner Officer Lindsey that he witnessed a Ford Taurus turn into the parking lot of a Motel 6 without signaling. (Doc. 246-1 at 94.) The Officers observed the Taurus backed into a parking spot in the Motel 6 lot. (*Id.* at 95.) Officers Lindsey and Schneider parked and approached the vehicle on foot. (Doc. 246-1 at 96, Doc. 246 at ¶ 3, Doc. 35 at ¶ 13.) Johnny Wheatcroft was the front passenger seat of the vehicle, and Anya Chapman and minors J.W. and B.W. were in the back seat. (Doc. 35 at ¶ 14.) Officer Schneider approached the passenger side of the vehicle and spoke to the seated Wheatcroft through the open window. (Doc. 35 at ¶ 17, Doc. 246 at ¶ 19, Def. Ex. 9 (Schneider Body Camera ("SBC")) at 0:39 [Redacted].) Officer Schneider asked Wheatcroft if he was staying at the Motel 6, and Wheatcroft responded, "Not yet, about to get a room." (Doc. 246 at ¶ 19; Doc. 261 at ¶ 19, SBC at 0:42.) Officer Schneider asked if anyone had identification, and Wheatcroft responded "No." (Doc. 246 at ¶ 20; Doc. 261 at ¶ 20, SBC at 0:51.) Officer Schneider then instructed the driver to use a turn signal when making a turn. (SBC at 0:52.) Schneider walked to the rear of the car to run the license plate, then returned to the passenger's side to talk to Wheatcroft again. (Doc. 246 at ¶ 21; Doc. 261 at ¶ 21.) When Officer Schneider asked Wheatcroft for his name, he refused to answer, and questioned why the Officer was asking him. (Doc. 246 at ¶ 22, Doc. 261 at ¶ 22, SBC at 1:42, 1:44–2:00.) Schneider then commanded Wheatcroft multiple times to stop reaching into the backpack at his feet and the space between his seat and the center console. (Doc. 246 at ¶ 24, Doc. 261 at ¶ 24, SBC at 1:42, 1:44.) The parties dispute whether Wheatcroft was accessing his backpack or the area between his seat and the center console at all. (*See id.*)

Meanwhile, Officer Lindsey spoke with the driver of the vehicle, who, it turns out,

did not have identification or insurance, and was driving with a suspended license. (Doc. 246-1 at 96, 150.) Next, Wheatcroft told Officer Schneider that he did not have to provide his ID to the officer. (SBC at 1:58.) Officer Schneider told Wheatcroft he would take Wheatcroft down to the station and for fingerprinting, to which Wheatcroft responded "I didn't do anything wrong." (SBC at 2:05.) Once again, Officer Schneider commanded Wheatcroft not to "stuff anything down between the seats." (SBC at 2:25.) Wheatcroft denies that he was doing so. (Doc. 261, Pl. Statement of Facts ¶ 9.) Then, Officer Schneider opened the passenger door, and Wheatcroft put his right foot on the ground. (SBC at 2:25.) Officer Schneider grabbed Wheatcroft's upper right forearm with his left hand. (SBC at 2:26.) Officer Schneider unholstered his Taser and placed it between Wheatcroft's neck and shoulder, telling him to "relax your arm." (SBC at 2:29–2:34.) Officer Schneider asked, "Are you going to fight or not?" Wheatcroft responded: "No, I promise you I'm not." (SBC at 2:52.) Officer Schneider reholstered his Taser. (SBC at 2:54.) Around this time, Officer Fernandez arrived on the scene and Officer Lindsey gestured him over for assistance. (Doc. 246 at ¶ 47, Doc. 261 at ¶ 47.) Officer Lindsey came around to the passenger side area of the car to assist Officer Schneider. (Doc. 246 at ¶ 46.)

Officer Lindsey unholstered his Taser and told Wheatcroft "You've got a Taser on you right now." (LBC at 3:01.) Wheatcroft began shouting profanities. (*Id.*) Schneider repeatedly commanded Wheatcroft to stop tensing up, but Wheatcroft verbally denied that he was. (SBC at 3:09.) Officer Lindsey then used his Taser in short drive stun mode capacity twice, for a total combined connection of 0.4 seconds. (Doc. 246 at ¶ 51 and 246-2 at 51, Doc. 261 at ¶ 51.) Officer Lindsey used his Taser again in short drive stun mode for 0.2 seconds. (Doc. 246-2 at 51.)

At that point Anya Chapman, still in the back seat, grabbed a grocery bag full of soda cans and moved her upper body between the front two seats of the car, swinging the bag and hitting Officer Lindsey. (Doc. 246-1 at 176, 114, Doc. 246 ¶¶ 54–55.) Officer Lindsey fell onto his back on the pavement next to the car and was knocked unconscious

for several minutes.  (*See* LBC 3:19–4:08 (showing the sky).)  Plaintiffs maintain that Officer Lindsey slipped and fell on a water bottle.[2]  (Doc. 261 ¶¶ 54–55, Pl. Statement of Facts ¶ 37, Doc. 261-2 at 97.)

What happened next is highly disputed.  The parties agree that Officer Schneider deployed his Taser at Wheatcroft—still in the passenger seat—in dart mode once but did not make a connection.  (Doc. 246 at ¶ 58, Doc. 261 at ¶ 58.)  Officer Fernandez also deployed his Taser for a total of 1.5 to 2 seconds, which made connection.  (Doc. 246 at ¶ 67, Doc. 261 at ¶ 67.)  At that point, Officer Fernandez handcuffed Wheatcroft and Officer Schneider drive stunned Wheatcroft's shoulder blade, but the parties dispute which happened first.  (Doc. 246 at ¶¶ 71, 72, Doc. 261 at ¶¶ 71, 72, SBC at 3:40–4:17.)  The Officers removed Wheatcroft from the vehicle, but his legs were tangled in the car's seatbelt.  (Doc. 246 at ¶ 74, Doc. 261 at ¶ 74, SBC at 3:25–4:07.)  One of Wheatcroft's minor children reached forward and unlatched the seatbelt.  (SBC at 4:36.)  The Officers laid Wheatcroft face down on the ground while Officer Fernandez applied his knee to Wheatcroft's back.  (Doc. 246 at ¶ 76, Doc. 261 at ¶ 76, SBC 5:02.)  The Officers claim that Wheatcroft began kicking his legs at Officers Schneider and Fernandez, causing Officer Schneider to command Wheatcroft to stop and kick him back.  (*See* Doc. 246 at ¶¶ 77–80, SBC at 5:03–5:13.)  Plaintiffs dispute all of this.  (Doc. 261 at ¶¶ 77–80.)  However, Officer Schneider's body camera clearly shows Wheatcroft's feet thrashing and kicking Officer Schneider, with Officer Schneider returning Wheatcroft's kicks.[3]  (SBC at 4:58–5:10.)  Next, Schneider used his Taser on Wheatcroft in drive stun mode.  Plaintiffs assert that Officer Schneider pulled down Wheatcroft's shorts and Tased his testicles.  (Doc. 261, Pl. Statement of Facts ¶ 48.)  Defendants claim that Officer Schneider's body camera shows that the Tasing did not occur on Wheatcroft's genitals.  (Doc. 246 at ¶ 83.)

---

[2] Anya Chapman pleaded guilty to aggravated assault of a police officer.  (Doc. 246-1 at 176, *see also* Doc. 246-3 at 21.)  Chapman was a co-plaintiff in this case but has been dismissed.  (Doc. 199.)

[3] Plaintiffs dispute the fact that Wheatcroft kicked the officers (Doc. 261 at ¶ 77) but also cite Officer Schneider's body camera as support.  Again, the Court "do[es] not accept a non-movant's version of events when it is 'clearly contradict[ed]' by a video in the record." *Hernandez*, 989 F.3d at 743 (9th Cir. 2021).

Finally, Wheatcroft went limp and was arrested.  (Doc. 246 at ¶ 87, Doc. 261 at ¶ 87.)

Later a grand jury indicted Wheatcroft for assaulting an officer and resisting arrest. (Doc. 246-3 at 21.)  The County Attorney dismissed the charges without prejudice.  (Doc. 245 at 8.)

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255 (internal citations omitted); *see also Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).  That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.   *Daubert*

A party seeking to offer expert testimony must establish that the testimony satisfies Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As gatekeepers, trial judges make a preliminary assessment as to whether expert testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). Specifically, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. To meet the requirements of Rule 702, an expert must be qualified, the expert's opinion must be reliable in that it is based on sufficient facts or data and is the product of reliable principles and methods, and the expert's testimony must fit the case such that the expert's opinion is relevant. *Id.* at 589–95. The Rule 702 inquiry is "flexible." *Id.* at 594. The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Because the requirements of Rule 702 are conditions for determining whether expert testimony is admissible, a party offering expert testimony must show by a preponderance of the evidence that the expert's testimony satisfies Rule 702. Fed. R. Evid. 104(a); *see also Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## III.   DISCUSSION

### A.   Section 1983 Claims

Plaintiffs allege that Officers Schneider, Lindsey, and Fernandez (collectively, "the Officers") violated Wheatcroft's rights under the Fourth Amendment and bring claims of wrongful arrest, excessive force, retaliation, and malicious prosecution. (Doc. 35 at 8–15.) Plaintiffs also allege that the Officers' conduct violated their rights to familial association under the First, Fourth, and Fourteenth Amendments. (*Id.* at 16–17.) Finally, Plaintiffs allege that the City of Glendale violated their constitutional rights for ratifying the acts of the Officers and for failing to train, supervise, and discipline the Officers. (*Id.* at 21.)

A plaintiff asserting a claim for relief under § 1983 must prove that: "(1) the conduct

complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a constitutional right." *L. W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992). "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). State officials or municipalities are liable for deprivations of life, liberty, or property that rise to the level of a "constitutional tort" under the Due Process Clause of the Fourteenth Amendment. *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007).

It is undisputed that Officers Schneider, Lindsey, and Fernandez acted under color of law. At issue, then, is whether the Officers' actions deprived Wheatcroft and/or the other Plaintiffs of rights, privileges, and immunities secured by the Constitution or laws of the United States. Defendants assert that they did not violate any Constitutional right, and even if they did, the Officers are entitled to qualified immunity. (Doc. 245.)

As an initial matter, the Defendants argue that they had reasonable suspicion to conduct an investigatory stop of the car. (Doc. 245 at 8–9.) *See Arizona v. Johnson*, 555 U.S. 323, 326 (2009). Plaintiffs disagree for various reasons. (Doc. 260 at 6–7.) But the Court cannot find in Plaintiffs' Complaint any cause of action premised on the Officers' lack of warrant or lack of exception to the warrant requirement. The Court only addresses the claims that Plaintiffs make in their complaint—relevant here are excessive force and wrongful arrest. (Doc. 35 at 8, 12.)

### 1.    Excessive Force

The Officers argue that summary judgment should be granted on Plaintiffs' claim for excessive force because their use of force was objectively reasonable taking their view of the facts. (Doc. 245 at 14.) The Officers also assert they are entitled to qualified immunity because it was not clearly established that their use of force was unconstitutional. (Doc. 245 at 26.) Plaintiffs argue that there are disputed material facts surrounding the Motel 6 incident and that a reasonable jury could conclude that the Officers' use of force was excessive or that the Officers "tried to provoke a situation where force would be

needed." (Doc. 260 at 15–19.)  Plaintiffs also argue that Defendants violated Plaintiff's clearly established federal rights. (*Id.* at 19–21.)

### i.     Fourth Amendment Standard

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  When evaluating a Fourth Amendment claim of excessive force, a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id.* at 397.  "[T]here are no per se rules in the Fourth Amendment excessive force context; rather, courts must still slosh [their] way through the factbound morass of reasonableness." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (internal quotation marks omitted).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *Scott v. Harris*, 550 U.S. 372, 383 (2007).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The Ninth Circuit has articulated a three-step approach to the *Graham* balancing test. *See Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011).  First, the district court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id.* (internal quotation marks omitted).  Second, the district court must "evaluate the government's interest in the use of force." *Id.*  Finally, the district court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (internal quotation marks omitted).  "Because [the excessive force inquiry] nearly always requires a jury to sift

1    through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit

2    has] held on many occasions that summary judgment or judgment as a matter of law in

3    excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689,

4    701 (9th Cir. 2005) (en banc).

### ii.    Severity of the Intrusion

6        We first assess the quantum of force used to arrest Wheatcroft by considering "the

7    type and amount of force inflicted." *Headwaters Forest Def. v. Cnty. of Humboldt*, 240

8    F.3d 1185, 1198 (9th Cir. 2000) (vacated and remanded on other grounds sub nom. *Cnty.*

9    *of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001)).  The parties do not dispute

10   the type of force that the Officers used on Wheatcroft.  Here, the Officers used arm bars,

11   Tasers (four drive stuns and two dart modes, though the parties dispute how many dart

12   mode applications connected), and foot strikes against Wheatcroft during their interaction,

13   which lasted just over five minutes.  (*See* LBC, SBC at 2:23 (Officer Schneider went

14   "hands on" with Wheatcroft)–7:28 (Wheatcroft placed in patrol vehicle).)   Wheatcroft

15   asserts that during these applications of force, he "sustained serious injuries, including

16   penile functionality issues." (Doc. 260 at 5.)

17       Taken in total, the force used here was an intermediate level.[4]  While not rising to

18   the level of deadly force, it was likely to cause physical injury.  The Ninth Circuit has held

19   that a Taser used in dart mode constitutes "an intermediate, significant level of force."

20   *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  In contrast, a Taser used in drive

21   stun mode "delivers an electric shock to the victim, but it does not cause an override of the

22   victim's central nervous system as it does in dart-mode."  *Mattos*, 661 F.3d at 443.  The

23   arm bar, a type of control hold, is a minimal use of force.  *Donovan v. Phillips*, 685 F.

24   App'x 611, 612–13 (9th Cir. 2017) (officer's use of "control hold" when plaintiff exited

---

25   [4] Defendants assert that this Court must "conduct an analysis of each use of force by each
26   individual officer" pursuant to *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1547
     (2017).  But *Mendez* instructs the Court to "analyze[] separately" each of plaintiff's Fourth
27   Amendment claims.  *Id.* (holding that excessive force claims must be analyzed under
     *Graham* alone, and the provocation rule or any other Fourth Amendment standard should
     not be conflated with "excessive force claims that cannot succeed on their own terms").
28   Because Plaintiffs assert only one claim for excessive force here (Doc. 35 at 8), the Court
     conducts one analysis using *Graham*.

car by grabbing their wrist, and pulling their arm downward, causing them to roll onto the ground was "relatively minimal" force).  But the foot strikes may constitute a significant use of force.  *Cf. Lopez v. City of Imperial*, No. 13-CV-00597-BAS WVG, 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015) (finding fist and knee strikes to likely be "a significant use of force").

Here, there can be no question that the six uses of a Taser, including four drive stuns and two darts, as well as the foot strikes, constitutes serious intrusions upon an individual's liberty and thus they must be justified by a commensurately serious state interest. *Headwaters Forest Def.*, 240 F.3d at 1162–63.

### iii.   Government's Interest

With respect to the second step, the "strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Glenn*, 673 F.3d at 872 (quoting *Graham*, 490 U.S. at 396).  The "most important [of these factors] is whether the suspect posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441 (internal quotations omitted).  "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis removed) (quoting *Garner*, 471 U.S. at 3).

The three primary factors for evaluating the second step of the *Graham* test, however, are not exclusive.  *See Bryan*, 630 F.3d at 826 (describing these as the "core factors").  The Ninth Circuit has made clear that the district court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in Graham." *Glenn*, 673 F.3d at 872 (quotation omitted).  Other relevant factors may include the availability of less intrusive force and whether proper warnings were given.  *See, e.g.*, *id.* at 872; *Bryan*, 630 F.3d at 831; *Deorle*

*v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001).  With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct.  *Scott*, 39 F.3d at 915.

Here, a genuine dispute exists as to whether Wheatcroft presented an immediate threat to the safety of the Officers.  Officer Lindsey testified during his deposition that Wheatcroft was "reaching toward the middle console" and "continuing to reach" into the console after Officer Schneider gave him a command to stop.  (Doc. 246-1 at 85.)  Officer Lindsey testified that he believed "[t]here could be a weapon in there.  There could be something that could harm the people in the vehicle, harm me, harm themselves." (*Id.*) Officer Schneider testified he went "hands on" with Wheatcroft "[b]ecause he started reaching down into the center console." (Doc. 246-1 at 129.)  But Wheatcroft testified that during his conversation with the Officer, he was "trying to unbuckle his seat belt" and while the Officer had him in an arm bar, he was not pulling his arm away, the Officer was "twisting" his arm, which was "making [him] go down." (Doc. 261-2 at 66, 74.)

The Officer Defendants assert that their methods of force were necessary given the "high crime area" around the Motel 6, Wheatcroft's refusal to obey the Officers' commands, Wheatcroft's agitated demeanor, his use of obscenities, and his acts of tensing his arm and "shifting his hands in between his backpack and the center console." (Doc. 245 at 18–22.)  But almost all of Defendants' justification for their use of force against Wheatcroft is disputed: the parties dispute whether the Motel 6 had an active trespass agreement with the City of Glendale Police Department; whether Wheatcroft was moving his hands around the car and accessing his backpack; where the Taser struck on Wheatcroft's body; and even whether Wheatcroft had to identify himself to the Officers in the first place.  (*Compare* Doc. 260 at 5, 2, and 3, 8–9, *with* Doc. 245 at 2, 2–3, 6, and 9–10.)  Even more so, the parties strenuously dispute whether Wheatcroft was tensing his arm to resist Officer Schneider's arm bar and whether Wheatcroft was "idly sitting in a non-threatening manner" or "vigorously kicking and striking the Officers" after the Officers removed him from the car.  (Doc. 245 at 4, *compare* Doc. 260 at 3 *with* Doc. 245 at 7.)

1   Based on the conflicting evidence, a reasonable jury could conclude that Wheatcroft did
2   not present an immediate threat to the Officers or anyone else.

3   Defendants allege that Wheatcroft violated A.R.S. § 13-2412 (failure to state true
4   full name on request of a peace officer who has lawfully detained the person based on
5   reasonable suspicion that the person has committed a crime), A.R.S. § 28-622 (failure to
6   comply with lawful order of a police officer invested with authority to direct traffic); A.R.S.
7   §13-1502(A) (trespass); and the felony offenses of resisting arrest and assault of an officer.
8   Some of these alleged crimes are minor—failure to provide identification, trespass on
9   private property.  *See Bryan*, 630 F.3d at 828 ("Traffic violations generally will not support
10  the use of a significant level of force.")  But assault of an officer is a considerably more
11  severe crime.  Because these allegations of crimes occurred on a continuum with the
12  allegations of excessive force, it is difficult to match an allegation of a crime with an
13  allegation of force.  As such, this factor does not weigh in favor of granting summary
14  judgment for Defendants.

15  Finally, viewing the evidence in the light most favorable to Plaintiffs, a jury could
16  conclude that Wheatcroft was not resisting arrest, based on his deposition testimony.
17  Wheatcroft was asked to stop tensing his arm and he verbally responded that he was not
18  "pulling away."  (Doc. 261-2 at 74.)  He also testified in his deposition he was not
19  "opposing the force" that Officer Schneider was applying to him at all, and he did not "try
20  to pull" back, and he "didn't resist at all that day."  (*Id.* at 76–77.)

21  ### iv.   Balancing the Interests

22  In light of all of the circumstances, a reasonable jury could conclude that the
23  Officers' substantial use of force against Wheatcroft outweighed the Officers' need for its
24  use.  The Defendants have failed to show that the force they applied was objectively
25  reasonable based on Wheatcroft's version of the facts, which the Court must accept as true
26  for the purposes of this motion.  Accepting Wheatcroft's version of the facts, a jury could
27  find that the Officer's use of force here was unreasonable.  Wheatcroft was Tasered six
28  times, forcibly removed from a car where he was a passenger, and handcuffed, all in about

1   five minutes from when Officer Schneider first went "hands on" with Wheatcroft.  (*See*

2   SBC at 2:23–7:28.)  Defendants do not argue that the amount of force the Officers used

3   against Wheatcroft was small, but rather, was justified under the circumstances.  (*See* Doc.

4   245 at 16.)  But these circumstances—as the Defendants present them to the Court—all

5   come from the point of view of the Defendants themselves.  Thus, the Officers "have done

6   little more than present their own version of the facts and ask the court to rule in their favor.

7   Defendants have utterly failed to show that the force they applied was objectively

8   reasonable under [Plaintiffs'] version of the facts, which the [C]ourt must accept as true

9   for purposes of this motion."  *Carino v. Gorski*, No. 07-455-PHX-NVW, 2008 WL

10  4446706, at *4 (D. Ariz. Sept. 30, 2008).

11                          **v.    Qualified Immunity**

12          "An official sued under § 1983 is entitled to qualified immunity unless it is shown

13  that the official violated a statutory or constitutional right that was clearly established at

14  the time of the challenged conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).  While

15  "[q]ualified immunity shields federal and state officials from money damages[,]" *Ashcroft*

16  *v. al-Kidd*, 563 U.S. 731, 735, (2011), it is "an immunity from suit rather than a mere

17  defense to liability[,]" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Consequently, it "is

18  effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231.

19          A district court evaluating whether a government official is entitled to qualified

20  immunity at the summary judgment stage asks two questions: (1) whether, taking the facts

21  in the light most favorable to the nonmoving party, the officers' conduct violated a federal

22  statutory or constitutional right, and (2) whether the right was clearly established at the

23  time of the alleged misconduct.  *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).  Either

24  question may be addressed first, and if the answer to either is "no," then the officers cannot

25  be held liable for damages.  *See Pearson*, 555 U.S. at 236.  With respect to the second

26  prong, "[b]ecause the focus is on whether the officer had fair notice that her conduct was

27  unlawful, reasonableness is judged against the backdrop of the law at the time of the

28  conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  For this reason, the Supreme

1  Court has emphasized the importance of ensuring the evidence is reviewed through the

2  appropriate lens when deciding the "clearly established prong" on summary judgment.

3  *Tolan v. Cotton*, 572 U.S. 650, 657–58 (2014).

4          The Supreme Court has "repeatedly stressed that courts must not 'define clearly

5  established law at a high level of generality, since doing so avoids the crucial question

6  whether the official acted reasonably in the particular circumstances that he or she faced.'"

7  *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 590 (2018) (quoting

8  *Plumhoff*, 572 U.S. at 779 (2014)).   Thus, the second step in the qualified immunity

9  analysis "must be undertaken in light of the specific context of the case, not as a broad

10 general proposition." *Saucier*, 533 U.S. at 201. "The 'clearly established'

11 standard . . . requires that the legal principle clearly prohibit the officer's conduct in the

12 particular circumstances before him.  The rule's contours must be so well defined that it is

13 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"

14 *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). "This requires a high degree

15 of specificity." *Id.* (internal quotation omitted). "This demanding standard protects all but

16 the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v.

17 Briggs*, 475 U.S. 335, 341 (1986)).

18         Defendant's argument as to qualified immunity misses the mark.  Defendants do not

19 argue, as they should, that no prior case put the Officers on notice that their conduct was

20 unlawful using Plaintiffs' version of the facts.  (*See* Doc. 267 at 18–22.)   Instead,

21 Defendants accept their own disputed version of the facts as true and conclude that prior

22 precedent does not put them on notice that their actions violated Wheatcroft's

23 constitutional rights, so they are entitled to qualified immunity.  (*Id.* at 26.)  But in the

24 qualified immunity analysis, the court must consider all disputed facts in the light most

25 favorable to the nonmovant—here, Plaintiffs.  *Isayeva v. Sacramento Sheriff's Dep't*, 872

26 F.3d 938, 946 (9th Cir. 2017).

27         These disputed facts prevent the entry of qualified immunity for Officers.  *Wilkins

28 v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to

qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."). The Court therefore denies the summary judgment motion as to excessive force. As critical here, the parties dispute whether Wheatcroft offered resistance to the Officers' arrest. (*Compare* Docs. 245 at 27 (describing Wheatcroft as "noncompliant" and "actively resist[ing] officer control") *with* Doc. 260 at 13–14 (describing Wheatcroft as "not resisting" and "passive").)

Under the version of facts as told by Plaintiffs, Wheatcroft offered *no* resistance to the Officers. The videos of the incident reflect Wheatcroft verbally telling the Officers he is not resisting. (Doc. 260 at 19, *see* SBC at 3:09.) It is unequivocal that force "is only justified when there is a need for force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (citing *Graham*, 490 U.S. 386). The *Blankenhorn* court held that "this clear principle would have put a prudent officer on notice" that the force applied in that case—gang-tackling a relatively calm trespass suspect—was a Fourth Amendment violation. *Id.* The same principle applies here. *Blankenhorn* and *Graham* would adequately put a reasonable officer on notice that Tasing Wheatcroft six times to effectuate an arrest when he offered no resistance to the Officers, and even told them he was not resisting, was a Fourth Amendment violation. The law here was clearly established at the time of Wheatcroft's arrest and gave the Officers sufficient notice. *See id.*; *see also Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018); *Rice v. Morehouse*, 989 F.3d 1112, 1125 (9th Cir. 2021) (the "right to be free from the application of non-trivial force for engaging in mere passive resistance" is well established.); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The Court therefore denies the Officer Defendants' summary judgment motion as to excessive force.

## 2. Wrongful Arrest

Plaintiffs allege that the Officers wrongfully seized Wheatcroft by arresting him without probable cause. (Doc. 260 at 6–11.) Defendants assert that they had probable cause and even if they did not, they enjoy qualified immunity. (Doc. 245 at 11–15.)

### i.      Probable Cause

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted). Warrantless arrests are lawful if there is "probable cause to believe that the arrestee has committed, or is committing, an offense." *Torres v. City of L.A.*, 548 F.3d 1197, 1207 n.7 (9th Cir. 2008).

The parties do not dispute that Wheatcroft was arrested without a warrant. Therefore, Defendants must show they had probable cause to arrest him. Probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "An officer with probable cause to believe that even a very minor criminal offense has been committed in his presence may arrest the offender without violating the Fourth Amendment." *Id.*; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Probable cause must be grounded in "facts and circumstances known to the officers at the moment of the arrest." *United States v. Newman*, 265 F. Supp. 2d 1100, 1106 (D. Ariz. 2003). But "where probable cause does exist civil rights are not violated by an arrest even though innocence may subsequently be established." *Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1966).

The Court's inquiry here is whether the Officers, at the moment of Wheatcroft's arrest, had probable cause to believe Wheatcroft committed a crime. The chronology of the events as established by the body worn cameras was as follows: (1) Wheatcroft refused to provide the Officers with his name; (2) Officer Schneider commanded Wheatcroft multiple times not to stuff anything between the seats or in the backpack at his feet;

(3) Chapman knocked Officer Lindsey unconscious; (4) there was a five-minute-long melee with screaming and swearing wherein Wheatcroft was Tased and placed in handcuffs; (5) Wheatcroft kicked at Officer Schneider and Officer Schneider kicked back; and finally (6) Wheatcroft was moved to Officers' patrol vehicle.

Defendants argue that Officers were entitled to detain Wheatcroft, ask him for identification, and remove him from the vehicle because they had reasonable suspicion based on Wheatcroft "reaching into a bag at his feet" (Doc. 267 at 6) as well as the "location's criminal history, the Taurus suspiciously backing into the parking spot with two men sitting in the front seats, the time of night, and the traffic violation" (Doc. 245 at 11).

"[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). "In evaluating the validity of a [*Terry*] stop . . . , [courts] must consider the totality of the circumstances—the whole picture." *Sokolow*, 490 U.S. at 8 (internal quotation marks omitted).

Plaintiffs dispute each aspect of the Defendants' stated reasonable suspicion. Plaintiffs argue that their presence at the Motel 6 was lawful, that the area was high crime cannot impute reasonable suspicion to them, and "it is not illegal to back into a parking spot." (Doc. 260 at 9–10.) But although facts, standing alone, can be "innocent in the eyes of the untrained," they "may carry entirely different messages to the experienced or trained observer." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1021 (9th Cir. 2009) (quoting *United States v. Bernard*, 623 F.2d 551, 560 (9th Cir. 1980)). Officer Lindsey testified at his deposition that although "there is no law that says you can't back into a [parking space], it prevents [an Officer] from running a plate," so the driver's maneuver amounted to "suspicious activity." (Doc. 246-1 at 100.) Likewise, Officer Lindsey testified that

Wheatcroft "continuously reach[ed] for his bag or for the middle console" even though "he[ had] already identified to [the Officers] that he [did not] have an identification." (Doc. 246-1 at 227.)  The Court finds that the totality of the circumstances constitute reasonable suspicion to initially detain Wheatcroft.

### ii.     Arrest

The next issue is whether and when the Officers converted the detention into an arrest, requiring probable cause.  Although the parties do not dispute that the detention became an arrest, (*see* Doc. 246 at ¶ 87, Doc. 261 at ¶ 87), the parties never clearly address when the arrest was effectuated.  *See United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).  The Officers assert that probable cause accrued when Officer Schneider attempted to remove Wheatcroft from the vehicle but "Wheatcroft immediately tensed up and resisted." (Doc. 245 at 13.)  Then, after Wheatcroft was Tased and handcuffed, he "still continued to fight and resist arrest" by kicking.  (*Id.*)  Though Plaintiffs never identify when they believe the arrest occurred, they state that "Defendants were arresting him for resisting arrest before any purported resisting arrest occurred." (Doc. 260 at 11.)

"There is no bright-line rule to determine when an investigatory stop becomes an arrest.  Rather, in determining whether stops have turned into arrests, courts consider the totality of the circumstances.  As might be expected, the ultimate decision in such cases is fact-specific." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citations and internal quotation marks omitted); *see also United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("[O]ur cases impose no rigid time limitation on Terry stops.").

An officer conducting a *Terry* stop is "authorized to take such steps as [are] reasonably necessary . . . to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).  "The use of such force doesn't convert the *Terry* stop into an arrest, even if the suspect doesn't feel free to leave." *Leibel v. City of Buckeye*, No. CV-18-01743-PHX-DWL, 2021 WL 3773770, at *14 (D. Ariz. Aug. 25, 2021).

Here, Officer Schneider grabbed Wheatcroft's upper arm, told him to "relax your

arm," and placed his Taser on him.  (SBC at 2:29–2:34.)  But shortly thereafter Officer Schneider released Wheatcroft's arm and reholstered his Taser.  (SBC at 2:52–2:54.)  Next, Officers Schneider and Fernandez used their Tasers, removed Wheatcroft from the car, and handcuffed him.  Then Wheatcroft kicked Schneider.  (*See* SBC at 3:25–5:08.)  Throughout these events, the Court acknowledges that Wheatcroft would not believe himself to be "free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).  But for these events, the investigatory detention had not yet transformed into an arrest.  *See United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977) ("A police officer attempting to make an investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop, and the use of such force does not transform a proper stop into an arrest.").  The Court finds that the Officers did not effectuate an arrest until the point where the Officers moved Wheatcroft into the patrol vehicle.  And at that point, Wheatcroft had engaged in activity that could constitute the crime of assaulting an officer, so probable cause had accrued.  Moreover, at that point, it would be clear to a reasonable person that indefinite custodial detention is inevitable.  *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (explaining that to measure when a detention turns into an arrest, the court must analyze whether the intrusive measures "would cause a reasonable person to feel that he or she will not be free to leave after brief questioning—i.e., that indefinite custodial detention is inevitable").  Therefore, because Wheatcroft's arrest was supported by probable cause, summary judgment must be granted for the Officer Defendants on the wrongful arrest claim.

### iii.    Effect of the Grand Jury Indictment

Independent of the facts giving rise to the arrest, Defendants assert that the Grand Jury indictment establishes prima facie evidence of probable cause.  (Doc. 245 at 13.)  Generally, probable cause for an arrest "may be satisfied by an indictment returned by a grand jury." *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008) (quoting *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997)); *see also Palato v. Botello*, 2012 WL

7018239, at *2 (C.D. Cal. Nov. 15, 2012), *report and recommendation adopted*, 2013 WL 164197 (C.D. Cal. Jan. 11, 2013) ("The filing of a valid grand jury indictment establishes probable cause for plaintiff's arrest and vitiates his Fourth Amendment claims for wrongful arrest and false imprisonment."). A grand jury indictment is prima facie evidence that the defendant has committed an offense. *Bryant v. City of Goodyear*, 2014 WL 2048013, * 3 (D. Ariz. May 19, 2014). However, "[t]his presumption of probable cause can be rebutted if officers improperly exerted pressure on the prosecutor, knowingly provided misinformation, concealed exculpatory evidence, 'or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings.'" *Id.* (quoting *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)).

Wheatcroft was indicted for assaulting a police officer in violation of A.R.S. §§ 13-1203, 13-1204, 13-701, and 13-801, and resisting arrest in violation of A.R.S. §§ 13-2508, 13-301, 13-302, 13-303, 13-304, 13-701, 13-702, and 13-801. Wheatcroft maintains that he was "engaging [in] passive resistance" throughout his arrest. (Doc. 260 at 14.) But given the Court's conclusion that the arrest was effectuated when Wheatcroft was placed in the patrol vehicle, the indictment—which covers all of the activity up to the point of the arrest—shows that the Officers had probable cause to arrest Wheatcroft for the violations named in the indictment. *Lacy*, 631 F. Supp. 2d at 1194.

Furthermore, Plaintiffs have presented no evidence that the Officers engaged in improper pressure tactics or concealed exculpatory evidence. *Id.* Instead, Plaintiffs argue that the video evidence contradicts the police reports. (Doc. 260 at 11.) But Plaintiffs cite to no specific portions of the video evidence nor the police reports to support this conclusion. Plaintiffs also complain that they do not know what information was provided to the Grand Jury, stating instead that "the evidence shows the officers provided false information to include [in] the police report." (*Id.*) Without citation to what, specifically, the evidence shows, the Court cannot evaluate the merits of this assertion.

Accordingly, the Court will enter summary judgment for the Officer Defendants on Plaintiffs' wrongful arrest claim. Finding summary judgment appropriate, the Court does

1    not need to reach the Officer Defendants' qualified immunity arguments.

2                    **3.    Retaliation**

3    Plaintiffs next assert a claim of First Amendment retaliation against Officer

4    Schneider. (Doc. 35 at 10.)  To state such a claim against a government official, a plaintiff

5    must prove "(1) he engaged in constitutionally protected activity; (2) as a result, he was

6    subjected to adverse action by the defendant that would chill a person of ordinary firmness

7    from continuing to engage in the protected activity; and (3) there was a substantial causal

8    relationship between the constitutionally protected activity and the adverse action." *Blair*

9    *v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (footnote omitted).  Wheatcroft

10   claims he engaged in protected speech—questioning why he needed to provide his

11   identification—then was subjected to adverse action—threatened arrest.  (Doc. 260 at 21.)

12   Assuming that Wheatcroft is entitled to a First Amendment right to refuse to

13   identify himself during an investigatory stop exists, the right is not clearly established so

14   Officer Schneider is entitled to qualified immunity.  "The relevant, dispositive inquiry in

15   determining whether a right is clearly established is whether it would be clear to a

16   reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*,

17   533 U.S. at 201.  Wheatcroft maintains that he "engaged in protected speech" by

18   "questioning why he needed to provide identification when he did nothing wrong." (Doc.

19   260 at 21.)  But here, the relevant case law either suggests that the First Amendment

20   precedent allows refusal-to-identify arrests during investigatory stops or concludes that the

21   right is not clearly established.  *See Abdel-Shafy v. City of San Jose*, No. 17-CV-07323-

22   LHK, 2019 WL 570759, at *10 (N.D. Cal. Feb. 12, 2019) (concluding that Plaintiff did not

23   have a clearly established First Amendment right to refuse to identify herself during a *Terry*

24   stop); *Hiibel v. Sixth Judicial Dist. Ct. of Nevada*, 542 U.S. 177, 187 (holding that "[t]he

25   principles of *Terry* permit a State to require a suspect to disclose his name in the course of

26   a *Terry* stop" in the context of a Fourth and Fifth Amendment challenge, which likely

27   extends to the First Amendment); *see also Koch v. City of Del City*, 660 F.3d 1228, 1244

28   (10th Cir. 2011) (finding "no authority recognizing a First Amendment right to refuse to

1   answer questions during a Terry stop").   Accordingly, finding the right is not clearly

2   established, the Court need not proceed to the second prong of the analysis, and summary

3   judgment for Defendant Schneider is granted as to this claim.

### 4.   Malicious Prosecution

5          Plaintiffs also assert a malicious prosecution claim against Officers Fernandez,

6   Schneider, and Lindsey.  (Doc. 35 at 14.)  To prevail on their malicious prosecution claim,

7   Plaintiffs "must show that the [D]efendants prosecuted [Wheatcroft] with malice and

8   without probable cause, and that they did so for the purpose of denying [him] equal

9   protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d

10  1180, 1189 (9th Cir. 1995) (citations omitted).  Even assuming that the malice and lack of

11  probable cause elements can be met, the presumption of prosecutorial independence must

12  still be rebutted.

> Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination of the prosecutor, and, thus, precludes liability for those who participated in the investigation or filed a report that resulted in initiation of proceedings.  However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on him, knowingly provided misinformation to the prosecutor, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings.

19  *Awabdy*, 368 F.3d at 1067.  Malicious prosecution actions are not limited to suits against

20  prosecutors and may also be "brought against other persons who have wrongfully caused

21  the charges to be filed."  *Id.* at 1066.

22         Plaintiffs have not identified any evidence establishing a genuine issue of material

23  fact as to whether any of the Officers exerted pressure on any prosecutor to prosecute

24  Wheatcroft or whether the Officers concealed exculpatory evidence.  Plaintiffs argue that

25  Defendants "provided false information" in their police report, including that Wheatcroft

26  "was refusing to comply, was combative, was resisting, and was repeatedly kicking the

27  officers throughout the entire interaction."  (Doc. 260 at 24.)  Plaintiffs also argue that

28  Defendants' reports should have included "that the [O]fficers used excessive force against

Plaintiff." (*Id.*)   These allegations, even when viewed in the light most favorable to Plaintiffs, are insufficient to overcome the presumption of prosecutorial independence.

Moreover, Defendants argue that the grand jury indictment bars Plaintiff's malicious prosecution claim as a matter of law because the indictment creates a presumption of probable cause for Wheatcroft's arrest.  (Doc. 267 at 24.)  The Court in *Merritt v. Arizona* held, "[b]ased on Restatement § 644(2), decisions from other jurisdictions, and Arizona's grand jury statute, . . . the Arizona Supreme Court would hold that an indictment creates a presumption of probable cause for purposes of a malicious prosecution claim."  425 F. Supp. 3d 1201, 1218 (D. Ariz. 2019) (citing Restatement (Second) of Torts § 644).  The challenger can overcome this presumption by showing that the indictment "was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."  *Id.*  (quoting *DeGroot v. United States*, 786 Fed. Appx. 638, 641–42 (9th Cir. 2019)).  "Plaintiff must identify evidence that Defendants acted inappropriately."  *Id.*; *see also McSherry*, 584 F.3d at 1136 (granting summary judgment on a malicious prosecution claim and finding no evidence that his prosecution was based on any improper conduct because "[s]urmise, conjecture, theory, speculation and an advocate's suppositions cannot 'do duty for probative facts' and valid inferences").  The grand jury returned a true bill indicting Wheatcroft on two counts: assaulting an officer and resisting arrest.  (Doc. 246-3 at 21.)  Besides concluding that Defendants' version of the facts on their police report was wrongful conduct undertaken in bad faith, Plaintiffs provide no other probative facts nor valid inferences to show that Wheatcroft's prosecution was based on any improper conduct.  As such, the Court will grant summary judgment for the Officer Defendants on Plaintiffs' malicious prosecution claim.

### 5. "Civil Rights" Violations/Familial Interests

Plaintiffs assert a claim for "civil rights violations," which they define as "a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of the parent/child relationship without governmental interference."  (Doc. 35 at 15 ¶ 108.)  The Court construes this as a claim for violation of

1    familial rights.  *See Lee v. Cty. of L.A.*, 250 F.3d 668, 685–86 (9th Cir. 2001).  Though the

2    contours of this right are not well-established, *see Kaur v. City of Lodi*, 263 F. Supp. 3d

3    947, 973 (E.D. Cal. 2017), Plaintiffs must show that Defendants' "actions and policies

4    constituted an 'unwarranted interference' with [Plaintiffs'] right to familial association."

5    *Lee*, 250 F.3d at 686.  Additionally, the Defendant's alleged harmful conduct "must shock

6    the conscience or offend the community's sense of fair play and decency."  *Crosby v.*

7    *Wellpath, Inc.*, No. 20-CV-08529-MMC, 2021 WL 3053056, at *4 (N.D. Cal. July 20,

8    2021) (internal alterations omitted).

9         Defendants argue that the Officers did not have time to deliberate, so "a use of force

10   shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons

11   unrelated to legitimate law enforcement objectives."  *Gonzalez v. City of Anaheim*, 747

12   F.3d 789, 797 (9th Cir. 2014) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.

13   2008)).  Plaintiffs argue that actual deliberation was practical here, so "an officer's

14   'deliberate indifference' may suffice to shock the conscience."  *Wilkinson v. Torres*, 610

15   F.3d 546, 554 (9th Cir. 2010) (quoting *Porter*, 546 F.3d at 1137).

16        In *Porter*, the Ninth Circuit considered an "approximately five-minute altercation"

17   between a police officer and a victim that ended in a shooting along a spectrum of similarly

18   situated cases.  546 F.3d at 1137–39.  Because the situation evolved quickly and the officer

19   was forced to make "repeated split-second decisions," the court applied the purpose-to-

20   harm standard.  *Id.* at 1139–40.  The court also noted that "deliberation" should not be

21   interpreted in the narrow, technical sense, reasoning that the Supreme Court had rejected

22   the deliberate indifference standard even in cases where an officer giving chase could have

23   deliberated while pursuing the suspect.  *Id.* at 1139–40.

24        Here, application of the purpose to harm standard is appropriate given the

25   circumstances.  *Id.*  at 1140; *see also Wilkinson*, 610 F.3d at 554.  Like in *Porter*, the total

26   altercation lasted approximately five minutes.  (SBC at 2:23 (Officer Schneider went

27   "hands on" with Wheatcroft)–7:28 (Wheatcroft placed in patrol vehicle).)  The situation

28   rapidly evolved from a traffic stop to an arrest, with several Officers in close proximity to

Wheatcroft, the driver, Chapman, and two minor children.  During the course of that five-minute interaction, Chapman swung the grocery bag and hit Officer Lindsey, knocking him unconscious and causing Officer Lindsey to fall onto his back on the pavement.  (Doc. 246-1 at 176, 114, LBC 3:19–4:08 (showing the sky).)  The events were constantly changing, with more Officers arriving, yelling, swearing, confusion, and the minor children crying.  *Porter*, 546 F.3d at 1140 (finding "yelling" and "confusion" created a "constant flux" of events that weighed in favor of applying the purpose to harm standard).

Applying this standard and viewing the evidence in the light most favorable to Plaintiffs, a jury could conclude that the Officers had a "purpose to harm" Wheatcroft outside of legitimate law enforcement objectives.  Plaintiffs argue that the Officers' intent to harm Wheatcroft was apparent from the Officers "attack[ing] and tortur[ing] Plaintiff who was a mere passenger in the car and was not posing any threat."  (Doc. 260 at 28.)  Wheatcroft was Tased six times within the five-minute altercation, and it is undisputed that at least one of the Tases was administered after Wheatcroft was handcuffed.  (Doc. 246 at ¶ 81.)  *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (holding jury could find that an officer stomping on the head of a suspect who no longer posed a threat was not acting from any legitimate law enforcement purpose).   If the jury concludes that Wheatcroft was not resisting and the Officers' use of force was unreasonable under the circumstances, then a reasonable jury could also conclude that the Officers' intent to inflict force could be inferred from their actions.  "It is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983." *Porter*, 546 F.3d at 1140.  Accordingly, summary judgment will be denied unless the Officers are entitled to qualified immunity.

The Officers claim they are entitled to qualified immunity on Plaintiffs' familial association claim.  (Doc. 245 at 32.)  But on the date of the Motel 6 incident, it was clearly established law that an Officer who acts with a purpose to harm unrelated to a legitimate law enforcement objective violates the Fourteenth Amendment due process clause.  *A.D. v. California Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013).  The *Kaur* court

1   concluded qualified immunity was not appropriate where the officer defendants shot a non-

2   fleeing, non-dangerous suspect, even opining that the facts "present an obvious case such

3   that qualified immunity is inapplicable, even without a case directly on point." 263 F. Supp.

4   3d at 973 (quoting *A.D.*, 712 F.3d at 455) (internal quotation marks omitted).   Like in

5   *Kaur*—and construing the facts in the light most favorable to the Plaintiffs, as the Court

6   must—Wheatcroft was not fleeing from the Officers, was not armed with a gun or knife,

7   and was "not resisting" and "passive" while the Officers Tased him six times.  (Doc. 260

8   at 13–14.)  Qualified immunity is not appropriate on this claim.  The Officer Defendants'

9   summary judgment motion is denied as to this claim.

10      **B.    Municipal Liability**

11          A governmental entity may be held liable (1) "when the individual who committed

12   the constitutional tort was an official with final policy-making authority or such an official

13   ratified a subordinate's unconstitutional decision or action and the basis for it," (2) "when

14   implementation of its official policies or established customs inflicts the constitutional

15   injury," and (3) when "omissions," including the failure to train employees, "amount to the

16   local government's own official policy."  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d

17   1232, 1249 (9th Cir. 2010) (internal quotation marks omitted), *overruled on other grounds

18   by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).  Plaintiffs appear to assert

19   that municipal liability exists under all three of these theories.    (Doc. 35 at 18–20.)  For

20   the purposes of this Order, the Court assumes a reasonable jury could find constitutional

21   violations requisite to satisfy the first prong of a *Monell*, violation of a constitutional right.[5]

22   *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (a *Monell* claim cannot survive

23   without an underlying constitutional violation).

24   ///

---

[5] Defendants move for summary judgment on all *Monell* violation claims because they argue that "Plaintiffs suffered no constitutional violation by the individual Defendants (or because the Defendants are entitled to qualified immunity."  (Doc. 245 at 31–32.)  But "municipal defendants may be liable under § 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights."  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).  And for the purposes of this motion, the Court assumes the prerequisite constitutional violation has been satisfied.

1                **1.    Ratification**

A local government may be held liable under § 1983 when "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). "There must, however, be evidence of a conscious, affirmative choice" on the part of the authorized policymaker. *Gillette*, 979 F.2d at 1347. To prove *Monell* liability under a ratification theory, the authorized policymaker must make a deliberate choice from among various alternatives to follow a particular course of action. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986). "Accordingly, ratification requires, among other things, knowledge of the alleged constitutional violation." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). "Ordinarily, ratification is a question for the jury." *Id.* at 1238–39. But a failure to discipline employees, without more, is insufficient to establish municipal liability for ratification. *Clouthier*, 591 F.3d at 1253–54.

Plaintiffs contend that Chief Sergeant John and Sergeant Moody "reviewed the incident," and "[d]espite review, no steps were taken to reprimand or discharge Lindsey and Fernandez for their constitutional violations, and no steps were taken to reprimand or discharge Schneider for most of his multiple constitutional violations." (Doc. 260 at 30.) A failure to discipline employees does not establish a basis for a *Monell* claim. *Id.* Plaintiffs also argue, with no citation to the record, that the City of Glendale "publicly approved of, condoned, and ratified the actions of Schneider, Lindsey and Fernandez" via "various press releases stating their officers are held to the highest professional standards and that they reviewed the officers' conduct, yet it only disciplined one officer for one wrongful act while condoning and approving the other numerous wrongful acts." (Doc. 260 at 31.) But Plaintiffs' reliance on these "various press releases" do not tend to show that Defendants endorse or approve unconstitutional conduct by the Officers—indeed, the "press releases" that Plaintiffs reference do not express either approval or disproval of the Officers' conduct, only that the Officers are held to high standards and their conduct was reviewed. *Cf. Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020)

(finding a triable issue of fact as to municipal liability where the police chief affirmatively stated she "sign[ed] off on the incident" and "believe[d] that it was within policy and training"); *Peck v. Cty. of Orange*, 501 F. Supp. 3d 852, 871 (C.D. Cal. 2020) (finding a triable issue of fact where Plaintiffs showed that investigators "actually ignored physical evidence that could have either disproved or proved the officers' theory of events, including fingerprints and ballistic evidence").  Here, no triable issue of fact exists as to the City of Glendale's ratification of the Officers' conduct, so summary judgment is granted for Defendant City of Glendale.

## 2.      Policies, Customs, Practices

A municipality may be held liable if a plaintiff can "prove that (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation."  *Lockett v. Cnty. of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020).  A policy within the meaning of *Monell* exists where official policy makers "consciously" choose a particular course of action or procedure "from among various alternatives."  *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985); *see also Pembaur*, 475 U.S. at 483 ("[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").  "Liability for improper custom may not be predicted on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Plaintiffs allege that Defendants had "the practice of stopping vehicles for turn signal violations even when the elements [of a turn signal violation] were not met." (Doc. 260 at 32.)  It is undisputed that Wheatcroft was not the driver of the vehicle that the Officers approached. (*See* Doc. 260 at 2, Doc. 246 at ¶ 7.)  And Plaintiffs never alleged a cause of action for an unreasonable seizure under the Fourth Amendment due to the

Officers' investigatory stop of the car.  (Doc. 35.)  Since the first element that a plaintiff must be able to prove to show a *Monell* violation here is that he himself was deprived of a constitutional right, and Plaintiffs have not alleged any causes of action unconstitutional seizure for the traffic stop itself, Plaintiffs' claim fails.  Plaintiffs do include (in one clause of their brief) that "case law clearly set[s] forth the requirement . . . [of] when identification can be requested from a passenger."  (Doc. 260 at 32.)  But they do not cite any evidence of the existence of a City of Glendale policy.  *See Tuttle*, 471 U.S. at 823.  Nor do Plaintiffs cite any evidence that any such policy has been carried out with "sufficient duration, frequency and consistency."  *Trevino*, 99 F.3d at 918.  Accordingly, the Court grants summary judgment for the City of Glendale as to this prong of Plaintiffs' *Monell* claim.

### 3.      Failure to Train and Supervise

The test announced by the court for determining whether a municipality may be held liable for the inadequate training or supervision of its police officers revolves around "deliberate indifference."  Only where the failure to train or supervise amounts to a deliberate indifference to the rights of persons with whom the police come into contact may the inadequacy of police training or supervision serve as the basis for a § 1983 claim. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  Moreover, a plaintiff alleging municipal liability under § 1983 must show there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.  *Id.* at 385.

Plaintiffs broadly allege that the City of Glendale "may be liable under § 1983 for failing to train employees," and the City of Glendale "was aware of the inadequate training."  (Doc. 35 at ¶¶ 122, 131.)  Plaintiffs also assert the City of Glendale "failed to instruct, supervise control, and/or monitor its police officers."  (Doc. 35 at ¶ 132.)  But Plaintiffs do not provide any specific allegations or facts that would support a claim that the City of Glendale was deliberately indifferent to the rights of citizens in failing to train or supervise its police officers in a manner that would give rise to liability under § 1983. *Id.* at 388.  And Plaintiffs seem to abandon this claim in their responsive briefing.  (*See* Doc. 260 at 30–32.)  Generally, when a plaintiff fails to respond to a motion for summary

judgment with sufficient evidence to support his or her claims, that plaintiff has failed to meet its burden of showing the existence of a genuine issue of material fact, and therefore summary judgment will be granted to the defendant. *T.W. Elec. Service v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). As such, as to Plaintiff's *Monell* claims for failure to train and supervise, Defendant City of Glendale's Motion for Summary Judgment is granted as to this claim.

### 4.    State Law Claims

Minors J.W. and B.W. assert state law claims against the City of Glendale for (1) intentional infliction of emotional distress, (2) grossly negligent infliction of emotional distress, and (3) loss of consortium. (Doc. 35 at 21–22.)

### 1.    Intentional Infliction of Emotional Distress

To succeed on their intentional infliction of emotional distress claim, Plaintiffs must show "extreme and outrageous conduct, a causal connection between the conduct and the emotional distress, and emotional distress which is severe." *Lindsey v. Dempsey*, 153 Ariz. 230, 233 (App. 1987). Extreme and outrageous conduct goes "beyond all possible bounds of decency, and [is] to be regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554 (App. 1995). Additionally, "[e]ven if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Nelson v. Phx. Resort Corp.*, 181 Ariz. 188, 199 (App. 1994), quoting *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987).

Plaintiffs first assert that they are particularly susceptible to emotional distress, so the standard for outrageousness must be lowered. "[A] relevant factor in determining outrageousness is defendant's knowledge that plaintiff is particularly susceptible to emotional distress." *Mintz*, 183 Ariz. at 563. In *Stoker v. Hartford Life & Accident Ins. Co.*, the court listed the plaintiff's myriad of psychological and physical conditions (major depressive disorder, post-traumatic stress disorder, generalized anxiety disorder, and

insomnia, as well as neuropathy and chronic back pain) and noted that the defendant was aware of those conditions.  355 F. Supp. 3d 893, 899 (D. Ariz. 2019).  The Defendant was "rude, dismissive, irritated, and impatient" with the plaintiff, accusing her of lying about her disabilities, and terminating her disability benefits near the anniversary of her child's death.  *Id.*  The *Stoker* court found, "viewed through the lens of Plaintiff's weakened emotional state," reasonable jurors could disagree as to whether Defendant's conduct was outrageous.  *Id.* at 900; *see also A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1209 (9th Cir. 2016) (using the descriptor "the eggshell plaintiff rule" when focusing on the plaintiff's susceptibility to emotional distress); Restatement (Second) of Torts § 46 cmt. f ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.")  Plaintiffs claim they "qualify as uniquely susceptible to emotional distress by virtue of witnessing their father being tortured by Defendants."  (Doc. 260 at 33.)  But this reasoning is backward.  The fact that Plaintiffs witnessed the Officers Tase Wheatcroft does not equate to "some physical or mental condition or peculiarity."  Restatement (Second) of Torts § 46 cmt. f.

Plaintiffs, however, do raise a genuine issue of material fact as to whether or not the City of Glendale's conduct was extreme and outrageous.  Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that that the conduct at issue here—the Officers using their Tasers six times to effectuate an arrest for assaulting an officer and resisting arrest, with the minor Plaintiffs screaming in the background—is "utterly intolerable in a civilized society."  *Patton v. First Fed. Sav. and Loan Ass'n of Phoenix*, 118 Ariz. 473, 476 (1978) ("It is the duty of the court as society's conscience to determine whether the acts complained of can be considered sufficiently extreme and outrageous to state a claim for relief."); *see also Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1019 (D. Ariz. 2012) (finding outrageous conduct where a reasonable jury could find that an Officer fabricated his statement to implicate Plaintiff and impede the treatment

1    of a child who fell from a height of six feet).[6]  Reasonable minds could differ as to the

2    severity of Defendants' conduct.  *Nelson v. Phx. Resort Corp.*, 181 Ariz. 188, 199 (App.

3    1994).  Therefore, summary judgment is denied on this claim.

4              **2.      Negligent Infliction of Emotional Distress**

5              Plaintiffs allege a cause of action in their complaint for "grossly negligent infliction

6    of emotional distress."  (Doc. 35 at 21.)  The Court construes this as a cause of action for

7    negligent infliction of emotion distress ("NIED"), given that Plaintiffs cite the elements for

8    such a claim in their briefing.  (Doc. 260 at 34.)

9              Arizona does not appear to have a cognizable claim for *grossly* negligent infliction

10   of emotional distress, though it does for gross negligence, *see Noriega v. Town of Miami*,

11   243 Ariz. 320, 328, ¶ 35 (App. 2017), and negligent infliction of emotional distress, *see*

12   *Guerra v. State*, 237 Ariz. 183, 186, ¶ 12 (2015).

13             "A party is grossly or wantonly negligent if he acts or fails to act when he knows or

14   has reason to know facts which would lead a reasonable person to realize that his conduct

15   not only creates an unreasonable risk of bodily harm to others but also involves a high

16   probability that substantial harm will result."  *Noriega v. Town of Miami*, 243 Ariz. 320,

17   328, ¶ 35 (App. 2017) (quoting *Walls v. Ariz. Dep't of Public Safety*, 170 Ariz. 591, 595

18   (App. 1991)).  Gross negligence is "action or inaction with reckless indifference to

19   the . . . safety of others." *Williams v. Thude*, 180 Ariz. 531, 539 (App. 1994).  It is "is highly

20   potent, and when it is present it fairly proclaims itself in no uncertain terms.  It is 'in the

21   air,' so to speak.  It is flagrant and evinces a lawless and destructive spirit." *Cullison v.*

22   *City of Peoria*, 120 Ariz. 165, 169 (1978).  Generally, whether gross negligence occurred

23   is a question of fact for a jury to determine.  *Armenta v. City of Casa Grande*, 205 Ariz.

24   367, 373, ¶ 21 (App. 2003).  "In order to present such an issue to the jury, gross negligence

25   need not be established conclusively, but the evidence on the issue must be more than slight

26   and may not border on conjecture." *Walls*, 170 Ariz. at 595.  Summary judgment is

27

28   _____
[6] Plaintiffs' reliance on *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1099 (9th Cir. 2013), a Ninth Circuit case interpreting the State of Washington's "outrage tort," is not persuasive in this Court's analysis of Arizona state law.  (Doc. 260 at 33.)

appropriate "no evidence is introduced that would lead a reasonable person to find gross negligence." *Id.* Here, Plaintiffs have produced no evidence that would lead a reasonable person to find gross negligence. *Id.* Moreover, Plaintiffs appear to abandon any gross negligence cause of action they might have. (*See* Doc. 260 at 34.)

Arizona does recognize a claim for negligent infliction of emotional distress when someone witnesses an injury to a closely related person. *Keck v. Jackson*, 122 Ariz. 114, 115 (1979). To recover on a bystander claim of NIED, the plaintiff bears the burden proving: 1) the plaintiff witnessed an injury to a closely related person; 2) the plaintiff was within the zone of danger at the time of the injury; and 3) the plaintiff suffered mental anguish manifested as physical injury. *Guerra v. State*, 237 Ariz. 183, 186, ¶ 12 (2015). Arizona law stipulates that purely emotional harm is not compensable under the tort of NIED. *Id.*

Defendants do not challenge elements one or two. (Doc. 245 at 37.) In fact, Defendants do not even challenge the injuries that Plaintiffs list that they suffered. Instead, Defendants challenge whether Plaintiffs' suffered injuries manifested as physical injury. (*Id.*) Plaintiffs assert they have sustained physical and mental injuries, they continue to experience anxiety, they "freak out when their mom leaves the house because they think the cops will beat her up," and they "experience violent nightmares." (Doc. 260 at 34–35.) Plaintiff B.W. "will duck down when he sees an[] officer so they do[ not] see him because he is so scared." (*Id.* at 34.) Plaintiff J.W. "has had issues with school including getting suspended." (*Id.*) Both Plaintiffs "are afraid to leave the house." (*Id.*)

Defendants argue that these factual allegations amount to temporary or transitory conditions and are not long term enough to constitute physical manifestations of injury. (Doc. 245 at 37.) *See Monaco v. HealthPartners of S. Arizona*, 196 Ariz. 299, 302–03, ¶ 8 (App. 1999) (citing the Restatement (Second) of Torts § 436A and explaining that "a physical injury, as a well as a long-term physical illness or mental disturbance, constitutes sufficient bodily harm to support a claim of negligent infliction of emotional distress"). But Defendant's assertions are conclusory. As such, construing Plaintiffs' evidence as

true, a reasonable jury could find that Plaintiffs are suffering from substantial, long-term emotional disturbances sufficient to support a claim for negligent infliction of emotional distress. *Id.* Therefore, summary judgment is denied on this claim.

### 3. Loss of Consortium

The minor Plaintiffs also allege a claim of loss of consortium based on "the abuse, assault/battery, and wrongful arrest of Plaintiff." (Doc. 260 at 35–36.) Under Arizona law, "[l]oss of consortium is a derivative claim, so it cannot exist unless all elements of the underlying cause are proven." *Tavilla v. City of Phoenix*, No. 1 CA-CV 10-0429, 2011 WL 4794940, at *9, ¶ 37 (Ariz. Ct. App. Oct. 11, 2011) (*quoting Barnes v. Outlaw*, 192 Ariz. 283, 285–86, ¶ 8 (1998) (internal quotations and alterations omitted)). In order for a child to bring a loss of consortium claim, "the child/plaintiff must show that the defendant injured the child's parent in a manner that would subject the defendant to liability under ordinary tort principles." But Plaintiffs did not allege a cause of action for abuse, assault, or battery or wrongful arrest arising under state law.[7] (Doc. 35.) Plaintiffs assert that the facts of the case establish a tort claim for battery and wrongful arrest. But Plaintiffs cite no authority, and the Court can find none, that allows a derivate claim for loss of consortium to exist in Arizona where the underlying claim is not pleaded. *See, e.g.*, *Villareal v. State, Dep't of Transp.*, 160 Ariz. 474, 481 (1989) (describing the nature of the loss of consortium claim). Moreover, Plaintiffs cannot rely on any other state law claim from which to derive their loss of consortium claim because Wheatcroft did not allege any. (*See* Doc. 35.) *Id.* (pointing out the distinctions between a child's loss of consortium claim and a NIED claim). Therefore, summary judgment is granted for Defendant City of Glendale on Minor Plaintiffs' loss of consortium claims.

### D. *Daubert*

Plaintiffs retained Dr. Jeffeory Hynes to "evaluate the conduct of the Defendants in this case." (Doc. 243 at 18.) Defendants challenge the admissibility of testimony of Dr. Hynes on multiple grounds. (Doc. 243.) Whether the expert is appropriately qualified,

---

[7] Wheatcroft did allege a claim of wrongful arrest arising under § 1983. (Doc. 35 at 12.) But he did not also allege a claim of wrongful arrest arising out of state law. (*Id.*)

1   whether his testimony is relevant, and whether his testimony is reliable are all distinct

2   inquiries under Rule 702.  See *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert I*), 509 U.S.

3   579, 591(1993); *see also Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 (9th Cir. 2002)

4   (indicating that reliability of an expert's testimony is a distinct inquiry from whether an

5   expert is qualified).

6   **1.    Qualifications**

7   Defendants argue that Dr. Hynes is not qualified to offer an opinion as to emotional

8   distress experienced by the minor Plaintiffs experienced.  (Doc. 243 at 6.)  Rule 702

9   "contemplates a broad conception of expert qualifications . . . [and] is broadly phrased and

10   intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton*

11   *Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  "As the terms of the rule state, an expert

12   may be qualified either by 'knowledge, skill, experience, training or education.'"  *Id.*

13   (quoting Fed. R. Evid. 702).  To satisfy this requirement, only a "minimal foundation of

14   knowledge, skill, and experience" is required.  *Hangarter v. Provident Life & Accident Ins.*

15   *Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).  As a result, a deficiency in one qualification

16   parameter, such as training, is not necessarily dispositive as to whether the expert is

17   qualified overall.  For example, courts have held that specialized experience is sometimes

18   of equal or greater importance than medical training in qualifying an expert to opine about

19   some medical causation issues.  *See Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995)

20   (determining no abuse of a trial court's discretion to exclude a neurologist's testimony

21   regarding head injuries because the doctor lacked experience in accident reconstruction

22   and forensic medicine).

23   Dr. Hynes is a retired Phoenix Police Commander and now works as a professor at

24   Glendale Community College.  (Doc. 243 at 22.)  He generally opines about defensive

25   tactics, use of force, and community policing.  (*Id.*)  Dr. Hynes does not have any special

26   training or experience in child psychology or psychiatry.  Therefore, he does not meet the

27   above qualification standards with respect to emotional distress.  To that end, Wheatcroft

28   concedes that "Dr. Hynes [will] not be providing any expert opinions as to emotional

distress sustained by the Wheatcroft family." (Doc. 250 at 3.)  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding an expert is not permitted to give an opinion based simply on "subjective belief or unsupported speculation").  Accordingly, any emotional distress testimony by Dr. Hynes will be excluded.  But Dr. Hynes is qualified, based on his training as a Police Commander and knowledge and experience working on the Professional Standards Bureau, to serve as an expert as to use of force.

## 2.    Reliability

Once qualified, an expert may testify within her area of expertise so long as the expert's testimony "is both relevant and reliable."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Daubert I*, 509 U.S. at 589.  Expert testimony is relevant if it assists the trier of fact in understanding evidence or in determining a fact in issue.  *Daubert I*, 509 U.S. at 591. Thus, the party proffering such evidence must demonstrate a valid scientific connection, or "fit," between the evidence and an issue in the case.  *Id.* A court therefore examines whether the proffered expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Expert knowledge also assists the trier of fact when it provides knowledge beyond the trier of fact's common knowledge.  *Id.*; *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

Defendants argue that the Court should exclude Dr. Hynes' opinion that the City of Glendale did not provide the Officers with proper training and supervision.  (Doc. 243 11–13.)  The Court has granted summary judgment for Defendants on Plaintiffs' *Monell* claims, so this issue is moot.  Defendants also argue for exclusion of Dr. Hynes' opinions relating to how the incident unfolded.  (*Id.* at 8–11.)  The crux of Defendants' argument is that because Dr. Hynes' conclusions were not supported by their view of the factual record (for example, Dr. Hynes found that Wheatcroft was engaged in passive resistance), Dr. Hynes' factual recitation should be excluded.  (*Id.* at 10–11.)  But Dr. Hynes' opinions and inferences were based on his review of a number of documents and body camera videos, including Officers Schneider, Lindsey, Fernandez, and others, the professional standards

unit folder, the Taser reports, and deposition transcripts.  (Doc. 243 at 19–21.)  And Defendants' arguments go to weight, not admissibility, of Dr. Hynes' opinions.  *See, e.g.*, *Nomo Agroindustrial Sa De Cv v. Enza Zaden N. Am., Inc.*, No. CV 05-351-TUC-FRZ, 2009 WL 211085, at *5 (D. Ariz. Jan. 29, 2009) ("The jury is entitled to hear expert testimony and decide whether to accept or reject it after considering whether predicate facts on which the expert relied were accurate.") (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (11th Cir. 2002)).  Ultimately, Defendants' opposition to Dr. Hynes' report is that they disagree with his conclusions—and that is not a basis for exclusion under *Daubert*.  *See, e.g.*, *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) ("Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert.").

### 3.    Legal Conclusions

Defendants also argue that Dr. Hynes improperly asserts legal conclusions in his expert report, and he is poised to offer them at trial.  (Doc. 243 at 3–6.)  Wheatcroft responds that Dr. Hynes is qualified to give those expert conclusions, and he does not plan on eliciting these legal conclusions at trial.[8]  (Doc. 250 at 5–7.)

"Expert testimony, when 'otherwise admissible,' is not objectionable merely because it embraces an ultimate issue." *Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1264 (D. Ariz. May 8, 2020) (quoting Fed. R. Evid. 704(a)).  Expert testimony is admissible when it "help[s] the trier of fact to understand the evidence or determine a fact in issue[.]" Fed. R. Evid. 702(a).  It is well-established that an expert witness may not explain the law to the jury or tell the jury how to apply the law to the facts of the case. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058–59 (9th Cir. 2008). Consequently, "[a]n expert witness cannot give an opinion as to her legal conclusion, i.e. an opinion on an ultimate issue of law." *Mukhtar v. Cal. State. Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.

---

[8] Wheatcroft also argues that Defendants' own expert draws similar conclusions.  (Doc. 250 at 4.)  The admissibility of Defendants' expert's report and testimony is irrelevant to the pending motion and is not properly before the Court.

1   1994)).

2   Here, irrespective of Dr. Hynes' qualifications, he may not offer opinion testimony

3   as to the ultimate legal questions in this case.  As set forth more fully above, the Court

4   holds that the Officers had probable cause to arrest Wheatcroft, so therefore, Dr. Hynes

5   need not testify as to whether or not the Officers had probable cause.  (*See, e.g.*, Doc. 243

6   at 29, 58 ("There is no reasonable suspicion or probable cause against the passenger Mr.

7   Wheatcroft, to demand his identification and grab him . . . .").)  Plaintiffs' excessive force

8   claim survives, so Dr. Hynes' legal conclusions as to excess use of force are prohibited.

9   (*See, e.g.*, Doc. 243 at 29 ("[T]herefore the officers' actions were extremely excessive and

10  in my opinion criminal.").)  The Court defers ruling on Defendants' remaining challenges

11  on these grounds until trial, however, as the Court will be better able to determine where

12  to draw the line in that context.  *See Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF,

13  2020 WL 533006, at *1 (N.D. Cal. Feb. 3, 2020) ("In many instances . . . rulings 'should

14  be deferred until trial, so that questions of foundation, relevancy, and potential prejudice

15  may be resolved in proper context.'") (quoting *United States v. Pac. Gas & Elec. Co.*, 178

16  F. Supp. 3d 927, 941 (N.D. Cal. 2016)).

17  **4.    Rule 403 Concerns**

18  Given the admissibility of some of Dr. Hynes' testimony, Defendants also argue

19  that Dr. Hynes' opinions as to individual officers' violations of City of Glendale policies

20  are not relevant to the § 1983 claims or the state law claims.  Unlike objections to

21  foundation and hearsay, objections that evidence is not relevant or is misleading are

22  superfluous at the summary judgment stage.  These objections are unnecessary at the

23  summary judgment stage because Rule 403 provides for the exclusion of evidence that may

24  "mislead the jury," not the Court.  *See* Fed. R. Evid. 403 (emphasis added); *see also Bafford

25  v. Travelers Cas. Ins. Co. of Am.*, No. Civ. S-11-2474 LKK/JFM, 2012 WL 5465851, at *8

26  (E.D. Cal. Nov. 8, 2012).

27  **E.    Plaintiff's Rule 16 Motion**

28  In January 2022, over a year after the deadline for final supplemental discovery and

disclosures, and about nine months after the deadline for filing dispositive motions (Doc. 178), Plaintiffs filed a "Notice Regarding Testimonial Evidence" (Doc. 284) in which they request "to supplement their disclosures in this case to include the transcripts of the testimony of Sgt. Flosman, Mr. McClelland, and other witnesses who have testified and who will testify" in related criminal proceedings against Officer Schneider.[9] (Doc. 284 at 2, Doc 291 at 8.) Plaintiffs also request follow-up depositions of Sgt. Flosman, Blake McClelland, and "any other witnesses who provide testimony during the preliminary hearing that contradicts or changes." (Doc. 291 at 2.) Plaintiffs' stated authority for this request is Rule 16(b)(4), which provides that scheduling order to be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

To determine whether to amend a Rule 16 scheduling order to reopen discovery, the Ninth Circuit has instructed courts to consider:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017)

Here, the factors strongly weigh against Plaintiff's motion to reopen discovery. First, although trial has not been scheduled, the summary judgment motion has been fully briefed, oral argument has been heard, and the next step is to schedule a trial-setting conference. Second, Plaintiffs' discovery request is opposed. (*See* Doc. 290.) Third, the non-movant Defendants would certainly be prejudiced by defending Plaintiffs' overbroad request to take secondary depositions of any other witness who provides testimony in this ancillary criminal proceeding, including their own expert. (Doc. 291 at 2.) Fourth, the Court has already admonished Plaintiffs for missing previously set discovery deadlines. (Doc. 240 at 3, Doc. 280 at 1–3.) Fifth, though Plaintiffs do not specify how much time

---

[9] Sgt. Flosman is a Glendale Police Department employee and he conducted a post-hoc investigation of the Motel 6 incident. (*See* 261-4 at 30–31.) Mr. McClelland is Defendants' expert. (*See* Doc. 246-2 at 79.)

they request to conduct multiple depositions and supplemental disclosures, it is foreseeable that reopening discovery could extend the lifespan of this case by many months or years. This is unreasonable, especially given the effort and resources that the Court and parties have already expended on this case—which has been ongoing since July 2018, three and a half years ago.  (Doc. 1.)  Of particular concern to the Court, Defendants filed a notice indicating that the second day of Officer Schneider's preliminary hearing has been postponed for six weeks due to "unanticipated witness scheduling issues." (Doc. 293 at 1.) Finally, Plaintiffs' request is too overbroad to assess for its potential to yield relevant evidence.  Accordingly, Plaintiffs' request to reopen discovery is denied.  (Doc. 284.)

## VI.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the Clerk of the Court shall file this Order under seal.

**IT IS FURTHER ORDERED granting** Defendants' Motion for Summary Judgment (Docs. 245 and 274) as to Plaintiffs' claims for retaliation in violation of the First Amendment (Count II), wrongful arrest (Count III), malicious prosecution (Count IV), municipal liability (Count VI), and loss of consortium (Count VIII).

**IT IS FURTHER ORDERED denying** Defendant's Motion for Summary Judgment (Docs. 245 and 274) as to Plaintiffs' claims for excessive force (Count I), civil rights violations (Count V), and intentional and negligent infliction of emotional distress (Count VII).

**IT IS FURTHER ORDERED denying** Plaintiff's Notice Regarding Testimonial Evidence.  (Doc. 284.)  The Court makes no ruling as to whether the evidence may be used as impeachment evidence at trial.

**IT IS FURTHER ORDERED granting in part and denying in part** Defendants' partial *Daubert* Motion Regarding Jeffeory Hynes (Doc. 243) as explained herein.

**IT IS FURTHER ORDERED** that this Order will remain under seal for 14 days from today's date.  This Order will be automatically unsealed on March 8, 2022, unless prior thereto the parties jointly file a copy of this Order, unsealed, redacting only the

information that must remain sealed consistent with the prior Orders of the Court allowing certain information to be filed under seal.  Each party will be responsible for identifying and redacting its own information.  If the unsealed, redacted order is filed within the deadline, the parties shall simultaneously submit a joint supplemental brief stating the legal authority that justifies each redaction.  If the parties file the unsealed, redacted order within the deadline, the Clerk of the Court shall leave this order under seal while the Court reviews the parties' supplemental brief.  The parties are advised that the Court's preference is to have this Order filed, in its entirety, on the public docket.

**IT IS FINALLY ORDERED** that the Clerk of the Court shall send copies of this Order to only:

Jody Lynn Broaddus
Attorneys for Freedom Law Firm
3185 S Price Rd.
Chandler, AZ 85248

Joseph John Popolizio
Jones Skelton & Hochuli PLC
40 N Central Ave., Ste. 2700
Phoenix, AZ 85004

Dated this 22nd day of February, 2022.

Michael T. Liburdi
United States District Judge